**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:

AUTO WHOLESALE OF BOCA, LLC,                     Chapter 11

                                                  Case No. 22-15627-EPK

     Debtor.

_____/

### HI BAR CAPITAL, LLC'S MOTION TO DISMISS

Hi Bar Capital, LLC ("Hi Bar"), pursuant to Rule 9014, Federal Rules of Bankruptcy Procedure, Local Rule 9014-1, and 11 U.S.C. Section 1112(b), including "for cause," moves this Court to enter an order dismissing the chapter 11 case commenced by Auto Wholesale of Boca, LLC (the "Debtor"). In addition to other reasons, this chapter 11 filing by the Debtor is a "bad faith" filing initiated to try to continue to shield the misdeeds and wrongful actions of the Debtor and its principals who have been attempting to convert property actually belonging to Hi Bar's pledgors, Karma of Broward, Inc. and Karma of Palm Beach, Inc. (collectively, "Karma"), which serves as collateral for Karma's contractual obligations to Hi Bar.[1] Hi Bar also objects to the Debtor's eligibility as a Subchapter V debtor-in-possession.

In support of this Motion, Hi Bar states:

### A. Background Facts

1.     Hi Bar is a New York limited liability company that provides merchant services to entities that engage in various business activities.

---

[1] Hi Bar has filed in this case contemporaneously with this motion its Verified Motion for Relief from the Automatic Stay.

2.      At the material times, Karma of Broward, Inc. operated its car dealership in Ft. Lauderdale and Karma of Palm Beach, Inc. operated its car dealership in Palm Beach. Both focused on the retail sale of high-end luxury automobiles.

3.      On or about October 27, 2021, Hi Bar and Karma and its affiliates entered into a Revenue Purchase Agreement (the "Purchase Agreement"), a true and authentic copy of which is attached hereto as **Exhibit A.[2]** The Purchase Agreement grants Hi Bar as security interest is substantially all the assets of Karma and its affiliates, as follows:

> Merchants grant to HBC a security interest in and lien upon: (a) all accounts, chattel paper, documents., equipment, general intangibles, instruments, and inventory, as those teems ace each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to HBC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets").

4.      Page 5 of Hi Bar's Security Agreement states: "Remedies: Upon any Event of Default, HBC may pursue any remedy available at law (including those available under the provisions of the UCC) … ."

5.      Karma materially breached and therefor defaulted under the Purchase Agreement by failing to remit the purchased receivables to Hi Bar in accordance with the terms of the Purchase Agreement.

6.      On December 19, 2021, Karma, among others, entered into a settlement agreement with Hi Bar (the "Settlement Agreement"), a true and accurate copy of which is attached hereto as **Exhibit B,** in which Karma admitted one Page 1 that "on November 16, 2021, the Sellers defaulted on the Purchase Agreement."

---

[2] Excell Auto Group, Inc. ("Excell"), a Florida corporation, a party to the Purchase Agreement is a chapter 7 in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, Case No. 22-12790-EPK.  However, Excell is not a party to the Hi Bar suit, and Hi Bar is not seeking to enforce any legal rights against Exell or its property.

7.      Paragraph 1.b. of the Settlement Agreement also provides for a grant to Hi Bar of a security interest in the "Collateral," which is virtually the same as the Secured Assets.

8.      Karma materially breached the Settlement Agreement by failing to timely pay to Hi Bar the sums required under the terms thereof.

9.      On January 25, 2022, a financing statement was filed by Hi Bar's legal representative with the Florida Secured Transaction Registry against Karma, File No.2021093624865, a certified copy of which is attached hereto as **Exhibit C**, covering among other things "all accounts receivable," "inventory" and "general intangibles" that are "now owned or hereafter acquired."

10.     The "Secured Assets" under the Purchase Agreement and "Collateral" under the Settlement Agreement include but are not limited to the vehicle inventory of Karma held for sale, including the 19 cars described in **Exhibit D** attached hereto (the "Subject Vehicles").[3]

11.     On January 28, 2022, Hi Bar filed suit against Karma and other affiliates in the Supreme Court of New York, Kings County (the "New York Action") for breach of the Settlement Agreement.

12.     On February 1, 2022, Hi Bar and Karma, among others, entered into a Stipulation of Settlement Pursuant to CPLR § 3215(i) with respect to the New York Action (the "**Stipulation**"), a copy of which is attached hereto as **Exhibit E,** in which Karma again admitted on page 1 that "on November 16, 2021 (the "Default Date"), the Obligated Parties defaulted on their obligations to Purchaser under the Agreements."

