UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:  22-15627-EPK
Chapter 11

In re:

AUTO WHOLESALE OF BOCA, LLC,

Debtor.
_____/

FVP OPPORTUNITY FUND III, LP,
a Delaware limited partnership;
FVP INVESTMENTS, LLC, a Delaware
limited liability company; and
FVP SERVICING, LLC, a Delaware
limited liability company,

Plaintiff,

v.                              Adv. No.:  22-1218-EPK

AUTO WHOLESALE OF BOCA, LLC,

Defendant.
_____/

Main Case ECF # 6
Adversary ECR # 2

August 3, 2022

The above-entitled cause came on for hearing before the HONORABLE ERIK P. KIMBALL, one of the Judges of the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, Palm Beach County, Florida, on Wednesday, August 3, 2022, commencing at or about 10:27 a.m., and the following proceedings were had:

Transcribed from a digital recording by:
Helayne Wills, Court Reporter

Page 2

APPEARANCES:

LINDA LEALI, Subchapter V Trustee

JAMES B. MILLER, P.A., by
JAMES B. MILLER, ESQ.,
on behalf of the Debtor/Defendant

FOLEY & LARDNER, LLP, by
MARK J. WOLFSON, ESQ.,
on behalf of Hi Bar Capital, LLC

FURR & COHEN, by
ALAN R. CRANE, ESQ.,
JASON S. RIGOLI, ESQ.,
on behalf of Creditor Nicole Mehdipour

DAVID R. SOFTNESS, P.A., by
DAVID R. SOFTNESS, ESQ.,
and
BARON BRESLIN & SARMIENTO, by
JERRELL A. BRESLIN, ESQ.,
on behalf of FVP Opportunity Fund III, LLP

SHRAIBERG PAGE, P.A., by
BRADLEY S. SHRAIBERG, ESQ.,
on behalf of Wing Lake Capital Partners

OFFICE OF THE UNITED STATES TRUSTEE, by
HEIDI A. FEINMAN, ESQ.,
on behalf of the U.S. Trustee

WEISS HANDLER & CORNWELL, P.A., by
HARRY WINDERMAN, ESQ.,
on behalf of Karma of Broward

ALSO PRESENT VIA COURTSOLUTIONS:
ECRO - Electronic Court Reporting Operator
MOSHE FARACHE
KEITH LEE

Page 3

THE COURT:  Next we have FVP Opportunity Fund III, LP, and others, against Auto Wholesale of Boca, LLC.

Let me start on the phone again with Mr. Crane.

MR. CRANE:  Alan Crane, special counsel for Nicole Testa Mehdipour, the Chapter 7 Trustee in the Excell bankruptcy, which is a creditor in this bankruptcy.

THE COURT:  Okay.  Thank you.

Mr. Breslin.

MR. BRESLIN:  Good morning, Your Honor.  I am co-counsel with Mr. Softness for FVP Opportunity Fund.

THE COURT:  Okay.  And let me make sure. I see Mr. Softness.  You're -- should I call the main case, as well?  Would that make everything easier?  Yes.

Auto Wholesale of Boca, LLC, as well. Then I'll go to my other list.  I already have Mr. Crane.

Mr. Rigoli.

MR. RIGOLI:  Good morning, Your Honor. Jason Rigoli on behalf of Nicole Testa Mehdipour, Chapter 7 Trustee for Excell Auto Group, an

Page 4

interested party in this case.

THE COURT:  Thank you.

Mr. Softness, good morning.

MR. SOFTNESS:  Good morning, Judge.  David Softness, S-O-F-T-N-E-S-S.  As you know, I'm here with Jerry Breslin.  He's our state court counsel.  My clients are FVP Opportunity Fund III, LP, FVP Investments, LLC, and FVP Servicing, LLC.

Judge, also in the courtroom is my client, Mr. Keith Lee.

THE COURT:  Very good.  Let's see.  I don't know if your client is here actually.  Not here.  Apparently not.

Ms. Feinman, good morning.

MS. FEINMAN:  Good morning, Your Honor.  Heidi Feinman for the U.S. Trustee.

THE COURT:  Mr. Wolfson.

Oh, Mr. Lee is on the Zoom meeting.

MR. SOFTNESS:  Yes.  I meant the Zoom, yes.

THE COURT:  Oh, I apologize.  I could swear you said in the courtroom, Mr. Softness.  So all of us here are looking around.

Mr. Lee, good morning.

MR. LEE:  Good morning, Your Honor.

Page 5

THE COURT:  Let's see.  We have Ms. Feinman.

MS. FEINMAN:  Heidi Feinman for the U.S. Trustee.

THE COURT:  Mr. Wolfson.

MR. WOLFSON:  Good morning, Your Honor, Mark Wolfson of Foley & Lardner on behalf of Hi Bar Capital, LLC.

THE COURT:  And Ms. Leali.

MS. LEALI:  Good morning, Your Honor. Linda Leali.  I'm the Subchapter V Trustee in the debtor's case.

THE COURT:  And you're -- I got all of that, but there's something up with your sound.  It went in and out a little bit.

Anybody else who I failed to call who would like to appear?

MR. WINDERMAN:  Yes, Your Honor.  This is Harry Winderman from Weiss Handler & Cornwell, on behalf of Karma of Broward, an interested party.

THE COURT:  Thank you.

And Mr. Shraiberg.

MR. SHRAIBERG:  Good morning, Your Honor. Brad Shraiberg on behalf of Wing Lake Capital Partners, formally known as Franklin Capital Group.

THE COURT:  All right.  Does anyone have a suggestion where I should start this morning?  I have a couple of matters.

MR. MILLER:  Do you want to address -- I apologize.  I think the shorter matter would be the insurance premium finance, Your Honor.

THE COURT:  Sounds wise to me.  That's ECF 6 in the main case.

Who would like to present that?

MR. MILLER:  James Miller on behalf of the debtor-in-possession, Your Honor.

Your Honor, this motion is filed, based upon the fact there are two outstanding insurance premium finance agreements that pre-existed the bankruptcy, that have monthly obligations that are due the 13th of every month.  That's why we filed on an emergency basis, because we want to get there before that deadline, to have the Court determine whether or not we're allowed to pay it.

These are one-year financing agreements for mandatory insurance that we're required to carry pursuant to the U.S. Trustee's requirements, and it's natural in the industry to have these types of insurance.  We have two policies.  The debtor-in-possession has two types of policies, as

identified in Page 3 of Document 6.

You have a $4.96 million policy with Colony Insurance that's financed for a total premium of $48,000 a year, plus a little change. And then we have an additional policy in effect with Berkley Specialty Insurance Company. That is a $500,000 each occurrence. It has a $100,000 rental policy requirement, $5,000 medical, all little extras that are added in these kinds of policies.

Again, these policies pre-existed the bankruptcy. We believe we need them, because we do house vehicles in the warehouse that are subject of a lease that we have.

By the way, Your Honor, we have sent copies of these insurance policies, the full policies, to the U.S. Trustee's office, and to Ms. Leali, as well. They have complete copies, and they do read like a book, typical insurance policy.

They're necessary for the debtor to continue to operate, and to obviously retain -- to insure these automobiles where they're at until we get the Court's determination on what we're going to do with them. It's in the best interest of the debtor -- the debtor believes it's in its best interest, and it's a necessary requirement under

U.S. Trustee guidelines and applicable industry requirements, Your Honor.

THE COURT:  Ms. Feinman, do you wish to weigh in?

MS. FEINMAN:  Your Honor, Heidi Feinman for the U.S. Trustee.

The one thing I did not hear from Mr. Miller is whether the debtor has the funds to make those monthly payments, and how much those monthly payments are.  I know it's -- I believe it's in the motion, but I'd like to have it on the record.

MR. MILLER:  Sure.  Your Honor, the debtor does have the funds.  As indicated in the date of the filing of the petition, we had over $200,000 in our bank account.  We have moved all three accounts, consolidated them into a DIP account the first date after the post-petition.  All the money is in there, and then there's plenty of money, over $200,000, to pay for these monthly obligations.

The only issue is, we would like, obviously, under the standard 364(c) requirement is that the insurance company would get a lien for the premiums on non-liened property.  So I'd like to include that language in there, with default notice

requirement and things of that nature.  And they have been served with a copy.

