UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO. 9:22-BK-15627

CHAPTER 11

In re:

AUTO WHOLESALE OF BOCA, LLC

      Debtor,

_____/

- - -

DEPOSITION OF SCOTT ZANKL
A WITNESS
TAKEN BY THE INTERESTED PARTY,
DEREK STEPHENS
REMOTELY VIA ZOOM

- - -

DATE: November 14, 2022

TIME: 10:12 A.M. - 12:23 P.M.

PLEASANTON & MARSAA COURT REPORTING
561.963.9700

The deposition of SCOTT ZANKL, in the above-entitled and numbered cause was taken remotely via Zoom before me, Angela Connolly, Registered Professional Reporter, Certified Realtime Reporter, Florida Professional Reporter, Notary Public for the State of Florida at large, taken on the 14th day of November, 2022, pursuant to Notice in said cause for the taking of said deposition on behalf of the Interested Party, Derek Stephens.

APPEARING VIA ZOOM ON BEHALF OF DEBTOR:

        James B. Miller, Esq.
        JAMES B. MILLER, P.A.
        19 West Flagler Street
        Suite 416
        Miami, Florida 33130

APPEARING VIA ZOOM ON BEHALF OF ADVERSARY PLAINTIFF FVP:

        Jerrell A. Breslin, Esq.
        BARON, BRESLIN & SARMIENTO
        The DuPont Building
        169 East Flagler Street
        Suite 700
        Miami, Florida 33131
                &

        David R. Softness, Esq.
        DAVID R. SOFTNESS, P.A.
        201 South Biscayne Boulevard
        Suite 2740
        Miami, Florida 33131

PLEASANTON & MARSAA COURT REPORTING
561.963.9700

APPEARING VIA ZOOM ON BEHALF OF INTERESTED PARTY, DEREK STEPHENS:

        Evan D. Appell, Esq.
        C. Cory Mauro, Esq.
        MAURO LAW, P.A.
        1001 Yamato Road
        Suite 401
        Boca Raton, Florida 33431


APPEARING VIA ZOOM ON BEHALF OF INTERESTED PARTY, KARMA of PALM BEACH, INC., KARMA OF BROWARD, INC.:


        Harry Winderman, Esq.
        WEISS, HANDLER & CORNWELL
        2255 Glades Road
        Suite 205E
        Boca Raton, Florida 33431


APPEARING VIA ZOOM ON BEHALF OF CREDITOR, FARACHE ENTERPRISES:


        Scott C. Gherman, Esq.
        SCOTT C. GHERMAN, P.A.
        902 Clint Moore Road
        Suite 120
        Boca Raton, Florida 33487

ALSO PRESENT VIA ZOOM:

Derek Stephens, Interested Party

Moshe Farache, Creditor

Greg Nelson, representative of Franklin Capital Group d/b/a Wing Lake Capital Partners

I  N  D  E  X

WITNESS                                                          PAGE

SCOTT ZANKL

  Direct Examination By Mr. Appell                                 6

  Cross-Examination By Mr. Miller                                 85

  Cross-Examination By Mr. Breslin                               103

  Cross-Examination (cont.) By Mr. Miller                        105

E  X  H  I  B  I  T  S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Derek Stephens' 1 | Derek Stephens Notice of Taking Deposition Duces Tecum via Zoom of Corporate Representative of Karma of Palm Beach, Inc., d/b/a KARMA PALM BEACH | 18 |
| Derek Stephens' 2 | Derek Stephens Notice of Taking Deposition Duces Tecum via Zoom of Scott Zankl | 18 |
| Derek Stephens' 3 | 32 pages of text messages between Scott Zankl and Derek Stephens | 18 |
| Derek Stephens' 4 | April 2, 2022 email from Kristen Zankl to Michele Martin and Moshe Farache | 21 |
| Derek Stephens' 5 | June 20, 2022 email from Kristen Zankl to Det. Randa White and Derek Stephens | 21 |

E  X  H  I  B  I  T  S (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Derek Stephens' 6 | March 11, 2022 Consignment Agreement | 28 |
| Derek Stephens' 7 | March 11, 2022 Purchase Agreement | 42 |
| Derek Stephens' 8 | Power of Attorney | 60 |
| Debtor's 9 | Certificate of Title | 101 |
| Debtor's 10 | 04/02/22 Bill of Sale | 101 |
| Debtor's 11 | November 11, 2021 Unconditional Guarantee | 101 |

- - - - - - - - - - - - - - - - -

Thereupon:

SCOTT ZANKL,

Having been first duly sworn by me, was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. APPELL:

Q    All right.  Good morning, Mr. Zankl.

A    Good morning.

Q    My name is Evan Appell.  I'm representing Derek Stephens, who's also here with us on the Zoom today.  How are you?

A    Good.  Good.

Q    Good.  All right.  I'm going to show you a couple of documents just to start off quickly.

Are you appearing today as a corporate representative for Karma Palm Beach?

A    Yes, sir.  Yes.

Q    Okay.  I'm going to show you this document here.

All right.  Can you see my screen with this Notice of Taking Deposition?

A    Yes.

Q    All right.  I'm going to scroll down to the

second page here.

Have you seen this request for documents to be provided at this deposition?

A    Yes.

Q    Okay.  And do you have any documents responsive to this -- to these requests on behalf of the entity Karma?

A    Just the text messages on my cell phone between Mr. Stephens and myself.

Q    Okay.  And were those produced?

A    Yes.

Q    Did you produce them today or prior to today?

A    I sent some of them last week, and then I sent some more this morning.

Q    To whom?  To myself or Mr. Mauro?

A    To my attorney, Mr. Winderman.

Q    Okay.  So they haven't been produced to us yet?

MR. WINDERMAN:  Evan, I'll have them forwarded over to you at the first break.

MR. APPELL:  Okay.

BY MR. APPELL:

Q    All right.  So nothing else on this --

MR. WINDERMAN:  There are only three or four of them.

MR. APPELL:  Okay.  No problem.

BY MR. APPELL:

Q    All right.  But you have no other documents responsive to the requests?

A    **I don't have any of the sales agreements or any of that documentation.  I'm just reading what you said here.**

(C. Cory Mauro joined the Zoom meeting.)

BY MR. APPELL:

Q    Sure.

A    **I don't have any of those other documents, no.**

Q    All right.  Do you know where those documents are?

A    **I believe they would be with the trustee.**

Q    Okay.  So anything you had or might have had related to this transaction and this vehicle would have been turned over to the bankruptcy trustee in the Excell bankruptcy?

A    **Yes.**

Q    Okay.  And for purposes of this deposition, as you can see in request number 1, it talks about a 2013 Ferrari 458 Spider with the following VIN number.  So if I say "the Ferrari" throughout this deposition, can we all understand that we're talking about that vehicle identified in that request?

A     Yes.

Q     Okay.  Perfect.

All right.  I'm going to show you --

All right.  And then here -- I'm going to show you the same thing.  This is an individual notice of deposition.  And, again, the only documents you have responsive to these requests are what we already talked about, correct?

A     Yes.  Yes.

Q     Okay.  And you're familiar with Mr. Stephens, correct?

A     Yes.  I think I met Mr. Stephens once, but I know his name very well.

Q     Okay.  How do you know his name very well?

A     Just because he's done business with my store.

Q     And how many -- when you say "he's done business," approximately how many transactions has he done?

A     Well, I know he's done a couple.  I don't know the exact number, but he's done a few.

Q     Okay.  I'm going to share my screen again and put up some documents.

So I don't know if these are the text messages -- can you see my screen now?

A     Yes, sir.

Q    Okay.  I don't know if these are the text messages that you've produced or not, but these are documents that we produced in response to the subpoena issued to Mr. Stephens.  So I'm going to go through some of these with you, and first I'll ask if these look familiar to you.

Obviously I'm going to be scrolling through a bunch, but does this text conversation on this first page look familiar to you between you and Mr. Stephens?

A    Yes, sir.  Yeah.  I only have text messages --

I've never really talked to Mr. Stephens prior to this transaction.  He always dealt with one of my sales guys, so these are the only text messages.

Yeah, whatever he's providing to you is exactly what I have.

Q    Okay.  And when you say he dealt with your sales guys, do you know who specifically he dealt with?

A    Yes.  I believe Jonathan Martin was his salesman --

Q    Okay.

A    -- that helped Mr. Stephens.

Q    Would that have been for any and all transactions that Mr. Stephens had with Karma Palm Beach?

A    Yes.  Well, it depends.  I mean, as far as him

buying the cars, yes, Johnny; but if there was anything else, he could have dealt with some of my office girls. Or depending on what the issue was, I had different people that handled different things. But Jonathan was his primary contact because that was his salesman that always handled his stuff.

Q    Okay. All right. Perfect.

So we're going to go through a couple of these text messages, so just bear with me. And if you need some more time to read through them as I'm scrolling, just let me know, and I'll stop on the page. All right?

A    Yes.

Q    Okay. So this first text message, which is dated April 4th -- I assume that's April 4th of this year, 2022, correct?

A    Yes.

Q    And do you recall this text conversation with Mr. Stephens?

A    Yes.

Q    All right. So I'm going to go -- your -- Mr. Stephens' text is on the right, and your text is on the left, correct?

A    Yes.

Q    Okay. So I'm going to scroll down to this where it says "your tile and car was never supposed to

be given.  It was a mistake."

I assume that you meant to say title?

A    Yeah, yeah.  Sorry, it was voice -- voice texting.

Q    Yeah.  I'm very familiar with the errors of voice texting, so...

A    Yeah.  Sorry about that.

Q    What did you mean by that?

A    Just what I said.  I mean, my landlord, Mr. Farache, he had taken all of my cars and he was never supposed to take any of them.

Q    But specifically with regard to Mr. Stephens' Ferrari, what were you saying here to him that was a mistake?

A    Just I was saying the same thing that I was saying about all of my cars.  It was never supposed to be -- none of my cars were given to Mr. Farache; he took them.

The only thing was Mr. Stephens' car happened to be there the following day or a couple days after because he took all of the cars on April 1st, the night of April 1st.  And I'm not sure where Mr. Stephens' car was on April 1st, why he didn't take it that night, but he had taken all of the cars and tried to get his hands on all of the titles that he could at the dealership.

Q    When you say your title, which I know it says "tile," but your title on car, were you saying that because the title and car belonged to and were owned by Mr. Stephens at that time?

A    No, because -- no, because it wasn't owned by him at that time because we had already done the transaction on the Lamborghini, so if you --

In the state of Florida, when you do -- when a dealership is selling a car and taking a trade-in, if the paperwork is signed and dated, then that's -- that's transferring ownership to the dealership.

Q    Did Mr. Stephens pay for the Lamborghini or was the trade-in credit applied for the Lamborghini?

A    So I wasn't there when this transaction happened, I was on the phone with Jonathan, my sales guy.  We originally had Mr. Stephens' Ferrari sold to an individual, and Mr. Stephens originally was going to trade the Ferrari in for the Lamborghini, and the deal -- if I'm correct, the deal was -- something was going south on the original deal of the Ferrari.

My sales guy still thought it was going to happen but hadn't put it completely to bed yet that it was dead; he was still working the deal.  And Mr. Stephens wanted the Lamborghini, and he wanted to drive out with it the day -- that day, and Jonathan, my

sales guy, called me and said "What should I do?"

And I said, "Look," I said, "You know, Mr. Stephens needs to write a check for the Lambo because his Ferrari -- we're not sure if it's done, if it's not done." And at that time we were selling it for him, this was prior to the Lamborghini, and we were taking it in trade.

So once my guy did the paperwork with Mr. Stephens and signed the Bill of Sale and he signed all of the stuff with the Ferrari and the Lamborghini, then I was responsible no matter what. So even if the guy didn't end up buying the Ferrari, it was -- I still had to -- no matter what I had to give Mr. Stephens the money for the Ferrari because we showed it as a tax credit and we did a Bill of Sale showing it as a trade-in, and then he signed all of the documents and the title which that turns over ownership.

So whether this customer bought the Ferrari or not, it didn't matter anymore. I was responsible for the Ferrari, and I had to pay Mr. Stephens no matter what.

Q So wasn't the trade-in -- based on what you just described, wasn't the trade-in contingent upon the sale of the Ferrari otherwise the $250,000 --

A No.

Q    Why do you say that?

A    Because I -- once he signed the Bill of Sale trading in the Ferrari for the Lambo, there was no stipulation on selling the Ferrari.  I owed him -- I owed him the money no matter what.

So when I talked to my sales guy, Jonathan, that was -- the understanding of the deal is that -- and I explained that.  I explained that to my sales guy. I'm like, "Jon, once we do the paperwork and Mr. Stephens signs this car over" --

Because we were giving him more money than I wanted to give him for the car, but we were banking on this guy buying it.  And my sales guy told me he still felt very confident he was buying the car, but I explained to my sales guy, I'm like, "Once Mr. Stephens signs that paperwork showing what I'm giving him on trade and ownership, I'm locked and loaded.  I can't -- that's what I got to give Mr. Stephens.  I'm -- now I'm stuck.  So whether the Ferrari sells or doesn't sell, I owe Mr. Stephens the money for the Ferrari."

Q    At some point did you tell Mr. Stephens to come pick up his vehicle?

MR. WINDERMAN:  Which vehicle?

MR. APPELL:  The Ferrari.

THE WITNESS:  I don't recall if I -- I think

Jonathan might have or -- I don't know if I did or Jonathan did, but that's when Moshe came and took all the cars.

Like I said, I don't remember why because I wasn't there. I don't remember where Mr. Stephens' Ferrari was and why Moshe didn't take it that night of April 1st. I don't know if it was at my service shop or -- I'm not sure where the car was at that time.

And I don't know if I did or Jonathan might have let Mr. Stephens know because then Mr. Stephens, I think, showed up that day to take the car out of there, but Mr. Farache, I think, had blocked him in or something.

BY MR. APPELL:

Q    So why would you have been telling or why would Jonathan Martin have been telling Mr. Stephens to come pick up the vehicle if it wasn't his to come pick up?

If you're saying that you owned that -- Karma owned the vehicle, why would that call be made to Mr. Stephens to come get what you termed as "his" vehicle?

A    Well, because if it was myself or Jonathan, the only reason why is because I was still liable to pay

Mr. Stephens because I hadn't paid him for the car yet.

So the only reason I can think Jonathan would have done it is to try to protect the asset because if Moshe got his hands on it, I still owe Mr. Stephens the money, and if we got the car out of there and got it away from where Farache couldn't have it, then I could still try to finish the deal and sell it and then give Mr. Stephens back the money; but if Moshe took it, there was no chance of that happening.

Q   But if Mr. Stephens didn't own the car, what would be the purpose of saying come get the vehicle?

A   Like I said, to try to protect the asset.

Q   All right.  I'm going to scroll down.  It says "Alana and they were scared so they gave him what titles I had but yours was not supposed to happen."

So it seems like you're specifically stating you gave him all of the titles but his specifically was not supposed to go to Farache.  Can you explain that statement?

A   Well, I was stating -- I wasn't there, my -- actually, my wife was there.  Mr. Farache had made my wife give all of the titles that we had at the dealership.

None of those titles were supposed to be given to Mr. Farache.  I was putting that in there for his as

well.  I mean none of them were supposed to.

There was nine titles that were taken by Mr. Farache that my wife had signed this document, but none of those titles were supposed to be given to Mr. Farache.

Q    Okay.  I'm going to show you an email.

THE COURT REPORTER:  Mr. Appell, are you marking these as exhibits?

MR. APPELL:  Yes, I'm sorry.  The first two depo notices will be Exhibit 1 and 2 and then these texts will be Exhibit 3.

(Thereupon, Derek Stephens' Exhibit 1 was marked for identification.)

(Thereupon, Derek Stephens' Exhibit 2 was marked for identification.)

(Thereupon, Derek Stephens' Exhibit 3 was marked for identification.)

BY MR. APPELL:

Q    I'm going to show you two emails here.

Okay.  Can you see my screen with this email?

MR. WINDERMAN:  Yes, we can see your screen.

THE WITNESS:  I can see, yes, sir.

BY MR. APPELL:

Q    Okay.  This is an email -- is this your wife's email address, kzankl@att.net?

A    Yes, it is.

Q    And who's Michele Martin?

A    She works for Moshe Farache.

Q    Okay.  And there's an email from your wife that says, as you can see on the screen, "Just confirming that Moshe will return the key to the black Ferrari Monday, April 4th at 9:00 a.m.  This key belongs to Excell Auto Group."  Do you see that?

A    Yes.

Q    Was an email sent to Michele and Moshe about all of the cars he took or just this specific car?

A    Well, I don't know if she's referencing Mr. Stephens' black Ferrari because Moshe also had a black Ferrari -- another black Ferrari he had as well, an 812, but I -- we were trying to get everything back.

And like I said before, I had not paid Mr. Stephens for this car yet.  He gave me the money for the Lamborghini, and I knew that I owed Mr. Stephens the money for the Ferrari.  All of the other cars that they took the titles to, I had already paid for all of those cars.  Mr. Stephens was the only car that I had not paid for that Moshe took.  Even though Mr. Stephens signed all of the paperwork and signed the title over, I had not paid him for the car.

So that is also another reason why -- because

you asked me the question of why we were trying to get the car out of there is because if I couldn't sell it to anyone that we thought we had it sold to to get Mr. Stephens the money, I got the car out of there so that I could try to get rid of it to pay for Mr. Stephens. Because I had already paid for all of the other cars, so all of the other cars Mr. Moshe took were already paid for out of those nine cars.

And I think Mr. Stephens had reached out to my wife and told her that the car was on consignment and that I -- you know, that I never owned the car. So, you know, my wife and I hadn't talked about it, and my wife doesn't really know -- she was never involved in the day-to-day operations, so she wouldn't know what it technically means you own a car or doesn't own a car.

So she doesn't understand that when the paperwork, in the state of Florida -- when it's signed and a Bill of Sale is signed and you're showing something as a tax credit and you're showing it as a deal and it's a trade, then the dealership is responsible and owns that vehicle. My wife is not aware of that. She just knows she's got a guy telling her that he had a car on consignment that my landlord took so, you know, she was trying to help get the car back.

Q    Okay.  This will be Exhibit 4.  And I'm going

to show you another email, which we'll mark as

Exhibit 5.  This, again, is from Kristen Zankl.

That's your wife's email address, correct?

A    Exactly.  Yes.

(Thereupon, Derek Stephens' Exhibit 4 was
marked for identification.)

(Thereupon, Derek Stephens' Exhibit 5 was
marked for identification.)

BY MR. APPELL:

Q    All right.  And this is to
RWhite@ci.boca-ratonfl.us.  Do you know who that is?

A    I don't know who that is.

Q    All right.  I'll represent to you that that's
Officer Randa White of the Boca Raton Police Department.
Okay?

A    Okay.

Q    All right.  And my client, Derek Stephens, is
copied on this email as well.  And this was an email
dated -- do you see there? -- June 20, 2022, correct?

A    Yes.

Q    All right.  It says -- your wife writes to
Officer White:  "I wrote that it belongs to 'Excell Auto
Group' as it really belonged to Derek Stephens."

How do you --

A    I don't know why she wrote that.

Q    I'm sorry, go ahead.

A    I don't know why she wrote that.

Q    Did you have any discussion with your wife between that April 2nd email and this June 20th email about Mr. Stephens' Ferrari?

A    Oh, yeah, numerous conversations. Mr. Stephens was texting my wife all of the time.

Q    Did you have any conversations with the Boca Police Department about the Ferrari?

A    Yes, sir, I did.

Q    Did you give any written statement to the Boca Police Department about the Ferrari?

A    I went in and they took a statement, yes.

Q    And what did you tell them about the status of the car when it was taken from Karma?

A    They didn't really ask me questions about the Ferrari, they were more concerned about the check that Mr. Stephens deposited that didn't -- that bounced.

Q    Okay.  And do you know if your wife spoke with Officer White or anyone else at the Boca Police Department?

A    I don't think my wife had any conversations with Detective White.  I could be wrong, but I don't think so.

I think Mr. Stephens had asked her to send

this email to Detective White, but I'm not sure.  That's a question you got to ask her.

