UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO. 9:22-BK-15627

CHAPTER 11

In re:

AUTO WHOLESALE OF BOCA, LLC

     Debtor,

_____/

- - -

DEPOSITION OF KRISTEN ZANKL
A WITNESS
TAKEN BY THE INTERESTED PARTY,
DEREK STEPHENS
REMOTELY VIA ZOOM

- - -

DATE: November 14, 2022

TIME: 12:34 P.M. - 1:23 P.M.

PLEASANTON & MARSAA COURT REPORTING
561.963.9700

The deposition of KRISTEN ZANKL, in the above-entitled and numbered cause was taken remotely via Zoom before me, Angela Connolly, Registered Professional Reporter, Certified Realtime Reporter, Florida Professional Reporter, Notary Public for the State of Florida at large, taken on the 14th day of November, 2022, pursuant to Notice in said cause for the taking of said deposition on behalf of the Interested Party, Derek Stephens.

APPEARING VIA ZOOM ON BEHALF OF DEBTOR:

    James B. Miller, Esq.
    JAMES B. MILLER, P.A.
    19 West Flagler Street
    Suite 416
    Miami, Florida 33130

APPEARING VIA ZOOM ON BEHALF OF ADVERSARY PLAINTIFF FVP:

    Jerrell A. Breslin, Esq.
    BARON, BRESLIN & SARMIENTO
    The DuPont Building
    169 East Flagler Street
    Suite 700
    Miami, Florida 33131
        &
    David R. Softness, Esq.
    DAVID R. SOFTNESS, P.A.
    201 South Biscayne Boulevard
    Suite 2740
    Miami, Florida 33131

APPEARING VIA ZOOM ON BEHALF OF INTERESTED PARTY, DEREK STEPHENS:

    Evan D. Appell, Esq.
    C. Cory Mauro, Esq.
    MAURO LAW, P.A.
    1001 Yamato Road
    Suite 401
    Boca Raton, Florida 33431


APPEARING VIA ZOOM ON BEHALF OF INTERESTED PARTY, KARMA of PALM BEACH, INC., KARMA OF BROWARD, INC.:

    Harry Winderman, Esq.
    WEISS, HANDLER & CORNWELL
    2255 Glades Road
    Suite 205E
    Boca Raton, Florida 33431


APPEARING VIA ZOOM ON BEHALF OF CREDITOR, FARACHE ENTERPRISES:

    Scott C. Gherman, Esq.
    SCOTT C. GHERMAN, P.A.
    902 Clint Moore Road
    Suite 120
    Boca Raton, Florida 33487

ALSO PRESENT VIA ZOOM:

Derek Stephens, Interested Party

Moshe Farache, Creditor

Greg Nelson, representative of Franklin Capital Group d/b/a Wing Lake Capital Partners

I N D E X

WITNESS                                                          PAGE

KRISTEN ZANKL

  Direct Examination By Mr. Appell                                5

  Cross-Examination By Mr. Miller                                25

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Derek Stephens' 1 | Derek Stephens Notice of Taking Deposition Duces Tecum via Zoom for Kristin Zankl | 10 |
| Derek Stephens' 2 | list of nine vehicles | 10 |
| Derek Stephens' 3 | April 2, 2022 email from Kristen Zankl to Michele Martin and Moshe Farache | 15 |
| Derek Stephens' 4 | June 20, 2022 email from Kristen Zankl to Det. Randa White and Derek Stephens | 19 |

- - - - - - - - - - - - - - - - - - - -

Thereupon:

KRISTEN ZANKL,

Having been first duly sworn by me, was examined and testified as follows:

THE WITNESS:  Yes.

DIRECT EXAMINATION

BY MR. APPELL:

Q    All right.  So, again, Mrs. Zankl, I'm Evan Appell on behalf of Mr. Derek Stephens.  I'm going to quickly put up a document on the screen and ask you if you've seen this document before, which is the Notice of Deposition for you to be here today.

I know it says 4 o'clock, but have you seen this document before?

A    Yes.

Q    And you've seen the document requests here on this document?

A    Yes.

Q    All right.  And do you have any --

I know you sent some text messages to us -- or they're going to be sent to us, I think.  I don't know if they've been sent to us yet, but --

A    Right.  No, they're on their way.

Q    Okay.  But other than those text messages, do

you have any documents responsive to these requests that are on this document?

A   No, I don't think so.  That's it.

Q   Okay.  And the text messages that are on their way, are they correspondence with Mr. Stephens?

A   Yes.

Q   Is there any other person you had any written correspondence with regarding the vehicle as it's defined in this request right here?

A   I think I had sent two emails to Mr. Farache just confirming that he was going to return the keys to the black Ferrari.

Q   Okay.

A   I had sent it to him after he was at the dealership and he took the keys.  And he knew he had the keys and he gave me some nonsense why he couldn't return the keys.

Q   Okay.  We can get into that, but for purposes of this, any other person or entity or anyone that you've had any correspondence with -- written correspondence with, that would be responsive to these requests?

A   No.

Q   All right.  And just for purposes -- like with your husband's deposition, if I refer to "the Ferrari,"

we'll understand that I'm talking about this 2013 Ferrari 458 Spider as it's defined in this request. Okay?

A    Of course.

Q    Okay. All right.

In March of 2022 through April 2022 what was your role with Karma of Palm Beach?

A    So the last two weeks of March my husband was very sick and he was not able to come into the dealership. I had just started coming on board like in early 2022. I was helping with HR policies and procedures, drug testing, that type of thing.

So I would go in a few days, like, each month, January, February; and then March I was there the end -- the last two weeks because Scott could not make it in.

Q    And did you have any role in the day-to-day transaction of the buying and selling of vehicles?

A    No.

Q    All right. Do you know, prior to your text message correspondence with Mr. Stephens which is on the way --

A    Right.

Q    -- have you ever spoken to or communicated with Mr. Stephens?

A    No.

Q    Did you know anything about the transaction regarding the Ferrari until you spoke with him via text message?

A    No.  No.  The only thing that I knew was that on Friday, April 1st, Mr. Farache and his wife and his two sons came to the dealership.  They told me that I was going to be arrested.  They said, "The Feds are on their way and you're going to be arrested."

So, okay, well, I'm a busy mom of three.  It didn't make sense.  I didn't know.  I did trust Lisa Farache, so I didn't know what -- I didn't understand.

And then on Saturday I was back in the office and that's when Moshe took -- the car was still there, but the key -- he had taken the keys, and Johnny told us -- Johnny said, "That's not your car," like repeated over and over.  Johnny was very passionate about it. He's like, "That's not your car" because he knew that car was -- belonged to somebody else.

So we asked for the keys back and Moshe said, "Oh, my -- my son has them.  We took them home, but my son's at my house drinking and he can't drive."

So we suggested, I believe, "Well, how about if your son gets in an Uber and brings them over?"  But he was reluctant to return the keys that day, and he said he would definitely bring them back -- I believe it

was on Monday.  And then I sent him an email asking to please return, make sure you bring the keys.

Q   Okay.  So going back, Johnny -- is that Jonathan Martin?

A   That's correct.

Q   Okay.  And you said Jonathan, at the time when Mr. Farache, Mrs. Farache, and her son were in your office, told them that the car belonged to somebody else?

A   Yes.

Q   And who did Mr. Martin say the car belonged to?

A   He just said "That's not your car."  He just was over -- he was very adamant with Moshe and just said "That's not your car."

Q   Okay.  And he didn't mention whose car it was at that time?

A   He just said "That's not your car."

Q   And what about the remaining cars that were there that were taken?  Did Mr. Martin have any discussion about saying "That's not your car"?

A   No.  He just -- it was in reference to the black one.

