UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO.: 9:22-BK-15627

CHAPTER 11

In re:

AUTO WHOLESALE OF BOCA, LLC,

  Debtor.

----------------------------------------/

- - -

DEPOSITION OF KEITH LEE
A WITNESS
TAKEN BY THE INTERESTED PARTY,
DEREK STEPHENS
REMOTELY VIA ZOOM

- - -

DATE:  November 16, 2022

TIME:  10:03 - 11:25 a.m.

PLEASANTON & MARSAA COURT REPORTING
561.963.9700

I-N-D-E-X

November 16, 2022

KEITH LEE

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| By Mr. Mauro | 5 | | | |
| By Mr. Breslin | | 44 | | |
| By Mr. Miller | | 53 | | |
| By Mr. Winderman | | -- | | |
| By Mr. Pendergraft | | -- | | |
| By Mr. Gresham | | -- | | |

EXHIBITS

| | Identified |
|---|---|
| Derek Stephens' Exhibit 1<br>Exhibit R | 14 |
| Derek Stephens' Exhibit 2<br>Karma letter, 04/01/22 | 22 |
| Derek Stephens' Exhibit 3<br>UCC-1 | 30 |
| Derek Stephens' Exhibit 4<br>Verified Complaint for Injunctive<br>Relief and Monetary Damages | 40 |
| FVP Exhibit 1<br>Breslin email, 10/12/22 | 50 |
| FVP Exhibit 2<br>list of Dropbox folders | 58 |

Letter to Jerrell Breslin, Esq.

Errata Sheets (to be forwarded upon completion)

PLEASANTON & MARSAA COURT REPORTING
561.963.9700

The deposition of KEITH LEE, an Adversary Plaintiff in the above-entitled and numbered cause was taken by me, Ann Marie Pleasanton, Registered Professional Reporter, Florida Professional Reporter, remotely via ZOOM, on Wednesday, the 16th day of November, 2022, pursuant to Notice in said cause for the taking of said deposition on behalf of the Interest Party, Derek Stephens.

APPEARING ON BEHALF OF DEBTOR:

    James B. Miller, Esq.
    JAMES B. MILLER, P.A.
    19 West Flagler Street
    Suite 416
    Miami, Florida  33130

APPEARING ON BEHALF OF ADVERSARY
  PLAINTIFF FVP:

    Jerrell Breslin, Esq.
    BARON, BRESLIN & SARMIENTO
    The DuPont Building
    169 East Flagler Street
    Suite 700
    Miami, Florida  33131
        & 

    David R. Softness, Esq.
    DAVID R. SOFTNESS, P.A.
    201 South Biscyane Boulevard
    Suite 2740
    Miami, Florida  33131

APPEARING ON BEHALF OF INTERESTED PARTY
DEREK STEPHENS:

    C. Cory Mauro, Esq.
    Evan D Appell, Esq.
    MAURO LAW, P.A.
    1001 Yamato Road
    Suite 401
    Boca Raton, Florida  33431
       &amp;
    Derek Stephens


APPEARING ON BEHALF OF INTERESTED PARTY
KARMA of PALM BEACH, INC., KARMA OF
BROWARD, INC.:

    Harry Winderman, Esq.
    WEISS, HANDLER & CORNWELL
    2255 Glades Road
    Suite 205E
    Boca Raton, Florida  33431


APPEARING ON BEHALF OF CREDITOR EDVARD
DESSALINES:

    Eric S. Pendergraft, Esq.
    SHRAIBERG PAGE, P.A.
    2385 N.W. Executive Center Drive
    Suite 300
    Boca Raton, Florida  33431
       &amp;
    Greg Nelson


APPEARING ON BEHALF OF CREDITOR FARACHE
ENTERPRISES:

    Scott C. Gherman, Esq.
    SCOTT C. GHERMAN, P.A.
    902 Clint Moore Road
    Suite 120
    Boca Raton, Florida 33487
       &amp;
    Moshe Farache

- - -

THEREUPON,

KEITH LEE,

having been first duly sworn by myself remotely

via ZOOM, was examined and testified as follows:

THE WITNESS:  Yes.

DIRECT EXAMINATION

By MR. MAURO:

Q.   Good morning, sir.

Could you please state your full name?

A.   Keith Lee.

Q.   Mr. Lee, what is your position with FVP?

A.   I'm the managing partner for the... for

FVP and its affiliates.

Q.   When you say "affiliates," does it have

a great many affiliates?

A.   A few affiliates, yes.

Q.   Can you tell me what they are?

A.   Sure.

The Plaintiff is FVP Opportunity Fund

III, which is a limited partnership where I serve

as the general partner, the general partner of

the fund.

And then there's another, which is FVP

Investments where it's wholly owned by a company

where I'm the CEO.

And then there is FVP Servicing, which is the agents on the loan and I'm also the CEO.

Q. Thank you.

What kind of business is FVP in?

A. We're in the business primarily of lending.

Q. And is that your -- personally is that your professional background?

A. It is.

Q. How long have you been in that business generally?

A. I have been in the lending business for... since 1994.

Q. Did you graduate from college?

A. Yes.

Q. Where did you go?

A. I went to Knox College in Galesburg, Illinois.

Q. What kind of degree?

A. I have a Bachelor of Arts in economics and philosophy.

Q. How about grad school?

A. I went to the University of Chicago, Booth School of Business.

Q. When did you graduate?

A.   1998.

Q.   Okay.

So you were in the lending business even before you graduated from Chicago; is that correct?

A.   Yes.

As an analyst first and then even during business school I had an interest...

Q.   Okay.

I saw that you worked for...  well, strike that.

What other companies have you worked for?

A.   Several companies beginning with a small insurance company after college called Capital Markets Insurance Corporation.

And then I worked at CAC World Markets.

Lehman Brothers.

Goldman Sachs.

UBS Investment Bank.

And then H/2 Capital Partners, which is a large commercial real estate debt platform.

And then I founded Feenix.

Q.   Thank you.

And I saw quite a bit of litigation out

there.

I presume you have been deposed a few times; is that correct?

A.   Once.

Q.   Only once?

A.   Yes.

Q.   Okay.

I'm gonna ask you questions today, this won't be too long.

It's very important that we allow each other to finish talking, particularly while we're on Zoom, so the court reporter can take everything down.

If you need a break, please don't hesitate to ask me to take one.  I want to keep you comfortable and keep this moving.

Okay?

A.   Sure.

Q.   Are you planning, by the way, on testifying live at the...  I will call it the trial for the final hearing of this matter on November 28th?

A.   I'm not sure.  I haven't discussed that with counsel yet.

Q.   Are you planning on attending the

hearing in person?

A.   If I can.

I'm based in New York.

Q.   Understood.

Is that where you are today?

A.   Yes.

Q.   Okay.

FVP entered into some contracts with the Zankls and Karma in January 2022; is that right?

A.   That's correct.

Q.   Was that the first instance of you doing business with those folks?

A.   Yes, it was.

Q.   How did you meet them?

A.   We met them through a consultant (indecipherable) --

THE COURT REPORTER:  A consultant...

I'm sorry, I didn't understand.

A.   A consultant at Biltmore Consultants, with a gentleman by the name of Frank O'Donnell.

Q.   Was Mr. O'Donnell hired by the Zankls or Karma?

A.   He was supposed to be the outsource CFO for Karma.  That's what was represented to us.

Q.   Okay.

What was the understanding at that time of why Karma needed money?

A.   Karma needed...  Karma needed...  my understanding was that they needed money to purchase inventory for the dealership.

Q.   "Inventory" being vehicles?

A.   Vehicles.

Q.   Instead of -- we will look at some of them, but there were some documents signed in January of 2022, correct?

A.   That's correct.

Q.   And my question is:  Was there ever another time that you signed documents with Karma and/or the Zankls, other than that batch of documents that was signed in January of 2022?

A.   There might have been in terms of subsequent funding requests.

I'm not sure.

Q.   Do you know as you sit here today what the initial fund was, how much you lent them?

A.   I think it was something on the order of $3 million, $3.5 million.

I don't have that closing statement.

Q.   Okay.

And after the 3 million, there was

subsequent funding?

A.   Yes, two.

Q.   Two instances?

A.   Yes.

Q.   And so what was the total that you lent them?

A.   7.5 million.

Q.   In the general sense, Mr. Lee, can you explain to me how the general transaction worked?

You lent them money and then what did they agree to do in return?

A.   We lent them money and it was a regular way secured loan, secured by the... all of the borrower's inventory and they would have to maintain a borrowing base consisting of cash plus cars to satisfy the appropriate coverage for us.

Q.   Okay.

And how... how did you determine what was within their inventory?

A.   Contractually, they needed to supply reports.  I can't remember the exact frequency, but it's outlined in the documents.

And then as well as our ability generally to do periodic audits at our discretion.

And that's what we also coordinated with Frank O'Donnell at Biltmore Consultants, to provide us with that information as we needed.

Q.   Were you provided the required reports?

A.   Not all of them.

Q.   Tell me what you were provided.

A.   We had an initial list of inventory some... a group of titles and then on each funding request, associated either titles or payoff amounts on the cars.

And we got a regular update of cars in inventory.

Q.   Do you know when that initial list was provided to you?

A.   It was provided a few times.

Certainly before closing.

Q.   Okay.

And physically what did it look like? Was it just a list of cars or what was on that?

A.   It was an Excel spreadsheet that had a description of the inventory of the vehicles.

Q.   I'm going to show you...

(Document displayed on the screen via SHARE.)

Q.   Can you see this?

We timed out here, hold on.

Are you able to see my screen right now, Exhibit R?

A.   Yes.

Q.   Okay.

Is this the report that you just described?  Or one of them?

A.   I think it's a... it's an extraction from other spreadsheets that we received.

Q.   Okay.

Can you elaborate on that?  How was this extracted?

A.   I think this -- we prepared this as a summary list from a larger file.

Q.   Okay.

So the larger file consisted of what additional information, if any?

A.   I would have to look, but this is dated March 12th and so we had other inventory lists pre-closing and maybe periodically after closing, as the compilation changed.

Q.   Okay.

Do you have a record of the original materials that you would have received and prepared this exhibit from?

A.    We would have to search our folders.

Q.    Okay.

      This is an inventory list as of March 12th, 2022; is that correct?

