Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:          CASE NO. 22-15627-EPK
AUTO WHOLESALE OF BOCA, LLC
            Debtor.
_____/

            ECF #114
        November 28, 2022
        The above-entitled cause came on for hearing
before the Honorable Erik P. Kimball, one of the Judges in
the UNITED STATES BANKRUPTCY COURT, in and for the
SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler Dr.,
West Palm Beach, Palm Beach County, Florida, on
November 28, 2022, commencing at or about 9:30 a.m., and
the following proceedings were had.

        Transcribed from a digital recording by:
            Cheryl L. Jenkins, RPR, RMR

Page 2

APPEARANCES:

LINDA MARIE LEALI, Subchapter V Trustee (via Zoom)

    JAMES B. MILLER, P.A., by
    JAMES B. MILLER, Esquire
    On behalf of the Debtor

    DAVID R. SOFTNESS, P.A., by
    DAVID R. SOFTNESS, Esquire
        and
    RICHARD BARON LAW, by
    JERRELL A. BRESLIN, Esquire
    JONATHAN SCHWARTZ, Esquire
On behalf of FVP Investments, LLC, FVP Opportunity Fund,
    III, LP and FVP Servicing, LLC

    MAURO LAW FIRM, by
    CORY MAURO, Esquire
    EVAN APPELL, Esquire
    On behalf of Derek Stephens

    AKERMAN, by
    AMANDA KLOPP, Esquire (via Zoom)
    On behalf of Edward Brown

    HARRY WINDERMAN, Esquire (via Zoom)
    On behalf of Karma of Palm Beach, Inc.
        and Karma of Broward, Inc.

    ALSO PRESENT

    ECRO - Electronic Court Reporting Operator

        - - - - - - -

Page 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RE-CROSS |
|---|---|---|---|---|
| Jonathan Martin | | | | |
| By Mr. Appell | 30 | 104 | | |
| By Mr. Breslin | | 53 | 108 | |
| By Mr. Miller | | 80 | | |
| Derek Stephens | | | | |
| By Mr. Mauro | 113 | 188 | | |
| By Mr. Breslin | | 155 | | |
| By Mr. Miller | | 180 | | |
| Moshe Farache | | | | |
| By Mr. Miller | 195 | 227 | | |
| By Mr. Mauro | | 205 | | |
| By Mr. Breslin | | 210 | | |
| Scott Zankl | | | | |
| By Mr. Breslin | 232 | | | |
| By Mr. Mauro | | 248 | | |
| By Mr. Miller | | 275 | | |
| Brian Rohl | | | | |
| By Mr. Breslin | 288 | | | |
| By Mr. Mauro | | 310 | | |
| By Mr. Miller | | 313 | | |

EXHIBITS

| | Page |
|---|---|
| Stephens' Exhibit 1 | 42 |
| Stephens' Exhibit 9 | 52 |
| FVP's Exhibit 4 | 87 |
| Debtor's Exhibit 2A | 91 |
| Debtor's Exhibit 6A | 93 |
| Debtor's Exhibit 7A | 94 |
| Debtor's Exhibit 3A | 99 |
| Debtor's Exhibit 5A | 103 |
| Debtor's Exhibit 1A | 200 |
| Debtor's Exhibit 4A | 205 |
| Stephens' Exhibit 16 | 231 |
| FVP's Exhibit 5 | 233 |

Page 4

THE COURT: All right. Good morning everyone.

Other than that, I don't need to do anything, I take it.

We're here in Auto Wholesale of Boca, LLC. Let's have appearances in the courtroom first.

MR. MAURO: Good morning, your Honor. Cory Mauro, on behalf of Derek Stephens. I'm joined by Evan Appell.

MR. APPELL: Good morning.

THE COURT: Good morning.

Mr. Miller.

MR. MILLER: Good morning, your Honor. James Miller, M-i-l-l-e-r, on behalf of the debtor-in-possession, Auto Wholesale of Boca, LLC.

THE COURT: Thank you.

Mr. Softness.

MR. SOFTNESS: Good morning, Judge. David Softness, representing the FVP parties. With me in the courtroom is Jerry Breslin and Jonathan Schwartz.

THE COURT: Good morning.

MR. BRESLIN: Good morning, your Honor.

MR. SCHWARTZ: Good morning, Judge.

THE COURT: Anyone else in the courtroom who wishes to make an appearance?

1 (Pages 1 to 4)

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 5

(No verbal response.)

THE COURT: No?

I have some parties on the phone. Ms. Klopp, would you like to appear? I know you're just listening today.

MS. KLOPP: Yes, your Honor, that's correct. Amanda Klopp on behalf of Edward Brown.

THE COURT: Ms. Leali, good morning.

MS. LEALI: (No verbal response.)

THE COURT: That's okay, you don't have to appear if you don't want to, but I can see you. She's on mute and can't come off.

All right. Is there anybody else who wishes to appear from the phone? It's okay if you wish to just monitor, no problem.

All right. So where do we begin today?

MR. MAURO: Judge, on behalf of the FVP parties, we would invoke the rule, please.

THE COURT: Let me -- oh, that's great. If you could go to the podium.

Ms. Leonard, is he being picked up? He is? All right. Not terrible, but -- and who would be excluded? Who would need to be here, and who would be excluded, gentlemen?

MR. MILLER: Mr. Zankl will be leaving,

Page 6

your Honor.

THE COURT: Great. Thank you.

Gentlemen, there is conference rooms out there. Feel free to use them.

All right. Very good. Have we achieved what we need to achieve?

MR. MAURO: Yes.

THE COURT: Good, very good.

All right. Well, next where do we go?

MR. MAURO: I'm prepared to proceed with an opening statement, your Honor, if we're ready to begin.

THE COURT: Are there any preliminary matters that we need to address before we get started? Yes, Mr. Miller.

MR. MILLER: Yes, your Honor, Miller speaking on behalf of the debtor-in-possession.

We did file objections to exhibits that have been tendered to the Court.

THE COURT: Usually I take those in the course of presentation.

MR. MILLER: Okay.

THE COURT: Because not all exhibits, necessarily, will be offered, for example, and it would not be a good use of time to have a fight over each exhibit at the start.

Page 7

Also, oftentimes the context of the exhibit being offered is relevant to the objection and a potential ruling.

So, unless there is something specific that you want me to address up front, I would prefer to do that.

MR. MILLER: No, I spoke to Mr. Mauro earlier. I filed some objections to deposition transcripts, and I had asked him if there were particular pages. He advised he was just going to use them as impeachment purposes. So --

THE COURT: Well, then we'll wait.

MR. MILLER: -- we'll wait until that point.

THE COURT: Yes, that's good.

MR. MILLER: And Mr. Breslin and I have worked out on one of his exhibits some of our objections as well, so we'll wait for that matter.

THE COURT: Good. Excellent.

Yes.

MR. BRESLIN: Yes, Judge, one procedural matter.

My understanding is, is that Mr. Mauro is going to request that the Ferrari automobile be carved out of the bankruptcy estate, and as I indicated to your Honor a couple of times on the Zooms, we will be, you know,

Page 8

presenting in our amended complaint that will be filed on the 9th, evidence, or certainly allegations that address over 20 vehicles, this being one of them, and we -- and as we've mentioned earlier, our presentation as to those vehicles will be substantial, will involve multiple witnesses, a lot of data, and information, and documents. So this is one of those vehicles.

And as I mentioned to your Honor the other day, what I didn't want to have to do is, just for this one vehicle, put on our entire case as to why this vehicle should remain Karma inventory as opposed to being AWB bankruptcy estate property.

So, my understanding of how this is going to go procedurally today is that Mr. Mauro is going to try to establish that this vehicle is not either -- it's not Karma inventory, and it's not AWB property.

What I don't want to have to do today, Judge, is have my fight with Mr. Miller on whether or not this vehicle, this particular vehicle is Karma inventory or AWB property, because that's just a much longer and more involved presentation.

So, I would like the -- I would like, as far as today's evidence and ruling, to be confined to just whether or not Mr. Stephens is entitled to get his car back, and I think that would be focused on whether or not

2 (Pages 5 to 8)

Page 9

this car ever became Karma inventory, and that way I believe that Mr. -- and then to the extent that we can continue to argue that at the trial in this case, that it's not AWB property, I think that we should leave that for another day. That way we don't have to have the entire presentation as to whether it's Karma inventory or AWB inventory, because that's got nothing to do with Mr. Stephens.

THE COURT: Gentlemen, I obviously cannot tell you what the necessary finding would be at the end of the hearing in order to react to the request for relief in the motion, which I was just looking at, to make sure I knew what it was.

Yes, Mr. Miller.

MR. MILLER: Just dovetailing on what Mr. Breslin was saying, I think that, in fact, the relief sought is against the debtor, and it is estate property.

I think that Mr. Breslin is correct that he'd have to -- that Mr. Stephens has a two-step hurdle to get through, the first hurdle, did the property go to Karma of Palm Beach, and then did the property go to us.

But, however, again, we're the only party to file objection to exhibits. Under the Local Rule the exhibits are admitted for the Court to consider, and our exhibits, Numbered 1A through 7A, all reflect it's

Page 10

property of the estate. It's in the record now. You have Court Paper 65, that we identified as Exhibit 1A. We have the original title endorsed from Mr. Stephens to Karma Palm Beach, to Auto Wholesale of Boca. We have the bill of sale, another exhibit of ours, that's Exhibit Number 3A, that is endorsed from Karma Palm Beach to Auto Wholesale of Boca, and we have a power of attorney, executed by Mr. Stephens, in favor of Karma Palm Beach, allowing the car to be transferred to Karma Palm Beach.

THE COURT: All right. You're just saying that in order to rule on this, I may necessarily have to rule on things that impact the adversary, which I knew when I set this hearing, and I'm going to rule on the motion after the end of this hearing, and I'm not going to tell you ahead of time that I will limit what I need to consider in order to do that, because the evidence is not yet admitted, in spite of what Mr. Miller just said. It has to be offered, I need to admit it, and if you wish to partake in the hearing, you are here, and you may do so.

MR. BRESLIN: Thank you, Judge.

MR. MILLER: Thank you.

THE COURT: All right. Shall we go over to opening?

Now, it's usually really helpful to me if you give me a preview of what the evidence is going to

Page 11

show, and your theory. Of course I've had a preliminary hearing on the matter.

MR. MAURO: Yes.

THE COURT: I've read the transcript from that, so I know what we discussed at that time, but things may have changed between now and then.

MR. MAURO: Indeed.

THE COURT: And so I'd like to know what I am about to hear, and why you believe that you're entitled to relief.

MR. MAURO: That's what I hope to do with this opening statement, and avoid any urge to argue.

So, as you know, we're here on our motion to turn over and abandon title to my client's Ferrari. Earlier this year, in March of 2022, Karma was a dealership that was on the ropes, behind with, we don't know how many lenders. It's no secret that the Zankls had major cash flow issues.

The evidence is that their business of 20 years was in dire straights, and in walks Derek Stephens. He had no idea that the dealership was out of money. Derek presented an opportunity to Karma when he walked in, not unlike a lot of the other aggrieved parties that are part of this bankruptcy.

Derek was a consumer, and he operated in

Page 12

good faith to buy a car and trade one in, and he was taken advantage of, plain and simple, caught in the vortex of the Karma/Zankl situation, and that situation, and this transaction, as a result, have become convoluted.

The issue today, however, can be stated quite simply, and the issue is, if the Ferrari was acquired by Karma, brought into inventory legally, then it's FVP's collateral and I lose, we lose.

If on the other hand the Ferrari was not acquired by Karma, it was not brought into inventory, then we win, it's as simple as that, that's what we're here to decide today.

To answer that question we're going to look at the transaction in detail, and the first thing you'll learn about the transaction is that it was transacted between two individuals, Derek Stephens, my client, and Jonathan Martin, the salesperson at Karma. He's been excluded by invocation of the rule, but he's here to testify. So you're going to hear from the two people that transacted on March 11th the relevant transaction, and their testimony in that regard is a closed loop. They're the only ones that were there, and nobody is there -- nobody is here to dispute what they did.

So two big dates here, the first is March 11th. What happened on March 11th? What you'll

3 (Pages 9 to 12)

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 13

learn is that the original deal, the one that they rely on, contemplated that the Ferrari would be traded in against the purchase of a Lamborghini. My client is trading in his Ferrari and buying a Lamborghini, and he decides that he's going to do that, and tells Karma, paper the deal, draw up the papers, he tells them that around lunchtime on the 11th, I'll be back after work.

And that's what happens, they draw up the papers for Derek to trade in his Ferrari, he's going to get $230,000 credit against a $250,000 purchase, that's the deal that they papered. That's not the deal that they performed.

When my client came back to pick up his new Lamborghini and sign the papers, he was told, sorry, you can't drive the Lamborghini off the dealership, we've got to be paid for that, because we didn't sell your Ferrari yet. We've got a buyer, and we've got somebody in the pipeline, but we didn't sell it yet, and so if you want to drive that Lamborghini home, then you've got to pay for it.

So, Derek wrote a check for $250,000, and he signed the consignment agreement. He signed the consignment agreement because he wasn't going to pay $250,000, and trade in a $230,000 car, thus paying $480,000 for a $250,000 car, simple math.

Page 14

So, contrary to the purchase agreement that my opposition rely on, the parties enter into this alternative arrangement. There is a check exchanged for $250,000, that's not reflected on the purchase agreement at all. The purchase agreement reflects a $230,000 trade, and to memorialize this new deal, they enter into the consignment agreement, and that's really the key to the case, because the consignment agreement contains an integration clause.

So March 11th, about 6:00 p.m., Friday, the dealership is closing, everyone is packing up to go home, this consignment agreement, it's the last thing that's signed, the big check is exchanged, and the consignment agreement has an integration clause, and everything we did before is superseded. So the transaction was modified, the transaction that they rely on was modified.

My client was never paid for the Ferrari, he was never given trade value for the Ferrari, and what we find, rather unimaginable, and I said I was going to avoid argument, and I'm going to do my best, but our opposition attempts to weaponize somehow this transaction that Derek, a consumer, coming into a dealership, undertook.

And you look around today, there is truly a full court press on this one car within this substantial bankruptcy, and all of the opponents have somehow -- you

Page 15

may see this more often than I do, but all of the opponents have lined up against this one consumer.

You know, in Shakespeare's The Tempest, a shipwrecked man seeks shelter with a sleeping monster, and we get, I think, the brilliant phrase, misery acquaints a man with strange bedfellows.

FVP seeks shelter in Scott Zankl. FVP's claim is wholly reliant on Scott Zankl. I don't think they have a witness here today. They depend solely on information, a concocted narrative by Mr. Zankl, and yet they have alleged about Mr. Zankl that it was objectively apparent, I quote, that Zankl conspired with Farache.

FVP says that Zankl engaged in a, quote, outright and bold scheme to defraud creditors. In an attempt to convert funds, FVP says that Zankl's conduct was patently illegal, that it constituted an outrageous fraud, but for today, and today only, you should trust him, you should trust the guy that FVP, your Honor, says cannot be trusted.

To be clear, FVP seeks to capitalize on Zankl's outrageous fraud. FVP's only witness is the bad actor in their narrative, strange bedfellows.

So there is one essential question before the Court today, I told you what it is, did Karma acquire the Ferrari from Derek, yes or no.

Page 16

THE COURT: Oh, gentlemen, I should let you know that the microphones are very sensitive, and the things you think are not on the record become part of the record, and I have no control over that.

MR. BRESLIN: I'm very sorry.

THE COURT: So be very careful when you're speaking at side bar.

Yes, go ahead.

MR. MAURO: So that's the sole issue, did Karma acquire the car from Derek. How do dealerships acquire cars? They buy them or are they acquire them in trade? And I think that's the universe. So your inquiry today can be further refined, did Karma buy or acquire the car through trade.

I told you how the evidence is going to show that this deal on March 11th culminated in the consignment agreement. The evidence is also going to show that after the consignment agreement, Karma called Derek to pick up his Ferrari, those words, come pick up your Ferrari. They told the police, the Boca P.D., who was investigating the outrageous fraud that they allege, they told the police that it was Derek's car, that's Derek's Ferrari, and they were utterly consistent, when I say "they" I mean Karma and the Zankls, were utterly consistent that this was Derek's car until we came before your Honor on this

4 (Pages 13 to 16)

Page 17

motion, that's when everything changed, and the story changed dramatically, and I asked myself why would that be?

Back to our strange bedfellows. Why on earth would Scott Zankl testify for FVP, a company accusing him of outrageous fraud, and the answer is simple, Judge, Mr. Zankl and his wife have personally guaranteed Karma's indebtedness to FVP. So the Ferrari would reduce Karma's indebtedness, were it awarded to them, and, in turn, reduce Mr. Zankl and his wife's personal liability, and that is the reason that my client has been the target of all of these folks.

In the end, the only credible evidence that you're going to hear today is from the two people who transacted the deal, entered into the consignment agreement. It will be important for you to hear, too, that Karma never paid for the Ferrari, that is undisputed. It will be important for you to hear also that Karma never afforded my client any value for the trade, that is undisputed also, and accordingly the Ferrari never legally became part of Karma's inventory.

Thank you.

THE COURT: Very good. Would anyone like to respond or have a -- or you can hold your opening until the beginning of evidence, Mr. Miller, or -- yes.

Page 18

MR. BRESLIN: I have some brief comments, your Honor.

THE COURT: Would you mind going to the podium?

MR. BRESLIN: Yes, of course.

THE COURT: I want to make sure you're picked up.

MR. BRESLIN: Judge, the evidence is going to show that Mr. Stephens bought his Ferrari from the Karma dealership, Karma Palm Beach, in the spring of 2021. He financed it through a third-party bank, then in the fall of 2021 he brought the car there, and he testified at deposition that he brought the car there from time to time while he was away back in Texas, and he left it there to see if they could sell it.

Now there was never a consignment agreement signed back when he testified that he had it there, he said he had it there approximately 20 days a month in November, and December, and January, and February. You'll hear some testimony about that.

What happened was, in March, and, Judge, you're going to see conflicting evidence about what happened and when. What we do know is that around the 10th, because we have an email from Jonathan Martin to one of the employees at Karma Palm Beach, telling the employee

Page 19

at Karma Palm Beach to put the Ferrari, that's Mr. Stephens' Ferrari, in Palm Beach inventory, and so that's the 10th, that's the day before all these transactions took place.

So what I believe the evidence is going to show, through Mr. Stephens, and through Mr. Martin, and Mr. Zankl is going to testify, is that on the 11th, Mr. Stephens wanted a Lamborghini, and he desperately wanted to have that Lamborghini for the weekend. So what they did was they, quote, papered a deal where he would trade his Ferrari in for the Lamborghini.

Now, what you will see in this case, Judge, is that there is three different versions of that purchase agreement. There is one that was -- that Mr. Stephens sent to his bank in Texas, that's unsigned, that talks about a trade. All the documents say the same thing, that the car was traded, the Ferrari was traded for the Lambo, and then there are two different versions of it, one -- and with two different payout numbers, that got executed on or about the 11th, nobody is really sure, because we have an email a few days later from Alana Bailey to Mr. Zankl that talks about redoing one of the purchase agreements.

But the long and short of it is, all of the purchase agreements, they're different, but they're all

Page 20

dated on the 11th. So, why did Mr. Stephens write a check for $250,000? And that's ultimately what you're going to have to decide here, why did this happen this way?

He went into the dealership, and he wanted to do -- he wanted to have a trade, and the trade that he wanted to get for his Ferrari was for $230,000, because Mr. Martin believed he had a buyer, and I submitted evidence because they had a deal in the pipeline, and they believed that they could sell that Ferrari for $230,000, and that's the number Mr. Stephens wanted. He wanted to get $230,000 for the Ferrari, and he also wanted to buy the Lambo.

But what's critical here, Judge, is that he wanted to have the Lambo for that weekend. He needed to have the car for that weekend, and so they papered the deal, and you'll see different versions of it, but the long and short of it is it got papered, dated that date, but Scott Zankl said I'm not going to allow you to take the Lamborghini unless you pay for it.

Okay, and so if he was just going to buy the Lamborghini for $250,000, he'd have to pay tax on it, but if he traded in his Ferrari worth $230,000, he'd only pay tax on 20.

So, Mr. Stephens wanted the best of both worlds. What he wanted to do was leave the lot with the

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 21

Lamborghini that day. He wanted to write a check for $250,000. He wanted to make a deal where he got his $250,000 back, and he didn't have to pay tax on the $250,000. That's a business decision he made.

So what the agreement that they came to that day was, is that he's going to take the Lambo, drive off the lot, he's going to give them a check for $250,000, and then he's going to pay the difference in the paperwork, and the difference in the paperwork was $22,000.

So Mr. Stephens, assumedly, notified his bank in Texas, because you will see the documents from the bank in Texas, they're dated March 11th as well. His bank in Texas sent the difference, the $22,000, they sent out a check to Karma Palm Beach that day.

So what was the deal that Stephens made with Scott? And he made it with Scott Zankl, not with Mr. Martin. The deal was, I'm going to give you $250,000 today. When you sell the Lam -- the Ferrari, you give me my 250 back, and that's what the evidence is going to show here. They made a business deal.

Okay, and, Judge, we haven't objected to any vehicles that any of these good faith purchases came in and claimed, because there is a lot of vehicles that people bought from Karma, and the car was taken, and they came in and they sought the cars back, and you gave them

Page 22

back, but that's not this particular case, because in this particular case, Mr. Stephens made a business deal, and what was the business deal? I'm going to put up $250,000, when you sell the car in the future, I'm going to get my 250 back.

Now let's take a look at the evidence. So what Mr. Mauro doesn't want your Honor to take any -- you know, take note to, are the documents that he signed that day, and there is a critical, and I think dispositive document that Mr. Stephens signed on that day, and I believe it's Exhibit Number 5 in our list, it's what's called the trade pack, and this is the trade pack document that Mr. Stephens signed, and this is the only -- other than his testimony, this is the only document that is under oath. So what Mr. Stephens signed on that date was a document that -- under oath, that was going to be delivered to the Department of Motor Vehicles, that said I'm trading in this car, this is the mileage on that car, and I'm stating this under oath, and that's our Exhibit Number 5.

So we have a lot of talk, but we have something that's under oath, and this is the only document that's under oath. So what he said on that day, on March 11th was, I'm trading this car.

Now, what's a trade? A trade is not a

Page 23

consignment. By definition it's not a consignment, and so let's talk about the assignment (sic). Why was there a consignment agreement? Well, we're going to hear some testimony about the consignment, Judge, but let's go to Mr. Stephens' own words.

One of the exhibits that we have filed here, it's 37 pages of text messages, okay? So, if -- and these are the text messages that Mr. Stephens is sending to Scott Zankl, this is in April, this is after Mr. Farache took the vehicle.

So after he took the vehicle, Mr. Zankl was doing what he could to try to make Mr. Stephens whole, to the extent that he could, but what he never said to Mr. Stephens was, is that -- that car was not Karma inventory, because when you look at the business records of Karma, that car was taken into their inventory on 3-11.

We have our forensic who is prepared to testify, that will talk about the Dealertrack records from Karma, and he will testify that that went into Karma inventory on 3-11.

We have an email from Mr. Martin, to the people at Karma, that is Exhibit Number 20, the day before, March 10th, saying put the Ferrari into Karma inventory.

So, there is substantial evidence that shows

Page 24

that that car went into Karma inventory, and if it went into Karma inventory, then it's FVP collateral, by definition.

So now how do we know that Mr. Stephens, himself, didn't believe he had a consignment? Let's take his own words. There is 37 pages of text messages in this case, Judge, from Mr. Stephens, and when you look at those text messages, and we'll go through them line by line, if Mr. Stephens chooses to testify, and what he testifies in his -- what these text messages state are he consistently asks for his $250,000.

Here is what he doesn't say, he doesn't say you have my car on consignment, I want my car back, and there is 37 pages of it. He asks for his $250,000, I don't know, at least a dozen times, and furthermore, you know, if you look at Page 14 of the text messages, this is a very interesting quote, it says, I have --

THE COURT: You might be getting a little bit into the middle of the evidence at this point. This is just an overview. This isn't closing argument.

MR. BRESLIN: Okay. All right. Okay. So my point is that if you look at Mr. Stephens' own words, not in court, not at a deposition, where he's just talking to Scott Zankl, talking about the deal, he asks for his $250,000 multiple times. He never says, you know, I get

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 25

my car -- I want my car back.

And critically what he said is, I have been promised the 250-K since 3-13, and that's a -- we're going to need to ask about that, and then he says, and I do have a consignment agreement dated 3-11, and as you know the website still has it for sale.

So, if you look at Mr. Stephens' own words, he talks about wanting his, wanting his 250, asked for it multiple times, saying that he has a document that's dated, quote, dated 3-11. He doesn't say, well, I have a consignment agreement, you have my car on consignment. He says I have a consignment agreement dated 3-11, that's odd, and then this is really critical, on Page 16, he says, honestly, if I can just get the Ferrari and title today, you can take a month to get the $250,000. So, that's his own words.

So does that sound like a consignment? I don't think so. Here is what it sounds like, it sounds like he made a business deal to put up $250,000, transfer his car to Karma inventory, and he was owed 250 and, Judge, he's owed 250, a hundred percent. As he sits here today, Mr. Stephens is owed $250,000 from Karma Palm Beach.

But here is what he can't do, he can't come in and unwind the deal and pretend like he didn't trade

Page 26

the car in when he did. The car went into Karma inventory, okay, and since it went into Karma inventory, it's FVP collateral and, therefore, that is why FVP is here objecting to this, and basically only this vehicle, because this is Karma inventory, and it's our collateral.

Thank you very much, Judge.

THE COURT: It's okay if you keep it briefer than that.

MR. MILLER: I know.

I just think the theory is a little different, Judge. I think what you're going to find is when you see the records, the only thing that shows that it's actually a valid opening and closing, was the trade-in of the Ferrari for acquisition of the Lamborghini. It's represented to Mr. Stephens' own bank, where he does, he sends the trade-in information in, the bank relies upon it, funds the deal, pays the balance check to Karma Palm Beach.

The 250 --

THE COURT: So that was a loan from a bank?

MR. MILLER: Yes, what happened was the money -- the Ferrari had a debt on it. So Mr. Stephens had to transfer the debt to the Lamborghini, to purchase the Lamborghini. So he sent the information to the bank to do that.

Page 27

What is misleading is the $250,000 check. The $250,000 check, if anybody read it, at the bottom left-hand side of the memo, it says for hold of the Lambo.

Mr. Stephens was giving a check to Mr. Zankl to hold the Lamborghini. Mr. Zankl negotiated the check. That's why Mr. Stephens is making these text messages, you owe me 250 grand, and then he starts figuring out how he can get repaid, how he can get his money back, but it's a check written to hold for the Lamborghini.

Mr. Zankl deposited and negotiated the Lamborghini check -- the check. Mr. Stephens repeatedly, as Mr. Breslin said, made demand for the return of his $250,000.

It's only later on that he starts talking about the Ferrari, and in this case he starts talking about the Ferrari, but that Lamborghini, that check was a deposit to hold the Lamborghini, that apparently Mr. Zankl convinced him it needed to be done. I don't know why, but the reality is the check is independent of the Ferrari.

The transaction that occurs, the Ferrari is traded in, the paperwork shows the Ferrari is traded in. The bank relies upon that, transfers the balance of the Ferrari to the Lamborghini, and issues the balance check to Karma Palm Beach for the difference, because the Ferrari, everybody recognizes and acknowledges, was not

Page 28

worth $250,000. The sale price of the Ferrari would have been $230,000 on a credit.

Mr. Zankl previously testified that he didn't think the car was worth 230, but he was willing to give him a trade-in value of that. So why would he ask for a $250,000 check for a car that's worth less than 230, it makes no sense.

I think at the end of the day you'll find that that check is a red herring issue that has no relevance to the interest in the Ferrari, and strictly was a deposit for the Lamborghini to be held, and was supposed to be returned to Mr. Stephens, and that's why he's making those demands.

THE COURT: Very good. Anyone else?
(No verbal response.)

THE COURT: All right. Wherever you'd like to begin.

MR. APPELL: Sure, I'll call Derek Stephens, please.

THE COURT: Mr. Stephens, good morning.

MR. STEPHENS: Good morning, sir.

THE COURT: If you can make your way over to the witness box, and I will swear you in.

MR. APPELL: Oh, you know what, I apologize.

THE COURT: Sure.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 29

MR. APPELL: We were actually going to call Jonathan Martin first.

THE COURT: Whatever order you would like. Mr. Stephens, it's just a little exercise.

MR. MAURO: Yep, he's getting --

MR. APPELL: He's outside.

THE COURT: Why don't you go ahead and grab him?

Good morning. If you could just find your way over to the witness box, it's easy to find, we have someone to assist you, and if you could remain standing and raise your right hand?

Do you swear under penalty of perjury the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. MARTIN: Yes, sir.

THE COURT: Okay. Have a seat. Make yourself comfortable. You don't need to be right on top of the microphone, but try not to get more than a foot away from it. You can move it wherever you like.

THE WITNESS: Is this good?

THE COURT: That's fine. You don't need to lean forward.

THE WITNESS: Okay.

THE COURT: If you could start with his

Page 30

name, that's helpful.

Thereupon,

JONATHAN MARTIN,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. APPELL:

Q. All right. Can you please state your name for the record?

A. Jonathan Martin.

Q. At one point were you employed by Karma of Palm Beach, Inc.?

A. Well, I worked for the company for three years, but it was only Karma for probably the last eight months.

Q. Prior to that who were you technically employed by?

A. Excell Auto.

Q. And prior to your employment by Excell Auto and Karma, what was your role in the automotive industry, if any?

A. I worked for Mercedes-Benz of Delray.

Q. For how long?

A. Seven years.

Q. And prior to that, any other experience?

Page 31

A. Yes.

Q. Where?

A. Rhode Island.

Q. In the automotive industry?

A. Yes, sir, about 20 years in the auto industry.

Q. Okay. When did you leave your employment at Karma Palm Beach/Excell Auto?

A. When the business ended.

Q. When was that?

A. I don't have the exact date, but I've got to think it was late March, maybe, early April.

Q. Of 2022?

A. Yes.

Q. What was your role at Karma and Excell?

A. Sales.

Q. Was that your -- your title was salesperson?

A. Yep.

Q. Salesman?

And what was part of your duties as a salesperson for Karma and Excell?

A. Take care of the client, you know, sell the cars, make sure everything was supposed to be there with the car, and make sure the client was happy.

Q. In your role as salesperson at Karma, did

Page 32

you eventually meet Derek Stephens?

A. Yes.

Q. How did you meet Derek Stephens?

A. He was referred through that gentleman sitting right back there, Scott Enis (phonetic).

Q. Okay, and do you remember when you first met Mr. Stephens?

A. That would probably be in March of '21, when he purchased the Ferrari.

Q. And the Ferrari he purchased, is that the 2013 Ferrari 458 Spyder?

A. Yes.

Q. All right. So if I reference, and you reference a Ferrari throughout this testimony, we'll understand we're speaking about that vehicle, okay?

A. Yes.

Q. And you say you bought a Ferrari in March of 2021?

A. Yes.

Q. Did you do any other transactions with Mr. Stephens after March of 2021?

A. Yes.

Q. What other transactions?

A. He purchased a Lamborghini.

Q. Any other transactions with Mr. Stephens?

8 (Pages 29 to 32)

Page 33

A.   No deals came to fruition, but I tried to sell his Ferrari throughout time.

Q.   You say you tried to sell his Ferrari.  At any point in time did Mr. Stephens keep the vehicle at Karma Palm Beach?

A.   Yes.

Q.   And what was that arrangement?

A.   It was there on consignment, and sometimes if he came to town, he would just drive it on the weekend.

Q.   Do you know when he put it on consignment?

A.   I don't have the exact date, no.

Q.   But it was some time after March of 2021, obviously?

A.   Yes.

MR. MILLER:  Objection, leading.

THE COURT:  Sustained.

You can restate.

MR. APPELL:  That's okay.

BY MR. APPELL:

Q.   While the Ferrari was at Karma, was that vehicle considered for sale?

A.   Yes.

Q.   Was the Ferrari on the Karma website as a vehicle for sale?

A.   Yes.

Page 34

Q.   Did you eventually approach Mr. Stephens with a buyer for the Ferrari?

MR. MILLER:  Objection, leading.

THE COURT:  Sustained, although we do only have one day for this hearing.  So if it's obvious where he's headed, you don't need to feel tempted to raise that objection.

Go ahead.

MR. APPELL:  I'm going to ask the question.

THE COURT:  He's going to ask the question again.

THE WITNESS:  Okay.

BY MR. APPELL:

Q.   At any point were you approached by -- let me rephrase.

While the vehicle was for sale at Karma, did anyone ever approach you to purchase that vehicle?

A.   Yes.

Q.   Do you remember when that was?

A.   I don't have the exact date from Mr. Coulter when we started our conversations.

Q.   Do you have an approximate date?

A.   It's got to be in March of '22.

Q.   And you say Mr. Coulter, who is Mr. Coulter?

A.   He was a customer lead on the car, that

Page 35

wanted to purchase the car.  So, then we got him approved through the bank.

MR. MILLER:  Objection, hearsay, your Honor.

THE COURT:  Okay.  Sustained.

I'm not sure why it matters, but go ahead.

BY MR. APPELL:

Q.   So, Mr. Coulter, you say he was a potential buyer for the Ferrari?

A.   Uh-huh.

Q.   What happened after he, Mr. Coulter, approached you with regard to Mr. Stephens?  Did you talk to Mr. Stephens about --

A.   Sure.

Q.   What did you talk to him about?

MR. MILLER:  Objection, hearsay.

THE COURT:  What did you do to -- overruled.

BY MR. APPELL:

Q.   What did you talk to Mr. Stephens about with regard to the Ferrari?

A.   That we had a potential buyer for the car.

Q.   And what did you do after that with regard to the Ferrari?

A.   We sent it to Ferrari for an inspection.

Q.   When you say you sent it to Ferrari, which dealership was that?

Page 36

A.   Ferrari of Fort Lauderdale.

Q.   All right.  What was the purpose of that inspection?

A.   It's what they call pre-PPI, which is they inspect the car for the client that's potentially purchasing the car, to let them know if the car has a clean bill of health.

Q.   Do you remember when you sent that vehicle to Ferrari of Fort Lauderdale?

A.   I don't have the exact date, but I would -- I don't want to guess on the date.

Q.   Sure.

Was it in or around March of 2022?

MR. MILLER:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. APPELL:

Q.   Did you have any other discussion with Derek at this time regarding any other vehicles?

A.   Yes.

Q.   And what did you discuss with Derek about any other vehicles?

A.   What would you like to replace it with if the deal happens.

Q.   Okay, and what were those discussions, what

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 37

did that lead to?

A. A test drive of an Aventador, a test drive of the Lamborghini that he purchased, and that was it.

Q. And you say the Lamborghini that he purchased, what Lamborghini was that?

A. The 2017 Lamborghini Huracan Spyder.

Q. And do you remember when that was?

A. He purchased it on March 11th.

Q. Of 2022?

A. (No verbal response.)

Q. What were the terms of the agreement for Mr. Stephens to purchase the Lamborghini?

MR. MILLER: Objection, Judge, parol evidence. The contract itself would be the best evidence of that.

THE COURT: Overruled. Go ahead.

THE WITNESS: Maybe I didn't understand the question.

BY MR. APPELL:

Q. Sure.

What were the terms of the agreement for Mr. Stephens to purchase the Lamborghini?

A. It was just a normal deal, and at this point in the deal, he was still trading in his car.

Q. What do you mean by that?

Page 38

A. He was -- at this point in the deal, he was still trading in his car, it was part of the deal to purchase the new car.

Q. Was Mr. Stephens getting a trade credit applied to the purchase?

A. A sales tax credit, yes.

Q. Do you remember what that amount was?

A. It's 6 percent of 230 grand. I mean --

Q. Was there going to be a trade-in amount applied as a credit as well to the purchase of the Lamborghini?

A. Whatever the difference is versus what he owed, yeah.

Q. But do you know what that trade amount was, what it was going to be?

A. 230 grand minus his balance.

Q. Okay, and did the deal go through under those terms?

A. No.

Q. What happened?

A. The bank -- Derek's bank couldn't fund the deal that day, and at that point Derek asked to speak to Scott. So I put him on the phone with Mr. Zankl, and they worked out a deal.

Q. Do you know what the terms of that deal was?

Page 39

MR. MILLER: Objection, hearsay.

THE WITNESS: I know that I --

THE COURT: Stop.

MR. APPELL: Hold on.

THE COURT: Stop, stop.

Overruled, you can answer.

THE WITNESS: I know I received a check from Mr. Stephens for $250,000 that I handed to the office.

BY MR. APPELL:

Q. Was the $250,000 check for the purchase of the Lamborghini?

MR. BRESLIN: Objection, leading.

THE COURT: Stop.

Sustained. You can ask it in a different way.

BY MR. APPELL:

Q. Do you know what the $250,000 check was applied to?

A. From my understanding, that it was in lieu of the money coming from his bank.

Q. What do you mean by that?

A. There was money coming from his bank with the title.

Q. Did that money ever come from his bank?

A. I don't know.

Page 40

Q. Do you know if the $230,000 trade credit was ever applied to the transaction?

A. I don't believe it was.

Q. Why do you -- why don't you believe it was applied to the transaction?

A. Because they never registered his car.

Q. What do you mean by that?

A. In order for the deal to be completed, you have to, you have to register the car, which means you have to have the proper paperwork in order to do that.

Q. And what would the paperwork be that would be necessary in order to register the deal?

A. The title to the car that he was buying.

Q. And you never received that?

A. I don't know. I didn't, I never received any titles.

Q. Do you know if Karma ever received any title?

A. No.

Q. All right. At any point did Mr. Stephens end up signing any additional agreements with Karma of Palm Beach?

A. Yes.

Q. Do you know what those agreements were?

A. A consignment agreement.

10 (Pages 37 to 40)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 41

MR. APPELL: Your Honor, I have what's previously been marked as Exhibit 1. May I approach the witness?

THE COURT: Sure.

Okay. Is there more than one Exhibit 1 in this case?

MR. APPELL: It's 206-1, it's Derek Stephens' Exhibit 1.

BY MR. APPELL:

Q. Mr. Martin, have you seen this document before?

A. Sure.

Q. And what is this document?

A. This is a consignment agreement.

Q. Is that your signature on the bottom of the consignment agreement?

A. Yes, sir.

Q. And was anyone else with you when you signed this consignment agreement?

A. Mr. Stephens.

Q. Anybody else?

A. No.

MR. APPELL: Your Honor, we would like to move this into evidence as Exhibit 1.

THE COURT: Any objections?

Page 42

MR. BRESLIN: Authenticity.

THE COURT: Was that objection raised consistent with the Court's procedure prior to this hearing?

MR. APPELL: Your Honor, I'll represent to you --

THE COURT: Stop, I had a question.

MR. APPELL: I'm sorry. It was not.

THE COURT: It was not. Overruled.

Actually, wait a minute, do I preserve -- wait I minute, I reserved for -- which two things are reserved in the order? There were two things that are reserved.

MR. MILLER: Relevance and --

THE COURT: Relevance and duplication, correct?

MR. MILLER: I think so.

THE COURT: Okay. Overruled, go ahead. Let's see. We'll call it Stephens' 1. Unfortunately we have multiple 1s. Stephens' 1 is admitted.

(Thereupon, Stephens' Exhibit 1 was admitted into evidence.)

BY MR. APPELL:

Q. Were you authorized to sign this document that we're looking at as Exhibit 1 on behalf of Karma?

Page 43

A. Yes.

Q. Is this something you did in your normal course of business as a salesperson?

A. Yes.

Q. Did anyone else at Karma know that consignment agreement was being executed at the time?

A. There may have been a copy in the paperwork. I'm not aware if there was or if there isn't. There may have been.

Q. As it relates to the $250,000 payment made by Mr. Stephens, was this consignment agreement signed before or after that payment was made?

A. After.

Q. Was there any other document signed by Mr. Stephens on March 11th, other than this -- or, I'm sorry, after this consignment agreement?

A. No.

Q. Do you know why Mr. Stephens signed the consignment agreement?

MR. BRESLIN: Objection --

MR. MILLER: Objection, calls for speculation.

THE COURT: Overruled. If you know.

THE WITNESS: Because he wrote a check for 250 grand, and also his bank was paying for the car. So,

Page 44

I would --

THE COURT: If you're about to say guess, don't do it.

THE WITNESS: Okay. I'm not going to use that word.

Why would a man pay twice for one car?

BY MR. APPELL:

Q. What do you mean by that?

A. The bank was sending the money, and he wrote a check for the vehicle, that Mr. Zankl was going to give back that following Monday or Tuesday, which he did not.

Q. When you say "he didn't give back", are you referring to the check?

A. Yes, the money.

THE COURT: Hold on. Did you say the check would be returned, or $250,000 would be returned? I don't know what you just said.

THE WITNESS: Oh, I'm sorry, a check for 250,000.

BY MR. APPELL:

Q. And why was there going to be a check returned for $250,000?

A. Because that was the deal that him and Scott had made.

Q. After the consignment agreement was

Page 45

executed, what was the status of the vehicle at Karma?

A. On consignment.

Q. Was it on Karma's website as a vehicle for sale after March 11?

A. Yes.

Q. Did you do anything to try and procure any buyers for the vehicle after March 11?

A. Yes.

Q. What did you do?

A. I worked every lead that I had, and I still worked -- any lead that came in on the car, I worked it.

Q. Was the car ever sold off of consignment?

A. No.

Q. What happened to the Ferrari?

A. It left -- oh, no, no, it didn't leave. When Mr. Stephens came to get his car, he was -- he could not take it.

Q. Why is that?

A. Because it was blocked in by another car.

Q. And what other car was blocking it in?

A. An Escalade.

Q. Do you know whose Escalade that was?

A. I believe it was this gentleman's right here.

Q. Okay. Who is this gentleman?

Page 46

A. Moshe.

Q. Okay. Were you -- so, Mr. Stephens wasn't able to take his car?

A. Correct.

Q. Do you know what happened to the vehicle after that?

A. It went to the storage where all the vehicles went.

Q. Whose storage did it go to?

A. I don't know who owns the storage.

Q. Were you in -- did you ever have any discussion with anyone at Karma of Palm Beach about the status of Mr. Stephens' vehicle?

A. Yes.

Q. Who did you speak with?

A. I spoke with Mrs. Zankl, I spoke with Moshe's wife, Moshe, Moshe's son, everybody that was involved in that vehicle.

Q. And what did you tell them about the status of the vehicle?

A. That this --

MR. MILLER: Objection, hearsay.

THE COURT: He's going to say what he said.

MR. MILLER: It's still hearsay. It's not --

Page 47

THE COURT: Overruled.

BY MR. APPELL:

Q. You can answer.

A. That this vehicle was not part of the problem that Mr. Moshe and Scott were having.

Q. What do you mean by that, the problem?

A. Well, Friday night all the cars left the dealership, and on Saturday, everything that was there wasn't part of that problem, and when I went to get the car, the car was there on Saturday, and that's when I told -- I said, hey, guys this isn't part of that, this is Mr. Stephens' car, and then the key disappeared to Mr. Stephens' car.

Q. And that was after Mr. Stephens was blocked in the vehicle?

A. No, this was Saturday, leading to that Monday.

Q. And what happened on that Monday with regard to the vehicle, is that when Mr. Stephens was blocked in?

A. Yes.

Q. And what did you -- did you tell anybody else, or any -- I'm sorry.

Did you tell anything else to anybody at Karma regarding the status of the vehicle on that Friday or Saturday?

Page 48

A. No.

Q. Do you know if Karma, at that point, signed over the title to the vehicle to anybody?

A. No.

Q. You don't know, or they didn't?

A. I do not know.

Q. Okay. Do you know if Karma ever paid Derek, Mr. Stephens, for the Ferrari?

A. Not to my knowledge, no.

Q. And you mentioned you had a potential buyer for the Ferrari at one point, Mr. Coulter.

A. Uh-huh.

Q. What happened to that sale of the vehicle?

A. When the inspection came back, there was some things in the inspection that weren't favorable, so he said he was going to think about it.

Q. And what ended up happening with Mr. Coulter, did he end up purchasing the Ferrari?

A. No. Finally, when he finally, finally wanted to purchase the Ferrari, it was past that point. We were no longer in business.

Q. Did you receive the inspection report directly from Ferrari of Fort Lauderdale?

A. Yes.

Q. What did you do at that point with the

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 49

inspection report?

A. I sent a copy to Mr. Stephens.

Q. Why did you send a copy to Mr. Stephens?

A. To let him know what they said about his car.

Q. And would you have sent that report to Mr. Stephens if that vehicle was in Karma's inventory?

A. No.

Q. Why not?

A. Why would I send information on a car that's not yours?

Q. So what is the reason you did send it to Mr. Stephens?

A. Because it was his car. I wanted to let him know what Ferrari said, issues that we may need to fix in order to sell his car.

Q. Do you recall if Mr. Stephens replied to your correspondence?

A. He did.

Q. Do you remember what he said?

A. He thought it was comical, the issues that they found at Ferrari.

Q. Do you remember what the date of that exchange was?

A. I don't have the exact date, no.

Page 50

MR. APPELL: All right. Your Honor, I'd like to approach the witness with what's been previously marked as Exhibit 206-9.

THE COURT: Great. Yes, go ahead. I'll call it Stephens' 9, by the way.

BY MR. APPELL:

Q. All right. Mr. Martin, I've handed you what's been marked as Stephens' Exhibit 9. Do you recognize this email correspondence?

A. Yes.

Q. What is the date on this email correspondence?

A. It says March 16.

Q. Of 2022?

A. Yes.

Q. Is this the email you're referring to that Mr. Stephens responded as it related to the inspection report?

A. Yes.

Q. So this email came after the March 11th consignment agreement was executed, correct?

A. Correct.

Q. And attached to this email as Exhibit 9 is the Ferrari report that you received, is that accurate?

A. Yes.

Page 51

Q. Is this the full report from Ferrari regarding the vehicle?

A. Yes.

MR. APPELL: Your Honor, we'd like to move Stephens' Exhibit 9 into evidence?

MR. MILLER: Judge, we had filed the objection. This is hearsay, and contains hearsay within hearsay, and it's irrelevant to the matter of the car right now.

THE COURT: Okay. Two objections, hearsay and relevance.

MR. APPELL: So I'll tackle the relevance one first, your Honor. This is a document, an email transmission between Mr. Martin and Mr. Stephens after the date of the consignment agreement, showing that Mr. Stephens is getting information about the vehicle that he still owns after the date of the consignment agreement, which everybody else contends was now put into Karma's inventory. So that's the relevance issue.

THE COURT: Relevance is overruled. Next.

MR. APPELL: As to hearsay, your Honor, this is an email chain between Mr. Stephens and Mr. Martin. He said he's seen this email before. He's identified it, and we have -- it's not being offered for the truth of the

Page 52

matter asserted. It's being offered --

THE COURT: So, do I have to believe anything in this document, other than the fact that it was sent from one party to another party in the context of what is attached?

MR. APPELL: I don't know that you do. If he's arguing --

THE COURT: Very good, overruled. Thank you. It's admitted as 9, Stephens' 9 is admitted.

(Thereupon, Stephens' Exhibit 9 was admitted into evidence.)

BY MR. APPELL:

Q. When the sale of the vehicle fell through with Mr. Coulter, was the vehicle still on consignment at Karma?

A. Yes.

Q. Did you have any communication with Mr. Stephens after the deal with Mr. Coulter fell through regarding the vehicle and the potential sale?

A. Yes.

Q. And you would not have -- would you have done that if the vehicle was in the inventory of Karma?

A. No.

MR. APPELL: No further questions, your Honor.

13 (Pages 49 to 52)

Page 53

THE COURT: Cross-examination.

MR. BRESLIN: Yes.

CROSS-EXAMINATION

BY MR. BRESLIN:

Q. Mr. Martin --

THE COURT: Make sure you don't speak in the middle of the room, because it may not be picked up.

It's very frustrating when you get back a transcript and it says inaudible.

MR. BRESLIN: I'll try not to do that. Thank you.

BY MR. BRESLIN:

Q. Mr. Martin, are you an authorized signatory for Karma Palm Beach?

A. For the purchase -- I mean, for the consignment agreements, yes.

Q. Okay. So, are you saying that the only documents that you're authorized to sign by that -- were authorized to sign by that company were consignment agreements?

A. Yes, sir.

Q. All right. Now let's talk about consignment agreements.

Was it the policy of the company when a car was delivered to the company on consignment, that there

Page 54

would be some written document showing that it was there on consignment?

A. Yes.

Q. Okay. So now Mr. Stephens had dropped off that Ferrari at the Karma Palm Beach lot on numerous occasions prior to March of 2022, correct?

A. Yes.

Q. All right. Now, for that car to be covered by the insurance of the company, there would have to be some evidence, some document to show that the company was lawfully possessing that car for some reason, including a sale, correct?

A. Sure.

Q. Okay. So, every time that Mr. Stephens dropped that car off at the Karma lot prior to March of 2022, the car was there on consignment, correct?

A. Correct.

Q. All right, and were you the contact for Mr. Stephens when he would bring the car and drop it off?

A. Yes, sir.

Q. All right. So, is it your testimony that each and every time he dropped the car off, there was some document that you signed authorizing Karma to possess that car?

A. No.

Page 55

Q. And why is that?

A. There would be multiple consignment agreements every time the car came in and out. There was -- you guys have all my stuff from my desk, so I don't know, but there was probably one in the file when we originally put the car on consignment.

Q. All right. So what you're saying then is, is there is a prior consignment agreement, other than the one you've talked about in court today, correct?

A. I don't know if there is.

Q. Well, did the car ever come on the Karma lot on consignment prior to March of 2022?

A. Yes.

Q. Okay, and you were the point man, and you were the one that would sign that agreement, correct?

A. Yes.

Q. Okay. So, is it your testimony then, sir, that there is a prior consignment agreement out there somewhere involving this Ferrari prior to the one that was signed in March of 2022?

A. I do not know there is one.

Q. Okay. Well, you just testified that if a car comes on the lot, paperwork is executed.

A. Yes.

Q. Okay. So if it was your custom and practice

Page 56

to execute a document when someone brought the car to the lot to be sold there, that would be a consignment agreement, correct?

A. Correct. I'm not aware of where all the documents went --

Q. Well --

A. -- from October until March.

Q. Okay, but my question is simple, do you recall signing a consignment agreement prior to the one you talked about in court today?

MR. APPELL: Objection, asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't recall.

BY MR. BRESLIN:

Q. So other than consignment agreements, you were not authorized to sign any documents?

A. No, sir.

Q. Okay. Now, is it your testimony that this consignment agreement was executed after Mr. Stephens had his conversation with Mr. Zankl?

A. Yes, sir.

Q. Okay. So whatever conversation Mr. Stephens had with Mr. Zankl, that was between them, they had that on the phone?

A. Yes, sir.

14 (Pages 53 to 56)

Page 57

Q. All right. So they came to some agreement that you're aware of?

A. Yes, sir.

Q. Okay, and you were not -- it wasn't a three-way call?

A. No, sir.

Q. Okay. Now, do you know whether or not part of that agreement involved a consignment?

A. No, sir.

Q. Okay. So was it your custom, as a salesperson at Karma Palm Beach, that if the boss, Mr. Zankl, entered into a business transaction with one of his customers, that you would just decide to change that, and change it on your own?

A. No, sir.

Q. Okay. So if Mr. Zankl entered into an agreement with Mr. Stephens that had nothing to do with a consignment, and you then executed a consignment agreement, that would be inconsistent with that deal, wouldn't it?

A. No, sir.

Q. Why not?

A. Because this was a one-off deal where a client paid twice for one car.

Q. Okay. Tell me how that happened, how did

Page 58

the client pay twice?

A. His bank was sending the difference in the money for Monday, and he also wrote a check for the car, which would be two payments for the same car. I've never had a client pay twice for a car.

Q. Okay. Let's just unpack that a little bit. So you believe that Mr. Stephens wouldn't pay twice for the car because his bank was going to pay for the car, right?

A. Correct.

Q. Did his bank pay for the car?

A. I'm not privy to the information from his bank to ours.

Q. Do you know what paperwork Mr. Stephens sent to his bank?

A. No.

Q. Do you know what he told his bank?

A. No.

Q. Do you know what his bank agreed to fund?

A. It would be whatever the paperwork said.

Q. Okay, but do you know what that is?

A. I don't have the paperwork in front of me.

Q. Okay. So your testimony that you believe the bank was going to pay for the car on Monday, is that you speculating as to that?

Page 59

A. No, I spoke with his banker.

Q. All right. You spoke to who at the bank?

A. I don't have his name. His banker, I don't have his name.

Q. All right. So you called up which bank?

A. Derek's bank.

Q. Well, what was the name of the bank?

A. I don't know, sir.

Q. What was the name of the banker?

A. I don't know.

Q. What did the banker say to you?

A. That they're going to fund the deal on Monday.

Q. All right, and did the banker tell you how much was going to be funded?

A. No.

Q. Do you know whether or not the bank believed that the Ferrari was going to be traded?

A. At that time they probably did think it was going to be traded.

Q. Okay. Now, you assume that?

A. It was part of the deal at that time.

Q. Okay.

A. And then the deal changed after that when Mr. Stephens and Scott spoke.

Page 60

Q. All right. So it's your understanding that there was going to be a deal, and that deal was going to be a trade?

A. Sure.

Q. And then Mr. -- he had a conversation with Mr. Zankl?

A. Yes.

Q. And then whatever they agreed, that was the deal, right?

A. Yes.

Q. Okay, and then it was after that conversation that you say you signed this consignment agreement?

A. When he wrote the check, yes. The second payment, yes.

Q. Now, were you privy to any of the paperwork that Mr. Stephens signed on or about March 11th?

A. What do you mean by "privy"?

Q. Well, were you aware that he signed a trade pack, stating under oath that he was trading in the Ferrari, were you aware that he signed that document?

A. Yes.

Q. All right. So, this document didn't mean anything?

A. I'm sure it means a lot.

15 (Pages 57 to 60)

Page 61

Q. Okay. Well, can you trade a car that you can sign?

A. Say it again.

Q. If a car is traded, can it be consigned?

A. I don't know that.

Q. Okay.

A. I don't know.

Q. But is it your understanding that when a vehicle is traded, that title passes to the dealership of the trade-in vehicle?

A. Yes.

Q. Okay. That's not a consignment, is it?

A. It is a consignment in this case.

Q. Okay. I'm -- let's talk about generally. When you trade a car in, title goes to the dealership, correct?

A. That is correct.

Q. Okay. Now if title goes to the dealership, could that be a consignment?

A. Yes, in this case.

Q. Okay. So what you're saying is, is that the title went to the dealership in this case, but it was also a consignment?

A. Yes.

Q. Okay. So the consignment document that

Page 62

you've testified to here today, you're saying that even though Mr. Stephens traded the car, transferred title to Karma Palm Beach, that since there is also a consignment agreement, that the title didn't pass to Karma Palm Beach?

A. No, the check for $250,000 would kind of stop that.

Q. Okay. So --

A. And then he paid the sales tax.

Q. All right. So let me just back up a little because you said, when a car is traded, title goes to the dealership, correct?

A. Yes.

Q. All right. When the title goes to the dealership, it goes in the dealership inventory, correct?

A. I would assume so.

Q. Okay. Well, you talked about what was in and out of inventory, so you know what's in and out of inventory?

A. I don't put cars in inventory.

Q. Okay. Now, do you know what Dealertrack is?

A. Sure.

Q. All right. Now, does Dealertrack keep track of the inventory of Karma Palm Beach?

A. I think people have to input it into it. I don't think it keeps track of it.

Page 63

Q. Well --

A. I think it's a tool where you put information into it.

Q. All right, but one of the purposes of that program is to keep track of what's in inventory and what's not, correct?

A. Dealertrack is more to make deals, yes.

Q. All right. So you're not sure whether or not it keeps track of inventory?

A. I believe the cars are in there.

Q. Okay. So, do you -- is it your understanding that Dealertrack is used to keep track of the inventory of the dealership?

A. No, it's more used to do deals for the dealership.

Q. Okay. So it's your testimony, sir, that the car, the Ferrari was traded in to Karma Palm Beach as part of the Lambo, Lamborghini transaction, correct?

A. In the beginning, yes.

Q. Okay, but you also said that it was, in fact, traded, but there was also a consignment agreement?

A. Correct, it was traded until that deal. After the phone call went, that deal kind of died there.

Q. Okay. All right, but --

A. And then Scott and Derek made their own

Page 64

deal.

Q. Okay, but my point is, and what you just testified to is that, in fact, in this case, the Ferrari was traded in for the Lamborghini, correct?

A. It was traded.

Q. Okay, and then after that you signed a consignment agreement?

A. Correct.

Q. Okay. Now, so other than this document that you signed, this consignment agreement, is there any -- do you know of any other evidence anywhere in the world that would indicate that the Ferrari was on consignment and not transferred to the inventory of Karma Palm Beach?

A. Yes.

Q. What is that?

A. Why would I send a client information about a car they don't own?

Q. All right. So you rely on your own acts as evidence?

A. Well, it's information, I sent him the information.

Q. Okay.

A. I generally, in my 20 years, I've never sent a client information about a car they don't own.

Q. Now, you already testified that you did not

16 (Pages 61 to 64)

Page 65

ask Mr. Zankl whether or not you could execute a consignment agreement, correct?

A. I never asked him if I could execute --

Q. All right. So --

A. -- a consignment agreement.

Q. -- when you signed this consignment agreement document, you did that on your own? You made --

A. Yes, sir.

Q. You made that decision?

A. Yes, sir.

Q. All right, and after you made the decision to sign that consignment agreement, when was it dated?

A. The day of the deal.

Q. Which what was date?

A. It says 3-11.

Q. Is that your recollection of when that --

A. Yes, sir.

Q. -- when it was dated?

Do you know anything that happened two days later, on 3-13?

A. Is that Monday?

Q. I'm not sure.

THE COURT: The 11th was a Friday, right?

UNIDENTIFIED: I believe.

THE COURT: Nobody knows, really?

Page 66

UNIDENTIFIED: Yes.

THE COURT: Yes, the 13th was the Sunday.

THE WITNESS: I probably watched sports on Sunday.

BY MR. BRESLIN:

Q. All right. Are you aware of any agreement made between Mr. Zankl and Mr. Stephens on March 13th?

A. No.

Q. After you signed this consignment agreement, who did you give it to?

A. I gave a copy to Mr. Stephens, and then there was probably a copy in the Deal.

Q. I'd like you not to speculate.

A. Well, I don't know if they put the paperwork in the Deal.

Q. Who is "they"?

A. The office.

Q. Okay. Here is my question to you, sir, and it's a simple question, you signed -- you went and got a form, and it was a consignment form, and it's already been introduced into evidence, correct?

A. Yes, sir.

Q. And it's a one-page document, and you've already testified to it, correct?

A. (No verbal response.)

Page 67

Q. All right. So you went and got this form somewhere before it got filled out at the dealership, correct?

A. Yep.

Q. You went and got a piece of paper, and somebody wrote in this information, correct?

A. Yes.

Q. Who was that?

A. I did.

Q. All right. So you put this J. Martin at the top?

A. Yes.

Q. You filled in this information?

A. Yes.

Q. All right, and then at the bottom, that's your signature?

A. Yes.

Q. And did you date it that date?

A. That's not my date, that's not my signature.

Q. I'm sorry?

A. That's not my writing.

Q. For the date?

A. Correct.

Q. Okay, and whose writing is it?

A. It looks like Mr. Stephens.

Page 68

Q. Are you familiar with his handwriting?

A. I'm looking at it right here, when he signed it.

Q. My question to you, sir, is --

A. I am not familiar with his handwriting, no.

Q. All right. Was it dated in front of you, or don't you recall?

A. Yeah, he signed and dated at my desk.

Q. All right. So you saw it dated on the 11th?

A. I saw him sign it in front of me, yes.

Q. All right. So after that document was signed in front of you, what did you do with that piece of paper?

A. I made two copies.

Q. Okay.

A. One, I keep. One, I give to the client and one goes with the paperwork.

Q. All right. Now what paperwork was that?

A. It would be the whole deal with -- I don't know where it would go in this case, because this is a really rare case.

Q. All right. So that document went somewhere with the rest of the paperwork, correct?

A. It should have.

Q. All right, and that would have been the

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 69

trade pack documents, correct?

A. I don't know.

Q. All right. Now, there were several buy/sell agreements that were executed in this case, the purchase agreements, are you familiar with those?

A. I know what a purchase and sales agreement looks like.

Q. Okay. Was there a purchase and sale agreement for the Lamborghini?

A. I would believe so.

Q. Okay. Now, when a car gets sold, there is always a purchase agreement, correct?

A. Sure.

Q. Okay. All right. So the purchase agreements in this case reflected the sale of the Lamborghini to Mr. Stephens, correct?

A. Yep.

Q. Do you know whether or not the purchase agreement showed there was a trade of the Ferrari --

A. Yes.

Q. -- for that car?

All right. So the actual purchase agreement itself showed a trade?

A. Yes.

Q. Okay, and so there is no paperwork, there is

Page 70

no purchase agreements that don't show a trade that you're aware of, correct?

A. Not that I'm aware of.

Q. All right, and you already testified that you don't know what Mr. Stephens said to his bank, what the bank did, how much the bank paid, or when it paid it, correct?

A. Correct.

Q. Now, you testified that you did not believe that the car was listed as Karma inventory after that date on Karma's books and records, is that correct?

A. I didn't say that.

Q. Do you know whether or not the Ferrari was listed as inventory --

A. It was on our website. I don't know what it -- in the computer, that I don't know.

Q. All right. So you don't know how the car was listed as held in the Karma books and records after March 11th, 2022, correct?

A. No, sir.

Q. Did it ever occur to you before you signed a consignment agreement to call up Scott Zankl to see if that was inconsistent with the deal that he made?

A. Yes.

Q. But you didn't do it?

Page 71

A. I spoke with Mr. Zankl. Mr. Zankl seemed only interested in making sure Mr. Stephens left money.

Q. Now, the reason that Mr. -- now, was Mr. Zankl happy with the $230,000 trade-in price for the Ferrari?

A. I've got to believe so.

Q. Didn't he think that was too high?

A. No.

Q. Okay. Did you have any conversations with Mr. Zankl whether or not he believed 230 was too high for a trade for that vehicle?

A. I don't recall. We didn't speak much at this point with Scott.

Q. Did you earn commissions on this transaction?

A. I don't think I did, actually.

Q. Okay. At the time were you salaried or commission only?

A. I was commissioned.

Q. Okay. So if you didn't make a commission on this transaction, you didn't get paid?

A. Correct.

Q. Okay. So when Mr. Zankl had his conversations with Mr. Stephens, you obviously were interested in getting paid, weren't you?

Page 72

A. Sure.

Q. Okay. So you wanted to do anything you could do to make sure that this transaction occurred?

A. No, sir.

Q. Okay. What was your -- how much were you going to earn on this transaction?

A. Probably $700.

Q. Do you recall sending an email the day before March 10th to -- let me get it up here -- to a mayaracardoso@ExcellAuto.com regarding the Ferrari?

A. I don't recall sending it, but if I sent it.

Q. Okay. I'd like to show the witness, this is our Exhibit 20, it's Exhibit 233-1, Page 8, it purports to be an email?

THE COURT: 233.

MR. BRESLIN: 233-1, Page 8, an email.

THE COURT: Hold on a moment.

MR. MILLER: It's Exhibit 20?

THE COURT: Yes, I'm trying to figure out what it is as well.

It's in ECF 233? Those are your exhibits, right?

MR. BRESLIN: Yes.

THE COURT: 20.

UNIDENTIFIED: Judge, it's Page 3, 3 of 12.

18 (Pages 69 to 72)

Page 73

THE COURT: Yes, but I need to figure out --

THE WITNESS: Page 3 of 12? I'm sorry, Judge.

UNIDENTIFIED: Judge, it's 233-1, and then within that exhibit Page 3 of 12.

MR. BRESLIN: I'm sorry, Judge, it's Page 3.

THE COURT: 233-1.

MR. MAURO: Which number?

THE COURT: I'm just trying to figure out -- I'm trying to open it.

MR. MILLER: 232 --

THE COURT: Okay. This is very confusing.

MR. MILLER: -- dash one, Page --

THE COURT: Okay, and what number exhibit is this for you? I don't want to reference the docket, it will be extremely confusing. So did you number your exhibits?

MR. BRESLIN: Yes, Judge, it's Exhibit 20.

THE COURT: Thank you. So this is -- just a moment. So this is FVP 20, go ahead.

MR. BRESLIN: Thank you.

BY MR. BRESLIN:

Q. I'm going to show you what's been marked as Exhibit 20, or what will be marked, which purports to be an email from you, and ask you if you recognize it?

Page 74

A. Yes, sir.

Q. All right. What is that document?

THE COURT: Okay. I have to tell you, I cannot find that email. So, it's Exhibit 20, you said?

MR. BRESLIN: Yes.

THE COURT: It's a 12-page document?

MR. BRESLIN: Yes, Judge, it's marked at the top 233-1 filed 11-27-2022.

THE COURT: Okay. The document I have is a deal jacket for the Ferrari. So, I'm not looking at any email.

MR. BRESLIN: Yes, Judge, and then you go to Page 3 of the PDF, and on Page 3 --

THE COURT: Please add to Karma Palm Beach?

MR. BRESLIN: That's correct, Judge.

THE COURT: All right. Go ahead.

MR. MILLER: Which --

THE COURT: It's Exhibit 20, the third page. If you open their exhibits at 233, ECF 233 -- oh, you have paper. It's ECF 233, there is two attachments to it, one of them is Exhibit 20, FVP 20.

BY MR. BRESLIN:

Q. All right. Sir, you've had a chance to take a look at the document?

A. Indeed.

Page 75

Q. And tell me what was that email about?

A. That is an email to put the car into inventory in order to make a purchase and sales agreement.

Q. All right. So on the 10th, the day before the 11th --

A. Uh-huh.

Q. -- you are sending an email to Mayara Cardoso --

A. Yes.

Q. -- at Excell, telling her to add the Ferrari --

A. Correct.

Q. -- to Karma inventory?

A. Correct.

Q. All right. Do you know if she did that?

A. Yes.

Q. Okay.

A. Because it allowed us to print paperwork.

Q. And that was in anticipation of the purchase agreement the next day, where the Ferrari was a trade?

A. Correct.

Q. Okay. Now, are you familiar with any purchase agreements involving the Lamborghini that does not show the Ferrari as a trade-in?

A. No, sir.

Page 76

MR. BRESLIN: All right. Just one moment, please, your Honor.

Oh, yes, one question.

BY MR. BRESLIN:

Q. The title, the title to the Ferrari, when is the first time you saw that?

A. Oh, when Mr. Farache showed it to me on his phone.

Q. Pardon me?

A. When Mr. Farache showed it to me on his telephone, a picture of it.

Q. Okay, and when was that?

A. Monday morning.

Q. Monday?

A. Monday, the day that Mr. Stephens came to get his car.

Q. So that would have been in April?

A. Yeah.

Q. Okay. Now, do you know --

THE COURT: Just so you all know, until that moment I thought it was in March. So, I right now do not have a very good timeline of what has happened.

I know there is a Friday the 11th. I know there is some questions about the 13th, and there was a lot of questions that started with "at that time", but

19 (Pages 73 to 76)

Page 77

I've just learned that that was in April, in case anybody is curious about my knowledge of the timeline.

All of you have been swimming in this for months. I don't think about this case every day.

BY MR. BRESLIN:

Q. All right. So just to clarify, sir, the transaction with Mr. Stephens was in the beginning of March, and culminated on March 11th when this paperwork was executed, correct?

A. The deal, the deal, the original deal, then there was a second deal that Scott and him spoke about, that's why he gave the money, and then Scott never gave the money back.

Q. Okay.

A. So now the dealership, or whoever, is sitting with double payment for a car.

Q. Okay.

A. It doesn't happen all that often.

Q. All right. So we're talking about dates.

A. Oh, okay.

Q. All right. So all this occurred on March 11th.

THE COURT: Unfortunately in this case allegations of double payment on a car are very common. We've also had triple payment of a car, but anyway, go

Page 78

ahead.

BY MR. BRESLIN:

Q. All right. So this all occurred on March 11th, correct, the deal with Mr. Stephens?

A. Yes.

Q. All the paperwork is signed on March 11th, correct?

A. (No verbal response.)

Q. All right, and when the cars were removed from the lots of Karma Palm Beach, do you recall when that occurred?

A. I was -- I don't have the exact date, but it was a Friday night.

Q. All right. That was around the beginning of April, wasn't it?

A. Yeah.

Q. So that was approximately three weeks after this transaction, correct?

A. If you say so.

Q. Why don't you tell me what your belief is.

A. I don't have a calendar in front of me.

Q. Does it sound correct to you?

A. Within reason.

Q. Okay. Now, do you know how the title to the Ferrari came to be in the possession of Karma Palm Beach?

Page 79

A. Do I know how it got there?

Q. Uh-huh.

A. I don't know if it was the post office or FedEx, I don't know.

Q. Do you know if someone delivered it?

A. It had to have gotten there somehow.

Q. All right. Do you know who had the title before it was delivered to Karma Palm Beach?

A. Mr. Stephens' bank.

Q. Okay. Did Mr. Stephens tell you that his bank had it?

A. Well, if there is a loan on a car --

Q. I'm not asking you to speculate.

A. No, no, sir.

Q. All right. So you don't know where the title was --

A. No, sir.

Q. -- prior to it coming into the possession of Karma Palm Beach?

A. No, sir.

Q. You don't know when it came into the possession of anyone at Karma Palm Beach?

A. No, sir.

Q. And you don't know if it was mailed, hand-delivered, you don't know?

Page 80

A. It could have came by pony.

Q. Or when, correct?

A. No.

MR. BRESLIN: Just one minute, Judge.

Those are all the questions I have, your Honor.

THE COURT: Thank you.

Anyone else? Yes, Mr. Miller.

UNIDENTIFIED: If your Honor would like to follow along, I have the exhibits.

THE COURT: No, let me let you all know, under our current rules, the electronic exhibits are the exhibits, and you should make it easy for me to find them, and so if it takes me more than 10 seconds to find an electronic exhibit, you have failed, and I'm looking only at the official exhibits, which are here in ECF.

So, you need to direct me to them, and then also refer to them on the record in a way so that the transcript makes sense, but I don't use paper unless it's the original note, et cetera.

Mr. Miller, whenever you're ready.

CROSS-EXAMINATION

BY MR. MILLER:

Q. Good morning, Mr. Martin. I'm Jim Miller. I represent Auto Wholesale of Boca.

20 (Pages 77 to 80)

Page 81

A.   Good morning, Mr. Miller.

Q.   I just want to try to address some things that you testified to.

A.   Sure.

Q.   Okay.  In regards to the Ferrari, who normally at Karma Palm Beach would have handled the, as we call it, the paperwork, the title, the bill of sale, powers of attorney, those type of documents?

A.   The office staff.

Q.   Not you?

A.   No, sir.

Q.   Okay, but you would have seen them, correct?

A.   Not the title and stuff like that.

Q.   Okay.  You earlier testified that Mr. Stephens had given a check to Karma Palm Beach for $250,000 --

A.   Yes, sir.

Q.   -- is that correct?

MR. MILLER:  Judge, this is exhibit -- this is 204-4, Court Paper 204-4, Exhibit 4.  This comes from Mr. -- I can't remember, I think it's FVP's exhibit book, 204-4, it's a copy of a check.

May I approach the witness, your Honor?

THE COURT:  Yes.

BY MR. MILLER:

Page 82

Q.   Okay.  I'm going to hand you a copy of a check for $250,000 written to Karma Palm Beach.  Is that written by Mr. Stephens to Karma Palm Beach?

A.   (No verbal response.)

Q.   Sir, is that the check written by Mr. Stephens to Karma Palm Beach?

A.   Yes.

Q.   Do you recall, did Mr. Stephens give that check to you to take to the office?

A.   Yes.

Q.   Oh, so you saw it?

A.   Yeah, I handed it to the ladies in the office.

Q.   You would -- and keep looking at the check, do you see the bottom where it say memo section on the left?

A.   Yep.

Q.   Does it not say "for hold 2017 H"?

A.   It does say that.

Q.   All right.  So that was Mr. Stephens giving a check to make sure the Lamborghini wasn't going to be sold to somebody else, right?

A.   I don't know what that means at the bottom.

Q.   He wasn't buying the Lamborghini for $250,000, right, for that check?

Page 83

A.   Well, that's how much the car cost as well.

Q.   Okay.  So you walk in, you buy a $250,000 car.  Aren't there certain additional expenses, like sales tax that you'd have to include in that check?

A.   I believe he paid those.

Q.   You're speculating, you don't know that for a fact, right?

A.   Sales taxes were paid.

Q.   They were paid when he paid with that check?

A.   No, sir.

Q.   Okay.  So on that date, on March 11th, 2022, that check was written and handed to you by Mr. Stephens, correct?

A.   Yes.

Q.   You walked up to the office and you handed it to somebody at the office at Karma Palm Beach, correct?

A.   Yes.

Q.   Did you hand it to Alana Bailey?

A.   It was either Alana -- I don't know if Nidia was gone yet.  I'm not sure who was in the office.

Q.   Okay.  Alana was still working at Karma Palm Beach on that day, right?

A.   Yes.

Q.   Okay.  Alana would have handled a lot of the paperwork, correct?

Page 84

A.   Yes.

Q.   Okay.  So earlier you were testifying that you believed the car was going to be on consignment because you didn't want Mr. Stephens to pay twice for the same car, right?

A.   No, it's not what I wanted.

Q.   Well, you didn't care if he paid twice for the same car?

A.   I've never had a client pay twice for the same car.

Q.   You don't want him to pay twice for the same car, right?

A.   It was a deal he had worked out with Mr. Zankl.

Q.   I'm just asking a simple question.  You don't want him to pay twice for the same car, right?

A.   No.

Q.   Okay.  So, when he gave that check to you to hold the Lamborghini, there was also paperwork prepared to sell the Ferrari as a trade-in for the Lamborghini, correct?

A.   Correct.

Q.   Okay, and the transaction for the trade-in, you called to confirm with the bank that they were going to fund the deal, right, they were going to --

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 85

A.   Correct.

Q.   Okay.  Did Mr. Stephens also tell you that, in fact, he had already made the application with the bank to transfer the debt from the Ferrari to the Lamborghini?

A.   He called the bank in front of me, yes.

Q.   So you're aware of that, correct?

A.   Yes.

Q.   Okay, and you called the bank to confirm the money was going to be paid.  They said it would be paid on Monday, correct?

A.   Correct.

Q.   Okay.  Now, then you said there was a subsequent change of heart, and there was this consignment, right?

A.   There was not a change of heart.

Q.   Well, it was never a consignment when he was trading in the car, correct?

A.   Correct.

Q.   Okay.  So --

A.   Then he spoke to Scott, and Scott said you cannot drive the car without payment.

MR. MILLER:  I move to being nonresponsive, Judge, and hearsay.

THE COURT:  Okay.  On hearsay grounds, sustained.

Page 86

MR. MILLER:  I'm sorry?

THE COURT:  I said on hearsay grounds, sustained.

MR. MILLER:  Okay.

BY MR. MILLER:

Q.   So, in regards to the automobile, the Lamborghini, this was supposed to be financed by transferring the Ferrari, as a trade-in, and then the Lamborghini -- the debt on the Ferrari would be transferred to Lamborghini, so Mr. Stephens would have an obligation to pay off the balance that he owed on the Ferrari, right?

A.   Sure.

Q.   Okay.  You called to confirm it with the bank?

A.   Yes.

Q.   They said we'll have it done on Monday, right?

A.   (No verbal response.)

Q.   Yes?

A.   Yes.

Q.   Okay, and then you said that in the fu -- that that Monday Mr. Zankl was supposed to return the $250,000 check back to Mr. Stephens, correct?

A.   Yes.

Page 87

Q.   Okay.  So, Mr. Zankl, do you know if he ever gave a check to Mr. Stephens?

A.   I believe he did.

Q.   Okay.  Now --

MR. MILLER:  And, Judge, just for the record, I'd move that Exhibit 4 into evidence.

THE COURT:  Okay.  This is FVP 4, correct?

MR. MILLER:  Yes, and it's also, I think --

THE COURT:  Well, right now I'm looking at FVP 4.

MR. MILLER:  Okay.

THE COURT:  So, any objection?

MR. APPELL:  No objection, your Honor.

THE COURT:  FVP 4 is admitted.

(Thereupon, FVP Exhibit 4 was admitted into evidence.)

MR. MILLER:  May I approach the witness and get the exhibit?

THE COURT:  Yes, of course.

You can all approach the witness box at will whenever you'd like.  Just try not to speak until you get back to the podium, otherwise you may not be picked up.

BY MR. MILLER:

Q.   Are you aware of the fact that the bank actually transferred the debt from the Ferrari to the

Page 88

Lamborghini?

A.   You're telling me now.

Q.   Okay.  Well, then you were not aware until now?

A.   I don't know what happened after that.

Q.   Okay.  So if, in fact, the automobile had been traded in, the bank relied upon your phone call and the paperwork sent to them by the office, right?

A.   (No verbal response.)

Q.   Correct, yes?

A.   By the people --

Q.   You have to speak.

A.   -- in the office, sir, yes.

Q.   Okay, and then --

A.   My phone call would mean nothing.

Q.   And then if the bank transferred the debt from the Ferrari to the Lamborghini, they honored the trade-in, right, if that happened?

A.   Yes.

Q.   Okay, and, in fact, the Ferrari itself wasn't worth $250,000, was it?

A.   According to who?

Q.   Well, according to your sales agreement you were selling it for 230, right?  I mean, you were buying it back for 230?

22 (Pages 85 to 88)

Page 89

A. Yes.

Q. You were giving him a trade-in for 230 on the Ferrari, right?

A. Yes.

Q. The Lamborghini was 250, right?

A. (No verbal response.)

Q. You've got to speak, sir.

A. Yes.

Q. Okay.

A. But if you add the sales tax and those items, you get to about 250.

Q. So if you add the sales -- but it's not 250. It's not an even 250, is it?

A. That was the deal he had worked out with Scott.

Q. That's not my question.

It's not an even 250?

A. No, sir.

Q. Okay. In fact, Mr. Zankl owed the 250 back to Mr. Stephens once the bank funded the deal on the trade-in, right?

A. (Inaudible) -- sir.

Q. Okay. Are you familiar with what role Alana Bailey played at Karma Palm Beach?

A. She played multiple roles, but, yes.

Page 90

Q. She's authorized to sign title documents?

A. Yeah, I believe so.

MR. MILLER: Okay. Judge, this is Debtor's Exhibit 2, which is 207-2, two pages, certificate of title.

May I approach the witness?

THE COURT: Yep. You don't have to ask, but, yes.

MR. MILLER: I just like to make sure.

BY MR. MILLER:

Q. I've just handed you Exhibit 2 --

MR. MILLER: Actually it's 2A, Judge, I apologize.

BY MR. MILLER:

Q. -- Exhibit 2A. Do you recognize Alana Bailey's signature at the bottom there?

A. Yes.

Q. Okay. Can you turn to the second page of that document? Do you recognize Alana Bailey's signature on that page?

A. Yes.

Q. Okay, and this is a title endorsement from, under a power of attorney from Derek Stephens, first to Karma Palm Beach, correct?

A. (No verbal response.)

Page 91

Q. The first page, sir.

A. It looks like a title.

Q. Are you -- let me back up.

Are the familiar with how to transfer a title for an automobile?

A. No, sir.

Q. Okay, but you recognize Alana Bailey's signature on those two pages, right?

A. Yes, sir.

MR. MILLER: Okay. May I approach the witness, Judge?

THE COURT: Sure.

MR. MILLER: I'd move Debtor's Exhibit 2A into evidence, your Honor.

MR. APPELL: No objection.

THE COURT: Debtor's 2A is admitted.

(Thereupon, Debtor's Exhibit 2A was admitted into evidence.)

MR. MILLER: Your Honor, I'm looking at Debtor's Exhibit 6A, which is 207-6.

UNIDENTIFIED: 6A, Jim?

MR. MILLER: 6A.

THE COURT: Yes, why do you have an A afterwards, it's because --

MR. MILLER: Because everybody is using --

Page 92

apparently was using numbers. I wanted to make sure there was no confusion.

THE COURT: Right, but I'd rather you just reference the fact that it's the debtor's exhibit, so --

MR. MILLER: It's Docket Entry 207-6.

THE COURT: Yes, Debtor's 6, go ahead.

MR. MILLER: Approaching the witness.

BY MR. MILLER:

Q. Mr. Martin, I'm handing you what's identified as Debtor's Exhibit 6A. This is a power of attorney document, is it not?

A. It is.

Q. And that's a document that's endorsed by whom, by Alana Bailey, or by Derek Stephens?

A. By both.

Q. Okay, and did you handle this form at the time of the transaction with Mr. Stephens?

A. Yes.

Q. Okay. So that's a copy of an original that was kept in the files of Karma Palm Beach?

A. I assume so.

Q. Okay, and this indicates that Mr. Stephens was endorsing a power of attorney, and giving authority to Karma Palm Beach to transfer title to the vehicle, correct?

23 (Pages 89 to 92)

Page 93

A.   Yes.

MR. MILLER:  Okay.  Your Honor, I would move this exhibit into evidence.

THE COURT:  Which is Debtor's 6?

MR. MILLER:  This is 6A, yes.

THE COURT:  Yes, any objection?

MR. APPELL:  No objection.

THE COURT:  Debtor's 6 is admitted.

(Thereupon, Debtor's Exhibit 6A was admitted into evidence.)

MR. MILLER:  Thank you, sir.

Your Honor, I'm looking at, I guess poorly typed, 207-7, which is Debtor's Exhibit 7A.  I'm going to show it to the witness, your Honor.

THE COURT:  Sure.

BY MR. MILLER:

Q.   Sir, I'm handing you Debtor's Exhibit 7A.  This is, if you check both pages, please?

Okay.  Is this a check written from Karma Palm Beach to Mr. Stephens?

A.   It appears to be, yes.

Q.   What's the date on the front of the check?

A.   4-8.

Q.   Of, year?

A.   2022.

Page 94

Q.   Correct, and is it endorsed by Mr. Stephens on the second page?

A.   Yes.

Q.   So, in fact, Mr. Zankl had paid Mr. Stephens, by this check, at least, the sum of what?

A.   $250,000.

Q.   Which matches the same amount of money that was in that first check that I showed you, correct?

A.   Yes.

MR. MILLER:  Okay.  Judge, I move this into evidence, please.

THE COURT:  All right, and this was which number?

MR. MILLER:  7, Exhibit 7A.

THE COURT:  7.  Any objection?

MR. APPELL:  No objection.

THE COURT:  Debtor's 7 is admitted.

MR. MILLER:  Thank you.

(Thereupon, Debtor's Exhibit 7 was admitted into evidence.)

BY MR. MILLER:

Q.   By the way, when you said that you weren't sure that Mr. Stephens was going to get funding for the car, you called originally to confirm the funding would be by Monday, right?

Page 95

A.   Uh-huh.

Q.   Yes?  You have to say yes or no.  Uh-huh and huh-uh do not reflect an affirmative or negative response on the record.

A.   I was trying to understand your question.

Q.   Oh, okay.

So, you said that you called the bank to confirm the money was going to be paid on the transaction when he was trading in the vehicle, correct?

A.   Yes, sir.

Q.   Okay, and then something happened along the way, there was a change of opinion, or how it was going to go down, correct?

A.   Yes.

Q.   Okay.  Did you pick up the phone right away and call the bank and tell them, cancel that, don't fund us?

A.   The bank was closed at that point, sir.

Q.   Did you call the next business day?

A.   That would be Monday, when Mr. Zankl was supposed to give him back his check.

Q.   Did you call them -- oh, so it was subject to the $250,000 being returned to Mr. Stephens, is that what the deal was?

A.   It was either/or.

Page 96

Q.   Okay, but you never called the bank after that?

A.   No, I let the back office handle that part.

Q.   Oh, you let the people in Karma Palm Beach do that?

A.   Yes, sir.

MR. MILLER:  Okay.  Just one moment, your Honor.

Judge, this is Debtor's Exhibit 3A, which is 207-3.

BY MR. MILLER:

Q.   Mr. Martin, I've handed you Debtor's Exhibit 3A.  This document is a bill of sale from Karma Palm Beach to Auto Wholesale Boca, correct?

A.   Yes.

Q.   And is it signed by Alana Bailey on the right-hand side, sir?

A.   Alana, yes.

MR. MILLER:  Okay.  Your Honor, I move Exhibit 3A into evidence.

THE COURT:  Objections?

MR. BRESLIN:  Judge, may I voir dire the witness?

THE COURT:  Yes, yes.

MR. BRESLIN:  Mr. Martin --

24 (Pages 93 to 96)

Page 97

THE COURT: Wait until you get to the podium, please. Don't ask him questions standing there.

MR. MILLER: Jerry, you can stand there.

MR. BRESLIN: Mr. Martin, the document that you have in your hand, is this the first time you've ever seen that document?

THE WITNESS: Yes, sir.

MR. BRESLIN: All right. Do you know what it represents?

THE WITNESS: Selling a vehicle to Auto Wholesale of Boca, Inc.

MR. BRESLIN: Do you know anything about that transaction?

THE WITNESS: No, sir.

MR. BRESLIN: Do you know whether or not that transaction was authorized by anybody at Karma Palm Beach?

THE WITNESS: No, sir.

MR. BRESLIN: Do you know under what circumstances that the signature appears on that page?

THE WITNESS: No, sir.

MR. BRESLIN: Do you know whether or not that vehicle -- any money changed hands for the transaction that appears to be represented in that document?

Page 98

THE WITNESS: No, sir.

MR. BRESLIN: All right. Judge, I would object that this witness is not qualified to establish that that document is anything other than rank hearsay, and is not what it represents to be.

Thank you.

THE COURT: That's a very interestingly worded objection.

MR. APPELL: Your Honor --

THE COURT: Yes.

MR. APPELL: -- we join in that objection.

THE COURT: Oh, interesting. All right.

MR. APPELL: And as to relevance as well.

THE COURT: Oh, really? Okay. Yep.

Mr. Miller.

MR. MILLER: I'm sorry, Judge --

THE COURT: I think I heard a slightly veiled authentication, a hearsay, and relevance.

MR. MILLER: Judge, no written objection was made to this exhibit. It was filed with the Court pursuant to Local Rules.

THE COURT: Well, relevance.

MR. MILLER: Relevance, it reflects the transfer to the debtor, property of the estate.

MR. APPELL: Your Honor, this --

Page 99

MR. MILLER: They already have the title in evidence as well.

MR. APPELL: This transaction is between -- purports to be between AWB and Karma, not between Mr. Stephens and any of the parties. So that's why we believe there is no relevance.

THE COURT: Well, we have a -- if it's not relevant, then the car is not the debtor's, I don't need to have this hearing at all. It's a motion for turnover. The debtor -- everybody believes the debtor has the vehicle, yes?

MR. APPELL: I'm sorry, Judge?

THE COURT: Everybody believes it's the debtor's -- well, you believe it's the debtor's vehicle.

MR. MILLER: It's the debtor's vehicle. We -- all our exhibits reflect that.

THE COURT: So, overruled. I'm trying to figure out how it's not relevant to a motion for turnover from the debtor.

Any other objections were not timely raised and, therefore, overruled. It's admitted. That would be Debtor's Exhibit 3.

(Thereupon, Debtor's Exhibit 3A was admitted into evidence.)

MR. MILLER: Judge, I'm looking at Debtor's

Page 100

Exhibit 5A, which is 207-5.

THE COURT: Thank you.

MR. MILLER: Where is the other debtor binder? Open to 5. Okay. Thanks.

BY MR. MILLER:

Q.   Mr. Martin, I'm handing you what has been previously marked as Debtor's Exhibit 5A. It's two pages. Do you recognize these documents?

A.   Yes, sir.

Q.   Okay. Is this referencing the deal for the trade-in of the Ferrari for the Lamborghini?

A.   Yep, yes.

Q.   And on one it shows an estimated amount owed to Texas -- Texans Credit Union of about $112,317.25, correct?

A.   Say that again.

Q.   Do you have Page 1 of 2, sir, in front of you?

A.   Yes.

Q.   Okay. Do you see on the left where it says estimated amount owed for the automobile --

A.   Yes.

Q.   -- the Ferrari?

The balance being 112,317.25?

A.   Yes.

25 (Pages 97 to 100)

Page 101

Q. Okay, and then you see the allowance amount on the trade-in of $230,000?

A. Yes.

Q. So it indicates this Ferrari is being traded in to purchase the Lamborghini, correct?

A. Yes.

Q. And the purchase price of the Lamborghini is $250,000, correct?

A. Yes.

Q. And the balance due on delivery says 134,655.13, correct?

A. Correct.

Q. Okay. Then the second document indicates a trade-in as well, but on this document it indicates a balance due on delivery of 22,337.88, correct?

A. Correct.

Q. Again, lienholder being Texans Credit Union, correct?

A. Correct.

Q. Did you prepare these two documents?

A. No, sir.

Q. Have you ever seen these two documents before?

A. Yep, yes.

Q. Okay, and are those Derek's --

Page 102

THE COURT: Gentlemen, gentlemen, if you're going to talk, please be more quiet.

Go ahead.

BY MR. MILLER:

Q. Are these Derek Stephens' signatures on both these pages?

A. Yes.

Q. Okay, and the dealer representative, was that you on both of these pages?

A. No.

Q. Who would that be?

A. Whoever printed the paperwork.

Q. Okay. So, but you're the person that was negotiating the deal with Mr. Stephens, correct?

A. Correct.

Q. So the person that prepared this paperwork would have received the information from you to prepare it properly, is that right?

A. Or they verify for theirselves.

Q. Okay, but both these documents do indicate this is a trade-in of the Ferrari for the Lamborghini, correct?

A. Correct.

Q. Okay, and the date on that is March 11th, 2022, as well?

Page 103

A. Yes, sir.

Q. Okay, and it indicates the buyer being Derek Clayton Stephens for the Lamborghini, correct?

A. Yes.

MR. MILLER: Okay. Judge, I move Debtor's Exhibit 5A, which is 207-5, into evidence.

THE COURT: Objections.

MR. APPELL: No objection.

THE COURT: Debtor's 5 is admitted.

(Thereupon, Debtor's Exhibit 5A was admitted into evidence.)

BY MR. MILLER:

Q. If one were to go to the store where Karma Palm Beach operated from, its storefront -- where you worked at, right?

A. (No verbal response.)

Q. Yes?

A. What is the question, if one were to go there?

Q. If one were to go to the storefront, that's where you worked at, correct?

A. Yes.

Q. For Karma Palm Beach, correct?

A. Yes.

Q. Okay, and if they were to look at the

Page 104

placards and signs inside the facility, would they see a sign that says, we take automobiles on consignment?

A. I don't believe there is a placard that says that.

Q. Okay.

A. But there is a folder up front that says consignment.

Q. A folder that just says consignment?

A. Yes.

Q. Yes?

A. Yes.

Q. Okay.

MR. MILLER: I have no further questions, your Honor.

MR. APPELL: Your Honor, if I may on redirect?

THE COURT: Of course.

REDIRECT EXAMINATION

BY MR. APPELL:

Q. Just a couple more questions, Mr. Martin. Thank you for your time.

You testified that the vehicle was traded at one point?

A. Yes.

Q. Was that trade ever changed to a

26 (Pages 101 to 104)

Page 105

consignment?

MR. MILLER: Objection, leading.

THE WITNESS: Well, that's --

THE COURT: Stop.

THE WITNESS: -- to --

THE COURT: Hold on, stop.

Overruled.

It would be very nice if everybody referred to the vehicles at least by their make, and gave me a few dates and times and the like in the questions.

MR. APPELL: Sure.

THE COURT: It would be very helpful.

BY MR. APPELL:

Q. Was the Ferrari deal initially a trade?

A. Yes.

Q. Was that Ferrari deal changed to a consignment?

A. Yes.

Q. And you were shown by Mr. Breslin and Mr. Miller a purchase agreement. Do you recall looking at that document?

A. Yes.

Q. And that was a purchase agreement for the Ferrari?

A. Both.

Page 106

Q. For the Lamborghini?

A. They showed two different documents, the purchase and sales agreement, and then them -- this company purchasing it from Karma.

Q. All right. Were both of those documents signed before the consignment agreement for the Ferrari?

MR. MILLER: Objection, leading.

THE COURT: He's just asking about the dates. If you want to -- or, okay, I'm confused.

MR. MILLER: A better question would have been, what was the timing of the documents? Not suggesting the answer.

THE COURT: I understand what leading means, but we do only have one day, and I really would like to get through the hearing, and apparently, if he knows the answers, I'd like to get to the answers.

Sustained. Could you ask the question in a different way?

BY MR. APPELL:

Q. Do you know the timing in which those documents were executed?

A. Yes, the agreement between Karma and Mr. Stephens was 3-11, and the agreement between Boca Wholesale and Karma was the 2nd of April.

Q. Let me go back.

Page 107

Do you know what the consignment agreement was executed relative to the purchase and sale agreement?

A. After the deal could not be delivered because of Scott's terms, and then Mr. Stephens and Scott worked out a deal, and then that's when we made the purchase -- we made the consignment agreement because the deal had changed.

THE COURT: So the answer is later in the same day?

THE WITNESS: Yes, sir.

THE COURT: Friday, March 11th, 2021 -- '22, excuse me.

BY MR. APPELL:

Q. Were cars on consignment listed on the Karma website?

A. Yes, sir.

Q. You were shown an email provided to you, it was an email dated March 10th, 2022.

A. Yes.

Q. That was prior to the execution of the consignment agreement, or after the execution of the consignment agreement?

A. Prior.

Q. Do you know if anything was ever made of the email you sent to Ms. Cardoso regarding the Ferrari going

Page 108

into inventory?

A. It was put into the computer, into inventory in order to print paperwork.

Q. The --

A. But --

Q. I'm sorry, go ahead.

A. But there is no financial thing there. You can put any car into inventory, it doesn't mean you own it.

Q. Got it.

You also mentioned that you spoke to the Zankls, and they were interested in getting money in the door?

A. Yes.

Q. What did you mean by that?

A. He wanted to make sure that he was covered for the cost of that car, of the Lamborghini that Mr. Stephens was purchasing.

MR. APPELL: All right. I have no further questions.

Thank you, Mr. Martin.

MR. BRESLIN: Brief?

THE COURT: Brief, yes.

RECROSS-EXAMINATION

BY MR. BRESLIN:

27 (Pages 105 to 108)

Page 109

Q.   Mr. Martin, you testified that the paperwork, the purchase agreement that traded the Ferrari for the Lamborghini was executed, correct?
A.   Yes, sir.
Q.   And then after that you signed a document that we now have been referring to as the consignment agreement, correct?
A.   Yes.
Q.   Okay.  Now -- and you indicated earlier that you had the authority to sign consignment agreements, correct?
A.   Yes, sir.
Q.   All right.  Did you have the authority, in your employment at Karma Palm Beach, to change the status of a car that was owned by the company?
A.   No, sir.
Q.   All right.  So if a car was taken into Karma Palm Beach inventory and, therefore, it was owned by the company, did you have the authority to sign a document that changed the ownership status of that car?
A.   I had the authority to sign a consignment agreement.
Q.   All right.  Please listen carefully to my question.
If a car was already taken into inventory

Page 110

and owned by the company --
A.   I --
Q.   -- did you have the authority to change the status of the ownership of that car from owned by the company to owned by the prior customer?
A.   I think you're confused with owning the car.  It goes into inventory, that doesn't mean you own the car, sir.
Q.   What does it mean?
A.   It means you can print paperwork.  There was no purchase, there was no payment of that car.  So you could -- I could take your car and put it into inventory.  That means I own it.
Q.   How could do you that?
A.   All I need is your VIN number.
Q.   Well, wouldn't I have to sign something transferring it to you?
A.   Not to go into inventory, no.
Q.   All right.  So you --
A.   It's simply typing into a computer.
Q.   All right.  So what you're saying is that you could go into your computer and type in any VIN number in, and that automatically makes it owned by the company?
A.   Well, that's what you're saying, sir.
Q.   Well, I'm not saying that.  I'm asking

Page 111

questions.
So let's get back to my question.  Did you have the authority to change the ownership status of any vehicles that were held in inventory at Karma Palm Beach?
A.   I had the authority to sign a consignment agreement.
Q.   Okay, and that's with the customer, correct?
A.   Yes.
Q.   Okay.  Once a car is owned by the company, did you have the authority to change the ownership status of that car?
A.   No.
MR. BRESLIN:  Thank you.
No further questions.
THE COURT:  I assume Mr. Martin can be excused?
MR. BRESLIN:  Yes.
THE COURT:  Thank you very much.  You can go.
MR. MARTIN:  I don't know whose these are.
THE COURT:  You can leave them there.  Thank you.  Thank you very much.  All right.
MR. MARTIN:  Have a good day.
THE WITNESS:  Good afternoon.

Page 112

Does anybody need a break?
UNIDENTIFIED:  Yes.
THE COURT:  Yes, all right, how much time?  Just five minutes?  All right.
And also, while you're at break, think about what you want for a lunch break.  It can be very short, whatever you want.
Yes, Mr. Miller.
MR. MILLER:  Oh, no, I just wanted --
THE COURT:  You didn't want to speak, all right.
MR. MILLER:  I like to hang out right here.
THE COURT:  You like to, good.
Court is in recess.
(Thereupon, a recess was had, after which the following proceedings were had:)
THE COURT:  All right.  We're back on the record.
Who would you like to call?
MR. MAURO:  Thank you, your Honor, we would like to call Derek Stephens.
THE COURT:  Mr. Stephens, good morning.
Whenever you're ready, and if you could raise your right hand.
Do you swear under penalty of perjury that

28 (Pages 109 to 112)

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 113

the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. STEPHENS: Yes, sir.

THE COURT: Thank you. Please have a seat. Make sure you get comfortable first.

Thereupon,

DEREK STEPHENS,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MAURO:

Q.   Sir, please state your name.

A.   Derek Clayton Stephens.

Q.   And we're going to start by you telling the Court a little about yourself. Where do you live?

A.   615 High Ridge Lane in McKinney, Texas.

Q.   Did you go to school out that way?

A.   Yes, sir. My undergraduate was Texas A&M University. My dad, his dad and my son are there now, and my MBA was for Southern Memphis University.

Q.   And tell us just briefly what you do for work.

A.   I spent about 22 years with IBM as an executive. In 2015 I left and started my own company. I've been doing the same thing ever since, business

Page 114

consulting.

Q.   You also devote some time to public service that's kind of interesting. Tell us about that.

A.   Yes, sir. So, I was a certified firefighter for many years, and a position opened up in City Council, which is appointed in midterm, and so I took that for about a year. I ran for mayor of the town the next term, and was elected mayor, and served for seven terms, for 14 years. I didn't run this last November.

Q.   And while you live in Texas, you spend time in Florida, is that correct?

A.   Yes, sir.

Q.   Do you have family here?

A.   Yes, my parents have been here since the '70s. I did elementary, middle school, and most of my high school in Florida, and have a business, business partner, employees here, friends, family. I'm here about once a month or so, 10 days a month on average.

Q.   Do you actually have a home here?

A.   Yes, sir.

Q.   And does that mean that you keep cars here?

A.   Yes, I have one at my parents' house in Naples, and two here in South Florida.

Q.   Do you own a Ferrari?

A.   Yes, sir.

Page 115

Q.   What kind?

A.   It's a 2013 458 Italia.

Q.   And when did you buy that car?

A.   It was March 12th, I think, 2021.

Q.   How much did you pay for that car?

A.   185, plus tax, title, license, whatever the total was.

Q.   And where did you buy it?

A.   Excell.

Q.   Was that the first deal that you had done with Excell, Zankl, Karma?

A.   Yes.

THE COURT: It's okay if you direct your answers --

THE WITNESS: I just didn't know --

THE COURT: -- back to counsel.

THE WITNESS: -- who I should be looking at. I apologize.

THE COURT: No, you don't need to -- yes, it would be very uncomfortable. You can direct them back to counsel.

BY MR. MAURO:

Q.   So what brought you to that dealership in particular?

A.   I had friends who had bought cars there

Page 116

before, and it all started when one of them let me drive his sports car for lunch one day, and it gave me that itch to go back and get another sports car. So I blame my friend for letting me drive his car, he started it all.

Q.   Okay, and did you drive that Ferrari back to Texas and keep it there?

A.   No, I left it in Florida.

Q.   And at some point did you start, essentially, keeping it at the Excell/Karma dealership?

A.   Yeah, right around August I hit a pothole one evening, and had a dent in the rim. I took it in for service. They had it for a week or two, whatever the duration was, but it was at my friend's house from March until August, and then right around September, when I was picking it up from the service, we talked about selling the car, marketing the car. This was right around September, I would leave the car there for two, three weeks, come to town, drive it for a week, drop it back off before I left town.

Q.   When you say September, you're talking about September of 2021, you started leaving the car when you'd go out of town --

A.   Absolutely.

Q.   -- at Karma?

Did you enter into a consignment agreement

29 (Pages 113 to 116)

Page 117

at that time?

A. No.

Q. Did you have an arrangement with Excell/Karma at that time?

A. They could market the car for sale on their website, we had a ballpark price, and whenever I came to town, they would have it, you know, detailed, ready to go, and I'd drive it off the lot.

Q. Do you know when they actually put the car up on the website?

A. I don't know the date they put it on the website, but they had it on the website when I first purchased it. So they had all the same materials from the previous purchase.

Q. And they just essentially reposted the materials they already had?

A. At some point in time, I'm not sure when they posted it. I remember emailing friends about that, hey, it's for sale, go buy it.

Q. Do you know whether they had it up on the website by January or February of '22?

A. Oh, absolutely.

Q. Probably earlier than that?

A. I would imagine so. I didn't check.

Q. So the Ferrari would be held at

Page 118

Excell/Karma. When you'd come into town, would you use it?

A. Absolutely.

Q. I want to focus now your attention on early 2022. Did Karma reach out to you around that time?

A. Yes.

Q. And what did they tell you?

A. They had a buyer for the car.

Q. Did they tell you anything about the buyer, the terms?

A. At that time I didn't know the name, I didn't know what they were selling it for. I think we had it on the website for 235. They said that they would give me 230 for it.

Q. And so in response to that phone call, letting you know that they had a buyer, did you do anything?

A. I don't know what I did specifically, but they asked me around the 4th of March to drop it off so the potential buyer could do a PPE, a pre-purchase inspection.

For some reason I didn't comply with the request on the 4th, and it was the 7th, around lunchtime I think I brought it in, March 7th.

Q. So you brought the Ferrari in to Karma on

Page 119

March 7th of 2022 so that they could do an inspection for a potential buyer?

A. Yes. They weren't doing the inspection themselves. They were shipping it off to Ferrari of Fort Lauderdale.

Q. Okay, and we talked this morning about March 11th. We're talking right now about March 7th.

Does anything happen between March 7th and March 11th that you know about relative to the Ferrari?

A. Yes, absolutely. So, on the 7th I brought it in. Obviously when you bring the car in, I'm sure I talked to them, I'm sure I saw other inventory. All those months the intent was just to sell the car outright, there was no trade-in, there wasn't, like, there was a certain car I was looking at.

Some time on the 7th, I probably noticed all the cars on the inventory. I know a gentleman that's actually in the room with me, Keith Houston, apparently we went up there on the 9th, we went up there, we saw some cars, and then on the 10th we actually test-drove some cars.

Q. Okay.

A. March 10th, 2022.

Q. Yes, sir.

Anything else other than what you just

Page 120

testified about between the 7th and 11th, or does that take us into the 11th?

A. Well, that's the 10th, I think we test-drove it, test-drove two different Lamborghinis, I didn't really like them, but then when the deal was becoming more and more real, around 9:00 in the morning, I text and said, hey, I'd like to come test-drive the Lamborghini one more time, the white Lamborghini. That was in the morning of the 11th.

At my lunch break at work, I went and test-drove the white Lamborghini, and when I brought it back, I said, hey, I want the car. You've got to remove this big ugly one-foot-long racing stripe down the middle of it, it wasn't my -- I'm more conservative, I asked them to remove the stripe, and gave them my intent to buy it, and that I would come back after work that day, the 11th, to purchase the car.

Q. So that conversation happened around lunchtime on March 11th, correct?

A. After my test-drive, when I brought the car back, I said, hey, let's go forward with the Lamborghini as a trade, since they had the Ferrari sold.

Q. Okay. Did you contact your lender at that time?

A. Yes, I called my -- the same loan officer

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 121

I've used for years, a gentleman named Chad Johnson, and said, hey, I'm going to, you know, trade in the Ferrari, which you have as one of my loans, I'm going to get the Lamborghini, just write it up, send me the paperwork, and we'll process it later.

Q. Okay. So we're midday on March 11th, and tell me if I've got this right, your intent is to purchase the Lamborghini and trade in the Ferrari, correct?

A. Correct.

Q. And did Karma prepare purchase documents to that effect?

A. Yeah, I arrived sometime, I'm assuming around 6:00 p.m., after my work, I Ubered into the office -- into their location. They had everything ready to go, because, you know, time is money, like, I just want to get in and get out, I don't want to spend hours and hours. So they had it all prepared before I arrived.

Q. I'm going to show you Exhibit Debtor's 5, which is in evidence. It's a two-page exhibit.

Do you recognize those documents?

A. Yes, sir.

Q. Are those the purchase documents that you just testified Karma prepared?

A. Yes.

Q. And as you look at both of those

Page 122

documents -- by the way, they're separate purchase transactions, or separate purchase agreements?

A. It's for the same vehicle, the same trade-in, same car, different dollar amounts on the trade-in value.

Q. Do you have any idea why there are two?

A. Well, at the time I wasn't probably paying just enough attention to it, but in hindsight, when I originally purchased the Ferrari back in March of 2021, they arranged for the lender, which was U.S. Bank.

Some time between the day I purchased it in March, and before end of year, I refinanced it at a better rate with my credit union.

And so when they did the original purchase agreement, I assume they thought they -- there was a different lender, they knew my new lender was Texans Credit Union. They thought it was two. When they realized it was the same creditor, they drafted a second one, which shows just the 22-K due, because they just transferred my balance due to a different loan.

Q. And you signed both of these documents?

A. I signed everything they put in front of me.

Q. But you agreed, didn't you, that you were going to buy the Lamborghini for $250,000, and be credited with $230,000 for trading in the Ferrari, right?

Page 123

A. Absolutely.

Q. Now, you come back -- by the way, what time did you get back to the dealership that day?

A. Sometime around 6:00 p.m.

Q. 6:00 p.m.?

A. I'm not sure, 5:50, 6:20, I don't know, sometime after work that day.

Q. After work on March 11th. What time does the dealership close, do you know?

A. I assume 6 o'clock. There wasn't a lot of people there. I don't know their hours. I'm sure it can be validated what their hours were.

Q. That's when you signed the two documents in evidence as Debtor's 5?

A. Yes, sometime that evening I signed these two documents.

Q. And that's the deal that you believed would be carried out?

A. At that time, yes.

Q. Something changed, is that correct?

A. Yes.

Q. What happened?

A. When I -- the car is out front, I'm dropped off, I sign the paperwork. I'm, like, where is the keys, let's go. I'm told I can't drive the car.

Page 124

Q. You can't drive the car that you're buying?

A. That I just did all the paperwork on, I've never seen that before.

Q. Was there something wrong with the car, to your knowledge?

A. No.

Q. Was it ready to go as far as you know?

A. It was out front, detailed, everything I had asked to be done to it was done.

Q. The racing stripe was removed?

A. Yes.

Q. Why did Karma tell you that you couldn't drive the car that you were buying off of the lot?

A. Jonathan asked me to get on the phone with the owner, Scott Zankl, and Scott Zankl said that, hey, you know, I'm not compensated for the car. I had a past customer that wrecked the car after buying the car. He made it sound like he had some personal liability to it, and so he was not allowing me to leave with that car.

Q. Now, at this time, do you know whether there is a purchaser for the Ferrari lined up?

A. I was told there was, yes.

Q. Okay. Do you know whether that deal had closed or not?

A. I was told it was not yet closed.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 125

Q.   So what did Scott tell you you had to do if he wanted to drive off in the Lamborghini?

A.   He said the only way you can drive off with the car is if you pay for the car.

Q.   So what did you do?

A.   I wrote a check out of my business account for $250,000.

Well, actually I communicated that I'd be willing to write the check at that point in time.

Q.   I'm going to show you --

(Inaudible sound.)

MR. MAURO:  It must be on Zoom, I guess.

BY MR. MAURO:

Q.   Okay.  I'm going to show you what is already in evidence as FVP 4.

THE COURT:  Interesting, everyone on Zoom is muted.  No, I heard it, too.  I heard it, too.

BY MR. MAURO:

Q.   Is FVP -- sorry, FVP 4, the check that you just testified about?

A.   Yes.

Q.   Okay.  Did you give this check to Karma for the Lamborghini?

A.   Yes, I did.

Q.   Would you have paid $250,000 for the

Page 126

Lamborghini if you were getting $230,000 in credit for the Ferrari?

A.   No.

Q.   After you wrote that check, what happened?

A.   After I wrote the check, we signed a consignment agreement, and we wrapped up, it was probably 7 o'clock at night, I don't know the exact time, and I drove off the lot.

Q.   I'm going to show you what is in evidence as Stephens' 1.

What's this?

A.   This is a consignment agreement that we signed after Scott told me I couldn't take the car.

Q.   Who signed it?

A.   I signed it, and Johnson signed it, but I couldn't tell you who signed it first.

Q.   What time is it when this agreement gets signed?

A.   It's some time after 6:30, 7:00 p.m., I couldn't tell you the exact time.

Q.   After the purchase agreements that we looked at were signed?

A.   Absolutely.

Q.   After you handed the check to Karma for the Lamborghini?

Page 127

A.   Yes.  Before I left the room, before he left the room, we signed this.

Q.   Okay, and what was your understanding regarding the status of the Ferrari after you paid $250,000 for the Lamborghini and signed the consignment agreement?

A.   That they had a buyer, he was approved, and it would process next week, that it would sell next week.

Q.   Okay.  So you paid the check that we just looked at, you signed the consignment agreement that we just looked at.

MR. MILLER:  I'm just going to object to the summary.  This is -- typically you just ask the question and get the answer.  You don't re-summarize the testimony. He's at direct, not cross-examination.

MR. MAURO:  Your Honor.

THE COURT:  He hasn't got to the question yet, so overruled.

MR. MAURO:  And just for the record, your Honor made the comment that you wanted a timeline, and I'm trying to lay things out for you, and this is --

THE COURT:  Very helpful.

THE WITNESS:  And I hate to do it to you, sir, but you might have to repeat the question because I'm not sure where we left off.

Page 128

MR. MAURO:  Fair enough.

THE COURT:  There was no question yet. So --

MR. MAURO:  Yes, I didn't get there yet.

THE COURT:  -- we'll eventually get there. Go ahead.

MR. MAURO:  I've got to think of one now.

BY MR. MAURO:

Q.   So, we're at the very end of March 11th. You give Karma a check.  We just looked at that.  You signed the consignment agreement.  What did you do next?

A.   I think I pretty much packed up and left with the car.  I don't think there was much more after I finished everything they asked me to do.

Q.   You were sitting here when Jonathan Martin was questioned by Mr. Miller.  You may recall that he asked, well, didn't you call the bank and let them know the deal had changed?

A.   Oh, I did not call them that night, no, they were closed.  It's -- I'm not going to call the bank after hours.

Q.   Did you call the bank?

A.   I did call the bank on Monday, yes.

Q.   Tell me about that.

A.   I called Chad.  I did not reach him.  I

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 129

said, hey, the deal changed, hold the title.  As soon as I get more details, I'll let you know.  It was a relatively short voicemail message.
    Q.   To be clear, you didn't have the title to the Ferrari?
    A.   I never had the title to the Ferrari.
    Q.   Did you have any belief or understanding as to what the consignment agreement meant?
    A.   That this car is mine, he has to sell it.  Once he sells it, I get paid.
    Q.   Did Karma tell you that?
    A.   I mean, I can read the agreement.  I mean, that's pretty much my understanding of what the agreement was.  Jonathan made it very clear it was my car.
         We had a conversation that said explicitly that car doesn't leave the showroom until I get paid.
    Q.   There was a balance of 22,000 and change required under one of the purchase agreements.  Did you write that check?
    A.   No.
    Q.   How did that get paid?
    A.   When I was asked about this $22,000, I looked at my AmEx, where I charge most of my charges, I looked at my bank accounts.  I found nothing for 22,337.  I didn't know where it came from until I looked at the

Page 130

Lamborghini paperwork and realized that bank had sent that amount.
    Q.   And who provided the purchase and sale agreement to the bank?
    A.   I presume Karma did.  I never sent this paperwork.
    Q.   Okay.  Does that take us to the end of March 11th, you drive off in the Lamborghini, correct?
    A.   I'm probably missing something that I'm sure I'm going to get cross-examined on, but that's what I know so far.
    Q.   Okay, and you testified that you had called -- March 11th was a Friday.  I believe your testimony was that you called the bank --
    A.   On the 14th.
    Q.   -- on Monday?
    A.   Yes, I went to my records and verified that I called them.
    Q.   Okay.  So that brings us up to March 14th?
    A.   Monday.
    Q.   Okay.  On March 16th, did you hear from Jonathan?
    A.   Yes, I received an email.
    Q.   I'm going to hand you what's in evidence as Stephens' 9.  What's this?

Page 131

    A.   It's an email dated March 16th, around 12:39 p.m.  I see initially my response to Jonathan.  I'm sure if I scroll back, I see the original came from Charles Coulter to Jonathan, and then Jonathan had forwarded it for me.  So Jonathan just forwarded it.
    Q.   And just explain to the Court what this email shows?
    A.   Attached was a document showing the inspection by Ferrari of Fort Lauderdale calling out different issues and concerns that the -- they were hired by the potential buyer to pick it apart.
    Q.   Can you think of any reason that Karma would be communicating with you about the inspection of the Ferrari if they believed that they had acquired it?
         MR. MILLER:  Objection, calls for speculation.
         MR. MAURO:  I asked him if he can think of any --
         MR. MILLER:  (Inaudible) --
         MR. MAURO:  -- reason.
         MR. MILLER:  -- Palm Beach.
         THE COURT:  Okay.  Can you repeat that question?
         MR. MAURO:  I can.  I asked him if he can think of any reason that Karma would be communicating with

Page 132

him about the inspection of the Ferrari if they believed they owned it.
         THE COURT:  Okay.  I'll sustain the objection.
         You can ask a different question.
BY MR. MAURO:
    Q.   Can you think of any reason that Karma would have sent you this email?
         MR. BRESLIN:  Objection, it's the same objection.
         THE COURT:  Well, it is the same objection, sustained.
BY MR. MAURO:
    Q.   Was it clear to you when you received this email who the Ferrari belonged to?
    A.   Absolutely, he's clearly asking me -- he's clearly sending me over $24,000 worth of nitpicking things that they're saying need to be done, and saying that there was not a service done, and literally in the same calendar year I had service done by West Palm Beach Ferrari.  So I know a lot of these things were false.
    Q.   Now, the Ferrari did not sell to Mr. Coulter, is that right?
    A.   It never sold.
    Q.   Karma did not pay you for the Ferrari,

33 (Pages 129 to 132)

Page 133

correct?

A. No, they did not.

Q. You weren't credited with the Ferrari, the $230,000, on your purchase of the Lamborghini, correct?

A. Clearly not.

Q. Okay. I want to now focus on April. When is the next time that you heard from Karma in the timeline here?

A. So that was March 16th of 2022, is when they sent me the purchase inspection. Right around March 29th I received a message, good news on all fronts, call me in the morning. That was right around March 29th.

Q. Who was that from?

A. Jonathan Martin.

Q. What did he mean, good news, call me in the morning?

A. It sounds like this gentleman came back and decided he did want to buy the car.

MR. MILLER: Calls for speculation. He just testified it says good news.

THE WITNESS: I talked to him the next day.

THE COURT: Great, now overruled. Go ahead. Remember I'm not a jury. So, go ahead.

BY MR. MAURO:

Q. Do you know what he meant by "good news"?

Page 134

A. I do now, yes.

Q. Why, why do you know?

A. Because Mr. Coulter came back and said he wanted to purchase the car, and he also said they're going to give me more money for the car, they're going to give me 235 for my car.

Q. Who --

MR. MILLER: Objection. Judge, it's hearsay. He's taking two levels of hearsay, and some other party speaking to a third party.

THE COURT: And you're objecting to the price, and the fact that somebody wanted to buy the vehicle.

MR. MILLER: All of it, it's hearsay.

THE COURT: Right.

MR. MILLER: Everything he's testifying is --

THE COURT: I'll sustain that objection. Ask a different question.

MR. MAURO: Sure.

THE COURT: We can have a second day on this if we need it. I'm glad to schedule it. Why don't you go ahead and -- we'll talk about that immediately after lunch. Why don't you go ahead and ask him the series of questions that will lead you to the answer that you were

Page 135

hoping to obtain by one.

BY MR. MAURO:

Q. Are you aware of whether Karma was working on a deal to sell your Ferrari?

A. That's the only thing I cared about at that time with Excell, is getting paid for my Ferrari.

Q. And did Karma advise you that there was a buyer for the Ferrari?

A. Yes, they did.

Q. That's on March 29th, you say?

A. The 29th is when I received the notice that we have good news. The next day is when I heard they had a buyer.

Q. Okay. So what did you do?

A. What did I do at that point in time? I don't think I did much of anything. I'm not sure I did much with that information.

Q. Did you go to the dealership?

A. No, I was out of town.

Q. Did you send your friends?

A. Oh, no, I didn't send my friends because (inaudible) a buyer. No, I didn't send anybody, because why would I send them for another buyer at that point in time? I had no other news.

Q. Okay. Yeah, let me take a step back. I

Page 136

guess we were just talking about March 29th, good news. What's the next bit of news that you received from Karma?

A. April 2nd I received a call to come get your car.

Q. Who told you come get your car?

A. Jonathan Martin.

Q. What did you do?

A. I was out of town. I called Keith Houston and Eric Mintz (phonetic) and said, hey, guys, I'm out of town. Can you guys go pick up my two cars. I had a Ferrari there, and I had my BMW, I was having some service work done to it.

Q. Were they successful in obtaining the car?

A. They met Jonathan up there. They spent about an hour. They were able to find the key to the BMW. They could not find the key to the Ferrari, my spare key.

Q. Karma was trying to give them your Ferrari?

MR. MILLER: Objection, calls for speculation.

THE WITNESS: They were at --

THE COURT: Stop. Wait a minute. That calls for speculation? He was there.

MR. MILLER: He wasn't there.

THE COURT: I mean, his friends were there. Okay.

Page 137

MR. MAURO: (Inaudible) was there.

THE COURT: No, that's fine, that's fine. Calls for speculation.

Ms. Leonard, after lunch could you let them know, before we depart, what other dates we have available in the next two weeks?

Sustained.

Go ahead.

BY MR. MAURO:

Q. Are you aware of whether Karma was trying to give your friends your Ferrari?

A. Absolutely, they Facetimed me, they were calling me right there.

MR. MILLER: Judge, object, speculation, he's not there. He's testifying as to what a third party is telling him.

THE COURT: Okay. Sustained.

You'll be able to subpoena them for the second day of the hearing if you wish.

MR. MAURO: I'm trying to --

THE COURT: I'll be glad to permit that.

MR. MAURO: -- cut to the proverbial chase.

BY MR. MAURO:

Q. Did you have any conversations with Jonathan Martin about what happened that day, on

Page 138

March 2nd, when your friends went to pick up the Ferrari from Karma?

A. It was actually April 2nd.

Q. I'm sorry, April 2nd.

A. They couldn't find the key.

Q. You learned from Jonathan Martin, though, that Karma was trying to deliver the Ferrari --

A. Absolutely.

Q. -- to your friends?

THE COURT: Too late.

BY MR. MAURO:

Q. Did you arrange to meet -- or did you arrange to go to Karma at that point?

A. When I received notice that they could not take delivery and take the car back, I was in Lafayette for a client engagement. I tried to find flights from Lafayette to Florida. The closest airport is New Orleans, Houston, Dallas. I could not get there in time to get to a plane, to get back to Florida before Monday morning. So I had elected to drive, because I had the original key physically with me. So I had the key to get to my car.

Q. Do you have that key?

A. I do, right here.

Q. You never turned that over to Karma?

A. No, I had it the day that I went to trade

Page 139

in, I was planning to give it to them, but the deal changed.

Q. So when did you arrive to the Karma dealership?

A. I got into South Florida probably around 3:00 in the morning. Of course I was not planning to go to the dealership in the middle of the night. So we arranged to go there when they opened in the morning at 8:00 a.m.

Q. Is that when you got there?

A. 7:55, 8:05, around that time, yes.

Q. So that would be --

THE COURT: On what date?

Thank you.

THE WITNESS: I'm sorry.

BY MR. MAURO:

Q. That would be April --

A. I believe Monday would be April 4th, does that sound right?

Q. It does.

And what did you observe when you arrived to the dealership around 8:00 a.m. on April 4th?

A. It looked like chaos. There were employees sitting outside, not knowing what to do. A lot of cars had already been removed from the lot. My car was sitting

Page 140

out front. I immediately got in my car, started the car, attempted to drive off the car (sic), and either Mr. Moshe, or his daughter, or son, or -- I'm sorry, Chase, his son, or I don't know who put his Range Rover, it was not an Escalade, which is what was communicated earlier, it was a Range Rover, was blocked in front of me, and I was not allowed to leave.

Q. So you physically could not drive the car off the lot because you were blocked in?

A. The car was running, I was blocked in.

Q. Did you talk to the people who were blocking you in?

A. Absolutely.

Q. What was that conversation?

A. I think it was civil.

MR. MILLER: Calls for hearsay.

MR. MAURO: It's a party opponent admission.

THE COURT: Well, first you need to find out who he was talking to.

MR. MAURO: I will. Yes, your Honor. Thank you.

BY MR. MAURO:

Q. Did you have a conversation with anyone on behalf of the landlord?

A. I had conversations with quite a few people

35 (Pages 137 to 140)

Page 141

that day, the full day I was there.

Q. What about anybody on behalf of AWB?

A. Yes, Mr. Moshe, his wife was there, his son, Chase, was there. There was many other people there that I don't know their associations with Mr. Moshe.

Q. What, if anything, did you learn from any representative of AWB, including Mr. Farache?

A. I learned that he had physical possession of my title, and he apparently had physical possession of my key, that I assume he got because he was the landlord and had access to the block box. I don't know how he got the key, I don't have that information.

Q. Okay. Are you speaking with Karma at this point, too?

A. Absolutely.

Q. And what are they telling you?

A. It's my car. Jonathan is there, he's there. At some point during that morning the police showed up. I'm showing them my registration. I'm showing them my key. I'm in the car. If I left the car physically, I had a friend get in the car, to use the restroom. I mean, I was talking to quite a few people that day, my attorney on the phone.

Q. Now, among the people you talked to, you were texting with Scott Zankl?

Page 142

A. I did have a text conversation that day with Mr. Zankl.

Q. I'm going to show you what's been marked as Stephens' 6.

MR. MILLER: Where is my objections?

THE WITNESS: I have it in front of me.

(Sneeze.)

MR. MAURO: Bless you, sir.

MR. MILLER: Your Honor, we had objected to Stephens' 6.

THE COURT: Well, it hasn't been offered yet.

BY MR. MAURO:

Q. What is Stephens' 6?

A. It's a text message with myself and Scott Zankl, dated April 4th, it started at 10:50 a.m., where I had reached out to Scott directly --

Q. Okay.

A. -- after I received his phone number, which I did not have prior to that time, from Jonathan Martin.

Q. And how did this exhibit, let's say, make it to paper?

A. I have all my text messages. I'm an iPhone user. It's on iMessage, so I was able to quickly just

Page 143

screenshot every transaction.

Q. What's the first text message that you sent to Mr. Zankl?

A. I just let him know that I --

MR. MILLER: Judge.

THE COURT: Hold on.

Go ahead.

MR. MILLER: We filed an objection to Exhibit 6. It's hearsay, hearsay within hearsay.

THE COURT: Your response.

MR. MAURO: Yes, your Honor.

THE COURT: Yes, it's hearsay?

MR. MAURO: No.

There are --

THE COURT: Why is it not?

MR. MAURO: -- several responses here.

First of all, it's been tendered that part of their position is that some agreement was entered into by Mr. Stephens and Mr. Zankl when they were speaking by text message, you heard that as part of the theory. So that would make these materials not offered for the truth of the matter asserted, but rather for independent legal significance, not unlike a contract, you're not -- not asked to believe their truth, but the matter that's being negotiated, that's number one.

Page 144

Number two --

THE COURT: Well, if they are false, are they useful to you?

MR. MAURO: There is more to my response. I think that it's important that some of the statements are true, but there is 36 pages of text messages. So there is layers here.

As for the document itself, they're arguing that it's a contract. The next issue --

THE COURT: That this is the contract?

MR. MAURO: I've heard argument, and maybe I'm wrong, maybe they'll tell me that I'm wrong.

THE COURT: This is April 4th, and one would think the contract, if it was what you think it is, happened on the 11th.

MR. MAURO: I couldn't agree more.

THE COURT: Okay. So this is after the fact, communications between somebody who is not here, who is not your opponent.

MR. MAURO: Well, that was going to be my next point, I think they are our opponent, respectfully. You know, Karma is the only party who is arguing against the notion that this car was not sold, not bought, not taken in on trade. That is Karma's position. We are opposite them. In state court proceedings they are a

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 145

party.

THE COURT: Okay, but this isn't the state court, and they're not here opposing you today, are they?

MR. MAURO: They are not.

THE COURT: I think Mr. Winderman is listening to us. So --

MR. MAURO: But I do believe, though --

UNIDENTIFIED: He's physically here.

MR. MAURO: I do believe that Mr. Zankl is outside, and that he's going to be called to testify.

THE COURT: Well, then -- but the question is whether this document contains hearsay.

Now, if there are components of it that you want to point me to, that you believe are not hearsay for one reason or another, you can certainly try that. I don't need to rule on the entire document but, in general, it seems like an uphill battle.

So, maybe the best way to handle this is to have you address what you want me to get --

MR. MAURO: Happy to do that.

THE COURT: -- out of this document, but Mr. Miller gets to reassert his objection repeatedly.

MR. MAURO: Okay. Fair enough, fair enough.

THE COURT: And you should know, Mr. Stephens, if Mr. Miller objects, don't talk --

Page 146

THE WITNESS: Yes, sir.

THE COURT: -- until I've ruled, okay?

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

MR. MAURO: Thank you, your Honor.

BY MR. MAURO:

Q. Let's look at Page 2.

First of all, which side is Mr. Zankl, and which side is you?

A. I'm on the right side of the text messages, in more of a lighter color, and he's on the left side, because he says, Derek, I have this, blah, blah, blah. So he's clearly on the left. I'm on the right.

Q. Okay, and within that first text message on Page 2 of Exhibit 6, did Karma -- did Mr. Zankl refer to the Ferrari?

A. Yes.

Q. And how is the Ferrari referred to?

A. Your --

MR. MILLER: Objection, hearsay.

THE COURT: All right. So you want me to -- you can point me to what you're hoping --

MR. MAURO: Yes, your Honor. I'm hoping that the Court will hear the evidence that Mr. Zankl texted Mr. Stephens, quote, your -- he says tile,

Page 147

obviously a mistype, your tile, title and car was never supposed to be given. It was a mistake. It was Friday evening at 7:00 p.m., and the guy was yelling at my wife.

THE COURT: Okay, but that -- how is that not hearsay?

MR. MAURO: Okay.

THE COURT: I'm trying to figure out how it is not.

MR. MAURO: Sure.

THE COURT: Because any argument you would make would make it not usable to you.

MR. MAURO: Well, I think, Judge, it reflects what the dealership, and what Mr. Zankl believed was --

THE COURT: Well, yes, but -- hearsay might be helpful to you, but that doesn't still make it -- it doesn't magically make it not hearsay.

I'm trying to figure out how you overcome the evidentiary objection.

MR. MAURO: I think it's a present sense impression. I think that at this time, Judge, the dealership was under siege. This is the man's 20-year business.

THE COURT: I don't think that's about what was happening that day. He's talking about what happened

Page 148

three weeks ago.

MR. MAURO: It shows his belief as to who he thought the car belonged to. That's his state of mind as opposed to the truth of the matter asserted. It's relevant here because what he thinks --

THE COURT: State of mind, interesting.

Your response to that? That's usually not used in this context.

MR. MILLER: Yeah, I don't think that applies. I think -- and, in fact, this is weeks after the fact. Mr. Zankl has given testimony previously that he wasn't even present during any of this stuff. He's basically talking about what he believes somebody else on, not just one level, but three levels of hearsay, informed him of. Mr. Zankl wasn't there when any of this stuff went down. He's just writing this, you know, please forgive me text message, but it's not a present sense impression, it's not a statement of mind or anything like that. This is hearsay, and levels of hearsay, three or four layers.

THE COURT: Okay. Well --

MR. MILLER: There is no foundation.

THE COURT: -- maybe we wouldn't go that far. He was -- was he not the owner of the business? So, but I do think it's still hearsay.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 149

MR. MAURO: I'm going to offer one more objection -- one more response for your Honor's consideration, and that is Rule 807.

Hearsay may be admissible if it's supported by sufficient guarantees of trustworthiness, if the evidence is corroborated, if it's more probative on the point than anything else and if there is notice, and in this instance, Judge, we have indicia of trustworthiness, it's a text message. Mr. Zankl is going to corroborate that it's his text message.

THE COURT: It hasn't happened yet.

MR. MAURO: It has not.

THE COURT: So you can call him. You can also cross-examine him using this, if he testifies inconsistent with it.

MR. MAURO: Okay.

THE COURT: But right now the objection is sustained.

MR. MAURO: Okay.

THE COURT: So are there other components of this --

MR. MAURO: Yes.

THE COURT: -- that you think will -- okay.

MR. MAURO: Yes, your Honor. I'm sorry to --

Page 150

THE COURT: Don't apologize.

BY MR. MAURO:

Q. Did anybody at Karma tell you not to take the car that day?

MR. MILLER: Objection, hearsay.

THE COURT: Tell you not to, okay, sustained.

BY MR. MAURO:

Q. Did anybody at Karma stop you from taking the car?

A. No.

THE COURT: Did anybody at Karma stop you from taking the car, the answer was no.

MR. MILLER: I didn't object to that question. That's --

THE COURT: No, I know that, I know that. I'm just --

THE WITNESS: I waited.

THE COURT: I'm just repeating. Go ahead.

BY MR. MAURO:

Q. You heard Mr. Breslin suggest that you weren't asking for the car, you were asking for $250,000 instead, is that true?

A. Yes, I wanted the car or the money.

Q. But you're sitting in the car when you

Page 151

agreed to take this check from Karma?

A. I wanted to drive off that lot, unequivocally did not want money. He was going through whatever he was going through. I wanted to drive off.

I was blocked in, could not leave with the car. I wanted the car. When I realized I was not going to be allowed to drive off the car (sic), the police came and went, my attorney says get a check, get a payment.

Q. Pardon me one second.

How long were you in the car?

A. Sometime between 8:00 a.m., and I'm pretty confident I left by 5:00, 5:30.

Q. Literally all day?

A. All day, a hundred-something degrees, not a good experience.

Q. And at no point were you able to negotiate the car around the vehicle that was blocking you?

A. I mean, initially I could have probably hit the curb a little bit, got around it, but then they moved another car and had it blocked in after a certain point in time.

Q. When did the standoff end?

A. When they brought a check out to me, but I want to make it very clear, I asked -- and Scott was saying they were going to give me a wire the next day in

Page 152

the text messages, he was saying he was going to call me, I was getting paid on this. I only took the check -- I asked him to give another title to Mr. Farache, he said he would take a different title. He didn't have another title to give. I was at the end of my rope, and wanted to confirm that I had rights to that car, and I believe if you do the right things, the right things will happen and it will all work itself out. So I drove off in a separate car.

Q. Did you expect that check to clear?

A. He did tell me in advance it would not clear that day, that he was going to get me a wire the next day, and then, through multiple contacts with Mr. Zankl, he made different promises, to make the wire, he asked for -- you know, he asked for my VIN number for the wire information, he asked for all this information.

Q. Are you aware whether Karma ever advised the police that the Ferrari belonged to you?

A. I don't know --

MR. MILLER: Objection, calls for hearsay, Judge.

THE COURT: Overruled.

THE WITNESS: Can you ask the question again?

BY MR. MAURO:

38 (Pages 149 to 152)

Page 153

Q.   I will and, in fact, I'll show you what we have marked as Stephens' 7.

Are you aware of whether Karma ever advised the police that the Ferrari belonged to you?

A.   Yes.

MR. MILLER:  Objection, Judge, calls for speculation, hearsay, and this document is hearsay, and we filed an objection to it as well.

THE COURT:  Which document was this?

MR. MAURO:  I'm sorry.

MR. MILLER:  Exhibit 7, that's their Court Paper 206-7.

MR. MAURO:  I've not moved the --

THE COURT:  Hold on.

MR. MAURO:  -- exhibit in.

THE COURT:  Hold on.

MR. MAURO:  Yes, your Honor.

THE COURT:  I know you haven't moved the exhibit.

Okay.  So you're not yet offering this, and the question was, was he aware that the police were informed that it was his?

MR. MAURO:  Yes.

THE COURT:  Overruled.

THE WITNESS:  I was not aware on April 4th

Page 154

if the police were advised what the conversation between Karma -- I was not privy to the conversations Karma was having with the police at the time.

I am privy to the conversation that the Zankls were having with the Boca police department, because I was copied on an email.

MR. MILLER:  Objection, Judge, calls for hearsay testimony.

MR. MAURO:  It's the same thing that we just overruled, he's talking about the email that I just showed him.  I've asked him if he's aware of whether Karma advised the police that the Ferrari belonged to Mr. Stephens.  He's answering that question.

MR. MILLER:  And he's about -- and what he's saying is, he's aware of conversations between the Zankls and the police department, hearsay, and he's just about --

THE COURT:  Well, he hasn't told me what they are.

MR. MILLER:  I'm sorry?

THE COURT:  He just said he's aware of conversations.  He has not told me what they are.  So I haven't heard a statement attributed to another party.  So, overruled.

THE WITNESS:  On June 20th, I received a copy that Kristen Zankl, an owner of Excell/Karma, had

Page 155

sent Detective White, with the Boca police department, I wrote it --

MR. MILLER:  Objection, Judge, hearsay.  He's reading from the exhibit.  I objected to that exhibit.

THE COURT:  Sustained, sustained.

BY MR. MAURO:

Q.   Are you aware of whether Karma --

(Thereupon, the main recording stopped at 12:28 p.m. and the backup recording was used to transcribe the following:)

-- advised the police that the Ferrari belongs to you?

A.   Yes.

MR. MAURO:  No more questions, your Honor.

THE COURT:  Should we take our lunch break now?  How much time do you need?

(No verbal response.)

THE COURT:  No one is going to speak up, really?

MR. MAURO:  Oh, for lunch?

THE COURT:  Yes.

MR. MILLER:  Whatever you prefer, your Honor.

THE COURT:  No, it's up to you.  You're all

Page 156

trying the case.  You can sit down, Mr. Stephens, you don't need to stand.

During the break don't discuss your testimony with anyone, including your counsel, understood?

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.  You can talk about vacation (inaudible) Texas.

All right.  How much time do you think --

UNIDENTIFIED:  There is nothing walkable, right?

MR. MILLER:  Well, downstairs you have the CVS, you can get a soda.

ECRO:  And a bag of chips.

THE COURT:  That's why I'm asking you how much time you need.

UNIDENTIFIED:  Like a half hour, Judge.

UNIDENTIFIED:  One hour, your Honor?

THE COURT:  One hour.  Who else?

UNIDENTIFIED:  45 minutes.

THE COURT:  Excellent, I'll see you at a quarter past 1:00.

(Thereupon, a lunch recess was had, after which the following proceedings were had and they were transcribed from the main recording:)

THE COURT:  Welcome back everyone.  Thank

39 (Pages 153 to 156)

Page 157

you.  Please have a seat.

I believe we are at cross-examination, correct?  Why don't you return to the witness box?

Thank you, Ms. Leonard.  You gave me one thing to do and I failed to do it.  Thank you.

Mr. Stephens, could you please acknowledge that you remain under oath?

THE WITNESS:  I remain under oath, yes, sir.

THE COURT:  Thank you.  Whenever you're ready.

MR. BRESLIN:  Thank you.

CROSS-EXAMINATION

BY MR. BRESLIN:

Q.   Mr. Stephens, you heard Mr. Martin testify that for an automobile to be left at the Karma of Palm Beach lot, that there had to be a consignment agreement, did you hear him testify to that?

A.   I didn't hear it the same way.

Q.   How did you hear that?

A.   That they a consignment agreement, but often they clearly don't.

Q.   Okay.  So my question to you is, prior to the consignment agreement that you say was executed on March 11th, 2022, was there ever a prior consignment agreement?

Page 158

A.   No.

Q.   All right.  So your testimony is that you left your automobile at the Karma lot while it was being offered for sale by Karma of Palm Beach on numerous occasions prior to March of 2022?

A.   Yes.

Q.   And all those times, knowing your car was on the Karma lot, and in their possession, there was never a consignment agreement?

A.   Correct.

Q.   Do you understand the difference between a trade-in and a consignment?

A.   I'm not an attorney, but I believe a high-level definition, I understand it, yes, sir.

Q.   What's your understanding, sir?

A.   You trade a car in, you get compensated for it.  You put it on consignment, you get compensated once it sells.

Q.   All right.  So a trade is you would transfer title of your automobile to the dealer you're trading it in to, and for a consignment, you would be giving them possession of the vehicle, with the authority to sell it for you?

A.   I don't know the definite possession, that they physically have the car.

Page 159

Q.   All right.  So a trade, as far as you understand it, would be a transfer of title, correct?

A.   Yes.

Q.   Okay, and a consignment would not be a transfer of title, correct?

A.   Yes.

Q.   All right.  Now speaking of titles, let's deal with that.  Did you testify during your direct that you were unaware of where the title to the Ferrari came from?

A.   Yes, I believe I said that, yeah.

Q.   All right.  Now, was it your belief that Texans Credit Union had that title?

A.   Yes.

Q.   All right.  Were you aware, sir, that all of their entire file was subpoenaed for this case by the FVP plaintiffs?

A.   I think I saw a copy of it, yes, sir.

Q.   All right.  Were you aware, sir, that there was not a copy of the title in their file?

A.   I don't know, I didn't look that close at it, if there is title or not.  Whatever the paperwork you subpoenaed, I presume they provided it.  I'm not familiar if it's paper titles anymore, electronic titles, I'm not a -- I'm not in the business.

Page 160

Q.   Well, my question to you, sir, is the actual physical title document got delivered to Karma of Palm Beach somehow, correct?

A.   Apparently.

Q.   All right, and you don't know how?

A.   Correct.

Q.   And it wasn't you that delivered it there?

A.   Absolutely not.

Q.   Did anyone deliver it on your behalf?

A.   I didn't request anyone to do it, except for whatever paperwork I signed that evening on the 11th.

Q.   Now, you testified, sir, that there was paperwork that was prepared by Karma, the people at Karma of Palm Beach, and that you went there and you signed all that paperwork, correct?

A.   Yes.

Q.   And part of that paperwork was a purchase agreement, correct?

A.   Yes.

Q.   And there came a time when that purchase agreement was sent off to Texans Credit Union, correct?

A.   I don't know what they did with the paperwork.

Q.   Well, how did the -- how did Texans Credit Union become aware of the fact that you were purchasing

40 (Pages 157 to 160)

Page 161

the Lamborghini?

A. I called them earlier that day.

Q. On March 11th?

A. Yes.

Q. 2022?

A. Yes, sir.

Q. Okay. All right. So, the first -- is it your testimony that the first time Texans Credit Union became aware of this transaction was when you called them on the phone on March 11th, 2022?

A. I can't confirm or deny it, if they called them first, or I called them first. I just know that I physically did call the credit union that day.

Q. All right, and what conversation did you have with the credit union on that day?

A. That I found a car, I'm going to trade in the Ferrari, can you pre-approve me and get all of the paperwork going, so when I go down there I can process this transaction.

Q. And what did they say?

A. Of course. I mean, they just said, okay, give me the pin numbers, give me, whatever they asked me for over the phone, and then sometime during the course of the day they sent me some DocuSign information to execute.

Page 162

Q. All right. So you told the bank that you wanted to trade the Ferrari in for a Lamborghini, and you wanted to borrow money from the bank, using the Lamborghini as collateral, correct?

A. Effectively, yes.

Q. All right, and they sent you documents by DocuSign, correct?

A. DocuSign or AdobeSign, it was an electronic signature process.

Q. All right. So your bank was under the impression on March 11th, 2022 that you were trading in the Ferrari for the Lamborghini, correct?

A. Yes.

Q. All right. Now, the paperwork that you executed with Karma of Palm Beach, there is actually a couple of different purchase agreements, are you familiar with those?

A. Yes, sir.

Q. All right. So you've seen those in the discovery that was exchanged?

A. Yes, the ones that were presented, yes.

Q. Okay, and you signed two different versions of it, correct?

A. Yes.

Q. Did you sign both versions on March 11th,

Page 163

2022?

A. Yes.

Q. Okay. Now, would you agree, sir, that on both of these purchase agreements, both of them indicate that the Ferrari is being traded for the Lamborghini?

A. Yes.

Q. Are you familiar with any purchase agreement for the Lamborghini that does not have the Ferrari as a trade?

A. No.

Q. All right. So, all this paperwork was executed, including the Florida trade pack document, wherein you signed an odometer disclosure statement, correct?

A. I signed whatever they put in front of me. If that was in the information pack, yes.

Q. All right. Well, you're a sophisticated businessman, are you not?

A. I don't know the definition of that. I'm not in the car business.

Q. Okay. Well, if -- when you sign a document that says that you're signing it under penalties of perjury, do you take the time to read it?

A. Probably not.

Q. All right. So, your testimony then is that

Page 164

sometimes when we see your signature, you actually read the document, and other times maybe not?

A. True.

Q. So do you know, of all the documents that I've just mentioned to you, the purchase agreements and the Florida trade pack, do you know, can you tell us today how many of those you actually read before you signed?

A. You said "trade packs", I'm not familiar with that term.

Q. Okay. Mr. Stephens, I show you what's been marked as Plaintiff's -- Adversary Plaintiff's Document 204-5, Page 102, which purports to be a document that is self-styled as the trade pack Florida. Would you take a look at that document, please?

A. Yes.

Q. Did you sign that document?

A. Yes.

Q. Did you read it before you signed it?

A. I probably saw the odometer reference, the number, and signed it. I didn't read all of these "who's this", and "when this", and "should that's".

Q. All right, but was it your understanding that by signing that, you were indicating that you were trading in the Ferrari?

A. Yes.

41 (Pages 161 to 164)

Page 165

Q. All right. So at that point in time you signed all these documents, it was your understanding that the Ferrari was a trade-in, correct?

A. Yes.

Q. And you testified early that there came a point in time when, at least in your mind, that changed?

A. In my mind?

Q. Yes.

A. Yes.

Q. All right. So now in your mind there is a difference between trading the Ferrari for the Lamborghini, and consigning the Ferrari to Karma of Palm Beach for them to sell it for you, correct?

A. Yes.

Q. All right. So there came a time on March 11th that after -- you say after you signed these documents, that the deal changed.

A. Yes.

Q. Okay, and that deal changed because you had a conversation with Mr. Zankl?

A. It changed because I wasn't allowed to drive the car off the lot, and then we had the conversation with Mr. Zankl.

Q. Okay, and so all the paperwork was executed, the car was traded, all the paperwork was signed, sealed,

Page 166

and delivered, you were going to pick up your car, and Mr. Zankl told his employees, and then you, that you could not take the car off the lot, correct?

A. I was not allowed to take the car off the lot, correct. How the order, who talked to who, when they talked --

Q. Okay.

A. -- I just wouldn't --

Q. And so, and then you had a conversation with Mr. Zankl?

A. Yes.

Q. And what was that conversation?

A. I couldn't take the car off the lot. He told me a story about a previous customer that wrecked and had some liability, and had to pay for the car if I wanted to take the car.

Q. Okay. So what deal did you make with him?

A. What deal?

Q. Yes.

A. I said I would write the check for $250,000 and take possession of the car.

Q. Okay. So, you had all this paperwork that was executed, and then you get on the phone with Mr. Zankl and you came to a business arrangement so you could take the car off the lot that day, correct?

Page 167

A. A "business arrangement"? I don't know the legal definition of what you're saying a business arrangement is, but I can assure you, when I wrote that check, I was putting that car on consignment, and that was my car for him to sell.

Q. Okay, and I understand that you want to get all those thoughts across, but if you could just answer my questions.

Did you enter into an agreement with Mr. Zankl regarding you giving him $250,000 and leaving that day with the Lamborghini?

A. Yes.

Q. All right. Now, when you made that agreement with Mr. Zankl, you didn't redo this transaction. You made a different transaction, correct?

A. It was 7:00 p.m., there was no new paperwork. There was a check and a consignment agreement after that.

Q. All right. So the agreement was, is that you were going to give him the check for $250,000, correct?

A. Yes.

Q. And when were you -- and how were you going to get your money back?

A. When he sells the car.

Page 168

Q. Okay. So the agreement you made then was you were going to give him $250,000, and then when he sells the Ferrari, he's going to pay your $250,000 back, correct?

A. The following week, the expectation was the following week, yes.

Q. All right, but your agreement with him was that you were going to give him $250,000 today, and that when he sells the Ferrari, you were going to get $250,000 back?

A. Whenever the actual rounded numbers were, we were going to "settle up next week", was his quote.

Q. Well, didn't you testify that the agreement was you were going to get your $250,000 back?

A. Well, it's 230 trade, plus the bank is sending 22,000. I'm only entitled to the 20,000. The $2,000 taxes, I'm not, obviously, entitled to. So the total due to me is $250,000.

Q. All right. So, now on March 11th, were you aware that your bank was going to send $22,000 to Karma of Palm Beach?

A. No.

Q. All right. They did that without your knowledge, correct?

A. Correct.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 169

Q.   All right.  So, you testified in your deposition that they sent that money without you even knowing about it, right?

A.   Well, it was -- I signed paperwork in a DocuSign, but I didn't see the dollar amount.

Q.   All right, but you testified in your deposition that you weren't even aware that they made a payment to Karma?

A.   No, I was not aware of the payment.

Q.   And you testified that you didn't authorize them to make a payment to Karma of Palm Beach, correct?

A.   Well, if I signed their documents, I effectively authorized them to do it.  I didn't realize that I had done that.

Q.   All right.  So their documents indicated that you're trading the Ferrari in, and they were substituting the collateral, and they were making a payment of $22,000 to Karma of Palm Beach, correct --

A.   Yes.

Q.   -- as part of that transaction?

A.   That first initial transaction, correct.

Q.   All right.  So that agreement that you made with Mr. Zankl was when the Ferrari got sold, you were going to get $250,000 back, right?

A.   When the Ferrari sold the following week I

Page 170

was going to get the $250,000 back.

Q.   Okay.  Now, the following week you didn't get the $250,000 back, correct?

A.   No.

Q.   All right.  Now, the Ferrari was never going to sell for $250,000, correct?

A.   I thought the car was worth $250,000.  The market had those cars going for 258, 262.  That car was worth 250.

Q.   All right.  Can we all agree that on the trade paperwork the number was $230,000?

A.   What I would get was $230,000.  What it would sell for is a totally different number that I'm not privy to.

Q.   Okay.  So my question to you, sir, is the agreement was, is that the car was being traded for $230,000, that's the value that you were going to get on the trade, correct?

A.   On the first transaction, correct.

Q.   Right, and that you were trying to -- and that car, you were trying to sell the car for some period of time before this date, correct?

A.   Correct.

Q.   All right.  So, the car, as you under -- as far as you understood, when the Ferrari sold, you were

Page 171

going to get $250,000, right?

A.   Yes.

Q.   Okay, but you also understood that the value assigned to the Ferrari was $230,000 on all the paperwork, correct?

A.   The value I was receiving was 230 for the trade-in.  The value of the car, I believe, is higher.  They were selling at a discount to market, at 235, 237, whatever the number was.

Q.   And then is the reason that Mr. Zankl told you that you couldn't leave the lot with the Lamborghini was because he didn't believe the Ferrari was worth $230,000, and he didn't want to give you that amount for a trade?

A.   He never gave me that communication, that was never said to me.

Q.   Now, the selling price for the Lamborghini was $250,000, correct?

A.   Yes.

Q.   All right, and when you wrote that check for $250,000, was it your belief that you were buying the Lamborghini with that money?

A.   Yes.

Q.   Did it occur to you that you have to pay tax?

Page 172

A.   Yes.

Q.   All right.  Was there ever a document, a purchase agreement that shows that you were buying the Lamborghini for $250,000 without a trade-in?

A.   No.

Q.   And so even the next week, when you didn't get the money that they promised you, did you go back and try to redo any of this paperwork?

A.   I called the bank, told them the deal changed, hold the title.  I did not go -- I was physically already out of the state.  I did not physically go back and say redo the paperwork.

They made it sound like in every promise they were going to just take care of it.  I didn't follow up another time other than the 16th, because they said they had the buyer, they were going back and forth on other buyers.  So, no, I do not have an updated piece of paperwork other than the consignment agreement.

Q.   All right.  So there was never a new -- there was never new paperwork to show that, A, you were buying the Lamborghini, paying for it, paying taxes --

A.   Uh-huh.

Q.   -- and there was a car that was given to Karma of Palm Beach on consignment that you could take back whenever you wanted.  That never happened, correct?

43 (Pages 169 to 172)

Page 173

A.   There was not another piece of paperwork, no.

Q.   All right.  Now were you aware of the selling price when they were trying to do the deal with Mr. Coulter, of what they were going to sell it to him for?

A.   I didn't know at that time.  I think I might have found out in the last 30 days with some of the paperwork you guys have been shooting back and forth, but I didn't know at the time what the number was.

Q.   All right.  Now, there came a time when Karma of Palm Beach got the title, and transferred the title to the vehicle to Karma of Palm Beach, you became aware of that at some point, correct?

A.   In the month of June, July, a long time after, yeah.

Q.   Okay, and that's dated, the transfer of title is dated March 11th, 2022, do you see that on the agreement, on the document?

A.   I'd like to see that agreement if that's all right, because I remember there is a 3-25 date somewhere on that agreement, if I'm not mistaken.

MR. BRESLIN:  This is Document 204-8, Page 1.

THE WITNESS:  Thank you.

Page 174

Okay.  So it says first lienholder, electronic title prior to 3-25, and then in the transfer of title by seller, there is a reference of 3-11-22, but again, I don't know when that was signed, or if that's valid, if it was really signed on the date or not.

There is no way it could have been signed on the date because it was 7:00 p.m., so it was clearly backdated.

BY MR. BRESLIN:

Q.   Do you know when it was backdated and by whom?

A.   I clearly did not sign this document, because my signature is not on it.  Someone put the backdate on it of 3-11, because it wasn't in their possession until the following week, to your own testimony, it wasn't done on 3-11 at 7:00 p.m.

Q.   Okay.  Now, do you -- to repeat, do you know whether or not Texans Credit Union ever had a copy or the original of this title?

A.   No, I have no idea.

Q.   Now, the document that I just handed you, there is nothing in here that indicates that any liens were either on this title or released, correct?

A.   I apologize, if you'd show it to me again, but I didn't look that close to that section.

Page 175

Can you repeat the question?

Q.   Yes, whether or not the title document itself shows whether or not it had a lien on it?

A.   It showed registered owner, my name, mailed to Texans Credit Union, at the top, date of issue, 7-20-2021, it's probably when they paid off the U.S. Bank, and then underneath where the certificate of title is, it says first lienholder, electronic title prior to 3-25-2022.

Q.   Okay.

A.   So there is no other name of a bank or anything on this.

Q.   So the week after this transaction occurred -- so this transaction occurred on March 11th, 2022.  The next week, you never went back to Karma of Palm Beach and tried to redo the paperwork regarding the purchase of the Lamborghini, correct?

A.   I was out of state.  I didn't have to, I had a consignment agreement in place, and I had multiple conversations with Jonathan about it.

Q.   Okay.  So the only conversations that you had regarding a consignment were had with Jonathan, correct?

A.   Yes.

Q.   All right.  You never had a conversation

Page 176

with Mr. Zankl about a consignment, did you?

A.   He was nonexistent in 2022 at that dealership.

Q.   All right, but when you talked to him on the phone, there was no talk about a consignment, correct?

A.   On which day?

Q.   On March 11th, 2022.

A.   Was there -- I don't know what the conversation was at that time.

Q.   Well, he told you that you couldn't leave the lot unless you put -- until you paid for the Lamborghini, correct?

A.   Right.

Q.   Was there any discussion with Mr. Zankl regarding the consignment -- a consignment of the Ferrari?

A.   Yes.

Q.   So your testimony is you actually talked to Mr. Zankl about the consignment of the Ferrari?

A.   Yes, of course it was on a consignment.  We didn't talk about a consignment agreement, but of course it was for sale, and I would be paid when it was sold.

Q.   I'm not asking --

A.   It was just a consignment.

Q.   I'm not asking you what, of course, happened.  I want you to tell me exactly what he said

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 177

regarding a consignment?

A.   That when my car sells, I will get paid for my Ferrari.

Q.   Correct.  Did he use the word consignment?

A.   I don't recall.

Q.   All right.  So the arrangement you had with Mr. Zankl was, when the Ferrari sells, you'll get the $250,000 back, correct?

A.   Yes.

Q.   All right.  Now you testified on direct examination that you wanted to get your car back, correct?

A.   What time and date are we talking about right now?

Q.   You said, you testified that after all this happened, that you -- when your attorney asked you about whether or not this was just about money, you said I wanted the money or I wanted my car back.

A.   Correct.

Q.   All right.

A.   One or the other.

Q.   In fact, you wanted the money, correct?

A.   I would prefer to have the money, because then I'd have to sell it and go though that process.  Of course I'd prefer to have the money.

Q.   Okay.  Now, how about, what happened to the

Page 178

title with the Lamborghini?

A.   I had paper plates.  They expired after 30 days.  I had an attorney advise me, go down to the DMV through a process and file for the paper plates for another 30 days, and to file, since the dealership was in bankruptcy, you fill out this form and you send it in, and I received the paper plates, and eventually I received the hard plates.

Q.   All right.  Mr. Stephens, in your text messages to Mr. Zankl, there are 37 pages.  Have you had a chance to review them?

A.   I think we were trying to review those a moment ago.  I presume it's the same ones.

Q.   Okay.  Your attorney was asking you questions about them, correct?

A.   I presume it's the same ones that you're referencing, yes.

Q.   Yes, there is one set of texts, it's 37 pages.  It's the same ones that your attorney asked you about, okay?

A.   Okay.

Q.   All right.  Did you get a chance to review those before you came to court today?

A.   No, I didn't review them before I went to court today.  I basically screenshot them and sent them

Page 179

weeks, or maybe a month ago.

Q.   All right.  So.  But you've had a chance to review them prior to your testimony today, correct?

A.   I didn't go through line by line of my 37 pages of texts between now and when I sent them, no.

Q.   All right, and these were texts, these are text messages from you to Mr. Zankl asking for your $250,000, correct?

A.   There is a lot of things in those things, in those 37 pages.

Q.   I understand.

A.   That's one of them.

Q.   But do you ever, in these 37 pages of texts, say that you have my car on consignment and I want my car back?

A.   I'd love to have the texts in front of me and be able to review that and confirm that position yes or no.  I'm not going to answer without the opportunity to review them.

Q.   All right.  Well, do you recall texting that to him?

A.   About getting the car back or the money, yes.

Q.   Okay.  So it's your testimony as you sit here today that you wanted either the car or the money --

Page 180

A.   One of the --

Q.   -- one or the other?

A.   What time are we talking about right now?

Q.   I'm talking about when you were texting him back in April --

A.   On April 4 --

Q.   -- when you were --

A.   -- I wanted to drive off the lot with my car and I was blocked in.  I wanted my car.  In lieu of the car, I wanted the money.

Q.   Okay.  So let me read you a text that you sent to Mr. Zankl on or about, I guess, April 4th.  Let me get the date.  This would be April 6th.  It says, hey, Scott TY for the reply.  Communication is important in these fun times.  Smiley face.

I'm pretty frustrated but remain positive and confident we'll quickly resolve this, but I'm told that 600-K was transferred yesterday, and I just want the 250-K you promised me via the wire.

In the State of Florida the postdated check can be presented for payment at any time.  So my attorney advises me to go to Chase and attempt to deposit it into one of my Chase business accounts.  If it doesn't clear via positive pay immediately, today it will be a criminal offense.

45 (Pages 177 to 180)

Page 181

I have been promised the 250-K since 3/13, and I do have a consignment agreement dated 3/11, and as you know the website still has it for sale.

Q. Do you recall texting Mr. Zankl those words?

A. It sounds accurate.

Q. And it goes on, if you are not able to get me 250-K today, get me the title to the 213 (sic) Ferrari, and possession of the Ferrari, period.

I will hold it and give it to you when I get the 250-K, and will drop the lawsuits. I fly out this afternoon but back Sunday.

Do you recall texting those words to Mr. Zankl?

A. I'm sure I did. I'd love to see the context of what was before it and after it in that text.

Q. It goes on, I'm working this AM out of your dealership if you want to stop by. Honestly, if I just get the Ferrari and the title today, you can take a month to get the $250,000. It feels like that would be the best for all parties. There will be an injunction anyway, so I'm not going to sell it until we get a resolution.

Do you recall texting those words to Mr. Zankl?

A. I did send -- if you're reading it off the text screens that you have in front of you, I'm sure

Page 182

that's what I wrote.

MR. BRESLIN: Okay. One moment, please.

Those are all the questions I have, your Honor. Thank you.

THE COURT: Mr. Miller.

MR. MILLER: Surprised.

THE COURT: No, not at all.

MR. MILLER: I was laying low, Judge.

CROSS-EXAMINATION

BY MR. MILLER:

Q. Mr. Stephens, you're aware I represent Auto Wholesale Boca, correct?

A. Yes, sir.

Q. Okay. I want to go back to some of the beginning of your testimony that you were giving -- Mr. Mauro was getting direct testimony from you. You had said that the $250,000 check that you wrote to Karma Palm Beach was to purchase the car outright, correct?

A. Yes, at that time.

Q. And the reason for that was, it was late in the evening, you felt the deal had changed, and the consignment agreement was brought to you by Mr. Martin, is that right?

A. Yes.

Q. What time was that, that consignment

Page 183

agreement?

A. I don't think I arrived at the dealership until 6:00 p.m. It could be 6:30, it could be 7:00, I have no idea what time it was that evening. It was after work.

Q. Fair enough.

And what time, then, did you write them the $250,000 check?

A. It was at the end of the evening.

Q. After 7:00 p.m.?

A. I'm not going to say.

Q. After 6:00 p.m.?

A. After 6:00 p.m. would be my expectation.

MR. MILLER: Okay. Your Honor, I believe it's already in evidence, it's 204-4, Exhibit 4 of -- let's see what this is, I think it's FVP. I believe that was already put into evidence.

THE COURT: Let me check. The check?

MR. MILLER: Yes.

THE COURT: I believe it was. Mr. Huss (phonetic), do you know?

THE CLERK: (Inaudible.)

THE COURT: Go ahead.

MR. WINDERMAN: Donald Trump was born on the second record --

Page 184

THE COURT: That was Mr. Winderman.

Go ahead, please.

BY MR. MILLER:

Q. Mr. Stephens, do you recognize that check, 204-4 there?

A. Yes.

Q. Okay, and is that the check you wrote the evening of March 11th, 2022 to Karma Palm Beach?

A. Yes.

Q. Was that check endorsed by Karma Palm Beach for deposit?

A. It's blacked out, but it says "Kar" and then "each", so I presume it's Karma Beach, I presume so.

Q. So it was negotiated by Karma Palm Beach, right?

A. I believe so.

Q. Well, are you not sure that your -- that that check cleared and the money was removed from your account?

A. No, I'm very clear the money was removed from my account. You said --

Q. So does that check evidence --

A. -- it was Karma --

Q. Does that check evidence the money that you paid to Karma Palm Beach the late evening, after

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 185

6:00 p.m., on March 11th, 2022?

A. Yes, I thought you were asking about the endorsement on the back. I can't confirm or deny where it went.

Q. Okay, and this is a bank copy, and on the top, on the left side, it will indicate the date the check cleared. Do you see the date the check cleared?

A. March 11th.

Q. Sir?

A. March 11th.

Q. You would agree with me that J.P. Morgan Chase Bank closes at 5:00 p.m. daily, Monday through Friday, correct?

A. I don't know when Chase Bank closes.

Q. Well, if you, at 7:00 p.m., wrote a check for $250,000 on March 11th, 2022, doesn't it seem logical that there is nobody that could run that check to the bank and physically deposit it March 11th, 2022?

A. You can remote install a bank at any time, you can remote deposit a check any time.

Q. Well, there are certain limits on how much you can deposit remotely, correct?

A. I'm not a banker, I don't know.

Q. Okay. So that check, though, that you have there, your testimony is you wrote that after 6:00 p.m. on

Page 186

March 11th, 2022?

A. Yes.

Q. And that check shows that it cleared the bank, your bank on March 11th, 2022, correct?

A. I'm reading it. Give me one moment, please.

Q. Sure.

A. We received your deposit. You can print a record for your receipts, date, March 11th, one deposit. I'd have to try to deposit a check, or write a check after 6:00 p.m. and confirm your position.

Q. Okay.

A. I don't know.

Q. And the check also references some handwritten language in the memo section, correct?

A. Yes.

Q. This says what?

A. It says hold for 2017 H.

Q. And that would be the automobile, that Huracan, that you wanted to purchase, correct?

A. The 2017 H is a reference to the Huracan, correct.

Q. Yes, and that's the same car that Mr. Breslin examined you about earlier regarding the fact that there was all this paperwork that was prepared for a trade-in of the Ferrari for the same Huracan, right?

Page 187

A. Can you repeat that question?

Q. Is that the same car that Mr. Breslin was asking you about on the trade-in of the Ferrari for the Huracan?

A. You don't have to raise your voice when I ask for a second question, just repeat it, that would be awesome, yes.

Q. Well, I didn't think you heard me, I apologize.

A. I hear you fine. I just didn't digest the question. So just let me hear it, and I would appreciate it. Thank you.

Q. Okay. So -- and I apologize, because I am hearing impaired, so sometimes I speak a little more loudly than what most other people do.

Now, with that said, you -- originally the purpose of that check was so you could drive the Lamborghini off the lot that evening, correct?

A. So I could purchase a car and drive off the lot, yes.

Q. Well, your demand, as Mr. Breslin was asking about, was that you wanted the $250,000 back from Karma Palm Beach, correct?

A. I wanted $250,000 back from Karma Palm Beach.

Page 188

Q. And you sat here and heard Mr. Martin testify that the deal was that you were supposed to get your $250,000 check back that following Monday, correct?

A. The check? I'm supposed to get $250,000 back.

Q. Well, either way, you wanted your 250 that following Monday, correct?

A. Yes.

Q. Okay.

MR. MILLER: Judge, I'm getting an exhibit.

BY MR. MILLER:

Q. Did you file a police report for the bad check?

A. I went to do a police report, and the police said I didn't need to because I knew where the car was.

Q. Okay. So you attempted to file a police report on the bad check?

A. I went to the police department to write -- to report the car stolen, and to write a case for the bad check, yes, for both.

Q. So either one, you would have been happy if you got the car back or the 250?

A. Absolutely, I wasn't expecting both.

Q. Okay, and you also testified that somebody from Karma Palm Beach, in that early April date, when you

47 (Pages 185 to 188)

Page 189

said you were sitting in the car, handed you a check for $250,000, correct?

A. Yes.

Q. And Mr. Zankl told you it was a postdated check, correct?

A. Yes.

Q. And you negotiated the check, right?

A. Negotiated the check, please explain that definition from a legal term.

Q. You deposited the check, sir, is that correct?

A. I attempted to deposit the check, yes.

Q. And that -- and by the way, that check that you attempted to deposit, you deposited it into your company account, right?

A. Yes, where I took the money out, the $250,000 out.

Q. But this check that I just showed you, Exhibit 4, was a check written off your personal account, wasn't it?

A. Yes, it was.

Q. Okay.

A. Am I allowed to explain why I did that, or just answer yes?

Q. I didn't ask you a question.

Page 190

A. Fair enough. I just wanted to know if I can provide coloring or not.

Q. Have you sued Karma Palm Beach for the $250,000 check?

A. My initial injunction had both Auto Wholesale of Boca, and Karma, and the Zankls initially listed on my filing, yes, my first injunction, yes.

Q. Okay. Do you --

MR. MILLER: Actually, let me just double-check, Judge, I might be pretty quick.

I have no further questions, your Honor.

THE COURT: Any redirect?

MR. MAURO: Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. MAURO:

Q. Mr. Stephens, Mr. Breslin asked you, are you familiar with any purchase agreement that does not reflect the Ferrari being traded, and you answered no.

Are you familiar with any purchase agreement reflecting that you would pay $250,000 cash for the purchase of the Lamborghini?

A. Not a purchase agreement, no.

Q. Mr. Breslin asked you, when you wrote the check for $250,000, you didn't redo the paperwork. Was it your job to redo Karma's paperwork?

Page 191

A. No.

Q. Who was preparing the paperwork in this instance?

A. I don't know who did it in their office. I just know Jonathan presented it to me. I don't know who does their paperwork.

Q. Was Karma presenting the paperwork to you to sign?

A. Yes.

Q. Now, until Mr. Farache or AWB took the Ferrari, was it your understanding that the sale of the Ferrari was still in progress?

A. As of April 2nd it was still on consignment, I had not been paid. I'm not familiar -- I was familiar on March 29th that Mr. Coulter was interested in pursuing the car, but then, you know, they went -- you know, everything went sour two days later so it never processed.

Q. So there wasn't a problem, in other words, until Mr. Farache took the car?

A. Absolutely.

Q. And there was no reason to redo paperwork when they were still engaged in selling it?

MR. MILLER: Objection, leading.

THE COURT: Sustained.

BY MR. MAURO:

Page 192

Q. Mr. Breslin also asked you, do you ever say in the text messages I want the car back because it's on consignment, something like that. Do you recall that question?

A. May I see, am I allowed to look at what I wrote, or do I just have to recall it? I absolutely actually called out the car, consignment. It was 37 pages, a lot of things were said in that text message.

Q. Yeah, and you said it on direct, but where were you when you were texting --

A. I was --

Q. -- Mr. Zankl?

A. -- physically either in the car, or physically right next to the car with a friend in the car in front, on the dealership property.

Q. Key in the ignition?

A. Running.

Q. You were there for eight hours?

A. Roughly.

Q. Trying to leave?

A. Absolutely.

Q. With the car?

A. And not being blocked by anybody but Mr. Moshe. No one from the dealership was blocking me from taking that car.

48 (Pages 189 to 192)

Page 193

Q.   You asked, at Page 7 of the text string with Mr. Zankl, quote, can you just have the office write the landlord the check for 230,000.  That's all he wants.

A.   Yes.

Q.   Did you write that because you wanted to leave with the car?

A.   Yes, and Mr. Moshe -- I'm sorry, Moshe is the first name, but Moshe indicated that he would take that from -- he would take either a title of 230 or a money wire, whatever.  He would not take Scott's check.

Q.   You also heard Mr. Breslin ask you about a text exchange wherein you say the attorney is going to put an injunction on the car.  Do you recall?

A.   Absolutely, I think it happened two or three days later, after that Monday morning --

Q.   Okay.

A.   -- it was filed.

Q.   And by putting an injunction on the car, what were you trying to do?

A.   Just get it on hold, in a safe, controlled place because these cars, I wanted to make sure they were maintained, and let the courts figure it out.

Q.   Mr. Miller asked you about Exhibit -- I think it's FVP 4.

MR. MAURO:  If I may I approach?

Page 194

BY MR. MAURO:

Q.   Sir, do you see beneath where it says deposit checks?

A.   Bear with me one moment.

Yes, sir.

Q.   There is a checkmark?

A.   Yes.

Q.   What's it say next to that checkmark?

A.   We received your deposit.  You can print a record for your receipts -- records, and if I'm allowed to expand on this, I would love to say what that means.

Q.   Okay.

MR. MILLER:  Objection, Judge.

THE COURT:  Sustained.

UNIDENTIFIED:  How can I not tell where this check came from?

THE COURT:  Sustained, sustained.

BY MR. MAURO:

Q.   This is not from your bank.  This is from Karma's bank, correct?

A.   No, this is from my bank saying they received my deposit.  What I -- am I allowed to answer why I believe this is showing this way?

Q.   Yes.

MR. MILLER:  Judge, objection.  It's not a

Page 195

question I asked, and the reality is he has to wait for the question asked.

THE COURT:  Sustained.

You can ask him some questions.

BY MR. MAURO:

Q.   What do you believe happened in this transaction?

A.   I took $250,000 out of my payroll business account, transferred $250,000 from my personal account, and wrote the check for $250,000.

Q.   Is there any doubt in your mind that you paid Karma $250,000 on March 11th?

A.   No.

Q.   Are you aware of anybody ever, other than Mr. Miller on your cross-examination, so much as suggesting that the check was written on any other day besides March 11th?

A.   No, this deposit check I believe is when my business partner gave a copy into this proceeding, of when we had a copy, that I was proving that I paid for this check.  This is, I believe, submitted from my business partner, Scott Earnest.

MR. MAURO:  Okay.  Thank you.

THE COURT:  No.

You can step down.  Thank you.

Page 196

THE WITNESS:  I'm sorry?

THE COURT:  You can step down.  Thank you.

All right.  Where do we go next?

MR. MAURO:  Your Honor, that concludes our witnesses.

THE COURT:  All right.  Thank you.

MR. MAURO:  Thank you.

THE COURT:  Who would like -- Mr. Miller.

MR. MILLER:  I'm sorry, Judge.

THE COURT:  Oh, I apologize.

MR. MILLER:  You can speak loudly to me.

THE COURT:  All right.  It is your podium.

MR. MILLER:  Well, right now I would ask the Court to make a finding under Rule 52(c), judgment as a matter of partial findings in favor --

THE COURT:  Denied.  You can put on your case.

MR. MILLER:  I will put -- call Moshe Farache to the witness stand.

THE COURT:  Mr. Farache, good afternoon.

MR. FARACHE:  Good afternoon, your Honor.  I'm here?

THE COURT:  No, here.  Yep.  Thank you.

If you could please raise your right hand.  Do you swear under penalty of perjury that the testimony

Page 197

you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. FARACHE: Yes.

THE COURT: Thank you.

Thereupon,

MOSHE FARACHE,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MILLER:

Q. Would you state your name for the record, please?

A. Moshe Farache.

Q. Okay, and, Mr. Farache, what's your affiliation with Auto Wholesale of Boca, LLC?

A. I'm the manager member.

Q. Okay, and is this company a family business?

A. Yes.

Q. Okay. Who are the other owners?

A. My wife and my son.

Q. Okay, and, Mr. Farache, just to sort of shorten this, are you aware of the facts surrendering the Ferrari at issue in this -- in regards to the motion to compel? Are aware of the -- strike that. I'll go back. You're aware that the issue before the Court

Page 198

today is that certain Ferrari that Mr. Stephens is claiming to be the owner of?

A. Yes.

Q. Okay, and as you sit here today, who owns that Ferrari?

A. Auto Wholesale of Boca.

Q. Okay, and was that car -- do you have the -- let me just go here. Oh, this is not my exhibits.

MR. MILLER: If I may approach the witness?

THE COURT: Sure, of course.

BY MR. MILLER:

Q. Mr. Farache, I've handed you the exhibit book and register for the debtor in this hearing. You have it before you, correct?

A. Yes.

Q. Okay. Can you turn to Exhibit Number 1, please?

Do you recognize Exhibit Number 1, sir?

A. Yes.

Q. Okay. Is this a correct copy of the amended schedules filed on behalf of Auto Wholesale of Boca in the bankruptcy case?

A. Yes.

Q. Okay, and in regards to this document, will you please -- let me see if I can find the right page.

Page 199

What page is it?

THE COURT: It should be Item 47. I think it's Page 5 of the schedule itself.

MR. MILLER: Sorry, Judge, I've got to find the -- what page is this?

BY MR. MILLER:

Q. Okay. Turn to one, two, three, the fourth page, please. I'm sorry, the fifth page.

THE COURT: I think it's 47.15.

MR. MILLER: 47.15.

BY MR. MILLER:

Q. Do you see the item listed, Number 47.15?

A. Yes, sir.

Q. Is this the Ferrari that Mr. Stephens is claiming to be the owner of?

A. Yes.

Q. Okay, and you have filed this document under penalty of perjury with the court?

A. Yes.

Q. And you swear that this car is owned by Auto Wholesale of Boca, LLC?

A. Yes.

MR. MILLER: Okay, and, Judge, I'll move Exhibit 1A, Debtor's Exhibit 1A into evidence. That's 207-1.

Page 200

THE COURT: Any objections?

(No verbal response.)

THE COURT: Debtor's Exhibit 1 is admitted.

(Thereupon, Debtor's Exhibit 1A was admitted into evidence.)

MR. MILLER: Thank you.

BY MR. MILLER:

Q. And will you look now at Exhibit Number 2A, please? Turn to the tab that says 2.

Do you recognize this document, sir?

A. 207-2?

Q. No, no, just turn to Tab 2. Turn to Tab 2, and there is a document in front of you?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. Okay. Is this a true and correct copy of both pages of the original certificate of title for the Ferrari at issue in this hearing?

A. Yes.

Q. Okay, and do you -- do you know who Alana Bailey is?

A. Yes.

Q. Who is she?

A. She's an Excell, Palm Beach, Broward,

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 201

basically the title, in-house title agent.

Q. Okay, and do you recognize her signature if you see it?

A. Yes.

Q. Is that her signature on the first page?

A. Alana Bailey, yes, yes.

Q. Okay, and on the second page, do you recognize Alana Bailey's signature there?

A. No.

Q. On the middle, sir.

A. Oh, on the bottom, yes.

Q. Okay, and there is a Michelle Martin that signed there. Who is Michelle Martin?

A. She's my bookkeeper/manager of Auto Wholesale.

Q. Okay, and why would she sign the second page of that document?

A. Because they transfer the title to Auto Wholesale of Boca.

Q. Okay, and when this title was signed over to Auto Wholesale of Boca, what's the date, April 2nd, 2022?

A. Yes.

Q. Okay, and it was -- at that time was it represented to you that Karma Palm Beach had good title and it could transfer this to Auto Wholesale?

Page 202

A. Yes.

Q. Okay, and then on the next, Exhibit 3, turn the tab, and do you recognize this document?

A. Yes.

Q. What is this document?

A. It's basically bill of sale.

Q. From whom to who?

A. From Karma Palm Beach to Auto Wholesale of Boca.

Q. Okay, and did Alana Bailey sign this document on behalf of Karma Palm Beach?

A. Yes.

Q. And did Michelle Martin sign it accepting it as the buyer?

A. Yes.

Q. Okay, and this was a transfer document for the Ferrari that's at issue today?

A. Yes.

Q. Okay, and then the next document, Exhibit 4. Do you recognize Exhibit 4?

A. Yes.

Q. Okay. What is this document?

A. Basically Auto Wholesale of Boca transferred the title to get a clean title from the Motor Vehicle.

Q. So the automobile is titled in the name of

Page 203

Auto Wholesale of Boca, LLC?

A. Yes.

Q. Okay, and does Auto Wholesale of Boca, LLC have possession of this vehicle?

A. Yes.

Q. Is it in storage?

A. Yes.

Q. Okay, and has it been paying to maintain the property at the storage facility?

A. Yes.

Q. Okay, and so these records show that Auto Wholesale, to the best of your knowledge, is the owner, record title owner of this automobile, correct?

A. Yes.

Q. Okay, and will you look at Exhibit 6, please? Do you recognize what Exhibit 6 is?

A. Ah --

Q. Do you recognize this form, sir?

A. Yes.

Q. What is this form, do you know?

A. I think that's the form my -- we using to get the title.

Q. Is this a power of attorney that's signed by Alana Bailey?

A. Yes.

Page 204

Q. Okay, and you seem to be a little struggling with reading this. Can you -- do you read English fluently, or does it take you time?

A. I'm not -- I don't graduate from even middle school.

Q. What is your primary language?

A. Hebrew.

Q. Okay, and that's what you're fluent in?

A. Yes.

MR. MILLER: Okay. Judge, I think all of the debtor's exhibits are in evidence, 1 through 7.

THE COURT: I don't know the answer to that. Mr. Huss, do you know?

THE CLERK: (Inaudible.)

THE COURT: Are any of them marked admitted at this point?

THE CLERK: (Inaudible.)

MR. MILLER: I'll move all of the exhibits, 1 through 7A into evidence, Judge, the debtor's exhibits, that's 207-1 to 207 --

THE COURT: I got it. Any objections?

MR. MAURO: Your Honor, can I have a moment?

THE COURT: Sure.

MR. MAURO: We've been keeping a pretty

Page 205

accurate list.

THE COURT: Good.

MR. MAURO: And there are several that I don't see.

THE COURT: What do you have admitted so far? We can go back.

MR. MAURO: First the debtor's documents, 2A, 6A, 7A, 3A, and 5A.

THE COURT: That leaves 4 and 1.

MR. MAURO: And 1, I think, just came in, correct? And 1 as well.

THE COURT: Okay. So that leaves only 4.

MR. MAURO: I just want to look at 4, your Honor.

THE COURT: 4 is the more recent certificate of title.

MR. MAURO: Okay. No objection from us, your Honor.

THE COURT: Okay. Debtor's 4 is admitted.

(Thereupon, Debtor's Exhibit 4A was admitted into evidence.)

THE COURT: So, that seems to be that all of them now are admitted.

MR. MILLER: So they're all in, Judge?

THE COURT: Yes.

Page 206

MR. MILLER: Okay.

BY MR. MILLER:

Q. Mr. Farache, in regards to this Ferrari that Auto Wholesale of Boca has in its possession, did you threaten or strong-arm anybody to get this car?

A. No.

Q. And have you always gotten along with Alana Bailey?

A. Until today, yes.

Q. All of the employees of Excell and Karma Palm Beach and Karma Broward?

A. Yes, very good relationship.

Q. Okay. Had any of them ever called 911 against you or your family?

A. Never.

MR. MILLER: Okay. I don't think I have any further questions, Judge, of this witness.

THE COURT: Well, thank you.

Gentlemen.

CROSS-EXAMINATION

BY MR. MAURO:

Q. Good afternoon, Mr. Farache. Mr. Farache or Mr. Farache?

A. I'm good.

Q. All right.

Page 207

A. Good afternoon.

Q. Good afternoon.

You weren't present on March 11th when Mr. Stephens and Karma entered into agreements, were you?

A. No.

Q. You have no knowledge whatsoever of anything that happened that day, other than what you've seen in this case?

A. Nope.

Q. Okay. You agree with me?

A. Yes.

Q. Yes, and you agree that if the Ferrari was not actually purchased by Karma, then FVP wouldn't have any entitlement to it, do you agree with that?

MR. MILLER: Objection, calls for a legal conclusion.

THE COURT: Could you repeat the question because --

MR. MAURO: Sure.

THE COURT: -- frankly, I didn't hear it.

BY MR. MAURO:

Q. Yes.

You'd agree that if the Ferrari wasn't actually acquired by Karma, then it wouldn't be part of their inventory, do you agree with that?

Page 208

THE COURT: And do you still have an objection?

MR. MILLER: I think it calls for a legal conclusion.

THE COURT: Interesting. Overruled.

Go ahead.

THE WITNESS: Can you repeat the question?

BY MR. MAURO:

Q. I'm happy to do so.

Do you agree that if the Ferrari was not actually purchased, or acquired by trade by Karma, then it would not be part of Karma's inventory?

MR. MILLER: Objection, Judge, calls for facts -- calling for speculation, and facts outside the testimony given at the hearing today.

THE COURT: Didn't he just testify as --

MR. MILLER: He would not be able to testify as to that.

THE COURT: Then how did he sign the schedules?

MR. MILLER: No, he's saying Karma. It would be --

THE COURT: Oh, I see.

MR. MILLER: Counsel is asking -- this is Auto Wholesale.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 209

THE COURT: Yes, I do get that.

MR. MILLER: He's asking about Karma Palm Beach. How would my client know about Karma Palm Beach records.

THE COURT: Can you restate the question again?

MR. MAURO: Yes.

BY MR. MAURO:

Q. Is it the basis of your claim that AWB is entitled to the Ferrari based on your claim that the Ferrari was acquired by Karma?

A. I have a bill of sale, I have a title and possession of the vehicle.

Q. From Karma?

A. Whatever the bill of sale say.

Q. Do you know what the bill of sale says?

A. Yeah.

Q. What's it say?

A. Let me look at exhibit.

Q. Sure.

A. Karma Palm Beach to Auto Wholesale of Boca.

Q. Okay. Back to my question. Do you agree that if the Ferrari was not actually purchased or acquired by Karma, then you would have no entitlement to it?

A. I don't understand your question.

Page 210

Q. You don't?

A. No.

Q. Okay. If Karma doesn't own the Ferrari when you purportedly acquired it from Karma, would you agree that that would be impossible for you to acquire a vehicle from Karma that it doesn't own?

A. I don't understand.

MR. MILLER: Calls for speculation.

THE COURT: Overruled.

BY MR. MAURO:

Q. Do you not have an understanding as to how to answer that question?

A. Just ask me. You know, you confuse it, and I don't understand.

Q. You find my question confusing?

A. A little bit.

Q. Okay. Can you buy something from somebody that they don't own?

A. That's why you have the Motor Vehicle, and when we submit the title, and we get new title, it means we own the vehicle.

Q. So can you buy something from somebody that they don't own?

A. I don't know about it.

Q. Okay. Why don't we take a look at Debtor's

Page 211

Number 3? Do you have that document in front of you?

A. Yes.

Q. Okay. When you look at Debtor's 3, what does it say was the price of the Ferrari?

A. $230,000.

Q. Who paid that?

A. That's -- we not pay for it, because that's -- we have agreement, that's antecedent debt from Karma.

Q. It says that $230,000 was paid for the Ferrari, doesn't it?

A. Yes, sir.

Q. And this was -- who signed this on behalf of AWB?

A. Michelle Martin.

Q. So this document inaccurately reflects that $230,000 was actually paid for the Ferrari, correct?

A. Can you repeat it?

Q. Yes.

This document, Debtor's 3, inaccurately shows that $230,000 was paid for the Ferrari, correct?

A. We don't pay for this. It's antecedent debt or swap against something else.

Q. You agree that $230,000 was not paid for the Ferrari, don't you?

A. Yes.

Page 212

Q. Did you hear the testimony Mr. Stephens gave about coming to Karma and starting the Ferrari, and trying to leave, did you hear that?

A. Yes.

Q. Did you observe that happen?

A. I'm there, yes.

Q. Did you block him in?

A. Yes.

MR. MAURO: No more questions. Thank you.

THE COURT: Mr. Breslin?

CROSS-EXAMINATION

BY MR. BRESLIN:

Q. Mr. Farache, is it your testimony that Auto Wholesale of Boca purchased the Ferrari?

A. We have purchase agreement, antecedent debt for this particular vehicle.

Q. Well, I understand there is a purchase agreement, but did Auto Wholesale of Boca ever pay any money for the vehicle?

A. For this particular vehicle, no.

Q. Okay. So there is a purchase agreement. What date -- what is the date of the purchase agreement?

A. April 2nd.

Q. All right. Tell the Judge how it happened that on April 2nd that document was created and signed.

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 213

THE WITNESS: Do you want me to --

THE COURT: Yes, you can speak to me if you want. You can speak to him. You don't have to talk to him. Go ahead.

THE WITNESS: Okay. So, basically we have agreement from the day before April 1st, Mrs. Zankl come to me and she say to me, Mr. Farache, you have been nothing good for my family for the last 10 years, and I don't want you to get hurt by my husband, crying, what he does to you guys. I want you to have all the vehicle equal to your debt. So this way, by the time we done, you always secure, and she say to me, be here tomorrow by 1:30, she asked me for Wednesday to start moving my vehicle.

Friday night she give me authorization to move the vehicle because it's another -- and then she said tomorrow 1 o'clock we be here, I going to give you them to you, all the title we have claim for the vehicle, and she said Monday morning the guys going to pull the car out for you, and Monday morning I come, I never drove those cars, I don't know how to drive them, and you never no see me drive in a sport car probably.

So I come, by her authorization, she pull the cars out, they wait for me in the morning, I come back. I say, you know, I've got to move them to my

Page 214

storage. So I wait until somebody is qualified to move them.

Meantime Jon come to me and he says move it as fast as you can, the guy thinks he owns it, he's going to be here, and I just block it until the police come, and basically say to me, based on your paperwork, you're the owner of the vehicle. If you want me to arrest Mr. Stephens, I can arrest him. I say, oh, no, let him sit in the car until whatever him and Mr. Zankl do, I don't want anybody to get hurt. Whatever he does with Mr. Zankl, the cop gave me authorization to pull the vehicle later on in the day. Around 12 or 1 o'clock we pulled the vehicle out.

BY MR. BRESLIN:

Q. All right. Mr. Farache, we were talking about the Ferrari. How did it come to pass that the car was purchased by AWB?

A. It's antecedent debt, a lot of cars been purchased by AWB, and we no receive it. So that's their decision.

Q. I'm sorry, I didn't understand what you just said?

A. That's their decision.

Q. Whose decision?

A. Karma of Palm Beach.

Page 215

Q. All right. So you're saying that Karma Palm Beach entered into a purchase agreement with your company, Auto Wholesale of Boca, regarding this car, correct?

A. Yes.

Q. And on the purchase agreement it says that $230,000 was paid for this car, correct?

A. But you don't see the other paper.

Q. Well, let's talk about the purchase agreement. Doesn't the purchase agreement say that $230,000 was paid for this car?

A. Yes.

Q. All right. Was $230,000 paid for this car?

A. Not from Auto Wholesale of Boca.

Q. Okay. So, in fact, Auto Wholesale of Boca never paid any money for this car, correct?

A. And this point now, no.

Q. Okay. Now explain to the Judge how it is that on April 1st you took every car on the Karma lot.

A. I no took every car. This car, I took it Monday morning.

Q. Okay. Do you think that's funny?

A. No.

Q. Well, then why are you laughing?

A. I don't laugh.

Q. Okay. All right.

Page 216

THE COURT: Hold on. What was the date of Monday morning?

THE WITNESS: April 4th.

THE COURT: April 4th.

BY MR. BRESLIN:

Q. Okay. Now there came a time, sir, when you went to the auto -- the Karma Palm Beach lot and removed all of the cars, correct?

A. Yes.

Q. Okay. Why did you go and remove all the cars?

A. Because I got authorization by Mrs. Zankl to move all the vehicle that belonged to Auto Wholesale of Boca.

Q. All right. Now, isn't it true that you removed all the cars on the lot?

A. No.

Q. How many cars did you leave there?

A. Whatever I no have the paperwork.

Q. How many cars did you take?

A. I don't remember.

Q. Do you recall your attorney, Mr. Brandis (phonetic) telling you that the Feds were going to raid Karma Palm Beach?

A. Yes.

54 (Pages 213 to 216)

Page 217

Q. Okay. When did Mr. Brandis tell you that the Feds were going to raid Karma Palm Beach?
A. Friday.
Q. All right. So, Friday, April 1st?
A. Yes.
Q. All right. So on Friday April 1st you had a conversation with Mr. Brandis, and he said that the Feds were going to raid the place, is that correct?
A. I don't remember exactly, but obviously, yes, that's why we hire a security, not to let anybody take any vehicle until we have a meeting with Mr. -- Mrs. Zankl.
Q. Okay, but I'm talking about Mr. Brandis telling you that the Feds were going to raid the place, that's what caused you to go grab as many cars as you could, correct?
A. No.
Q. No?
A. I just took them that belonged to Auto Wholesale.
Q. All right. How many cars belonged to Auto Wholesale on April 1st?
A. I don't have the list in front of me.
Q. Okay. So your testimony is that the only cars you took were the ones that were owned by Auto

Page 218

Wholesale of Boca, correct?
A. Based on my knowledge on Friday night, yes.
Q. Okay. So on April 1st, 2022, you took cars, multiple cars from the lots of Karma Palm Beach and Karma Broward, that your testimony today is that your company owned, correct?
A. Yes.
Q. Okay. Now, so what you're saying is for every car that you took, you had paperwork to show that title was owned -- title was in Auto Wholesale of Boca, correct?
A. Based on my knowledge, but I've got to look on every piece of paper and I can tell you yes or no.
Q. Okay. Now, I show you what's been marked as -- this would be Mr. Stephens' exhibit, it's Document 206, number 11. I'd like you to take a look at that document.
THE COURT: Is that Exhibit 10, gentlemen, Stephens' 10?
MR. BRESLIN: It's 206.
UNIDENTIFIED: 11.
THE COURT: It's 11.
MR. BRESLIN: 11, and it purports to be a letter on Karma letterhead.
BY MR. BRESLIN:
Q. Do you see that document, sir?

Page 219

A. Yes.
Q. All right. Now that is a document that was typed on -- it's dated 4 -- April 1st, 2022, correct?
A. Yes.
Q. Have you seen this document before?
A. I saw the paper. I have another document.
Q. When is the first time you've seen this document?
A. I think on April 1st or 2nd, one of these days.
Q. Okay. Is that your signature on there?
A. No.
Q. It's not?
A. Nope.
Q. Do you know how the name Moshe Farache got on this document?
A. I don't know.
Q. Okay. Do you have a copy of this document in your records?
A. Yes.
Q. And does it have your signature on it?
A. It's not my signature.
Q. All right, but do you have a document with your signature on it?
A. No.

Page 220

Q. Okay. So, you're saying that this document here, that purports to have some type of signature, was not signed by you?
A. Nope.
Q. Okay. So, you did not see this document on April 1st, 2022, correct?
A. I saw this document.
Q. On that date, April 1st?
A. I think on April 2nd.
Q. Okay, and how did you see this document?
A. I think Mrs. Zankl hand them to me.
Q. She handed it to you?
A. Yes.
Q. Okay. So who created this document?
A. Mrs. Zankl.
Q. Okay. Who was it that listed all these cars in this document?
A. Mrs. Zankl.
Q. Okay. So you're saying that it was Mrs. Zankl that had this document created, and that it was she that typed these nine vehicles on the document and signed it at the bottom?
A. Yes.
Q. All right. So the nine vehicles that are on this document, she chose to put those vehicles on there,

55 (Pages 217 to 220)

Page 221

correct?

A. Yes.

Q. Okay, and it says at the -- is it a true -- is this an accurate statement, that the following vehicle titles are being given to Auto Wholesale of Boca as collateral against a loan amount, is that a true statement?

A. I mean, it's identifying the debt, what they have to Auto Wholesale, they send 4-31 -- 3-31 meeting.

Q. Okay, but my point is, this is a document that says car titles are being given to you as collateral against a debt. So, is that a true statement that's in this letter?

A. When you say "collateral", it's not collateral, it's antecedent debt, because he got paid for vehicle and he never not pay us.

Q. Okay.

A. So he give to us this vehicle instead of -- to cover the debt.

Q. Okay. I'm just reading it, okay? Let me read it again. You can look at it yourself, and what it says is, the following vehicle titles are being given to Auto Wholesale of Boca, LLC as collateral against the loan amount. Do you see where it says that? Do you see that?

A. Yes.

Page 222

Q. Okay. Now, is that an accurate statement?

A. That's what she write.

Q. Okay. Well, were you given vehicle titles when you received this letter?

A. I no receive this letter.

Q. Okay. You never got this letter?

A. I got it after the fact. I think by Monday or Tuesday I receive.

Q. How did you get the letter?

A. From Alana Bailey.

Q. All right. So you never were handed this document, this letter by Kristen Zankl?

A. I received it by Saturday, and I say to her I can't do anything until I go back to my office and look at my paperwork.

Q. Okay. So, what you're saying is, is that Kristen Zankl never signed this document, or handed you this document?

A. She signed the document, she give it to me, and I said to her, Kristen, you've got to give me a day or two to make sure I go to my office, the same like I tell everybody, got to make sure everything is right, ad then I coming back. I no sign any paper.

Q. All right. Okay. So I must have misunderstood you. So you're saying that she did, in

Page 223

fact, hand you this document?

A. She given to me the document --

Q. Okay.

A. -- and I say to her, the only thing I can tell you, you can email to us all the information, let Michelle go through the whole paperwork, and before we do anything, we want to make sure it's healthy.

Q. Okay. So was this letter given to you with the titles to the automobiles that are listed in this document?

A. I don't think so.

Q. Okay. Did you get the titles -- how did you come in -- how did you take possession of the titles to the cars that are listed in this document?

A. They make with us appointment, and Saturday, 1 o'clock, we come 1 o'clock, and basically they have their team, they just give them to us to make sure all the paperwork, Mrs. Zankl is there, she said, yes, yes, give him, give him, give him, and she basically, through the whole week, she give authorization to make sure we get all of our vehicles.

Q. Okay. So it was Kristen Zankl that gave you the titles to these cars?

A. Yes.

Q. Okay, and one of the titles that she gave

Page 224

you was the Ferrari that we have been --

A. Yes.

Q. -- talking about today, correct?

A. Yes.

Q. All right. So when you took that -- when you got that title to that Ferrari, that was on April 1st?

A. 2nd.

Q. 2nd.

Now after you got that title, that would be the same day that you got this letter, right?

A. I don't got it. She show me the letter, and I said to her, before you do anything, let me make sure everything is right.

Q. Okay, and so -- but did you take a copy of the letter with you?

A. I don't remember --

Q. Okay.

A. -- if it's Saturday, or I took it Monday or Tuesday.

Q. All right. So, but if you look at this letter, it certainly seems to indicate that she's giving you titles for you to hold as collateral against a loan, correct?

A. Say it again, I'm sorry.

Q. If you look at what it says in this letter,

56 (Pages 221 to 224)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 225

it appears that she's handing you a letter, or delivering a letter to you, and with that letter are titles to automobiles, correct?

MR. MILLER: Objection, the document speaks for itself, and it's hearsay.

THE COURT: Hold on. So your objection is what?

MR. MILLER: It speaks --

THE COURT: He's asking a question about whether titles were delivered, that was the question, no?

MR. MILLER: Mr. Breslin is reading from the letter, asking -- basically asking the witness if he agrees with the facts of the letter, trying to get information into evidence that he can't --

THE COURT: It's only the sixth time he's asked the same question.

Where are you headed with this?

MR. BRESLIN: I'm sorry, Judge?

THE COURT: Where are you headed? You've asked him over and over again when he got the titles, whether he got the titles. I'm also curious why I'm hearing about a lot of other cars that are actually not at issue today.

So we have a Ferrari, and the title was apparently delivered, and they actually have it. So --

Page 226

MR. BRESLIN: Okay. Let's go from there.

BY MR. BRESLIN:

Q.   All right. So you got this title on April 2nd, correct?

A.   Yes, sir.

Q.   And the purchase paperwork, when was that dated?

A.   April -- let me look, one second. You're talking about the bill of sale, correct?

Q.   Yes.

A.   That date, April 2nd.

Q.   Okay. So, you were handed the title on April 2nd to the Ferrari, and then a bill of sale was created, correct?

A.   Yes.

Q.   Who created the bill of sale?

A.   Alana Bailey.

Q.   Okay, and so the bill of sale -- and we already indicated that there was no money exchanged for this particular vehicle, correct?

A.   Yes.

Q.   All right. Now, tell me -- you failed to tell me exactly what Mr. Brandis said to you about the Feds coming to raid Karma Palm Beach.

MR. MILLER: I'm going to object, Judge.

Page 227

This is getting into attorney/client privilege. I believe Mr. Brandis was counsel to Auto Wholesale of Boca.

MR. BRESLIN: He already testified to it, he opened the door to the extent that there was a privilege.

THE COURT: He did, and there was no objection. Overruled.

BY MR. BRESLIN:

Q.   Tell me what Mr. Brandis said exactly regarding the Feds coming to raid the place?

A.   Based on my knowledge, he say, you know, I just want to let you know, it's supposed to happen tonight, the Feds supposed to come and pick up Mr. Zankl and Mrs. Zankl. I say to him, what do you think I should do? I hire security, and I say make sure none -- I explained that to Mrs. Zankl, and she say I'm glad you're doing it. I hire a security to protect the vehicle.

Q.   Did Mr. Brandis tell you to go collect as many cars as you could?

A.   I show up in the dealership, and basically mutual agreement between Mrs. Zankl and Mr. Zankl, they give me authorization, and the key to all the vehicle to take them out.

Q.   All right. Now you understood, sir, that when you did that, you shut down the business --

A.   No --

Page 228

Q.   -- correct?

A.   -- the business, it's been shut down, that's what she explained to me.

Q.   The business had already been shut down?

A.   She explained to me, if you don't take your vehicle, they're not going to be here.

Q.   All right. So you're saying that Ms. Kristen Zankl said to you that if you don't take the vehicles, they're not going to be here?

A.   You can't sell a vehicle after three people, to the number four person, and you see in this case many vehicle been -- she show me, it's been disaster in the dealership, and that's the reason she want me to move the vehicle.

Q.   All right. So your testimony is that Kristen Zankl wanted you to remove the vehicles that you removed?

A.   Yes.

Q.   All right. Is it your testimony, sir, that every vehicle that you removed was because Kristen Zankl asked you to remove those vehicles?

A.   That belong to Auto Wholesale.

Q.   All right. I understand your position on that, but I'm trying to find out what Kristen Zankl said to you regarding that.

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 229

A.   Basically to, if you look in her email, she wants me to move my vehicle.

MR. BRESLIN:  Okay.  Just one moment, please.

I have no further questions at this time, Judge.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. MILLER:

Q.   Mr. Farache, I'm sorry, I apologize, I don't have the best of hearing.  Were you saying the words "antecedent debt", is that what you were saying?

A.   Yes.

Q.   Okay.  So are you saying that the $230,000 price identified on the bill of sale was to serve as a credit towards a debt owed by Karma Palm Beach to Auto Wholesale of Boca?

A.   Yes.

Q.   Okay.  As a matter of fact, would you take a look at -- it's premarked as Stephens' 16.

MR. MILLER:  Judge, it's Court Paper 206-16.

BY MR. MILLER:

Q.   Sir, I've handed you what's been premarked by Mr. Stephens as Exhibit 16 for Mr. Stephens.  This is a copy of a document entitled unconditional guarantee.

Page 230

Is this document evidencing debt that's owed by Karma Palm Beach to Auto Wholesale of Boca, LLC?

A.   Yes.

Q.   And when you say it was -- you were paying, you were getting paid on an antecedent debt, is that what you were referring to, crediting that note --

A.   Yes.

Q.   -- or that debt?

Okay, and you also said something about swaps, what is a swap?

A.   What's happen in the industry, Mr. Zankl sold the vehicle, and it's belonging to AWB, and the vehicle basically has debt.  By the time he send the title and the payoff to the bank or the financial, sometimes it takes 30 days and we hold the title.  So what's happen is they say to us, okay, I just took this one as a trade, hold this title, and I give you the difference in check or another title equal to the amount.  So, then we swap the car.  It's basically a way of sales.

Q.   So, in other words, it's just payment of a debt that was owed?

A.   Yes.

MR. MILLER:  Okay.  Judge, I move Stephens' 16 into evidence.

THE COURT:  Any objection?

Page 231

(No verbal response.)

THE COURT:  No?

MR. MAURO:  No objection here.

THE COURT:  Stephens' 16 is admitted.

(Thereupon, Stephen's Exhibit 16 was admitted into evidence.)

BY MR. MILLER:

Q.   Mr. Breslin said that you had taken possession of all the vehicles that day, that weekend of April 1st.  Is that true, sir?

A.   Say it again, I'm sorry.

Q.   Mr. Breslin was examining you, and said you had taken possession of all the vehicles at the premises on that day in April?

A.   It's not true.

Q.   Okay.  As a matter of fact, you left numerous cars at the premises, correct?

A.   Yes, because I don't have the title.  Whatever is belong to Auto Wholesale, I took it.

Q.   Okay, but anything that didn't, you didn't take?

A.   No.

Q.   And if Mrs. Zankl or Mr. Zankl said don't take it, you didn't take it?

A.   I no took it.

Page 232

MR. MILLER:  Okay.  Nothing further, your Honor.

THE COURT:  All right.  Thank you.

Thank you, Mr. Farache.

MR. FARACHE:  Thank you.

THE COURT:  All right.  Let's take a five-minute break.  Court is in recess.

(Thereupon, a recess was had, after which the following proceedings were had:)

THE COURT:  All right.  Where to next, gentlemen?

MR. BRESLIN:  Your Honor, I --

MR. MILLER:  Your Honor, Mr. Breslin is going to call Scott Zankl as a witness.

THE COURT:  Very good.

Mr. Breslin.

MR. BRESLIN:  Let me just get him.

THE COURT:  Please.

Mr. Zankl, if you could please find your way to the witness box?  If you could raise your right hand?

Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. ZANKL:  I do.

THE COURT:  Please have a seat.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 233

Thereupon,

SCOTT ZANKL,

having been first duly sworn, was examined and testified as follows:

MR. BRESLIN: And before I begin, I understand I failed to move an exhibit in, Exhibit 204-5. I'd like to move that in at this time.

THE COURT: Okay. Let me have a look at that.

MR. BRESLIN: That's the trade, the Florida trade packs.

THE COURT: That's marked as Exhibit 5, correct, for FVP?

MR. BRESLIN: Yes.

THE COURT: All right. Any objection to Exhibit FVP 5?

MR. MILLER: No objection, your Honor.

THE COURT: It is admitted.

(Thereupon, FVP Exhibit 5 was admitted into evidence.)

THE COURT: All right.

DIRECT EXAMINATION

BY MR. BRESLIN:

Q.   Sir, please state your name.

A.   Scott Zankl.

Page 234

Q.   Mr. Zankl, how are you employed?

A.   Currently, I'm not employed.

Q.   Okay, and previously?

A.   I had Excell Auto Group -- I had two different, three different stores, Excell Auto Group and Karma Palm Beach and Karma Broward.

Q.   Okay, and we're here, Mr. Zankl, to talk about a Ferrari, a vehicle that a transaction was done with Mr. Derek Stephens. Are you familiar with that vehicle?

A.   Yes.

Q.   All right. Explain to the Court how you first became involved and became aware of the Stephens' Ferrari transaction.

A.   Well, actually I was out of town at the time, and my salesman, Jonathan, had called me, and he was on a -- it was on a Friday, and said that he had a deal that Mr. Stephens wanted to do, he wanted to buy a Lamborghini that was at the store, and at that time Jonathan, my salesman, had his Ferrari sold to another customer, and I believe, in fact, Jonathan already him pre-approved at the bank, and had the deal structured and done.

And Jonathan called me and said, you know, Mr. Stephens wants to buy the Lamborghini and take it home

Page 235

that afternoon, and I told Jonathan we couldn't do it because the Ferrari deal wasn't done yet, and then Mr. Stephens got on the phone and said, well, I want to take the car home. He got on the phone, and I talked to Mr. Stephens, and he said he wanted to take the car home, and I told Mr. Stephens we had two options, one is he can wait until the Ferrari is sold, Jonathan has a deal on it, or he can just buy the Lamborghini and write a check for it.

So he opted to write a check for the car, he didn't want to wait, and then he did all the documents and paperwork and he traded that Ferrari in.

Q.   All right. Now, let's talk about Jonathan for a moment. He's a salesperson, or was a salesperson at Karma Palm Beach?

A.   Yes.

Q.   All right. Now, were you aware of the fact that Mr. Stephens had left that Ferrari with the Karma Palm Beach store previously in an effort to sell it?

A.   No. The car did arrive before the 11th, I don't remember exactly the date. It was there, I think, a couple of weeks prior to the 11th, but Mr. Stephens was a great customer, and he would -- the car would be there all the time, we'd service it, oil change it. If he left town, periodically we'd, like a lot of our clients, would

Page 236

allow them to bring the car over, and we'd put them on a battery charger so the batteries wouldn't die. So that was normal.

Q.   All right. Now, did Jonathan Martin have authority to execute a consignment agreement?

A.   No, he'd have to get it approved by myself, or Teddi, or Nidia.

Q.   Okay. Now, were you aware that the Ferrari, at any time prior to March of 2022, was on the lot of Karma of Palm Beach, advertised for sale by Karma of Palm Beach, on a consignment prior to March of 2022?

A.   No, because we'd have to have that consignment agreement signed and executed.

Q.   Okay. So you don't take a car on the lot and advertise it for sale unless there is written documentation to that effect, correct?

A.   Correct, the insurance company requires it.

Q.   All right. So let's talk about this transaction.

So when you first heard about this transaction, it was already papered, and there was a -- the Ferrari was being traded for the Lamborghini, correct?

A.   Yes.

Q.   And what's the difference between a trade-in and a consignment?

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 237

A.   Well, a trade-in is, the difference is, is that the dealership is putting a number on it, and then at that point in time when the paperwork is executed, the dealership takes ownership and it's their property, it becomes their inventory.

Q.   All right.  So, you've had a chance to take a look at the paperwork that was generated for the Ferrari/Lamborghini transaction, correct?

A.   Yes.

Q.   And all of the paperwork reflects the same thing, and that is that the Ferrari was traded for the Lamborghini, correct?

A.   Yes, because it also showed a tax credit as well.

Q.   All right.  So, now, the difference being that if Mr. Stephens just walked in the door and wanted to buy the Lamborghini, the Lamborghini is $250,000, if he was going to buy it.  It would be $250,000 plus tax, correct?

A.   Correct, yes.

Q.   All right, but, in fact, for this transaction, Mr. Stephens wanted to trade in the Ferrari, get the tax credit for that, and then he would only have to pay the tax on the difference, correct?

A.   Yes, that's correct.

Page 238

Q.   All right.  Now, if you look at the paperwork, and I know you're familiar with it, the trade price for the Ferrari was $230,000.

A.   Yes.

Q.   All right, what's important about that?  Why did you require that he put up some money if he wanted to take the Lambo off the lot?

A.   Well, the 230 is what was contracted.  So that was my obligation.  I didn't have any wiggle room once we signed the paperwork, I had to give him 230, that's one of the differences between that and the consignment.  A consignment is, whatever it sells for, it sells for, but that I was locked in at 230.

Q.   All right.  So, now, you testified that you had a conversation with Mr. Stephens, and he wanted to leave with the car that day.

A.   Yes.

Q.   Now, is that the only reason that he had to put up any money, is because he wanted to leave that day with the car?

A.   That's correct, yeah, because I told him he can either wait until Jonathan's deal closes, because he had a deal that he had papered up, that was supposed to close the following week.  I said, you've got an option to wait until that closes, or if you're going to take the car

Page 239

home tonight, you've got to pay for the car.

Q.   Okay.  So, if he elected to just wait until the following week, and not write a check, then he would have waited, and it would have been determined next week whether or not the Ferrari sold, correct?

A.   Correct.

Q.   And then he could have decided whether or not he wanted to do the deal, correct?

A.   Correct.

Q.   All right.  Now, the $230,000 for the Ferrari, did you believe that that was -- well, let me rephrase.  Was that a price that you, as a dealership, were willing to pay for that Ferrari?

A.   No.  In fact, that's one of the things I had talked to Mr. Stephens and Jonathan on the phone about, that I didn't want to do the deal at that number because once I signed the -- once the bill of sale was executed, and the documents were executed, I was stuck at 230, and I expressed myself that I didn't want to do the deal at 230, but Jonathan, a good salesman, sold me that he had the car sold, he had it being delivered the following week, he had the gentleman approved at the bank, and the paperwork was being FedExed to him.

So, and Mr. Stephens is a great customer, and listened to Jon, my sales guy, and I said, okay, well,

Page 240

if you have it sold for sure, do the deal, but I didn't want to do it because I knew I'd be stuck at 230 if something happened, which it did.

Q.   Okay, and that was even with taking the check for 250, correct?

A.   Yes.

Q.   All right, because even by taking the check for 250, you still were obligated to pay him 230 --

A.   Yes, correct.

Q.   -- pursuant to the contract you had with him?

A.   Yes.

Q.   All right.  Now, did you have any conversations with Mr. Stephens about consignment?

A.   No.  Just that one conversation we had on the phone that Friday, was I told him he's got two options, wait until the following week or, you know, take the car today, but you had to write a check for it.

Q.   All right, and so you told him straight up, if he wanted to leave with the Lamborghini, he had to write you a check for $250,000?

A.   Yes, correct.

Q.   And so the business deal that you made with him was that he would give you a check for $250,000, he would pay the difference on the contract for purchase,

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 241

which is 22,000, either he or his bank, and then when the Lam -- when the Ferrari sold, he would get the whole 250 back, correct?

MR. MAURO: Objection, leading.

THE COURT: Sustained.

THE WITNESS: Yes, that's correct.

BY MR. BRESLIN:

Q. Tell the Judge what the business deal was --

THE COURT: No, you're not supposed to answer.

Go ahead. I sustained the objection.

MR. BRESLIN: I understand.

THE COURT: Yes.

BY MR. BRESLIN:

Q. Please explain to the Judge exactly what the business transaction, the deal was between you and Mr. Stephens, and the 250?

A. Well, the price of the car was 250, and I had told Mr. Stephens if he wanted to leave that afternoon with the car -- because he had an event that weekend he wanted to drive it to -- he had to write a check for the car, which was the 250, and then he had to also send the money for the difference in the sales tax, and registration, and fees, which he did. I believe he did it a few days after the 11th, and then once the Ferrari was

Page 242

finalized, we were supposed to finalize the following week, Jonathan told me, that I would be cutting Mr. Stephens back his check for the 250. That was what we agreed on.

Q. All right. So at the conclusion of that deal on Friday, the sum -- the end result was, is that the Ferrari was taken into inventory of Karma, correct?

A. Yes.

Q. It was a trade?

A. Yes.

Q. Title was transferred to Karma?

A. Yes.

Q. That day --

MR. MAURO: Objection, leading.

THE COURT: Stop.

Yes, sustained.

MR. BRESLIN: All right.

BY MR. BRESLIN:

Q. Was title transferred to Karma?

A. Yes.

Q. All right. Was the car taken into inventory?

MR. MAURO: Objection, leading.

THE COURT: Sustained.

BY MR. BRESLIN:

Page 243

Q. Did there come a time when the Ferrari came into the inventory of Karma Palm Beach?

MR. MAURO: Objection, leading.

THE COURT: Sustained.

BY MR. BRESLIN:

Q. All right. What happened with the Ferrari?

A. Well, as on any other -- on any deal, it's the same as every deal, when you take the car in trade, or you purchase a vehicle, it comes into inventory, and it's the date of the date that the contracts are signed.

Q. All right. What's Dealertrack?

A. Dealertrack is the software company that we use to keep track of all of our records, and it also prints and does all the documentation and the documents for the DMV and for the State of Florida.

Q. All right. Do you know whether or not the Ferrari was put into inventory in the Dealertrack program at Karma Palm Beach?

A. Yes, it has to, because when you print the bill of sale and you load the deal into Dealertrack, you have to load the information of the trade, otherwise it won't print on the bill of sale, or any of the other DMV documents. So, when they -- you have to do that, it automatically brings the car into inventory.

Q. All right. Once a transaction occurs where

Page 244

a car is taken into inventory and it's owned by the dealership, who at the dealership would have the authority to change the status of that car?

A. I'm not sure, what do you mean "change the status"?

Q. Well, let me just put it to you this way, at some point on March 11th, 2022, Jonathan Martin signed a consignment agreement regarding that Ferrari, and he testified that that consignment agreement was signed after --

MR. MAURO: Objection, your Honor.

BY MR. BRESLIN:

Q. -- the trade jacket.

THE COURT: Hold on. What's the objection?

MR. MAURO: First of all, he's leading.

Second of all, he's telling the witness, who was subject to the rule, what the testimony in this case is.

THE COURT: Sustained on both counts.

Sustained on both counts.

BY MR. BRESLIN:

Q. Okay. All right. Did Jonathan Martin have the authority to transfer an inventory car to a consigned car without your authority?

A. Well, first of all that's impossible, you can't do that. I mean, you can't have -- you can't take a

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 245

car in trade, and show transfer of ownership and a tax credit, which we send in to the State of Florida, and then the car be on consignment.  You can only have one or the other, you can't have both.

Q.    Okay.  If Jonathan Martin signed a consignment agreement on the Ferrari after it already became inventory of Karma Palm Beach, would that have been an unauthorized act?

A.    Yes.

Q.    Now, the car was put into the -- the Ferrari was put into Karma of Palm Beach inventory on what date, as far as you know?

A.    I believe it was on March 11th.

Q.    And does it remain there to this day?

A.    It is, yes, it's still in the inventory.

Q.    All right, and as we sit here today, does Karma of Palm Beach owe Mr. Stephens any money?

A.    Yes.

Q.    All right.  How much money does Karma Palm Beach owe Mr. Stephens?

A.    It still owes Mr. Stephens the 250,000.

Q.    All right.  So, as we sit here today, does Karma of Palm Beach owe him a vehicle, or does it owe him money?

A.    Money.

Page 246

Q.    All right.  As we sit here today, does Mr. Stephens have any legal claim to the Ferrari automobile that you're aware of?

MR. MAURO:  Objection.

THE COURT:  Sustained.

BY MR. BRESLIN:

Q.    There came a time in April when Mr. Stephens was texting you regarding the $250,000 that you owed him, correct?

A.    Yes.

Q.    And you have had a chance to review, prior to your testimony today, 37 pages of texts between you and Mr. Stephens that occurred on or about the beginning of April, correct?

A.    Yes.

Q.    All right, and those texts occurred over a period of three days, correct?

A.    I'm not sure, but it sounds about right.

Q.    All right.  So, does it sound correct that the texts began on April 4th, and conclude on April 6th, as far as can you recall?

A.    I believe so.  There might have been one after the 6th, but I believe so.

Q.    And from your recollection of those texts, Mr. Stephens wanted his $250,000, correct?

Page 247

A.    Yes.

Q.    And do you recall during those texts, that Mr. Stephens suggested to you that if you could get possession and the title to the Ferrari and let him hold them for some period of time, he would then give it back to you if you gave him his $250,000?

A.    Yes, that's correct.

Q.    Now, there came a time on April 6th that Mr. Stephens texted to you, he said that he had been promised $250,000 since March 13th.  Do you know the relevance of that date, March 13th?

A.    No, I don't know the relevance of that date.

MR. BRESLIN:  Excuse me one moment.

THE WITNESS:  Sir, is it possible I can have some water?

THE COURT:  Yes, please go ahead and get up.

THE WITNESS:  Can I get up and get it?

THE COURT:  Yes, you can get it.  He's just getting some water.

BY MR. BRESLIN:

Q.    Mr. Zankl, taking you back to March 11th, when you had the telephone conversation with Mr. Stephens, who initiated that telephone call?

A.    Gosh, I don't remember if I called him or he called me.  I believe I may have texted him to call me.

Page 248

Q.    All right, and why was that?

A.    Just because he wanted to talk about the 250,000 and how I was going to get it back to him.

Q.    All right.  Now, whose decision was it to require $250,000 for him to leave with the Lamborghini that day?

A.    That was me, because that was the price of the car.

Q.    Okay, and so that was solely your decision?

A.    Yes.

Q.    And Mr. Martin did not have the authority to make that call, correct?

A.    No, no, he did not.

Q.    And Mr. Martin did not have the authority to sign a consignment agreement on a car that was already in Karma inventory, correct?

A.    Yes, correct, yes.

MR. BRESLIN:  Okay.  Thank you.  I have nothing further.

MR. MAURO:  Mr. Breslin.

CROSS-EXAMINATION

BY MR. MAURO:

Q.    Good afternoon, Mr. Zankl.  My name is Cory Mauro.

A.    Hey, Cory.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 249

Q.   I represent Mr. Stephens.
A.   Yes.
Q.   You just testified that you gave Mr. Stephens a choice, he could wait for the Ferrari to sell, or he could buy the Lamborghini outright, do you recall that testimony?
A.   Yes.
Q.   And he chose to buy the Lamborghini outright, correct?
A.   Yes.
Q.   We're clear that Mr. Stephens bought the Lamborghini outright for $250,000, correct?
A.   He paid the price of the car, yes, correct.
Q.   And on top of that, you contend that he also traded in the Ferrari?
A.   Yes.
Q.   So effectively Mr. Stephens gave you $480,000 consideration for a $250,000 car, agreed?
A.   Yes.
Q.   Now, you also testified that Mr. Stephens was not getting that money back until the Ferrari sold, do you agree?
A.   Yes, that was his idea, though.
Q.   You testified that salespeople don't sign consignment agreements.  That's not true, is it?

Page 250

A.   No, they will sign it, but they have to have permission to sign it by myself, because we have a protocol to take in consignment vehicles.  They just can't take one in without my permission, or Teddi, or Nidia's permission.  It has to go through an inspection process.
Q.   Sir, you don't get involved in consignment agreements, do you?
A.   I get involved in approving if the cars can come in, yes.
Q.   In this instance you deferred to Mr. Martin relative to the consignment, didn't you?
A.   No.
Q.   Do you recall being deposed on November 14th in this matter?
A.   Yes.
Q.   And you were represented by counsel that day, Mr. Winderman?
A.   Yes.
Q.   You were under oath, correct?
A.   Yes.
Q.   You agreed to tell the truth?
A.   Yes.
Q.   And on that day, at Page 33, Line 11, you were asked, quote, so if Jonathan said that the car was on consignment prior to March 11th, 2022, you wouldn't have

Page 251

any way to dispute or confirm that, correct?
And you answered, the only way that you could, that you could really confirm it, is the guys in the back of my office that does the inventory whenever a car was put on consignment, or for that matter if we bought the car, it always got inspected.
Do you recall that answer and question?
A.   Yes, but it's inspected.  So that was part of our consignment, too, the car had to get inspected.
Q.   You were further asked, do you know if, in this instance, if Mr. Stephens' car was on consignment prior to the execution of the actual consignment agreement, and your answer was, that's what I said earlier.  I can't tell you 100 percent yes or no, because I never, I never get into that stuff.  I was involved -- I never was involved in that.
The next question was, who would know that, if anyone, from Karma, and your answer was Jonathan, yeah, the gentleman that Mr. Stephens always dealt with, which was Jonathan Martin, he would know.
Do you recall that question and answer?
A.   Yes, but that's not -- that -- you're taking only part of the answer.
So what I meant by, when I said that, the question that was asked to me was, Jonathan would have

Page 252

handled it, but it still would have to be approved by me, Teddi, or Nidia.  A sales guy can't just pull a car in off the street and bring it on consignment without approval, and the car had to have an inspection done.
Q.   You weren't there on March 11th when the deal was transacted, correct?
A.   No, I was not.
Q.   Where did you say you were?
A.   I was either out of town, or I was gone for the day.  I don't remember exactly, but I wasn't there.
Q.   At some point were you sick and --
A.   The last couple weeks of March, yes.
Q.   The last couple of weeks of March, including the beginning of April?
A.   Yes.
Q.   Okay.  So, when the -- for instance, when the incident with Mr. Farache coming to take cars from your lot, you weren't physically present for that either, were you?
A.   No, I was there that night.
Q.   Okay.  So you were back from being sick?
A.   No, I was still sick, but I was there that night.
Q.   Okay.  So what period of time were you not coming to the dealership?

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 253

A.   The last couple of weeks in March, and the first week in April.

Q.   But suffice it to say, you were not there on March 11th when this deal was transacted?

A.   Correct.

Q.   And you didn't see the purchase agreement for the Lamborghini for Mr. Stephens' purchase of it, is that right?

A.   Correct, but the sales guys were not allowed to do any sales without clearing it with me, whether it was in person or by phone.

Q.   In terms of the conversation between Mr. Stephens and Mr. Martin on March 11th relative to the consignment agreement, you don't have any knowledge of that, correct?

A.   No, because it wouldn't -- there won't be a consignment agreement if the car was traded.  It just -- in the State of Florida, the bill of sale would supersede that.

Q.   But you know that there is one in this instance, correct?

A.   Yes, yes, absolutely.

Q.   You know that Mr. Martin signed one on behalf of Karma, and Mr. Stephens signed on his behalf a consignment agreement for the Ferrari, you know that,

Page 254

right?

A.   Right, but he didn't have authorization to do that, and nor was it valid.

Q.   Sir, that wasn't my question.

A.   Yeah.

Q.   My question was, do you have any knowledge of the conversation between those men when that agreement was signed?

A.   No.

Q.   Now although you weren't there on March 11th, you were aware that the original deal terms that Karma and Stephens contemplated, was that the Lamborghini would sell for $250,000, and there would be $230,000 trade credit for the Ferrari against the purchase, right?

A.   That's because Jonathan had the car pre-sold.

Q.   Yes or no, was that the original deal?

A.   Yes, but there is more to it.

Q.   Okay, and Derek was going to trade the Ferrari for the Lamborghini, that was the original deal?

A.   That was the deal.

Q.   Instead he purchased it, agreed?

A.   No, because he traded the car.

Q.   He did both, he purchased the Lamborghini

Page 255

and traded the Ferrari, both?

A.   Yes, that's because he had to have the car that Friday.  He had an option to wait a week.

Q.   Is that legal, can you sell somebody a car and make them pay for it, and then also take a trade that's worth hundreds of thousands of dollars?

A.   Yes.

Q.   That's okay?

A.   Yeah.

Q.   Okay.  Now at that time, on March 11th, you were having cash issues at Karma, weren't you?

A.   No, not depending on what day it was, but, no.

Q.   You recall being deposed on November 14th, correct?

A.   Yes.

Q.   And you agreed to tell the truth, right?

A.   Yes.

Q.   And do you recall that you were asked, do you know what he's referring to when he says -- I'm sorry, on Page 69, at Line 4, you were asked, do you know what he's referring to when he says you had a float problem, and your answer was, yeah, he sent me a couple text messages, like he had in his business, you know, he ran into cash issues once in a while when things got tight, so

Page 256

he said he knew what I was going through.

The next question, so you were having cash issues at that time?

Answer, yes, I was having cash issues at that time, and he was also -- he knew that I wasn't going to.  I didn't want to pay $230,000 for his car either.

Do you recall giving that testimony?

A.   Yes.

Q.   So you didn't have the cash to pay Mr. Stephens for the Ferrari on March 11th, did you?

A.   Well, I didn't owe it to him on March 11th.  He gave it to me on March 11th.  I don't understand what you're saying.

Q.   Right, you owed him $230,000 for the Ferrari when the car sold?

A.   Correct, because I wouldn't -- I didn't want to give him 230 for the car.

Q.   Okay, and it's no secret, right, that Mr. Stephens never got paid for the Ferrari?

A.   Correct, yes.

Q.   You never closed that deal out, did you?  Because Mr. Farache showed up and took the cars?

A.   Jonathan -- I don't know what happened with the deal, but I do know the customer was approved at the bank.  I do know that the paperwork was actually FedExed

64 (Pages 253 to 256)

Page 257

to the client, but I don't know why he didn't go through with the deal.

Q.   When Mr. Farache showed up to take the cars, Karma told Derek to pick up his Ferrari, correct?

A.   I was told that, yes.  I think Jon called him, I'm not sure.

MR. MILLER:  Objection, hearsay.

THE COURT:  I think it's a little late.

Overruled.

BY MR. MAURO:

Q.   You told --

THE COURT:  You have to object before the question is answered.  You don't get to hear the answer and then object to the question.

Go ahead.

BY MR. MAURO:

Q.   You told Mr. Stephens that his title and his car was never supposed to be given to Mr. Farache, didn't you?

MR. MILLER:  Objection, hearsay.

THE COURT:  Can you restate the question?  I don't think it asked for hearsay.  But you can object to every question with hearsay, I suppose.

But what was the question again?

MR. MAURO:  I asked the witness if he

Page 258

advised Mr. Stephens that his title was not supposed to be given to Mr. Farache, and that that was a mistake.

THE COURT:  Overruled.  Go ahead, you can answer it.

THE WITNESS:  I did tell him that, along with all the cars, not just his.

BY MR. MAURO:

Q.   But you did call his car out specifically and say, your title and car was never supposed to be given, it was a mistake, correct?

A.   No, that's -- I told him, yes, his car, plus all of the other cars.  I mean, it was all the cars that were owed by Karma, none of those cars were supposed to be taken.

MR. MAURO:  Your Honor, I'm going to offer into evidence as a -- well, let me ask some questions.

BY MR. MAURO:

Q.   You were asked about the text chain between you and Mr. Stephens on direct examination, correct?

A.   I believe so, yes.

Q.   Okay, and you've had an opportunity to see that text chain?

A.   Yes.

Q.   Right.  By the way, have you emailed with Mr. Breslin?

Page 259

A.   When, today or --

Q.   Ever?

A.   Yes.

Q.   Have you emailed with him during the course of these proceedings?

A.   No.

Q.   By "these proceedings" I don't mean --

A.   You mean today or --

Q.   -- today.  No, I mean -- when is the last time you emailed Mr. Breslin?

A.   I don't -- I mean, I'd have to go back and look, I don't know exactly what date.

Q.   Okay, and what was the nature of your emails between Mr. Breslin and you?

A.   It might have been copies of text messages, I don't remember exactly.

Q.   You've seen the text messages between you and Mr. Stephens, correct?

A.   Yes.

Q.   Okay.  They are authentic, is that right?

A.   Yes.

Q.   Okay.  They say what you guys said.  It's, in other words, an accurate record of what you and Mr. Stephens said to one another, correct?

A.   It just depends on what you're talking

Page 260

about.  I mean, you can take things out of context, but --

Q.   Okay.  Well, I just asked you if you called out his car and said your title and car was never supposed to be given, it was a mistake, and you corrected me and said, no, that's not what I said, I referred to all of the cars.  Do you recall that?

A.   Right, but I talked to Mr. Stephens on the phone, and so did my wife, and he knows what I'm talking about.  There was nine cars specifically that Mr. Farache took and took titles, and he wasn't supposed to, and Mr. Stephens' car was one of those cars.

MR. MAURO:  (Inaudible.)  I'm sorry, I'll get back to the podium, your Honor.

THE COURT:  Thank you.

BY MR. MAURO:

Q.   I've handed you Page 2 of the text chain, which is Stephens' 6, and there you write, your title and car was never supposed to be given, it was a mistake.  It was Friday evening at 7:00 p.m., and the guy was yelling at my wife, and Alana and they were scared, so they gave him what titles I had, but your (as read) was not --

MR. MILLER:  Objection.

BY MR. MAURO:

Q.   -- supposed to happen, and we told him that, and he said he would bring them back today, and now he has

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 261

changed his mind.

THE COURT: Okay. Stop for a second. What's the objection?

MR. MILLER: He's basically trying to publish something that's not in evidence. He hasn't asked the witness about the document, and it's hearsay.

THE COURT: Well, he hasn't got to the question yet. So, I'm waiting --

MR. MILLER: Well, he's --

THE COURT: -- for the question.

MR. MILLER: -- reading from the document itself.

THE COURT: Okay. Remember, I mean, I know earlier I said I'm not a jury, and you gave me a look.

What I mean by that is, the gatekeeping function is a lot less important in the context of a bench trial, and so I am often called on to ignore things that I've already seen, because oftentimes I have to rule on the objection relating to something.

So right now, I haven't heard a question yet. I assume there will be a question coming, and if the question is objectionable, or the testimony is about to be objectionable, then you can let me know.

But, you know, the exhibits have been in the register for days at this point, so if I need to ignore

Page 262

it, I'll ignore it, and you can lodge the objection again if you need to.

Go ahead.

BY MR. MAURO:

Q.   Do you see the passage that I just read?

A.   Uh-huh, yes, I do.

Q.   Did you write that?

MR. MILLER: Objection, hearsay.

THE COURT: He just testified inconsistent with it.

Overruled. Go ahead, you can ask the question.

MR. MAURO: Yeah, I thought he answered.

BY MR. MAURO:

Q.   Did you write that?

THE COURT: Did he answer? He said yes? You said yes?

THE WITNESS: Yes, yes.

THE COURT: Okay.

MR. MAURO: That was the question.

BY MR. MAURO:

Q.   Now, you had testified as well before that Mr. Stephens was asking you for money, not the car. Do you recall that testimony?

A.   Yes.

Page 263

Q.   But Mr. Stephens, when you guys are texting, he's sitting in the car trying to leave the dealership, but blocked in at the time by Mr. Farache or someone on his team, is that right?

A.   Yes, we --

MR. MILLER: Objection, calls for hearsay. Mr. Zankl wasn't present, lack of foundation.

THE COURT: Overruled, overruled. Go ahead.

BY MR. MAURO:

Q.   So you know that he's trying to leave with the car on that day, don't you?

A.   Yes, he was trying to take the car, yes.

Q.   All right, and he texts you and says, can you just have the office write the landlord a check for $230,000, that's all he wants from me. Do you recall him saying that to you?

A.   Yes.

Q.   Okay, and your understanding of that particular request was if you paid the landlord, then Mr. Stephens would leave in the car, correct?

A.   Correct.

Q.   Okay, and I started to ask you this before and we got sidetracked, but when Mr. Farache seized the Ferrari, you were still trying to sell it, correct?

A.   Yes, I believe Jonathan was working another

Page 264

deal on the car.

Q.   Right, and you were still trying to sell it in order to pay Mr. Stephens?

A.   Correct.

Q.   Okay. Now, when a dealership acquires a car by trade or purchase, is there business left to do with that seller once the car is actually acquired?

A.   I'm sorry, what do you mean?

Q.   Yeah, it's probably not a great question, sir.

Once you acquire a car, take a car in on trade, are you still talking with the seller about anything relative to that car?

A.   Can you be more specific? I mean, I'm not sure what you mean.

Q.   When you've acquired a car by trade, okay --

A.   Okay.

Q.   -- from Mr. Smith --

A.   Right.

Q.   -- do you call him up the next day and let him know that his car is looking good?

A.   Well, it wouldn't be me. My sales guys, they keep in contact with their customers all the time.

Q.   For sales purposes?

A.   Both, just to make sure that the purchase is

66 (Pages 261 to 264)

Page 265

good, and if there is an issue with the trade.

So when we take a trade, too, we have a clause in the deal that if anything with that car is discovered wrong, mechanically, paintwork, an accident that wasn't disclosed, that we can go back to the customer. So that's part of what we do when we take a trade.

Q. And where is that language located?

A. It's usually, the sales guys will write it in the We Owe, it's on a We Owe document.

Q. We agree that Derek was -- Derek Stephens was never paid for the Ferrari, correct?

A. Yes.

Q. Okay, and when you look at the purchase agreement and it shows -- you're familiar with the purchase agreement, correct?

A. Yes.

Q. And it shows the line, $230,000 Ferrari trade, you agree that that was never given to Mr. Stephens, correct?

A. Right, but the difference is when it's showed as a trade on a bill of sale, I can't give him anything less than that either. So -- and that was one of the reasons why I didn't want to do the deal, because if for some reason we sold the car for 210 or 215, I still

Page 266

had to give him 230. That's what that bill of sale is, I am now taking that car into inventory.

Whether I owe him the money or not, it doesn't matter, it's coming into my inventory, I'm responsible to pay that dollar amount.

Q. And so that risk is now passed to Mr. Stephens?

A. No, it's passed to me.

Q. Now, Karma told the police that the Ferrari belonged to Mr. Stephens, didn't they?

A. I'm not sure who would have told him that.

Q. Your wife wrote to the police officer and told them the Ferrari belongs to Mr. Stephens, right?

MR. MILLER: Objection, lack of knowledge, speculation, and hearsay.

THE COURT: Sustained. Well, not the last one, but part of it is sustained.

BY MR. MAURO:

Q. Are you aware of whether your wife wrote to the police relative to the Ferrari?

A. I'm aware that Mr. Stephens reached out to my wife, in trying to get her to help get the car back, because at the time we didn't have the 250 to give him. So he was trying to either get the 250 or take his car back.

Page 267

Q. Can you testify today that your wife did not tell the police that the car belonged to Derek Stephens?

MR. MILLER: Objection, speculation.

THE COURT: Sustained.

BY MR. MAURO:

Q. How many lawsuits by customers have been filed against you or your entities?

A. I don't know the exact number.

Q. How many since April of 2022?

A. That's what I'm saying, that's all there would be, since April of '22, I don't know the exact number.

Q. Is it a big number?

A. I mean, it depends what you think a big number is, but --

Q. How many customers, approximately, have made a claim against you, can you count?

A. If I'm going to give you a number, it's me guessing. Probably four or five.

Q. Do you know how many claims have been made in the bankruptcy?

A. Not off the top of my head, no.

Q. You agree that if the Ferrari had gone back to Mr. Stephens, like you had planned, without Mr. Farache's intervention, we wouldn't be here, right?

Page 268

A. No, I'd still be, because I still owe him the money, because even if he got the Ferrari back, that's not 250, and he couldn't have sold the car himself because the title had been signed over to Karma Palm Beach. If it went back to him, he'd have to pay sales tax again.

Q. You recall being deposed on November 14th, correct?

A. Yes.

Q. You swore to tell the truth, right?

A. Yes.

Q. And on Page 23, Line 3, you were asked, so, do you believe that her statement saying the car belonged to Derek Stephens was inaccurate?

And your answer was, so I think she was trying to just handle the situation, in helping and telling whoever that this was the car, because at the end of the day, if the car would have been -- if the car would have went back to Mr. Stephens, he wouldn't be here today, okay? We wouldn't be here today, okay? He'd have his Ferrari back, so he would basically be made whole. Do you recall giving that testimony?

A. Yes, but he wouldn't be made whole, but that -- he'd still owe the 250. The car is not worth 250.

Q. Do you know where the title documents for the Ferrari came from, who sent them to Karma?

67 (Pages 265 to 268)

Page 269

A.   Either Mr. Stephens or an associate of his dropped off the title to the Ferrari.

Q.   Do you know one way or the other?

A.   I don't, I just know one of those two ways happened, because the bank never got the title.

Q.   You -- well, strike that.

How many other people have claimed that Karma didn't pay them on a consignment deal?

A.   I think there is, one, two -- I think four.

Q.   Four, and you didn't call any of those people, other than Mr. Stephens, to pick up their vehicles, correct?

A.   No, because their vehicles were gone, but that wasn't -- you're talking -- I'm not sure, what do you mean by that?

Q.   You mean their vehicles had been sold to someone else?

A.   The consignment vehicles?  Yeah, you said how many have claims against that are coming -- for the consignment vehicles, that's what you said.

Q.   My question was, you didn't ask any of them to come pick up their cars, like you did Mr. Stephens?

A.   Well, if a customer had the car on consignment, yes, they did come, a couple of guys did come pick up their cars, but they were truly consignment cars.

Page 270

Q.   So you did ask other people to come pick up their cars?

A.   I didn't, personally, no.  My staff did, but those people had consignment agreements, they weren't -- I don't own those cars.

Q.   Do you have any agreement or arrangement with FVP relative to your testimony today?

A.   No.

Q.   Derek's Ferrari was the only car among the eight titles that your wife turned over to Mr. Farache that was requested back, correct?

A.   Say that again, I'm sorry.

Q.   Yes, are you aware that your wife turned over eight titles?

A.   Nine.

Q.   Nine, okay, and of those nine only Mr. Stephens' was requested back, the keys were requested back from Mr. Farache?

A.   No, all nine were.

Q.   Were any of the other nine actually paid for --

A.   Yes.

Q.   -- by Karma?

A.   Yes.

Q.   How many?

Page 271

A.   All of them.

Q.   You, personally, guaranteed Karma's indebtedness to FVP, correct?

A.   Yes.

Q.   You and your wife?

A.   Yes.

Q.   By the way, do you dispute, or does your wife dispute, to your knowledge, her signature on the personal guarantee?

A.   No.

Q.   And if FVP is awarded Mr. Stephens' Ferrari, then Karma's indebtedness to FVP would be reduced by the amount of that Ferrari, you agree?

A.   It's either way for me.  It either decreases FVP or decreases Mr. Stephens.  I mean, either way, it goes both for me.

Q.   Do you have personal liability to Mr. Stephens?

A.   No, but he's still suing me.

Q.   So, you're not -- you don't take the position that you're personally indebted to Mr. Stephens relative to the $250,000, do you?

A.   I do take it personally, yes.

Q.   That wasn't my question, sir.

Are you personally liable to him?

Page 272

A.   I feel that I am, yes.

Q.   Have you reviewed the allegations made against you by FVP in their lawsuit?

A.   Say that again, please.

Q.   Yes, have you reviewed, have you read the allegations made by FVP against you in their lawsuit?

A.   No.

Q.   Are you aware that they have alleged that you -- that it was objectively apparent that the Zankls conspired with Farache, that Zankl engaged in an outright and bold scheme to defraud creditors, have you read these allegations?

A.   No.

MR. BRESLIN:  Objection, it's asked and answered, the same question.  (Inaudible.)

THE COURT:  All right.  Sustained.  It's a little late, but that doesn't matter.

MR. MAURO:  One moment, please.

THE COURT:  Sure.

THE WITNESS:  Can I get some more water, sir?

THE COURT:  Sure.

MR. MILLER:  Why don't you just take it with you, Mr. Zankl?  We're not drinking it.  We've got bottles.  You can take it with you.  Feel free to take it

Page 273

up there.

THE WITNESS: Just one more.

THE COURT: No, no worries.

THE WITNESS: Thank you.

MR. MAURO: I'm not sure that this particular item is marked.

THE COURT: Is this in here somewhere, is that what you said?

MR. MAURO: I'm trying to see, it might be a FVP document.

Do you guys have the We Owe in your set of documents?

MR. MILLER: Which exhibit?

MR. MAURO: It's the We Owe.

MR. MILLER: What's the number?

MR. MAURO: I'm not sure, I'm trying to find it.

My apologies.

THE COURT: It's 3?

MR. MAURO: Yes, it's the second page of -- it's FVP, it's 204-3, it's on the second page, or I guess it's the first page, the bottom.

THE COURT: Hold on. Let me have a look here.

So it's Exhibit 3?

Page 274

MR. MAURO: Exhibit 3, 204-3 of FVP.

THE COURT: Yes, I'm trying to find it. Oh, I see, all right, yes.

MR. MILLER: What page?

UNIDENTIFIED: The first.

BY MR. MAURO:

Q. When you testified about the We Owe, is this the We Owe?

A. Yes.

Q. Okay, and you said that there is language on it relative to misrepresentation of the physical condition of the car?

A. Correct, but you didn't, you didn't understand what I was saying, because I said to you that these cars all get inspected. If the car doesn't get inspected and we take it in trade or we purchase it, prior to it being inspected, it's written on the We Owe, and the salesmen are responsible for having it written on the We Owe, that if anything is discovered of the vehicle on trade, if there is any malfunctions of the engine, mechanical, paintwork, accidents, then the deal is nullified. If the car does have an inspection prior to the transaction, then there is nothing on the We Owe.

Q. Understood.

A. That's what a We Owe is, it's for after the

Page 275

sale.

Q. Do you have any knowledge as you sit here today whether there was such language in this instance?

A. If it's not on that We Owe, that means the car was inspected prior to the deal.

MR. MAURO: Thank you.

No more questions.

CROSS-EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Mr. Zankl.

A. Good afternoon.

Q. You're aware I represent Auto Wholesale of Boca?

A. Yes.

Q. Okay. Mr. Zankl, there is a bunch of paperwork around this Ferrari. There was a trade-in purchase agreement signed by Mr. Stephens, correct?

A. Yes.

Q. Okay, and he was going to trade in his Ferrari, and transfer the debt from the Ferrari to the Lamborghini he was acquiring from Karma Palm Beach, is that right?

A. Well, I'm not sure what you mean by "transfer". I mean, he traded the car, he did the bill of sale, he did execute and trade it, if that's what you mean

Page 276

by the debt.

Q. Well, the Ferrari had a lien on it with Texas Credit Union, right?

A. Correct, but the lien was never filed on that car with the credit union.

Q. Okay. So --

A. Never filed.

Q. But Mr. Stephens was personally liable to the credit union for financing that vehicle, the Ferrari, right?

A. Well, that would be between him and the credit union, but I'm just telling you that the lien was never filed on that title in the State of Florida.

Q. Then why would you have written up a deal that gave him a credit, but also deducted the cost to Texas Credit Union?

A. We didn't, we showed it at 230,000, if you look at the bill of sale that he executed. There was no lien payoff.

Q. Well, let's look at Exhibit 5 of the debtor.

MR. MILLER: Can I have my debtor book, please?

BY MR. MILLER:

Q. Exhibit 5, please.

Let me know when you have it open, sir.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 277

A. Yes, I have it.

Q. 5?

A. Yes.

Q. Okay. These are -- this is actually two different documents, right, two purchase agreements?

A. Yes, correct.

Q. Okay, and they both show, each of them, that the Ferrari, that's subject to this hearing, is being traded in, correct?

A. Yes.

Q. Okay, and on each of these documents they identify a lienholder, correct?

A. Well, it does it in two different sections, though. For example, the first bill of sale that shows the trade, it says balance owed, which then references the Texas Credit Union.

If you go to the second bill of sale, there is no lien on the Ferrari trade, but it's referencing the Texas Credit Union for the lien for the Lamborghini.

Q. Because he's transferring the debt from the Ferrari to the Lamborghini?

A. No, that's not what it means. That just means that he's taking debt on the Lamborghini.

The reason the second bill of sale was done was because the lien was never processed on the Ferrari,

Page 278

so there was no way -- because as a car dealer, when you take a car in trade, and there is a lien, we're required to pay the lien off.

Q. Can you look at the second page of that document, please?

A. Sure.

Q. Do you see on the left side, where it indicates trade-in description number one --

A. Yes.

Q. -- and it identifies estimated amount owed, 112,317.25?

A. That's the first bill of sale, yes.

Q. That's the amount that's owed on the Ferrari?

A. Well, but that's -- I understand what you're saying. I'm just trying to explain to you that in Florida, when you have a loan or a lien against -- see, credit unions are different, he could have a line of credit, and he could be using that car, if he chose to do so, against his line of credit.

All I'm trying to say to you is that in the State of Florida, for any bank or any institution to have a lien on a car, it has to be recorded through the DMV, and it's got to be on the title. That was never done for the Texas Credit Union.

Page 279

Q. I'm not disputing, we're not having an argument.

A. Yeah.

Q. And it's not a trick question.

A. Right.

Q. Mr. Stephens owed 112,000-plus dollars to the Texas Credit Union for the Ferrari, correct, according to this document?

A. That's what the document says, yes.

Q. Okay, and he didn't prepare this document, right?

A. No.

Q. Okay, and then he wanted to acquire the Lamborghini for $250,000, correct?

A. Yes.

Q. And if he's going to do a trade-in of the Ferrari for the Lamborghini, he's going to get a credit of $230,000, correct?

A. Correct.

Q. And less any debt he has to pay to satisfy the Texas Credit Union, that's his obligation, right?

A. No.

Q. Is that your obligation?

A. If it was a true lien on the car, it would be my obligation, because I'm taking the car in trade.

Page 280

That's why we have a payoff authorization form signed, that we have to pay the car off.

Q. Mr. Zankl, you're giving him a $230,000 credit for the value of the Ferrari under this document, correct?

A. Yes, sir.

Q. And if he still owes $112,000 on that very automobile, he's got to pay that off and satisfy it, that's why Mr. Martin called the credit union, to make sure that the process -- that it was going to get paid off, and transfer the title to Karma Palm Beach, right?

A. Well, that, I don't know abut that phone call, no.

Q. All right, and it also indicates there is a sum that is to be paid to Karma Palm Beach on the first paper of 22,237.09, right?

THE COURT: When you say the first paper, I've been confused.

MR. MILLER: There is two pages to this.

THE COURT: I know, I think you have them reversed.

THE WITNESS: Mine is the second page. You keep referring --

THE COURT: Yes.

MR. MILLER: Oh --

70 (Pages 277 to 280)

Page 281

THE COURT: The first page is the one that shows Texan Credit Union, with an estimated amount owed, and the second page is the one that does not.

MR. MILLER: I apologize, I put them in this one backwards. So I stand corrected.

THE COURT: Okay. Go ahead.

That's partially why he was confused by some of your questions.

MR. MILLER: Where was I?

THE WITNESS: Yes.

BY MR. MILLER:

Q. Anyway, eventually Texas Credit Union sent a check for the $22,337.88 to Karma Palm Beach, right?

A. That's correct, because, once again, the lien -- the lien was never filed on the Ferrari, so that's why we did it -- the bill of sale you're referencing right now is the one that actually got registered.

Q. I get what you're saying about the lien. I'm just saying, as far as Mr. Stephens is concerned, he owed money on that Ferrari to the Texas Credit Union, and he had to make sure he gave the Ferrari to you in a clear title state to get the credit of 230, right?

A. Correct.

Q. Okay. So Mr. Stephens trades in the Ferrari for the Lamborghini, then he wants to drive the

Page 282

Lamborghini off the lot, right?

A. Yes.

Q. He's traded in the car, he's signed the documents. Karma Palm Beach has processed the trade documents and faxed the information to Texas Credit Union to let them know that he is going to be trading in that vehicle, correct?

A. That, I'm not sure what happened on that part, because I wasn't there. I don't know what Alana did.

Q. But he also wrote a check, because you said you can't drive that car off the lot unless you give me a check for $250,000, correct?

A. Yes.

MR. MILLER: Okay. Let me hand you what was previously already in evidence, but it's 206-4, your Honor, Exhibit 4, FVP, and Stephens had it in 206-4.

THE COURT: All right. So it's Stephens' 4 he's looking at, just to be clear.

MR. MILLER: I think it was Stephens, it was 204-6.

BY MR. MILLER:

Q. Do you see that check, sir?

A. Yes.

Q. Okay. That's the $250,000 check that

Page 283

Mr. Stephens gave to Karma Palm Beach so that he could drive the Lamborghini off of the lot, right?

A. Yes.

Q. Okay, and that check was handed to somebody in your office, right?

A. Yes.

Q. Because I think you testified you weren't there March 11th.

A. No.

Q. You had a phone call with Mr. Stephens, but you didn't actually physically meet him that day?

A. No, sir, I didn't. I had a phone call because they had to clear the deal with me, because this was an out of the ordinary deal, so they needed my approval.

Q. Okay. So he gave you the check, and what does the check say on the bottom left corner of the memo?

A. It says, I think it hold something.

Q. Hold 2017 H, right?

A. Yes.

Q. That's referring to the Huracan, the Lambo that he's supposedly acquiring on the trade-in, right?

MR. BRESLIN: Objection, leading.

THE COURT: Sustained.

BY MR. MILLER:

Page 284

Q. Is that for -- what is that for?

A. I mean, I'm not sure what it's -- I mean, I don't know what he exactly means here by hold, I don't know what he means, because he left with the car. So I don't know what that means.

Q. Well, you didn't see this check, right?

A. No, sir, I didn't.

Q. And your staff was not instructed to hold that check, correct?

A. No, no.

Q. Okay. They negotiated it right away?

A. Correct, yes.

Q. Right, and the money, the $250,000 that Karma Palm Beach owed to Mr. Stephens is the amount of that check, right?

A. Yes.

Q. Okay, because it was the intention of Karma Palm Beach to sell the Ferrari, right?

A. Yes, that was the whole reason -- like I said, I testified earlier, that was the whole reason that Mr. Stephens wrote the check for 250.

Because normally -- how that transaction would have normally happened, is Mr. Stephens would have just traded the Ferrari and left -- and not given me this check, as long as I was giving him the correct value on

71 (Pages 281 to 284)

Page 285

the Ferrari, but I wasn't. We were giving him a lot more money from the Ferrari than I wanted to because my salesman said he had it sold.

Q. So you were giving him greater value for the Ferrari than what it was worth?

A. A hundred percent, I told him and --

Q. Wait.

A. -- Jon --

Q. Just answer my questions.

A. Yes, sir.

Q. Okay. So, why then would he be entitled to $250,000?

A. Because that was the check that he gave me, correct.

Q. All right. So that's the value of this check that he wrote that day, right?

A. Yes, sir.

Q. So the idea was, once the bank released the lien to the Ferrari, that I know you say is not a lien on the DMV records, but this is a Texas bank, they probably do things differently in Texas. So -- but when you received the title from the credit union for the Ferrari, then you would have had a clean transfer, right? He's got his Lambo. You've got the Ferrari. He picks up the value difference of the 22 or $24,000. That all adds up to the

Page 286

250, right?

A. Yes.

Q. Okay. Did Mr. Stephens have, like, multiple cars he wanted you to sell for him?

A. He had mentioned to me that once everything got cleared up, he had more cars he wanted me to help him with, yes.

Q. Like 14 cars, right?

A. I think that's what he said, yes.

Q. Okay, and --

MR. MILLER: I don't have any further questions. Let me just make one --

BY MR. MILLER:

Q. And one last. Actually, you did write a check, or have your staff deliver a check to Mr. Stephens for $250,000, which was postdated, right?

A. Yes, sir.

Q. And he wasn't supposed to cash it right away, correct?

A. He wasn't supposed to. I sent him numerous text messages not to deposit it.

Q. Okay, but he did negotiate, try to negotiate it?

A. He did deposit it, yes --

Q. Okay.

Page 287

A. -- after I told him not to.

MR. MILLER: I have no further questions. I'm just going to get the exhibits.

THE COURT: Sure.

MR. MILLER: Thank you.

THE COURT: Thank you, Mr. Zankl. You can step down.

THE WITNESS: Thank you.

THE COURT: All right. Mr. Miller, what do you have next?

MR. MILLER: I don't think I have anything left, Judge, to put on.

THE COURT: All right. Mr. Breslin.

MR. BRESLIN: Just, if I can just have a moment?

THE COURT: Sure.

MR. BRESLIN: Do you know how late we are going to go today?

THE COURT: Well, it depends on what you tell me you need to do. If the answer is a lot, then we'll be ending soon, and if the answer is not, then we'll continue.

MR. MILLER: Can I take two minutes, run out the door?

THE COURT: Absolutely. Do you mind if I

Page 288

not leave? You can go ahead.

(Thereupon, a recess was had, after which the following proceedings were had:)

THE COURT: All right. Is everyone back? Except for Mr. Farache, who will be back momentarily. Oh, there he is.

We're all set, I take it. Ms. Leonard, let me know when you are ready.

All set. Would you raise your right hand? Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. ROHL: Yes, I do.

THE COURT: Thank you.

Thereupon,

BRIAN ROHL,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRESLIN:

Q. Please state your name for the record.

A. My name is Brian Rohl.

Q. And how are you em --

MR. MILLER: I'm sorry, just a general objection. I don't recall seeing this witness on a

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 289

witness list.

THE COURT:  Did I require a witness list in this instance?  I don't remember.

MR. MILLER:  Under the rule, I think -- I put a witness list together.

THE COURT:  I just don't remember what I ordered in this particular instance.  Does anyone know?  You can direct me to the order if you'd like.

MR. BRESLIN:  There was not an order requiring a witness list.

THE COURT:  Ah, we had the usual exchange of exhibits with the objection provisions, correct?

MR. BRESLIN:  Yes, your Honor.

THE COURT:  All right.  So if you can point me to an order that required a witness list by particular date, then I will --

MR. MILLER:  Let me go back and look at your order.

THE COURT:  All right.  Well, in the meantime, let's continue.

You can go ahead and look, but if you're going to make that objection --

MR. MILLER:  I'm not going to be able to listen to him at the same time.

THE COURT:  Well, maybe someone else can

Page 290

look for you, but if you're going to make that objection, you should be prepared to point me to a rule.

If this was an adversary proceeding, there would be such an order, but I don't remember one in this case.

Go ahead.

MR. BRESLIN:  Thank you, Judge.

THE COURT:  Overruled for now.  You can lodge it again.

BY MR. BRESLIN:

Q.   And how are you employed, sir?

A.   I'm a certified public accountant with Fisk & Company.

Q.   And how did you come to be involved in this matter?

A.   FVP contracted Fisk & Company for expert witness services in the state court case against --

Q.   Could you speak up, please?

A.   Yes.

THE COURT:  Just move the microphone.

THE WITNESS:  Move the mic closer?

THE COURT:  Yes, you don't need to move your body.  Yes, that's good.

THE WITNESS:  Okay.  There we go.

So, my firm, Fisk & Company, was contracted

Page 291

by FVP in the state court case, originally between Auto Wholesale of Boca and FVP.

BY MR. BRESLIN:

Q.   Okay, and what's your educational background?

A.   I have a bachelor's of science in accounting and Finance from the University of South Florida.

Q.   Okay, and do you hold any degrees or licenses?

A.   Yes, I hold both those bachelor's degrees, I have a CPA license in the State of Florida, I have a credential from the American Institute of CPAs, called the Certified & Financial Forensics, and I have a second credential from the American Institute of CPAs, that is the Accredited & Business Valuation credential.

Q.   Okay, and have you participated in preparing an expert witness disclosure in the adversary proceeding in this bankruptcy case?

A.   I have, yes.

Q.   And together with that disclosure, your CV was attached, was it not?

A.   That's correct.

Q.   All right, and as far as you know, that was filed of record in this case, correct?

A.   Yes.

Page 292

THE COURT:  It's not evidence in this matter right now.  So, if you think that made it part of the evidence in this matter, it did not, and I do not intend to look at it.  I just want the record to --

MR. BRESLIN:  Well, I'm just trying to qualify him as an expert.

THE COURT:  Well, that's fine, if you wish to qualify him, you can ask him questions.

MR. BRESLIN:  All right.

BY MR. BRESLIN:

Q.   All right, and so have you ever testified as an expert in court?

A.   Yes.

Q.   How many times?

A.   Once, in June of 2021.

MR. BRESLIN:  All right, and I will tender him as an expert as this point, Judge.

THE COURT:  On what?

MR. BRESLIN:  On his qualifications that he's a certified public accountant, and he's --

THE COURT:  Okay, but on what, an expert on what?

MR. BRESLIN:  Well, what Mr. Rohl did in this case, Judge, is he received all the data, the business records, the Dealertrack records, all the

73 (Pages 289 to 292)

Page 293

financial records from the trustee in both the Excell case and the -- and as far as the Karma Palm Beach entities, and his testimony in this case will involve testimony regarding the books and records of Karma and Palm -- of Palm Beach as it relates to the Ferrari transaction.

So his testimony, he would testify as to what was in the Dealertrack records that were taken into custody by the trustee on this particular Ferrari transaction, when it was taken into inventory, and how, and the financial money that -- and the financial transactions regarding the Ferrari. That's what his testimony will involve.

THE COURT: So usually when I ask that question, what I meant is what is his area of expertise on which you would seek his opinion testimony today?

MR. BRESLIN: Accounting.

THE COURT: And it's just generally accounting?

MR. BRESLIN: Yes, in this case it would simply be accounting as to the books and records, to the general ledgers, the financial transactions involved regarding the Ferrari transaction.

THE COURT: And these are the records of Karma of Palm Beach?

MR. BRESLIN: Correct, that were taken into

Page 294

custody by the trustee.

THE COURT: In the Excell case?

MR. BRESLIN: Correct.

THE COURT: Understood. All right.

MR. MAURO: Yes, objection.

THE COURT: Where to start?

MR. MAURO: I was going to defer to Mr. Miller because he was already kind of halfway into this.

THE COURT: He's usually jumping up, but that's okay.

MR. MILLER: You're making me do research right now.

MR. MAURO: So a couple of issues here. First of all, we did subpoena FVP, we asked for witness statements. We didn't get any disclosure of an expert or any --

THE COURT: You sought discovery which would have elicited --

MR. MAURO: At least the report or a statement, which I'm understanding he's prepared, and so we didn't receive anything in that regard.

We didn't receive a notice of an expert, and as I understand it, and I'm trying to kind of reverse engineer this, but we don't have a package of, here are

Page 295

the documents that this expert relied on.

I know that we have some of the records individually that Mr. Breslin just referenced, that he may, the witness may have reviewed, but there is no corpus of documents that we can effectively use to challenge the opinions of the witness to know what he's reviewed.

THE COURT: Okay. If --

MR. BRESLIN: Well, judge --

THE COURT: Hold on. Stop for a moment.

Now, so far apparently no one has looked to see, or has found, I shouldn't criticize Mr. Miller, who is apparently looking, to see what the structure was when I set this hearing.

This is a motion for turnover, where I'm actually a little surprised that there is an expert witness, and so -- but in general, if I set an evidentiary hearing on a contested matter in which all we have is an exchange of exhibits, then it's up to the parties to do the discovery that would elicit a response that discloses the fact that there was an expert, because there wouldn't be a disclosure requirement that was in any order, scheduling order.

So you're saying -- okay.

MR. MAURO: Yes, I'm --

THE COURT: I understand your technical

Page 296

problem, but that may not be an actual objection to the testimony.

MR. MAURO: I appreciate that. I'll finish my objection.

THE COURT: Sure.

MR. MAURO: And I want to answer your Honor's question.

THE COURT: What did I say?

MR. MAURO: On Docket Entry 135 --

THE COURT: Okay.

MR. MAURO: -- Exhibit --

THE COURT: Yes, order setting, 135. I've got too many documents open. That's all it is. Yes.

MR. MAURO: But --

THE COURT: It's not a scheduling order.

MR. MAURO: But our subpoena certainly asks, if the man prepared a statement, we should have received it, that's number one.

Number two, I'm hard-pressed to think of how an accountant is going to offer you any expert analysis that could aid the Court in interpreting facts that are in dispute, in this narrow dispute today. So we'd object on that basis as well, your Honor.

THE COURT: All right. Can you give me --

MR. BRESLIN: Judge --

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 297

THE COURT: -- a little preview of what this is about?

MR. BRESLIN: Yeah, yes, Judge, and just to address Mr. Mauro's objection, the FVP parties were given just voluminous data, as I mentioned to your Honor at several hearings.

When Mr. Mauro sent a subpoena to us for the information that we may or may not use at this hearing, I gave him all the data, I gave him every bit of data that our expert, you know, combed through to find, you know, relevant information that has to do with this particular vehicle. So they got all the raw data.

In response to that, I got an e-mail from Mr. Mauro saying that that's too much data, just give us -- send us the exhibits. So I sent him the exhibits.

On top of that, I filed exhibits that were created from the raw data that we got involving this matter, and that raw data is all the information in the Dealertrack, all the information in the general ledger of the company, the accounting data, and the information within the company.

So, what Mr. Rohl will testify to regarding this Ferrari, he'll testify as far as the Dealertrack data goes, and the Dealertrack is the software that Mr. Zankl testified about. The Dealertrack is the software program

Page 298

that keeps track of the inventory. So he will testify that within that data this vehicle, this Ferrari came in -- sorry, I keep knocking that -- the Ferrari came in to Karma inventory on March 11th, just like we -- just like, you know, our witnesses testified to.

He can also testify as far as the money in and money out, the 250,000, there has been a lot of questions about that, how this transaction was recorded on the books and records of the company and the general ledger. He has all of that information, and he took all the raw data from multiple sources, distilled it down, and has that information at his fingertips, and he can testify as to what anyone wants to know about this particular transaction.

So, for me, for him to testify in that regard, I believe that he would need to be qualified as an expert, because as an expert he can opine as to what the data says, as opposed to him just saying, this is what the data says, which would ultimately be hearsay.

THE COURT: Well, I'm trying to figure out why I would need help to interpret the financial data, or the data that's in that software.

MR. BRESLIN: Well, how else --

THE COURT: How complicated can it be?

MR. BRESLIN: Well, he's going to testify

Page 299

what's in those records.

THE COURT: Why do I need an expert to testify about what's in the records? Why wouldn't you have just offered whatever records there were, and have a custodian to testify?

MR. BRESLIN: Well, the relevant records have been listed as our exhibits, and we have our exhibit, we have Number 12, check register data, deal analysis capped only, this is all from the records of the company, we have the general ledger data, 14. 15, we have general ledger data. 16, vehicle acquisition report, and Mr. Rohl will be able to testify exactly what those documents mean, because what you're going to see are just, you know, rows of numbers that were extracted from the raw data that we received from the trustee.

THE COURT: And his expertise, he will be able to tell me what that means?

MR. BRESLIN: Exactly.

THE COURT: All right. Okay. So you don't -- right now I don't have an opinion question. So I'm not -- you know, you can tell me he's not qualified. I don't know what he's going to testify, or what even these documents are yet.

MR. MAURO: Yes, I --

THE COURT: There was no deadline to

Page 300

designate him. So what other objection do you have?

MR. MAURO: I just want to make the small point for the record purpose, Mr. Breslin's description of the document production was not correct. I didn't say, oh, you've given me too much, just give me the exhibits.

What happened was, I think he admitted it, that Mr. Breslin turned over every document relative to the entire case. They have a production that they're using for the state court case, and so I said that's not what we asked for, look back at our subpoena, we asked for records relative to the Ferrari that we're here talking about. I don't want records about the Porsche. So, that was the culling down.

My point is that we do not have access, so far as I know, to the records that he --

THE COURT: Well, apparently they're in the exhibits.

MR. MAURO: But they're not identified as such, and so --

THE COURT: What did you mean? I don't understand.

MR. MAURO: They're not identified as records that an expert examined and opined on.

THE COURT: I understand your concern.

MR. MAURO: Yes.

75 (Pages 297 to 300)

Page 301

THE COURT: We would normally have a scheduling order in an adversary, for example. Nobody asked me for such a scheduling order here, or else I would have done it.

MR. MAURO: My point --

THE COURT: And I didn't do it because, frankly, I'm surprised that there is an expert being offered.

But I can't see a prohibition on at least putting the person on the stand, and then if there are appropriate objections, you may tender them.

MR. MAURO: Okay.

THE COURT: How long do you think this is going to take?

MR. BRESLIN: 10 minutes.

THE COURT: Oh, dear, that will be a miracle. I find that very unlikely, but go ahead.

MR. BRESLIN: I've tendered Mr. Rohl as an expert.

THE COURT: We don't really know what that is. So everyone is reserving, may reserve their objections to his qualifications when I hear the opinion questions, okay?

MR. BRESLIN: All right. I just thought they may want to voir dire at this point, but if you'd --

Page 302

THE COURT: Do you wish to? Is there accounting issues?

MR. MAURO: Not yet.

THE COURT: Okay.

MR. MILLER: What was the question, Judge?

THE COURT: Well, did you wish to voir dire? My problem is I'm not --

MR. MILLER: We don't know what the arena is.

THE COURT: Exactly.

So let's just wait until we hear the opinion questions.

BY MR. BRESLIN:

Q. All right. Mr. Rohl, explain to the Court how you came to have within your knowledge the -- let's start with the Dealertrack, the information regarding the Dealertrack, how did that information come to your attention?

A. So, how did I obtain it?

Q. Yes.

A. So when I was first brought on to this state court case, the bankruptcy hadn't been filed yet.

Q. Speak up, please.

A. Oh, sorry.

When I was brought on to the state court

Page 303

case, I began meeting with Zankl, who had been cooperating, and he had access to the Dealertrack records, and I pulled from the Dealertrack portal that he had access to, the Karma Palm Beach, and the Karma Broward records, and those are segregated as the Dealertrack reports in our production.

Separately, the Excell Auto Group records were under the custody of the trustee and their contractor B. Riley Advisory. So I met with B. Riley Advisory, and ran essentially every report I ran for the Karma entities, Karma Broward, Karma Palm Beach, using the log-in provided by B. Riley for the Excell Auto Group and, just as well -- those are just relating to the Dealertrack reports.

Q. Okay, and what does the Dealertrack software program indicate as far as inventory in the particular companies?

A. So, Dealertrack, when a car is taken in, it will reflect it as being in inventory, it will reflect the amount, that is sort of the cost of the car, the acquired cost for the particular entity, and it will also -- with regards to the inventory, it will also, within the general ledger, the accounting data, the accounting data will also reflect transactions, and they will be tagged as pertaining to a particular car, identified by their VIN number.

Page 304

Q. All right. So the general ledger, that would be the accounting data within the companies that talk about valuations, and money in and money out, correct?

A. Yes, yes.

Q. All right. Now, did there come a time when you were asked to do an analysis of this, the Ferrari that we're here talking about today?

A. Yes, this was one of the first cars we were -- I was asked to analyze, because in the state court case Auto Wholesale of Boca provided multiple deal jackets for various vehicles which Auto Wholesale of Boca had title to. This Ferrari, with the last six of the VIN 191526, was among those vehicles.

So, upon commencing our analysis, a particular focus was given to this car among, about, like, 37 others, with respect to all the Dealertrack data, data and then in addition myself, and a few other employees under my supervision, traveled to the trustee's office, B. Riley Advisory, to flag for copying by a third-party vendor the trustee jackets, the deal jackets held by the trustee pertaining to those vehicles, and the Ferrari was among those.

Q. All right. So, you reviewed the data within Dealertrack regarding this Ferrari, correct?

76 (Pages 301 to 304)

Page 305

A. Yes.

Q. And you also reviewed deal jackets that were not only provided by Mr. Farache, but also in the possession of the trustee, correct?

A. That's correct.

Q. All right. So you -- so to include in your analysis, you looked at financial data, you looked at hard copies of paperwork in the deal jackets, correct?

A. Correct, correct.

Q. All right, and for your testimony here today, you prepared certain documents that we listed, and you can -- you have the binder in front of you as 12, 13, 14, and 15 -- it's 12 through 16, correct?

A. Yes.

Q. All right, and --

A. Yes.

Q. -- were these documents that are listed as 12 through 16, those are summaries of information that was retrieved from the software programs and the general ledgers of the company?

MR. MILLER: Objection, leading.

THE COURT: Sustained.

BY MR. BRESLIN:

Q. All right. Let's take a look at Exhibit Number 12, check register data.

Page 306

A. Yes.

Q. Did you prepare that document?

A. Yes, I ran --

Q. Explain to the Judge exactly what that is.

A. So, the check register is every time that a check, which, you know, they can say accounting, non-negotiable, they can be, you know, negotiable instruments and all of that are generated, it is my understanding exclusively from the Dealertrack software. So the Dealertrack software, with regards to the Chase bank accounts of the dealership entities, checks have to be generated by Dealertrack, and when a check is created, it creates the physical check, you know, that's signed, given to the vendor, and a record of that check being created is left in Dealertrack. Just, this check register data, is just a -- is a compilation of all of the checks from Karma Palm Beach which are titled or, you know, paid to the order of Derek Stephens.

Q. All right. So that is Exhibit Number 12, and can you take a look at Exhibit Number 12 now, please?

A. Yes.

Q. And what does Exhibit Number 12 indicate?

A. So Exhibit Number 12 indicates that for the first couple of rows in this -- in these selected rows, it's just minor transactions with, you know, credit card

Page 307

payments for tags, tag refunds, $250 paid on a credit card.

But the ones that are, you know, more pertinent, are the transactions, the last four rows of data here. The first two rows -- the first two of those four rows, the ones dated March 25th, what that -- this indicates that on that date a check was generated by Dealertrack, Check Number 5247, and it was made to Derek Stephens, or payable to Derek Stephens. The reference number is the last -- I think that's the last eight numbers of the VIN of the Ferrari in question, and the description, this report doesn't capture all of it, it cuts off a bit, just the limitation of the software, but it appears to say refund for overpayment, with a reference to that car.

Q. Okay.

A. Now, the amount is in the void column, as opposed to the amount column, indicating that that March 25th, 2022 check was voided and was never -- had never -- could not be cashed, wherever that physical check is.

Q. Okay. Now, does this report indicate that there was $250,000 paid by Mr. Stephens at some point?

A. No, that would be in a separate report.

Q. Okay.

Page 308

A. You mean from Stephens to Karma Palm Beach?

Q. Right.

A. That would be in the general ledger.

This one is from Karma Palm Beach outgoing payments.

Q. Okay. So it shows that there was a check generated on 3-25 that never -- that was voided?

A. Correct.

Q. All right. So you don't know if that was ever given to Mr. Stephens or not, there is no way to tell from the data that you looked at, correct?

A. No, I can't tell whether it was.

Q. And so there is something that says posted, the second one from the bottom, there is a minus 250,000, does that mean, on 4-8?

A. And this is for Check Number 5265?

Q. Yes.

A. That check is -- it's separately in one of the other exhibits here.

This check was written, and just based on available other evidence, was presented to Mr. Stephens and, you know, based on that exhibit as well, was attempted -- Mr. Stephens did attempt to deposit that check, but it did not --

MR. MAURO: Objection, move to strike.

77 (Pages 305 to 308)

Page 309

"Based on other evidence", it sounds like he's testifying based on hearsay.

THE COURT:  Well, I think it's the evidence that's already admitted.

My question for Mr. Breslin is, is this testimony going to lead me in the direction of something that is not already supported in the evidence, or that remains in dispute?

MR. BRESLIN:  Well, let me just get to the bottom line.

BY MR. BRESLIN:

Q.   Mr. Rohl, on what date did the Ferrari come into the inventory of Karma Palm Beach?

A.   That was on the 10th of March, according to the general ledger records, which are at Exhibit 14.

Q.   And in addition to the general ledger, does the Dealertrack show that the Ferrari went into inventory of Karma Palm Beach?

A.   That's correct --

Q.   On what --

A.   -- the general ledger indicates that.

Q.   Or what date?

A.   The 10th of March.

Q.   All right.  So the Dealertrack and the general ledger are the same thing?

Page 310

A.   Well, when you say Dealertrack, the general ledger would be a subset.  So, do you mean the vehicle acquisition report or --

Q.   Well, you tell me.

A.   So according to the general ledger, the first entry that added this car, identified by its VIN number, to the inventory of Karma Palm Beach is dated the 10th of March, 2022.  In Exhibit 14 -- it's the second transaction on Exhibit 14.

Q.   Okay, and does it -- is it still in inventory of Karma Palm Beach, the Ferrari?

A.   According to Dealertrack it is.  On Exhibit 16, the second entry.  The first entry is for the Lamborghini Huracan, the second is for the Ferrari.  Dealertrack does indicate it's currently still in inventory.

MR. BRESLIN:  All right.  That's all I have, Judge.  Thank you.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. MAURO:

Q.   Are you aware of whether a car can go into Karma's inventory despite that it was not purchased?

A.   Well, anyone can put something into Dealertrack, yes, but as of -- it wouldn't be a common

Page 311

appearance based on the vehicle records I have investigated in this case.  I wouldn't say it's common, but possible.

Q.   Are you aware whether the Ferrari at issue was purchased by Karma?

A.   Documents were executed to indicate, but I don't want to render a legal opinion whether the -- on the transaction closing and all of that, but transaction paperwork was available that could indicate that.

Q.   What was that paperwork?

A.   (No verbal response.)

MR. MAURO:  May I ask counsel, does that paperwork include anything that's not before the Court today.

THE WITNESS:  Oh, no, it is within the -- it's within the exhibits.

Do you want me to --

BY MR. MAURO:

Q.   But you don't know, as you sit here today, whether Karma purchased the Ferrari at issue, do you?

A.   As far as legally, one transaction superseding another?  I'm aware of several other transactions with this car.

There does appear to be, within the records, transactional paperwork indicating an addition to

Page 312

inventory, that the car was purchased.  There is paperwork indicating that, but as far as whether it was a completed transaction legally, I can't opine to that.

Q.   Right, you don't know whether Karma paid for the car, do you?

A.   Karma Palm Beach paid whom?

Q.   Paid Derek Stephens for the Ferrari?

A.   The transaction paperwork indicates that Mr. Stephens was given a trade allowance towards the acquisition of a Lamborghini.

Q.   And so that's a fact that you took into account in rendering the testimony that you just gave, that Derek Stephens was afforded a trade value of $230,000 for the Ferrari against the Lamborghini?

A.   That's what one of the pieces of transactional paperwork indicates, but I can't --

Q.   Do you know if Mr. Zankl takes the position one way or another whether Mr. Stephens was paid for the Ferrari?

A.   I'm not sure what he testified to here today.

Q.   What if he testified, no, I did not pay Derek Stephens for the Ferrari, would that change your conclusion that the Ferrari was properly part of the inventory of Karma?

78 (Pages 309 to 312)

Page 313

A.   If you were the only person that could make a decision to acquire the car, as far as him having knowledge of all transactions that could have transpired, there could have been a separate acquisition he was unaware of.

Q.   Are you aware of any separate acquisitions?

A.   Other than the ones that Zankl would be aware of, other than -- not as I sit here, I'm not aware of separate transactions, other then ones that I believe Zankl would be aware of.

MR. MAURO:  Thank you.

THE COURT:  All right.  Anything else, gentlemen?

(No verbal response.)

THE COURT:  Thank you very much.

Oh, no, there is something?  Go ahead.

CROSS-EXAMINATION

BY MR. MILLER:

Q.   I represent Auto Wholesale of Boca.

Mr. Mauro asked you, are you aware of a car that -- something to the effect of, if the car was purchased, do you recall that question?

A.   Yes, yes.

Q.   Okay, and do you know what the word "purchased" means?  In your mind's eye, what does it mean?

Page 314

A.   It would mean, you know, executed documents, transfers of ownership, and consideration and all.

Q.   Okay, and so it could mean payment of cash, right?

A.   That could be one form of consideration.

Q.   It could be a trade-in, correct?

A.   Right, if another car was coming the other way that --

Q.   So there is a lot of different concepts that cover a purchase, right?

A.   That's correct.

Q.   Okay.  So it doesn't just mean you dig in your pocket and you pay cash?

A.   No, not necessarily, it could be a trade-in allowance.

Q.   So in your analysis did you determine whether or not Karma Palm Beach reflects in its records that is still owes $250,000 to Mr. Stephens?

A.   The accounting records do indicate that, the general ledger, specifically.

Q.   It doesn't indicate that the Ferrari is supposed to be given back to Mr. Stephens.  It indicates there is a debt owed of $250,000 to Mr. Stephens?

A.   It's difficult to say on the first part.  The general ledger wouldn't reflect, like, a vehicle being

Page 315

owed, but as far as the, I believe the second part --

Q.   250,000.

A.   -- where $250,000 is owed, the general ledger does indicate that, just based on the transactions that are identified as being related to this car --

Q.   Okay.

A.   -- and related to Mr. Stephens, yes.

MR. MILLER:  Thank you.

THE COURT:  Anything else, gentlemen?

(No verbal response.)

THE COURT:  Thank you.  Thank you very much.  You can step down.  Thank you very much.

All right.  Anything else in terms of evidence?

(No verbal response.)

THE COURT:  Would you like to sum up?

MR. MAURO:  I would, your Honor.

We told you in the opening that we would prove that the purchase agreement that FVP and Zankl rely on was superseded, that the parties changed the deal, and you heard Jonathan Martin, the only one who doesn't have a dog in the fight, you heard him testify, quote, the deal could not be delivered and so it changed, and that's what happened.

Everybody is kind of, you know, pointing at

Page 316

different times, and this is the time that matters, this is the time that matters.  The fact of the matter is, the transaction changed from the purchase agreement that my opposition is relying on.

THE COURT:  Well, I'm curious which purchase agreement they rely on.  Actually there is two in evidence.  They're both signed by both parties.  One of them has a trade, and the other -- excuse me, one of them has a lien payoff, and the other one doesn't.

MR. MAURO:  Yes.

THE COURT:  I don't think I have any evidence whether the lien was actually paid off, although the debtor will tell me there was no lien, I think.  So, that's kind of interesting.

But then, I'm not sure I've ever seen a transaction where there is, what the seller of a vehicle says involved a trade, where the purchaser nonetheless paid the purchase price in full.  It seems like a very unusual transaction.

So what is it?

MR. MAURO:  It strikes --

THE COURT:  Is it a consignment?  Is it a loan of $250,000?  It seems to me the dealership was stuck with the deal that was signed in the original purchase agreement, but then they didn't want to let the buyer

Page 317

leave with the vehicle.

MR. MAURO: I mean, one thing that we know for sure, right, is that the deal that was papered on the purchase agreements, both of which show a $230,000 trade value, was simply not performed.

You heard Mr. Zankl say it over and over again, he never forwarded a credit, a trade credit to Mr. Stephens of $230,000, and Mr. Stephens was never paid for the Ferrari.

You heard him say as well that Mr. Stephens effectively paid $480,000 for a $250,000 car. There is no dispute in this record -- a couple of things here. There is no dispute that Derek never received payment for the Ferrari. There is no dispute that he never received value on the trade-in for the Ferrari. There is no dispute that he entered into a consignment agreement, and that the deal was changed such that he had to reach into his pocket, his company's pocket, and tender a check.

And, again, we heard reference to it with the expert. You know, that there is only so many ways that the Ferrari could come in. It's not a bunch of different ways, there is only a couple of ways, it's purchased or it comes in on trade. Neither happened here.

Keep in mind, it doesn't show up on their inventory records. It shows up -- and I think the expert

Page 318

just testified to that as well, the inventory records don't show us whether Mr. Stephens is owed the car, they're showing financial transactions.

I cannot, for the life of me, understand why a dealership would tell the police months after, or weeks after the transaction, by the way, this car belongs to Mr. Stephens, if it wasn't true, or tell him to come pick it up when Mr. Farache was taking cars.

So there is simply no basis to conclude that the car legally came into inventory. The documents haven't even really been made sense of, certainly not by Mr. Zankl.

So Derek is caught up in the crossfire between Mr. Zankl, FVP, AWB, Karma, and their creative way of doing business.

I want to talk for a moment about the consignment agreement, it's Exhibit 1. There are a couple of points that I think are important.

It is clear that under the agreement, the consignor will, will, future looking, reassign title upon the purchase of the vehicle, you heard Mr. Zankl say it over and over again, Mr. Stephens was not getting paid for the Ferrari until he sold it. That's a consignment, and that's exactly what the parties were doing. Continuing.

With the agreement, Karma was only

Page 319

authorized to sell the vehicle on consignor's behalf, they didn't have the right to collateralize it, they didn't have the right to pledge it, you know, on a loan. The agreement goes on, your Honor, that Mr. Stephens would keep the vehicle insured, he has, and he agreed to hold the dealer harmless for damage. That doesn't happen if you trade in a car.

And, finally, I've made reference to this in our opening, finally, as to this particular point, the agreement contains an integration clause. I'll read it, quote, there are not promises, terms, conditions, or obligations other than those outlined herein, and this contract shall supersede all previous communications, representations, or agreements, either verbal or written between consignor and dealer.

You heard the unrebutted testimony from Mr. Martin and Mr. Stephens, that the consignment agreement was the last thing that was signed on March 11th. It superseded the prior purchase and sale agreements, and it's interesting that Mr. Zankl took the position that, no, Mr. Martin wasn't authorized to sign the consignment agreement. You heard his inconsistent testimony at deposition.

But at a minimum, there is no doubt that Mr. Martin had apparent authority to enter into this deal.

Page 320

He's at the table signing transaction documents with my client, a consumer, relative to the purchase and sale of this Ferrari, right? So his -- I think when we determine apparent authority, we look at the conduct of the parties, the circumstances, is it reasonable to conclude that Mr. Martin has authority to sign on behalf of Karma in those circumstances? Absolutely.

Now, if there is no consignment agreement, then Derek was cheated. If the transaction is what they say it is, then Derek was cheated out of his Ferrari. He was conned into leaving his Ferrari on the basis of entering into a consignment agreement, and conned into paying $250,000 at the same time for the Lamborghini. This is fraudulent inducement, plain and simple.

Their version of the facts, and I'm stunned to hear it, frankly, is that, yes, of course he paid $480,000 for a $250,000 car. I asked if that was legal, Zankl said no problem.

There are three fundamental problems with this under Florida law. The first is, documents, contracts are interpreted against the drafter. It is well founded, I said Florida law, I mean, this is law of the land, Supreme Court, right, it's well-founded principle of contract construction that an instrument shall be construed most strongly against its draftsman.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 321

The first position is that the integration clause knocks out the purchase and sale agreement. However, if the Court finds any cause to disagree with the application of the consignment, and particularly the integration clause, then the agreements must be construed together, right, we've got to find a way to reconcile the purchase and sale agreement, which shows a $230,000 trade value, the consignment agreement that says, no, no, we're going to sell it for you and we'll pay you then, and then all of this testimony that he never, Derek never got credit, never got paid.

No ambiguity in those documents can give rise to a result for the dealership, for the folks who stand in the shoes of the dealership today, FVP. It's got to be interpreted in our favor.

The second fundamental problem with their interpretation of the deal, it's equally well founded, that an agreement that contravenes public policy is void as a matter of law. What can you even say about this one, right? I mean, if the transaction is what they say it is, Derek paid twice for the same car, the transaction is occurring by somebody who -- the very person, the very entity that's opposing us, alleges committed an outrageous fraud. It's taken by another lender under circumstances that are allegedly, at least, made for t.v., and now we

Page 322

hear a new wrinkle today, by the way, from Mr. Farache, that Kristen, the wife of Scott, actually went to him and said, hey, I don't want you to be hurt by my husband's actions, so I'm going to give you all these cars. This is wild, it is absolutely wild. There is an FBI raid.

And now Mr. Farache testifies today, too, yeah, you can buy something from someone that they don't own and you don't have to pay for it. So we're living in this world of bizarre transactions, and their transaction, the way they characterize it, would result in these folks beating a consumer on an arm's length deal.

There is a case that I think is interesting to look at, it's in the category of public policy, it's called the Correa case. I'd be pleased to hand the Court a copy of it, and I'm pushing along my remarks, Judge, because I'm aware of what time it is.

THE COURT:  No, you shouldn't do that.  And you can hand it up if you'd like.

MR. MAURO:  I'll hand up a copy.

THE COURT:  You can give it to Ms. Leonard. Thank you.

So this is under the -- you said under the argument of --

MR. MAURO:  Yes.

THE COURT:  You said under the argument of,

Page 323

it's an agreement in violation of public policy, it's a 4th DCA case.

MR. MAURO:  Yes, and I want to make sure my opposition has a copy.  So, pardon me.

So, the plaintiff purchases a Cadillac at a dealership, had no idea that the dealership had an agreement with the lender.  It's one of these show floor lenders, the same kind of relationship they have here, and the original owner had sold the car to the dealership, and delivered title, and the car was added to the lender relationship as inventory.

Lo and behold the plaintiff comes in, buys it, and he can't get title issued.  There is a dispute between the dealership and the lender, just like this case.

Now, the express question the Court addresses is admittedly a little different, because they're talking about whether the consumer acquired the car despite that he couldn't get title from the bank, and you -- frankly you look at this case in the context of other buyers in this bankruptcy, but what the Court writes I think is equally applicable here.  The Court explains, in this case we have a situation where the plaintiff purchased an automobile from the dealer who was in the business of selling automobiles, and had sold the

Page 324

plaintiff two automobiles in the past.  There is no question that the dealer was an automobile dealer.  Nor could there be any question that the plaintiff dealt with the dealer on the basis that he was an automobile dealer.

We determine the situation calls for the application of a very old universally accepted principle that, quote, when one of two persons must suffer through the fraud of a third person, the one who made it possible for the fraud to be perpetrated must bear the loss.

Derek came to this dealership to transact a simple transaction, and it was papered in a way that's inexplicable and, frankly, just messy.  That shouldn't fall on him.  The notion that he can be told, give us your car and we're going to give you this consignment agreement, but that they're really acquiring the car, and taking payment for the other car, it's textbook against public policy, and that agreement, the agreement they argue came into being simply can't be enforced.

Let's talk about the check.  They also argue that Karma's bad check, this $250,000 check that Karma wrote to Derek that he couldn't cash, they argue that this resolved the transaction because he took the check while he was sitting in the car trying to drive off.

Mr. Miller, I think, says that Derek negotiated the check.  That's not negotiating the check.

81 (Pages 321 to 324)

Page 325

A bad check is a bad check. For parties to settle a dispute, there has to be actual performance, analyzed like any other contract, and if a settlement payment fails for insufficient funds, there is no performance of that settlement. I'm pleased to present law on that proposition as well, but I think these are such fundamental propositions, your Honor, in other words, it's not enough to say, okay, we'll settle on these terms, hand me a bad check, and then say, got you, the check didn't clear but we're settled. That doesn't work. The bad check is a nonevent, it's a nullity.

The Woodruff case out of the 4th DCA, quote, the delivery of a personal check is at best conditional payment, because whether or not it is drawn on a trust account or escrow account, it is not finally paid until the conclusion of the settlement process, in other words, when the bank pays out the money, and in the interim the account may fluctuate in amount, may be garnished, set off by a bank, or the drawer may stop payment on a check. Simply put, a bad check doesn't do anything to change this transaction, it's a nonevent.

I appreciate your time and your attention today. I'm going to sit down, but --

THE COURT: I have a question.

MR. MAURO: Yes.

Page 326

THE COURT: A great deal of your analysis assumes, or one would think would assume that Karma of Palm Beach is effectively the debtor, but it's not, and it's Auto Wholesale of Boca that had the title under, I think, Exhibit 6, the Debtor's Exhibit 6, which is effective as of April 6th.

Are you arguing that under the circumstances that you've outlined, that the debtor could not have obtained good title to the vehicle?

MR. MAURO: Absolutely they couldn't have obtained good title because the car was never purchased or brought in on trade, and everything, all of the analysis that occurs relative to their acquisition of the car, or their acquisition of the car comes after the March 11th transaction.

The only thing relevant is unwinding and figuring out what happened on March 11th, and how to apply, you know, where the chips fall, so to speak, after the Court analyzes the March 11th transaction.

THE COURT: Well, let's start with the initial documentation on March 11th, because your view of the evidence is that the deal was different by the end of the day.

MR. MAURO: Yes.

THE COURT: But earlier in the day your

Page 327

client signed the usual documents that would permit the dealer, in this case, Karma Palm Beach, to facilitate transfer of what was initially a trade, in your view, to that dealership, correct? Those documents exist, and you didn't retract them. You're saying they were superseded by the later agreement.

MR. MAURO: Yes.

THE COURT: But the -- and are you saying that, let's say that that dealership, Karma of Palm Beach, wrongfully used the documents which he signed earlier in the day to obtain title, which you would say would be wrongful title in their name, and then transferred for good consideration to the debtor, that the debtor had some duty to investigate -- the debtor could not obtain good title under those circumstances?

MR. MAURO: The debtor cannot obtain good title under those circumstances because Karma has not acquired the car. In other words, the transaction as papered was very clearly revoked, even if you don't get to the consignment agreement, because both --

THE COURT: I'm saying assume all of that, assume that that is true, and there is a purchaser who now has obtained, from a party that appears to have record title to the car, and let's -- I'm not -- we're going to get to the evidence on the debtor's side of the

Page 328

transaction on this point, but we have Karma and the debtor entering into some kind of transaction where title is transferred under the exhibit I just referenced, that's how the debtor got the car.

So, what law would you point to to support the conclusion that the debtor cannot get good title under those circumstances? Remember, it actually has the title.

MR. MAURO: It actually has the title, but --

THE COURT: And I'm looking at it.

MR. MAURO: Well, the title was provided by the bank, and not by Mr. Stephens, on the basis of the agreement that was superseded.

And, again, the undisputed testimony is that the car was never actually purchased, and value was never actually given in trade.

So, I think the thing that may separate this from the situation that you're suggesting, you know, the purchaser -- I'm sorry, Karma never took the position that it acquired the car. It was telling Mr. Stephens, right up to the moment that Mr. Farache took the car, and wouldn't let him out, this is your car, and the evidence is clear on that. The evidence is clear that Mr. Stephens was trying to get his car --

THE COURT: Well, let me change the facts a

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 329

little bit.

MR. MAURO: Okay.

THE COURT: This is probably not an Article IX consignment, even if it's a consignment, correct?

MR. MAURO: Okay.

THE COURT: I'm just asking you.

MR. MAURO: I think the consignment agreement is --

THE COURT: Understood.

MR. MAURO: -- clear --

THE COURT: Okay, but it's not an Article IX consignment, probably, because it's a consumer good from the point of view of --

MR. MAURO: Yes.

THE COURT: -- your client, correct?

MR. MAURO: I agree.

THE COURT: All right. So let's say it's actually a consignment. So if I consign a vehicle to a dealer, that admittedly sometimes has cars under consignment, and they sell the vehicle and not pay me, I don't have a right to that vehicle, correct?

MR. MAURO: I agree, I agree they were authorized to sell.

THE COURT: The debtor is going to tell me

Page 330

that's what happened.

MR. MAURO: No, no, no.

THE COURT: They sold it to --

MR. MAURO: No, they never sold it.

THE COURT: They didn't.

MR. MAURO: No. I mean, Mr. Farache testified, I thought it was clear that Mr. Farache testified that they didn't pay that $230,000. His statement --

THE COURT: Satisfaction of debt.

MR. MAURO: -- was that they have an underlying debt.

THE COURT: Well --

MR. MAURO: That's not a purchase.

THE COURT: It's not?

MR. MAURO: No.

THE COURT: Satisfaction of debt is not consideration to purchase a vehicle?

MR. MAURO: There was no transaction that occurred after the time that they say they got title. I think it's, you know, clear from his testimony that he's essentially invoking self-help and taking the asset to satisfy debt.

He hasn't taken the position, AWB hasn't taken the position that they -- that there was an arm's

Page 331

length transaction that resulted in acquiring that car. There is -- they manipulated paperwork to create a paper trail that shows that they're taking title, but nobody else was involved in that, in that transaction. There has been no testimony today that would suggest that that was anything but paper being created to kind of pass title from one entity to the other.

THE COURT: Well, other than Mr. Farache's testimony that he was asked to take certain vehicles, including this one, in satisfaction of, I also did not understand you saying the word antecedent, but that was cleared up with later testimony, in satisfaction of an existing debt obligation, which is, in fact, supported by a document that's been admitted into evidence, the existence of a debt, that other than that, what testimony or evidence do I have that the Ferrari in question was not transferred by Karma of Palm Beach to the debtor in satisfaction of debt?

MR. MAURO: Well --

THE COURT: What contrary evidence do I have? I know you have a theory.

MR. MAURO: Yeah, I mean, I --

THE COURT: But do I have any evidence?

MR. MAURO: Well, I think the fact of the matter is, AWB has knowledge that with respect to this

Page 332

car, this is minimally a dispute. Okay. He's got Mr. Stephens sitting in the car trying to drive it off the lot, he's got Ms. Zankl saying bring the keys back to this --

THE COURT: Well, that was -- hold on. That was April 4th, right? That was Monday, April 4th, and I believe the cars were transferred on the 1st and the 2nd, which is a Friday and a Saturday. So, we wouldn't have known that, based on the evidence I have, until Monday, the 4th, when he was physically present. Do I have any evidence that Mr. Farache knew there was a dispute about ownership of this vehicle before Monday the 4th?

MR. MAURO: Is there any evidence that the car was not --

THE COURT: Nope, the question I just asked is, is there any evidence that Mr. Farache knew there was a dispute with regard to the ownership of this vehicle before Monday the 4th of April?

MR. MAURO: Yeah.

THE COURT: When, according to the testimony and his own admission, he personally blocked it.

MR. MAURO: Yes.

THE COURT: He said yes, the question was, was it you, yes. So, he knew there was a dispute then because he was there.

83 (Pages 329 to 332)

Page 333

MR. MAURO: Right. So Mr. Martin did testify that when the -- when Mr. Farache showed up to take the title, and take the keys, that he told him that's not your car, you can't take that car, and that's part of Mr. Martin's --

THE COURT: You're using --

MR. MAURO: -- testimony.

THE COURT: -- pronouns. Who told who that --

MR. MAURO: Mr. Martin.

THE COURT: Yes.

MR. MAURO: And I believe the testimony was that Kristen Zankl told Mr. Farache that's not your car.

THE COURT: On which day?

MR. MAURO: On the day that he showed up to take the titles and the keys, which was --

THE COURT: April 1st.

MR. MAURO: -- April 1st.

THE COURT: April 1st, okay.

MR. MAURO: Yes.

THE COURT: And you can point me to law that would lead me to the conclusion that under those circumstances, if your client retained a right in the Ferrari, that he would win against the debtor? Do you see what I'm saying?

Page 334

MR. MAURO: I do see what you're saying. I do see what you're saying. I don't have a case on that subject matter as I stand here before you.

THE COURT: Right, but we can deal with that.

MR. MAURO: Okay.

THE COURT: But my concern is that a lot of the analysis today assumes that the Court's inquiry ends at Karma of Palm Beach, but that's not who has title to the vehicle today. The debtor does.

So, I need to figure out why the debtor does not have a right in the vehicle, and there are circumstances in the law where someone can acquire title that, for example, even a consignee, who has failed to pay the consignor, can transfer good title --

MR. MAURO: Right.

THE COURT: -- under many circumstances.

MR. MAURO: Right.

THE COURT: So, even if your theory is correct, I'm trying to figure out why the debtor doesn't win.

MR. MAURO: I understand, and you're asking me for --

THE COURT: I need to get those last couple of links in the chain, assuming I agree with your theory

Page 335

overall.

MR. MAURO: Yeah, I think back to Correa. So, you know, there is -- Correa deals with the same situation, essentially, where you have a show floor lender, and the dealership, and there is this notion by the Court that you can't enter into that agreement, create this circumstance, paper a deal a certain way, and then work an injustice on a consumer.

THE COURT: But remember it's the debtor that has title right now though.

MR. MAURO: I --

THE COURT: You're focusing on Karma, and you're throwing the debtor into that.

Now --

MR. MAURO: Yes, because Karma is -- because the title that the debtor obtains from Karma is tainted, and the debtor knows it. The debtor is told, this is not your car. Under those circumstances he has notice that it's not a, not a good faith -- you know, he's not a bona fide purchaser for value at that point where there is --

THE COURT: My question is, is that the standard? And --

MR. MAURO: I believe that it is.

THE COURT: And earlier today I was thinking, in walking through this, you know, if it's a --

Page 336

and no one had argued this before this point, so I was asking questions in a vacuum, which I do all the time, and the question was, does this fall under Article IX or it doesn't fall under Article IX? What does that mean with regard to the nature of later acquirers of title? What rights can they and can they not obtain? I don't know the answer to that. So, I don't know if the rules in Article IX are derived from common law, which would otherwise be Florida law in this instance or not, I don't know the answer.

So, as the evidence was coming in, I kept asking the question, is this focusing on the party that currently has -- at least holds title to the vehicle, which is the debtor, and I could not see those last two links. Maybe it is a legal issue, and that you can brief it for me and explain, assuming the rest of it, assuming I agree with your theory overall about the nature of the contract as it existed at the end of the day, the end of the business day on the 11th of March.

MR. MAURO: Yes, you know, I go back to that. I guess what I'm struggling with is if the transaction on the 11th is not enforceable because it contravenes public policy, if the documents have to be interpreted against the dealership in that instance and that transaction --

84 (Pages 333 to 336)

Page 337

THE COURT: You mean Karma.

MR. MAURO: -- is void -- being Karma, but also FVP, who stands in its shoes relative to what its inventory is, as does Mr. Farache.

Mr. Farache is relying on those, on those vehicles coming into the inventory because, based on their agreements, that's what their collateral is. So it's not a simple purchase, it's not a simple, you know, did he -- was he a guy off the street who purchased a car?

If the underlying transaction is void against public policy, and it has to be interpreted against the dealership, then you don't get to the next level.

THE COURT: Then nobody acquiring title from that dealership in the meantime gets to keep the property?

MR. MAURO: No.

THE COURT: Well, I'm trying to figure out what the law -- I don't know what the law is in this instance.

MR. MAURO: But I think there is a -- I want to answer your Honor's question.

THE COURT: Well, you don't know the answer yet, and that's fine --

MR. MAURO: Well, what I --

THE COURT: -- you can brief it.

Page 338

MR. MAURO: Okay, but what I do know is that their rights depend on what collateral is, and if FVP was here today to testify, you know, we would have looked at their documents. Their documents weren't presented, but the basis of their claim is that we have a right to the collateral of Karma, and that's AWB's basis for a right in those cars, we have a right to the inventory.

So they've got to demonstrate that there was an acquisition. It's not the same, respectfully, your Honor, as, you know, somebody coming in and buying the car, and the hypothetical question can title transfer.

THE COURT: And if that's the case, then you'll point me to the case law that says that.

The only evidence I received today is that the debtor's acquisition was -- the consideration for the debtor's acquisition of this particular vehicle was satisfaction of an existing financial obligation, that's the only evidence I have.

MR. MAURO: That is the only evidence you have, and I think that that's -- that's not adequate to demonstrate a basis for AWB to claim that it has good title, notwithstanding that the underlying transaction is void.

THE COURT: And it would be better if they had paid cash? I'm trying to figure out why it matters.

Page 339

MR. MAURO: It matters because the only thing, pursuant to contract that they have a right to, is the collateral, and the collateral is defined by what's in inventory, and if something does not become inventory, then by operation of contract, in this instance, they don't have a contract right to execute against --

THE COURT: But can't the party offer something that's not collateral in satisfaction of the debt? I don't follow you logically.

If you have a lien on four of my five items of inventory, and I offer you the fifth one, which we agree fully satisfies your debt obligation, why can't I do that? I don't understand why --

MR. MAURO: If it's not yours to offer, then I think you can't offer it.

THE COURT: Well, if you don't -- let's say you don't know that, or it depends on what your duty is under the law, and you haven't told me what the law is on that.

MR. MAURO: Fair enough, I understand that I'm going to need to present a --

THE COURT: Well, you need to answer the question why the -- even if you're right, why the debtor -- this is turnover motion, why the debtor has to give up the vehicle.

Page 340

MR. MAURO: Okay.

THE COURT: Why the debtor did not acquire rights in the vehicle.

MR. MAURO: Okay. That's something that we'll brief --

THE COURT: That's my focus.

MR. MAURO: -- with leave of Court --

THE COURT: Yes, of course.

MR. MAURO: -- to do so. Happy to do that.

THE COURT: Is there anything else that, during the course of presentation today, that you thought, I wish to address that as a legal matter?

MR. MAURO: No, your Honor. I think I've covered it.

THE COURT: All right, and the documents you would focus on, the documentary evidence, is really the consignment agreement, in light of the timing pursuant to the testimony that I heard, yes?

MR. MAURO: That's right, and I'd also -- from a documentary perspective, you're asking me?

THE COURT: Yes.

MR. MAURO: Yes, the consignment agreement, absolutely.

THE COURT: You're not focusing really on anything but that because of the testimony that I've heard

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 341

with regard to the timing of the transaction --

MR. MAURO: I guess I --

THE COURT: -- both from Mr. Martin and your client.

MR. MAURO: Yes, I still want to circle back and then suggest that the consignment agreement is part of the file, and so, again, on the question of whether the debtor had any knowledge of the underlying issue, there is a consignment agreement in the file. So, there is a dispute, there is an active dispute as to this car. There is --

THE COURT: Well, it's in the file, and Mr. Farache was physically there, and he was apparently --

MR. MAURO: There is --

THE COURT: I have evidence that he was told by Ms. Zankl about this, the fact that the car was, from the point of Karma, not its property.

MR. MAURO: That's correct, and I think there is also the issue, and we're getting outside of my role in this case, I suppose but, you know, there is also the issue of the legality of coming in and, you know, blocking people, and seizing cars, and seizing titles, which I don't think was, you know, the subject of today's testimony, and we don't have a fulsome record relative to that, but I think it's abundantly clear that it was

Page 342

abundantly unclear in the record that Karma had, in the deal jacket that Mr. Farache and his people had access to, that this car was not claimed by somebody else, that it was not on consignment on behalf of somebody else.

THE COURT: Very good. Thank you.

Who would like to go next? Mr. Breslin.

MR. BRESLIN: I can (inaudible) --

THE COURT: Sure, yes.

MR. BRESLIN: Judge, you know, with your questions, you kind of, you took it away from where I was going to head, but --

THE COURT: Well, don't let me deter you from --

MR. BRESLIN: Okay. I'll try not to, but I'd just like to focus on --

THE COURT: You know, I could go down the wrong rabbit hole, you know, and I'd rather you tell me that now.

MR. BRESLIN: Right. Anyway, the -- if you look at the motion for abandonment it's very clear, it says that Mr. Stephens consigned his car to Karma of Palm Beach, and it's still consigned and he wants his car back, that's his presentation.

And so let's take a look at that, and because it's our position that there was no consignment,

Page 343

and if you look at all the paperwork, the entire body of evidence in this case, it's overwhelming that it was not a consignment, and why.

THE COURT: Well, why would you say that?

MR. BRESLIN: Because every contract has a trade, A, so it shows that the -- the Ferrari was either traded or it was consigned, it can't be both. I think we can all agree on that.

If you take a look at the paperwork, the Ferrari was traded. There is a trade pack, he swore under oath that it was traded, he told his bank it was traded, both agreements say that the Ferrari was traded. All the evidence shows that it was traded, and so --

THE COURT: I mean, just for the record I'm wincing because all the evidence doesn't show that it was traded. This is --

MR. BRESLIN: Well, there is documentary evidence.

THE COURT: -- the weirdest trade in history.

MR. BRESLIN: Pardon me?

THE COURT: All the evidence, what about the $250,000 check? That is an extremely strange fact --

MR. BRESLIN: And I'm --

THE COURT: -- in the midst of your -- all

Page 344

the evidence summation.

MR. BRESLIN: And I'm going to get to that. I'm talking, the documentary evidence shows that --

THE COURT: The check is a document.

MR. BRESLIN: -- there was a trade.

So, I understand that.

So, why was a check for $250,000 issued that day? Well, if you take a -- if you just think back on what Mr. Stephens testified to, and what Mr. Zankl testified to, the reason that a $250,000 check was issued, because that wasn't the amount to buy the Lamborghini, that's important, because he couldn't buy the Lamborghini for $250,000. If he was going to buy the Lamborghini, it would be $250,000, plus tax. That wasn't that, okay?

What the deal was, what the transaction was, was I'm going to -- we have a set of paperwork, I'm going to give you $250,000 for the sole purpose of me being able to drive off the lot with the car today, because let's not forget that, that's the only reason the check was written, was so that he could have that car that day, all right?

THE COURT: All right. So you say it's the purchase agreement. Let's choose the one with the bank payoff in it.

MR. BRESLIN: Okay.

THE COURT: That's the binding deal, right?

86 (Pages 341 to 344)

Page 345

MR. BRESLIN: All right.

THE COURT: Right, we have that binding deal. Why -- I've looked at it, it's signed by both parties.

MR. BRESLIN: Right.

THE COURT: Why does the movant have to tender a check for $250,000? Here is our deal, here is the Ferrari, I'm going home, you have to deal with my bank, they'll pay the extra, which, in fact, they did.

MR. BRESLIN: Right.

THE COURT: But why would that not be the deal?

MR. BRESLIN: Why? Because of the testimony of Mr. Zankl, it's because he wasn't going to give him $230,000 for the Ferrari, because he didn't think it was worth $230,000, and the only way he's going to give him $230,000 is if he sold it for 230,000, and that's what he testified to. That's the only reason this happened, because the deal was done, and instead of him giving a check for 22,000 -- because if the car was worth 230, we wouldn't be having this conversation, but it wasn't. Mr. Stephens wanted to get 230 for it. He didn't mind waiting to get 230 for it, and he didn't mind putting up 250 so he could leave with the Lambo that day, with the understanding that he would get the 230 for it.

Page 346

What he got for the 250 was he got a car -- a trade-in value for the Ferrari that was much greater than it was worth, and that's what Mr. Zankl testified to.

THE COURT: And so then why did the dealership sign the purchase agreement with the $230,000 value?

MR. BRESLIN: Because, as Mr. Zankl testified to, his salesman convinced him that he was going to sell the Ferrari, and that's why I listed as one of my exhibits --

THE COURT: So, that means --

MR. BRESLIN: -- the paperwork that --

THE COURT: -- even that contract isn't the full agreement under your theory. I have to take into account the testimony of at least Mr. Zankl --

MR. BRESLIN: Right.

THE COURT: -- in order to interpret the deal.

MR. BRESLIN: Well, right, because --

THE COURT: It's not just the original contract.

MR. BRESLIN: -- it makes no sense for him to write a check for $250,000.

THE COURT: Well, I think we can all agree on that.

Page 347

MR. BRESLIN: Right, but it does make sense, if you factor in that he wanted to leave with the Lamborghini that day, and Mr. Zankl was not prepared to give him a $230,000 guarantee for his Ferrari --

THE COURT: And --

MR. BRESLIN: -- until the Ferrari was sold.

THE COURT: And the last signed agreement of the day just doesn't exist?

MR. BRESLIN: Well, we don't -- we sure don't know which one was the last one.

THE COURT: The only testimony I have is that the last one was the consignment agreement.

MR. BRESLIN: Well, right, Mr. Stephens testified to the consignment agreement, and let's talk about that. You know, so Mr. Zankl said, he certainly didn't have the authority to execute that, that Mr. Martin had the authority to execute it, and it's completely inconsistent with --

THE COURT: Well, stop. Well, it's not inconsistent with the testimony I heard from both the salesperson and the purchaser of the Lamborghini.

MR. BRESLIN: Right, but they're going -- but here is the thing, that's why I talked about it, Judge, it's either a trade or it's not. If it's a trade, then it's not a consignment. If it's a consignment, then

Page 348

it's not a trade. Which is it?

THE COURT: Well, either we have a trade with someone who has made a gift or a short-term loan of $250,000, or we have a consignment.

MR. BRESLIN: Right. What we have here is a business deal where Mr. Stephens was -- where he was ready and did give a check for $250,000 to leave with a car that day, because if he didn't want to leave with the car that day, then he wouldn't have had to write a check for 250, and the following week something would have happened, either the Ferrari would have been sold or it wouldn't, there wouldn't have been a deal. That's the only reason that he put up 250, and that is why we're here, because -- and that is why when you look at all the texts and everything about it, he wanted to get his 250. He didn't want to get his Ferrari.

THE COURT: So is there any, any evidence whatsoever that contradicts the following statement, the agreement between the parties is that the movant would get $250,000 when the Ferrari was sold?

MR. BRESLIN: No.

THE COURT: No. If you go to Black's Law Dictionary and look up the definition of -- what's the word, it's late in the day, the agreement.

UNIDENTIFIED: Consignment.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 349

THE COURT: Right, consignment, sorry, that's it.

MR. BRESLIN: Right, okay, but the consignment agreement, if you look at the consignment agreement that got signed, it says that Mr. Stephens would retain title. Okay. You just have to read it, just look at what it says, it says, I'm going to retain title, you're going to get to sell the car for me, and if and when you sell the car, then I get to decide whether or not I want to sell it. That's what the consignment agreement says, but that's not what the deal -- that's not the deal we have here.

The deal we have here is, he's going to get 230. A consignment is, you have my car, you have my Ferrari, and the guy comes in for 215, I call you up and say do you want to --

THE COURT: Okay. These are two completely unrelated things.

MR. BRESLIN: Pardon me?

THE COURT: These are two completely unrelated things, and every time I heard this today, I thought it was laughable. There is a credit for a trade-in, it's not cash, it's a credit.

MR. BRESLIN: Correct.

THE COURT: I don't think any -- when the

Page 350

purchase price for the vehicle is greater than the amount of the trade-in, it's a credit.

MR. BRESLIN: Correct.

THE COURT: There is no cash transaction to happen there.

MR. BRESLIN: Right.

THE COURT: In a normal trade-in, there is no other check. There is a $250,000 check, and I don't think anybody disputes that he was entitled to $250,000 back --

MR. BRESLIN: Correct.

THE COURT: -- yes?

MR. BRESLIN: Right.

THE COURT: Okay. So, and it was triggered by the sale of the vehicle.

MR. BRESLIN: Right, but why --

THE COURT: So when you say he's only entitled to 230, no, that's only in a deal where it's a credit for a trade-in.

MR. BRESLIN: If it was a consignment, Judge, he wouldn't be entitled to 250, he'd be entitled to what the car sold for, okay, and that's the difference. Zankl and Karma were --

THE COURT: A consignment without someone under this strange circumstance having written a check,

Page 351

which the debtor immediately deposited that same day, that's what that exhibit shows. It does not show the check clearing, by the way, there is nothing on that page that shows --

MR. BRESLIN: I understand.

THE COURT: -- the check clearing on the 11th. It is the receipt that all of us get when we do an electronic deposit of a check.

MR. BRESLIN: Right, I understand.

THE COURT: The funds aren't even available yet.

MR. BRESLIN: I understand.

THE COURT: Okay. So, the --

MR. BRESLIN: So if it was a true consignment, Judge, the car would have been sold for whatever, whatever, and Mr. Stephens would have received that amount, that's what a consignment is.

That's not what we had here. What we had here was a business deal, and the business deal was, I'm going to give -- I want to leave with this Lambo today, I don't want to wait until next week, and for me to leave with the Lambo today, I'm going to give you $250,000, and then you're going to give me the whole 250 back.

Okay. So, you know, I know that Mr. Stephens and his lawyers want to talk about him buying

Page 352

the Lambo. He didn't buy the Lambo, because I asked him, is there a -- do you have a contract regarding the Lambo, and the answer was no. The only contracts show that the Lambo involves a trade of the Ferrari. Okay, and then you have the outlier, which is the consignment agreement, that's executed by Mr. --

THE COURT: Which I should ignore?

MR. BRESLIN: Well, you should absolutely ignore it because you either have a trade or -- you either have a trade or a consignment, and they're trying to say that there is both, okay, and you can't have both, it's one or the other.

And here is what's important, when I asked Mr. Martin, did you ask Mr. Zankl whether or not you could execute a consignment agreement, he said, no.

Okay. So, now Mr. Mauro talks about apparent authority. Take a look at all the documents. What other document did Mr. Martin sign? He didn't sign anything. He wasn't one of the reps that could sign a purchase agreement. Look at the purchase agreements, he didn't sign any of them. He signed one document, and that was the document to make his customer happy.

You know, assuming that this happened on 3-11, and the text, the text that came three weeks later that says I have a consignment agreement that's dated 3-11

88 (Pages 349 to 352)

Page 353

-- you know, why does the text say that? You know, they testified that it was dated on that date, so let's take it at face value, but --

THE COURT: Both the salesperson and the client testified that it was signed on that day.

MR. BRESLIN: I know, and when people come to court, they testify to things that are often not accurate. So, when you look at the text, the texts are very telling, and I talked about this in my opening.

THE COURT: Well, wait a minute, what text can I look at? I think the texts in their entirety were not admitted. The only texts I have are the things that were read into the record without objection.

MR. BRESLIN: Right, right, and so --

THE COURT: That's all I'm going to look at.

MR. BRESLIN: And the ones that I, the ones that I read in, one of the passages was, I have a consignment agreement that's dated 3-11, and --

THE COURT: What's remarkable about that? It's true.

MR. BRESLIN: I understand that, it's true, but why say it like that? Because when you look at the text that I read into the record, he talks about -- just, he says, give me the Ferrari, give me the title, I'll hold them until you give me the 250.

Page 354

THE COURT: Is that -- what you've just described to me, is that in the record?

MR. BRESLIN: Yes, I read it into the record.

THE COURT: You read that part, okay.

MR. BRESLIN: Yeah, right, and he says that, and that's the point, when you look at the text, he wants his 250, and just think about this, Judge, if this car is there on consignment, every one of those texts, he'd be saying, hey, my car is there on consignment, I want my car back.

THE COURT: He's sitting in it at the time he's texting that.

MR. BRESLIN: Well, Judge, and that's the thing, take a --

THE COURT: Sitting in it. Isn't that someone who wants to drive away with the car?

MR. BRESLIN: Well, Judge, those texts --

THE COURT: He had the key with him in the witness box.

MR. BRESLIN: Those texts were from three different days --

THE COURT: Okay, and part of that --

MR. BRESLIN: -- and I brought that up.

THE COURT: -- is when he's sitting in the

Page 355

car.

MR. BRESLIN: Well, which ones did he issue, which ones did he text while he was sitting in the car? There is three different days.

THE COURT: Okay. Well, one of them is, I assume you're telling me -- let's see, the 4th of April, yes.

MR. BRESLIN: There is the 4th, the 5th --

THE COURT: Because he flew --

MR. BRESLIN: -- and the 6th, and I wanted -- what I was going to get up and clarify with the witness and you said I couldn't ask any more questions --

THE COURT: Well, I think we were done with repetitive back and forth.

MR. BRESLIN: No, I understand, but I just wanted the record to be clear, that those texts occurred over three different days.

But the point is, if this is a straight-up consignment, and that's -- and let's not forget, this is their theory. Their theory is not -- it's nothing other than this car was consigned, okay? And when you look at the evidence, I think the evidence is very clear that this was not a consignment, it was a business deal, and that the business deal -- because Mr. Farache came and took the cars, and the place closed down on April 1st, it just got

Page 356

-- it got stopped in mid-deal.

So now a business deal was made that would have been, assumedly, you know, finished at some point, but it got stopped because of what happened on April 1st.

Now, you know, the attorneys for Mr. Stephens argue that it was all a fraud, that this was a rip-off, like, they were trying to rip him off that day, on 3-11. Nobody was trying to rip him off on 3-11. On 3-11 he could have went home --

THE COURT: Well, let's see, they took the vehicle, they immediately obtained a title, transferred it to somebody else, also received $250,000 extra, and then did not pay him back.

MR. BRESLIN: I understand, but what was the deal? The --

THE COURT: The check was deposited immediately.

MR. BRESLIN: But the deal was, you'll get your 250 when we sell the Ferrari. Why? Because the Ferrari wasn't worth what he agreed to give him in the deal. The deal was when he gets the 230 for the Ferrari, then he'll give him the 250.

THE COURT: No, that was not the deal, and there is no evidence that says that, zero.

MR. BRESLIN: Well --

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 357

THE COURT: Stop.

The deal was when the Ferrari sells, for $10 or $200,000, there is not a single piece of evidence that says there is a threshold for the sale of the Ferrari, zero.

MR. BRESLIN: You're absolutely right.

THE COURT: Exactly, and, guess what, it did sell, but -- it didn't? If it didn't sell, then the debtor doesn't own it.

MR. BRESLIN: Well, that's a whole nother matter.

THE COURT: So, is it --

MR. BRESLIN: Yes, whether or not --

THE COURT: Hold on. Is it your view that the debtor does not own the Ferrari?

MR. BRESLIN: Judge, my view is that this vehicle, along with many other vehicles, as I've alleged in my complaint, and will allege in the next complaint --

THE COURT: This is a different --

MR. BRESLIN: -- were wrongfully taken.

THE COURT: This is not the complaint. This is not the complaint.

MR. BRESLIN: I understand.

THE COURT: I just asked you what your client's view is, does the debtor own the vehicle?

Page 358

MR. BRESLIN: Our view is that the Karma entities own the vehicle.

THE COURT: In which case the motion should be granted.

MR. BRESLIN: Well, I hear what you're saying, Judge, and I understand what you said at the last hearing, but it is what it is. I mean, our position -- the FVP position is, and will remain, that this vehicle, along with all the other vehicles --

THE COURT: Is still owned by Karma?

MR. BRESLIN: -- is still owned by -- they're all Karma inventory.

THE COURT: Now, you did not feel compelled to put on that evidence today.

MR. BRESLIN: I did not, Judge, because if it's Karma inventory, regardless of what ruling you make today, we have a lien on the vehicle. If you rule that it was never Karma inventory, then we're out of luck, that's the thing.

So, I mean, we're protected either way, otherwise, as I mentioned to you on the Zoom, my examination of Mr. Farache wouldn't have been, you know, 15 minutes, it would have been, you know, a day and a half, and there would have been just substantial evidence, and I wasn't going to put anybody through that today.

Page 359

So, it's not like my client is unprotected, but our position is quite clear, and that is that this car, like all the other cars, is Karma inventory, and there is a much, much bigger picture as to what happened with Mr. Farache, other than what he talked about today. There is just over -- there is tons of evidence that you'll hear eventually, but that's --

THE COURT: Right, but it may not --

MR. BRESLIN: -- not today.

THE COURT: It may not have anything to do with this car after today.

Is there any other vehicle that is like this one with regard to the nature of the transaction? Am I likely to hear this particular view on any other cars?

MR. BRESLIN: No, no, no, Judge, and that's the thing, FVP has not taken a position on any of the other cars, because all the other -- there are several other cars that you've returned to their owners, and they were just, you know, good faith purchasers, you know, customers who came in and bought cars.

What separates this car from the other vehicles is, A, Mr. Stephens alleges a consignment agreement that we believe that the evidence establishes did not exist. Number two, the car became --

THE COURT: So the document is a forgery --

Page 360

MR. BRESLIN: No.

THE COURT: -- or the --

MR. BRESLIN: If you take all the evidence you heard today and you accept it as true, what that is is a salesperson signing a piece of paper and handing it to Mr. Stephens that had absolutely no effect.

THE COURT: Completely unauthorized, and no apparent authority.

MR. BRESLIN: No, absolutely no apparent authority. If you look at all the other documents that he says he signed that day, show me one that Jonathan Martin signed.

THE COURT: Why does that matter? Why does he have to sign any other document?

MR. BRESLIN: Well, what's apparent authority?

THE COURT: What's apparent authority? A representative who is negotiating with the client on behalf of the dealership who enters into a written agreement with the client.

MR. BRESLIN: Right, and this is the same salesperson that couldn't make the deal, he had to get Scott Zankl on the phone, and Scott Zankl said, hey, listen, Mr. Stephens, you know, all those, the papers you just signed, you can't take the car without writing me a

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 361

check. So where is the apparent authority? It's certainly not with Mr. Martin.

Let's look at the evidence. All the documents were signed before the consignment agreement. Look at all of them, show me one that Mr. Martin signed. Where is the apparent authority?

The evidence shows that he had no authority. When it came to talking to Mr. Stephens about what he could and couldn't do, he had to get Mr. Zankl on the phone. Mr. Zankl told him straight up, you can't leave with the car. You can leave with the car if you pay me, give me 250, that's the purchase price, and we'll forget about the tax, and we'll work it out next week. I'll give you your 250 back when I sell the Ferrari. That's the apparent authority.

So if you look at what was going on that day, Mr. Martin was a sales guy, but he wasn't making any of the decisions that day. On the contrary, the evidence showed that he was the last guy that could make a decision.

So, because he -- you know, as Mr. Stephens testified to, you know, he thought he was leaving. Why? Because he was dealing with Jonathan Martin, but Jonathan didn't sign anything except the consignment agreement.

Page 362

So, apparent authority, you know, I don't think that washes, Judge, I don't think it even comes close.

THE COURT: I disagree. I think apparent authority is fairly obvious here, given the testimony that I heard, and the evidence that I received today. Maybe there is other stuff that you know, but it is not in evidence.

Mr. Miller.

MR. BRESLIN: Thank you, Judge.

MR. MILLER: Judge, I will keep this short.

THE COURT: It's okay. Have I been telling people to keep it short? I have not.

MR. MILLER: Mr. Breslin swore --

THE COURT: We're still here at --

MR. MILLER: -- he wouldn't be up here that long but he did.

THE COURT: It happens. Lawyers greatly underestimate time.

MR. MILLER: I think there is three tracks this could go down. Any of those tracks at the end of the day would not compel turnover of the car to Mr. Stephens.

Mr. Mauro's client wants to argue they have this late in the evening consignment agreement.

You were asking what's the effect of a

Page 363

consignment agreement on the debtor? Better yet, what's the effect of the consignment agreement even on FVP? None.

Consignor, under Florida law, submits their goods or their product for resale, that's called a sale or purchase -- sale or return under the Uniform Commercial Code. You have a couple of commercial code provisions that would govern this.

THE COURT: Why would the Uniform Commercial Code govern -- can you look at the definition of consignment?

MR. MILLER: Do you want me to look it up right now?

THE COURT: Yeah, I do, because this is a consumer good and its excluded, so it's not covered by the Uniform Commercial Code.

MR. MILLER: No, it's a consigned good, it's a consigned good -- it's a sale or return.

THE COURT: If you look at the definition of a consignment agreement under Article IX, you'll discover that it excludes consignments of consumer goods, and a consumer good is measured from the point of view of the consignor, in this case it was a good used personally or for his family, and so this is not an Article IX consignment.

Page 364

Maybe I'm wrong, and you can -- oh, you think, you're looking under Article II.

MR. MILLER: Article II, 672.326.

THE COURT: Okay. Go ahead.

MR. MILLER: So, under 672.326, the consigned goods would be just like a general good in the store, anybody can buy it, and they become a wholly unsecured creditor of Karma of Palm Beach, who would be indebted to them.

At the end of the day, this -- if you go down to the consigned goods argument that they want to argue, they gave up the value of that vehicle when they turned it in to be sold, and they -- if that's what they really did on the consigned basis, and ultimately the debtor acquired the vehicle as satisfaction, a partial satisfaction of a debt, and that is consideration.

As a matter of fact, it's consideration recognized under the Uniform Florida -- the fraudulent transfer statutes of Florida, and even the Bankruptcy Code, satisfaction of an antecedent debt is consideration. So, there is consideration given if you go with the consignment theory.

I can understand Mr. Breslin's theory, that he wants to focus on this 250 check. I mean, the reality is the 250 check, sort of like that wild deed on real

91 (Pages 361 to 364)

Page 365

estate, it just doesn't make any sense until you read the memo, and I don't believe that that check was supposed to be cashed. Mr. Zankl wasn't in the premises. The check is handed by Mr. Martin to the staff, and it says for hold of this car, this 2017 Huracan.

They do cash it. Mr. Martin's testimony is we're supposed to give him a check that following Monday, that would be March 14th or so. He was supposed to get that check. Mr. Stephens said, yeah, I was supposed to get a check, he corrected me. I said you weren't supposed to get that check back, he says, what check? I was supposed to get a check for $250,000.

There is nothing in any of the written documents that says Mr. Stephens is getting $250,000 for the Ferrari.

The world acted on Mr. Stephens' trade in of that vehicle, and by the way, I think you did ask Mr. Mauro if there was any evidence that the lien on the Ferrari had been either satisfied or paid off.

THE COURT: Yes.

MR. MILLER: It was, it's in Exhibit Number 6 of FVP -- or, I'm sorry, Exhibit 19, because they received a late production finally from Texas Credit Union, and that is Exhibit 19 in their exhibit register, and if you look through it you will see that the debt that

Page 366

I kept trying to get Mr. Zankl -- I thought he understood the transaction, but the debt was satisfied. It was transferred from the Ferrari, over to the Huracan.

Mr. Stephens DocuSigned -- remember he testified he DocuSigned some documents for the bank, he DocuSigned the loan application to transfer the debt from the Lamborghini -- from the Ferrari to the Lamborghini. He acted as if it was a trade-in, and it was going to be done this way, and he reacted with what the bank had asked him to do. He did all the necessary formalities.

The quarter million dollar check, Judge, the quarter million dollar check was solely for Mr. Stephens to drive the car off the lot, that's what it was.

He wasn't purchasing the car with that check. He wasn't including the payment of sales tax or anything. There is no purchase agreement for $250,000, and nothing else identifying it whatsoever. All the purchase agreements refer to this Lamborghini and this Ferrari, one refers to the Ferrari outright, the other does reference the dollar figure for the payoff, and they both represent in the box Texans Credit Union as the lienholder.

So that was the transaction contemplated, and they went through it and finished that transaction. Mr. Martin called to confirm with the bank, the bank said

Page 367

that they would pay it off by that Monday. So I think there is just a lot of red herrings out there.

Yes, Mr. Stephens did get a postdated check, and he tried to negotiate it, and it bounced, there is no doubt about that as well, but he did want that $250,000.

I think what Mr. Breslin was trying to say was the car, the Ferrari wasn't worth 250 grand, that was never a part of the money that was supposed to be paid to Mr. Stephens. It was really the check floated by Mr. Stephens on the hold check. Mr. Stephens finally said, hey, you've got to pay me back my check. At no point in time did Mr. Stephens say, I didn't want to do this deal, I put a stop order on the check. Okay. He didn't do that, he let that check get cashed. It went through.

THE COURT: He didn't have much of a chance to put a stop order.

MR. MILLER: Well, you get --

THE COURT: They put it in that night.

MR. MILLER: -- three business days to put a stop payment on a check.

THE COURT: I know.

MR. MILLER: But the point is, there was still -- you're right, and it's crazy.

THE COURT: It would have cleared the next

Page 368

day, so --

MR. MILLER: It's crazy. None of us ran this business empire of Mr. Zankl, none of us. So we're left with the fragments, and trying to put it together, and at the end of the day, the only things that make sense are either, A, there was this subsequent consignment, which, if that's the case, Mr. Stephens has no better interest in that vehicle -- has a lesser interest than the debtor. The debtor has possession, has title, has an endorsed title, has all --

THE COURT: That's the question I was asking earlier, and I'd like you to brief that. We'll get to that at the end.

MR. MILLER: I am so sorry, my hearing aids weren't working today, so --

THE COURT: I apologize, I didn't realize that.

That is one of the questions I was focusing on earlier, how do you get -- what is the debtor's interest at the end of the day, and how does all of this affect the debtor's interest, and I'd like that to be briefed.

MR. MILLER: The debtor is the owner of the property, it's property of the estate. The debtor has --

THE COURT: I get that, I get what you're

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 369

arguing. You were making an argument based on consignment --

MR. MILLER: Consignment.

THE COURT: -- law.

MR. MILLER: Yes.

THE COURT: And that, I want that part briefed.

MR. MILLER: The debtor would acquire that interest no different than anybody else that walked in that store and acquired the property. The debtor didn't dig in its pocket and pay for the property. The debtor was owed, as like --

THE COURT: I get the theory. I want the law.

MR. MILLER: Oh, okay.

THE COURT: Not now.

MR. MILLER: Oh.

THE COURT: After today.

MR. MILLER: Okay.

THE COURT: All right. What else?

MR. MILLER: So, you have the consignment argument, and you have the sale argument, but nobody in this room, at these two tables, put Mr. Stephens in the predicament he was in.

He seems like a nice guy. No one is saying

Page 370

he's a bad person, but Mr. Farache is a nice guy, too. Sometimes Mr. Breslin can be a nice guy, but the point is, nobody put Mr. Stephens in that predicament.

He chose, he wanted that car so bad, he may have been duped by Mr. Zankl, like hundreds of other people, and other business enterprises, but he took that risk when he wrote a check for $250,000, and he thought that putting in the memo "for hold 2017 H", that that would be enough to protect him, and it didn't, and he didn't turn around right away -- you've got no evidence to show that Mr. Stephens turned around right away and said, hey, man, that's my check, I want my money back, because the bank paid you that following Monday.

By the way, Judge, you said he couldn't put a stop payment, sure --

THE COURT: Well, can I ask you, the document you pointed to, is that admitted, the one that has all the bank records?

MR. MAURO: No.

THE COURT: No, okay.

MR. MILLER: Well, I'll move it into evidence, because there is no objection pursuant to the Local Rule and the court order.

THE COURT: But it wasn't offered during the trial. Would anybody object to -- what exhibit number?

Page 371

MR. MILLER: It's Mr. --

THE COURT: Hold on, hold on. If there is an objection it's going to be sustained.

Exhibit 19.

MR. MILLER: It's Exhibit 19, it's at Court Paper 232 dash --

THE COURT: 2.

MR. MILLER: -- 1.

THE COURT: Oh, okay, yes.

MR. MILLER: Which is, it's starting on Page 22 of 34, is the document signed by Mr. Stephens.

THE COURT: Understood, this was not offered during the evidentiary hearing.

Does anybody object to it being admitted?

MR. MAURO: I object to it coming in now.

THE COURT: Okay. Sustained, it's not coming in.

MR. MILLER: I don't know how in good faith you object when it's your own document.

THE COURT: It doesn't matter, it wasn't offered during the evidentiary hearing.

MR. MILLER: That was transferred --

THE COURT: This is called closing argument for a reason. The evidence is over.

All right. So --

Page 372

MR. MILLER: Well, anyway, Mr. Stephens didn't lose out twice, the car is his, he got the Lamborghini, and everything he asked for was done in the paperwork with his bank, and so -- and that's an example of, you know, shuffling, and hiding paperwork, and doing things, like, that's inappropriate.

If you -- if they want to come in and be honest about their argument, then put all your cards on the table, and let's --

THE COURT: How have they not been honest?

MR. MILLER: What's that?

THE COURT: What are you talking about? How are they not honest?

MR. MILLER: Are they going to acknowledge that the -- look, the transaction took place, the car is traded in, the lien is transferred from the Lamborghini -- from the Ferrari to the Lamborghini. Everything that was contemplated under the transaction took place for the sale.

Okay. The subsequent consignment that they want to argue, that's another one of their -- they're very creative, their theory is very creative, but Mr. Zankl testified --

THE COURT: It would be more creative if there wasn't actually a consignment agreement. I mean,

93 (Pages 369 to 372)

Page 373

I'm very entertained by the majority of the people in the room pretending the document doesn't exist, or that somehow the sales associate had a personal agenda. He was acting on behalf of the entity. It's not --

MR. MILLER: Well, I --

THE COURT: It's not bound by the consignment, I need to ignore it entirely.

MR. MILLER: Well, I think it goes back to something you were asking earlier about, where, your Honor, you said, well, how do you do a consignment after you've already done a sale? How is that possible?

Mr. Zankl testified, you can't do a consignment once you've done the sale. We did the sale. We prepared the paperwork. We did all these things.

THE COURT: Mr. Zankl was not particularly believable. Okay. So, let's start with that.

But that argument presumes that a transaction was had at the moment that the purchase agreement was signed, which, if you go with the authority argument, he also testified that that was unauthorized, and so that means there aren't any agreements. That's not what we have here.

We have, at a minimum, two agreements, a purchase agreement and a consignment agreement. The consignment agreement either modifies the purchase

Page 374

agreement, or must be read in context with it. It's not going to be ignored.

So, and then my question after that is what does that mean for the debtor, and you have a legal argument to make, which you will brief after.

MR. MILLER: The debtor still owns a property interest, it's still property of the estate, deemed a good faith purchaser for value under the --

THE COURT: That's the argument you need to brief. It's not in any of the documents, understood? Yes.

All right. What else do we have?

(No verbal response.)

THE COURT: So the only thing I've identified for post-trial briefing, unless one of you is going to ask me to brief something else, is the question of, assuming that the movant's arguments are accepted with regard to the nature of the transaction that occurred, mostly on the 11th of March, 2022, what rights did the debtor obtain as a result of the transaction that caused the debtor to, in the end, hold title to this vehicle, the Ferrari?

I think that Mr. Miller has made most of the argument, and that is his view is that Florida law provides that they can still obtain good title in spite of

Page 375

the fact that Mr. Farache apparently, according to the evidence, knew of the dispute with regard to the vehicle.

MR. MILLER: No, the title to the vehicle was endorsed prior to that date.

THE COURT: Okay. Well, you'll need to outline that --

MR. MILLER: Okay.

THE COURT: -- in your argument.

I'm not asking for full findings, you can refer to that kind of evidence, but the title is effective as of the 6th, and the interactions began on the 1st, which is a Friday. So, we have some of the interactions with Ms. Zankl on Friday and Saturday, the 1st and 2nd, then we have the Mexican standoff -- I'm probably not allowed to use that phrase anymore, it's been retired -- the standoff on Monday, the 4th, and then title is transferred effective on the 6th.

MR. MILLER: The issued new title was on the 6th. The endorsed title was April 2nd.

THE COURT: The endorsed title -- right, that is --

MR. MILLER: To the debtor.

THE COURT: -- after, allegedly, Ms. Zankl told him that the vehicle is not his.

MR. MILLER: No.

Page 376

THE COURT: Well, then someone else can -- you point me to why I'm wrong about that.

MR. MILLER: Okay.

THE COURT: I'm sure someone else will point to that in response, but I think there is evidence that says that's the case. Yes? They're all nodding over there.

MR. MILLER: Well, the title is endorsed April 2nd by Alana Bailey for Karma Palm Beach to the debtor.

THE COURT: Okay.

MR. MILLER: So, I'm sure --

THE COURT: And I thought there was evidence on the 1st and the 2nd that Mr. Farache knew, was told that it's not his.

MR. MILLER: No, I think that was on that Monday, that that was what was said.

THE COURT: Well --

MR. MILLER: That's the date that I think that he was locked in the --

THE COURT: No, I think --

MR. MILLER: He was sitting in the car.

THE COURT: That's correct, but I think there is evidence before that.

MR. MILLER: All right.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 377

THE COURT: All right, and I'm focusing only on those issues.

Anything else you people feel that you want to brief now? Yes?

MR. MILLER: Is there anything you want me to add, Judge, because --

THE COURT: No, no, no. I recently had someone stand up and tell me they want 50 pages, and then later they asked me to approve 110, and I said, no.

Yes.

MR. BRESLIN: Can we submit some authority on apparent authority?

THE COURT: Sure.

MR. MILLER: How would you like this addressed?

THE COURT: It's really a problem, because this is -- the context involves three different parties briefing, and I would like to give you an ability to respond to each other, and so, because some of these arguments, there might be some argument contrary to the apparent authority case law, for example, and on Mr. Miller's arguments on consignment law, you may want to tender a response, and I don't want to hamper you.

So what I would propose is to have an initial brief, and then a response from each of the

Page 378

parties, and how much time do you need?

MR. MILLER: Well, we have a -- unfortunately, or fortunately, we have a confirmation hearing on December 7th. So I'm actually preparing all week for that, and then, you know, I'm a sole practitioner, so I'm pretty wrapped up. I mean, I hate to put it off, but --

THE COURT: Well, give me a date so you can respond to something.

MR. MILLER: I'd prefer a January briefing date.

THE COURT: Oh, gosh.

MR. BRESLIN: I have the (inaudible) so at least the week after that, if that's okay.

THE COURT: That's fine with me.

MR. MAURO: December would be fine for me, too, Judge.

THE COURT: Why can't we go after -- we'll go a week after the confirmation hearing, Mr. Miller.

MR. MILLER: So, Friday, December 16th?

THE COURT: That seems fine, good.

For initial page limits, someone volunteer something. Please don't say 50 pages.

MR. MILLER: Oh, you want page limits.

THE COURT: Yes.

Page 379

MR. MAURO: 20.

MR. MILLER:: No War and Peace then?

THE COURT: No, no, no, there is a sign in my office --

MR. BRESLIN: 10.

THE COURT: I like him.

MR. MILLER: You can't do 10.

THE COURT: There is a sign in my office that says less but better.

MR. MAURO: I'm good with 10.

THE COURT: Okay. If anybody can tell me who said that, you get an extra two pages.

(Laughter.)

MR. MILLER: The moment you need a Spotify for quotes.

THE COURT: That's better. Okay. All right. So, 20?

MR. MILLER: 21?

THE COURT: 20 pages.

MR. MILLER: Of argument, not like the style and all that stuff.

THE COURT: Every single page other than the certificate of service.

MR. MILLER: Single-spaced.

THE COURT: Double-spaced.

Page 380

MR. MILLER: Nine font.

THE COURT: All right. Mr. Hess, make sure we do the thing where I tell them how big the margins are, what font to use, and how many footnotes they can have per page.

If you think I'm joking, I just used it last week. All right. So, all right, 20 pages, 10-page response two weeks later.

MR. SCHWARTZ: Your Honor (inaudible) --

THE COURT: Well, I think that -- everyone can address -- well, which issues do you think are up? So far I only have two.

MR. BRESLIN: We requested (inaudible) --

THE COURT: Okay, that's one, and two is the issue of the debtor's --

MR. MILLER: Good faith purchaser presumption for debtor.

THE COURT: Yes.

MR. MILLER: And consignment, that's what I understood.

THE COURT: Well, that's together, that's one issue really.

MR. MILLER: Oh, so I don't know if 20 is going to -- okay.

THE COURT: 20 will do it.

95 (Pages 377 to 380)

Page 381

MR. MILLER: I'll try.

THE COURT: Yeah, you can do it, otherwise I'll just strike it.

So, all right, yeah, that's really one issue. The issue is, does the debtor get good title even if the movant is correct on every point, that's my question.

MR. MILLER: What was --

THE COURT: It's probably not good faith purchaser, he's right, but I don't want to step out onto that limb because --

MR. MILLER: Bona fide --

THE COURT: -- I don't know the law on that issue.

All right. Anything else?

MR. MILLER: Was that the only issue then?

THE COURT: Well, there is two issues.

MR. MILLER: I didn't hear Mr. Schwartz.

MR. SCHWARTZ: (Inaudible.)

MR. MILLER: Everyone is talking.

THE COURT: Apparent authority, yes, right.

MR. MAURO: Judge, so are we -- is it contemplated that my team here is responding to --

THE COURT: You can file an initial brief and/or response to any other brief two weeks later.

Page 382

MR. MAURO: Okay. I view our part more tied up than the response aspect.

THE COURT: You're not required to file anything.

MR. MAURO: That's fine. The reason I'm saying that is I have a vacation the week after Christmas, and the 14 days after the 16th puts us at the 30th.

THE COURT: Oh, yeah, that's terrible. I'll move the dates, you'll see it in the order. Yeah, I'll give you more than a week, all right, because the holidays are always a disaster.

MR. MAURO: Yes right.

THE COURT: Okay. Great. Any other questions?

MR. MILLER: So the initial brief December 16th?

THE COURT: Yes.

MR. MILLER: Okay, and then replies will be?

THE COURT: Sometime in early January, I'll put it in an order, and I'm not kidding about the page limits and the other restrictions.

MR. SCHWARTZ: There will be an order, Judge?

THE COURT: Yes, there will be an order, I'll address very briefly what the two issues are as I see

Page 383

outstanding.

Any other issues you're worried about?

(No verbal response.)

THE COURT: All right. Good luck. Court is adjourned.


(Thereupon, the hearing was concluded.)

Page 384

CERTIFICATION

STATE OF FLORIDA      :
COUNTY OF MIAMI-DADE  :

I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

WITNESS my hand this 7th day of December, 2022.


_____
CHERYL L. JENKINS, RPR, RMR
Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #HH 170910
December 27, 2025

96 (Pages 381 to 384)