**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
West Palm Beach Division
www.flsb.uscourts.gov

In re:

**AUTO WHOLESALE OF BOCA, LLC,**                    **CASE NO. 22-15627-EPK**

        Debtor.                                     Chapter 11/SubChapter 5
_____/

**FVP'S AND KARMA ENTITIES OBJECTION TO**
**DEBTORS MOTION TO SELL CARS ([CP # 261)**

        **COME NOW**, FVP Opportunity Fund III, LP, a Delaware limited partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP Investments"), FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing"), (collectively, the FVP Fund, FVP Investments and FVP Servicing are "FVP" or the "FVP Parties"); and Karma of Palm Beach, Inc., a Florida corporation; Karma of Broward, Inc., a Florida corporation, (collectively, Karma of Palm Beach, Inc. and Karma of Broward, Inc. are the "Karma Entities") by undersigned counsel, hereby object to the motion filed herein by the Debtor Auto Wholesale of Boca, LLC ("Debtor")[1] entitled "Debtor's Expedited Motion to Sell Inventory" (CP # 261, the "Motion to Sell"), and hereby object as follows.

**PRELIMINARY STATEMENT**

        1.      Although the facts underlying this dispute are complicated and convoluted as to how this matter arrived in this Court, the legal issues before the Court on this Motion to Sell are simple and straightforward.

---

        [1]      For ease, the defined terms "Debtor" is meant to include its owners -the Faraches – as the context allows or requires,

2.      The streamlined factual narrative as to FVP is that in January 2022, FVP loaned $7.5 Million Dollars (the "FVP Loan") to the Karma Entities.  The FVP Loan was - generally speaking – a vanilla flavored loan - which was secured by a lien on all of the Karma Entities assets and inventory.

3.      The nub of it here is that the Karma Entities assets include all of the vehicles that are listed in the Debtors schedules and all of the vehicles that are the subject of the Debtor's Motion to Sell.[2]

4.      Since May of 2022, FVP has advocated that the Disputed Vehicles be sold and the money escrowed, allowing the combatants litigate over just money.  The Debtor consistently refused.   Now, apparently, that same sale has become a self-created emergency.

**EVIDENCE FILED OF RECORD IN OPPOSITION TO MOTION TO SELL**

5.      So the record is clear, FVP has asserted from well prior to the inception of this Bankruptcy case that AWB does not own the Disputed Vehicles and that the taking and possession of he Disputed Vehicles was unlawful and to the extent that it does own any, or otherwise holds title or an identifiable interest in any, it is inferior to the rights and interests of FVP and that therefore the Debtor has no rights to the Disputed Vehicles or the proceeds therefrom.

---

[2]      For ease of reference, and to be consistent with FVP's pending Joint Adversary Complaint, the vehicles that are the subject of this Motion to Sell are those included in the "Disputed Vehicles" defined in FVP and Karma Entities Joint Adversary Complaint [CP. 145 in Case 22-01218-EPK] and shall be referred to as such herein.

6.      In support of this objection the FVP and Karma Entities attach their Composite Exhibit A – Affidavits and Evidence in Opposition to the Debtors Motion to Sell ("Composite Exhibit A").

7.      As is outlined in Composite Exhibit A, on or about April 1, 2022, the Debtor, simply, and for lack of a better word, unlawfully "took" all of Karma's cars, shut down the Karma businesses and caused a public and media outcry. The Disputed Vehicles were, and are, FVP's collateral under any objective view of the facts.

8.      Since "taking" the Disputed Vehicles, the Debtor and the Faraches have tried three distinct and diametrically inconsistent positions to try to keep them.

   a. First, that they had a lien on the Disputed Vehicles and were entitled to foreclose (which, even if true, does not justify the "taking").  Moshe Farache swore to this in a state court lawsuit.

   b. Second, that they purchased the Cars from the Karma Entities. Moshe Farache swore to this in a different state court lawsuit.

   c. Third, that they were the owners of the Cars all along.[3]

After the Debtor "took" the Disputed Vehicles, FVP almost immediately obtained a "freeze order" in the state court regarding the Cars so that the Debtor could not sell or

---

[3]      In fact, the Debtor's First Amended Plan ("Plan") says all three, to wit:  "The automobiles in the possession of the Debtor are automobiles acquired in business transactions that were legitimate, and certainly not acquired in a strong-arm threatening manner or in bad faith by Debtor.  Debtor asserts that it is the true owner of these automobiles, is an ordinary course buyer under the UCC, or has a valid and unavoidable lien interest in the same,. . ." (Plan at page 4 of 20, second Par from the bottom) (Moshe Farache signed off on the Plan, too).

otherwise dispose of them.   This Court essentially entered a similar Order (or two) forbidding the Debtor to sell the Disputed Vehicles.

As is outlined in Composite Exhibit A, the Debtor's attorneys told the Court on April 14, 2022 that Farache sold several of the Cars before the freeze order(s), the proceeds of which, FVP believes were wrongly used to fund this Case.

## THE SALE MOTION

9.      Since May of 2022, FVP has advocated that the Cars be sold, and the combatants litigate over the remaining cash.  The Debtor has consistently refused.

10.      NOW, the Debtor has the Motion to Sell on an expedited basis (the urgency is not even addressed and – particularly given the passage of time - eludes FVP).

11.      Apparently, the Debtor is finding his possession of the Disputed Vehicles to be inconvenient, but it is an inconvenience that the Debtor voluntarily sought and but adamantly defended (and continues to defend) both in and out of court. FVP would cite the Court to the "Ransom of Red Chief" by O. Henry (1907) for the proposition -relevant here - that taking something to which you are not entitled does not always end as you had hoped.[4]

12.      Without limitation, FVP's Objection is essentially four-fold.

---

[4]      The Motion to Sell states that "Debtor continues to incur expenses on a daily and monthly basis for the maintenance, security, care, insurance and storage of these vehicles." (Motion to Sell at par. 14, page 4). "The Ransom of Red Chief" is a short story by O. Henry first published in the July 6, 1907, issue of The Saturday Evening Post. It follows two men who kidnap and demand a ransom for a wealthy Alabamian's son. Eventually, the men are driven crazy by the boy's spoiled and hyperactive behavior, and they pay the boy's father to take him back.

13.    First and foremost, the phrase "cash collateral" is nowhere in the body of the Motion to Sell, it first appears in the "wherefore" clause, where the Debtor seeks an order "authorizing the Debtor to "use cash collateral."

14.    Various parties have asked that the Debtor drop this covert "wherefore" or otherwise acknowledge that the Motion to Sell is not a precursor to seeking use of the proceeds (the "Cash").

15.    The Debtor has refused.

16.    The Cash is not cash collateral, and it is not the Debtor's in any event (as the proceeds of the "taken" Cars).  And certainly, even if it were, how could the Debtor possibly provide adequate protection?  It certainly makes no attempt to do so in the Motion to Sell – in fact - does not even address any of these issues.

17.    If the Debtor seeks use of "Cash Collateral" - overtly or covertly -, the Motion to Sell cannot be granted.

18.    Second, the Debtor cannot sell what it does not own. Darby v. Zimmerman (In re Popp), 323 B.R. 260, 266 (B.A.P. 9th Cir. 2005) (even before one gets to Section 363(f), Section 363(b)...requires that the estate demonstrate that the property it proposes to sell is "property of the estate."); Anderson v. Conine (In re Robertson), 203 F.3d 855, 863 (5th Cir. 2000) (holding that section 363(f) does not permit a trustee to sell the property of a non-debtor spouse because such property was not "property of the estate"); In re Coburn, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (finding it necessary to determine whether an asset is property of the estate in order to decide whether the trustee is entitled to sell the asset pursuant to section 363(f)). FVP has filed its evidence of record

– the Composite Exhibit A - herewith to support the proposition that the Debtor does not own the Disputed Vehicles.

19.     Further, the Joint Adversary Compliant is pending [CP. 145 in Case 22-01218-EPK] in which it is very clearly alleged that the Debtor has no interest in the Disputed Vehicles.

20.     As the Court might appreciate, as matters stand, FVP's collateral is (hopefully) safe and sound.   If this Motion to Sell is granted, it appears that FVP's collateral will transmogrify from safe and sound to, "in play", as "cash collateral."

21.     Third, the Debtor does not explain how it will sell the Cars.  FVP believes – past being prologue - that the Debtor will sell them at auction.  The reality here is that in fact, the Debtor is not in the business of selling high end automobiles at all.

22.     Thus, how the sales will happen is an open question, making the Motion to Sell objectionable.  The parties have discussed this issue and attempted to resolve it consensually with the Debtor - without success.

23.     Fourth, the Debtor is not entitled to any expenses on any of these Disputed Vehicles unless or until this Court determines that the Debtor is either the owner or lawfully took and/or is otherwise properly and legally  in possession of them.  Composite Exhibit A establishes the opposite.

24.     FVP categorically objects to the Debtor recouping any funds as to any storage or keeping of these vehicles because: a) they were unlawfully taken, and b) FVP offered to sell them and escrow the funds back in May at the inception of this case.

25. Here, the Debtor used the unlawful possession as a bargaining chip and now wants FVP to pay for it. FVP objects as to the expenses as a whole and to each line item.

26. Further regarding the expenses, the laundry list of expenses the Debtor proposes to pay if the Motion to Sell is granted is lengthy and expansive (and vague).

27. The Debtor's contradiction here is glaring. If it is "in the business of selling used high-end and exotic cars and has done so for over a decade" (Motion to Sell at Par. 17), then why will it have such a breadth of expenses in . . . selling these Cars?

## CONCLUSION

The Motion to Sell cannot be granted. It is not this Court's burden to take the wildly overreaching Motion to Sell and prune it into one that can be granted. Rather, the Court's role is to decide if it can be granted or not. It cannot.

**WHEREFORE**, FVP and the Karma Entities respectfully objects to the Motion to Sell and asks that it be denied in its entirety.

Dated        December 19, 2022.

CASE NO. 22-15627-EPK
FVP's Objection to Motion to Sell Cars
Page 8 of 9

**For the FVP Plaintiffs**

David Softness, Esq.
David R. Softness, P.A.
201 S. Biscayne Blvd., Ste 2740
Miami, Florida 33131
Phone: (305) 341-3111
E-mail:  david@softnesslaw.com

By:  s/ David R. Softness
     David R. Softness, Esq.
     Florida Bar No. 513229

Jerrell A. Breslin, Esq.
Baron, Breslin & Sarmiento
The DuPont Building
169 East Flagler Street, #700
Miami, Florida 33131
Phone: (305) 577-4626
E-mail:  JB@RichardBaronLaw.com
EService@RichardBaronLaw.com

Jonathan Noah Schwartz, Esq.
Florida Bar No. 1014596
Jonathan Schwartz Law PLLC
10200 NW 25th Street, Suite 111
Doral, FL 33172
Tel.: (973) 936-2176
E-mails:
        jschwartz@jonschwartzlaw.com
                JNSEsquire@gmail.com

***Counsel for Karma Entities Below have Authorized the Filing of this Objection for the Karma Entities by the FVP Parties.***

For the Karma Entities

By: s/ Harry Winderman
Harry Winderman, Esq.
Weiss, Handler & Cornwell, P.A.
2255 glades road, suite 205 A
Boca Raton, FL  33431

By:  /s/ Harry Winderman

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this date, the pleading(s) below was/were filed electronically - on the date(s) indicated - and served via CM/ECF upon all parties entitled to electronic notice and by email upon: the Subchapter5 Trustee by serving Linda Leali, Esq. at lleali@lealilaw.com; upon the Debtor/Defendant by serving James B. Miller, Esq. at bkcmiami@gmail.com and jbm@title11law.com; upon Wing Lake Capital Partners f/k/a Franklin Capital Group, LLC by serving Bradley Shraiberg, Esq. at bss@lpplaw and Pat Dorsey, Esq. at pdorsey@slp.law; upon Karma of Broward, Inc. and Karma of Palm Beach, Inc. by serving Harry Winderman, Esq. at harry4334@hotmail.com; upon Ed Brown by serving Brett Marks, Esq., at brett.marks@akerman.com and Amanda Klopp, Esq., at amanda.klopp@akerman.com and Eyal Berger, Esq., at eyal.berger@akerman.com; and upon Hi Bar by serving Steven Wells at Steve@wellspc.com, Jason DeJonker, Esq. at Jason.DeJonnker@bclplaw.com and Jarret Hitchings, Esq. at jarret.hitchings@bclplaw.com and David Unseth, Esq. at dmunseth@bclplaw.com, upon Derek Stephens by serving Cory Mauro, Esq. at cory.mauro@maurolaw.com, and upon the Faraches by serving Scott Gherman, Esq. at sgherman@scottghermanpa.com.

Dated:           December 19, 2022

/ s/ David R. Softness
David R. Softness, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**
www.flsb.uscourts.gov

In Re:

AUTO WHOLESALE OF BOCA, LLC,                    Case No.: 22-15627-EPK

        Debtor.

_____/

**EXHIBIT A COMPOSITE**

**THE FVP PARTIES AND KARMA ENTITIES**
**AFFIDAVITS AND EVIDENCE SUBMITTED IN OPPOSITION TO DEBTOR'S**
**MOTION TO SELL [CP. 261]**

COME NOW, FVP Opportunity Fund III, LP, a Delaware limited partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP Investments"), FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing"), (collectively, the FVP Fund, FVP Investments and FVP Servicing are "FVP" or the "FVP Parties"); and Karma of Palm Beach, Inc., a Florida corporation; Karma of Broward, Inc., a Florida corporation, (collectively, Karma of Palm Beach, Inc. and Karma of Broward, Inc. are the "Karma Entities") (collectively, FVP and the Karma Entities are the " Adversary Plaintiff Parties" in Case No: 22-01218-EPK), and hereby file evidence and affidavits in opposition to the Debtor's Motion to Sell and the Debtor's assertion that the Debtor is the owner of vehicles taken from the lots of the Karma Entities on or about April 1, 2022.

**VERIFIED FACTS IN OPPOSITION TO THE DEBTORS ASSERTION**
**THAT HE OWNS THE DISPUTED VEHICLES**

PURSUANT TO FED. R. CIV. P. 10, THE PLAINTIFF PARTIES ADOPT BY REFERENCE ALL ALLEGATIONS AND EXHIBITS FILED OF RECORD IN THE PLAINTIFF PARTIES JOINT AMENDED ADVERSARY COMPLAINT [CP. 145]

1.      For the purpose of this opposition, the evidence submitted herewith applies, without limitation, to twenty three vehicles and proceeds defined in the Adversary Plaintiff Parties Adversary Complaint [CP.145 in in Case No: 22-01218-EPK] and defined in Part One of that pleading as the "Disputed Vehicles".

2.      The Karma Entities claim ownership to all of the Disputed Vehicles and claim that

the Disputed Vehicles were taken by conversion, force and fraud undertaken and/or directed by the Debtor and its members, Moshe Farache ("Farache"), Lisa Farache and Chase Farache.

3.      To the extent that the Debtor holds any possession, interest or title, the Debtor was not a good faith purchaser in the ordinary course of business and is not entitled to the vehicles or the proceeds therefrom.

4.      FVP claims its rights in the Disputed Vehicles as the inventory of the Karma Entities that were never sold to a buyer in the ordinary course.

5.      Farache is the principal of the Debtor. All acts Farache are those of the Debtor for the purpose of this filing.

6.      Farache and Scott Zankl, the principal of the Karma Entities (with his wife Kristen), had a lender / borrower relationship that was both legal and illegal. There were two (2) sets of loans. One legal loan with paperwork and notes and legal interest rates, and a simultaneous illegal loan without notes or paperwork and bearing usurious and illegal interest rates. (*See* e.g., Exhibit K).

7.      Farache was a lender, not a car dealer as is reflected in the allegations of a lawsuit sworn to by Farache filed in Palm Beach County, Florida attached hereto. All of the paperwork created by, or for, Farache at AWB or the Karma Entities was created solely to support both the legal and illegal loan transactions and to explain the usurious interest payments that Zankl was paying to Farache on the loans that had no paperwork for tax purposes.

8.      During the year of 2021, Farache created false paperwork to ostensibly show well over one hundred purchase agreements between AWB and the Karma Entities that never occurred. The typical papers showed that after one of the Karma Entities purchased a vehicle, it would then purportedly be sold to Excell Auto Group ("Excell" a company now in its own Bankruptcy), which would then either purportedly sell the car on paper to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of the Karma Entities. All fictional.

9.      These were not transactions but simply papers being created and placed in folders. Folders that are now in the possession of FVP and the other claimants. The fictional paperwork shows agreements without money representing the market value of the vehicles really being paid between any of the parties. The papers were created either by, or at the request of, Farache, who

Page 2 of 15

apparently believed that these fabricated documents would give the Farache and the Debtor a basis to explain large usurious interest payments paid to him by Zankl and his companies. And then later, to falsely assert a security interest in vehicles to make up for the Debtor's lack of any security interest in any of the inventory of the Karma Entities.

10.     At no time in 2021 for the well over one hundred (100) fabricated transactions where the Debtor purports to acquire ownership in the Karma Entities' inventory, did the Debtor or Farache ever take possession of any of the vehicles.

11.     At all times the vehicles purportedly transacted remained on the Karma Entities' lots until ultimate customers bought those vehicles by paying funds directly to the Karma Entities. In other words, the Karma Entities both bought the vehicles and sold the vehicles to the end customer.

12.     The transactions in 2022 were no different.

13.     In 2022, Farache with the forced acquiescence under duress of Scott Zankl, who directed his employees to give Farache anything he wanted, created false paperwork to ostensibly and falsely show that after one of the Karma Entities purchased a vehicle from a third party, the vehicle would then be sold to Excell, which would then either transfer it to the Debtor, or back to one of the Karma Entities, or from the Debtor to one of those entities. All paper transactions and all false.

14.     The 2022 transactions were without objective market value being paid for any of these paper transactions. All the paper transactions were false and fraudulent and were done at the demand of Farache who believed that these false paper transactions would give his company, the Debtor, an apparently legitimate claim to a security interest in the vehicles mentioned in the papers superior to those of FVP in the Karma Entities inventory.

15.     However, the business and bank records show the falsity of the scheme which is preliminarily shown by the preliminary affidavit of Brian Rohl **Exhibit A** and will be established in detail with bank records, summaries and other proof at trial on the Adversary Plaintiff Parties adversary complaint.

16.     All of the Disputed Vehicles were purchased by the Karma Entities and taken into Karma Entities inventory. After the purchase by the Karma Entities, the sham paperwork was

created and exchanged at the request of the Debtor to ostensibly show that the Debtor was a purchaser for value.

17.     However, the applicable bank records and other documentary evidence reflect that the Debtor *received* millions of dollars from the Karma Entities when the Debtor should have been *paying* those millions of dollars if the created sham purchase and sale paperwork was in fact true.

18.     The reason for all of the above described sham transactions and the participation of Scott Zankl in the false paperwork is that when Scott Zankl told Farache that he and Excell were having problems paying the money that he and Excell borrowed from Farache, Farache threatened Scott Zankl.

19.     Zankl justifiably believed the threat and gave in to it. All of the transactions in which Farache and his agents took the Karma Entities inventory, either by papers, titles or actually removing the vehicles, was only because of extreme duress and intimidation by Farache and his agents.

20.     Therefore, the FVP and the Karma Entities assert that all of the Disputed Vehicles remain owned by the Karma Entities and at no time was the Debtor a legitimate good faith purchaser for value and/or buyer in the ordinary course of any of the Disputed Vehicles and therefore the Disputed Vehicles remain the property and inventory of the Karma Entities.

### THE DEBTOR'S CONVERSION OF THE DISPUTED VEHICLES AND THEN THE MULTIPLE FALSEHOODS REGARDING THE UNLAWFUL TAKING

A.    FARACHE'S PARTICIPATION IN THE DUE DILIGENCE ASSURANCES INDUCING THE APPROVAL OF THE FVP LOAN AND THE KNOWLEDGE OF FARACHE OF FVP'S SECURITY INTERESTS IN THE COLLATERAL AUTOMOBILES.

21.     Farache and Scott Zankl have been co-owners of Excell Auto Sport and Service, Inc., since 2016. Further, Farache and his wife, Lisa Farache, are the owners of 1001 Clint Moore, LLC, which company is the landlord of Karma of Palm Beach.

22.     Farache was fully aware of the FVP loan and security interest requirements, and participated in, and agreed to, FVP's requirements of the Landlord entity as a condition of the FVP agreeing to enter into the loan transaction. *See* **Exhibit B**) [the "Landlord's Waiver and Consent"] signed by Lisa Farache and copied to Farache.

23.     Specifically, the Landlord's Waiver and Consent addressed the landlord's waiver

and consent expressly regarding the FVP' Loan and entitled: "Re: Loan to Karma of Palm Beach, Inc./Karma of Broward, Inc.[,]" landlord company's agreement that Farache's landlord company will allow FVP Servicing access to Karma of Palm Beach retrieve their Collateral. Evidencing Farache's knowledge of understanding that FVP, not Farache or any of his companies, had a first right to the Collateral:

> "Although neither 1001, nor any of its members, are parties to the loan, or will in any way either directly, or indirectly, receive any consideration by virtue of the loan to Karma, in good faith, 1001 agrees to allow FVP /Lender access to the Lease Premises to retrieve the collateral that serves as the security for its loan."

24.     As Farache took every high priced vehicle on the lot (other than some Karma and Moke's) it is hard to fathom what "collateral" the landlord was going to permit access to.

B.     FARACHE, WITH THE ASSISTANCE OTHERS, CONSPIRED TO DEFRAUD, AND DEFRAUDED, FVP AND THE KARMA ENTITIES.

25.     Frank O'Donnell of Biltmore Consultants ("O'Donnell") is an agent of the Zankl's and assumed the obligation to FVP to confirm inventory, who, together with his colleagues, monitored the inventory of the Karma Entities.

26.     O'Donnell was advised by a telephone call that, Farache, and others at his direction, removed over thirty-five (35) automobiles from the lots of Karma of Palm Beach, all of which represented the Karma Entities inventory and FVP's Collateral.

27.     FVP immediately hired Robert Crispin, a private investigator with federal law enforcement experience to attempt to determine what happened.

28.     Robert Crispin, coincidentally, was personally known to the Zankl's. After contacting Scott Zankl and gaining his trust, Scott Zankl gave several statements to Mr. Crispin regarding the events that occurred with Farache and the Karma Entities inventory. Scott Zankl told Mr. Crispin:

   a.  That Scott Zankl and his wife Kristen (the Zankl's) were indebted to Farache from past loans which were years old.

   b.  That Farache had threatened the life of Scott Zankl.

   c.  That Farache had threatened to make Scott Zankl "disappear" if he did do as he was directed and direct his employees to do so.

d.  That both Scott Zankl and Kristen Zankl were petrified of Farache.

e.  That Farache had told them that he was associated with Israeli intelligence and criminal underworld figures, and that he was a very dangerous person.

f.  That Farache sent thugs to the business location to intimidate the Zankl's.

g.  That the Scott Zankl believed the threats.

h.  That Kristen Zankl executed, **Exhibit C**, out of intimidation which on its face indicates that the nine (9) cars listed in the document are "collateral" for the money owed to Farache by the Zankl's.

i.  That on April 8, 2022, the Zankl's reported to the police that Farache had, in fact, stolen the vehicles through extortion the week prior. *Boca Raton Police Department – Report Case No.: 22-4685.*

29.  On April 9, 2022 at 3:00 P.M., FVP's attorneys emailed Mark Brandes, then counsel for Defendant Farache, and demanded the return of FVP's collateral, an accounting and the location of the vehicles. The demand was not complied with.

30.  On April 9, 2022 at 7:30 pm, undersigned counsel was advised by FVP's investigator that Defendant Farache appeared at the location of Karma of Broward and attempted to take possession of even more vehicles illegally and without court process. The police were called, and Defendant Farache left the facility.

31.  The investigative report of Robert Crispin confirming the aforementioned is attached hereto and incorporated herein as **Exhibit D** which covers his investigation reports, information and results from April 7, 2022 through April 11, 2022.

32.  The public and media certainly took notice of the fact that a long operating and well known business was shuttered under mysterious circumstances overnight with Farache taking multiple vehicles which he had no authority to take. **Exhibit E.**

C.  THE AMAZING EVER-CHANGING LIST OF CONVERTED VEHICLES. FARACHE'S LAWYERS MADE MATERIAL MISREPRESENTATIONS TO FVP'S LAWYERS; FARACHE FILED FALSE AND INCONSISTENT AFFIDAVITS AND MISLED TWO STATE COURTS TO PERMIT FARACHE TO CONVERT AND SELL THE KARMA ENTITIES INVENTORY AND FVP'S COLLATERAL. THIS COURT IS GETTING THE SAME TREATMENT.

33.     On November 28, 2022, Moshe Farache testified under oath in a hearing before this Court that the reason that he suddenly emptied the Karma Entities' lots on April 1, 2022 was that at or around the end of March of 2022, Marc Brandes, his then attorney, told Farache that Brandes had heard from a reliable source in the automobile dealer industry that "the feds" "were going to raid" the Zankl's business locations and that Farache should collect as may cars as he could.

34.     And that is exactly what Farache did.  The problem was that he had no legal authority to do it.

35.     After Farache, unlawfully took the automobiles from the Karma Entities' lots, Farache, through his attorney on April 8, 2022, in an attempt to legitimize the unlawful acts, filed a lawsuit in Palm Beach County, Florida, styled *Auto Wholesale of Boca, Inc., v Scott Zankl, et al.,* Case No 2022-CA-3358 (the "Palm Beach Verified Complaint") in which Farache alleged, under oath, that Farache and his companies were entitled to *foreclose a security interest in all of the Disputed Vehicles (See Exhibit D thereto among others) because he and his companies had a security interest in the vehicles.* **Exhibit F**.

36.     As is seen in **Exhibit F**, Farache's sworn complaint is materially false and a fraud upon the court as it materially misrepresents that he was seeking *possession* of vehicles that he *did not yet possess* when he in fact had already taken possession of the vehicles and grabbed and manipulated their titles. *See, e.g.,* Palm Beach Verified Complaint at paragraphs 106-107. The same vehicles that are the subject of this hearing.

