UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                          Case No. Case No. 9:22-bk-15627
                                                                Chapter 11
AUTO WHOLESALE OF BOCA, LLC

        Debtor.
_____/

## DEREK STEPHENS' RESPONSE TO THE FVP PARTIES' SUPPLEMENTAL HEARING MEMORANDUM

Derek Stephens ("Stephens") responds to FVP Opportunity Fund III, LP, FVP Investments LLC, and FVP Servicing, LLC's (collectively "FVP") Supplemental Memorandum (DE 277) as follows:

### INTRODUCTION

The only position presented by FVP in its post-trial brief is its argument that Jonathan Martin ("Martin") was not authorized to enter into the Consignment Agreement between Karma and Derek Stephens. But the evidence at trial clearly demonstrated that Martin had both actual and apparent authority to execute the Consignment Agreement. *See* Trial Tr. at 362:4-8 ("COURT: I think apparent authority is fairly obvious here, given the testimony that I heard, and the evidence that I received today. Maybe there is other stuff that you know, but it is not in evidence"). Martin was a salesperson, transacting business on behalf of his employer, Karma, at its car dealership with his regular customer, Derek Stephens, when he signed the Consignment Agreement—an act which his employer conceded he was expressly authorized to do. Stated plainly, authority is not an issue in this case.

1

### A.       Martin Had Actual Authority to Sign

Actual authority "exists when a principal delegates authority to an agent by expressly authorizing the agent to do a delegable act." *Fla. Power & Light Co. v. McRoberts*, 257 So. 3d 1023, 1026 (Fla. 4th DCA 2018).   That is exactly what happened here.   Martin testified Karma expressly authorized him to enter into consignment agreements and that he did so in the normal course of his employment at Karma:

Q.      Were you authorized to sign this document that we're looking at
        as Exhibit 1 [the Consignment Agreement] on behalf of Karma?

A.      Yes.

Q.      Is this something you did in your normal course of business as a
        salesperson?

A.      Yes.

                                   * * *

Q.      Mr. Martin, are you an authorized signatory for Karma Palm
        Beach?

A.      For the purchase -- I mean, for the consignment agreements, yes.

Q.      Okay. So, are you saying that the only documents that you're
        authorized to sign by that -- were authorized to sign by that
        company were consignment agreements?

A.      Yes, sir.

                                   * * *

A.      I had the authority to sign a consignment agreement.

Tr. Trans. at 42:22-43:2; 53:11-19; 109:19-20; *see* Trial. Tr. at 373:1-4 (emphasis added) ("I'm very entertained by the majority of the people in the room pretending

the [Consignment Agreement] doesn't exist, **or that somehow the sales associate had a personal agenda.  He was acting on behalf of the entity**").

Martin's employer, Karma, through its owner Scott Zankl ("Zankl"), confirmed that Martin had actual authority to sign consignment agreements for Karma. While his testimony was at times inconsistent,[1] Zankl admitted through impeachment by prior inconsistent statement that Karma salespersons are indeed authorized to sign consignment agreements. Tr. Trans. at 249:24-250:5.  And while he attempted to narrow that testimony by claiming that the salespersons needed his prior authority to do so, Zankl also testified that "I never, I never get into [consignment agreements]. . . I never was involved in that." *Id.* at 251:14-16.  In the end, Zankl conceded that Martin was "the one" who would know whether or not Stephens' Ferrari was on consignment or not. *Id.* at 251:17-22 ("yeah, the gentlemen that Mr. Stephens always dealt with, which was Jonathan Martin, he would know").

Because Karma delegated to Martin the act of signing consignment agreements, he had actual authority to do so in this instance.  Accordingly, the Consignment Agreement must be given effect; the Ferrari belongs to Mr. Stephens.

### B.    Martin Had Apparent Authority to Sign

The Consignment Agreement is just as enforceable if Martin's authority was actual or apparent. "Apparent authority arises from the authority a principal knowingly tolerates or allows an agent to assume, or which the principal by his

---

[1] As the Court noted, "Mr. Zankl was not particularly believable."  Trial Tr. at 373:15.

actions or words holds the agent out as possessing." *Clayton v. Poggendorf*, 237 So. 3d 1041, 1046 (Fla. 4th DCA 2018)(citing *Regions Bank v. Maroone Chevrolet, L.L.C.*, 118 So.3d 251, 255 (Fla. 3d DCA 2013)).  In other words, even if a certain act is not expressly authorized, if the principal tolerates its performance by an agent, such acquiescence constitutes apparent authority.  *Ramos-Barrientos v. Bland,* 661 F.3d 587, 600 (11th Cir. 2011) ("Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance") (quoting Restatement (Second) of Agency § 43(1)).

