Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                          CASE NO. 22-15627-EPK

AUTO WHOLESALE OF BOCA, LLC

            Debtor.
_____/


                    ECF #261

                December 21, 2022

            The above-entitled cause came on for hearing before the Honorable Erik P. Kimball, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler Dr., West Palm Beach, Palm Beach County, Florida, on December 21, 2022, commencing at or about 1:30 p.m., and the following proceedings were had.




                Transcribed from a digital recording by:
                    Cheryl L. Jenkins, RPR, RMR

APPEARANCES:


LINDA MARIE LEALI, Subchapter V Trustee (via Zoom)


JAMES B. MILLER, P.A., by
JAMES B. MILLER, Esquire
On behalf of the Debtor


DAVID R. SOFTNESS, P.A., by
DAVID R. SOFTNESS, Esquire (via Zoom)
and
RICHARD BARON LAW, by
JERRELL A.  BRESLIN, Esquire (via Zoom)
On behalf of FVP Investments, LLC, FVP Opportunity Fund,
III, LP and FVP Servicing, LLC


BRYAN CAVE LEIGHTON PAISNER, by
DAVID UNSETH, Esquire (via Zoom)
On behalf of HighBar Capital, LLC


SHRAIBERG PAGE, by
BRADLEY SHRAIBERG, Esquire
PATRICK DORSEY, Esquire
On behalf of Wing Lake Capital Partners


SCOTT GHERMAN, Esquire
On behalf of Moshe Farache


HEIDI FEINMAN, Trial Attorney (via Zoom)
Office of the U.S. Trustee
Department of Justice

CONTINUED APPEARANCES

ALSO PRESENT

Moshe Farache

Miriam Jaime

ECRO - Electronic Court Reporting Operator

- - - - - - -

Page 4

THE COURT:  All right.  Let's see, we're here in the matter of Auto Wholesale of Boca, LLC.  Let's start in the courtroom.  Mr. Miller.

MR. MILLER:  Good afternoon, your Honor.  James Miller on behalf of the debtor-in-possession.  With me today is Moshe Farache, one of the owners of Auto Wholesale of Boca, and my assistant, Miriam Jaime, is in the courtroom, as well is Scott Gherman, G-h-e-r-m-a-n, who personally represents Mr. Farache.

THE COURT:  Welcome.  Good afternoon, everyone.

Mr. Shraiberg.

MR. SHRAIBERG:  Good afternoon, your Honor.  Brad Shraiberg on behalf of secured creditor Wing Lake Capital Partners, formally known as Franklin Capital.  I'm joined today with my partner, Patrick Dorsey, on Zoom.

THE COURT:  Very good.  Good afternoon, Mr. Dorsey.

MR. DORSEY:  Good afternoon, Judge.

THE COURT:  Let's see, I see Mr. Breslin.  Good afternoon.

MR. BRESLIN:  Good afternoon, your Honor.  I'm present for the FVP plaintiffs.  Mr. Softness will be representing the FVP adversary plaintiffs in this matter today.  Thank you.

Page 5

THE COURT:  All right.  Thank you.

Where is Mr. Softness?  I see your name, but not your face.

Good afternoon.

UNIDENTIFIED:  There he is.

MR. SOFTNESS:  You need only ask.

THE COURT:  You've made your entrance.

Good afternoon.

Let's see, Ms. Feinman.

MS. FEINMAN:  Good afternoon, your Honor. Heidi Feinman for the U.S. Trustee.

THE COURT:  Ms. Leali.

MS. LEALI:  Good afternoon, your Honor. Linda Leali, I'm the Subchapter V Trustee in this case.

THE COURT:  Let's see, Mr. Wolfe.

MR. WOLFE:  Good afternoon, your Honor.  I'm here on the DATG matter.

THE COURT:  Ah, thank you.

Is there anybody who would like to appear in Auto Wholesale of Boca who I haven't called out?

MR. UNSETH:  Good afternoon, your Honor. David Unseth, from the law firm of Bryan Cave Leighton & Paisner, on behalf of HighBar Capital.

THE COURT:  Very good.  Good afternoon.

Anyone else?

Page 6

(No verbal response.)

THE COURT:  All right.  Mr. Miller.

MR. MILLER:  I apologize, Judge.  We're having a problem connecting to the Internet on our computer to have my --

THE COURT:  Do you need a moment?

MR. MILLER:  I'm just trying to get a case, my case.

THE COURT:  No, go ahead.

(Technical difficulties.)

MR. MILLER:  I'll use my phone Internet to try and make the argument, your Honor.  So it may go a little slower than I anticipated.

THE COURT:  That's fine.

MR. MILLER:  Your Honor, we're here this afternoon on the debtor's motion, 261, expedited motion to sell inventory.

The Court, I'm sure by now, has gotten the full flavor of most of this case, and how it ended up where it is, and the issues relating to the various automobiles that we acquired that's in our inventory. When I say "our", I mean AWB, Auto Wholesale of Boca.

Going back and forth, if you recall in the beginning of the case, the creditors -- purported creditors, because we disagree that they're creditors, but

Page 7

they allege that they have a lien interest on some, if not all, of these automobiles.

We've gone through several days of judicial settlement conferences with his Honor, Judge Russin, who, you know, has an incredible amount of patience, and great skill, and tried to get the parties to a resolution.

Ultimately, a few weeks ago, Mr. Softness responded to the Judge, and we agreed that it was at an impasse, and the Judge filed an impasse notice.  So that's where we ended up.

At that point in time, we're still -- the debtor is still retaining these cars, the debtor is caring for them, insuring them, storing them.  The debtor is in possession of every one of the cars identified on 261-1. The debtor either has the newly issued titles in the name of the debtor, or an original endorsed title, to which it's not yet been able, as to one car, to transfer over, and that was only because the DMV had an issue shortly before the bankruptcy that's now been cleared up after the bankruptcy.  So we do have the endorsed title on it.  We just never transferred the title into the name of the debtor.

It's important, Judge, that the Court understand that we are in possession of these cars, that we've acted as the owner of these cars.  We've stored

Page 8

these cars.  We've maintained these cars.  We've insured these cars.  We cleaned these cars.  We've had security guard these cars.  So, we've incurred the expenses associated with that.  We also entered into a lease so we could put these cars into a building.

This Court has had a hearing on an emergency motion to authorize the postpetition assumption of certain obligations, contractual obligations relating to the insurance that covers these vehicles, and the Court approved that.  The debtor has listed in Court Paper 65 its ownership interest under penalty of perjury of these vehicles.  The debtor has always taken the position that these cars are owned by the debtor.

Your Honor, I'll start with the first process, the first argument, which I'll just pull up my case law, it's a particular -- it's a good case, it's Judge Hyman.  I noticed that when I was reading all the objections filed by counsel, none of them cited the Judge Hyman opinion on the concept of a 363(f) sale, and his Honor, in the case -- and just one moment, I'll pull it up, your Honor, because my computer is down, but I have my phone available.  Now it's going to take forever.

