

**ORDERED in the Southern District of Florida on February 10, 2023.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                                                           **Case No. 22-15627-EPK**
                                                                    **Chapter 11**

**AUTO WHOLESALE OF BOCA, LLC,**

    Debtor.

_____/

<u>**ORDER DENYING MOTION FOR TURNOVER**</u>

This matter came before the Court for evidentiary hearing on November 28, 2023, upon *Derek Stephens' Motion to Compel Turnover of 2013 Ferrari 458 Spider and to Abandon Title* [ECF No. 114] (the "Motion").

Through the Motion, Mr. Stephens asks for an order directing Auto Wholesale of Boca, LLC (the "Debtor") to turn over and abandon title to a 2013 Ferrari 458 Spider (the "Ferrari"). For the reasons stated below, the Court finds that Mr. Stephens relinquished the Ferrari in trade for another vehicle. Mr. Stephens retained no right to the Ferrari. Accordingly, the Court will deny the Motion.

Mr. Stephens, the Debtor, and FVP[1] participated in the evidentiary hearing. Shortly after the Debtor filed its petition, FVP filed a complaint to determine the extent of the Debtor's interests in, and the existence and priority of liens on, a number of vehicles in the Debtor's possession. Adv. Pro. No. 22-01218-EPK. FVP claims a first-position lien on the Ferrari.

The Court considered the evidence presented at the evidentiary hearing, the arguments of counsel, and the parties' briefs. ECF Nos. 277, 284, 285, 335, 336, 337. The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Mr. Stephens lives in Texas but frequently travels to Florida. He has friends, family, a business partner, and employees in Florida. His parents live in Naples. Mr. Stephens spent most of his childhood in Florida before attending Texas A&M University and Southern Methodist University. Mr. Stephens has a home in Florida and resides in Florida about ten days each month.

Mr. Stephens' friends introduced him to supercars. He got the "itch." In early 2021, he purchased the Ferrari from Excell Auto Group ("Excell"), a luxury dealership owned by Scott and Kristen Zankl. The Zankls also owned, and still own, Karma of Palm Beach ("Karma") and Karma of Broward and operated Excel and Karma out of the same location. Mr. Stephens kept three cars in Florida: one at his parents' house and two in South Florida. For a time, he kept the Ferrari at a friend's home and drove it when he visited South Florida.

In the fall of 2021, Mr. Stephens hit a pothole and dented the rim of the Ferrari. He took it to Excell/Karma for repair. After the repair, Mr. Stephens left the Ferrari with

---

[1] FVP means FVP Opportunity Fund III, LP, FVP Investments, LLC, and FVP Servicing, LLC.

Excell/Karma so the dealership could market it for sale. Excell/Karma kept the car maintained and detailed, and Mr. Stephens drove it when he came to town. At the time, Mr. Stephens intended to sell the Ferrari without purchasing a replacement vehicle.

Mr. Stephens did not enter into any formal agreements regarding the marketing and sale of the Ferrari. Mr. Zankl testified that Excell/Karma often maintained and stored customers' vehicles. Many customers did not reside in South Florida year-round. The dealership stored the vehicles in a secure facility, put them on battery tenders, and had them ready when the owners visited.

In early 2022, Jonathan Martin, a salesperson for Excell/Karma, informed Mr. Stephens that he had a buyer for the Ferrari. Mr. Stephens dropped the Ferrari off on March 7 for presale inspection. While there, he browsed Karma's inventory. Mr. Stephens returned two days later to continue looking. On March 10, he test drove two Lamborghinis. Initially, neither Lamborghini suited his fancy. However, he woke up the next morning and decided that a 2017 Huracan Spyder (the "Huracan") deserved a second look. Mr. Stephens returned on his lunch break and test drove the Huracan again. He decided to purchase it. He told Karma to remove a racing stripe—he was more conservative than that—and that he would return that evening to finalize the purchase and take delivery. Rather than sell his Ferrari outright, Mr. Stephens now wanted to trade it in as part of the Huracan purchase.

