# EXHIBIT 3

**Exhibit 3**

Case 22-15627-EPK    Doc 390-3    Filed 02/31/23    Page 2 of 66
FVP TR EX  004013

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO.

AUTO WHOLESALE OF BOCA, LLC
a Florida limited liability company, MMS
ULTIMATE SERVICES, INC., a Florida
corporation and MOSHE FARACHE, an individual,

     Plaintiffs,

vs.

EXCELL AUTO GROUP, Inc. a Florida
corporation, KARMA OF PALM BEACH, INC.
d/b/a KARMA PALM BEACH, a Florida corporation,
SCOTT ZANKL, an individual and
KRISTEN ZANKL, an individual,

     Defendants.

                              /

## VERIFIED COMPLAINT FOR DAMAGES FOR BREACH OF NOTE AND SECURITY AGREEMENT, REPLEVIN, FORECLOSURE OF SECURITY INTEREST AND APPOINTMENT OF A RECEIVER

Plaintiffs, Auto Wholesale of Boca, LLC. ("AWB"), MMS Ultimate Services, Inc. ("MMS") and Moshe Farache ("Farache"), by and through its undersigned counsel, sues the Defendants, Excel Auto Group, Inc., ("EAG"), Karma of Palm Beach, Inc. ("KPB"), Scott Zankl ("SZ") and Kristen Zankl ("KZ"), and states as follows:

### Jurisdiction Venue and Parties

1. This is an action for damages for breach of note and security agreement, replevin, foreclosure of a security interest, and appointment of a receiver.

2. This action is for more than $30,000 and, as such, it is within this Honorable Court's general jurisdiction.

3. AWB is a Florida limited liability corporation with its principal place of business in Boca Raton, Florida. AWB is authorized to do and is doing business in Palm Beach County, Florida.

FVP TR EX  004014

4. MMS is a Florida corporation with its principal place of business in Boca Raton, Florida. MMS is authorized to do and is doing business in Palm Beach County, Florida.

5. Farache is a resident of Palm Beach County, Florida, is over the age of eighteen (18) and is otherwise sui juris.

6. EAG is a Florida corporation with its principal place of business in Boca Raton, Florida. Excel is authorized to do and is doing business in Palm Beach County, Florida.

7. Karma is a Florida corporation with its principal place of business in Boca Raton, Florida. Karma is authorized to do and is doing business in Palm Beach County, Florida.

8. SZ is a resident of Palm Beach County, Florida, is over the age of eighteen (18) and is otherwise sui juris.

9. KZ is a resident of Palm Beach County, Florida, is over the age of eighteen (18) and is otherwise sui juris.

10. Venue is proper in Palm Beach County, Florida because the property that is the subject to this action is located in Palm Beach County, Florida, the note and security agreement was breached in Palm Beach County, Florida, and EAG and AWB/MMS/Farache's customary place of business is in Palm Beach County, Florida.

## General Allegations

### The Demand Promissory Notes and Loan and Security Agreements

11.    EAG operates a used car dealership, per section 320.27(1)(c)(2), Fla. Stat.

12.    KPB operates a new and used car dealership, per section 320.27(1)(c)(1), Fla. Stat.

13.    On or about November 5, 2017, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to AWB a Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $2,500,000. ("Financed Inventory").

FVP TR EX  004015

14.     On or about November 11, 2021, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to AWB an Amended Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $2,500,000. ("Financed Inventory"). This amended the Secured Promissory Note referenced in paragraph 13 above. The Amended Secured Promissory Note was personally guaranteed by SZ and KZ. The Secured Promissory Note, the Amended Security Promissory Note, the Security Agreement and Unconditional Guaranty are herein referenced as ("Promissory Note 1") and attached hereto as Composite Exhibit "A".

15.     On or about July 7, 2021, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to MMS and Farache, a Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $1,080,000. ("Financed Inventory"). The Secured Promissory Note was personally guaranteed by SZ and KZ. The Secured Promissory Note, the Security Agreement and Unconditional Guaranty are herein referenced as ("Promissory Note 2") and attached hereto as Composite Exhibit "B".

16.     On or about November 11, 2021, EAG, by and through its president, Kristen Zankl ("KZ"), executed and delivered to AWB a Secured Promissory Note agreement for the financing of vehicle inventory in the amount of $2,664,450. ("Financed Inventory"). The Secured Promissory Note was personally guaranteed by SZ and KZ. The Secured Promissory Note, the Security Agreement and Unconditional Guaranty are herein referenced as ("Promissory Note 3") and attached hereto as Composite Exhibit "C".

17.     Pursuant to Exhibits A, and C, AWB advanced funds to EAG, to be used for the purchase of motor vehicle inventory. Exhibits A and C are guaranteed by SZ, KZ and KPB.

FVP TR EX 004016

18. Pursuant to Exhibit B, MMS and Farache advanced funds to EAG, to be used for the purchase of motor vehicle inventory. Exhibit B is guaranteed by SZ and KZ.

19. To secure the payment of all Financed Inventory owing by EAG under the three (3) Notes, EAG granted a security interest to AWB, MMS and Farache in, all, right, title, and interest in the following:

(a) all of Debtor's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles (also including "Locate Vehicles"), vehicle parts or inventory now owned or hereafter acquired, including, without limitation: all accounts and accounts receivable, general intangibles, chattel paper whether tangible or electronic, together with all attachments, accessions, and equipment now or hereafter affixed thereto or used in connection therewith, all substitutions and replacements thereof and any products and proceeds thereof pertaining to Excel Auto Leasing, Inc.

20. The personal property collateral in which AWB, MMS and Farache have a perfected first priority security interest and which is the subject of this action consist of, the report attached hereto and incorporated herein as Exhibit "D", and any other proceeds arising therefrom.

21. AWB and FARACHE have a first position security interest and lien on the inventory evidenced by its possession of the Titles to the Units, that certain UCC-I Financing Statement Number 202107709869 filed July 13, 2021. A true and correct copy of the Financing Statement is attached hereto as Exhibit "E" and incorporated herein.

22. Pursuant to the Promissory Notes 1-3, EAG represented, covenanted and agreed.

   a. *Debtor shall at all times maintain its records as to the Collateral at its chief place of business at the address referred to hereinabove. Debtor further covenants that, except for Collateral delivered to Secured Party or an agent for Secured Party, Debtor will not store, use or locate any of the Collateral at any place other than as listed in the Agreement.*

   b. *Debtor currently uses, and during the last five years has used, no business or trade names, except as set forth herein. Debtor shall promptly notify Secured Party, in*

FVP TR EX  004017

*sufficient detail, of any changes in, additions to, or deletions from the business or trade names used by Debtor for billing purposes.*

*c.     The Collateral is now and will be used in Debtor's business and not for personal, family, household or family use.*

*d.     Debtor has paid and will continue to pay or otherwise provide for the payment when due, of all taxes, assessments or contributions required by law which have been or may be assessed or levied against Debtor, whether with respect to any of the Collateral, to any wages or salaries paid by Debtor, or otherwise, and will deliver satisfactory proof of such payment to Secured Party on demand. In the event the Debtor shall fail to pay any such tax, assessment, levy or governmental charge or to discharge any such lien or contest the same in good faith, then the Secured Party, without waiving or releasing any obligation or default of the Debtor hereunder, may at any time or times hereafter, but shall be under no obligation to do so, upon prior written notice to Debtor, make such payment, settlement, compromise or release or cause to be released any such lien, and take any other action with respect thereto which the Secured Party deems advisable. All sums paid by the Secured Party in satisfaction of, or on account of any tax, levy or assessment or governmental charge, or to discharge or release any lien and any expenses, including reasonable attorneys' fees, court costs and other charges relating thereto, shall become a part of the Liabilities secured by the Collateral, payable on demand.*

*e.     The grant of the security interest in the Collateral is effective to vest in Secured Party a valid priority security interest, superior to the rights of any person in and to the Collateral as set forth herein, except to the extent following: None.*

## Perfection of Security Interest.

*Debtor shall to the extent necessary execute all such financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law, including the Federal Assignment of Claims Act and any state motor vehicles registration statute, as Secured Party may require, each in form satisfactory to Secured Party. Debtor also shall pay all filing or recording costs with respect thereto, and all costs of filing or recording this Security Agreement or any other agreement or document executed and delivered pursuant hereto or to the Obligations (including the cost of all federal, state or local mortgage, documentary, stamp or other taxes), in each case, in all public offices where filing or recording is deemed by Secured Party to be necessary or desirable. Debtor authorizes Secured Party to (i) file any Uniform Commercial Code financing statements or amendments thereto without the signature of Debtor or by signing of Debtor's name to any such financing statements as its attorney-in-fact, (ii) file a photographic or other reproduction of this Security Agreement as a financing statement, (iii) file notices of assignment pursuant to the Federal Assignment of Claims Act, (iv) file applications for certificates of title or (v) take all other action which Secured Party may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this*

FVP TR EX  004018

*Security Agreement.*

## General Covenants.

*Debtor shall:*

(a)    furnish Secured Party from time to time, at Secured Party's request, written statements and schedules further identifying and describing the Collateral in such detail as Secured Party may reasonably require;

(b)    advise Secured Party promptly, in sufficient detail, of any substantial change in the Collateral or of the occurrence of any event which would affect the value of the Collateral or Secured Party's security interest therein;

(c)    comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official applicable to Debtor or any Collateral or to the operation of Debtor's business except where the failure to comply (i) is non-material and (ii) has no effect on the value of the Collateral or on the ability of Secured Party to exercise its rights and remedies hereunder;

(d)    perform and observe all covenants, restrictions and conditions contained in any agreement or document executed in connection with the Obligations as though the same were fully set forth in this Security Agreement;

(e)    promptly execute and deliver to Secured Party such further agreements or other instruments and take such further action from time to time as Secured Party may deem necessary to perfect, protect or enforce its security interests in the Collateral or otherwise to effect the intent of this Security Agreement;

(f)    keep or cause to be kept the Collateral in good working order and marketable condition, ordinary wear and tear excepted;

(g)    insure the Collateral against loss or damage by fire or other hazards, and extended coverage, theft, burglary, bodily injury and such other risks, with such companies and in such amounts, as is required by Secured Party at any time;

(h)    use the Collateral for lawful purposes only in conformity with all laws, rules and regulations;

(i)    allow Secured Party and its agents, at all reasonable times and for reasonable durations, to inspect any of the Collateral and to examine and make extracts from Debtor's books and records relating to the Collateral; and

(i)    not assign, sell, mortgage, lease, transfer, pledge,  grant a security interest in or lien upon, encumber or otherwise dispose of or abandon, any part or all of the Collateral, without the express prior written consent of Secured Party, except for the sale from time to

FVP TR EX  004019

time in the ordinary course of business of Debtor of such items of Collateral as may constitute part of the business inventory of Debtor.

23.     Pursuant to the Promissory Notes 1-3, the events of default are:

The occurrence of any one or more of the following events shall constitute an event of default ("Event of Default") by Debtor under this Security Agreement:

(j)   a "Default" or "Event of Default" shall occur under the terms of the Note or any other agreement giving rise to or executed in connection with the Obligations;

(k)   if at any time Secured Party shall, in its reasonable discretion, consider the Obligations unsecured or any part of the Collateral unsafe, insecure or insufficient, and Debtor shall not on demand furnish other collateral or make payment on account, reasonably satisfactory to Secured Party;

(l)   if Debtor or any obligor, guarantor of, or any party to any of the Obligations or the Collateral (the same, including Debtor, being collectively referred to herein as "Debtors") shall default in the punctual payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of any of the Obligations or of this Security Agreement or any other agreement between any Debtor and Secured Party;

(m)  if any warranty or representation made to Secured Party by or on behalf of any Debtor is false or misleading in any material respect;

(n)   in the event of loss, theft, substantial damage to or destruction of any portion of the Collateral deemed material by Secured Party, or the making or filing of any lien, levy, or execution on, or seizure, attachment or garnishment of, any of the Collateral;

(o)   if any of the Debtors being a natural person or any general partner or member of an Debtor which is a partnership or a limited liability company, shall die or (being a partnership, limited liability company or corporation) shall be dissolved, or if any of the Debtors (if an entity) shall fail to maintain its existence in good standing;

(p)   if any of the Debtors shall become insolvent or make an assignment for the benefit of creditors, or make or send notice of an intended bulk transfer, or if there shall be convened a meeting of the creditors or principal creditors of any of the Debtors or if a committee of creditors is appointed for any of them;

(q)   if there shall be filed by or against any of the Debtors any petition for any relief under the bankruptcy laws of the United States now or hereafter in effect or under any insolvency, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity);

(i)   if the usual business of any of the Debtors shall be terminated or suspended;

(j)   if any proceedings, procedure or remedy supplementary to or in enforcement of judgment shall be commenced against, or with respect to any property of: any of the Debtors;

(k)   if any petition or application to any court or tribunal, at law or in equity, be filed by or against any of the Debtors for the appointment of any receiver or trustee for any of the Debtors or any part of the property of any of them;

(l)   if there occur the sale, lease, transfer, assignment, encumbrance (except by purchase money liens on property acquired after the date of the Note) or other disposition of any of the Collateral to a third party, except in the ordinary course of business, without the prior

FVP TR EX  004020

Complaint
Page **8** of **30**

written consent of the Secured Party; or

(m) if there is a change of the ownership structure or interests of the Debtor during the term of the loan evidenced by the Note without the prior written consent of the Secured Party.