---

[3] With respect to the Lamborghini Urns, VIN ZPBUA1ZLXLLA06529,  a customer of Karma named Eric Dore has filed a motion to intervene in the Broward Circuit Court legal action to assert that he paid Karma in full for the car but it was at the dealership awaiting new tires when the Debtor's principal moved all the Karma vehicles from the Debtor's dealership premises. Prior to the Debtor's bankruptcy petition, Hi Bar is evaluating whether Mr. Dore, unlike the Debtor (as discussed more fully herein), qualifies as a "buyer in the ordinary course of buyer" and thus this one vehicle would not be subject to Hi Bar's security interest.

13. Karma then materially breached the Stipulation by failing to timely pay to Hi Bar the sums required under the terms thereof.

14. As of April 28, 2022, Hi Bar is owed the principal sum of $2,500,000 pursuant to the Purchase Agreement, Settlement Agreement and Stipulation (collectively, the "Agreements"), plus $625,000 in attorneys' fees pursuant to the Stipulation for a subtotal of $3,125,000, and interest and additional attorney's fees and costs as provided in the Agreements.

15. Hi Bar has never entered into any business transaction with the Debtor, and Hi Bar is not a party to any agreement with the Debtor. Hi Bar never executed a release, partial or otherwise, with respect to the Subject Vehicles in favor of the Debtor.

16. The Debtor has no security agreement with Karma and has not filed a financing statement against Karma. Moreover, the Security Agreement provisions of the Purchase Agreement (Page 5) included a negative pledge against Karma granting further security interests on Hi Bar's Collateral.

17. Between the winter of 2021 and April 2022, unbeknownst to Hi Bar, the Debtor appears to have engaged in a series of transactions with Karma where Karma, which had both possession and ownership of the Subject Vehicles, allowed agents of the Debtor to control the title application and transfer process that resulted in the name of the Debtor to be eventually added to Certificates of Title for the Subject Vehicles in a series of sham transactions. Because the Debtor did not have a perfected security interest in the inventory of Karma, the Debtor and its agents concocted a scheme whereby most of the Subject Vehicles were transferred first from Karma to Excel and then from Excel to the Debtor, which Hi Bar was not aware of at the time.

18. However, upon information and belief, the Debtor in actuality did not pay Karma money or otherwise provide adequate consideration to Karma that Karma retained. Rather,

4856-3210-4747.1

because the Debtor did not have a security interest in the inventory of Karma, the Debtor and its agents concocted a scheme whereby most of the Subject Vehicles were transferred first from Karma to Excel and then from Excel to the Debtor. There were no ordinary course transfers from Karma to Excell and then from Excell to the Debtor at any time. The bank records of Karma of Palm Beach, Inc., Karma of Broward, Inc., Excell and the Farache companies (which includes the Debtor), establish that money was consistently paid to the Debtor by Karma to Farache owned or controlled entities despite the fact that there were paper transactions that would have required many millions of dollars paid by the Debtor to the Karma. In sum, every month, when viewing the loans extended Excell, Karma *paid* the Farache companies substantial sums. In February 2022 alone for example, Karma paid the Farache entities over $3 million dollars when the paper transactions prepared pursuant to the scheme would have required that the Debtor pay Karma approximately $2.5 million for the  "purchases" the false paperwork alleges.

19.    Further, upon information and belief, the Debtor appears to have liquidated (and pocketed the proceeds) other vehicles in addition to the Subject Vehicles that were part of Karma's inventory and thus the collateral of Hi Bar and other secured parties.

20.    After Hi Bar had learned that the Debtor had taken possession of the Subject Vehicles, on May 2, 2022, Hi Bar filed its *in rem* replevin and personal property foreclosure that includes the Subject Vehicles, captioned *Hi Bar Capital, LLC v. Karma of Palm Beach, Inc., et. al.*, Case No. CACE-22-006401, which has been consolidated with a similar action captioned *FVP Opportunity Fund III, LP, FVP Investments LLC, and FVP Services, LLC* v. *Excell Auto Group, Inc., et. al.*, Case No. CACE-22-5125, Broward County Circuit Court.

21.    A two-day evidentiary hearing before the Circuit Court was set for July 25 and 26, 2022 on the Hi Bar and FVP's separate motions for pre-judgment replevin and FVP's motion

4856-3210-4747.1

for appointment of a receiver and injunctive relief. The hearings had been scheduled by order of the Circuit Court on June 26, 2022. The Circuit Court also set a hearing for the morning of July 26, 2022 for the Debtor's principal, Mr. Moshe Farache, to show cause why he should not be held in contempt of court for statements made to the Court under oath.