By the way, Judge, we did list them as a creditor.  They have notice of the hearing, notice of the motion, as well.

THE COURT:  Understood.

Ms. Feinman.

MS. FEINMAN:  The monthly payment, and whether or not there's any other cash collateral concerns from which these funds would be used.

MR. MILLER:  A, there's no cash collateral concerns, because the debtor was self-financed through Mr. Farache, who's present here in the courtroom.  And so there's no cash collateral issue as to proceeds in these accounts.

B, the monthly expenses are laid out at Paragraph 10 of Docket Entry 6, which provides that the monthly payments are $4,365.81 a month for the Colony policy, and $2,372.98 a month for the Berkley policy.

THE COURT:  Ms. Feinman.

MS. FEINMAN:  Thank you.  I have no objection, Your Honor.

THE COURT:  Thank you.

Anybody else wish to be heard on ECF 6 in

Page 10

the main case?

Mr. Wolfson, good morning.

MR. WOLFSON:  Good morning again, Your Honor.  Mark Wolfson of Foley & Lardner on behalf of Hi Bar Capital.

I don't know if Your Honor -- we have filed in this case, which are not before Your Honor yet, we filed a motion for stay with respect to the 19 vehicles that are subject to the freeze order in the state court, and we already set a few others, as well as a motion to dismiss the entire case, which is obviously not set until the end of August.

A couple of questions.  One is, with respect to these policies, do they cover other entities in which Mr. Farache controls the loan and the facilities, or just with respect to the debtor itself?  That's the first question.

The second question is, we are claiming, and obviously, they may dispute it, we are claiming the 19 vehicles are subject to a lien under the UCC, and I think also FVP is claiming that, as well, and maybe Franklin, as well.  Therefore, that we have an inventory filing against the UCC when these cars were owned by Karma of Broward and Karma of Palm Beach.  And that's the names on the title first,

Page 11

before Mr. Farache's entity, the debtor, got title to them.  We thought, make a record title.

Therefore, we think that maybe we should be listed as an additional insured to protect our client's interests.

THE COURT:  All right.  Did you hear the second part?

MR. MILLER:  It's horrible.  I couldn't hear anything Mr. Wolfson was saying.  Everyone else I could hear.

THE COURT:  A question and a request was just made.  The question was, did the policies cover any entity other than Auto Wholesale of Boca, LLC?

MR. MILLER:  Not that I'm aware of, Your Honor.  But for purposes of the notice requirements, the U.S. Trustee has a copy indicating they get notice.  They're not a covered party, no.

THE COURT:  They're not covering other businesses, other locations, just the debtor?

MR. MILLER:  No.  They're written in the name of the debtor.

THE COURT:  Okay.  Then Mr. Wolfson was requesting that his client be added as an additional insured.

MR. MILLER:  No.  Don't agree.  There's no

objection filed.

THE COURT:  That's irrelevant.  I don't care about that.  That objection is overruled.  But they won't be added as an additional insured.

Anybody else wish to be heard on this motion?  All right.  You may tender an order granting the motion.

MR. MILLER:  I will do that, Your Honor. Thank you.

THE COURT:  All right.  Let's go to the adversary.  Who would like to present the emergency motion?

MR. SOFTNESS:  Judge, I will present the emergency motion, at least from the 30,000-foot level, because Mr. Breslin is knee deep in all of it, and he's going to have to take over pretty quickly as we get into the facts.

We're here on FVP's emergency motion, which is at Court Paper Number 2 in the adversary, and we seek two things, which could be simultaneous or conjunctive or alternative.  A, that the freeze order from the state court remains in effect until we work out various things, and at the same time, that the debtor not be allowed to sell any of the disputed cars -- strike that.  I said it wrong.

That you determine that the sale of any of these disputed cars is not in the ordinary course of business.  In both of those things, Judge, we're trying to get to the same place.  Somebody needs to decide who owns these cars and has the right to sell them, who has a lien on them.  It's pretty straightforward in the end, but it's fact driven.

I think it's important for the Court to understand, a huge amount of work went into preparing to try these very issues in the state court.  I mean, voluminous undertaking, discovery, depositions.  And we got to the night before, you know, in business days, and they filed this bankruptcy.  We could have worked it all out.

I think their position today is that this is a routine thing, "We all lease cars, we have the title, we're free to sell them, that's what we do." I just want to point out, if that's true, then they would have just tried the case last week and we'd have been done, win or lose.

There's a couple of obvious problems that jumped out, and again, I had less knowledge than my co-counsel.  The first thing that jumps out at me is, there's 19 cars in this debtor.  All of them are the ones we claim a lien on and Hi Bar claims a lien

on, and for all I know, Mr. Shraiberg claims a lien on.

How can they only have 19 cars?  I mean, they're going to tell you, "We buy and sell cars, that's what we do for a living."  All 19 are the ones that we claim were taken inappropriately, improperly.  I'm choosing my words carefully.

The fourth thing is -- the last thing I'm going to argue is -- Judge, I don't think you know that the debtor knew -- they knew we were making this loan a few months ago against the cars at issue.  They did and said nothing.  Then after we made the loan the cars disappeared.  I mean, that alone seems like a basis to continue this freeze until we can get a judge -- I want to delve out of the facts for a minute.

We do have some interesting, I would say, to me very interesting, procedural issues, because as Mr. Wolfson said, he sought stay relief, which we joined in late yesterday.  We joined in just insofar as, if you're going to give him stay relief, we need it, too.  He's willing to dismiss and that might -- that could happen.

We could have further litigation in the adversary.  We could litigate some of these issues

Page 15

in the main case.  There's a possibility, based on some allegations, that there could be a consideration of a trustee or an examiner or even the conversion.

Where this case needs to go, I'm really not sure yet, but for today -- and I'm going to turn it over to Mr. Breslin -- for today, the issue is, can we keep the cars from being sold out from under our lien while we figure out the answers to these hopefully not too complicated questions.

If I may, I'd like to turn it over to Mr. Breslin.

THE COURT:  Sure.

MR. BRESLIN:  Thank you, Judge.  And I will be very brief.

Judge, what happened in this case is that Mr. Farache had a business relationship with Scott Zankl and Scott Zankl's company, and primarily the Excell Auto Group, and that is a company that is now in bankruptcy.  In the spring of 2021, the Excell Auto Group owed Mr. Farache a substantial amount of money, and elected to go out of business in the automobile industry and shift their business to Karma of Broward and Karma of Palm Beach.  Karma Broward and Karma Palm Beach purchased the Excell

inventory in 2021, and then went into business on their own in late 2021 and in 2022.

Mr. Farache was advised by Mr. Zankl that Mr. Zankl was unable to pay him the sums that he owed him personally and that Excell owed him. At that point Mr. Farache undertook creating -- he and Mr. Zankl in unison engaged in creating hundreds and hundreds of false documents that purported to show that automobiles were purchased by Mr. Farache's companies from Excell.

So what they did was, they gave us literally hundreds of deal jackets that we've gone through and put them under a microscope, and they say in 2021 we purchased over -- AWB purchased over a hundred cars. We can prove that that is false. And that in 2022 they purchased, you know, another, you know -- dozens of cars. We can prove that that's false.

So what we did, Judge, we filed a lawsuit in the state court, and the state court judge looked at this -- and let me just give you a very important fact. What happened here, Judge, was on April 1st, Mr. Farache went to the Excell Auto Group and the Karma companies and took every vehicle. So on March 31st, Excell Auto Group and the Karma

companies were ostensibly in business.  On April 1st they were out of business.

The police were called.  Reporters came to the site.  Lawsuits were filed and the businesses were shut down.  So multi-million dollar businesses were shut down overnight.  So this was a very, very unusual happening.

I represent FVP, who had loaned seven and a half million dollars to the Karma companies in January, and by April 1st that money was gone and all our collateral was gone.  We filed an emergency -- we filed a lawsuit in the state court, an emergency motion in the state court.

The state court judge saw what was going on and she said, "I'm ordering a freeze frame. Nobody is going to sell the assets that Mr. Farache took."

Just so you know, Judge, as is outlined in the pleadings, Mr. Farache's companies have been sued by multiple parties, because he not only took the Karma property, he took every car on the lot. He took cars that were there getting fixed.  There are four or five lawsuits that have been filed against Mr. Farache and company for conversion of automobiles that were bought and paid for, because

Page 18

what happened was, for every car Mr. Farache took, he took vehicles, and he also took titles to cars that he didn't take.