Q    Okay.  So do you believe that her statement saying that the car belonged to Derek Stephens was inaccurate?

A    Like I said before, my wife was trying to do the best she could to help me because I also was sick the last two weeks of March.  And my wife wouldn't know, based on the laws and the rules in the state of Florida and Department of Motor Vehicles, who technically owns a car and who doesn't.

All she knows is there's a gentleman that's texting my wife telling her that the car's his, it's on consignment; telling her that, you know, he doesn't want to go to the police and make a police report against me; and telling her that, you know, I gave him a check that bounced, which I have numerous text messages to Mr. Stephens asking him not to deposit the check even though he deposited it after I told him not to.

So I think she was trying to just handle the situation and helping and telling whoever that this was the car.  Because at the end of the day, if the car would have went back to Mr. Stephens, we wouldn't be here today, okay.  He'd have his Ferrari back, so he would be basically made whole.

So he doesn't have his Ferrari, he doesn't have the Lambo, so he's trying to get either the car or the money. So my wife, I think, was trying to solve an issue.

Q    So she was trying to solve --

A    That's the only thing I can think of. Yeah, that's the only thing I can think of.

Q    All right. So I'll have to ask her about that, but did you know, prior to sitting here today, that that email was sent by her to the Boca Police Department?

A    I can't tell you if I did or didn't. I don't remember. I mean, there's been a lot --

When was that email dated? June?

Q    Yeah. June of 2020.

A    I don't -- I don't know. I don't remember.

Q    All right. We're going to keep going through these text messages --

We'll mark that as Exhibit 5, that prior email; and we'll go back to Exhibit 3, which is, again, a string of text messages between you and Mr. Stephens.

MR. MILLER: Wait, wait. Evan, what's Number 4 then?

MR. APPELL: Number 4 is the first Zankl email to Moshe and Martin, and Number 5 is the email to

Boca Police.

MR. MILLER: Okay. Thank you.

BY MR. APPELL:

Q All right. So here you say "I will have your $250,000 tomorrow. Text me your wire."

Again, are you giving him the $250,000 -- what's the reason you're giving him the $250,000?

**A Because he had written a check for 250 for the Lamborghini, and I still owed him the money for the Ferrari.**

MR. MILLER: Mr. Appell, can we just get one clarification? Who's present in the room with Mr. Zankl?

MR. WINDERMAN: Mrs. Zankl and me, Jim.

MR. MILLER: Okay. So, Mr. Appell, there's another witness present in the room there.

MR. APPELL: Yeah, I didn't see that on my end. She's not a party to the case, so...

MR. MILLER: She's not a party to the case. I don't think she can be present, but that's up to you, Mr. Appell.

MR. APPELL: Yeah. I mean, I'd prefer she not be sitting in the room. She's not a party, I don't know that she has a right to be in the room at the moment.

I saw Mr. Winderman.  I did not see Mrs. Zankl, so --

THE WITNESS:  Well, you're deposing her later today.  Why -- I don't -- she is a part of the case.

MR. APPELL:  No, she's a witness.

MR. MILLER:  She's a witness.

THE WITNESS:  Oh, okay.

MR. MILLER:  Witnesses can't be present when the other witness is testifying.

THE WITNESS:  Okay.

MR. APPELL:  Sorry.  Is she still in the room? I can't see on my end.

MR. WINDERMAN:  Yes.  Are you invoking the rule?

MR. APPELL:  Well, is she still in the room?

THE WITNESS:  Yes.

MR. WINDERMAN:  She's still in the room.  I'm asking you if you want her to leave.

MR. APPELL:  Yes, please.

MR. WINDERMAN:  Okay.  Then she will leave.

MR. APPELL:  Thank you.

MR. WINDERMAN:  You have her scheduled for 4 o'clock.  I doubt this deposition is going to run that long.  Do you have a better idea so she can

make arrangements for picking up their daughter or whatever else she needs to do today?

MR. APPELL:  If we can do it back to back, that's perfectly fine.  I don't know what time she has to be out.

I know that Mr. Breslin told me he's probably not going to have any questions.  I don't know if anybody else will; but if she wants to do it right after this is over, that's perfectly fine.

(Thereupon, a brief discussion was had off of the record regarding scheduling.)

BY MR. APPELL:

Q    All right.  I'm going to scroll down.  I don't know that we got an answer to the question, so let's just go back.

So you said you'll have the 250,000 for him tomorrow.  What was the purpose of that statement to Mr. Stephens?

A    Like I said before, Mr. Stephens wrote the check for the Lamborghini; I think his check was for 250.  I owed him the money for the Ferrari because we did the transaction.

It wasn't like I had a choice, so I had to pay him for the Ferrari.  Because once we executed the Bill of Sale and we showed it as a trade and he drove off

with the Lamborghini, I couldn't back out and be like "Oh, I'm not buying your Ferrari." I had to buy it, so that's the money that I owed him back. That's what I'm referencing to.

THE COURT REPORTER: One moment. I'm sorry. I have Moshe Farache in the waiting room. Is it okay to let him in?

MR. APPELL: Yes. Yes, you can let him in.

(Moshe Farache joined the Zoom meeting.)

BY MR. APPELL:

Q   Are you familiar with the consignment agreement that Mr. Stephens entered into?

A   I mean, I saw it after all of this stuff happened, yes.

Q   Okay. I'm going to pull that up, and we'll mark this as Exhibit 6.

Okay. This will be Exhibit 6, it's the consignment agreement. Have you seen this document before?

Oh, you can see my screen now, correct?

A   Yes, I can see it.

(Thereupon, Derek Stephens' Exhibit 6 was marked for identification.)

BY MR. APPELL:

Q   All right. Have you seen this document

before?

A   Yes.  I saw it, like I said, once all of this stuff started happening.  I didn't see it prior to this stuff happening with the case, no.

Q   And when you say you didn't see it prior to all of this stuff happening, what are you referring to and when are you referring to the date you first saw this on or about?

A   I didn't see this document until probably the beginning of April.

Q   Okay.  And whose signature is on the bottom there, if you know, on behalf of Karma Palm Beach?

A   I mean, it looks like it's Jonathan Martin's, but I can't tell you for sure.

Q   All right.  Because that's --

A   He's the one that filled it out.

Q   But that's not your signature?

A   No, no, no.  That's not my signature, no.

Q   Okay.  So what typically happens -- I'm not talking about this one, but with the consignment agreement, what typically happens when someone signs a consignment agreement with Karma?

Would they provide you the car, the title, the keys?  How does that whole process work?

A   So the consignment agreements, they sign this

because then it's insured.  They have to sign this agreement so if God forbid something happens, it's insured.

Yes, the cars are physically at the store.  We do not take the titles to the cars until they're sold. We don't -- I never wanted -- I would not take the titles to the consignment car because I didn't want to have the responsibility if anything ever happened, so that doesn't happen.

And the consignment agreements are generally -- there's a time frame on them.  Some people don't have a time frame on them.  Some customers like a 30-day, 60-, 90-day time frame on them, but generally the agreement is open-ended.  For example, that means the client, at any point in time, can pull his car.

I don't have a responsibility to pay for the car when it's on consignment.  And we also, as well, can call the client and tell them to come pick up the car if we're not getting any action, there's no calls coming in, the car is overpriced.  Both people have the option of canceling the consignment agreement at any point in time.

Q    Okay.  Now prior to this March 11th date on this consignment agreement, do you know if Mr. Stephens' Ferrari was with you at Karma physically?

A     I don't -- I don't know.

Q     Do you know when Mr. Stephens purchased the vehicle, the Ferrari?

A     I don't have the exact date, no, not with me. But he -- I know he bought the car from us, but I don't remember the date, no.

Because, like I said, I didn't do anything with sales.  My sales guys did all the sales.

Q     And after Mr. Stephens purchased the Ferrari, at any time was it back in the Karma showroom?

A     I think we did some service stuff to it.  That would have been Jonathan as well and my guys that handle that, but I think we might have done some stuff for him in servicing, but I don't recall -- I don't recall any other reason why it was there.

Q     Do you know if, prior to this March 11, 2022 date, if Excell/Karma -- if either entity listed Mr. Stephens' Ferrari on its website as a vehicle for sale?

A     Prior to the 11th of March I couldn't tell you 100 percent yes or no.  I don't know.

Q     All right.  If cars were listed on the Karma website as a car for sale, is that something that it would distinguish whether or not a car was either on consignment or if it was there because it was inventory

of Karma?

A    If a car was on the website marketed for sale, then it's got to be either a car that Karma owns, has the rights to, or it's on consignment.

Now a lot of -- a lot of our clients over the years -- we have a lot of winter residents, you want to call them, where they spend some time here and they travel.  So there's been circumstances over the years where the sales guys -- the customers would give my sales guys a car on consignment to bring into the store, and it would be done by text or email.

And then when the customer came into town or my guys would FedEx them or email them a consignment agreement, but there was -- there were times in the past when the cars would come in on consignment without having the form signed that particular day but had it signed shortly after the fact because either the customer was traveling or wasn't accessible, and sometimes they would email it to them or send them a consignment agreement.  Because the cars could be at their house here and they were up north and they would call my sales guy and say "Hey, I want to get rid of my car.  Go to my house and pick it up and, you know, send me the consignment form or email it to me," and they would do it.

Q    Do you know if, in this instance, if Mr. Stephens' car was on consignment prior to the execution of the actual consignment agreement?

A    That's what I said earlier.  I can't tell you 100 percent yes or no because I never -- I never got into that stuff.  I never was involved in that.

Q    Who would know that, if anyone, from Karma?

A    Jonathan.  Yeah.  The gentleman that Mr. Stephens always dealt with, which was Jonathan Martin.  He would know.

Q    So if Jonathan said that the car was on consignment prior to March 11, 2022, you wouldn't have any way to dispute or confirm that, correct?

A    The only way that you could -- that you could really confirm it is the guys in the back of my office that does the inventory, whenever a car was put on consignment -- or, for that matter, if we bought the car, it always got inspected.

That was one of my rules that the sales guys knew, that it had to go for what's called a PPI, pre-purchase inspection, to see if there's any mechanical issues with the cars or failures with the cars prior to putting it on the website so that I wasn't going to be held liable.  So there would be a receipt dated for the pre-purchase inspection of Mr. Stephens'

car, so that would be the only way to really verify whatever Jonathan Martin would say is because there would be a receipt at the service shop that would be dated.

So if it was on consignment prior to the 11th, we would have that receipt proving that. And it's dated -- there will be a date, too, when the car was listed on the website. So that would all be a way to verify what Jonathan said, whatever he says.

Q    And if a car is listed on the website, it doesn't distinguish for the potential buyer if it's on consignment or in inventory --

A    No.

Q    -- correct?

A    No.

THE COURT REPORTER:  One moment.  We have a Scott Gherman in the waiting room.

MR. APPELL:  Yeah, that's fine.

(Scott Gherman joined the Zoom meeting.)

BY MR. APPELL:

Q    All right.  If Jonathan Martin disagreed with your -- and I don't know, he's not testifying here.  I'm just asking because he signed the consignment agreement. If he had a way -- if he believed the car was on consignment after March 11, 2022, on or after, would you

have any way to dispute that?

A   Yes.

Q   How so?

A   The Purchase Agreement.  I mean, when Mr. Stephens signed the Bill of Sale and that was the risk that I was taking, and I knew there was a risk -- and I wasn't really wanting to do the transaction, but Mr. Stephens is a great customer and Jonathan raves about him and he wanted this car.  So once that Bill of Sale was executed and signed, there was no way out for me.  I had to buy the Ferrari.

And I didn't want to give Mr. Stephens how much we actually showed him on trade for the Ferrari, but my sales guy told me he's very confident that this guy is going to go through with the sale and buy the Ferrari, so I stuck my neck out and -- because, like I said, once I signed the -- once my business signed that Bill of Sale and we did the transaction, and Mr. Stephens signed over the title, there was no way for me to be, like, out.  I have to buy the car.  That's the difference.

I mean that cancels the consignment agreement because the consignment agreement -- I'm not liable to buy the car.  I don't have to buy the car.  If I sell it, great; but if I don't, I don't have to give him any

money.

Once that Bill of Sale is executed for the dollar amount that we showed on trade for the Ferrari, I was liable for that dollar amount no matter what.

Q   Do you know if the consignment agreement was executed before or after the Bill of Sale?

A   Before.  Based on the dates of the Bill of Sale -- I believe the Bill of Sale that he did the transaction was like four days after the consignment agreement, so that cancels out the consignment agreement.

Q   All right.

A   But I don't have the Bill of Sale in front of me.  I think I glanced at it the other day and the date was after the 11th of March.

Q   Okay.  And you said there was a potential buyer for the Ferrari.  Do you know who that person was?

A   No, I don't.  Jonathan was working that transaction as well.

Q   Do you know when that potential buyer was identified?

A   At the very beginning of March, like right there around the same time these dates are all in there.

I mean, Mr. Stephens -- I think Jonathan talked to Mr. Stephens about the transaction, so

that's -- that's what I said earlier is that I really didn't even want to do this transaction, but Jonathan --

You know, he's a great sales guy and he's a great boy and when I was on the phone with him, Jonathan was like "Scott, I'm very confident that this guy is going to close on Mr. Stephens' Ferrari" -- because Mr. Stephens was adamant about taking the Lamborghini. Like, he didn't want to lose the car. He didn't want anyone else to buy it. He wanted to drive it home that Friday. So I took it upon my sales guy, that he was telling me something that was accurate, that the deal was going to go through.

Q    When you say Mr. Stephens was adamant about taking the car that day, is that based on your communications with him or what Mr. Martin told you about his communications with Mr. Stephens?

A    Both.  Because if I remember correctly, I think Jonathan, my sales guy -- if I remember correctly, he called me while Mr. Stephens was actually at the dealership and I believe Mr. Martin, Jonathan, handed the phone to Mr. Stephens so that I could talk to Mr. Stephens, and we had a conversation.  And that's when I told Mr. Stephens -- I'm like, "Listen, I don't have this" --

In my mind this Ferrari, you know, isn't sold.

I said -- I explained to Mr. Stephens I'm taking a big risk by doing this paperwork because now I'm liable.  I don't have a way out.

And that's when Mr. Stephens and I said that he was going to write a check for the Lambo and that when I -- when the Ferrari closed, I would pay him for the -- back the money for the Ferrari, which was very nice of Mr. Stephens to do.

Because, once again, my sales guy was telling Mr. Stephens and telling myself that he felt very confident that this other consumer was going to end up closing on the Ferrari, but we all knew that when the paperwork was executed, I couldn't call Mr. Stephens back and say "Hey, guess what?  I'm -- I'm not writing you a check for your Ferrari" or "Hey, you know, I know I told you I'm giving you this, but the deal never happened, now I got to give you 20 grand less." Mr. Stephens would have hung up on me.

I was -- once those documents were signed, I was liable for it.  And I own the car now; I was responsible for the car.  I mean, you know, it goes on my insurance as I own the vehicle.  The DMV will -- same thing, I mean the DMV is very, very, very strict on this stuff and there's no misinterpreting it.  I mean, once the Bill of Sale is signed and the title is signed over

to the dealership -- if the car would have caught on fire or blown up, I mean my insurance company would have been like "That's your car, it's not a consignment car."

Q    Did you put the Ferrari on your insurance?

A    It's automatically -- we don't -- it's called a garage liability policy.  They have a dollar amount, so it's all of the cars that are under the facility are under that dollar amount as long as we have the documentation to show either proof of ownership, proof of purchase, or if it's consignment.

Q    Do you know whether or not Mr. Stephens maintained insurance on that vehicle on the Ferrari?

A    I don't know.  I have no idea.

Q    Would it be possible for two different people to have insurance on the same vehicle?

MR. WINDERMAN:  Form.

THE WITNESS:  Yeah, absolutely.

BY MR. APPELL:

Q    That's not something an insurance company can cross-reference and figure out if there's coverages being paid for by two separate individuals?

A    No, no.  Because in the state of Florida, for example, you know how many clients will come and they'll trade a car in or sell me a car and their assistant or whoever forgets to call the insurance company and cancel

it meanwhile someone else bought the car and insures it?
It happens every day. I mean, there's no way.

Unless it's the same insurance company, they might catch it, but I -- I don't know.

Q Okay. Back to Exhibit 6, the consignment agreement. Do you know why that was executed?

A Well, I'm assuming why it was executed was because the original intent was to have the car on consignment. Because at the time, you know, the market was so hot and the cars were selling for a lot more money than they really should have, and I think Mr. Stephens wanted to take advantage of that, like every other consumer did.

We had tons of clients calling us and wanting to help us sell their cars because the market was just crazy. But I believe that, you know, that was the original intent, and that's what Mr. Stephens wanted, but then that Lamborghini came in and Mr. Stephens saw that car and fell in love with it.

Q Do you know when the transaction for the Lamborghini took place relative to the execution of the consignment agreement?

A You have the Bill of Sale. I mean, those dates are accurate. I mean, I don't have any reason not to believe that they're accurate dates.

So, I think you just showed the consignment agreement was March 11th.  I don't have the purchase sale in front of me, but I think it was three, four days after the consignment agreement.

Q   All right.  I'm going to put up on the screen what we'll mark as Exhibit 7.

You can see my screen, I assume?

A   I can.  I just can't see the date because your guys' video is blocking it.

Q   I think you might have to move it on your side, but can you see it now?

A   No, not yet.

MR. WINDERMAN:  Hold on a minute.

THE WITNESS:  Yeah, just give me one second.

THE COURT REPORTER:  Also, there's a David Softness in the waiting room.

MR. APPELL:  That's fine.

THE COURT REPORTER:  Okay.  And for the people on the side, you can click the box and move us around.

MR. APPELL:  Yeah, you can just drag the video away because I can't control what you see on your end.

MR. WINDERMAN:  We can see it now.

THE WITNESS:  Yeah, I can see it now.

(David Softness joined the Zoom meeting.)

(Thereupon, Derek Stephens' Exhibit 7 was marked for identification.)

BY MR. APPELL:

Q    Okay.  So this is what appears to be the Bill of Sale/Purchase Agreement for the Lamborghini we've been discussing, correct?

A    Yes.

Q    All right.  And is that your dealer representative or someone else signed that?

A    **That looks like Alana Bailey.**

Q    And who's that?

A    **She's one of my office managers.**

Q    Okay.  So she was authorized to sign these types of Purchase Agreements?

A    **Yes.  Absolutely.**

Q    So at the top here, you see the date is March 11, 2022?

A    **Yes.**

Q    And that's the same date as the consignment agreement we looked at as Exhibit 6, right?

A    **Yes, it is the same date.**

**Are you sure there's not another Bill of Sale for this?  Because I thought I saw one that had a different date than March 11th.**

Q   Well, why would there be two Bills of Sale?

A   I don't know, that's why I'm asking right now if you guys -- because I could have sworn I saw a Bill of Sale that had a different date than 3/11.

Q   Well, I guess my question would be:  What would be the reason there would be two different Bills of Sale?

A   I don't know.  I wasn't at the store.  All I'm asking you, as the lawyer -- I'm saying do you have another Bill of Sale as well as this one?  That's all.

I could have sworn I saw one that had a different date than 3/11 somebody showed me recently.

Q   Well, we'll go with this one first.

A   Okay.

Q   Give me one sec, let me get that document back up.

All right.  So we're going to go with this one first, which is dated, as you said, the same day of the consignment agreement, March 11, 2022.

So now that you've seen that there is a Bill of Sale on that same date for purchase -- you're using "Bill of Sale" and "Purchase Agreement" interchangeably, correct?

A   Yeah, it's the same -- it's the same thing.  I mean --

Q   Okay.

A   -- Purchase Agreement and Bill of Sale, yeah.

Q   All right.  I just want to make sure we're talking the same language here.

So this was dated the same day, and it references a trade allowance of $230,000.

A   Correct.

Q   Is that for the Ferrari?

A   Yes.  Because if you see to the left, it gives allowed amount, and it gives the description of the Ferrari for 230.

Q   Right.  So this trade allowance appears but was not applied because a check for $250,000 was provided to you for the purchase of this car, is that accurate?

A   Correct.

Q   So the trade allowance was never applied to this transaction?

A   Correct.  Except for sales tax purposes.