Q   And did you ever discuss with him, with Mr. Martin, why he said that wasn't their car to take?

A       No, I did not.

Q       Okay.  Who handed the keys over to the vehicle, to the Ferrari, to -- well, let me go back.

You said the keys were handed over.  Who were they handed over to?

A       So I guess the night before, when he and his wife and his sons came and took the cars, that's when they collected all the keys.

Q       And where did they collect them from?

A       I guess it was in a box that they were in.

Q       Okay.

A       The showroom is like a big area, and I wasn't standing right there when that transpired.

Q       I'm going to share my screen real quick.  And the depo notice will be marked as Exhibit 1.  This will be Exhibit 2.

Can you see my screen?

A       Yes.

(Thereupon, Derek Stephens' Exhibit 1 was marked for identification.)

(Thereupon, Derek Stephens' Exhibit 2 was marked for identification.)

BY MR. APPELL:

Q       Okay.  So are these the vehicles that you're referring to that were taken that night?

A     You know, I -- honestly, I just know that he -- whatever was in the showroom, he took.

Q     All right.  And is that your signature on the bottom?

A     That's my signature, yes.

Q     Okay.  So you -- did you type up this document?

A     No.

Q     Who did?

A     I -- maybe Alana did.

Q     And do you know how --

A     I'm not really sure who typed it up, to be honest with you.

Q     Do you know how it was identified which cars or which keys or which vehicles would be handed over at that time?

A     I really don't know, to be honest with you.  I just -- I was not involved in this aspect of the business, so I just -- I was filling in since Scott wasn't there.

And Teddi, who was -- did a lot of our accounting, our controller, she was calling me the last two weeks of March, like yelling and screaming at me that somebody needed to be in there because Moshe was giving them such a hard time and they needed a warm body

owner in the store.

I mean, I was trying to balance my kids, Scott being sick, you know, doing stuff for the business. I was kind of all over the place, but I had -- but Teddi was very adamant that I needed to be in there because Moshe was giving everyone a hard time.

Q   Okay. So at the time when this document was signed, it's dated April 1st, is that when you signed this document?

A   I don't -- I honestly don't remember. If it was --

Q   And you're not -- I'm sorry?

A   I really honestly don't. I have -- I mean, that day was extremely stressful for me. The two weeks leading up to then was very stressful, so I just --

I couldn't tell you if it was exactly April 1st or the -- I would say, because it's dated April 1st, probably.

Q   And sitting at that time, you didn't know the rhyme or reason why these specific vehicles were included on this document?

A   No. I mean, I was handed a document. I knew that we just needed to -- Moshe wanted -- we were giving him the cars as collateral. They were not his; he did not own them.

And, once again, this is just -- I don't have specifics because this was not my area of the business. This isn't what I did on a day-to-day basis.

Q    Sure.  I understand.

So the 2013 Ferrari 458, which this is the remaining numbers of the VIN, I guess, that were included --

A    Yes.

Q    I'll represent to you that that's the same VIN and that is the Ferrari that we're talking about.  Okay?

A    Okay.

Q    Is this the car that Jonathan Martin was telling Mr. Farache was not his and he couldn't take it?

A    Yes.

Q    Okay.  I'm going to stop sharing that.

Okay.  Do you have any knowledge -- I know you said you weren't involved in the day-to-day.  Do you have any knowledge about any agreements that Mr. Stephens signed with Karma regarding the Ferrari or the Lamborghini that we've also talked about?

A    No.  I was not involved in any of that.

Q    Okay.  I'm going to share screen again.

Can you see my screen here?

A    Yes.

Q    Is this your email address at the top?

A    Yes.

Q    All right.  And you're writing to Michele Martin and Mr. Farache?

A    Yes.  That's the email I was talking about previously.

Q    Okay.  What was the reason you were sending this email?

A    Because, as I had stated earlier, he took the keys to all of the cars and on April 2nd Johnny told him "That's not your car," so that was the story -- that's what I just explained to you, how he said his son had the keys at his house and they gave me this nonsense story of how they couldn't return the keys.

He obviously had no intention of returning the keys, but he said he would on Monday, and so I was just sending that to follow up that he said he would return the keys.

Q    Did you write any other emails to Mr. Farache or anyone else at Auto Wholesale regarding the return of keys to any other vehicles that were taken in that list of nine that we looked at on Exhibit 2?

A    No, just this one in particular.

Q    And you were sending this email based on information you had from Jonathan Martin?

A    Yes.

Q    And do you know if Jonathan Martin provided any other information to either you or Mr. Farache or anyone else at Auto Wholesale regarding why he believed the car was not theirs?

A    Did -- no.  No.

Q    Okay.

A    I don't know.  No.  Jonathan -- I just --

All I know is that Jonathan just said this car didn't belong to Moshe.  I had no reason in the world not to believe Jonathan and that it belonged to somebody else.

Q    Okay.  That will be Exhibit 3.

All right.  Did you ever start communicating --

Well, I know you said you started communicating with Mr. Stephens at some point, correct?

A    Yes.

(Thereupon, Derek Stephens' Exhibit 3 was marked for identification.)

BY MR. APPELL:

Q    And what were your communications about, typically?

A    The car.

Q    And what was he -- what were you communicating about with regard to the car?

A    I was -- he was asking -- he was trying to get the car back.  So he said it was his car, and so I was just trying to help facilitate that to get his car returned to him.

Q    When you say "he said it was his car," did you check any of the Karma records to determine whether or not it was his car or was it Karma's car or was it anybody else's car?

A    I did not do any fact-checking, to be honest with you.

Q    Did you speak with your husband about your communications with Mr. Stephens?

A    I'm sure that we spoke about it, that I was communicating with him.  I don't remember specifically, to be honest with you.  That was probably more back in like May or June, but I don't -- I couldn't tell you like any word-for-word conversation that we might have had.

Q    All right.  And what were you trying to do to help him get the car back?

A    What was I trying to do?  I think I spoke to my attorneys.

I don't specifically recall.  Whatever it was he asked, I -- you know, I tried to help do.

Q    Did you speak with anyone at the Boca Police

Department regarding the Ferrari?

A   I did.

Q   Who did you speak with?

A   I don't remember who.  Whoever it was that Mr. Stephens spoke with and he asked me, "Would you speak to this person?"  So I just said yes.

Q   Did you provide any sort of sworn or written statement to the police department?

A   No.

Q   You just spoke with an officer/detective?

A   I believe so.  I was -- I was on the phone and I was with my -- with my daughter, so I was, you know, keeping an eye on my daughter and having this conversation.

Q   Do you remember what you told or what you spoke with the police officer about?

A   We just spoke about -- it was in reference to the car.

Q   And --

A   I know I --

Q   -- did the police officer ask you anything regarding ownership of the vehicle?

A   I don't remember.  To be honest with you, I don't recall the conversation.  It was several months ago.

Q    Did you tell the police officer that Mr. Stephens was the owner of the Ferrari?

A    I may have.

Q    Was that based on your discussion with Jonathan Martin?

A    That was based on my discussion with Mr. Stephens and from Jonathan Martin probably too.

Q    And did Jonathan Martin tell you what his basis was for saying that Mr. Stephens owned the vehicle?

A    No.  I mean, Jonathan -- the only conversation that ever really occurred is when Jonathan was very upset with Mr. Farache and was telling him "That's not your car."  I mean, that was -- that was kind of, like, it.

I just went on Jonathan's word because he knew, he was a salesman, so he was involved in the transaction and he said "That's not your car."

Q    Do you know if anyone else at Karma was involved in Mr. Stephens' transactions for the Ferrari?

A    No.

Q    You don't know or nobody else was?

A    No, I had no idea.  I was not involved in this aspect of the business.  Like, I cannot tell you enough. I was -- if you went back to every one of my

depositions, the truth doesn't change.  I was not involved in this aspect of the business.