A.    Yes.

Q.    And just so I understand, there are other spreadsheets that were provided to you, FVP, from which FVP prepared this document, correct?

A.    I believe so.

      MR. MAURO:  Madam Court Reporter, I'm going to drag in documents into the Chat to be used as exhibits, if that suits you.

      Is that okay?

      THE COURT REPORTER:  Sure.

      Thank you.

      MR. MAURO:  That will be Exhibit 1.

      (Exhibit R was marked as Stephens' Exhibit No. 1 for identification, upon receipt, and a photocopy is attached hereto.)

Q.    So in terms of collateral, pursuant to this agreement that you have testified about, FVP had an interest, security interest, in vehicles that were purchased by Karma; is that correct?

A.    Purchased or held.

Q.   Purchased or held?

A.   Owned.  We had an interest in all assets of Karma.

Q.   Okay.

FVP doesn't take the position that it had an interest in vehicles that were on a consignment with Karma, correct?

A.   I don't know how to answer that.

Q.   Why don't you know how to answer that?

A.   It's, it's a legal conclusion.

We just had a blanket, you know, all assets.  If there was value to the consignment contract, I would imagine that's an asset as well.

(Scott Gherman, Esq., enters the Zoom deposition.)

Q.   Would FVP have an interest in property that was on the Karma premises not owned by Karma?

A.   If it's not a Karma asset, we wouldn't have an interest in it.

Q.   You wouldn't have an interest in borrowed property, correct?

A.   "Borrowed property" as in...  if it's an asset on Karma's balance sheet, we would have in

interest in it.

          If it's a liability in Karma's balance sheet, we would...

     Q.   FVP wouldn't have an interest in stolen property that was on Karma's facility, agreed?

     A.   I don't think so.  Yes, I agree.

     Q.   When we go back to that spreadsheet that we just looked at that was marked as Exhibit 1 to your deposition, there's no mention on it of the Ferrari that we're here talking about today.

          Do you agree?

     A.   If it's not on that list, that's correct.

     Q.   Okay.

          And I suppose I should clarify...  are you aware of what car we're here talking about today?

     A.   Just from the -- reviewing the Complaints.

     Q.   Okay.

          And so I'm kind of going back to the materials that were provided to you.

          I think you said that you were provided some reports and also some title documents in order to track your collateral; is that accurate?

A.   Yes.

Q.   All of those documents were provided to you by Karma?

A.   Karma or Frank O'Donnell acting -- representing himself as an agent of Karma.

Q.   Do you know where Frank O'Donnell was physically located?

A.   I think he's based in the Charlotte area.

Q.   Did Frank O'Donnell provide FVP with any documents that relate to the Ferrari we're here talking about today?

A.   I would have to look through our records, but I don't know offhand.

Q.   Okay.

And it was your understanding that Frank O'Donnell was an agent of and working for Karma; is that correct?

A.   Yes.

He said -- he represented to me to be the outsourcer and he's actually in our loan documents.

Q.   Uh-huh.

Now, you also reference periodic audits, sir.

Did FVP conduct any audits of Karma's inventory?

A.   Physically, no, post-closing.

Q.   I'm sorry, say that again.

A.   Post-closing, we did not.

We did a physical onsite inspection prior to closing.

Q.   Was the Ferrari we're here talking about today part of the inventory when the physical audit was done prior to closing?

A.   I just have to look at the inventory list.  There was sixty some vehicles on that.

Q.   Okay.

You don't know?

A.   I don't know off the top of my head.

Q.   And post-closing, so after January 2022 forward, FVP did not conduct a physical audit of Karma's inventory, correct?

A.   That's correct.

Q.   Now, you were careful to say physical audit.

Did FVP conduct any other kind of audit of Karma's inventory post-closing?

A.   We had regular dialogue, not me personally, one of my partners that works for me.

We had ongoing regular dialogue with Frank O'Donnell as well as the main principal at Karma, Scott Zankl.

So, you know, as to inventory related to the collateral, we have general inspection rights under our loan documents and so I would say that... again, maybe -- I'm not a lawyer, so I don't know exactly, but as a... from a layman's perspective it would fall under the umbrella of inspection rights.

Q.    Yeah, fair enough.  I get that.

Who was your partner who had the dialogue?

A.    Primarily Matthew Pilkington.

Q.    Can you spell his last name, please?

A.    P-i-l-k-i-n-g-t-o-n.

Q.    And were you included in any of that dialogue?

A.    Not in verbal communications, but I would imagine I was copied on... potentially on any emails.

Q.    As you sit here today, are you aware of any emails or other written communication that concerned the Ferrari we're here talking about today?

A.   I'm not aware, but, again there's a lot of cars.

The only correspondence that I think would be related to this proceeding right now.

Q.   Fair enough.

Did you ever speak directly with Scott Zankl about the car we're here talking about today?

A.   I don't think so.  Not that I can remember.

Q.   Did you ever speak directly with Frank O'Donnell concerning the car we're here talking about today?

A.   I don't think so.

Q.   Do you know whether Matthew Pilkington or anyone else within your organization spoke to either Frank O'Donnell or Scott Zankl about the car we're here talking about today?

A.   I don't think so.

Q.   It sounds to me like you had to rely on Scott Zankl and Frank O'Donnell in order to know what cars were part of the inventory; is that right?

A.   Yeah, that was pretty much the only way because as the dealership's inventory...  it is

expected to evolve.

Q. Yes.

There was apparently I will call it a meeting that Mr. Farache was involved in and Kristen Zankl was involved in where title to the car we're here talking about today was one of the subject matters of discussion.

Are you familiar with what I'm talking about?

A. If you're referring to the... a letter that Kristin Zankl signed, yes.

Q. Okay.

And when I say "meeting," are you aware that those people that I just mentioned were in the same physical space at or about the same time that letter was prepared?

A. Only indirectly. Meaning that I wasn't there obviously, but I was told.

Q. Sure.

What do you know about that particular meeting as it relates to the Ferrari we're here talking about today?

A. Just, among other things, my recollection of what transpired was there was a demand on the part of Moshe Farache either direct

by himself or through his related entities and...

to handling her vehicles for initially as a loan,

that served as collateral for a loan that Farache

-- I would say Farache and all of the Defendants

on our...  to handle vehicles initially under a

loan that he had made to Excell Auto and a letter

acknowledging those vehicles or some of the

vehicles that were itemized, including the

Ferrari.

Q.   Thank you.

I'm gonna share my screen, make sure
we're talking about the same letter.

(Document displayed on the screen via

SHARE.)

Q.   Can you see my screen?

A.   Yes.

MR. MAURO:   We will mark this as Exhibit

2.

(Karma letter, 04/01/22 was marked as

Exhibit No. 2 for identification, upon

receipt, and a photocopy is attached hereto.)

Q.   I will just scroll so you can see the

signatures.

Is this the letter that you were

referring to?

A.   Yes.

Q.   Okay.

And the first sentence of the letter says:  The following titles are being given to Auto Wholesale of Boca, LLC, as collateral against the loan amount of blank.

And then here I'm highlighting 2013 Ferrari 458.

Is it your understanding that that's the Ferrari we're talking about today?

A.   Yes.

Q.   And to save money on the transcript we're just going to call it Ferrari; is that fair?

A.   Sure.

Q.   Okay, great.

This letter is effectively what put the Ferrari on FVP's radar; is that fair?

A.   Can you explain that?

Q.   Yeah.

You didn't...  FVP didn't learn about the Ferrari through Zankl or Mr. O'Donnell having recorded it as part of Karma's inventory, correct?

A.   That's correct.

There was no... we never pay attention to a specific car because we had a lien on all inventory, which was constantly changing.

Q.   Right.

In the wake of the letter that we marked as Exhibit 2 to your deposition, are you aware of whether Karma and/or the Zankls took the position that the Ferrari was not part of its inventory?

A.   I wasn't aware.

Q.   Do you know that through these proceedings?

And I'm not asking you to talk about anything that you discussed with your lawyer, but are you aware through these proceedings that there have been inconsistent statements on behalf of the Zankls or Karma concerning whether that car was part of inventory?

A.   I haven't been a part of these discussions.

Q.   Do you believe Karma's recordkeeping was accurate?

MR. WINDERMAN:   Form.

A.   Excuse me?

MR. WINDERMAN:   Form.

Q.   You can disregard that.

A.    Reasonably accurate.  I think they kept a good log of transactions.

(Greg Nelson entered the Zoom deposition.)

Q.    Do you believe that the Zankls' and Karma's recordkeeping was trustworthy?

MR. WINDERMAN:  Form.

A.    I...  I can't make that conclusion, but I think that the information that we reviewed -- that we -- are factually accurate.

Q.    Do you have any pause as you sit here today to doubt the recordkeeping of the Zankls or Karma?

A.    I haven't reviewed all of the materials. I don't think it can be...

I can't draw a definitive conclusion. Obviously this is a situation where we're gonna be skeptical about everything.

Q.    Including the Zankls' recordkeeping?

A.    I think it's...  you know, this is... this is verify, verify, verify.

Ordinarily there's trust but verify; this is just verify.

Q.    Now, in your view, do the Zankls have an incentive to now maintain that the Ferrari was

part of Karma's inventory?

A.    I don't... I don't think they have a particular incentive.  Their decisions on this is far greater than just one car.

Q.    Did Mr. and Mrs. Zankl personally guarantee the indebtedness to FVP?

A.    They did.

Q.    So reducing that indebtedness would be in the Zankls' personal best interest?

A.    To...

      I don't understand your question.

Q.    You didn't understand it, okay.

      Well, if the Ferrari is treated as collateral within the meaning of the security agreement, then that would go to reducing Karma's indebtedness to FVP, you agree?

A.    On that, yes.

Q.    Okay.

      And that would, in turn, reduce the personal liability on the personal guarantees of the Zankls, you agree with that?

A.    Yes.

Q.    Okay.

      So going back to the letter that we looked at... were there other documents that FVP

relied on in concluding that the Ferrari was part of Karma's inventory?

A.   I don't know offhand because I would have to review the inventory list, which without the benefit of the spreadsheets in front of me, I... it's not... it doesn't come out as something that... that I can single out.

Q.   Okay.

Let me try asking a different way.