37.     Critically, Farache described himself as a *lender* and the automobiles that he sought (already took) as the *"Financed Inventory."* See Master Inventory List – Exhibit D to Exhibit A the Palm Beach complaint. The Palm Beach complaint makes clear that Farache was seeking replevin and foreclosure of the "Financed Inventory," and that: "EAG is the record owner of the subject Financed Inventory." *See* **Exhibit F** at ¶ 121.

38.     On information and belief, that was the last time Farache told the truth, and it was a partial truth at that. It was accurate that he was owed money by Scott Zankl and his companies, but he had no security interests in any of the Karma Entities inventory and could not therefore could not foreclose on any Karma Entities inventory.

39.     It is self-evident that Farache realized this fact sometime between April 8, 2022 and April 14, 2022 because, like magic, over the next six (6) days, Farache the *lender* became Farache

the *buyer*.

40.     Farache knew that the Palm Beach Verified Complaint was false when filed, as Farache well knew that the vehicles were already removed from the Zankl's businesses lots and in the possession of Farache at the time the Verified Complaint was filed.

41.     On April 12, 2022, undersigned counsel for FVP via email requested that Marc Brandes, counsel for Farache and AWB notify FVP of the vehicles that were in the possession of Farache. In response, on April 13, 2022, Brandes sent counsel for FVP a list containing *32 vehicles*. **Exhibit G.**

42.     The following day, April 14, 2022, a hearing was held on FVP's Motion for Appointment of a Receiver in the State Court Action. *A Transcript of April 14, 2022 Hearing was filed of record on 6/2/2022 Filing # 150717053 in Case No.: CACE-22-5125.*

43.     At that hearing, attorney Craig Blinderman, on behalf of Farache and the Debtor, represented to the Court that *27 vehicles* of those expensive luxury vehicles that Farache took from the Karma Entities lots of the *32 vehicles* that were on the list sent to undersigned counsel the day before on April 13, 2022, were in the possession of Farache. (April 14, 2022. Transcript. P 20. "We only have these 27 vehicles. The other vehicles were sold.")

44.     However, minutes before the hearing on April 14, 2022, Defendant Farache, through his attorneys filed a *sworn affidavit* that stated:

9.     AWB also purchased, obtained title and took possession of the vehicles listed as numbers 28-36 on **Exhibit 1**. These vehicles, prior to their purchase by AWB, were in Palm Beach County, Florida, and continue to be held in Palm Beach County, Florida.

10.     AWB is presently storing the aforementioned vehicles in its possession in an air-conditioned, secured facility located in Palm Beach County, Florida. Moreover, AWB procured a commercial general liability insurance in the sum of $500,000, per vehicle, each occurrence. A copy of the certificate of insurance is attached hereto as **Exhibit 4**.

*See Exhibit GG filed of record on 7/21/2022 Filing # 153792567 in the State Court Action.*

45.     The list attached to Defendant Farache's Affidavit, at Exhibit 1, listed *22 vehicles*.

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
Exhibit A Composite to Objection to Motion to Sell

| | MAKE | MODEL | YEAR | COLOR | VIN | PURCHASE DATE | TITL |
|---|---|---|---|---|---|---|---|
| 1 | ASTON MARTIN | DB11 VOLANTE | 2019 | BEIGE | SCFRMFCW6KGM07671 | 2/28/2022 | Y |
| 2 | FERRARI | F12 BERLINETTA | 2017 | RED | ZFF74UFA7H0221036 | 2/2/2022 | Y |
| 6 | MERCEDES | G63 | 2020 | GREEN | W1NYC7HJ6LX346462 | 2/23/2022 | Y |
| 8 | ROLLS ROYCE | GHOST | 2021 | GRAY | SCATV0C04MU207524 | 3/9/2022 | N |
| 10 | BENTLEY | FLYING SPUR | 2017 | BLACK | SCBEC9ZA0HC065523 | 4/1/2022 | Y |
| 11 | BMW | X7 | 2019 | BLUE | 5UXCX4C56KLS39222 | 12/29/2021 | Y |
| 13 | GMC | YUKON | 2019 | WHITE | 1GKS1CKJ8KR354378 | 3/15/2022 | Y |
| 16 | MCLAREN | 720S | 2018 | WHITE | SBM14DCA9JW000606 | 3/1/2022 | Y |
| 17 | MERCEDES | G WAGON | 2021 | WHITE | W1NYC7HJ0MX390328 | 2/16/2022 | Y |
| 18 | MERCEDES | G63 | 2020 | BLUE | W1NYC7HJ6LX362080 | 2/9/2022 | Y |
| 20 | PORSCHE | 911 | 2008 | RED | WP0AD29978S783176 | 3/15/2022 | Y |
| 24 | MCLAREN | 720S | 2020 | WHITE | SBM14FCA5LW004229 | 1/19/2022 | Y |
| 26 | LAMBORGHINI | URUS | 2019 | BLUE | ZPBUA1ZLXKLA01961 | 3/7/2022 | N |
| 27 | FERRARI | 812 SUPERFAST | 2020 | BLACK | ZFF83CLA1L0254693 | 3/9/2022 | Y |
| 28 | CADILLAC | ESCALADE | 2018 | BLACK | 1GYS4BKJXJR261612 | 4/2/2022 | Y |
| 29 | FERRARI | 458 ITALIA | 2013 | BLACK | ZFF68NHA8D0191526 | 4/2/2022 | Y |
| 30 | JEEP | GLADIATOR | 2021 | BLACK | 1C6HJTAG0ML564806 | 4/2/2022 | Y |
| 31 | JEEP | GLADIATOR | 2021 | BLACK | 1C6HJTAG1ML571540 | 4/2/2022 | Y |
| 32 | LAMBORGHINI | HURACAN | 2017 | BLACK | ZHWUR2ZF8HLA08121 | 4/2/2022 | Y |
| 34 | MCLAREN | 720S | 2018 | BLACK | SBM14DCA7JW001804 | 4/2/2022 | Y |
| 35 | MCLAREN | 720S | 2019 | ORANGE | SBM14FCA9KW003714 | 4/2/2022 | Y |
| 36 | MERCEDES | G CLASS | 2020 | BLUE | WDCYC7HJ9LX334940 | 4/2/2022 | Y |

46.    Putting aside that Farache's lawyers represented that "*27 vehicles* that currently are in Mr. Farache's possession. They're being held in an air conditioned secure location" Farache stated in writing and under oath that **22 were in his possession** by affidavit on April 14, 2022. Meaning 10 cars were removed from the list sent to FVP's attorneys the previous day.

47.    Keep in mind that the average price of one of these vehicles is $200,000.00. So, the difference in value in the representations between April 13 and 14 alone could easily be $2,000,000.00 worth of vehicles.

48.    At the hearing of April 14, 2022 in the State Court Action, both by attorneys for Farache and Farache himself under oath in writing, stated that the number of cars as represented were safe.

49.    The Court took Defendant Farache at his word and ordered a "freeze frame" wherein no cars could be sold, and the number of cars represented as being held by Farache and his attorneys safeguarded. The Court authorized FVP to immediately check the vehicles, and the location of the vehicles was stated on the record at the hearing.

50.    Immediately after the hearing, Robert Crispin, FVP's investigator, went to the "airconditioned warehouse" identified by Defendant Farache and *found only 13 vehicles*. Defendant Farache and his wife Lisa Farache confirmed to Mr. Crispin that those were all the remaining vehicles from the over 32 originally taken by Defendants Farache, Lisa Farache and Chase Farache from the Karma Entities lots. **Exhibit H.**

51.    Further, one of the vehicles that Farache represented in his April 14, 2022 Affidavit

as being "safeguarded" in the "air-conditioned warehouse" – Vehicle No. 30 in Exhibit 1 in the Farache Affidavit – a 2021 Jeep Gladiator Black, VIN: 1C6HJJAG0ML564806 (Gladiator 4806) which came into the possession of Farache on or about April 1, 2022, was in fact sold during or after the hearing. **Exhibit I.**

52.     Critically, and inexplicably, the Affidavit of Farache filed on April 14, 2022, diametrically changed the claim that Farache was making to the vehicles from that filed under oath in the foreclosure action in Palm Beach County just six (6) days prior. In the Farache April 14, 2022 Affidavit, Farache swore under oath that he *purchased* all of the vehicles and that he was entitled to the possession of the vehicles because he or his companies *then owned them*.

53.     The same position he is falsely taking in this Court.

54.     On April 15, 2022, FVP immediately moved to hold Farache in contempt for his intentional misrepresentations to the Court the previous day. That Court issued its rule to show cause in contempt which remains pending hearing.

55.     In an attempt to defend against the rule to show cause in contempt and to spin the obviously false affidavit filed of record on April 14, 2022, Farache filed a *third* Affidavit on May 26, 2022 in which he offered various excuses for his April 14, 2022 sworn statement and then stated that he was holding *19 vehicles*. **Exhibit J.**

56.     Meaning, of course, that Farache removed six (6) vehicles from hiding at a different location when questioned by the investigator on April 14, 2022 and added them to the list.

57.     So, to summarize Farache's representations to date regarding only the quantity of the disputed vehicles:

a.   **April 6, 2022 - 0 Vehicles.** Farache swore under oath he owned and possessed 0 vehicles but was entitled to foreclose on them as a secured lender. Exhibit CC.

b.   **April 13, 2022 - 32 Vehicles.** Farache through his attorneys said he had possession of 32 vehicles.

c.   **April 14, 2022 – 27 Vehicles.** , Farache through his attorneys represented to the court several times he had 27 vehicles safeguarded in an "air conditioned warehouse".

d. **April 14, 2022 – 22 Vehicles**. Farache swore under oath that he had 22 vehicles safeguarded in an "air conditioned warehouse".

e. Farache sold one of the "safeguarded" vehicles during or after the hearing. Exhibit xx.

f. **April 14, 2022, - 13 Vehicles.** Investigator Crispin inspected the vehicles that Farache claimed to have possession of and, after questioning him, found only 13 vehicles.

g. **May 26, 2022 – 19 Vehicles.** On May 26, 2022, in response to the Rule to Show Cause in Contempt, Mr. Farache filed a second affidavit stating that his attorneys were the cause of his prior inconsistent statements. See **Exhibit H.**

D. FARACHE'S AND AWB'S CLAIM TO OWNERSHIP OF ANY OF THE DISPUTED VEHICLES TAKEN IS FRAUDULENT AND THE DEBTOR HAS NO LEGITIMATE CLAIM TO ANY INTEREST IN ANY OF THE VEHICLES .

58.     Farache's and therefore AWB's claim to ownership to any of the vehicles or other property removed from the lots of the Karma Entities, either personally or through any of his companies, was fabricated. The Karma Entities, at all times, owned all of the vehicles that were taken by Farache, Lisa Farache, Chase Farache and their coconspirators.

59.     Farache and Scott Zankl had a creditor / debtor relationship. Part of the creditor / debtor relationship was pursuant to a written loan agreement, while the other part was oral. The result being that Farache was charging and collecting a usurious interest rate from Zankl and his companies over the years.

60.     In fact, Nicole Testa Mehdipour, Trustee for In re Excel Auto Group, Inc., Case No. 22-12790-EPK, in proof of claim 18-1, filed a proof of claim against the Debtor for $30,634,447.89, which includes, inter alia, treble damages for usurious loans pursuant to 18 U.S.C. § 1962. **Exhibit K.**

61.     To hide the illegal loans, Farache created false paperwork to ostensibly show that after one of the Karma Entities purchased a vehicle, it would then purportedly be sold to Excell Auto Group and then to one of the Farache companies.

62.     These transactions were without money representing the market value of the

vehicles really being paid between any of the parties and were done at the request of Farache, who apparently believed that these transactions would give the Debtor a basis to assert a security interest in the vehicle to make up for the lack of a security agreement and financing statement from the Karma Entities.

63.     At no time in 2021 for the over 100 fabricated transactions did Farache, or his companies ever take possession of any of the vehicles. At all times, the vehicles remained on the Karma Entities' lots until ultimate customers bought the vehicles by paying funds directly to the Karma Entities. In other words, the Karma Entities sold the vehicles to the end customer.

64.     FVP and the Karma Entities have filed their adversary complaint and have asserted their rights to the property and interests claimed by the Debtor and categorially object to:

a.   the Debtor having any rights to the Disputed Vehicles or any funds from the taking, storage or sale of any of the Disputed Vehicles; and

b.   any voice in the sale of the of the Disputed Vehicles.

65.     FVP and the Karma Entities request that this Honorable Court order the Disputed Vehicles sold at retail and the proceeds held in trust pending further order of the court.

## VERIFICATION OF FILING

I, Scott Zankl, hereby swear and affirm that the statements and representations made herein are true and correct.

Scott Zankl

STATE OF FLORIDA      )

COUNTY OF                  )

The foregoing instrument was acknowledged before me on December 19th, 2022, by Scott Zankl, who is personally known to me ( ) or ( X ) who produced a Florida driver's license as identification, and who did  take an oath and having acknowledged that each has executed this document for the purposes stated therein.

Notary Public

Patricia Taylor

My commission expires

PATRICIA TAYLOR
MY COMMISSION # HH 037060
EXPIRES: August 26, 2024
Bonded Thru Notary Public Underwriters

## VERIFICATION OF FILING

I, Kristen Zankl, hereby swear and affirm that the statements and representations made herein are true and correct.

Kristen Zankl

STATE OF FLORIDA       )

COUNTY OF              )

The foregoing instrument was acknowledged before me on December 19th, 2022, by Kristen Zankl, who is personally known to me ( ) or ( X ) who produced a Florida driver's license as identification, and who did take an oath and having acknowledged that each has executed this document for the purposes stated therein.

Notary Public

Patricia Taylor

My commission expires

PATRICIA TAYLOR
MY COMMISSION # HH 037060
EXPIRES: August 26, 2024
Bonded Thru Notary Public Underwriters

Dated: December 19, 2022

For the FVP Plaintiffs

| | |
|---|---|
| Jerrell A. Breslin, Esq.<br>Baron, Breslin & Sarmiento<br>The DuPont Building<br>169 East Flagler Street, #700<br>Miami, Florida 33131<br>Phone: (305) 577-4626<br>E-mail: JB@RichardBaronLaw.com<br>EService@RichardBaronLaw.com<br><br>By:    s/ Jerrell Breslin<br>        Jerrell Breslin, Esq.<br>        Fla Bar No: 269573 | David Softness, Esq.<br>David R. Softness, P.A.<br>201 S. Biscayne Blvd., Ste 2740<br>Miami, Florida 33131<br>Phone: (305) 341-3111<br>E-mail: david@softnesslaw.com<br><br>By:    s/ David R. Softness<br>David R. Softness, Esq.<br>Florida Bar No. 513229 |
| Jonathan Noah Schwartz, Esq.<br>Florida Bar No. 1014596<br>Jonathan Schwartz Law PLLC<br>10200 NW 25th Street, Suite 111<br>Doral, FL 33172<br>Tel.: (973) 936-2176<br>E-mails: jschwartz@jonschwartzlaw.com<br>JNSEsquire@gmail.com | |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that; I electronically filed the foregoing was served via Email electronic transmission under Local Rule 7026 -1 upon those parties and attorneys who are registered with the Court to receive notifications in this matter but not filed of record and by email upon: the office of the US Trustee by serving Heidi A. Feinman, Esq. at Heidi.A.Feinman@usdoj.gov, upon the Subchapter 5 Trustee by serving Linda Leali, Esq. at lleali@lealilaw.com, upon the Debtor/Defendant by serving James B. Miller, Esq. at bkcmiami@gmail.com, upon Karma or Broward, Inc. and Karma of Palm Beach, Inc. by serving Harry Winderman, Esq. at harry4334@hotmail.com, upon Ed Brown by serving Brett Marks, Esq., at brett.marks@akerman.com, and upon Hi Bar by serving Jarret P. Hitchings, Esq., at jarret.hitchings@bclplaw.com for Hi Bar.

/ s/ Jerrell Breslin
Jerrell Breslin, Esq.

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION
www.flsb.uscourts.gov

In Re:

**AUTO WHOLESALE OF BOCA, LLC,**                    Case No.: 22-15627-EPK

    Debtor.

_____/

**FVP OPPORTUNITY FUND III, LP,** a                  **ADVERSARY PROCEEDING**
Delaware limited partnership; **FVP**               **CASE NO.: 22-01218-EPK**
**INVESTMENTS, LLC,** a Delaware
limited liability company; and **FVP**
**SERVICING, LLC,** a Delaware limited
liability company, **and HI BAR**
**CAPITAL, LLC**, a New York Limited
Liability Company,

    Plaintiffs,
vs.

**AUTO WHOLESALE OF BOCA, LLC,**

    Defendant.

_____/

### AFFIDAVIT IN OPPOSITION TO MOTION TO SELL

**COME NOW** the Plaintiffs, FVP Opportunity Fund III, LP, a Delaware limited partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP Investments"), and FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing") (collectively "FVP" or the "Plaintiffs"), and hereby file their affidavit of Forensic Expert, Brian Rohl, CPA / ABV / CFF, in opposition to the Debtor's motion to sell the disputed vehicles. [ECF. 261]

Affidavit:

I, the undersigned affiant, Brian Rohl, CPA / ABV / CFF,  Manager, Forensic and Valuation Services, Fiske & Company, 1250 S. Pine Island Road, Suite 300, Plantation, FL 33324, hereby swear and affirm that the representations made by, or referring to the

CASE NO. 22-15627-EPK
ADV. PROC. CASE NO.: 22-01218-EPK
Disclosure under Fed. R. Civ. P. 26

Page 2 of 2

work product of the undersigned affiant, made in the Expert Witness Disclosure Statement filed of record on October 14, 2022 [ECF. 100] [Exhibit A] are true and correct.

**FURTHER AFFIANT SAYETH NAUGHT.**

Dated: December 16, 2022

Brian Rohl
FL DL #R400-064-90-383-0

**SWORN TO AND SUBSCRIBED** before me this 16th Day of December, 2022 by Brian Rohl who has produced a Florida Drivers License as identification.

Notary Public, State of Florida
Print Name:

# EXHIBIT A

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**
www.flsb.uscourts.gov

In Re:

**AUTO WHOLESALE OF BOCA, LLC,**　　　　Case No.: 22-15627-EPK

　　　Debtor.

_____/

**FVP OPPORTUNITY FUND III, LP**, a　　　**ADVERSARY PROCEEDING**
Delaware limited partnership; **FVP**　　　**CASE NO.: 22-01218-EPK**
**INVESTMENTS, LLC,** a Delaware
limited liability company; and **FVP**
**SERVICING, LLC**, a Delaware limited
liability company, **and HI BAR**
**CAPITAL, LLC**, a New York Limited
Liability Company,

　　　Plaintiffs,
vs.

**AUTO WHOLESALE OF BOCA, LLC**,

　　　Defendant.

_____/

**ADVERSARY PLAINTIFFS' EXPERT WITNESS DISCLOSURES**
**Fed. R. Civ. P. 26((a)(2)A)**

**COME NOW** the Plaintiffs, FVP Opportunity Fund III, LP, a Delaware limited partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP Investments"), and FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing") (collectively "FVP" or the "Plaintiffs"), and hereby make their disclosures required by Fed. R. Civ. P. 26((a)(2)A), pursuant to this Court's trial order as follows:

(2) *Disclosure of Expert Testimony.*

(A) *In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.*

- Brian Rohl, CPA / ABV / CFF,  Fiske & Company, 1250 S. Pine Island Road,

Suite 300, Plantation, FL 33324.

- Joel Wiegert, Esq., Kutak Rock, Omaha Building, 1650 Farnam St., Omaha, NE 68102.

*(B)* Witnesses Who Must Provide a Written Report. *Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report— prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.* [1]

- Brian Rohl, CPA / ABV / CFF,  Fiske & Company, 1250 S. Pine Island Road, Suite 300, Plantation, Florida 33324.

*(i) a complete statement of all opinions the witness will express and the basis and reasons for them;*

Mr. Rohl will express the following opinions and the basis and reasons for them as follows:

Mr. Rohl was retained to undertake a forensic evaluation of the business and banking records of Karma of Palm Beach, Inc., Karma of Broward, Inc. (collectively, the "Karma Entities"); Excell Auto Group, Inc ("EAG") and the banking records of Auto Wholesale of Boca, LLC, a Florida limited liability company (the "Debtor"); MMS Ultimate Services, Inc., a Florida corporation; Pompano 2009 LLC, a Florida limited liability company; Mazel Tov Inc., a Florida corporation; Farache Enterprises, Inc., a Florida corporation; and M & M Development Consultants LLC, a Florida limited liability company (collectively, the "Defendant Affiliated Entities"). Mr. Rohl was supplied: [2]

- o the transaction records supplied by the Debtor and / or Moshe Farache for the purported purchase and sale of numerous automobiles in 2021 and 2021.

---

[1] The Expert's Report is required by Court order to be filed 14 days after the disclosure.

[2] Mr. Rohl is still waiting on various reports and records that have been requested in production and subpoenaed which will be incorporated into his trial testimony.

- the transaction records supplied by the Karma Entities and EAG, including, without limitation, records obtained from the EAG bankruptcy trustee regarding the for the purported purchase and sale of numerous automobiles in 2021 and 2021.

- Debtor and / or Moshe Farache for the purported purchase and sale of numerous automobiles in 2021 and 2021.

- Bank records from the Karma Entities and EAG as well as the Debtor Auto Wholesale of Boca, LLC, a Florida limited liability company (the "Adversary Defendant"); MMS Ultimate Services, Inc., a Florida corporation; Pompano 2009 LLC, a Florida limited liability company; Mazel Tov Inc., a Florida corporation; Farache Enterprises, Inc., a Florida corporation; and M & M Development Consultants LLC, a Florida limited liability company (collectively, the "Defendant Affiliated Entities").

- DealerTrack records and the internal accounting records from the Karma Entities and EAG. Karma Entities and EAG and Defendant Affiliated Entities.

- Sworn lawsuits and affidavits of Moshe Farache.

- Schedules filed by the Debtor in this bankruptcy proceeding.

- Bank records subpoenaed from Chase Bank, TD Bank and Synovus bank.

- Depositions of any witnesses in this action.

In considering the aforementioned facts or data, and other facts or data supplied to the expert during discovery, Mr. Rohl has or will create summaries pursuant to Fed. R. Evid. 1009 of the facts or data supplied and will opine from the facts, data, summaries, or otherwise, that the banking and financial records of the Karma Entities, EAG and Defendant Affiliated Entities do not support the assertion by the

Debtor that the Debtor purchased the automobiles reflected in the transactional paperwork supplied by the Debtor and/ or Moshe Farache in discovery in this case and the state court case. Mr. Rohl will opine that the banking records and business records, on the contrary, show that the Debtor and Defendant Affiliated Entities, *received* many millions of dollars from the Karma Entities and EAG when the Debtor and Defendant Affiliated Entities should have been *paying* many millions of dollars to the Karma Entities and EAG for the automobiles if the transactions records showing well over one hundred purported automobile purchases by the Debtor were accurate. The expert reserves the right to opine on any further data or documents brought to his attention after the filing of this disclosure.

*(ii) the facts or data considered by the witness in forming them;*
See above.

*(iii) any exhibits that will be used to summarize or support them;*

The witness shall use any of the aforementioned documents or data already exchanged by the parties in discovery or obtained in discovery after the filing of this disclosure and summaries created under Fed. R. Evid. 1009.  The expert will rely upon and use summaries of all the aforementioned data and documents as provided by the trial order and Fed. R. Evid. 1006 and filed pursuant to the trial order seven days before the pretrial conference. The Adversary Plaintiff will submit exhibits via CM/ECF by no later than 4:00 p.m. four business days before the scheduled trial or evidentiary hearing.

*(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;*

The witnesses CV is (attached hereto and incorporated herein as Exhibit A)

*(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition;*

ALPER AUTOMOTIVE, INC. D/B/A AA IGNITION v. DAY TO DAY IMPORTS, INC., Case Number: 9:18-cv-81753-DMM, United States District Court Southern District of Florida West Palm Beach Division.

*(vi) a statement of the compensation to be paid for the study and testimony in the case.*

The compensation agreement and compensation paid to the Expert has been supplied to the Adversary Defendant with the Adversary Plaintiffs initial disclosures.

*(C) Witnesses Who Do Not Provide a Written Report. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:*

- Joel Wiegert, Esq., Kutak Rock, Omaha Building, 1650 Farnam St., Omaha, NE 68102. [3]

## **Invocation of Privilege as to Attorney Joel Wiegert, Esq.**

**Mr. Wiegert is an attorney who, for all relevant times herein, has had, and continues to have, a privileged attorney/client relationship with the Plaintiffs and their principals. Nothing in this disclosure is meant to suggest, or does suggest, that Mr. Wiegert either has the authority to, or does, waive any privileges granted to both Mr. Wiegert and his clients under Florida law, Rules of Evidence or Rules of Court; or Federal law, , Rules of Evidence or Rules of Court, including without limitation, Fed. R. Civ. P. 501 and 502, as to any and all "attorney-client privilege" communications, to be interpreted in the broadest sense; or "work-product protection" to be interpreted in the broadest sense. All privileges are hereby expressly preserved and are hereby expressly invoked by the FVP Plaintiffs and their principals as to Mr. Wiegert.**

*(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and*

Mr. Wiegert is a mixed fact / expert witness. Mr. Wiegert is the transactional attorney who created and oversaw the loan transaction and security agreement

---

[3] Joel Wiegert, Esq., is a mixed fact / expert witness and therefore not a witness defined in Fed. R. Civ. P. 26((a)(2)(B), and therefore not required to give an expert report. (*if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony*).

documents executed between the FVP entities and the Karma Entities; and the filing of the financing statements by the FVP entities to secure the loan transaction between the FVP entities and the Karma entities. Mr. Wiegert is an expert in the understanding and application of the security agreements, Uniform Commercial Code, (UCC), UCC financing statements and perfection of the security interests in the inventory and collateral in sought by the Plaintiffs in this case.

Mr. Wiegert is both a fact witnesses as to his role in the creation of, and the execution of, the loan transaction documents and security agreements; and an expert as defined in Fed. R. Evid. 702 as Mr. Wiegert has specialized knowledge that will help the trier of fact to understand the evidence, the law as it applies to the evidence or to determine a fact in issue.