FVP readily admits that apparent authority exists if the principal "creates the appearance of an agency relationship."  *See Izquierdo v. Hialeah Hosp., Inc.*, 709 So. 2d 187 (Fla. 3d DCA 1998). "The rationale for the doctrine of apparent authority is that a principal should be estopped to deny the authority of an agent when the principal permitted an appearance of authority in the agent and, in so doing, justified a third party's reliance upon that appearance of authority as if it were actually conferred upon the agent." *Roessler v. Novak*, 858 So. 2d 1158, 1161 (Fla. 2d DCA 2003).

Karma plainly created the appearance of an agency relationship with Martin. Martin was Karma's salesman; he was employed by Karma; Karma allowed Martin to sell cars to and buy cars from Derek Stephens, at the Karma car dealership, on multiple occasions.  Trial Tr. at 30:10-15, 31:20-24, 32:6-33::2.  Martin was Stephens'

principal contact at Karma. *Id*. at 54:18-20. And it is undisputed that Karma salespersons were authorized to sign consignment agreements. *Id*. at 249:24-250:1

Once the Consignment Agreement was executed, Martin submitted it as part of the deal paperwork. *Id*. at 68. There is no evidence that Karma rejected the Consignment Agreement thereafter. From March 11 until "the standoff" on April 4 and beyond, Karma never rejected but instead operated in alignment with the Consignment Agreement. Martin even sent Stephens correspondence concerning the inspection of the Ferrari for purposes of its sale to someone else. Trial Tr. at 48:22-49:11. Had Karma owned the Ferrari as it seems now to claim, Karma would have had to pay Stephens immediately after March 11, and certainly would have had no cause to keep him informed about efforts to resell it. Before, during and after the transaction, Karma unwaveringly created the appearance that Martin was authorized to effectuate transactions on its behalf, including consignments. *Id*. at 360:17-20 ("What's apparent authority? A representative who is negotiating with the client on behalf of the dealership who enters into a written agreement with the client").

Karma's narrative only changed when Zankl realized he could avoid personal liability by assisting FVP. Zankl and his wife are personal guarantors of the FVP debt. Thus, if the Court were to determine that Karma was to be awarded the Ferrari, then the Zankls' personal liability to FVP would be reduced by its value. Trial Tr. at 271:11-19. Both Zankls maintained that the Ferrari belonged to Stephens until these proceedings. Trial Tr. at 154:4-6 and 155:6-12. Mr. Zankl's trial testimony must be

MAURO LAW | 1001 YAMATO ROAD, SUITE 401 | BOCA RATON, FLORIDA 33431 | 561.202.1992 | WWW.MAUROLAWFIRM.COM

read with his incentive to reduce personal liability, and his prior inconsistent statements in mind. *See, e.g.*, *Id*. at 257:17-262 (Zankl texts Stephens that "your title and car was never supposed to be given, it was a mistake").

Knowing well that Karma's actions confirm Martin's authority, FVP incorrectly contends it is necessary for Stephens to establish that Karma "represented to Mr. Stephens that Martin had the authority to execute a document that bound the company." This is utterly false, for such a requirement would turn the law of apparent authority on its head. In *Roessler,* the court examined whether the hospital gave the impression **by its actions** that a doctor was its agent. 858 So. 2d 1158 at 1162-1163; s*ee Owen Indus., Inc. v. Taylor,* 354 So.2d 1259, 1261 (Fla. 2d DCA 1978) (Apparent authority is "the authority a principal knowingly tolerates or allows an agent to assume, or which the principal **by his actions or words** holds the agent out as possessing") (emphasis added); *Ramos-Barrientos*, 661 F.3d at 600 (Authority often "can be created by written or spoken words **or other conduct** of the principal which, reasonably interpreted causes the agent to believe that the principal desires him so to act on the principal's account") (emphasis added). Simply put, apparent authority does not turn on express representations.

The circumstances at this car dealership on March 11 gave Stephens no reason to doubt Martin's authority to sign the Consignment Agreement. *See Underwriters Ins. Co. v. Kirkland*, 490 So. 2d 149, 153 (Fla. 1st DCA 1986) ("Kirkland was given no reason to inquire into the scope of Whitman's apparent authority to continue the policy in force"). Stephens had completed multiple transactions with Karma in the

past and worked with Martin each time. Trial Tr. at 32:6-11 and 20-24. Indeed, through his prior dealings with Martin, Karma kept the Ferrari at the dealership and marketed it for sale on behalf of Stephens, without a written consignment agreement, for several months. *Id.* at 33:3-14. If Martin could authorize that arrangement, Stephens had no cause to question his authority to sign a Consignment Agreement.