Okay.  Judge, I believe we're on the Internet now.  I can do this much more easily.

I apologize for the delay, Judge.

Page 9

THE COURT:  That's fine.  Sometimes these things happen.

MR. MILLER:  I'll have to find the cite, your Honor.

THE COURT:  Is it TFLO.

MR. MILLER:  Yes, it's the one where his Honor -- his Honor ruled in that case that the debtor doesn't have to establish that it is the owner a hundred percent of the vehicle.  Merely -- the Court merely is supposed to, for purposes of 363(f), look at the record, look at the matters, and determine whether or not there is an interest of the debtor in the property that's to be sold, and that's subject to future rulings, and the Court didn't say you have to find that it's the owner of the item, of the property.

THE COURT:  Right, but in this particular case the debtor has the record, or has the assignment of the record ownership in every vehicle, and actually holds them.  So --

MR. MILLER:  We have a bill of sale.

THE COURT:  Right.

MR. MILLER:  We have titles, original endorsed, and titles issued in our name.  We act as the owner of the vehicles.

Now, under Florida law, the certificate of

title itself is evidence of ownership, but not unrebuttable, as Florida law has clearly said.

However, what Florida law goes on to say is, if you exercise control, possession, and all the elements and things relevant to the maintenance of a vehicle, it is -- for all intents and purposes, you are the owner.  For example, there is case law out there about the father buying the car in his name, but it's really the son's car, and the courts ultimately find that the son is the one who paid the insurance, paid for the car, maintained, cared, and drove the car.  That's what we have here, your Honor.

The --

THE COURT:  Well, actually you have facts that are better than those resulting trust cases.  In those resulting trust cases, the title would be in the name of the father, and it would be the son claiming ownership, under your example.

MR. MILLER:  Exactly, and we've gotten the best -- the better case, where the cars were not only transferred to us, but that we have the endorsed titles, the bills of sale, and the new titles issued in our name, much better than the case law that we would rely on for arguing that matter.

THE COURT:  Right, but your reference to Judge Hyman's case really is, I would expect, focused

Page 11

primarily on his conclusion that a dispute with regard to ownership can be a bona fide dispute within the meaning of 363(f).

MR. MILLER:  That's the purpose of the statute.  I mean, it would make no sense to make a debtor -- everybody could come in and claim an interest in property and say it's not the debtor's property, and basically destroy the ability of the debtor to reorganize.

If, in fact, at the end of the day -- I mean, even under 363(f)(5), you know, each of these parties are not claiming to be owners.  They're claiming to have a lien interest.  A lien interest is satisfied by payment of money.

So, what better way than to liquidate these assets, as we've asserted in our motion, let any liens, to the extent they are valid, enforceable, unavoidable, et cetera, et cetera, attach.

Your Honor, you had a case -- actually Mr. Shraiberg was debtor's counsel in it, I think, 160 Royal Palm, or something to that effect, where you actually did rule something similar.

THE COURT:  I'm only giggling because that was the single most highly litigated case in my 15 -- fourteen and a half years here.

MR. MILLER:  Well, this is about to get

there.

THE COURT:  Oh, no, there is no way it could be, unless you intend to go to the Supreme Court multiple times, and two of them petitions for cert fully presented, but anyway --

MR. MILLER:  So --

THE COURT:  -- so what did I do in 160 that's relevant here?

MR. MILLER:  You authorized the sale. Mr. Shraiberg, in that case, represented the debtor, and was seeking approval of a sale.

THE COURT:  Right, but no one was claiming the debtor didn't own it, but there was a huge dispute over a lien.

MR. MILLER:  Right, at the end I think they actually conceded the ownership interest to the debtor, but they were arguing other matters, sort of like -- in this case, although they -- they want their cake and to eat it, too.  They want to stay in Bankruptcy Court, and let the Court believe there could be an ownership interest, but they also want to get out of Bankruptcy Court and argue it elsewhere and, therefore, compel abandonment, or whatever it may be, but none of these parties in interest have every asserted an ownership interest in these cars, just merely a lien interest, which

can, again, be satisfied by the payment of money.

So, all we're asking the Court, and what I would proffer to the Court, and I'd offer Mr. Farache to testify if the Court would like, or any party would want to cross-examine him is, his affidavit asserting and representing under penalty of perjury that these are the titles to the vehicles issued in the name of the debtor, the debtor has possession of each one of these vehicles, the debtor has paid for the insurance on these vehicles, the security, the maintenance, care, and storage of all of these vehicles, and has acted, under all intents -- for all intents and purposes as the owner of these vehicles.

And under the applicable case law in Florida, that would be enough to establish a rebuttal -- anything can be rebutted, but basically an ownership interest.

There is the Nash case, which I cited in another matter in this Court, but the Nash case is right on point on that, that the certificate of title is evidence, but not -- it's prima facie evidence of ownership, but not irrebuttable, which is what these parties like to argue, that it's not the debtor's property interest in the adversary proceeding.

But for all -- but for this case, for 363(f)(4), the Court can approve the sale of this

Page 14

property, can make an initial finding that the debtor has an interest and, therefore, it's property of the estate.

Now that interest may ultimately be found to be bare legal title, equitable, but whatever it may be under the definition of property of the estate, it's a very broad term.  So -- and nobody can be negatively impacted by the sale of these vehicles, because these vehicles, like I said, the only parties that are objecting are the parties that say they have a lien interest in the vehicles.  So that's my proffer to the Court.

I'm ready to argue, if the Court would like to hear it.  I can cite the Court to -- the first case I said was Nash, your Honor.  It's a Florida Supreme Court decision, 47 So.2d 701, Florida Supreme Court, 1950, where, in that case, the facts were an unendorsed certificate of title to the party asserting the ownership interest, and the Court found that even though unendorsed, it still -- the owner is the party that has the title, and in this case we have the title, and that's further followed up, you know, because it's really an old case, but it's still good law, and it's cited again in In Re: Forfeiture of 1989 Isuzu Pickup Truck at 612 So.2d 695, a Florida 1st DCA opinion from 1993.

The same thing, Judge, a certificate of title establishes presumptive ownership of a vehicle,

Page 15

which presumption can be overcome by competent evidence.

So, the case law is pretty clear on that, and there can't be any argument that there was no delivery, because we got the vehicles.  So there is definitely delivery, and there is some other case law, Judge, that goes on and addresses various parts of ownership, but they all say pretty much the same thing.

As a matter of fact, there is a -- it's not Florida law, but it's similar.  There is an Alabama decision at Turner versus DeKalb Bank, its cite is 209 BR 558, an opinion of the Bankruptcy Court for the Northern District of Alabama, Eastern Division in 1997.

This case actually did a great job of providing a number of cases around the country that have that issue arise, to determine property ownership, and property of the estate, and did a great analysis of various cases, not just in Alabama, but in other courts where the same finding, you have the title, you have possession, you are exercising all indicia of ownership, therefore, the presumption is you are the owner.