When Mr. Stephens returned, Mr. Martin had the paperwork prepared and the racing stripe removed. Mr. Stephens executed a purchase agreement that priced the Huracan at $250,000 and included a $230,000 trade credit for the Ferrari. As a result of the trade credit, Mr. Stephens would avoid paying over $10,000 in sales tax. He owed a balance of $22,337.88 and received confirmation that his bank would send the funds to Karma the following week. Mr. Stephens' bank had financed the Ferrari. The bank agreed to release its lien on the Ferrari and take a lien on the Huracan. Mr. Stephens also signed an odometer disclosure and

a power of attorney authorizing the dealership to transfer title to the Ferrari on his behalf. Consistent with the trade, Karma transferred title to itself that same day. The documents and the actions of Karma and Mr. Stephens were consistent with the customary process for trading in a vehicle.

After Mr. Stephens signed these documents, he learned that the principal of Karma, Mr. Zankl, was not comfortable with the proposed transaction. Mr. Martin directed Mr. Stephens to call Mr. Zankl directly to discuss the deal. Mr. Zankl was willing to assign a credit of $230,000 for the Ferrari only because Mr. Martin had a potential sale of that vehicle lined up for the following week. Karma was experiencing cash flow problems. Mr. Zankl was concerned that if the Ferrari did not sell the following week, Karma would risk having overpaid for the Ferrari. Mr. Zankl offered Mr. Stephens two options. Mr. Stephens could wait until the Ferrari sold and then take home the Huracan. Or Mr. Stephens could pay $250,000, drive off that night in the Huracan, and Karma would agree to repay the $250,000 when the Ferrari sold. This would shift to Mr. Stephens the risk of the Ferrari not selling. Mr. Stephens wanted the Huracan and wrote a $250,000 check out of his business account. Mr. Stephens had a new toy in time for the weekend. Karma deposited the check.

If this was the entire history of the transaction, the Court's work would be done. But there is a twist. After Mr. Stephens reached agreement with Mr. Zankl and tendered the $250,000 check, Mr. Martin presented Mr. Stephens with a consignment agreement for the Ferrari. Mr. Martin did so without the knowledge or direction of Mr. Zankl. Mr. Martin, concerned that Mr. Stephens was essentially paying twice for the Huracan, attempted to provide Mr. Stephens some protection. The consignment agreement provided that Mr. Stephens retained title to the Ferrari and agreed to accept $230,000 for it once Karma found a buyer. Mr. Stephens signed, and Mr. Martin signed allegedly on behalf of Karma. The

consignment agreement conflicts with the agreement Mr. Stephens negotiated directly with Karma's principal, Mr. Zankl.

Mr. Martin did not have authority to sign the consignment agreement on behalf of Karma. Mr. Martin testified he had authority to sign only consignment agreements and no other auto transaction documents. Mr. Zankl testified that Mr. Martin lacked authority to sign any documents on behalf of Karma. The Court found Mr. Zankl credible on this issue. Mr. Martin apparently intended to protect Mr. Stephens from his own employer. Good intentions do not create corporate authority.

Mr. Stephens knew or should have known Mr. Martin lacked authority to sign the consignment agreement. Of all the transaction documents in evidence, only the consignment agreement bears Mr. Martin's signature. More importantly, the consignment agreement directly contradicts the agreement that Mr. Stephens reached with Mr. Zankl, Karma's principal. Mr. Zankl never discussed a consignment with Mr. Stephens. Even if Mr. Martin had general authority to sign some consignment agreements on behalf of Karma, he did not have authority to sign one in this instance, changing the agreement made directly with Karma's principal.

Mr. Stephens testified that he called his bank the next business day, a Monday, to tell them the deal had changed and to cancel the transfer of funds to Karma. He testified he could not reach his loan officer and left a voicemail. The Court did not find Mr. Stephens' testimony credible on this point. The bank made the transfer to Karma as originally requested, consistent with the transaction Mr. Stephens negotiated with Mr. Zankl.

The following week, the Ferrari failed to sell.

Mr. Stephens later received an email from Mr. Martin containing the Ferrari inspection report ordered in connection with the failed sale. Mr. Martin testified he would only send an inspection report to Mr. Stephens if Mr. Stephens still owned the car. If Mr.