(n)  Uses the security, including but not limited to, any vehicles purchased with Secured Party's funds as collateral to take a loan or for any other purpose;

(o)  Breaches any obligation under the lease agreements with 1001 Clint Moore, LLC with respect to the premises located at 1001 Clint Moore Rd., Suite 101-103, Boca Raton, FL 33487;

(p) Fails to assign and provide the title to Auto Wholesale of Boca, LLC for any and all vehicles purchased with Lender's funds, and/or fails to provide the bill of sale pertaining to any such vehicles.

24.     Pursuant to the Promissory Notes 1-3, the rights and remedies of default are:

a.     In the event of the occurrence and continuance of any Event of Default, Secured Party shall  at  any time thereafter  have the right,  with or without  (to the extent permitted by applicable law) notice to Debtor, as to any or all of the Collateral, by any available judicial procedure or without judicial process, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral, and generally to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, Debtor agrees that Secured Party shall have the right to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation' or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions, all as Secured Party in its sole discretion may deem advisable, and Secured Party shall have the right to purchase at any such sale; and, if any Collateral  shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, Secured Party shall have the right, at its sole option and discretion, and at Debtor's sole cost and expense, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Collateral in such saleable or disposable form as it shall deem appropriate. At Secured Party's request after any Event of Default, Debtor shall assemble the Collateral and make it available to Secured Party at places which Secured Party shall select, whether at Debtor's premises or elsewhere, and make available to Secured Party, without rent, all of Debtor's premises and facilities for the purpose of Secured Party's taking possession of, removing or putting the Collateral in saleable or disposable form. If any of the Collateral consists of motor vehicles, Secured Patty may use Debtor's license plates, in any lawful manner.

b.     Any such sale, lease or other disposition of Collateral may be made without demand for performance or any notice of advertisement whatsoever except that where an applicable statute requires reasonable notice of sale or other disposition, Debtor agrees that the sending of five days' notice by ordinary mail, postage prepaid, to Debtor of the place and time of any public sale or of the time at which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof Notwithstanding the foregoing. if any of the Collateral is perishable and may be materially diminished in value during such five day period,

FVP TR EX  004021

*Secured Party shall provide Debtor with such sh01ter notice as it deems reasonable under the circumstances.*

    c.     *The proceeds of any such sale, lease or other disposition of the Collateral shall be applied first to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like, and to the reasonable attorneys' fees and legal expenses incurred by Secured Party, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which Secured Party shall account to Debtor for any surplus proceeds. If, upon the sale, lease or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor will be liable for the deficiency, together with interest thereon, at the rate prescribed in the agreements giving rise to the Obligations, and the reasonable fees of any attorneys employed by Secured Party to collect such deficiency. To the extent permitted by applicable law, Debtor waives all claims, damages and demands against Secured Party arising out of the repossession, removal, retention or sale of the Collateral, except to the extent same is caused by the gross negligence or willful misconduct of Secured Party, its agents or employees.*

25.     Pursuant to the Promissory Notes 1-3, *Any and all fees, costs and expenses, of whatever kind or nature, including the reasonable attorneys' fees and legal expenses incurred by Secured Party, in connection with the filing or recording of financing statements and other documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, insurance premiums, encumbrances or otherwise protecting, maintaining or preserving the Collateral arid Secured Party's security interest therein, or in defending or prosecuting any actions or proceedings arising out of or related to the transaction to which this Security Agreement relates, shall be paid by Debtor on demand. Until so paid, all such amounts shall be added to the principal amount of the Obligations and shall bear interest at the rate prescribed in the agreements giving rise to the Obligations.*

26.     AWB is the legal and equitable holder and owner of Promissory Note 1 and 3, including the original Note, and has the right to enforce the same.

27.     MMS and Farache are the legal and equitable holders and owners of Promissory Note 2, including the original Note, and has the right to enforce the same.

28.     Regarding Promissory Notes 1 and 4, SZ, KZ and KPB are the unconditional guarantors.

29.     Regarding Promissory Note 3, SZ and KZ are the unconditional guarantors.

### Short Term Loan

30. In addition to money lent pursuant to Promissory Notes 1-3, EAG required money for the purchase of inventory at a time that Promissory Notes 1-3 were at their maximum and no further money was available to lend to EAG.

31. Despite this, AWB and MMS orally agreed to loan money to EAG for the purchase of inventory. EAG would provide a bill of sale to AWB, AWB would fund the purchase and EAG would provide title to the purchased car to AWB.

32. So as to protect their interest, AWB would have the title of vehicle placed in the name of AWB.

33. EAG has not repaid any money under the short term loan.

34. Do date, EAG owes AWB $1,564,000 and MMS a total of $800,000.

### The Default by EAG of all Promissory Notes and Short Term Loan

35. On or about November 2021, AWB, MMS and Farache learned that EAG had sold approximately $4,000,000 of the Financed Inventory vehicles to consumers and failed to pay AWB, MMS and Farache. This occurred while AWB held titles, in AWB's name, to the sold vehicles. Attached hereto as Exhibit "D", are a list of vehicles that are titled in the name of AWB that were sold by EAG, without receiving any payment by EAG. This is a violation of Promissory Notes 1-3.

36. In addition to selling Financed Vehicles without paying AWB, MMS and Farache, EAG, through its owners Scott Zankl and Kristen Zankl, committed fraud. By way of example, KPB leased a 2019 Lamborghini Aventador SVJ 63 Coupe, VIN ZHWUM6ZD5KLA08766 from Luxury Lease Company. KPB was to obtain title and assign the title to Luxury Lease Company. A copy of the title, assigning ownership to Luxury Lease Company is attached hereto as Exhibit "F".

FVP TR EX 004023

37.     When AWB, MMS and Farache confronted EAG, SZ and KZ, in an effort to reduce the monies owed by EAG, SZ and KZ, ***assigned the very same title to AWB***. A copy of the title, assigning ownership to AWB is attached hereto as Exhibit "G".

38.     EAG, through its owners, KZ and SZ, committed fraud by attempting to use the value of 2019 Lamborghini Aventador, that was owed by Luxury Lease Company, to reduce the debt owed to AWB, MMS and Farache.

39.     By way of another example of EAG, SZ and KZ fast and loose business dealings, EAG asked that AWB purchase a 2021 Lamborghini Urus, VIN ZPBUA1ZL1MLA12270 for EAG inventory. The vehicle was paid for by AWB and Title is in the name of AWB. AWB has learned that EAG has given possession of said vehicle to Mr. Edward Brown. EAG has not paid AWB, WWS or Farache for said vehicle. Mr. Brown refuses to return said vehicle to AWB, MMS or Farache, stating SZ and KZ owed him money and the vehicle was a form of payment. The vehicle is worth appoximately $435,000.

40.     When EAG sold units of AWB, MMS and Farache Financed Inventory without paying AWB, MMS and Farache for them, it sold the units "out of trust," meaning EAG sold these vehicles to consumers, but did not hold the funds generated from the sale of the units in trust for the sole benefit of AWB, MMS and Farache or remit the funds to AWB, MMS and Farache from the sale of these units.

41.     On information and belief, at least fifteen (15) Units of Financed Inventory, and possibly more, have been sold by EAG without providing the sales proceeds to AWB, MMS and Farache.

42.     Selling Financed Inventory out of trust constitutes an Event of Default pursuant to Section 5 of the Promissory Note, which identifies, inter alia, the following as events of default:

*Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:*

A. *Fails to do anything required by this Note and other Loan Documents;*

B. *Defaults on any other loan with Lender;*

C. *Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;*

D. *Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender;*

E. *Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender.*

43.     All amounts due under the Promissory Notes 1-3 are accelerated and due and owing by EAG to AWB, MMS and Farache.

44.     EAG's right to sell, lease, or otherwise dispose of the financed vehicles is and has been revoked.

45.     AWB, MMS and Farache retained Kurkin Forehand Brandes LLP and is obligated to pay them their reasonable fees and costs.

46.     All other conditions necessary to bring this action have been waived, satisfied, or have otherwise occurred.

## COUNT 1
### (Action on Promissory Note 1)

47.     EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

48.     This is an action for damages as a result of a breach of the terms of Promissory Note 1, as described above.

49.     AWB is the owner and holder of Promissory Note 1.

50.     As described in greater detail above, EAG has defaulted under the terms of Promissory Note 1 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due.

FVP TR EX  004025

51.       All amounts owed under Promissory Note 1 have been accelerated and are due and payable in full.

52.       As a result of the breach of Promissory Note 1, AWB has been damaged.

53.       Due to EAG's breach of the Note, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which EAG is obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 1, as amended, in the amount of $2,371,600.00, with interest accruing daily, for damages against EAG, for any amounts due under the Promissory Note 1, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT II
### (Action against Guarantors of Promissory Note 1)

54.       EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

55.       This is an action for damages as a result of a breach of the terms of the Unconditional Guaranty for Promissory Note 1, as described above.

56.       AWB is the owner and holder of Promissory Note 1.

57.       As described in greater detail above, EAG has defaulted under the terms of Promissory Note 1 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due. As a result of such default, SZ, KZ and KPB are responsible for the debts of EAG as it relates to Promissory Note 1.

FVP TR EX  004026

58.     All amounts owed under Promissory Note 1 have been accelerated and are due and payable in full.

59.     As a result of the breach of Promissory Note 1, AWB has been damaged.

60.     Due to EAG's breach of Promissory Note 1, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which SZ, KZ and KPB are obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 1, as amended, in the amount of $2,371,600.00, with interest accruing daily, for damages against SZ, KZ and KPB, for any amounts due under the Promissory Note 1, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT III
(Action on Promissory Note 2)

61.     MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

62.     This is an action for damages as a result of a breach of the terms of Promissory Note 2, as described above.

63.     MMS and Farache are the owners and holder of Promissory Note 2.

64.     As described in greater detail above, EAG has defaulted under the terms of Promissory Note 2 by, among other things, selling Financed Inventory out of trust and without payment to MMS and Farache, concealing sales to third parties to avoid payment obligations to MMS and Farache, and failing to make payment when due.

65.     All amounts owed under Promissory Note 2 have been accelerated and are due and payable in full.

FVP TR EX  004027

66.    As a result of the breach of the Note, MMS and Farache have been damaged.

67.    Due to EAG's breach of the Note, MMS and Farache will incur costs and expenses, which include but are not limited to attorneys' fees and costs which EAG is obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, MMS and Farache respectfully demands judgment in the amount owed to it under the Promissory Note 2, in the amount of $800,000.00, with interest accruing daily, for damages against EAG, for any amounts due under the Promissory Note 2, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT IV
### (Action against Guarantors of Promissory Note 2)

71. MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

72.    This is an action for damages as a result of a breach of the terms of the Unconditional Guaranty for Promissory Note 2, as described above.

73.    MMS and Farache are the owner and holder of Promissory Note 2.

74.    As described in greater detail above, EAG has defaulted under the terms of Promissory Note 2 by, among other things, selling Financed Inventory out of trust and without payment to MMS and Farache, concealing sales to third parties to avoid payment obligations to MMS and Farache, and failing to make payment when due. As a result of such default, SZ and KZ are responsible for the debts of EAG as it relates to Promissory Note 2.

75.    All amounts owed under Promissory Note 2 have been accelerated and are due and payable in full.

76.    As a result of the breach of Promissory Note 2, MMS and Farache have been damaged.

FVP TR EX 004028

77. Due to EAG's breach of Promissory Note 2, MMS and Farache will incur costs and expenses, which include but are not limited to attorneys' fees and costs which SZ and KZ are obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, MMS and Farache respectfully demands judgment in the amount owed to it under Promissory Note 2, in the amount of $800,000.00, with interest accruing daily, for damages against SZ and KZ, for any amounts due under the Promissory Note 2, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT V
(Action on Promissory Note 3)

78. EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

79. This is an action for damages as a result of a breach of the terms of Promissory Note 3, as described above.

80. AWB is the owner and holder of Promissory Note 3.

81. As described in greater detail above, EAG has defaulted under the terms of Promissory Note 3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due.