22.     The Debtor filed its bankruptcy petition on July 22, 2022, the Friday afternoon before the hearings scheduled in the Circuit Court.

### A.  Applicable Law and Legal Arguments

23.     Section 1112(b)(1) provides that the court shall dismiss a case under Chapter 11 for cause. Section 1112(b)(4) sets forth a non-exhaustive list of grounds that may constitute "cause" for dismissal.

24.     A case also may be dismissed for cause if the petition was not filed in good faith. *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir. 1984). What amounts to bad faith is the same for both proceedings on a motion to dismiss and a motion for relief from the automatic stay. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).

25.     "Cause" exists under 11 U.S.C. Section 1112(b) because the Debtor commenced this case in "bad faith" and primarily to avoid an adverse legal ruling in the Circuit Court on the issue of its putative claim to title of the Subject Vehicles.

26.     "Cause" and bad faith also exists because Debtor's principal, Mr. Moshe Farache, has filed a false Official Form 204 in an attempt to misrepresent to the court and creditors the extent of *bona fide* unsecured creditors of the Debtor. Specifically, notwithstanding the clear mandate of the Bankruptcy Rules and the express warning in bold letters on Official Form 204, the Debtor listed the following entities as non-insider creditors making up part of the "top twenty" largest unsecured creditors: M & M Development Consultants LLC ("M&M") with a claim of $1,289,168.77, Mazel Tov Inc. ("Mazel Tov") with a claim of $77,838.87, and Express

Emergency Services, Inc. with a claim of $3000. The Debtor has further compounded the problem by listing the insider debts as being undisputed, non-contingent and liquidated. A review of official public records of the Florida Department of State reflect that the members (owners) of the Debtor, Moshe Farache, Lisa Farache and Chase Farache, are also members (owners) of M&M (Moshe, Lisa and Chase), Mazel Tov (Lisa and Chase), and Express (Moshe).

27.     "Cause" further exists because the Debtor simply has no equitable or beneficial interest in the Subject Vehicles under 11 U.S.C. Section 541(a)(1) as a matter of applicable non-bankruptcy law. This is because, as was being decided in the Circuit Court, the Debtor's asserted acquisition of the Subject Vehicles was a sham, a conversion, and without true consideration and the result of "duress."

28.     Hi Bar contends the Debtor's conduct constituted a conversion, trespass, and/or tortious interference with Hi Bar's rights and therefore the Debtor has substantial exposure for losses and damages suffered by Hi Bar (and perhaps other secured parties) for which it has no ability to satisfy under any restructuring plan based upon its very limited assets.

29.     Moreover, even assuming *arguendo*, which Hi Bar does not concede, that the Debtor has some ownership interest in the Subject Vehicles, the cars are subject to Hi Bar's security interest and are depreciating assets for which the Debtor cannot provide Hi Bar adequate protection of its security interest, and thus there is nothing that the Debtor can do with the Subject Vehicles that can benefit the estate.[4]

30.     Alternatively, the case should be dismissed because the Debtor has no equity in the Subject Vehicles either because it simply has no real ownership interest therein or any

---

[4] As the Court is aware from other papers filed in this case, other entities also assert security interest in the Subject Vehicles, and the Debtor would have to provide adequate protection to any person or entity that has a perfected consensual lien in this inventory. Hi Bar understands that the "FVP entities" (whose financing statement was filed after Hi Bar's) assert they are owed the principal sum of approximately $7.5 million.

4856-3210-4747.1

interest is wholly encumbered by prior perfected security interests that the Debtor took subject to as matter of applicable non-bankruptcy law, here, Florida's version of Article 9, Chapter 679, Florida Statutes.

### The Debtor has No Real Interest in the Subject Vehicles

31.     As noted above, simply put, the Subject Vehicles are not "property of the estate" because the Debtor has no legal or beneficial interest under 11 U.S.C. Section 541(a)(1).

32.     Subsection 541(d) applies to and limits the Debtor's asserted interest in the Subject Vehicles.[5] At most, the Debtor has bare, naked title to the Subject Vehicles and nothing more because it engaged in conduct to abscond with personal property belonging to an entity with whom it had no security agreement. *Newpower v. Boyd*, 233 F. 3d 922 (6th Cir. 2000).