So on April 1st, that was like D Day. That's when all the cars were taken, all the titles were taken, and then the lawsuits began.  The state court judge saw that this was a very unusual circumstance.  She ordered that none of the cars in Mr. Farache's possession be sold until further order of the Court.

I asked only that I be given the amount of time necessary to explain to the Court -- and this is very detailed, because we have multiple and voluminous bank records, (inaudible) track records and field jacket records to explain exactly what happened here.

We can establish through the evidence, through the written evidence, through the bank record evidence, that Mr. Farache was a lender to Mr. Zankl and the Excell company, and when he learned that he wasn't going to be paid, he then attempted inappropriately -- and we suggest fraudulently in the state court action, and here -- that he attempted to create paper transactions where these vehicles were taken from the Karma companies,

moved to the Excell company, and then to the AWB company.

We can establish through evidence, Your Honor, that there was not one transaction with any of these vehicles that was an ordinary course transaction. We will be able to show through the bank records, Judge, that Mr. Farache alleges that he purchased over a hundred vehicles in 2021, and if he was going -- if he actually would have purchased those vehicles in 2021, he would have had to have paid $26 million when, in fact, in 2021 he received $1.8 million from Zankl and his companies.

The same for 2022. If we look at the bank records for 2022, Mr. Farache's now position is that he purchased these vehicles. If you look at the paperwork records, he would have had to have spent $8.3 million to purchase these vehicles in 2022 when, in fact, he received 1.5 million in 2022.

So this is a very unusual case, Your Honor. And it's going to take at least one full day, and more likely two days, for us to be able to present the evidence to Your Honor, because we have absolute black and white evidence that Mr. Farache did not purchase these vehicles.

And then my one last note on this, Judge,

is, in April -- after he took these vehicles on April 1st of 2022, he filed -- Mr. Farache filed a lawsuit under oath in Palm Beach.  In that lawsuit, in a verified filing, he said that he was a lender, and he was asking the Circuit Court to exercise his security rights in the vehicles that he already took, and he moved to foreclose the vehicles that he already took.

Then a week later, when we're in front of Judge Towbin Singer in the state court, Mr. Farache filed another affidavit and he said, "Oh, no.  Wait a second.  I'm not foreclosing on them.  I purchased those vehicles."

And he filed that affidavit, and after certain evidence was heard by Judge Towbin Singer, she issued a rule to show cause and contempt, which we started the hearing ten days ago, and we're going to finish at Judge Towbin Singer's discretion.

So, Judge, we were prepared -- so there's multiple affidavits, including the ones that he's filed here.  So we were prepared to go forward on the hearing, a two-day special set hearing, when this matter was -- when this bankruptcy was filed.

So, Judge, all we want from Your Honor is to maintain the status quo.  We don't want -- you

Page 21

know, we don't want Mr. Farache and his company to pull a gotcha by filing a bankruptcy and undoing months of litigation in the state court, and a full blown two-day trial that was scheduled by Judge Towbin Singer.  So we have joined Mr. Wolfson's motion for relief from stay.

THE COURT:  Why?

MR. BRESLIN:  So we can --

THE COURT:  I have a case where apparently the debtor claims that the primary asset is a bunch of vehicles, and everybody in the case wants to return to the state court.  Why would I grant such relief?  I would either dismiss the case, or I would just determine all the matters myself.

MR. SOFTNESS:  Judge, if I could just answer your question.

It's a one-page joinder where, if they get stay relief, then we would necessarily have to get it, too, and we did not take an aggressive position either way.

THE COURT:  I get it.  Thank you.

MR. SOFTNESS:  I started my comments with, I don't know where this goes.

THE COURT:  Understood.  All right.  Thank you.  That's a good answer, Mr. Breslin.

Mr. Softness gave the right answer.  Actually, I have your joinder open and your signature block goes on to the second page.

All right.  Mr. Breslin, we interrupted you.

MR. BRESLIN:  That's the ultimate facts that we believe we would be able to present at an evidentiary hearing on this matter, and we believe that all of the secured interest holders in UCC filings, holders have priority over Mr. Farache.  We believe that he converted the plaintiff's collateral.

THE COURT:  Right.  So a great deal of what you said really gets to the relief sought in the complaint, and here today I have a motion that's kind of an interesting motion that, A, asks me to either find that apparently this Court and the parties in this case remain bound by an injunction -- I'm calling it an injunction -- an order entered by the state court, or, if this Court enters a similar order, and also a finding that any sale of the vehicles in question, which is essentially all of the vehicles the debtor has -- would not be in the ordinary course of business, apparently thereby cutting off, in the movant's

Page 23

view, the ability of the debtor to move forward under 363(c) to have ordinary course sales, assuming that's what the debtor's goal is.  That's what I'm being asked to rule today, those things from the relief sought in the motion.

Mr. Softness, did you wish to add anything?

MR. SOFTNESS:  Only one thing, Judge.  The harm to my client would be considerable if you let them sell these cars.  The harm to them would be pretty de minimis, because if they win in the end and they own these cars, there's still a lot of expensive cars and they can then sell them.  The best argument they have there would be, I don't know, depreciation or -- they could go up, too.

I only wanted to add that.  Thank you for your time, Judge.

THE COURT:  Mr. Softness, why would I be bound by the state court's freeze order at all?  Why would the debtor be bound by the state court's freeze order, now that the bankruptcy was filed?  Can you explain?

MR. SOFTNESS:  Well, it's --

THE COURT:  Is it a property right?

MR. SOFTNESS:  It's not a property right.

Page 24

THE COURT:  I'm just trying to figure out why we have -- the Bankruptcy Code seems to me completely supplants that.  Don't we have a supremacy clause issue?

MR. SOFTNESS:  I don't -- Judge, you're not bound to it in any way, and we're asking you to basically do the same thing.

THE COURT:  Understood.  Very good.

Before I go on to responses, Ms. Leali, would you like to weigh in?

MS. LEALI:  Your Honor, I am very new to the case.  We had the initial debtor interview (inaudible).  At this point in time I don't feel that I'm in a strong enough position to weigh in.

THE COURT:  Thank you.

Ms. Feinman.

MS. FEINMAN:  Your Honor, I'm not taking a position on this at this time.

THE COURT:  Thank you.

Mr. Wolfson, I saw your hand.

MR. WOLFSON:  Thank you, Judge.

In support of the motion, really, the crux here is that if you allow the debtor -- if the debtor believes it can simply just continue on and sell these, as if it was a -- in the business, which

Page 25

I think the evidence will show it really wasn't in the business of -- it was in the finance business, it really wasn't in the car sale business.

But if you allow me to do that, there's a UCC concept that passes through bankruptcy that they must adhere to, subject to certain limitations. If the, you know -- 679 or Section 9-320 about the buyer of goods, our view is, they bought -- if they acquired these goods, which we believe was a sham, they acquired them subject to any liens on those, because those 19 vehicles -- by the way, to be clear, one vehicle is claimed by someone who we believe was a (unintelligible) buyer of the UCC, one of the vehicles. There's only 18, I think, at issue here.

But as to the other vehicles, the 18 vehicles, they are subject to -- they remain subject to any existing lien, unless the debtor was a buyer in the ordinary course of business, and the evidence will show you, we think it's pretty overwhelming, the evidence, that they were not a buyer in the ordinary course of business, and remain subject to the lien.

The UCC is set up so that if you have an inventory lien, for example, FVP is just a

Page 26

(unintelligible) planner, a customer comes into the property, buys a car, fills out the paperwork, says, "thank you," drives away, and assumes the title later, that customer doesn't have to worry about an inventory blanket lien lender or plain lender, calling him up and saying, "Oh, I need a release of your inventory lien," because that's what the code is set up to do.

On the other hand, if somebody walks in as a wholesaler, or someone who is an alleged creditor, and inquired in the unusual fashion we'll see in the e-mails back and forth, wires back and forth to acquire these vehicles, that entity, of course, can acquire the vehicles free of the liens, but of course, if you look at your record, it doesn't reflect a lien against the debtor, because the debtor didn't have original title to them, wasn't the one involved, but it's acquired them subject to.