Q   Okay.  So if the trade allowance was not applied, what was the status of the Ferrari once the $250,000 check for the Lamborghini was provided to Karma?

A   Wait, say that again.

Q   Once you received the $250,000 check for the

Lamborghini from Mr. Stephens -- which you've acknowledged you received, correct?

A     Yes.

Q     All right.   This trade allowance right here that says $230,000 was not applied to this transaction at that point?

A     No, it was applied.   Because if you look, you see where it says "Sales Tax, $1,279.88"?

Q     Yes.

A     It is applied.   It is applied.   Because if the Ferrari was not on this Bill of Sale, and it wasn't shown anywhere, then that sales tax would have been 7 percent of the 250,000.

Q     So did Mr. Stephens provide you a check for $250,000 and get a trade allowance of $230,000?

A     He got it because we were supposed to give him back the money.

Like I said to you before, when Jonathan was doing the transaction and Mr. Stephens was there and he wanted to do the deal, and it was on a Friday, Jonathan called me and I told Jonathan point blank "I don't -- I don't want to do this deal.   I don't want to be -- until the Ferrari's sold, I don't want to do this deal."

And that's when Jonathan said, "Look, we're going -- we'll do the purchase paperwork and we're going

to do the trade.  We're going to do all of the documents."

And that's when I talked to Mr. Stephens. Mr. Stephens was saying "Look, I'll write a check for the 250 for the car so you're not out the money and you can pay me back after the Ferrari's sold."

I said, "Okay."  But I said, "Mr. Stephens," I said, "Do you understand that I don't have an out? Like, I don't really want to give you -- if this guy doesn't buy the car, I have to give you a trade allowance of 230,000.  Your car is not worth 230,000, it's worth maybe 200 grand, but I'm locked into this number now.  Once we do the documents, there's no turning back for me."  I said, "I have to pay you for the Ferrari."

And I wasn't comfortable locking myself in and that's -- you know, Mr. Stephens was very adamant and said, "Look, I want the car today.  I'll give you 250 for the Lambo.  When the Ferrari cashes out, give me back the check; and I won't push you and I trust you, and it's not going to be an issue."

So he knew that I was locked and loaded.  And, like I said, I had no option to call Mr. Stephens.  Like if nothing would have happened and everything would have been business as usual, if I called Mr. Stephens, you

know, after the first week in April and said "Mr. Stephens, I got a problem. I don't have -- the Ferrari is not sold. I own it. I owe you 230,000 for it, but it's only worth 200, I need you to take 200, not 230," he would have been -- he would have told me to fly a kite. I was locked into the deal. I mean, there was no choice.

Q   So it sounds like what you're saying is the $230,000 trade allowance was contingent upon the sale to another different party.

A   No. No, it was not contingent. Once I signed the Bill of Sale --

Like I've said before, this Purchase Agreement doesn't make it contingent. The contingent would have been if the car remained on consignment because then I would have the option of telling Mr. Stephens "Come pick up your car" or "Mr. Stephens, the car is not sold, come get it."

There is no contingency on selling this car. I owed the 230 grand. That's why I was so adamant about not even doing this Bill of Sale, but everybody told me -- my sales guy was convincing me that he had his Ferrari sold because I did not want to give him 230,000 for his car, and Mr. Stephens knew that. I mean, that's like retail money for the car at the time.

Q    But at some point, we already talked about this, you did call Mr. Stephens and tell him to come pick up his car, though?

A    No.  I've told you I don't remember if I called him or if Johnny called him, but this is when Moshe was taking all the inventory, taking everything out of the dealership.

And, like I said earlier, I said the same thing:  I still owed Mr. Stephens for the car, and I owed him the money; so if Mr. Farache got ahold of the Ferrari, there was no way for me to get Mr. Stephens any money.

So either myself or Jonathan, I don't remember, may have called Mr. Stephens because I had nowhere to put the car, I was in bed sick.  Jonathan had nowhere to put the car.  So Jonathan, I think, or myself might have said "Let Mr. Stephens know to come grab the car so that we can later sell it to get him his money."

Because all my inventory was gone April 1st. Everything I had and I owned, Moshe took.  And Moshe even went to the service shop and took cars that weren't even mine.

Q    What was the purpose of telling him to come get the car, though, if you could have just put it somewhere else, given it to somebody else, sold it to

somebody else at that point?

Why make the call directly to Mr. Stephens and say "Come get this vehicle" if he doesn't own it anymore?

MR. WINDERMAN:  Form, asked and answered.

THE WITNESS:  Like I said, and I'll say it again, I don't know -- I don't remember if it was myself or Jonathan who called Mr. Stephens.

And I owe Mr. Stephens the money for the car; I'm not disagreeing and saying I don't.  I'm not running from that; I owe the money for the car. But at the time he had signed the Bill of Sale which made me responsible to owe the money to Mr. Stephens, so we --

Myself or Jonathan, whoever let Mr. Stephens know, was trying to protect the asset, and that asset was supposed to be converted to cash so that I could pay Mr. Stephens.

So there was no other place for me to put the car, so either myself or if Jonathan called Mr. Stephens, there wasn't anywhere else for me to put the car.

BY MR. APPELL:

Q    Do you know if Mr. Stephens' Ferrari was ever listed for sale on the Karma website?

A      I'm sure it was.  I couldn't tell you 100 percent, but I'm sure it was.

THE COURT REPORTER:  One moment.  Sorry, there's an iPhone 83 in the waiting room.

(Thereupon, a brief discussion was had off of the record, and Moshe Farache joined the Zoom meeting.)

BY MR. APPELL:

Q      All right.  We were talking about the car listed on the website, and you said you weren't sure whether or not it was actually listed for sale on the website at any time, right?

A      Yeah.  I can't tell you today 100 percent.  I had a gentleman that -- Oleg and Jordan did all of the advertising stuff for the cars and listed them on the website, so I couldn't tell you today 100 percent.

Q      Do you have any -- would you have any documents or information anywhere that lists when cars go on the website, what their status is when they go on the website, anything along those lines?

A      What do you mean by "status"?

Q      Whether they're on consignment, whether they're in inventory, whether they're trade-ins, or anything like that.

A      No.  I mean, it's -- I mean, the office had

that stuff.  The girls in the office had whether it was consignment or if it was owned inventory.

But as far as the website goes, no, there isn't anyplace on there to list it as consignment or inventory.

Q   Sure.  Right.  But I meant internally on the back end.

A   Yeah.  My girls in the office knew which cars because they had to have -- we had to have the consignment agreements in the files.

Q   Did you ever have any situations where customers, who had cars on consignment, kept the vehicles with you but they would come and use it if they were in town or if they wanted to just pop in and take a ride?

A   Yeah, I'm sure that happened.  Like I said, we had guys that, you know, would fly into town and they had multiple homes.  So if we had a car on consignment and it's their car, I mean they could do what they want with it, so we can't tell a client no.  If the guy wanted to come pick up his car Friday and drive it for the weekend, I mean, it's his car.

Q   Do you know if, prior to March 11, 2022, Mr. Stephens' Ferrari was in Karma on consignment at any time?

Page 52

A    You asked me that earlier, and I'll say the same thing again:  I'm not sure.  I don't know.

Q    Do you ever recall seeing Mr. Stephens at Karma?

A    You know, I'm seeing Mr. Stephens and I'm seeing him in his video.  I mean, I want to say that I've met him, but, I mean, Mr. Stephens may have a better recollection of if we've met or not, but I don't recall because he doesn't --

I know the name.  I mean, everyone in my store loves him and talks so highly of him, so -- but I don't recall if I've met him or haven't met him in person.

Q    Do you have any documentation showing whether or not the Ferrari was officially put into inventory or if its status was consignment?

A    No.  It was put into inventory the day -- it would have been within 24 hours, I think, after he signed all of the paperwork.  It's still in my inventory as of even today.

Q    And how do you reconcile that with the consignment agreement?

A    What do you mean?

Q    You put it into inventory with a pending, we'll call it, consignment agreement.

A    No.

Q    Did you know --

A    No.  No.  Because, see, like I said before, the Bill of Sale -- when he took delivery of the Lamborghini and did the Purchase Agreement and Bill of Sale, that canceled out the consignment agreement so the girls would put it into inventory because we're showing it as a tax credit.

So we're showing that car as a tax credit for the state of Florida, and we're only collecting a piece of the tax.  So if he wasn't trading the car in, and I didn't take ownership of it, then I would have had to collect the full 7 percent tax of the 250.

So once that paperwork was done and he executed it and signed the title, then my girls put it in inventory, and there was then "payable back to Mr. Stephens" put in the books.

Q    So for purposes of this -- I know you don't know the timing of when everything lined up, but if the consignment agreement was executed after the Bill of Sale, would that have changed the status of the vehicle internally?

A    No, because, like I said, the Bill of Sale supersedes the consignment agreement.  You can't -- you can't do that Purchase Agreement and have a consignment agreement.  You can't do it.

You can't have them both.  The DMV would cancel -- anyone in the DMV, Department of Motor Vehicles, the sales tax, the state of Florida sales tax, everything would cancel that consignment agreement.  The Bill of Sale supersedes that.

Q    Even if the consignment agreement was signed after the Bill of Sale?

A    Yeah, it doesn't matter.  Because then the state of Florida, the DMV, would say then redo the Bill of Sale and remove the Ferrari from the Bill of Sale and collect all the sales tax.

Q    If the Bill of Sale was executed -- I know you don't know the order.  I'm just trying to play it out.

A    No.

Q    Right.  The Bill of Sale was executed prior to the consignment agreement and contemplated a trade-in, and the trade-in fell through and then the consignment agreement was executed, would that change the status of the vehicle internally for you versus -- meaning inventory versus consignment?

A    No, because once again --

Listen, if Jonathan signed the paperwork and Alana signed all of the paperwork with Mr. Stephens and he did the Bill of Sale, he signed the title, he did all of that stuff, and then you're saying if he did a

consignment agreement after the fact, then Jonathan and Alana would be exposed to tax fraud because you can't --

A dealer cannot take a car on trade and save him all of that money in sales tax unless the dealer takes it in trade.

If a car is on consignment, you cannot show it as a trade because now you're -- now you're not paying the government the proper amount of tax that's due.

Q   Do you know if Mr. Stephens ever paid that sales tax amount on the Purchase Agreement/Bill of Sale that we looked at as Exhibit 7?

A   Well, he wrote a check for 250, so he didn't owe 250.  If you look at the Bill of Sale, I don't know what the exact dollar amount is, but that should have probably covered everything.

Q   All right.  So let's go back and look at the Purchase Agreement.

All right.  So we'll look at this, can you see my screen?

A   Yes, sir.

Q   What was previously marked Exhibit 7.

So there's a balance due on delivery of -- it says 134,655.13.  You never received a check from Mr. Stephens for that amount, right?

A   No.

Q    But you did receive a check for $250,000?

A    Well, we also, I believe, got money from him for 20,498.  I think he did both.

Q    Okay.  And what would have been the reason that he would have done both?

A    Because he had to pay for the sales tax and the registration and stuff for this deal.

Q    So it looks like what you're saying is if he paid you 250 plus another 20 and change, he paid for the Lamborghini in cash or via check and then paid for all of the associated charges without the application of this trade allowance?

A    No, no, no, no.  That's not what I said; you're not listening.

He wrote a check for 250 -- which you see the sales price is 250?

Q    Yeah.

A    Okay.  Then he also sent in -- I don't know if it was a wire or a check, but he sent in more money that was equivalent to the 498 dealer fee, the subtotal between the two cars -- I can't see with your arrow there, which I think is 20,000, plus the dealer fee, plus the $1,279.88, plus the 500, plus the 60 bucks, so that money he also paid.

If the Ferrari wasn't counted, like you're

trying to say, the 230, then he would have had to pay the allowance of the 20,000 plus 7 percent tax of the whole 250, not $1,279. That's all we collected from Mr. Stephens in sales tax was $1,279.88. And the only reason they collected that little amount on tax is because he got credit for the Ferrari.

If he hadn't gotten credit for the Ferrari as a trade, then he would have paid 7 percent tax of the full 250. Does that make sense?

Q    Yeah. And do you know whether or not he ever did pay the 7 percent tax on the full 250?

A    He did not. He only paid the $1,279.88.

Q    And where was that $1,279.88 reflected? In a separate payment you're talking about outside of the 250?

A    Yes.

Q    So you're saying that it was 20,498 -- $20,498 plus $1,279.88 was a separate payment?

A    And then another 500 and I believe another $60.

Q    Okay. All right. Understood. Let me see if there's anything else.

And is this the check -- on the bottom here of Exhibit 7, is this the check paid to you, paid to Karma rather, that we're talking about for $250,000?

A      I never saw the check, so -- but I -- I'm assuming that's the check.  I never physically saw it.

Q      All right.  Do you know what the notation on the reference line on the bottom left of the check is or means?  Do you have any idea?

A      I don't.  I don't know what that is.  I don't know what that means.

Q      Okay.  Did Karma deposit this check?

A      Yes.

Q      It cleared?

A      Yes.

Q      All right.  So based on the text messages -- and I'm going to pull those up again -- it seemed like you were trying to pay back the $250,000 to Mr. Stephens, right?

A      Yes.

Q      And let me pull these up.

All right.  I have the texts back up on the screen.  Do you see those?

A      Yes.

Q      Okay.  So here you say "Can I give you a check dated for tomorrow?"

And what was the purpose of postdating a check or asking if you could postdate a check to Mr. Stephens?

A      Because I didn't have the funds available for

that day to be able to do anything that day, so I asked him about a check dated tomorrow.

And then if you go down further, Mr. Stephens says date it -- I think he told me to date it a week, actually, from that day.

Q    Okay.  We might get there.  I don't know where in the chain that is, but --

A    Yeah, it's down a little bit further.  I think he also references that he was sitting at the -- in the Ferrari that day, arguing back and forth with Mr. Farache, and Mr. Stephens told me that he needed to leave with a cashier's check or a check or something. And then he said that he spoke to his lawyer and his lawyer said to leave with the check and make sure that it's dated and it's okay to be postdated.

And then he wanted to make sure that I knew that if the check wasn't good and he deposited it, that it was a criminal offense in Florida.

Q    If Mr. Stephens had been able to take the car and drive off the lot with it that day, there was no interference and he was sitting with the car today, what would be the status of that vehicle internally for purposes of Karma?

Would he owe you money?  Would you owe him money?  How would that work out?

A    The car -- the car would have to be -- the car would have to be sold through Karma and then the proceeds from the Ferrari I would return -- I would return back to Mr. Stephens.

Because the title had been signed off for Mr. Stephens to Karma. We showed it as a tax credit, which that gets submitted to the IRS for the state of Florida for tax purposes for Palm Beach County, so there was no way of undoing that part. So Mr. Stephens could not have sold that car himself, it would have had to have been sold through the Karma store.

Q    Okay. I'm going to pull up --

All right. I'm showing you now what we'll mark as Exhibit 8, which is a power of attorney, it looks like. Are you familiar with this document?

A    This particular -- I know the document. I'm not -- like I said, I wasn't there when this happened on this actual paperwork, but I'm familiar with the document, yes.

(Thereupon, Derek Stephens' Exhibit 8 was marked for identification.)

BY MR. APPELL:

Q    All right. So what is this document?

A    It's a limited power of attorney for motor vehicles. Whenever we buy or sell cars or trade-ins or

anything like that, the girls usually will have --

always is supposed to have a limited power of attorney

signed.

Q    And what is the purpose of the limited power

of attorney?

A    It allows the girls in the office -- if

there's an issue with the title, if there's a

misspelling, if there's an error in the title, it allows

our company to get everything fixed without having to

bother Mr. Stephens.

Q    So at this point, whenever this form was

executed, who owned the vehicle, the Ferrari?

A    Well, once it was signed and executed, Karma

Palm Beach owned it.

Q    So it's turning over title or it's just giving

authority to act on Mr. Stephens' behalf?

A    It's both.  Because if you look at the

document, it references Purchaser's Dealership Name,

Karma Palm Beach; Seller's Signature, Mr. Derek

Stephens.

So he's -- he's releasing ownership over to us

and this is part of the documents that we're required in

the state of Florida to have.  And it's also an odometer

disclosure statement.

Q    Is there a reason, on the top portion under

his name where he's appointing Karma Palm Beach, that there's no date there?

A    No, because there's a date down below.

Q    So what does the date down below signify?

A    Well, it looks like that's the date -- no. That's the date that somebody in my office signed it down there, so that's not the -- that's the date she signed it, Bianca Carter.  She was one of the girls that worked at the dealership.

Q    And what does that date signify, though? That's the date that this becomes effective?  That's the date that you transfer title?

What does that date mean for purposes of this document?

A    It really doesn't.  It doesn't mean anything, to be honest with you.  I mean that date is just when the girls started probably to process the paperwork.

Q    So how long --

A    And that's something down below that is signed by an employee after the fact, not at the time Mr. Stephens signed it.

Q    Is this a document that you would typically take during a consignment arrangement?

A    No, no, no, no.  You never -- no, because I don't own the vehicle.  There's no reason to have this

document.  This is only when we're buying a car from somebody or we're taking a car in trade.  It's the only way you would ever use this document.

Q    If you take a car on consignment, how does the title get transferred?  Does it go from the original owner to Karma to the new owner, or does it go from the original owner directly to the new owner?

A    No, you can't do that.  It's called jumping titles.  It's against the law.  You -- consignment --

If I buy a car and sell it on consignment, the person that owns the car signs the title over to Karma, would sign over to Karma Palm Beach; and because Karma Palm Beach is a licensed dealer in the state of Florida, then they're required to do the registration tag work and transfer title to the new owner.  It has to flow through that way.

Q    So is it possible that this document was a part of that transfer flow where it goes from Mr. Stephens to Karma to new owner?

A    Well, this gets signed -- like I said earlier, anytime we buy a car from a customer or we take a car in trade, this document would be signed and executed.

It doesn't mean that the car is sold on that spot.  This just sits in the file that allows us that when we eventually do sell it, we have documentation to

show ownership.

Q   Right.  But my question was:  Is it possible, in a consignment arrangement, that this document would be executed so that the title flows how you described, from --

A   No.  No, not at all.

Q   So what would be executed in a consignment arrangement that would transfer title from --

A   Nothing.  Not until -- the consignment agreement that you keep referring to is just an agreement authorizing the store to sell the car.

So, for example, if a guy were to consign a car and we sold it for him, then we would -- the customer then, at the time after this -- right after the sale, would come into the dealership and sign purchase documents that they're selling the car to my dealership.

And once they sign the sales agreements that they're selling the car to my dealership, they would sign this form that you're referencing here and then either we would pay their loan off or give them their equity check, but this document wouldn't be executed until we were actually buying the car, not on consignment.

Q   So do you know if this document -- so what you're saying is this document would be executed once

you know you had a consignment deal in place, or is that -- this is never getting executed once a consignment -- once there's a purchaser on a consigned vehicle?

MR. WINDERMAN:  I think he answered the question three or four times now.

MR. APPELL:  Okay.  All right.

THE WITNESS:  Let me try one last time.

BY MR. APPELL:

Q   All right.  I'll ask another question.

Other instances of consignments, did Karma ever take title documents before it paid the seller?

A   Before it paid the seller or before the car was sold?

Q   Before it paid the seller.

A   Yes.

Q   And what were those instances?

A   For example, if -- take Mr. Stephens here. Let's say Mr. Stephens didn't buy the Lamborghini and his car was strictly on consignment and we sold Mr. Stephens' Ferrari and Mr. Stephens owned the car cash -- for us, in the state of Florida, the dealership, if we give Mr. Stephens the money for the car, sign the paperwork and actually give him the money, he can no longer use that car as a trade credit against any future

purchases.  He loses the tax credits completely.

If we hold the funds in our account and he signs the purchase paperwork and signs the title over and gives us all of the proper documents, but we do not give Mr. Stephens any of his funds and we hold it with us until he finds a new car to buy, which he has 12 calendar months from that day, then we can show his car as a trade credit.

So, to answer your question, did we ever sell cars on consignment and not give the customer funds right on the spot, yes, because we would hold them for tax credits because they were going to buy another car right after.