I could tell you about HR.  I could tell you about drug testing.  I could tell you about marketing.  This is one area that I just -- I was not involved in.

Q   So you wouldn't know whether a car was in inventory, on consignment, whether it was sold, whether it was about to be sold?  You had no concept of that aspect?

A   Exactly.  Yes.  Thank you for wording it that way.  That's exactly correct.

Q   Okay.  All right.  I'm going to share my screen again.

All right.  I'm showing you what's marked as Exhibit 4, which is another email.  Is that your email address?

A   Yes.

(Thereupon, Derek Stephens' Exhibit 4 was marked for identification.)

BY MR. APPELL:

Q   Okay.  And you're writing to RWhite@ci.boca.  Do you know who RWhite is?

A   I'm guessing it was somebody in the police department.

Q   Okay.  Does the name Randa White sound

familiar to you?

A    Yes.

Q    Is that who you spoke with on the phone when you were with your daughter?

A    I guess that's who it was.

Q    Okay.  And then it's a forwarded message and Mr. Stephens is copied on it.

A    Right.

Q    And it says "I wrote that it belongs to 'Excell Auto Group' as it really belonged to Derek Stephens."

Do you know, first, is there a prior email that you wrote to Ms. White about Mr. Stephens' car or any other vehicles?

A    I don't know, to be honest with you.  I can go back and search my email on that one for you, but I honestly don't remember that.  I have no idea.

Q    Okay.  And where you wrote "I wrote that it belongs to 'Excell Auto Group' as it really belonged to Derek Stephens," what did you mean by that?

A    So I think if you go back to the original email that I sent to Mr. Farache, I believe I referenced the car and said it belonged to Excell Auto Group; but after numerous conversations in our text messages with Mr. Stephens, I believe the car belonged to him.  So I

was just clarifying that, through those conversations, that I believed it was Mr. Stephens' car.

Q    Did you have any reason to believe it wasn't Mr. Stephens' car when you wrote that email?

A    No.  At the time I just -- like I said, I just had conversations with him and he said he dropped the car off and I --

You know, he explained to me what happened, so I figured it was his car.

Q    Okay.  Do you have any knowledge, sitting here today, whether it's his car or someone else's car?

A    I don't.  It's just that's not my part of the business.

Q    Okay.  Aside from that potential other email that you might have forwarded or might have sent to Officer White, do you have any other communications with any other law enforcement agency regarding the Ferrari?

A    No.

Q    When was the last time you had spoken with Mr. Stephens about the Ferrari?

A    I don't know.  I would have to go back and check in my phone to see when I had our last conversation or text message.  I'm not sure.

Q    When was the last time you spoke with law enforcement -- not written, but orally -- about the

Ferrari or the vehicle of any kind?

A    Whenever that -- probably whenever that email was dated, like right around that time.  That's the only time I've ever talked to them.

Q    Were those -- was reaching out to the police department the only efforts you made to try and help Mr. Stephens get the vehicle back?

A    Yes.  He asked me to -- I think he had a conversation with them, and then he asked if I could reach out to them, and so I did.

Q    And I assume that Mr. Farache or anyone from Auto Wholesale -- they never returned the keys to you for the Ferrari, correct?

A    No.  No.

Q    Did you have any follow-up conversation with them after that email that we previously looked at as Exhibit 3 regarding the keys to the vehicle?

A    No.

Q    Do you know if Jonathan Martin had any correspondence with Mr. Farache or anyone at Auto Wholesale regarding the keys to the vehicle?

A    I don't know.

Q    Just give me one minute.

A    Sure.

MR. APPELL:  We'll go off the record for --

we'll come back at 1 o'clock.  It's 12:55 now.

Does that work for everyone?

THE WITNESS:  Okay.

MR. APPELL:  All right.  Thanks.

(Thereupon, a short break was taken from

12:55 p.m. to 1:00 p.m.)

BY MR. APPELL:

Q    All right.  A couple more questions and then I will get you out of here.  I don't know about the other attorneys, how long they're going to take, so...

Did you ever tell the police officer that you spoke with on the phone verbally that the Ferrari belonged to Mr. Stephens when you had that conversation?

A    I honestly don't -- I don't recall the conversation word for word.  I think the conversation may have taken place back in June.

Q    But you don't recall whether or not you affirmatively stated that the car belonged to Mr. Stephens or not?

A    I may have said that.  I just --

Q    Okay.

A    I --

MR. WINDERMAN:  If you're not sure, then you're not sure.

THE WITNESS:  Okay.  Yeah.

BY MR. APPELL:

Q    So is that yes, no, or you're not sure?

A    I'm not sure.

Q    All right.  If the police -- if the officer had written -- a written record of the conversation and she stated that you said the car was Mr. Stephens, would you have any reason to dispute that?

A    Oh, no.

Q    Okay.  In some texts that we looked at earlier with your husband, there was some discussion about titles to vehicles being taken under duress.

A    Yes.

Q    Is that what we discussed on that night with Mr. Farache and Mrs. Farache and their two sons coming to the office?

A    Yes.

Q    Okay.  And the keys were not given, you said. They were just taken?

A    Yes.  I -- I was not standing where they keep the keys.  Like I said, the showroom was big and I believe I was on the other end.

It was chaotic, to say the least, when he showed up with his wife and kids and somebody that worked for him to remove the automobiles that did not belong to him.

Q    All right.  But you didn't physically hand him the keys?

A    No.

Q    And you didn't see anybody physically hand him or anyone else there on his behalf the keys?

A    No.

MR. APPELL:  All right.  I have no further questions.  I thank you for your time.  I'll let --

I don't know if Mr. Miller or Mr. Breslin have any questions.

MR. MILLER:  I have a few questions.

CROSS-EXAMINATION

BY MR. MILLER:

Q    Mrs. Zankl, I'm Jim Miller.  I represent Auto Wholesale of Boca.

You've testified that it's your belief that the automobile at issue, the Ferrari, belongs to Derek Stephens, correct?

A    I did.  After having conversations with him, yes.

Q    Okay.  Did you have a conversation with your husband regarding this automobile?

A    I -- we had talked, but I don't even -- this was a -- I don't remember what we discussed.

Q    So prior to today's examination of you, you

did not confer at all with your husband regarding the facts relating to this automobile?

A    The facts, no.  I mean, I just -- he knew that I was, you know, texting and talking to Derek, but specific facts, no.

Q    Okay.  So in preparation for today's deposition you didn't review anything or confer with your husband?

A    No.

Q    You did or you did not?

A    I did not.

Q    Okay.  So are you aware of the fact that your husband has given sworn testimony saying that the automobile subject to Mr. Derek Stephens' claim was actually owned by Karma Palm Beach?

A    Okay.

Q    Are you aware of that?

MR. WINDERMAN:  How could she be?  You excluded her from the depo.

MR. MILLER:  Mr. Winderman, Mr. Winderman, you're not here to testify.

MR. WINDERMAN:  You're right.  Form.

BY MR. MILLER:

Q    Please, ma'am, can you answer the question?

A    I -- I just -- I don't know who it belonged

to.  I'm -- I was not involved in this aspect of the business, and I cannot give an answer on this.

Q    So if you didn't know who it belonged to, why were you making so much effort to give it to Mr. Stephens?

A    Because at the time I thought it was his.

Q    And were you not concerned at all --

Okay.  So as of today, though, do you know, was Mr. Stephens entitled to the return of the car, or was it owned by Karma Palm Beach?

A    I --

MR. WINDERMAN:  Form.

THE WITNESS:  I have not gone through the paperwork.  This is not my area of expertise.  I did not mess with this part.  I don't know.  I don't know this.