As you sit here today as the corporate representative of FVP, on what documents does FVP presently rely to support its conclusion that the Ferrari is or was part of Karma's inventory?

A.   First and foremost, our loan and security agreement is what we rely on, which encompass all assets of the borrower.

And so we're never gonna know or we would not know as a lender what assets at any particular point in time that are possessed, which is why our documents are laid out such that it's all assets.

And so as these situations, as we sit here today and we're in a recovery mode on our loan, we would do extensive recovery on reclaiming all assets from the borrower, which is

the exact situation here.

Q.   Besides the loan and security agreements in the lien, as you sit here today are you aware of any other document that supports or relates to FVP's claim that the Ferrari was part of Karma's inventory?

A.   Yes.

Q.   What?

A.   Those would be the... some of the documents in our response complaint, including various different sales, purchase and sales agreements.

Q.   And when you say attached to the complaint, you're referring to your response to my client, Mr. Stephens' motion to essentially release the car from the bankruptcy proceedings; is that correct?

A.   Yes.

I think there's a number of exhibits that show multiple transactions related to that car.

Q.   Other than the exhibits to that response, are you aware of any other documents that pertain to that issue?

A.   I'm not aware personally.

Q.   And the first part of your answer was that FVP would rely on its loan and security documents and its lien, correct?

A.   Yes.

Q.   I'm going to show you the UCC filing...

(Document displayed on the screen via SHARE.)

Q.   January 26, 2022, UCC filing which reflects, quote, all assets of debtors now owned or hereafter acquired and wherever located.

And the debtor is identified and included Karma of Palm Beach, Inc.

Is this -- when you say the lien, is this what you mean?

A.   Yes.

Q.   Okay.

And, as far as you know, this is a one-page document, it is what it is, we're looking at it; is that correct?

A.   Yes.

**And it is supported by the security agreement.**

Q.   Okay.

MR MAURO:  And we will mark this as Exhibit 3 and drag it into the Chat before I

forget.

(UCC-1 was marked as Stephens' Exhibit No. 3 for identification, upon receipt, and a photocopy is attached hereto.)

Q.   And it goes without saying, the UCC filing does not identify the Ferrari, correct?

A.   **That's correct.**

Q.   Nor do the transaction documents?

A.   **That's correct, it's changing.**

Q.   Okay.

So the documents that you are aware of that relates specifically to whether the Ferrari was part of inventory are those documents that are included in your response, correct?

A.   **Yes.**

Q.   Okay.

(Document displayed on the screen via SHARE.)

Q.   I'm showing you Response to Derek Stephens' Motion to Compel Turnover of 2013 Ferrari and to Abandon Title and Request for Order to Show Cause.

Is this the document that you are referring to?

A.   **Yes.**

Q.   And I'm just going to scroll through, tell me when to stop...

But we have got a Purchase Agreement here...

We have a Consignment Agreement here...

We have another Purchase Agreement here...

We have what's called the Trade Pack...

A.   Yes.

Q.   Certificate of Title...

Of the documents that we just looked at, do you have any personal knowledge as to any of the transactions reflected in those documents?

A.   **No personal knowledge other than these exhibits.**

Q.   In other words, you learned about these matters through these exhibits after the fact, correct?

A.   **Yes.**

Q.   There is some redacted bank statements here reflecting payments.  You don't have any personal knowledge concerning these payments of $250,000.00 and $22,337.88, correct?

A.   **That's correct.**

Q.   We have already talked about the letter.

Exhibit G to the response, which is the last page of it, purports to be an Odometer Disclosure Statement dated April 2nd, 2022.

Do you have any personal knowledge of this document?

A.    Just what we see here.  No.  Other than that, no.

Q.    Okay.

I'm showing you now the Notice of Taking Deposition of Corporate Representative of FVP Opportunity Fund III and we requested some documents in this Notice of Deposition.

The first category are all documents relating to, referencing or discussing your ownership or security interest in the 2013 Ferrari 458 Spider.

Are the documents that we have looked at attached to your response and the transaction documents from January of 2022 the universe of documents that would be responsive to request number 1?

A.    I believe it is.

Q.    I'm not missing anything that as you're sitting here today you know of; is that correct?

A.    I think we searched all of our relevant

files that we had and there is hundreds and hundreds of files and documents, but this is...

Did we use our prudent efforts to try what we could?  Yes.

Q.   And as you sit here today, those that we have talked about attached to the response and the transaction documents of January of 2022 are all of the documents that you found relating to this issue, correct?

A.   That's correct.

Q.   Okay.

The second category here is:  All correspondence, including, but not limited to, text/SMS messages, referencing, relating to or discussing the vehicle.

I asked you about this before, but just in the context of the document request, sir, are you aware of any text messages or emails or correspondence that relate to the vehicle?

A.   I'm not aware of any, other than what we have produced.

(Document displayed on the screen via SHARE.)

Q.   I'm showing you the Verified Complaint for Injunctive Relief and Monetary Damages filed

by FVP against Karma, the Zankls, Farache, Auto Wholesale of Boca, MMS Ultimate Services, Excell Auto Sport and Service and Excell Auto Finance.

Are you familiar with this document?

A.   I am.

Q.   FVP alleged that at the time of filing it was, quote, objectively apparent that the Zankls and their co-conspirator, Farache, engaged in an outright and bold scheme to defraud the Plaintiffs in an attempt to convert the funds received from the Plaintiffs into expensive exotic automobiles.

You further allege that the fraudulent scheme was to then transfer the collateral automobiles outright to Farache and his companies in satisfaction of obligations arising from a fabricated or otherwise hidden antecedent debt, end quote.

Do you agree with that allegation?

A.   I think this was accurate at the time.

I don't know if there was a co-conspiracy, having reviewed the evidence thereafter.

Q.   So you believe that Zankl was carrying out the bold scheme to defraud the Plaintiffs and

that it was not a conspiracy with Farache?

A.   I don't know if it's...  I think we were just defrauded.  Whether they were together or they were independently, we will see...  but we were certainly defrauded by these parties because the cars that we thought were ours are no longer in our possession.

Q.   You allege in Paragraph 3 that the Zankls have claimed that they gave Plaintiffs' collateral automobiles to Farache because he threatened to kill Scott Zankl, specifically to make him disappear.

And to support this version of events, the Zankls then on April 8th, 2022, a full week after Farache took the Plaintiffs' collateral automobiles, filed a police report and reported that the Plaintiffs' collateral automobiles taken by Farache on April 1 were, in fact, stolen by extortion.

Do you agree with that allegation?

A.   I do based on what we were told.

Q.   Now, one of the automobiles that was... title for which was signed over to Farache purportedly because he had threatened to kill Scott Zankl or make him disappear was the Ferrari

we're here talking about today, correct?

A.   I believe so.

Q.   In Paragraph 6, FVP alleges that, quote, it is this lawsuit brought by the Plaintiffs which seeks to restore lawful order and common sense and to call a halt to the patent illegality and outrageous fraud of the past thirty days and have this honorable court appoint a receiver to collect and safeguard the assets which were purchased with the Plaintiffs' $7.5 million that they loaned to the Zankl companies, only to then be de facto stolen by the Zankls and Farache.

Do you agree that... do you agree with that allegation?

A.   I do.

Q.   Is it FVP's position that the Ferrari was purchased with Plaintiffs' $7.5 million?

A.   No.  I believe that the -- I'm not sure if it was purchased...  I think the purchase happened before our loan.

But we -- I believe that that was our inventory because it was owned by Karma of Palm Beach.

Q.   FVP characterizes the situation as, quote, an extraordinary case of patent fraud and

illegal conduct that requires the intervention of the judicial system on an emergency temporary basis and further on a permanent basis in Paragraph 7.

Do you agree with that?

A.   I do.

Q.   Scrolling down to Paragraph 26, FVP alleged, quote, under the guise of seeking to grow the businesses, associated with a promising new car brand in Karma, a Chinese producer of luxury electric vehicles, the Zankls sought from the Plaintiffs a substantial loan in the amount of 7,500,000 for purposes of purchasing exotic car inventory for Palm Beach and Broward.

Do you agree that that was the purpose of the loan?

A.   Yes.

Q.   I'm sorry, if there was an answer I missed it.

A.   Yes.

Q.   I'm sorry, I apologize.

And we talked about this before, sir, but contemporaneous with the loan agreement, the Zankls entered into a personal guarantee agreement personally guaranteeing all sums due

under the loan agreement, correct?

A.   That's correct.

Q.   In Paragraph... well, really generally in Section C here, there is an allegation of conspiracy.

It sounds like you're less convinced that there was a conspiracy today than you were when the allegations were made.

Is there something specific that caused you to doubt whether there was a conspiracy?

A.   I thought of it in terms of fraud.

And so conspiracy, did people act together to do that?

We have to look at all the evidence and come to that conclusion.

But at the outset, that was certainly our... we had more than a reasonable basis to draw or to make that allegation.

Q.   Paragraph 48 alleges aside from communicating to the Plaintiffs that there was a lot of stuff going on and that he would call the Plaintiffs as soon as he was finished meeting with his attorneys, Scott Zankl has refused all of the Plaintiffs' inquiries and requests concerning their collateral.

Is that a true statement?

A. Within that context, yes.

He, prior to us bringing this suit, stopped communicating with us.

Q. Now, this Complaint was... it was signed by you on April 10th, 2022.

Have there been communications with Mr. Zankl concerning the collateral since that time?

A. The collateral meaning the Ferrari or...

Q. Generally or specifically... generally collateral, specifically the Ferrari.

Either one.

A. There have been communications with Scott Zankl and us regarding our collateral generally.

Q. To your knowledge, has Scott Zankl made any statements concerning the Ferrari at issue here today?

A. I don't remember specifically talking about the Ferrari.

Q. FVP characterized the situation as rampant lawlessness with civil fraud and felonious extortion.

Do you agree with that characterization of Paragraph 54 of the Complaint?

A.   I do.

Q.   And we looked at it before, but that's your signature there on April 10th, 2022?

A.   Yes.   That was electronic signature, yes.

Q.   Fair enough, yeah.

MR. MAURO:   Tell you what, let's take just a five-minute break.   I'm going to go back through my notes and see if I have any follow-up, but we are pretty much done.   So give me five minutes to confirm that and we will wrap up either way, okay?