*(ii) a summary of the facts and opinions to which the witness is expected to testify.*

The facts that Mr. Wiegert will testify about are those facts that are pled in the Third Amended Complaint, or such complaint as further amended prior to trial. Mr. Wiegert will opine as to the terms, conditions and effect of the terms, conditions and obligations of the loan and security agreements between the FVP Plaintiffs and the Karma Entities.

Mr. Wiegert will opine as to the perfection of the security interests of the FVP Plaintiff's in the inventory of the Karma entities and the meaning of the perfection of the security agreements in the inventory / collateral as it relates to the rights of the FVP Plaintiffs to recover their collateral.

Mr. Wiegert will opine as to whether any of those perfected security interests held by the Plaintiffs in the Karma collateral were affected by any subsequent transactions asserted by the Debtor. In particular, the purported transactions where the Debtor asserts that it was a buyer in the ordinary course of business, that the Plaintiffs assert, was an unsuccessful attempt to defeat the perfected security interests of the FVP Plaintiffs.

Mr. Wiegert will opine that none of the transactions claimed by the Debtor were

transactions in which the Debtor was a buyer in the ordinary course as to the FVP Plaintiffs collateral and therefore had no effect on the perfected security interests of the FVP Plaintiffs.

Dated October 14, 2022

For the FVP Plaintiffs

| | |
|---|---|
| Jerrell A. Breslin, Esq.<br>Baron, Breslin & Sarmiento<br>The DuPont Building<br>169 East Flagler Street, #700<br>Miami, Florida 33131<br>Phone: (305) 577-4626<br>E-mail: JB@RichardBaronLaw.com<br>EService@RichardBaronLaw.com<br><br>By: s/ Jerrell Breslin, Esq.<br>Jerrell Breslin, Esq.<br>Fla Bar No: 269573 | David Softness, Esq.<br>David R. Softness, P.A.<br>201 S. Biscayne Blvd., Ste 2740<br>Miami, Florida 33131<br>Phone: (305) 341-3111<br>E-mail:david@softnesslaw.com |
| Jonathan Noah Schwartz, Esq.<br>Florida Bar No. 1014596<br>Jonathan Schwartz Law PLLC<br>10200 NW 25th Street, Suite 111<br>Doral, FL 33172<br>Tel.: (973) 936-2176<br>E-mails:jschwartz@jonschwartzlaw.com<br>JNSEsquire@gmail.com | |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that; I electronically filed the foregoing was served via Email electronic transmission under Local Rule 7026 -1 upon those parties and attorneys who are registered with the Court to receive notifications in this matter but not filed of record and by email upon: the office of the US Trustee by serving Heidi A. Feinman, Esq. at Heidi.A.Feinman@usdoj.gov, upon the Subchapter 5 Trustee by serving Linda Leali, Esq.

at lleali@lealilaw.com, upon the Debtor/Defendant by serving James B. Miller, Esq. at bkcmiami@gmail.com, upon Karma or Broward, Inc. and Karma of Palm Beach, Inc. by serving Harry Winderman, Esq. at harry4334@hotmail.com, upon Ed Brown by serving Brett Marks, Esq., at brett.marks@akerman.com, and upon Hi Bar by serving Mark Wolfson, Esq. at MWolfson@foley.com.

/ s/ Jerrell Breslin
Jerrell Breslin, Esq.

# EXHIBIT B

TO:        FVP Servicing LLC

FROM:    1001 Clint Moore, LLC

DATE:    January __, 2022

Re:        Loan to Karma of Palm Beach, Inc./Karma of Broward, Inc.

1001 Clint Moore LLC ("1001") is the owner of the property located at 1001 Clint Moore Road, Unit B, Boca Raton, Florida (the "Leased Premises"). The Leased Premises are currently being rented to Excell Auto Group, Inc. ("Excell") and Karma of Palm Beach, Inc., pursuant to a written lease agreements between 1001 and Excell and 1001 and Karma of Palm Beach, Inc. as amended, modified, supplemented, restated, extended or renewed from time to time, (the "Lease").

The owner/representative of Excell and Karma of Palm Beach, Inc., Scott Zankl ("Zankl"), has advised us that his companies Karma of Palm Beach, Inc./Karma of Broward, Inc., (collectively "Karma") are attempting to obtain financing from FVP Servicing LLC ("FVP"), on its own behalf and/or as agent for and on behalf of one or more other lenders (collectively, "Lender"); and, as condition to the loan, FVP requires 1001's agreement that, in the event of Excell's and/or Karma of Palm Beach, Inc., default of the Lease, 1001 will allow FVP access to the Lease Premises to retrieve the collateral that serves as the security for its loan.

Although neither 1001, nor any of its members, are parties to the loan, or will in any way either directly, or indirectly, receive any consideration by virtue of the loan to Karma, in good faith, 1001 agrees to allow FVP/Lender access to the Lease Premises to retrieve the collateral that serves as the security for its loan.

Please note that, in giving its agreement for FVP/Lender to access to the Leased Premises to retrieve the collateral securing its loan, 1001 has not been asked, nor is it agreeing to provide notice to FVP/Lender in the event of Excell's default of the lease, except as required by Florida law. In addition, the access being granted by 1001 is for the specific purpose of FVP/Lender retrieving only the property owned by Karma securing FVP/Lender's loan, and does not include any property owned by 1001, or other person or entity, including but not limited to, any fixtures, furniture, office equipment, and/or vehicles, which is currently or may from time to time be located on the Leased Premises.

Finally, in exchange 1001's good faith agreement to FVP/Lender in the event of a default of the Lease, 1001 expects that FVP/Lender will show the same good faith in the event FVP/Lender will be accessing the Leased Premises to retrieve its collateral under circumstances where there has been no default of the Lease, by providing 1001 written notice of its intent do the same. Accordingly, 1001 does hereby request that, in any circumstance where FVP/Lender will be accessing the Leased Premises for the purpose of retrieving the collateral securing its loan to Karma, FVP will give at least five (5) days prior to notice to 1001, including the date and time FVP/Lender will be making access.

Please send any and all future notices pertaining to this matter via email to:

Lisa Farache (lisafarache@gmail.com )
Moshe Farache (moshefarache@gmail.com)
Michele Martin (michelemartin1010@gmail.com )
Scott C. Gherman, Esq. (sgherman@scottghermanpa.com)

LANDLORD:

**1001 CLINT MOORE, LLC**

By: _____

Name: Lisa Farache, as Manager

# EXHIBIT C

**Exhibit C**



KARMA | PALM BEACH

O: 561.998.5557
F: 561.998.4703
1001 Clint Moore Rd. Ste 103
Boca Raton, FL 33487

On 04/01/2022,

The following vehicle titles are being given to Auto Wholesale of Boca LLC as collateral against the loan amount

of $_____:

2013 Ferrari 458 #0191526---$230,000
2021 Jeep Gladiator #564806---$117,000
2018 Cadillac Escalade #261612---$60,000
2018 Mclaren 720 #001804----$282,080.03
2020 Lamborghini Huracan Evo #A14316---$330,000

2017 Lamborghini Huracan #A08121---$240,000
2019 Mclaren 720s #003714---$295,000
2020 Mercedes G63 #334940---$225,000
2021 Jeep Gladiator #571540---$138,607.80

The values of these vehicles, along with the $115,000.00 wired to Auto Wholesale of Boca LLC on 4/1/22 towards 2020 Bentley Flying Spur #082455, shall serve as collateral for the aforementioned loan amount.

As the loan is reduced, these vehicle titles will be returned.

_Moshe Farache MGD_

Moshe Farache--Auto Wholesale of Boca LLC

_Kristen Zankl_

Kristen Zankl--Karma Palm Beach

excellauto.com

# EXHIBIT D



**INVESTIGATIVE REPORT**

**Reference: FVP SERVICING, LLC**

On April 7th, 2022, Crispin Special Investigations, Incorporated, was retained by Chief Executive Officer Keith Lee of Feenix Venture Partners (FVP) located at 1201 Broadway, 7th Floor, New York, New York 10001.

According to Lee, his company funded a substantial loan amount to Karma of Broward and Karma Palm Beach, dealerships owned and operated by Scott and Kristen Zankl, located in Boca Raton, Florida. Lee indicated that FVP was unable to reach either Zankl's and requested an immediate response in an attempt to locate Scott and Kristen Zankl as well as account for his inventory of multiple high-end vehicles used for collateral for the loan.

On April 7, 2022, additional information was developed which indicated a subject identified as Moshe Farache may be in possession of these vehicles. Therefore, Investigators Robert W. Crispin and Richard D. Truntz responded to 270 S. Silver Palm Road, Boca Raton, Florida, 33432 in an effort to locate numerous high-end vehicles taken from the Karma Palm Beach Dealership located at 1001 Clint Moore Road, Boca Raton, Florida, 33487. The residence is owned by Moshe Farache. Upon arrival, investigators noted several high-end vehicles parked in the driveway of the residence.





On April 8, 2022, Investigators Robert W. Crispin, and Richard D. Truntz, traveled to 16937 Pierre Circle, Delray Beach, Florida 33446 in an effort to locate and interview Scott and Kristen Zankl in reference their financial lender being unable to reach them.  Upon arrival, investigators met with both Scott and Kristen Zankl who invited investigators into their home.    Once inside, investigators explained our purpose for the interview and the attempt to locate several of the high-end vehicles which were noted missing from the showroom at Karma Palm Beach.

During the interview, both Scott and Kristen provided the following information relative to the events which occurred on April 1, 2022, at their dealership identified as Karma Palm Beach, located at 1001 Clint Moore Road, Boca Raton, Florida.

According to both Scott and Kristen, Moshe Farache is a former business associate of both herself and husband Scott Zankl.  Both indicated that on April 1st, 2022, Farache stormed into their dealership and in a threatening manner forced Kristen to type up a document which indicated she was consensually turning over multiple high-end vehicles as collateral for monies her husband Scott owed to Farache for previous auto sale transactions. Scott admitted he originally owed Farache about 3.1 million dollars for the past 5 years but had decreased the loan amount down to 2.1 million dollars.  Scott indicated he had a promissory note for the original amount and was working with Farache over the course of the past years to pay down the debt through the sale of vehicles.  According to Scott, Farache has funded the purchase of vehicles in the past at which point Scott would sell them, pay back Farache for the original purchase as well as split

or agree to a percentage of the profits.  Scott indicated Farache grew increasing hostile and at one point told Scott he will "make him disappear."

Kristen added Farache was aggressive and intimidating towards her and indicated she felt threatened and in fear of Farache who stood over her as she was forced to type up the document, sign it and ultimately hand over several vehicle keys and vehicle titles in fear of being hurt herself or her husband.

According to Kristen, Farache proceeded to then remove several vehicles with the assistance of Farache's wife (Lisa) and two sons C.F., and J.F., from the showroom floor.  Kristen indicated sometime between April 2, 2022, at 9PM until Monday April 4th, 2022, unknown person entered the dealership and removed the remaining vehicles. Kristen and Scott indicated they did not return to the dealership because they were in fear for their safety by Farache nor did they call the police in fear of retribution by Farache or unknown persons.

Kristen indicated Farache had been showing up at the dealership on multiple occasions leading up to the April 1st, 2022, incident as well as when her husband Scott was recently in the hospital.  Kristen indicated Farache would storm into the business office, intimidate their office employees, threatening Kristen and followed female employees around the dealership making them uncomfortable.

The employees were identified as Alana Baily, Mayara Cardosa, Sandra Guerrero, Jonathan Martin, Oleg Kouznestov and Gui Bastos.  Kristen indicated she was told by Farache he would "make her husband disappear."

Kristen then provided investigators with a photograph of Farache standing over their bookkeeper allegedly taken by a subject identified as Konstantinos Amaxopoulos.  According to Kristen, Amaxopoulos was a wholesaler they use to use and have done business with, in the past.

Kristen indicated Karma Palm Beach has no monies owed to Amaxopoulos or any active business transactions with him. According to Kristen, Amaxopoulos recently started showing up with Farache and would walk around the dealership for no reason in what Kristen described as being an intimidating manner while Farache was inside the business office.  Kristen indicated there was no reason for Amax to be at the dealership as he had no business transactions. Kristen indicated that on April 7, 2022, Farache went into Scott's office and began going through all of the desk drawers as well as paperwork on the desk.  Both Scott and Kristen stated they did not interfere in fear for their safety.

According to Kristen several employees were intimidated by Amaxopoulos' presence which Kristen described his actions being that of a "muscle man" providing intimidation thru his presence for persons owing monies to Farache. Amaxopoulos, was identified through his social media account identified as "Maximus_444" and is believed to reside in Miami, Florida, 33132. A background investigation indicated Amaxopoulos has been arrested for Battery (2009) Broward County, Florida, Retail Theft (2015) Palm Beach County, Florida as well as multiple traffic infractions including No Tag, No License, No Insurance as well as speeding citations.





Kristen indicated that on April 7th, 2022, she received a text from a business associate identified as Edward Brown. In the text was a photograph of Farache standing over the Karma Palm Beach bookkeeper. According to Kristen, Brown told Kristen he received the photo from Amaxopoulos with a message that stated, "Moshe watching over the money". Brown then followed up with a call to Kristen telling her what Amaxopoulos wrote in the text when he sent the picture to him. Brown only sent the photograph of Farache to Kristen and not the actual text. That he told her verbally.







While still conducting the investigative interviews, Kristen was actively receiving text messages from employee Sandra Guerrero.  According to Kristen, Sandra Guerrero had just received a text message from Amaxopoulos which indicated people were coming up from Miami.

Sandra Guerrero indicated the messages were coming from Konstantino S. Amaxopoulos.  Guerrero was asking Kristen for police protection at the dealership and indicated someone in a dark colored vehicle was taking photographs of the dealership.  Below are the messages received by Kristen from her employee as well as a Google Review posted by Konstantino Amaxopoulos.





**They left a while ago, I can't remember I think it was a Ford**

**Konstantine is saying he is sending people from Miami who are on their way**



Below are additional statements made by both Scott and Kristen Zankl during their interview:

1. That Scott Zankl and Kristen Zankl were indebted to Farache from past loans that were years old.

2. That Farache had threatened the life of Scott Zankl.

3. That Farache had threatened to make Scott Zankl disappear if he did not turn over to him the Plaintiffs collateral.

4. That both Scott Zankl and Kristen Zankl were petrified of Farache.

5. That Farache had told them that he was associated with Israeli intelligence and criminal underworld figures and that he was a very dangerous person.

6.  That Scott Zankl and Kristen Zankl believed the threats.

7.  That Farache appeared at the Karma of Palm Beach location on April 1, 2022 and told Scott Zankl and Kristen Zankl that if they did not give him every car, title and keys that Scott Zankl would disappear.

8. That in extreme fear for their lives that Scott Zankl and Kristen Zankl turned over all the collateral automobiles, keys, and titles on the lot to Farache and that Kristen Zankl signed a document produced by Kristen Zankl at the direction of Farache out of fear as collateral for the money owed to Farache by Scott Zankl and Kristen Zankl.

9.Collateral letter was signed under direct threat to the life of Scott Zankl.

10.That Scott Zankl and Kristen Zankl considered that Farache stole the collateral automobiles by threat.

11.That Scott Zankl and Kristen Zankl were afraid to report the matter to the police because the feared that Farache would get revenge and that the police could not protect them.

12.That neither Scott Zankl nor Kristen Zankl had any of the $7.5 million loaned to them by FVP and that Farache had all the vehicles that were purchased with the FVP loaned funds. Scott Zankl indicated 3.5 million dollars went to operating expense and the remainder was used to purchase vehicle inventory taken by Farache

13.That on April 8, 2022, Scott Zankl and Kristen Zankl reported to the theft to Boca Raton Police

that Farache had in fact stolen the vehicles the prior week by threat. Boca Raton Police Case number 22-4685. Officer J. Campbell ID # 607.

On April 9, 2022, at approximately 6:15PM, investigators from Crispin Special Investigations observed Moshe Farache along with his wife Lisa arrive at the Karma Dealership located at 1717 SE 17th Street, Fort Lauderdale, Florida.  The couple arrived in a White Range Rover bearing Florida Tag # PXAI86.  Records indicate this vehicle is registered to Lisa Beth Farache, 270 South Silver Palm Road, Boca Raton, Florida 33432.







According to Kristen and Scott Zankl, this location is owned solely by Scott and Kristen Zankl. As the investigator watched, Moshe and his wife were observed walking around the dealership, pulling on the doors in what appeared to be an attempt to gain access to the building and taking multiple photographs of the interior of the dealership.

A short time later, the investigator observed uniform police units arrive and make contact with both subjects.   After an extended period of time on scene, both Moshe Farache and his wife departed.

Additionally, on April 11th, 2022, at approximately 6:21am an investigator on surveillance from Crispin Special Investigations, Inc., observed Moshe Farache arrive back at the Karma dealership driving a light-colored Cadillac Escalade bearing Florida Tag #JREU29.  Records indicate this vehicle is registered to Moshe Farache, 270 S. Silver Palm Road, Boca Raton, Florida 33432.  As Investigator Timothy Zimmerman watched, Farache was observed walking around the dealership property and taking a photograph of the interior of the building again.





A short time later while on foot surveillance, Investigator Zimmerman came face to face with Farache at which point Farache asked Investigator Zimmerman if he was interested in purchasing a car. Investigator Zimmerman told Farache no and was just going to take a picture of one of the cool cars. Farache stated ok and the two walked in separate directions. A short time later, Farache departed in his vehicle.

On April 11th, 2022, investigator Robert W. Crispin received information from Scott Zankl that he went into his backyard to see why his dogs were barking. Scott indicated once out back a male subject yelled to him "pay the money you owe to Moshe or else." Scott immediately re -entered his home and contacted this investigator to report same. Immediately this investigator instructed Scott to call 911.



**End of Report**

**Electronically Submitted,**
**Robert W. Crispin, Investigator**
**Richard D. Truntz, Investigator**
**Timothy O. Zimmerman, Investigator**
**Crispin Special Investigations, Inc**
**101 N Riverside Drive,**
**Suite 207**
**Pompano Beach, Florida 33062**
**Ph: (954) 767-2007**

# EXHIBIT E

**Exhibit E**

Case 22-15627-EPK    Doc 287    Filed 12/19/22    Page 60 of 155



Menu



● Watch Live

Quick links...

NEWS  ⟩  LOCAL NEWS  ⟩  **INVESTIGATIONS**

  

# Exotic cars vanish from Excell Auto Group in Boca Raton

Customers out thousands of dollars; 2 lawsuits filed against company



Several buyers in Boca Raton are out nearly half a million dollars after they purchased exotic cars from an auto group that has now disappeared.

By: Jessica Bruno

*Posted at 6:52 PM, Apr 13, 2022 and last updated 8:32 PM, Apr 13, 2022*

BOCA RATON, Fla. — Several automobile buyers in Boca Raton are out nearly half a million dollars after they purchased exotic cars from an auto group that has now disappeared. Two lawsuits have been filed against the company, which has filed for Chapter 7 bankruptcy.

For many people, it's their dream car. So Frederick Hall was in disbelief when he went to pick up his Lamborghini from Excell Auto Group in Boca Raton last week and it wasn't there.

"I located the Lamborghini on the internet, and I purchased via a sales person at the dealership," Hall told WPTV Contact 5.



Kaan Pala/WPTV

This Lamborghini that Frederick Hall purchased from Excell Auto Group in Boca Raton was his dream car.

Hall said it cost him more than $400,000, which he paid in full.

After the sale, Hall wanted the group's body shop to do some maintenance work on the car and that's when it disappeared.

"I'm working with detectives and trying to find out exactly where my car is," Hall said.



Kaan Pala/WPTV

Frederick Hall stands outside Excell Auto Group in Boca Raton, where he paid in full for a Lamborghini that he left at the body shop for some maintenance. Now he's out more than $400,000 and has no Lamborghini to show for it.

He said no one at the body shop had answers. Two days later, Excell Auto Group's owner, Scott Zankl, filed for bankruptcy, claiming they owe between $10 million and $50 million to their creditors.

"There's a scam going on here, literally," Hall said.

Excell Auto Group is now facing two lawsuits that were both filed last week. One was filed by their landlord and creditor Auto Wholesale of Boca. The second lawsuit was filed by Prestige Luxury Cars.

According to the lawsuits, Prestige and Excell "formed a joint venture whereby Prestige would pay for the acquisition of exotic cars located by Excell."

Case 22-15627-EPK    Doc 287    Filed 12/19/22    Page 63 of 155



Kaan Pala/WPTV

A pair of lawsuits have been filed against Excell Auto Group in Boca Raton, which has now filed for bankruptcy.

Prestige had provided $1.3 million to Excell, where cars were acquired and resold at a profit. According to the documents, Excell wrote two checks to Prestige. Both bounced.

"I think what's going to have to happen is a forensic investigation on accounting and accountability for where finances and funds were heading to," Hall said.

Boca Raton police confirm to WPTV that they are investigating several complaints against the auto group.

One of those complaints is from Chad Zakin.

"I've never felt so violated in my life," Zakin said.



Kaan Pala/WPTV

A "no trespassing" sign at Excell Auto Group shows that the dealership has filed for Chapter 7 bankruptcy.

Zakin told Contact 5 he dropped his car off at Excell for an appraisal a few months ago but never agreed to a sale.

"On Monday, driving by, I saw the front of his dealership full of police cars, so I pulled in and realized all the cars are missing and vanished," Zakin said.

One of those vanished cars was his Lamborghini. He discovered Excell sold the car without his permission for about $400,000. He hasn't received a penny.

"It's going to be a real big involvement of a lot of owners, cars, probably previous owners, and we'll have to see where it lies," Hall said.

Guy Fronstin, attorney for Scott Zankl, said, "The vehicles in question we're unlawfully taken from Excel Auto's showroom and Mr. Zankl is doing everything he can to help the police find the vehicles so that they can be returned to their rightful owners."

Copyright 2022 Scripps Media, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# EXHIBIT F

**Exhibit F**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO.

AUTO WHOLESALE OF BOCA, LLC
a Florida limited liability company, MMS
ULTIMATE SERVICES, INC., a Florida
corporation and MOSHE FARACHE, an individual,

     Plaintiffs,

vs.

EXCELL AUTO GROUP, Inc. a Florida
corporation, KARMA OF PALM BEACH, INC.
d/b/a KARMA PALM BEACH, a Florida corporation,
SCOTT ZANKL, an individual and
KRISTEN ZANKL, an individual,

     Defendants.

_____/

**VERIFIED COMPLAINT FOR DAMAGES FOR BREACH OF
NOTE AND SECURITY AGREEMENT, REPLEVIN, FORECLOSURE OF
SECURITY INTEREST AND APPOINTMENT OF A RECEIVER**

Plaintiffs, Auto Wholesale of Boca, LLC. ("AWB"), MMS Ultimate Services, Inc. ("MMS") and Moshe Farache ("Farache"), by and through its undersigned counsel, sues the Defendants, Excel Auto Group, Inc., ("EAG"), Karma of Palm Beach, Inc. ("KPB"), Scott Zankl ("SZ") and Kristen Zankl ("KZ"), and states as follows:

**Jurisdiction Venue and Parties**

1. This is an action for damages for breach of note and security agreement, replevin, foreclosure of a security interest, and appointment of a receiver.

2. This action is for more than $30,000 and, as such, it is within this Honorable Court's general jurisdiction.

3. AWB is a Florida limited liability corporation with its principal place of business in Boca Raton, Florida. AWB is authorized to do and is doing business in Palm Beach County, Florida.

4. MMS is a Florida corporation with its principal place of business in Boca Raton, Florida. MMS is authorized to do and is doing business in Palm Beach County, Florida.

5. Farache is a resident of Palm Beach County, Florida, is over the age of eighteen (18) and is otherwise sui juris.

6. EAG is a Florida corporation with its principal place of business in Boca Raton, Florida. Excel is authorized to do and is doing business in Palm Beach County, Florida.

7. Karma is a Florida corporation with its principal place of business in Boca Raton, Florida. Karma is authorized to do and is doing business in Palm Beach County, Florida.

8. SZ is a resident of Palm Beach County, Florida, is over the age of eighteen (18) and is otherwise sui juris.

9. KZ is a resident of Palm Beach County, Florida, is over the age of eighteen (18) and is otherwise sui juris.

10. Venue is proper in Palm Beach County, Florida because the property that is the subject to this action is located in Palm Beach County, Florida, the note and security agreement was breached in Palm Beach County, Florida, and EAG and AWB/MMS/Farache's customary place of business is in Palm Beach County, Florida.

## General Allegations

### The Demand Promissory Notes and Loan and Security Agreements

11. EAG operates a used car dealership, per section 320.27(1)(c)(2), Fla. Stat.

12. KPB operates a new and used car dealership, per section 320.27(1)(c)(1), Fla. Stat.

13. On or about November 5, 2017, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to AWB a Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $2,500,000. ("Financed Inventory").

14.    On or about November 11, 2021, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to AWB an Amended Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $2,500,000. ("Financed Inventory"). This amended the Secured Promissory Note referenced in paragraph 13 above. The Amended Secured Promissory Note was personally guaranteed by SZ and KZ. The Secured Promissory Note, the Amended Security Promissory Note, the Security Agreement and Unconditional Guaranty are herein referenced as ("Promissory Note 1") and attached hereto as Composite Exhibit "A".

15.    On or about July 7, 2021, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to MMS and Farache, a Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $1,080,000. ("Financed Inventory"). The Secured Promissory Note was personally guaranteed by SZ and KZ. The Secured Promissory Note, the Security Agreement and Unconditional Guaranty are herein referenced as ("Promissory Note 2") and attached hereto as Composite Exhibit "B".

16.    On or about November 11, 2021, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to AWB a Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $2,664,450. ("Financed Inventory"). The Secured Promissory Note was personally guaranteed by SZ and KZ. The Secured Promissory Note, the Security Agreement and Unconditional Guaranty are herein referenced as ("Promissory Note 3") and attached hereto as Composite Exhibit "C".

17.    Pursuant to Exhibits A, and C, AWB advanced funds to EAG, to be used for the purchase of motor vehicle inventory. Exhibits A and C are guaranteed by SZ, KZ and KPB.