The burden FVP would have this Court impose on a consumer—a duty to inquire about a car salesman's authority to conduct normal business at a car dealership—is not supportable under Florida law. Karma's lender FVP cannot simply disregard the Consignment Agreement on the basis of the self-serving, contradiction-laden testimony of Zankl. "An employer is liable for intentional acts of an employee when the employee is acting within the scope of the employer's apparent authority, even if the employer did not permit or otherwise authorize the act, or it was not necessary or appropriate to serve the interest of the employer." *GolTV, Inc. v. Fox Sports Latin Am. Ltd.,* 277 F. Supp. 3d 1301, 1317 (S.D. Fla. 2017) (quoting *Canto v. J.B. Ivey & Co.*, 595 So.2d 1025, 1028 (Fla. 1st DCA 1992)).

Zankl knew that Stephens was working with Martin on the transaction to purchase the Lamborghini and sell the Ferrari. Trial Tr. at 38:22-23 ("…and at that point Derek asked to speak to Scott. So I put him on the phone with Mr. Zankl…"). But there is no evidence that Zankl made any statement to Stephens (or anyone else) that Martin's authority to represent Karma in the dealings with Stephens was in any way limited. Stephens dealt with Martin as "the face" of Karma, in good faith, and

7

entered into the Consignment Agreement, as any other consumer might have done. "If a corporation . . . or its directors, either intentionally *or* negligently*,* clothe a particular officer or agent with an apparent authority to act for it in a particular business or transaction, and persons deal with him in good faith, it will be bound to the same extent precisely as if such apparent authority were read." *Johnson v. Chase Bankcard Servs., Inc.,* 582 F. Supp. 3d 1230, 1240 (M.D. Fla. 2022), appeal dismissed, No. 22-10679-GG, 2022 WL 3716649 (11th Cir. June 24, 2022)(citing *Jacksonville Am. Pub. Co. v. Jacksonville Paper Co.*, 143 Fla. 835, 197 So. 672, 679 (1940)), *See also*, *Campbell v. Osmond*, 917 F. Supp. 1574, 1583–84 (M.D. Fla. 1996) ("When viewed in a light most favorable to Campbell, this evidence establishes at a minimum, that Creations caused or allowed others to believe that Washburn was an authorized agent if not directly establishing actual authority as Defendants' agent.").

## CONCLUSION

The Court is correct; Martin's authority to sign the Consignment Agreement is "fairly obvious." The only evidence FVP relies on is the compromised testimony of Zankl that he was required to authorize the Consignment Agreement before Martin could sign it, and that testimony should be given little weight, if any. On the other hand, all of the other evidence regarding Martin's express authority to sign consignments, the circumstances of the March 11 transaction and appearance of agency Karma created leaves no room for doubt that Martin had both actual and apparent authority to sign the Consignment Agreement. Thus, failing to award the

MAURO LAW | 1001 YAMATO ROAD, SUITE 401 | BOCA RATON, FLORIDA 33431 | 561.202.1992 | WWW.MAUROLAWFIRM.COM

Ferrari to Derek Stephens would be to disregard a valid contract, and in turn constitute a miscarriage of justice.

Respectfully submitted,

**MAURO LAW P.A.**

/s/  C. Cory Mauro
C. Cory Mauro
Florida Bar No.:  384739
Evan D. Appell
Florida Bar No.:  58146
1001 Yamato Road, Suite 401
Boca Raton, FL 33431
cory@maurolawfirm.com
service@maurolawfirm.com
evan@maurolawfirm.com
Telephone: (561) 202-1992
*Counsel for Derek Stephens*

MAURO LAW | 1001 YAMATO ROAD, SUITE 401 | BOCA RATON, FLORIDA 33431 | 561.202.1992 | WWW.MAUROLAWFIRM.COM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was filed with the Court by using the Notice of Electronic Mail through the Case Management/Electronic Case Filing to those parties registered to receive electronic notices of filing in this case on January 6, 2023.

**MAURO LAW P.A.**

*By: /s/ C. Cory Mauro*
   C. Cory Mauro

Mauro Law | 1001 Yamato Road, Suite 401 | Boca Raton, Florida 33431 | 561.202.1992 | www.MauroLawFirm.com