So what we would like to do, Judge, is obviously sell these cars in a fashion in which the debtor has historically sold cars.  The debtor is not a retail enterprise.  It's primarily a wholesaler.  The tax returns of the debtor reflect that up until 2021, it historically

made sales of anywhere from 30 to $50 million a year. They know what they're doing.  They know how to get a profit out of an automobile, and the debtor is competent at what it does.

But we also would like to be able to pay for certain expenses to get the car to the auction that we choose, and liquidate that car there so we can maximize the price, but to do that we have to prep the cars, they've been in storage for a while.  There is going to be probably some tire changes, some battery changes, things like that, prep it, clean it, wipe it down.  Those are expenses we'd like to deduct from whatever sale proceeds we can obtain, and then there is going to be the expense of the auction.

The auction, your Honor, shouldn't cost more per car than between 550 and $700 a car.  Let me just confirm.

Yes, it's not going to be -- I know that one of the parties had suggested that we use one of their companies that they're affiliated with, or friends with, and that company wanted to charge 4 percent to sell the cars.  We're, like, no.  First of all, this is our motion to sell, this is what we do, we know how to --

THE COURT:  Well, I should point out, the motion does not talk about this at all.  One of my

questions for you was going to be, what is the proposed method of sale, or marketing, because it's not addressed at all in the motion, and why would whatever the debtor proposes be the best one?  Because I'm not even sure if anybody could object to the motion on those grounds, because there was nothing provided in terms of method.

So now you're saying auction.

MR. MILLER:  That's what the debtor -- that's how the debtor typically sells its automobiles, in the wholesale industry, you typically would sell them through auction, unless there is another dealer that would like to purchase the car, and it's typically put up at auction.  I can have -- I'd have to ask Mr. Farache to take the stand and advise the Court as to how that process works, because I'm not very familiar with it, but basically it's designed to maximize the value.

There is a -- particularly Manheim would be the used one.  Manheim is one of the largest operations --

THE COURT:  I know who Manheim is, but they're not going to be doing this for 6 or 750 a car, are they?

MR. MILLER:  Yes, that's their fee.

THE COURT:  Okay.  So, and a buyer's premium is added on?

MR. MILLER:  What's that?

Page 18

THE COURT:  A buyer's premium is added on?

Manheim makes only from the seller 6 to $750?

MR. FARACHE:  The buyer pay also.

MR.. MILLER:  Mr. Farache says, yes.

MR. FARACHE:  The buyer pay also a fee.

MR. MILLER:  Right, a buyer's premium.

MR. FARACHE:  So both side pay a fee.

MR. MILLER:  A buyer's premium.

MR. FARACHE:  But we have a flat rate, because we use the same agent/person --

THE COURT:  I see.

MR. FARACHE:  And also --

THE COURT:  Okay.  That's fine.  I don't want to get into testimony, not under oath.

MR. FARACHE:  I'm sorry.

THE COURT:  All right.  So the proposal is auction?

MR. MILLER:  Yes.

THE COURT:  Go ahead.

MR. MILLER:  So, yes, that's the regular business of the debtor.  They would -- they do --

THE COURT:  You keep saying that, but when you file a motion to sell, it can be a private sale, it can be through an auction.  There is nothing in the motion

Page 19

that tells me how the cars will purport to be sold.  It just says the debtor wants authority to sell.

MR. MILLER:  Well, they want authority to sell to maximize the value.  If the primary basis would be auction, we would sell it at auction.  If we can sell it to another entity, another --

THE COURT:  Dealer.

MR. MILLER:  -- dealer, yes, for a better value, we will do that.

The debtor will exercise its best efforts to maximize the value, Judge.  It's in its best interest to maximize the value.  There is not -- in other words, the idea was not to take all these cars at one time to the auction house and do a dump, it's not going to work well to do that.

There has got to be a controlled process, and Mr. Farache is familiar with that process, and so all we're asking for is the authority, because earlier, in August, the Court entered an order that did not allow us to sell the cars.

And, again, we went through the settlement process, and ultimately that didn't turn out for anybody.  So now we would like to be able to sell the cars so we can at least transfer, get rid of these cars, reduce the cost to the estate, reduce the necessity of storage, the

Page 20

necessity of the insurance, because, you know, in January we've got upcoming a new issue for one of them.  So we would like to do all these things, reduce the expense to the estate, and just liquidate the value of these car for now.

The proceeds would be held in my trust account pending further order of the Court, with whatever interest may have attached to the automobiles, you know, that are unavoidable, et cetera, et cetera, would be attached to these proceeds pending further order of the Court, and the process, again, is simply whatever the -- the debtor is a debtor-in-possession.  The debtor knows its business enterprise, and knows what would maximize the value for the car.

On a given day that car may go at the auction for a better price than the dealership that they're, on the Internet, also listing that automobile, but it just depends on the market, and we want to be able to move with wherever the market is, in the best interest of the estate, to maximize the value of that, not having to spend a lot of money on -- we're not a retail operation, so we didn't put up sales, ads, and things like that.  You know, we might put it on the Internet, but we're not going to do a lot more than that in that regard, your Honor.

Page 21

THE COURT:  So the proposal would not involve any individual retail buyers?

MR. MILLER:  I'm sorry, I'm wearing my hearing aids and I'm having a hard time.

THE COURT:  Oh, I said the proposal would not involve any individual retail buyers?

MR. MILLER:  No.  I mean, it could.  I mean, if somebody off the street says I have a friend that wants something, it may, but more likely than not, no, because we don't want to get into -- when you get into the retail industry, you're starting to deal with consumer law and things of that nature, and the debtor does not want to be involved in those types of transactions typically.

THE COURT:  So, you mentioned some preparation costs.

MR. MILLER:  Yes.

THE COURT:  And other than a broker, an auctioneer, would there be any third party rendering any of those services, is that what you're saying?

MR. MILLER:  Yes, there would be -- your Honor, there would be towing expenses, because the idea is these are high-end exotic cars, you don't want to put miles on them.  So, we'd have to have a tow service, pick the vehicle up with a flatbed, take it to the place, whichever we're selling it at, and drop it off there, and

Page 22

then there is going to be -- you know, if the car has a flat tire, we're going to have to replace it, if a battery has to be replaced, you know, buff and clean to make sure it looks its best for purposes of show.

THE COURT:  That's all third parties?

MR. MILLER:  It should be all third parties, yes.  I mean, we may do some of these things, but we're not asking the Court to pay us for that.  It's only third party expenses.

THE COURT:  Understood.

Okay.  Anything else?

MR. MILLER:  I believe that's it, Judge, for now.

THE COURT:  All right.

MR. MILLER:  Maybe I can get my Internet to work.

THE COURT:  Well, who would like to -- is there anybody who would like to speak in favor of the motion to sell?

Ms. Leali.

MS. LEALI:  Well, your Honor, I just have a few comments.  I don't know if it's in favor, it's a comment.