Stephens had traded the car, Mr. Martin testified he would not have sent the report. The Court did not find this explanation credible. The inspection misstated the Ferrari's service history. Mr. Martin sent the inspection to the person most familiar with the Ferrari's history, the prior owner. Mr. Stephens also had an ongoing interest in the vehicle's condition as Karma's repayment of the $250,000 depended on the sale of the Ferrari. Mr. Zankl testified that Karma would send its trade customer inspection reports on trade-ins if Karma had not had a chance to complete an inspection before accepting the trade. If the inspection came back unsatisfactory, Karma would charge the customer for any newly discovered issues. This provides another explanation for why Mr. Stephens received a report on a vehicle he no longer owned.

At the end of March, Mr. Stephens learned from Mr. Martin that Karma had a potential buyer for the Ferrari. However, that deal never materialized.

On April 1, Ms. Zankl contacted Moshe Farache, the Debtor's principal. The Zankls' businesses owed the Debtor millions of dollars. The Zankl's businesses were collapsing. Ms. Zankl told Mr. Farache she did not want him to suffer on account of Mr. Zankl's fraud. Ms. Zankl agreed to transfer all Karma vehicles to the Debtor to protect Mr. Farache. Mr. Farache had also received a tip from his personal lawyer that federal agents planned to raid Karma, which never occurred.

On April 2, knowing that Mr. Stephens had not been repaid the $250,000, Mr. Martin told Mr. Stephens to pick up "his" car. Mr. Stephens was in Texas and sent two of his friends to take the Ferrari. When those friends arrived at Karma, nobody could find the keys.

Also on April 2, Mr. Farache went to Karma and executed paperwork transferring various titles to the Debtor, including title to the Ferrari. Karma transferred the Ferrari to the Debtor in partial satisfaction of existing debt. Mr. Farache made plans to return on Monday, April 4, to transport the cars to the Debtor's storage. Mr. Martin testified that he

protested the transfer of the Ferrari title because, in his view, that car still belonged to Mr. Stephens. Again, Mr. Martin tried to protect Mr. Stephens, but Mr. Stephens had already given up the Ferrari.

Mr. Farache returned to Karma the morning of Monday, April 4. Mr. Farache testified that Mr. Martin told him to move the Ferrari quickly because Mr. Stephens thought he still owned it. Mr. Farache moved his own car in front of the Ferrari, to block it in, just before Mr. Stephens arrived.

Chaos greeted Mr. Stephens at Karma. Mr. Farache had already removed many cars. Karma's employees huddled outside not knowing what to do. Mr. Stephens jumped into the Ferrari and attempted to drive it away, but he could not leave as Mr. Farache's car blocked the way. Mr. Farache claimed the Debtor owned the Ferrari. Mr. Stephens refused to exit the vehicle.

Mr. Stephens spent most of the day in the Ferrari. He began texting Mr. Zankl to try to resolve the situation. Mr. Stephens told Mr. Zankl he wanted either to be repaid the $250,000 or to take the Ferrari. Mr. Stephens preferred the money but, at that point, was willing to take whatever he could get. Mr. Farache offered to let Mr. Stephens have the Ferrari if Karma could replace it with a vehicle of equivalent value. But Karma had nothing left.

Mr. Stephens asked Mr. Zankl for $250,000. Mr. Zankl responded that he did not have $250,000. Mr. Zankl offered to wire the money in the next few days and to give Mr. Stephens a postdated check as security. Mr. Stephens accepted, a Karma employee delivered the check, and Mr. Stephens let the Debtor take the Ferrari. Predictably, Karma never wired $250,000 to Mr. Stephens. Mr. Zankl told Mr. Stephens the check would not clear. Mr. Stephens attempted to negotiate the check, which bounced.

Karma endorsed the Ferrari's title to the Debtor on April 2, and the Debtor received a certificate of title on April 6. The Debtor currently stores, insures, and maintains the Ferrari. Karma never repaid the $250,000 to Mr. Stephens.

### Arguments Presented and Applicable Law

Mr. Stephens argues that the consignment agreement replaced the trade-in provision of the purchase agreement, Mr. Stephens retained title to the Ferrari, and, therefore, Karma could not transfer ownership to the Debtor. The Debtor and FVP both argue that Mr. Stephens relinquished title to the Ferrari but disagree over the existence and extent of the Debtor's interest in the vehicle.