82. All amounts owed under Promissory Note 3 have been accelerated and are due and payable in full.

83. As a result of the breach of Promissory Note 3, AWB has been damaged.

FVP TR EX  004029

84.     Due to EAG's breach of Promissory Note 3, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which EAG is obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 3, in the amount of $2,015,450.00, with interest accruing daily, for damages against EAG, for any amounts due under the Promissory Note 3, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT VI
### (Action against Guarantors of Promissory Note 3)

85.     EAG re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

86.     This is an action for damages as a result of a breach of the terms of the Unconditional Guaranty for Promissory Note 4, as described above.

87.     AWB is the owner and holder of Promissory Note 3.

88.     As described in greater detail above, EAG has defaulted under the terms of Promissory Note 3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, concealing sales to third parties to avoid payment obligations to AWB, and failing to make payment when due. As a result of such default, SZ, KZ and KPB are responsible for the debts of EAG as it relates to Promissory Note 3.

89.     All amounts owed under Promissory Note 4 have been accelerated and are due and payable in full.

90.     As a result of the breach of Promissory Note 4, AWB has been damaged.

91.	Due to EAG's breach of Promissory Note 4, AWB will incur costs and expenses, which include but are not limited to attorneys' fees and costs which SZ, KZ and KPB are obligated to pay those amounts pursuant to the terms and conditions of the Note.

WHEREFORE, AWB respectfully demands judgment in the amount owed to it under Promissory Note 3, in the amount of $2,015,450.00, with interest accruing daily, for damages against SZ, KZ and KPB, for any amounts due under the Promissory Note 3, any compensatory, incidental and other damages, interests, costs, attorneys' fees, and any and all other relief this Court deems necessary, just and proper.

## COUNT VII
### (Fraud in the Inducement)

92.	AWB, MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

93.	This is an action for fraud in the inducement as to EAG, DZ, KZ, KPB.

94.	The actions of EAG, DZ, KZ, and KPB which include, but are not limited to, falsely stating that they would abide by Promissory Notes 1-3; that they would make timely payments; that they would pay AWB, MMS and Farache for vehicles sold by EAG; vehicles EAG, KZ, SZ and KPB pledged to AWB, MMS and Farache, to pay down the debt EAG owed and KZ, SZ and KPB personally guaranteed would not be encumbered; and they would not operate out of trust, were false statements of material facts.

95.	KPB, EAG, SZ and KZ knew or should have know that such statements were false.

96.	KPB, EAG, SZ and KZ made such statements to induce reliance upon AWB, MMS and Farache, so as to avoid AWB, MMS and Farache from declaring EAG's Promissory Notes (that KPB, SZ and KZ guaranty) in default.

97.    AWB, MMS and Farache justifiably relied upon EAG, KPB SZ and KZ false statements to their detriment.

WHEREFORE, AWB, MMS and Farache respectfully demands judgment, with interest accruing daily, for damages in the amount of $7,145,050.00, against SZ, KZ, EAG and KPB, any compensatory, incidental and other damages, interests, costs, and any and all other relief this Court deems necessary, just and proper.

## COUNT VIII
(Replevin)

98.    AWB, MMS and Farache re-alleges and incorporates by reference the allegations in paragraphs I through 46 previously pled as if fully set forth herein.

99.    AWB, MMS and Farache sues EAG for replevin under Chapter 78, Florida Statutes.

100.    EAG came into possession of the Financed Inventory by using funds lent to it by AWB, MMS and Farache under the loans as evidenced by Promissory Notes 1-3, to purchase the units of the Financed Inventory.

101.    The Promissory Notes 1-3 provides AWB, MMS and Farache a security interest in the Financed Inventory and such interest is perfected.

102.    The Units of Financed Inventory are identified and described in detail in the report attached hereto and incorporated herein as Exhibit "G".

103.    As described in greater detail above, EAG has defaulted under the terms of Promissory Note 1-3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, MMS and Farache, concealing sales to third parties to avoid payment obligations to AWB, MMS and Farache, and failing to make payment when due.

FVP TR EX  004032

104.    Consequently, EAG is in material breach of Promissory Note 1-3, as amended.

105.    Demand has been made for turnover of the Financed Inventory.

106.    The Financed Inventory are being wrongfully detained.

107.    To the best of AWB, MMS and Farache's knowledge, information, and belief, the remaining Financed Inventory are presently located at EAG's principal place of business: 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487.

108.    As AWB, MMS and Farache has been unable to complete a lot audit and full review of any legitimate sales contracts, the value of the Financed Inventory which remain is unknown.

109.    EAG presently owes at least $9,062,737.83 in principal, interest and fees, plus attorneys' fees and costs to AWB, MMS and Farache under the Promissory Notes 1-3.

110.    AWB, MMS and Farache are entitled to possession of the Financed Inventory.

111.    AWB is the owner and holder of Promissory Note 1, and 3.

112.    MMS and Farache are the owners and holders of Promissory Note 2.

113.    The Promissory Notes 1-3 grants a first priority security interest in the Financed Inventory to AWB, MMS and Farache and AWB holds the Titles for the Financed Inventory. Consequently, AWB, MMS and Farache are entitled to possession of the Financed Inventory.

114.    The Financed Inventory have not been taken for a tax, assessment, or fine pursuant to the law.

115. The Financed Inventory have not been taken under an execution or attachment against the property of AWB, MMS or Farache.

116. The Financed Inventory are now in danger of destruction, concealment, waste, removal from the state, removal from the jurisdiction of the court, or transfer to an innocent purchaser during the pendency of this action.

WHEREFORE, AWB, MMS and Farache respectfully requests this Court enter judgment for possession of the Financed Inventory, together with interest, costs, attorneys' fees pursuant to the Promissory Notes 1-4, and any other relief the Court deems just and proper.

## COUNT IX
### (Foreclosure of Security Interest)

117. AWB, MMS and Farache re-alleges and incorporates by reference allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

118. This is an action to foreclose a security interest on property located in Palm Beach County, Florida.

119. AWB is the holder of the original Promissory Note 1 and 3, secured by the Financing Statement which is the subject of this action and is entitled to enforce the terms of the Note pursuant to Section 673.3011(1), Florida Statutes, by virtue of its physical possession of the Note.

120. MMS and Farache is the holder of the original Promissory Note 2, secured by the Financing Statement which is the subject of this action and is entitled to enforce the terms of the Note pursuant to Section 673.3011(1), Florida Statutes, by virtue of its physical possession of the Note.

121. EAG is the record owner of the subject Financed Inventory.

122. As described in greater detail above, EAG has defaulted under the terms of the Promissory Note 1-4 by, among other things, selling Financed Inventory out of trust and without

FVP TR EX  004034

payment to AWB, MMS and Farache, concealing sales to third parties to avoid payment obligations to AWB, MMS and Farache, and failing to make payment when due.

123.    EAG presently owes at least $9,062,737.83 in principal, interest and fees, plus attorneys' fees and costs to AWB, MMS and Farache, pursuant to the Promissory Note 1-3.

124.    EAG may claim an interest in the Financed Inventory by virtue of its ownership of the units of Financed Inventory, however, AWB, MMS and Farache's interest in the Financed Inventory is superior to that of EAG and EAG's interest is subordinate, junior, and inferior to AWB, MMS and Farache's interest.

WHEREFORE, AWB, MMS and Farache prays as follows:

a. This Court take jurisdiction of this cause, the subject matter and the parties hereto.

b. This Court ascertain and determine the sums of money due and payable to AWB, MMS and Farache from EAG and guarantors SZ, KZ and KPB, including without limitation principal, interest, advances, attorney's fees and costs pursuant to Promissory Notes 1-3, including the Note.

c. The sum of money found to be due be decreed by this Court to be a lien upon the

Financed Inventory described in the report.

d. Such lien be foreclosed in accordance with the rules and established practice of this Court, and upon failure of EAG and or guarantors, SZ, KZ or KPB to pay the amount of money found to be due by it to AWB, MMS and Farache, the said Financed Inventory be sold to satisfy said lien.

e. This Court decree that the lien of AWB, MMS and Farache is superior to any and all right, title or interest of EAG herein or any person or parties claiming by, through, or under it since the institution of this suit.

f. All right, title, or interest of EAG or any person claiming by, through or under it be forever barred and foreclosed.

g. This Court grant general relief in this cause as in its discretion might be just and proper including, but not limited to, a deficiency judgment, except where a discharge is applicable, if the proceeds of the sale are insufficient to pay AWB, MMS and Farache's claim.

## COUNT X
(Appointment of Receiver)

125. This is an action to appoint a Receiver for the Collateral.

126. AWB, MMS and Farache re-alleges and incorporates herein the allegations contained in Paragraphs 1 through 46 above.

127. As described in greater detail above, EAG has defaulted under the terms of Promissory Notes 1-3 by, among other things, selling Financed Inventory out of trust and without payment to AWB, MMS or Farache, concealing sales to third parties to avoid payment obligations to AWB, MMS or Farache, and failing to make payment when due.

128. Upon information and belief, the Financed Inventory are not being properly protected and thereof are not being held in trust for AWB, MMS or Farache.

129. EAG has caused the Financed Inventory to be sold out of trust in violation of the Promissory Notes 1-3 and is likely to continue to do so.

130. EAG may use the proceeds of those sales of Financed Inventory, which are to be held in trust for AWB, MMS or Farache, to fund business operations or pay the owners of the EAG or for other improper purposes, rather than remitting those funds to AWB, MMS or Farache.

131. In order to protect the Financed Inventory and the income derived therefrom, to reduce the debt due to AWB, MMS or Farache under the Promissory Notes 1-3, to protect, maintain, and preserve AWB, MMS or Farache 's collateral position, and to prevent the deterioration of the Financed

Inventory, it is necessary that a Receiver be appointed by the Court and that a Receiver be invested with such powers as the Court shall deem appropriate.

132.    Absent the appointment of a Receiver, AWB, MMS or Farache has no assurance of the continued protection and preservation of the Financed Inventory or any equity in said collateral.

133.    Moreover, absent the appointment of a Receiver, AWB, MMS or Farache may be without an adequate remedy at law.

WHEREFORE, AWB, MMS or Farache respectfully requests that this Honorable Court enter an order appointing a Receiver for the purpose of protecting and maintaining the Financed Inventory during the pendency of this action and providing as follows:

a.    Such Receiver be appointed during the pendency of this action, pending further order of this Court, and immediately take possession and charge of the Financed Inventory.

b.    Such Receiver be vested with all of the powers, rights and duties provided under applicable law and, among other things, the specific powers and rights to: (i) enter upon and take possession and control of any and all of the Financed Inventory; (ii) take and maintain possession of all documents, books, records, papers and accounts relating to the Financed Inventory; (iii) manage and protect the Financed Inventory; (iv) preserve and maintain the Financed Inventory; (v) make repairs and alterations to the Financed Inventory; (vi) undertake any repairs to the Financed Inventory, with such changes, additions or modifications of the Financed Inventory as AWB, MMS and Farache may in its sole discretion deem appropriate or desirable; (vii) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as AWB, MMS and Farache may in its sole discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted; (viii) enter into leases or other agreements, under such terms and conditions as AWB, MMS and Farache may in its sole discretion deem appropriate or desirable; (xi) collect and receive the revenues, income, profits, payments, or proceeds from the Financed Inventory; (x) repossess the Financed Inventory, as provided by law, for breaches of the conditions of their leases or other agreements; (xi) sue for unpaid revenues, income, profits, payments, or proceeds; (xii) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent; (xiii) compromise or give acquittance for rents, revenues, income, profits, payments, or proceeds that may become due; (xiv) apply the rents, revenues, income, profits, payments, and/or proceeds from sale generated or to be generated by the Financed Inventory, after payment of necessary operating expenses, taxes, insurance, and costs of receivership, to reduce the outstanding debt due under the Promissory Notes 1-3; (xv) undertake variances with respect to the Financed Inventory, and enter into any document in connection with the foregoing; (xvi) market the Financed Inventory, or individual units thereof, for sale and, with the authorization of AWB, MMS and Farache and this Court, sell the Financed Inventory, or individual units thereof, prior to the conclusion

of this lawsuit; and (xvii) do any lawful acts reasonably requested by AWB, MMS and Farache to protect its security interest in the Financed Inventory and the security hereof and use such measures, legal or equitable, reasonably requested by AWB, MMS and Farache to implement and effectuate the provisions of the Promissory Notes 1-3.