33.     The Debtor's conduct, through its agents, may have amounted to "theft" under Florida's criminal statutes. Section 812.014, Florida Statutes, states clearly following simple elements that arguably occurred here:

> **812.014   Theft.**—
> (1)   A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
>
> (a)   Deprive the other person of a right to the property or a benefit from the property.

34.     "Theft" under Florida law is an omnibus statute that covers a variety of criminal conduct that at its heart occurs where one unlawfully steals another's property regardless of the means. Section 812.012(3), Fla. Stats.[6] *Martin v. State*, 379 So. 2d 179 (Fla. 1st DCA 1980).

---

[5] "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, … , becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

[6] (3)   "Obtains or uses" means any manner of:
(a)   Taking or exercising control over property.
(b)   Making any unauthorized use, disposition, or transfer of property.

35.     At the very least, the Debtor converted property of Karma.  Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." *Special Purpose v. Prime One*, 125 F. Supp .2d 1093, 1099–1100 (S.D. Fla.2000) (citing *Warshall v. Price*, 629 So.2d 903, 904 (Fla. 1993)); *Goodrich v. Malowney*, 157 So.2d 829 (Fla. 2nd DCA 1963). Regardless of the nature of the theft, consistent with Florida law the Debtor should not be able to acquire a property interest that satisfies the requirements of Section 541(a)(1).

**Any Interest of the Debtor is Subject to Prior Existing Security Interests and the Debtor's Lack of Equity Supports Dismissal**

36.     Even if the Debtor could somehow convince this Court that it has some interest under Section 541(a)(1) of the Bankruptcy Code, this Court also should nevertheless modify the automatic stay to permit Hi Bar to complete its replevin and foreclosure action against the Subject Vehicles because the Debtor's interest therein is fully subordinate to the secured claim of Hi Bar (and of others), both legally and economically.

37.      If the secured party complies with the requirements of Article 9, then that secured party is statutorily authorized to enforce its rights and remedies should the circumstances arise necessitating legal action. Further, there are very limited circumstances where a stranger to the secured transaction can preempt or defeat the secured party's rights. Those limited circumstances are not present in this case to benefit the Debtor.

38.     If the secured party complies with the requirements of Article 9, then that secured party is statutorily authorized to enforce its rights and remedies should the circumstances arise

---

(c)   Obtaining property by fraud, willful misrepresentation of a future act, or false promise.
(d)1.   Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; … .

necessitating legal action. Further, there are very limited circumstances where a stranger to the secured transaction can preempt or defeat the secured party's rights. Those limited circumstances are not present in this case to benefit the Debtor.

39.     First, Hi Bar has a security agreement executed by Karma before the Debtor obtained ownership or title to the Subject Vehicles and that agreement expressly grants a security interests in the property pledged therein, which includes the "inventory" of Karma, whether existing or thereafter acquired, and secondly, Hi Bar has a financing statement filed with the Florida Secured Transaction Registry, as required by Florida's version of Article 9.

40.     As mandated by Section 679.2011(1), Florida Statutes, "… a security agreement is effective according to its terms between the parties, <u>against purchasers of the collateral, and against creditors</u>." (emphasis added)   The Debtor claims to be a purchaser of the Subject Vehicles.[7] However, absent some exception recognized under Article 9, Hi Bar's right to recover its collateral through authorized remedies under Florida law trumps any claim of the Debtor as a purchaser of that same collateral or as a creditor of Karma.

### The Debtor is not a "Buyer in the Ordinary Course of Business"

41.     Hi Bar's perfected security interests in any vehicle that Karma acquired from and after the filing of the financing statements prevails over any claim of the Debtor to the cars, <u>unless</u> the Debtor was a "buyer in the ordinary course of business" (a "BITOCOB") with respect

---

[7] In a legal action filed on April 7, 2022, by the Debtor in Palm Beach County Circuit Court, *Auto Wholesale of Boca LLC v Excel Auto Group, Inc., et. al.,* Case No. 50-2022-CA-003358-XXXX-MB, the Debtor claimed it held a security interest in the inventory of Excell, not Karma, and attempted to replevin and foreclose the inventory of Karma. Regardless, the Debtor's position as an owner or secured creditor is subordinate and inferior to the claims of Hi Bar because whatever legal interest it acquired such interest was not legally effective until after January 25, 2022.