So the concept is, you have to weigh how could the debtor sell those the way it acquired them?  "Well now, I'm in the auto dealership business, so I can just sell them as ordinary course."

We don't think they can do that.  We think either through the adversary proceeding before Your

Honor, which they started out, you said, "Why shouldn't I determine it?"

One reason, Judge, is there's a lot of parties.  In the state court there's like seven, eight, nine or ten parties.  They would all have to be brought in, non-debtor parties.  That's arguably the reason not for the Court to decide it --

THE COURT:  We are going to get to this on, I think, the 10th of August when your motion is set.  Aren't all those parties arguing about who has ownership or liens on property that the debtor claims is property of the estate?

MR. WOLFSON:  Yes.

THE COURT:  I think I have original jurisdiction over all that.  So I'm not really worried about multiple -- you know, we deal with lots of parties here.

MR. WOLFSON:  Yes.  But if you ask is there a reason, then that could be a reason why you would send it back down, Judge.

THE COURT:  Mr. Wolfson, I'll warn all of you now.  It is extremely unlikely I would grant relief from stay on these central issues in a bankruptcy case.  I would simply dismiss the case. There's no good reason to keep the bankruptcy case

and send everything in it elsewhere, unless you convince me that there is.

I can think of one case in my career where that, in fact, happened, where all the litigation happened in the Florida state court.  I signed the complaint.  We asked for more than a billion dollars in damages, and we litigated for years.  Then we used the bankruptcy to distribute the proceeds.  That's really not what this case is about.

MR. WOLFSON:  I understand.

THE COURT:  But I'll hear about that on the 10th of August, and you may convince me otherwise.  I haven't read through everything yet.  I just know that they're set.

But for today you agree you want me to tell the debtor they can't sell any of the cars until somebody decides who owns them and who has liens?

MR. WOLFSON:  That's correct, Your Honor.

THE COURT:  Mr. Shraiberg.

MR. SHRAIBERG:  Thank you, Your Honor.

We support the motion, and as Mr. Softness alluded, my client as well (inaudible).

THE COURT:  I'm having a hard time hearing you.  You're a little bit muddled.  It's not just

me.  I mean, I am aging now, so it could be me.

MR. SHRAIBERG:  Is it any better?

THE COURT:  It just sounds like the microphone is quite distant from you.  I've seen your fee applications.  I think you can afford a good microphone.

MR. SHRAIBERG:  Let me see.

THE COURT:  Everybody is smiling at that one.  I've seen all of your fee applications.  Don't do that.

Mr. Shraiberg.

MR. SHRAIBERG:  Is it better now?

THE COURT:  It seems a little better, sure.  Go ahead.

MR. SHRAIBERG:  We support the motion, but there is one issue that I wanted to clarify.

I don't think that either Mr. Softness or Mr. Wolfson objects to the sale of the car if a buyer is found for a particular automobile and the price is commercially reasonable.  Part of the relief that's being sought is that there's a determination that a sale of an automobile is not pursuant to the ordinary course and would require a motion.

That's all that I think for a safeguard to

get to the next hearing, I think it's a good fallback to offer the creditors protection.  We all would prefer to be fighting over money versus the actual automobiles.  So if there could just be a finding that, without prejudice, that if there is going to be a sale of a car, that either there's a negative notice proceeding to facilitate that sale, or if the parties can't agree, it would then be brought to this Court.

That's the thing that at least my client (unintelligible).

THE COURT:  Mr. Softness is disagreeing. Negative notice is probably not helpful in a retail car sale.

But Mr. Softness, your request to me that I rule that the sales would not be in the ordinary course means they have to file a motion.  That's what you want.

MR. SOFTNESS:  No, that's not what I want. I want -- I mean, yes, they can make a motion, and our response would be, "You don't own that car."  So we need to adjudicate whether they own the car.  And we can't possibly do this piecemeal like that.

Just so the Court knows, we've offered to try to collaborate saying, "If you want to sell and

put it in escrow, now you've got something." But what Mr. Shraiberg just suggested was not that. So, yeah, it's got to be an all or nothing situation.

THE COURT: All right.

Mr. Shraiberg, anything else?

MR. SHRAIBERG: No, Your Honor.

THE COURT: Thank you.

MR. SOFTNESS: Thanks for your help, Brad.

THE COURT: Mr. Wolfson, I think your hand is raised.

MR. WOLFSON: Yes. With respect to Mr. Shraiberg's suggestion, in a perfect world that would be something that might work. The issue is really this: If, in fact, the debtor holds bare naked legal title, that's all he really holds, he doesn't really have the ability to sell them. Obviously, by consent, unrelated to bankruptcy or anything else, if any creditor, secured party, who claim an interest in the debtor, agreed to some sale process, then I think we can agree to that collectively, and the proceeds can go into an escrow account.

MR. SOFTNESS: And I lose control of my own motion.

THE COURT: Mr. Softness, let Mr. Wolfson

finish.

MR. SOFTNESS: I'm sorry.

MR. WOLFSON: What I'm saying, Judge, in a perfect world that might work, but the question is, if the debtor doesn't own something, they can't really sell it. Even 363 says that and 541 says that. So you almost have to decide the threshold question, and that's what the state court was in the process of doing at least.

By the way, Judge, if you're not familiar with -- it wasn't really a full trial. It was going to be an injunction replevin case, a preliminary hearing, to kind of permanently freeze them during the litigation so they wouldn't have been able to be sold except by consent of the parties. So that's where the rubber meets the road.

THE COURT: Here the adversary asks for me to determine who owns the property and who has liens on it, a really basic request for relief. Again, I'm not ruling on that today. I have a specific request for relief with really two alternative things and then another thing.

Anybody else before I hear from Mr. Miller?

Oh, Ms. Feinman. I apologize.

MS. FEINMAN:  Your Honor, no concern.  I was really just asking if I could be excused.  I hate to leave this wonderful discussion, but I am late for a continued 341 Meeting that started at 7:30 this morning.  And so if the Court would indulge my being able to leave so I can finish that 341, I would appreciate it.

THE COURT:  Good luck to you.  Good morning.

MS. FEINMAN:  Thank you.

THE COURT:  All right.  Mr. Miller.

MR. MILLER:  Thank you, Your Honor.  I will admit that I could not clearly hear Mr. Wolfson nor Mr. Shraiberg very well.

THE COURT:  Mr. Wolfson, is your hand still up or are you done?

MR. WOLFSON:  I'm done, Your Honor.  I'm sorry.

THE COURT:  All right, thank you.

Mr. Miller.

MR. MILLER:  However, I think the sum and substance of what's being sought here is basically injunctive relief.  There are elements to be satisfied and bonds that have to be posted, not just for purposes of --

Page 34

THE COURT:  Mr. Miller, Section 363(c) itself says, unless the Court orders otherwise, so I can even limit the debtor's ability to sell in the ordinary course.  I don't need to make those findings.

I want you to explain to me why the debtor should be able to at this point sell what it believes are cars it owns, what it believes would be in the ordinary course, without asking for permission, when I have allegations the debtor doesn't even own them.

So let me just point out that 363 starts with property of the estate.  Debtor can't sell things that are not property of the estate, and I have people saying that it's not the debtor's property.  So why would I not simply use 363(c) and the discretion it gives me to tell the debtor you need to file a motion to sell any car?

MR. MILLER:  Very good starting point, Your Honor.  And with that, Your Honor, none of the parties on that conference are saying they own the cars.  They're saying they have a lien in the car. There's saying there's collateral in the car. That's what they're saying.  They don't say they own them.  And that is a --

Page 35

THE COURT:  Well, they say the debtor doesn't own them.  Isn't that helpful?

MR. MILLER:  Well, Judge, the debtor has title to the automobiles.  Everybody in the world can say they have a lien interest in something, and that doesn't presuppose that they have a superior right in the property.

It's no different than if I came before the Court and filed an emergency cash collateral order, and these things were truly financed or subject to other liens, the Court would probably authorize it and allow the substitution of the purported collateral for the sale proceeds, but allow the debtor, if it was an automobile company like ours, to continue to operate the business, to sell the automobiles in the ordinary course.  Nobody is going to buy a car if you can't sell it in the ordinary course.

THE COURT:  What is the ordinary course of this debtor?