Q   Well, it wasn't really a matter of -- that was sort of my question, but my question was really --

A   No, that was your question:  Did I ever give funds before signing the paperwork.

Q   No.  My question was:  Did you take title documents --

A   Without giving funds, and I'm explaining to you examples of why.

Q   Okay.  Do you know any specific examples of individuals who you've done that with?

A   Not off the top of my head, but it happened quite a bit over the years.  You're talking 20 years.

Q    Okay.  Anything recently in the last year that you can recall?

A    Not off -- I mean, there's been a couple guys, but not off the top of my head.  I don't want to -- I mean there's a couple of customers I can remember, yeah.

Q    All right.  But it's not an uncommon practice for you?

A    No, it's not.  In fact, it's not uncommon for any dealership in the state of Florida.

Q    I'm going to pull the text messages back up.

All right.  I'm going to scroll down.  I'll put these text messages back up, Exhibit 3, again.  And there's a line here from Mr. Stephens to you saying "I trusted you, Scott.  I did the right then for you back on 3-11, please do the right thing for me."

Do you know what he's referring to?

A    He's referring -- the only thing I can say that I think he's referring to is -- well, I don't know why he's actually saying he did the right thing -- is because when we did that Bill of Sale and stuff, he gave a check for the Lamborghini as opposed to, you know, doing the trade credit for his car because he knew, one, that I was giving him more than what the car was truly worth.  He knew that I was banking on my sales guy completing the transaction, but he also knew that I was

then liable for that transaction.  There was no way out for me.

So I don't -- you know, I don't know what he's really referencing to because, like I said, I -- I didn't want to do this transaction.  If I could go back and change it, trust me, I would.  So I don't know what -- by right thing by me, I don't know.

Q    All right.  So he then says "I had my car key. I paid the 250, sounds like the buyer of the 458 backed out and you had a float problem."

Was this a cash flow issue where you went back and said "I don't want to do the trade, I need the 250 in cash"?

A    No.  No.  This was -- this text message was the deal was already done.

So, this deal was already done so I guess this -- this is when Jonathan might have told Mr. Stephens that the guy that originally was buying the 458 backed out.  I don't know what date this is on the text; it doesn't tell me.

Q    So I'm going to scroll up and see if we can see when this starts.

Well, I can represent to you it's after April 4th because that's --

A    Yeah, yeah.  No, it's fine.  I mean, I'm just

saying that's probably when Jonathan, my sales guy, told Mr. Stephens that, you know, that the deal that he thought he had on his car was completely dead.

Q Do you know what he's referring to when he says "you had a float problem"?

A Yeah. He sent me a couple of text messages like he had -- in his businesses, you know, he ran into cash issues once in a while and things got tight, so he said he knew what I was going through.

Q So were you having cash issues at the time?

A Yes. I was having cash issues at the time and he also was -- knew that I wasn't going to -- I didn't want to pay 230,000 for his car either.

So now that that deal was dead, but I was still stuck -- I had no way out. I had to pay the amount that was on that Purchase Agreement.

Q So was it better for you then if the trade fell through and the 250 was paid in cash as opposed to applying that credit just business-wise?

A No. It didn't -- it didn't matter because it didn't matter either way. It actually made things worse because if he had never done the deal, I wouldn't be in this situation for that car, so...

Q Even with the cash flow issues?

A Yeah. And I didn't want to buy the Ferrari.

I mean, everybody -- Jonathan knew it and Mr. Stephens knew it.  I did not want to own that Ferrari for 230,000.  I mean, that's why I didn't want the deal to even happen.

And then that's when Jonathan called me from the store and explained to me that he felt very comfortable the car was going to go through, and then I got on the phone with Mr. Stephens and, you know, like I said, he wanted the car and he wanted to drive it home that Friday, and the only way I was going to let that happen is he had to -- I did not want to do the credit. He had to write the check for the Lambo.

Q     Okay.  I'm going to read a little bit more.

It says "I have been promised the 250k since 3/13 and I do have a consignment agreement dated 3/11 and as you know the website still has it for sale."

Is there any reason you didn't respond or dispute any of those comments in your next text to him?

MR. WINDERMAN:  Form.

THE WITNESS:  No, because I -- this was a guy that was very -- he was upset and I felt bad and I wasn't going to get into an argument with him in text messages.

Him and I had a conversation.  I mean, it's -- it just -- it wasn't done correctly.  If we were

truly consigning his car and it was a true, true consignment, then it just -- it wouldn't have been done that way. We would have never showed the car as a tax credit.

BY MR. APPELL:

Q   When you say "show the car as a tax credit," was that actually reported to the state?

A   Yes.

Q   Do you have documents to that effect?

A   Well, the girls submit, every month, the tax revenue. And then once you do a transfer of plate or a temp tag, it goes to the DMV and goes right to the tax agency. They have the record of the sale.

And you see on the 13th there, the March 13th?

Q   Yeah.

A   Yeah. Do you guys have a Bill of Sale with that date on it?

Q   That I don't know, but it says it's been promised since 3/13.

A   Okay. I think there is a Bill of Sale with 3/13 on it.

Q   So there would be two Bills of Sale?

A   I believe there is.

Q   And what would be the reason there would be two Bills of Sale then?

A    No idea.

Q    All right.  Let me see what I have here.

A Bill of Sale you're talking about for the Lamborghini or the Ferrari?

A    The Lamborghini.

Q    I don't believe we have a second Bill of Sale for the Lamborghini; so if there is one, I don't know that we have it.

But if there was one, what would have been the reason there would have been two Bills of Sale at that point?

MR. WINDERMAN:  Form, asked and answered.

THE WITNESS:  That would be a great question because Mr. Stephens wrote the check and bought the car on the 13th of March.  There would be no reason for my girls to backdate a Bill of Sale to March 11th, so I'm just trying to figure out --

I'm almost positive there's a Bill of Sale floating around on the 13th of March, and now this one on the 11th automatically appeared somehow.

BY MR. APPELL:

Q    Are you contending that the one on the 11th is not valid?

A    I am not saying anything.  I'm just curious, that's all.  That's why I asked you if you had it in

your possession.

Q   All right.  Other than these text messages --
I know you said you produced some text messages to your
attorney.  Is anything that we've looked at today
different than what we have here?

Do you have any additional text messages?

A   Yeah.  I mean, I provided more text messages.
I don't know if you've got them all here, but --

Q   Okay.

A   -- I provided them.  You know, I provided some
other ones that I don't -- we're not really going over
them, but I provided other ones too that I think are
pretty, you know, pertinent too that I keep relaying to
Mr. Stephens do not deposit that check and, you know, he
references --

I think if you go back up you'll see it maybe
or maybe he didn't -- I don't know -- where he's telling
me that he's -- because his lawyer is telling him to go
deposit that check because if it bounces, it's a
criminal offense.  So he references that in there and I
keep telling him don't deposit it, and then he deposits
it without telling me.

Q   Okay.  So on these text messages --

A   We don't want to talk about those text
messages, though.

Q    All right.  So on these text messages, where it says "and need to know if I need to report the car stolen since it was taken by mistake and sounds like your landlord is not giving it back," do you know why Mr. Stephens would have been the one to report the car stolen if he no longer had ownership, as you contend at that point?

A    No.  If you look at the full text message, he actually asks me if I should be reporting it stolen or does he need to report it stolen.

Q    Right.

A    So at the end of the day -- because at the end of the day I still owed him the money for the car.

Q    And did you speak with him when you said you can speak, I guess, at 11:39, 11:30?  Do you recall having a conversation with him about that?

A    I know we talked on the phone a couple of times.  I can't tell you if I actually talked to him on April 12th at that time, but I know I talked to him.

Q    Okay.  Over here on this April 12th, at 5:07 -- actually, I'll scroll down here since it's --

A    No, that one's a good text here; go over that one.

Q    All right.  So he asks "I am getting calls and seeing the news.  If you are not planning to resolve

this, just let me know."

Did you ever end up speaking with him on April 12th, on or around April 12th, about whatever issues you guys were having?

MR. WINDERMAN:  Form.

THE WITNESS:  I don't know if I talked to him on that day.  That's when he told me that he also deposited that check for 250, if you look at his text right there.

BY MR. APPELL:

Q   Right.  "Bad check was presented to the bank." So that's the check you wrote him that you informed him wasn't going to clear?

A   Yeah.  I told him on three different occasions "Don't deposit that check."

Q   Okay.

A   But he said he was being told to do it by his lawyer.

Q   Okay.  On this April 14th text from Mr. Stephens to you, it says, on number 2, "Did you report the Ferrari stolen?  Did you tell the police it was taken in error?  I hope you are helping to at least get the Ferrari back to me."

Did you have any discussion with the Boca Police on or around that date about the Ferrari?

A    No.

Q    And how come?

A    They didn't really have any questions about the Ferrari.  Like I said, they only brought me in to talk about the check that Mr. Stephens reported to the police that I gave him that bounced.

Q    All right.  What did they discuss with you about that?

A    Well, I showed them the text messages that I had told Mr. Stephens to not deposit it, and they said "Scott, we don't know why Mr. Stephens came in and filed this report because you obviously gave him notice the check was no good," so they told me go ahead and leave.

Q    Okay.  And on this text here you ask for his wire info.  Do you see that?

A    Yes.

Q    And what were you asking for his wire information for?

A    Because I had some money that was supposed to be coming in on a transaction, and I was going to take some of the money from that transaction to pay Mr. Stephens.

Q    And did that ever occur?

A    No, it didn't.

Q    Okay.  Now I'm going to scroll down here.  You

asked -- I guess he provides you with his bank information: Routing number, account number, and then you tell him "It will go out tomorrow." And that's the same wire transaction that never went forward?

A    That's correct. Yes, sir.

Q    All right. And if we keep going down, Mr. Stephens is asking you about the wire on the Ferrari, and you say "We are delayed till Monday. . . my attorney is sending you an email."

This is, again, relating to the same wire transaction?

A    Yeah. We had talked -- we had actually --

Yeah, I called him and told him that it was delayed and it was still supposed to happen, and then he called me right after -- he sent me another text which is where he said "my attorney says to go to the police and file a report and then talk about the bad check," yeah.

Q    Okay.

A    And then he said there -- go back up there. And then he had said to me that if I'm able to wire the 250, he will drop the charges and everything against me, so...

Q    Okay. But you never wired the 250, right?

A    No, I did not.

Q    When was the last communication you had with Mr. Stephens about the Ferrari or the wire transactions, if you recall?

A    It would have been -- I got to look and see what date I went in and talked to the Boca Police because when I talked to the Boca Police, they had told me I can no longer have any contact with Mr. Stephens.

Q    And why was that?

A    Because there was an investigation going on and they said "You may not have any more conversations with Mr. Stephens," so I stopped talking to him and answering anything after that.

Q    Okay. All right. I need to take a five-minute break just to use the restroom, so --

A    I do, too.

Q    All right. So do you want to plan on coming -- it's 11:39 now. Do you want to shoot for 11:50 just so you can get up for a couple of minutes?

A    Perfect.

Q    Okay.

MR. WINDERMAN:  Do you have much more?

MR. APPELL:  I'm sorry?

MR. WINDERMAN:  Do you have much more?

MR. APPELL:  I don't know. When I get back from the restroom I'm going to take a look, and

I'll let you know when I get back how much more we got going on.

MR. WINDERMAN:  Thank you.

THE WITNESS:  Thank you.

MR. APPELL:  Okay.  Thanks.

(Thereupon, a short break was taken from 11:39 a.m. to 11:50 a.m.)

BY MR. APPELL:

Q    All right.  I just have a couple more kind of follow-up questions to what we've already discussed.

The email that we looked at earlier from your wife to the Boca Police Department, you did not tell her what to communicate to them as it relates to the Ferrari you said, correct?

A    No.  It was -- no.  We were actually -- we actually went and talked to the police as well, but, no, I didn't -- I didn't direct her on the particular Ferrari.

Like I said, she was communicating with Mr. Stephens herself and Mr. Stephens was, like I said, texting my wife a lot, you know, trying to see if she could help him either get the money or the car back to pay him the money.

And like I had said before, you know, his car that he traded in, to me, was amongst those nine cars

that my wife signed an agreement over -- I want to say April 2nd maybe it was -- to Moshe, my landlord at the time and an investor, that he was going to hold titles to these cars as additional collateral, but my wife really was put into a corner to do that and -- but those cars were never supposed to be transferred to Auto Wholesale.  They were just to be held as collateral, and it says it on the form that my wife actually signed.

And there was nine cars because Auto Wholesale never paid any consideration for any of those nine vehicles.  And Mr. Stephens, when he traded the Ferrari, that car got caught up in those nine cars.  And, like I said, he was supposed to take the cars and the titles, hold them as collateral, not take them as ownership, which they did.  They converted the cars actually into their name, which I don't know how they did that to this day, but it was done.

Q    And when you said your wife was going to help him get the car back to help him get paid for it, how would that have helped him get paid for it if the car was retrieved and then somehow returned to him as opposed to Karma?

A    Because Mr. Stephens had told my wife that he would not pursue legal lawsuit, criminal or anything against me, if my wife could help either get the money

to him or get the Ferrari back for him; that he would take the Ferrari as payment as well.

Q   At that time who had legal title to the Ferrari?

A   Karma Palm Beach.

MR. WINDERMAN:  Form.

THE WITNESS:  Oh, sorry.  Karma Palm Beach.

BY MR. APPELL:

Q   And you have that title document?

A   I don't anymore; Moshe took it.  So...

Q   Okay.

A   But at that time -- well, no, as of April 2nd the title -- the title is in Karma's -- would have been in Karma's until April 2nd, I think.  I think Moshe took it on the 2nd.

Q   Okay.  How many other people claim, if you know, that they weren't paid under a consignment agreement with Karma?

A   I don't have the exact number in front of me, but I'd say that it's probably three or four guys.

Q   And are those situations similar to this in terms of the layout of the transaction, or are they all different?

A   Well, no.  I mean, they're all different, but they all bought cars -- either bought cars or they

traded me their cars, and they all got caught up in the stuff when Moshe took all of the inventory.

Q   Did you call any of the other individuals --

You talked about nine cars that Moshe took. Did you call --

A   Those are all Karma Palm Beach cars.  Those were not -- none of those cars were owned by anybody else but Karma Palm Beach.

Q   Okay.  Other than Mr. Stephens, did you call any of the people who used to own those cars and tell them to try to come get them or that you'd pay them back?

A   No, because I had paid for all of those cars, so Mr. Stephens' car was the only one that I still owed money on.  Even though it was transferred into Karma Palm Beach's name, I still owed him money for the car, so that's why we reached out to him.

The other eight vehicles that Moshe took and we gave -- my wife gave that document as additional collateral -- not ownership, collateral, we had already paid for those cars.  They were not owned by anybody else.  Karma Palm Beach already paid for them.  There was no reason to contact anybody else.

Q   Okay.  If you were giving the trade-in credit to Mr. Stephens for the Ferrari -- I just want to tie up

this issue -- why were you requiring him to then issue you a check for $250,000 for the Lamborghini at that time?

A     That was actually Mr. Stephens' idea because I didn't -- like I said, I didn't want to do this transaction, and Jonathan and Mr. Stephens called me to push me to do the deal.

And, like I said, you know, anyone that knows me for the last 20 years in business knows that I always try to do what's best for the customers, even when it's not best for me, and my sales guy was adamant about doing this deal with Mr. Stephens.

Like I said, Mr. Stephens is a great customer. My whole staff loves him.  And he was there at the dealership, and it was a Friday afternoon, and he was adamant he wanted the car.  And Mr. Stephens is the one that offered and said "Look, I'll write a check for the 250 for the Lambo, and when everything's finalized, you write me a check back on the Ferrari."

I was okay with that, but I wanted Jonathan to be very clear -- and I actually told Jonathan I wanted to do two different Bill of Sales:  One reflecting the 230, and one reflecting 200 because if God forbid I got stuck having to buy his Ferrari, I wanted to own it for 200, not 230, but Jonathan wouldn't -- he said, "That

won't fly.  And I'm not going to even offer that because I think I've got it sold, and I'm very confident this guy is going to buy the car anyways."  So I told Jonathan go ahead.

Q    Okay.  And you weren't with Jonathan and Mr. Stephens when any of the Bills of Sale or consignment agreements were executed?

A    No, I was not.

Q    And did you ever have any discussion with Jonathan Martin or Mr. Stephens about the consignment agreement on or around March 11, 2022?

A    No.  The only thing I -- the only thing that I remember -- not with Mr. Stephens.  I talked to Mr. Stephens the first time was that day he was at the store to buy the Lamborghini.

Jonathan had told me that Mr. Stephens is bringing the car -- wants us to sell the car for him, and I think that was at the beginning of March, if I remember correctly, but I don't know what time or what day it actually transpired where the Ferrari came in and we started trying to sell it for him.  I just know that on the 12th or the 13th of March is when he was there to buy the Lamborghini.  That I do know because I got on the phone and spoke to Mr. Stephens while he was on the showroom floor.

Q    You spoke with him in person in the showroom?

A    Not in person, no.  I was on the phone.

Q    Okay.  Do you remember the details of that discussion?

A    Yeah.  I just told you all about it.

Q    Okay.  Anything else?

A    I told him I didn't want to do the transaction, and that's when Mr. Stephens offered to write a check for the 250 to put my mind at ease.

MR. APPELL:  All right.  I have no further questions.  I appreciate the time.

I don't know if any of the other attorneys on here have any questions for you.

MR. MILLER:  Yeah, I have a few quick ones. Real fast, let me look through my notes.

THE WITNESS:  I don't know who's talking.  Can they tell me who's talking?

MR. MILLER:  Yes, James Miller.  When you see the yellow box when it lights up, it shows who's talking.  I'm the attorney for Auto Wholesale of Boca, which you're aware of obviously, but let me ask you a couple of questions.

CROSS-EXAMINATION

BY MR. MILLER:

Q    Mr. Zankl, you said that the car, the

Ferrari -- earlier testimony that the car itself wasn't worth the 230, meaning you didn't want to be committed to that, but rather you wanted to be committed to what you felt it was worth was 200; is that right?

A    That's what I had told my sales guy and, like I said, he felt confident that the buyer that he had in place was going to buy the car, and he didn't think that Mr. Stephens would do that transaction like that.

Q    Okay.  And this automobile -- Mr. Stephens brought it or had it delivered to your facility -- correct? -- for sale?

A    I don't know how it got there.  I don't remember -- I wasn't --

I don't know if Mr. Stephens dropped it off, if he had it delivered.  I don't know.

Q    Okay.  And Mr. Stephens had given you a power of attorney, I think you said, correct?

A    It's always done at the time -- whenever we do a buy-sale agreement --

If we're buying a car, selling a car, taking a trade, they're always -- that power of attorney is always done, yes.

Q    Okay.  And I think you were testifying earlier, you believe there was actually two Bills of Sales -- there's a subsequent Bill of Sale, which no

one's been able to show you on this Zoom deposition yet, but you believe there's one actually dated March 13th -- is that right? -- of 2022?

A    I think it was -- like I said, it was either the 12th or the 13th, but I know that it exists because I saw it and that's why --

I've never seen the one that he presented today that's dated the 11th because it doesn't make sense to me that that Bill of Sale would be dated the 11th when he didn't do the transaction and buy the Lambo until the 12th or 13th.

There's -- there's zero reason for Alana to do a Bill of Sale and backdate it two days.  It doesn't make sense to me.

Q    And what was -- what role did Alana Bailey play at Karma Palm Beach?

A    She did all of the paperwork:  The tag and title work and contracts with the customers.

Q    And was she authorized to sign Bills of Sale and purchase orders for the company?

A    Yes.

Q    She was authorized to endorse titles?

A    She was authorized to endorse titles, but she had -- not by her making her own decision to do titles, no.  She'd have to have permission from either myself or

Teddi if she's signing over a title to anybody.

Q   And just for the record, Teddi is Teddi Sofoul; is that right?

A   Yes.

Q   And would you, for the record, spell her first and last name.

A   First name T-E-D-D-I; and last name Sofoul, S-O-F-O-U-L.

Q   Okay.  And as I understand your testimony today, you testified that Mr. Stephens originally decided to bring his Ferrari in as a consigned on the deal, and then subsequent to that he issued a Bill of Sale and you were going to purchase the vehicle from him; is that correct?