BY MR. MILLER:

Q    For the last two weeks of operations, the last part of March 2022, though, you basically operated the business because you said your husband was ill, correct?

A    I would not say I operated the business, no.

Q    You directed the employees to conduct transactions?

A    They kind of are on autopilot.  They knew what they were doing; I did not direct them.

Q    Okay.  Let me share my screen with you.  Now I have to hit this and go to screen 2.

Do you see my screen, ma'am, where there's a Certificate of Title on it?

A    **Yes, I see that.**

Q    Okay.  And it indicates that the registered owner on this Certificate of Title was Derek Clayton Stephens of Hillsboro Beach, Florida; is that correct?

A    **I see that.**

Q    Okay.  And then, as you go down, it shows that the automobile was being purchased by Karma Palm Beach on March 11, 2022, correct?

A    **I see that's written there.**

Q    Okay.  Do you know whose handwriting that is?

A    **No.**

Q    Would that be Alana Bailey's handwriting?

A    **I don't know.**

Q    Would that have been your handwriting?

A    **It was not my handwriting, no.**

Q    Would it have been an employee of Karma Palm Beach's handwriting?

A    **I have no idea.  I cannot answer your question.  I don't know about it.**

Q    Well, let's take another sharper look at this and focus in.

Do you see where it says "Seller Must Sign Here" and it puts -- there's a signature that says "by POA"?  Do you see that on the left?

A    I see "POA," yes.

Q    And you know that stands for power of attorney, correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    Okay.  And below that is the signature of Alana Bailey and then her name printed, Alana Bailey, correct?

A    That's correct.  I see that.

Q    Do you recognize Alana Bailey's signature?

A    I'm -- I never really saw stuff with Alana's signature on there.

Q    Okay.  But if Alana Bailey signed --

A    It's not something I would look at every day and say "Oh, I recognize her signature right off the bat."

Q    Okay.  So if Alana Bailey signed this document for the benefit of Karma Palm Beach, would you agree that she had authority to endorse that document?

A    I don't know.  This was not -- I don't know what the deal was in -- when it came to tags, titles,

registration.  This is --

I cannot answer this question.  I was not involved in this part of the business.

Q    Okay.  But have you ever --

Well, have you or your husband ever accused Alana Bailey of any kind of fraud or forgery?

A    No, I've never accused her of that.

Q    Do you find her to be an honest person?

A    I do.

Q    Okay.  Do you believe she forged this instrument?

A    I would -- forge it with her -- I had -- no. I mean, I have no idea.  I don't --

Did I see her sign this?  No.  Do I know that she signed it?  I don't know.

Q    But she had authority to obviously endorse this title to Karma Palm Beach, correct?

A    I can't -- I can't say that.

MR. WINDERMAN:  Form, asked and answered.

THE WITNESS:  Once again, I told you I was not involved in this part of the business.

BY MR. MILLER:

Q    You said you ran the business in the last part of March of 2022, correct?

MR. WINDERMAN:  Form.

THE WITNESS:  I did not say I ran the business.

BY MR. MILLER:

Q    Your husband wasn't there for the last part of March of 2022, correct?

A    That's correct.

Q    Was he there in the first two weeks of March of 2022?

A    He was there.

Q    Okay.  And were you there in the first two weeks of March of 2022?

A    I don't think I was really in that much in the beginning of March.

Q    Okay.  But according to this document, if we accept it as true, the owner of the vehicle that Mr. Stephens now claims to own was actually, as of March 11, '22, Karma Palm Beach, correct?

MR. WINDERMAN:  Form.

THE WITNESS:  Once again, I don't know.  This is not my -- this is -- I can't say what -- what's what on this.  I was not involved in this.  I did not see anybody sign it.

BY MR. MILLER:

Q    Are you familiar with how to endorse an automobile title to somebody?

A    No, I'm not.

Q    Okay.  And do you know how a power of attorney for an automobile transfer works?

A    No, I really don't.

Q    Okay.  So in regards to the operations of Karma Palm Beach, what exactly were your duties?

A    I -- once again, HR, policy and procedure, and marketing.

Q    So you're not familiar with the daily transactions of assignment of titles and things of that nature in regards to Karma Palm Beach?

A    Exactly.

Q    Are you familiar with the loan agreements that Karma Palm Beach took out with FVP Opportunity Fund?

A    That one I was familiar with.  That occurred in the end of January, and that's when I started to step in and become a little more active with that type of thing.

Q    Okay.  What -- are you familiar with whether or not Karma Palm Beach was ever funded by FVP Opportunity Fund?

A    FVP was for -- was Karma Broward.

Q    Okay.  Not Karma Palm Beach?

A    I really don't remember if it was -- it was -- it could be Karma Palm Beach.

Q    And you guaranteed the debt of FVP, correct?

A    Yes.

Q    And your husband guaranteed it, correct?

A    Correct.

Q    Okay.  And we'll stay on this.

On the next page of this title, it shows there's some handwritten language here that says that the seller is Karma Palm Beach, and the purchaser is Auto Wholesale of Boca on April 2, 2022, correct?

A    I see the writing.

Q    Right.  Okay.

And it's also signed by Alana Bailey, correct?

A    I see her -- I see that.

Q    Okay.  Now, let me stop one second.  Let me ask -- I'm going to share this one.

So on this next document, this is a Bill of Sale from Karma Palm Beach.  I don't know if I can turn this -- yeah.

Okay.  This document is a Bill of Sale from Karma Palm Beach to Auto Wholesale of Boca, correct?

A    I mean, I'm just reading it.  As I said, this is not what I did.  I'm just reading it along as you put it up there.

Q    I'm asking you if this document reflects that Karma Palm Beach is issuing a Bill of Sale to Auto

Wholesale of Boca.  Is that what this document reflects?

A    I mean, can you scroll down for a second?

Okay.  Go back up.

Q    Do you see where it says "Purchaser:  Auto Wholesale of Boca, LLC"?

A    Yes.

Q    Do you see where it says "I, Karma Palm Beach," and it's attesting to the odometer?

A    Right.

Q    And it says Transferor, Karma Palm Beach.  Do you see that?

A    I see that.

Q    And you see Alana Bailey's signature there?

A    I see that.

Q    Okay.  And this is the Ferrari that Mr. Stephens says that he's entitled to have returned to him, correct?

A    I guess so.  Like I said, this is -- go ahead.

Q    Let me ask you:  Did you tell Alana Bailey "Whatever you do, do not execute a Bill of Sale to Auto Wholesale for this car"?

A    I did not.

Q    And did you tell Alana Bailey "Whatever you do, do not endorse the title to the instant Ferrari that Mr. Stephens claims is his over to Auto Wholesale of

Boca"?  Did you tell her that?

A    I did not give Alana any instructions --

Q    Okay.

A    -- regarding any of this.

Q    Okay.

A    My guess, if this was done, it was done --

Q    I'm not asking you to guess.

A    -- under duress.

MR. WINDERMAN:  Don't guess.

THE WITNESS:  Okay.

BY MR. MILLER:

Q    You know, you can volunteer duress all you want, but you know what's incredible is there's videotape of everything that went on that day, isn't there?

A    Yeah.

Q    Yeah.  And, in fact, the titles that were endorsed were freely endorsed.  Nobody held a gun to the head of you, your husband, Ms. Bailey, or any other employee of Karma Palm Beach, did they?

A    Does duress qualify having -- does it have to be a gun?

Q    I asked a simple question.  Do you want to argue or do you want to answer my question?

MR. WINDERMAN:  You didn't ask a simple

question.

MR. MILLER:  I did ask a simple question.

BY MR. MILLER:

Q   Did anybody hold a gun to you, your husband's, or any employee's -- the heads of any of the employees of Karma Palm Beach on that day?