THE WITNESS:   Okay.

(Recess was held from 10:56 to 11:02.)

MR. MAURO:   We will mark the Complaint as Exhibit 4.

(Verified Complaint for Injunctive Relief and Monetary Damages was marked as Stephens' Exhibit No. 4 for identification, upon receipt, and a photocopy is attached hereto.)

By MR. MAURO:

Q.   Mr. Lee, I'm gonna share my screen again and we're gonna look again at the response.

Scroll back up so you can see the title, the response that we looked at before.

A.   Yes.

Q.   And I'm taking you through a couple of the allegations.

Number one, Mr. Stephens purchased the Ferrari 1526 from Karma on March 12th, 2021.

You don't have any personal knowledge about that transaction, do you?

A.   Other than the exhibit, no.

Q.   And in Paragraph 2, on or about March 2022, Mr. Stephens went to Karma of Palm Beach facility and advised representatives that he wanted to sell the Ferrari 1526.

You don't have any knowledge of that allegation either, do you?

A.   No personal knowledge.

Q.   Okay.

How did FVP learn that Mr. Stephens went to Karma of Palm Beach and advised representatives he wanted to sell the Ferrari 1526?

A.   Through document production and if there were conversations with Scott Zankl.

Q.   Who had conversations with Scott Zankl that would have resulted in that bit of information?

A.   We didn't personally, but I don't know

if he spoke to my counsel.

Q. Okay.

Suffice it to say that you, FVP, don't have any personal knowledge concerning what Mr. Stephens did or said relative to wanting to sell the Ferrari in March of 2022; is that correct?

A. That's correct.

Q. Paragraph 3 says virtually immediately after entering the Consignment Agreement, Mr. Stephens observed a Lamborghini and it was love at first sight.

Where did those facts come from, if you know?

A. I'm just guessing a little bit. I do not personally know exactly where that came from.

Q. You don't have any personal knowledge concerning the allegations in Paragraph 3 of the response?

A. Not personal knowledge.

Q. Do you know whether the Consignment Agreement was signed before or after Mr. Stephens observed the white Lamborghini?

A. I don't know.

Q. Do you know whether the Consignment Agreement was signed before or after the first

agreement that's attached to this response?

I will show it to you.

I'm sorry, that's not it.

(Document displayed on the screen via SHARE.)

Exhibit 3 to your response.

A.   I don't know personally.

We're just going by the dates that are on the documents.

Q.   Go ahead and take a moment to review Paragraph 5.

Let me know if you have any personal knowledge of the allegations contained in Paragraph 5.

A.   I don't have personal knowledge.

Q.   Same with Paragraph 6?

A.   We were not part of these discussions so I don't have personal knowledge.

Q.   Same with Paragraphs 7 through 11 that are on your screen?

A.   We were not pertinent to any of these discussions.

Q.   And it's your belief that all of the allegations that we just looked at came from Mr. Zankl, correct?

A.     Correct.

MR. MAURO:   I appreciate you taking the time today to sit for your deposition, answer my questions and I do not have any more questions for you.

Thank you.

MR. BRESLIN:   I have just a couple of questions.

Cory, could you put up the Exhibit S, the March 12th inventory, please.

It was one of the first exhibits I believe you showed him.

(Document displayed on the screen via SHARE.)

CROSS EXAMINATION

By MR. BRESLIN:

Q.   All right, Mr. Lee, please take a look at your screen.

Do you know who prepared this particular document?

A.   We prepared this schedule, but...

Q.   I don't mean the data.

I mean do you know who prepared this actual data?

A.   Meaning the source?

Q. Yeah.

Do you know who prepared this particular Word document and typed the words Karma of Palm Beach inventory list and the date and then inserted that data from an Excel spreadsheet? Do you know who did that?

A. It was either -- somebody here.

Q. All right.

Would it surprise you to learn that I am the one that did it?

A. Yes.

Q. All right.

So this was a document that was created to be attached to the Complaint that was filed in the State court; is that your understanding, sir?

A. That's correct.

Q. And you supplied information regarding -- from your data sets regarding the information that was available to FVP regarding the Karma inventory, correct?

A. That's correct.

Q. And that data was then put into a format that was filed and that decision was made by your attorney; correct?

A. That's correct.

Q.   Okay.

Now, is it your testimony, sir, that this is a true and accurate depiction of the inventory that was on any of the Karma lots on March 12th, 2022?

A.   **That's correct.**

Q.   All right.

So do you know whether or not this accurately reflected every car that was there on March 12th or do you not?

A.   **We don't...  it couldn't possibly be... it's everything that we knew.  There could be more.**

Q.   The reason I ask that, we're looking at transaction documents showing that Karma purchased the Stephens vehicle the day before, on March 11th, 2022.  That vehicle is not reflected in this inventory.

So getting back to my question.

It's not your position -- is it? -- that this truly and accurately reflects all the Karma inventory on March 12th, 2022, correct?

A.   **Yes, that's right.**

**This is just what we knew at the time from the information that was furnished to us,**

but certainly...

Q. And do you know when the last time you received any inventory updates from the Karmas as you sit here today?

A. I think following the standard before.

Q. No, the reports --

A. We were -- we got more information specifically just to confirm this inventory, potentially others. The data is not complete.

Q. Okay.

How long did it take your attorneys and investigators to figure out exactly how many cars were taken off the lots at the Karma companies?

A. How long did it take?

Q. Right.

To figure out how many cars were taken.

How long did it take?

A. It took quite some time. We... it took months I think to figure out what was taken and what was not.

Q. And isn't it true that even as recently as the past couple of weeks other cars that were taken from those lots were discovered, correct?

A. That's correct.

Q. So it's accurate to say that you don't

have any first-hand information about the Stephens' transaction, correct?

A. That's correct.

Q. All right.

Now, Mr. Mauro showed you the response that was filed.

I drafted that document, did I not?

A. Yes.

Q. I didn't ask you for any information that was in that document, did I?

A. No.

Q. And do you know where I got the information that was in that document?

A. From the data, the production from Zankl and others.

Q. And do you know which witnesses I spoke to to gather that information?

A. Only probably Zankl and potentially O'Donnell.

I'm not...

Q. Mr. Lee, I don't want you to speculate.

You either know or don't know.

Do you know who I spoke to to get that information?

A. I don't know other than Zankl.

Q.   Now, Mr. Mauro asked you about whether or not the entire body of evidence regarding or relating to the Stephens' vehicle and the Stephens' transaction was contained within the response that was filed.

Do you recall him asking you that?

A.   Yes.

Q.   Okay.

And you said you believed that that was the entire body of information, correct?

A.   Yes.

Q.   Okay.

I would like to share my screen with you.

(Document displayed on the screen via SHARE.)

Q.   I show you what purports to be --

MR. BRESLIN:  And I will make a pdf copy, Ms. Court Reporter, and submit it as... what exhibit number are we at?

THE COURT REPORTER:  If you are continuing on, 5.

MR. BRESLIN:  All right.

This will be the Adversary Plaintiff's Exhibit Number 1.

(Breslin email, 10/12/22, was marked as FVP's Exhibit Number 1 for identification, upon receipt, and a photocopy is attached hereto.)

Q.   And what is on your screen is what purports to be an email that says Derek Stephens FVP depositions and what purports to be an email to Stephens' attorney with a Dropbox on it that is copied to Mr. -- that is sent to Mr. Mauro and his assistant, Mr. Appell, Mr. Winderman, Handler, Miller, Schwartz.

Do you see this document?

Do you see this email?

A.   Yes.

Q.   And what this email purports to show is a Dropbox link of documents that were supplied in response to the subpoena that was served on you.

Were you aware of that, sir?

A.   (No response.)

Q.   You are or you aren't.

A.   No, I wasn't.

Q.   Now, I'm gonna again share my screen and I'm gonna show you the... what is contained in that Dropbox.

(Document displayed on the screen via

SHARE.)

Q.    And what is contained in that Dropbox link are actually 100 documents that commence with Bates Number 1 and concludes at Bates 1,036.

Do you see that, sir?

A.    Yes.

Q.    So were you aware that all of these documents were supplied to Mr. Stephens' attorneys in response to his subpoena?

A.    No.

Q.    So now that you have seen this and you have seen that -- all the universe of documents that he was provided, do you now change your response to say that what was actually attached to the response that was filed is not the entirety of the documents that FVP is relying on to make its case against Mr. Stephens?

A.    I change my answer.

I didn't realize there was this much production.

Q.    Now, is it safe to say, Mr. Lee, that from the time that you retained your attorneys in this case back in April until today, that your view of what has happened in this case has evolved to some degree?

A.    Yes.

Q.    And the statements that were made in the filing in April that you swore to under oath were true and accurate representations of your belief of what occurred at that time, correct?

A.    Right.

Q.    All right.

Now, you testified that you didn't believe that FVP funds were involved in the Stephens' transaction because you may have a belief that that transaction occurred prior to loan funding.

Do you recall saying that?

A.    Yes.

Q.    Okay.

Well, when we look at the documents, the Stephens' transaction occurred on March 11th, 2022, that was well after FVP was funded with the full 7.5 million; is that correct?

A.    That's correct.

Q.    So to the extent that any Karma entities' funds were used, they could very well have been FVP loan proceeds, correct?

A.    That's correct.

Q.    All right.

MR. BRESLIN:  I would just like to take a two-minute break and then I believe I'm done, but let me just confirm.

MR. MILLER:  I have a few questions, Mr. Breslin.

MR. BRESLIN:  Do you want to go ahead and then if you want to take a break after you're done, Mr. Miller?

MR. MILLER:  Yeah, that's fine.

My questions will be pretty short and quick.

MR. BRESLIN:  Okay.

CROSS EXAMINATION

By MR. MILLER:

Q.   Mr. Lee, you know I represent Auto Wholesale of Boca in the bankruptcy case, correct?

A.   Yes.

Q.   And you know that Auto Wholesale of Boca is in a Chapter 11 case, correct?

A.   That's right.

Q.   And in that case your attorney, Mr. Breslin, on behalf of FVP has asserted a claim or lien interest in certain automobiles and inventory of Auto Wholesale of Boca, correct?