18.     Pursuant to Exhibit B, MMS and Farache advanced funds to EAG, to be used for the purchase of motor vehicle inventory. Exhibit B is guaranteed by SZ and KZ.

19.     To secure the payment of all Financed Inventory owing by EAG under the three (3) Notes, EAG granted a security interest to AWB, MMS and Farache in, all, right, title, and interest in the following:

(a)  all of Debtor's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles (also including "Locate Vehicles"), vehicle parts or inventory now owned or hereafter acquired, including, without limitation: all accounts and accounts receivable, general intangibles, chattel paper whether tangible or electronic,  together with all attachments, accessions, and equipment now or hereafter affixed thereto or used in connection therewith, all substitutions and replacements thereof and any products and proceeds thereof pertaining to Excel Auto Leasing, Inc.

20.     The personal property collateral in which AWB, MMS and Farache have a perfected first priority security interest and which is the subject of this action consist of,  the report attached hereto and incorporated herein as Exhibit "D", and any other proceeds arising therefrom.

21. AWB and FARACHE have a first position security interest and lien on the inventory evidenced by its possession of the Titles to the Units, that certain UCC-I Financing Statement Number 202107709869 filed July 13, 2021. A true and correct copy of the Financing Statement is attached hereto as Exhibit "E" and incorporated herein.

22.     Pursuant to the Promissory Notes 1-3, EAG represented, covenanted and agreed.

a.      *Debtor shall at all times maintain its records as to the Collateral at its chief place of business at the address referred to hereinabove. Debtor further covenants that, except for Collateral delivered to Secured Party or an agent for Secured Party, Debtor will not store, use or locate any of the Collateral at any place other than as listed in the Agreement.*

b.      *Debtor currently uses, and during the last five years has used, no business or trade names, except as set forth herein. Debtor shall promptly notify Secured Party, in*

*sufficient detail, of any changes in, additions to, or deletions from the business or trade names used by Debtor for billing purposes.*

      *c.     The Collateral is now and will be used in Debtor's business and not for personal, family, household or family use.*

      *d.     Debtor has paid and will continue to pay or otherwise provide for the payment when due, of all taxes, assessments or contributions required by law which have been or may be assessed or levied against Debtor, whether with respect to any of the Collateral, to any wages or salaries paid by Debtor, or otherwise, and will deliver satisfactory proof of such payment to Secured Party on demand. In the event the Debtor shall fail to pay any such tax, assessment, levy or governmental charge or to discharge any such lien or contest the same in good faith, then the Secured Party, without waiving or releasing any obligation or default of the Debtor hereunder, may at any time or times hereafter, but shall be under no obligation to do so, upon prior written notice to Debtor, make such payment, settlement, compromise or release or cause to be released any such lien, and take any other action with respect thereto which the Secured Party deems advisable. All sums paid by the Secured Party in satisfaction of, or on account of any tax, levy or assessment or governmental charge, or to discharge or release any lien and any expenses, including reasonable attorneys' fees, court costs and other charges relating thereto, shall become a part of the Liabilities secured by the Collateral, payable on demand.*

      *e.     The grant of the security interest in the Collateral is effective to vest in Secured Party a valid priority security interest, superior to the rights of any person in and to the Collateral as set forth herein, except to the extent following: None.*

## Perfection of Security Interest.

*Debtor shall to the extent necessary execute all such financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law, including the Federal Assignment of Claims Act and any state motor vehicles registration statute, as Secured Party may require, each in form satisfactory to Secured Party. Debtor also shall pay all filing or recording costs with respect thereto, and all costs of filing or recording this Security Agreement or any other agreement or document executed and delivered pursuant hereto or to the Obligations (including the cost of all federal, state or local mortgage, documentary, stamp or other taxes), in each case, in all public offices where filing or recording is deemed by Secured Party to be necessary or desirable. Debtor authorizes Secured Party to (i) file any Uniform Commercial Code financing statements or amendments thereto without the signature of Debtor or by signing of Debtor's name to any such financing statements as its attorney-in-fact, (ii) file a photographic or other reproduction of this Security Agreement as a financing statement, (iii) file notices of assignment pursuant to the Federal Assignment of Claims Act, (iv) file applications for certificates of title or (v) take all other action which Secured Party may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this*

*Security Agreement.*

*General Covenants.*

*Debtor shall:*

*(a)      furnish Secured Party from time to time, at Secured Party's request, written statements and schedules further identifying and describing the Collateral in such detail as Secured Party may reasonably require;*

*(b)      advise Secured Party promptly, in sufficient detail, of any substantial change in the Collateral or of the occurrence of any event which would affect the value of the Collateral or Secured Party's security interest therein;*

*(c)      comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official applicable to Debtor or any Collateral or to the operation of Debtor's business except where the failure to comply (i) is non-material and (ii) has no effect on the value of the Collateral or on the ability of Secured Party to exercise its rights and remedies hereunder;*

*(d)      perform and observe all covenants, restrictions and conditions contained in any agreement or document executed in connection with the Obligations as though the same were fully set forth in this Security Agreement;*

*(e)      promptly execute and deliver to Secured Party such further agreements or other instruments and take such further action from time to time as Secured Party may deem necessary to perfect, protect or enforce its security interests in the Collateral or otherwise to effect the intent of this Security Agreement;*

*(f)      keep or cause to be kept the Collateral in good working order and marketable condition, ordinary wear and tear excepted;*

*(g)      insure the Collateral against loss or damage by fire or other hazards, and extended coverage, theft, burglary, bodily injury and such other risks, with such companies and in such amounts, as is required by Secured Party at any time;*

*(h)      use the Collateral for lawful purposes only in conformity with all laws, rules and regulations;*

*(i)      allow Secured Party and its agents, at all reasonable times and for reasonable durations, to inspect any of the Collateral and to examine and make extracts from Debtor's books and records relating to the Collateral; and*

*(i)      not assign, sell, mortgage, lease, transfer, pledge,  grant a security interest in or lien upon, encumber or otherwise dispose of or abandon, any part or all of the Collateral, without the express prior written consent of Secured Party, except for the sale from time to*

time in the ordinary course of business of Debtor of such items of Collateral as may constitute part of the business inventory of Debtor.

23.     Pursuant to the Promissory Notes 1-3, the events of default are:

The occurrence of any one or more of the following events shall constitute an event of default ("Event of Default") by Debtor under this Security Agreement:

(j)    a "Default" or "Event of Default" shall occur under the terms of the Note or any other agreement giving rise to or executed in connection with the Obligations;

(k)    if at any time Secured Party shall, in its reasonable discretion, consider the Obligations unsecured or any part of the Collateral unsafe, insecure or insufficient, and Debtor shall not on demand furnish other collateral or make payment on account, reasonably satisfactory to Secured Party;

(l)    if Debtor or any obligor, guarantor of, or any party to any of the Obligations or the Collateral (the same, including Debtor, being collectively referred to herein as "Debtors") shall default in the punctual payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of any of the Obligations or of this Security Agreement or any other agreement between any Debtor and Secured Party;

(m)    if any warranty or representation made to Secured Party by or on behalf of any Debtor is false or misleading in any material respect;

(n)    in the event of loss, theft, substantial damage to or destruction of any portion of the Collateral deemed material by Secured Party, or the making or filing of any lien, levy, or execution on, or seizure, attachment or garnishment of, any of the Collateral;

(o)    if any of the Debtors being a natural person or any general partner or member of an Debtor which is a partnership or a limited liability company, shall die or (being a partnership, limited liability company or corporation) shall be dissolved, or if any of the Debtors (if an entity) shall fail to maintain its existence in good standing;

(p)    if any of the Debtors shall become insolvent or make an assignment for the benefit of creditors, or make or send notice of an intended bulk transfer, or if there shall be convened a meeting of the creditors or principal creditors of any of the Debtors or if a committee of creditors is appointed for any of them;

(q)    if there shall be filed by or against any of the Debtors any petition for any relief under the bankruptcy laws of the United States now or hereafter in effect or under any insolvency, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity);

(i)    if the usual business of any of the Debtors shall be terminated or suspended;

(j)    if any proceedings, procedure or remedy supplementary to or in enforcement of judgment shall be commenced against, or with respect to any property of: any of the Debtors;

(k)    if any petition or application to any court or tribunal, at law or in equity, be filed by or against any of the Debtors for the appointment of any receiver or trustee for any of the Debtors or any part of the property of any of them;

(l)    if there occur the sale, lease, transfer, assignment, encumbrance (except by purchase money liens on property acquired after the date of the Note) or other disposition of any of the Collateral to a third party, except in the ordinary course of business, without the prior

written consent of the Secured Party; or

(m) if there is a change of the ownership structure or interests of the Debtor during the term of the loan evidenced by the Note without the prior written consent of the Secured Party.

(n)  Uses the security, including but not limited to, any vehicles purchased with Secured Party's funds as collateral to take a loan or for any other purpose;

(o)  Breaches any obligation under the lease agreements with 1001 Clint Moore, LLC with respect to the premises located at 1001 Clint Moore Rd., Suite 101-103, Boca Raton, FL 33487;

(p) Fails to assign and provide the title to Auto Wholesale of Boca, LLC for any and all vehicles purchased with Lender's funds, and/or fails to provide the bill of sale pertaining to any such vehicles.

24.      Pursuant to the Promissory Notes 1-3, the rights and remedies of default are:

a.      In the event of the occurrence and continuance of any Event of Default, Secured Party shall  at  any time thereafter  have the right,  with or without  (to the extent permitted by applicable law) notice to Debtor, as to any or all of the Collateral, by any available judicial procedure or without judicial process, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral, and generally to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, Debtor agrees that Secured Party shall have the right to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation' or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions, all as Secured Party in its sole discretion may deem advisable, and Secured Party shall have the right to purchase at any such sale; and, if any Collateral  shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, Secured Party shall have the right, at its sole option and discretion, and at Debtor's sole cost and expense, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Collateral in such saleable or disposable form as it shall deem appropriate. At Secured Party's request after any Event of Default, Debtor shall assemble the Collateral and make it available to Secured Party at places which Secured Party shall select, whether at Debtor's premises or elsewhere, and make available to Secured Party, without rent, all of Debtor's premises and facilities for the purpose of Secured Party's taking possession of, removing or putting the Collateral in saleable or disposable form. If any of the Collateral consists of motor vehicles, Secured Patty may use Debtor's license plates, in any lawful manner.

b.      Any such sale, lease or other disposition of Collateral may be made without demand for performance or any notice of advertisement whatsoever except that where an applicable statute requires reasonable notice of sale or other disposition, Debtor agrees that the sending of five days' notice by ordinary mail, postage prepaid, to Debtor of the place and time of any public sale or of the time at which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof Notwithstanding the foregoing, if any of the Collateral is perishable and may be materially diminished in value during such five day period,

*Secured Party shall provide Debtor with such sh01ter notice as it deems reasonable under the circumstances.*

c.        *The proceeds of any such sale, lease or other disposition of the Collateral shall be applied first to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like, and to the reasonable attorneys' fees and legal expenses incurred by Secured Party, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which Secured Party shall account to Debtor for any surplus proceeds. If, upon the sale, lease or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor will be liable for the deficiency, together with interest thereon, at the rate prescribed in the agreements giving rise to the Obligations, and the reasonable fees of any attorneys employed by Secured Party to collect such deficiency. To the extent permitted by applicable law, Debtor waives all claims, damages and demands against Secured Party arising out of the repossession, removal, retention or sale of the Collateral, except to the extent same is caused by the gross negligence or willful misconduct of Secured Party, its agents or employees.*

25.        Pursuant to the Promissory Notes 1-3, *Any and all fees, costs and expenses, of whatever kind or nature, including the reasonable attorneys' fees and legal expenses incurred by Secured Party, in connection with the filing or recording of financing statements and other documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, insurance premiums, encumbrances or otherwise protecting, maintaining or preserving the Collateral arid Secured Party's security interest therein, or in defending or prosecuting any actions or proceedings arising out of or related to the transaction to which this Security Agreement relates, shall be paid by Debtor on demand. Until so paid, all such amounts shall be added to the principal amount of the Obligations and shall bear interest at the rate prescribed in the agreements giving rise to the Obligations.*

26.        AWB is the legal and equitable holder and owner of Promissory Note 1 and 3, including the original Note, and has the right to enforce the same.

27.        MMS and Farache are the legal and equitable holders and owners of Promissory Note 2, including the original Note, and has the right to enforce the same.

28.        Regarding Promissory Notes 1 and 4, SZ, KZ and KPB are the unconditional guarantors.

29.        Regarding Promissory Note 3, SZ and KZ are the unconditional guarantors.

## Short Term Loan

30.     In addition to money lent pursuant to Promissory Notes 1-3, EAG required money for the purchase of inventory at a time that Promissory Notes 1-3 were at their maximum and no further money was available to lend to EAG.

31.     Despite this, AWB and MMS orally agreed to loan money to EAG for the purchase of inventory. EAG would provide a bill of sale to AWB, AWB would fund the purchase and EAG would provide title to the purchased car to AWB.

32.     So as to protect their interest, AWB would have the title of vehicle placed in the name of AWB.

33.     EAG has not repaid any money under the short term loan.

34.     Do date, EAG owes AWB $1,564,000 and MMS a total of $800,000.

## The Default by EAG of all Promissory Notes and Short Term Loan

35.     On or about November 2021, AWB, MMS and Farache learned that EAG had sold approximately $4,000,000 of the Financed Inventory vehicles to consumers and failed to pay AWB, MMS and Farache. This occurred while AWB held titles, in AWB's name, to the sold vehicles. Attached hereto as Exhibit "D" , are a list of vehicles that are titled in the name of AWB that were sold by EAG, without receiving any payment by EAG. This is a violation of Promissory Notes 1-3.

36.     In addition to selling Financed Vehicles without paying AWB, MMS and Farache, EAG, through its owners Scott Zankl and Kristen Zankl, committed fraud. By way of example, KPB leased a 2019 Lamborghini Aventador SVJ 63 Coupe, VIN ZHWUM6ZD5KLA08766 from Luxury Lease Company. KPB was to obtain title and assign the title to Luxury Lease Company. A copy of the title, assigning ownership to Luxury Lease Company is attached hereto as Exhibit "F".

37.     When AWB, MMS and Farache confronted EAG, SZ and KZ, in an effort to reduce the monies owed by EAG, SZ and KZ, ***assigned the very same title to AWB***. A copy of the title, assigning ownership to AWB is attached hereto as Exhibit "G".

38.     EAG, through its owners, KZ and SZ, committed fraud by attempting to use the value of 2019 Lamborghini Aventador, that was owed by Luxury Lease Company, to reduce the debt owed to AWB, MMS and Farache.

39.     By way of another example of EAG, SZ and KZ fast and loose business dealings, EAG asked that AWB purchase a 2021 Lamborghini Urus, VIN ZPBUA1ZL1MLA12270 for EAG inventory. The vehicle was paid for by AWB and Title is in the name of AWB. AWB has learned that EAG has given possession of said vehicle to Mr. Edward Brown. EAG has not paid AWB, WWS or Farache for said vehicle. Mr. Brown refuses to return said vehicle to AWB, MMS or Farache, stating SZ and KZ owed him money and the vehicle was a form of payment. The vehicle is worth appoximately $435,000.

40.     When EAG sold units of AWB, MMS and Farache Financed Inventory without paying AWB, MMS and Farache for them, it sold the units "out of trust," meaning EAG sold these vehicles to consumers, but did not hold the funds generated from the sale of the units in trust for the sole benefit of AWB, MMS and Farache or remit the funds to AWB, MMS and Farache from the sale of these units.

41.     On information and belief, at least fifteen (15) Units of Financed Inventory, and possibly more, have been sold by EAG without providing the sales proceeds to AWB, MMS and Farache.

42.     Selling Financed Inventory out of trust constitutes an Event of Default pursuant to Section 5 of the Promissory Note, which identifies, inter alia, the following as events of default:

*Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:*

A. *Fails to do anything required by this Note and other Loan Documents;*

B. *Defaults on any other loan with Lender;*

C. *Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;*

D. *Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender;*

E. *Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender.*

43.     All amounts due under the Promissory Notes 1-3 are accelerated and due and owing by EAG to AWB, MMS and Farache.

44.     EAG's right to sell, lease, or otherwise dispose of the financed vehicles is and has been revoked.

45.     AWB, MMS and Farache retained Kurkin Forehand Brandes LLP and is obligated to pay them their reasonable fees and costs.

46.     All other conditions necessary to bring this action have been waived, satisfied, or have otherwise occurred.

## COUNT 1
### (Action on Promissory Note 1)

47.     EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

48.     This is an action for damages as a result of a breach of the terms of Promissory Note 1, as described above.

49.     AWB is the owner and holder of Promissory Note 1.

50.     As described in greater detail above, EAG has defaulted under the terms of Promissory Note 1 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due.

51.      All amounts owed under Promissory Note 1 have been accelerated and are due and payable in full.

52.      As a result of the breach of Promissory Note 1, AWB has been damaged.

53.      Due to EAG's breach of the Note, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which EAG is obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 1, as amended, in the amount of $2,371,600.00, with interest accruing daily, for damages against EAG, for any amounts due under the Promissory Note 1, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT II
### (Action against Guarantors of Promissory Note 1)

54.      EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

55.      This is an action for damages as a result of a breach of the terms of the Unconditional Guaranty for Promissory Note 1, as described above.

56.      AWB is the owner and holder of Promissory Note 1.

57.      As described in greater detail above, EAG has defaulted under the terms of Promissory Note 1 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due. As a result of such default, SZ, KZ and KPB are responsible for the debts of EAG as it relates to Promissory Note 1.

58.      All amounts owed under Promissory Note 1 have been accelerated and are due and payable in full.

59.      As a result of the breach of Promissory Note 1, AWB has been damaged.

60.      Due to EAG's breach of Promissory Note 1, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which SZ, KZ and KPB are obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 1, as amended, in the amount of $2,371,600.00, with interest accruing daily, for damages against SZ, KZ and KPB, for any amounts due under the Promissory Note 1, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT III
(Action on Promissory Note 2)

61.      MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

62.      This is an action for damages as a result of a breach of the terms of Promissory Note 2, as described above.

63.      MMS and Farache are the owners and holder of Promissory Note 2.

64.      As described in greater detail above, EAG has defaulted under the terms of Promissory Note 2 by, among other things, selling Financed Inventory out of trust and without payment to MMS and Farache, concealing sales to third parties to avoid payment obligations to MMS and Farache, and failing to make payment when due.

65.      All amounts owed under Promissory Note 2 have been accelerated and are due and payable in full.

66.	As a result of the breach of the Note, MMS and Farache have been damaged.

67.	Due to EAG's breach of the Note, MMS and Farache will incur costs and expenses, which include but are not limited to attorneys' fees and costs which EAG is obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, MMS and Farache respectfully demands judgment in the amount owed to it under the Promissory Note 2, in the amount of $800,000.00, with interest accruing daily, for damages against EAG, for any amounts due under the Promissory Note 2, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

### COUNT IV
(Action against Guarantors of Promissory Note 2)

71. MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

72.	This is an action for damages as a result of a breach of the terms of the Unconditional Guaranty for Promissory Note 2, as described above.

73.	MMS and Farache are the owner and holder of Promissory Note 2.

74.	As described in greater detail above, EAG has defaulted under the terms of Promissory Note 2 by, among other things, selling Financed Inventory out of trust and without payment to MMS and Farache, concealing sales to third parties to avoid payment obligations to MMS and Farache, and failing to make payment when due. As a result of such default, SZ and KZ are responsible for the debts of EAG as it relates to Promissory Note 2.

75.	All amounts owed under Promissory Note 2 have been accelerated and are due and payable in full.

76.	As a result of the breach of Promissory Note 2, MMS and Farache have been damaged.

77.      Due to EAG's breach of Promissory Note 2, MMS and Farache will incur costs and expenses, which include but are not limited to attorneys' fees and costs which SZ and KZ are obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, MMS and Farache respectfully demands judgment in the amount owed to it under Promissory Note 2, in the amount of $800,000.00, with interest accruing daily, for damages against SZ and KZ, for any amounts due under the Promissory Note 2, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT V
(Action on Promissory Note 3)

78.      EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

79.      This is an action for damages as a result of a breach of the terms of Promissory Note 3, as described above.

80.      AWB is the owner and holder of Promissory Note 3.

81.      As described in greater detail above, EAG has defaulted under the terms of Promissory Note 3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due.

82.      All amounts owed under Promissory Note 3 have been accelerated and are due and payable

in full.

83.      As a result of the breach of Promissory Note 3, AWB has been damaged.

84.     Due to EAG's breach of Promissory Note 3, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which EAG is obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 3, in the amount of $2,015,450.00, with interest accruing daily, for damages against EAG, for any amounts due under the Promissory Note 3, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT VI
(Action against Guarantors of Promissory Note 3)

85.     EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

86.     This is an action for damages as a result of a breach of the terms of the Unconditional Guaranty for Promissory Note 4, as described above.

87.     AWB is the owner and holder of Promissory Note 3.

88.     As described in greater detail above, EAG has defaulted under the terms of Promissory Note 3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due. As a result of such default, SZ, KZ and KPB are responsible for the debts of EAG as it relates to Promissory Note 3.

89.     All amounts owed under Promissory Note 4 have been accelerated and are due and payable in full.

90.     As a result of the breach of Promissory Note 4, AWB has been damaged.

91.     Due to EAG's breach of Promissory Note 4, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which SZ, KZ and KPB are obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 3, in the amount of $2,015,450.00, with interest accruing daily, for damages against SZ, KZ and KPB, for any amounts due under the Promissory Note 3, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT VII
### (Fraud in the Inducement)

92.     AWB, MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

93.     This is an action for fraud in the inducement as to EAG, DZ, KZ, KPB.

94.     The actions of EAG, DZ, KZ, and KPB which include, but are not limited to, falsely stating that they would abide by Promissory Notes 1-3; that they would make timely payments; that they would pay AWB, MMS and Farache for vehicles sold by EAG; vehicles EAG, KZ, SZ and KPB pledged to AWB, MMS and Farache, to pay down the debt EAG owed and KZ, SZ and KPB personally guaranteed would not be encumbered; and they would not operate out of trust, were false statements of material facts.

95.     KPB, EAG, SZ and KZ knew or should have know that such statements were false.

96.     KPB, EAG, SZ and KZ made such statements to induce reliance upon AWB, MMS and Farache, so as to avoid AWB, MMS and Farache from declaring EAG's Promissory Notes (that KPB, SZ and KZ guaranty) in default.

97.    AWB, MMS and Farache justifiably relied upon EAG, KPB SZ and KZ false statements to their detriment.

WHEREFORE, AWB, MMS and Farache respectfully demands judgment, with interest accruing daily, for damages in the amount of $7,145,050.00, against SZ, KZ, EAG and KPB, any compensatory, incidental and other damages, interests, costs, and any and all other relief this Court deems necessary, just and proper.

## COUNT VIII
(Replevin)

98.    AWB, MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs I through 46 previously pled as if fully set forth herein.

99.    AWB, MMS and Farache sues EAG for replevin under Chapter 78, Florida Statutes.

100.    EAG came into possession of the Financed Inventory by using funds lent to it by AWB, MMS and Farache under the loans as evidenced by Promissory Notes 1-3, to purchase the units of the Financed Inventory.

101.    The Promissory Notes 1-3 provides AWB, MMS and Farache a security interest in the Financed Inventory and such interest is perfected.

102.    The Units of Financed Inventory are identified and described in detail in the report attached hereto and incorporated herein as Exhibit "G".

103.    As described in greater detail above, EAG has defaulted under the terms of Promissory Note 1-3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, MMS and Farache, concealing sales to third parties to avoid payment obligations to AWB, MMS and Farache, and failing to make payment when due.

104.    Consequently, EAG is in material breach of Promissory Note 1-3, as amended.

105.    Demand has been made for turnover of the Financed Inventory.

106.    The Financed Inventory are being wrongfully detained.

107.    To the best of AWB, MMS and Farache's knowledge, information, and belief, the remaining Financed Inventory are presently located at EAG's principal place of business: 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487.

108.    As AWB, MMS and Farache has been unable to complete a lot audit and full review of any legitimate sales contracts, the value of the Financed Inventory which remain is unknown.

109.    EAG presently owes at least $9,062,737.83 in principal, interest and fees, plus attorneys' fees and costs to AWB, MMS and Farache under the Promissory Notes 1-3.

110.    AWB, MMS and Farache are entitled to possession of the Financed Inventory.

111.    AWB is the owner and holder of Promissory Note 1, and 3.

112.    MMS and Farache are the owners and holders of Promissory Note 2.

113.    The Promissory Notes 1-3 grants a first priority security interest in the Financed Inventory to AWB, MMS and Farache and AWB holds the Titles for the Financed Inventory. Consequently, AWB, MMS and Farache are entitled to possession of the Financed Inventory.

114.    The Financed Inventory have not been taken for a tax, assessment, or fine pursuant to the law.

115.    The Financed Inventory have not been taken under an execution or attachment against the property of AWB, MMS or Farache.

116.    The Financed Inventory are now in danger of destruction, concealment, waste, removal from the state, removal from the jurisdiction of the court, or transfer to an innocent purchaser during the pendency of this action.

WHEREFORE, AWB, MMS and Farache respectfully requests this Court enter judgment for possession of the Financed Inventory, together with interest, costs, attorneys' fees pursuant to the Promissory Notes 1-4, and any other relief the Court deems just and proper.

## COUNT IX
(Foreclosure of Security Interest)

117.    AWB, MMS and Farache re-alleges and incorporates by reference allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

118.    This is an action to foreclose a security interest on property located in Palm Beach County, Florida.

119.    AWB is the holder of the original Promissory Note 1 and 3, secured by the Financing Statement which is the subject of this action and is entitled to enforce the terms of the Note pursuant to Section 673.3011(1), Florida Statutes, by virtue of its physical possession of the Note.

120.    MMS and Farache is the holder of the original Promissory Note 2, secured by the Financing Statement which is the subject of this action and is entitled to enforce the terms of the Note pursuant to Section 673.3011(1), Florida Statutes, by virtue of its physical possession of the Note.