You know, your Honor, obviously I agree with your Honor there was a dearth of information as to how the

Page 23

debtor intended to sell the cars, and we've heard a little bit about it.

The business is at a standstill at this point in time, and so the debtor needs to, you know, either -- they need to continue its operations.  So I think to the extent that this debtor is going to have a hope of reorganizing, it's going to need to start up its operations.

THE COURT:  Thank you.

Anyone else in favor or neutral before I hear objections?

(No verbal response.)

THE COURT:  It's okay for the Subchapter V Trustee to be neutral.

All right.  Who would like to address any objections?

Mr. Softness.

MR. SOFTNESS:  Thank you, Judge.  Forgive me, I'll take a few minutes of your time.  I need to go up to 30,000 feet here.

I represent probably the purest victim in this whole case.  My client is a lender from out of state, has no pre-existing relationship with any of these parties.

They were approached, they did some due

Page 24

diligence, and they loaned seven and a half million dollars, and they loaned into a cesspool. The interrelationships and the machinations here are astounding, and the one I'll focus on for today, obviously, AWB or its owners knew about this loan, I can prove that, and I'm going to prove that.

But they take all the titles -- and I just found this, but it is their methodology, when Karma would buy a car, they would title it over to AWB to protect their interests, and then when AWB would sell -- when Karma would sell it, they would title it back, and it would be sold.

You know, this whole notion of AWB being in the car business is not true. You know, and what do they do? They send cars to auction. Auction is Latin for get the worst price. You know, nobody at the auction is paying bust out retail. Everybody at the auction is buying wholesale so they can sell retail.

THE COURT: Well, doesn't that --

MR. SOFTNESS: So, that notion --

THE COURT: Well, hold on.

I mean, I'm with you if it's the standard used car auction, being the grandson of a former used car salesman, but the cars we're talking about here are a little bit unusual. Aren't they the ones that are at

Page 25

Barrett-Jackson and the like?  Isn't that a little different?

MR. SOFTNESS:  I'm not --

THE COURT:  Go ahead.

MR. SOFTNESS:  I'm not there yet.

THE COURT:  Okay.  Go ahead.

MR. SOFTNESS:  This debtor is a lender, and we've had all of this hyperbole, and we've heard that it's a mom and pop.  It's not.  I mean, Mr. Miller just said that they sold many, many millions of cars at the auction.

THE COURT:  Millions of dollars of cars.

MR. MILLER:  Millions of dollars of cars at the auction, that's their function as a lender, and that's really all they are, and the rest of it is fiction.

Let me get right to it, Judge.

THE COURT:  Well, Mr. Softness, wouldn't it be an unusual lender who was auctioning vehicles?  If they actually did auction vehicles, that would not be a typical lender.

MR. SOFTNESS:  I know.

THE COURT:  All right.

MR. SOFTNESS:  No, they get the collateral, they sell it quickly and efficiently.  They're not in it to make a profit.  They're in it to get rid of their collateral.  That's precisely my point.

Page 26

I think it's important you understand what I'm saying about the debtor being a lender, and not in the car business, and it's not just in a function of what's the best way to sell these cars. It's a function of this whole case.

You know, my client loaned in good faith, took a lien on all these cars. Every car that Mr. Farache swore to in his affidavit yesterday was at some point owned by my borrower. Okay. How did that happen, we loaned money to a borrower, and Mr. Farache gets all the titles? I mean, your antenna has to be, you know, going up a little bit.

Let me ask you a couple of questions. Let me pose a couple of questions. If AWB is a car sales company, as opposed to a lender, then why did the Excell trustee file a $30 million claim based on usury? That's just another borrower in the Zankl group, you know, and their trustee says they were the victims of usury.

My next question is how come all of the cars owned by this car dealer came from Karma and Excell? They put an affidavit before you, every single one, not one car was from a third party to AWB.

So, there is some sort of strange relationship, which we understand, and we'll have to prove one day, but my question is why say no other source of

Page 27

cars, they're in the car business.  They're moving millions and millions of dollars, and yet when they filed this bankruptcy, the only cars were my collateral, and the only money, I can assure you, was proceeds of my collateral.

So, if they are in the -- and getting back into a little bit of Chapter 11 talk here, but if they're lenders -- I mean, if they're in the car business, why haven't they bought and sold any cars in this Chapter 11?  Suddenly they have no access to capital, no other avenues of obtaining financing to go out and buy cars, and no ability to buy cars with or without financing, that sounds like a lender, not somebody in the car business.

And my last question, before I get into some very simple argument, is where is the emergency in this case, Judge?

There is a lot -- you pointed out how the debtor could have discussed the sale methodology before today.  The debtor did not really address for you the nature of all these claims against these cars.  I mean, the debtor's view now is, well, they're my cars, and these fake liens, you know, will be dealt with accordingly.  There is a lot more to be discussed, put before you, and then litigated before you can grant a motion like this.

You know, the debtor is saying we have

Page 28

title.  Well, we know they have title.  We told you how they got that title in other context.

Let me get to the nub of it, Judge.  We have said let's sell these cars from day one.  We still think selling these cars is the way to go, but sure enough here we are, and the debtor doesn't just want to sell the cars, he wants to use the money.

We called him on that, we discussed it, and discussed it, and conferred, and discussed it.  The debtor says, that's his cash collateral, and if and when he chooses to, he will seek use of it.

I don't think you'd allow it under these circumstances, but here is our argument today, Judge, our property is standing still and protected.  Nothing bad, hopefully, is going to happen to it.

Why would we -- why would you sell it? You're not changing anything for the debtor, why would you sell it, put the money in the bank, and then we have something knew to fight about?

You're going to resolve this sooner or later, and when you do, whoever gets the cars, gets the cars.  You know, the debtor has told you that they're maintaining them, you know, taking good care of them.  So, they're fine.  So that is really the nub of it.

There is a sale that we would agree to, of

course there is, but not this one.

THE COURT: Well, that begs the question, what is that sale that you would agree to?

MR. SOFTNESS: Very simple, if the debtor agrees that the proceeds are not cash collateral, we will work with the debtor to sell it. Maybe we can't talk them out of an auction, but if that money is in limbo, then we're not agreeing, and you'll only do it over our objection. It's that simple.

THE COURT: Right. I'm trying to figure out -- and, Mr. Miller, at the end I'll let you -- I'm going to say this so you have a lot of chance to think about it before you end up back at the podium, the debtor doesn't have any other assets, and so if all the vehicles are sold, and there is a big pile of cash, I don't know how it would be possible to provide adequate protection to anyone who claims to have a lien in the cash unless I determine whether those liens do exist and what their priority is.

So, I'm not sure how I would permit the use of it until there were a resolution of all the various claims.

And, Mr. Softness, that's what you're asking for, you would, depending on the circumstances of the proposed sale, not be opposing a sale, so long as the debtor wasn't immediately able to use the proceeds.