The Uniform Commercial Code, as enacted in Florida, applies to transactions for the sale of goods. Both the Huracan purchase and the transaction between the Debtor and Karma are transactions for the sale of goods. If Mr. Stephens delivered the Ferrari on consignment, that transaction does not involve a sale of goods and either Florida common law or the consignment provisions of Article 9 would govern. Florida common law also determines whether Mr. Martin had authority to sign the consignment agreement.

The parties raised the following points of law in argument and briefing, most of which do not apply.

### Florida Statutes § 672.403(1)

Florida Statutes § 672.403(1) provides that "A purchaser of goods acquires all title which her or his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased."

### Florida Common Law Consignments

Under Florida common law, a purchaser of consigned goods acquires good title against the consignor. *Glass v. Continental Guar. Corp.*, 88 So. 876, 879 (Fla. 1921). A buyer takes good title even if the terms of the sale violate the consignment agreement so long as the

purchaser "pays value for such goods and gets possession thereof without notice of the terms or conditions of the original delivery, consignment, or sale." *Id.* Knowledge of the existence of a consignment does not defeat the buyer's title. The buyer must have notice of the actual terms of that agreement. However, the consignee's creditors lack similar protection. *See, Nash Miami Motors v. Bandel*, 37 So. 2d 366, 368 (Fla. 1948). Persons seeking to take a security interest have the duty to investigate whether the person in possession has the authority to encumber the collateral. *Id.*

Mr. Stephens argues the Debtor could not have obtained an enforceable security interest in the Ferrari. This misconstrues the Debtor's position. The Debtor has not claimed that it had a security interest in the Ferrari and exercised self-help to seize collateral. The Debtor claims to have acquired the Ferrari in partial satisfaction of an existing debt.

**Agency and Authority**

Agents may bind principals where either actual or apparent authority exists. An agent has actual authority when two parties create an agency relationship where the principal and agent agree that the agent will act for the principal under the principal's control. *Fernandez v. Florida Nat'l Coll., Inc.*, 925 So. 2d 1096, 1101 (Fla. 3d DCA 2006) (quoting *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n. 5 (Fla. 1990)).

If two parties have not entered an agency relationship, a purported agent has apparent authority to bind the principal where a third person acts in reliance on a principal's representations that the agency exists. *Stiles v. Gordon Land Co.*, 44 So. 2d 417, 421-22 (Fla. 1950). The analysis focuses on whether the "*principal* creates the appearance of an agency relationship." *Izquierdo v. Hialeah Hosp. Inc.*, 709 So. 2d 187, 188 (FLA. 3d DCA 1998) (quoting *Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.a.*, 483 So. 2d 775, 777 (Fla. 3d DACA 1986) (emphasis in original)). Only reasonable reliance supports a

claim for apparent authority. *All Seasons Condo. Ass'n, Inc. v. Patrician Hotel, LLC*, 274 So. 3d 438, 449-450 (Fla. 3d DCA 2019). Apparent authority also extends to that authority a principal "knowingly tolerates or permits" an agent to assume. *Roessler v. Novak*, 858 So. 2d 1158, 1161 (Fla. 2d DCA 2003).

**Entrustment Doctrine**

Florida Statutes § 672.403(2) provides that "entrusting of possession of goods to a merchant who deals in goods of that kind gives the merchant power to transfer all rights of the entruster to a buyer in ordinary course of business." Entrustment occurs when an owner of goods voluntarily delivers the goods and assents to their continued possession. *Carlsen v. Rivera*, 382 So. 2d 825, 826 (Fla. 4th DCA 1980). This includes goods delivered on consignment. *See Correria v. Orlando Bank & Tr. Co.*, 235 So.2d 20, 22 (Fla. 4th DCA 1970). A merchant is a "person who deals in goods of the kind." Fla. Stat. § 672.104(1).

A person qualifies as a buyer in the ordinary course of business if that person "buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, from a person, other than a pawnbroker, in the business of selling goods of that kind." Fla. Stat. § 671.201(9). The sale must follow the seller's normal practices. *Id.* A person cannot qualify as a buyer in the ordinary course if that person acquires goods in satisfaction of debt. *Id.*

Karma qualifies as a merchant who dealt in goods of the same kind as the Ferrari. Karma's entire business consisted of buying and selling luxury vehicles. However, based on the evidence before the Court, the Debtor acquired the Ferrari in partial satisfaction of an existing debt. A buyer in the ordinary course of business cannot acquire goods in "partial satisfaction of a money debt." The Debtor does not qualify as a buyer in the ordinary course of business and cannot claim the benefits of § 672.403(2).