## COUNT XI
### (Unjust Enrichment)

134.    AWB, MMS and Farache re-alleges and incorporates by reference allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

135.    AWB, MMS and Farache have conferred a benefit on EAG, who has knowledge thereof.

136.    EAG voluntarily accepted and retained the benefit conferred.

137.    The circumstances are such that it would be inequitable for EAG to retain the benefit without paying the benefit without paying the value thereof to AWB, MMS and Farache.

WHEREFORE, AWB, MMS and Farache respectfully demands judgment, with interest accruing daily, for damages in the amount of $7,145,050.00, against EAG and KPB SZ, KZ (as guarantors), any compensatory, incidental and other damages, interests, costs, and any and all other relief this Court deems necessary, just and proper.

## COUNT XII
### (Conversion)

138.    AWB, MMS and Farache re-alleges and incorporates by reference allegations in paragraphs 1 through 46 previously pled as if fully set forth herein.

139.    AWB, MMS and Farache are owners or have the right to the property described in Exhibit "G".

140.    EAG's conversion by wrongful act inconsistent with the property rights of AWB, MMS and Farache.

141.    AWB, MMS and Farache have been damaged by EAG's actions.

FVP TR EX  004038

WHEREFORE, AWB, MMS and Farache respectfully demands judgment, with interest accruing daily, for damages in the amount of $7,145,050.00 against EAG and KPB SZ, KZ (as guarantors), any compensatory, incidental and other damages, interests, costs, and any and all other relief this Court deems necessary, just and proper.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**VERIFICATION**

BY:   _____
(signature)

ITS:   MANAger
(title)

STATE OF FLORIDA            )
                           ) ss
COUNTY OF PALM BEACH       )

BEFORE    ME,    the    undersigned    authority,    personally    appeared, Moshe Farache _____, MANAger _____ (title) of Auto Wholesale of Boca, LLC, who is personally known to me or who has produced _____ as personal identification and who first by me being duly sworn, says that it is the Plaintiff in the above-styled cause, that he/she has read the foregoing Verified Complaint and has personal knowledge of the facts and matters set forth and alleged in it; and that each of the facts and matters are true and correct.

The foregoing instrument was acknowledged before me by means of ( X ) physical presence or ( ) online notarization, this 7th day of April, 2022

_____
Notary Public

My Commission Expires:



Notary Public State of Florida
Scott C. Gherman
My Commission GG 951287
Expires 01/27/2024

Complaint
Page **28** of **30**

BY: _____
      (signature)

ITS: PRESIDENT
      _____
      (title)

STATE OF FLORIDA                    )
                                    ) ss
COUNTY OF PALM BEACH                )

    BEFORE    ME,    the    undersigned    authority,    personally    appeared, _Miles A Early_____, _President_____ (title) of MMS Ultimate Services, Inc., who is personally known to me or who has produced _____ as personal identification and who first by me being duly sworn, says that it is the Plaintiff in the above-styled cause, that he/she has read the foregoing Verified Complaint and has personal knowledge of the facts and matters set forth and alleged in it; and that each of the facts and matters are true and correct.

    The foregoing instrument was acknowledged before me by means of (✗) physical presence or (__) online notarization, this _7th_ day of April, 2022



Notary Public State of Florida
Scott C. Gherman
My Commission GG 951287
Expires 01/27/2024

_____
Notary Public

MOSCHE FARACHE

BY:  _____
(signature)

STATE OF FLORIDA          )
                          ) ss
COUNTY OF PALM BEACH      )

BEFORE ME, the undersigned authority, personally appeared, Moshe Farache, (who is) (personally known to me or who has produced _____ as personal identification and who first by me being duly sworn, says that it is the Plaintiff in the above-styled cause, that he/she has read the foregoing Verified Complaint and has personal knowledge of the facts and matters set forth and alleged in it; and that each of the facts and matters are true and correct.

The foregoing instrument was acknowledged before me by means of ( X ) physical presence or (__) online notarization, this 7th day of April, 2022

_____
Notary Public

Notary Public State of Florida
Scott C. Gherman
My Commission GG 951287
Expires 01/27/2024

FVP TR EX  004042

Dated this _____ day of April 2022.

> **KURKIN FOREHAND BRANDES LLP**
> *Attorneys for Plaintiff*
> 18851 NE 29th Avenue, Suite 303
> Aventura, Florida 33180
> Tel: (305) 929-8500 / Fax: (954) 206-0214
> Email: mbrandes@kfb-law.com
>            bvillalobos@kfb-law.com
>
> By: ___/S/ Marc E. Brandes_____
>            Marc E. Brandes, Esq.
>            Florida Bar No. 866423



COMPOSITE
EXHIBIT "C"

NOT A CERTIFIED COPY

FVP TR EX  004044



## SECURED PROMISSORY NOTE

$2,664,450.00                                                 November $\underline{\phantom{11}}$, 2021

### 1. Principal.

FOR VALUE RECEIVED, the undersigned, EXCELL AUTO GROUP, INC., a Florida corporation maintaining its principal address at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487 ("Borrower") promises to repay AUTO WHOLESALE OF BOCA, LLC, a Florida Limited Liability Company ("Lender"), whose address is 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487, the principal sum of Two Million & Six Hundred Sixty-Four Thousand & Four-Hundred & Fifty Dollars ($2,664,450.00) **(An itemization accounting for the principal sum is attached hereto as Exhibit "A.")**, with annual interest thereon calculated in accordance with the terms and provisions provided below. All sums owing under this note are payable in lawful money of the United States of America.

### 2. Definitions.

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note. "Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

### 3. Payments/Interest.

(a)  Lender and Borrower agree to split the profits 50/50 on all vehicle sales funded by this note. Lender has the right to review all pertinent information, including but not limited to, backup documentation (with all customer information redacted) as to how Borrower calculated the profit

(b)  A guaranteed monthly payment of $10,000.00, due on the first of each month, shall be paid by Borrower to Lender in the event that the profit split does not equal $10,000.00 on the first line of $1,000,000.00. Credit shall be given for the percentage of profit funded by this first million.

(c)  On the remaining $1,664,450.00, the profit shall be split 50/50.

(d)  All amounts required to be paid under Lender's note shall be payable at Lender's office located at 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487, or at such other place as Lender, from time to time, may designate in writing.

Initials: _____

1

NOT A CERTIFIED COPY

FVP TR EX 004045

(e) Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

### 4. Maturity Date.

The entire principal balance of this note, together with all accrued and unpaid interest/payments, shall be due and payable one (1) year from the date of execution of the note ("maturity date"), unless otherwise prepaid in accordance with the terms of this note.

### 5. Default:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due;

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent;

M. Becomes a subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note;

N. Uses the security, including but not limited to, any vehicles purchased with Lender's funds as collateral to take a loan or for any other purpose;

O. Breaches any obligation under the lease agreements with 1001 Clint Moore, LLC with respect to the premises located at 1001 Clint Moore Rd., Suite 101-103, Boca Raton, FL 33487;

P. Fails to assign and provide the title to Lender for any and all vehicles purchased with Lender's funds, and/or fails to provide the bill of sale pertaining to any such vehicles; or

2

Initials: _____

NOT A CERTIFIED COPY

FVP TR EX  004046

## 6. Lender's Rights if there is a Default:

Without notice or demand and without giving up any of its rights, Lender may:

- A. Require immediate payment of all amounts owing under this Note;
- B. Collect all amounts owing from any Borrower or Guarantor;
- C. File suit and obtain judgment;
- D. Take possession of any Collateral; or
- E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

## 7. Prepayment.

Borrower may prepay the whole principal sum of this note on any date, upon five days' notice to Lender. Should Borrower prepay the note, in addition to repaying the principal sum, Borrower shall pay lender one year of interest at 12% ($319,734.00).

## 8. Lender's General Powers:

Without notice and without Borrower's consent, Lender may:

- A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
- B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
- C. Release anyone obligated to pay this Note;
- D. Compromise, release, renew, extend or substitute any of the Collateral; and
- E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

## 9. Successors and Assigns:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

## 10. General Provisions:

Initials: _SR_

_K2_

3

NOT A CERTIFIED COPY

FVP TR EX 004047

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

## 11. Attorneys' Fees and Costs.

If Lender engages any attorney to enforce or construe any provision of this note or the mortgage, or as a consequence of any default whether or not any legal action is filed, Borrower shall immediately pay on demand all reasonable attorneys' fees and other Lender's costs, together with interest from the date of demand until paid at the highest rate of interest then applicable to the unpaid principal, as if such unpaid attorneys' fees and costs had been added to the principal.

## 12. Waivers.

(a) Borrower hereby waives and releases all benefit that might accrue to Borrower by virtue of any present or future laws of exemption with regard to real or personal property or any part of the proceeds arising from any sale of any such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment. Borrower agrees that any real estate that may be levied on under a judgment obtained by virtue hereof, on any writ of execution issued thereon, may be sold upon any such writ in whole or in part in any order desired by Lender.

(b) Borrower and all endorsers, sureties, and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest, notice of protest of this note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this note. They agree that each shall have unconditional liability without regard to the liability of any other party, and that they shall not be

4

Initials: ___S+2___

___K2___

NOT A CERTIFIED COPY

FVP TR EX 004048

affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender. Borrower and all endorsers, sureties, and guarantors consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this note, and to the release of any collateral or any part thereof, with or without substitution, and they agree that additional borrowers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder.

(c) Lender shall not be deemed by any act of omission or commission to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Lender, and then only to the extent specifically set forth in writing. A waiver on one event shall not be construed as continuing or as a bar to or waiver of any right or remedy to a subsequent event.

### 13. Notices.

All notices required under or in connection with this note shall be delivered or sent by certified or registered mail, return receipt requested, postage prepaid, to the addresses set forth in Paragraph 1 hereof, or to such other address as any party may designate from time to time by notice to the others in the manner set forth herein. All notices shall be deemed to have been given or made either at the time of delivery thereof to an officer or employee or on the third business day following the time of mailing in the aforesaid manner.

### 14. Costs and Expenses.

Borrower shall pay the cost of any revenue tax or other stamps now or hereafter required by law at any time to be affixed to this note.

### 15. Interest Rate Limitation.

Notwithstanding anything contained herein to the contrary, the holder hereof shall never be entitled to collect or apply as interest on this obligation any amount in excess of the maximum rate of interest permitted to be charged by applicable law. If the holder of this note ever collects or applies as interest any such excess, the excess amount shall be applied to reduce the principal debt; and if the principal debt is paid in full, any remaining excess shall be paid to the Borrower forthwith. In determining whether the interest paid or payable in any specific case exceeds the highest lawful rate, the holder and the Borrower shall to the maximum extent permitted under applicable law (a) characterize any nonprincipal payment as an expense, fee, or premium rather than as interest; (b) exclude voluntary prepayments and the effects of these; and (c) spread the total amount of interest throughout the entire contemplated term of the obligation so that the interest rate is uniform throughout the term. Nothing in this paragraph shall be deemed to increase the total dollar amount of interest payable under this note.

5

Initials: _Sh_
_K2_

NOT A CERTIFIED COPY

FVP TR EX  004049

## 16. Modification.

In the event this note is pledged or collaterally assigned by Lender at any time or from time to time before the maturity date, neither Borrower nor Lender shall permit any modification of this note without the consent of the pledgee/assignee.

## 17. Number and Gender.

In this note the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa, if the context so requires.

## 18. Headings.

Headings at the beginning of each numbered paragraph of this note are intended solely for convenience of reference and are not to be construed as being a part of the note.

## 19. Time of Essence.

Time is of the essence with respect to every provision of this note.

## 20. Governing Law.

This note shall be construed and enforced in accordance with the laws of the state of Florida, except to the extent that federal laws preempt the laws of the state of Florida.

SIGNATURE PAGE FOLLOWS

NOT A CERTIFIED COPY

6

Initials: _____

FVP TR EX 004050

IN WITNESS WHEREOF, Borrower has executed this promissory note on the date set forth above.

Excell Auto Group, LLC

By: _____

Kristen Zankl, as President

Date: __11 - 11 - 2021__

By: _____

Scott Zankl, as officer

Date: __11 - 11 - 2021__

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this __11__ day of November, 2021, by Kristen Zankl on behalf of Excell Auto Group LLC who [✓] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_____
Notary Public

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this __11__ day of November, 2021, by Scott Zankl on behalf of Excell Auto Group LLC who [✓] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_____
Notary Public

7

Initials: _____

NOT A CERTIFIED COPY

FVP TR EX 004051

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** dated November __11__, 2021 (the "Security Agreement"), by and among **EXCELL AUTO GROUP, INC.** ("Excell") a Florida corporation Beach maintaining its principal address at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487 (the "Debtor") and **AUTO WHOLESALE OF BOCA, LLC**, a Florida Limited Liability Company whose address is 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487 and MOSHE FARACHE (collectively the "Secured Party").