4856-3210-4747.1

to its acquisition of the vehicles. Section 679.320, Fla. Stats.[8] Section 671.201(9), Florida Statutes, defines a BITOCOB. "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing." Section 679.1021(qq), Florida Statutes. It is no longer merely a subjective standard, as made clear in the Official Comment.

42.    It does not matter that the pledgor under the security agreement is no longer in possession of the collateral. The case of *Brescher v. Assocs. Financial Services Co.*, 460 So. 2d 464 (Fla. 4th DCA 1984) makes it clear that a secured party has the right to obtain possession, including repossession through replevin, after default under a security agreement, even if the debtor no longer has possession of the collateral. In <u>Brescher</u>, the court said:

> [W]e hold that a secured party, upon default by a debtor, may recover possession of a chattel by replevin from a sheriff who has taken possession thereof under execution.

*Accord PNCEF, LLC v. South Aviation, Inc.*, 60 So. 3d 1120 (Fla. 4th DCA 2011) (a secured party properly permitted to replevin four airplanes from the debtor's lessee who was in possession).

43.    The reason for the narrow "BITOCOB exception" is obvious. A person walks into a car dealership in Ft. Lauderdale. Typically, the dealership has dozens or hundreds of cars/trucks on its lot, a customer picks out a car, negotiates a purchase price, signs a purchase order, pays cash or finances the purchase, drives away in the new (or used) car, and a Certificate of Title (COT) eventually is sent to the customer.[9] The customer is buying a car from an

---

[8] Of course, the Debtor's claim to ownership of the cars also could be subject to challenge under other legal theories such as chapter 726, Florida's fraudulent transfer statute, because of either actual fraud or constructive fraud.

[9] While a secured party claiming a security interest in motor vehicles that are "rolling stock" of company or in a car purchased by a retail customer from a dealer must perfect its lien under Florida's Certificate of Title law, Section 319.22, Florida Statutes, it is indisputable that Article 9, specifically Section 679.3111(4), unequivocally makes it clear that the Certificate of Title law does not apply to "inventory held

automobile dealer in a common or customary manner that repeats itself thousands of times each day in the United States.

44.     A typical or ordinary customer never has to worry about getting a release of lien of its new car from the blanket inventory lien of the automobile dealer's secured party as Section 679.320(1) provides that automatic "release" by operation of law because the dealer-to-consumer sale is an ordinary course transaction. On the other hand, the Debtor is another car dealer licensed in Florida and appears to have been a lender to Excell and therefore is a "merchant" under the UCC. The definition provision of Article 9, Section 679.1021(2), makes certain of the definitions in Section 672.102, including "Merchant applicable to Article 9.  Section 672.104(1), Florida Statutes, defines "Merchant."

45.     The Debtor is not an ordinary customer that walks into a retail dealership to buy a car. Moreover, the conduct, documentation, financial dealings between the Debtor and Karma and their agents were anything but "ordinary course."  The alleged sales to the Debtor did not as required by Section 671.201(9) "comport with the usual or customary practices in the kind of business in which [Karma] is engaged or with the seller's own usual or customary practices." Karma was not in the business of selling large numbers of its cars to a wholesaler who claimed a security interest in the inventory of its affiliate.

---

for sale" by "a person in the business of selling goods of that kind."  Official Comment 4 to 9-311  explains this result more clearly:

> 4. Under subsection (d), perfection of a security interest in the inventory of a person in the business of selling goods of that kind is governed by the normal perfection rules, even if  the inventory is subject to a certificate-of-title statute. Compliance with a certificate-of-title   statute is both unnecessary and  ineffective to perfect a security interest in inventory to which this subsection applies. Thus, a secured party who finances an automobile dealer that is in the business of selling and leasing its inventory of automobiles  can perfect a security interest in all the automobiles by filing a financing statement but not by compliance with a certificate-of-title statute.

46.     The case of *Swift v. J.I. Case Co.*, 266 So. 2d 279 (Fla. 1st DCA 1972, is on point. In *Swift*, the court held the tractor company that had come to own a tractor "through a series of commercial transfers" was nevertheless subject to the prior perfected security interest of the original seller who received a security interest and perfected the same by filing a financing statement, even though the current owner did not know of the security interest.   The court explained, On Rehearing:

> A commercially prudent tractor merchant may not purchase a tractor from another dealer and thereby acquire title free of any prior recorded security interest without first making a good faith inquiry into the existence of such previously perfected interest. *Id*. at 381.