MR. MILLER:  This debtor would typically take the automobiles and sell them at particular auto auctions, and sometimes to end users.  Not a lot.  That's why we have very little money owed to -- because it's quarterly, Your Honor.  We would

Page 36

have paid it, but for the fact that it's not due for the quarter, $7,000 owed to the State of Florida, Department of Revenue, for sale tax.

So we're not a big end user seller.  We would typically sell at auction facilities, or you do what's commonly called dealer to dealer sales, and we would do that.  The debtor has been doing this since 2012, Your Honor.  It understands the industry.  It knows how it works.  It knows how to sell a car and try to maximize the value of the car.

The reality is, all of this purported fraud, and Mr. Breslin's hyperbolic argument about Moshe Farache, how evil he is, he's sitting here today.  He's not an evil guy.

You have attached to our response the three primary people at Excell Automotive that testified under oath Mr. Farache did not intimidate them, did not force them to do anything, everything was done because Scott Zankl or Christen Zankl directed those employees to do what he told them to do.  And we attached copies of documents evidencing payments, wire transfers, that we purchased these automobiles and all these other things.

And really, if you're going to look at this as an injunction standard, and you were going

to take a look at it and say, "Okay, well, don't they have to prove up -- doesn't FVP have to prove up that it does, at least at this preliminary hearing, have a superior interest on a priority lien in these automobiles," when you have to look at their documents --

THE COURT:  Let me put some -- I don't know how to say this more directly.  The debtor filed a bankruptcy.  We are here in the Bankruptcy Court.  There's a whole bunch of rules that get overlaid over the debtor's business, as you know, separate and apart from the disputes that already existed in the state court, and that is, what can the debtor do, and what limitations are on the debtor's ability to, for example, sell things.

So now we have a completely new overlay. I have a lot of discretion under the statute, under Section 363, and I am extremely likely to tell the debtor that you need to file a motion to sell any vehicle.

So my question to you is going to be, let's assume this bankruptcy survives the hearing that I think is on the 24th of August.  If that's the case, why aren't you all just working at getting to an evidentiary hearing as quickly as possible?

The debtor wants to sell cars.  You think you have a great case.  Let's get to it.

MR. MILLER:  I agree.

THE COURT:  Good.

MR. MILLER:  Wait.  I don't want to say I agree to everything.

THE COURT:  I know you disagree with my view that I am going to tell the debtor you can't sell any cars, but I'm going to tell the debtor you can't sell any cars.  That's going to be the outcome of this hearing.

So explain to me why I am without the power to do that.  That's the only argument that I will listen to at this point, in spite of 363(c), which by the way says -- at least Congress thought there was some meaning to the phrase, unless the court orders otherwise, I'm going to order otherwise.

MR. MILLER:  May I speak?

THE COURT:  Sure.

MR. MILLER:  Okay.  We're not going to argue with the Court's power and authority, Your Honor.  We're not here beating our chest challenging the Court.

The party opponent is FVP in this matter.

Page 39

They're the ones who filed a motion in an adversary proceeding, asking this Court to basically enforce an injunction -- this is their relief they requested --

THE COURT:  Well, there are several things.  They say, say that the freeze order applies, or enter my own freeze order, which is really an injunction, or say that the sale of any disputed vehicles would not be in the ordinary course of business.  So let's go there.

So we have a circumstance with a substantial dispute.  Everybody is here.  Let's see who we have.  Mr. Wolfson, Mr. Shraiberg, in addition to the movants, and they're all telling me that you shouldn't be able to sell these cars, and you're saying the sales would be in the ordinary course of business?  That's interesting.

MR. MILLER:  Judge, you know, not to get into an intellectual debate with the Court, because you're not the party opponent.  It is the people on the Zoom meeting.

THE COURT:  People tell me that at times it seems like I am.

You should all put it on mute if you can. Go ahead, Mr. Miller.

Page 40

MR. MILLER:  Let me just go back to my argument, and I'll address your question of whether or not we should be allowed to continue to operate in the ordinary course, because basically, if you direct that the debtor is not allowed to operate in the ordinary course, then the debtor basically is shut down and continues to be shut down.

THE COURT:  We'll get to trial really quickly.

All these cars became the debtor's -- the debtor received title to these cars when, how many months ago?

MR. MILLER:  We have actually --

THE COURT:  Four months?

MR. MILLER:  No, Your Honor.  That's not accurate.  I filed a response that lay down the dates of acquisition and the dates of purchase, everything.

THE COURT:  I read it.

MR. MILLER:  So the cars, over a period of time I want to say go back as far as either July or August of '21, and through April 1st or 2nd of '22. I lay out the chain of title that we have that shows how we acquired these vehicles.

My whole point was, and as I set forth in

the response is, that again, I don't care if there's a million people on that Zoom call that say, "Hey, we believe we have an interest." They have to prove that interest. And FVP filed and attached to their 368 voluminous page complaint, with attachments, documents that show they would not have had a lien on any pre-existing inventory of entities -- let's talk about where we got the cars.

THE COURT: That's not an argument. I saw that.

MR. MILLER: We got cars from both Excell -- so we agree, there could be no liens in favor of FVP on Excell inventory, because they didn't have a lien on Excell's inventory. They took a lien out on Karma Palm Beach and Karma Broward, but they have two problems with that.

They have a subordination agreement with West Lake that says, we're not going to lien anything you may have a lien on," and then when you read the loan documents they say, "We, exclusionary lien, there shall be no lien on any automobile for which the proceeds that we fund are not, A, used to purchase that specific car, and only after you make a written draft request to us.

Meaning, FVP had to be given a draft

request saying, I, Scott Zankl, through KB or KPB, am going to buy this one or two or three exotic cars, giving a VIN number, and now you, authorized agent, are going to -- if you approve it, you'll give me the draw down to do that.  Then they can trace the proceeds and show that that occurred.

So the reality is, the majority of the cars, at least 12 or 15 of them, didn't come from Karma Palm Beach or Karma Broward.  They came from Excell; A.

B, to the extent that some of these cars that came from Karma Palm Beach and Karma Broward, we're able to show that we used our proceeds to purchase that car, not FVP.  I attached the wire transfers to our response.

So what the real issue is, they want to go and sit down and say, Judge, freeze all 19 cars, just because we say, that's their argument.  Because they can't show and they -- if they had all the draws, they would have attached them, I am sure, to their complaint, saying here, they attached this draw, and on this day these three VIN numbers were sent to us, so therefore, we put the money in the bank account of Karma Palm Beach or Karma Broward, and those proceeds were used to acquire that

vehicle.

The problem with their whole basis of their complaint is that they seek really to try and get the Court to be convinced that they have a general (unintelligible) financing agreement.  They don't.  What they have actually is what's commonly referred to as a purchase money security interest, identified in Article 9 of the UCC.  They don't have a (inaudible) agreement.

So they would have needed -- and I don't want to get to the (unintelligible) conclusion -- they would have needed to actually put a lien on those titles.  That's for another day.  That's at the end of an evidentiary hearing or trial on that the matter.

So what they're basically saying is, casting a wide net, what Mr. Breslin is not telling you is, the list of the disputed vehicles that he has came from predecessor counsel when we filed the action.  Their initial complaint did not have these disputed vehicles listed.  They didn't have any of these automobiles.  We gave them an inventory of what we had, and they now turned around saying this is the inventory that's our stock.  That's their argument.

Page 44

So we shouldn't be shut down simply because they want to argue it.  Again, I know, Your Honor, you have the ability to say, I'm not going to require posting a bond, but read their complaint.  Their complaint requests a replevin.  A replevin mandates a bond for double the value of the assets you're seeking to freeze.

THE COURT:  Great.  Maybe you -- you could have made that argument.  You could have made that argument in the state court.  Apparently you tried to and were not successful.  Today we have --

MR. MILLER:  I'm just saying in this complaint they're seeking replevin.

THE COURT:  Today we have a Chapter 11 case.  So I don't really care about the rest of that stuff right now.  And I frankly was -- I was perplexed why there was replevin in an adversary proceeding filed in the Bankruptcy Court.

But I have a list of vehicles, and I have a lot of people telling me the debtor shouldn't be able to sell them.  You had an order telling you you couldn't sell them in the state court, and you thought maybe you'd get a different result in Bankruptcy Court.