A   Well, it's not like a separate agreement, so when -- when he executed that Bill of Sale by the Lamborghini and we showed the Ferrari as a trade, right then and there, when that was executed and one of my employees signed it, the company Karma Palm Beach is then liable for the Ferrari.

Q   And it became the title --

A   It became the ownership of Karma Palm Beach, yes.

Q   Okay.  So that's your understanding then, that in fact --

A     That's not my understanding, that's the Florida -- that's the DMV.  I mean, that's just how it is.

Q     Okay.

A     I mean, there's no other way to look at it.

Q     Mr. Zankl, I'm asking:  Is it your understanding in your business, though, that Karma Palm Beach then became the owner of the vehicle; is that right?

A     Yes.

Q     Okay.  And let me see if I can share my screen.

MR. MILLER:  Am I allowed to share my screen, Madam Reporter?

THE COURT REPORTER:  Yes.  It should be available for everybody.

BY MR. MILLER:

Q     Okay.  Tell me if you can see this, Mr. Zankl.  Can you see what's on my screen?

A     No, sir, I don't.  There's -- oh, okay.  Now I do, yes.

Q     Okay.  It's a Certificate of Title for this -- the Ferrari at issue in this matter.  Do you agree?

A     Yes, it is.  Yeah.

Q     And as a matter of fact this document appears

to be dated March 11th of '22; is that correct?

A   It says it on there, yes.

Q   And the endorsement is -- it says by power of attorney, POA, correct?

A   Yes.

Q   And the person that is signing or endorsing this under the power of attorney is, in fact -- is that Alana Bailey?

A   Yes.  It says her name right there, yep.

Q   So she was authorized to endorse this title for -- under that power of attorney, correct?

A   Oh, yeah.  Like I said earlier, she was allowed, but, like I said, anything title-related, you know, showing --

This she didn't need anyone's permission because all it was was acknowledging that Karma was taking that car in on a trade, so she wouldn't need anybody; but if we were transferring that title to somebody else after this, then it would have to be approved by myself or Teddi.

Q   Okay.  And --

A   But she had authority to do that, yes.

Q   Okay.  And, Mr. Zankl, this is the -- this is the front of the original title of this vehicle that's at issue that was -- the original registered owner was

Derek Clayton Stephens; is that correct?

A    Yes.

Q    Okay.  And then the endorsement's under power of attorney by your employee, Alana Bailey, on March 11th of '22, correct?

A    Yes.

Q    And it's endorsed to whom?  To Karma Palm Beach?

A    Yes.

Q    Okay.  And let's go to the next page.  And this is also an endorsement -- correct? -- on that title?

A    Yes.  That's -- yes, that is.  That's Alana's name and signature.

Q    Okay.  So Alana endorsed this title from Karma Palm Beach to Auto Wholesale of Boca, LLC on April 2nd of '22, correct?

A    No, I don't know that for sure.  All I know is that she signed the back of that title.

From what my understanding was, that those nine titles that my wife gave to your client --

Q    Mr. Zankl, I'd like you to answer my question.

A    I'm answering it.  I don't know.  I mean, anyone can fill out that information on the top of that title, but that is Alana's signature.  And I know that

she was supposed to sign it and leave it -- sign the title off, but I don't -- I can't sit here and tell you that she actually filled out that information, no.

Q   Okay.  And -- but you would agree with me that Alana's signature is in black ink and the handwritten information from Karma Palm Beach to Auto Wholesale of Boca is in black ink as well?

A   Yeah, but that doesn't mean anything.

Q   I don't need you to be argumentative, I'm just asking you to answer the question.

A   Yeah.  That's true, yeah.

Q   Okay.  So at least according to this title, it shows that it was endorsed to Auto Wholesale of Boca on April 2, 2022.

I know you disagree with whether or not your employee filled this information out, but she certainly signed this page, correct?

A   She signed the back of it, yes.

Q   Okay.  So as far as you're concerned -- as far as Karma Palm Beach is concerned, on at least that date -- on at least that date, if, in fact, this is a valid endorsement, then Auto Wholesale of Boca became the owner of this vehicle; is that correct?

A   No.  No.  Because Auto Wholesale never paid consideration for the car, so how could it be the owner?

It's got to pay consideration.  It's got to pay for the car.

Q   All right.  Hold on.  Hold on.  You want to be argumentative.  You're trying to be defensive.  I'm asking you a series of questions.  We're not going to get into all of the money that you diverted from the companies, we're just going to get into this question here.  Okay?

A   I'm answering the question.

Q   All right.  Well, no, you're volunteering and argumentative -- arguing.

So, here's my question:  In order to be the record title owner of something, you have to have the automobile.  You had to have the title endorsed to you to make you the record title owner -- correct? -- in your business?

A   You have to have it endorsed over, correct. You have to have the proper documentation to go along with it.  You've got -- the DMV requires you to have a Bill of Sale and other documents.  Yeah, there's just not the title, no.

Q   Okay.  Okay.  That's fair enough.

So I'm going to keep my screen open, and I'm going to show you another document.

Do you see my screen?  It's got a yellow form

on it.

A    Yes.

Q    Okay.  And this is a Karma Palm Beach form; is that right?

A    Yes.

Q    And this shows that the automobile that's at issue in this dispute, the 2013 Ferrari, 458 Italia, as being -- as there's a Bill of Sale being issued to -- it's being issued by Karma Palm Beach to Auto Wholesale of Boca on April 2nd of 2022.  Is that what this document shows?

I'm not asking you if you agree or disagree, I'm just asking you is that what that document shows?

MR. WINDERMAN:  Form.

THE WITNESS:  I can see where Michele Martin dated it 4/2, but I don't see Alana dating anything there, so I don't know what date that this was actually done.  But I do see Michele signing it, I don't see my employee putting a date there, which there normally would have to be a date there because the DMV would require that.

BY MR. MILLER:

Q    Okay.  But you see that's Alana Bailey's signature again, isn't that?

A    It does look like her signature, yes.

Q Okay. And you just assume that the date 4/2/22 was Michele Martin's handwritten -- handwriting; is that right?

A Well, you're correct. I didn't see Michele sign this. I didn't see that. I just see the date next to her signature, so...

Q Okay. And Ms. Bailey signed both on the right-hand side of this document and the left-hand side of this document; is that correct?

A That is correct, yes.

Q Okay. So it was your understanding, though, that as far as the Derek Stephens' automobile is concerned, that Mr. Stephens relinquished his ownership interest in that vehicle when he executed a Bill of Sale to Karma Palm Beach; is that right?

MR. APPELL: Object to form.

MR. MILLER: You get a standing objection to form in any deposition, Mr. Winderman. You don't need to make the objection.

MR. WINDERMAN: That wasn't me, but thank you for the criticism.

MR. MILLER: I apologize, Mr. Winderman. I don't know who made the objection then.

MR. WINDERMAN: Don't apologize. I'm sure there will be plenty of things that I do wrong that

you don't have to chastise me about.

MR. MILLER:  All right.

BY MR. MILLER:

Q    I'm sorry, Mr. Zankl, can you answer the question?

A    I'm sorry, Mr. Miller, can you say it again?

MR. MILLER:  I'll let the stenographer read it back, you know.

THE COURT REPORTER:  Okay.  The question is: "Okay.  So it was your understanding, though, that as far as the Derek Stephens' automobile is concerned, that Mr. Stephens relinquished his ownership interest in that vehicle when he executed a Bill of Sale to Karma Palm Beach; is that right?"

THE WITNESS:  It's not my -- it's not whether it's my opinion or not, that's just it's a fact.  I mean, that's what the documents state and that's how we were guided by the DMV, so...

BY MR. MILLER:

Q    So that's your understanding, though, that --

A    Yes.  Correct.

Q    -- when the Bill of Sale was endorsed by Mr. Stephens, the car became the ownership interest of Karma Palm Beach; is that right?

A    Correct.

Q    And then you just -- Karma Palm Beach then owed money to Mr. Stephens for the car?

A    Correct.

Q    Okay.  Let me just double-check, I might be done, Mr. Zankl.  I'm sorry to be so quick with you.  I know you wanted to stay all day, but I'll try to finish this more rapidly.

MR. WINDERMAN:  We object to your form, Jim.

MR. MILLER:  You got it, Harry.

BY MR. MILLER:

Q    And at some point in time Karma of Palm Beach, Karma and Kristen Zankl and Scott Zankl signed an Unconditional Guarantee in favor of Auto Wholesale; is that correct?

MR. WINDERMAN:  Can you show us a document?

MR. MILLER:  Well, I just want to ask him a question first.

MR. WINDERMAN:  Okay.

THE WITNESS:  What are you referencing?  I mean, what are you referring -- I'm sorry.  The loan agreement -- you mean the loan agreement that I had with AWB?

BY MR. MILLER:

Q    Yeah.  I'm asking you if there was --

A    Yeah, I -- yes, but that was -- yes, you're

correct, my wife and I did sign a loan agreement --

Q    Okay.  Let me -- let me --

A    -- which was a guarantor, that's correct, for Excell, yes.

Q    Okay.  And it was also a guarantee -- and I'll put it up on the screen here.  It was a guarantee of November 11, 2021, correct?  Do you see the date?

You're frozen.  He's frozen.

A    I'm reading it because I don't remember -- I don't remember any of the stuff being included in the Karma Palm Beach and Karma -- with Auto Wholesale.  It was always Excell.  That's why I'm just reading the document.

Q    Okay.  Let me know -- I'll take you to the bottom.  You can look at the signatures, is that fair enough?

A    Yeah.

Q    Those are your initials and your wife's initials on the first page, the bottom?

A    Keep going down.  They don't look like either one of our initials, no.

Q    Are these your initials on the second page?

A    No.  No, definitely not.

Q    Are these your initials on the third page?

A    No.

Q    Are these your initials on the fourth page?

A    No.

Q    Are these your signatures, you and your wife, on the last page?

A    The signature -- that is my signature, yes. That's not my wife's signature, no. Definitely not my wife's signature, but that is my signature.

Q    Well, do you know who would have signed for your wife? Would you have done that?

A    No, not in this document. I don't -- I mean the girls in the office sign stuff for my wife sometimes; but, no, I can't -- I can't sign her name that well or that neatly.

Q    Okay. So you say the girls in your office would sign her name sometimes. Is that because they were authorized to sign her name?

A    No. I -- no. No. I just -- I know that sometimes in documents and stuff like that, just to speed up processes, the girls would sign my wife's name without checking with her.

Q    Okay. Well, I would think, you can correct me if I'm wrong --

Well, how long have you been married to your wife?

A    20 years.

Q   Okay.  And you would recognize this if you think -- if this was your wife's signature, correct?

A   Yeah, it's definitely not her signature.  That 100 percent is not her signature.

Q   Well, you signed this document, you said, correct?

A   I did, yeah.  Yeah, I did, yeah.  That's my signature, but those initials aren't mine, so those -- that's not how I do my initials, but that is my signature, yes.

Q   Okay.  And in regards to this document, you -- did anybody witness you sign this document?

A   No, not that I remember.  I don't -- no, I don't think so.  I don't remember.

There would be a witness, I think, signature, but no, I don't -- I don't recall that, no.

MR. MILLER:  All right.  Madam Court Reporter, I'm going to --

THE WITNESS:  What was the date on that, sir?

I'm sorry, do you mind?  I apologize.

BY MR. MILLER:

Q   Do you see it right there, November 11th?

A   No, the signature date.  Was it the same, November 11th?

Q   That's what it says.

A     Okay.

MR. MILLER:  Okay.  So I'm going to identify and mark as exhibits the title as --

What number did you leave off, Evan?

MR. APPELL:  I got up to 8.

THE COURT REPORTER:  Yes.

MR. MILLER:  So would I be starting at 8 or 9?

MR. APPELL:  You would be starting at 9.

THE COURT REPORTER:  9.

MR. MILLER:  Okay.  So my title is going to be, two pages, going to be Exhibit Number 9.

Exhibit Number 10 will be the Bill of Sale.

And Exhibit 11 will be the Unconditional Guarantee.

And since I don't have Evan's documents that he used for today for the examination, I don't know if I have any other questions on those documents because I couldn't read them; he was moving pretty quickly through them.  And just one final --

Yeah, I do have one more for you, Mr. Zankl.

(Thereupon, Debtor's Exhibit 9 was marked for identification.)

(Thereupon, Debtor's Exhibit 10 was marked for identification.)

(Thereupon, Debtor's Exhibit 11 was marked for

identification.)

BY MR. MILLER:

Q    In fact, Karma Palm Beach never paid Mr. Stephens for the car that it acquired from Mr. Stephens; is that correct?

A    Can you -- what do you mean?  The Ferrari?

Q    Is that the car you acquired from Mr. Stephens?

A    That he -- I didn't acquire it; he traded it in.

Q    Okay.  Let's try again.

Did Karma Palm Beach pay Mr. Stephens for the Ferrari?

A    No, sir.  No, I did not.  Karma Palm Beach did not.

Q    Did Karma of Broward pay Mr. Stephens for the Ferrari?

A    No.

Q    Did you or your wife pay Mr. Stephens for the Ferrari?

A    No.

Q    Did any entity affiliated or associated with you pay Mr. Stephens for the Ferrari?

A    No.

Q    Did any entity affiliated or associated with

your spouse, Kristen Zankl, pay Mr. Stephens for the Ferrari?

A    No.

MR. MILLER:  Okay.  I'll reserve on questions.
Mr. Breslin, if you would like, the floor is open.

MR. BRESLIN:  Yes, I have a couple very brief questions.  Thank you.

CROSS-EXAMINATION

BY MR. BRESLIN:

Q    Mr. Zankl, I'm going to share my screen with you.  You indicated that you believed that there was another Purchase Agreement regarding this car that was a couple of days after March 11, 2022.  Do you recall your testimony?

A    Yes.

Q    Okay.  I'm sharing my screen right now and this is what's been marked as FVP Stephens Bates 1013, which purports to be a Purchase Agreement for this same vehicle between Karma Palm Beach and a Mr. Charles Coulter.  Do you see that on your screen?

A    Yes.

Q    Okay.  And I'm going to scroll up, and this appears to be the deal jacket that was recovered in this case regarding this vehicle.

Does that appear -- do you recognize that?

A    Yeah.  That's one of our deal jackets, yes.

Q    Okay.  So when I scroll down to this next page, we have a date of 3/14/22, and another Purchase Agreement that's made out three days later.  Do you see this document?

A    Yes.  That was -- that -- Mr. Coulter is the guy that my sales guy, Jonathan, you know, thought that he had the car sold to.

Q    Right.  And there's actually an entire deal jacket on this -- this transaction; I'm scrolling through it.  Do you recall that?

A    I never saw the documents until after all of this happened, but Jonathan was keeping me informed so I -- that's correct.

Q    All right.  My question to you is:  You said that you recall seeing two different Purchase Agreements.  Could you -- the second Purchase Agreement that you were referring to, could it be this document that I'm showing you on the screen?

A    No.  There was another Purchase Agreement -- I'll have to find it in my emails, but there's another Purchase Agreement for Mr. Stephens that's on the Lamborghini that he bought.  There's another date on that that's not the 11th.  I want to say it's either the 12th or the 13th.

Q    Okay.  And that would be --

A    The day he came in and gave the check for the Lamborghini, I'm not sure exactly what date that was, that's the date that he signed the Bill of Sale that my girls would have filed with the state of Florida.

They wouldn't -- they wouldn't date it a day or two earlier.  So, I don't know.  Whatever date he gave me that check is the date that there is another Bill of Sale.

MR. BRESLIN:  Okay.  All right.  Thank you. That's all I have for today.  Thank you.

MR. MILLER:  I do have just one last follow-up, if I may.  I'm sorry, Mr. Zankl, I don't mean to tie you up.

CROSS-EXAMINATION (cont.)

BY MR. MILLER:

Q    Do you know -- in the beginning of your testimony, you said that there had been several transactions before with Mr. Derek Stephens and your company; is that right?

A    Yeah.  I believe -- I mean, Jonathan, I believe, had sold Mr. Stephens other cars.  I could be wrong, but I mean the way that Jonathan and my staff would talk about it, I want to say that I think he's bought other cars from us; but I can't tell you

100 percent, but I believe he did.

Q    Okay.  And to the best of your recollection, do you recall which company Mr. Stephens had purchased these other cars through or sold other cars through with you?

Was it Karma Palm Beach, Karma Broward, Excell, something else?

A    Well, if it was prior to 2021, then it would have been Excell.  Because after 2021 Excell didn't sell any cars retail or buy any cars retail after the first quarter of '21, they were all Karma Palm Beach or Broward.

Q    Okay.  And then in regards to Mr. Stephens, do you know whether or not Mr. Stephens is affiliated with any entities that are in the auto sales industry?

Does he buy cars and flip them?  Does he have a sales license?  Do you know of any of that?

A    No, I don't.

MR. MILLER:  Okay.  I have nothing further.

MR. APPELL:  Okay.  I have nothing further.  I don't know that there's any other attorneys on the line that --

David, anything on your end?

MR. SOFTNESS:  No.  Thank you.

MR. APPELL:  Okay.  All right.  So --

MR. MILLER:  Hold on.  I think you have to ask Mr. Winderman if he wants to cross-examine his own client.

MR. WINDERMAN:  Not today, Jim, but some day, but I do look forward to taking your clients' deposition.

MR. MILLER:  I look forward to being there.

MR. WINDERMAN:  How long a period of time do you need in between this deposition and Mrs. Zankl?

MR. APPELL:  Five minutes is fine, unless you want a couple of more, but we can just -- it won't be as long, at least on my end, so we can probably knock it out pretty quickly.

MR. WINDERMAN:  Okay.  It is 12:22.  Do you want to start back up at 12:30?

MR. APPELL:  Perfect.  All right.

Mr. Zankl, thank you.  You have the right to read or waive.  Mr. Winderman can talk to you about that.

MR. WINDERMAN:  Yeah.  We'll let you know.

MR. MILLER:  On the exhibit exchange, Mr. Appell, are you going to forward copies of your exhibits to myself, Mr. Breslin, Mr. Softness, and Mr. Winderman?

MR. APPELL:  Yeah.  I'm going to email

everybody, including the court reporter.  I have them all marked as Exhibits 1 through 8.  And then I guess if you want to, maybe it would be easier for the court reporter if you respond to my email.

MR. MILLER:  Yeah.  And then I'll attach my exhibits and send them out to everybody.

MR. APPELL:  Yeah.

(Whereupon, the deposition was concluded at 12:23 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA     )

COUNTY OF ST. LUCIE )

I, ANGELA CONNOLLY, Registered Professional Reporter, Certified Realtime Reporter, Florida Professional Reporter, Notary Public, State of Florida, certify that SCOTT ZANKL remotely appeared before me via Zoom and was duly sworn on the 14th day of November, 2022.

Signed this 20th day of November, 2022.

_Angela Connolly_
_____
Angela Connolly, RPR, CRR, FPR-C
Notary Public, State of Florida

ANGELA CONNOLLY
MY COMMISSION # HH 126112
EXPIRES: August 21, 2025
Bonded Thru Notary Public Underwriters

Personally known     _____
Produced identification  FL DL

PLEASANTON & MARSAA COURT REPORTING
561.963.9700

CERTIFICATE OF REPORTER

STATE OF FLORIDA      )

COUNTY OF ST. LUCIE )

I, ANGELA CONNOLLY, Registered Professional Reporter, Certified Realtime Reporter, Florida Professional Reporter, certify that I was authorized to and did stenographically report the deposition of SCOTT ZANKL; that a review of the transcript was requested; and that the foregoing transcript, Pages 1 through 108, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

The certification does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the reporter.

DATED this 20th day of November, 2022.

*Angela Connolly*
_____
Angela Connolly, RPR, CRR, FPR-C

Harry Winderman, Esq.
WEISS, HANDLER & CORNWELL
2255 Glades Road
Suite 205E
Boca Raton, Florida 33431


DATE:   November 21, 2022



In re: Auto Wholesale of Boca, LLC


Dear Mr. Winderman:

This letter is to inform you that the deposition taken on November 14, 2022 in the above-captioned matter has been completed and is ready for SCOTT ZANKL to read and sign.