A   A gun was not held to my head, but --

Q   Okay.

A   -- an intimidating man was standing over who had been following me around for two weeks.

Q   Yeah, I'll move to strike that.  That's nonresponsive.

MR. WINDERMAN:  No, we'd object.

BY MR. MILLER:

Q   So you owe a lot of money on a lot of guarantees to a lot of people, right?

A   This was one aspect that my husband handled.

Q   So you're going to say all of the financial obligations of your family are the responsibility of your husband?

A   This is what -- this is his -- what he handled, yes.

Q   But you personally guaranteed debts with FVP Opportunity Fund, correct?

A   That is correct.

Q    You guaranteed debts with Hi Bar Capital, correct?

A    I don't know.  I'd have to go back and review.

Q    Okay.  You guaranteed debts with Franklin Capital, correct?

A    Like I said, I'd have to go back and review.

Q    You guaranteed debts with Woodside Lending, correct?

A    I would have to go back and review.

Q    Okay.  I mean, that's a lot of money.  That's $20 million-plus right there, right?

A    I don't know.  I'd have to go back and review.

Q    Okay.  And if you can get this car returned to Mr. Stephens, that's just $250,000 less that you or your husband may be obligated to pay to Mr. Stephens, correct?

A    No.  I believe the car -- I believe Mr. Stephens, that it was his car, and I wanted to get the car back to the rightful owner.

Q    And you didn't ask your husband who the rightful owner was?

A    I believe Mr. Stephens.

Q    I asked you a question.  Did you ask your husband who the rightful owner was?

A    I don't think I did.  I don't think I had a

conversation with him.

Q    So you took it upon yourself, operating this business, Karma Palm Beach, to make that decision, correct?

A    I would not say I -- that.  I would say I had multiple conversations with Mr. Stephens.

I knew, from having been in the showroom with Johnny, that he told me that the car did not belong to Moshe, it belonged to somebody else, so I followed Mr. Stephens.  I believe the car belonged to him.

Q    Has FVP told you that they claim to have a lien on Mr. Stephens' car?

A    I have not -- I have not been involved in any type of those conversations.

Q    Are you aware of that?

A    I -- once again, I have not been involved.  I was not involved in any of this type of transaction from the beginning, and I'm not now.

Q    Okay.  My question is:  Are you aware of that?

A    I'm aware of what's been said from what you're telling me right now, but I have not been involved in any conversations as far as who -- who actually owns the car.

Q    Let me show you another exhibit that was used in your husband's examination and ask you:  Do you

recognize this exhibit?

It says "Unconditional Guarantee."  Do you see that, ma'am?

A    I see it.

Q    Okay.  Do you recognize this document?

A    I'm looking to see.

Q    I'll go down and show you.  There's a series of initials.  Do you see those initials on the first page?

A    Uh-oh.

Q    Do you see the initials on the bottom right, ma'am?

A    Okay.  Yes, I see those initials.

Q    Are those your initials and your husband's initials?

A    Those are my husband's initials, yes.

Q    Are they your initials?

A    I don't think so, no.

Q    Okay.  And on page 2, are those your husband's initials and your initials?

A    They -- they are my initials, but that's not my signature.

Q    Okay.  Is that your husband's initials?

A    Well, his initials are STZ, so...

Did I see him sign that?  No.

Q    Do you recognize it as if it's his penmanship, though?

A    It could be.

Q    Okay.  How about page 3?  Are those -- is that your -- did you initial this page?

A    No.

Q    Did your husband initial this page?

A    I don't know.  It doesn't -- it doesn't -- no, it does not look to me like his signature.

Q    I'm not asking about his signature, I'm asking if he initialed that.

A    Okay.  So, no -- no, I don't -- I can't answer that.  I don't know.

Q    Okay.  On the next page --

A    Same.

Q    -- same response:  You don't know?

A    That's correct.

Q    Okay.  Let's go to the last page.

Mr. Zankl, by the way, did testify that this was his signature.  Is that your signature?

A    No.

Q    Okay.  Who signed this document for you?

A    I don't know.

Q    Did you ask your husband if he signed it for you?

A    I didn't ask him, no.

Q    Okay.  So as you sit here today testifying, you don't know whether or not the automobile that Mr. Stephens is seeking to recover was ever owned by Karma Palm Beach?

A    I know -- I was told that it was Derek's car.

Q    Who told you that?

A    Mr. Stephens.

Q    Okay.  Well, I'm not asking what Mr. Stephens told you.  I'm asking you --

A    You asked me who told me that; I just told you.

Q    No.  I asked you -- right -- after you volunteered that you were told, ma'am.

So my question is:  Do you have any firsthand knowledge as to who owned the Derek Stephens' car after March 11, 2022?

A    I believe it was Mr. Stephens' car.  That's what I --

Q    And why -- and what do you base that upon?

A    Because of the conversations that I had with him.

Q    Okay.  So you base it solely upon what Mr. Stephens had told you?

A    Yes.

Q    Okay.  You didn't review your own records at Karma Palm Beach to determine if Karma Palm Beach actually owned the car?

A    No, I did not.

Q    You didn't ask Alana Bailey if she had transferred or sold or assigned this car to anybody?

A    No.  This was something that Scott handled.

Q    What do you mean it was something Scott handled?

A    This was his area of the business.  This is what he did.

Q    What is that area, ma'am?

A    He took care of buying and selling cars.

Q    Okay.  So you didn't bother asking Scott Zankl about who owned this car then, right?

A    That's correct.

Q    Didn't you feel it was important to ask Scott Zankl who owned the car?

MR. WINDERMAN:  Form.

THE WITNESS:  No.

BY MR. MILLER:

Q    Why?

A    Because, once again, this was his area.  I was not involved in this.  I was letting him handle it.  That's what he did, so...

Q    Now you just testified that you tried to get the car back for Mr. Stephens.

A    Yes.

Q    And now you're saying that you left it in the hands of your husband.  Which is it?

A    Well, when Scott wasn't feeling well and Mr. Stephens reached out to me, I wanted to communicate to him and acknowledge his texts.  And he told me it was his car, so I believed him, that it was his car, and I helped him to get the car back.

MR. MILLER:  Okay.  I don't have any further questions for the witness.

MR. WINDERMAN:  Thank you.  Anybody else?

MR. BRESLIN:  Jerry Breslin here.  No, no questions.

MR. WINDERMAN:  Okay.  Good.  Thank you very much all.  We'll let you know if we're reading or waiving.

MR. MILLER:  Okay.

MR. APPELL:  Okay.  And, Ms. Connolly, we are going to order both transcripts, if it's possible to have them by the 21st of this month.

THE COURT REPORTER:  Yes.  Okay.  No problem.

MR. MILLER:  Send me a copy, please.

MR. APPELL:  All right.  Thank you.

MR. WINDERMAN:  Thank you.

MR. APPELL:  Thank you, Mrs. Zankl, for your time.

**THE WITNESS:  Thanks.**

(Whereupon, the deposition was concluded at 1:23 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA      )

COUNTY OF ST. LUCIE )

         I, ANGELA CONNOLLY, Registered Professional Reporter, Certified Realtime Reporter, Florida Professional Reporter, Notary Public, State of Florida, certify that KRISTEN ZANKL remotely appeared before me via Zoom and was duly sworn on the 14th day of November, 2022.

         Signed this 20th day of November, 2022.