A.   Correct.

Q.   And one of those automobiles in which FVP is asserting a lien interest in happens to be the Derek Stephens' car that is the subject of this dispute that we're having this deposition over right now, correct?

A.   Correct.

Q.   And, in fact, in order to prepare for today's deposition, I am sure you reviewed the records to familiarize yourself with Mr. Stephens' transaction; is that correct?

A.   Yes.

Q.   Okay.

So in that regard, you would agree that the automobile that's in dispute with Mr. Stephens is currently in the possession of Auto Wholesale of Boca, correct?

A.   That's correct.

Q.   And, in fact, the automobile that is at issue with Mr. Stephens is also currently titled to the name of Auto Wholesale of Boca, correct?

A.   Right.

Q.   Okay.

And do you recall the employees of Karma Palm Beach?

A.   I don't offhand.

I might... if you read them back, I might be familiar, but I couldn't tell you.

Q.   You're familiar with the fact of Awana Bailey being an employee there at Karma Palm Beach?

A.   Yes.

Q.   As a matter of fact, her signature would often appear on various bills of sale and titles of Karma Palm Beach?

A.   Correct.

Q.   She was also an employee at that time of Excell Auto Group, too, correct?

A.   I believe so.

Q.   But she was working at all the... what we called the Zankl enterprises, correct?

A.   Right.

Q.   And Scott Zankl operated various enterprises, including Karma Palm Beach, Karma Broward and Excell Auto Group, correct?

A.   Correct.

Q.   Okay.

And at some point in time you testified that you were approached through Mr. O'Donnell to do some lending to Mr. Zankl's entities, correct?

A.    Correct.

Q.    And you had even considered not just lending to Karma Palm Beach or Karma Broward, but also Excell Auto Group, correct?

A.    Correct.

Q.    But at the end of the day you decided not to lend to Excell Auto Group, correct?

A.    Correct.

Q.    And in that regard, the -- currently the -- back to Derek Stephens' automobile, other than what has been relayed to you through your counsel or your speaking to third parties, you don't really have any first-hand knowledge as to how the Derek Stephens' automobile got in the possession and custody of Karma Palm Beach, correct?

A.    That's correct.

Q.    And you wouldn't have any personal first-hand knowledge as to how that automobile ended up in the possession, custody and control of Auto Wholesale of Boca, correct?

A.    That's correct.

MR. MILLER:   Just give me one minute, Mr. Breslin.

By MR. MILLER:

Q.   And, Mr. Lee, you have no evidence that you can provide to Mr. Mauro or myself or Mr. Breslin today that would show that any money went from your enterprise, FVP, to Mr. Stephens for the automobile in dispute today, correct?

A.   **Not that I can recall.**

Q.   Okay.

And, in fact, you're aware of the fact that Mr. Zankl has previously testified that he did not pay Mr. Stephens for the automobile, correct?

A.   **I don't know personally, but I haven't read any of his testimony.**

Q.   You weren't made aware of what his testimony was from the Monday deposition conducted by Mr. Appell?

A.   **I'm aware from my attorneys that Zankl or Karma did not make the payment.**

Q.   But they did remit a check to Mr. Stephens which ultimately bounced or was returned NSF, correct?

A.   **That was relayed to me by my attorneys.**

Q.   So Mr. Stephens did accept a post-dated check as a form of payment for this automobile?

MR. MAURO:  Objection.

A.   That was relayed to me.

MR. MILLER:  Mr. Breslin, your witness.

MR. BRESLIN:  Yeah, I don't have any other questions.  I don't need a break.

Cory, did you want to re-examine at all?

MR. MAURO:  No.

We're good.

MR. BRESLIN:  We will read and take a copy.

MS. MILLER:  I will take a courtesy copy since Mr. Breslin is paying the bigger fee.

MR. MAURO:  And we would like a copy, Madam Court Reporter, by next Monday, please.

MR. BRESLIN:  Okay, we're off the record.

(Discussion off the record.)

(List of Dropbox folders was marked as FVP Exhibit Number 2 for identification, upon receipt, and a photocopy is attached hereto.)

- - -

(Witness excused.)

(Deposition concluded.)

- - -

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF CITRUS        )

I, ANN MARIE PLEASANTON, Registered Professional Reporter, Florida Professional Reporter, Notary Public, State of Florida, certify that KEITH LEE remotely via ZOOM appeared before me and was duly sworn on the 16th day of November, 2022.

WITNESS my hand and official seal this 21st day of November, 2022.

*AnPleasanton*

ANN MARIE PLEASANTON, RPR, FPR
Notary Public, State of Florida

Notary Public State of Florida
Ann Marie Pleasanton
My Commission HH 000798
Expires 07/20/2024

Personally known  _____

Produced identification:  NY d/l

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )
COUNTY OF CITRUS        )

          I, ANN MARIE PLEASANTON, Registered
Professional Reporter, Florida Professional
Reporter, certify that I was authorized to and
did remotely via ZOOM stenographically report the
deposition of KEITH LEE; that a review of the
transcript was requested; and that the
transcript, Pages 1 through 58, is a true and
complete record of my stenographic notes.


          I further certify that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorney or counsel
connected with the action, nor am I financially
interested in the action.


          The certification does not apply to any
reproduction of the same by any means unless
under the direct control and/or direction of the
reporter.


          Dated this 21st day of November, 2022.




          _Ann Pleasanton_
          ANN MARIE PLEASANTON, RPR, FPR

Jerrell Breslin, Esq.
BARON, BRESLIN & SARMIENTO
The DuPont Building
169 East Flagler Street
Suite 700
Miami, Florida  33131

November 21, 2022

In re:  Auto Wholesale of Boca

Dear Mr. Breslin:

For your convenience, attached hereto you will find Errata Sheets for the use of Keith Lee in entering any changes to the deposition.

Please photocopy the executed documents and forward a copy of the executed documents to all parties involved in this matter for placement in the transcript.

If no changes are to be noted, please indicate that on the Errata Sheet and forward a copy to all parties so they may be advised that no changes were made.

We find that the above procedure facilitates handling of signature matters and puts the necessary documents directly into the hands of all parties.

Cordially yours,

*Ann Pleasanton*

Ann Marie Pleasanton, R.P.R., F,P.R.

cc:  Cory Mauro, Esq.
     James Miller, Esq.

ERRATA SHEET

In re:  Auto Wholesale of Boca
Case No.:  9:22-bk-15627
November 16, 2022

DO NOT WRITE ON TRANSCRIPT - - ENTER CHANGES HERE:

Page: _____     Line: _____
Now reads:  _____
Should read:  _____
Reason for Change:  _____

Page: _____     Line: _____
Now reads:  _____
Should read:  _____
Reason for Change:  _____

Page: _____     Line: _____
Now reads:  _____
Should read:  _____
Reason for Change:  _____

Page: _____     Line: _____
Now reads:  _____
Should read:  _____
Reason for Change:  _____

Page: _____     Line: _____
Now reads:  _____
Should read:  _____
Reason for Change:  _____

Page: _____     Line: _____
Now reads:  _____
Should read:  _____
Reason for Change:  _____

Under penalties of perjury, I declare that I have read my foregoing transcript and, together with any changes made above, the facts stated herein are true.

_____     _____
DATE                      KEITH LEE

**Exhibits**

Keith Lee - 11.16.22 -
Stephens' Exhibit 1 2:13
14:17,19 16:8

Keith Lee - 11.16.22 -
Stephens' Exhibit 2 2:14
22:17,18,20 24:6

Keith Lee - 11.16.22 -
Stephens' Exhibit 3 2:16
29:25 30:2,3 43:6

Keith Lee - 11.16.22 -
Stephens' Exhibit 4 2:17
40:16,19

Keith Lee - 11.16.22 - FVP'
Exhibit 1 2:19 50:2

Keith Lee - 11.16.22 - FVP'
s Exhibit 2 2:21

**$**

$22,337.88 31:23

$250,000.00 31:23

$3 10:22

$3.5 10:22

$7.5 36:10,17

**0**

04/01/22 22:19

**1**

1 14:17,19 16:8 32:21
35:18 49:25 50:2 51:4

1,036 51:4

10/12/22 50:1

100 51:3

10:56 40:14

10th 39:6 40:3

11 43:19 53:20

11:02 40:14

11th 46:17 52:17

12th 13:19 14:4 41:5 44:10

46:5,10,22

1526 41:5,12,19

1994 6:13

1998 7:1

**2**

2 22:18,20 24:6 41:9 58:17

2013 23:7 30:20 32:15

2021 41:5

2022 9:9 10:10,15 14:4
18:16 29:8 32:3,19 33:7
35:14 39:6 40:3 41:10
42:6 46:5,17,22 52:18