121.    EAG is the record owner of the subject Financed Inventory.

122.    As described in greater detail above, EAG has defaulted under the terms of the Promissory Note 1-4 by, among other things, selling Financed Inventory out of trust and without

payment to AWB, MMS and Farache, concealing sales to third parties to avoid payment obligations to AWB, MMS and Farache, and failing to make payment when due.

123.    EAG presently owes at least $9,062,737.83 in principal, interest and fees, plus attorneys' fees and costs to AWB, MMS and Farache, pursuant to the Promissory Note 1-3.

124.    EAG may claim an interest in the Financed Inventory by virtue of its ownership of the units of Financed Inventory, however, AWB, MMS and Farache's interest in the Financed Inventory is superior to that of EAG and EAG's interest is subordinate, junior, and inferior to AWB, MMS and Farache's interest.

WHEREFORE, AWB, MMS and Farache prays as follows:

a. This Court take jurisdiction of this cause, the subject matter and the parties hereto.

b. This Court ascertain and determine the sums of money due and payable to AWB, MMS and Farache from EAG and guarantors SZ, KZ and KPB, including without limitation principal, interest, advances, attorney's fees and costs pursuant to Promissory Notes 1-3, including the Note.

c. The sum of money found to be due be decreed by this Court to be a lien upon the

Financed Inventory described in the report.

d. Such lien be foreclosed in accordance with the rules and established practice of this Court, and upon failure of EAG and or guarantors, SZ, KZ or KPB to pay the amount of money found to be due by it to AWB, MMS and Farache, the said Financed Inventory be sold to satisfy said lien.

e. This Court decree that the lien of AWB, MMS and Farache is superior to any and all right, title or interest of EAG herein or any person or parties claiming by, through, or under it since the institution of this suit.

f. All right, title, or interest of EAG or any person claiming by, through or under it be forever barred and foreclosed.

g. This Court grant general relief in this cause as in its discretion might be just and proper including, but not limited to, a deficiency judgment, except where a discharge is applicable, if the proceeds of the sale are insufficient to pay AWB, MMS and Farache's claim.

## COUNT X
### (Appointment of Receiver)

125.    This is an action to appoint a Receiver for the Collateral.

126.    AWB, MMS and Farache re-alleges and incorporates herein the allegations contained in Paragraphs 1 through 46 above.

127.    As described in greater detail above, EAG has defaulted under the terms of Promissory Notes 1-3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, MMS or Farache, concealing sales to third parties to avoid payment obligations to AWB, MMS or Farache, and failing to make payment when due.

128.    Upon information and belief, the Financed Inventory are not being properly protected and thereof are not being held in trust for AWB, MMS or Farache.

129.    EAG has caused the Financed Inventory to be sold out of trust in violation of the Promissory Notes 1-3 and is likely to continue to do so.

130.    EAG may use the proceeds of those sales of Financed Inventory, which are to be held in trust for AWB, MMS or Farache, to fund business operations or pay the owners of the EAG or for other improper purposes, rather than remitting those funds to AWB, MMS or Farache.

131.    In order to protect the Financed Inventory and the income derived therefrom, to reduce the debt due to AWB, MMS or Farache under the Promissory Notes 1-3, to protect, maintain, and preserve AWB, MMS or Farache 's collateral position, and to prevent the deterioration of the Financed

Inventory, it is necessary that a Receiver be appointed by the Court and that a Receiver be invested with such powers as the Court shall deem appropriate.

132.    Absent the appointment of a Receiver, AWB, MMS or Farache has no assurance of the continued protection and preservation of the Financed Inventory or any equity in said collateral.

133.    Moreover, absent the appointment of a Receiver, AWB, MMS or Farache may be without an adequate remedy at law.

WHEREFORE, AWB, MMS or Farache respectfully requests that this Honorable Court enter an order appointing a Receiver for the purpose of protecting and maintaining the Financed Inventory during the pendency of this action and providing as follows:

a.    Such Receiver be appointed during the pendency of this action, pending further order of this Court, and immediately take possession and charge of the Financed Inventory.

b.    Such Receiver be vested with all of the powers, rights and duties provided under applicable law and, among other things, the specific powers and rights to: (i) enter upon and take possession and control of any and all of the Financed Inventory; (ii) take and maintain possession of all documents, books, records, papers and accounts relating to the Financed Inventory; (iii) manage and protect the Financed Inventory; (iv) preserve and maintain the Financed Inventory; (v) make repairs and alterations to the Financed Inventory; (vi) undertake any repairs to the Financed Inventory, with such changes, additions or modifications of the Financed Inventory as AWB, MMS and Farache may in its sole discretion deem appropriate or desirable; (vii) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as AWB, MMS and Farache may in its sole discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted; (viii) enter into leases or other agreements, under such terms and conditions as AWB, MMS and Farache may in its sole discretion deem appropriate or desirable; (xi) collect and receive the revenues, income, profits, payments, or proceeds from the Financed Inventory; (x) repossess the Financed Inventory, as provided by law, for breaches of the conditions of their leases or other agreements; (xi) sue for unpaid revenues, income, profits, payments, or proceeds; (xii) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent; (xiii) compromise or give acquittance for rents, revenues, income, profits, payments, or proceeds that may become due; (xiv) apply the rents, revenues, income, profits, payments, and/or proceeds from sale generated or to be generated by the Financed Inventory, after payment of necessary operating expenses, taxes, insurance, and costs of receivership, to reduce the outstanding debt due under the Promissory Notes 1-3; (xv) undertake variances with respect to the Financed Inventory, and enter into any document in connection with the foregoing; (xvi) market the Financed Inventory, or individual units thereof, for sale and, with the authorization of AWB, MMS and Farache and this Court, sell the Financed Inventory, or individual units thereof, prior to the conclusion

of this lawsuit; and (xvii) do any lawful acts reasonably requested by AWB, MMS and Farache to protect its security interest in the Financed Inventory and the security hereof and use such measures, legal or equitable, reasonably requested by AWB, MMS and Farache to implement and effectuate the provisions of the Promissory Notes 1-3.

## COUNT XI
### (Unjust Enrichment)

134.    AWB, MMS and Farache re-alleges and incorporates by reference allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

135.    AWB, MMS and Farache have conferred a benefit on EAG, who has knowledge thereof.

136.    EAG voluntarily accepted and retained the benefit conferred.

137.    The circumstances are such that it would be inequitable for EAG to retain the benefit without paying the benefit without paying the value thereof to AWB, MMS and Farache.

WHEREFORE, AWB, MMS and Farache respectfully demands judgment, with interest accruing daily, for damages in the amount of $7,145,050.00, against EAG and KPB SZ, KZ (as guarantors), any compensatory, incidental and other damages, interests, costs, and any and all other relief this Court deems necessary, just and proper.

## COUNT XII
### (Conversion)

138.    AWB, MMS and Farache re-alleges and incorporates by reference allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

139.    AWB, MMS and Farache are owners or have the right to the property described in Exhibit "G".

140.    EAG's conversion by wrongful act inconsistent with the property rights of AWB, MMS and Farache.

141.    AWB, MMS and Farache have been damaged by EAG's actions.

WHEREFORE, AWB, MMS and Farache respectfully demands judgment, with interest accruing daily, for damages in the amount of $7,145,050.00 against EAG and KPB SZ, KZ (as guarantors), any compensatory, incidental and other damages, interests, costs, and any and all other relief this Court deems necessary, just and proper.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## VERIFICATION

BY: _____
(signature)

ITS: **MANAger** _____
(title)

STATE OF FLORIDA          )
                          ) ss
COUNTY OF PALM BEACH      )

BEFORE ME, the undersigned authority, personally appeared, **Moshe Farache** , **MANAger** (title) of Auto Wholesale of Boca, LLC, who is personally known to me ~~or who has produced~~ _____ ~~as personal identification and~~ who first by me being duly sworn, says that it is the Plaintiff in the above-styled cause, that he/she has read the foregoing Verified Complaint and has personal knowledge of the facts and matters set forth and alleged in it; and that each of the facts and matters are true and correct.

The foregoing instrument was acknowledged before me by means of ( X ) physical presence or (__) online notarization, this **7th** day of April, 2022

_____
Notary Public

My Commission Expires:



Notary Public State of Florida
Scott C. Gherman
My Commission GG 951287
Expires 01/27/2024

BY: _____
(signature)

ITS:   PRESIDENT
_____
(title)

STATE OF FLORIDA          )
                          ) ss
COUNTY OF PALM BEACH      )

BEFORE      ME,      the      undersigned      authority,      personally      appeared,

Miles A Early _____, President _____ (title) of MMS Ultimate

Services, Inc., who is personally known to me or who has produced _____ as personal

identification and who first by me being duly sworn, says that it is the Plaintiff in the above-styled

cause, that he/she has read the foregoing Verified Complaint and has personal knowledge of the facts

and matters set forth and alleged in it; and that each of the facts and matters are true and correct.

The foregoing instrument was acknowledged before me by means of (X) physical presence or

(__) online notarization, this 7th day of April, 2022

_____
Notary Public

Notary Public State of Florida
Scott C. Gherman
My Commission GG 951287
Expires 01/27/2024

MOSCHE FARACHE

BY: _____
(signature)

STATE OF FLORIDA )
                 ) ss
COUNTY OF PALM BEACH )

BEFORE ME, the undersigned authority, personally appeared, Moshe Farache, (who is) (personally known to me or who has produced _____ as personal identification and who first by me being duly sworn, says that it is the Plaintiff in the above-styled cause, that he/she has read the foregoing Verified Complaint and has personal knowledge of the facts and matters set forth and alleged in it; and that each of the facts and matters are true and correct.

The foregoing instrument was acknowledged before me by means of (X) physical presence or (__) online notarization, this 7th day of April, 2022

_____
Notary Public



Notary Public State of Florida
Scott C. Gherman
My Commission GG 951287
Expires 01/27/2024

Dated this _____ day of April 2022.

> **KURKIN FOREHAND BRANDES LLP**
> *Attorneys for Plaintiff*
> 18851 NE 29th Avenue, Suite 303
> Aventura, Florida 33180
> Tel: (305) 929-8500 / Fax: (954) 206-0214
> Email: mbrandes@kfb-law.com
>            bvillalobos@kfb-law.com
>
> By: ___/S/ Marc E. Brandes_____
>            Marc E. Brandes, Esq.
>            Florida Bar No. 866423



COMPOSITE
EXHIBIT "C"

NOT A CERTIFIED COPY



## SECURED PROMISSORY NOTE

$2,664,450.00                                        November __11__, 2021

### 1. Principal.

FOR VALUE RECEIVED, the undersigned, EXCELL AUTO GROUP, INC., a Florida corporation maintaining its principal address at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487 ("Borrower") promises to repay AUTO WHOLESALE OF BOCA, LLC, a Florida Limited Liability Company ("Lender"), whose address is 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487, the principal sum of Two Million & Six Hundred Sixty-Four Thousand & Four-Hundred & Fifty Dollars ($2,664,450.00) **(An itemization accounting for the principal sum is attached hereto as Exhibit "A.")**, with annual interest thereon calculated in accordance with the terms and provisions provided below. All sums owing under this note are payable in lawful money of the United States of America.

### 2. Definitions.

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note. "Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

### 3. Payments/Interest.

(a)  Lender and Borrower agree to split the profits 50/50 on all vehicle sales funded by this note. Lender has the right to review all pertinent information, including but not limited to, backup documentation (with all customer information redacted) as to how Borrower calculated the profit

(b)  A guaranteed monthly payment of $10,000.00, due on the first of each month, shall be paid by Borrower to Lender in the event that the profit split does not equal $10,000.00 on the first line of $1,000,000.00. Credit shall be given for the percentage of profit funded by this first million.

(c)  On the remaining $1,664,450.00, the profit shall be split 50/50.

(d)  All amounts required to be paid under Lender's note shall be payable at Lender's office located at 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487, or at such other place as Lender, from time to time, may designate in writing.

Initials: _____

1

NOT A CERTIFIED COPY

(e)  Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

**4. Maturity Date.**

The entire principal balance of this note, together with all accrued and unpaid interest/payments, shall be due and payable one (1) year from the date of execution of the note ("maturity date"), unless otherwise prepaid in accordance with the terms of this note.

**5. Default:**

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.  Fails to do anything required by this Note and other Loan Documents;

B.  Defaults on any other loan with Lender;

C.  Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D.  Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender;

E.  Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender;

F.  Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G.  Fails to pay any taxes when due;

H.  Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I.  Has a receiver or liquidator appointed for any part of their business or property;

J.  Makes an assignment for the benefit of creditors;

K.  Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L.  Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent;

M.  Becomes a subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note;

N.  Uses the security, including but not limited to, any vehicles purchased with Lender's funds as collateral to take a loan or for any other purpose;

O.  Breaches any obligation under the lease agreements with 1001 Clint Moore, LLC with respect to the premises located at 1001 Clint Moore Rd., Suite 101-103, Boca Raton, FL 33487;

P.  Fails to assign and provide the title to Lender for any and all vehicles purchased with Lender's funds, and/or fails to provide the bill of sale pertaining to any such vehicles; or

NOT A CERTIFIED COPY

Initials: _SK_
_K2_

2

### 6. Lender's Rights if there is a Default:

Without notice or demand and without giving up any of its rights, Lender may:

    A.  Require immediate payment of all amounts owing under this Note;

    B.  Collect all amounts owing from any Borrower or Guarantor;

    C.  File suit and obtain judgment;

    D.  Take possession of any Collateral; or

    E.  Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

### 7. Prepayment.

Borrower may prepay the whole principal sum of this note on any date, upon five days' notice to Lender. Should Borrower prepay the note, in addition to repaying the principal sum, Borrower shall pay lender one year of interest at 12% ($319,734.00).

### 8. Lender's General Powers:

Without notice and without Borrower's consent, Lender may:

    A.  Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

    B.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

    C.  Release anyone obligated to pay this Note;

    D.  Compromise, release, renew, extend or substitute any of the Collateral; and

    E.  Take any action necessary to protect the Collateral or collect amounts owing on this Note.

### 9. Successors and Assigns:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

### 10. General Provisions:

3

Initials: _S\2_

_K2_

NOT A CERTIFIED COPY

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

## 11. Attorneys' Fees and Costs.

If Lender engages any attorney to enforce or construe any provision of this note or the mortgage, or as a consequence of any default whether or not any legal action is filed, Borrower shall immediately pay on demand all reasonable attorneys' fees and other Lender's costs, together with interest from the date of demand until paid at the highest rate of interest then applicable to the unpaid principal, as if such unpaid attorneys' fees and costs had been added to the principal.

## 12. Waivers.

(a) Borrower hereby waives and releases all benefit that might accrue to Borrower by virtue of any present or future laws of exemption with regard to real or personal property or any part of the proceeds arising from any sale of any such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment. Borrower agrees that any real estate that may be levied on under a judgment obtained by virtue hereof, on any writ of execution issued thereon, may be sold upon any such writ in whole or in part in any order desired by Lender.

(b) Borrower and all endorsers, sureties, and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest, notice of protest of this note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this note. They agree that each shall have unconditional liability without regard to the liability of any other party, and that they shall not be

4

Initials: _S&2_

_K2_

NOT A CERTIFIED COPY

affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender. Borrower and all endorsers, sureties, and guarantors consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this note, and to the release of any collateral or any part thereof, with or without substitution, and they agree that additional borrowers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder.

(c) Lender shall not be deemed by any act of omission or commission to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Lender, and then only to the extent specifically set forth in writing. A waiver on one event shall not be construed as continuing or as a bar to or waiver of any right or remedy to a subsequent event.

### 13. Notices.

All notices required under or in connection with this note shall be delivered or sent by certified or registered mail, return receipt requested, postage prepaid, to the addresses set forth in Paragraph 1 hereof, or to such other address as any party may designate from time to time by notice to the others in the manner set forth herein. All notices shall be deemed to have been given or made either at the time of delivery thereof to an officer or employee or on the third business day following the time of mailing in the aforesaid manner.

### 14. Costs and Expenses.

Borrower shall pay the cost of any revenue tax or other stamps now or hereafter required by law at any time to be affixed to this note.

### 15. Interest Rate Limitation.

Notwithstanding anything contained herein to the contrary, the holder hereof shall never be entitled to collect or apply as interest on this obligation any amount in excess of the maximum rate of interest permitted to be charged by applicable law. If the holder of this note ever collects or applies as interest any such excess, the excess amount shall be applied to reduce the principal debt; and if the principal debt is paid in full, any remaining excess shall be paid to the Borrower forthwith. In determining whether the interest paid or payable in any specific case exceeds the highest lawful rate, the holder and the Borrower shall to the maximum extent permitted under applicable law (a) characterize any nonprincipal payment as an expense, fee, or premium rather than as interest; (b) exclude voluntary prepayments and the effects of these; and (c) spread the total amount of interest throughout the entire contemplated term of the obligation so that the interest rate is uniform throughout the term. Nothing in this paragraph shall be deemed to increase the total dollar amount of interest payable under this note.

5

Initials: _Sh_
_K2_

NOT A CERTIFIED COPY

### 16. Modification.

In the event this note is pledged or collaterally assigned by Lender at any time or from time to time before the maturity date, neither Borrower nor Lender shall permit any modification of this note without the consent of the pledgee/assignee.

### 17. Number and Gender.

In this note the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa, if the context so requires.

### 18. Headings.

Headings at the beginning of each numbered paragraph of this note are intended solely for convenience of reference and are not to be construed as being a part of the note.

### 19. Time of Essence.

Time is of the essence with respect to every provision of this note.

### 20. Governing Law.

This note shall be construed and enforced in accordance with the laws of the state of Florida, except to the extent that federal laws preempt the laws of the state of Florida.

SIGNATURE PAGE FOLLOWS

NOT A CERTIFIED COPY

6

Initials: _____

IN WITNESS WHEREOF, Borrower has executed this promissory note on the date set forth above.

Excell Auto Group, LLC

By: _Kristen Zankl_
Kristen Zankl, as President

Date: _11-11-2021_

By: _Scott Zankl_
Scott Zankl, as officer

Date: _11-11-2021_

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this __11__ day of November, 2021, by Kristen Zankl on behalf of Excell Auto Group LLC who [X] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_____
Notary Public

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this __11__ day of November, 2021, by Scott Zankl on behalf of Excell Auto Group LLC who [X] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_____
Notary Public

7

Initials: _SZ_ _KZ_

NOT A CERTIFIED COPY

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** dated November __11__, 2021 (the "Security Agreement"), by and among **EXCELL AUTO GROUP, INC.** ("Excell") a Florida corporation Beach maintaining its principal address at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487 (the "Debtor") and **AUTO WHOLESALE OF BOCA, LLC,** a Florida Limited Liability Company whose address is 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487 and **MOSHE FARACHE** (collectively the "Secured Party").

WHEREAS, Secured Party has provided financing for the Debtor which financing is evidenced by the Amended and Restated Promissory Note of even date herewith made by Debtor to Secured Party in the amount of Two Million & Six Hundred Sixty-Four Thousand & Four-Hundred & Fifty Dollars ($2,664,450.00).

NOW, THEREFORE, for value received and in consideration of the foregoing and to induce Secured Party to grant such financing, the Debtor hereby pledges, assigns, transfers, sets over and grants to Secured Party a continuing general lien and security interest in the Collateral described below.

i.    **Security Interest Granted and Obligation Secured.**

(a)    **Security for Obligation.** This Security Agreement secures the payment of all now existing or hereafter arising obligations of Debtor to Secured Party under the Note and related documents, whether primary or secondary, direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not, liquidated or unliquidated, arising by operation of law or otherwise under any promissory note, guarantee, loan or credit agreement, letter of credit, draft, acceptance, interest rate or foreign exchange agreement, mortgage or other documents evidencing indebtedness whether for principal, interest, fees, expenses or otherwise, together with all costs of collection or enforcement, including, without limitation, reasonable attorneys' fees incurred in any collection efforts or in any action or proceeding (all such obligations being the "Obligations"). Without limiting the foregoing, the Obligations include all obligations of Borrower under the Note; and all obligations of Debtor under the guaranty instruments made by Debtor in favor of the Secured Party, and dated the date hereof, guaranteeing payment and performance by Borrower under the Note.

(b)    **Grant of Security.** As security for the Obligations, Debtor hereby grants to Secured Party a Purchase Money Security Interest in all Debtors assets and properties wherever located, including without limitation all equipment of any kind or nature, any and all vehicles, vehicle parts or inventory now owned or hereafter acquired with the loan proceeds, including, without limitation: all accounts and accounts receivable, general intangibles, chattel paper whether tangible or electronic, together with all attachments, accessions, and equipment now or hereafter affixed thereto or used in connection therewith, all substitutions and replacements thereof and any products and proceeds thereof pertaining to the Excell Auto Group Inventory (the "Collateral").

(c)    **Debtor Remains Liable.** This Security Agreement shall not affect Debtor's liability to perform all of its duties and obligations under the transactions giving rise to the Obligations. The exercise by Secured Party of any of the rights hereunder shall not release Debtor from any of its duties or obligations under the transactions giving rise to the Obligations, which shall remain

NOT A CERTIFIED COPY

unchanged as if this Security Agreement had not been executed. Secured Party shall not have any obligation or liability under the transactions giving rise to the Obligations by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(d)     **Continuing Agreement.** This Security Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until payment in full of the Obligations.

2.     **Debtor's Title: Liens and Encumbrances.** Debtor represents and warrants that Debtor is, or will be the owner of the Collateral, having good and marketable title thereto, free from any and all liens, security interests, encumbrances and claims, except as set forth herein. Debtor will not create, assume or permit to exist any such lien, security interest, encumbrance or claim on or against the Collateral except as permitted by this Security Agreement, and Debtor will promptly notify Secured Party of any such other claim, lien, security interest or other encumbrance made or asserted against the Collateral and will defend the Collateral against any such claim, lien, security interest or other encumbrance.

3.     **Representations and Warranties; Location of Collateral and Records; Business and Trade Names of Debtor.**

(a) Debtor shall at all times maintain its records as to the Collateral at its chief place of business at the address referred to hereinabove. Debtor further covenants that, except for Collateral delivered to Secured Party or an agent for Secured Party, Debtor will not store, use or locate any of the Collateral at any place other than as listed in the Agreement.

(b)     Debtor currently uses, and during the last five years has used, no business or trade names, except as set forth herein. Debtor shall promptly notify Secured Party, in sufficient detail, of any changes in, additions to, or deletions from the business or trade names used by Debtor for billing purposes.

(c)     The Collateral is now and will be used in Debtor's business and not for personal, family, household or family use.

(d)     Debtor has paid and will continue to pay or otherwise provide for the payment when due, of all taxes, assessments or contributions required by law which have been or may be assessed or levied against Debtor, whether with respect to any of the Collateral, to any wages or salaries paid by Debtor, or otherwise, and will deliver satisfactory proof of such payment to Secured Party on demand. In the event the Debtor shall fail to pay any such tax, assessment, levy or governmental charge or to discharge any such lien or contest the same in good faith, then the Secured Party, without waiving or releasing any obligation or default of the Debtor hereunder, may at any time or times hereafter, but shall be under no obligation to do so, upon prior written notice to Debtor, make such payment, settlement, compromise or release or cause to be released any such lien, and take any other action with respect thereto which the Secured Party deems advisable. All sums paid by the Secured Party in satisfaction of, or on account of any tax, levy or assessment or governmental

Initial(s) _____

charge, or to discharge or release any lien and any expenses, including reasonable attorneys' fees, court costs and other charges relating thereto, shall become a part of the Liabilities secured by the Collateral, payable on demand.

(e)     The grant of the security interest in the Collateral is effective to vest in Secured Party a valid priority security interest, superior to the rights of any person in and to the Collateral as set forth herein, except to the extent following: None.

4.     **Perfection of Security Interest.**

Debtor shall to the extent necessary execute all such financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law, including the Federal Assignment of Claims Act and any state motor vehicles registration statute, as Secured Party may require, each in form satisfactory to Secured Party. Debtor also shall pay all filing or recording costs with respect thereto, and all costs of filing or recording this Security Agreement or any other agreement or document executed and delivered pursuant hereto or to the Obligations (including the cost of all federal, state or local mortgage, documentary, stamp or other taxes), in each case, in all public offices where filing or recording is deemed by Secured Party to be necessary or desirable. Debtor authorizes Secured Party to (i) file any Uniform Commercial Code financing statements or amendments thereto without the signature of Debtor or by signing of Debtor's name to any such financing statements as its attorney-in-fact, (ii) file a photographic or other reproduction of this Security Agreement as a financing statement, (iii) file notices of assignment pursuant to the Federal Assignment of Claims Act, (iv) file applications for certificates of title or (v) take all other action which Secured Party may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this Security Agreement.

5.     **General Covenants.**

Debtor shall:

(a)     furnish Secured Party from time to time, at Secured Party's request, written statements and schedules further identifying and describing the Collateral in such detail as Secured Party may reasonably require;

(b)     advise Secured Party promptly, in sufficient detail, of any substantial change in the Collateral or of the occurrence of any event which would affect the value of the Collateral or Secured Party's security interest therein;

(c)     comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official applicable to Debtor or any Collateral or to the operation of Debtor's business except where the failure to comply (i) is non-material and (ii) has no effect on the value of the Collateral or on the ability of Secured Party to exercise its rights and remedies hereunder;

(d)     perform and observe all covenants, restrictions and conditions contained in any agreement or document executed in connection with the Obligations as though the same were fully set forth in this Security Agreement;

Initial(s) _____

(e)  promptly execute and deliver to Secured Party such further agreements or other instruments and take such further action from time to time as Secured Party may deem necessary to perfect, protect or enforce its security interests in the Collateral or otherwise to effect the intent of this Security Agreement;

(f)  keep or cause to be kept the Collateral in good working order and marketable condition, ordinary wear and tear excepted;

(g)  insure the Collateral against loss or damage by fire or other hazards, and extended coverage, theft, burglary, bodily injury and such other risks, with such companies and in such amounts, as is required by Secured Party at any time;

(h)  use the Collateral for lawful purposes only in conformity with all laws, rules and regulations;

(i)  allow Secured Party and its agents, at all reasonable times and for reasonable durations, to inspect any of the Collateral and to examine and make extracts from Debtor's books and records relating to the Collateral; and

(i)  not assign, sell, mortgage, lease, transfer, pledge, grant a security interest in or lien upon, encumber or otherwise dispose of or abandon, any part or all of the Collateral, without the express prior written consent of Secured Party, except for the sale from time to time in the ordinary course of business of Debtor of such items of Collateral as may constitute part of the business inventory of Debtor.