Page 30

MR. SOFTNESS:  Did I say that out loud?
Yes.

THE COURT:  I think you did.

MR. SOFTNESS:  We are all about a sale that would make the most sense, but not like this.

THE COURT:  Understood.

MR. SOFTNESS:  Not like this.

THE COURT:  Well, not like this, what do you mean by "this", an auction --

MR. SOFTNESS:  Well, the debtor -- well, I differ with the auction.  I don't really think the debtor cares.  The debtor is going to want the best price, and if we have a better way, maybe they'll listen to us, maybe they won't.  Maybe we come back before you, but I truly doubt that we can't figure that out, but I don't think you can grant it as written today, but we can figure that out.

It's a one-issue problem, Judge.  If that money is going to be at risk, then you'll do it only over our objection, and I don't think it's at risk.  I don't think you'd ever let them use it, particularly, you know, to do what, to start buying cars with my money?  I don't think so.

So that's our view.  I'm not worried about the sale method.  I'm sure that we will figure that out as responsible professionals.  I made an objection as to the

Page 31

cost, I'm sure we can keep a handle on that.  So, really it comes back to if the money is going to be in play, that's it, that's our objection.

THE COURT:  All right.  Thank you.

Who would like to go next?

MR. SOFTNESS:  Thank you.

THE COURT:  Mr. Shraiberg.

MR. SHRAIBERG:  Thank you, your Honor.

We agree that we're stuck between a rock and a hard place, like FVP was just stating.  Franklin also wants the cars sold, but the way that this is queued up, and I know it's queued up as an emergency, and it's queued up as there is no methodology for how the debtor is going to conduct the sale, it forced Franklin to file an objection to the sale, coupled with the fact that this is a unique case, as your Honor pointed out, that there are allegations that the debtor does not own any of these assets, and as this Court has previously pointed out with regard to the original adversary that was filed, if these are not assets of the estate, then the Court doesn't have jurisdiction over any of the -- anything that's going on right now.

So, how do we solve the problem?  One suggestion that we had was, and we're stuck because this was filed on an emergency basis when there isn't a reason

Page 32

for it.  There is no pending emergency.  Even in the debtor's presentation, they're not stating how quickly these cars will be sold, who they're -- what the process is, and how much are these assets depreciating, if at all, on a daily basis.

One solution is a modification of the stay and simply doing this by contract.  If we all are saying we want to sell the cars, we can do that without getting into this gray area, does the Court have jurisdiction to --

THE COURT:  Okay, okay, let me just let you know --

MR. SHRAIBERG:  Sure.

THE COURT:  -- I don't think jurisdiction is at issue here at all.

The example you gave is the context where under the complaint that no longer exists in that adversary, I could have been placed in the position, based on the relief that's requested, that I would determine that a vehicle is not the debtor's, and then still, under that pre -- under that old complaint, be asked to determine who had the better right in it.  At that point I would have not have jurisdiction over that question.

Here, I have a debtor that holds title to 12 vehicles in its name, that has a thirteenth, where the

Page 33

title is assigned to it, it's endorsed in its favor, the debtor has facial ownership and possession of the vehicles, and I think there is a legal question, which Mr. Miller pointed to Judge Hyman's decision, that answers in the affirmative, and the legal question is, is a dispute with regard to ownership under circumstances, I believe that was intellectual property, but a dispute with regard to ownership, is that something that falls under the dispute provision in 363(f), and Judge Hyman said, yes.

If that's the case, I have jurisdiction over the whole thing.  So, it's not a jurisdictional issue. Just to let -- just to point out, I don't think I have a thorn, thorny jurisdictional issue at all.

MR. SHRAIBERG:  But under (b), before you get to (f), you have to -- it has to be property of the estate.

THE COURT:  And the estate has something, a toehold is enough, in Judge Hyman's view.

Okay.  So --

MR. SHRAIBERG:  So we cited cases from --

THE COURT:  I get it.

MR. SHRAIBERG:  -- Delaware that --

THE COURT:  Yes.

MR. SHRAIBERG:  -- you know, that say that

Page 34

-- but then if you couple it, I think there is no question that there was no binding -- the 11th Circuit has not ruled on this issue.  There is no binding precedent on how do you read (f) and (b) together.

THE COURT:  Let me stop you.

MR. SHRAIBERG:  Sure.

THE COURT:  I know you have a presentation, but I'm curious about, everybody wants the vehicles to be sold.  Everyone wants these vehicles to be sold.

MR. SHRAIBERG:  Yes.

THE COURT:  There are a few vehicles where there are people who would love to have the vehicle itself --

MR. SHRAIBERG:  Sure.

THE COURT:  -- and that's not these 13.

MR. SHRAIBERG:  Right.

THE COURT:  So, and there was kind of a vacuum in this motion.  Normally I have a motion that says we request to hire this auctioneer, and have this process, with these expenses, and you may even have, for example, a minimum sale price, filed under seal, for each of the cars, so that everybody agrees ahead of time that anything this and above, whatever, have a process.  There is no process.

MR. SHRAIBERG:  Right.

Page 35

THE COURT:  So I am troubled by that, but if there was a process that you agreed to, and the debtor was not going to be using the cash afterwards, you'd probably be supporting a sale process.

MR. SHRAIBERG:  Correct.

THE COURT:  All right.  Let me ask, in your client's view, is it likely that these particular vehicles are declining in value?

MR. SHRAIBERG:  Not at a rate that we need to sell them tomorrow.  We think that they're subject to the market, where this month they may be, and next month they may be increasing in value.

THE COURT:  Right.

MR. SHRAIBERG:  They're not being driven. They're antiques, as one of my clients told me, it's art, so the market will dictate, but they're not decreasing because they're being driven, and it's not like --

THE COURT:  Right.

MR. SHRAIBERG:  -- driving a traditional car off a lot.

So, that's why, as I started, we're stuck between a rock and a hard place.  We're not saying that we don't want the cars sold.  We've wanted the cars sold since day one.

We need a methodology that works, and we

Page 36

were backed into the corner due to the emergency nature of objecting, and that's where we are.

And we're glad that they have withdrawn the request to use cash collateral. That, you know, gets rid of a huge concern of ours, but for right now the motion, at a minimum, needs to be denied until they give a methodology to sell, and if they're bringing in an auction house, they probably need to file an application to employ, and so all of this needs to be done, and it needs to be done in an orderly manner.

And, equally, we'll volunteer, that -- we're not suggesting that the debtor would be violating its business judgment by proposing how it should sell these assets. We just need the proposal.

So, with that, as presented, we believe that the motion should be denied.

THE COURT: Thank you.

Who would like to go next?

Mr. Breslin.

MR. BRESLIN: Judge, very, very briefly. I know I said Mr. Softness was going to comment, but I just wanted to make a couple of comments.

THE COURT: But I find it unlikely that you think he did an inadequate job.

MR. BRESLIN: No, I just wanted to point out

Page 37

a couple of things.