**Article 9 Consignments**

An Article 9 consignment occurs when a person delivers goods for the purpose of sale to a non-auctioneer merchant not generally known to sell the goods of others. Fla. Stat. § 679.1021(1)(t). The goods cannot be consumer goods immediately prior to delivery. *Id.* Consumer goods are those "used or bought for use primarily for personal, family, or household purposes." Fla. Stat. § 679.1021(1)(x). The consignor in an Article 9 consignment holds a purchase money security interest in inventory of the consignee. Fla. Stat. § 679.1031(4). As to creditors of and purchasers for value from a consignee, the consignee has the same rights and title as the consignor. Fla. Stat. § 679.319.

Mr. Stephens drove the Ferrari as his personal vehicle. The Ferrari constituted consumer goods immediately prior to delivery to Karma. If Mr. Stephens delivered the Ferrari for the purpose of sale and retained title, that transaction would not constitute an Article 9 consignment. The Debtor argues Mr. Stephens produced no evidence that he held the Ferrari for personal, family, or household purposes. To the contrary, Mr. Stephens testified he drove the Ferrari as his personal vehicle when he visited South Florida. The evidence points to only personal use.

**Sale or Return**

Florida Statutes § 672.326 determines a creditor's ability to reach goods where the buyer has the right to return conforming goods to the seller. In a sale or return transaction, goods are delivered primarily for resale and are subject to a creditor's claims while the buyer has possession. *Id.* While Karma acquired the Ferrari for resale, Karma had no right to return the Ferrari to Mr. Stephens. If Mr. Stephens delivered the Ferrari on consignment, then Karma did not purchase the Ferrari. No party alleges Karma had a right to return the

Ferrari. Thus, no theory of the transaction involves a sale with a right of return, and § 672.326 does not apply.

## Conclusions of Law

If the Court determines Mr. Stephens traded the Ferrari, then Mr. Stephens gave up his rights in the Ferrari and the analysis ends. If Mr. Stephens consigned the Ferrari, the Court must then determine whether the Debtor nevertheless obtained good title under Florida statutory and common law. Whether the parties entered a consignment relationship turns on whether Mr. Martin had authority to alter the agreement between Mr. Stephens and Mr. Zankl and to bind Karma to the consignment agreement.

Mr. Martin did not have actual authority to sign the consignment agreement. While he testified that he had authority to sign consignment agreements and nothing else, Mr. Zankl credibly testified that Karma's salespersons did not have authority to bring in vehicles on consignment.

Mr. Stephens claims Mr. Martin had apparent authority. However, Mr. Zankl did not represent in any way that Mr. Martin could bind Karma to consignments. Mr. Martin did not sign any transaction documents other than the consignment agreement. The consignment agreement contradicts the agreement Mr. Stephens negotiated directly with Karma's principal, Mr. Zankl. Under the circumstances of this case, no reasonable person would believe Mr. Martin had authority to sign the consignment agreement.

Mr. Stephens made a deal with Mr. Zankl. Mr. Stephens agreed to pay $250,000 to drive away in the Huracan that evening and relieve Karma from the risk of getting stuck with the Ferrari at an inflated trade value. Mr. Stephens transferred all title and interest he had in the Ferrari, retaining only the claim to be repaid the $250,000. He cannot now complain that he never gave up the Ferrari in the first instance.

The Court finds that Mr. Stephens has no right or interest in the Ferrari. The Court makes no finding with regard to Mr. Stephens' claims against any other person or entity. Other than Mr. Stephens, the Court makes no finding regarding the existence or extent of any party's interest in the Ferrari.

### Order

For the foregoing reasons, it is ORDERED and ADJUDGED that the Motion [ECF No. 114] is DENIED.

###

Copy to:

C. Cory Mauro, Esq.

*C. Cory Mauro, Esq. is directed to serve a copy of this order on all appropriate parties and shall file a certificate of service with the Court.*