WHEREAS, Secured Party has provided financing for the Debtor which financing is evidenced by the Amended and Restated Promissory Note of even date herewith made by Debtor to Secured Party in the amount of Two Million & Six Hundred Sixty-Four Thousand & Four-Hundred & Fifty Dollars ($2,664,450.00).

NOW, THEREFORE, for value received and in consideration of the foregoing and to induce Secured Party to grant such financing, the Debtor hereby pledges, assigns, transfers, sets over and grants to Secured Party a continuing general lien and security interest in the Collateral described below.

1.      **Security Interest Granted and Obligation Secured.**

(a)      **Security for Obligation.** This Security Agreement secures the payment of all now existing or hereafter arising obligations of Debtor to Secured Party under the Note and related documents, whether primary or secondary, direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not, liquidated or unliquidated, arising by operation of law or otherwise under any promissory note, guarantee, loan or credit agreement, letter of credit, draft, acceptance, interest rate or foreign exchange agreement, mortgage or other documents evidencing indebtedness whether for principal, interest, fees, expenses or otherwise, together with all costs of collection or enforcement, including, without limitation, reasonable attorneys' fees incurred in any collection efforts or in any action or proceeding (all such obligations being the "Obligations"). Without limiting the foregoing, the Obligations include all obligations of Borrower under the Note; and all obligations of Debtor under the guaranty instruments made by Debtor in favor of the Secured Party, and dated the date hereof, guaranteeing payment and performance by Borrower under the Note.

(b)      **Grant of Security.** As security for the Obligations, Debtor hereby grants to Secured Party a Purchase Money Security Interest in all Debtors assets and properties wherever located, including without limitation all equipment of any kind or nature, any and all vehicles, vehicle parts or inventory now owned or hereafter acquired with the loan proceeds, including, without limitation: all accounts and accounts receivable, general intangibles, chattel paper whether tangible or electronic, together with all attachments, accessions, and equipment now or hereafter affixed thereto or used in connection therewith, all substitutions and replacements thereof and any products and proceeds thereof pertaining to the Excell Auto Group Inventory (the "Collateral").

(c)      **Debtor Remains Liable.** This Security Agreement shall not affect Debtor's liability to perform all of its duties and obligations under the transactions giving rise to the Obligations. The exercise by Secured Party of any of the rights hereunder shall not release Debtor from any of its duties or obligations under the transactions giving rise to the Obligations, which shall remain

FVP TR EX  004052

unchanged as if this Security Agreement had not been executed. Secured Party shall not have any obligation or liability under the transactions giving rise to the Obligations by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(d)    **Continuing Agreement.** This Security Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until payment in full of the Obligations.

2.    **Debtor's Title: Liens and Encumbrances.** Debtor represents and warrants that Debtor is, or will be the owner of the Collateral, having good and marketable title thereto, free from any and all liens, security interests, encumbrances and claims, except as set forth herein. Debtor will not create, assume or permit to exist any such lien, security interest, encumbrance or claim on or against the Collateral except as permitted by this Security Agreement, and Debtor will promptly notify Secured Party of any such other claim, lien, security interest or other encumbrance made or asserted against the Collateral and will defend the Collateral against any such claim, lien, security interest or other encumbrance.

3.    **Representations and Warranties; Location of Collateral and Records; Business and Trade Names of Debtor.**

(a) Debtor shall at all times maintain its records as to the Collateral at its chief place of business at the address referred to hereinabove. Debtor further covenants that, except for Collateral delivered to Secured Party or an agent for Secured Party, Debtor will not store, use or locate any of the Collateral at any place other than as listed in the Agreement.

(b)    Debtor currently uses, and during the last five years has used, no business or trade names, except as set forth herein. Debtor shall promptly notify Secured Party, in sufficient detail, of any changes in, additions to, or deletions from the business or trade names used by Debtor for billing purposes.

(c)    The Collateral is now and will be used in Debtor's business and not for personal, family, household or family use.

(d)    Debtor has paid and will continue to pay or otherwise provide for the payment when due, of all taxes, assessments or contributions required by law which have been or may be assessed or levied against Debtor, whether with respect to any of the Collateral, to any wages or salaries paid by Debtor, or otherwise, and will deliver satisfactory proof of such payment to Secured Party on demand. In the event the Debtor shall fail to pay any such tax, assessment, levy or governmental charge or to discharge any such lien or contest the same in good faith, then the Secured Party, without waiving or releasing any obligation or default of the Debtor hereunder, may at any time or times hereafter, but shall be under no obligation to do so, upon prior written notice to Debtor, make such payment, settlement, compromise or release or cause to be released any such lien, and take any other action with respect thereto which the Secured Party deems advisable. All sums paid by the Secured Party in satisfaction of, or on account of any tax, levy or assessment or governmental

Initial(s) _S____

FVP TR EX  004053

Page 3 of 12

charge, or to discharge or release any lien and any expenses, including reasonable attorneys' fees, court costs and other charges relating thereto, shall become a part of the Liabilities secured by the Collateral, payable on demand.

(e)    The grant of the security interest in the Collateral is effective to vest in Secured Party a valid priority security interest, superior to the rights of any person in and to the Collateral as set forth herein, except to the extent following: None.

4.    **Perfection of Security Interest.**

Debtor shall to the extent necessary execute all such financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law, including the Federal Assignment of Claims Act and any state motor vehicles registration statute, as Secured Party may require, each in form satisfactory to Secured Party. Debtor also shall pay all filing or recording costs with respect thereto, and all costs of filing or recording this Security Agreement or any other agreement or document executed and delivered pursuant hereto or to the Obligations (including the cost of all federal, state or local mortgage, documentary, stamp or other taxes), in each case, in all public offices where filing or recording is deemed by Secured Party to be necessary or desirable. Debtor authorizes Secured Party to (i) file any Uniform Commercial Code financing statements or amendments thereto without the signature of Debtor or by signing of Debtor's name to any such financing statements as its attorney-in-fact, (ii) file a photographic or other reproduction of this Security Agreement as a financing statement, (iii) file notices of assignment pursuant to the Federal Assignment of Claims Act, (iv) file applications for certificates of title or (v) take all other action which Secured Party may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this Security Agreement.

5.    **General Covenants.**

Debtor shall:

(a)    furnish Secured Party from time to time, at Secured Party's request, written statements and schedules further identifying and describing the Collateral in such detail as Secured Party may reasonably require;

(b)    advise Secured Party promptly, in sufficient detail, of any substantial change in the Collateral or of the occurrence of any event which would affect the value of the Collateral or Secured Party's security interest therein;

(c)    comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official applicable to Debtor or any Collateral or to the operation of Debtor's business except where the failure to comply (i) is non-material and (ii) has no effect on the value of the Collateral or on the ability of Secured Party to exercise its rights and remedies hereunder;

(d)    perform and observe all covenants, restrictions and conditions contained in any agreement or document executed in connection with the Obligations as though the same were fully set forth in this Security Agreement;

Initial(s) _SR_

FVP TR EX  004054

(e)    promptly execute and deliver to Secured Party such further agreements or other instruments and take such further action from time to time as Secured Party may deem necessary to perfect, protect or enforce its security interests in the Collateral or otherwise to effect the intent of this Security Agreement;

(f)    keep or cause to be kept the Collateral in good working order and marketable condition, ordinary wear and tear excepted;

(g)    insure the Collateral against loss or damage by fire or other hazards, and extended coverage, theft, burglary, bodily injury and such other risks, with such companies and in such amounts, as is required by Secured Party at any time;

(h)    use the Collateral for lawful purposes only in conformity with all laws, rules and regulations;

(i)    allow Secured Party and its agents, at all reasonable times and for reasonable durations, to inspect any of the Collateral and to examine and make extracts from Debtor's books and records relating to the Collateral; and

(i)    not assign, sell, mortgage, lease, transfer, pledge, grant a security interest in or lien upon, encumber or otherwise dispose of or abandon, any part or all of the Collateral, without the express prior written consent of Secured Party, except for the sale from time to time in the ordinary course of business of Debtor of such items of Collateral as may constitute part of the business inventory of Debtor.

6.    **Assignment of Insurance.**

At or prior to the date hereof, Debtor shall deliver to Secured Party certificates of the issuing companies with respect to all policies of insurance owned by Debtor covering or in any manner relating to the Collateral, in form and substance satisfactory to Secured Party, naming Secured Party as an additional insured party as its interests may appear with respect to liability coverage and as loss payee with respect to property and extended insurance coverage, and indicating that no such policy will be terminated, or reduced in coverage or amount, without at least thirty (30) days prior written notice from the insurer to Secured Party. Debtor hereby assigns to Secured Party all sums, including returned or unearned premiums, which may become payable under or in respect of any such policy of insurance, and Debtor hereby directs each insurance company issuing any such policy to make payment of sums directly to Secured Party. Debtor hereby appoints Secured Party as Debtor's attorney-in-fact with authority to endorse any check or draft representing any such payment and to execute any proof of claim, subrogation receipt and any other document required by such insurance company as a condition to or otherwise in connection with such payment, and upon the occurrence of any Event of Default, to cancel, assign or surrender any such policies. All such sums received by Secured Party shall be applied by Secured Party to satisfaction of the Obligations or, to the extent that such sums represent unearned premiums in respect of any policy of insurance on the Collateral refunded by reason of cancellation, toward payment for similar insurance protecting the respective interests of Debtor and Secured Party, or as otherwise required by applicable law.

Initial(s) _____

FVP TR EX  004055

If the Debtor shall at any time or times hereafter fail to obtain and maintain any of the policies of insurance required above, or fail to pay any premium in whole or in part relating to any such policies, then the Secured Party may, but it shall have no obligation to do so, following prior written notice to Debtor, obtain and cause to be maintained any or all of such policies, and pay any part or all of the premiums due thereon without thereby waiving any default by the Debtor and any sum so disbursed by the Secured Party shall become a part of the Liabilities secured by the Collateral payable on demand.

7.  **Fixtures.**

Except to the extent that fixtures are included in the description of the Collateral herein, it is the intent of Debtor and Secured Party that none of the Collateral is or shall be regarded as fixtures, as that term is used or defined in Article 9 of the Uniform Commercial Code, and Debtor represents and warrants that it has not made and is not bound by any lease or other agreement which is inconsistent with such intent. Nevertheless, if the Collateral or any part thereof deemed material by Secured Party is or is to become attached or affixed to any real estate, Debtor will, upon request, furnish Secured Party with a disclaimer or subordination in form satisfactory to Secured Party of the holder of any interest in the real estate to which the Collateral is attached or affixed, together with the names and addresses of the record owners of, and all other persons having interest in, and a general description of, such real estate.

8.  **Collections.**

(a)  Except as provided herein, Debtor may collect all checks, drafts, cash or other remittances (i) in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, (ii) in payment of any Collateral sold, transferred, leased or otherwise disposed of, or (iii) in payment of or in account of its accounts, contracts, notes, drafts, acceptances and all other forms of obligations relating to any of the Collateral so sold, transferred, or leased or otherwise disposed of. All of the foregoing amounts so collected after the occurrence of an Event of Default shall be held in trust by Debtor for and as the property of Secured Party, and shall not be commingled with other funds, money or property of Debtor.

(b)  Upon the request of Secured Party, Debtor will immediately upon receipt of all such checks, drafts, cash or other remittances in payment of any of its accounts, contract rights or general intangibles constituting all of the Collateral or in payment for any Collateral sold, transferred, leased or otherwise disposed of, deliver any such items to Secured Party accompanied by a remittance report in form supplied or approved by Secured Party. Debtor shall deliver such items in the same form received, endorsed or otherwise assigned by Debtor where necessary to permit collection of such items.

(c)  Upon the request of Secured Party, Debtor will promptly notify Secured Party in writing of the return or rejection of any goods represented by any accounts, contract rights or general intangibles and Debtor shall forthwith account therefor to Secured Party in cash without demand or notice. Until such payment has been received by Secured Party, Debtor will receive and hold all such goods separate and apart, in trust for and subject to the security interest in favor of Secured Party, and Secured Party is authorized to sell, for Debtor's account and at Debtor's sole risk, all or any part of such goods.

Initial(s) _____

FVP TR EX  004056

Page 6 of 12

(d)    In its discretion, Secured Party may, upon the occurrence of an Event of Default, in its name or Debtor's or otherwise, notify any account debtor or Debtor of any account, contract, instrument, chattel paper or general intangible included in the Collateral to make payment to Secured Party.