47.     The Debtor is not an ordinary customer that walks into a retail dealership to buy a car. Moreover, the conduct, documentation, financial dealings between the Debtor and Karma and their agents were anything but "ordinary course, the Debtor would have been aware of Plaintiffs' security interests in the inventory of Karma and been put on "inquiry notice" to determine the nature of those consensual liens had it checked the public record for financing statements against Karma filed with the Florida filing agency. At that point, the Debtor would have to investigate the nature and extent of the pre-existing security interest and obtain partial releases or subordinations from those secured parties, failing which any acquisition by the Debtor would be subject to the perfected liens.  The same result occurs if the non-BITOCOB of a company's asset goes forward with its purchase without heeding the official record of filed financing statements.

48.     The case of *Morey Machinery Co. v. Great Western Industrial Machinery Co.*, 507 F.2nd 987 (5th Cir. 1995) drives this point home. A machinery company sold 36 lathes to Florida machinery dealer and took back a promissory note and security agreement. The dealer sold the lathes to another dealer who took possession. When the secured party brought a suit for damages against the second dealer, the defendant asserted the BITOCOB defense. The court held

the debtor was not an "ordinary course" buyer because "The mutual business relations between the seller and buyer, the quick sale to Great Western and the terms of that sale do not evidence the arm's length transaction which occurs between a seller and a buyer in the ordinary course of business."

49.     In all events, the principals of Karma, Mr. Scott Zankel, and of the Debtor, Mr. Moshe Farache and its agents, engaged in a series of purported business transactions involving the exchange of hundreds of pages of documents, funds flowing back and forth between the parties, the "fast tracking" of applications to change the name of the owner on Certificates of Title, and many emails back and forth between where the alleged buyer, the Debtor, is clearly leading the process.  These transactions were the epitome of "quick sales."

50.     At some point, Mr. Farache for the Debtor decided to exercise self-help to try to recover money allegedly owed to him by Excell and/or Mr. Zankel.  The Debtor engaged in and in fact led a series of orchestrated transactions to try to reflect that the Debtor was buying cars from Excell, but in fact, those cars had been acquired by Karma from various third parties (person or other dealer). Karma's name appears as the first "purchaser" on the original Certificates of Title. Mr. Farache and agents of the Debtor, with Mr. Zankel's cooperation or acquiescence, manipulated the transactions and documents to cause purchase papers and title documents to reflect "fake" or at least "not ordinary" sales from Karma to the Debtor or from Karma to Excell and then from Excell to the Debtor.

51.     As a matter of law, however, the instant Karma acquired an ownership interest in a vehicle, the security interests of Hi Bar attached to those cars and remained unabated, unless expressly released by the secured party, which has never occurred, absent the Debtor acquiring a car as a "buyer in the ordinary course of business which was never the case.  The Debtor does

4856-3210-4747.1

not come close to meeting the test for that classification. Moreover, the Debtor's lacks any equity in the Subject Vehicles for the amounts owed to Hi Bar and other secured creditors (e.g., FVP) with asserted security interest therein exceed the value of the property.

52.     Therefore, the Debtors filing of chapter 11 was in "bad faith" and, in any event, the Debtor either has no legal or beneficial interest in the Subject Vehicles or its interest has no equity due to the size of the perfected liens against them, and without the ability to benefit from the subject property, there is no business to reorganize.

53.     In view of the foregoing reasons, including that the Debtor does not have a legitimate automobile buy and sale business as alleged in its Case Management Summary, and in any event, at the time of the filing of the petition, this Debtor did not have "a realistic expectation of income over time."

## CONCLUSION

Wherefore, Hi Bar request this Court enter an order dismissing this case pursuant to 11 U.S.C. Section 1112(b) and grant another appropriate relief.


Dated: July 27, 2022                                    Respectfully submitted,


*/s/ Mark J. Wolfson*_____
Mark J. Wolfson (FBN 0352756)
FOLEY & LARDNER LLP
100 N. Tampa Street, Suite 2700
Tampa, Florida  33602
(813) 229-2300 (telephone)
(813) 221-4210 (facsimile)
Primary email: mwolfson@foley.com
Secondary email: crowell@foley.com

***Counsel for Hi Bar Capital, LLC***

4856-3210-4747.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed and served this 27th day of July, 2022 via the CM-ECF filing system which will send email notification to those registered recipients, plus by U.S. Mail to the twenty largest creditors, and to the Debtor Auto Wholesale of Boca, LLC at 6560 West Rogers Circle, B-27, Boca Raton, FL 33487.

*/s/ Mark J. Wolfson*_____
Attorney

4856-3210-4747.1