MR. MILLER:  Actually, we didn't forum

shop.  I want to make that very clear.  We were getting picked apart in eight different lawsuits, with many of these being the same cars.  I list and identify in my written response --

THE COURT:  I know.  I've had some interesting hearings in the case.

MR. MILLER:  I'm sorry, Judge?

THE COURT:  I've had some interesting hearings in this case with multiple people telling me they have the right to vehicles that the debtor abandoned.

MR. MILLER:  We didn't forum shop.

THE COURT:  Different case.  Excuse me.

MR. MILLER:  As a matter of fact, the bankruptcy wasn't contemplated the last minute.  The bankruptcy was contemplated months ago, and we had multiple cases being filed against our client, and we ultimately decided that it was the best interest to everybody into this court.  As you said earlier, this court is a court this resolves claims, and the purpose of a bankruptcy is to make sure the debtor and its assets are not picked apart.  That's exactly why we're here.

THE COURT:  So why isn't your goal, let's get to a hearing quickly?

MR. MILLER:  That is my goal, to go to a hearing, an evidentiary hearing, where we have a full evidentiary hearing, rather than argument of counsel about what their positions are and what they believe they could have.

Look, Judge.  I don't think it's going to be as simple as simply just saying A, B, C in some of these issues, because they're very good at throwing the kitchen sink.  If you read the complaint it's a kitchen sink.  When you read these pleadings they're a kitchen sink.  So you have to address a lot of issues.

But the reality is, there's no reason why the Court should enjoin in this adversary the sale of these cars.  I will tell you this:  We would still need to file a motion with this Court to ask you to authorize the Department of Motor Vehicles to let us sell these cars.

Our plan was to file a motion before the Court before we had all these other pleadings getting filed and all this stuff filed against us. We plan on filing a motion with the Court to ask you to authorize the Department of Motor Vehicles to allow us to transact.  The Department of Motor Vehicles, based upon the fraud of Scott Zankl,

anything he came close to, they're not approving the titles. They're saying no, we're not doing that.

Mr. Zankl is subject of multiple -- let's just say multiple investigations. That's as far as I'm allowed to go with that. But he's got problems. And the things that he did in Excell and Karma Palm Beach and Karma Broward, are wrong.

I do want to touch on one other thing. Mr. Breslin said that Mr. Farache showed up and took all the inventory in the premises and wiped it out. Really? Does anybody bother looking back at the Excell bankruptcy and seeing how many times there were motions to compel the trustee to abandon automobiles or to return automobiles?

You had a hearing one time where you said, "I'm not directing the trustee to abandon these 20 or 30 cars to anybody in particular." And you said, "And, Madam Trustee, if you can find a corner to park those cars on, you go ahead and park them over there. She's not obligated to give --"

THE COURT: Well, not yet. I threatened to do that, and then they reached an agreement.

MR. MILLER: But the point is, as you're well aware, because you're familiar with the case, that is an outright misstatement to say that we took

everything, when they were in the premises.

THE COURT:  I'm not making any conclusions on that.  All I'm hearing --

MR. MILLER:  But it's hyperbole.

THE COURT:  I'm hearing that the debtor doesn't own the vehicles, there's lots of liens on the vehicles, and you shouldn't be able to sell them in the ordinary course.  That's what I'm hearing.

MR. MILLER:  And so the concept would be simply, let us sell our cars, let us get the DMV to approve.  We'll file a motion with the Court.  We'll sell our cars, and if and to the extent any of these parties can establish a priority first lien that went to this automobile, it would have attached to those proceeds.

My client is not in the business to lose money.  My client knows the value of the automobiles, knows what he can sell them for and how much profit can be made.  That's what we do.  That's what Auto Wholesale Boca does.

This is not a game being played.  This is a family owned enterprise which got taken advantage of, like a lot of these people, didn't do their due diligence obviously, and simply did things they shouldn't have done.  I'll address, for example,

later on, Hi Bar's position and FVP's position, and anybody else that's filed their motions, and address those as we get to those hearings.

But for now I would ask the Court in this adversary proceeding -- and you can direct me, "Mr. Miller, although I have not entered an order in the Farrell (phonetic) case, I'm directing your client that absent a court order, they're not allowed to sell those cars, but I'm not making a final determination as to who's interest there is."

THE COURT:  Isn't that exactly what Mr. Softness is asking for?

MR. MILLER:  What's that?

THE COURT:  Isn't that exactly what the motion asks for?

MR. MILLER:  They're asking for the adversary proceeding, which sort of means that I get tied up and AWB gets tied up, in this litigation, because I can assure you, despite Mr. Breslin's representation and Mr. Softness' representation, I have Mr. Farrell (phonetic) here that had to handle all that litigation.  Despite all of our efforts trying to get earlier hearings on matters, somebody for some reason, because they're getting a free ride with no bond, had no interest in setting hearings at

earlier dates.  So --

THE COURT:  I don't know if you realize this, but I'm the one who sets hearings here in this court.

MR. MILLER:  I understand that.

THE COURT:  I think you were here earlier when I insisted on setting a hearing very soon.

MR. MILLER:  Yes.

THE COURT:  Very soon, right?

MR. MILLER:  And I'm familiar with that.

THE COURT:  You want to present your case, you have all these adversaries?  I'm glad to hear it.  I have lots of time this month and next month.  You think I'm joking?

MR. MILLER:  I'm not.  Why would I --

THE COURT:  You and I have both been involved previously in matters that got to trial in less than a month.  You want to go to trial, I'll get this thing to trial.

But that isn't what today is about.  Today is about -- and I know that you're somehow sensitive about the fact that this motion is filed in the adversary.  I don't really care.  I'm going to enter the order in the main case.  The order is going to say that I don't think it will be in the ordinary

course, but it doesn't matter, because under 363(c) I am ruling that the debtor must seek a motion to sell any of the vehicles.

I'll enter the order in the main case if you like.  I don't really -- it doesn't really matter to me where it's entered.  I'm not sure what advantage any of your opponents gets if I enter it in the adversary.

MR. MILLER:  Well, my concern is, in the adversary preceding I don't know how far we'll get into that or how quickly or what issues will be raised by their motion practice or other matters. Your Honor, if I may --

THE COURT:  You want this to be resolved quickly?

MR. MILLER:  Yes.

THE COURT:  Then let's move up the status conference date and set the matter for trial.  I don't see any reason why I should have motion practice in this.  If I set the matter for trial we can short circuit any motions for summary judgment.

It seems to me you want to present the evidence.  You have a lot of opponents.  In the meantime, I have people asking me to send the entire litigation back to the state court.

MR. MILLER:  And that's my whole point. FVP has acknowledged in their own pleading they may not be in first place, if you look at their complaint.  So if Your Honor rules --

THE COURT:  I'm really good at liens and Article 9.  So I'm really not intimidated by any of that.  We can get to those issues quickly.  I'm used to looking, by the way, at financing statements and security agreements.  I spent my whole life doing finance work --

MR. MILLER:  I am aware of that, Judge.

THE COURT:  -- before I was appointed 14 years ago.  So I am confident I can understand what the evidence is.  So isn't the goal to get to trial on this?  Yes.

MR. MILLER:  Yes.

THE COURT:  All right.  But I'm still troubled about the fact that -- the circumstances of this case would lead me to conclude I don't know how you could possibly think that the debtor has the ability to sell these vehicles in the ordinary course of business.  It can't possibly be the ordinary course of business of this debtor under the circumstances that currently exist.  I don't see how that is.

MR. MILLER:  And I --

THE COURT:  Well, that's what you wanted to do.  You were going to file a motion solely asking technically to encourage the State of Florida to be cooperative, but had nothing to do with the ability to sell, and you just told me that you were going to take all the vehicles to auction.

MR. MILLER:  No.  We can't sell the cars without the State of Florida authorizing us to issue title.

THE COURT:  That's not a motion asking for permission to sell.  That's a different motion entirely.

MR. MILLER:  I think it started at the beginning, about ten minutes ago, when I said our intent was to seek relief from the Court to allow us to sell, but we need the State of Florida to accept titles that we endorse, and that ultimately, if any of these parties can establish that they are the first priority holder on that particular car -- there's 19 different cars -- then their lien would attach to those proceeds in that regard.  They become a secured creditor in that regard.