The transcript is being held in my office.  Please make arrangements with my office so he can read and sign his deposition.

Thank you for your prompt attention to this matter.



Cordially yours,

*Angela Connolly*

Angela Connolly, RPR, CRR, FPR-C


cc: Evan D. Appell, Esq.
    C. Cory Mauro, Esq.
    James Miller, Esq.
    Jerrell Breslin, Esq.
    David Softness, Esq.
    Scott Gherman, Esq.

ERRATA SHEET

IN RE: AUTO WHOLESALE OF BOCA, LLC
Case No. 9:22-BK-15627
Taken: November 14, 2022

DO NOT WRITE ON TRANSCRIPT - - ENTER CHANGES HERE:

Page: _____        Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____        Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____        Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____        Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____        Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

        Under penalties of perjury, I declare that I
have read my foregoing transcript and, together with any
changes made above, the facts stated herein are true.


_____        _____
SCOTT ZANKL                                    Date

PLEASANTON & MARSAA COURT REPORTING
561.963.9700

Index: $1,279..action

**Exhibits**

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 1** 18:10,12

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 2** 18:14

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 3** 18:11,16 24:20 67:12

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 4** 20:25 21:5

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 5** 21:2,7 24:19

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 6** 28:16,17,22 40:5 42:21

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 7** 41:6 42:2 55:11, 21 57:24

**11-14-22 Scott Zankl - Derek Stephens' Exhibit 8** 60:14,20

**11-14-22 Scott Zankl - Debtor's Exhibit 9** 101:11,21

**11-14-22 Scott Zankl - Debtor's Exhibit 10** 101:12,23

**11-14-22 Scott Zankl - Debtor's Exhibit 11** 101:13,25

**$**

**$1,279** 57:3

**$1,279.88** 45:8 56:23 57:4, 12,13,18

**$20,498** 57:18

**$230,000** 44:6 45:5,15 47:9

**$250,000** 14:24 25:5,6,7 44:13,22,25 45:15 56:1 57:25 58:14 83:2

**$60** 57:20

**1**

**1** 8:21 18:10,12 108:2

**10** 101:12,23

**100** 31:21 33:5 50:2,13,16 100:4 106:1

**1013** 103:17

**11** 31:16 33:12 34:25 42:18 43:19 51:23 84:11 98:7 101:13,25 103:13

**11:30** 74:15

**11:39** 74:15 78:17 79:7

**11:50** 78:18 79:7

**11th** 30:23 31:20 34:5 36:15 41:2 42:25 72:17, 20,22 87:8,10 90:1 91:5 100:22,24 104:24

**12** 66:6

**12:22** 107:14

**12:23** 108:9

**12:30** 107:15

**12th** 74:19,20 75:3 84:22 87:5,11 104:25

**134,655.13** 55:23

**13th** 71:14 72:15,19 84:22 87:2,5,11 104:25

**14th** 75:19

**1st** 12:21,22,23 16:7 48:19

**2**

**2** 18:10,14 75:20 92:14

**20** 21:19 38:17 56:9 66:25 83:9 99:25

**20,000** 56:22 57:2

**20,498** 56:3 57:17

**200** 46:12 47:4 83:23,25 86:4

**2013** 8:21 94:7

**2020** 24:15

**2021** 98:7 106:8,9

**2022** 11:15 21:19 31:16 33:12 34:25 42:18 43:19 51:23 84:11 87:3 92:14 94:10 103:13

**20th** 22:4

**21** 106:11

**22** 90:1 91:5,17

**230** 44:11 47:5,20 57:1 83:23,25 86:2

**230,000** 46:11 47:3,23 69:13 70:3

**24** 52:17

**250** 25:8 27:21 46:5,18 53:12 55:12,13 56:9,15,16 57:3,9,11,15 68:9,12 69:18 75:8 77:22,24 83:18 85:9

**250,000** 27:16 45:13

**250k** 70:14

**2nd** 22:4 80:2 81:12,14,15 91:16 94:10

**3**

**3** 18:11,16 24:20 67:12

**3-11** 67:15

**3/11** 43:4,12 70:16

**3/13** 70:15 71:19,21

**3/14/22** 104:3

**30-day** 30:13

**4**

**4** 20:25 21:5 24:23,24 26:24

**4/2** 94:16

**4/2/22** 95:2

**458** 8:22 68:9,19 94:7

**498** 56:20

**4th** 11:14 19:7 68:24

**5**

**5** 21:2,7 24:19,25

**500** 56:23 57:19

**5:07** 74:21

**6**

**6** 28:16,17,22 40:5 42:21

**60** 56:23

**60-** 30:13

**7**

**7** 41:6 42:2 45:13 53:12 55:11,21 57:2,8,11,24

**8**

**8** 60:14,20 101:5,7 108:2

**812** 19:15

**83** 50:4

**9**

**9** 101:7,8,9,11,21

**90-day** 30:13

**9:00** 19:7

**A**

**a.m.** 19:7 79:7

**absolutely** 39:17 42:16

**accessible** 32:18

**account** 66:2 77:2

**accurate** 37:11 40:24,25 44:15

**acknowledged** 45:2

**acknowledging** 90:16

**acquire** 102:9

**acquired** 102:4,7

**act** 61:16

**action** 30:19

actual 33:3 60:18

adamant 37:7,13 46:17 47:20 83:11,16

additional 73:6 80:4 82:19

address 18:25 21:3

advantage 40:12

advertising 50:15

affiliated 102:22,25 106:14

afternoon 83:15

agency 71:13

agree 89:23 92:4 94:12

agreement 28:12,18 29:21,22 30:2,14,21,24 32:14,20 33:3 34:23 35:4, 22,23 36:5,10,11 40:6,22 41:2,4 42:6,21 43:19,22 44:2 47:13 52:21,24 53:4, 5,19,23,24,25 54:4,6,16, 18 55:1,17 64:10,11 69:16 70:15 80:1 81:18 84:11 86:19 88:15 97:21 98:1 103:12,18 104:4,17,20,22

Agreement/bill 55:10

agreements 8:5 29:25 30:10 42:15 51:10 64:17 84:7 104:17

ahead 22:1 76:13 84:4

ahold 48:10

Alana 17:14 42:11 54:23 55:2 87:12,15 90:8 91:4, 15 94:16,23

Alana's 91:13,25 92:5

allowance 44:6,12,17,20 45:4,15 46:11 47:9 56:12 57:2

allowed 44:10 89:13 90:13

amount 36:3,4 39:6,8 44:10 55:8,10,14,24 57:5 69:16

answering 78:12 91:23 93:9

anymore 14:19 49:4 81:10

anyone's 90:15

anyplace 51:4

anytime 63:21

apologize 95:22,24 100:20

appeared 72:20

appearing 6:17

appears 42:5 44:12 89:25 103:23

Appell 6:8,11 7:21,22 8:1, 2,9 15:24 16:15 18:7,9,18, 23 21:9 24:24 25:3,11,15, 17,21,22 26:6,12,16,20,22 27:3,12 28:8,10,24 34:18, 20 39:18 41:17,21 42:4 49:23 50:8 60:22 65:7,9 71:5 72:21 75:10 78:22,24 79:5,8 81:8 85:10 95:16 101:5,8 106:20,25 107:10, 16,22,25 108:7

application 56:11

applied 13:13 44:13,17,21 45:5,7,10

applying 69:19

appointing 62:1

approved 90:20

approximately 9:17

April 11:14 12:21,22,23 16:7 19:7 22:4 29:10 47:1 48:19 68:24 74:19,20 75:3,19 80:2 81:12,14 91:16 92:14 94:10

arguing 59:10 93:11

argument 70:22

argumentative 92:9 93:4, 11

arrangement 62:23 64:3,8

arrangements 27:1

arrow 56:21

asks 74:9,24

asset 17:3,12 49:16,17

assistant 39:24

assume 11:14 12:2 41:7 95:1

assuming 40:7 58:2

attach 108:5

attorney 7:16 60:14,24 61:2,5 73:4 77:9,16 85:20 86:17,21 90:4,7,11 91:4

attorneys 85:12 106:21

authority 61:16 90:22

authorized 42:14 87:19, 22,23 90:10 99:16

authorizing 64:11

auto 19:8 21:22 80:6,9 85:20 91:16 92:6,13,22,24 94:9 97:13 98:11 106:15

automatically 39:5 72:20

automobile 86:9 93:14 94:6 95:12 96:11

aware 20:21 85:21

AWB 97:22

B

back 17:8 19:15 20:24 23:23,24 24:20 27:3,15 28:1,3 31:10 33:15 38:7, 14 40:5 43:15 45:17 46:6, 14,20 51:7 53:15 55:16 58:14,18 59:10 60:4 67:10,12,14 68:5,11 73:16 74:4 75:23 77:20 78:24 79:1,22 80:19 81:1 82:12 83:19 91:19 92:18 96:8 107:15

backdate 72:16 87:13

backed 68:9,19

bad 70:21 75:11 77:17

Bailey 42:11 87:15 90:8 91:4 95:7

Bailey's 94:23

balance 55:22

bank 75:11 77:1

banking 15:12 67:24

bankruptcy 8:17,18

based 14:22 23:9 36:7 37:14 58:12

basically 23:25

Bates 103:17

Beach 6:18 10:24 29:12 60:8 61:14,19 62:1 63:12, 13 81:5,7 82:6,8,22 87:16 88:19,22 89:8 91:8,16 92:6,20 94:3,9 95:15 96:14,24 97:1,11 98:11 102:3,12,14 103:19 106:6, 11

Beach's 82:16

bear 11:9

bed 13:22 48:15

beginning 29:10 36:22 84:18 105:17

behalf 7:6 29:12 61:16

believed 34:24 103:11

belonged 13:3 21:23 23:4

belongs 19:7 21:22

Bianca 62:8

big 38:1

Bill 14:9,15 15:2 20:18 27:24 35:5,9,18 36:2,6,7, 8,13 38:25 40:23 42:5,23 43:3,10,20,22 44:2 45:11 47:12,21 49:12 53:3,4,19, 22 54:5,7,9,10,12,15,24 55:13 67:20 71:16,20 72:3,6,16,18 83:22 86:25 87:9,13 88:12,16 93:20 94:8 95:14 96:14,22 101:12 105:4,9

Bills 43:1,6 71:22,25 72:10 84:6 86:24 87:19

bit 59:8 66:25 70:13

black 19:6,13,14 92:5,7

blank 45:21

blocked 16:14

blocking 41:9

blown 39:2

Boca 21:14 22:8,11,20 24:10 25:1 75:24 78:5,6 79:12 85:21 91:16 92:7, 13,22 94:10

books 53:16

**bother** 61:10

**bottom** 29:11 57:23 58:4 98:15,19

**bought** 14:18 31:5 33:17 40:1 72:14 81:25 104:23 105:25

**bounced** 22:18 23:17 76:6

**bounces** 73:19

**box** 41:19 85:19

**boy** 37:4

**break** 7:20 78:14 79:6

**Breslin** 27:6 103:5,6,9 105:10 107:23

**bring** 32:10 88:11

**bringing** 84:17

**brought** 76:4 86:10

**Broward** 102:16 106:6,12

**bucks** 56:23

**bunch** 10:8

**business** 9:15,17 35:17 46:25 83:9 89:7 93:16

**business-wise** 69:19

**businesses** 69:7

**buy** 28:2 35:11,15,20,24 37:9 46:10 60:25 63:10,21 65:19 66:6,12 69:25 83:24 84:3,15,23 86:7 87:10 106:10,16

**buy-sale** 86:19

**buyer** 34:11 36:17,20 68:9 86:6

**buying** 11:1 14:12 15:13, 14 28:2 63:1 64:22 68:18 86:20

---

**C**

---

**C** 8:8

**calendar** 66:7

**call** 16:21 30:18 32:7,22 38:13 39:25 46:23 48:2 49:2 52:24 82:3,5,9

**called** 14:1 33:20 37:19

39:5 45:21 46:25 48:5,14 49:8,20 63:8 70:5 77:13, 15 83:6

**calling** 40:14

**calls** 30:19 74:24

**cancel** 39:25 54:2,4

**canceled** 53:5

**canceling** 30:21

**cancels** 35:22 36:10

**car** 11:25 12:19,22 13:2,3, 9 15:10,12,14 16:8,13 17:1,5,10 19:11,17,21,24 20:2,4,10,11,15,23,24 22:15 23:4,11,22 24:2 29:23 30:7,15,17,18,20 31:5,23,24 32:2,3,10,23 33:2,11,16,18 34:1,7,10, 24 35:9,20,24 37:8,14 38:20,21 39:1,3,24 40:1,8, 19 44:14 46:5,10,11,18 47:15,17,19,24,25 48:3,9, 15,16,18,24 49:9,11,20,22 50:9 51:18,19,21,22 53:8, 10 55:3,6 59:19,21 60:1, 10 63:1,2,4,10,11,21,23 64:11,13,16,18,22 65:13, 20,21,23,25 66:6,7,12 67:22,23 68:8 69:3,13,23 70:7,9 71:1,3,6 72:15 74:2,5,13 79:22,24 80:12, 19,20 82:14,16 83:16 84:3,17 85:25 86:1,7,20 90:17 92:25 93:2 96:23 97:2 102:4,7 103:12 104:8

**car's** 23:13

**cars** 11:1 12:10,16,17,21, 24 16:3 19:11,19,21 20:7, 8 30:4,5 31:22 32:15,20 33:22,23 39:7 40:10,15 48:21 50:15,18 51:8,12 56:21 60:25 66:10 79:25 80:4,6,9,12,13,15 81:25 82:1,4,6,7,10,13,21 105:22,25 106:4,10,16

**Carter** 62:8

**case** 25:18,19 26:5 29:4 103:24

**cash** 49:17 56:10 65:22 68:11,13 69:8,10,11,18,24

**cashes** 46:19

**cashier's** 59:12

**catch** 40:4

**caught** 39:1 80:12 82:1

**cell** 7:8

**Certificate** 89:22

**chain** 59:7

**chance** 17:9

**change** 54:18 56:9 68:6

**changed** 53:20

**charges** 56:11 77:22

**Charles** 103:19

**chastise** 96:1

**check** 14:3 22:17 23:16,18 25:8 27:20 38:5,15 44:13, 22,25 45:14 46:4,20 55:12,23 56:1,10,15,19 57:23,24 58:1,2,4,8,21,23, 24 59:2,12,14,17 64:21 67:21 70:12 72:14 73:14, 19 75:8,11,12,15 76:5,13 77:17 83:2,17,19 85:9 105:2,8

**checking** 99:20

**choice** 27:23 47:7

**circumstances** 32:8

**claim** 81:16

**clarification** 25:12

**Clayton** 91:1

**clear** 75:13 83:21

**cleared** 58:10

**click** 41:19

**client** 21:17 30:15,18 51:20 91:21 107:3

**clients** 32:5 39:23 40:14

**clients'** 107:5

**close** 37:6

**closed** 38:6

**closing** 38:12

**collateral** 80:4,7,14 82:20

**collect** 53:12 54:11

**collected** 57:3,5

**collecting** 53:9

**comfortable** 46:16 70:7

**comments** 70:18

**committed** 86:2,3

**communicate** 79:13

**communicating** 79:19

**communication** 78:1

**communications** 37:15,16

**companies** 93:7

**company** 39:2,19,25 40:3 61:9 87:20 88:19 105:20 106:3

**completely** 13:22 66:1 69:3

**completing** 67:25

**concerned** 22:17 92:19,20 95:13 96:12

**concluded** 108:8

**confident** 15:14 35:14 37:5 38:11 84:2 86:6

**confirm** 33:13,15

**confirming** 19:6

**consideration** 80:10 92:25 93:1

**consign** 64:12

**consigned** 65:3 88:11

**consigning** 71:1

**consignment** 20:10,23 23:14 28:11,18 29:20,22, 25 30:7,10,17,21,24 31:25 32:4,10,13,15,20,24 33:2, 3,12,17 34:5,12,23,25 35:22,23 36:5,9,10 39:3, 10 40:5,9,22 41:1,4 42:20 43:19 47:15 50:22 51:2,4, 10,12,18,24 52:15,21,24 53:5,19,23,24 54:4,6,16, 17,20 55:1,6 62:23 63:4,9, 10 64:3,7,9,23 65:1,3,20 66:10 70:15 71:2 81:17 84:7,10

Index: consignments..double-check

consignments 65:11

consumer 38:11 40:13

cont 105:15

contact 11:5 78:7 82:23

contemplated 54:16

contend 74:6

contending 72:22

contingency 47:19

contingent 14:23 47:9,11, 14

contracts 87:18

control 41:22

conversation 10:8 11:17 37:22 70:24 74:16

conversations 22:6,8,22 78:10

converted 49:17 80:15

convincing 47:22

copied 21:18

copies 107:22

corner 80:5

corporate 6:17

correct 9:8,11 11:15,22 13:19 21:3,19 28:20 33:13 34:14 42:7 43:23 44:7,16, 19 45:2 77:5 79:14 86:11, 17 88:14 90:1,4,11 91:1,5, 11,17 92:17,23 93:15,17 95:4,9,10 96:21,25 97:3, 14 98:1,3,7 99:21 100:2,6 102:5 104:14

correctly 37:17,18 70:25 84:19

Cory 8:8

Coulter 103:20 104:6

counted 56:25

County 60:8

couple 6:16 9:19 11:8 12:20 67:3,5 69:6 74:17 78:18 79:9 85:22 103:6,13 107:11

court 18:7 28:5 34:16

41:15,18 50:3 89:15 96:9 100:17 101:6,9 108:1,4

coverages 39:20

covered 55:15

crazy 40:16

credit 13:13 14:15 20:19 53:7,8 57:6,7 60:6 65:25 66:8 67:22 69:19 70:11 71:4,6 82:24

credits 66:1,12

criminal 59:18 73:20 80:24

criticism 95:21

CROSS-EXAMINATION 85:23 103:8 105:15

cross-examine 107:2

cross-reference 39:20

curious 72:24

customer 14:18 32:12,18 35:8 63:21 64:14 66:10 83:13

customers 30:12 32:9 51:12 67:5 83:10 87:18

D

date 29:7 30:23 31:4,6,17 34:7 36:14 41:8 42:17,20, 22,25 43:4,12,21 59:4 62:2,3,4,5,6,7,10,11,12, 13,16 68:19 71:17 75:25 78:5 92:21 94:17,19,20 95:1,5 98:7 100:19,23 104:3,23 105:3,4,6,7,8

dated 11:14 13:10 21:19 24:14 33:25 34:4,7 43:18 44:5 58:22 59:2,15 70:15 87:2,8,9 90:1 94:16

dates 36:7,23 40:24,25

dating 94:16

daughter 27:1

david 41:15 42:1 106:23

day 12:20 13:25 16:12 23:22 32:16 36:14 37:14 40:2 43:18 44:5 52:16 59:1,5,10,20 66:7 74:12,