*Angela Connolly*
_____
Angela Connolly, RPR, CRR, FPR-C
Notary Public, State of Florida

ANGELA CONNOLLY
MY COMMISSION # HH 126112
EXPIRES: August 21, 2025
Bonded Thru Notary Public Underwriters

         Personally known    _____
         Produced identification FL DL

CERTIFICATE OF REPORTER

STATE OF FLORIDA     )

COUNTY OF ST. LUCIE )

          I, ANGELA CONNOLLY, Registered Professional
Reporter, Certified Realtime Reporter, Florida
Professional Reporter, certify that I was authorized to
and did stenographically report the deposition of
KRISTEN ZANKL; that a review of the transcript was
requested; and that the foregoing transcript, Pages 1
through 44, is a true record of my stenographic notes.

          I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

          The certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or direction of the reporter.

          DATED this 20th day of November, 2022.


          _____
          Angela Connolly, RPR, CRR, FPR-C

Harry Winderman, Esq.
WEISS, HANDLER & CORNWELL
2255 Glades Road
Suite 205E
Boca Raton, Florida 33431


DATE:   November 21, 2022


In re: Auto Wholesale of Boca, LLC


Dear Mr. Winderman:

This letter is to inform you that the deposition taken on November 14, 2022 in the above-captioned matter has been completed and is ready for KRISTEN ZANKL to read and sign.

The transcript is being held in my office.  Please make arrangements with my office so she can read and sign her deposition.

Thank you for your prompt attention to this matter.


Cordially yours,

*Angela Connolly*

Angela Connolly, RPR, CRR, FPR-C


cc: Evan D. Appell, Esq.
    C. Cory Mauro, Esq.
    James Miller, Esq.
    Jerrell Breslin, Esq.
    David Softness, Esq.
    Scott Gherman, Esq.

ERRATA SHEET

IN RE: AUTO WHOLESALE OF BOCA, LLC
Case No. 9:22-BK-15627
Taken: November 14, 2022

DO NOT WRITE ON TRANSCRIPT - - ENTER CHANGES HERE:

Page: _____          Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____          Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____          Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____          Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

Page: _____          Line: _____
Now reads:
_____
Should read: _____
Reason for Change: _____

        Under penalties of perjury, I declare that I
have read my foregoing transcript and, together with any
changes made above, the facts stated herein are true.


_____          _____
KRISTEN ZANKL                                     Date

**Exhibits**

11-14-22 Kristen Zankl - Derek Stephens' Exhibit 1 10:15,19

11-14-22 Kristen Zankl - Derek Stephens' Exhibit 2 10:16,21 14:21

11-14-22 Kristen Zankl - Derek Stephens' Exhibit 3 15:12,18 22:17

11-14-22 Kristen Zankl - Derek Stephens' Exhibit 4 19:15,18

**$**

$20 37:11

$250,000 37:14

**1**

1 10:15,19 23:1

11 28:12 31:17 41:17

12:55 23:1,6

1:00 23:6

1:23 44:6

1st 8:5 12:8,17,18

**2**

2 10:16,21 14:21 28:2 33:9 39:19

2013 7:1 13:5

2022 7:6,11 27:19 28:12 30:24 31:5,8,11 33:9 41:17

21st 43:22

22 31:17

2nd 14:9

**3**

3 15:12,18 22:17 40:4

**4**

4 5:14 19:15,18

458 7:2 13:5

**A**

accept 31:15

accounting 11:22

accused 30:5,7

acknowledge 43:8

active 32:17

adamant 9:14 12:5

address 13:25 19:16

affirmatively 23:18

agency 21:17

agree 29:22

agreements 13:18 32:13

ahead 34:18

Alana 11:10 28:16 29:11, 14,17,21 30:6 33:12 34:13,19,23 35:2 42:5

Alana's 29:15

Appell 5:8,10 10:23 15:20 19:20 22:25 23:4,7 24:1 25:7 43:20,25 44:2

April 7:6 8:5 12:8,17,18 14:9 33:9

area 10:12 13:2 19:5 27:14 42:10,12,23

argue 35:24

arrested 8:7,8

aspect 11:18 18:24 19:2,9 27:1 36:17

assigned 42:6

assignment 32:10

assume 22:11

attesting 34:8

attorney 29:6 32:2

attorneys 16:22 23:10

authority 29:23 30:16

Auto 14:19 15:3 20:10,19, 23 22:12,20 25:14 33:9, 20,25 34:4,20,25

automobile 25:17,22 26:2, 14 28:11 31:25 32:3 41:3

automobiles 24:24

autopilot 27:24

aware 26:12,17 38:15,19, 20

**B**

back 8:12,19,25 9:3 10:3 16:2,15,20 18:25 20:16,21 21:21 22:7 23:1,16 34:3 37:3,6,9,12,19 43:2,10

Bailey 29:11,17,21 30:6 33:12 34:19,23 35:19 42:5

Bailey's 28:16 29:14 34:13

balance 12:2

Bar 37:1

base 41:20,23

based 14:23 18:4,6

basically 27:19

basis 13:3 18:9

bat 29:20

Beach 7:7 26:15 27:10 28:8,11 29:22 30:17 31:17 32:6,11,14,20,23,25 33:8, 17,20,25 34:8,10 35:20 36:6 38:3 41:5 42:2

Beach's 28:21

beginning 31:13 38:18

behalf 5:10 25:5

belief 25:16

believed 15:3 21:2 43:9

belong 15:9 24:25 38:8

belonged 8:18 9:8,11 15:10 20:10,19,23,25 23:13,18 26:25 27:3 38:9, 10

belongs 20:9,19 25:17

benefit 29:22

big 10:12 24:20

Bill 33:16,19,25 34:20

black 6:12 9:23

board 7:10

Boca 16:25 25:15 33:9,20 34:1,5 35:1

body 11:25

bother 42:14

bottom 11:4 39:11

box 10:10

break 23:5

Breslin 25:9 43:14

bring 8:25 9:2

brings 8:23

Broward 32:22

business 11:19 12:3 13:2 18:24 19:2 21:13 27:2,20, 21 30:3,21,23 31:2 38:3 42:10

busy 8:9

buying 7:17 42:13

**C**

calling 11:22

Capital 37:1,5

car 8:13,15,17,18 9:8,11, 13,15,16,18,21,25 13:12 14:10 15:4,8,23,25 16:2,3, 5,7,8,20 17:18 18:14,18 19:6 20:13,23,25 21:2,4,7, 9,11 23:18 24:6 27:9 34:21 37:13,17,18,19 38:8,10,12,23 41:6,16,18 42:3,6,15,18 43:2,9,10

care 42:13

cars 9:19 10:7 11:14 12:24 14:9 42:13

Certificate 28:4,7

change 19:1

chaotic 24:22

check 16:6 21:22

claim 26:14 38:11

claims 31:16 34:25

clarifying 21:1

Clayton 28:7

collateral 12:24

collect 10:9

collected 10:8

communicate 43:7

communicated 7:23

communicating 15:14,16, 24 16:14

communications 15:21 16:12 21:16

concept 19:8

concerned 27:7

concluded 44:5

conduct 27:22

confer 26:1,7

confirming 6:11

Connolly 43:20

consignment 19:7

controller 11:22

conversation 16:17 17:14, 24 18:11 21:23 22:9,15 23:13,15 24:5 25:21 38:1

conversations 20:24 21:1, 6 25:19 38:6,14,22 41:21

copied 20:7

copy 43:24

correct 9:5 15:16 19:11 22:13 25:18 27:20 28:8,12 29:6,12,13 30:17,24 31:5, 6,17 33:1,3,4,9,12,20 34:17 36:24,25 37:2,5,8, 16 38:4 40:17 42:16