26 29:8 37:7

28th 8:22

2nd 32:3

**3**

3 10:25 29:25 30:3 35:8
42:8,17 43:6

**4**

4 40:16,19

458 23:8 32:16

48 38:19

**5**

5 43:11,14 49:22

54 39:25

**6**

6 36:3 43:16

**7**

7 37:4 43:19

7,500,000 37:13

7.5 11:7 52:19

**8**

8th 35:14

**A**

Abandon 30:21

ability 11:23

accept 57:23

accurate 16:25 24:21
25:1,10 34:20 46:3 47:25
52:4

accurately 46:9,21

acknowledging 22:7

acquired 29:10

act 38:12

acting 17:4

actual 44:24

additional 13:17

Adversary 49:24

advised 41:11,18

affiliates 5:13,14,15,16

agent 17:5,17

agents 6:2

agree 11:11 16:6,11 26:16,
21 34:19 35:20 36:13
37:5,15 39:24 54:14

agreed 16:5

agreement 14:22 26:15
27:15 29:22 31:3,5,6
37:23,25 38:1 42:9,21,25
43:1

agreements 28:2,12

ahead 43:10 53:6

allegation 34:19 35:20
36:14 38:4,18 41:14

allegations 38:8 41:3
42:17 43:13,24

allege 34:13 35:8

alleged 34:6 37:8

alleges 36:3 38:19

amount 23:6 37:12

amounts 12:10

analyst 7:7

and/or 10:14 24:7

antecedent 34:17

apologize 37:21

apparent 34:7

apparently 21:3

Appell 50:10 57:16

appoint 36:8

approached 55:24

April 32:3 35:14,18 39:6
40:3 51:23 52:3

area 17:9

arising 34:16

Arts 6:20

asserted 53:23

asserting 54:3

asset 15:13,20,25

assets 15:2,12 27:16,18,
21,25 29:9 36:9

assistant 50:10

attached 14:20 22:21
28:13 30:4 32:18 33:6
40:20 43:1 45:14 50:3
51:14 58:18

attempt 34:10

attending 8:25

attention 24:1

attorney 45:24 50:8 53:22

attorneys 38:23 47:11
51:9,22 57:17,22

audit 18:10,17,21,22

audits 11:24 17:24 18:1

Auto 22:6 23:5 34:1,3
53:15,19,25 54:16,21
55:13,20 56:4,7,21

automobile 54:15,19
56:10,14,19 57:5,10,24

automobiles 34:12,15

35:10,16,17,22 53:24 54:2

**Awana** 55:4

**aware** 16:16 19:22 20:1 21:13 24:6,9,14 28:3,23, 25 30:11 33:18,20 50:18 51:7 57:8,14,17

---

**B**

---

**Bachelor** 6:20

**back** 16:7,21 26:24 40:9, 24 46:19 51:23 55:2 56:10

**background** 6:8

**Bailey** 55:5

**balance** 15:25 16:2

**bank** 7:20 31:20

**bankruptcy** 28:16 53:16

**base** 11:15

**based** 9:3 17:8 35:21

**basis** 37:3 38:17

**batch** 10:14

**Bates** 51:4

**Beach** 29:12 36:23 37:14 41:10,18 45:4 54:25 55:6, 10,19 56:3,15

**beginning** 7:14

**behalf** 24:15 53:23

**belief** 43:23 52:4,11

**believed** 49:9

**benefit** 27:5

**bigger** 58:11

**bills** 55:9

**Biltmore** 9:19 12:2

**bit** 7:25 41:23 42:14

**blank** 23:6

**blanket** 15:11

**Boca** 23:5 34:2 53:16,19, 25 54:17,21 56:21

**body** 49:2,10

**bold** 34:9,25

**Booth** 6:24

**borrowed** 15:23,24

**borrower** 27:16,25

**borrower's** 11:14

**borrowing** 11:15

**bounced** 57:20

**brand** 37:10

**break** 8:14 40:8 53:2,7 58:4

**breslin** 44:7,16 49:18,23 50:1 53:1,5,6,12,23 56:24 57:3 58:2,3,8,11,14

**bringing** 39:3

**Brothers** 7:18

**brought** 36:4

**Broward** 37:14 55:20 56:3

**business** 6:4,5,10,12,24 7:3,8 9:12

**businesses** 37:9

---

**C**

---

**CAC** 7:17

**call** 8:20 21:3 23:13 36:6 38:21

**called** 7:15 31:8 55:16

**Capital** 7:15,21

**car** 16:16 20:7,12,18 21:6 24:2,17 26:4 28:16,21 37:10,14 46:9 54:4

**careful** 18:20

**carrying** 34:24

**cars** 11:16 12:10,11,19 20:2,22 35:6 47:12,16,22

**case** 36:25 51:17,23,24 53:16,20,22

**cash** 11:15

**category** 32:13 33:12

**caused** 38:9

**CEO** 5:25 6:2

**Certificate** 31:10

**CFO** 9:23

**change** 51:13,18

**changed** 13:21

**changing** 24:3 30:9

**Chapter** 53:20

**characterization** 39:24

**characterized** 39:21

**characterizes** 36:24

**Charlotte** 17:8

**Chat** 14:12 29:25

**check** 57:19,24

**Chicago** 6:23 7:4

**Chinese** 37:10

**civil** 39:22

**claim** 28:5 53:23

**claimed** 35:9

**clarify** 16:15

**client** 28:15

**closing** 10:23 12:16 13:20 18:7,10

**co-conspiracy** 34:22

**co-conspirator** 34:8

**collateral** 14:21 16:25 19:5 22:3 23:5 26:14 34:14 35:10,15,17 38:25 39:8,9,11,14

**collect** 36:9

**college** 6:14,17 7:15

**comfortable** 8:16

**commence** 51:3

**commercial** 7:22

**common** 36:5

**communicating** 38:20 39:4

**communication** 19:23

**communications** 19:19 39:7,13

**companies** 7:12,14 34:15 36:11 47:13

**company** 5:24 7:15

**Compel** 30:20

**compilation** 13:21

**complaint** 28:10,14 33:24 39:5,25 40:15,17 45:14

**Complaints** 16:19

**complete** 47:9

**concerned** 19:24

**concluded** 58:21

**concludes** 51:4

**concluding** 27:1

**conclusion** 15:10 25:8,16 27:12 38:15

**conduct** 18:1,17,22 37:1

**conducted** 57:16

**confirm** 40:11 47:8 53:3

**considered** 56:2

**consignment** 15:7,12 31:5 42:9,20,24

**consisted** 13:16

**consisting** 11:15

**conspiracy** 35:1 38:5,7, 10,12

**constantly** 24:3

**consultant** 9:15,17,19

**Consultants** 9:19 12:2

**contained** 43:13 49:4 50:23 51:2

**contemporaneous** 37:23

**context** 33:17 39:2

**continuing** 49:22

**contract** 15:13

**contracts** 9:8

**Contractually** 11:20

**control** 56:20

**conversations** 41:21,22

**convert** 34:10

**convinced** 38:6

coordinated 12:1

copied 19:20 50:9

copy 49:19 58:9,10,12

corporate 27:10 32:10

Corporation 7:16

correct 7:5 8:3 9:10 10:10, 11 14:4,9,24 15:7,23 16:13 17:18 18:18,19 23:24,25 28:17 29:3,19 30:6,7,9,14 31:18,23,24 32:24 33:9,10 36:1 38:1,2 42:6,7 43:25 44:1 45:16, 20,21,24,25 46:6,22 47:23,24 48:2,3 49:10 52:5,19,20,23,24 53:17, 20,25 54:1,6,7,11,17,18, 21 55:11,13,16,20,21,25 56:1,4,5,7,8,16,17,21,22 57:5,11,21

correspondence 20:3 33:13,19

Cory 44:9 58:5

counsel 8:24 42:1 56:11

couple 41:2 44:7 47:22

court 8:12 9:17 14:11,15 36:8 45:15 49:19,21 58:13

courtesy 58:10

coverage 11:16

created 45:13

CROSS 44:15 53:13

custody 56:15,20

**D**

Damages 33:25 40:18

data 44:22,24 45:5,18,22 47:9 48:14

date 45:4

dated 13:18 32:3

dates 43:8

day 46:16 56:6

days 36:7

de 36:12

dealership 10:5

dealership's 20:25

debt 7:22 34:17

debtor 29:11

debtors 29:9

decided 56:6

decision 45:23

decisions 26:3

Defendants 22:4

definitive 25:16

defraud 34:9,25

defrauded 35:3,5

degree 6:19 51:25

demand 21:25

depiction 46:3

deposed 8:2

deposition 15:16 16:9 24:6 25:4 32:10,12 44:3 54:5,9 57:15 58:21

depositions 50:7

Derek 30:19 50:6 54:4 56:10,14

description 12:21

determine 11:18

dialogue 18:24 19:1,13,18

direct 5:6 21:25

directly 20:6,11

disappear 35:12,25

Disclosure 32:3

discovered 47:23

discretion 11:25

discussed 8:23 24:13

discussing 32:14 33:15

discussion 21:7 58:15

discussions 24:19 43:17, 22

displayed 12:23 22:13 29:6 30:17 33:22 43:4 44:13 49:15 50:25

dispute 54:5,15 57:5

disregard 24:25

document 12:23 14:8 22:13 28:4 29:6,18 30:17, 23 32:5 33:17,22 34:4 41:20 43:4 44:13,20 45:3, 13 48:7,10,13 49:15 50:12,25

documents 10:9,13,15 11:22 14:12 16:24 17:2, 11,22 19:6 26:25 27:11,20 28:10,23 29:3 30:8,11,13 31:11,13 32:12,13,17,19, 20 33:2,7,8 43:9 46:15 50:16 51:3,8,12,16 52:16

doubt 25:12 38:10

drafted 48:7

drag 14:12 29:25

draw 25:16 38:18

Dropbox 50:8,16,24 51:2 58:16

due 37:25

duly 5:3

**E**

economics 6:20

effectively 23:17

efforts 33:3

elaborate 13:11

electric 37:11

electronic 40:4

email 50:1,6,7,13,15

emails 19:21,23 33:18

emergency 37:2

employee 55:5,12

employees 54:24

encompass 27:16

end 34:18 56:6

ended 56:20

engaged 34:8

entered 9:8 25:3 37:24

entering 42:9

enterprise 57:4

enterprises 55:16,19

enters 15:15

entire 49:2,10

entirety 51:16

entities 22:1 55:25

entities' 52:22

Esq 15:15

essentially 28:15

estate 7:22

events 35:13

evidence 34:22 38:14 49:2 57:1

evolve 21:1

evolved 51:25

exact 11:21 28:1

EXAMINATION 5:6 44:15 53:13

examined 5:4

Excel 12:20 45:5

Excell 22:6 34:2,3 55:13, 20 56:4,7

Excuse 24:23

excused 58:20

exhibit 13:3,25 14:17,18, 19 16:8 22:17,20 24:6 29:25 30:2 32:1 40:16,19 41:8 43:6 44:9 49:20,25 50:2 58:17

exhibits 14:13 28:19,22 31:15,17 44:11

exotic 34:12 37:13

expected 21:1

expensive 34:11

explain 11:9 23:19

extensive 27:24

extent 52:21

extortion 35:19 39:23

extracted 13:12

extraction 13:8

extraordinary 36:25

**F**

fabricated 34:17

facility 16:5 41:11

fact 31:17 35:18 54:8,19 55:4,8 57:8

facto 36:12

facts 42:12

factually 25:10

fair 19:11 20:5 23:14,18 40:6

fall 19:9

familiar 21:8 34:4 55:3,4

familiarize 54:10

Farache 21:4,25 22:3,4 34:1,8,15 35:1,10,15,18, 23 36:12

fee 58:11

Feenix 7:23

felonious 39:23

Ferrari 16:10 17:11 18:8 19:24 21:21 22:9 23:8,10, 13,18,22 24:8 25:25 26:13 27:1,13 28:5 30:6,12,21 32:16 35:25 36:16 39:9, 11,17,20 41:5,12,19 42:6