6.  **Assignment of Insurance.**

At or prior to the date hereof, Debtor shall deliver to Secured Party certificates of the issuing companies with respect to all policies of insurance owned by Debtor covering or in any manner relating to the Collateral, in form and substance satisfactory to Secured Party, naming Secured Party as an additional insured party as its interests may appear with respect to liability coverage and as loss payee with respect to property and extended insurance coverage, and indicating that no such policy will be terminated, or reduced in coverage or amount, without at least thirty (30) days prior written notice from the insurer to Secured Party. Debtor hereby assigns to Secured Party all sums, including returned or unearned premiums, which may become payable under or in respect of any such policy of insurance, and Debtor hereby directs each insurance company issuing any such policy to make payment of sums directly to Secured Party. Debtor hereby appoints Secured Party as Debtor's attorney-in-fact with authority to endorse any check or draft representing any such payment and to execute any proof of claim, subrogation receipt and any other document required by such insurance company as a condition to or otherwise in connection with such payment, and upon the occurrence of any Event of Default, to cancel, assign or surrender any such policies. All such sums received by Secured Party shall be applied by Secured Party to satisfaction of the Obligations or, to the extent that such sums represent unearned premiums in respect of any policy of insurance on the Collateral refunded by reason of cancellation, toward payment for similar insurance protecting the respective interests of Debtor and Secured Party, or as otherwise required by applicable law.

Initial(s) _____

If the Debtor shall at any time or times hereafter fail to obtain and maintain any of the policies of insurance required above, or fail to pay any premium in whole or in part relating to any such policies, then the Secured Party may, but it shall have no obligation to do so, following prior written notice to Debtor, obtain and cause to be maintained any or all of such policies, and pay any part or all of the premiums due thereon without thereby waiving any default by the Debtor and any sum so disbursed by the Secured Party shall become a part of the Liabilities secured by the Collateral payable on demand.

7.    **Fixtures.**

Except to the extent that fixtures are included in the description of the Collateral herein, it is the intent of Debtor and Secured Party that none of the Collateral is or shall be regarded as fixtures, as that term is used or defined in Article 9 of the Uniform Commercial Code, and Debtor represents and warrants that it has not made and is not bound by any lease or other agreement which is inconsistent with such intent. Nevertheless, if the Collateral or any part thereof deemed material by Secured Party is or is to become attached or affixed to any real estate, Debtor will, upon request, furnish Secured Party with a disclaimer or subordination in form satisfactory to Secured Party of the holder of any interest in the real estate to which the Collateral is attached or affixed, together with the names and addresses of the record owners of, and all other persons having interest in, and a general description of, such real estate.

8.    **Collections.**

(a)    Except as provided herein, Debtor may collect all checks, drafts, cash or other remittances (i) in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, (ii) in payment of any Collateral sold, transferred, leased or otherwise disposed of, or (iii) in payment of or in account of its accounts, contracts, notes, drafts, acceptances and all other forms of obligations relating to any of the Collateral so sold, transferred, or leased or otherwise disposed of. All of the foregoing amounts so collected after the occurrence of an Event of Default shall be held in trust by Debtor for and as the property of Secured Party, and shall not be commingled with other funds, money or property of Debtor.

(b)    Upon the request of Secured Party, Debtor will immediately upon receipt of all such checks, drafts, cash or other remittances in payment of any of its accounts, contract rights or general intangibles constituting all of the Collateral or in payment for any Collateral sold, transferred, leased or otherwise disposed of, deliver any such items to Secured Party accompanied by a remittance report in form supplied or approved by Secured Party. Debtor shall deliver such items in the same form received, endorsed or otherwise assigned by Debtor where necessary to permit collection of such items.

(c)    Upon the request of Secured Party, Debtor will promptly notify Secured Party in writing of the return or rejection of any goods represented by any accounts, contract rights or general intangibles and Debtor shall forthwith account therefor to Secured Party in cash without demand or notice. Until such payment has been received by Secured Party, Debtor will receive and hold all such goods separate and apart, in trust for and subject to the security interest in favor of Secured Party, and Secured Party is authorized to sell, for Debtor's account and at Debtor's sole risk, all or any part of such goods.

Initial(s) _____

(d)     In its discretion, Secured Party may, upon the occurrence of an Event of Default, in its name or Debtor's or otherwise, notify any account debtor or Debtor of any account, contract, instrument, chattel paper or general intangible included in the Collateral to make payment to Secured Party.

(e)     All of the foregoing remittances shall be applied and credited by Secured Party in accordance with the provisions of Section 10(e) of this Security Agreement.

9.     **Events of Default.**

The occurrence of any one or more of the following events shall constitute an event of default ("Event of Default by Debtor under this Security Agreement:

(a)  a "Default" or "Event of Default" shall occur under the terms of the Note or any other agreement giving rise to or executed in connection with the Obligations;

(b)  if at any time Secured Party shall, in its reasonable discretion, consider the Obligations unsecured or any part of the Collateral unsafe, insecure or insufficient, and Debtor shall not on demand furnish other collateral or make payment on account, reasonably satisfactory to Secured Party;

(c)  if Debtor or any obligor, guarantor of, or any party to any of the Obligations or the Collateral (the same, including Debtor, being collectively referred to herein as "Debtors") shall default in the punctual payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of any of the Obligations or of this Security Agreement or any other agreement between any Debtor and Secured Party;

(d)  if any warranty or representation made to Secured Party by or on behalf of any Debtor is false or misleading in any material respect;

(e)  in the event of loss, theft, substantial damage to or destruction of any portion of the Collateral deemed material by Secured Party, or the making or filing of any lien, levy, or execution on, or seizure, attachment or garnishment of, any of the Collateral;

(f)  if any of the Debtors being a natural person or any general partner or member of an Debtor which is a partnership or a limited liability company, shall die or (being a partnership, limited liability company or corporation) shall be dissolved, or if any of the Debtors (if an entity) shall fail to maintain its existence in good standing;

(g)  if any of the Debtors shall become insolvent or make an assignment for the benefit of creditors, or make or send notice of an intended bulk transfer, or if there shall be convened a meeting of the creditors or principal creditors of any of the Debtors or if a committee of creditors is appointed for any of them;

(h)  if there shall be filed by or against any of the Debtors any petition for any relief under the bankruptcy laws of the United States now or hereafter in effect or under any insolvency, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity);

(i)  if the usual business of any of the Debtors shall be terminated or suspended;

(j)  if any proceedings, procedure or remedy supplementary to or in enforcement of judgment shall be commenced against, or with respect to any property of: any of the Debtors;

(k)  if any petition or application to any court or tribunal, at law or in equity, be filed by or against any of the Debtors for the appointment of any receiver or trustee for any of the Debtors or

Initial(s) ___

any part of the property of any of them;

(l) if there occur the sale, lease, transfer, assignment, encumbrance (except by purchase money liens on property acquired after the date of the Note) or other disposition of any of the Collateral to a third party, except in the ordinary course of business, without the prior written consent of the Secured Party; or

(m) if there is a change of the ownership structure or interests of the Debtor during the term of the loan evidenced by the Note without the prior written consent of the Secured Party.

(n) Uses the security, including but not limited to, any vehicles purchased with Secured Party's funds as collateral to take a loan or for any other purpose;

(o) Breaches any obligation under the lease agreements with 1001 Clint Moore, LLC with respect to the premises located at 1001 Clint Moore Rd., Suite 101-103, Boca Raton, FL 33487;

(p) Fails to assign and provide the title to Auto Wholesale of Boca, LLC for any and all vehicles purchased with Lender's funds, and/or fails to provide the bill of sale pertaining to any such vehicles.

## 10. Rights and Remedies.

(a) In the event of the occurrence and continuance of any Event of Default, Secured Party shall at any time thereafter have the right, with or without (to the extent permitted by applicable law) notice to Debtor, as to any or all of the Collateral, by any available judicial procedure or without judicial process, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral, and generally to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, Debtor agrees that Secured Party shall have the right to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation' or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions, all as Secured Party in its sole discretion may deem advisable, and Secured Party shall have the right to purchase at any such sale; and, if any Collateral shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, Secured Party shall have the right, at its sole option and discretion, and at Debtor's sole cost and expense, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Collateral in such saleable or disposable form as it shall deem appropriate. At Secured Party's request after any Event of Default, Debtor shall assemble the Collateral and make it available to Secured Party at places which Secured Party shall select, whether at Debtor's premises or elsewhere, and make available to Secured Party, without rent, all of Debtor's premises and facilities for the purpose of Secured Party's taking possession of, removing or putting the Collateral in saleable or disposable form. If any of the Collateral consists of motor vehicles, Secured Patty may use Debtor's license plates, in any lawful manner.

(b) Any such sale, lease or other disposition of Collateral may be made without demand for performance or any notice of advertisement whatsoever except that where an applicable statute requires reasonable notice of sale or other disposition, Debtor agrees that the sending of five days' notice by ordinary mail, postage prepaid, to Debtor of the place and time of any public sale or of the time at which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof. Notwithstanding the foregoing, if any of the Collateral is perishable and may be materially diminished in value during such five day period, Secured Party shall provide Debtor with such shOlter notice as it deems reasonable under the circumstances.

Initial(s)

(c)    The proceeds of any such sale, lease or other disposition of the Collateral shall be applied first to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like, and to the reasonable attorneys' fees and legal expenses incurred by Secured Party, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which Secured Party shall account to Debtor for any surplus proceeds. If, upon the sale, lease or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor will be liable for the deficiency, together with interest thereon, at the rate prescribed in the agreements giving rise to the Obligations, and the reasonable fees of any attorneys employed by Secured Party to collect such deficiency. To the extent permitted by applicable law, Debtor waives all claims, damages and demands against Secured Party arising out of the repossession, removal, retention or sale of the Collateral, except to the extent same is caused by the gross negligence or willful misconduct of Secured Party, its agents or employees.

11.    **Costs and Expenses.**

Any and all fees, costs and expenses, of whatever kind or nature, including the reasonable attorneys' fees and legal expenses incurred by Secured Party, in connection with the filing or recording of financing statements and other documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, insurance premiums, encumbrances or otherwise protecting, maintaining or preserving the Collateral and Secured Party's security interest therein, or in defending or prosecuting any actions or proceedings arising out of or related to the transaction to which this Security Agreement relates, shall be paid by Debtor on demand. Until so paid, all such amounts shall be added to the principal amount of the Obligations and shall bear interest at the rate prescribed in the agreements giving rise to the Obligations.

12.    **Power of Attorney.**

Debtor authorizes Secured Party and does hereby make, constitute and appoint Secured Party, and any officer or agent of Secured Party, with full power of substitution, as Debtor's true and lawful attorney-in-fact, with power, in its own name or in the name of Debtor, to do any of the following upon and after the occurrence of any Event of Default: (a) to endorse any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of Secured Party; (b) to sign and endorse any invoice, height or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts, and other documents relating to Collateral; (c) to pay or discharge any taxes, liens, security interest or other encumbrances at any time levied or placed on or threatened against the Collateral; (d) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (e) to receive, open and dispose of all mail addressed to Debtor and to notify the Post Office authorities to change the address for delivery of mail addressed to Debtor to such address as Secured Party may designate; and (f) generally to do all acts and things which Secured Party deems necessary to protect, preserve and realize upon the Collateral and Secured Party's security interest therein. Debtor hereby approves and ratifies all acts of said attorney or designee, who shall not be liable for any acts of commission or omission, nor for any error or judgment or mistake of fact or law except for its own gross negligence or willful misconduct. This power of attorney shall be irrevocable for the term of this Security Agreement and thereafter as long as any

Initial(s)

of the Obligations shall be outstanding.

13.    **Notices.**

Unless the party to be notified otherwise notifies the other party in writing as provided in this Section, notices shall be given hereunder by telecopy, by certified mail or by recognized overnight delivery services to Debtor and Secured Party at its address herein.

Notices shall be effective (a) if given by certified mail, on the third day after deposit in the mails with postage prepaid, addressed as aforesaid; (b) if given by recognized overnight delivery service, on the business day following deposit with such service, addressed as aforesaid; or (c) if given by telecopy, when the telecopy is transmitted to the telecopy number as aforesaid; provided that all notices to Secured Party shall be effective on receipt.

14.    **Other Security.**

To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other person, then Secured Party shall have the right in its sole discretion to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of Secured Party's rights and remedies hereunder.

15.    **Further Security.**

To further secure the Obligations, Debtor hereby grants, pledges and assigns to Secured Party a continuing lien on, security interest in and rights of set-off in all money, securities and other property of Debtor, and the proceeds thereof, now or hereafter actually or constructively held or received by or for Secured Party or any affiliate of Secured Party. Debtor hereby authorizes Secured Party to deliver a copy of this Agreement to others as written notification of Debtor's transfer of a security interest in the foregoing property. Upon and after any Event of Default, Secured Party is hereby authorized at any time and from time to time, without notice, to apply all or part of such moneys, securities, proceeds, deposits or credits to any of the Obligations in such amounts as Secured Party may elect in its sole and absolute discretion, although the Obligations may then be contingent or unmatured and whether or not the collateral security may be deemed adequate.

16.    **Miscellaneous.**

(a)    Beyond the safe custody thereof, Secured Party shall have no duty as to the collection of any Collateral in its possession or control or in the possession or control of any agent or nominee of Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(b)    No course of dealing between Debtor and Secured Party, or Secured Party's failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as waiver thereof. Any single or partial exercise of any right, power or privilege hereunder shall not preclude

Initial(s) _____

any other or further exercise thereof or the exercise of any other right, power or privilege.

(c)   All of Secured Party's rights and remedies with respect to the Collateral, whether established hereby or by any other agreements, instruments or documents or by law, shall be cumulative and may be exercised singly or concurrently.

(d)   This Security Agreement may be amended or modified, and a provision hereof may be waived, only by a writing signed by all of the parties hereto.

(e)   The provisions of this Security Agreement are severable, and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Security Agreement in any jurisdiction.

(f)   The benefits of this Security Agreement shall inure to the benefit of the successors and assigns of Secured Party. The rights and obligations of Debtor under this Security Agreement shall not be assigned or delegated without the prior consent of Secured Party.

(g)   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

(h)   Debtor hereby irrevocably consents to the jurisdiction of the courts of the State of Florida in connection with any action or proceeding arising out of or relating to the Obligations, this Security Agreement or the Collateral, or any document or instrument delivered with respect to any of the Obligations. Debtor hereby waives personal service of any summons, complaint or other process in connection with any such action or proceeding and agrees that the service thereof may be made by certified mail directed to Debtor at the address provided herein for receipt of notices. Debtor so served shall appear or answer to such summons, complaint or other process within thirty days after the mailing thereof. Should Debtor so served fail to appear or answer within said thirty-day period, Debtor shall be deemed in default and judgment may be entered by Secured Party against Debtor for the amount or such other relief as may be demanded in any summons, complaint or other process so served. In the alternative, in its discretion Secured Party may affect service upon Debtor in any other form or manner permitted by law.

(i)   IN THE EVENT OF ANY LITIGATION RELATING TO THIS AGREEMENT OR THE OBLIGATIONS, DEBTOR WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY.

IN WITNESS WHEREOF, Debtor has executed or caused its duly authorized officer, on Debtor's behalf, to execute, this Security Agreement as of the day and year first written above.

Initial(s) _____

NOT A CERTIFIED COPY

**DEBTOR:**

**Excell Auto Group, LLC**

By: _Kristen Zankl_
Kristen Zankl, as President

Date: _11-11-2021_

By: _Scott Zankl_
Scott Zankl, as officer

Date: _11-11.2021_

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this __11__ day of November, 2021, by Kristen Zankl on behalf of Excell Auto Group LLC who [X] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_____
Notary Public

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this __11__ day of November, 2021, by Scott Zankl on behalf of Excell Auto Group LLC who [X] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_____
Notary Public

Initial(s) _____

NOTA CERTIFIED COPY

**SECURED PARTY:**

Auto Wholesale of Boca, LLC

By: _____    Date: _____11-11-21_____
    Moshe Farache,
    as managing member

By: _____    Date: _____11-11-21_____
    Moshe Farache, personally


STATE OF FLORIDA        }
                       }  ss.:
COUNTY OF PALM BEACH  }

The foregoing instrument was acknowledged before me this ___11___ day of November, 2021, by Moshe Farache personally and on behalf of Auto Wholesale of Boca, LLC, on behalf of the company. He is personally known to me or has produced _____ as identification.

_____
Notary Public

MICHELE A. MARTIN
Commission # GG 942844
Expires April 27, 2024
Bonded Thru Troy Fain Insurance 800-385-7019

Initial(s) _____

NOT A CERTIFIED COPY

**SECURED PARTY:**

Auto Wholesale of Boca, LLC

By: _____     Date: ___11-11-21___
    Moshe Farache,
    as managing member

By: _____     Date: ___11-11-21___
    Moshe Farache, personally


STATE OF FLORIDA        }

                         }   ss.:

COUNTY OF PALM BEACH  }

The foregoing instrument was acknowledged before me this ___11___ day of November, 2021, by Moshe Farache personally and on behalf of Auto Wholesale of Boca, LLC, on behalf of the company. He is personally known to me or has produced _____ as identification.

_____
Notary Public

MICHELE A. MARTIN
Commission # GG 942844
Expires April 27, 2024
Bonded Thru Troy Fain Insurance 800-385-7019

NOT A CERTIFIED COPY

Initial(s)_____
_____

## UNCONDITIONAL GUARANTEE

THIS GUARANTY dated November **11**, 2021 (together with any amendments or modifications hereto in effect from time to time, the "Guaranty"), made by **Scott Zankl** and **Kristen Zankl**, and **Karma Of Palm Beach, Inc. D/B/A Karma Palm Beach**, jointly and severally, (the "Guarantor(s)"), having an address at Unit B located at 1001 Clint Moore Road, Boca Raton, Florida 33487, in favor of Auto Wholesale of Boca, LLC, a Florida Limited Liability Company ("Lender"), whose address is 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487.

To induce Lender to make loans, extensions of credit or other financial accommodations to Excell Auto Group, Inc., a Florida corporation and ("Borrower"), now or in the future, to secure the observance, payment and performance of the Liabilities (as defined below), and with full knowledge that Lender would not make the said loans, extensions of credit or financial accommodations without this Guaranty, which shall be construed as a contract of suretyship, Guarantor unconditionally agrees as follows:

1. **Guarantee:**

   Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor(s) must pay all amounts due under the Note when Lender makes written demand upon Guarantor(s). Lender is not required to seek payment from any other source before demanding payment from Guarantor(s).

2. **Note:**

   The "Note" is the promissory note dated November **11**, 2021 in the principal amount of $2,664,000.00 from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3. **Definitions:**

   *"Collateral"* means any property taken as security for payment of the Note or any guarantee of the Note. "Loan" means the loan evidenced by the Note.
   *"Loan Documents"* means the documents related to the Loan signed by Borrower, Guarantor(s) or any other guarantor, or anyone who pledges Collateral.

4. **Lender's General Powers:**

   Lender may take any of the following actions at any time, without notice, without Guarantor(s)' consent, and without making demand upon Guarantor(s):

Initials _SZ_ _KZ_

NOT A CERTIFIED COPY

A. Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B. Refrain from taking any action on the Note, the Collateral, or any guarantee;

C. Release any Borrower or any guarantor of the Note;

D. Compromise or settle with the Borrower or any guarantor of the Note;

E. Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F. Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G. Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H. Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5. **Rights, Notices, and Defenses that Guarantor(s) Waives; To The Extent Permitted by Law:**

   A. Guarantor(s) waives all rights to:
      1) Require presentment, protest, or demand upon Borrower;
      2) Redeem any Collateral before or after Lender disposes of it;
      3) Have any disposition of Collateral advertised; and
      4) Require a valuation of Collateral before or after Lender disposes of it.

   B. Guarantor(s) waives any notice of:
      1) Any default under the Note;
      2) Presentment, dishonor, protest, or demand;
      3) Execution of the Note;
      4) Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
      5) Any change in the financial condition or business operations of Borrower or any guarantor;
      6) Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
      7) The time or place of any sale or other disposition of Collateral.

   C. Guarantor(s) waives defenses based upon any claim that:
      1) Lender failed to obtain any guarantee;
      2) Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
      3) Lender or others improperly valued or inspected the Collateral;
      4) The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

Initials _S.H._ _K._

NOT A CERTIFIED COPY

5) Lender impaired the Collateral;

6) Lender did not dispose of any of the Collateral;

7) Lender did not conduct a commercially reasonable sale;

8) Lender did not obtain the fair market value of the Collateral;

9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11) Lender made errors or omissions in Loan Documents or administration of the Loan;

12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor:

13) Lender impaired Guarantor's suretyship rights;

14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will be liable for the increased amounts and related interest and expenses;

15) Borrower has avoided liability on the Note; or

16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

6.  **Duties As To Collateral:**

Guarantor(s) will preserve the Collateral pledged by Guarantor(s) to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

7.  **Successors And Assigns:**

Under this Guarantee, Guarantor(s) includes heirs and successors, and Lender includes its successors and assigns.

8.  **General Provisions:**

A.  *Enforcement Expenses*. Guarantor(s) promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.  *Lenders Not a Co-Guarantor(s)*. Lender is not a co- guarantor with Guarantor. Guarantor(s) has no right of contribution from Lender.

C.  *Subrogation Rights*. Guarantor(s) has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.  *Joint and Several Liability*. All individuals and entities signing as Guarantor(s) are jointly and severally liable.

E.  *Document Signing*. Guarantor(s) must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or

Initials _S̶t̶v̶_  _K̶_

NOT A CERTIFIED COPY

maintain Lender's liens on Collateral.

F. *Financial Statements*. Guarantor(s) must give Lender financial statements as Lender requires.

G. *Lender's Rights Cumulative, Not Waived*. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H. *Oral Statements Not Binding*. Guarantor(s) may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I. *Severability*. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J. *Consideration*. The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

9. **Notices:**

Any notice or other communication to Lender shall be addressed to Auto Wholesale of Boca Raton LLC 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487, or such other address as may be designated by registered or certified mail, return receipt requested, and the time of rendition of such notice or other communication shall be when it is deposited in an official United States Mail receptacle, postage prepaid.

10. **Governing Law:**

This Guaranty, which is to be governed by and construed in accordance with the laws of the State of Florida, shall also bind Guarantor(s)'s legal or personal representatives, heirs, successors and assigns (as the case may be) and inure to the benefit of Lender's successors and assigns and any other person or entity at any time having the rights of Lender under the Note and any other Loan Documents.

11. **Attorney's Fees:**

Guarantor(s) will forthwith pay to Lender all attorney's fees and disbursements incurred by Lender in connection with any breach or default by the Borrower in its obligations under the Note or other Loan Documents and/or the enforcement of this Guaranty, in each instance whether or not suit is brought (and if suit is brought, through appeals and collection efforts).

12. **Jurisdiction and Venue:**

Guarantor(s) agrees that in any action or proceeding brought on, under or by virtue by this Guaranty Agreement, Guarantor(s) shall and does hereby waive trial by jury, and Guarantor(s) agrees that the applicable courts of Florida may have jurisdiction over Guarantor(s) upon appropriate service on Guarantor(s) anywhere in the United States in a

Initials _SL_ _KL_

manner in accordance with the laws of Florida and that venue shall proper in Palm Beach County, Florida. Without limiting the foregoing, Guarantor(s) hereby irrevocably appoints Delegate's registered agent as Guarantor(s)'s agent for service of process related to this Guaranty.