Judge, there has been a new adversary complaint filed, and the new adversary complaint does allege that the debtor does not own the vehicles, and the Karma entities make those claims, and that is of record, that's number one.

And, number two, my client had these vehicles inspected by an auction company about a month ago. We shared that information with the debtor, I shared that information with Ms. Leali, and like Mr. Softness said, we've been trying to sell these cars since May, literally May, long before Mr. Miller got involved in this case.

So, you know, we are certainly not adverse to that, but my client -- what my client is very concerned about, is that if you just blindly grant this motion, and these cars get sent off or sold at a reduced value, that it would hurt him ultimately because, you know, we're confident in our position in this case. So he wants the ability to bid on these cars.

So I sent Ms. Leali a nationwide, widely known auction company, that's already inspected the cars, they've agreed to reduce their fee to 4 percent. I don't know if that's better or worse than what the debtor is suggesting, but --

Page 38

THE COURT:  That's the seller's -- I'm just curious, that's the seller's premium, Mr. Breslin?

MR. BRESLIN:  Yes, yes.

THE COURT:  It comes off the top of the proceeds?

MR. BRESLIN:  The auction company would take 4 percent.

Now, I don't know if that's better or worse than what the debtor is suggesting, but I would just like your Honor to be able to make a ruling on whatever it's going to be, and we just want to be able to protect our client to be able to bid on each car, because they may be -- he may very well buy each and every car.

THE COURT:  Understood.  Thank you.

MR. BRESLIN:  Thank you.  Thank you, your Honor.

THE COURT:  Who would like to go next?

MR. UNSETH:  Your Honor, David Unseth --

THE COURT:  Thank you.

MR. UNSETH:  -- on behalf of HighBar Capital.

THE COURT:  Yes.

MR. UNSETH:  Your Honor, I'll be brief.  I think we echo a lot of the arguments that have been made by both FVP and Franklin.

The two things, as your Honor has pointed out, that we are concerned about is that the motion doesn't elaborate on any process for the sale.

We are not opposed, necessarily, to a sale of the vehicles but, you know, once again, we're not aware as to the process for that, and then further, we just want it to be clear, that if there is a sale that's approved by the Court, that those funds need to be set aside and (inaudible) the liens of the parties, and held pending further order for further use, as opposed to the debtor being able to freely use those as they seem to propose to do in their motion, as cash collateral.  So that's our position, your Honor.

THE COURT:  Right.  Mr. Unseth, and a couple of you have commented on this, one of your colleagues as well, it seems to me that ECF 291 modifies the motion to take away the general request for use of cash collateral, and Mr. Miller will talk about that in a moment, I'm sure.

All right.  Would anyone else like to be heard before I give the podium back to Mr. Miller?

(No verbal response.)

THE COURT:  All right.  Mr. Miller.

MR. MILLER:  Thank you, your Honor.  A couple of things, Judge.

I'll just address the last thing first, the

Page 40

cash collateral, that was a typo, and as a matter of fact, what I was amazed at was the filings that objected to the term in there, when we actually had a Zoom conference with all of these attorneys last week --

MR. SHRAIBERG:  Objection, your Honor, he's --

THE COURT:  Yes, don't talk about it.

MR. MILLER:  -- where it's not --

THE COURT:  It doesn't -- it was in the motion, so I saw it, and I thought, oh, this is interesting.

MR. MILLER:  And a clarification was asked, and I said, no, we are not seeking that.

THE COURT:  Right.

So are you proposing that all the proceeds, if there was going to be a sale process, they would all be held pending further order, you said that earlier today.

MR. MILLER:  That is correct, that's in the motion.

THE COURT:  Okay.  All right.

MR. MILLER:  That is correct.

THE COURT:  Is there anything else you'd like to respond to?

MR. MILLER:  Yes, a couple of things.

The costs that are considered -- by the way

Page 41

-- oh, yes, Mr. Breslin's last offer there, that they wanted to offer to purchase the cars, this is the first time we've ever heard that.  It's not in any pleadings, it's never be been told to us directly, or indirectly, or otherwise.

THE COURT:  Well, this is a sale hearing.

MR. MILLER:  Right.

THE COURT:  And he --

MR. MILLER:  And if they want to make an offer --

THE COURT:  His client wants to make sure they can bid.

MR. MILLER:  If they want to make an offer, send an offer.

You know, what I'm hearing is, they don't want to sell the cars, but they do want to sell the cars. It's very interesting walking that tightrope.

THE COURT:  I don't hear anybody saying let's not sell the cars.  I hear people saying I'd like to now how are you going to do it, I'd like to know what protections there are, I'd like to know what the process is.

MR. MILLER:  And so for the --

THE COURT:  The questions that I had, frankly.

Page 42

MR. MILLER:  The best way to describe the process, Judge, would be, this is a wholesale debtor, not a retailer.  This isn't BMW South Motors, where they would come in and say we're going to sell the cars, and you'd say, well, how are you going to do it?  And say, well, we'd do it at retail.  This is -- this is what we do in this industry.

They wouldn't put on this big dog and pony show to describe that this is what they do in the retail industry.  You've got to rely upon the debtor's business judgment, and the fact that they have an obligation to do what's in the best interest of the estate, and maximize value.

So in this instance, we have a wholesaler with, right now, 13 cars, high-end automobiles, doing the same thing they've been doing for 12 or 15 years, sell these cars for maximum value.

So there is really not a lot to offer up in the context of how we would go about doing it, other than we would literally put it on a website with the auction house, and this is on -- and, again, let's assume that's the low end, because if you look at our exhibit attached thereto, that exhibit attaches the prospective value we think we would get for the sale, low-end/high-end for the price of that automobile.  Why?  Because of Mr. Farache's

Page 43

expertise in that arena for these many years.  So, this is what our anticipated likely sale price would be.

This price is well within the parameters of the pricing that Mr. Breslin was speaking about earlier, where we allowed him to go and inspect the cars.  We said, sure, you want to go look at the cars, go look at the cars.  They went down, they did their own little detailed reports.  Mr. Breslin was kind enough to share it with us, after I requested it, and these sale prices are well within the parameters that Mr. Breslin's expert would like -- that believes the cars would go for a sale price.

As a matter of fact, that's who Mr. Breslin has suggested that they would use, but at a substantial commission rate.  We're not interested in paying that substantial commission rate.  These fees are rather de minimus compared to what Mr. Breslin's client --

THE COURT:  Well --

MR. MILLER:  -- would charge.

THE COURT:  -- plus the seller's premium on the one that you would use, that's not disclosed in the motion.

MR. MILLER:  I believe that Mr. Farache said the seller's premium is between 5 and $750 a car.

THE COURT:  No, that's the fee paid by the seller -- I mean, the buyer's premium, excuse me.

Page 44

MR. MILLER:  I think it's the same amount.

MR. FARACHE:  The same, we have a flat fee.

THE COURT:  And a buyer pays only $750 to buy a Ferrari?