(e)    All of the foregoing remittances shall be applied and credited by Secured Party in accordance with the provisions of Section 10(c) of this Security Agreement.

9.    **Events of Default.**

The occurrence of any one or more of the following events shall constitute an event of default ("Event of Default by Debtor under this Security Agreement:

(a)  a "Default" or "Event of Default" shall occur under the terms of the Note or any other agreement giving rise to or executed in connection with the Obligations;

(b)  if at any time Secured Party shall, in its reasonable discretion, consider the Obligations unsecured or any part of the Collateral unsafe, insecure or insufficient, and Debtor shall not on demand furnish other collateral or make payment on account, reasonably satisfactory to Secured Party;

(c)  if Debtor or any obligor, guarantor of, or any party to any of the Obligations or the Collateral (the same, including Debtor, being collectively referred to herein as "Debtors") shall default in the punctual payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of any of the Obligations or of this Security Agreement or any other agreement between any Debtor and Secured Party;

(d)  if any warranty or representation made to Secured Party by or on behalf of any Debtor is false or misleading in any material respect;

(e)  in the event of loss, theft, substantial damage to or destruction of any portion of the Collateral deemed material by Secured Party, or the making or filing of any lien, levy, or execution on, or seizure, attachment or garnishment of, any of the Collateral;

(f)  if any of the Debtors being a natural person or any general partner or member of an Debtor which is a partnership or a limited liability company, shall die or (being a partnership, limited liability company or corporation) shall be dissolved, or if any of the Debtors (if an entity) shall fail to maintain its existence in good standing;

(g)  if any of the Debtors shall become insolvent or make an assignment for the benefit of creditors, or make or send notice of an intended bulk transfer, or if there shall be convened a meeting of the creditors or principal creditors of any of the Debtors or if a committee of creditors is appointed for any of them;

(h)  if there shall be filed by or against any of the Debtors any petition for any relief under the bankruptcy laws of the United States now or hereafter in effect or under any insolvency, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity);

(i)  if the usual business of any of the Debtors shall be terminated or suspended;

(j)  if any proceedings, procedure or remedy supplementary to or in enforcement of judgment shall be commenced against, or with respect to any property of, any of the Debtors;

(k)  if any petition or application to any court or tribunal, at law or in equity, be filed by or against any of the Debtors for the appointment of any receiver or trustee for any of the Debtors or

Initial(s) _____

NOT A CERTIFIED COPY

FVP TR EX 004057

any part of the property of any of them;

    (l) if there occur the sale, lease, transfer, assignment, encumbrance (except by purchase money liens on property acquired after the date of the Note) or other disposition of any of the Collateral to a third party, except in the ordinary course of business, without the prior written consent of the Secured Party; or

    (m) if there is a change of the ownership structure or interests of the Debtor during the term of the loan evidenced by the Note without the prior written consent of the Secured Party.

    (n) Uses the security, including but not limited to, any vehicles purchased with Secured Party's funds as collateral to take a loan or for any other purpose;

    (o) Breaches any obligation under the lease agreements with 1001 Clint Moore, LLC with respect to the premises located at 1001 Clint Moore Rd., Suite 101-103, Boca Raton, FL 33487;

    (p) Fails to assign and provide the title to Auto Wholesale of Boca, LLC for any and all vehicles purchased with Lender's funds, and/or fails to provide the bill of sale pertaining to any such vehicles.

### 10. Rights and Remedies.

    (a) In the event of the occurrence and continuance of any Event of Default, Secured Party shall at any time thereafter have the right, with or without (to the extent permitted by applicable law) notice to Debtor, as to any or all of the Collateral, by any available judicial procedure or without judicial process, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral, and generally to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, Debtor agrees that Secured Party shall have the right to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation' or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions, all as Secured Party in its sole discretion may deem advisable, and Secured Party shall have the right to purchase at any such sale; and, if any Collateral shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, Secured Party shall have the right, at its sole option and discretion, and at Debtor's sole cost and expense, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Collateral in such saleable or disposable form as it shall deem appropriate. At Secured Party's request after any Event of Default, Debtor shall assemble the Collateral and make it available to Secured Party at places which Secured Party shall select, whether at Debtor's premises or elsewhere, and make available to Secured Party, without rent, all of Debtor's premises and facilities for the purpose of Secured Party's taking possession of, removing or putting the Collateral in saleable or disposable form. If any of the Collateral consists of motor vehicles, Secured Party may use Debtor's license plates, in any lawful manner.

    (b) Any such sale, lease or other disposition of Collateral may be made without demand for performance or any notice of advertisement whatsoever except that where an applicable statute requires reasonable notice of sale or other disposition, Debtor agrees that the sending of five days' notice by ordinary mail, postage prepaid, to Debtor of the place and time of any public sale or of the time at which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof. Notwithstanding the foregoing, if any of the Collateral is perishable and may be materially diminished in value during such five day period, Secured Party shall provide Debtor with such shorter notice as it deems reasonable under the circumstances.

Initial(s) _____

NOT A CERTIFIED COPY

FVP TR EX 004058

Page 8 of 12

(c)    The proceeds of any such sale, lease or other disposition of the Collateral shall be applied first to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like, and to the reasonable attorneys' fees and legal expenses incurred by Secured Party, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which Secured Party shall account to Debtor for any surplus proceeds. If, upon the sale, lease or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor will be liable for the deficiency, together with interest thereon, at the rate prescribed in the agreements giving rise to the Obligations, and the reasonable fees of any attorneys employed by Secured Party to collect such deficiency. To the extent permitted by applicable law, Debtor waives all claims, damages and demands against Secured Party arising out of the repossession, removal, retention or sale of the Collateral, except to the extent same is caused by the gross negligence or willful misconduct of Secured Party, its agents or employees.

11.    **Costs and Expenses.**

Any and all fees, costs and expenses, of whatever kind or nature, including the reasonable attorneys' fees and legal expenses incurred by Secured Party, in connection with the filing or recording of financing statements and other documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, insurance premiums, encumbrances or otherwise protecting, maintaining or preserving the Collateral and Secured Party's security interest therein, or in defending or prosecuting any actions or proceedings arising out of or related to the transaction to which this Security Agreement relates, shall be paid by Debtor on demand. Until so paid, all such amounts shall be added to the principal amount of the Obligations and shall bear interest at the rate prescribed in the agreements giving rise to the Obligations.

12.    **Power of Attorney.**

Debtor authorizes Secured Party and does hereby make, constitute and appoint Secured Party, and any officer or agent of Secured Party, with full power of substitution, as Debtor's true and lawful attorney-in-fact, with power, in its own name or in the name of Debtor, to do any of the following upon and after the occurrence of any Event of Default: (a) to endorse any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of Secured Party; (b) to sign and endorse any invoice, height or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts, and other documents relating to Collateral; (c) to pay or discharge any taxes, liens, security interest or other encumbrances at any time levied or placed on or threatened against the Collateral; (d) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (e) to receive, open and dispose of all mail addressed to Debtor and to notify the Post Office authorities to change the address for delivery of mail addressed to Debtor to such address as Secured Party may designate; and (f) generally to do all acts and things which Secured Party deems necessary to protect, preserve and realize upon the Collateral and Secured Party's security interest therein. Debtor hereby approves and ratifies all acts of said attorney or designee, who shall not be liable for any acts of commission or omission, nor for any error or judgment or mistake of fact or law except for its own gross negligence or willful misconduct. This power of attorney shall be irrevocable for the term of this Security Agreement and thereafter as long as any

Initial(s) _____

of the Obligations shall be outstanding.

13.    **Notices.**

Unless the party to be notified otherwise notifies the other party in writing as provided in this Section, notices shall be given hereunder by telecopy, by certified mail or by recognized overnight delivery services to Debtor and Secured Party at its address herein.

Notices shall be effective (a) if given by certified mail, on the third day after deposit in the mails with postage prepaid, addressed as aforesaid; (b) if given by recognized overnight delivery service, on the business day following deposit with such service, addressed as aforesaid; or (c) if given by telecopy, when the telecopy is transmitted to the telecopy number as aforesaid; provided that all notices to Secured Party shall be effective on receipt.

14.    **Other Security.**

To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other person, then Secured Party shall have the right in its sole discretion to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of Secured Party's rights and remedies hereunder.

15.    **Further Security.**

To further secure the Obligations, Debtor hereby grants, pledges and assigns to Secured Party a continuing lien on, security interest in and rights of set-off in all money, securities and other property of Debtor, and the proceeds thereof, now or hereafter actually or constructively held or received by or for Secured Party or any affiliate of Secured Party. Debtor hereby authorizes Secured Party to deliver a copy of this Agreement to others as written notification of Debtor's transfer of a security interest in the foregoing property. Upon and after any Event of Default, Secured Party is hereby authorized at any time and from time to time, without notice, to apply all or part of such moneys, securities, property, proceeds, deposits or credits to any of the Obligations in such amounts as Secured Party may elect in its sole and absolute discretion, although the Obligations may then be contingent or unmatured and whether or not the collateral security may be deemed adequate.

16.    **Miscellaneous.**

(a)    Beyond the safe custody thereof, Secured Party shall have no duty as to the collection of any Collateral in its possession or control or in the possession or control of any agent or nominee of Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(b)    No course of dealing between Debtor and Secured Party, or Secured Party's failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as waiver thereof. Any single or partial exercise of any right, power or privilege hereunder shall not preclude

Initial(s) _____

FVP TR EX 004060

any other or further exercise thereof or the exercise of any other right, power or privilege.

(c) All of Secured Party's rights and remedies with respect to the Collateral, whether established hereby or by any other agreements, instruments or documents or by law, shall be cumulative and may be exercised singly or concurrently.

(d) This Security Agreement may be amended or modified, and a provision hereof may be waived, only by a writing signed by all of the parties hereto.

(e) The provisions of this Security Agreement are severable, and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Security Agreement in any jurisdiction.

(f) The benefits of this Security Agreement shall inure to the benefit of the successors and assigns of Secured Party. The rights and obligations of Debtor under this Security Agreement shall not be assigned or delegated without the prior consent of Secured Party.

(g) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

(h) Debtor hereby irrevocably consents to the jurisdiction of the courts of the State of Florida in connection with any action or proceeding arising out of or relating to the Obligations, this Security Agreement or the Collateral, or any document or instrument delivered with respect to any of the Obligations. Debtor hereby waives personal service of any summons, complaint or other process in connection with any such action or proceeding and agrees that the service thereof may be made by certified mail directed to Debtor at the address provided herein for receipt of notices. Debtor so served shall appear or answer to such summons, complaint or other process within thirty days after the mailing thereof. Should Debtor so served fail to appear or answer within said thirty-day period, Debtor shall be deemed in default and judgment may be entered by Secured Party against Debtor for the amount or such other relief as may be demanded in any summons, complaint or other process so served. In the alternative, in its discretion Secured Party may affect service upon Debtor in any other form or manner permitted by law.

(i) IN THE EVENT OF ANY LITIGATION RELATING TO THIS AGREEMENT OR THE OBLIGATIONS, DEBTOR WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY.

IN WITNESS WHEREOF, Debtor has executed or caused its duly authorized officer, on Debtor's behalf, to execute, this Security Agreement as of the day and year first written above.

Initial(s) _____

NOT A CERTIFIED COPY

DEBTOR:

Excell Auto Group, LLC

By: _Kristen Zankl_
Kristen Zankl, as President

Date: _11-11-2021_

By: _Scott Zankl_
Scott Zankl, as officer

Date: _11-11.2021_

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this _11_ day of November, 2021, by Kristen Zankl on behalf of Excell Auto Group LLC who [X] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_Notary Public_

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this _11_ day of November, 2021, by Scott Zankl on behalf of Excell Auto Group LLC who [X] is personally known to me or [ ] produced _____ as identification.

ALANA C. BAILEY
MY COMMISSION # HH 094110
EXPIRES: May 30, 2025
Bonded Thru Notary Public Underwriters

_Notary Public_

Initial(s) _____

NOT A CERTIFIED COPY

SECURED PARTY:

Auto Wholesale of Boca, LLC

By: _____     Date: _____ 11-11-21 _____
    Moshe Farache,
    as managing member

By: _____     Date: _____ 11-11-21 _____
    Moshe Farache, personally


STATE OF FLORIDA          }

                          }    ss.:

COUNTY OF PALM BEACH   }

The foregoing instrument was acknowledged before me this _____ day of November, 2021, by Moshe Farache personally and on behalf of Auto Wholesale of Boca, LLC, on behalf of the company. He is personally known to me or has produced _____ as identification.