That's what I said.

THE COURT:  Okay.  That's great.  Except

Page 54

right now I'm not entirely confident the debtor owns the vehicles.  So now you want me to authorize sales when I don't know who owns the vehicles?  You're going to have to show me -- it's strangely parallel to another case I have running right now.  You're going to have to show me the debtor actually owns the vehicles, because that is, at least theoretically, in dispute at this point.

MR. MILLER:  Actually, Judge, the dispute is not ownership.  The dispute is liens.  None of these parties are asserting ownership that are on this Zoom conference.  They're asserting liens in purported collateral.  It's a completely different thing.  If they were disputing ownership, yes, you'd be right, because you'd have two parties saying, oh, we each own this, now let's hold on to that one.

But that is not what they're saying. They're saying that these are their collateral. They have a purported lien on collateral, which obviously, a cash collateral order could be entered approving that if that was the case.  This is the format I'm describing to the Court.

But it's not an ownership question.  It's a collateral question.  We put in our response -- I will get back to you.

Page 55

MR. WINDERMAN:  Your Honor, if I may --

THE COURT:  I will get back to you.

Yes.

MR. WINDERMAN:  If I may, Your Honor, this is Harry Winderman for Karma of Broward, Karma of Palm Beach.

Mr. Miller is incorrect.  We are claiming ownership of those cars.  We are claiming that any titles that Mr. Farache holds in his possession were obtained under duress, and that Mr. Farache, through this debtor, was the landlord for Karma of Palm Beach, and waived his landlord rights in the particular collateral.

He knew that those were not his cars.  And he's also filed an affidavit in the state court saying that they weren't his cars, that he had a lien on them.  So he can't have both.  As a matter of fact, he filed an action in the Palm Beach County Circuit Court claiming that he had a lien on the vehicles and that he wasn't the owner.

So he's already made his statements.  Those issues will be dealt with by the Court, but I didn't want it to go unstated as to who claims ownership to these cars.  Mr. Miller should stop pointing to the lienholders and start pointing to

Page 56

Karma of Broward and Karma of Palm Beach when he talks about ownership of the cars.

MR. MILLER:  Judge --

THE COURT:  Thank you.

Mr. Wolfson, go ahead.  You're on mute, Mr. Wolfson.

MR. WOLFSON:  Most of my friends and family would appreciate that.

Let me just back up for a second, because these things are really, I think, important.  First of all, Mr. Miller is saying without a bond. Although I'm sure Mr. Miller is a great bankruptcy lawyer, I do both bankruptcy and creditors' rights in state court, and there are two versions of having to -- if you use the replevin show cause procedure and have a hearing, no bond is required.

In fact, if the Judge finds that there's a likelihood the creditor is going to prevail, then the Judge can stay or freeze the cars pending the litigation, and the bond duty or burden shifts to the alleged owner, number one.

Number two, if there was a (unintelligible) of cars from Excell -- and you will see, Judge.  I mean, I looked at the documents myself.  You will see when the time comes -- and a

quick hearing is fine -- that the titles were -- at least 18 of them, I'm pretty sure, had Karma's name on the title, and then it had Excell's, and then it had the debtor's name on it.  So their name was clearly in the chain of title on the actual certificate of title, that I see.

More importantly, Judge, on the issue about the trial, if they file a motion to sell, at the very first hearing, really, that can resolve all the issues, just like the stay issue, just like the adversary, because you have to decide whether it's (unintelligible) or because the facts that support the argument about whether Karma had been subject to the lien, my client, which had a blanket lien, an inventory lien, blanket inventory lien, under Article 9, you can decide them all at the first hearing.

Finally, I think, Judge, you're at the right place when you said that regardless of the adversary, whatever else, that I could under 363 say you can't sell them except by motion, Counsel, Mr. Miller, basically admitted it by saying that they have to get the state's approval to sell the cars, that itself is an acknowledgment that it's not ordinary course, because your usual dealer or

Page 58

somebody else's dealership doesn't have to go get

approval to sell cars, because they were involved

with -- the prior owner was involved in some

dispute.  So that itself is acknowledgment that it's

not really ordinary course.  I don't know what else

you need for that.

I think we're all prepared, Mr. Breslin,

myself, Mr. Shraiberg, as quickly as you want to try

the underlying issues of whether or not, one, the

debtor owns them -- and by the way, we all are

saying that the debtor does not own them.  We say

that so that we get to the lien argument, you need

to necessarily decide to get to the validity of the

existing -- the survival of the liens and owners or

not.  So I think you're going down the right path,

and I support that.

THE COURT:  Flattery will get you

everywhere.

Mr. Miller.

MR. MILLER:  Unfortunately, Judge, I

couldn't hear Mr. Wolfson.  It doesn't come through

on the speaker very well.

THE COURT:  I think I'm listening to the

same speaker.

MR. MILLER:  I stood under each one of

these.  It's muffled.  His microphone must be muffled or something.  I don't know.

THE COURT:  Mr. Wolfson, could you summarize briefly again, just so he can hear you.  And speak really loudly.

MR. WOLFSON:  Okay.  I'll do that.

Number one is that under state law --

THE COURT:  Let me just paraphrase that.  And then I'm going to tell you why it doesn't really matter to me.  He's saying that there's more than one method of obtaining replevin relief, and one of them does not require that there be a bond.

Let me just point out to you that 363(c) does not require me to address a bond issue.  The debtor came to this Court, and given the facts of this case, I will effectively grant one of the things that Mr. Softness requested, which was, A, a ruling that it does not appear that the sales would be in the ordinary course of business, but B, more importantly, I'll enter a separate order saying that even if they are in the ordinary course of business, and, in fact, that they are the debtor's property, there needs to be a motion.

I'm using the language in 363(c) to order that the debtor cannot sell any of the vehicles, and

I'm going to ask all of you to confirm that the vehicles are listed in Paragraph 23 of the debtor's response, ECF 13, on Page 5 of 19, going on to the following page, that that's the list.  If anybody later on thinks that that is not the list, you need to let me know.

I'll rule that independently.  So I don't care about the bond argument.

Your next argument, Mr. Wolfson.

MR. WOLFSON:  I was saying, Judge, that with respect to ordinary course, I said the fact that Mr. Miller acknowledged that the debtor has to get state approval --

THE COURT:  He's saying the fact that you said that you need to seek approval from the state to get the transfer, but his argument was not based on the debtor, it was based on another person entirely, Mr. Zankl, having an issue with the State of Florida, and that you'd have a hard time getting title to be issued, correct?

MR. MILLER:  The DMV will not -- any of Mr. Zankl's titles --

THE COURT:  I don't think that's an acknowledgment that the debtor can't sell.  He's saying that the fact that Mr. Zankl was in title

creates a problem for them.

MR. WOLFSON:  The fact that they have to seek approval, if the debtor has to seek approval from the state means ex facto with a jury, it's not ordinary course.

THE COURT:  Oh, I see what you're saying. Okay.

MR. WOLFSON:  No other party will have to go get that approval to sell cars.

THE COURT:  He's saying that's evidence that it wouldn't be in the ordinary course of business.

MR. WOLFSON:  Exactly.

THE COURT:  Any other things you hit on?

MR. WOLFSON:  The other point was that we believe that if you look at all the subject titles in question, that Excell was a paper intermediary. It never really paid anything to find the titles, that the titles were shifted from Karma to Excell and then to the debtor, in order for the debtor to be able to claim that they were maybe under its lien that it had at one point.

So we believe that the intermittent title in the name of Excell was a sham.  Mr. Breslin will be able to speak to that.

THE COURT:  All right.  Did you hear that last part?  He said the transfers through Excell were part of a sham essentially.

Anyway, right now we've gotten way into the weeds of what the underlying issues are.  You have an adversary.  Someone is asking me not to hear it at all, to send it all back to the state court.

I also have a motion to dismiss the entire case.  It's coming up for hearing, I think at the end of August, the 24th.  Right now I have very limited relief that has been asked for in the case.

Anything else you wish to address?

MR. MILLER:  Mr. Winderman's last minute -- this has been a part of the problem.  Everybody wants to jump in.  Mr. Winderman has not filed anything on behalf of any of these entities.  Now he's saying, we claim to have an ownership interest.