13 75:7 80:17 84:14,20 97:6 105:2,6 107:4

day-to-day 20:14

days 12:20 36:9 41:3 87:13 103:13 104:4

dead 13:23 69:3,14

deal 13:19,20,23 15:7 17:7 20:20 37:11 38:16 45:20, 22,23 47:6 56:7 65:1 68:15,16 69:2,14,22 70:3 83:7,12 88:12 103:23 104:1,9

dealer 42:9 55:3,4 56:20, 22 63:13

dealership 12:25 13:9,11 17:23 20:20 37:20 39:1 48:7 61:18 62:9 64:15,16, 18 65:22 67:9 83:15

dealt 10:12,16,17 11:2 33:9

Debtor's 101:21,23,25

decided 88:11

decision 87:24

defensive 93:4

delayed 77:8,14

delivered 86:10,15

delivery 53:3 55:22

Department 21:14 22:9, 12,21 23:10 24:11 54:2 79:12

depending 11:3

depends 10:25

depo 18:10

deposing 26:3

deposit 23:18 58:8 73:14, 19,21 75:15 76:10

deposited 22:18 23:19 59:17 75:8

deposition 6:23 7:3 8:20, 23 9:6 26:24 87:1 95:18 107:6,9 108:8

deposits 73:21

Derek 6:12 18:12,14,16

21:5,7,17,23 23:4 28:22 42:2 60:20 61:19 91:1 95:12 96:11 105:19

description 44:10

details 85:3

Detective 22:23 23:1

difference 35:21

direct 6:7 79:17

directly 49:2 63:7

disagree 92:15 94:12

disagreed 34:21

disagreeing 49:10

disclosure 61:24

discuss 76:7

discussed 79:10

discussing 42:7

discussion 22:3 27:10 50:5 75:24 84:9 85:4

dispute 33:13 35:1 70:18 94:7

distinguish 31:24 34:11

diverted 93:6

DMV 38:22,23 54:1,2,9 71:12 89:2 93:19 94:21 96:18

document 6:20 18:3 28:18,25 29:9 43:15 60:15,16,19,23 61:18 62:14,22 63:1,3,17,22 64:3,21,24,25 81:9 82:19 89:25 93:24 94:11,13 95:8,9 97:15 98:13 99:10 100:5,11,12 104:5,18

documentation 8:6 39:9 52:13 63:25 93:18

documents 6:16 7:2,5 8:3, 11,12 9:6,22 10:3 14:16 38:19 46:2,13 50:18 61:22 64:16 65:12 66:4,19 71:9 93:20 96:17 99:18 101:15, 17 104:12

dollar 36:3,4 39:6,8 55:14

double-check 97:4

doubt 26:24

drag 41:21

drive 13:25 37:9 51:21
59:20 70:9

drop 77:22

dropped 86:14

drove 27:25

due 55:8,22

duly 6:4

**E**

earlier 33:4 37:1 48:8 52:1
63:20 79:11 86:1,24 90:12
105:7

ease 85:9

easier 108:3

effect 71:9

effective 62:11

email 18:6,20,24,25 19:4,
10 21:1,3,18 22:4 23:1
24:10,14,20,24,25 32:11,
13,19,24 77:9 79:11
107:25 108:4

emails 18:19 104:21

employee 62:20 91:4
92:16 94:19

employees 88:19

end 14:12 23:22 25:18
26:13 38:11 41:23 51:7
74:12 75:2 106:23 107:12

endorse 87:22,23 90:10

endorsed 91:7,15 92:13
93:14,17 96:22

endorsement 90:3 91:11
92:22

endorsement's 91:3

endorsing 90:6

entered 28:12

entire 104:9

entities 106:15

entity 7:7 31:17 102:22,25

equity 64:21

equivalent 56:20

error 61:8 75:22

errors 12:5

Evan 6:11 7:19 24:22
101:4

Evan's 101:15

eventually 63:25

everything's 83:18

exact 9:20 31:4 55:14
81:19

examination 6:7 101:16

examined 6:5

examples 66:21,22

Excell 8:17 19:8 21:22
98:4,12 106:7,9

Excell/karma 31:17

exchange 107:21

executed 27:24 35:10
36:2,6 38:13 40:6,7 53:14,
19 54:12,15,18 61:12,13
63:22 64:4,7,21,25 65:2
84:7 88:16,18 95:14 96:13

execution 33:3 40:21

exhibit 18:10,11,12,14,16
20:25 21:2,5,7 24:19,20
28:16,17,22 40:5 41:6
42:2,21 55:11,21 57:24
60:14,20 67:12 101:11,12,
13,21,23,25 107:21

exhibits 18:8 101:3 107:23
108:2,6

exists 87:5

explain 17:18

explained 15:8,15 38:1
70:6

explaining 66:20

exposed 55:2

**F**

facility 39:7 86:10

fact 32:17 55:1 62:20 67:8

88:25 89:25 90:7 92:21
96:16 102:3

failures 33:22

fair 93:22 98:15

familiar 9:10 10:6,9 12:5
28:11 60:15,18

Farache 12:10,17 16:13
17:6,18,21,25 18:3,5 19:3
28:6,9 48:10 50:6 59:11

fast 85:15

favor 97:13

Fedex 32:13

fee 56:20,22

fell 40:19 54:17 69:18

felt 15:14 38:10 70:6,21
86:4,6

Ferrari 8:22,23 12:13
13:16,18,20 14:4,10,12,
14,18,20,24 15:3,4,19,20,
24 16:6 19:7,13,14,19
22:5,9,12,17 23:24 24:1
25:10 27:21,24 28:2 30:25
31:3,9,18 35:11,13,16
36:3,17 37:6,25 38:6,7,12,
15 39:4,12 44:8,11,21
45:11 46:15,19 47:3,23
48:11 49:24 51:24 52:14
54:10 56:25 57:6,7 59:10
60:3 61:12 65:21 69:25
70:2 72:4 75:21,23,25
76:4 77:8 78:2 79:13,18
80:11 81:1,2,4 82:25
83:19,24 84:20 86:1
88:11,17,20 89:23 94:7
102:6,13,17,20,23 103:2

Ferrari's 45:23 46:6

figure 39:20 72:17

file 63:24 77:17

filed 76:11 105:5

files 51:10

fill 91:24

filled 29:16 92:3,16

final 101:19

finalized 83:18

find 104:21

finds 66:6

fine 27:4,9 34:18 41:17
68:25 107:10

finish 17:7 97:6

fire 39:2

five-minute 78:14

fixed 61:9

flip 106:16

float 68:10 69:5

floating 72:19

floor 84:25 103:5

Florida 13:8 20:17 23:9
39:22 53:9 54:3,9 59:18
60:8 61:23 63:13 65:22
67:9 89:2 105:5

flow 63:15,18 68:11 69:24

flows 64:4

fly 47:5 51:17 84:1

follow-up 79:10 105:13

forbid 30:2 83:23

forgets 39:25

form 32:16,24 39:16 49:5
61:11 64:19 70:19 72:12
75:5 80:8 81:6 93:25 94:3,
14 95:16,18 97:8

forward 77:4 107:5,7,22

forwarded 7:19

fourth 99:1

frame 30:11,12,13

fraud 55:2

Friday 37:10 45:20 51:21
70:10 83:15

front 36:13 41:3 81:19
90:24

frozen 98:8

full 53:12 57:9,11 74:8

funds 58:25 66:2,5,10,17,
20

future 65:25

FVP 103:17

**G**

garage 39:6

gave 17:14,17 19:17 23:16 67:20 76:6,12 82:19 91:21 105:2,8

generally 30:11,13

gentleman 23:12 33:8 50:14

Gherman 34:17,19

girls 11:2 51:1,8 53:6,14 61:1,6 62:8,17 71:10 72:16 99:11,14,19 105:5

give 14:13 15:12,18 17:7, 22 22:11 32:9 35:12,25 38:17 41:14 43:15 45:16 46:9,10,18,19 47:23 58:21 64:20 65:23,24 66:5,10,16

giving 15:11,16 25:6,7 38:16 61:15 66:20 67:23 74:4 82:24

glanced 36:14

God 30:2 83:23

good 6:9,10,14,15 59:17 74:22 76:13

government 55:8

grab 48:17

grand 38:17 46:12 47:20

great 35:8,25 37:3,4 72:13 83:13

Group 19:8

Group' 21:23

guarantee 97:13 98:5,6 101:14

guarantor 98:3

guess 38:14 43:5 68:16 74:15 77:1 108:3

guided 96:18

guy 13:16,21 14:1,8,12 15:6,8,13,15 20:22 32:22 35:14,15 37:3,5,10,18 38:9 46:9 47:22 51:20 64:12 67:24 68:18 69:1 70:20 83:11 84:3 86:5

104:7

guys 10:13,17 31:8,12 32:9,10,13 33:15,19 43:3 51:17 67:3 71:16 75:4 81:20

guys' 41:9

**H**

handed 37:20

handle 23:20 31:12

handled 11:4,6

hands 12:24 17:4

handwriting 95:2

handwritten 92:5 95:2

happen 13:22 17:15 30:9 70:4,11 77:14

happened 12:19 13:15 28:14 30:8 38:17 46:24 51:16 60:17 66:24 104:13

happening 17:9 29:3,4,6

Harry 97:9

head 66:24 67:4

held 33:24 80:7

helped 10:21 80:20

helping 23:21 75:22

Hey 32:22 38:14,15

highly 52:11

hold 41:13 66:2,5,11 80:3, 14 93:3 107:1

home 37:9 70:9

homes 51:18

honest 62:16

hope 75:22

hot 40:10

hours 52:17

house 32:21,23

hung 38:18

**I**

idea 26:25 39:13 58:5 72:1

83:4

identification 18:13,15,17 21:6,8 28:23 42:3 60:21 101:22,24 102:1

identified 8:25 36:21

identify 101:2

inaccurate 23:5

included 98:10

including 108:1

individual 9:5 13:17

individuals 39:21 66:23 82:3

industry 106:15

info 76:15

information 50:18 76:18 77:2 91:24 92:3,6,16

informed 75:12 104:13

initials 98:18,19,21,22,24 99:1 100:8,9

ink 92:5,7

inspected 33:18

inspection 33:21,25

instance 33:1

instances 65:11,17

insurance 38:22 39:2,4, 12,15,19,25 40:3

insured 30:1,3

insures 40:1

intent 40:8,17

interchangeably 43:22

interest 95:14 96:13,23

interference 59:21

internally 51:6 53:21 54:19 59:22

inventory 31:25 33:16 34:12 48:6,19 50:23 51:2, 5 52:14,16,18,23 53:6,15 54:20 82:2

investigation 78:9

investor 80:3

invoking 26:14

involved 20:13 33:6

iphone 50:4

IRS 60:7

issue 11:3 24:4 46:21 61:7 68:11 83:1 89:23 90:25 94:7

issued 10:4 88:12 94:8,9

issues 33:22 69:8,10,11, 24 75:4

Italia 94:7

**J**

jacket 103:23 104:10

jackets 104:1

James 85:18

Jim 25:14 97:8 107:4

Johnny 11:1 48:5

joined 8:8 28:9 34:19 42:1 50:6

Jon 15:9

Jonathan 10:18 11:4 13:15,25 15:6 16:1,2,10, 17,24 17:2 29:13 31:12 33:8,9,11 34:2,9,21 35:8 36:18,24 37:2,4,18,20 45:18,20,21,24 48:13,15, 16 49:8,15,20 54:22 55:1 68:17 69:1 70:1,5 83:6,20, 21,25 84:4,5,10,16 104:7, 13 105:21,23

Jordan 50:14

jumping 63:8

June 21:19 22:4 24:14,15

**K**

Karma 6:18 7:7 10:23 16:20 22:15 29:12,22 30:25 31:10,22 32:1,3 33:7 44:23 49:25 51:24 52:4 57:24 58:8 59:23 60:2,6,11 61:13,19 62:1 63:6,11,12,19 65:11 80:22 81:5,7,18 82:6,8,15,22

87:16 88:19,22 89:7 90:16 91:7,15 92:6,20 94:3,9 95:15 96:14,24 97:1,11,12 98:11 102:3,12,14,16 103:19 106:6,11

**Karma's** 81:13,14

**keeping** 104:13

**key** 19:6,7 68:8

**keys** 29:24

**kind** 79:9

**kite** 47:6

**knew** 19:18 33:20 35:6 38:12 46:22 47:24 51:8 59:16 67:22,24,25 69:9,12 70:1,2

**knock** 107:13

**Kristen** 21:2 97:12 103:1

**kzankl@att.net** 18:25

---

**L**

**Lambo** 14:3 15:3 24:2 38:5 46:19 70:12 83:18 87:10

**Lamborghini** 13:7,12,13, 18,24 14:6,10 19:18 25:9 27:20 28:1 37:7 40:18,21 42:6 44:22 45:1 53:4 56:10 65:19 67:21 72:4,5, 7 83:2 84:15,23 88:17 104:23 105:3

**landlord** 12:9 20:23 74:4 80:2

**language** 44:4

**law** 63:9

**laws** 23:9

**lawsuit** 80:24

**lawyer** 43:9 59:13,14 73:18 75:18

**layout** 81:22

**leave** 26:19,21 59:12,14 76:13 92:1 101:4

**left** 11:22 44:9 58:4

**left-hand** 95:8

**legal** 80:24 81:3

**liability** 39:6

**liable** 16:25 33:24 35:23 36:4 38:2,20 68:1 88:20

**license** 106:17

**licensed** 63:13

**lights** 85:19

**limited** 60:24 61:2,4

**lined** 53:18

**lines** 50:20

**list** 51:4

**listed** 31:17,22 34:8,10 49:25 50:10,11,15

**Listen** 37:23 54:22

**listening** 56:14

**lists** 50:18

**LLC** 91:16

**loaded** 15:17 46:22

**loan** 64:20 97:21 98:1

**locked** 15:17 46:12,22 47:6

**locking** 46:16

**long** 26:25 39:8 62:18 99:23 107:8,12

**longer** 65:25 74:6 78:7

**looked** 42:21 55:11 73:4 79:11

**lose** 37:8

**loses** 66:1

**lot** 24:13 32:5,6 40:10 59:20 79:21

**love** 40:19

**loves** 52:11 83:14

---

**M**

**Madam** 89:14 100:17

**made** 16:21 17:21 23:25 49:13 69:21 95:23 104:4

**maintained** 39:12

**make** 23:15 27:1 44:3 47:14 49:2 57:9 59:14,16 87:8,14 93:15 95:19

**making** 87:24

**managers** 42:13

**March** 23:8 30:23 31:16,20 33:12 34:25 36:15,22 41:2 42:18,25 43:19 51:23 71:14 72:15,17,19 84:11, 18,22 87:2 90:1 91:5 103:13

**mark** 21:1 24:19 28:16 41:6 60:14 101:3

**marked** 18:13,15,17 21:6, 8 28:23 42:3 55:21 60:21 101:21,23,25 103:17 108:2

**market** 40:9,15

**marketed** 32:2

**marking** 18:8

**married** 99:23

**Martin** 10:18 16:17 19:2 24:25 33:10 34:2,21 37:15,20 84:10 94:15

**Martin's** 29:13 95:2

**matter** 14:11,13,19,20 15:5 33:17 36:4 54:8 66:14 69:20,21 89:23,25

**Mauro** 7:15 8:8

**meaning** 54:19 86:2

**means** 20:15 30:14 58:5,7

**meant** 12:2 51:6

**mechanical** 33:22

**meeting** 8:8 28:9 34:19 42:1 50:7

**message** 11:13 68:14 74:8

**messages** 7:8 9:24 10:2, 10,13 11:9 23:17 24:18,21 58:12 67:10,12 69:6 70:23 73:2,3,6,7,23,25 74:1 76:9

**met** 9:12 52:7,8,12

**Michele** 19:2,10 94:15,18 95:2,4

**Miller** 24:22 25:2,11,15,19

26:7,9 85:14,18,24 89:13, 17 94:22 95:17,22 96:2,3, 6,7,19 97:9,10,16,23 100:17,21 101:2,7,10 102:2 103:4 105:12,16 106:19 107:1,7,21 108:5

**mind** 37:25 85:9 100:20

**mine** 48:22 100:8

**minute** 41:13

**minutes** 78:18 107:10

**misinterpreting** 38:24

**misspelling** 61:8

**mistake** 12:1,14 74:3

**moment** 25:25 28:5 34:16 50:3

**Monday** 19:7 77:8

**money** 14:14 15:5,11,20 17:5,8 19:17,19 20:4 24:3 25:9 27:21 28:3 36:1 38:7 40:11 45:17 46:5 47:25 48:10,12,18 49:9,11,13 55:4 56:2,19,24 59:24,25 65:23,24 74:13 76:19,21 79:22,23 80:25 82:15,16 93:6 97:2

**month** 71:10

**months** 66:7

**morning** 6:9,10 7:14

**moshe** 16:2,6 17:4,8 19:3, 6,10,13,22 20:7 24:25 28:6,9 48:6,20 50:6 80:2 81:10,14 82:2,4,18

**motor** 23:10 54:2 60:24

**move** 41:10,19

**moving** 101:18

**multiple** 51:18

---

**N**

**neatly** 99:13

**neck** 35:16

**needed** 59:11

**news** 74:25

**nice** 38:8

night 12:21,23 16:6

north 32:21

notation 58:3

notes 85:15

notice 6:23 9:5 76:12

notices 18:10

November 98:7 100:22,24

number 8:21,22 9:20 24:22,24,25 46:13 75:20 77:2 81:19 101:4,11,12

numerous 22:6 23:17

**O**

object 95:16 97:8

objection 95:17,19,23

occasions 75:14

occur 76:23

odometer 61:23

offense 59:18 73:20

offer 84:1

offered 83:17 85:8

office 11:2 33:15 42:13 50:25 51:1,8 61:6 62:6 99:11,14

Officer 21:14,22 22:20

officially 52:14

Oleg 50:14

one's 74:22 87:1

open 93:23 103:5

open-ended 30:14

operations 20:14

opinion 96:16

opposed 67:21 69:18 80:22

option 30:20 46:23 47:16

order 54:13 93:12

orders 87:20

original 13:20 40:8,17 63:5,7 90:24,25

originally 13:16,17 68:18 88:10

overpriced 30:20

owe 15:20 17:4 47:3 49:9, 11,13 55:13 59:24

owed 15:4,5 19:18 25:9 27:21 28:3 47:20 48:9,10 74:13 82:14,16 97:2

owned 13:3,5 16:20,21 20:11 48:20 51:2 61:12,14 65:21 82:7,21

owner 63:6,7,15,19 89:8 90:25 92:23,25 93:13,15

ownership 13:11 14:17 15:17 39:9 53:11 61:21 64:1 74:6 80:14 82:20 88:22 95:13 96:13,23

owns 20:21 23:10 32:3 63:11

**P**

p.m. 108:9

pages 101:11

paid 17:1 19:16,20,21,24 20:6,8 39:21 55:9 56:9,10, 24 57:8,12,24 65:12,13,15 68:9 69:18 80:10,19,20 81:17 82:13,21,22 92:24 102:3