correspondence 6:5,8,20, 21 7:20 22:20

couple 23:8

COURT 43:23

CROSS-EXAMINATION

25:12

---
**D**
---

daily 32:9

dated 12:8,17 22:3

daughter 17:12,13 20:4

day 8:24 12:14 29:18 35:14 36:6

day-to-day 7:16 13:3,17

days 7:13

deal 29:25

dealership 6:15 7:10 8:6

debt 33:1

debts 36:23 37:1,4,7

decision 38:3

defined 6:9 7:2

department 17:1,8 19:24 22:6

depo 10:15 26:19

deposition 5:13 6:25 26:7 44:5

depositions 19:1

Derek 5:10 10:19,21 15:18 19:18 20:10,20 25:17 26:4,14 28:7 41:16

Derek's 41:6

determine 16:6 42:2

direct 5:7 27:25

directed 27:22

discuss 9:24

discussed 24:13 25:24

discussion 9:21 18:4,6 24:10

dispute 24:7

document 5:11,12,15,17, 18 6:2 11:7 12:7,9,21,22 29:21,23 31:14 33:16,19, 24 34:1 39:5 40:22

documents 6:1

drinking 8:21

drive 8:21

dropped 21:6

drug 7:12 19:4

duly 5:4

duress 24:11 35:8,12,21

duties 32:6

---
**E**
---

earlier 14:8 24:9

early 7:11

effort 27:4

efforts 22:6

else's 16:8 21:11

email 9:1 13:25 14:4,7,23 19:15 20:12,16,22 21:4,14 22:2,16

emails 6:10 14:18

employee 28:20 35:20

employee's 36:5

employees 27:22 36:5

end 7:14 24:21 32:16

endorse 29:23 30:16 31:24 34:24

endorsed 35:18

enforcement 21:17,25

entitled 27:9 34:16

entity 6:19

Evan 5:9

examination 5:7 25:25 38:25

examined 5:5

Excell 20:10,19,23

excluded 26:19

execute 34:20

exhibit 10:15,16,19,21 14:21 15:12,18 19:15,18 22:17 38:24 39:1

expertise 27:14

explained 14:11 21:8

drive 8:21

extremely 12:14

eye 17:13

---
**F**
---

facilitate 16:3

fact 26:12 35:17

fact-checking 16:9

facts 26:2,3,5

familiar 20:1 31:24 32:9, 13,15,19

family 36:19

Farache 6:10 8:5,11 9:7 13:13 14:3,18 15:2 18:13 20:22 22:11,20 24:14

February 7:14

Feds 8:7

feel 42:17

feeling 43:6

Ferrari 6:12,25 7:2 8:2 10:3 13:5,10,19 17:1 18:2, 20 21:17,20 22:1,13 23:12 25:17 34:15,24

figured 21:9

filling 11:19

financial 36:18

find 30:8

firsthand 41:15

Florida 28:8

focus 28:25

follow 14:16

follow-up 22:15

forge 30:12

forged 30:10

forgery 30:6

Form 26:22 27:12 30:19, 25 31:18 42:19

forwarded 20:6 21:15

Franklin 37:4

fraud 30:6

freely 35:18

Friday 8:5

Fund 32:14,21 36:24

funded 32:20

FVP 32:14,20,22 33:1 36:23 38:11

**G**

gave 6:16 14:12

give 22:23 27:2,4 35:2

giving 11:25 12:6,23

Good 43:16

Group 20:10,19,23

Guarantee 39:2

guaranteed 33:1,3 36:23 37:1,4,7

guarantees 36:16

guess 10:6,10 13:6 20:5 34:18 35:6,7,9

guessing 19:23

gun 35:18,22 36:4,7

**H**

hand 25:1,4

handed 10:2,4,5 11:15 12:22

handle 42:24

handled 36:17,22 42:7,9

hands 43:5

handwriting 28:14,16,18, 19,21

handwritten 33:7

happened 21:8

hard 11:25 12:6

head 35:19 36:7

heads 36:5

held 35:18 36:7

helped 43:10

helping 7:11

Hillsboro 28:8

hit 28:2

hold 36:4

home 8:20

honest 11:13,17 16:9,15 17:23 20:15 30:8

honestly 11:1 12:10,13 20:17 23:14

house 8:21 14:12

HR 7:11 19:3 32:7

husband 7:8 16:11 24:10 25:22 26:1,8,13 27:20 30:5 31:4 33:3 35:19 36:17,20 37:15,20,24 40:7,24 43:5

husband's 6:25 36:4 38:25 39:14,16,19,23

**I**

idea 18:23 20:17 28:22 30:13

identification 10:20,22 15:19 19:19

identified 11:14

ill 27:20

important 42:17

included 12:21 13:7

incredible 35:13

information 14:24 15:2

initial 40:5,7

initialed 40:11

initials 39:8,11,13,14,15, 16,17,20,21,23,24

instant 34:24

instructions 35:2

instrument 30:11

intention 14:14

intimidating 36:9

inventory 19:7

involved 11:18 13:17,21 18:17,20,23 19:2,5 27:1

30:3,21 31:21 38:13,16, 17,21 42:24

issue 25:17

issuing 33:25

**J**

January 7:14 32:16

Jerry 43:14

Jim 25:14

Johnny 8:14,15,16 9:3 14:9 38:8

Jonathan 9:4,6 13:12 14:24 15:1,7,8,10 18:5,7, 8,11,12 22:19

Jonathan's 18:16

June 16:16 23:16

**K**

Karma 7:7 13:19 16:6 18:19 26:15 27:10 28:11, 20 29:22 30:17 31:17 32:6,11,14,20,22,23,25 33:8,17,20,25 34:7,10 35:20 36:6 38:3 41:5 42:2

Karma's 16:7

keeping 17:13

key 8:14

keys 6:11,15,16,17 8:14, 19,24 9:2 10:2,4,8 11:15 14:9,12,13,15,17,20 22:12,17,21 24:17,20 25:2,5

kids 12:2 24:23

kind 12:4 18:14 22:1 27:24 30:6

knew 6:15 8:4,17 12:22 18:17 26:3 27:24 38:7

knowledge 13:16,18 21:10 41:16

KRISTEN 5:3

**L**

Lamborghini 13:20

language 33:7

law 21:17,24

leading 12:15

left 29:3 43:4

Lending 37:7

letting 42:24

lien 38:12

Lisa 8:10

list 14:20

LLC 34:5

loan 32:13

long 23:10

looked 14:21 22:16 24:9

lot 11:21 36:15,16 37:10

**M**

made 22:6

make 7:15 8:10 9:2 38:3

making 27:4

man 36:9

March 7:6,8,14 11:23 27:19 28:12 30:24 31:5,8, 11,13,17 41:17

marked 10:15,20,22 15:19 19:14,19

marketing 19:4 32:8

Martin 9:4,11,20,25 13:12 14:3,24 15:1 18:5,7,8 22:19

mention 9:16

mess 27:15

message 7:20 8:3 20:6 21:23

messages 5:21,25 6:4 20:24

Michele 14:2

Miller 25:9,11,13,14 26:20, 23 27:17 30:22 31:3,23 35:11 36:2,3,14 42:21 43:11,19,24

million-plus 37:11

minute 22:23

mom 8:9

Monday 9:1 14:15

money 36:15 37:10

month 7:13 43:22

months 17:24

Moshe 8:13,19 9:14 11:24 12:6,23 15:9 38:9

move 36:11

multiple 38:6

**N**

nature 32:11

needed 11:24,25 12:5,23

night 10:6,25 24:13

nonresponsive 36:12

nonsense 6:16 14:12

notice 5:12 10:15

numbers 13:6

numerous 20:24

**O**

object 36:13

obligated 37:15

obligations 36:19

occurred 18:12 32:15

odometer 34:8

office 8:12 9:8 24:15

officer 17:16,21 18:1 21:16 23:11 24:4

officer/detective 17:10

operated 27:19,21

operating 38:2

operations 27:18 32:5

Opportunity 32:14,21 36:24

orally 21:25

order 43:21

original 20:21

owe 36:15

owned 18:9 26:15 27:10 41:4,16 42:3,15,18

owner 12:1 18:2 28:7 31:15 37:19,21,24

ownership 17:22

owns 38:22

**P**

p.m. 23:6 44:6

Palm 7:7 26:15 27:10 28:11,20 29:22 30:17 31:17 32:6,11,14,20,23,25 33:8,17,20,25 34:7,10 35:20 36:6 38:3 41:5 42:2