figure 47:12,16,19

file 13:14,16

filed 33:25 35:16 45:14,23 48:6 49:5 51:15

files 33:1,2

filing 29:5,8 30:6 34:6 52:3

final 8:21

Finance 34:3

fine 53:9

finish 8:11

finished 38:22

first-hand 48:1 56:13,19

five-minute 40:8

folders 14:1 58:16

folks 9:12

follow-up 40:10

foremost 27:14

forget 30:1

form 24:22,24 25:7 57:24

format 45:22

forward 18:17

found 33:8

founded 7:23

Frank 9:20 12:2 17:4,6,10, 16 19:1 20:11,17,21

fraud 36:7,25 38:11 39:22

fraudulent 34:13

frequency 11:21

front 27:5

full 5:9 35:14 52:19

fund 5:19,22 10:20 32:11

funded 52:18

funding 10:17 11:1 12:9 52:12

funds 34:10 52:9,22

furnished 46:25

FVP 5:11,13,19,23 6:1,4 9:8 14:8,22 15:5,17 16:4 17:10 18:1,17,22 23:21 26:6,16,25 27:11 29:2 32:10 34:1,6 36:3,24 37:7 39:21 41:17 42:3 45:19 50:7 51:16 52:9,18,23 53:23 54:3 57:4 58:17

FVP's 23:18 28:5 36:16 50:2

**G**

Galesburg 6:17

gather 48:17

gave 35:9

general 5:21 11:8,9 19:5

generally 6:11 11:24 38:3 39:10,15

gentleman 9:20

Gherman 15:15

give 40:11 56:23

Goldman 7:19

good 5:8 25:2 58:7

grad 6:22

graduate 6:14,25

graduated 7:4

great 5:15 23:16

greater 26:4

greg 25:3

group 12:8 55:13,20 56:4, 7

grow 37:9

guarantee 26:6 37:24

guaranteeing 37:25

guarantees 26:20

guessing 42:14

guise 37:8

**H**

H/2 7:21

halt 36:6

handle 22:5

Handler 50:11

handling 22:2

happened 36:20 51:24

head 18:15

hearing 8:21 9:1

held 14:25 15:1 40:14

hereto 14:20 22:21 30:4 40:20 50:4 58:18

hesitate 8:15

hidden 34:17

highlighting 23:7

hired 9:21

hold 13:1

honorable 36:8

hundreds 33:1,2

**I**

identification 14:19 22:20 30:3 40:19 50:2 58:17

identified 29:11

identify 30:6

III 5:20 32:11

illegal 37:1

illegality 36:6

Illinois 6:18

imagine 15:13 19:20

immediately 42:8

important 8:10

incentive 25:25 26:3

included 19:17 29:12 30:14

including 22:8 25:19 28:10 33:13 55:19

inconsistent 24:15

indebtedness 26:6,8,16

indecipherable 9:16

independently 35:4

indirectly 21:17

information 12:3 13:17 25:9 41:24 45:17,19 46:25 47:7 48:1,9,13,17,24 49:10

initial 10:20 12:7,13

initially 22:2,5

Injunctive 33:25 40:17

inquiries 38:24

inserted 45:5

inspection 18:6 19:5,10

instance 9:11

instances 11:3

insurance 7:15,16

interest 7:8 14:23 15:2,6,
17,21,22 16:1,4 26:9
32:15 53:24 54:3

intervention 37:1

inventory 10:5,6 11:14,19
12:7,12,21 13:19 14:3
18:2,9,11,18,23 19:4
20:22,25 23:23 24:3,8,17
26:1 27:2,4,13 28:6 30:13
36:22 37:14 44:10 45:4,20
46:4,18,22 47:3,8 53:25

investigators 47:12

Investment 7:20

Investments 5:24

involved 21:4,5 52:9

issue 28:24 33:9 39:17
54:20

itemized 22:8

J

January 9:9 10:10,15
18:16 29:8 32:19 33:7

judicial 37:2

K

karma 9:9,22,24 10:2,3,13
14:24 15:3,7,18,19,20
17:3,4,5,17 19:2 22:19
24:7,16 25:13 29:12 34:1
36:22 37:10 41:5,10,18
45:3,20 46:4,15,21 47:13
52:21 54:24 55:5,10,19
56:3,15 57:18

Karma's 15:25 16:2,5
18:1,18,23 23:23 24:20
25:6 26:1,15 27:2,13 28:5

Karmas 47:3

Keith 5:2,10

kill 35:11,24

kind 6:4,19 16:21 18:22

knew 46:12,24

knowledge 31:12,14,22
32:4 39:16 41:6,13,15

42:4,16,19 43:13,15,18
56:13,19

Knox 6:17

Kristen 21:5

Kristin 21:11

L

laid 27:20

Lamborghini 42:10,22

large 7:22

larger 13:14,16

lawful 36:5

lawlessness 39:22

lawsuit 36:4

lawyer 19:7 24:13

layman's 19:8

learn 23:21 41:17 45:9

learned 31:16

Lee 5:2,10,11 11:8 40:22
44:17 48:21 51:21 53:15
57:1

legal 15:10

Lehman 7:18

lend 56:7

lender 27:18

lending 6:6,12 7:3 55:25
56:3

lent 10:20 11:5,10,12

letter 21:10,16 22:6,12,19,
24 23:3,17 24:5 26:24
31:25

liability 16:2 26:20

lien 24:2 28:3 29:3,13
53:24 54:3

limited 5:20 33:13

link 50:16 51:3

list 12:7,13,19 13:14 14:3
16:12 18:12 27:4 45:4
58:16

lists 13:19

litigation 7:25

live 8:20

LLC 23:5

loan 6:2 11:13 17:21 19:6
22:2,3,6 23:6 27:14,24
28:2 29:2 36:20 37:12,16,
23 38:1 52:12,23