13. **Guarantor Acknowledgment of Terms:**
Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

14. **Guarantor Name(s) and Signature(s):**
By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

By: _____   Date: 11-11-202_
Scott Zankl

By: _____   Date: 11-11-2021
Kristen Zankl

Karma of Palm Beach, Inc. d/b/a Karma Palm Beach

By: _____
Kristen Zankl, as President

Date: _____ 11-11-2021 _____

By: _____
Scott Zankl, as Vice President

Date: _____ 11-11-2021 _____

Initials _SZ_  _KZ_

NOT A CERTIFIED COPY



EXHIBIT "D"

NOT A CERTIFIED COPY

# MASTER INVENTORY LIST WITH LOCATIONS

| MAKE | MODEL | YEAR | COLOR | PURCHASE DATE | VIN | PURCHASE PRICE | TITLE IN AW NAME | IN AWB POSSESSION |
|---|---|---|---|---|---|---|---|---|
| **PROMISSORY NOTE # 3   $2,664,450** | | | | | | | | |
| ASTON MARTIN | DB11 VOLANTE | 2019 | BEIGE | 02/28/22 | M07671 | $175,000.00 | Y | Y |
| FERRARI | F12 BERLINETTA | 2017 | RED | 02/02/22 | 221036 | $300,000.00 | Y | Y |
| LAMBORGHINI | AVENTADOR | 2017 | GRAY | 12/17/21 | A06402 | $420,000.00 | NO TITLE | N |
| LAMBORGHINI | URUS | 2020 | WHITE | 12/02/21 | A06529 | $185,000.00 | Y | Y |
| MCLAREN | 600LT | 2019 | PURPLE | 12/17/21 | 006903 | $225,450.00 | Y | Y |
| MERCEDES | G63 | 2020 | GREEN | 02/23/22 | 346462 | $235,000.00 | Y | Y |
| MERCEDES | METRIS | 2018 | BLACK | 12/29/21 | 366588 | $100,000.00 | APPLIED 04.06.22 | N |
| ROLLS ROYCE | GHOST | 2021 | GRAY | 03/09/22 | 207524 | $375,000.00 | NO TITLE | Y |
| | | | | | AMOUNT USED | $2,015,450.00 | | |
| **PROMISSORY NOTE # 1   $2,500,000 NOTE** | | | | | | | | |
| BENTLEY | FLYING SPUR | 2017 | BLACK | 04/01/22 | 065523 | $130,000.00 | Y | Y |
| BMW | X7 | 2019 | BLUE | 12/29/21 | S39222 | $75,000.00 | Y | Y |
| FORD | RHINO | 2016 | BLACK | 09/29/21 | B18666 | $190,000.00 | Y | N |
| GMC | YUKON | 2019 | WHITE | 03/15/22 | 354378 | $57,000.00 | PROBLEM TITLE | Y |
| LAMBORGHINI | URUS | 2021 | WHITE | 08/20/21 | A12270 | $435,000.00 | Y | Y |
| LAMBORGHINI | AVENTADOR | 2012 | WHITE | 02/23/22 | A00244 | $265,000.00 | Y | N |
| MCLAREN | 720S | 2018 | WHITE | 03/01/22 | 000606 | $255,000.00 | Y | Y |
| MERCEDES | G WAGON | 2021 | WHITE | 02/16/22 | 390328 | $265,000.00 | Y | Y |
| MERCEDES | G63 | 2020 | BLUE | 02/09/22 | 362080 | $340,000.00 | Y | Y |
| PORSCHE | CAYENNE | 2014 | BLACK | 03/15/22 | A00731 | $30,000.00 | Y | Y |
| PORSCHE | 911 | 2008 | RED | 03/15/22 | 783176 | $85,000.00 | Y | Y |
| ROLLS ROYCE | DAWN | 2017 | WHITE | 02/16/22 | 107006 | $244,600.00 | Y | |
| | | | | | AMOUNT USED | $2,371,600.00 | | |
| **PROMISSORY NOTE #2 MMS AND MOSHE FARACHE   $1,080,000** | | | | | | | | |
| ROLLS ROYCE | CULLINAN | 2021 | WHITE | 12/28/21 | 204097 | $400,000.00 | Y | N |
| FERRARI | 488 PISTA | 2019 | SILVER | 12/23/21 | 245966 | $400,000.00 | Y | N |
| | | | | | AMOUNT USED | $800,000.00 | | |
| **AUTO WHOLESALE SHORT TERM LOAN** | | | | | | | | |
| FERRARI | 812 | 2021 | RED | 11/15/21 | 261176 | $650,000.00 | Y | N |
| MCLAREN | 720S | 2020 | WHITE | 01/19/22 | 004229 | $315,000.00 | Y | N |
| LAMBORGHINI | HURICAN | 2018 | BLACK | 03/07/22 | A11207 | $330,000.00 | Y | Y |
| LAMBORGHINI | URUS | 2019 | BLUE | 03/07/22 | A01961 | $238,000.00 | Y | N |
| FERRARI | 812 SUPERFAST | 2020 | BLACK | 03/09/22 | 254693 | $425,000.00 | NO TITLE | N |
| | | | | | AMOUNT USED | $1,958,000.00 | | |
| | | | | | **TOTAL** | **$7,145,050.00** | | |

NOT A CERTIFIED COPY



EXHIBIT "E"

NOT A CERTIFIED COPY

**FINANCING STATEMENT FORM**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

SCOTT C. GHERMAN; 5612516625

Email SGHERMAN@SCOTTGHERMANPA.COM

B. SEND ACKNOWLEDGEMENT TO:

# FILED

2021 Jul 13 12:51 PM

\*\*\*\*\*\*\* 202107709869 \*\*\*\*\*\*\*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EXCELL AUTO GROUP INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS Line One | | This space not available. | | |
| 1001 CLINT MOORE RD., STE 101 | | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| | | BOCA RATON | FL | 33487 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| ZANKL | KRISTEN | | | |
| 2c. MAILING ADDRESS Line One | | This space not available. | | |
| 1001 CLINT MOORE RD., STE 101 | | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| | | BOCA RATON | FL | 33487 | US |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AUTO WHOLESALE OF BOCA LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS Line One | | This space not available. | | |
| 6560 WEST ROGERS CIRCLE, SUITE #B27 | | | | |
| MAILING ADDRESS Line Two | | CITY | STATE | POSTAL CODE | COUNTRY |
| | | BOCA RATON | FL | 33487 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

All debtor's assets and properties wherever located, including without limitation all equipment of any kind or nature, any and all vehicle (also including "Locate Vehicles"), vehicle parts or inventory now owned or hereafter acquired, including without limitation: all accounts and accounts receivable, general intangibles, chattel paper whether tangible or electronic, together with all attachments, accessions, and equipment now or hereafter affixed thereto or used in connection therewith, all substitutions and replacements thereof and any products and proceeds thereof pertaining to Excell Auto Group Inc.

NOT A CERTIFIED COPY

**5. ALTERNATE DESIGNATION (if applicable)**
☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK EXACTLY ONE  BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.05/2013)    Filing Office Copy    Approved by the Secretary of State, State of Florida



NOT A CERTIFIED COPY

Mail Lien Satisfaction to: Dept of Highway Safety and Motor Vehicles, Neil Kirkman Building, Tallahassee, FL 32399-0500

T# 1622978905
B# 2789379

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

Date of Issue   03/22/2022

Lien Release
Interest in the described vehicle is hereby released
By_____
Title_____
Date_____

Registered Owner:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL  33487

Mail To:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL  33487

IMPORTANT INFORMATION

1. When ownership of the vehicle described herein is transferred, the seller MUST complete in full the Transfer of Title by Seller section at the bottom of the certificate of title.
2. Upon sale of this vehicle, the seller must complete the notice of sale on the reverse side of this form.
3. Remove your license plate from the vehicle.
4. See the web address below for more information and the appropriate forms required for the purchaser to title and register the vehicle, mobile home or vessel. http://www.hsmv.state.fl.us/html/titlinf.html

## CERTIFICATE OF TITLE

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

Lien Release
Interest in the described vehicle is hereby released

| Prev State | Color | Primary Brand | Secondary Brand | No of Brands | Use | Prev Issue Date |
|---|---|---|---|---|---|---|
| KS | GRN | | | | PRIVATE | |

By_____
Title_____

| Odometer Status or Vessel Manufacturer or OH use | Engine Drive | Hull Material | Prop | Date of Issue |
|---|---|---|---|---|
| 817 MILES 03/02/2022 ACTUAL | | | | 03/22/2022 |

Date_____

Registered Owner
KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL  33487

1st Lienholder
NONE

DIVISION OF MOTORIST SERVICES          TALLAHASSEE          FLORIDA          DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES

Robert R. Kynoch
Director

Control Number  155160062

10 /8:  155160062;

Terry L. Rhodes
Executive Director

TRANSFER OF TITLE BY SELLER (This section must be completed at the time of sale.)
Federal and/or state law require that the seller state the mileage, purchaser's name, selling price and date sold in connection with the transfer of ownership.
Failure to complete or providing a false statement may result in fines and/or imprisonment.
This title is warranted to be free from any liens except as noted on the face of the certificate and the motor vehicle or vessel described is hereby transferred to:

Seller Must Enter Purchaser's Name: Luxury Lease Company          Address: 210 Summit Ave. Ste C4, Montvale, NJ 07645

Seller Must Enter Selling Price_____     Seller Must Enter Date Sold:_____

I/We state that this  ☐ 5 or  ☐ 6 digit odometer now reads |_|_|_| 8|1|7| X.| (no tenths) miles,  date read_____     and I hereby certify that to the best of my knowledge the odometer reading
☑ 1. reflects ACTUAL MILEAGE.          ☐ 2. is IN EXCESS OF ITS MECHANICAL LIMITS.          ☐ 3. is NOT THE ACTUAL MILEAGE.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

SELLER Must Sign Here:_____          CO-SELLER Must Sign Here:_____

Print Here: Tiana Bailey          Print Here:_____

Selling Dealer's License Number: VF/1133543/1          Tax No. 60-8018195758-0          Tax Collected Lease

Auction Name:_____          License Number:_____

PURCHASER Must Sign Here:_____          CO-PURCHASER Must Sign Here:_____

Print Here:_____          Print Here:_____

NOTICE: PENALTY IS REQUIRED BY LAW IF NOT SUBMITTED FOR TRANSFER WITHIN 30 DAYS AFTER DATE OF PURCHASE

NOT A CERTIFIED COPY

STATE OF FLORIDA
DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES
DIVISION OF MOTOR VEHICLES
2900 Apalachee Parkway • Neil Kirkman Building - Tallahassee, FL 32399-0620
Notice of Sale of Motor Vehicle, Mobile Home or Vessel

Section 319.22(2), Florida Statutes, requires that the seller file a Notice of Sale with the department within 30 days after the sale or transfer of the motor vehicle, vessel or mobile home. Filing this form removes any civil liability for the operation of the sold motor vehicle, vessel or mobile home. In addition to filing this form, we suggest you keep a copy of your bill of sale (we suggest it be notarized), certificate of title or other type of transaction document showing the vehicle was sold. Complete the information below, tear the top portion of this document at the perforation and mail to the address above or submit to your local tax collector's office or license plate agency.

I have this _____ day of _____, _____, transferred by assignment of and delivered Florida Certificate of Title to:

Name: Purchaser(s) _____    Purchaser's DL/ID _____
                          First          MI          Last

Address _____    Selling Price $ _____

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

Seller's Signature _____    Co-Seller's Signature _____

NOTE: THE SUBMISSION OF THIS FORM, ACCURATELY COMPLETED, TO A TAX COLLECTOR'S OFFICE, LICENSE PLATE AGENCY OR TO THE ADDRESS ABOVE WILL ALLOW THE TITLE CLERK TO UPDATE THE DMV DATABASE TO REFLECT THE TITLE RECORD AS "SOLD". HOWEVER, THE OWNERSHIP STATUS WILL NOT CHANGE UNTIL THE PURCHASER APPLIES FOR AND IS ISSUED A CERTIFICATE OF TITLE.

NOT A CERTIFIED COPY

ODOMETER CERTIFICATION - Federal and state laws require that you state the mileage in connection with transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

**FIRST REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____    Selling Dealer's Name: _____    Tax No.: _____    Tax Collected: _____

Selling Dealer's Address: _____    Date Sold: _____

Purchaser's Name(s): _____    Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS ▦▦▦▦▦▦ XX (NO TENTHS) MILES, DATE READ ___/___/___ AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX
☐ 1. REFLECTS ACTUAL MILEAGE    ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)    ☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____    Co-Purchaser Must Sign Here: _____

Print Here: _____    Print Here: _____

Seller/Agent Must Sign Here: _____    Auction Name (When Applicable): _____

Print Here: _____    Auction License Number: _____

**SECOND REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____    Selling Dealer's Name: _____    Tax No.: _____    Tax Collected: _____

Selling Dealer's Address: _____    Date Sold: _____

Purchaser's Name(s): _____    Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS ▦▦▦▦▦▦ XX (NO TENTHS) MILES, DATE READ ___/___/___ AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX
☐ 1. REFLECTS ACTUAL MILEAGE    ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)    ☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____    Co-Purchaser Must Sign Here: _____

Print Here: _____    Print Here: _____

Seller/Agent Must Sign Here: _____    Auction Name (When Applicable): _____

Print Here: _____    Auction License Number: _____

**THIRD REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____    Selling Dealer's Name: _____    Tax No.: _____    Tax Collected: _____

Selling Dealer's Address: _____    Date Sold: _____

Purchaser's Name(s): _____    Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS ▦▦▦▦▦▦ XX (NO TENTHS) MILES, DATE READ ___/___/___ AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX
☐ 1. REFLECTS ACTUAL MILEAGE    ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)    ☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____    Co-Purchaser Must Sign Here: _____

Print Here: _____    Print Here: _____

Seller/Agent Must Sign Here: _____    Auction Name (When Applicable): _____

Print Here: _____    Auction License Number: _____



# EXHIBIT "G"

## STATE OF FLORIDA — LIEN SATISFACTION

Mail Lien Satisfaction to: Dept of Highway Safety and Motor Vehicles, Neil Kirkman Building, Tallahassee, FL 32399-0500

T# 1622978905
B# 2789379

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

Date of Issue    03/22/2022

**Lien Release**
Interest in the described vehicle is hereby released

By_____
Title_____
Date_____

Registered Owner:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

### IMPORTANT INFORMATION

1. When ownership of the vehicle described herein is transferred, the seller MUST complete in full the Transfer of Title by Seller section at the bottom of the certificate of title.
2. Upon sale of this vehicle, the seller must complete the notice of sale on the reverse side of this form.
3. Remove your license plate from the vehicle.
4. See the web address below for more information and the appropriate forms required for the purchaser to title and register the vehicle, mobile home or vessel: http://www.hsmv.state.fl.us/html/titlinf.html

Mail To:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

---

## CERTIFICATE OF TITLE

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

| Prev State | Color | Primary Brand | Secondary Brand | No of Brands | Use | Prev Issue Date |
|---|---|---|---|---|---|---|
| KS | GRN | | | | PRIVATE | |

**Lien Release**
Interest in the described vehicle is hereby released

By_____
Title_____
Date_____

| Odometer Status or Vessel Manufacturer or OH use | Engine Drive | Hull Material | Prop | Date of Issue |
|---|---|---|---|---|
| 817 MILES 03/02/2022 ACTUAL | | | | 03/22/2022 |

Registered Owner

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

1st Lienholder
NONE

DIVISION OF MOTORIST SERVICES        TALLAHASSEE        FLORIDA        DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES

*Robert R. Kynoch*

Robert R. Kynoch
Director

Control Number    **155160062**

10 /8    155160062

*Terry L. Rhodes*

Terry L. Rhodes
Executive Director

### TRANSFER OF TITLE BY SELLER (This section must be completed at the time of sale.)

Federal and/or state law require that the seller state the mileage, purchaser's name, selling price and date sold in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.
This title is warranted to be free from any liens except as noted on the face of the certificate and the motor vehicle or vessel described is hereby transferred to.

Seller Must Enter Purchaser's Name_____    Address_____

Seller Must Enter Selling Price_____    Seller Must Enter Date Sold_____

I/We state that this ☐ 5 or ☐ 6 digit odometer now reads |__|__|__|__|__|__| X | (no tenths) miles, date read_____ and I hereby certify that to the best of my knowledge the odometer reading
☐ 1. reflects ACTUAL MILEAGE.    ☐ 2. is IN EXCESS OF ITS MECHANICAL LIMITS.    ☐ 3. is NOT THE ACTUAL MILEAGE

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

SELLER Must Sign Here: _____    CO-SELLER Must Sign Here: _____

Print Here: _____    Print Here: _____

Selling Dealer's License Number: _____    Tax No.: _____    Tax Collected _____

Auction Name: _____    License Number: _____

PURCHASER Must Sign Here: _____    CO-PURCHASER Must Sign Here: _____

Print Here: _____

NOTICE: PENALTY IS REQUIRED BY LAW IF NOT SUBMITTED FOR TRANSFER WITHIN 30 DAYS AFTER DATE OF PURCHASE.

HSMV 82250 (REV 3/16)    STATE OF FLORIDA

NOT A CERTIFIED COPY

# EXHIBIT G

**Exhibit G**

# Jerry Breslin

| | |
|---|---|
| **From:** | Marc Brandes <MBrandes@kfb-law.com> |
| **Sent:** | Wednesday, April 13, 2022 10:14 AM |
| **To:** | Jerry Breslin; Matthew Pilkington; Wiegert, Joel L.; William Baker; Wiegert, Joel L.; Jonathan Schwartz, Esq. |
| **Cc:** | Craig Blinderman; Brandy Villalobos |
| **Subject:** | RE: FVP Collateral as of March 12, 2022 |
| **Attachments:** | 820112.xlsx |

Jerry:

Attached is AHB list of vehicles in their possession that FVP is alleging is their collateral.

Regards,

Marc

**Marc E. Brandes, Esq.**



**KURKIN FOREHAND BRANDES LLP**
**Harbour Centre**
**18851 N.E. 29th Avenue, Suite 303**
**Aventura, Florida 33180**
mbrandes@kfb-law.com
www.kfb-law.com
**Tele:  305.929.8500**
**Direct: 954.357.3961**
**Fax:  305.675.0564**
**Toll Free:  866.252.7888**
**Cell:  305.450.4224**

IRS CIRCULAR 230 NOTICE:  Pursuant to recently enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice expressed above was neither written nor intended by the sender or this firm to be used and cannot be used by any taxpayer for the purpose of avoiding penalties that may be imposed under U.S. tax law.  If any person uses or refers to any such tax advice in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement to any taxpayer, then the advice should be considered to have been written to support the promotion or marketing by a person other than the sender or this firm of that

transaction or matter, and such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

The information in this email transmission is privileged and confidential.  If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited.  If you have received this email in error, please notify the sender by email reply.  Thank you.

**From:** Jerry Breslin <jb@richardbaronlaw.com>
**Sent:** Tuesday, April 12, 2022 6:57 PM
**To:** Marc Brandes <MBrandes@kfb-law.com>; Matthew Pilkington <mpilkington@feenixpartners.com>; Wiegert, Joel L. <joel.wiegert@kutakrock.com>; William Baker <wbaker@feenixpartners.com>; Wiegert, Joel L. <joel.wiegert@kutakrock.com>; Jonathan Schwartz, Esq. <jschwartz@jonschwartzlaw.com>
**Subject:** FVP Collateral as of March 12, 2022

Marc:

As you know from the review of the loan documents, FVP's collateral is broader than the automobiles but, as promised, the attached is a list of FVP automobile collateral on both lots as of March 12, 2022.

As I stated on the phone, without records from Zankl and his companies and the banks, there could be additional automobiles and other collateral, including proceeds, that FVP is entitled to under the loan documents which they will seek to recover.

Please circulate to all a list of the automobiles in your clients possession as far in advance of the Zoom for our review.

This email will further confirm that you have assured us that all of the vehicles that were removed from the Palm Beach lot will be safeguarded. This email will also confirm that you advised that two of the vehicles that were removed from the Palm Beach lot have been sold but that your client contends that they were his to sell but that there will be further sales, liens or movement of the vehicles pending a court order. Please send us documentation regarding those cars and sales.

I will see you on the Zoom tomorrow at 11:15.

Thank you

Best,

Jerry

**Jerry Breslin, Attorney at Law**
**Email: JB@RichardBaronLaw.com**

**Direct Tel.: 786-636-1138**

**Service of Court Documents - Primary Email: Eservice@RichardBaronLaw.com**

**Baron, Breslin & Sarmiento, Attorneys at Law**
**The DuPont Building**
**Suite 700**
**169 East Flagler Street**
**Miami, Florida 33131**
**Tel: 305-577-4626 – Ext. 362**
**Direct: 786-636-1138**
**Fax: 305-577-4630**
**www.rbaronlaw.com**

**Confidentiality Notice**: The information contained in this e-mail message is attorney/client privileged or confidential information intended only for use by the individual or entity named above or intended recipient if emailed in error.  Both the Attorney/Client and Attorney Work product Privileges apply and any unauthorized disclosure of the contents of this communication is prohibited by law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone at 305-577-4626 and delete the original message. Thank you.

| | MAKE | MODEL | YEAR | COLOR | VIN |
|---|---|---|---|---|---|
| 1 | ASTON MARTIN | DB11 VOLANTE | 2019 | BEIGE | SCFRMFCW6KGM07671 |
| 2 | FERRARI | F12 BERLINETTA | 2017 | RED | ZFF74UFA7H0221036 |
| 3 | LAMBORGHINI | AVENTADOR | 2017 | GRAY | ZHWUG4ZD6HLA06402 |
| 4 | LAMBORGHINI | URUS | 2020 | WHITE | ZPBUA1ZLXLLA06529 |
| 5 | MCLAREN | 600LT | 2019 | PURPLE | SBM13RAA6KW006903 |
| 6 | MERCEDES | G63 | 2020 | GREEN | W1NYC7HJ6LX346462 |
| 7 | | | | | |
| 8 | ROLLS ROYCE | GHOST | 2021 | GRAY | SCATV0C04MU207524 |
| 9 | ROLLS ROYCE | CULLINAN | 2021 | WHITE | SLATV8C09MU204097 |
| 10 | BENTLEY | FLYING SPUR | 2017 | BLACK | SCBEC9ZA0HC065523 |
| 11 | BMW | X7 | 2019 | BLUE | 5UXCX4C56KLS39222 |
| 12 | FORD | RHINO | 2016 | BLACK | 1FDUF4HT8GEB18666 |
| 13 | GMC | YUKON | 2019 | WHITE | 1GKS1CKJ8KR354378 |
| 14 | LAMBORGHINI | URUS | 2021 | WHITE | ZPBUA1ZL1MLA12270 |
| 15 | LAMBORGHINI | AVENTADOR | 2012 | WHITE | ZHWUC1ZD2CLA00244 |
| 16 | MCLAREN | 720S | 2018 | WHITE | SBM14DCA9JW000606 |
| 17 | MERCEDES | G WAGON | 2021 | WHITE | W1NYC7HJ0MX390328 |
| 18 | MERCEDES | G63 | 2020 | BLUE | W1NYC7HJ6LX362080 |
| 19 | PORSCHE | CAYENNE | 2014 | BLACK | WP1AA2A22ELA00731 |
| 20 | PORSCHE | 911 | 2008 | RED | WP0AD29978S783176 |
| 21 | ROLLS ROYCE | DAWN | 2017 | WHITE | SCA666D51HU107006 |
| 22 | | | | | |
| 23 | FERRARI | 488 PISTA | 2019 | SILVER | ZFF90HLA8K0245966 |
| 24 | MCLAREN | 720S | 2020 | WHITE | SBM14FCA5LW004229 |
| 25 | LAMBORGHINI | HURICAN | 2018 | BLACK | ZHWUD4ZF0JLA11207 |
| 26 | LAMBORGHINI | URUS | 2019 | BLUE | ZPBUA1ZLXKLA01961 |
| 27 | | | | | |
| 28 | CADILLAC | ESCALADE | 2018 | BLACK | 1GYS4BKJXJR261612 |
| 29 | FERRARI | 458 ITALIA | 2013 | BLACK | ZFF68NHA8D0191526 |
| 30 | JEEP | GLADIATOR | 2021 | BLACK | 1C6HJTAG0ML564806 |
| 31 | JEEP | GLADIATOR | 2021 | BLACK | 1C6HJTAG1ML571540 |
| 32 | LAMBORGHINI | HURACAN | 2017 | BLACK | ZHWUR2ZF8HLA08121 |
| 33 | | | | | |
| 34 | MCLAREN | 720S | 2018 | BLACK | SBM14DCA7JW001804 |
| 35 | MCLAREN | 720S | 2019 | ORANGE | SBM14FCA9KW003714 |
| 36 | MERCEDES | G CLASS | 2020 | BLUE | WDCYC7HJ9LX334940 |

# EXHIBIT H

**Exhibit H**

## AFFIDAVIT OF ROBERT W. CRISPIN

I, **ROBERT W. CRISPIN**, am a Florida licensed Private Investigator and CEO of Crispin Special Investigations, Incorporated (CSI), a South Florida based private investigations agency in Fort Lauderdale, Florida.

I am over the age of 21 years of age, and I have personal knowledge of the facts and circumstances as more fully described below.

I am also a retired South Florida police detective with 25 years of law enforcement experience with training in multiple aspects of law enforcement. I am also a formerly sworn Federal Task Force Agent with the United States Department of Justice (DOJ), Drug Enforcement Administration (DEA), Miami Field Division (MFD). I have investigated violations of United States Codes related to the enforcement of narcotic importation, possession and distribution as well as Title III investigations.

I have been qualified and have testified on numerous occasions as an expert witness in Federal Court, for the United States Southern District of Florida for cases related to narcotic possession, identifications, distribution; methods of concealment and importation, as well as marijuana grow operations.

On April 14, 2022 investigators Robert W. Crispin, Richard Dean Truntz and Eric Mercer traveled to 5471 S. Dixie Highway, Boca Raton, Florida in an effort to inventory vehicles under the control of Mosche Farache.

Upon arrival investigators met with Farache who allowed access and consent into his warehouse which contained multiple vehicles. Below is a list of the vehicles which Farache represented as being associated with the FVP matter. In total, 13 vehicles were inspected, and their Vehicle Identification Numbers (VIN), recorded and photographed by investigators.

Below is a list of those vehicles. It should be noted 10 of the vehicles are stored inside the warehouse and 3 vehicles are stored behind the building as they would not fit inside the warehouse space due to its size. The building has no alarm, and the property is not gated.

1. 5UXCX4CS6KLS3922; 2019 BMW X7 Black; Outside

2. 1C6HGTAG1ML571540; 2021 Jeep Gladiator Black; Outside

3. 1GKS1CKJ8KR354378; 2019 GMC Yukon White; Outside

4. ZFF74UFA7H0221036; 2017 F12 Berlinetta Ferrari Red; Inside

5. WDCYC7HJ9LX334940; 2020 Mercedes G63 Blue; Inside

6. 1GY54BKJXJR261612; 2018 Cadillac Escalade SUV Blue; Inside

7. SCFRMFCW6KGM07671; 2019 Aston Martin Beige/ Gold; Inside

8. ZPBUA1ZLXLLA06529; 2020 Lamborghini Urus White; Inside

9. W1NYC7HJ6LX362080; 2020 Mercedes G63 Powder Blue with Box Kit; Inside

10. SBM14DCA9JW000606; 2018 McLaren 720 S Silver; Inside

11. W1NYC7HJ0MX393328; 2021 G63 Mercedes White; Inside

12. SBM14FCASLW004229; 2020 McLaren 720 White; Inside

13. SBM14FCA9KW003714; 2019 McLaren 720 Orange; Inside

FURTHER AFFIANT SAYETH NAUGHT

**I understand that this sworn statement is given under oath and will be treated as though it was made before a judge in a court of law. I understand that any information in this sworn statement which is not to the best of my knowledge and done in good faith may expose me to a penalty for perjury and other possible penalties under the statutes of the State of Florida. Under the penalties of perjury, I declare that I have read the forgoing document that the facts stated in it are true.**

Affiant
**ROBERT W. CRISPIN, Investigator**
101 N Riverside Drive, Suite 207
Pompano Beach, FL 33062
(954) 767-2007

STATE OF FLORIDA
COUNTY OF BROWARD

SWORN TO AND SUBSCRIBED before me this 15ᵗʰ day of April, 2022 by ROBERT W. CRISPIN, who did take an oath, and who is personally known to me.