MR. FARACHE:  The buyer pays 1 percent of the value.

THE COURT:  1 percent, all right.

MR. MILLER:  1 percent, so I stand corrected.

THE COURT:  All right.

MR. MILLER:  Which is less than the 4 percent that Mr. Breslin has suggested.

THE COURT:  But I point out, none of this is in the motion, and those dollar amounts are just advisory, they're not guideposts, certainly not the low-end is not a guidepost.

MR. MILLER:  We'll, they're --

THE COURT:  It's just what you think --

MR. MILLER:  -- anticipated sales in the industry.

THE COURT:  Right, but that's not a minimum sale price, for example.

MR. MILLER:  No.

THE COURT:  Right, not a lot of detail in the motion.

Page 45

MR. MILLER:  Well, I understand, Judge.  We were trying to get this out the door as quickly as possible.  The negotiations had not gotten us anywhere, so we ended up filing this motion on an expedited basis, given the holiday season, to try and maximize the value of the sale of the cars.

THE COURT:  Well, okay, how would that -- what goal do you have to maximize -- I'm trying to figure out how the timing --

MR. MILLER:  Well, we want to maximize the value for the benefit of the estate.

THE COURT:  Well, of course, but I'm trying to figure out what the timing is.  Are they holiday gifts, is that the idea, and you wanted --

MR. MILLER:  Everybody that has ever bought these cars are ridiculously wealthy, and that's exactly what they'd buy them for, for different events.

THE COURT:  All right.  Well, then why wasn't the motion filed in November?

MR. MILLER:  Because we were still in settlement negotiations with the parties, your Honor, that's why.

THE COURT:  All right.

MR. MILLER:  We were still in settlement mode with them.  We were waiting to see.  I'm not going to

Page 46

get into what was discussed, but we were -- they had us hanging out, waiting, and so that's why we were holding on to the cars.

Now that you've seen the impasse filed by Judge Russin, even after that, though, there has been several discussions --

THE COURT:  Good.

MR. MILLER:  -- with various parties.

THE COURT:  Good, good.

MR. MILLER:  So, it's not been completely quashed at this point in time.

However, these cars cost money, and they do -- and Mr. Farache, I would proffer, would testify that the value of these cars decline substantially every month, from 1 to 4 percent a month.  That's an increasing loss in value every month while they're sitting there.

We are incurring substantial expenses relating to these cars, securing them, maintaining them, storing them, caring for them, insuring them.  These are all expenses not born by any of these parties here that are arguing against us.  Now, I'm not sure they're arguing against a sale, or what they're arguing at this point, I can't figure it out.

But, your Honor, again, our process, it's not complicated, we would take our car, we would prep it,

Page 47

get it ready for the sale, put it on the tow truck.  Tow trucks cost roughly $250 each tow, because they're all flatbeds, they're very high-end cars, that people come in and pay probably a higher insurance rate for their towing service, to come out and take the car to the auction house.  The auction house takes the car in its possession.  Upon sale we have to pay a fee, as Mr. Farache said, it's between 500 to $750 per car, depending on the price, I guess, I'm not sure how it works, and then there would be some transactional costs that we'd probably have to pay, like, 30 or $40 per car for some documents or something that we have to do.

But if we sold them at retail, then we have to deal with the Florida sales tax, we have to deal with consumer advisory, consumer transaction issues.  You know, it's no longer really a caveat emptor thing, like it is in the auction from wholesaler to wholesaler, and things of that nature.

So, that's our process, and I'm proffering that.  I can put Mr. Farache on the witness stand to testify as to those matters, your Honor, but I think it's in everybody's best interest, let's liquidate these cars. The debtor will exercise its best efforts in what it understands to have been doing for the past 12 or 15 years, maximizing the value of automobiles, to get the

Page 48

best price.

The proceeds will be held in my trust account pending further order of this Court, they're not going anywhere, just authorize per car up to a per diem -- an amount per car, that that's the maximum cost that can be paid to third parties.

You have the, up to 750 per auction fee, 250 per tow, maybe 2 or $300 for additional stuff, or if it has to replace a tire, or a battery.  I mean, these are things that, let's assume worse case scenario, the Court ultimately found that Mr. Breslin's client got one car lien, and that car happened to have a dead battery, and the debtor dug in its pocket and put the new battery in, there is no reason why they shouldn't bear that expense, if that has to be done to that vehicle, but that's what we're requesting, your Honor.

THE COURT:  Understood.

All right.  Mr. Breslin.

MR. BRESLIN:  Judge, I know that you've commented several times that none of this was in the motion, and we certainly weren't prepared to address that.

Are we going to have a filing as to the manner of sale?  Because I really would like --

THE COURT:  Well, Mr. Breslin, Mr. Breslin,

Page 49

I'm sure you'll be relieved to know that if there is a filing that has more detail, it will be a completely new motion, because I'll be denying this one.

MR. BRESLIN:  All right.

THE COURT:  Okay.  So, do you wish to add anything else before I explain to Mr. Miller why I'm denying the motion?

MR. BRESLIN:  No, your Honor.

THE COURT:  Okay.  Mr. Miller, the debtor has a good deal of leeway in deciding how to exercise its business judgment, to move forward with a potential sale, but when you come to the Court to ask for approval of a sale, you need to be a lot more specific, particularly in an open-ended matter such as this, where it is not a private sale with a pre-identified purchaser.

And when you do that, it isn't just the auctioneer and the arrangement with the auctioneer, but you have to explain why you've chosen that one.  For example, a couple of the things you said, have suggested to me, that the auctioneer would be someone who does business primarily with other business people and not with end-users, the identity of the auctioneer and the nature of their business would be important.  There are certainly auctioneers who would be selling to end-users, like

Page 50

Barrett-Jackson, that I mentioned a few moments ago.  I'm not recommending anybody.  I'm just noting someone who I happen to have watched on television.

And so -- but when you have an open-ended sale, you have to provide a lot more information.  What is the process?  How did the debtor reach the conclusion that that's the appropriate process?  And all of the related expenses.

For example, when I read your motion, it was unclear to me whether the debtor thought that if there are any secured claims, they should, in effect, be surcharged by the debtor's internal costs to prep a vehicle.  I had no idea whether it would be third parties, who they were. I don't think the word "towing" appears anywhere in the motion, for example, and so you need to be much more clear about what the process is.

If you're going to engage a third-party professional to assist the debtor in selling assets, they have to be retained.  So normally you would file that simultaneously or, in many cases, before you file the sale motion.

You need a process.  You need a lot more detail.  This motion is not adequate, and so it will be denied.

I'm making no ruling on the legal issues,

Page 51

although I think I've given some hints about my concerns about certain of the legal issues.  At this point no ruling on any of the legal issues.  Everyone is preserving their rights.