_____
Notary Public

MICHELE A. MARTIN
Commission # GG 942844
Expires April 27, 2024
Bonded Thru Troy Fain Insurance 800-385-7019


Initial(s) _____

NOT A CERTIFIED COPY

FVP TR EX  004063

**SECURED PARTY:**

Auto Wholesale of Boca, LLC

By: _____        Date: ___11-11-21___
      Moshe Farache,
      as managing member

By: _____        Date: ___11-11-21___
      Moshe Farache, personally

STATE OF FLORIDA          }
                          }  ss.:
COUNTY OF PALM BEACH      }

The foregoing instrument was acknowledged before me this __11__ day of November, 2021, by Moshe Farache personally and on behalf of Auto Wholesale of Boca, LLC, on behalf of the company. He is personally known to me or has produced _____ as identification.

_____
Notary Public

MICHELE A. MARTIN
Commission # GG 942844
Expires April 27, 2024
Bonded Thru Troy Fain Insurance 800-385-7019

Initial(s)_____
_____

NOT A CERTIFIED COPY

FVP TR EX 004064

Page 1 of 5

## UNCONDITIONAL GUARANTEE

THIS GUARANTY dated November **11**, 2021 (together with any amendments or modifications hereto in effect from time to time, the "Guaranty"), made by **Scott Zankl** and **Kristen Zankl**, and **Karma Of Palm Beach, Inc. D/B/A Karma Palm Beach**, jointly and severally, (the "Guarantor(s)"), having an address at Unit B located at 1001 Clint Moore Road, Boca Raton, Florida 33487, in favor of Auto Wholesale of Boca, LLC, a Florida Limited Liability Company ("Lender"), whose address is 6560 West Rogers Circle, Suite #B27, Boca Raton, FL 33487.

To induce Lender to make loans, extensions of credit or other financial accommodations to Excell Auto Group, Inc., a Florida corporation and ("Borrower"), now or in the future, to secure the observance, payment and performance of the Liabilities (as defined below), and with full knowledge that Lender would not make the said loans, extensions of credit or financial accommodations without this Guaranty, which shall be construed as a contract of suretyship, Guarantor unconditionally agrees as follows:

1. **Guarantee:**

   Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor(s) must pay all amounts due under the Note when Lender makes written demand upon Guarantor(s). Lender is not required to seek payment from any other source before demanding payment from Guarantor(s).

2. **Note:**

   The "Note" is the promissory note dated November **11**, 2021 in the principal amount of $2,664,000.00 from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3. **Definitions:**

   *"Collateral"* means any property taken as security for payment of the Note or any guarantee of the Note. "Loan" means the loan evidenced by the Note.
   *"Loan Documents"* means the documents related to the Loan signed by Borrower, Guarantor(s) or any other guarantor, or anyone who pledges Collateral.

4. **Lender's General Powers:**

   Lender may take any of the following actions at any time, without notice, without Guarantor(s)' consent, and without making demand upon Guarantor(s):

Initials SZ KZ

FVP TR EX  004065

A. Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B. Refrain from taking any action on the Note, the Collateral, or any guarantee;

C. Release any Borrower or any guarantor of the Note;

D. Compromise or settle with the Borrower or any guarantor of the Note;

E. Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F. Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G. Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H. Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5. **Rights, Notices, and Defenses that Guarantor(s) Waives; To The Extent Permitted by Law:**

A. Guarantor(s) waives all rights to:

　1) Require presentment, protest, or demand upon Borrower;

　2) Redeem any Collateral before or after Lender disposes of it;

　3) Have any disposition of Collateral advertised; and

　4) Require a valuation of Collateral before or after Lender disposes of it.

B. Guarantor(s) waives any notice of:

　1) Any default under the Note;

　2) Presentment, dishonor, protest, or demand;

　3) Execution of the Note;

　4) Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;

　5) Any change in the financial condition or business operations of Borrower or any guarantor;

　6) Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and

　7) The time or place of any sale or other disposition of Collateral.

C. Guarantor(s) waives defenses based upon any claim that:

　1) Lender failed to obtain any guarantee;

　2) Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;

　3) Lender or others improperly valued or inspected the Collateral;

　4) The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

Initials _S.L._  _K.D._

NOT A CERTIFIED COPY

FVP TR EX  004066

5)  Lender impaired the Collateral;

6)  Lender did not dispose of any of the Collateral;

7)  Lender did not conduct a commercially reasonable sale;

8)  Lender did not obtain the fair market value of the Collateral;

9)  Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11) Lender made errors or omissions in Loan Documents or administration of the Loan;

12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor:

13) Lender impaired Guarantor's suretyship rights;

14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will be liable for the increased amounts and related interest and expenses;

15) Borrower has avoided liability on the Note; or

16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

6.  **Duties As To Collateral:**

Guarantor(s) will preserve the Collateral pledged by Guarantor(s) to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

7.  **Successors And Assigns:**

Under this Guarantee, Guarantor(s) includes heirs and successors, and Lender includes its successors and assigns.

8.  **General Provisions:**

A.  *Enforcement Expenses.* Guarantor(s) promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.  *Lenders Not a Co-Guarantor(s).* Lender is not a co- guarantor with Guarantor. Guarantor(s) has no right of contribution from Lender.

C.  *Subrogation Rights.* Guarantor(s) has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.  *Joint and Several Liability.* All individuals and entities signing as Guarantor(s) are jointly and severally liable.

E.  *Document Signing.* Guarantor(s) must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or

Initials  _____  _____

NOT A CERTIFIED COPY

FVP TR EX  004067

maintain Lender's liens on Collateral.

F. *Financial Statements.* Guarantor(s) must give Lender financial statements as Lender requires.

G. *Lender's Rights Cumulative, Not Waived.* Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H. *Oral Statements Not Binding.* Guarantor(s) may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I. *Severability.* If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J. *Consideration.* The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

9. **Notices:**

Any notice or other communication to Lender shall be addressed to Auto Wholesale of Boca Raton LLC 6560 West Rogers Circle, Suite #B27, Boca Raton, Fl 33487, or such other address as may be designated by registered or certified mail, return receipt requested, and the time of rendition of such notice or other communication shall be when it is deposited in an official United States Mail receptacle, postage prepaid.

10. **Governing Law:**

This Guaranty, which is to be governed by and construed in accordance with the laws of the State of Florida, shall also bind Guarantor(s)'s legal or personal representatives, heirs, successors and assigns (as the case may be) and inure to the benefit of Lender's successors and assigns and any other person or entity at any time having the rights of Lender under the Note and any other Loan Documents.

11. **Attorney's Fees:**

Guarantor(s) will forthwith pay to Lender all attorney's fees and disbursements incurred by Lender in connection with any breach or default by the Borrower in its obligations under the Note or other Loan Documents and/or the enforcement of this Guaranty, in each instance whether or not suit is brought (and if suit is brought, through appeals and collection efforts).

12. **Jurisdiction and Venue:**

Guarantor(s) agrees that in any action or proceeding brought on, under or by virtue by this Guaranty Agreement, Guarantor(s) shall and does hereby waive trial by jury, and Guarantor(s) agrees that the applicable courts of Florida may have jurisdiction over Guarantor(s) upon appropriate service on Guarantor(s) anywhere in the United States in a

Initials _S̸h̸_  _K̸_

NOT A CERTIFIED COPY

FVP TR EX  004068

manner in accordance with the laws of Florida and that venue shall proper in Palm Beach County, Florida. Without limiting the foregoing, Guarantor(s) hereby irrevocably appoints Delegate's registered agent as Guarantor(s)'s agent for service of process related to this Guaranty.

13. **Guarantor Acknowledgment of Terms:**
Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

14. **Guarantor Name(s) and Signature(s):**
By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

By: _____    Date: 11-11-20___
    Scott Zankl

By: _____    Date: 11-11-2021
    Kristen Zankl

Karma of Palm Beach, Inc. d/b/a Karma Palm Beach

By: _____
Kristen Zankl, as President

Date: _____11-11-2021_____

By: _____
Scott Zankl, as Vice President

Date: _____11-11-2021_____

Initials _Sz__  _Kz__

NOT A CERTIFIED COPY

FVP TR EX_004069

# EXHIBIT "D"

NOT A CERTIFIED COPY

FVP TR EX  004070

# MASTER INVENTORY LIST WITH LOCATIONS

| MAKE | MODEL | YEAR | COLOR | PURCHASE DATE | VIN | PURCHASE PRICE | TITLE IN AW NAME | IN AWB POSSESSION |
|---|---|---|---|---|---|---|---|---|
| **PROMISSORY NOTE # 3** | **$2,664,450** | | | | | | | |
| ASTON MARTIN | DB11 VOLANTE | 2019 | BEIGE | 02/28/22 | M07671 | $175,000.00 | Y | Y |
| FERRARI | F12 BERLINETTA | 2017 | RED | 02/02/22 | 221036 | $300,000.00 | Y | Y |
| LAMBORGHINI | AVENTADOR | 2017 | GRAY | 12/17/21 | A06402 | $420,000.00 | NO TITLE | N |
| LAMBORGHINI | URUS | 2020 | WHITE | 12/02/21 | A06529 | $185,000.00 | Y | Y |
| MCLAREN | 600LT | 2019 | PURPLE | 12/17/21 | 006903 | $225,450.00 | Y | Y |
| MERCEDES | G63 | 2020 | GREEN | 02/23/22 | 346462 | $235,000.00 | Y | Y |
| MERCEDES | METRIS | 2018 | BLACK | 12/29/21 | 366588 | $100,000.00 | APPLIED 04.06.22 | N |
| ROLLS ROYCE | GHOST | 2021 | GRAY | 03/09/22 | 207524 | $375,000.00 | NO TITLE | Y |
| | | | | | AMOUNT USED | $2,015,450.00 | | |
| **PROMISSORY NOTE # 1** | **$2,500,000 NOTE** | | | | | | | |
| BENTLEY | FLYING SPUR | 2017 | BLACK | 04/01/22 | 065523 | $130,000.00 | Y | Y |
| BMW | X7 | 2019 | BLUE | 12/29/21 | S39222 | $75,000.00 | Y | Y |
| FORD | RHINO | 2016 | BLACK | 09/29/21 | B18666 | $190,000.00 | Y | N |
| GMC | YUKON | 2019 | WHITE | 03/15/22 | 354378 | $57,000.00 | PROBLEM TITLE | Y |
| LAMBORGHINI | URUS | 2021 | WHITE | 08/20/21 | A12270 | $435,000.00 | Y | Y |
| LAMBORGHINI | AVENTADOR | 2012 | WHITE | 02/23/22 | A00244 | $265,000.00 | Y | N |
| MCLAREN | 720S | 2018 | WHITE | 03/01/22 | 000606 | $255,000.00 | Y | Y |
| MERCEDES | G WAGON | 2021 | WHITE | 02/16/22 | 390328 | $265,000.00 | Y | Y |
| MERCEDES | G63 | 2020 | BLUE | 02/09/22 | 362080 | $340,000.00 | Y | Y |
| PORSCHE | CAYENNE | 2014 | BLACK | 03/15/22 | A00731 | $30,000.00 | Y | Y |
| PORSCHE | 911 | 2008 | RED | 03/15/22 | 783176 | $85,000.00 | Y | Y |
| ROLLS ROYCE | DAWN | 2017 | WHITE | 02/16/22 | 107006 | $244,600.00 | Y | |
| | | | | | AMOUNT USED | $2,371,600.00 | | |
| **PROMISSORY NOTE #2 MMS AND MOSHE FARACHE** | | | **$1,080,000** | | | | | |
| ROLLS ROYCE | CULLINAN | 2021 | WHITE | 12/28/21 | 204097 | $400,000.00 | Y | N |
| FERRARI | 488 PISTA | 2019 | SILVER | 12/23/21 | 245966 | $400,000.00 | Y | N |
| | | | | | AMOUNT USED | $800,000.00 | | |
| **AUTO WHOLESALE SHORT TERM LOAN** | | | | | | | | |
| FERRARI | 812 | 2021 | RED | 11/15/21 | 261176 | $650,000.00 | Y | N |
| MCLAREN | 720S | 2020 | WHITE | 01/19/22 | 004229 | $315,000.00 | Y | N |
| LAMBORGHINI | HURICAN | 2018 | BLACK | 03/07/22 | A11207 | $330,000.00 | Y | Y |
| LAMBORGHINI | URUS | 2019 | BLUE | 03/07/22 | A01961 | $238,000.00 | Y | N |
| FERRARI | 812 SUPERFAST | 2020 | BLACK | 03/09/22 | 254693 | $425,000.00 | NO TITLE | N |
| | | | | | AMOUNT USED | $1,958,000.00 | | |
| | | | | | **TOTAL** | **$7,145,050.00** | | |

NOT A CERTIFIED COPY

FVP TR EX_004071

# EXHIBIT "E"

NOT A CERTIFIED COPY

FVP TR EX  004072

## FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**

SCOTT C. GHERMAN; 5612516625

Email  SGHERMAN@SCOTTGHERMANPA.COM

**B. SEND ACKNOWLEDGEMENT TO:**

# FILED

2021 Jul 13 12:51 PM

******* 202107709869 *******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| EXCELL AUTO GROUP INC. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S/INITIAL/S) | SUFFIX |
| 1c. MAILING ADDRESS Line One | | This space not available. | |
| 1001 CLINT MOORE RD., STE 101 | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | BOCA RATON | FL | 33487 | US |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| ZANKL | KRISTEN | | |
| 2c. MAILING ADDRESS Line One | | This space not available. | |
| 1001 CLINT MOORE RD., STE 101 | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | BOCA RATON | FL | 33487 | US |

**3. SECURED PARTY'S NAME**  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AUTO WHOLESALE OF BOCA LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS Line One | | This space not available. | |
| 6560 WEST ROGERS CIRCLE, SUITE #B27 | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | BOCA RATON | FL | 33487 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

All debtor's assets and properties wherever located, including without limitation all equipment of any kind or nature, any and all vehicle (also including "Locate Vehicles"), vehicle parts or inventory now owned or hereafter acquired, including without limitation: all accounts and accounts receivable, general intangibles, chattel paper whether tangible or electronic, together with all attachments, accessions, and equipment now or hereafter affixed thereto or used in connection therewith, all substitutions and replacements thereof and any products and proceeds thereof pertaining to Excell Auto Group Inc.