I don't want the Court thinking that that should be a basis for relief, but I understand what your ruling is, Judge.

THE COURT:  Hold on.  He's here.  Did I give a deadline for people to object?

MR. MILLER:  No, but that's not the point.

First of all, I don't know if the Court is

aware of the fact that Mr. Winderman is the one who filed the Excell bankruptcy and was the one advising Mr. Zankl.  Then he started representing all the purported creditors.  Now he's representing the other entities that Mr. Zankl ran, Karma of Palm Beach and Karma of Broward, who Mr. Zankl runs.

So I think we should take it with a little bit of -- careful.  Just be careful with that.

THE COURT:  Remember, all of you have more experience with all the parties than I do.  So I take everything with a grain of salt.  I have a bunch of allegations, and I have a case and I have a lot of people telling me that you said it's about liens.  I have Mr. Winderman and Mr. Wolfson saying it's really about property.  The debtor has 19 vehicles.  You'd like to be able to sell them, and right now I don't know whether the debtor owns them, who has liens on them.

For example, if you look at 363, if you have a blanket lien -- I know you told me they don't have a lien, but if you have a blanket lien, then the sale price for that one vehicle has to exceed the entire amount of the claim, or it has to be in dispute.  We're not going to get there unless you're filing motions.

It seems to me the best way to approach this is for you to get all this stuff litigated.  So I would be focusing on getting to a trial.  I was not joking when I told you I have time this month and next month.  I see no reason why this can't happen quickly.  All these people want it resolved, unless I grant the motion for relief from stay, unless I grant the motion to dismiss.

I think you need to figure out what your strategy is, but your strategy is not going to be getting permission to sell everything next week at auction, because that's not happening.  So if that's what the goal in filing this case was, it failed.  I don't know what the goal was.  You have a lot of people litigating with the debtor, and you want to bring it all to one place, that's an excellent goal.  If that's the goal, let's get there.

I'm a little bit alarmed that the debtor thought that it could under the circumstances go and sell all these vehicles.  I would not -- if I filed this case, I would have filed a motion asking for the Court to permit the debtor to move forward with sales.

MR. MILLER:  And that's exactly what we were going to do, except we've been hit with all

Page 65

these multitude of pleadings, from the beginning of the case to literally the weekend that we filed, on that Sunday evening, this emergency motion and the complaint was filed.

And the purported creditors are being very good at being aggressive and keeping us focused on their issues, rather than being able to go through and addressed other matters, Judge, and that's the problem. So we're not saying that we were going to go and sell the cars. That's not what we were going to do. As I told the Court, the Florida Department of Motor Vehicles was not going to accept certain titles to the vehicles which Mr. Zankl was affiliated with.

And we also knew that given that the multiple claims were -- because that's why we listed everybody who could possibly say they have an interest. We knew we'd have to file a motion with the Court asking for authority to do that. My only argument here today is, this is not the appropriate vehicle to put in force in the adversary proceeding injunctive relief.

As you've said, well, under 363 you're going to enter it in the parent case. I understand your ruling, Judge, but I don't want you thinking

we're attempting to mislead you or not trying to do our job.

THE COURT:  I wasn't.  You're all making arguments, and as I told you, I take everything with a grain of salt.

I don't know -- I read your argument with interest about a particular security interest and how it doesn't attach at all.  That's great.  I'm not going to be making a decision on that kind of thing today.  All you were pointing out to me is that there's substantial dispute on the issues.

So -- and I'd be very keen on getting to the evidence and seeing what, in fact, the various documents provide, when things were bought and paid for, where the cash went or did not go, what loans were satisfied or not satisfied, all the arguments that are presented in the very large number of paragraphs that were filed leading up to today.

All right.  I'm going to grant the motion, only to the extent that it asks me to rule that the transactions would not be in the ordinary course of business.  I'll be doing my own order, Mr. Softness. In addition I'll be entering another order in the main case under Section 363(c), which I will also be preparing.

Page 67

My question for the parties is, is there anybody that believes that the list in Paragraph 23 of the debtor's response, which is Document 13, is wrong in any regard?  There are a number of subparagraphs.  Each line has a letter.  They are A through S as in Sam.  I think that is the list.  I would use that list.

MR. BRESLIN:  Your Honor, I'm going through that right now.  We just got that yesterday. I will let Your Honor know within the hour.

THE COURT:  How are you going to do that? You can't just call me.

MR. BRESLIN:  Okay.  I was going to notify your JA.

THE COURT:  You can't do that.

MR. BRESLIN:  I believe there's some hearings scheduled on this matter this afternoon, are there not?

THE COURT:  I don't think there's any hearings in this case.

MR. SOFTNESS:  Not that affect us, Jerry.

THE COURT:  I'm not continuing this to this afternoon.

MR. WOLFSON:  Your Honor --

THE COURT:  Yes.  Who is that?

Page 68

Mr. Wolfson.

MR. WOLFSON:  Mr. Wolfson.

I believe in one of my motions I filed a list, as well.  If they match up it's good with me. I haven't --

THE COURT:  Well, could you look?  I gave you some warning about five minutes ago.  I would have been comparing them.

MR. WOLFSON:  I mean, there's all the VIN numbers.  It's a question is if the VIN numbers -- because a lot is the same description, just different years and the VIN numbers are different. You have to really go through the VIN numbers.

MR. BRESLIN:  Judge, can I make a suggestion?

THE COURT:  Yes, of course.

MR. BRESLIN:  If we disagree within the next two hours we will upload a notice.

THE COURT:  Thank you.

MR. BRESLIN:  If you would hold off on your rulings until just midafternoon, if we disagree you'll know.

THE COURT:  Thank you.

MR. MILLER:  Your Honor, just for the record, these are the 19 vehicles we have in our

possession and we have no more, we can't make them up, other than that those are the subject of what they call the (unintelligible) vehicles.  We do list two in our SOFA that we took in about two weeks ago that we intend to sell, that have nothing to do with --

THE COURT:  They're not in this.  I'm more concerned about inaccurate -- accidental inaccurate fees in the last four digits of the various VIN numbers, frankly.  Or if somehow --

MR. MILLER:  Your Honor, let's say I got a VIN number backwards or something.  It doesn't matter.  These 19 cars are going nowhere.

THE COURT:  All right.  Good.

Anything else in this case today?

MR. WOLFSON:  Judge, there's also a status conference.  Are you going to set any other dates in the adversary, such as like the parties (unintelligible) or anything like?

THE COURT:  That's the whole point of our relatively new procedure in having a status conference, and entering the new form of pre-trial order, which, for those of you who have not any experience with it, is really modeled after the District Court's orders.

When is the status conference in this adversary? It must be out a ways at this point.

MR. BRESLIN: I think it's September 14th. I'm just guessing.

THE COURT: Let's see.

ECRO: I believe it's October 12th, Your Honor.

THE COURT: Right. Seems to me --

MR. BRESLIN: Missed it by that much.

THE COURT: That's a really long time from now. This does not seem to me to be a case that's going to be about testimony. It seems to me it's going to be a case about documents that you already all have.

So I would figure out -- please don't tell me you're going to file a summary judgment motion with 782 pages of attachments and think that will speed things up, because it will not. The best way to speedily have a resolution here is to actually have an evidentiary hearing. That's just my advice. If you want to file summary judgment motions I can't stop you, unfortunately.

Anything else in this case?

MR. MILLER: I don't think so, Judge.

THE COURT: Good. Thank you all. Very

Page 71

exciting.

MR. BRESLIN:  Thank you, Judge.

THE COURT:  Very exciting for me, maybe not for all of you.

MR. SOFTNESS:  Judge, have a good day.

THE COURT:  Good morning everyone.

(Thereupon, the hearing was concluded.)

Page 72

CERTIFICATION

STATE OF FLORIDA:

COUNTY  OF  DADE:

                I, HELAYNE F. WILLS, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were taken by electronic recording at the date and place as stated in the caption hereto on Page 1; that the foregoing computer-aided transcription is a true record of my stenographic notes taken from said electronic recording.

                WITNESS my hand this 9th day of August, 2022.


                   _____
                          HELAYNE F. WILLS
                   Court Reporter and Notary Public
                   In and For the State of Florida at Large
                   Commission No:  HH157788  Expires 8/2/2025