Palm 6:18 10:23 29:12 60:8 61:14,19 62:1 63:12, 13 81:5,7 82:6,8,16,22 87:16 88:19,22 89:7 91:7, 16 92:6,20 94:3,9 95:15 96:14,24 97:1,11 98:11 102:3,12,14 103:19 106:6, 11

paperwork 13:10 14:8 15:9,16 19:23 20:17 38:2, 13 45:25 52:18 53:13 54:22,23 60:18 62:17 65:24 66:3,17 87:17

part 26:4 60:9 61:22 63:18

party 25:18,19,23 47:10

past 32:14

pay 13:12 14:20 16:25 20:5 27:23 30:16 38:6

46:6,14 49:18 56:6 57:1, 11 58:14 64:20 69:13,15 76:21 79:23 82:11 93:1 102:12,16,19,23 103:1

payable 53:15

paying 55:7

payment 57:14,18 81:2

pending 52:23

people 11:4 30:11,20 39:14 41:18 81:16 82:10

percent 31:21 33:5 45:13 50:2,13,16 53:12 57:2,8, 11 100:4 106:1

Perfect 9:2 11:7 78:19 107:16

perfectly 27:4,9

period 107:8

permission 87:25 90:15

person 36:17 52:12 63:11 85:1,2 90:6

pertinent 73:13

phone 7:8 13:15 37:4,21 70:8 74:17 84:24 85:2

physically 30:4,25 58:2

pick 15:22 16:18 30:18 32:23 47:16 48:3 51:21

picking 27:1

piece 53:9

place 40:21 49:19 65:1 86:7

plan 78:16

planning 74:25

plate 71:11

play 54:13 87:16

plenty 95:25

POA 90:4

point 15:21 30:15,21 45:6, 21 48:1 49:1 61:11 72:11 74:7 97:11

police 21:14 22:9,12,20 23:15 24:10 25:1 75:21,25 76:6 77:16 78:5,6 79:12,

16

policy 39:6

pop 51:14

portion 61:25

positive 72:18

possession 73:1

postdate 58:24

postdated 59:15

postdating 58:23

potential 34:11 36:16,20

power 60:14,24 61:2,4 86:16,21 90:3,7,11 91:3

PPI 33:20

practice 67:6

pre-purchase 33:21,25

prefer 25:22

present 25:12,16,20 26:9

presented 75:11 87:7

pretty 73:13 101:18 107:13

previously 55:21

price 56:16

primary 11:5

prior 7:12 10:11 14:6 24:9, 19 29:3,5 30:23 31:16,20 33:2,12,23 34:5 51:23 54:15 106:8

problem 8:1 47:2 68:10 69:5

proceeds 60:3

process 29:24 62:17

processes 99:19

produce 7:12

produced 7:10,17 10:2,3 73:3

promised 70:14 71:19

proof 39:9

proper 55:8 66:4 93:18

protect 17:3,12 49:16

provide 29:23 45:14

provided 7:3 44:14,22 73:7,10,12

providing 10:14

proving 34:6

pull 28:15 30:15 58:13,17 60:12 67:10

purchase 35:4 39:10 41:2 42:15 43:21,22 44:2,14 45:25 47:13 53:4,24 55:10,17 64:15 66:3 69:16 87:20 88:13 103:12,18 104:3,16,17,20,22

purchased 31:2,9 106:3

purchaser 65:3

Purchaser's 61:18

purchases 66:1

purports 103:18

purpose 17:11 27:17 48:23 58:23 61:4

purposes 8:20 44:19 53:17 59:23 60:8 62:13

pursue 80:24

push 46:20 83:7

put 9:22 13:22 33:16 39:4 41:5 48:15,16,24 49:19,22 52:14,16,23 53:6,14,16 67:12 80:5 85:9 98:6

putting 17:25 33:23 94:19

**Q**

quarter 106:11

question 20:1 23:2 27:14 43:5 64:2 65:6,10 66:9,15, 16,18 72:13 91:22 92:10 93:7,9,12 96:5,9 97:17 104:15

questions 22:16 27:7 76:3 79:10 85:11,13,22 93:5 101:17 103:4,7

quick 85:14 97:5

quickly 6:16 101:19 107:13

**R**

ran 69:7

Randa 21:14

rapidly 97:7

Raton 21:14

raves 35:8

reached 20:9 82:17

read 11:10 70:13 96:7 101:18 107:18

reading 8:6 98:9,12

Real 85:15

reason 16:25 17:2 19:25 25:7 31:15 40:24 43:6 56:4 57:5 61:25 62:25 70:17 71:24 72:10,15 82:23 87:12

recall 11:17 15:25 31:14 52:3,9,12 67:2 74:15 78:3 100:16 103:13 104:11,16 106:3

receipt 33:24 34:3,6

receive 56:1

received 44:25 45:2 55:23

recently 43:12 67:1

recognize 100:1 103:25

recollection 52:8 106:2

reconcile 52:20

record 27:11 50:6 71:13 88:2,5 93:13,15

recovered 103:23

redo 54:9

reference 58:4

references 44:6 59:9 61:18 73:15,20

referencing 19:12 28:4 64:19 68:4 97:19

referring 29:6,7 64:10 67:16,17,18 69:4 97:20 104:18

reflected 57:13

reflecting 83:22,23

regard 12:12

registered 90:25

registration 56:7 63:14

related 8:16

relates 79:13

relating 77:10

relative 40:21

relaying 73:13

releasing 61:21

relinquished 95:13 96:12

remained 47:15

remember 16:4,5 24:13,16 31:6 37:17,18 48:4,14 49:7 67:5 84:13,19 85:3 86:13 98:9,10 100:13,14

remove 54:10

report 23:15 74:2,5,10 75:21 76:12 77:17

reported 71:7 76:5

reporter 18:7 28:5 34:16 41:15,18 50:3 89:14,15 96:9 100:17 101:6,9 108:1,4

reporting 74:9

represent 21:13 68:23

representative 6:18 42:10

representing 6:11

request 7:2 8:21,25

requests 7:6 8:4 9:7

require 94:21

required 61:22 63:14

requires 93:19

requiring 83:1

reserve 103:4

residents 32:6

resolve 74:25

respond 70:17 108:4

response 10:3

responsibility 30:8,16

responsible 14:11,19 20:21 38:21 49:13

responsive 7:6 8:4 9:7

restroom 78:14,25

retail 47:25 106:10

retrieved 80:21

return 19:6 60:3,4

returned 80:21

revenue 71:11

rid 20:5 32:22

ride 51:15

right-hand 95:8

rights 32:4

risk 35:6 38:2

role 87:15

room 25:12,16,23,24 26:12,16,18 28:6 34:17 41:16 50:4

Routing 77:2

rule 26:15

rules 23:9 33:19

run 26:24

running 49:11

Rwhite@ci.boca-ratonfl. us. 21:11

**S**

S-O-F-O-U-L 88:8

sale 14:9,15,24 15:2 20:18 27:25 31:19,23 32:2 35:5, 10,15,18 36:2,6,8,13 38:25 40:23 41:3 42:23 43:1,4,7,10,21,22 44:2 45:11 47:9,12,21 49:12,25 50:11 53:3,5,20,22 54:5,7, 10,12,15,24 55:10,13 64:15 67:20 70:16 71:13, 16,20,22,25 72:3,6,10,16, 18 84:6 86:11,25 87:9,13, 19 88:13,16 93:20 94:8 95:14 96:14,22 101:12 105:4,9

**Sale/purchase** 42:6

**sales** 8:5 10:13,17 13:15, 21 14:1 15:6,8,13,15 31:8 32:9,10,22 33:19 35:14 37:3,10,18 38:9 44:19 45:8,12 47:22 54:3,11 55:4,10 56:6,16 57:4 64:17 67:24 69:1 83:11,22 86:5,25 104:7 106:15,17

**salesman** 10:19 11:5

**save** 55:3

**scared** 17:14

**scheduled** 26:23

**scheduling** 27:11

**scott** 6:3 34:17,19 37:5 67:14 76:11 97:12

**screen** 6:22 9:21,24 18:20, 21 19:5 28:20 41:5,7 55:19 58:19 89:12,13,19 93:23,25 98:6 103:10,16, 20 104:19

**scroll** 6:25 11:24 17:13 27:13 67:11 68:21 74:21 76:25 103:22 104:2

**scrolling** 10:7 11:10 104:10

**sec** 43:15

**sell** 15:19 17:7 20:2 35:24 39:24 40:15 48:18 60:25 63:10,25 64:11 66:9 84:17,21 106:9

**seller** 65:12,13,15

**Seller's** 61:19

**selling** 13:9 14:5 15:4 40:10 47:19 64:16,18 86:20

**sells** 15:19

**send** 22:25 32:19,23 108:6

**sending** 77:9

**sense** 57:9 87:9,14

**separate** 39:21 57:14,18 88:15

**series** 93:5

**service** 16:7 31:11 34:3

48:21

**servicing** 31:14

**share** 9:21 89:11,13 103:10

**sharing** 103:16

**She'd** 87:25

**shoot** 78:17

**shop** 16:8 34:3 48:21

**short** 79:6

**shortly** 32:17

**show** 6:15,20 9:3,4 18:6, 19 21:1 39:9 55:6 64:1 66:7 71:6 87:1 93:24 97:15

**showed** 14:14 16:12 27:25 35:13 36:3 41:1 43:12 60:6 71:3 76:9 88:17

**showing** 14:15 15:16 20:18,19 52:13 53:6,8 60:13 90:14 104:19

**shown** 45:12

**showroom** 31:10 84:25 85:1

**shows** 85:19 92:13 94:6, 11,13

**sick** 23:7 48:15

**side** 41:11,19 95:8

**sign** 29:25 30:1 42:14 63:12 64:15,17,19 65:23 87:19 92:1 95:5 98:1 99:11,12,15,16,19 100:12

**signature** 29:11,17,18 61:19 91:14,25 92:5 94:24,25 95:6 99:5,6,7 100:2,3,4,8,10,15,23

**signatures** 98:15 99:3

**signed** 13:10 14:9,16 15:2 18:3 19:22,23 20:17,18 32:16,17 34:23 35:5,10, 17,19 38:19,25 42:10 47:11 49:12 52:18 53:14 54:6,22,23,24 60:5 61:3, 13 62:6,8,19,21 63:20,22 80:1,8 88:19 91:19 92:17, 18 95:7 97:12 99:8 100:5 105:4

**signify** 62:4,10

**signing** 66:17 88:1 90:6 94:18

**signs** 15:10,16 29:21 63:11 66:3

**similar** 81:21

**sir** 6:19 9:25 10:10 18:22 22:10 55:20 77:5 89:20 100:19 102:14

**sit** 92:2

**sits** 63:24

**sitting** 24:9 25:23 59:9,21

**situation** 23:21 69:23

**situations** 51:11 81:21

**Sofoul** 88:3,7

**Softness** 41:16 42:1 106:24 107:23

**sold** 13:16 20:3 30:5 37:25 45:23 46:6 47:3,17,23 48:25 60:2,10,11 63:23 64:13 65:14,20 84:2 104:8 105:22 106:4

**solve** 24:3,5

**sort** 66:15

**sounds** 47:8 68:9 74:3

**south** 13:20

**speak** 74:14,15

**speaking** 75:2

**specific** 19:11 66:22

**specifically** 10:17 12:12 17:16,17

**speed** 99:19

**spell** 88:5

**spend** 32:7

**Spider** 8:22

**spoke** 22:19 59:13 84:24 85:1

**spot** 63:24 66:11

**spouse** 103:1

**staff** 83:14 105:23

**standing** 95:17

**signify** 62:4,10

**start** 6:16 107:15

**started** 29:3 62:17 84:21

**starting** 101:7,8

**starts** 68:22

**state** 13:8 20:17 23:9 39:22 53:9 54:3,9 60:7 61:23 63:13 65:22 67:9 71:7 96:17 105:5

**statement** 17:19 22:11,13 23:3 27:17 61:24

**stating** 17:16,20

**status** 22:14 44:21 50:19, 21 52:15 53:20 54:18 59:22

**stay** 97:6

**stenographer** 96:7

**Stephens** 6:12 7:9 9:10,12 10:4,9,11,21,23 11:18 13:4,12,17,24 14:3,9,13, 20 15:10,15,18,20,21 16:11,12,17,22 17:1,4,8, 10 19:17,18,21,22 20:4,6, 9 21:17,23 22:7,18,25 23:4,18,23 24:21 27:18,19 28:12 31:2,9 33:9 35:5,8, 12,19 36:24,25 37:7,13, 16,19,21,22,23 38:1,4,8, 10,13,18 39:11 40:12,17, 18 45:1,14,19 46:3,4,7,17, 23,25 47:2,16,17,24 48:2, 9,11,14,17 49:2,8,9,14,15, 18,21 52:3,5,7 53:16 54:23 55:9,24 57:4 58:15, 24 59:3,11,19 60:4,6,9 61:10,20 62:21 63:19 65:18,19,21,23 66:5 67:13 68:18 69:2 70:1,8 72:14 73:14 74:5 75:20 76:5,10, 11,22 77:7 78:2,7,11 79:20 80:11,23 82:9,25 83:6,12,13,16 84:6,10,13, 14,16,24 85:8 86:8,9,14, 16 88:10 91:1 95:13 96:12,23 97:2 102:4,5,8, 12,16,19,23 103:1,17 104:22 105:19,22 106:3, 13,14

**Stephens'** 11:21 12:12,19, 22 13:16 16:5 18:12,14,16 19:13 21:5,7 22:5 28:22

30:24 31:18 33:2,25 37:6 42:2 49:24 51:24 60:20 61:16 65:21 82:14 83:4 95:12 96:11

**stipulation** 15:4

**stolen** 74:3,6,9,10 75:21

**stop** 11:11

**stopped** 78:11

**store** 9:15 30:4 32:10 43:8 52:10 60:11 64:11 70:6 84:15

**strict** 38:23

**strictly** 65:20

**string** 24:21

**stuck** 15:19 35:16 69:15 83:24

**stuff** 11:6 14:10 28:13 29:3,4,6 31:11,13 33:6 38:24 50:15 51:1 54:25 56:7 67:20 82:2 98:10 99:11,18

**submit** 71:10

**submitted** 60:7

**subpoena** 10:3

**subsequent** 86:25 88:12

**subtotal** 56:20

**supersedes** 53:23 54:5

**supposed** 11:25 12:11,16 17:15,18,24 18:1,4 45:16 49:17 61:2 76:19 77:14 80:6,13 92:1

**sworn** 6:4 43:3,11

_____

**T**

**T-E-D-D-I** 88:7

**tag** 63:14 71:12 87:17

**takes** 55:5

**taking** 6:23 13:9 14:7 35:6 37:7,14 38:1 48:6 63:2 86:20 90:17 107:5

**talk** 37:21 73:24 76:5 77:17 105:24 107:18

**talked** 9:7 10:11 15:6 20:12 36:25 46:3 48:1 74:17,18,19 75:6 77:12 78:5,6 79:16 82:4 84:13

**talking** 8:24 29:20 44:4 50:9 57:14,25 66:25 72:3 78:11 85:16,17,20

**talks** 8:21 52:11

**tax** 14:14 20:19 44:19 45:8,12 53:7,8,10,12 54:3, 11 55:2,4,8,10 56:6 57:2, 4,5,8,11 60:6,8 66:1,12 71:4,6,10,12

**technically** 20:15 23:10

**Teddi** 88:1,2 90:20

**telling** 16:16,17 20:22 23:13,14,16,21 37:11 38:9,10 47:16 48:23 73:17,18,21,22

**temp** 71:12

**termed** 16:22

**terms** 81:22

**testified** 6:5 88:10

**testifying** 26:10 34:22 86:23

**testimony** 86:1 88:9 103:14 105:18

**text** 7:8 9:23 10:1,8,10,13 11:9,13,17,21 23:17 24:18,21 25:5 32:11 58:12 67:10,12 68:14,20 69:6 70:18,23 73:2,3,6,7,23,24 74:1,8,22 75:9,19 76:9,14 77:15

**texting** 12:4,6 22:7 23:13 79:21

**texts** 18:11 58:18

**thing** 9:5 12:15,19 24:6,7 38:23 43:24 48:9 52:2 67:15,17,19 68:7 84:12

**things** 11:4 69:8,21 95:25

**thought** 13:21 20:3 42:24 69:3 104:7

**tie** 82:25 105:14

**tight** 69:8

**tile** 11:25 13:2

**till** 77:8

**time** 11:10 13:4,6 14:5 16:9 22:7 27:4 30:11,12, 13,15,22 31:10 32:7 36:23 40:9 47:25 49:12 50:12 51:25 62:20 64:14 65:8 69:10,11 74:19 80:3 81:3, 12 83:3 84:14,19 85:11 86:18 97:11 107:8

**times** 32:14 65:6 74:18

**timing** 53:18

**title** 12:2 13:1,2,3 14:17 19:23 29:23 35:19 38:25 53:14 54:24 60:5 61:7,8, 15 62:12 63:5,11,15 64:4, 8 65:12 66:3,18 81:3,9,13 87:18 88:1,21 89:22 90:10,18,24 91:12,15,19, 25 92:2,12 93:13,14,15,21 101:3,10

**title-related** 90:13

**titles** 12:25 17:14,17,22,24 18:2,4 19:20 30:5,7 63:9 80:3,13 87:22,23,24 91:21

**today** 6:13,17 7:12 23:24 24:9 26:4 27:2 46:18 50:13,16 52:19 59:21 73:4 87:8 88:10 101:16 105:11 107:4

**told** 15:13 20:10 23:19 27:6 35:14 37:15,23 38:16 45:21 47:5,21 48:4 59:4, 11 68:17 69:1 75:7,14,17 76:10,13 77:13 78:6 80:23 83:21 84:3,16 85:5,7 86:5

**tomorrow** 25:5 27:17 58:22 59:2 77:3

**tons** 40:14

**top** 42:17 61:25 66:24 67:4 91:24

**town** 32:12 51:14,17

**trade** 13:18 14:7 15:17 20:20 27:25 35:13 36:3 39:24 44:6,12,17,20 45:4, 15 46:1,10 47:9 55:3,5,7 56:12 57:8 63:2,22 65:25 66:8 67:22 68:12 69:17 86:21 88:17 90:17

**trade-in** 13:9,13 14:16,22, 23 54:16,17 82:24

**trade-ins** 50:23 60:25

**traded** 79:25 80:11 82:1 102:9

**trading** 15:3 53:10

**transaction** 8:16 10:12 13:7,14 27:22 35:7,18 36:9,19,25 37:2 40:20 44:18 45:5,19 67:25 68:1, 5 76:20,21 77:4,11 81:22 83:6 85:8 86:8 87:10 104:10

**transactions** 9:17 10:23 78:2 105:19

**transfer** 62:12 63:15,18 64:8 71:11

**transferred** 63:5 80:6 82:15

**transferring** 13:11 90:18

**transpired** 84:20

**travel** 32:8

**traveling** 32:18

**true** 71:1 92:11

**trust** 46:20 68:6

**trusted** 67:14

**trustee** 8:14,17

**turned** 8:17

**turning** 46:14 61:15

**turns** 14:17

**types** 42:15

**typically** 29:19,21 62:22

_____

**U**

**uncommon** 67:6,8

**Unconditional** 97:13 101:13

**understand** 8:24 20:16 46:8 88:9

**understanding** 15:7 88:24 89:1,7 91:20 95:11 96:10, 20

**Understood** 57:21

**undoing** 60:9

**upset** 70:21

**usual** 46:25

---

**V**

---

**valid** 72:23 92:22

**vehicle** 8:16,24 15:22,23 16:18,21,23 17:11 20:21 31:3,18 38:22 39:12,15 49:3 53:20 54:19 59:22 61:12 62:25 65:4 88:13 89:8 90:24 92:23 95:14 96:13 103:19,24

**vehicles** 23:10 51:13 54:3 60:25 80:11 82:18

**verify** 34:1,9

**versus** 54:19,20

**video** 41:9,21 52:6

**VIN** 8:22

**voice** 12:3,6

**volunteering** 93:10

---

**W**

---

**wait** 24:22 44:24

**waiting** 28:6 34:17 41:16 50:4

**waive** 107:18

**wanted** 13:24 15:12 30:6 35:9 37:9 40:12,17 45:20 51:14,21 59:16 70:9 83:16,20,21,24 86:3 97:6

**wanting** 35:7 40:14

**website** 31:18,23 32:2 33:23 34:8,10 49:25 50:10,12,16,19,20 51:3 70:16

**week** 7:13 47:1 59:4

**weekend** 51:22

**weeks** 23:8

**White** 21:14,22 22:20,23 23:1

**Wholesale** 80:7,9 85:20 91:16 92:6,13,22,24 94:9 97:13 98:11

**wife** 17:21,22 18:3 19:4 20:10,12,21 21:21 22:3,7, 19,22 23:6,8,13 24:3 79:12,21 80:1,4,8,18,23, 25 82:19 91:21 98:1 99:3, 9,11,24 102:19

**wife's** 18:24 21:3 98:18 99:6,7,19 100:2

**Winderman** 7:16,19,24 15:23 18:21 25:14 26:1, 14,18,21,23 39:16 41:13, 24 49:5 65:5 70:19 72:12 75:5 78:21,23 79:3 81:6 94:14 95:18,20,22,24 97:8,15,18 107:2,4,8,14, 18,20,24

**winter** 32:6

**wire** 25:5 56:19 76:15,17 77:4,7,10,21 78:2

**wired** 77:24

**Witnesses** 26:9

**work** 29:24 59:25 63:14 87:18

**worked** 62:9

**working** 13:23 36:18

**works** 19:3

**worse** 69:21

**worth** 46:11,12 47:4 67:24 86:2,4

**write** 14:3 38:5 46:4 70:12 83:17,19 85:9

**writes** 21:21

**writing** 38:14

**written** 22:11 25:8

**wrong** 22:23 95:25 99:22 105:23

**wrote** 21:22,25 22:2 27:19 55:12 56:15 72:14 75:12

---

**Y**

---

**year** 11:15 67:1

**years** 32:6,8 66:25 83:9 99:25

**yellow** 85:19 93:25

---

**Z**

---

**Zankl** 6:3,9 21:2 24:24 25:13,14 26:2 85:25 89:6, 18 90:23 91:22 96:4 97:5, 12 101:20 103:1,10 105:13 107:9,17

**Zoom** 6:12 8:8 28:9 34:19 42:1 50:6 87:1