paperwork 27:14

part 21:12 27:15,19 30:3, 21,23 31:4

passionate 8:16

pay 37:15

penmanship 40:1

people 36:16

person 6:7,19 17:6 30:8

personally 36:23

phone 17:11 20:3 21:22 23:12

physically 25:1,4

place 12:4 23:16

POA 29:3,4

point 15:16

police 16:25 17:8,16,21 18:1 19:23 22:5 23:11 24:4

policies 7:11

policy 32:7

potential 21:14

power 29:5 32:2

preparation 26:6

previously 14:5 22:16

printed 29:11

prior 7:19 20:12 25:25

problem 43:23

procedure 32:7

procedures 7:12

provide 17:7

provided 15:1

purchased 28:11

purchaser 33:8 34:4

purposes 6:18,24

put 5:11 33:22

puts 29:2

**Q**

qualify 35:21

question 26:24 28:23 30:2 35:23,24 36:1,2 37:23 38:19 41:15

questions 23:8 25:8,10,11 43:12,15

quick 10:14

quickly 5:11

**R**

ran 30:23 31:1

Randa 19:25

reach 22:10

reached 43:7

reaching 22:5

reading 33:21,22 43:17

real 10:14

reason 12:20 14:6 15:9 21:3 24:7

recall 16:23 17:24 23:14, 17

recognize 29:14,19 39:1,5 40:1

record 22:25 24:5

records 16:6 42:1

recover 41:4

refer 6:25

reference 9:22 17:17

referenced 20:22

referring 10:25

reflects 33:24 34:1

regard 15:25

registered 28:6

registration 30:1

relating 26:2

reluctant 8:24

remaining 9:19 13:6

remember 12:10 16:14 17:4,15,23 20:17 25:24 32:24

remove 24:24

repeated 8:15

REPORTER 43:23

represent 13:9 25:14

request 6:9 7:2

requests 5:17 6:1,22

response 40:16

responsibility 36:19

responsive 6:1,21

return 6:11,16 8:24 9:2 14:13,16,19 27:9

returned 16:4 22:12 34:16 37:13

returning 14:14

review 26:7 37:3,6,9,12 42:1

rhyme 12:20

rightful 37:19,21,24

role 7:7,16

RWHITE 19:22

Rwhite@ci.boca. 19:21

**S**

Sale 33:17,19,25 34:20

salesman 18:17

Saturday 8:12

Scott 7:15 11:19 12:2 42:7,8,14,17 43:6

screaming 11:23

screen 5:11 10:14,17 13:22,23 19:13 28:1,2,3

scroll 34:2

search 20:16

seeking 41:4

seller 29:1 33:8

selling 7:17 42:13

Send 43:24

sending 14:6,16,23

sense 8:10

series 39:7

share 10:14 13:22 19:12 28:1 33:15

sharing 13:15

sharper 28:24

short 23:5

show 38:24 39:7

showed 24:23

showing 19:14

showroom 10:12 11:2 24:20 38:7

shows 28:10 33:6

sick 7:9 12:3

sign 29:1 30:14 31:22 39:25

signature 11:3,5 29:2,10, 14,16,19 34:13 39:22 40:9,10,20

signed 12:8 13:19 29:17, 21 30:15 33:12 40:22,24

simple 35:23,25 36:2

sit 41:2

sitting 12:19 21:10

sold 19:7,8 42:6

solely 41:23

son 8:20,23 9:7 14:11

son's 8:21

sons 8:6 10:7 24:14

sort 17:7

sound 19:25

speak 16:11,25 17:3,6

specific 12:20 26:5

specifically 16:14,23

specifics 13:2

Spider 7:2

spoke 8:2 16:13,21 17:5, 10,16,17 20:3 21:24 23:12

spoken 7:23 21:19

standing 10:13 24:19 36:9

stands 29:5

start 15:13

started 7:10 15:15 32:16

stated 14:8 23:18 24:6

statement 17:8

stay 33:5

step 32:16

Stephens 5:10 6:5 7:20,24 13:19 15:16 16:12 17:5 18:2,7,9 20:7,11,20,25 21:20 22:7 23:13,19 24:6 25:18 27:5,9 28:8 31:16 34:16,25 37:14,15,18,22 38:6,10 41:4,8,9,24 43:2,7

Stephens' 10:19,21 15:18 18:20 19:18 20:13 21:2,4 26:14 38:12 41:16,18

stop 13:15 33:14

store 12:1

story 14:10,13

stressful 12:14,15

strike 36:11

stuff 12:3 29:15

STZ 39:24

subject 26:14

suggested 8:22

sworn 5:4 17:7 26:13

**T**

tags 29:25

talked 13:20 22:4 25:23

talking 7:1 13:10 14:4 26:4

Teddi 11:21 12:4

telling 13:13 18:13 38:21

testified 5:5 25:16 43:1

testify 26:21 40:19

testifying 41:2

testimony 26:13

testing 7:12 19:4

text 5:21,25 6:4 7:19 8:2 20:24 21:23

texting 26:4

texts 24:9 43:8

thing 7:12 8:4 32:18

things 32:10

thought 27:6

time 9:6,17 11:16,25 12:6, 7,19 21:5,19,24 22:3,4 25:8 27:6 44:3

title 28:4,7 30:17 31:25 33:6 34:24

titles 24:11 29:25 32:10 35:17

today 5:13 21:11 27:8 41:2

today's 25:25 26:6

told 8:6,14 9:8 14:9 17:15 30:20 38:8,11 41:6,7,10, 11,14,24 43:8

top 13:25

transaction 7:17 8:1 18:18 38:17

transactions 18:20 27:23 32:10

transcripts 43:21

transfer 32:3

Transferor 34:10

transferred 42:6

transpired 10:13

true 31:15

trust 8:10

truth 19:1

turn 33:17

type 7:12 11:6 32:17 38:14,17

typed 11:12

typically 15:22

**U**

Uber 8:23

Uh-huh 29:7

Uh-oh 39:10

Unconditional 39:2

understand 7:1 8:11 13:4

upset 18:13

**V**

vehicle 6:8 10:3 17:22 18:10 22:1,7,17,21 31:15

vehicles 7:17 10:24 11:15 12:20 14:20 20:14 24:11

verbally 23:12

videotape 35:14

VIN 13:6,9

volunteer 35:12

volunteered 41:14

**W**

waiving 43:18

wanted 12:23 37:18 43:7

warm 11:25

weeks 7:8,15 11:23 12:14

27:18 31:7,11 36:10

**White** 19:25 20:13 21:16

**Wholesale** 14:19 15:3 22:12,21 25:15 33:9,20 34:1,5,21,25

**wife** 8:5 10:7 24:23

**Winderman** 23:23 26:18, 20,22 27:12 30:19,25 31:18 35:9,25 36:13 42:19 43:13,16 44:1

**Woodside** 37:7

**word** 18:16 23:15

**word-for-word** 16:17

**wording** 19:10

**work** 23:2

**worked** 24:24

**works** 32:3

**world** 15:9

**write** 14:18

**writing** 14:2 19:21 33:10

**written** 6:7,20 17:7 21:25 24:5 28:13

**wrote** 20:9,13,18 21:4

---
**Y**
---

**yelling** 11:23

---
**Z**
---

**Zankl** 5:3,9 25:14 40:19 42:14,18 44:2