loaned 36:11

located 17:7 29:10

log 25:2

long 6:10 8:9 47:11,14,17

longer 35:6

looked 16:8 26:25 31:11
32:17 40:2,25 43:24

lot 20:1 38:21

lots 46:4 47:13,23

love 42:10

luxury 37:11

M

Madam 14:11 58:13

made 22:6 38:8 39:16
45:23 52:2 57:14

main 19:2

maintain 11:15 25:25

make 22:11 25:8 35:12,25
38:18 49:18 51:17 57:18

managing 5:12

March 13:19 14:3 41:5,9
42:6 44:10 46:5,10,17,22
52:17

mark 22:17 29:24 40:15

marked 14:18 16:8 22:19
24:5 30:2 40:18 50:1
58:16

Markets 7:16,17

materials 13:24 16:22
25:14

matter 8:21 55:8

matters 21:7 31:17

Matthew 19:14 20:15

Mauro 5:7 14:11,17 22:17
29:24 40:7,15,21 44:2
48:5 49:1 50:9 57:2,25
58:6,12

meaning 21:17 26:14 39:9
44:25

meet 9:14

meeting 21:4,13,21 38:22

mention 16:9

mentioned 21:14

messages 33:14,18

met 9:15

Miller 50:11 53:4,8,9,14
56:23,25 58:2,10

million 10:22,25 11:7
36:10,17 52:19

minute 56:23

minutes 40:11

missed 37:19

missing 32:23

MMS 34:2

mode 27:23

moment 43:10

Monday 57:15 58:13

Monetary 33:25 40:18

money 10:2,4 11:10,12
23:12 57:3

months 47:19

morning 5:8

Moshe 21:25

motion 28:15 30:20

moving 8:16

multiple 28:20

N

needed 10:2,3,4 11:20
12:3

Nelson 25:3

notes 40:9

Notice 32:9,12

November 8:22

NSF 57:21

number 28:19 32:21 41:4 49:20,25 50:2 51:4 58:17

## O

O'DONNELL 9:20,21 12:2 17:4,6,10,17 19:2 20:12, 17,21 23:22 48:19 55:24

oath 52:3

Objection 57:25

objectively 34:7

obligations 34:16

observed 42:10,22

occurred 52:5,11,17

Odometer 32:2

offhand 17:14 27:3 55:1

one-page 29:18

ongoing 19:1

onsite 18:6

operated 55:18

Opportunity 5:19 32:11

order 10:21 16:25 20:21 30:22 36:5 54:8

Ordinarily 25:22

organization 20:16

original 13:23

outlined 11:22

outrageous 36:7

outright 34:9,15

outset 38:16

outsource 9:23

outsourcer 17:21

owned 5:24 15:2,18 29:9 36:22

ownership 32:15

## P

P-I-L-K-I-N-G-T-O-N 19:16

Pack 31:8

Palm 29:12 36:22 37:14 41:10,18 45:3 54:25 55:5, 10,19 56:3,15

Paragraph 35:8 36:3 37:4, 7 38:3,19 39:25 41:9 42:8, 17 43:11,14,16

Paragraphs 43:19

part 18:9 20:22 21:25 23:23 24:8,17,18 26:1 27:1,13 28:5 29:1 30:13 43:17

parties 35:5 56:12

partner 5:12,21 19:12

partners 7:21 18:25

partnership 5:20

past 36:7 47:22

patent 36:6,25

pause 25:11

pay 24:1 57:10

paying 58:11

payment 57:18,24

payments 31:21,22

payoff 12:10

pdf 49:18

people 21:14 38:12

periodic 11:24 17:24

periodically 13:20

permanent 37:3

person 9:1

personal 26:9,20 31:12, 14,22 32:4 37:24 41:6,15 42:4,16,19 43:12,15,18 56:18

personally 6:7 18:25 26:5 28:25 37:25 41:25 42:15 43:7 57:12

perspective 19:9

pertain 28:24

pertinent 43:21

philosophy 6:21

photocopy 14:20 22:21 30:4 40:20 50:3 58:18

physical 18:6,9,17,20 21:15

physically 12:18 17:7 18:3

Pilkington 19:14 20:15

Plaintiff 5:19

Plaintiff's 49:24

Plaintiffs 34:10,11,25 36:4 37:12 38:20,22

Plaintiffs' 35:9,15,17 36:10,17 38:24

planning 8:19,25

platform 7:22

point 27:19 55:23

police 35:16

position 5:11 15:5 24:7 36:16 46:20

possessed 27:19

possession 35:7 54:16 56:15,20

possibly 46:11

post-closing 18:3,5,16,23

post-dated 57:23

potentially 19:20 47:9 48:18

pre-closing 13:20

premises 15:18

prepare 54:8

prepared 13:13,25 14:8 21:16 44:19,21,23 45:2

presently 27:12

presume 8:2

pretty 20:24 40:10 53:10

previously 57:9

primarily 6:5 19:14

principal 19:2

prior 18:7,10 39:3 52:11

proceeding 20:4

proceedings 24:11,14 28:16

proceeds 52:23

produced 33:21

producer 37:10

production 41:20 48:14 51:20

professional 6:8

promising 37:9

property 15:17,23,24 16:5

provide 12:3 17:10 57:2

provided 12:4,6,14,15 14:7 16:22,23 17:2 51:13

prudent 33:3

purchase 10:5 28:11 31:3, 6 36:19

purchased 14:24,25 15:1 36:10,17,19 41:4 46:16

purchasing 37:13

purportedly 35:24

purports 32:2 49:17 50:6, 7,15

purpose 37:15

purposes 37:13

pursuant 14:21

put 23:17 44:9 45:22

## Q

question 10:12 26:11 46:19

questions 8:8 44:4,5,8 53:4,10 58:4

quick 53:11

quote 29:9 34:7,18 36:3, 25 37:8

## R

radar 23:18

rampant 39:22

re-examine 58:5

read 55:2 57:13 58:8

real 7:22

realize 51:19

reason 46:14

reasonable 38:17

recall 49:6 52:13 54:24 57:6

receipt 14:20 22:21 30:3 40:20 50:3 58:18

received 13:9,24 34:11 47:3

receiver 36:8

recently 47:21

recess 40:14

reclaiming 27:25

recollection 21:24

record 13:23 58:14,15

recorded 23:23

recordkeeping 24:20 25:6,12,19

records 17:14 54:10

recovery 27:23,24

redacted 31:20

reduce 26:19

reducing 26:8,15

reference 17:24

referencing 32:14 33:14

referring 21:10 22:25 28:14 30:24

reflected 31:13 46:9,17

reflecting 31:21

reflects 29:9 46:21

refused 38:23

regard 54:14 56:9

regular 11:12 12:11 18:24 19:1

relate 17:11 33:19

related 19:4 20:4 22:1 28:20

relates 21:21 28:4 30:12

relating 32:14 33:8,14 49:3

relative 42:5

relayed 56:11 57:22 58:1

release 28:16

relevant 32:25

relied 27:1

Relief 33:25 40:17

rely 20:20 27:12,15 29:2

relying 51:16

remember 11:21 20:10 39:19

remit 57:19

remotely 5:3

report 13:6 35:16

reported 35:16

reporter 8:12 9:17 14:11, 15 49:19,21 58:13

reports 11:21 12:4 16:24 47:6

represent 53:15

representations 52:4

representative 27:11 32:10

representatives 41:11,18

represented 9:24 17:20

representing 17:5

request 12:9 30:21 32:20 33:17

requested 32:11

requests 10:17 38:24

required 12:4

requires 37:1

response 28:10,14,23 30:14,19 32:1,18 33:6 40:23,25 42:18 43:1,6 48:5 49:5 50:17,19 51:9, 14,15

responsive 32:20

restore 36:5

resulted 41:23

retained 51:22

return 11:11

returned 57:20

review 27:4 43:10

reviewed 25:9,14 34:22 54:9

reviewing 16:18

rights 19:5,10

**S**

Sachs 7:19

safe 51:21

safeguard 36:9

sale 55:9

sales 28:11

satisfaction 34:16

satisfy 11:16

save 23:12

schedule 44:21

scheme 34:9,14,25

school 6:22,24 7:8

Schwartz 50:11

scott 15:15 19:3 20:6,17, 21 35:11,25 38:23 39:14, 16 41:21,22 55:18

screen 12:23 13:2 22:11, 13,15 29:6 30:17 33:22 40:22 43:4,20 44:13,18 49:13,15 50:5,22,25

scroll 22:22 31:1 40:24

Scrolling 37:7

search 14:1

searched 32:25

Section 38:4

secured 11:13

security 14:23 26:14 27:15 28:2 29:2,21 32:15

seeking 37:8

seeks 36:5

sell 41:12,19 42:5

sense 11:8 36:6

sentence 23:3

serve 5:20

served 22:3 50:17

Service 34:3

Services 34:2

Servicing 6:1

sets 45:18

share 12:24 22:11,14 29:7 30:18 33:23 40:22 43:5 44:14 49:13,16 50:22 51:1

sheet 15:25 16:3

short 53:10

show 12:22 28:20 29:5 30:22 43:2 49:17 50:15,23 57:3

showed 44:12 48:5

showing 30:19 32:9 33:24 46:15

sight 42:11

signature 40:3,4 55:8

signatures 22:23

signed 10:9,13,15 21:11 35:23 39:6 42:21,25

single 27:7

sir 5:8 17:25 33:17 37:22 45:15 46:2 50:18 51:5

sit 10:19 19:22 25:11 27:10,22 28:3 33:5 44:3 47:4

sitting 32:24

situation 25:17 28:1 36:24 39:21

situations 27:22

sixty 18:12

skeptical 25:18

small 7:14

sought 37:11

sounds 20:20 38:6

source 44:25

space 21:15

speak 20:6,11

speaking 56:12

specific 24:2 38:9

specifically 30:12 35:11 39:10,11,19 47:8

speculate 48:21

spell 19:15

Spider 32:16

spoke 20:16 42:1 48:16,23

Sport 34:3

spreadsheet 12:20 16:7 45:5

spreadsheets 13:9 14:7 27:5

standard 47:5

state 5:9 45:15

statement 10:23 32:3 39:1

statements 24:15 31:20 39:17 52:2

Stephens 41:4,10,17 42:5, 10,21 46:16 50:6 51:17 54:16,20 57:4,10,20,23

Stephens' 14:18 28:15 30:2,20 40:18 48:2 49:3,4 50:8 51:8 52:10,17 54:4, 11 56:10,14

stolen 16:4 35:18 36:12

stop 31:2

stopped 39:4

strike 7:11

stuff 38:21

subject 21:7 54:4

submit 49:19

subpoena 50:17 51:9

subsequent 10:17 11:1

substantial 37:12

Suffice 42:3

suit 39:3

suits 14:13

summary 13:14

sums 37:25

supplied 45:17 50:16 51:8

supply 11:20

support 27:12 35:13

supported 29:21

supports 28:4

suppose 16:15

supposed 9:23

surprise 45:9

swore 52:3

sworn 5:3

system 37:2

**T**

taking 32:9 41:2 44:2

talk 24:12

talked 31:25 33:6 37:22

talking 8:11 16:10,16 17:12 18:8 19:24 20:7,12, 18 21:6,8,22 22:12 23:10 36:1 39:19

temporary 37:2

terms 10:16 14:21 38:11

testified 5:4 14:22 52:8 55:23 57:9

testifying 8:20

testimony 46:2 57:13,15

text 33:18

text/sms 33:14

things 21:23

thirty 36:7

thought 35:6 38:11

threatened 35:11,24

time 10:1,13 21:15 27:19 34:6,20 39:8 44:3 46:24

47:2,18 51:22 52:5 55:12, 23

timed 13:1

times 8:3 12:15

title 16:24 21:5 30:21 31:10 35:23 40:24

titled 54:20

titles 12:8,9 23:4 55:9

today 8:8 9:5 10:19 16:10, 17 17:12 18:9 19:22,25 20:8,13,18 21:6,22 23:10 25:12 27:10,23 28:3 32:24 33:5 36:1 38:7 39:18 44:3 47:4 51:23 57:3,5

today's 54:9

told 21:18 35:21

top 18:15

total 11:5

track 16:25

Trade 31:8

transaction 11:9 30:8 32:18 33:7 41:7 46:15 48:2 49:4 52:10,11,17 54:11

transactions 25:2 28:20 31:13

transcript 23:12

transfer 34:14

transpired 21:24

treated 26:13

trial 8:21

true 39:1 46:3 47:21 52:4

trust 25:22

trustworthy 25:6

turn 26:19

Turnover 30:20

two-minute 53:2

typed 45:3

**U**

UBS 7:20

UCC 29:5,8 30:5

UCC-1 30:2

Uh-huh 17:23

Ultimate 34:2

ultimately 57:20

umbrella 19:9

understand 9:18 14:6 26:11,12

understanding 10:1,4 17:16 23:9 45:15

Understood 9:4

universe 32:19 51:12

University 6:23

update 12:11

updates 47:3

**V**

vehicle 33:15,19 46:16,17 49:3

vehicles 10:6,7 12:21 14:23 15:6 18:12 22:2,5,7, 8 37:11

verbal 19:19

verified 33:24 40:17

verify 25:21,22,23

version 35:13

view 25:24 51:24

virtually 42:8

**W**

wake 24:5

wanted 41:12,19

wanting 42:5

week 35:14

weeks 47:22

white 42:22

Wholesale 23:5 34:2 53:16,19,25 54:17,21 56:21

**wholly** 5:24

**Winderman** 24:22,24 25:7 50:10

**witnesses** 48:16

**Word** 45:3

**words** 31:16 45:3

**worked** 7:10,12,17 11:9

**working** 17:17 55:15

**works** 18:25

**World** 7:17

**wrap** 40:12

**written** 19:23

---

**Y**

---

**York** 9:3

---

**Z**

---

**Zankl** 19:3 20:7,17,21 21:5,11 23:22 26:5 34:24 35:11,25 36:11 38:23 39:8,14,16 41:21,22 43:25 48:14,18,25 55:16,18 57:9,17

**Zankl's** 55:25

**Zankls** 9:9,21 10:14 24:7, 16 25:12,24 26:21 34:1,8 35:9,14 36:12 37:11,24

**Zankls'** 25:5,19 26:9

**Zoom** 5:4 8:12 15:15 25:3