Notary Public-State of Florida

My Commission expires: 10-01-24 (Date)

SHERRY JAMES
Notary Public - State of Florida
Commission # HH 049786
My Comm. Expires Oct 1, 2024
Bonded through National Notary Assn.

# EXHIBIT I

**Exhibit I**

 **Manheim**

# BILL OF SALE

**THIS IS NOT AN INVOICE**

**DOCUMENT NOT VALID FOR EXPORT**

Case 22-15627-EPK Doc 287 Filed 12/19/22 Page 140 of 155

| 731 MANHEIM PALM BEACH | **Sale Date** |
|---|---|
| 600 SANSBURYS WAY | 14-APR-2022 17:28:48 |
| WEST PALM BEACH, FL 33411 US | |

**Vehicle Purchase Price**

| | |
|---|---|
| Sale Price | $ 130,000.00 |
| Adjustments | $ 0.00 |
| Final Sale Price | $ 130,000.00 |

**Yr Wk Ln Rn**
2022-15-94-11

Please refer to the vehicle release for the pickup location

**Sale Type**
OVE

**Seller**
AUTO WHOLESALE OF BOCA LLC
6560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US

Seller Rep:
*Signature on file*

**Remarker**
LUXLANE REMARKETING

**Owner**
AUTO WHOLESALE OF BOCA LLC

**Buyer**
PROVIDENCE AUTO GROUP LLC
1635 N ALBANY AVE
ATLANTIC CITY, NJ 08401 US

Buyer Rep: MIRANDA, ANTHONY
*Signature on file*

## Vehicle Information
2021 JEEP GLAD SPT S
CREW SPORT S BLACK Four Wheel Drive
1C6HJTAG0ML564806

Mileage: 1267 Miles 0

License Plate No:

## Title Information
State: FL    Number: 1

## Auction Lights

GREEN    Buyer protection to conditions
YELLOW    Certain conditions announced prior to sale

## Odometer Disclosure
Federal law (and state law, if applicable) requires the Seller to state the mileage upon transfer of ownership. Failure to complete or providing false information may result in fines and/or imprisonment.

Seller hereby states that the odometer for this Vehicle now reads identically to the Mileage stated on this Bill of Sale under Vehicle Information and certifies to the best of Seller's knowledge that this reflects the actual mileage of the Vehicle, unless disclosed otherwise in the Announcements & Notes below.

## Announcements & Notes
STRUCTURAL ALTERATION
 THIRD PARTY SELLER

## Vehicle Features
Convertible Hardtop
6-cylinder Gas
A/T
Power Steering
ORA
Leather Seats
A/C

Power Windows
Power Door Locks
Cruise Control
Rear Defrost
Driver Air Bag
Emissions label missing

Seller agrees to sell the vehicle covered by this Bill of Sale to Buyer for the price noted herein.
Seller is the transferor of the vehicle and is responsible for all disclosures, including odometer and mileage.
Buyer must return a signed copy of the title front and back, including the odometer statement therein, to Seller or be subject to civil and criminal penalties. See 49 CFR § 580.5(f).
Manheim retains a purchase money security interest in the Vehicle and its title until good funds are received from the Buyer.
Seller and Buyer agree to the Manheim Terms and Conditions in effect at the time of the sale.
Sale terms and this Bill of Sale are subject to adjustments by Manheim. Please check your customer account at Manheim.com for most current version of this document.
Bill of Sale is not an Invoice. Please refer to Invoices in your account on Manheim.com.

Printed on: 11-May-2022 06:12:50

 **Manheim**

# Credit Memo # 52629085

**PAY TO**
AUTO WHOLESALE OF BOCA LLC
6560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US
5333629

**REMIT TO**
Cox Automotive, Inc.
PO Box 105156
Atlanta, GA 30348-5156 US

| | |
|---|---|
| **INVOICE TYPE** | Seller |
| **INVOICE DATE** | 10-MAY-2022 |
| **PAYMENT DUE DATE** | 10-MAY-2022 |
| **BUYER REPRESENTATIVE** | MIRANDA, ANTHONY |
| **TRANSACTION LOCATION** | 731 MANHEIM PALM BEACH |
| **ORIGINAL BUYER** | |

**BUYER**
PROVIDENCE AUTO GROUP LLC
1635 N ALBANY AVE
ATLANTIC CITY, NJ 08401 US

**REMARKETER**
LUXLANE REMARKETING
6579 NW 31ST WAY
BOCA RATON, FL 33496 US

**INVOICING-SALES LOCATION**
MANHEIM PALM BEACH
600 SANSBURYS WAY
WEST PALM BEACH, FL 33411 US

| | |
|---|---|
| **LEASE ACCOUNT NO** | |
| **YEAR MAKE MODEL** | 2021 JEEP GLAD SPT S |
| **VIN** | 1C6HJTAG0ML564806 |
| **MILEAGE** | 1267 Miles |

| CHARGE DATE | WORK ORDER | UNIVERSAL KEY | DESCRIPTION | CUSTOMER PO# | PRICE | TAX | LINE TOTAL |
|---|---|---|---|---|---|---|---|
| 14-APR-2022 | 2062859 | 2022-15-94-11 | 2021 JEEP GLAD SPT S | | ($130,000.00) | $0.00 | ($130,000.00) |
| 14-APR-2022 | 2062859 | 2022-15-94-11 | SELLER SUCCESS FEE | | $575.00 | $0.00 | $575.00 |
| 29-APR-2022 | 2062859 | 2022-15-94-11 | REMIT ADMIN FEE TO SELLER - Luxlane Remarketing Rep fee | | $250.00 | $0.00 | $250.00 |
| 08-APR-2022 | 2062859 | 2022-15-94-11 | 15+3 Image Fee | | $25.00 | $0.00 | $25.00 |
| 08-APR-2025 | 2062859 | 2022-15-94-11 | CR W/O ESTIMATE FEE | | $25.00 | $0.00 | $25.00 |

**ADJUSTMENTS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | TOTAL ADJUSTMENTS | $0.00 |

**PAYMENTS**

| DATE | REF NO | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 10-MAY-2022 | 1970196 | Invoice Applied SBM13RAA6KW006903 | $2,000.00 |
| 10-MAY-2022 | 6131991 | Check Issued | $127,125.00 |
| | | TOTAL PAYMENTS | $129,125.00 |

**SPECIAL INSTRUCTIONS**
Please include the invoice number on all remittances and include remittance copy with postal payments.
Visit your Account at Manheim.com to manage preferences, view invoices & statuses, see history and pay invoices.
A late fee will be added, wherever applicable, to all past due invoices, subject to details in the Manheim Terms and Conditions.
If you have questions concerning this invoice, please call or email Manheim Client Care @ 1-866-MANHEIM (626-4346), Mon-Sat 8am-10pm; or email us by clicking on Contact Us on Manheim.com.

Overnight mailing address:
Cox Automotive Inc, Attn: Lockbox 105156, 3585 Atlanta Avenue, Hapeville, GA 30354-1705 US

| | |
|---|---|
| **SUB TOTAL** | ($129,125.00) |
| **TAX** | $0.00 |
| **ADJUSTMENTS** | $0.00 |
| **TOTAL BEFORE PAYMENTS** | ($129,125.00) |
| **PAYMENTS** | $129,125.00 |
| **AMOUNT DUE TO** | $0.00 |

Printed on: 2022-05-11 14:12:50

Case 22-15627-EPK Doc 287 Filed 12/19/22 Page 141 of 155

# Manheim

# Invoice # 1970196

**DUE FROM**
AUTO WHOLESALE OF BOCA LLC
6560 W ROGERS CIR # B27
BOCA RATON, FL 33487 US
5333629

**REMIT TO**
Cox Automotive, Inc.
PO Box 105156
Atlanta, GA 30348-5156 US

| | |
|---|---|
| **INVOICE TYPE** | Seller |
| **INVOICE DATE** | 27-APR-2022 |
| **PAYMENT DUE DATE** | 27-APR-2022 |
| **BUYER REPRESENTATIVE** | WILDRICK, RYAN |
| **TRANSACTION LOCATION** | 731 MANHEIM PALM BEACH |
| **ORIGINAL BUYER** | |

**BUYER**
BMD LLC
612 PLYMOUTH ST STE 4R
EAST BRIDGEWATER, MA 02333 US

**REMARKETER**
LUXLANE REMARKETING
6579 NW 31ST WAY
BOCA RATON, FL 33496 US

**INVOICING-SALES LOCATION**
MANHEIM PALM BEACH
600 SANSBURYS WAY
WEST PALM BEACH, FL 33411 US

| | |
|---|---|
| **LEASE ACCOUNT NO** | |
| **YEAR MAKE MODEL** | 2019 MCLAREN 600LT |
| **VIN** | SBM13RAA6KW006903 |
| **MILEAGE** | 7673 Miles |

| CHARGE DATE | WORK ORDER | UNIVERSAL KEY | DESCRIPTION | CUSTOMER PO# | PRICE | TAX | LINE TOTAL |
|---|---|---|---|---|---|---|---|
| | 2062658 | 2022-14-2-109 | Sale Price Adjustment Item | | $2,000.00 | $0.00 | $2,000.00 |

| ADJUSTMENTS DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | | TOTAL ADJUSTMENTS $0.00 |

| PAYMENTS DATE | REF NO | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 10-MAY-2022 | 52629085 | Credit Memo Applied 1C6HJTAG0ML564806 | $2,000.00 |
| | | TOTAL PAYMENTS | $2,000.00 |

**SPECIAL INSTRUCTIONS**
Please include the invoice number on all remittances and include remittance copy with postal payments.
Visit your Account at Manheim.com to manage preferences, view invoices & statuses, see history and pay invoices.
A late fee will be added, wherever applicable, to all past due invoices, subject to details in the Manheim Terms and Conditions.
If you have questions concerning this invoice, please call or email Manheim Client Care @ 1-866-MANHEIM (626-4346), Mon-Sat 8am-10pm; or email us by clicking on Contact Us on Manheim.com.

Overnight mailing address:
Cox Automotive Inc, Attn: Lockbox 105156, 3585 Atlanta Avenue, Hapeville, GA 30354-1705 US

| | |
|---|---|
| SUB TOTAL | $2,000.00 |
| TAX | $0.00 |
| ADJUSTMENTS | $0.00 |
| TOTAL BEFORE PAYMENTS | $2,000.00 |
| PAYMENTS | ($2,000.00) |
| OUTSTANDING BALANCE | $0.00 |

Printed on: 2022-05-11 18:18:08

Case 22-15627-EPK Doc 287 Filed 12/19/22 Page 142 of 155

# EXHIBIT J

**Exhibit J**

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY, FLORIDA

FVP OPPORTUNITY FUND III, LP,
a Delaware limited partnership, FVP INVESTMENTS,
LLC, a Delaware limited liability company, and FVP
SERVICING, LLC, a Delaware limited
limited liability company,

CASE NO.: CACE-22-005125 (21)

      Plaintiffs,

vs.

KARMA OF BROWARD, INC., a Florida
corporation, KARMA OF PALM BEACH,
INC., a Florida corporation, SCOTT ZANKL,
An individual, MOSHE FARACHE, an
individual, AUTO WHOLESALE OF BOCA,
LLC., a Florida limited liability company, MMS
ULTIMATE SERVICES, INC., a Florida
corporation, EXCELL AUTO SPORT AND
SERVICE INC., a Florida corporation, and
EXCELL AUTO FINANCE,
LLC, a Florida limited liability company,

      Defendants.

_____/

## AMENDED AFFIDAVIT OF MOSHE FARACHE

**Comes Now,** MOSHE FARACHE, pursuant to 28 U.S.C. § 1746(2), under penalty of

perjury and states the following to be true:

1. My name is Moshe Farache. I am over the age of eighteen (18) years of age; and, I have

   personal knowledge of the facts stated herein.

2. I am a managing member of Auto Wholesale of Boca, LLC ("AWB").

3. AWB's principal address is located at 6560 West Rogers Circle, Suite B-27, Boca Raton,

   FL 33487 (the "AWB Business Location").

4. AWB is a duly-licensed motor vehicle dealer in the State of Florida; and, has been in business for over nine (9) years.

5. AWB's primary business is to buy and sell automobiles.

6. I am submitting this Amended Affidavit to clarify my April 14, 2022 Affidavit ("April 14 Affidavit") filed by my former counsel, Marc Brandes ("Brandes").

7. On Sunday, April 10, 2022, the FVP Plaintiffs filed a Verified Complaint (the "Complaint") along with an Emergency Ex Parte Motion for Appointment of Receiver and for Temporary and Permanent Injunction (the "Ex Parte Motion").

8. On Wednesday, April 13, 2022, the FVP Plaintiffs filed a Notice of Hearing [at 12:34 p.m.] for purposes of scheduling the Ex Parte Motion for the following day, April 14, 2022 at 3:30 p.m. (the "TRO Hearing").

9. I have since discovered that the FVP Plaintiffs unilaterally scheduled the TRO Hearing without consulting my attorneys for their availability or mine. Apparently, my previous counsel, Brandes, had accepted service of process via email on April 11, 2022 on behalf of AWB.

10. It wasn't until April 14, 2022 at or about 1:54 p.m. that AWB's then-attorney, Brandes, sent me an email with the April 14 Affidavit, drafted by Brandes, attached (in pdf format) for the very first time, which also referenced Exhibits that were not attached to the email containing the April 14 Affidavit.

11. Given the extremely tight time frame between receiving the April 14 Affidavit at 1:54 p.m. and the time to travel to the TRO Hearing from Boca Raton to Fort Lauderdale, I was relying upon my memory as to the automobiles AWB had in its possession and was trying to get the information relating to the inventory while *en route*. Further, I did not see any

exhibits for the Affidavit, as they were apparently in Brandes' possession without my having seen them.

12. I must also mention that my native language is Hebrew; and, while I can speak English conversationally, I neither read nor write it fluently -- which further challenged my abilities to understand the April 14 Affidavit. In fact, I only had time for my wife, Lisa Farache, to read to me the first few paragraphs before it was signed. Note, this Amended Affidavit has been read to me by my family so I could properly understand its contents.

13. If the Court would recall, I stood up at the back of the Courtroom at the TRO Hearing indicating that the number of automobiles referenced by my attorneys were not correct; as AWB did not have in its possession twenty-seven (27) automobiles. Even my counsel, had indicated the same at the conclusion of the TRO Hearing, and, the Court, to me, appeared to note there was disagreement with the number of automobiles and appeared to direct the parties to confer regarding the inventory.

14. Therefore, I want to clarify the automobiles in AWB's possession as of the TRO Hearing.

15. For example, although Exhibit 1 to the April 14 Affidavit referenced a list of automobiles between numbers 1 through 36, certain consecutive numbers are omitted therein; and, there were not twenty-seven (27) automobiles referenced on Exhibit 1, but rather twenty-two (22) automobiles were referenced therein.

16. Exhibit 1 was not provided to me at the time I received the April 14 Affidavit at 1:54 p.m. on April 14 2022 nor was it provided to me prior to the TRO Hearing (which commenced at 3:30 p.m.); and, Exhibit 1 was not an accurate representation of the vehicles in AWB's then-current possession at the time of the TRO Hearing.

17. At the commencement of the TRO Hearing, AWB was in possession of twenty (20) automobiles which are accounted for in Exhibit "A" hereto.   AWB continues to be in possession of nineteen (19) of these automobiles, as AWB released a certain Rolls Royce Ghost pursuant to this Court's order.

18. At the time of the TRO Hearing, Exhibit "A" hereto represents all of the automobiles in AWB's then-possession.

19. Of the twenty-two (22) automobiles identified in the original Exhibit 1 to the April 14 Affidavit, three (3) of these automobiles were not in AWB's possession as of the commencement of the TRO Hearing as a result of sales prior to the TRO Hearing.

20. One (1) of these automobiles set forth on Exhibit 1, -- the Bentley Flying Spur (identified as #10 on Exhibit 1) --, was sold at Manheim Palm Beach on April 7, 2022.

21. Another automobile, a Jeep Gladiator (identified as #30 on Exhibit 1), was sold at Manheim Palm Beach prior to the TRO Hearing.

22. As such, these two (2) automobiles (Bentley Flying Spur and Jeep Gladiator) were sold before this Court's verbal Freeze Order; and, these two (2) automobiles should not have been on Exhibit "1" to the originally-filed Affidavit.

23. There was a third automobile listed on Exhibit 1 to the April 14 Affidavit that was also not in AWB's possession at the time of the TRO Hearing, and still is not. Specifically, that certain Lamborghini Huracan (identified as #32 on Exhibit "1"), was not in AWB's possession; but, was observed at Karma of Broward as recently as May 4, 2022. It should be noted that this automobile was listed as being black in color; however, when I recently saw it at Karma of Broward, it was wrapped in the color red.

24. Although omitted from Exhibit 1 to the Affidavit, the automobile identified as #4 on the attached Exhibit "A", (a Lamborghini Urus), was in AWB's possession, and said Lamborghini Urus continues to be held by AWB per the Court's verbal Freeze Order. And, the automobile identified as #33 on Exhibit "A" hereto, a Lamborghini Huracan, was also in AWB's possession at the time of the TRO Hearing (even though it was not listed on Exhibit 1 to the April 14 Affidavit) and continues to be held by AWB per this Court's verbal Freeze Order.

25. The confusion about the number and types of automobiles that AWB possessed at the time of the TRO Hearing was a function of limited information relating to the number and type of automobiles being available, the lack of time I had to confirm AWB's inventory count, that I did not receive any of the Exhibits from my attorney to review, and the miscommunication between myself and AWB's former attorneys.

26. Additionally, at the TRO Hearing, when my former counsel advised this Court that there were twenty-seven (27) automobiles in AWB's possession, I immediately attempted to and did tell him that the information  my counsel was referencing regarding the number of automobiles currently in AWB's possession was not accurate and needed to be verified and corrected.

27. Respectfully, the Court may recall that, at the end of the TRO Hearing, after I spoke to Mr. Brandes in open court, Mr. Brandes advised this Court that he needed to be sure of the number of automobiles; and, the Court appeared to understand that the number had to be addressed between the Parties to this litigation.

28. As a result of this Court's verbal Freeze Order, the remaining nineteen (19) automobiles are being housed, and insured by AWB, at its expense; and, unfortunately, the Freeze Order

has effectively shut down AWB's business operations and caused AWB to sustain damages, financial and otherwise on a continuing basis.

29. In conclusion, I did not intend to mislead the Court in any way; and, to the extent confusion was created and mistakes were made, I believe the same was the function of what I have stated above.

FURTHER AFFIANT SAYETH NAUGHT.

BY: _____

MOSHE FARACHE

COUNTY OF PALM BEACH    )
                        )SS:
STATE OF FLORIDA        )

BEFORE ME, the undersigned authority, personally appeared, _Moshe Farache, who is personally known to me or who has produced _____ as personal identification and who first by me being duly sworn, says that it is the Plaintiff in the above-styled cause, that he/she has read the foregoing and has personal knowledge of the facts and matters set forth and alleged in it; and that each of the facts and matters are true and correct.

The foregoing instrument was acknowledged before me by means of ( ✓ ) physical presence or ( ) online notarization, this 26 day of _May___ 2022.

_____
Notary Public
My Commission Expires:



MICHELE A. MARTIN
Commission # GG 942844
Expires April 27, 2024
Bonded Thru Troy Fain Insurance 800-385-7019

# EXHIBIT "A"

VEHICLES IN AWB POSSESSION   UPDATED 05.26.22   4:07PM

| AWB INVENTORY # | MAKE | MODEL | YEAR | VIN | TITLE Y/N | LOCATION | ESTIMATED DATE OF RETRIEVAL |
|---|---|---|---|---|---|---|---|
| 1 | ASTON MARTIN | DB11 VOLANTE | 2019 | SCFRMFCW6KGM07671 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 2 | FERRARI | F12 BERLINETTA | 2017 | ZFF74UFA7H0221036 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 4 | LAMBORGHINI | URUS | 2020 | ZPBUA1ZLXLLA06529 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 6 | MERCEDES | G63 | 2020 | W1NYC7HJ6LX346462 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/05/22 OR 04/06/22 |
| 11 | BMW | X7 | 2019 | 5UXCX4C56KLS39222 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - OUTSIDE | 04/07/22 |
| 13 | GMC | YUKON | 2019 | 1GKS1CKJ8KR354378 | N | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - OUTSIDE | 04/01/22 |
| 16 | MCLAREN | 720S | 2018 | SBM14DCA9JW000606 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 17 | MERCEDES | G WAGON | 2021 | W1NYC7HJ0MX390328 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 18 | MERCEDES | G63 | 2020 | W1NYC7HJ6LX362080 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 20 | PORSCHE | 911 | 2008 | WP0AD29978S783176 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 24 | MCLAREN | 720S | 2020 | SBM14FCA5LW004229 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/01/22 |
| 26 | LAMBORGHINI | URUS | 2019 | ZPBUA1ZLXKLA01961 | N | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/05/22 |
| 27 | FERRARI | 812 SUPERFAST | 2020 | ZFF83CLA1L0254693 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/02/22 |
| 28 | CADILLAC | ESCALADE | 2018 | 1GYS4BKJXJR261612 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - OUTSIDE | 04/07/22 |
| 29 | FERRARI | 458 ITALIA | 2013 | ZFF68NHA8D0191526 | Y | 6560 W ROGERS CIRCLE B 27 BOCA RATON FL 33487 - INSIDE (INJUNCTION FILED) | 04/04/22 |
| 31 | JEEP | GLADIATOR | 2021 | 1C6HJTAG1ML571540 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - OUTSIDE | 04/04/22 |
| 33 | LAMBORGHINI | HURACAN | 2020 | ZHWUT4ZF1LLA14316 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/04/22 |
| 35 | MCLAREN | 720S | 2019 | SBM14FCA9KW003714 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/04/22 |
| 36 | MERCEDES | G CLASS | 2020 | WDCYC7HJ9LX334940 | Y | 5471 N DIXIE HIGHWAY SUITE 1 & 2 BOCA RATON FL 33487 - INSIDE | 04/02/22 |
| 8 | ROLLS ROYCE | GHOST | 2021 | SCATV0004MU207524 | | PICKED UP BY OWNER BY COURT ORDER ON 05.06.22 | 04/01/22 |

# EXHIBIT K

**Exhibit K**

**Fill in this information to identify the case:**

Debtor 1    Auto Wholesale of Boca, LLC

Debtor 2   _____
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Florida

Case number   22-15627-EPK

Official Form 410

# Proof of Claim

12/15

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Nicole Testa Mehdipour, Trustee for In re Excel Auto Group, Inc., Case No. 22-12790-EPK
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Nicole Testa Mehdipour, Trustee
Name

6278 N. Federal Highway, Suite 408
Number    Street

Fort Lauderdale    FL    33308
City    State    ZIP Code

Contact phone (954) 302-5937

Contact email nicolem@ntmlawfirm.com

**Where should payments to the creditor be sent?** (if different)

Name

Number    Street

City    State    ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

Official Form 410        **Proof of Claim**        page 1

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No

❑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$_____30,634,447.89__. **Does this amount include interest or other charges?**

☑ No

❑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

___see detailed Exhibit A_____

**9. Is all or part of the claim secured?**

☑ No

❑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

❑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

❑ Motor vehicle

❑ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**:                          $_____

**Amount of the claim that is secured:**       $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $_____

**Annual Interest Rate** (when case was filed)_____%

❑ Fixed

❑ Variable

**10. Is this claim based on a lease?**

❑ No

❑ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

**11. Is this claim subject to a right of setoff?**

❑ No

❑ Yes. Identify the property: _____

---

Official Form 410                          **Proof of Claim**                          page 2

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.

$_____

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   09/28/2022
                   MM / DD / YYYY

/s/ Nicole Testa Mehdipour
Signature

**Print the name of the person who is completing and signing this claim:**

Name        Nicole Testa Mehdipour, Trustee
            First name          Middle name              Last name

Title       Nicole Testa Mehdipour, Trustee for In re Excel Auto Group, Inc., Case No. 22-12790

Company     _____
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     6278 N. Federal Highway, Suite 408
            Number          Street

            Fort Lauderdale                      FL          33308
            City                                 State       ZIP Code

Contact phone   (954) 302-5937            Email   nicolem@ntmlawfirm.com

---

Official Form 410                          **Proof of Claim**                          page 3

## EXHIBIT A - ATTACHMENT TO PROOF OF CLAIM
## AUTO WHOLESALE OF BOCA LLC, CASE NO. 22-15627-EPK

This Exhibit to Proof of Claim is intended to detail and preserve Claimant's rights as a claimant in this bankruptcy case.

Nicole Testa Mehdipour, the Chapter 7 Trustee for In re Excell Auto Group, Inc. ("Excell"), pending at Case No. 22-12790-EPK ("Claimant" or the "Excell Trustee"), is in the beginning stages of her investigation and submits this Proof of Claim ("Claim") detailing the causes of action and claims she has identified. Discovery is still ongoing and the Claim will be updated at the appropriate time.

Claimant asserts the following unsecured, nonpriority claim in the total estimated amount of $30,034,447.89, representing all payments made by Excell to the Debtor, which represent any and all claims under 11 U.S.C. §546, including but not limited to, claims pursuant to §§ 544, 547, 548, 549, and 550; treble damages for converting certain of the Debtor's high-end luxury vehicles pursuant to Fla. Stat. § 772.11; treble damages for usurious loans pursuant to 18 U.S.C. § 1962, Fla. Stat. §§ 895.02, 895.03, 895.05; breach of contract, unjust enrichment, and administrative fees and costs incurred by the Trustee and her professionals in the estimated amount of $600,000.00. This list is not exhaustive and shall be amended, when and if necessary.

Claimant specifically reserves the right (i) to amend, update and /or supplement this Proof of Claim at any time and in any respect including, but not limited to increasing the Claim for any subsequently discovered pre-petition amounts due or supplementing the Claim to include any other liability or indebtedness of the Debtor; (ii) to file requests for payment of administrative expenses in accordance with 11 U.S.C. §§ 503 and 507, including without limitation, requests for expenses included in the Claim, and/or (iii) to assert a right of setoff, recoupment, indemnification, or any other right. This Proof of Claim is filed without prejudice to the filing by Claimant of additional proofs of claim with respect to any other liability or indebtedness of the Debtor.