Now, what did I hear today?  I'm completely unsurprised I heard several parties, who believe that they have interest in these vehicles, agree that there should be a sale process.  So -- and let me also point out, I hope everybody heard my comment earlier, I do not see how this debtor could possibly provide adequate protection for the use of the cash proceeds from these vehicles.  There is no ongoing business, and I think it's Mr. Softness who said, is the debtor going to ask to use the proceeds, assuming it's your cash collateral, Mr. Softness, to buy other vehicles?  Well, the answer would be, only if everyone is agreeing, because I cannot imagine that that's the case in this particular circumstance.

So, what are you getting?  You're getting the cessation -- when I say "you", I mean the debtor -- the cessation of ongoing expense related to keeping and maintaining the vehicles, insuring them, et cetera.

By the way, I have no idea what that is. The motion doesn't tell me, not even in a range of what the cost is, it's X per month for storage.

And, by the way, I see these motions all the

Page 52

time in Chapter 7 cases.  Trustees in this district regularly will file a motion saying I want to sell it, and I want to save the costs of all these items, because I'm storing them, I'm paying rent, I'm paying insurance, and I know what the costs are, and why time is of the essence. Here, I have no idea.  You're in a hurry, apparently it will save some money.  I don't know if that's $1,000 a month, or $25,000 a month, or something else.

So this motion will be denied without prejudice to the debtor filing a motion which more thoroughly presents what the procedure is, and appropriately provides all the parties in interest who would wish to have input on it, a better idea of, if they are objecting, what they're objecting to.

Are there any questions?

MR. MILLER:  No, Judge, but some clarification.

THE COURT:  Sure.

MR. MILLER:  You said retention of third-party professionals.  We're not retaining third-party professionals.  A towing service, I don't think, would be considered professionals because --

THE COURT:  The auctioneer?

MR. MILLER:  It's an auction house, we would sell the cars at the auction house.  We're not using an

Page 53

auctioneer --

THE COURT:  So you're not going to pay them.

MR. MILLER:  -- like Fisher.

THE COURT:  You just told me you're paying them.

MR. MILLER:  Paying a fee per car. That's --

THE COURT:  Okay.

MR. MILLER:  Again, this is ordinary course of business, this is what the debtor does in the context of --

THE COURT:  This is an --

MR. MILLER:  -- those types of services.

THE COURT:  -- unusual circumstance.  So, I want to know who the auctioneer is.

MR. MILLER:  Yes.

THE COURT:  And if you think that you can somehow -- I hesitate to use the word "engage".  I'm not sure, you said this particular party is someone the debtor regularly does business with.

You're better off filing an application. Why would you not file an application?

MR. MILLER:  It wasn't designed -- Judge, it wasn't going to be one of these, as I said when I opened up, it wasn't we were going to take 13 cars down

Page 54

and dump them at the auction house, and have them auctioned off --

THE COURT:  Okay.  I'll tell you what question popped into my mind.  These are not 13 identical Ferraris.  Why would you not sell them all at the same time?  I don't know the answer to that.

I have -- you know, I've watched a full afternoon of auctions of high-end vehicles, they all go on sale at the same time.  So it's not like they're competing with one another.  The person looking at the Escalade, and the Jeep, whose value I still cannot understand is more than $100,000, it must be the first serial number of that vehicle, is not bidding on the Ferrari, it's not happening.  So, I didn't understand that.

So, if that's the case, explain to me what the debtor's series of sales might be, or what theory might be used in order to determine what the order of sale would be, but right now I have no idea, nor do any of the other parties in this case.

MR. MILLER:  Okay.  Judge, we're just trying to --

THE COURT:  I get it.

MR. MILLER:  -- get the cars sold, and do it as quickly as possible.

THE COURT:  You can have a call about how

Page 55

the process should go, because I didn't hear anybody say, we don't want the debtor to arrange a sale.

MR. MILLER:  And as for the question of the towing service, yeah, we didn't use word "towing service", we actually used the word "transportation".

THE COURT:  Okay.  Whatever, but I have no idea what the cost is.

MR. MILLER:  I understand.

THE COURT:  Right.

MR. MILLER:  That's why I was making the proffer today.

THE COURT:  That's not -- you don't include in a proffer the things that should be reflected in the motion to begin with.

If I grant the motion as requested, the debtor is authorized to sell, period.  I didn't know there would be an auctioneer, I didn't know what the deal was, I didn't know when it would happen.  You want me to make findings of good faith for buyers, I don't know who they are, and I will do that in an open-ended auction in certain circumstances, but I had no idea what was going to happen.  Will there be somebody standing in the parking lot being a barker?  That's not what you intended on, I assume.  It's not in the motion.

I'm trying not to be insulting, but it's an

Page 56

amazingly brief motion to sell millions of dollars of vehicles.

MR. MILLER: I understand, Judge, and this Court is aware that this case has taken on an exorbitant level of litigation and fees --

THE COURT: Yes.

MR. MILLER: -- and I'm trying to cap them, apparently it's not working. So --

THE COURT: Well, it might.

MR. MILLER: -- we'll go the long haul.

THE COURT: You just need a different motion.

MR. MILLER: Yes.

THE COURT: It is possible to present a different motion. I heard a whole bunch of input today, again, I don't know how many times I've said this, from people who said we really want to see a sale. Even Mr. Softness, he spoke for a long time, and then he said, a sale would be good. I'm paraphrasing.

MR. MILLER: And that's an example -- you just hit the nail on the head, that's an example of the difficulties the debtor has had in this case, getting to the simple, quick answer, spending time, effort and money litigating and briefing repeatedly on matters that just boils down to one simple thing, and you don't -- it

Page 57

doesn't happen.  You get the War and Peace briefs, you've got to address them, and that's the unfortunate side of this case so far.

THE COURT:  If you file a different sale motion, I'll be entertaining it.

Okay.  I think we're done today.  I'll do a brief order denying the motion without prejudice for the reasons stated on the record.

Thank you very much.

MR. MILLER:  Who did you want to --

MR. SOFTNESS:  Thank you, Judge.

THE COURT:  I'll do the order.

Thank you.  Good afternoon.

MR. MILLER:  Happy holidays.

THE COURT:  Thank you.  Thank you very much, and happy New Year to everyone as well.

MR. FARACHE:  Thank you.

THE COURT:  All right.

MR. UNSETH:  Have a good one, your Honor.

THE COURT:  I'm going on to the next case.

MR. MILLER:  This one, right?

THE COURT:  No, I have another case.

MR. MILLER:  Oh, okay.

THE COURT:  Yeah, you have to go.

Page 58

MR. MILLER:  I'm doing the professional thing, walking over and shaking Brad's hand, your Honor.

THE COURT:  Well, Mr. Shraiberg is the one who offered you his phone to log into the Internet.

(Thereupon, the hearing was concluded.)

Page 59

CERTIFICATION

STATE OF FLORIDA        :

COUNTY OF MIAMI-DADE    :


          I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

          WITNESS my hand this 9th day of January, 2023.



_____

CHERYL L. JENKINS, RPR, RMR

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #HH 170910
December 27, 2025