NOT A CERTIFIED COPY

**5. ALTERNATE DESIGNATION (if applicable)** ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ AG LIEN  ☐ NON-UCC FILING  ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK EXACTLY ONE  BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.05/2013)       Filing Office Copy       Approved by the Secretary of State, State of Florida

FVP TR EX_004073

# EXHIBIT "F"

NOT A CERTIFIED COPY

FVP TR EX_004074

Mail Lien Satisfaction to: Dept of Highway Safety and Motor Vehicles, Neil Kirkman Building, Tallahassee, FL 32399-0500

I # 1622978905
B # 2789379

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

Registered Owner:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

Date of Issue    03/22/2022

**Lien Release**
Interest in the described vehicle is hereby released

By _____
Title _____
Date _____

Mail To:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

**IMPORTANT INFORMATION**

1. When ownership of the vehicle described herein is transferred, the seller MUST complete in full the Transfer of Title by Seller section at the bottom of the certificate of title.
2. Upon sale of this vehicle, the seller must complete the notice of sale on the reverse side of this form.
3. Remove your license plate from the vehicle.
4. See the web address below for more information and the appropriate forms required for the purchaser to title and register the vehicle, mobile home or vessel. http://www.hsmv.state.fl.us/html/titlinf.html

## CERTIFICATE OF TITLE

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

**Lien Release**
Interest in the described vehicle is hereby released

| Prev State | Color | Primary Brand | Secondary Brand | No of Brands | Use | Prev Issue Date |
|---|---|---|---|---|---|---|
| KS | GRN | | | | PRIVATE | |

By _____
Title _____

| Odometer Status or Vessel Manufacturer or OH use | Engine Drive | Hull Material | Prop | Date of Issue |
|---|---|---|---|---|
| 817 MILES 03/02/2022 ACTUAL | | | | 03/22/2022 |

Date _____

Registered Owner

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

1st Lienholder
NONE

DIVISION OF MOTORIST SERVICES        TALLAHASSEE        FLORIDA        DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES

*Robert R. Kynoch*
Robert R. Kynoch
Director

Control Number  155160062

10 /8:  155160062

*Terry L. Rhodes*
Terry L. Rhodes
Executive Director

**TRANSFER OF TITLE BY SELLER** (This section must be completed at the time of sale.)

Federal and/or state law require that the seller state the mileage, purchaser's name, selling price and date sold in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment. This title is warranted to be free from any liens except as noted on the face of the certificate and the motor vehicle or vessel described is hereby transferred to:

Seller Must Enter Purchaser's Name: luxuryuase company        Address: 210 Summit Ave. Ste 41, montvale, NJ 07645

Seller Must Enter Selling Price _____        Seller Must Enter Date Sold: _____

I/We state that this ☐ 5 or ☐ 6 digit odometer now reads | | | 8|1|7| | X.| (no tenths) miles, date read _____ and I hereby certify that to the best of my knowledge the odometer reading

☑ 1. reflects ACTUAL MILEAGE.        ☐ 2. is IN EXCESS OF ITS MECHANICAL LIMITS.        ☐ 3. is NOT THE ACTUAL MILEAGE.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

SELLER Must Sign Here: *[signature]*        CO-SELLER Must Sign Here: _____

Print Here: Tiana Bailey        Print Here: _____

Selling Dealer's License Number: VF/1133543/1        Tax No. 60-8018195758-0        Tax Collected: lease

Auction Name: _____        License Number: _____

PURCHASER Must Sign Here: _____        CO-PURCHASER Must Sign Here: _____

Print Here: _____        Print Here: _____

NOTICE: PENALTY IS REQUIRED BY LAW IF NOT SUBMITTED FOR TRANSFER WITHIN 30 DAYS AFTER DATE OF PURCHASE

NOT A CERTIFIED COPY

STATE OF FLORIDA
**DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES**   FVP TR EX  004075
**DIVISION OF MOTOR VEHICLES**
2900 Apalachee Parkway  •  Neil Kirkman Building - Tallahassee, FL 32399-0620
**Notice of Sale of Motor Vehicle, Mobile Home or Vessel**

Section 319.22(2), Florida Statutes, requires that the seller file a Notice of Sale with the department within 30 days after the sale or transfer of the motor vehicle, vessel or mobile home. Filing this form removes any civil liability for the operation of the sold motor vehicle, vessel or mobile home. In addition to filing this form, we suggest you keep a copy of your bill of sale (we suggest it be notarized), certificate of title or other type of transaction document showing the vehicle was sold. **Complete the information below, tear the top portion of this document at the perforation and mail to the address above or submit to your local tax collector's office or license plate agency.**

I have this _____ day of _____, _____, transferred by assignment of and delivered Florida Certificate of Title to:

Name: Purchaser(s) _____   Purchaser's DL/ID _____
                    First              MI              Last

Address _____   Selling Price $ _____

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

Seller's Signature _____   Co-Seller's Signature _____

**NOTE: THE SUBMISSION OF THIS FORM, ACCURATELY COMPLETED, TO A TAX COLLECTOR'S OFFICE, LICENSE PLATE AGENCY OR TO THE ADDRESS ABOVE WILL ALLOW THE TITLE CLERK TO UPDATE THE DMV DATABASE TO REFLECT THE TITLE RECORD AS "SOLD". HOWEVER, THE OWNERSHIP STATUS WILL NOT CHANGE UNTIL THE PURCHASER APPLIES FOR AND IS ISSUED A CERTIFICATE OF TITLE.**

ODOMETER CERTIFICATION - Federal and state laws require that you state the mileage in connection with transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

**FIRST REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____   Selling Dealer's Name: _____   Tax No.: _____   Tax Collected: _____

Selling Dealer's Address: _____   Date Sold: _____

Purchaser's Name(s): _____   Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS ▦▦▦▦▦▦ XX (NO TENTHS) MILES, DATE READ ___/___/_____, AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX   ☐ 1. REFLECTS ACTUAL MILEAGE   ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)   ☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____   Co-Purchaser Must Sign Here: _____

Print Here: _____   Print Here: _____

Seller/Agent Must Sign Here: _____   Auction Name (When Applicable): _____

Print Here: _____   Auction License Number: _____

**SECOND REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____   Selling Dealer's Name: _____   Tax No.: _____   Tax Collected: _____

Selling Dealer's Address: _____   Date Sold: _____

Purchaser's Name(s): _____   Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS ▦▦▦▦▦▦ XX (NO TENTHS) MILES, DATE READ ___/___/_____, AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX   ☐ 1. REFLECTS ACTUAL MILEAGE   ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)   ☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____   Co-Purchaser Must Sign Here: _____

Print Here: _____   Print Here: _____

Seller/Agent Must Sign Here: _____   Auction Name (When Applicable): _____

Print Here: _____   Auction License Number: _____

**THIRD REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____   Selling Dealer's Name: _____   Tax No.: _____   Tax Collected: _____

Selling Dealer's Address: _____   Date Sold: _____

Purchaser's Name(s): _____   Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS ▦▦▦▦▦▦ XX (NO TENTHS) MILES, DATE READ ___/___/_____, AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX   ☐ 1. REFLECTS ACTUAL MILEAGE   ☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)   ☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____   Co-Purchaser Must Sign Here: _____

Print Here: _____   Print Here: _____

Seller/Agent Must Sign Here: _____   Auction Name (When Applicable): _____

Print Here: _____   Auction License Number: _____

NOT A CERTIFIED COPY

FVP TR EX  004076



EXHIBIT "G"

FVP TR EX 004077

## STATE OF FLORIDA — LIEN SATISFACTION

Mail Lien Satisfaction to: Dept of Highway Safety and Motor Vehicles, Neil Kirkman Building, Tallahassee, FL 32399-0500

T# 1622978905
B# 2789379

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

Date of Issue    03/22/2022

Lien Release
Interest in the described vehicle is hereby released

By _____
Title _____
Date _____

Registered Owner:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

### IMPORTANT INFORMATION

1. When ownership of the vehicle described herein is transferred, the seller MUST complete in full the Transfer of Title by Seller section at the bottom of the certificate of title.
2. Upon sale of this vehicle, the seller must complete the notice of sale on the reverse side of this form.
3. Remove your license plate from the vehicle.
4. See the web address below for more information and the appropriate forms required for the purchaser to title and register the vehicle, mobile home or vessel: http://www.hsmv.state.fl.us/html/titlinf.html

Mail To:

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

---

## CERTIFICATE OF TITLE

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| ZHWUM6ZD5KLA08766 | 2019 | LAMO | 2D | 3472 | | 140754945 |

Lien Release
Interest in the described vehicle is hereby released

| Prev State | Color | Primary Brand | Secondary Brand | No of Brands | Use | Prev Issue Date |
|---|---|---|---|---|---|---|
| KS | GRN | | | | PRIVATE | |

By _____
Title _____

| Odometer Status or Vessel Manufacturer or OH use | Engine Drive | Hull Material | Prop | Date of Issue |
|---|---|---|---|---|
| 817 MILES 03/02/2022 ACTUAL | | | | 03/22/2022 |

Date _____

Registered Owner

KARMA OF PALM BEACH INC
1001 CLINT MOORE RD STE 103
BOCA RATON, FL 33487

1st Lienholder
NONE

DIVISION OF MOTORIST SERVICES     TALLAHASSEE     FLORIDA     DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES

*Robert R. Kynoch*
Robert R. Kynoch
Director

Control Number    155160062

*Terry L. Rhodes*
Terry L. Rhodes
Executive Director

10 /8    155160062

### TRANSFER OF TITLE BY SELLER (This section must be completed at the time of sale.)

Federal and/or state law require that the seller state the mileage, purchaser's name, selling price and date sold in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

This title is warranted to be free from any liens except as noted on the face of the certificate and the motor vehicle or vessel described is hereby transferred to.

Seller Must Enter Purchaser's Name _____    Address _____

Seller Must Enter Selling Price _____    Seller Must Enter Date Sold _____

I/We state that this ☐ 5 or ☐ 6 digit odometer now reads | | | | | | | X | (no tenths) miles, date read _____ and I hereby certify that to the best of my knowledge the odometer reading

☐ 1. reflects ACTUAL MILEAGE    ☐ 2. is IN EXCESS OF ITS MECHANICAL LIMITS    ☐ 3. is NOT THE ACTUAL MILEAGE

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

SELLER Must Sign Here: _____    CO-SELLER Must Sign Here: _____

Print Here: _____    Print Here: _____

Selling Dealer's License Number: _____    Tax No: _____    Tax Collected _____

Auction Name: _____    License Number: _____

PURCHASER Must Sign Here: _____    CO-PURCHASER Must Sign Here: _____

Print Here: _____

NOTICE: PENALTY IS REQUIRED BY LAW IF NOT SUBMITTED FOR TRANSFER WITHIN 30 DAYS AFTER DATE OF PURCHASE.

HSMV 82250 (REV 3/15)    STATE OF FLORIDA

NOT A CERTIFIED COPY