# EXHIBIT 14

**Exhibit 14**

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION
CASE NO.22-15627-EPK

In Re:

AUTO WHOLESALE OF BOCA, LLC,

        Debtor,
_____/
FVP OPPORTUNITY FUND III, LP, a
Delaware limited partnership; FVP
INVESTMENTS, LLC, a Delaware
limited liability company; and FVP
SERVICING, LLC, a Delaware limited
liability company; and HI BAR CAPITAL,
LLC, a New York limited liability
company,
        Adversary Plaintiffs,
vs.
AUTO WHOLESALE OF BOCA, LLC,
        Adversary Defendant.
_____/

                        Virtual Proceeding
                        Thursday, 11:13 a.m. - 5:51 p.m.
                        January 12th, 2023

        VIDEOCONFERENCE DEPOSITION OF MOSHE FARACHE
                        VOLUME I
        Taken on behalf of the Adversary Plaintiffs before
Amber Cheek, Court Reporter, Notary Public in and for
the State of Florida at Large, pursuant to Amended
Notice of Deposition, Notice of Subpoena Duces Tecum For
Deposition in Adversary Case Of Corporate Representative
of Debtor in the above cause.

Page 2

APPEARANCES:

ATTORNEYS FOR PLAINTIFFS

JERRELL BRESLIN, ESQUIRE
jb@richardbaronlaw.com
BARON, BRESLIN & SARMIENTO
169 East Flagler Street
Suite 700
Miami, Florida 33131
(305)577-4626

JONATHAN SCHWARTZ, ESQUIRE
jschwartz@jonschwartzlaw.com
JONATHAN SCHWARTZ LAW PLLC
10200 Northwest 25th Street
Suite 111
Doral, Florida 33172
(973)936-2176

DAVID SOFTNESS, ESQUIRE
david@softnesslaw.com
DAVID R. SOFTNESS, P.A.
201 South Biscayne Boulevard
Suite 2740
Miami, Florida 33131
(305)341-3111

ATTORNEYS FOR MOSHE, LISA AND CHASE FARACHE AND FARACHE ENTITIES

SCOTT GHERMAN, ESQUIRE
sgherman@scottghermanpa.com
SCOTT C. GHERMAN, P.A.
902 Clint Moore Road
Suite 120
Boca Raton, Florida 33487
(561)757-6266

Page 3

APPEARANCES:

ATTORNEYS FOR HI BAR CAPITAL

JARRET HITCHINGS, ESQUIRE
jarret.hitchings@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER
301 South College Street
Suite 2150
Charlotte, North Carolina 28202
(704)749-8965

ATTORNEYS FOR AUTO WHOLESALE OF BOCA, LLC

JAMES MILLER, ESQUIRE
jbm@title11law.com
JAMES B. MILLER, ESQUIRE, P.A.
19 West Flagler Street
Suite 416
Miami, Florida 33130
(305)374-0200

ATTORNEYS FOR FRANKLIN CAPITAL FUNDING

PATRICK DORSEY, ESQUIRE
pdorsey@slp.law
SHRAIBERG, LANDAU & PAGE, P.A.
2385 Northwest Executive Center Drive
Suite 300
Boca Raton, Florida 33431
(561)443-0800

ATTORNEYS FOR KARMA OF PALM BEACH

HARRY WINDERMAN, ESQUIRE
harry4334@hotmail.com
LAW OFFICES OF HARRY WINDERMAN
2255 Glades Road
Suite 205E
Boca Raton, Florida 33431
(561)241-0332

Page 4

APPEARANCES:

ATTORNEYS FOR NICOLE MEHDIPHOUR

JASON RIGOLI, ESQUIRE
jrigoli@furrcohen.com
FURR & COHEN, P.A.
2255 Glades Road
Suite 419A
Boca Raton, Florida 33431
(561)395-0500

ATTORNEYS FOR EDWARD BROWN

AMANDA KLOPP, ESQUIRE
amanda.klopp@akerman.com
AKERMAN LLP
777 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
(561)653-5000

EYAL BERGER, ESQUIRE
eyal.berger@akerman.com
AKERMAN LLP
777 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
(561)653-5000

ALSO PRESENT:  Lisa Farache
Scott Zankl
Kristen Zankl
Katie Gleason
Shaya Baum
Greg Nelson
Mark Perry
Brian Rohl
Keith Lee
Miriam Jaime

Page 5

I N D E X

WITNESS:                              PAGE:

MOSHE FARACHE
Direct Examination by Mr. Breslin....................7
Witness Signature Page............................206
Errata Sheet......................................207
Certificate of Oath of witness....................208
Letter to Witness Re:  Reading....................210

EXHIBITS
NUMBER            DESCRIPTION            PAGE:

EXHIBIT 1      Amended Notice of Deposition.........38
               Notice of Subpoena Duces Tecum
               For Deposition In Adversary Case
               of Corporate Representative of
               Debtor

EXHIBIT 2      Auto Wholesale Inventory Report......38
               dated 12/30/2020
EXHIBIT 3      Auto Wholesale Inventory Report......38
               dated 12/30/2021

EXHIBIT 4      Debtor's/Defendant's Responses.......39
               And Objections to Plaintiffs'
               Duces Tecum Document Request in
               ECF 164
EXHIBIT A-01   Composite (Bates 000001 - 000044)...100
EXHIBIT A-02   AWB 2017 Tax Return.................127
               (Bates 000045 - 000069)

EXHIBIT A-03   Secured Promissory Note.............129
               dated 12/31/2018
               (Bates 000070 - 000086)

EXHIBIT A-04   AWB 2018 Tax Return.................135
               (Bates 000087 through 000106)

2 (Pages 2 - 5)

Page 6

I N D E X

EXHIBITS

NUMBER          DESCRIPTION          PAGE:

EXHIBIT A-05   AWB 2019 Tax Return..................141
        (Bates 000107 - 000147)
EXHIBIT A-06   AWB 2020 Tax Return..................148
        (Bates 000148 - 000175)
EXHIBIT A-07   Secured Promissory Note.............152
        dated 7/7/2021
        (Bates 000176 - 000195)
EXHIBIT B-01   Mercedes G550 deal jacket...........165
        Last four digits VIN 7603
        (Bates 000197 - 000206)
EXHIBIT B-03   Alfa Romeo deal jacket.............186
        Last four digits VIN 3628
        (Bates 000299 - 000309)

QUESTIONS WITH INSTRUCTIONS NOT TO ANSWER

Page    Line
9       24
13      17
47      3
60      20

BOOKMARKED FOR ATTORNEY BRESLIN

Page    Line
168     4

Page 7

Thereupon:

MOSHE FARACHE

was called as a witness and, having been first duly sworn and responding, "Yes," was examined and testified as follows:

DIRECT-EXAMINATION

BY MR. BRESLIN:

Q   Sir, please state your name for the record.

A   Moshe Farache.

Q   Your date of birth?

A   September 23rd, 1969.

Q   Your Social Security number?

A   I don't remember.

Q   Your address?

A   270 South Silver Palm, Boca Raton.

Q   Mr. Farache, who is present with you at the deposition today?

A   I have Jim Miller, Scott Gherman and Miriam.

Q   And who?

A   Miriam.

MR. MILLER:  Miriam Jaime.  She's my paralegal.

MR. BRESLIN:  Okay.  Will you spell that name for the record please.

MR. MILLER:  J-A-I-M-E.

Page 8

BY MR. BRESLIN:

Q   Mr. Farache, you're here pursuant to a subpoena that was issued to you.  Is that correct?

A   I think so.

Q   Sir, I'm going to share my screen with a document that will be identified as Exhibit Number 1.

MR. BRESLIN:  Ms. Court Reporter, there's going to be numerous exhibits that have a letter in front of them.  We're just going to keep the lettering that I have.  All right.  So these preliminary questions, I'm just going to give them a number.  Then after this, all the exhibits are going to have a letter and a number.  Okay.

Also, for everyone's information, I shared a Dropbox link for the exhibits.  I added some exhibits to it yesterday.  So I think what I'll do is at the conclusion of the deposition, to the extent that any more are added during the course of the deposition, I'll recirculate the Dropbox and get it to the court reporter so that can be included in the deposition.

I'm just giving everybody a heads-up.

BY MR. BRESLIN:

Q   Mr. Farache, I'm sharing my screen, and I'm showing you what purports to be an Amended Notice of

Page 9

Deposition and that is to take your deposition commencing today.  I'm going to scroll through this document and ask you if you recognize it.

Do you recognize this document?

A   I just look at it now, yes.

Q   All right.  Prior to you just looking at it right now, have you ever seen this document before?

A   Yes.

Q   When did you first see it?

A   I mean, like a couple weeks ago, we spoke about the deposition and dates and we got canceled and then we re-date the deposition.

Q   And so this document that's on the screen, that was delivered to you in some fashion either by email or handing it to you or by mail or fax, correct?

A   I'm not sure.

Q   Well, were you made aware that this document required you to bring certain documents and information to this deposition?

A   Yes.

Q   All right.  So if you look at the screen, it says, "Records Requested."  Do you see that?

A   Yes.

Q   All right.  So when you got a copy of this document, did you understand that to mean that you were

3 (Pages 6 - 9)

Page 10

required to bring certain documents and information to this deposition?

A   I mean, I have it with my legal team, so it's got to be here.

Q   All right.  Do you understand my question?

A   Can you repeat it please.

Q   Yes.

Did you understand that this document required you to bring certain documents and information with you to this deposition?

A   Can you repeat it one more time.  I'm sorry.

Q   Yes.

Did you understand this subpoena to command you or instruct you to bring certain documents and information with you to this deposition?

A   Yes.  I mean, my lawyers have all the paperwork.

Q   All right.  So my question to you is:  Do you understand that you had an obligation to bring certain information and documents, right?  It was your obligation.  You would agree with that, correct?

A   I got to see.  My lawyer is here, so they have the paperwork.  They're going to give them to me and I show you.

Q   All right.  So did you read this document to

Page 11

determine what you had to bring and not bring?

MR. MILLER:  Just for the record, this is Jim Miller speaking.  The Debtor produced and filed a response to court paper 164.  Mr. Breslin has copies of the documents that we've produced by email to Mr. Breslin as well.

MR. BRESLIN:  Hey, Jim, Jim, this is not going to go this way.  Okay.  You're not going to make speaking objections, A.  I asked the witness a question.  He can answer it in any way he wants.  What you're not going to do is instruct him how to answer.  Just so we're clear, that's not going to happen.

MR. MILLER:  Mr. Breslin, you're not going to cut me off.  Don't do it again.

I'm going to be very clear.  This is not a game.  Let me finish.  Your documents were produced.  A response was filed.  Your documents were produced.  You have a copy of the general ledgers.  We are not going to print them out.  It's over 270 pages.  If there's something in those ledgers you would like him to look at, feel free to do so.  We've produced those documents to you.  Okay.  So if you think we didn't give you something that we owed you, let us know.

Page 12

MR. BRESLIN:  All right.  And, Ms. Court Reporter, please certify that part of the transcript.

BY MR. BRESLIN:

Q   Let me go back to, Mr. Farache, were you made aware that you were required to bring certain documents and information to this deposition?

A   I mean, if I supposed to bring anything, then my legal team bring it to you or email to you.

Q   All right.  So my question to you, sir, was:  Were you aware that it was your obligation to produce certain documents pursuant to this subpoena?

A   And I think my legal team did it.

Q   But you would agree that you were aware you had an obligation, correct?

A   I think we support that.  So, you know, Jerry, I tried to answer you, but I'm assume you receive everything.

Q   So you assumed that we were provided everything that's on this list.  Is that correct?

A   I think so.

Q   All right.  Let me share my screen again.  Let's take a look at the list.  So it says, "Login and password for the QuickBooks file located in FVP second production, folder 13."

Page 13

Do you see where it says that?

A   Say it again.  You go for the number 1?

Q   Right, I'm reading number 1.  Can you read that on your screen?  Do you see what was requested?

A   Can you repeat it please.

Q   Sure.

Do you read English, sir?

A   Not really.

Q   Okay.  It requests the login and password for QuickBooks files that were provided to us in discovery.

Do you see where it requested you to bring the login and password?

A   A login password, I don't know if you can get that.

Q   Okay.  But do you see where we requested that?

A   Yes.

Q   Okay.  What is the login and the password for the AWB QuickBooks that was provided to us in folder 13?

MR. MILLER:  Objection.  Objection.

He's not providing the log-in and password information because it's in the cloud and we're not going to have everybody accessing it and modifying those records.  The hard copies of the records requested were produced by email to you in response to this Notice.  You have copies of them.  As I

4 (Pages 10 - 13)

Page 14

said before, it's over 270 pages. And we've identified that in court paper 180.

MR. BRESLIN: All right. Ms. Court Reporter, please certify that and we'll need an expedite on that.

BY MR. BRESLIN:

Q So, Mr. Farache, I assume you're going to follow your attorney's instructions and not answer that question, correct?

A Yes.

Q Now, the second request was documents pertaining to and detailing listing of transactions comprising the following balances from the 2021 AWB tax return. And then it says in subsection A, "Form 1065 page 1, line 15 'Interest.'"

Did you provide any documents in response to that request?

A Again, it's my legal team and I think you received everything from my legal team.

Q So you don't know, but you believe your lawyers provided it?

A Yes.

MR. MILLER: This is Jim Miller again. I would cite Mr. Breslin to court paper 180 at paragraph 5 indicating those documents were

Page 15

produced in folders 9, 5, 14 and 15 of our First Response To First Request For Production.

BY MR. BRESLIN:

Q All right. Mr. Farache, I'm looking at subsection B, "Schedule K line 5, 'Interest Income.'"

Did you bring any documents with you regarding that request?

A I believe my legal team support you with all of this paperwork.

Q So as far as you now, your lawyers responded to that request and you believe that that has been complied with, correct?

A Yes.

Q And would that be the same for Section C, "Schedule L line 3, 'Inventories'"?

A Yes, I believe my legal team support you with that too.

Q But you don't have any personal information regarding whether or not that has been complied with. You're relying on the advice of your attorneys.

Would that be an accurate statement?

A My legal team, yes.

Q When you say your "legal team," would that include Mr. Miller, Mr. Farrow, Mr. Dilley, Mr. Gherman and any other attorneys associated with those firms?

Page 16

A James Miller.

Q So when you say -- for the purposes of this deposition, when you say "legal team," you're referring to Mr. Miller, correct?

A Yes.

Q Okay. So Section D, "Form 1125-A line 2, 'Purchases,'" you believe that Mr. Miller has provided the documents requested in this subpoena, correct?

A Yes.

Q And as far as to questions number 3, 4 and 5, is it your belief that Mr. Miller has responded to this subpoena and supplied all of those documents requested?

A Can you read to me 3 separate from 4 and 5 so this way I can understand it please.

Q Sure.

Three says, "Any and all documents, bank records, communications, business records, that have been requested to be produced as above defined in the first request to produce served on the Debtor on August 24, 2022."

That's 3.

A Yes, I believe they produced those documents to you.

Q All right. And number 4, "Any and all documents, bank records, communications, business

Page 17

records, that have been requested to be produced as above defined in the second request to produce served on Debtor on September 13, 2022."

A Yes, I believe they produce it to you.

Q And is the same for number 5, "All deal jackets and other documents and communications produced in discovery in the Circuit Court Case CACE 22-5125 styled FVP vs. AWB at et al. in the Seventeenth Judicial Circuit of Florida"?

A Yes, I believe they produced that to you.

Q All right. Now, Mr. Farache, were you aware of what was produced in response to this subpoena? Did you actually see the documents produced?

A I can't tell you because I'm not a computer guy. So whatever they go over with me, I can tell you, you know, most of the paperwork I'm familiar with that. I'm going to tell I know it, I don't know, or I never no see it.

Q Okay. But my question to you is: Did you review what Mr. Miller sent to me in response to this subpoena prior to this date?

A Yes, most of it.

MR. MILLER: Just for the record -- this is Jim Miller speaking -- the documents responsive to request 3, 4 and 5 are actually referred to in

5 (Pages 14 - 17)

Page 18

request 3, 4 and 5 and having been produced responsive to the first request for production which is in a Drop link box which Mr. Breslin has.

The request to number 4 for the responses to the second production are in a Drop link box which Mr. Breslin has. And as request number 5, Mr. Breslin also has those in a Drop link box which Mr. Breslin has.

In regards to 2(a) through (d), Mr. Breslin was provided with these documents previously. One document though is not really a document producton. It's just a calculation on the face of the tax return.

And as we said, the request number 1 identifying the documents in folder 13 and the previous production by the Debtor, because it was password locked, we went ahead and printed PDF copies which we immediately forwarded to Mr. Breslin in response to this Notice of Examination.

So all the documents he's requesting he has possession of, and if there's something in those items he'd like to refer to, he can let us know.

BY MR. BRESLIN:

Q Mr. Farache, I'm going to share the screen

Page 19

with you. I was asking you whether or not you reviewed the documents that Mr. Miller responded with. And I show you what purports to be an email from Mr. Miller to me with two PDF documents.

Did you review this email for its accuracy before it was sent?

A Can you read it to me please.

Q Right.

It says, "Jerry, I'm attaching the last two documents inventory reports for 2021 tax return being produced herein as set forth in Debtor's response filed this even date to FVB's Amended Notice of examination."

That's what it says and then there's the document.

Did you review either of those documents prior to them being provided to me for their accuracy?

A To the best of my knowledge probably, because it's thousands and thousands of pages. So as I tell you yes, it's very hard for me to put the whole -- you know, I'm not a computer savvy guy. So everything I memorize. So if you show me something, I can tell you yes or no.

Q Well, right.

All we're talking about, Mr. Farache, at this moment is your response to my subpoena for you to appear and to bring information. And so I'm showing you the

Page 20

email I got from your attorney.

So my question is quite simple: Did you review what he sent me for accuracy before he sent it to me?

A I mean, most of the stuff, yes.

Q Okay. Now I'm talking specifically about the email that's on the screen, and that is this email that was sent on January 10th at 4:25 p.m. and that has two PDF documents there.

Did you review these two PDF documents for accuracy?

A If you open them, I can tell you. But you keep them closed, so it's hard for me to tell you anything. You know, I got to see stuff. I don't want to answer you if you don't show me.

Q Okay. So there's two documents that were attached. There's this document.

A Yes.

Q And there's this document.

A Yes.

Q All right. So let's go to the first document, the one that says, "12.30.21."

Who created this document?

A My bookkeeper, Michelle Martin.

THE COURT REPORTER: Mr. Farache, I need to

Page 21

get on screen. I can't see you at all.

THE WITNESS: Oh, I'm sorry.

THE COURT REPORTER: It's very important. I need you to lean in so I can see your mouth.

THE WITNESS: Michelle Martin.

THE COURT REPORTER: Thank you.

BY MR. BRESLIN:

Q Okay. So Michelle Martin created this spreadsheet, this document 12.30.21. Is that accurate?

A Yes.

Q When did she create it?

A I don't know.

Q Was it created in response to the subpoena?

A I don't know.

Q Well, when is the first time you saw this document?

A I see so many documents. I can't tell you where I see this one, where I see this one. I have boxes of papers.

Q Okay. And I understand there's just a lot of papers here. But the only thing I'm focused on right now is what you were asked to bring with you and what we were given. That's all we're talking about for right now. Okay.

So what I'm sharing on my screen shows a

6 (Pages 18 - 21)

Page 22

document that purports to show some information dated December 30, 2021, and so I'm asking you when was this document created?

A    I can't -- I don't know.

Q    So but you say Michelle Martin created it?

A    Yes.

MR. MILLER:  Mr. Breslin, can you give me one minute?

BY MR. BRESLIN:

Q    Did you request her to make it?

MR. MILLER:  Mr. Breslin, give me one minute. My computer just dropped.  I've got to get back on.

MR. BRESLIN:  No worries.  We'll wait.

BY MR. BRESLIN:

Q    Mr. Farache, who are you speaking to with? Mr. Farache, who are you speaking to?

A    Miriam.

Q    Mr. Farach, don't turn the microphone off please.  You're in the middle of a deposition.

A    Okay.  I'm sorry.

Q    What conversations did you just have?

A    She just basically showed me the two inventory lists, what you just showed me in the screen.  She showed me the paper, the hard copy.

Q    All right.  So you consulted with a lawyer in

Page 23

response to my question?

A    Okay.  I'm sorry.

Q    Is that correct?

A    Yeah, no problem.  I'm sorry about that.

Q    And who is the attorney that gave you a document and spoke to you just now?  What's that lawyer's name?

A    It's not a lawyer.  It's Miriam.

Q    And Miriam is who?

A    She's Jim's general manager.

Q    So she's an employee of Mr. Miller's law firm?

A    Yes, sir.

Q    Tell me exactly what Miriam just said to you?

A    She basically handed to me the two inventories; one from the '20 and one from the '21.

MR. MILLER:  She handed him the two exhibits that were identified that you're going through with him.

MR. BRESLIN:  Are you ready to go, Mr. Miller?

MR. MILLER:  Yeah.  I guess I got to wait for -- what is it -- the login person or whatever.

MR. BRESLIN:  Is there a reason why you can't proceed?  I mean, you can hear what I'm saying.

MR. MILLER:  Jerry, can you repeat yourself. I can't hear you.

Page 24

MR. BRESLIN:  I said is there a reason we cannot proceed?  Because you can hear what I am saying.

MR. MILLER:  No.  I just want to make sure that she logs me in when I get on.  But you can proceed now.

BY MR. BRESLIN:

Q    All right.  Mr. Farache, take a look at the screen.

MR. MILLER:  Jerry, if you're going to be showing the screen, hold on.  I do need to be online.

MR. BRESLIN:  Okay.

MR. MILLER:  Hold on, Jerry.  I've got 4 million emails you sent me.

MR. BRESLIN:  What do you need?  The link?

MR. MILLER:  I got to go back and find the link to get on. I'm in, Jerry.  I see your screen.

MR. BRESLIN:  Are we good?

MR. MILLER:  Yes.

BY MR. BRESLIN:

Q    All right.  Mr. Farache, please take a look at the screen, and I show you what purports to be a document that shows Auto Wholesale inventory dated

Page 25

12/30/21.  Do you see that?

A    Yes, sir.

Q    And that is one of two documents that were provided by your attorney in response to the subpoena, right?  Were you aware of that?

A    Yes.

THE COURT REPORTER:  Please make sure you stay on the screen.  I can't see you.

THE WITNESS:  I know, but I'm trying -- All right.  Yes.

THE COURT REPORTER:  Thank you.

BY MR. BRESLIN:

Q    Mr. Farache, is there a separate camera on that computer or is it built in?

A    I mean, we're trying to -- you know, I'm not the computer guy, but we're trying to get everything in one computer.

Q    All right.  If there's a camera that's attached, you can just turn it a little bit and that may help.

A    Okay.  Thank you.

Q    Take a look at the screen, and this is one of the documents that we got in response to the subpoena. Would you agree?

A    Yes.

7 (Pages 22 - 25)

Page 26

Q   So now I'm going to put the subpoena back up on the screen.  This document refers to which request?

A   I don't know.  Read it to me and I tell you which one.

Q   All right.  We have documents pertaining to a detailed listing of transactions regarding a tax return.  And there's four requests there.  And then the other three I just read to you.  It's any and all documents that were previously requested or otherwise requested in the State case.

So which request does that respond to?  Do you know?

A   Jerry, I wish if I can read and I can tell you without asking you a thousand questions.  I'm probably annoying you and I apologize for it.  But basically it say Auto wholesale inventory for December 21st and it's for the wholesale inventory for December 2020.

Q   Okay.  So to the extent that this document responds to any of the requests, this is it, right?

A   If you tell me exactly which one, I can say yes or no.  You know, I just want to make sure I don't give to you the wrong information.

Q   So this Auto Wholesale inventory 12/30/21, you said that this document was created by Michelle Martin, right?

Page 27

A   Yes.

Q   You don't know when she created it?

A   I don't.

Q   Do you know whether or not she created it in response to the subpoena?

A   I'm not sure because we have inventory -- you know, inventory list.

Q   Do you know whether or not this document was created in your QuickBooks systems or a separate system?

A   I don't know.

Q   How long has Michelle Martin been working for you?

A   Approximately eight till ten years.

Q   And she does all your bookkeeping?

A   Yes.

Q   All the information that goes to your accountants for your remember tax returns, is that information compiled by Ms. Martin?

A   Can you repeat this question please.

Q   Your tax returns are prepared by accountants, are they not?

A   My tax returns, yes.

Q   All right.  The information that's given to your accountants to prepare your tax returns, that's compiled by Michelle Martin, correct?

Page 28

A   I think so.  I mean, between both of them, they're working together to get it done.

Q   But Michelle Martin is the one that does the day-to-day bookkeeping and makes the entries into your QuickBooks and your other financial software, correct?

A   Yes.

Q   Do you know if you have any financial software other than QuickBooks?

A   Say again.  I'm sorry.

Q   Do you know if you have any financial software other than QuickBooks --

A   Based on my knowledge --

Q   -- to keep your books and records?

THE COURT REPORTER:  I'm sorry.  Hold on.  I need you to get on camera.  It's very important.

MR. BRESLIN:  There you go.

THE COURT REPORTER:  And you can't talk at the same time.  Okay.

So, "Do you have any financial software other than QuickBooks?"  The question again.

BY MR. BRESLIN:

Q   Mr. Farache, do you know what software Michelle uses to keep your books and records?

THE COURT REPORTER:  I think we're frozen.

MR. BRESLIN:  All this is off the record, Ms.

Page 29

Court Reporter.

(Discussion off the record.)

BY MR. BRESLIN:

Q   Mr. Farache, let me share my screen.  So let me just finish up with these documents so we can get started with the deposition.

So would you agree that two documents were supplied in response to the subpoena for your deposition?

A   Can you repeat it, Jerry.

Q   Yes.

I'm showing you two different documents on the screen, and these are the two documents that your attorney emailed to me in response to the subpoena before today.  Would you agree?

A   Yes.

Q   So you have no other documents and you brought no other documents with you as you sit here today, correct?

A   I don't bring anything because my legal team send it to you.  So you have it.

Q   Right, right.

But my point is:  I'm trying to get you to tell me that this is everything in response to my subpoena.  Is that an accurate statement, these two

8 (Pages 26 - 29)

Page 30

documents?

A   No.

Q   Correct?  I'm sorry.  What did you say?

A   No.

Q   Why?  Why is it a no?

A   Because whatever my team send to you, you have it.  So I don't know exactly what you have and what you don't have.

Q   But would you agree since you were the one that was responsible for bringing the documents, that I was emailed two documents in response to the subpoena other than being notified that we already had all that stuff?  Would you agree with that statement?

A   I don't really understand exactly what you're asking me here.

Q   Okay.  Do you know on what software program Michelle Martin created these two spreadsheets?

A   Basically we have QuickBooks, so that's the only things I can tell you.

Q   All right.  Now, have you ever used QuickBooks?

A   Myself?

Q   Yeah.

A   I wish.  Nope.

Q   Do you know how to use it?

Page 31

A   I wish.

Q   Is that a no?

A   No.

Q   How about Excel?  Do you use Excel to create data spreadsheets?

A   No.

Q   Now, the documents that we received in discovery, there's just a substantial amount of Excel spreadsheets.  Were all of those created by Michelle Martin as far as you know?

A   Yes.

Q   Now let's take a look at this first document that was sent to us.  It says, "Auto Wholesale Inventory 12/30/2021."

Now, when this references inventory, does this mean that every one of these cars was owned by Auto Wholesale of Boca on December 30th, 2021?

A   Yes.

Q   So every car on this list AWB had title to, correct?

A   AWB owned it, yes.

Q   So did they have title?

A   I can't answer that.

Q   Did they have possession of the car?

A   I can't answer that because, you know, it's

Page 32

still '21.  It's a year and-a-half ago.  It's almost two years.  I'm sorry.

Q   All right.  So let me try to clarify my question.

This shows a list of cars as of a certain date that is listed as Auto Wholesale inventory.  Do you see where it says that?

A   Yes.

Q   So every car on this list, does this list mean that Auto Wholesale of Boca owned every car on the list on that date, on 12/30/2021?

A   Yes.

Q   Now, is it your testimony that on that date, AWB had title to every one of those cars on this list?

A   I cannot tell you that.

Q   Can you tell me whether or not AWB had possession of these cars, physical possession?

A   They are in AWB and Excell Auto area in the building.  We have a space over there.

Q   Okay.  And we'll talk about that.

But is it your testimony, sir, that AWB physically had both possession and title to these vehicles on December 30th, 2021?

A   I can't tell you.  It's '21.  We're in '23.

Q   So you don't know and you didn't make this

Page 33

list.  Michelle Martin made this list.  Right?

A   Yes.

Q   Do you know where she got the information that she put in this list?

A   You know, we basically have a purchase order for every vehicle.

Q   Here's my question to you:  I'm looking at the list on the screen.  Did you help her create that list?

A   No.

Q   Did she ask you if this list was accurate?

A   We going over the inventory.

Q   Did you go over this list with Michelle Martin?

A   I can't tell you.  You know, Jerry, it's hundreds and hundreds.

Q   All right.

A   You know, for me to tell you something from, you know, 12/30/21, I got to be a genius.  I'm sorry.

Q   And I'm not trying to get you to say anything you don't know.  But I just got this document, okay, this week, and it says that on December 30th, 2021, AWB owned, you know, quite a few vehicles, and you're telling me that Michelle Martin created this list and your attorney sent me this list this week.

You're aware of that, right?

9 (Pages 30 - 33)

Page 34

A   Yes.

Q   So my question to you is:  Did you go over this list with Michelle Martin to make sure that it was accurate prior to it being delivered to me?

A   Probably in December 30th, 2021.  But, you know, based on my knowledge, not recently.  It's a year and-a-half ago.

Q   So what you're saying is that this document was created back then, back December 30th, 2021, right?

A   I'm assume.

Q   So you don't know when it was created?

A   This kind of stuff, you know, it's over around 12 months and, you know, it's hundreds and hundreds vehicle going back and forth.

Q   But before this document was sent to me, did you look at it to make sure it was accurate?

A   Not really.

Q   Now let me take a look at the next one, and this is for 12/30/2020.  Did you look at this document before it was sent to me to determine if it was accurate?

A   I look at it, but I don't go to each jacket to let you know exactly.

Q   Did you check it for accuracy?  That's my question.

Page 35

A   I can't tell you that.

Q   So this list then was created by Michelle Martin, correct?

MR. MILLER:  Mr. Breslin, you've got to let him finish his answer.  You're cutting him off.

MR. BRESLIN:  Oh, I'm sorry.  I didn't hear.

MR. MILLER:  He's trying to talk and you just move on to the next question.

BY MR. BRESLIN:

Q   I'm sorry, Mr. Farache.  I guess I'm having a little trouble hearing you.  I can turn up my volume here.  Did you want to say anything else?

A   I basically told you, you know, it's from December 30, 2020.  So it's two years ago or three years ago.

Q   And I understand that that's the date on it, but you also told me you don't know when this list was created, right?

A   I'm assuming everything, you know, is from the dates you see on the top of it, but I can't -- you know, I'm not a computer savvy.  So everything you show me, it's hard to me to answer you exactly what you're looking for, and it's a big frustration for you.

Q   Did you talk to Michelle Martin about this list that she created?

Page 36

A   I talked to --

Q   The one that's on my screen.

A   I basically talked to her about thousands and one things.

Q   Okay.

A   So maybe I can't tell you, you know.

Q   All right.  This is very a direct question.  I'm only talking about two documents that we were given this week.  I'm trying to find out where they came from, who created them and when they were created.

Do you understand that that's the questions I'm asking?

A   Yes.

Q   Okay.  We already talked about the other list.  Now we're on this list.  We're on the 12/20/202 list.

Do you know when this list, the one that was delivered to me, the one that's on my screen, was created?

A   I don't know.

Q   Do you know who created this list?

A   I mean, anybody can create it, but it looks it's coming from my legal team, so it's probably Michelle Martin.

Q   Do you know?

A   Say again.  I'm sorry.

Page 37

Q   Do you know who created this list?

A   If it's come from my legal team, it's probably my bookkeeper.

Q   Okay.  And this will go for the rest of the deposition.  If you don't know, that's a perfectly fine answer, but I would ask you not to speculate.  Okay?

Do you understand what I mean?

A   Yes.

Q   So I would rather you didn't tell me what probably happened.  You either know or you don't know.  Okay?

A   No problem.

Q   All right.  So do you know who created this list that's on my screen that was delivered to me this week?

A   If it's come from my legal team, probably Michelle Martin, my bookkeeper.

Q   Are you sure?

A   I tell you probably it's from Michelle Martin because I don't create lists.

Q   Did you have any conversations with Michelle Martin where this list came from?

A   I can't tell you exactly, but when I take a break, I can call her and ask her.

MR. BRESLIN:  For the record, Ms. Court

10 (Pages 34 - 37)

Page 38

Reporter, those documents, the Amended Subpoena will be Number 1, the 2020 report will be Number 2, and the 12/30/21 will be Number 3. Those will be the only exhibits that do not have a letter associated with them.

(FVP Exhibit 1, Exhibit 2 and Exhibit 3 were marked for Identification.)

BY MR. BRESLIN:

Q Let me just show you one more document and then we'll move on. This is what purports to be a document that your attorney filed in response to that subpoena that I showed you earlier.

Were you aware that your attorney filed this document?

A I'm assuming.

Q All right. If we could go back to what I just asked you to do a few minutes ago is not assume. If you don't know, please tell me you don't know. Okay? Agreed?

A I'm trying but, Jerry, I'm not a lawyer. You know, you ask a question. I'm not at my computer the whole day. I'm not a computer guy.

Q I understand and I'm just simply asking you questions to try to determine what your knowledge is, what you know and what you don't know. That's all this

Page 39

is about. Okay?

A I'm trying to giving you the right answer.

Q All right. So the document that's on my screen, the response and objection that was filed by your attorney, did you review that at anytime before today where it's now on the screen? Have you ever seen this document before?

A I'm not sure.

Q Do you know whether or not what's stated in this objection is accurate?

A If you read it to me, I can try to understand it please.

MR. MILLER: Ms. Court Reporter, this will be Exhibit Number 4.

(FVP Exhibit 4 was marked for Identification.)

MR. MILLER: Jerry, can I just say one thing please?

MR. BRESLIN: Of course.

MR. MILLER: Mr. Winderman, we're all enjoying watch you eat your lunch, but you might want to shut your video off.

You can go back, Mr. Breslin.

(Discussion off the record.)

BY MR. BRESLIN:

Q So let's talk about -- Mr. Farache, we're back

Page 40

to you now. We're back on the record. Now, let's talk about your ability to read. Can you read English?

A No.

Q Can you read any language?

A Yes.

Q What languages can you read?

A Hebrew.

Q So if a document is not in English, you don't know what it says?

A I can finagle -- I don't know how to say that exactly. But, you know, that's why I always ask you to help me, because when you read it, I can understand it better.

Q Okay. And I misspoke. What I meant to say was if it's not in Hebrew, you can't understand it. I think I said English.

Did you understand my question?

A Can you repeat it please.

Q Yes.

If the document is written in Hebrew, you can read it and understand it, correct?

A I'm not that educated. As much as I can, yes.

Q In Hebrew. You understand written --

A I'm still not educated, Jerry. I don't finish seventh grade.

Page 41

Q All right. So you have trouble reading the written language in any language. Is that accurate?

A You know, I make it to middle school.

Q Mr. Farache, I am not trying to minimize you as a businessman or as a person in any way. I'm simply trying to determine whether or not you can understand the English language when it is written and you're shown a document that's in English, whether or not you can understand what it says.

A As much as I can. That's why I always ask you please to repeat it and if you can read it to me because, you know, I'm not that educated. That's my biggest problem.

Q Okay. And you own multiple businesses and the businesses conduct their business in English, correct?

A Can you repeat it please.

Q When did you come to this country?

A 1995.

Q Are you a citizen?

A Yes.

Q When did you become a citizen?

A I'm not sure. Sometime between '95 till '90 -- I'm not sure.

Q And I'm going to give a list of companies and I want you to tell me whether or not you have an

11 (Pages 38 - 41)

Page 42

ownership interest in them.  Okay?

A   Please.

Q   M&M Development Consultants, LLC?

A   No.

Q   You have no ownership interest or any affiliation with that company?

A   Just business relationship.

Q   Do you know who owns this company?

A   Yes.  Mr. Early.

Q   Who?  I'm sorry.

A   Mr. Early.

Q   Can you spell that please.

A   You ask the wrong guy.  Just Early.

THE COURT REPORTER:  Early?

MR. GHERMAN:  Mr. Early.

THE COURT REPORTER:  Oh, there was a bad echo.  I can't hear you.

BY MR. BRESLIN:

Q   I believe Mr. Gherman was saying Early, E-A-R-L-Y.  Does that sound familiar?

A   Early.  I mean, that's the way I pronounce it.

Q   So you can't spell in English either I take it, correct?

A   Not really.

Q   So what type of business do you do with M&M

Page 43

Development Consultants?

A   If it's investment or it's any service business and I need his help or anything, we just do it together.

Q   So you have no ownership interest in the company, but you've done business deals with him, correct?

A   Yes.

Q   And what type of company is that?  What business are they in?

A   Just service.  We all in the service business.

Q   Salvage?

A   Service, service.  You know, we do service business.  We all come from the service business.

Q   You said service or salvage?

A   Service.

Q   Service?

A   Yes.

Q   And what type of services does that company provide?

A   They used to do house managing.

Q   When is the last time you did a business transaction with M&M Development Consultants, LLC or Mr. Early?

MR. MILLER:  Objection.

Page 44

Mr. Breslin, are you asking him as the corporate representative of AWB or are you asking him individually?

MR. BRESLIN:  Either one.

BY MR. BRESLIN:

Q   When is the last time you, Moshe Farache, did any business with M&m Development Consultants, LLC?

A   Probably once a month.  Twice a month.  Depends on the phone calls, you know, for service.

Q   Now, when you conduct a business transaction with M&M, do you do that personally or do you do that through AWB?

A   It depends.  It depends.  I can't tell you.

Q   You can't tell me because you don't know or you can't tell me for some other reason?

A   Because I don't have -- you know, you don't show me any documents.  If you show me something, I can answer you.  But, you know, we have different type of service business, so I can't tell you.

Q   All right.  Explain to me what the last bit of service business was you did with M&M Development either personally or through AWB.

A   Water damage or just consulting.  He use me.  I use them for consulting.

Q   What type of consulting?

Page 45

A   Water damage.  We are a restoration business.

Q   And what's the name of your restoration business?

A   EES.

Q   Say that again.

A   EES.

Q   So EES is your company, correct?

A   Yes.

Q   What's the full name of that company?

A   Express Emergency Service.

Q   Express --

A   Let me look at my business card so I can tell you.

Q   Sure.

A   Express Emergency Service, Inc.

Q   Express Emergency Service, Inc.  And who owns that company?

A   Moshe Farache.

Q   Who else?

A   That's it.

Q   All right.  So Moshe Farache owns one hundred percent of the stock of Express Emergency Service, Inc.  Is that accurate?

A   Based on my knowledge, yes.

Q   And that's a Florida corporation?

12 (Pages 42 - 45)

Page 46

A   Say it again.  I'm sorry.

Q   That's a Florida corporation?

A   USA, yeah.  I mean, it's in America, yes.

Q   Do you know where that company was formed?  Do you know whether or not it was formed in Florida or some other state?

A   Florida.  I'm always in Florida.

Q   Getting back to M&M Development Consultants very briefly, did you ever own any interest in that company?

A   Can you repeat it please.

Q   Did you ever own any interest in M&M Development Consultants, LLC ever?

A   No.

Q   Were you ever an officer or an employee of that company?

A   No.

Q   So all of your transactions with that company were through either yourself personally as an independent contractor or one of your businesses, correct?

A   Can you repeat it please.

Q   Yes.

All of your business with M&M Development Consultants, LLC was conducted either by you personally

Page 47

or through one of your businesses, correct?

A   Yes.

Q   When was Express Emergency Service formed?

A   Between 2011 til 2012 or '13.  Somewhere around that.

Q   Is that company still in existence?

A   Can you repeat it please.

Q   Yes.

Does that company still operate?  Is it still an operating company?  Does it do business?

A   Yes.

Q   And generally how much income did it earn for the year 2022?

MR. MILLER:  Objection.  Outside the scope.

MR. BRESLIN:  Ballpark.

MR. MILLER:  Objection.  Outside the scope of corporate representative for AWB.

Jerry, you're getting far a fetch.  I'll let you go for a little while, but you're getting way down a path.  This is a corporate representative deposition in an adversary proceeding.  This is not a general 2004 examination.

You know what?  I'm going to instruct you not to answer the question on the income.

MR. BRESLIN:  All right.  Please certify that,

Page 48

Ms. Court Reporter.


BY MR. BRESLIN:

Q   Farache Enterprises, Inc., you own that company, correct?

A   Yes.

Q   Are there any other owners to that company?

A   I don't think so.

Q   How long has that company been in business?

A   A long time.

MR. MILLER:  I'm going to make the same objection.  You're going far afield from a corporate representative of Auto Wholesale.

Mr. Farache, your answers to today's questions are strictly limited to your capacity as the corporate representative of the Debtor corporation, not you personally.  Okay.  So you answer questions about the corporation Auto Wholesale of Boca, no other entities, unless they did business obviously.

THE WITNESS:  Okay.

MR. BRESLIN:  So are you instructing him not to answer that question?

MR. MILLER:  If you want to lay a predicate.

MR. BRESLIN:  Mr. Miller, this is real simple.

Page 49

I'm going to ask the questions and your client is going to either answer or he's not.

MR. MILLER:  Ask your question.

MR. BRESLIN:  What I'm not going to do is answer your questions.

MR. MILLER:  And I'm not going to answer you.  How about that?  Just ask your question.

MR. BRESLIN:  All right.  Well, okay.  Great.

BY MR. BRESLIN:

Q   Now, as for Farache Enterprises, Inc., you said you owned that, correct?

MR. MILLER:  Same objection.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q   Does AWB own any interest in Farache Enterprises?

A   No.

Q   Does AWB own any interest in Express Emergency Service?

A   No.

Q   And Farache Enterprises, Inc., what type of business does that do?

A   Just land development in general.  Different businesses.

Q   Did you say lender?

13 (Pages 46 - 49)

Page 50

A   Land development.

Q   I didn't understand.

A   Total site development.

Q   Development?

A   Total site development.

Q   Total site development, is that what you said?

A   Yes.

Q   I don't know what this is.  Could you explain that please.

A   It's a company used to be in the land development of mine.

Q   So the name you just gave me is to a company?

A   That's Farache Enterprises, total site development.

Q   Oh.  So Farache Enterprises also goes by another name?

A   No.  It's the same name, but you asked me what the company does, no?

Q   Right.

A   You want to repeat the question so I answer?

Q   No, no, I'm not going to repeat that question.
How about Mazel Tov, Inc.?

A   Mazel Tov?

Q   Does AWB have any interest in Mazel Tov, Inc.?

A   No.

Page 51

Q   Did AWB do any business with Mazel Tov, Inc.?

A   Sometimes I think in the past.

Q   And what type of business did AWB do with Mazel Tov?

A   Just looking for transactions deal, buying and selling.

Q   All right.  Does AWB owe any money to Mazel Tov?

A   I'm not sure.

Q   Does Mazel Tov owe any money to AWB?

A   I'm not sure.

Q   And who owns Mazel Tov?

A   I think it's my kid's corporation.

Q   Which kid?

A   Jake and Chase.  Or Chase.  I'm not sure.

Q   So you don't know who owns Mazel Tov?

A   One I think both of them own it.  You can look on the tax records.

Q   All right.  But you have no ownership interest in it?

A   I don't think so.

Q   And AWB has no ownership interest in it?

A   No.

Q   How about your wife Lisa?  Does she have any ownership interest in it?

Page 52

A   I don't think so.

Q   How about Pompano 2009, LLC?  What can you tell me about that company?

A   That's a real estate company used to own a piece of property in Pompano Beach.

Q   Did AWB ever do business with that company?

A   I'm not sure.

Q   And does AWB owe that company any money?

A   I'm not sure.

Q   And does that company owe any money to AWB?

A   I'm not sure.

Q   And do you own that company?

A   It's not exist anymore.

Q   So it has no owners as far as you know?

A   As far as I know based on my knowledge, no.

Q   Okay.  How about MMS Ultimate Services, Inc.?  Tell me about that company.

A   It's nothing to do with me.

Q   So MMS Ultimate Services, Inc., you have no ownership interest in that company?

A   No.

Q   Do you know who owns that company?

A   Mr. Early.

Q   Mr. Early.
And does AWB do any transactions with MMS

Page 53

Ultimate Services?

A   In the past, yes.

Q   Does AWB owe any money to MMS Ultimate Services, Inc.?

A   Yes.

Q   And does MMS Ultimate Services, Inc. owe any money to AWB that you're aware of?

A   Based on my knowledge, no.

Q   All right.  How much is the debt that AWB owes to MMS?

A   Four hundred thousand.

Q   And how did that debt come into existence?

A   We invest in some vehicle and we got default.  Somebody stole the vehicle and sold it.

Q   So AWB entered into a transaction with MMS and purchased an automobile?

A   Yes.

Q   One automobile?

A   I'm not sure.

Q   Well, did you put up any money?

A   Yes.

Q   Did you put it up or did AWB put it up?

A   AWB, not myself.

Q   So AWB put up some money for an automobile, right?

14 (Pages 50 - 53)

Page 54

A  Can you repeat it, Jerry.

Q  Yes.

You told me that AWB put up money with MMS and purchased an automobile.  Is that accurate?

A  Yes.

Q  When did that happen?

A  I'm not sure.

Q  Do you know what year it happened?

A  I think in '22, sometime in '22.

Q  So do you know when in '22?

A  I can't tell you that, Jerry.  Sorry.

Q  So how much money did AWB put up for the automobile?

A  I'm not sure.

Q  What automobile was the money put up for?

A  I'm not sure.  I got to look in my paperwork.

Q  How much money did AWB put up?

A  I'm not sure.  I told you that.

Q  Do you know how much money MMS Ultimate Services, Inc. put up?

A  Four hundred.

Q  They put up 400 and AWB also put up some amount of money, correct?

A  Yes.

Q  And that was to buy one car or more than one

Page 55

car?

A  I'm not sure.

Q  All right.  Auto Wholesale of Boca, when was that company formed?

A  Sometime in early 2000s.  Between 2010 and 2012 I think.

Q  And tell me, as we sit here today, who are the members of Auto Wholesale of Boca?

A  Myself, my wife, and my sons a small, small percentage.

Q  Is there an Operating Agreement for Auto Wholesale of Boca?

A  Based on my knowledge, no.

Q  So how have you determined who the owners of Auto Wholesale of Boca are?

A  That's about my limit questions, Jerry.

Mr. Breslin.  I'm sorry.  I'm calling you Jerry all day.

Q  You can call me Jerry.  That's perfectly fine.

A  No, I want to call you Mr. Breslin.  You're a little bit older than me, so I got to give you some respect.

Q  I'm a lot older --

A  I like you older than me.

Q  -- unfortunately.

Page 56

A  Mr. Breslin.  I'm sorry.  I've been calling you Jerry the whole day.

Q  Whatever you want to call me is fine.

So let's talk about the ownership of AWB.  We'll call Auto Wholesale of Boca AWB for the rest of your depo, okay, so you understand.  All right?

A  Can you repeat it, Mr. Breslin.

Q  Yes.  What I said is I'm going to refer to Auto Wholesale of Boca as AWB.  Okay?

A  Okay.

Q  Now, there are no other companies that you have any ownership interest in that use the name Auto Wholesale of Boca or Auto Wholesale, correct?

A  No.

Q  Other than AWB?

A  No.

Q  All right.  So you said that you're an owner of AWB, your wife is an owner of AWB and your son is an owner of AWB, correct?

A  Based on my knowledge, yes.

Q  Now, that company was formed back in 2012, wasn't it?

A  I told you between 2010 and 2012 sometime.

Q  All right.  And whose idea was it to form that company?

Page 57

A  I think it's my idea.

Q  And when the company was formed, how did you determine who had ownership interest?  Was there a piece of paper that stated how much you own and how much your wife owns and how much your son owns?

A  You're above my limit, Mr. Breslin, with your question.

Q  So as far as you know, there's no documents anywhere that would say and state what the ownership interests are in that company, correct?

A  You're above my limit.

Q  I don't know what that means.  Does that mean you don't know the answer?

A  I don't know the answer.

Q  Okay.  If you don't know, please say you don't know.

So do you know how much of the company you own?

A  I don't know.

Q  Do you know how much of AWB your wife Lisa owns?

A  I don't know.

Q  Do you know how much of the company your son Chase owns?

A  Small, small percentage.

15 (Pages 54 - 57)

Page 58

Q   Do you know what that percentage is?

A   I don't know.

Q   Now, you have two sons, correct?

A   Yes.

I have also a daughter and I have a granddaughter.

Q   Oh, okay.  I'm sorry.

A   I'm younger than you and I have a granddaughter.

Q   Excellent.  I'm very happy for you.

A   Thank you.

Q   That said, what is your -- there's Chase.

What's your other son's name?

A   Jake.

Q   Jake.

And your daughter's name?

A   Samantha.

Q   Samantha.

Now, does Jake or Samantha have any ownership interest in AWB?

A   No.

Q   Does Jake or Samantha have any interest in any of your other companies that you're aware of?

A   No.

Q   Does Chase, your son Chase Farache, does he

Page 59

have any ownership interest in any of your other companies other than AWB that you're aware of?

A   No.

Q   And your wife Lisa, does she have any ownership interest in any other companies other than AWB that you're aware of?

A   I'm not sure about that.  I don't know.

Q   Who was it that you went to, to have Auto Wholesale of Boca created?

A   It's almost 11 years ago.  I can't tell you.

Q   Do you recall if you went to an attorney or you had one of your employees do it?

A   I'm not sure.

Q   Would it be safe to say when it comes to filling out forms and documents and filing things, that you rely on other people that are fluent in English and that understand the nature of the documents?

A   Can you repeat yourself, Mr. Breslin.

Q   Yes, yes.

Since you don't read English, would it be safe to say that when it comes to documents and forms and business documents and records, that you rely on other people that have the ability to read those documents to explain what those documents are and what they mean?

A   I mean, this is a very general question, you

Page 60

know.

Q   You told me you don't read English, right?

A   Yes.

Q   So in the discovery that was provided in this case, there's numerous legal documents.  There's notes and affidavits and all kinds of documents.

When you are presented with a document that's in the English language, how do you determine what it says?

A   I have some support team, and like I said to you before, I finagle, read it.  You know what I'm trying to say?  You know, some of the stuff, I can look at it and I can put it together if it's in my industry and my knowledge.  You know, but usually I take it to my support team and they read it to me.

Q   And who is your support team?

A   You know, I have Scott Gherman.

Q   Who else?

A   He is my general legal team.

Q   So would it be safe to say when it comes to legal documents that are in the English language that you have signed that you would have relied on Mr. Gherman's advice to you about what those documents say and mean?

MR. MILLER:  Objection.  Calls for legal

Page 61

advice, so I'm going to advise you not to respond to the question.

MR. BRESLIN:  Ms. Court Reporter, for all certified questions, I'd like a separate transcript of those and only those.

THE COURT REPORTER:  Okay.

MR. BRESLIN:  And you can do those on an expedite please.  That will apply to all of the questions that are objected to and not answered. All right?

THE COURT REPORTER:  Yes.

BY MR. BRESLIN:

Q   Now, when it comes to AWB, how often would you have meetings of the members of AWB?

A   I can't tell you.

Q   Did you ever have any members meetings or owners meetings regarding the operation of the business AWB?

A   Basically twice a week we go over the inventory and, you know, we go and make sure almost every other day just to make sure our inventory is on the floor.

Q   And who would that meeting be with?

A   Michelle Martin and myself.

In 2022 I really pay attention to my

16 (Pages 58 - 61)

Page 62

inventory.

Q   Now Michelle Martin, she has no ownership interest in AWB, correct?

A   No.

Q   She is an employee of that company?

A   W-2 -- I mean, subcontractor.

Q   So she is not a W-2 employee?  She doesn't get a salary?

A   W-9.

Q   And how long has she been with the company again?

A   Many years.

Q   Does she work only for AWB or does she work for other companies as well?

A   Other companies as well.

Q   All right.  So would it be safe to say that as far as Michelle goes, she was and is your bookkeeper for not only AWB but for all your other companies?  Would that be accurate?

A   Most of them, yes.

Q   Are there any companies that she would not have a participation in as a bookkeeper?

A   Some of them.

Q   Can you tell me which ones.

A   We have a mechanic shop, I have interests over

Page 63

there, and she has nothing to do with that.

Q   And that's Excell Auto Service?

A   I think so.

Q   Now, you have an ownership interest in that company, do you not?

A   Four people.

Q   Who are the owners of that company?

A   Four people.

Q   Their names please.

A   Jay, Rob, Scott, Moshe.

Q   Do you know Jay's last name?

A   No.

Q   And Scott, is that Scott the lawyer, Scott Gherman?

A   No.

Q   Do you know Scott Zankl?

A   Yes, sir.

Q   And who is the other one?

A   Rob.

Q   What's Rob's last name?

A   I don't know.

Q   And how long have you been partners with these people in that business?

A   More than five years I think.

Q   And when that company was formed, did you put

Page 64

up any money?

A   Yes.

Q   How much money did you put up?

A   Probably a few hundred thousand.

Q   And was that your personal money or was that AWB money?

A   I'm not sure.

Q   Well, when you put up money for any particular business or venture, at what point would you make a determination of whether or not that was going to be your money you were using or AWB's money?

A   Can you repeat the question please.

Q   Yeah.

How does one determine whether or not money came from you or money came from AWB?

A   I can't answer that.

Q   Did you ever keep notes or records as far as your personal and AWB's investments in other companies?

A   I can't answer you that.

Q   Before you formed AWB back in 2012, did you ever have conversations with Scott Zankl about the company?

A   I'm not sure.

Q   What prompted you to form a company to sell wholesale automobiles?

Page 65

A   My tenant.

Q   And who was your tenant?

A   Scott, Excell Auto.

Q   All right.  So you were a landlord at that time to a tenant Excell Auto, correct?

A   Not myself.  My wife owned the building.  So I'm basically the manager.  I'm the running -- I want to make sure everything is right.

Q   So back when AWB was formed, your wife owned what building?

A   The 1001.

Q   What's the whole name?

A   1001 Clint Moore.

Q   Thank you.

And is there a company by that name?

A   Say again.  I'm sorry.

Q   Is there a company by that name?

A   1001, yes.

Q   All right.  So your wife owns a company that is named 1001 Clint Moore, LLC., correct?

A   Based on my knowledge, yes.

Q   And 1001 Clint Moore, LLC is wholly owned by your wife Lisa.  Is that accurate?

A   Yes.

Q   She owns a hundred percent of it?

17 (Pages 62 - 65)

Page 66

A   Yes.

Q   What year were you married?

A   How long?

Q   Yeah.  What year did you get married?

A   1997, February 1997.

Q   And the company, as far as you know, 1001 Clint Moore, LLC, that company owned a building in which Excell Auto and Scott Zankle were tenants, right?

A   Excell Auto, yes.

Q   So the company Excell Auto?

A   Yes.

Q   And were you also a tenant at that time in that building?

A   Yes.

Q   Now, at the time that you formed AWB, was the lease for Excell at a location different than the 1001 Clint Moore?

A   I can't understand the question, Mr. Breslin.

Q   Okay.  Excell was a tenant of yours, or actually you're wife's company, prior to moving to the address in Palm Beach that it was located on when it filed bankruptcy, correct?

A   Can you repeat it, Mr. Breslin.

Q   Yes.

Excell Auto Group was a tenant of your wife's

Page 67

company or one of your wife's companies before it moved to its current address or the address it had when it filed for bankruptcy, correct?

A   I'm trying to understand.  I'm sorry, Mr. Breslin.

Q   Did Excell Auto Group have a location other than the 1001 Clint Moore as the tenant of your wife's company?

A   Besides this location?

Q   Right.

A   I don't know.

Q   Did you have conversations with Scott Zankl about relocating to the 1001 Clint Moore address?

A   I don't remember.

Q   It was right around the time that Excell moved into that address that you formed AWB, correct?

A   Yes.

Q   And you formed AWB to be in business with Excell Auto Group and Scott Zankl, correct?

A   No.

Q   Why did you form AWB?

A   Because he basically tell me an opportunity if I can buy cars, I can wholesale them and he can tell me about some opportunity and I can buy and sell them.

Q   So it was he that had told you about buying

Page 68

and selling cars and that there was money to be made.  Is that accurate?

A   Can you repeat it please.

Q   Yes.

It was Scott Zankl that first told you about the opportunity that you could have in buying and selling luxury cars, correct?

A   Cars in general.

Q   Say that again.

A   Cars, not luxury.  It doesn't have to be luxury.

Q   All right.  But automobiles, correct?

A   Yes.

Q   And at that time, Excell was selling sports cars and luxury cars, was it not?

A   I don't know.

Q   Well, weren't they a tenant?

A   They were a tenant, yes.

Q   So before you formed Auto Wholesale of Boca, you didn't pay attention to Excell's business?

A   I know them but I never no pay attention.

Q   So you formed AWB in 2012 as a company that would be able to buy and sell automobiles, correct?

A   Yes.

Q   And at that time, did you have any knowledge

Page 69

of the automobile business?

A   A little bit.

Q   Prior to forming AWB, did you buy or sell automobiles for a profit with any of your companies?

A   Yes, a lot.

Q   Which companies?

A   FEI.

Q   And what automobiles did you buy and sell for a profit with that company?

A   Heavy equipment.

Q   But not automobiles?

A   Big trucks, big garbage trucks, big dump trailers.

Q   All right.  But, as I said, prior to you forming AWB, you did not buy or sell cars, automobiles?

A   It's automobiles.

Q   So but prior to you forming AWB, you did not do any business with any luxury automobiles, correct?

A   Luxury, no.

Q   And your transactions were confined to trucks and equipment.  Would that be an accurate statement?

A   Say again please.  Could you repeat yourself, Mr. Breslin.

Q   Yes.

Your transactions prior to that were confined

18 (Pages 66 - 69)

Page 70

to buying and selling trucks and equipment, correct?

A   Can you repeat it one more time. I'm sorry.

Q   All right. You said that you sold equipment and garbage trucks with one of your companies, right?

A   I mean pickup trucks. You know, we always buy, trade for the business. Plus I have always people I support because they are our vendor and we help with the purchase and stuff like that.

Q   Were you ever in the garbage business?

A   Yes.

Q   What was the name of that company?

A   FEI.

Q   So Farache Enterprises, Inc. was in the garbage business, right?

A   Yes, sir.

Q   Did that conduct any business with Auto Wholesale of Boca?

A   I can't tell you. I don't know.

Q   Did Auto Wholesale of Boca sell any vehicles, or any of the companies that I have listed, either MMS, Mazel Tov, Farache or M&M?

A   I can't tell you that. I got to look at my books and records.

Q   How do you determine the value of a luxury automobile?

Page 71

A   Can you repeat it please.

Q   Yes.

How do you determine the value of a luxury automobile?

A   I can't tell you that, Jerry. Mr. Breslin. I'm sorry.

Q   It's quite all right.

MR. BRESLIN: All right. I think this is a perfect time to break. I'm going to go into a different area. How much of a break does everybody need for lunch?

MR. WINDERMAN: Two minutes.

MR. BRESLIN: I'm not asking you, Harry.

Jim, how long do you want to take? Twenty minutes?

This is off the record.

(The luncheon break was taken.)

BY MR. BRESLIN:

Q   Mr. Farache, you testified that AWB was formed back around 2012. If I told you that the records of the Florida Secretary of State showed that the company was formed in September of 2012, would that seem accurate to you?

A   I don't know. Approximately 2012 sometime.

Q   Okay. And you also testified that there are

Page 72

no documents that you're aware of that reflect who owns the ownership interests in AWB, correct?

A   Can you repeat yourself please.

Q   Yeah.

You told me that there are no papers that show who owns AWB. You said you own a part of it, your wife Lisa owns a part of it and your son Chase owns a small part of it, correct?

A   Very small, yes.

Q   And you said that there are no documents anywhere in the world that would show how much you own and how much your wife Lisa owns and how much your son Chase owns, correct?

A   Based on my knowledge. I'm not that paper oriental, yes.

Q   Right.

My question is very simple. It's very simple.

Do you know whether or not there's a piece of paperwork anywhere in the world that shows who owns AWB and in what percentages?

A   I don't know.

Q   Now, when AWB was formed, what was the address?

A   6560 West Rogers Circle I think.

Q   Did you ever have a lease or a property

Page 73

located at 17626 Middlebrook Way?

A   Yes.

Q   And was that a residence or was that a business location?

A   That's my house address, my old house address.

Q   So when the company was formed, your house address was used for a business address.

Is that your recollection?

A   I don't remember.

Q   And there came a time when the company AWB took space at 6560 West Rogers Circle, Suite 27, correct?

A   Can you repeat it please.

Q   Yes.

Are you familiar with the address 6560 West Rogers Circle?

A   Yes.

Q   What is that?

A   That's our office warehouse space.

Q   So who rents that space?

A   Can you be specific please.

Q   Yes.

Who's the tenant at that location?

A   We have AWB.

Q   Does AWB have a Lease Agreement at that

19 (Pages 70 - 73)

Page 74

location?

A   I think so.

Q   You don't know?

A   Last years, yes,we pay rent, yes.

Q   Okay.  I understand that you pay rent.
My question to you is:  Does AWB have a lease for the location 6560 West Rogers Circle in Boca Raton?

A   Yes.

Q   They do?

A   Yes.

Q   So if that lease has not been provided to us, you can provide it, correct?

A   For sure.

Q   Now, are there any other businesses that you have any interest in that operate out of that same location?

A   Can you be more specific which businesses?

Q   Yes.
Do you have any interest in any other businesses that operate out of that 6560 West Rogers Circle location?

A   Yes.

Q   Which businesses are those?  Please name them.

A   EES.

Q   Any other businesses?

Page 75

A   Say again.  I'm sorry.

Q   Any other businesses?

A   We're just using the mailing address, but we don't run it through there.

Q   Are there any other businesses that you're affiliated with that operate from that business address?

A   We're just using the address.

Q   And for how many businesses?

A   I'm not sure.

Q   Does M&M operate out of that address?

A   Yes.  We're using the address, yes.

Q   How about Mazel Tov, Inc., do they use that address?

A   Yes.

Q   Any other companies that you're aware of that use that address?

A   For mailing purposes, most of my companies.

Q   Are there any companies that you have an interest in that I haven't named?

A   I think you got all of them.

Q   How about 1001 Clint Moore Avenue, your wife Lisa's company, do they use that 6560 West Rogers Circle address?

A   Yes.

Q   Now, that is an office address, is it not?

Page 76

A   Can you repeat yourself please.

Q   The address 6560 West Rogers Circle, Suite 27, that's a business office, is it not?

A   You mean business -- we have office, yes.

Q   Yeah, you have an office.  It's not like it's a warehouse or a car dealership where there's a lot.  It's an office address, correct?

A   We have a warehouse.

Q   Where is the warehouse?

A   In the back.

Q   So you have a warehouse located at 6560 West Rogers Circle?

A   Yes.

Q   And how many square feet is the warehouse?

A   It's total 3,000 square feet.

Q   And that's entirely your warehouse?  You use that for you and your companies?

A   Can you repeat yourself.

Q   Yes.
Which companies use the warehouse?

A   We basically AWB.  We have a little bit -- you know, AWB usually.

Q   So if AWB was going to have possession of an automobile, would it be at the 6560 West Rogers Circle address?

Page 77

A   Depends.  We have different warehouses.

Q   How many warehouses do you have?

A   I have this one and I have one in East Boca.

Q   What's the address for the warehouse in East Boca?

A   5471.

Q   Go on.

A   North Dixie Highway.

Q   Go ahead.

A   So I storage cars over there.  I storage cars where I am.

Q   But the address is 5471 North Dixie Highway, is that in Boca?

A   Yes, sir.

Q   And that's a warehouse?

A   I have a warehouse over there, yes.

Q   So who is the tenant?  Who is the lease with?  Who is the landlord?

A   AWB.

Q   AWB is the tenant?

A   Yes, sir.

Q   And who is the landlord?

A   Mary something.  I'm not sure.

Q   And how long has AWB had the warehouse located at 5471 North Dixie?

20 (Pages 74 - 77)

Page 78

A   A few years.

Q   And so AWB then has two warehouse locations; one at the 1001 Clint Moore Avenue and the other one at 5471 North Dixie in Boca, correct?

A   Yes.

Q   Does AWB have any other space where it could hold or sell vehicles from?

A   Which?  You're talking about today? Yesterday?  Can you be more specific please.

Q   Yes.  Let's talk about the year 2021.

In the year 2021, other than those two locations, did AWB have any other locations where it could store or possess automobiles?

A   Yes.

Q   And where was that?

A   1001 Clint Moore Bay East Suite.

Q   So does AWB have a lease for that space?

A   Yes.

Can you be more specific to which year.

Q   Right.

You say that AWB has space located at 1001 Clint Moore East, Clint Moore Avenue.  You say you have an East suite?

A   And a building on the east side, yes.

Q   All right.  So does AWB have a lease for that

Page 79

space?

A   Prior to 2000 -- you know, sometime in '22 we no have a lease anymore.

Q   Okay.  But let's talk about 2021.

In 2021 you had the West Rogers Circle warehouse, you had the 5471 North Dixie warehouse, and you say you also had some space at 1001 Clint Moore on you said the East suite.  Is that accurate?

A   East side of the building and a -- the east side of the building.

But then you're going back to Dixie Highway. I think we have it in December -- November or December 2021 we have the lease over there.  I'm not sure.  I can't tell on the top of my head.

Q   All right.  Well, we'll get copies of those leases.

A   Yes.

Q   No worries.

But let me just say this:  Whatever date is on the Lease Agreement, the 5471 North Dixie, that's when AWB first had access to that space, correct?

A   Can you repeat yourself.

Q   Yes.

Prior to you entering into a lease at the 5471 location, did you use that warehouse for any purpose?

Page 80

A   Can you please repeat it.  I want to understand the question please.

Q   All right.

A   And be more specific who you're talking about.

Q   All right.  I'm talking about 5471 North Dixie.  There's some sort of space there, a warehouse, right?  Correct?

A   Yes.

Q   And AWB has a written document, a Lease Agreement to use that space.  Is that correct?

A   Yes.

Q   And prior to you signing that Lease Agreement, were you able to use that space?

A   AWB?

Q   Yes.

A   Just tell me again the time.  I'm looking for the month and the timing.

Q   Right.

All right.  You signed a lease there, right?

A   Yes.

Q   Before you signed the lease, were you able to use that space or were you only able to use it after you signed the lease?

A   After I signed the lease.

Q   And so we can get a copy of the lease that

Page 81

will tell us when you had access to that space, correct?

A   Why not?

Q   And are you still a tenant there?  Do you still have a lease at that location?

A   Yes.

Q   Now, so your testimony is AWB has a Lease Agreement for a 3,000-square-foot warehouse on Rogers Circle, it has a Lease Agreement for a location at 5471 North Dixie Highway, and there's also a Lease Agreement for some space at 1001 Clint Moore, correct?

A   Not anymore.

Q   But did you ever have a Lease Agreement to use any of the space at 1001 Clint Moore?

A   Yes.

Q   So you had a written document that AWB had space for it to use at 1001 Clint Moore, correct?

A   Yes.

Q   And did you sign that document on behalf of AWB?

A   I think so, but I want to look in my documents before I commit to something.

Q   And your wife owns that the company.  Your wife is the landlord.

A   Say it again.  I'm sorry, Jerry.

Q   Your wife Lisa owns the company.  She's the

21 (Pages 78 - 81)

Page 82

landlord. Correct?

A   Yes, sir.

Q   Now, in the year 2021, did you keep any automobiles at the West Rogers Circle warehouse?

A   Some of them.

Q   What cars did you actually have possession of in the West Rogers Circle warehouse in 2021?

A   I got to look in my documents, but I purchase a couple cars for clients.

Q   And which clients did you purchase cars for in 2021?

A   I can't tell you on the top of my head.

Q   Can you name any person that bought a car from AWB in 2021?

A   Moelle McKias (phonetic).

THE COURT REPORTER: I'm sorry.  Say that again.

THE WITNESS: Moelle McKias.

MR. BRESLIN: Is there anyone in the room that can spell that?

THE WITNESS: You find the wrong guy.  I'm sorry.

BY MR. BRESLIN:

Q   So what automobile was sold to Mr. McKias?

A   I think we bought for him some transit and we

Page 83

bought -- for this particular client, we just got a transit I think.

Q   So I don't know what a transit is.  Is that a type of vehicle?

A   Yes.

Q   And so AWB purchased a transit and sold it to Mr. McKias in 2021, correct?

A   Yes.

Q   And you stored that vehicle at the West Rogers Circle location after it was bought and before it was sold, correct?

A   Yes.

Q   Any other cars that AWB purchased in 2021 and sold that you can recall?

A   We have also some Porche and I think -- I'm not sure if it's another -- we also I think some Rolls-Royce, some McLaren we purchase.  You know, I can't tell you on the top of my head.  We did some few deals, you know, I mean, people approaching us.

Q   All right.  So what you're talking about is automobiles that AWB purchased and paid for from somebody in the world, paid money for and took possession of the car, and then you actually sold that car to a customer.  That's what we're talking about, correct?

Page 84

A   Some we sold to a customer.

Q   Well, what about the ones you didn't sell to a customer?  Do you still have them?

A   We took them to the auction.  We sold them over there.

Q   So are you saying that you bought cars at -- well, I'll get to that in a minute.

All right.  In 2021 how many cars were stored at anytime in your best estimate at the Rogers Circle location?

A   I don't know.  I don't know how many.

Q   How about the 5471 North Dixie Highway location?  How many cars were stored at that location after you signed the lease, if you can recall?

A   I'm not sure.

Q   So you can't name any particular car that was purchased and stored at any of these locations in 2021.  Is that accurate?

A   On the top of my head, I know we storaged a couple of them, but I can't tell you exactly which one.

Q   All right.  Now, when you say "a couple," how many cars does that mean to you?

A   More than two.  More than three.  I can't tell you exactly.

Q   Less than five?

Page 85

A   I can't tell you.  I got to look at my paperwork.

Q   Well, if AWB bought and sold cars in 2021, you must have some idea how many cars you bought and sold.

A   I don't know exactly.  I'm sorry.

Q   Is it more than five?

A   I can't tell you that.

Q   Is it more than ten?

A   AWB, more than ten for sure.

Q   Okay.  So you're saying AWB bought and sold more than ten cars in 2021?

A   A lot more.

Q   Now, of those cars in 2021 that you say you bought and sold, how many of those cars were physically at one of these three warehouse locations?

A   I can't tell you exactly.  Sorry.

Q   There came a time when you and Scott Zankl talked about either Zankl or his companies borrowing money from either you or your companies.  Is that a true statement?

A   Say it again.  I'm sorry.

Q   Did there come a time when you and Scott Zankl had conversations about you lending money to either Scott or his businesses?

A   I do not lend money.  I purchase vehicle.

22 (Pages 82 - 85)

Page 86

Q   Okay.  So you never leant any money to Excell or Scott Zankl?

A   AWB?  You're talking about AWB or Moshe Farache?

Q   I'm talking about AWB.

A   Can you repeat yourself.

Q   Yes.

Did AWB ever have any discussions with Scott Zankl about loaning Scott Zankl money?

A   We purchase vehicle.

Q   Did AWB ever loan any money to either Scott Zankl or any of his companies?  And by his companies we mean Excell Auto Group or the Karma entities.  Okay?  Do you understand that?

A   We purchased vehicle.

Q   So my question to you is:  Did AWB ever loan money to Excell Auto Group, Inc.?

A   We purchased vehicle.

Q   Sir, I'm asking you a yes-or-no question.

Did AWB ever loan money to Excell Auto Group?

A   When you're looking at -- when you say we loan money, we bought vehicle from AWB.  We purchased vehicle.

Q   So is your answer to my very simple direct question a no?

Page 87

A   Say it again.

Q   Did AWB ever loan money to Excell Auto Group, Inc.?

A   Short-term loan.  We lent money, but it's short-term loan because he has a buyer for specific vehicle.

Q   Okay.  Now, who did you just look to when you changed your answer?

A   Nobody.

Q   So you just told me several times that you purchased vehicles and there was no loan and now you're saying that there was, in fact, a loan.  Which is it?

A   We purchased -- every vehicle we purchased, but we have a short-term loan what he use it for relocation.

Q   So let me go back to my question.

Did AWB ever loan money to Excell Auto Group, Inc.?

A   For short-term loan.

Q   All right.  So the answer is yes?

A   For a short-term loan.

Q   When is the first time that AWB loaned money to the Excell Auto Group?

A   I'm not sure.

Q   How much money did AWB lend to the Excell Auto

Page 88

Group?

A   In the millions.

Q   You don't know?

A   Approximately always between seven and 10 million.

Q   So this is a little different than what you've just said.  So now you're saying that AWB, in fact, loaned money to Excell Auto Group, correct?

A   No.  We have short-term loan, small amount of money what we lend them to purchase specific vehicle.

Q   All right.  So let's just talk about the loans.  Okay.  When was the first time that AWB loaned money to Excell Auto Group?

A   For the short-term loan?

Q   Yes, for whatever you're talking about.

A   The short-term loan, we did it just around the Corona time.

Q   I'm sorry.  I didn't hear what you said.

A   We did it during the Corona time.

Q   Okay.  So tell me about that.  How did that happen?  Tell me about the conversations that were had and how that loan came into being.

A   He basically has clients he give to them deposit to purchase a specific vehicle, and he approach me and he say, I can buy this vehicle and I have a buyer

Page 89

for it.  I just need the loan for two or three weeks, and if you lend to me the money, I can do this transaction and you can make that much money.

Q   So that was a conversation that Scott Zankl had with you, correct?

A   Yes.

Q   All right.  So when Scott Zakle had that conversation with you, was he speaking about his company borrowing money?

A   Excell Auto?

Q   You tell me.  I mean, tell me what the conversation was.

A   We don't have this conversation.  We have relationship.

Q   Okay.  But I need to know when he approached you for this loan, what he said and what you said, if you can remember.

A   I don't remember.

Q   Okay.  But you do recall that he approached you and wanted to borrow money, correct?

A   For specific deals.

Q   Right.

He wanted to borrow money for certain business transactions that he described to you, correct?

A   For the relocation, yes.

23 (Pages 86 - 89)

Page 90

Q   And when he approached you, did he ask you or did he ask for a specific amount of money?

A   For the borrowing money?  Can you be more specific please.

Q   Yeah.  I want to know how much you loaned him and when and why?

A   I mean, you know, it all depends.  You know, he called me and he say, I have this car.  I can buy it and I have a buyer.  He already give me deposit.  And he sent to me the information.  And, you know, sometimes I have the money sitting and I did it.

Q   Did there ever come a time when you loaned Excell Auto Group a large amount of money in the millions?

A   In one time?

Q   Yeah.

A   One time?  I no lend money.  I purchase car.  So it's not one time.

Q   So there was never a time that AWB loaned millions of dollars to Excell Auto Group, correct?

A   You mean in one like -- can you be more specific.

Q   Okay.  I don't know how I could be more specific, but I'll try.

You say that there was a short-term small loan

Page 91

that you would give to either Zankl or Excell from time to time.

My question to you is:  Was there ever a large loan in the millions of dollars between AWB and Excell Auto Group?

A   You mean in one large point like I wrote for a million dollars in one shot?

Q   Yes.

A   I don't think so.

Q   Was there ever a time when AWB loaned $2 and-a-half million to Excell Auto Group?

A   I no loan to him $2 and-a-half million.  I purchased vehicle with excess of 2 and-a-half million.

Q   And when he came to you with this business transaction, was it your understanding that you were actually buying cars?

A   Always I'm buying cars.

Q   All right.  So it was never a loan?

A   The loan document is just to protect my family God forbid something happened to them.

Q   What loan document?

A   What we have with them.

Q   Well, tell me what you have.

A   We have some documents.

Q   What do those documents say?

Page 92

A   I'm not sure.

Q   Well, did you sign them?

A   Yes.

Q   Did someone explain to you what those documents meant before you signed them?

A   Just to make sure that God forbid something happened to me so my family know where is the money.

Q   Okay.  Tell me when you first signed the document and how much you're talking about.

A   I'm not sure.

Q   Okay.  Now, what's the largest amount of money that you gave to Excell Auto Group ever?

A   In one check?

Q   Yeah, one shot.

A   I'm not sure.

Q   So you just said a little earlier that there was between 7 and $10 million dollars in loans that went from AWB to Excell Auto Group over some period of time.  Was that an accurate statement?

A   It's not a loan.  It's purchasing of vehicle.

Q   Okay.  Now, have you ever borrowed money in your life?

A   Mortgage, yes.

Q   Do you know what a -- so you know what a mortgage is, right?

Page 93

A   Yes.

Q   Now, do you know what a Promissory Note is?

A   Yes.

Q   What's a Promissory Note?

A   When you owe somebody money.

Q   And so is it your understanding that a Promissory Note is a piece of paper that shows how much money you borrowed from someone?

A   Can you repeat yourself.

Q   Yes.

Is it your understanding that a Promissory Note states how much money that someone borrows from the holder of the note?

A   One more time.  I'm sorry.

Q   Have you ever signed a Promissory Note?

A   Myself?

Q   Yeah.

A   Personal?

Q   Either for AWB or personally.

A   For AWB, yes.

Q   So when you signed that Promissory Note for AWB, what did that mean to you?  What do you think that meant?

A   We borrowed the money and we got to pay it back.

24 (Pages 90 - 93)

Page 94

Q   Now, did Excell Auto Group ever give AWB a Promissory Note for any of the money that it borrowed?

A   We can't.  We don't borrow money from Excell.  How he going to give us a Promissory Note?

Q   So Excell Auto Group never gave you a Promissory Note for millions of dollars for moneys that you loaned them, correct?

A   We no borrow money from Excell.

Q   What?

A   We no borrow money from Excell.

Q   No, no.  I'm saying that you loaned money to Excell Auto Group.

A   I purchased vehicle with Excell Auto Group.

Q   Okay.

A   From Excell Auto Group.

Q   All right.  I just want the record to be very clear.  AWB never loaned $2 and-a-half million to Excell Auto Group and in return got a Promissory Note, correct?

A   I'm trying to understand what exactly you're trying to get out of me answering the question, and that's what I'm going to -- I just want to understand exactly specific.

Q   And that's where the problem is.  Because you're trying to figure out where I'm going as opposed to just listening to my question and answering.  Okay.

Page 95

So I simply am asking you whether or not AWB loaned Excell Auto Group $2 and-a-half million, and in return for that $2 and-a-half million got a Promissory Note saying that Excell owed AWB that money.

A   AWB purchased vehicle with $2 and-a-half million.

Q   Okay.  So there was never a Promissory Note, correct?

A   It is a Promissory Note if God forbid it's a problem, so we have a Promissory Note for the amount of the vehicle.

Q   So now you're saying that there is a Promissory Note?

A   If we have a problem like we have.

Q   Is there a Promissory Note or not?

A   It is a Promissory Note.

Q   And who signed this Promissory Note?

A   Excell Auto and Scott and Kristen.

Q   And how much was that -- what was the amount of that Promissory Note?

A   Two and-a-half million.

Q   And who told you that answer?

A   Nobody.  I'm looking in the eye.

Q   Because just a couple minutes ago, you said that there was never a transaction for $2 and-a-half

Page 96

million with Excell Auto Group and now you're saying there is.

A   Never one check go to any of that.  It's we purchased vehicle with this money, yes.

Q   All right.  So your testimony is that AWB purchased vehicles from Excell Auto Group, right?

A   Can you repeat yourself.

Q   Right.

Your testimony is that AWB purchased the automobiles from Excell Auto Group, right?

A   Different number, each one.

Q   Right.

But your testimony is that AWB bought, purchased automobiles from Excell Auto Group, correct?

A   Yes.

Q   Okay.  Now, if AWB is buying cars from Excell, why does Excell owe the money to AWB?

A   Can you repeat it one more time.

Q   All right.  Explain how the transactions work with Excell.  When AWB bought a car from Excell, how did that work?

A   They sent to us an email, or Scott call me and he said basically, Hey, I have this vehicle to purchase.

And I say to him, Is it a good deal?

He say, Yeah, it's excellent deal.  When we

Page 97

sell it, we can make this much money and I have a couple people that already interested to purchase it.

He sent to me a bill of sale, a copy of the title, a copy of how much he paid for it.  And I basically make sure I go to his office or Michelle go to his office, we have the title, we have the bill of sale, we have possession of the vehicle, and we write the check or we wire the money.

Q   Okay.  Now, where in that transaction does Excell owe you money or owe AWB money?

A   Can you -- I'm trying to understand.

Q   Yeah.

You're telling me that Excell owed AWB millions of dollars because of automobiles that you purchased from Excell, correct?

A   Yes.

Q   Okay.  If you purchased cars from Excell, why does Excell owe you the money?  Why does Excell owe AWB the money?

A   Because some of the vehicle is stolen when he sold them to different clients.

Q   Did you say stolen?

A   Yeah, if he took a vehicle and he sold it and we don't get paid for it.

Q   I'm trying to figure out how Excell owes AWB

25 (Pages 94 - 97)

Page 98

millions of dollars.

A   Be more specific. Give me --

Q   In AWB bought the cars, why does Excell owe AWB any money? Please explain.

A   Because they sold the vehicle to third party or two party and AWB never no got paid for the vehicle.

Q   Well, if AWB bought the vehicle, didn't AWB own the vehicle?

A   Yes.

Q   Well, if AWB owned the vehicle, how did another company sell it?

A   Why we're here?

Q   Do you understand my question?

A   If we no have this problem, we're not going to be here in deposition.

Q   Do you understand my question? My question to you is: If your testimony is that AWB purchased automobiles from Excell, took title, took possession and owned the cars, how does Excell then sell that car if you own it, if AWB owned it? How does that work? Did you sell it back? How did it work? Explain it to me.

A   He sold it to his clients, he received payment from end user, and he never no paid AWB for the vehicle.

Q   Okay. So what you're saying is that Excell

Page 99

would buy a car, right, that you would buy the car from Excell -- AWB would buy the car from Excell, correct?

A   Depends on the deal.

Q   Well, you're the one that said you bought all these cars. I'm trying to figure out how this makes sense. You're saying Excell bought the car. Then you bought the car from Excell. AWB bought the car from Excell. Right? Now you said you have the title, the car, right? You have possession, you got title, and now AWB owns the car. Now, I'm trying to figure out where in the transaction and how it works that Excell is going to owe you money.

A   If it sold the vehicle to third party.

Q   Oh, so what you're saying is that Excell then sold the car that AWB owned to a third party and, therefore, Excell would owe you the money for that car. Is that what you're saying?

A   Yes.

Q   Okay. Well, if you owned the car and you had the title to the car, wouldn't AWB have to sell that car?

A   Not all the time.

Q   Any of the time?

A   Not all the time.

MR. BRESLIN: I'm going to share my screen.

Page 100

And for the record, we are in the third folder A. And this is the first exhibit and this is A-01.

(FVP Exhibit A-01 was marked for Identification.)

BY MR. BRESLIN:

Q   Mr. Farache, I'd like you to take a look at your screen. And I'm going to scroll through this document. Well, before I scroll through it, do you even want me to scroll through it?

A   Why not?

Q   But does scrolling through it give you any more information or is it because this in the English language, you don't know what it says anyway?

A   I mean, you're going to explain to me everything, so you can go start from the beginning and explain to me so I can answer.

Q   All right. Well, I'm going to scroll through this document.

MR. MILLER: You're moving pretty quickly, Mr. Breslin. If you want him to understand the document, you might want to go a little slower.

MR. BRESLIN: Of course.

BY MR. BRESLIN:

Q   All right. This is the first page. Let's just talk about the first page.

Page 101

Do you understand what it says on here?

A   One second. Can you read it please.

Q   I'm just going to ask questions. I'm sorry. If you don't understand it, just please tell me.

A   You can ask me questions.

Q   Do you understand what you're seeing on the screen, what that says?

MR. MILLER: Are you pointing to some particular part of this document?

MR. BRESLIN: No. There's a document on the screen.

THE WITNESS: Can you just read to me please a little bit so I can put it together.

BY MR. BRESLIN:

Q   Well, let me just ask you this first: Looking at this document on the screen, just by looking at it, do you know what it is?

A   It's look like it's the Promissory Note that we have with Kristen and Scott and Excell Auto Group and AWB.

Q   Okay. So does that look familiar to you?

A   Yes.

Q   Do you recall that document?

A   Can you repeat yourself.

Q   Do you recall this document, the one you're

26 (Pages 98 - 101)

Page 102

looking at on the screen?

MR. MILLER: Can you show him the entire document, Mr. Breslin.

MR. BRESLIN: Of course.

For the record, I'm scrolling through Bates and all the Bates are FVP TR EX as the prefix.

THE WITNESS: Can you go back a little bit. Can you go back. Stop, stop, stop. Okay. Sorry. Thank you.

BY MR. BRESLIN:

Q   All right. This is the start of the next document on Bates 7. Do you understand what that document is by looking at it, just the title?

THE COURT REPORTER: I'm sorry. What, Mr. Miller? I can't hear you.

MR. MILLER: Which document is he referring to?

MR. BRESLIN: The document that's on the screen.

BY MR. BRESLIN:

Q   Can you tell what this document on the screen is referring to, Mr. Farache?

MR. MILLER: All right. Just for the record, you're asking him a question about a different document than the one you were showing him earlier.

Page 103

MR. BRESLIN: Right. It's all one document but this is a separate document within the package.

MR. MILLER: This is FVP TR EX 000007 Security Agreement, right? Mr. Breslin?

MR. BRESLIN: I'm referring to FVP TR EX five zeros 7.

THE WITNESS: That's 000007?

MR. MILLER: He said the number five.

MR. BRESLIN: That's just a number. All these pages have a number.

BY MR. BRESLIN:

Q   By looking at just this one cover page for this document, do you know what it is?

A   Can you read it for me please.

Q   Sure. It says, "Security Agreement."

A   Can you show me the whole document please.

Q   Of course. Of course.

Page 11 is the Security Agreement signature page. And we have another document that begins on Bates 18 which states, "Amended and Restated Secured Promissory Note."

A   Yes.

Q   Does that look familiar to you?

A   Yeah. Based on my knowledge, yes.

Q   The next document starts on page 26 in the

Page 104

exhibit which purports to be a Guarantee.

Do you know what a Guarantee is?

A   Say it again. I'm sorry.

Q   Do you know what a Guarantee is?

A   Yes.

Q   I'm scrolling through the document which appears to be a repeat of the prior document.

MR. MILLER: Slow down, Mr. Breslin.

MR. BRESLIN: Sure.

MR. MILLER: Stay there. I'm trying to keep up with your fast scrolling.

MR. BRESLIN: Right. In the shared exhibit, it's A-01.

MR. MILLER: This is a Security Agreement dated November 11th, 2021.

If you want to keep scrolling and show it to him, that's fine.

BY MR. BRESLIN:

Q   All right. Mr. Farache, I've now scrolled through it. And it's Bates A-01 in the shared folder A.

And now that you've seen those documents, does that refresh your memory as to whether or not there was a Promissory Note between AWB and Excell Auto Group?

A   Yes.

Q   Now, the date on this document shows

Page 105

November 5th, 2017. Does that seem like an accurate date to you?

A   Whatever they say, yes. I mean, it say that, November 5th, 2017.

MR. MILLER: The document you're referring to starts off with five zeros and a 1?

MR. BRESLIN: Yes, page 1 of Exhibit A-01.

THE WITNESS: Jerry, can we use the bathroom for five minutes?

MR. BRESLIN: You know what? We're going to just take a break ten minutes an hour. And so, yeah, absolutely. I'm sorry.

THE WITNESS: I'm sorry. I just got to make one phone call.

MR. BRESLIN: No, no. It's ten after. We'll be back at 20 after. How is that?

(A break was taken.)

MR. BRESLIN: All right. We're back on the record.

BY MR. BRESLIN:

Q   Mr. Farache, who did you speak to during the break?

A   I spoke to Scott, and I pushed my phone call to later on and just text him and tell him I call him later.

27 (Pages 102 - 105)

Page 106

Q   Did you have any discussions regarding your testimony?

A   No.

Q   Now I'm going to share my screen with you, and we're going to be looking at FVP Exhibit A-01. And this is the Secured Promissory Note. And this shows it's dated November 5th, 2017, and it's for $2 and-a-half million. Do you see that?

A   Yes.

Q   Is it your testimony that you never loaned $2 and-a-half million to Excell Auto Group in 2017?

A   Can you repeat yourself please.

Q   Yes.

Did you loan Excell Auto Group $2 and-a-half million in 2017?

A   I purchase vehicle probably with $2 and-a-half million.

Q   But you never loaned them money? You never loaned them $2 and-a-half million, correct?

A   The loan document what you see is just the evidence of the debt. If God forbid we have an issue, that's the evidence of this debt.

Q   Okay.

A   And I explain to you different way before.

Q   All right. So it's a very simple question,

Page 107

and so my question is: In November 2017 did you give -- when I say "you," I mean AWB. And I say "you" a lot. I'm sorry.

Did AWB give Excell Auto Group $2 and-a-half million?

A   In one check?

Q   Or a lot of little checks.

A   We don't wrote to them never a $2 and-a-half million check. We purchased vehicle from 2012.

Q   All right. So you purchased vehicles from Excell Auto Group over the years. Is that your testimony?

A   Say it again. Can you repeat yourself.

Q   I'd like you to explain to me why in November 2017 if you didn't give Excell $2 and-a-half million why Excell owed your company AWB $2 and-a-half million?

A   You mean -- I'm trying to answer you the right way. Because you're talking in, you know, about $2 and-a-half million. I no wrote no check for $2 and-a-half million.

Q   This document says that they owe you $2 and-a-half million. You agree that it says that, right?

A   Yes.

Q   And you agree that Scott Zankl and his wife

Page 108

signed it?

A   Yes.

Q   So they acknowledged in November of 2017 that Excell Auto Group owed AWB $2 and-a-half million, right?

A   With vehicle we purchasing, yes. If God forbid something happened, yes.

Q   So what you're saying to me is that you never gave them money -- you never gave Excell Auto Group money. You, in fact, purchased vehicles from Excell Auto Group in the amount of $2 and-a-half million over the years. Correct?

A   I really try to -- you know, I mean, we purchased more than $2 and-a-half million. We purchased vehicle every couple days. So, you know, it's back and forth. We're buying. We're selling.

Q   All right. But my point is: This $2 and-a-half million does not reflect money that AWB gave to Excell Auto Group. It reflects the value of automobiles purchased by AWB from Excell over the years. Correct?

A   No, because we bought a lot more.

Q   Okay. But let's just look at what's on the screen. This is all I'm talking about. I'm talking about the document that was signed I assume at your request in 2017, correct?

Page 109

A   Yes.

Q   So what this document says is that there's $2 and-a-half million owed. But what you're saying is that there was never a loan given to Excell, but this $2 and-a-half million in this piece of paper here reflects the amount of cars that AWB purchased from Excell Auto Group, correct?

A   No. We bought a lot of cars and we sell a lot more cars to AWB. It's more than $2 and-a-half million. That's what I'm trying to tell you.

Q   Okay. And I hear you. Let's just talk about the $2 and-a-half million. Okay. We're going to get to all of that, but let's just talk about this document. Can we do that? Mr. Farache, can we?

A   Yes.

Q   All right. Good.

What does that $2 and-a-half million represent?

A   The $2 and-a-half million represent if any problem with my cars or anything or stealing my cars or selling my cars without paying back to me, they're responsible for the amount up to $2and-a-half million.

Q   So what you're saying then is that this Secured Promissory Note does not reflect money that was actually paid. It reflects an amount that may become

28 (Pages 106 - 109)

Page 110

due if certain things happen, right?

A   Can you be more specific please.

Q   Yes.

Under what circumstances would they have to pay that $2 and-a-half million?

A   It's all depends.  If they selling my cars and I don't get paid for it, you know, and I'm missing $2, they owe me $2.

Q   So if they sold AWB cars for you and didn't pay you, then this Promissory Note would guaranty you or your family that you would get paid eventually.  Is that what you're saying?

A   They're not selling to me cars.  AWB purchased cars.  If they selling the car to a third party and AWB don't get paid, that's where.

Q   So the amount, this $2 and-a-half million in this Note, that would be due if they sold an AWB car and AWB was not paid, right?

THE COURT REPORTER:  Wait.  AWB was not?

MR. BRESLIN:  Paid.

THE COURT REPORTER:  Thank you.

THE WITNESS:  Wait.  Can you repeat it one more time because she interrupt.

MR. BRESLIN:  No, I'm incapable of that.  Sorry.

Page 111

THE WITNESS:  I'm sorry.

MR. BRESLIN:  I'm moving on.

BY MR. BRESLIN:

Q   Okay.  Let's go down here a little bit.

It says, "Payments and Interest."

So it says that $31,000 is due every month as interest on this loan that's not a loan, correct?

A   Yes.

Q   Was that 31,250 paid every month?

A   Up till sometime in 2022, yes.

Q   Okay.  So from 2017 until, you know, the time the business closed, you got paid 31,250 every month, right?

A   Yes.

Q   And that was interest that this Promissory Note stated was due on this $2 and-a-half million number here that you said was never actually given to them but was acting more as a guaranty, right?

A   Can you repeat it one more time.

Q   Yes.

The money, they paid $31,000 a month every month, right?

A   Yes.

Q   Now, that's 2017.  And it talks about definitions here, collateral.  It talks about a loan and

Page 112

loan documents.  Right?  Do you see that?

A   Say it again.  I'm sorry.

Q   The document talks about collateral, loan and loan documents, right?

A   I'm assuming, yes.

Q   Okay.  Well, that's what it says.  I'm sorry.  I forgot that you couldn't read English.

Here's what it says.  It says, "Collateral, Loan and Loan Documents."  Okay.  So this document refers to that 2,500,000 as a loan.  So that's not accurate.  It was not a loan.  Right?

A   Say it again.  I'm sorry.

Q   All right.  This was not a loan for $2 and-a-half million, correct?

A   If it's a loan?

Q   Your testimony is that this was not a loan for $2 and-a-half million; that this document represented amounts that may become due if they sold your cars and didn't pay you, right?

A   If they selling my cars and I don't get paid for it ...

Q   Then this document protected you, right?

A   Correct, yes.

Q   So now we are going to go down to page 7 on this document where it says, "Security Agreement."

Page 113

Now, when the document was executed back in 2017, did you have legal counsel?

A   I'm sorry.  Can you repeat yourself.

Q   Yeah.

Back in 2017 when this got signed, did you have a lawyer --

A   Yes.

Q   -- that helped you draw these papers?

A   Yes.

Q   And it was you that wanted these papers signed, right?

A   Say it again.  I'm sorry.

Q   Did you want these papers signed?

A   Yes.

Q   Do you know what a security interest is?

A   Can you repeat it.

Q   Do you know what a security interest is?

A   Security interest?

Q   Yes.  Do you know what that is?

A   Can you try to help me with that.

Q   No.  That's okay.  If you don't know, I understand.

I'm going down now to Exhibit A-01 Bates 18, and what this purport to be -- and let me make it a little bigger so you can see -- is a document that is

29 (Pages 110 - 113)

Page 114

signed on November 11th, 2021. Do you see that?

A   Yes.

Q   Do you recall this document being signed?

A   That's the same document you showed me before, no?

Q   The other one was dated in 2017. This is dated in 2021.

A   Oh, okay. I'm sorry. I don't pay attention. Wait. Let me just write it.

Q   I'd really like you to pay attention if you could. These are important matters.

A   Okay.

Q   So this is 2021. And this is what's called -- it says, "Amended and Restated Secured Promissory Note." In other words, what this is, is it's another document from 2021 that re-enforces and restates the prior Promissory Note. Are you aware of that?

A   I'm trying -- can you -- so this is taking over the 2000 -- that's what you try to -- can you be more specific.

Q   Well, let's do this. Why don't you tell me what your understanding of this Note was and why it was signed in November of 2021.

A   I mean, you told me it's amended. You know, I mean, you just basically told me basically it's like a

Page 115

new agreement. That's what you tried to say to me, no?

Q   Do you remember why in November of 2021 you wanted these papers to be signed?

A   Why I wanted? Because I want to make sure I'm secure by the Zankl family God forbid something happen.

Q   Okay. Now, this is the same -- this says that they owe $2 and-a-half million. Now, this is in November of 2021. This is the same $2 and-a-half million from four years prior, right?

A   I'm not sure which one this one.

Q   Okay. Well, how many Promissory Notes are you aware of?

A   I think we had two and one short-term note.

Q   So this is the second one that I'm showing you so far today. You say there's one more?

A   But I don't know which one is reflected.

Q   All right. Let's talk about the one that's on the screen. This is the one from November 2021. You remember November 2021, right?

A   Can you scroll through the whole thing.

Q   Of course.

A   Can we go slow and this way I can look at it please.

Q   Sure. This starts at Bates 18.

A   Slow, slow, slow. You're too fast. Keep

Page 116

going. Wait. That's the same one you show me before, no? Can you keep going. I want to see the signature and the dates. One second. One second.

Q   Do you have any recollection of this Amended and Restated Note that was executed in November of 2021?

A   I'm just trying to see because it sounds like you're showing me in 2017. What's your question?

Q   Do you recall this document being signed in November of 2021?

A   Keep scrolling it. Go back a little bit. Okay.

Q   All right. On page Bates 43, is that your signature?

A   Yes.

Q   And Michelle Martin?

A   Yes.

Q   That's your employee, right?

A   Yes.

Q   Does this refresh your memory as to who's signing this document in November 2021?

A   Yes.

Q   Now you remember it?

A   Yes.

Q   Do you remember why this document was prepared and signed?

Page 117

A   Because we were doing business for a long time and we basically trust -- you know, we have like a family relationship and we trust each other too much. But, you know, the end of the day I got to secure my family and, you know, I put it together God forbid something happened to me. So at least we have something to go by so it's --

Q   Well, let's take a look at this. And we are back on Bates page 18. This Amended and Restated Promissory Note, this is the same amount that's on the prior Note, right?

A   Yes.

Q   And it talks about the other Note that's dated November 5th, 2017, right?

A   Yes.

Q   And it says, "Which evidences an indebtedness from Borrower to Lender" of $2 and-a-half million, right?

A   Yes.

Q   So now it's November 11th, 2021. On November 11th, 2021, were you owed $2 and-a-half million? Was AWB owed $2 and-a-half million?

A   Yes.

Q   All right. Now, in November 2017 you said that AWB was not owed any money but there might be some

Page 118

debts that came up.

Are you telling me that between November 2017 and November 2021, that debts of $2 and-a-half million arose?

A   We only have vehicle. We purchasing vehicle, and the vehicle sitting somewhere on the floor between AWB and Excell Auto, and it's about $2 and-a-half million.

Q   Okay. But, now, you already told me that you never actually gave Excell money but that that number reflected cars that you purchased, okay, and that if they sold your cars and they didn't pay you, then they would have to pay.

Now, is it your testimony that in November 2021, they actually now owed you $2 and-a-half million?

A   If God forbid I don't get paid for the vehicle.

Q   But in November 2021, did they not pay you for any vehicles?

A   I'm not sure.

Q   Okay. Now let's take a look at that. Let's go down. It says that the Undersigned borrower promises to repay the lender $2 and-a-half million. So it states here in no uncertain terms that you're owed $2

Page 119

and-a-half million, right?

A   If I don't get paid for my vehicle.

Q   Okay. Now, it goes on to say that, "The entire principal balance of this Note, together with all accrued and unpaid interest-payment, shall be due and payable on November 4th, 2022."

Do you see where it says that?

A   Yes.

Q   Now, other than these two Notes that I showed you which evidence the same debt of $2 and-a-half million, are you aware of any other debt from Excell Auto Group owed to AWB?

A   Say again. I'm sorry.

Q   Yeah.

This Exhibit A-01 shows debt of $2 and-a-half million. Both these Promissory Notes say the same thing.

Are there any other documents to show that an amount greater than $2 and-a-half million is owed to AWB?

A   Can you repeat it, Jerry. I'm sorry.

Q   All right. These documents show a debt in an amount due of $2 and-a-half million if certain things happen, right? Correct?

A   But you not finish -- you ask me a different

Page 120

question before.

Q   Okay. My question to you is: These two documents talk about the same $2 and-a-half million.

Are there other documents showing more money that's owed?

A   Yes.

Q   And what are those documents and where are they?

A   They should be with your filing.

Q   Why don't you describe them for me. What are they?

A   They basically very similar, but it's just more money.

Q   All right. So you're saying that there is more Promissory Notes out there?

A   When you say it's a Promissory Note, it's just if God forbid something happen, we own the car. AWB own the car. If God forbid we don't get paid for the vehicle or somebody stealing our vehicle, Mr. Zankl's family owes us the money.

Q   All right. I understand what you're saying.

My question to you is: Are there any other papers that you're aware of that show an amount in addition to this $2 and-a-half million that is owed or was ever owed to AWB?

Page 121

A   Can you repeat yourself one more time.

Q   Yes.

How much money does Excell owe AWB today?

A   In the high six I think.

Q   So you're saying that AWB is owed over $6 million, correct?

A   Yes.

Q   All right. Which people or companies owe AWB that money?

A   Say it again please.

Q   Who or what company owes AWB over $6 million?

A   Excell and you have guarantor. You have a couple people that guaranty the loan.

Q   So you're saying Excell owes over 6 million, right?

A   I mean, Scott and his wife and his other companies.

Q   Okay. Right, that's what I'm asking you.

Who owes the money?

A   Kristen Zankl, Scott Zankl, Karma guarantee the money.

THE COURT REPORTER: I'm sorry. Karma. Okay.

THE WITNESS: One second.

Jerry, Karma, can you explain to her Karma is not a person. There's not a person called Karma.

31 (Pages 118 - 121)

Page 122

MR. BRESLIN: Ms. Court Reporter, when Mr. Farache says "Karma," he's referring to the Karma companies or entities. There are two Karma entities. There's Karma of Palm Beach and Karma of Broward. When he says "Karma," we all know what he's talking about.

THE COURT REPORTER: I just didn't know what word he said.

MR. BRESLIN: Karma, Karma. Like bad Karma. Like me being here in this depo today. Bad.

BY MR. BRESLIN:

Q   All right. So Excell owes AWB over $6 million. The Zankls owe you over 6 million, and the Karma entities also owe you over 6 million, correct?

A   I mean, between all of them, it doesn't matter how I get paid.

Q   Right.

But my point is: It's your testimony as the representative of AWB that there is debt over $6 million, almost triple the amount of this Promissory Note that was executed in 2021 just a few months before they went out of business, and that money is owed as we sit here today, correct?

A   But it's all -- don't forget that when I sell my cars, everything going to change. I own my cars. I

Page 123

have to sell them. When I sell them, I'm going to reduce the loan. You know, I own my car. Wait till I sell them. Then I'm going to tell you exactly how much is still owed. That's what I can't tell. I own the cars. I have a lot of vehicle in my possession.

Q   Mr. Farache, I would just like to focus on where we're at today, and as of today we have a Promissory Note for $2 and-a-half million. You say that there are some other documents out there to show even more debt, and that's where I'm going here.

What are those documents and where are they?

A   When I sell my -- AWB sells the cars, the document, I can give you the right numbers.

Q   Okay. But you misunderstand my question.

I'm not asking how much is going to be owed after you sell your cars. I'm asking how you establish that, in your words, high 6 million is owed to AWB as of today. How do you determine that?

A   AWB has inventory. So when you sell the inventory, my own vehicle, then I can tell you exactly. You've got to give me a chance to sell them.

Q   But why does Excell owe money for your inventory?

A   It doesn't. When I sell them, it doesn't.

Q   But even if you never sell them, why does

Page 124

Excell owe AWB money for cars that AWB purchased? Explain it to me.

A   Explain that to me please.

Q   I'm sorry?

A   Can you explain exactly what you're trying to say.

Q   Right, right.

You're saying that you own inventory, right, and that Excell and the Zankls and the Karmas owe you almost $7 million. Now I'm trying to figure out why anybody owes you money -- when I say "you," AWB -- why anybody in the world would owe AWB money for cars that it purchased. If you bought the cars and you own the cars, why does anybody owe you any money?

A   Why we here today? We have a dispute. That's what I can't sell my cars.

Q   Okay. Do you understand the question?

If you bought cars and you own cars, where is this debt coming from?

A   I don't understand you, Jerry.

Q   And, Mr. Farache, I'm trying to make my questions as simple and as clear as possible, so let me try it more time and then we'll move on.

Your testimony is that you're owed roughly $7 million from the Zankl companies, and you also say

Page 125

that you, AWB, own -- I don't know -- approximately $5 million worth of inventory in luxury automobiles, if we look at the spreadsheets that we talked about earlier that are, you know, a lot of money.

So if AWB owns those cars, explain to me why anybody owes AWB money.

A   Because I got to sell my cars and then I can give you the number. AWB owns the vehicle. When I sell them, I can tell you exactly the number.

Q   But you told me earlier that Excell is not going to owe you any money unless they sell your cars and don't pay you, right?

A   They don't need to sell my cars. I can sell my cars.

Q   Okay. Right.

A   Excell is not --

Q   Right.

But if you sell your own cars, then Excell is not going to owe you any money, right?

A   I don't know yet. Wait till I sell them.

Q   Got you.

All right. Now let me ask you something. Your tax returns --

MR. BRESLIN: Ms. Court Reporter, this Exhibit A is going be introduced as an exhibit to this

32 (Pages 122 - 125)

Page 126

deposition. It's actually in the shared folder. Here's what your Dropbox is going to look like. There is going to be folder A and it's the first one.

THE COURT REPORTER: Well, I can't see anything.

MR. BRESLIN: Well, it would be nice if I shared the screen. This is what the Dropbox is going to look like when you get it. It's going to be folder A and it's the first document. Okay?

So that's going to be Exhibit A-01.

BY MR. BRESLIN:

Q   Now, Mr. Farache, did AWB as far as you know report that $2 and-a-half million owed from Excell Auto Group to AWB on its tax returns?

A   You're asking me -- I'm not an accountant, Jerry. You make me the smartest guy. I wish half of what you say I am. I can tell you everything -- believe me, you give me so many compliments like I know accounting. I know Excell. I know everything, you know.

Q   And please understand that I'm not trying to hassle you or make fun of you or belittle you. You're the corporate representative for AWB. So if you don't know, that's a perfectly fine answer; and if you're

Page 127

answer is, Talk to my accountant, that's fine. But if you do know, I'd like to know if you know the answer. And if you don't know, then you just say, I don't know, okay, and that way this will go a whole lot quicker. Please understand I need to ask these questions. Okay?

A   No problem. Thank you, Mr. Breslin.

Q   All right. You're more than welcome.

(FVP Exhibit A-02 was marked for Identification.)

BY MR. BRESLIN:

Q   I'm showing what's been marked as Exhibit A-02 which purports to be the 2017 tax return. And I'm going to scroll go through it.

So Steven Levy, is he your accountant?

A   Yes.

Q   And he prepared your tax returns?

A   Yes.

Q   And did you deliver the information to him to file the company's tax returns or did Michelle do that?

A   I mean, Michelle does it, not me.

Q   So, you know, if I asked you any questions about any particular entry on this tax return, you would not know the answer to that, correct?

A   I can try. But, you know, I mean, most of the stuff is above my level. You know, that's why I was

Page 128

using tax accounting person.

Q   Of course.

So I've scrolled through it, so I have a very simple question about this.

MR. BRESLIN: And this, Ms. Court Reporter, is going to be Bates 45 through 69. It's the AWB tax 2017 return.

BY MR. BRESLIN:

Q   Assume for the purpose of my question that your tax return does not show the debt of $2 and-a-half million that's reflected in that Promissory Note that was signed in 2017. If you assume that your tax return did not show that debt, would you have a reason why? Would you be able to explain why?

A   No.

Q   Now, as far as any line items in here regarding inventory or interest or receivables or anything like that, that would be a question I would have to direct to either Michelle or your tax preparer, correct?

A   Yes, sir.

(FVP Exhibit A-03 was marked for Identification.)

Q   I am going to share my screen with you, and I am going to show you FVP Exhibit A-03 which purports to

Page 129

be a Secured Promissory Note. And that begins at Bates 70 and goes to page 86. So I'm going to scroll through this document and this is a document that purports to be signed on December 31st 2018. I'm going to go through it.

MR. MILLER: Jerry, what number did you start with?

MR. BRESLIN: Yeah, this is at 70, Jim. It's A003 in folder A. I'm just going through all the folders chronologically. Well, they're not chronological.

MR. MILLER: So this is Exhibit A-03?

MR. BRESLIN: Yeah, this is A-03.

MR. MILLER: Did we mark anything as Exhibit A-02?

MR. BRESLIN: Yeah, the tax return was A-02.

MR. MILLER: Okay.

MR. BRESLIN: The 2017 tax return was A-02.

MR. MILLER: All right.

MR. BRESLIN: Yeah, they're all marked in the folder. I will refer to them all as how they're delivered to everybody. And that's in the shared folder. They're all numbered.

BY MR. BRESLIN:

Q   So I'm going to go through this, Mr. Farache,

33 (Pages 126 - 129)

Page 130

and I'll just scroll through it. This is what appears to be a very similar Promissory Note. This is the dates, and the dates are September 31st, 2018. This is page 76 of the document beginning with, "Security Agreement," same date.

MR. MILLER: Jerry. You can keep scrolling, but just don't ask any questions. I got to run down the hall real fast.

MR. BRESLIN: Yeah. Hold on. What time is it? 3:03. Let's take our ten minutes. We'll be back at 3:15. How is that?

MR. MILLER: All right. Fine.

MR. BRESLIN: All right. We'll be right here.

(A break was taken.)

MR. BRESLIN: Okay. We're back on the record.

BY MR. BRESLIN:

Q   Mr. Farache, I was scrolling through. This is FVP Exhibit A-03. It begins at Bates 70 and it concludes at Bates 86, and it purports to be a Promissory Note from December 31st, 2018. I'm going to scroll through it and ask if you recognize it, and when we are done, I'm going to ask you a few questions about it.

Let me start here. Sorry about that.

MR. MILLER: Slow down, Jerry.

Page 131

BY MR. BRESLIN:

Q   Okay. Let me start over. Here we go. Page 170. Same page with Bates 76, the Security Agreement.

Mr. Farache, I direct your attention to the screen FVP A-03 which purports to be a Secured Promissory Note dated December 31st, 2018 between Excell Auto Group and AWB in the sum of $500,000.

Do you see this document?

A   Yes.

Q   Are you familiar with this document?

A   Yes.

Q   Now, a year and a month earlier, there was a Promissory Note, and this is the November 5th, 2017 Note. So that was a little more than a year and a month earlier. This is Exhibit A-01 which shows a loan of 2.5 million. We've gone through that in detail.

Now, here this is December 31st, 2018, and now there is a Secured Promissory Note for 500,000.

Do you recall the events surrounding that Note?

A   Yes.

Q   Okay. Explain them to me please.

A   It's the same, like I tell you the rest of them. It's evidence of debt. If God forbid something

Page 132

happened, you know, I'm secured by Mr. Zankl's wife and his businesses.

Q   All right. So the circumstances surrounding this Note are the same as you described for the prior Note, and that is that there was a contingent -- there was a liability that would be owed to you or you were protected for payment if your automobiles were sold and you were not paid, correct?

A   You know, if tomorrow, you know, you take my car, you drive it, and God forbid you left it in a parking lot and somebody steal it, you know, that's protect me.

Q   All right. So these were like insurance policies, these two Notes. Would that be a good description?

A   I mean, you know, you've got to be more specific, Jerry. I'm sorry.

Q   Well, you said that these Notes were there to protect your family in case something happened.

So did you look at these Notes as like, you know, an insurance policy that if you were owed money from Excell or of the Zankls, that these pieces of paper would protect your family?

A   Basically, you know, basically it's just keep everybody straight up because it's evidence of the debt.

Page 133

And, you know, I try to pronounce it a different way but, you know, basically it's just, you know, after I sell my cars and I know the number, I can tell you exactly where I am. You're asking me questions of numbers and, you know, I'm trying to help you as much as I can.

Q   And I appreciate that very much.

So, now, can we agree then that this $500,000, that was not money that was given to Excell on December 31st, 2018, correct?

A   I mean, I don't know. You know, you're talking about we are in four or five years later. You know, I mean, you know how many stupid money we go back and forth and we purchased vehicle. We selling vehicle. We have nine and-a-half years relationship.

Q   But there are not that many Promissory Notes. So this was the second one that got signed, and so this was for 500 -- the one earlier that was for $2 and-a-half million. Now here's one for 500,000.

So my question was, and I believe you answered, and that was that this second Note was signed for the same reasons the first Note, and that was to give you assurance that if money was due to you, you would be paid, right?

A   It's basically evidence of the debt. You

34 (Pages 130 - 133)

Page 134

know, you basically always want to make sure you have evidence of the debt.

Q   So are you telling me that on December 31st, 2018, there was debt of $500,000?

A   More than that.

Q   Okay.  Well, how did the debt of $500,000 come into play?  Did they sell your cars and didn't pay you?

A   I don't know.

Q   But what you can say is that you didn't give them $500,000 in return for this piece of paper, correct?

A   I maybe bought a car.  I don't know.  It's 2018.

Q   So maybe you bought a car worth $500,000 and then that would be why there was this Note?

A   Maybe two cars.  Maybe three cars.

Q   All right.  So what you're saying is that this December 31st, 2018 Promissory Note -- and that is Exhibit A-03 -- could have reflected AWB purchasing vehicles for the amount of $500,000, right?

A   It can be.

Q   All right.  Thank you.

Oh, one more thing about this Note.

Are you familiar with a company called Seaside?

Page 135

A   Seaside?

Q   Yeah.

A   Who is Seaside?

Q   I guess that's a no.

MR. BRESLIN:  All right.  I'm going to go through some tax returns, just scroll though them, and then we'll get to another document.

(FVP Exhibit A-04 was marked for Identification.)

BY MR. BRESLIN:

Q   Okay.  I show you what's been marked as FVP Exhibit A-04 which commences at Bates 87 and goes through 106.  And this purports to be the AWB tax return for 2018.  I'm just going to scroll through it.

MR. MILLER:  Jerry, you can just read it and we'll listen to you.

MR. BRESLIN:  You would like that.  I've not been punished enough.

BY MR. BRESLIN:

Q   I'm going to scroll through the 2018 tax return, sir.  I need to put this in the record.  All right.  I show you what's marked as FVP Exhibit A-04 for your deposition which purport to be the tax return for AWB from tax year 2018.  I'll just scroll through it.

Are you familiar with it?

Page 136

A   As far as I know.

Q   Can you vouch for any of the numbers on this document?

A   I can try.

Q   Okay.  Can you vouch from personal knowledge that any numbers on this document are accurate?

A   It's got to be accurate.

Q   I'm not asking what's got to be.  I want to know if you know with first-hand knowledge personally that these numbers are accurate?

A   Yes.

Q   Okay.  So it talks about gross receipts for sales of $27 million, gross profit is 66,000, and business income of minus 495,000.

Are those accurate numbers?

A   Supposed to be.

Q   What do you mean by that?

A   That's what is there.  It's accurate.

Q   But did you tell your accountant to put those numbers in there?

A   Whatever is there, that's the number.

Q   No, that wasn't my question.

My question was:  Did you tell your accountant what numbers to put in this document?

A   I can't answer you, Jerry.

Page 137

Q   So as of the last tax return, you said that Michelle Martin supplied the information from your books and records to your accountant who prepared the tax returns, correct?

A   Yes.

Q   All right.  Would it be the same for this 2018 tax return?

A   Yes.

Q   So this number 27,134.840, do you know how that was calculated?

A   Just probably that's the gross revenue.

Q   I'm not asking what's probable.  I'm asking you if you know from your own personal first-hand knowledge how this number was calculated?

A   Gross revenue, what we bought and sell cars.

Q   So it says, "Gross Receipts or Sales."

What does buying have to do with it?

A   Say again.

Q   You said that number is from buying and selling cars?

A   I mean, you've go to sell to buy.  You can't just buy.

Q   But my question to you is:  There's a number here.  There's a specific number.  You already said that you didn't keep your books and records and that was done

35 (Pages 134 - 137)

Page 138

by Michelle and that that information was provided to your accountant.

So I'm asking you whether or not you have personal first-hand knowledge as to any of the numbers on this tax return, whether or not they're accurate?

A    Which number?

Q    Any of them.

A    Show me specific which number.

Q    All right.  Let's start with gross receipts or sales, 27,134,840.

A    You're talking about the 1-A over there?

Q    Do you see the 27,134,840 over here?

A    That's probably the gross sales of the company for the year.

Q    Okay.  That's my question.

Do you know for a fact that your company AWB had gross sales of 27,134,840?

A    That's what it says on the paper.

Q    I know that's what it says.  I'm asking you if you know if that's accurate?

A    It is what it is.

Q    I can read what it says.  I'm asking you is that an accurate statement?  Did you have gross sales of 27 million?

A    That's the gross sales.

Page 139

Q    Okay.  So what you're telling me is that that's a true and accurate statement that your company had gross sales of 27,134,840 in 2018?

A    Mr. Breslin, if you show me some document that you write a number, the number is the number.

Q    I'm just trying to ask you some very simple questions.  You either know whether or not it's accurate or you don't.  If you don't know it's accurate say, I don't know, talk to my accountant.  Or if you know it's accurate, then you can explain to me why it's accurate.

It's a simple question.

A    You're going back five years ago, and as much as -- you know, that's got nothing to do with the last 24 months.  You know, you want me to answer you accurate answer.  I'm trying.  I'm trying to give you all my knowledge so I help you with your clients so hopefully you collect your money from your Debtor.

Q    Thank you, sir.  I'm very grateful for that.

Do you know whether or not that's an accurate statement?

A    It's got to be accurate.  Everything over there is accurate.

Q    Okay.  How about cost of goods sold?  Is that an accurate statement?

A    Everything you see, that's what it is.

Page 140

Q    So you're vouching under oath that these are all true and accurate numbers?

A    We submit an accounting number to our accounting firm and that's what they do for us.

Q    Okay.  Well, let me ask you something.  Did $27 million get deposited in your bank accounts in 2018?

A    It's the gross revenue.

Q    My question to you is:  And you're vouching for it.  Did your company receive $27 million in 2018 from sales?

A    Mr. Breslin, I'd love to answer you everything.  You know, if you ask me how much I have in my pocket, I can put my money and count it.  You can see through the camera and I can give you till the penny.

Q    Okay.  Well, let me ask you this then:  If your bank account didn't show $27 million being deposited in that entire year or the last several years, how do you explain that $27 million number as the representative of this company?

A    I don't know how to answer you that.

Q    Do you know why there's a negative income number of 495,000?

A    I don't know how to answer you.

Q    How about interest?  How was that interest number calculated?

Page 141

A    I don't know how to answer you.

Q    All right.  So your answer would be the same for any other questions I ask about this tax return, correct?

A    I mean, you know, I don't know how to -- you know, you try to knock me down with some questions --

Q    I'm not trying to knock you down.

A    -- and make me commit to something.  And I don't want you to make me fail in my deposition.  You've got to be -- you know, you've got to be very specific.  You're asking me questions like I'm an accounting firm.  I'm not.  I'm a simple guy.  You know, I'm trying to help you with all my answers.

Q    And I appreciate it.

(FVP Exhibit A-05 was marked for Identification.)

BY MR. BRESLIN:

Q    All right.  So let's move on to A-05 which is the 2019 tax return.

Well, let me go back to A-04.  That's Bates 87 through 106.

A-05 is Bates 107 through 147.  I'm just going to scroll through 2019.

MR. MILLER:  Can you slow down, Jerry.

MR. BRESLIN:  Of course.

36 (Pages 138 - 141)

Page 142

BY MR. BRESLIN:

Q   Here we are 2019.  Okay.  I've scrolled through it.  Have you had a chance to -- these documents were provided to you in advance of the depo.  Did you have a chance to look over this tax return for 2019?

A   I mean, I'm looking at it with you at the same time.

Q   So you didn't look at it before today?

A   I mean, I'm looking at, you know, in 2019.  I look at it probably in my office prior to me to come here.  But, you know, I'm looking in a different.  You're looking at different.

Q   But as a representative of the company, can you state that these are true and accurate reflections of the financial records of your company for that year?

A   Yes.

Q   And I'm not going to go through these numbers.  You don't know how any of these number were calculated by your bookkeepers and accountants, correct?

A   You can read it to me and I can tell you.

Q   Sure.  Let's try it one more time.

How was this gross receipt or sales number of 26,399,866, how was that calculated?

A   That's the gross revenue.

Q   I understand that it says, "Gross Receipts or

Page 143

Sales."  How was that number calculated?

A   That's what we sold cars.

Q   So you're telling me that in 2019, AWB sold vehicles and got receipts of 26,399,866 in the year 2019?

A   That's what it's saying.

Q   I know what it says.  I'm asking you if that's an accurate statement?

A   Whatever is there, it's accurate.

Q   Okay.  So you sold $26 million worth of cars in 2019, AWB?

A   That's what it's saying.

Q   So if you sold $26 million worth of cars in 2019, how many cars is that?

A   I don't know.  I can't tell you exactly.

Q   Well, you told me earlier that, you know, there was only a couple of cars sold.  That's a lot of cars.  Do you know how many cars you sold in 2019?

A   Maybe 150.  I don't know.

Q   Okay.

A   You can do the calculation.

Q   All right.  So that $26 million, that was money received from customers that bought AWB cars?

A   That's the total revenue.

Q   It says, "Gross Receipts or Sales."

Page 144

Did AWB receive 26,399,866 from customers who purchased cars from AWB in the year 2019?

A   Can you repeat it.

Q   Yes.

We're looking at the gross receipts or sales of 26,399,866, right?  Do you see that number?

A   Yes.

Q   That would indicate to, you know, a civilian like me that AWB sold cars worth $26 million in 2019.  Is that true?

A   That's what it's saying.

Q   I know what it says.  Is it true?

A   I think so, yes.  It should be true.

Q   So you're saying that $26 million was paid to the bank account of AWB in 2019?

A   You take it to a different level and you are a little bit wrong, because if we sell and we get trade in some cars instead of money, so you can't say $26 million deposit to the bank.  You know, you can say the revenue is --

Q   Okay.

A   You know, you're very tricky and I don't like it.

Q   Well, I'm not trying to be tricky.  I'm trying to figure out where your company sold $26 million worth

Page 145

of vehicles.  It says, "Gross Receipts or Sales."

So I know what the word "receipts" means and I know what the word "sales" means, and then I see the number over here.

A   It is what it is.

Q   So I'd like you to explain to me how AWB either had receipts or sales of $26 million when the bank account records do not establish that.

A   Because we can do a swap, we can do even money change, and that's still sales.

Q   Okay.  So you did swaps or even money exchanges to come up to this $26 million amount.  Is that what you're saying?

A   Yes, sir.

Q   Do you know how many cars you actually sold to end users in 2019?

A   No.

Q   Did you sell any?

A   I can't tell you that.

Q   Well, was AWB licensed to sell automobiles to the general public?

A   Yes.

Q   So you could sell cars to anybody you want, right?  You don't have to just sell cars wholesale, right?

37 (Pages 142 - 145)

Page 146

A    I can't sell it as a retail, but I can sell it if I put it on my Website, if I go put it -- I go to different dealers, I can go to my friend and he ask me to purchase a car for him, sure, I can. I have a dealer license.

Q    All right. So you can sell retail?

A    I can't put the car on the street and sell it, but I can sell them to my friends. I can sell them to the Internet.

Q    You're saying you're licensed to sell automobiles in a restricted fashion and but you can't sell cars retail? You have to sell them wholesale?

A    I can always sell them, yes.

Q    Can you sell them retail?

A    I can't put them in the street and sell them.

THE COURT REPORTER:  Can or can't?

THE WITNESS:  Cannot.

THE COURT REPORTER:  Okay. I can't hear that N-T.

BY MR. BRESLIN:

Q    So you cannot sell it retail on the street, right?

A    I cannot put them in the street. I don't have that kind of dealer license.

Q    Okay. So let me ask you this real quick:

Page 147

For this gross receipts or sales of 26 million that you made in 2019, did you pay taxes on that?

A    Whatever you say, that's what we paid.

Q    So off the top of your head, you can't tell me whether or not your company paid taxes on sales of 26 million, correct?

A    We pay taxes every year.

Q    And as a dealer that's not permitted to sell to the general public, you would not be required to charge sales tax, correct?

A    If I sell it to end user and it's a retail, I have to pay sales tax.

Q    Well, in 2019 did you sell any cars to end users?

A    I can't tell you on the top of my head. Sorry.

Q    Can you tell me for any year whether or not you sold cars to end users in 2018, '19, '20, '21? And we'll get to '22. Did you sell to any end users in those years?

A    If I sell to end user, I pay the sales tax, yes.

Q    Can you testify under oath that you, in fact, sold any vehicles to end users in those years?

A    Which years? You have to be very specific.

Page 148

Q    That would be 2018, 2019, 2020 and 2021.

A    Again, if I sell to a retail and I charge a sales tax, I pay the government the sales tax.

Q    Right. Okay.
So here's my question to you: You say that if you sell to an end user, you have to pay sales tax, and what I'm trying to find out is how many sales did you have to end users in those fours years that I just mentioned?

A    I can't tell you that.

Q    Can you give me a ballpark?

A    I can't.

Q    Was it five? Was it a hundred? Do you have any idea?

A    I can't tell you.

Q    Cannot tell me.

A    Not on the top of my head. I'm sorry.

MR. BRESLIN:  All right. One more. That was A-05. This is A-06.

(FVP Exhibit A-06 was marked for Identification.)

BY MR. BRESLIN:

Q    All right. I'm going to scroll through the 2020 tax return, Mr. Farache. This is for 2020.
Now, for all these years, it shows that you

Page 149

and your wife are 50/50 owners of AWB.
Does that sound accurate to you?

A    Yes.

Q    So the interest for Chase, your son, the small interest you testified about earlier, do you recall what year that was?

A    I'm not -- I'm not sure, but it's got to be around 2021 probably.

Q    Has AWB filed a tax return for 2021 yet?

A    Yes.

Q    All right. So this is Bates 148 to 175. It's the 2020 tax return. I've scrolled through it. You've had the chance to look at it.
Does that tax return truly and accurately reflect the books and records, finances, sales and taxes?

A    Based on my knowledge, yes.

Q    Right, based on your knowledge for the year 2020, is that accurate? Accurate? Did you hear me, Mr. Farache? I asked you if it was accurate?

A    Based on my knowledge, yes.

Q    Now we are in 2020, and we have net gross receipts at 37,374,000.

A    Net.

Q    Do you know how that number was calculated?

38 (Pages 146 - 149)

Page 150

A   Net gross received? I mean, you go to different -- before you show me something else. Now you show me something else.

Q   Okay.

A   I don't know how you read it.

Q   Well, listen. I'm just showing you the -- you want to go back? I was going to go back to the one I showed you on the last two tax returns. This is the last page. This is a Tax Return History Report.

A   I don't know what we are on.

Q   Okay. Let's go back up and we'll talk about the revenues and receipts here like we did on the last page. So it shows gross revenues -- excuse me -- receipts or sales of 37,374,876.

Is that an accurate number?

A   Based on my knowledge.

Q   So you had gross sales, gross receipts or sales of 37,374,000 and then cost of goods sold of 37,068,219. Do you see that?

A   Yes.

Q   And then gross profit.

Do you know how that number was calculated to gross profit?

A   I mean, if you take the top number minus the second number, that's what you have.

Page 151

Q   So how about the interest income? What's that all about?

A   It's still an income. It's an interest income.

Q   Is that from loans?

A   Depends.

Q   Well, did you receive interest income on loans in the year 2020?

A   I don't know exactly what you're referring to.

Q   I'm showing you line 15 interest of 126,524,000. Did your company -- did AWB receive interest income in that year?

A   That's what it's saying.

Q   Okay. But you're the rep. You're the president. How did your company earn interest in 2020? What did it earn interest on?

A   Say it again. Sorry.

Q   In 2020 what did your company earn interest on?

A   I got to look and tell you.

Q   Are you able to determine what your company earned interest on?

A   I got to look at my -- I got to look at all my paperwork and just get back to you.

Q   Okay. But that's not something you're looking

Page 152

at right now?

A   No, no. I just wrote a small note.

Q   So would that be interest on loans?

A   I got to answer you the right way.

Q   So you don't know? As you sit here today, you don't know?

A   I just want to make sure I'm giving you the right answer.

MR. BRESLIN: Okay. So that was Exhibit A-06. Now we are going to go to A-07.

(FVP Exhibit A-07 was marked for Identification.)

BY MR. BRESLIN:

Q   I now show you Exhibit A-07. And this is Bates 176 through 195. And I'm going to scroll through this.

And while I'm doing that, you testified earlier that AWB had a space at 1001 Clint Moore Road, right?

A   Yes.

Q   You had some space there.

Now, did you have a lease with the landlord for the space that you had at that address?

A   Yes.

Q   So it wasn't just some space that you were

Page 153

permitted to use?

A   You mean Moshe Farache has a lease?

Q   No, I mean AWB.

A   Can you repeat it one more time. I'm sorry.

Q   Right.

You said AWB had used the space at 1001 Clint Moore Road. You said you had a presence there.

So now my question to you is: Did AWB have a lease for some part of that property with the landlord?

A   Yes.

Q   So if we looked at the lease for Excell Auto Group, there would be a section carved out in that lease for AWB, correct?

A   Can you repeat it please.

Q   Right.

If Excell leased the whole property, there would have to be some section of the Excell lease that showed a part of that lease wasn't their leasehold, that that belonged to AWB?

A   You got to read the lease and then you understand.

Q   Okay. Give me one moment. So I'm going to scroll through this document which purports to be a Secured Promissory Note between Excell and MSM Ultimate Services, Inc. Do you see that?

39 (Pages 150 - 153)

Page 154

A   Excuse me.  I can't hear you.

Q   Can you hear me now?

A   Yes.

Q   This is a Secured Promissory Note that purports to be between MMS Ultimate Services, Inc. and Moshe Farache personally dated July 7th, 2021.

Do you see this front page here?  So I'm going to now scroll through this.  Sir, I've scrolled through this document and I asked you if you're familiar with it?

MR. MILLER:  Can you go slowly please.

BY MR. BRESLIN:

Q   I've already scrolled through it.  I asked you if you're familiar with it?

A   Can you go to the bottom.  You passed the signature part, so I want to make sure.

Q   Okay.  Then I'll show you the signatures on the Note which are here on page 181 or on page Bates 181.

On the Security Agreement --

A   Wait.  Can you go back a little bit.  I'm sorry.  A little bit more.  I just want to see --

Q   Say again.  Is that what you want to look at?

A   No.  I want you to go down because I want to see who signed.

Page 155

Q   Okay.  There is the Zankls.

A   Scott Zankl.

Q   There's the Security Agreement.  Are we good?

A   That's the whole Note?  That's it?

Q   That's the whole thing.

A   Okay.

Q   So let's go back to the top.

Are you familiar with this document?

A   Yes.

Q   What is it?

A   It's basically for relocation cars.

Q   So are you telling me that for this Note, the one between Excell and MMS and Moshe Farache, you personally, that the amount of $1,080 -- excuse me $1,080,000 -- was actually paid to Excell?

A   Say it again.  I'm sorry.

Q   Right.

Was $1,080,000 actually paid from MMS and/or you to Excell in July of 2021 in support of this Note?

A   It's a short-term loan.  We already get paid.  This Note is not exist.

Q   Here's my question to you:  Did MMS and you pay $1,080,000 to Excell in July of 2021 when this Note was signed by the Zankls and Excell?

A   Look at the attached document.  We paid for

Page 156

vehicle.

Q   So is the answer no?

A   I don't understand your question, Jerry.

Q   And I don't understand your response.

This document says that they owe you $1,080,000.  They're saying, We owe you that money.

So my question to you is:  Did they get 1,080,000 when they signed this piece of paper saying that they owed the money?

A   Looking in the relocation.  Look in the --

Q   And I will, but I need you to answer that question.  Did they actually get $1,080,000 in return for this Promissory Note?  Did they get money?

A   I don't -- I need to see the bottom line.

Q   Bottom of what?

A   The attached piece of paper.

Q   All right.  This is the Promissory Note.  Okay?  This is where the Promissory Note ends.

A   Keep going.

Q   But the Promissory --

A   Hold on please.

Q   I'm asking you about the Promissory Note.  I'm going to get to the Security Agreement in a moment.

MR. MILLER:  He's asking you --

BY MR. BRESLIN:

Page 157

Q   In response to this Promissory Note --

MR. MILLER:  The witness is asking to see the document, Mr. Breslin, so he can refresh his recollection.  You're not letting him see the document.

MR. BRESLIN:  Okay.

THE WITNESS:  Slow down.  Slow down.  One second.  Something doesn't -- I mean, that's a million one purchase price, one million 95 which we have a loan -- let me look at the amount of the loan for a second please.

What's your question?

BY MR. BRESLIN:

Q   My question is:  For this Promissory Note, did you give money -- when I say "you," I mean MMS and you personally -- did you give $1,080,000 to Excell Auto Group in return for this Note?

A   Yes, that's a location.  That's why I explained to you before.  That's locating cars, and every time he find a buyer -- you know, for example, like I can use an example if Jerry tomorrow -- if Mr. Breslin stop in the dealership and he say, I want specific cars, so Mr. Zankl got 10 percent from you; and then he come back to me and he say to me, Moshe, I can purchase the vehicle in California and we can split the

40 (Pages 154 - 157)

Page 158

pie so this way you make money and, you know, we lend to him the money.  So this is again --

Q   So for this Note, you actually gave him $1,080,000?

A   Well, the relocation --

Q   You transferred this money to Excell in some fashion in return for this Note, correct?

A   Can you repeat it one more time.

Q   Yes.

Did they get $1,080,000 when they signed this Secured Promissory note?

A   I can't tell you.  I don't know if it's a one time, but this Note is basically the evidence of the debt.

MR. MILLER:  Jerry, I want to just object because you're not being clear on who "you" are.  In this regard, this Note is not between AWB, debt Debtor, and Excell --

MR. BRESLIN:  All right.  This is --

MR. MILLER:  Wait, wait, wait.

It's between Excell Auto Group and MMS and Moshe Farache personally.

MR. BRESLIN:  Right.

MR. MILLER:  So you keep using the word "you" throughout this depo.  I don't want there to be any

Page 159

confusion as to who you're referring to.

MR. BRESLIN:  Right.

BY MR. BRESLIN:

Q   And so let me clarify, Mr. Farache.  We're looking at the document.  What I'm ask asking is:  Did MMS and you give to Excell Auto Group $1,080,000 in some fashion in return for this Promissory Note?

A   Can you try to explain to me one more time please.

MR. BRESLIN:  It's time for our hourly break.  It's 4:08.  We will start back up at 4:20.

(A break was taken.)

MR. BRESLIN:  All right.  We are back on the report.

BY MR. BRESLIN:

Q   Mr. Farache, I'm showing you this Secured Promissory Note, and you had trouble articulating whether or not you, in fact, tendered money to -- when I say "you," I mean MMS and you personally -- Excell Auto Group for the sum of $1,080,000.  Now, that you had a chance to think about it, was money actually paid to Excell for that Note?

A   When you say it's paid to Excell, it's lend to Excell to relocate cars.

Q   But my question is:  Did money actually change

Page 160

hands?  Did the sum of 1,080,000 go out from MMS and you to either Excell or someone that Excell told you to send the money to?

A   Yes.

Q   Where did that money go?

A   To relocate cars.

Q   What does that mean?  What did the million dollars go to?

A   If you look in the exhibit, it's attached to this drawing, for example.  Can you put the document back.

Q   Sure.  Is this the one you're talking about?

A   Yes.

If you looking at -- he purchased -- if you look in year 2018 Rolls-Royce, 2020 Austin Martin, 2020 Lamborghini, 2018 Land Rover or Range Rover and 2019 Porche, and then you look in the price what we paid for it, what Mr. Excell --

Q   Well, that's my question to you.

This purchase price, did MMS and you personally pay these amounts?

A   Sure.  That's a relocation.

Q   All right.  So this $245,000, who paid that?  MMS or you?

A   Both of us.

Page 161

Q   How much did you pay?

A   Half of what you see over there probably.

Q   Probably?

A   Yes.

Q   Well, that's my question and that's been my question.  So you're saying that you and MMS paid out 245,000, 275,000, 250,000, 100,000 and 225,000, correct?

A   Yes, sir.

Q   When were those payments made?

A   I can't tell you that.

Q   Were they made before or after this Note was signed?

A   Probably before or between.

Q   Okay.  Let me ask you something.  This Note says that, "Borrower will split the profit of any located cars with lender 50/50."

A   Where do you see that?

Oh, I think I see that.  I see the 50/50, yes.

Q   Here we go.  Right here.

It says, "Borrower stall split the profit of any located cars with lender 50/50 with payment being due to lenders by no later than 21 days from the date of the purchase of the vehicle."

Right?

A   Yes, sir.

41 (Pages 158 - 161)

Page 162

Q   Okay.  So now this document refers to MMS and you as lenders.  So for at least this transaction, that was a loan to Excell and you were splitting the profits on the cars that the money was loaned to them to purchase.  Is that an accurate statement?

A   Can you repeat it one more time please.

Q   Yeah.

This money, the 1,080,000 loaned to Excell by MMS and you was used to purchase cars, and there was a split of profit on the cars that were purchased, correct?

A   You're talking about individual Moshe Farache and MMS, correct?

Q   Yes, absolutely.

A   Yes.

Q   So there was a split of profit on the cars that the money was used to purchase, right?

A   Yes.

Q   Now, for this Note, MMS, MMS and you, you didn't buy the cars, you didn't own the cars unlike the other Notes.  This was different.  This was a straight loan.  Right?

A   Yes.

Q   Now, as we sit here today, has that money been repaid?

Page 163

A   Yes.

Q   So this is a transaction that money was put out and it was used and you were paid back and so this money is not due, correct?

A   It's history.

Q   Now, so let me ask you something.  The Rolls, do you know whether or not that's the Rolls Cullinan?

THE COURT REPORTER:  The Rolls what?

MR. BRESLIN:  Cullinan?

THE COURT REPORTER:  Cullinan.

MR. BRESLIN:  That's something that you're not familiar with, Amber.  That's the name of a Rolls-Royce.

THE COURT REPORTER:  Oh, okay.

MR. BRESLIN:  But for us on the screen here, we're familiar with it.

THE WITNESS:  What's your question?

BY MR. BRESLIN:

Q   Is this Rolls that this 245 was loaned to Excell for, was that for the Cullinan?

A   I don't know.

Q   Now, did MMS or you, did you ever have a UCC filing or anything to protect the security interest that's outlined in this security document?  Do you know?

A   I don't know.

Page 164

Q   All right.  And that was FVP Exhibit A-07.

Now, Mr. Farache, in 2021 were you aware that your lawyers provided -- and this would be the lawyers in the State case -- your lawyers provided deal jackets for approximately 150 car deals that AWB was involved in in 2021?  Were you aware of that?

A   Probably.  I mean, I can't tell you anything.

Q   Okay.  So as the corporate representative of AWB, how many cars did AWB participate in a business transaction regarding either the purchase or the sale of an automobile in 2021 ballpark?  Give me your best guess.

A   I hope a million.  I don't know what to tell you.  You're asking me questions like, I can't tell you.  You know, I got to look in my -- you know, I got to look in my numbers.  I'm not that sharp to tell you those stuff.  You know, vehicle, some worth X, Y, Z.  I can't --

MR. BRESLIN:  All right.  We're going to now go to Exhibit B-1 which is Bates 197 to 2026.

MR. MILLER:  Are you going to put it on the screen, Jerry?

MR. BRESLIN:  Oh, it's not on the screen?

MR. MILLER:  Again, you could just read it for us.  It's a lot of reading though.

Page 165

(FVP Exhibit B-01 was marked for Identification.)

BY MR. BRESLIN:

Q   Do you recall a transaction with AWB in 2021 regarding a Mercedes G550 year 2017, VIN 7603 last four digits?  Do you recall that transaction?

A   I can try to look in all of the stuff and answer you.  You know, I mean ...

Q   But before we get there, do you have any independent recollection at all --

A   No.

Q   -- regarding this Mercedes with VIN 7603?

A   No.

Q   I'm going to scroll through these documents and I'm showing you what purports to be a wholesale order on Auto Wholesale of Boca letterhead.

So my first question to you is:  Do you see this letterhead here?

A   Yes.

Q   Does that look familiar to you?

A   I mean, it say, "Auto Wholesale" --

Q   Well, right.  I mean, it appears to be a form document.  Are you familiar with that form?

A   Keep going.  I got to see the whole thing.  Keep going please.  Wait, wait.  You're going too fast.

42 (Pages 162 - 165)

Page 166

Keep going please.  Keep going please.  Keep going please.  Keep going please.  Keep going please.  Keep going please.  Okay.

MR. BRESLIN:  And for the record, this is FVP B-01, and it's Bates 197 through 206.

BY MR. BRESLIN:

Q   So let's talk about this.

Now, for starters, this cover here, this deal jacket, do you know what a deal jacket is?

A   The file for the particular vehicle.

Q   Did AWB keep its own deal jackets?

A   Say it again.  I'm sorry.

Q   Did AWB have a deal jacket for all the cars that it had an interest in or transacted business on?

A   Can you repeat it.

Q   Yes.

Did AWB keep deal jackets on automobiles?

A   Yes.

Q   What color was the cover of the deal jacket?

A   This color is green.

Q   I understand.

But the AWB deal jackets, what color were they?

A   This particular one is green.

Q   All right.  So this particular deal jacket,

Page 167

was this an AWB deal jacket?

A   I got to -- you know, I got to verify that.

Q   All right.  Because there's Excell deal jackets, there's Karma deal jackets, and then there's other deal jackets that were taken into the possession of the Trustee.

So by looking at this document, can you tell whether or not this with a Farache deal jacket or someone else's -- excuse me -- or an AWB deal jacket or another company's deal jacket?

A   I can write it down and tell you if not tomorrow -- I mean, today and tomorrow I'm busy --

Q   Well, I just need you to look at it and tell me whether or not you know as we sit here today.  Okay.

Do you know whether or not this green deal jacket is -- let me just make it a little bit bigger.

Do you know whether or not the green deal jacket is from AWB's records?

A   I'm not sure.

Q   Now, I show you what purports to be a wholesale order --

Before I get to the wholesale order, what type of software did AWB use to track its transactions?  Did it use Dealertrack?

A   No.

Page 168

Q   Did it have any software to track transactions?

A   QuickBooks.

Q   So the QuickBooks record would have all the records of all the transactions regarding all the vehicles, correct?

A   It should.

MR. BRESLIN:  All right.  Ms. Court Reporter, please bookmark that last question and answer.

BY MR. BRESLIN:

Q   Now, this form that I'm looking at on the screen, is that a form you're familiar with?

A   I mean, it's a purchase order for a vehicle, yes.

Q   Right.

But it purports to be a purchase order of AWB.  It purports to be one of AWB's forms.

A   He say that but, you know, I don't know whose deal jacket it come from, so I can't answer you the right answer.

Q   Well, the deal jacket was provided to you and your attorneys in advance of this depo.  So what I'm asking you is:  When you look at this document, does this appear to be a legitimate document that was issued by AWB at some point in 2021?

Page 169

A   I got to look into it and I got to ask my bookkeeper.

Q   So as you sit here today, you can't tell me that this appears to be an authentic document, correct?

A   It's just -- I just want to confirm before I answer.

Q   And I understand that you may or may not want to confirm, but I'm entitled to have you answer today and I'd like you to do that, very respectfully.  I'm being very respectful.  Just tell me whether or not when you look at this document if it appears to be a legitimate record that AWB kept in the normal course of business?

MR. MILLER:  Show him the whole file please.

MR. BRESLIN:  I already did.

MR. MILLER:  Show it to him again.

Jerry, are you frozen?

MR. BRESLIN:  No, I'm not frozen.  I'm asking the witness.

BY MR. BRESLIN:

Q   Mr. Farache, did you want me to move this image?

A   Yes, please.

Q   Would you like me to scroll down?

A   Yes, please.

43 (Pages 166 - 169)

Page 170

Q   Let's just say focused on the first document. Let me make it a little smaller so you could see the whole thing.

A   No, but can you scroll the whole thing. I want to see the whole thing.

Q   Okay. I'm going to scroll the whole file again. Okay?

A   Thank you. I appreciate it.

Q   I'm going to go real slow.

That's one document. There's another document. There's another document.

Are you good?

A   One second. I want to see something.

Q   Tell me where you want to go.

Just so you know, Mr. Farache, in between today and tomorrow, every one of these folders has been provided. You can look at them all in advance. Okay?

A   I'm going to try.

Q   Yeah.

A   Don't forget that I still got to make a living somehow.

Q   I understand. I'm just saying I'm not trying to trick you. That's why I gave everybody these documents in advance so you'd have a chance to look at them.

Page 171

MR. MILLER: Actually, just for the record, Mr. Breslin, you didn't give us all the documents in substantial advance. You uploaded documents at 4:33 p.m. yesterday evening that you originally had a de minimus amount and then you dumped a bunch more in there.

MR. BRESLIN: No, no, no, you got all these documents on Tuesday. I only added some stuff to the D folder, and I know it was about five or six files. So what you just said is not true.

Let's get back to the witness.

BY MR. BRESLIN:

Q   Mr. Farache, do you want me to scroll through this? Tell me what you want me to do.

A   Ask me the question.

Q   Oh. The question is: Am I done scrolling?

A   I mean, go to the particular question and show me what you're trying to get me to answer you.

Q   All right. Thank you.

So now we're back on this very first document, this wholesale order. And my question to you is: Does this appear to you to be a legitimate form and business record of your company AWB from the year 2021?

A   It looks like, yes.

Q   Okay. So in looking at it, it looks like it's

Page 172

something that your company would generate and keep in its business folder, correct?

A   Can you repeat what you just say.

Q   Yes.

By looking at it, it appears to you that it's a document that would be kept in the normal course of business by your employees or Michelle Martin, right?

A   Yes.

Q   Does that appear to be her signature on the page?

A   I think that's Michelle's signature.

Q   So when you look at the signature, does that appear to be that of Michelle?

A   I got to look in a couple more and then I tell you for sure.

Q   So just by looking at it, you're not sure?

A   I just want to verify.

Q   Do you know what her signature looks like?

A   I know, but I want to verify.

Q   So without verifying, you can't say that that appears to be her signature, correct?

A   I got to verify, Jerry. You know, I got to make sure, Mr. Breslin.

Q   And you're certainly entitled to verify, and your attorney can ask you all the questions he wants.

Page 173

But very respectfully, sir, I'm entitled to get some answers. So if you're not sure, you just say, I'm not sure. It's real simple. Say, I'm not sure.

A   I'm not sure and I want to verify.

Q   Okay. That's fine. That's okay. That's a perfectly fine answer.

All right. Let's take a look at this document. This purports to be a wholesale order where Auto Wholesale of Boca is selling a car to Excell Auto Group. Do you see that?

A   Yes.

Q   So this is for a 2017 Mercedes G550 green SUV with VIN 7603 for price 255,790 on it. Do you see that. And it's a Registration and Title Warranty, and it's signed a couple times by Michelle. Do you see that?

A   Yes, sir.

Q   Did Excell Auto Group, in fact, sell this vehicle to Excell Auto Group for $255,000 in I believe it's July of 2017 or at anytime in -- excuse me -- at anytime in 2021? Do you know?

A   The vehicle is 2017, but this transaction is in '21.

Q   Right. And you're absolutely correct and I misspoke.

A   I'm sorry.

44 (Pages 170 - 173)

Page 174

Q   Did your company sell this car to Excell Auto Group for $255,000 as reflected in this document in 2021?

A   They sent paperwork, yes.

Q   So did Excell Auto Group pay your company $255,000?

A   I'm not sure if that's the Corona time when we just did paperwork but we don't really move money because nobody can get to the bank to do wires.

Q   All right.

A   Or any --

Q   Let me ask this: Did Auto Wholesale of Boca have possession of this car?

A   When we did the paperwork?

Q   When you sold it.

A   I'm not sure. I can't tell you that.

Q   Did Auto Wholesale of Boca have title to this car when it sold it to Excell Auto Group?

A   I'm not sure.

Q   All right. So as far as this document goes, it shows a sale from AWB to Excell Auto Group, but you're not sure if AWB had title, you're not sure if AWB has possession of the car, and you're not sure if AWB was ever paid the purchase price, correct?

A   You got to look in the original sale by Excell

Page 175

to AWB for this vehicle.

Q   And I just asked you a question and I'd like you to answer.

You just said you don't know if AWB had title, right?

A   Say it again. I'm sorry.

Q   You don't know if AWB had title to this car when it allegedly sold it to Excell Auto Group, correct?

A   I'm not sure.

Q   You don't know if AWB had possession of this car when it allegedly sold it to Excell Auto Group, correct?

A   When we bought it, we have possession.

Q   So you're saying that AWB did have possession of the Mercedes G550, correct?

A   Based on my knowledge.

Q   All right. So tell me about that car. Tell me what you remember about this car.

A   I can't tell you. It's 2021.

Q   Okay. Well, it's a quarter-of-a-million-dollar transaction. You don't remember anything about it? Nothing?

A   Jerry, we deal with a hundred and hundred thousand dollars a week purchases.

Q   I understand. I understand. But I'm asking

Page 176

you about this car. We'll talk about some other cars, but I'm asking you about this car right now.

A   I can't tell you.

Q   So you don't have any memory of this particular car, right?

A   No.

Q   All right. So, like I said, you don't know if AWB had title, right? Correct?

A   I don't know.

Q   You don't know if AWB had possession of the car, physical possession? You don't know, right?

A   I don't know and I don't remember.

Q   And you don't know if Excell ever paid the purchase price for this car, correct?

A   Say it again. I'm sorry.

Q   You don't know if Excell ever paid AWB the purchase price that's reflected on the document, correct?

A   I mean, it's a transaction. It's showing a payment. I probably replace it with a different vehicle, because those times we have the Corona, so we can't do wires.

Q   And I'd like you not to speculate. I'd like just to tell me whether or not you can tell me whether or not AWB was paid the purchase price of $255,000 as

Page 177

reflected in this document.

A   You're asking me tricky questions, and I don't want to answer you because we did -- over the Corona, we did a lot of transaction paperwork, but we don't move money back and forth because the bank's been closed.

Q   So getting back to my question.

Do you know whether or not Excell Auto Group ever paid the purchase price of 2,550,790 to AWB for this vehicle?

A   I got to look in my --

Q   As you sit here today, do you know?

A   No, I can't tell you that.

Q   Now, being in business, do you know what an Odometer Disclosure Statement is?

A   Odonomo enclosen statement, yes.

Q   What is it?

A   Basically you got to sign up the mileage of the vehicle.

Q   You have to swear to it, right?

A   I mean, you got to make sure it's there, yes.

Q   Well, right.

I mean, when you sell an automobile, there has to be a verification of the mileage of the car. It's state law, isn't it?

A   I mean, yes.

45 (Pages 174 - 177)

Case 22-15627-EPK   Doc 423-14   Filed 02/11/23   Page 47 of 131

Page 178

Q   All right.  So now let's go to the next document here.  This is a document that purports to be an invoice from Auto Wholesale of Boca to Excell Auto Group.

Does this appear to be a legitimate invoice?

A   Based on my knowledge, yes.

Q   Okay.  So you have no reason to believe that this is anything other than a genuine business record, correct?

A   Can you repeat yourself please.

Q   Yes.

You have no reason to believe that this is anything other than a legitimate business record contained in the AWB books and records, correct?

A   It's look like it's an AWB invoice.

Q   Is there anything about the invoice that seems odd or off to you?

A   No.

Q   All right.  So this next document would appear to show an invoice amount of $255,790 in and an amount paid of 255,790.

Does that appear accurate to you?

A   Go back to the invoice.  I just want to make sure it's the same amount, 255,790.  Go back to the check, 255,790.  It's all the same.  The same invoice,

Page 179

the same everything.  Go back to the invoice number.  I just want to make sure.  Invoice 1438.  Go back to the paid.  I don't know why the invoice say something else.  The amount is right amount.

Q   So this document appears to be a check 63262 issued from Excell Auto Group payable to AWB for the amount of the invoice, correct?

A   Okay.

Q   These are AWB business records.

Does that appear to be a legitimate record that was contained in your business record files that was provided to us?

A   What's the invoice number?

Q   You want the invoice number?

A   No, no.  The paid invoice that maybe it's -- I don't know how they do it.

Q   So does this appear to be a check from Excell Auto Group to AWB paying for this car?

A   Yes.

Q   Do you know whether or not this check was ever deposited or cashed?

A   It's not deposit because that's the Corona time.  So we took a swap for it, so it's ...

Q   So the summer of '21, the banks weren't open?

A   The banks open but we can't do wires.

Page 180

You know, Mr. Zankl is very sick at the time.

Q   All right.  So you're telling me that in July of 2021, that Chase bank would not do wires?  Is that your testimony?

A   We can't do all the transactions because everything is by appointment and it's the Corona time and it's just no -- so we make some agreement to do all the paperwork and we can't get to the bank.  So we just going to continue to do all the paperwork and try to make it as straight as it can be.

Q   But the long and short of it is, this check was never deposited into the AWB accounts to pay for these vehicle, correct?

A   No.

Q   And there was no wire transfer to AWB to pay for this vehicle, correct?

A   No.

Q   Now we go to the next document.  And this is now for 7/14/21.  And if we look above here, this is Auto Wholesale of Boca is selling the car to Excell, right, on July 29th, right?  Is that right?

A   Wait.  I want to see the invoice prior to that.  It's one of the invoices.

Q   Okay.  We're going to go through every document in this folder.  So just so we're clear, the

Page 181

invoice from Auto Wholesale to Excell is dated 7/29/21, right?  Now, we have this check that was never paid or cashed or deposit and no wire transfer, correct?  Is that right?

A   I'm trying to figure out.  One second.

Q   Okay.  Now let's go down to this wholesale order.  I'd like you to look at the screen.  What this purports to show is that Excell sold this car to Auto Wholesale of Boca on July 14th.  Do you see that?

A   Yes.

Q   Is that a true and accurate transaction?

A   Based on what you show me.

Q   All right.  So what this shows is on July 14th, '21, this vehicle was sold by Excell to AWB for $255,790, right?

A   Yes, that's what it says, yes.

Q   Now, did you know whether or not AWB paid for the car?

A   I think it's during the Corona.  So this period of time which is all the paperwork but it's not obviously paid transaction.

Q   All right.  Now, do you have any explanation why this car would be sold to AWB on July 14th, 2021 for $255,790 and then told back to Excell two weeks later for the exact same amount?  Do you have any explanation

46 (Pages 178 - 181)

Veritext Legal Solutions

800-726-7007                                                                                    305-376-8800

Page 182

for that?

A   He pay us the profit in a different check.

Q   What?

A   He pay us the profit in different checks.

Q   I asked you how do you explain that Excell Auto sold you a car for a certain amount of money on July 14th and you sold that car back to them two weeks later for the exact same amount of money?  How do you explain that?

A   I can't tell you the whole detail of what the question you're asking me because I got to look in my paperwork and go back to the '21 with Excell.

Q   All right.  So let's continue down in your business record file.

Now we have here a check that's written from Auto Wholesale of Boca to Excell Auto Group for $255,000, correct?

A   Yes.

Q   So you purportedly or supposedly on July 15th, 2021 paid 255,000 for this vehicle and bought the vehicle from Excell, correct?

A   Yes.  But you're going back, we did all the paperwork, but it's not real movement of money on this particular time.

Q   Okay.  And that's exactly where we're going.

Page 183

So this check here from Auto Wholesale to Excell on July 15th was never deposited or cashed, right?

A   Yes.

Q   And where you're buying the car, and this check where you're selling it back to them 14 days later or 15 days later, that check is not cashed either, right?

A   Yes, no cash.

Q   All right.  So what we have here is a transaction where checks are written and signed that are not deposited where there is supposedly a transfer of ownership from Excell to AWB and from AWB and back to Excell of the exact same vehicle in the exact same price all within two weeks, correct?

A   You can see.  I mean, it's a swap.  We're basically swapping cars because we can't get to the bank.

Q   You're swapping what?  You're swapping a car for the same car?

A   We're moving from car to car.

Q   Okay.  Where is the other car?

A   You got to look.

Q   What do you mean it's a swap?  I'm showing you the documents for one car.

Page 184

A   I got to look in the whole paperwork, jerry.

Q   I know.  But as you sit here today, how do you explain that?  Why was that done that way?

A   I can't -- you know, I know in the period of the Corona, we did a lot of paperwork, no money transaction because we cannot get to the bank.

Q   Okay.  So when we look at your AWB business records and we find these checks that are signed, why were these signed checks just put in your business files if they were never deposited?

A   For all of the record.  We did it for bookkeeping record and make sure we comply --

Q   And --

THE COURT REPORTER:  Hold on.

MR. BRESLIN:  I apologize.

THE COURT REPORTER:  Yeah.

MR. BRESLIN:  I apologize.  I interrupted you, Mr. Farache, and I apologize.  Go ahead.  Please finish your answer.

THE WITNESS:  One second.

Say it again.  I'm sorry.

MR. BRESLIN:  No, I'm sorry.  I interrupted you.  I didn't mean to.

BY MR. BRESLIN:

Q   But getting back to this, these business

Page 185

records that we had got from your lawyers that show your deal jackets -- this is an AWB dealer jacket -- shows a transaction where Excell sold the car to AWB, issued an invoice, never got paid, and AWB sold it right back to itself two weeks later, issued an invoice and never got paid, but both companies put fake checks in the folder to paperwork the folder, and my question is why?  Who were you going to show this file to?

A   It's just for our bookkeeping records.

Q   Your bookkeeping.  Okay.

I don't understand.  Please explain that to me.  I have no understanding of why there would be this false paper transaction in your business records.

A   You don't need to understand.  It's not your business.  It's our business.

Q   Okay.  So I understand that it's none of my business, but I'm entitled to ask these questions because it appears that these business records show what on its face is a false and fraudulent transaction.  So I'd like you to, if you can, explain to me why that transaction, these papers were put in this folder.

A   First thing, don't ever say fraudulent.  That's the first thing I tell you.  And that's in-house bookkeeping record.

Q   For what purpose?  What did that transaction

47 (Pages 182 - 185)

Page 186

accomplish for your in-house business records?

A   Sell and buy vehicle.

Q   Why was this particular vehicle bought and sold?

A   Because that's our business with Excell.

Q   So your business was to buy a car from Excell and sell it back to Excell for the exact same amount of money within two weeks.  That's an interesting line of business.

A   Show me the paperwork.  I mean, everything you tell me, you know, is not -- you know, ever transaction has a reason behind it.

Q   Do you know as you sit here today, do you know what that reason is?

A   I don't.

MR. BRESLIN:  All right.  Ms. Court Reporter, that will be Exhibit B-01.  That Bates 197 through 206.

All right.  It's 5:04.  We're going to break.  Let's take 11 minutes and go to 5:15.  Then we'll go to 6:00, Mr. Farache, and then we'll start again tomorrow morning.

Does that work for everyone?

THE WITNESS:  Yes.

(A break was taken.)

Page 187

(FVP Exhibit B-03 was marked for Identification.)

BY MR. BRESLIN:

Q   I'm sharing my screen with FVP Exhibit B-03.  I'm skipping B-2.

Mr. Farache, I direct your attention to the screen.  This is Exhibit FVP B-03 299 through 309.

MR. MILLER:  To 309?

MR. BRESLIN:  Yes.

MR. MILLER:  Okay.

BY MR. BRESLIN:

Q   Mr. Farache, I'd like you to look at the cover of this document and tell me whether or not you recognize that as a AWB deal jacket cover.

A   Keep going so I can look at the whole paperwork please slowly.  Can you go slow when it come to the title please.

Q   Okay.  After scrolling through it, does it appear this is an AWB deal jacket?

A   Based on my knowledge, yes.

Q   On page Bates 300, we have what purports to be a wholesale order from Auto Wholesale of Boca which is very similar to the one in the last deal jacket, and this is selling an Alfa Romeo 3628.

Does this document on Bates 300 appear to be a

Page 188

legitimate business record from AWB?

A   Based on my knowledge, yes.

Q   At the time that this wholesale order was issued, did Auto Wholesale of Boca have title to the Alfa Romeo 3628?

A   If you go to the bottom, we can see it.  Yes, it's looks like that's the title.

Q   Are you telling me that the title reflects that AWB had title to that vehicle?

A   I'm not -- you no show me all the paperwork, the bill of sale and --

Q   Right.  Well, I was just talking to you about title.  You said scroll down to the title.  Let's scroll down to the title.  Can I go back up?

A   Can you show me the other side of the title please.

Q   All I have is what --

A   The other side of the title.

Q   Right.  All I have is what was provided to me.  Okay.  That's the only thing I have regarding title, and that would indicate that Karma Palm Beach took title of this car on 6/12/2021.  All I have is what's been supplied, Mr. Farache.  I'm sorry.  I don't have anything other than what you see.

So can I go back up?

Page 189

A   Yep.

Q   Okay.  So at the time that this transaction occurred, this wholesale order from or the sale from Auto Wholesale of Boca to Excell Auto Group, do you know whether or not AWB had title to this vehicle?

A   It looks like the title on the bottom, but we don't see the back.  But that's the title for the vehicle, so AWB has possession of the title, yes.

Q   So you're saying that AWB had physical possession of the title when this transaction occurred, correct?

A   Based on my knowledge and what you show me.

Q   Do you have any independent recollection as to this particular transaction?

A   No.

Q   So that document was signed by Michelle Martin again?

A   Yes.

Q   Undated.  It's undated, correct?

A   I don't know why it's undated, but maybe it's a mistake or something.

Q   All right.  Now we show on July 6th, 2021 that Auto Wholesale of Boca issued an invoice to Excell Auto Group for $33,000 for the Alfa 83628, correct?

A   Okay.

48 (Pages 186 - 189)

Page 190

Q   Does that appear to be a legitimate business record, Bates 301?

A   Based on what you show me, yes.

Q   Do you know whether or not AWB had possession of the vehicle at that time?

A   I got to look in my inventory record, but at the time we purchase it, usually we have possession of the vehicle and the title.

Q   Can you say from your memory where this document was -- excuse me -- where the car was on July 6th, 2021?

A   I can't tell you.  I don't remember.

Q   So it shows an invoice from Auto Wholesale of Boca to Excell Auto Group July 6th, 2021, right?  Do you see that?

A   Yes.

Q   Total amount due.

Now we go down here and we have a document that appears to show that $33,000 was, in fact, paid to Auto Wholesale of Boca on July 1st, 2021.  Do you see that?

A   Yes.

Q   So the invoice date is July 6th.  It shows payment on July 1st.  Can you explain that discrepancy?

A   It's not a discrepancy.  It's just the deal

Page 191

jacket paperwork from in-house bookkeeping, and you always go to see antecedent of debt.  So we always move cars with paperwork so this way everything is organized.

Q   But can you explain why a purported check was issued on July 1st when an invoice wasn't issued until five days later?

A   Maybe the car sold.  I can't tell you.  Those cars sell like peanuts.

Q   Well, you sold it to Excell Auto Group, right?

A   I bought it from them and I sold.

Q   Say that again.

A   We probably bought from them and sold it to them.

Q   All right.  So you bought the car from Excell Auto Group and sold the car to Excell Auto Group.  Is that what you're saying?

A   I got to look at the paper.

Q   Is that what you just said though?

A   Let me look at the paper again.

Q   But my question to you is --

A   Let me look at the paper.

Q   -- did you just say that you bought it from them and sold it to them?

A   Let me look at my paperwork.

Q   You don't know the answer to that question?

Page 192

A   I can look in the paperwork and tell you.

Q   Are you talking about the paperwork that I have on my screen?

A   Yes.

Q   Let me scroll down.

So here is the invoice date 7/6.  Here's the entry for the transaction showing a payoff.  Here's what purports to be a check from Excell Auto Group to Auto wholesale dated 7/1.

By the way, was this money ever -- was this check ever tendered?

A   Can you repeat yourself.

Q   Yes.

This check that we're looking on the screen at Bates 302, was this check ever delivered to AWB and attempted to be cashed?

A   No.  It's just for bookkeeping records.

Q   All right.  So someone at Excell created this document, this check, and put this what I guess is supposed to be a signature on this check and either gave you the check or a copy of the check and you put that paper in your business records, correct?

A   Can you repeat yourself.

Q   Yes.

Did AWB actually get a check or did they get a

Page 193

copy of the check?

A   I'm not sure.

Q   But you know for sure that AWB was never paid 33,000 on July 1st for this car, this Alfa Romeo, correct?

A   It's just for a book record.  If you look at it, that's the Corona time.  So we don't need any money transaction.  We just did everything as a book record.

Q   All right.  But my question is:  You never cashed this check or attempted to cash this check, correct?

A   No.

Q   All right.  Now we show what appears to be some entries regarding some other vehicles.  Do you know what that's in reference to?

A   It's look like it's a profit check.

Q   So but just by looking at that, can you be sure what these numbers mean?

A   I mean, when you're looking at it, it's some transaction for 2011 Bentley they pay us profit, and some transaction for 2014 Rolls-Royce they pay us profit.  The Alfa Romeo '20, they pay us profit.  The 2015 BMW, they pay us profit.

Q   So for this particular transaction, what you're telling me is this entry on the third line is

49 (Pages 190 - 193)

Page 194

what you believe to be a profit from the transaction involving the Alfa Romeo, correct?

A    Based on my knowledge, yes.

Q    But you don't recall this particular transaction independently, correct?

A    What do you mean?

Q    Well you don't remember it other than looking at the papers, right?

A    Can you explain to me very clear, Mr. Breslin.

Q    Yes.

My question to you is:  Do you remember anything about this Alfa Romeo transaction without looking at those papers?

A    No.

Q    Now we have another check which is a check from Excell to AWB for $9,100.

Do you know what the reason for that check was?

A    No.

Q    You will agree that that check was never cashed, correct?

A    I don't know.  It doesn't say for what the check.

Q    Well, if we go up -- but in any event, as far as you know, this was just another check that was issued

Page 195

for bookkeeping purposes, correct?

A    I'm not sure.

Q    All right.  Now here we have a wholesale order.  Now, this is from Excell Auto Group and this shows a transaction date of June 11th, 2021 and this shows that Auto Wholesale of Boca purchased the Alfa Romeo 3628 for $33,000, right?

A    Okay.

Q    Is that what it appears to be to you?

A    I'm trying to figure out.  You know, it's a lot of paperwork and it's all ...

Q    But when we look at the document, it appears to show that Excell Auto Group was selling this car to AWB on June 11th for $33,000.  That's what it at least appears to be, correct?

A    Yes.

Q    And if you look down here it says, "Date signed:  6/25/21."  So it could be that this transaction actually, this piece of paper, was created on 6/25/21, correct?

A    I can't tell you that.

Q    All we know is what we're seeing, correct?

A    Maybe it's a -- I don't know.

Q    Okay.  So now we have the title from the owner which purports to sell this car -- Jeanette Gorgas to

Page 196

sell this car to Karma Palm Beach on 6/12/21.  Do you see that?

A    Yes.

Q    Now we have another check here from Auto Wholesale of Boca where it purports to pay Excell Auto Group $33,000 on June 25th, 2021, correct?

A    Yes.

Q    Now, this check also was never cashed.  This was another check solely created for bookkeeping purpose, correct?

A    Yes.

Q    So my question to you is:  If Karma of Palm Beach acquired this car on June 12th, 2021, how then did Excell Auto Group allegedly sell the car to Auto Wholesale on 6/11/2021?  Can you answer that question?

A    I don't see his jacket for this vehicle.  He probably sold it from Karma to Excell.

Q    Well, or this car was purchased by Karma of Palm Beach and it was sold by Karma of Palm Beach to a customer, and then this document is just completely fabricated, check fabricated, these ledger entries fabricated, this wholesale order invoice fabricated, and this wholesale order fabricated.

That's another answer to that, correct?

A    What this mean fabricate?

Page 197

Q    That means that it didn't actually happen; that it was just papers created for bookkeeping purposes.

A    I think you're wrong.  It's not such a thing. We don't fabricate things.

Q    Well, we know that this document says that a payoff was made that never occurred, right?

A    I'm sorry?

Q    It says here, "Amount Paid," right?  There was no money paid.

A    It's a bookkeeping record.

Q    But my point to you is:  It says here that there was an amount paid, but there never an amount paid.  You've acknowledged that, correct?

A    It show a payment.  You have antecedent debt.

THE COURT REPORTER:  I'm sorry.  Say that again.  I don't know what you said.

MR. MILLER:  He said, "antecedent debt."

BY MR. BRESLIN:

Q    I don't understand what you just -- I don't know what you mean.  What do you mean antecedent debt?

A    You always go back to the antecedent debt, what he owed us a global number, and then we did the paperwork for all the transaction just to keep the record organized vehicle by vehicle.

50 (Pages 194 - 197)

Page 198

Q   So you're saying that where it shows this amount paid and payoff and the invoice and the wholesale order, that that had something to do with some debt that was owed?

A   It's always amount of money of debt.  Excell Auto Wholesale of Boca and every transaction, the reason we did it is just to keep the book record so we can see where is every money sitting, which vehicle, which title.  So this way it's keep it organized and legit.  And then because --

Q   Legit.

A   -- we cannot get to the bank.

Q   Okay.  So let me see if I understand this.

What you're saying is that the wholesale order, the invoice, the records showing an amount paid, and the sale from wholesale AWB to Excell and Excell to AWB, that all of those documents were created for bookkeeping records to show that this was a debt of $33,000 that was removed from the account owed by Excell.  Is that what you're saying?

A   Can you repeat yourself again.

Q   No.  I think I'll just ask you this:  Where in these documents does it talk about debt?

A   It's not.  It's just a transaction.

Q   But, you know, I'm not a bookkeeper.  But if

Page 199

you're owed let's say $5 million from Excell and Excell gives you an automobile that's worth 40, that's paying off the debt, right?

A   Can you repeat yourself.

Q   Yes.

If you're owed money from -- let's say Excell owes you $5 million.  Okay.  And they say, Okay, AWB, we owe you 5 million.  Here's a car.  Here's a car worth 200,000.  Now we don't owe you 5 million any more.  Now we owe you 4,800,000.

Wouldn't that be the accurate way to show that Excell is getting a credit against its debt?

A   Yes.

Q   Okay.  So but the documents that I'm looking at, the AWB business records, they don't talk about a debt.  They talk about the car being sold to Excell and Excell paying for it, and the car being sold to AWB and AWB paying for it, when neither of those payments occurred, correct?

A   They are not going bank to bank.  What we did is for the antecedent of debt, but it's also for bookkeeping and motor vehicle --

THE COURT REPORTER:  I'm sorry.  I didn't understand any of that.  "They are not going to the bank".

Page 200

MR. MILLER:  It sounds like the court reporter is getting tired there.  I don't know.

THE COURT REPORTER:  Well, I can't understand what he's saying.

MR. MILLER:  Well, he tries to say the best he can.  Do you need a volume change or what do you need?

THE COURT REPORTER:  No.

BY MR. BRESLIN:

Q   Mr. Farache, let me ask you a very simple question.  If Excell Auto owed you some substantial amount of money, why would you create paperwork that shows --

A   Because we --

Q   Let me finish my question.

-- why would you create paperwork that shows that AWB is going to pay Excell anything?

A   Can you repeat yourself one more time.

Q   Yes.

Take a look at the page here.  Let's just focus on 306.  We have what shows purports to be a check written from AWB to Excell for $33,000 that's signed but it's never cashed, right?

A   Yes.

Q   Why would this document be created instead of

Page 201

just putting a memo in the file saying that Excell now owes us $33,000 less?

A   It's our bookkeeping.

Q   I understand.  You're the corporate rep.  You're the boss.  Why was it done this way?

A   That's the way -- that's the decision we made.  For our bookkeeping records, we want to keep it this way.

Q   But if Excell sells you a car for 33,000 and you buy it back for 33,000, it's zero net.  Nothing happens.  Nobody gets benefits.  There's no profit.  There's no anything.  Why was it done?

A   Because if you look in the paperwork, I think it's a wire for 90-something-hundred been transferred to Excell Auto Group.

You know, you're looking in one thing.  You got to look in the whole things.  And I think you try to create like -- you know, Jerry, you -- Mr. Breslin, I'm sorry.  You try to create Excell Auto Group as a fraudulent.  We have nothing to do with this.  And what you look here, I come today to talk about the cars that's sitting in storage, and you bringing up stuff it's nothing to do with this case.  Talk of the cars that's sitting in storage.  That's what we're here for today.

51 (Pages 198 - 201)

Page 202

MR. BRESLIN: All right. Ms. Court Reporter, that is FVP Exhibit 3-0B. That's Bates 299 to 309.

MR. MILLER: Is this the same exhibit you jut used 299 to 309.

MR. BRESLIN: This is 4. That's 299 through 309.

MR. MILLER: You identify this earlier as Exhibit B-03 though.

MR. BRESLIN: This is B-03, right. I skipped B-02.

MR. MILLER: All right.

MR. BRESLIN: Ms. Court Reporter, that's B-2. You know, I think this is a good time to break for the evening because I have a substantial number of these deal jackets and I'm just going to cut off quite a few of them.

And we're off the record.

(Discussion off the record.)

MR. MILLER: Just for the record, your Notice of Deposition did not designate the areas of inquiry at all. So Mr. Farache is sitting here struggling, as are the rest of us, with your questions. And if you had designated an area that he would be able to focus on, he would have been better prepared. And as he said, you know, you're

Page 203

limiting your questions to a particular document and he said you got to look at all the documents we've given you. And you have the QuickBooks documents. You have the transaction documents. You have 12 bank records.

So if there's something you want Mr. Farache to look at and prepare for, don't send me 10,000 pages of documents, send me today, this evening, you know, within the next hour, the documents you intend to review for --

MR. BRESLIN: I'm not going to send you anything within the next hour.

MR. MILLER: Right. Well --

MR. BRESLIN: I've already supplied what I intend to use.

MR. MILLER: Let me finish. Mr. Breslin, you don't need to talk over me. Let me finish.

MR. BRESLIN: Okay.

MR. MILLER: Let's be professional. I know it's hard, but you can try.

MR. BRESLIN: All right.

MR. MILLER: But you keep saying that. Just stop and I can finish. Okay. You don't need to get the last word in.

So the point is: If you don't want to give

Page 204

him anything to be able to prepare and you want him to research 10,000 document that, you know, document dumped and said, Look at all this, and you haven't designated the areas of inquiry, then you get the responses you get. It's that simple.

I think Mr. Winderman gave you some pretty good advice.

MR. WINDERMAN: And just so the record is complete, Jim, and I appreciate the kindness that you've shown me in this case, but who else besides Ms. Martin is a person that can give any information about these deal jackets? Is there someone else that we should be looking toward except Mr. Farache who as far as we know is the person who personally handled each and every one of these transactions?

MR. MILLER: I think that if you have an inquiry, you can send me an inquiry or you can call me. I'm not here to answer your questions.

MR. WINDERMAN: It wasn't intended to get an answer. It's was a rhetorical question to help move the process along.

MR. MILLER: You're very good at that. Thank you.

MR. WINDERMAN: Thank you.

Page 205

MR. BRESLIN: Speaking of Michelle Martin, Jim, I requested a depo date for her. Scott approved it. I never heard back from you.

MR. MILLER: Okay. Well, you know what?

MR. BRESLIN: So take a look at that please.

MR. MILLER: Yeah, let's not have our open discussion about other discovery you had. You owe me a pile of documents and amended responses. We'll review that as well.

And by the way, if anybody orders it, we'll read it.

(The Reading and Signing is not waived and the deposition was adjourned at 5:51 p.m.)

52 (Pages 202 - 205)

Page 206

RE    : Auto Wholesale of Boca, LLC, FVP Opportunity
      Fund, III, LP, et al., vs. Auto Wholesale of
      Boca, LLC
DEPO OF : MOSHE FARACHE
TAKEN : January 12th, 2023
          EXCEPT FOR ANY CORRECTIONS
          MADE ON THE ERRATA SHEET BY
          ME, I CERTIFY THIS IS A TRUE
          AND ACCURATE TRANSCRIPT.
          FURTHER DEPONENT SAYETH NOT.
          _____
               MOSHE FARACHE

STATE OF FLORIDA    )
          ) SS:
COUNTY OF BROWARD    )

      Sworn and subscribed to before me this
_____ day of _____, 2023.
PERSONALLY KNOWN _____ OR I.D. _____
      _____
          Notary Public in and for
          the State of Florida at
          Large.

Commission No. HH398636
   Expires:  9/17/2026

---

Page 207

          ERRATA SHEET
RE    : Auto Wholesale of Boca, LLC, FVP Opportunity
      Fund, III, LP, et al., vs. Auto Wholesale of
      Boca, LLC
DEPO OF : MOSHE FARACHE

DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
Page # | Line # | Change          | Reason
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
_____| _____| _____| _____
State of Florida    )
County of BROWARD    )

Under penalties of perjury, I declare that I have read
my deposition transcript, and it is true and correct
subject to any changes in form or substance entered
here.
_____      _____
Date               MOSHE FARACHE

---

Page 208

     CERTIFICATE OF OATH OF WITNESS
STATE OF FLORIDA    )
          ) SS:
COUNTY OF BROWARD    )

   I, AMBER CHEEK, COURT REPORTER, Notary Public in
and for the State of Florida at Large, certify that the
witness, MOSHE FARACHE, appeared via videoconference on
January 12th, 2023, and was duly sworn by me.
      WITNESS my hand and official seal this 25th day of
January, 2023.

          _____
          AMBER CHEEK, Court Reporter
          Notary Public, State of Florida
          at Large

Commission No. HH398636
   Expires:  9/17/2026

---

Page 209

     REPORTER'S DEPOSITION CERTIFICATE

   I, AMBER CHEEK, Court Reporter, certify that I was
authorized to and did stenographically report the
deposition of MOSHE FARACHE, the witness herein on
January 12th, 2023; that a review of the transcript was
requested; that the foregoing pages numbered from 1 to
211 inclusive is a true and complete record of my
stenographic notes of the deposition by said witness;
and that this computer-assisted transcript was prepared
under my supervision.
   I further certify that I am not a relative,
employee, attorney or counsel of any of the parties, nor
am I a relative or employee of any of the parties'
attorney or counsel connected with the action.
      DATED this 25th day of January, 2023.

          _____
          AMBER CHEEK
          Court Reporter

53 (Pages 206 - 209)

Page 210

VERITEXT FLORIDA REPORTING CO.
One Biscayne Tower
Two South Biscayne Boulevard
Suite 2250
Miami, Florida 33131
(305) 376-8800

January 26th, 2023

Mr. Moshe Farache
c/o James Miller, Esquire
James B. Miller, Esquire, P.A.
19 West Flagler Street
Suite 416
Miami, Florida 33130

RE    : Auto Wholesale of Boca, LLC, FVP Opportunity
        Fund, III, LP, et al., vs. Auto Wholesale of
        Boca, LLC
DEPO OF :  MOSHE FARACHE
TAKEN  :  January 12th, 2023
READ & SIGN BY:  February 23rd, 2023

Dear Mr. Moshe Farache:

This letter is to advise you that the transcript of the deposition listed above is completed and is awaiting reading and signing.

Please arrange to stop by our office in Suite 2250, One Biscayne Tower, Two South Biscayne Boulevard, Miami, Florida 33131 to read and sign the transcript.  Our office hours are from 8:00 a.m. to 4:00 p.m. Monday through Friday.  Depending on the length of the transcript, you should allow yourself sufficient time. If the reading and signing has not been completed prior to the referenced date, we shall conclude that you have waived the reading and signing of the deposition transcript.  Your prompt attention to this matter is appreciated.
Sincerely,
AMBER CHEEK, Court Reporter

Page 211

VERITEXT FLORIDA REPORTING CO.
One Biscayne Tower
Two South Biscayne Boulevard
Suite 2250
Miami, Florida 33131
(305) 376-8800

January 26th, 2023

Jarrell Breslin, Esquire
Barron, Breslin & Sarmiento
169 East Flagler Street
Suite 700
Miami, Florida 33131
RE    : Auto Wholesale of Boca, LLC, FVP Opportunity
        Fund, III, LP, et al., vs. Auto Wholesale of
        Boca, LLC
DEPO OF :  MOSHE FARACHE
TAKEN  :  January 12th, 2023
READ & SIGN BY:  February 23rd, 2023

Dear Counsel:
The original transcript of the deposition listed above is enclosed for your file.  The witness did not waive reading and signing and has been sent a letter notifying them to come in and read and sign their deposition transcript.
The witness will be provided a copy of their deposition transcript for reading in our office should they come in to review the transcript, and we will forward to you any corrections made by the witness at that time, along with an original signature page which should be attached to the original transcript which is in your possession.

Sincerely,
AMBER CHEEK, Court Reporter

Veritext Legal Solutions

800-726-7007                                                          305-376-8800

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 212

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION
CASE NO.22-15627-EPK

In Re:

AUTO WHOLESALE OF BOCA, LLC,

     Debtor,
_____/
FVP OPPORTUNITY FUND II, LP, a
Delaware limited partnership; FVP
INVESTMENTS, LLC, a Delaware
limited liability company; and FVP
SERVICING, LLC, a Delaware limited
liability company; and HI BAR CAPITAL,
LLC, a New York limited liability
company,
     Adversary Plaintiffs,
vs.
AUTO WHOLESALE OF BOCA, LLC,
     Adversary Defendant.
_____/

Virtual Proceeding
Friday, 9:37 a.m. - 6:06 p.m.
January 13th, 2023

VIDEOCONFERENCE DEPOSITION OF MOSHE FARACHE
VOLUME II
Taken on behalf of the Adversary Plaintiffs before
Amber Cheek, Court Reporter, Notary Public in and for
the State of Florida at Large, pursuant to Amended
Notice of Deposition, Notice of Subpoena Duces Tecum For
Deposition in Adversary Case Of Corporate Representative
of Debtor in the above cause.

Veritext Legal Solutions
800-726-7007                                    305-376-8800

Page 213

APPEARANCES:

ATTORNEYS FOR FVP
JERRELL BRESLIN, ESQUIRE
jb@richardbaronlaw.com
BARON, BRESLIN & SARMIENTO
169 East Flagler Street
Suite 700
Miami, Florida 33131
(305)577-4626

JONATHAN SCHWARTZ, ESQUIRE
jschwartz@jonschwartzlaw.com
JONATHAN SCHWARTZ LAW PLLC
10200 Northwest 25th Street
Suite 111
Doral, Florida 33172
(973)936-2176

ATTORNEYS FOR MOSHE, LISA AND CHASE FARACHE AND FARACHE ENTITIES

SCOTT GHERMAN, ESQUIRE
sgherman@scottghermanpa.com
SCOTT C. GHERMAN, P.A.
902 Clint Moore Road
Suite 120
Boca Raton, Florida 33487
(561)757-6266

ATTORNEY FOR HI BAR CAPITAL

JARRET HITCHINGS, ESQUIRE
jarret.hitchings@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER
301 South College Street
Suite 2150
Charlotte, North Carolina 28202
(704)749-8965

Page 214

APPEARANCES:

ATTORNEYS FOR AUTO WHOLESALE OF BOCA, LLC
JAMES MILLER, ESQUIRE
jbm@title11law.com
JAMES B. MILLER, ESQUIRE, P.A.
19 West Flagler Street
Suite 416
Miami, Florida 33130
(305)374-0200

ATTORNEYS FOR KARMA OF BROWARD and PALM BEACH
HARRY WINDERMAN, ESQUIRE
harry4334@hotmail.com
LAW OFFICES OF WEISS, HANDLER & CORNWELL
2255 Glades Road
Suite 205E
Boca Raton, Florida 33431
(561)241-0332

ATTORNEY FOR NICOLE MEHDIPHOUR
JASON RIGOLI, ESQUIRE
jrigoli@furrcohen.com
FURR & COHEN, P.A.
2255 Glades Road
Suite 419A
Boca Raton, Florida 33431
(561)395-0500

JONATHAN CRANE, ESQUIRE
jcrane@furrcohen.com
FURR & COHEN, P.A.
2255 Glades Road
Suite 419A
Boca Raton, Florida 33431
(561)395-0500

Page 215

APPEARANCES:

ATTORNEYS FOR FRANKLIN CAPITAL FUNDING
ERIC PENDERGRAFT, ESQUIRE
ependergraft@slp.law
SHRAIBERG, LANDAU & PAGE, P.A.
2385 Northwest Executive Center Drive
Suite 300
Boca Raton, Florida 33431
(561)443-0800

ATTORNEYS FOR EDWARD BROWN
AMANDA KLOPP, ESQUIRE
amanda.klopp@akerman.com
AKERMAN LLP
777 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
(561)653-5000

EYAL BERGER, ESQUIRE
eyal.berger@akerman.com
AKERMAN LLP
777 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
(561)653-5000

ALSO PRESENT:  Lisa Farache
Scott Zankl
Kristen Zankl
Katie Gleason
Shaya Baum
Greg Nelson
Brian Rohl
Keith Lee
Linda Leali
Miriam Jaime

Page 216

INDEX

WITNESS:                          PAGE:

MOSHE FARACHE
Continued Direct-Examination by Mr. Breslin........220

EXHIBITS

NUMBER            DESCRIPTION            PAGE:

EXHIBIT A09     Email from Michelle Martin.......324
dated 4/23/2021
(Bates 4110 - 4113)

EXHIBIT A010     Secured Promissory Note..........226
dated 11/11/2021
(Bates 004200 - 004224)

EXHIBIT A011     Email String dated 11/9/2021.....235

EXHIBIT A012     AWB Invoice Number 1508..........249
dated 10/22/2021
(Bates 4300)

EXHIBIT B01A     Karma Palm Beach Purchase........253
Agreement dated 7/13/2021
(Bates 000263)

EXHIBIT B01B     Certificate of Title.............255
Munoz Leonel
(Bates 000215 - 000216)

EXHIBIT B01B2     Motor Vehicle Title..............257
Reassignment Supplement
(Bates 000217)

EXHIBIT B01C     US Bank Booking Confirmation.....258
Summary dated 7/14/2021
(Bates 000267 - 000268)

EXHIBIT B03A     Karma of Palm Beach Purchase.....268
Agreement dated 6/21/2011
(Bates 000359 - 000352)

2 (Pages 213 - 216)

Veritext Legal Solutions

800-726-7007                                    305-376-8800

Page 217

I N D E X

EXHIBITS

NUMBER          DESCRIPTION          PAGE:

EXHIBIT 03B    Certificate of Title.............268
    Jeanette Gorgas
    (Bates 000317 - 000318)

EXHIBIT 05    Lamborghini Uris deal jacket.... 274
    Last four digits VIN 7128
    (Bates 000394 - 000403)

EXHIBIT 05A    Certificate of Title.............275
    VA Leasing Corp
    (Bates 000408 -- 000409)

EXHIBIT 05B    Composite Karma of Palm Beach....284
    (Bates 000438 - 000439)

EXHIBIT 07    Ferrari 488 deal jacket..........287
    Las four digits VIN 6981
    (Bates 000452 - 000461)

EXHIBIT 07A    Composite of Excell Auto.........298
    documents, Quick Shift Capital
    (Bates 000464 - 000467)

EXHIBIT 07B    Composite of Karma Palm Beach....301
    documents, Ferrari 488 Spider
    Last four digits VIN 6981
    (Bates 000485 -- 000487)

EXHIBIT 09    Porche 911 deal jacket...........304
    Last four digits VIN 2124
    (Bates 000496 - 000506)

EXHIBIT 09A    Composite of Porche 911..........311
    documents
    (Bates 000515 - 000517,
    000561 - 564)

EXHIBIT 011    Porche 911 deal jacket...........318
    Last four digits VIN 6822
    (Bates 000592 - 000598)

Page 219

I N D E X

EXHIBITS

NUMBER          DESCRIPTION          PAGE:

EXHIBIT D09    State of Florida Uniform.........365
    Commercial Code Financing
    Statement Form dated 7/13/21
    (Bates 004150 - 004151)

EXHIBIT D010    State of Florida Uniform.........369
    Commercial Code Financing
    Statement Amendment Form
    dated 11/11/21
    (Bates 4152)

BOOKMARKED FOR ATTORNEY BRESLIN

Page     Line

388       6

Page 218

I N D E X

EXHIBITS

NUMBER          DESCRIPTION          PAGE:

EXHIBIT 011A    Composite of Porche 911..........224
    documents
    Last four digits VIN 6822
    (Bates 000607, 000608,
    000658 - 000663)

EXHIBIT 017    Dodge Viper deal jacket..........331
    Last four digits VIN 0680
    (Bates 000845 - 000857)

EXHIBIT 017A    Composite of Dodge Viper.........334
    documents
    (Bates 000860 - 000862,
    000886 - 000888)

EXHIBIT 019    Mercedes G63 deal jacket.........340
    Last four digits VIN 9244
    (Bates 000896 - 000905)

EXHIBIT 019A    Composite of Mercedes G63........347
    documents
    Last four digits VIN 9244
    (Bates 000914, 000915,000975,
    000979, 000980 and 000989)

EXHIBIT 021    Porche 911 deal jacket...........351
    Last four digits VIN 9039
    (Bates 001019 - 001032)

EXHIBIT 021A    Composite of Porche 911..........356
    documents
    Last four digits VIN 9039
    (Bates 001034 - 001036, 001041,
    001087 - 001089)

EXHIBIT 01    Letter to FVP Servicing LLP......375
    from 1001 Clint More, LLC
    dated January 2022
    (Bates 004001 - 004002)

Page 220

Thereupon:

        MOSHE FARACHE

was called as a witness and, having been first duly sworn and responding, "Yes, ma'am," was examined and testified as follows:

        CONTINUED DIRECT-EXAMINATION

BY MR. BRESLIN:

Q   Good morning.  Today is a continuation of the deposition that was taking place yesterday.

    Are you aware of that, sir?

A   Good morning, Jerry.

Q   Mr. Farache, did you hear my question?

A   Not yet.  Go ahead.

Q   Okay.  We are continuing your deposition today.  Were you aware of that?

A   Yes.

Q   This is a continuation.  So between yesterday and today, did you speak with anyone about your testimony in this case?

A   Basically not really.  I just took the train the first time and my wife in Florida and go back home.

Q   Okay.  So what's the answer to that question?

    Did you discuss your testimony --

A   No.

Q   -- with anyone after yesterday?

Veritext Legal Solutions

800-726-7007                                    305-376-8800

Page 221

A   No.

Q   Did you review any documents after yesterday and before today?

A   Yes.

Q   What did you review?

A   Basically I brought it with me because yesterday you mentioned to everyone I'm a fraudster, and when I tell you this the profit from some vehicle, I don't know exactly which exhibit, but I explained to you I'm not sure what the check I deposit or not for the profit of vehicle and buying and selling from Mr. Zankl for the last nine and-a-half years, and I just brought to you to see the check --

You show me one side of the check.  So when you call me a fraudster, I appreciate it if you don't use this word, and you and Mr. Zankl and all you guys just create the biggest fraud and dump everybody to the mess and I appreciate if you don't call me a fraudster.

And looking at --

Q   Mr. Farache, number one, I never called you a fraudster, A.

A   Well, take a look at the back of the check.

Q   B, if you have a document, please ask your attorney to email it to me.  Okay?

A   You see it in the back of the check.  You show

Page 222

one side of the check.

Q   Sir, would you please have your attorney email me both sides of that document?

MR. MILLER:  Just for the record, you do have this check because it's in the production of the bank records that you supposedly reviewed of the Debtor and of that sale.  This is the Excell check for $9,100 dated July 1st, 2021.  It's a front-and-back copy evidencing its negotiation and payment.

MR. BRESLIN:  Well, would you be kind enough to email it to me, because I can't see it on the screen.

BY MR. BRESLIN:

Q   Mr. Farache, other than reviewing the documents that you just showed me, have you reviewed any other documents?

A   Yes, I have a couple more piece of paper.  I brought it with me.

Q   Okay.  Would you be kind enough to have your attorney make copies of those and email them to me.

Can you describe them before we begin.

A   Everything is just basically some taxes for Mr. Zankl to us and just brief stuff.  Nothing is extreme.  It's just to, you know, also just a couple --

Page 223

I think it's a couple texts and that's it.

Q   Did you say taxes?

A   Text message.

Q   Oh, text messages.  Oh, okay.

All right.  Yes, if you'd be kind enough to give them to someone and ask them to email that to me, I would be grateful.

A   No problem.

Q   So other than the negotiated check and the text messages, are there any other documents that you reviewed?

A   Not really.  I just go home, have nice dinner and go to sleep.

Q   Now, that check that was negotiated, was that negotiated during the COVID summer?

A   I tell you the truth, I come to -- this is already deal with cars we sold, we buy, we sold.  So it's not really in my top of my memory.  But whatever you looking at dates, you can figure out.

Q   All right.  So the banks were open apparently to negotiate that check, correct?

A   We deposit.  It's not the bank.  He wrote to us a check and we deposit.

MR. BRESLIN:  All right.  So I'm going to go through a couple more exhibits in folder A.  I'm

Page 224

going to share my screen.  This is Exhibit A-09 in the folder you will get, and I'm going to share my screen.

THE COURT REPORTER:  So we skipped A-8?

MR. BRESLIN:  Yes.

THE COURT REPORTER:  Okay.

MR. BRESLIN:  There's no A-8.

THE COURT REPORTER:  Okay.

MR. BRESLIN:  And there's going to be a 10 and an 11.

THE COURT REPORTER:  Okay.

MR. BRESLIN:  I added a couple.

THE COURT REPORTER:  Okay.

MR. BRESLIN:  So this is Number 9.  This is going to be Bates 4110 to 4113.

(FVP Exhibit A-09 was marked for Identification.)

BY MR. BRESLIN:

Q   Mr. Farache, Michelle Martin worked for you.  You testified to that yesterday, correct?

A   Yes.

Q   And she was working for you in April of 2021, correct?

A   Yes.

Q   All right.  I'm sharing my screen which

4 (Pages 221 - 224)

Page 225

purports to be an email from Michelle Martin to Teddy Sofoul, Nidia Levia and Scott Zankl copied to you. It says, "Inventory Report" with a date 4/23/21.

I'm going to scroll through it. And just so you and your attorneys are aware, the actual Excel spreadsheet is in folder A for their review. You'll be able to review the metadata.

Do you have any recollection of this email?

A   I saw it before, but you know, I'm just looking at it.

Q   Do you need to take a moment to review it? Do you have any independent recollection of this email or its contents?

A   Not really.

Q   Okay. So Michelle Martin would have been the person that created the Excel spreadsheet that was attached to this email. Is that correct?

A   Yes.

Q   And I believe I already asked. You don't recall anything about this email back in April of '21, right?

A   Mr. Breslin, can you repeat yourself.

Q   Yes, yes.

You don't have any independent recollection, you don't have any independent memory about this

Page 226

particular email that has an Excel spreadsheet attached to it in April of 2021, correct?

A   What do you mean? It's a year and-a-half ago.

Q   Right.

My question to you is: As you sit here today, do you remember that event happening or you don't remember?

A   No.

(FVP Exhibit A-010 was marked for Identification.)

BY MR. BRESLIN:

Q   Now, the second one I'm going to bring up and show you is what I've marked and added to the folder as A-010. A10 is Bates 4220 through 4224. And I'm going to scroll through this very slowly, Mr. Farache, because this is a document that I didn't go through with you yesterday.

A   Can you go back a little bit.

Q   Sure.

A   Thank you. I'm sorry.

Q   No problem.

A   Okay.

Q   Have you had a chance to review it?

A   Briefly, yes.

Q   Are you familiar with it? Do you know what

Page 227

this is?

A   Yes.

Q   What is it?

A   Basically security evidence of debt to make sure all of my debt with Mr. Zankl, it's all paper-wise for the deposition where we are. We all got basically ripped off by Mr. Zankl; FVP, Moshe Farache, and probably another 30 people.

Q   So let me just dig into that a little bit.

Did you say you were ripped off by FVP?

A   No, never. The only thing I say is we all here because what's happened is we all here based on the Zankl fraud create.

Q   All right. So let's just talk about this document on the screen.

Do you know whether or not this debt was listed in the AWB bankruptcy?

A   I'm not sure.

Q   Is this money still owed?

A   All day.

Q   Is that a yes?

A   Yes.

Q   All right. So this Note is dated November 11th, 2021. Is that an accurate date? Is that when this Note was signed?

Page 228

A   I'm not sure.

Q   Now, did you pay Excell Auto Group $2,664,000 on or about November 11th or did this Note reflect money that was already owed?

A   This money is a continuation for buying and selling cars from AWB during a few years, more in one, more in two, and it's always buying and selling cars, AWB.

Q   So my question to you, sir, is: Did you give Excell Auto Group $2.6 million on or around November 11th, or was this Note signed for money that was already given to them?

A   It's basically money that's been used for purchasing cars, and the Note, it's just the evidence of debt.

Q   Okay. Now, this is dated November 11th, 2021. And if you recall in our Exhibit A-01, there is an Amended Note, an Amended and Restated Note for November 11th, 2021 for $2 and-a-half million. Is that correct?

A   Yes.

Q   So what your testimony is, is that on November 11th, 2021, two different Notes were signed; one for 2 and-a-half million and one for 2,664,450, correct?

A   That's what the Note say.

5 (Pages 225 - 228)

Page 229

Q   Well, do you recall?  It's a lot of money.

A   Yes.

Q   Do you recall this happening?

A   Yes.

Q   So these documents were signed on November 11th, 2021.  You remember that?

A   Yes.

Q   Now, is there some reason there was two different Notes?

A   Yes.

Q   Why?

A   Basically just to make sure we protect ourself and we have in-house dealings with AWB and we got to make sure we have evidence of the debt if God forbid something happened like it's happened now.  We all sitting here because the fraud what's happening with Excell Auto and Karma Palm Beach, Karma Broward.

Q   Now, who explained to you what was in this Note, if anyone?

A   My legal team.

Q   Do you recall who that was?

A   My lawyer.

Q   Do you have a name?

A   Scott Zankl.

    I'm sorry.  Oh, my God.  I'm so sorry.  Scott

Page 230

Gherman.  You imagine I use him?

Q   So you have a specific recollection that Mr. Gherman counseled you and reviewed these documents before you signed it.  Is that correct?

A   As much as he can, yes.

Q   Now, this document talks about --

    Well, while we're talking about Mr. Gherman, I asked you yesterday whether or not you relied upon him to explain legal documents to you.  Mr. Miller objected.  They have since withdrawn the objection.

    Is it safe to say that you used your attorney Mr. Gherman to explain legal documents that you didn't understand?

A   Most of the time.  You know, he read and write in English, so even if he read to me anything, it's help.

Q   Okay.  Now, this particular Note says, "Lender and Borrower agree to split the profits 50/50 on all vehicle sales funded by this Note."  Do you see that?

A   Yes.

Q   Did that happen?

A   Yes.

Q   And how were profits determined?

A   Can you repeat your question.

Q   Yeah.

Page 231

How did you figure out the profits?

A   I relied on my -- Mr. Zankl, Excell, Karma Palm Beach, Karma Broward paperwork.

Q   So you relied on the paperwork of Karma of Palm Beach to determine what the profits were on the sales?

A   Depends -- you know, you're very specific.  Depends which company the transaction happened.  You know, if it's happened from Karma Broward or Karma -- it depends on which entity.  You know, Mr. Zankl has three dealerships.

Q   Well, this Note is to Excell Auto Group, isn't it?  This says that Excell owes you the money, right?

A   Yes.

Q   Now, in your mind did you believe that this Note entitled you to 50 percent of the profits from not only Excell but from the Karma Palm Beach company as well as the Karma Broward company?

A   No.

Q   So this would only be profits on an Excell transaction?

A   As long as the car got bought by Excell.

    I'm sorry.  As long as the car sold to AWB.

Q   I don't understand.  As long as the car was sold to AWB?

Page 232

A   Yes.  If I bought it from AWB, I'm entitled for profit.  If the vehicle got bought by Zankl and his wife and they make profit, it's nothing to do with me.

Q   So are you saying that if AWB bought a car, then AWB would be entitled to a profit on that car?

A   If Excell sold it.  If AWB sold the car without Excell, Excell not entitled for profit from that.  If Excell bought a car with his own money, his own company money, and he's buying and selling it, then it's nothing to do with AWB.  I don't deserve to have the profit.

Q   Okay.

A   It's nothing to do with my house.

Q   All right.  So what you're saying is that this Note, this agreement in this Promissory Note, entitled AWB to half of the profits on any vehicles that Excell purchased with moneys given to Excell by AWB, correct?

A   Can you repeat yourself because this is a tricky one.

Q   Yes.

    So what this document says is that if AWB gave money to Excell and if Excell purchased a car with that money and if Excell sold that car for a profit, that AWB would be entitled to half of the profit?

A   You're a little bit -- you know, I think if

6 (Pages 229 - 232)

Page 233

AWB bought the car, it's no such thing as giving the money to Excell to buy the car. We buy the vehicle, AWB buy the vehicle, and then Excell sell it, we're entitled for 50 percent of the profit from this particular transaction. AWB buy the car, it doesn't giving the money to Excell to buy the car.

Q   All right. So you've made it very clear now that AWB was not a lender. It was a purchaser of cars. Correct?

MR. MILLER: Objection. Calls for a legal conclusion.

BY MR. BRESLIN:

Q   Is that correct, sir?

A   I don't know. How do you look at it?

Q   All right. And it says, "A guaranteed payment of $10,000 due on the first of each month shall be paid by Borrower to Lender in the event the profit to split does not equal 10,000."

Was that money paid?

A   It's all depends. It got to go back to my records. And I can tell you most of the time we are successful, so this is waived.

Q   Was interest due on this loan, on this Note?

A   Not really. It's not interest.

Q   So you're saying that on this debt that's

Page 234

reflected in this Promissory Note, there was no interest?

A   I don't see any interest. Show me interest on the document please.

Q   I'm asking you.

A   Show me.

Q   Do you recall that this transaction entitled your company to interest?

A   Mr. Breslin, I appreciate if you show me some interest Note and I can answer you.

Q   It says, "Interest Rate Limitation:

Notwithstanding anything contained to the contrary, the holder hereof shall never be entitled to collect or apply as interest on this obligation any amount in excess of the maximum rate of interest permitted to be charged by applicable law."

What this says is you can't collect more than the maximum interest rate allowed by law.

A   That's a little bit above my knowledge. Sorry. I'm not a lawyer. I got to ask my lawyer for this. This is --

MR. MILLER: Well, wait, wait. He hasn't asked a question.

BY MR. BRESLIN:

Q   But my question was: In your recollection,

Page 235

there was no interest on this debt? It was just a profit split?

A   You know how to read it, but you no show me any interest rates.

Q   Well, it says that you're owed -- AWB is owed 2.6 million with annual interest calculated in accordance with the terms.

So my question to you is: Do you know what the interest terms were?

That's a yes-or-no question.

A   I don't know.

MR. BRESLIN: All right. Ms. Court Reporter, that is A-010. And it's Bates 4200 to 4224.

(FVP Exhibit A-011 was marked for Identification.)

BY MR. BRESLIN:

Q   All right. I now show you -- this one has not been Bates numbered. This is going to be A-011. This is going to be Bates Number 4300 it to 4303 just like the rest of them.

I'm going to scroll through this very slowly, Mr. Farache.

MR. MILLER: Just for the record, Jerry, is the redaction made by you or somebody else?

MR. BRESLIN: Yeah, that's me. That's the

Page 236

redaction that I made.

MR. MILLER: The entire document is not being shown. Just the unredacted portion?

MR. BRESLIN: Right. This is what purports to be an email exchange between Scott Zankl and Michelle Martin and Michelle Martin and Scott Zankl with copies to AWB on or about November 9th, 2021.

MR. MILLER: And again just for the record, we don't know that because you redacted some of this document.

MR. BRESLIN: Okay.

BY MR. BRESLIN:

Q   I'm going to scroll through this, sir, and take a look at it.

MR. MILLER: Mr. Breslin, slow down a little bit. Remember, he doesn't read English very well.

THE WITNESS: I mean, he's got to read to me what he wants me to know.

BY MR. BRESLIN:

Q   Okay. And tell me when you ready for me to move on.

A   I mean, the biggest thing is just read to me exactly as much as you can, the number I can figure out, but as much as you can help me so I can answer it please.

7 (Pages 233 - 236)

Page 237

Q   I'll just scroll through it, sir.

Mr. Farache, what this document purports to be is an email from Scott Zankl to Michelle Martin on November 9th that makes a statement in response to an email from Michelle Martin on Tuesday November 9th to him with you copied as well as other members of AWB and the Excell/Karma companies.

It says, "Subject 1001 line and other things."

Do you have any independent recollection of receiving a copy of this email back in November of 2021?

A   I don't remember.

Q   Do you know what the 1001 line is?

A   It's just in-house memorize of loans and documents we have in-house.

Q   All right.  So Michelle Martin says, "When we sat in the meeting, Moshe did say to take off the line. It is 15 percent in lieu of profit.  It's the only fair way to do it as Moshe has money invested."

Do you see where it says that?

A   Yes.

Q   Did you have money invested?

A   I don't remember.  Or maybe --

Q   My question to you is:  Did you invest money --

MR. MILLER:  Mr. Breslin, he didn't finish

Page 238

answering.

MR. BRESLIN:  Go ahead, sir.  Please finish.

THE WITNESS:  I think based on my memory today, this line been paid off.  So we don't need to talk about it.

BY MR. BRESLIN:

Q   Okay.  But I'm going to go ahead and ask you some questions.  Okay?

A   No problem.

Q   It says here that Michelle Martin is telling Mr. Zankl that regarding to the profit split, it's the only fair way to do it because you have money invested. She uses the word "money invested."

Do you see where she says that?

A   Where do you see that?  I'm sorry.

Q   Right here.  It says, "We sat in the meeting and Moshe did say to take off the line.  It's the only fair way to do it as Moshe has money invested."

A   That's what he's saying.

Q   Okay.

A   Go ahead.  I'm sorry.

Q   No.  I didn't mean to interrupt.  Were you finished?

A   I'm waiting for the next question.

Q   Okay.  Did you have money invested or did you

Page 239

have money loaned?

A   I don't know.  I don't memorize this line because I think it's closed.

Q   Do you have any reason to believe as you look at this document today that this was not an accurate reflection of an email that was sent by Michelle Martin to Mr. Zankl in 2021?

A   I don't know about that one.  You know, some stuff -- you know, a lot of emails back and forth, so I can't memorize every one of them.

Q   But Michelle Martin, when she sent these emails, it was on behalf of AWB, was it not?

A   Everything is AWB.

Q   But my question to you is:  When Michelle Martin using this gmail sent these emails back and forth, this was on behalf of AWB, your company, correct?

A   I don't know.

Q   Now, did Michelle Martin have the authority to make business decisions regarding your loans, your investments, your profits or your losses for AWB?

A   No.

Q   So if there was a representation in an email that addressed a business decision regarding money or profits or things of that nature, that would have required the consent and approval of either you or your

Page 240

wife at AWB, correct?

A   Depends.

Q   What would it depend on?

A   If it's a repair problem or buying tires, buying miscellaneous to make the business better, she can make the decision.  She's been around this for a long time and we trust her.

Q   But as far as -- so for certain day-to-day decisions for AWB, you're saying Michelle Martin had the authority to make those decisions.  Is that accurate?

A   I can't tell you, because every -- we have so many different things going on.  So I can't tell you exactly.  You know, you got to be very, very specific what are you talking about.

Q   Did Michelle Martin have authority to make any decisions at all for AWB?

A   Depends on the decision.

Q   Were there decisions that she was authorized to make, any decisions?

A   Depends.  You got to always be very specific because --

Q   I am being specific.  I'm saying any decisions about anything.  Did she make any decision about anything for the company?

A   Some decisions yes, but it also depends what

8 (Pages 237 - 240)

Page 241

kind of decision.

Q   All right.  Now, as far as --

A   You're asking me in general, and I don't want to answer you in general.  You got to be very, very specific and you got to show me documents.

Q   So are you saying that if I don't show you documents and I don't ask the question in a way you like it, you're not going to give me an answer?

A   I always want to see what exactly you reference to so I answer you.  Everything you ask me so far I answer you.

Q   All right.

A   If I know the answer, I will going to answer you.

Q   I'm not talking about any documents.  I'm talking about how the business of AWB was conducted.  Okay.  Do you understand?

A   Yes.

Q   In the conduct of the business of AWB, did Michelle Martin have the authority to make any decisions at all regarding anything for AWB without your approval?

MR. MILLER:  Objection.  Asked and answered.

MR. BRESLIN:  Yeahs, that's pretty funny.

MR. MILLER:  Yeah, that is.  You can say whatever you want.  You're full of hyperbole.

Page 242

MR. BRESLIN:  Do you think I'm just asking it for fun?  I'd like an answer.

MR. MILLER:  Do you want to read back the one --

MR. BRESLIN:  Yeah, the answer was unless I show him a piece of paper --

MR. MILLER:  Mr. Breslin --

MR. BRESLIN:  -- and make it more specific --

MR. MILLER:  Mr. Breslin, stop for two seconds.  Take a breath.  He answered your question.  If the court reporter wants to go back about five minutes where you had these run-on sentences and questions, you will see he answered your question when he said, yes, sometimes.

So if you would like her to read that back, we can do that.  But you repeat asked-and-answered questions.  You're delaying the deposition.

MR. BRESLIN:  Are you instructing him not to answer?

MR. MILLER:  Does that sound like an instruction not to answer, sir?  Do you not know what objection asked and answered means?

MR. BRESLIN:  All right.

MR. MILLER:  It's not an instruction not to answer.

Page 243

MR. BRESLIN:  You can answer, Mr. Farache.

MR. MILLER:  Ask the question again and I'm going to object.  Asked and answered.

MR. BRESLIN:  All right.

BY MR. BRESLIN:

Q   Explain what decisions Michelle Martin was allowed to make without your authority.

MR. MILLER:  And just for the record, that's not the same question.  But you can answer that question, if you can, sir.

THE WITNESS:  It's, you know, paying bills.  We usually pay bills once or twice a month.  So we try even to pay once a week.  We pay all the bills.  So she just basically -- we have normal bills.  She pay them, you know, like every month bill.

You know, we don't need to talk about it.  It's part of our expense to be in business.  You know, if we owe any vendor owe any money, we always make sure everything get paid.  You know, we pay the auction.  We pay stuff like that.  You know, it's basically part of the business.

BY MR. BRESLIN:

Q   So in her normal duties, she would pay bills that would normally and customarily be paid without the necessity of asking you for permission, right?

Page 244

A   Yeah.  You know, we need to buy paper goods to the office, we need coffee, we need, you know, cleaning supplies, we need stuff like that, you know, we just pay it.

Q   All right.  Now, as far as decisions go regarding the buying or selling of automobile, would every one of those decisions have to be approved by you?

A   Most of them.

Q   What types of decisions regarding AWB buying or selling automobiles would Michelle Martin be authorized to make without your permission?

A   She basically prepare the paperwork and we go over it and I make the decision.

Q   So she would make the paperwork, you would review the paperwork, and then you would either authorize it or not.  Is that accurate?

A   Depends on the deal.  You know, I mean, I can't answer you in global because some decisions, you know, in the past we took fast decision.

Q   Well, because here's why I ask that:

Yesterday we looked at numerous documents, and we're going to look at more documents today, where she has signed these purchase orders on behalf of AWB.

Can we agree that for all of those purchase and sale orders that she signed on behalf of AWB, that

9 (Pages 241 - 244)

Page 245

every one of those was approved by you?

A   Yes.

Q   How much interest was AWB paid on a monthly basis from Excell Auto Group?

A   I can't answer you that.

Q   I show you a document that's been provided to us but has not been put in any folder that I will mark and insert in the folder which purports to be an invoice from Auto Wholesale of Boca to Excell Auto Group for October 2021 that appears to reflect an interest charge.

Do you see this?

A   Yes.

Q   Does that accurately reflect the interest payments that AWB expected from Excell on a monthly basis?

A   Depends on the month.  Sometimes we get more.

Q   How much more?

A   I can't tell you that.

Q   Now, when you see interest, what does interest mean to you?

A   We buying cars with some particular loan.  Not loan.  Basically we buying car with some particular fund what we put, commit to purchasing cars back and forth with Excell, and we need to in-house, we make the decision to make that kind of money every month and

Page 246

that's what we're going for.

Q   So are you saying that you would make -- when I say "you" -- are you saying that AWB would make an in-house decision how much money it was entitled to each month?

A   Not exactly.  We have $2 and-a-half million buying and selling cars with minimal -- maximum of collecting $31,250 a month.

Q   Now, the word "interest" to you, does that mean money paid on a loan or does that mean something else to you?

A   It's basically every month we got to make that kind of money from back book -- how do you say that?  Like you know you put the backs of money that is an amount.

Q   All right.  So are you telling me that the invoice that I'm looking at, invoice 1058 AWB 10/2/2210 showing $31,200, that there were other invoices for other months with different amounts that said "interest" on them?

A   It's not -- you know, it's different because, you know, we have different deals.  Every vehicle we have different agreements, and most of the agreements is between the Zankl and AWB and, you know, it's working for nine and-a-half years.

Page 247

Q   Okay.  Is there some reason that the word "interest" was used that you're aware of?

A   It's just probably paperwork tracks to make sure everything is right every month.  It's bookkeeping.

Q   But as far as you're concerned, this invoice reflects the money that AWB felt it was due from the business transactions that it did with Excell Auto Group for the month of October 2021.

Would that be an accurate statement?

A   I got to look in the whole months and then I can get back to you.  Because maybe I'm -- I don't want to giving you the wrong information.  I got to look in the whole months of November.

Q   Well, this says, "October."

A   So I got to look in the month of October.  I apologize.

Q   Well, I'm looking at -- are you saying that this is not a true and accurate copy of an invoice that was sent to Excell?

A   No.  But we have more income from Excell Auto in October.  So I don't want to give you the whole numbers.  You know, I mean, I can tell -- you know, we can look at the bank statements and tell you the whole income from October.

Q   Okay.  But as far as October of 2021, do you

Page 248

know whether or not there were any other invoices sent to Excell that was charging for interest?

A   I'm not sure.  You know, it's not -- you know, you got to look in the whole month of October and see how many transactions happened, how many invoices going -- you know, you've got to look at, you know, the whole months.  I can't answer you that.  I apologize.

Q   Well, take a look at the screen, and do you see where it says, "Description"?

A   Yes.

Q   Do you see those words under, "Description"?

A   Yes.

Q   It says, "November 2021 Interest."

Do you see where it says that?

A   Yes.

Q   So what this invoice would seem to suggest is that in October, you're sending a bill for November's interest.  Would you agree with that?

A   Yes.

Q   So this would be an invoice for interest payable in advance, right?

A   That's what I see, yes.

Q   Okay.  But your testimony, sir, is that this had nothing to do with any of the Promissory Notes that I showed you or any of the loans that were made to

10 (Pages 245 - 248)

Page 249

Excell, correct?

A   No.

MR. BRESLIN:  All right.  I'm going to take one minute here and switch gears.  Ms. Court Reporter, this is going to be --

MR. MILLER:  Jerry, did you mark that last invoice as an exhibit?

MR. BRESLIN:  I am right now.  I'm going to mark this one as A-012.

(FVP Exhibit A-012 was marked for Identification.)

THE WITNESS:  Can we take five or ten minutes?

MR. BRESLIN:  Yeah, absolutely.  It's 10:23.  Let's come back at 10:35.  That will give me a chance to do this and Bates number it and start back up with our next section.

Off the record.

(Discussion off the record.)

MR. BRESLIN:  We're back on the record.

Now, this is the shared folder.  We go to B.  This is now different than yesterday.  So I'm only going to talk about these folders.  Then we have not used -- these are ones in the folder yesterday that I'm not going to use with the witness or otherwise introduce.

Page 250

Okay.  So that's that.

MR. MILLER:  Jerry, you were just saying you were not going to review that Exhibit E.  Is that right?

MR. BRESLIN:  Yeah.

What I said was when we get to folder E, I'm just going to go through each of those and have him authenticate his records and ask him about whether or not he objects to anything in the Trustee folder.  Because what you will see in folder E are the AWB deal jackets that were provided to us and the corresponding Trustee deal jackets.  So that's E.  And that's for every car in this case.

So hopefully I don't have to go through them one by one, but I will.  If you want to go through that, you'll see -- just to show you, let me share the screen, how that's going to work.  If you look at E-1, it's got a green folder.  And the green ones are the AWB folders.  And then if you go to A-02, you'll have a blue folder, these are the ones that we got from the Trustee.

So if you go through them all, they're all, you know, sequential, AWB deal jacket, Trustee deal jacket.  So you'll see when you go in there.  So, like I said, I can go through it or not.  That's

Page 251

entirely up to you.  If I have to, I will.  But hopefully you'll just look at them all and say, okay, we agree.  But that will be in a couple hours.

BY MR. BRESLIN:

Q   Mr. Farache, before I move to the B folder, do you know whether or not the AWB bankruptcy estate has made any effort to collect any of the debt that I've shown you in these agreements today?

A   I don't know.  Because we still have the vehicle we own in warehouse.  So we don't know where we're going to be.  We got to sell them.  As soon as we sell them, then we can go after the rest of the money.

Q   Now I'm going to revisit Exhibit B-01.  We went through B-01 and we talked about -- we went through this yesterday and we talked about the actual documents and the timing of the documents.

Now on your screen is Bates 198.  This shows a wholesale work order signed by Michelle Martin.

Now, when Michelle Martin signed this document, was that on your instruction?

And when I say "your," I mean AWB's instruction.

A   You reference to this particular jacket?

Q   Right.  This is Exhibit B-01.  We went through

Page 252

this yesterday.  It's the Mercedes G550.  Let me just scroll through it so you're able to refresh your memory.  We went through this yesterday.  It's from July.

You told me that these checks were never cashed or deposited and that these documents were for internal bookkeeping purposes only.

Do you remember that?

A   Based on my memory, yes.

Q   Now, so Michelle Martin, when she signed this, was that on your instruction?

A   Yes.

Q   Do you know why it wasn't dated?

A   Maybe just mistake or something like that.  But we have no reason -- you can look in the checks and the timing.  You know, every time you show me a piece a paper, after yesterday I realized, you know, we have email back and forth and we got to bill before you see this kind of paperwork.

Q   No.  My question is real simple.

Do you know why this document, the wholesale work order, was not dated?

A   I can't answer you that.  I don't know.

Q   So this is the documents we went through yesterday.  We went through them in detail.

Now I've added four documents to the B folder

11 (Pages 249 - 252)

Page 253

which references the same car. So this car references a Mercedes G550, and it shows a transaction date where Auto Wholesale of Boca is selling that car to Excell on July 29th. And Excell is writing a check that's never cashed on July 29th. We see here that this folder, this deal jacket, shows that the car was sold to AWB on July 14th. It was sold to AWB on July 14th, and then it was sold back to Excell two weeks later on July 28th.

Now, again, in reference to Bates 201, this signature by Michelle Martin, did she sign that at your instruction on this wholesale order?

A    Based on what you show me, yes.

You reference to AWB, correct?

Q    Yes, AWB.

A    Thank you.

Q    All right. So now, this car is -- this B-01 folder references this 7604 Mercedes.

Now I'm going to show you Bates 263 which is B-1A.

MR. BRESLIN:  So in the folder, Ms. Court Reporter, this will B-01A.

(FVP Exhibit B-01A was marked for Identification.)

BY MR. BRESLIN:

Q    And I'd like you to look at your screen, sir.

Page 254

I'm going to scroll through it.

A    Can you go back for a second. I'm sorry.

Q    Sure.

A    All the way to the top.

Q    That's up all the way.

Do you see this document, sir?

A    Yes.

Q    Do you have any reason to believe that this is not an accurate Purchase Agreement between Karma Palm Beach and Mr. Alfonse Mazzarella dated July 13th, 2021?

MR. MILLER:  Objection. The document speaks for itself.

You can answer.

THE WITNESS:  I have nothing to do with this paperwork.

BY MR. BRESLIN:

Q    My question to you is: Do you have any reason to believe that this is not an accurate record of a sale by Karma Palm Beach to Mr. Mazzarella on July 13th, 2021?

MR. MILLER:  Objection. Asked and answered.

MR. BRESLIN:  You can answer.

THE WITNESS:  I don't know nothing about this deal.

MR. BRESLIN:  I'm going to show you some more

Page 255

exhibits in this same folder. So that was B-01A which is Bates 2663 which purports to be a Karma Palm Beach transaction between Karma and Mr. Mazzarella selling the Mercedes-Benz G class 7603 on 7/13/2021.

(FVP Exhibit B-01B was marked for Identification.)

BY MR. BRESLIN:

Q    I now show you on the screen Exhibit B-01B Bates 215 and 216 which purport to be a transfer of title of the automobile to Karma of Palm Beach on July 13th, 2021.

So on Bates 215 and 16, Exhibit B-01B, do you have any reason to believe that what is on the screen is not an accurate transfer of title to the Mercedes?

MR. MILLER:  Objection. The document speaks for itself.

MR. BRESLIN:  You can answer.

THE WITNESS:  Nothing to do with me. I never no see this document.

BY MR. BRESLIN:

Q    All right. Here's my question. My question is:  Is there anything you know of where you could look at the document and say, No, that's not accurate? Or is your answer, I don't know anything about it and I have

Page 256

no reason to contest this?

MR. MILLER:  Objection to the form of the question. Asked and answered.

MR. BRESLIN:  You can answer.

MR. MILLER:  He's testified he has nothing to do with the document.

MR. BRESLIN:  All right. Please don't tell him what to say.

MR. MILLER:  I didn't tell him what to say.

MR. BRESLIN:  That's exactly what you did.

Mr. Farache, you can answer the question.

BY MR. BRESLIN:

Q    Do you have any information about whether or not this transfer of the title is an accurate document?

A    AWB has nothing to do with this document. I don't know this document.

Q    Okay.

A    I'm not trying to be rude but, you know, I'm trying to give -- you know, whatever I know I answer it.

Q    Sir, just so we're clear, I'm only asking what you know. I'm not asking you to speculate. If you don't know anything about it, just please tell me. That's all. It's real easy.

A    That's fine. I'm good.

Q    All right. Thank you.

12 (Pages 253 - 256)

Page 257

(FVP Exhibit B-01B2 was marked for Identification.)

BY MR. BRESLIN:

Q    I'm showing you now what's marked as B-01B2. And this is Bates 217 and 228 which purports to be an assignment of the title to the Mercedes to Mr. Alfonse Mazzarella on 7/13/2021.

As you look at the document, sir, do you have any reason to believe that this is not an accurate transfer of the title to that vehicle on 7/13/2021?

MR. MILLER:  Objection.  The document speaks for itself.

MR. BRESLIN:  You can answer.

THE WITNESS:  Basically I don't know nothing about those documents.  And, you know, after what Mr. Zankl did selling the same vehicle to three people and lend money from two more people or banks, I have nothing to do with this paperwork.

BY MR. BRESLIN:

Q    So you have no reason to contest this is an accurate document.  Is that correct?

MR. MILLER:  Objection.  That's not his testimony.  Asked and answered.

MR. BRESLIN:  And I'll ask my question and he'll either answer or he won't.

Page 258

MR. MILLER:  Mr. Breslin, let me make an objection.  He is not going to authenticate a document that doesn't belong to him.

MR. BRESLIN:  I didn't ask him to authenticate anything.

MR. MILLER:  You've got to let me finish.

He's not going to authenticate a document that's not an AWB document that he has no personal knowledge of.  When he says he doesn't know, he doesn't know.  If you think it's an authentic document, that's on you.  He doesn't have to verify and authenticate a document he knows nothing about.

MR. BRESLIN:  Okay.  Thank you for the speech. I didn't ask him to authenticate it.  I asked him if he had any reason to believe that this is not an authentic document.

MR. MILLER:  And it's asked and answered.  He knows nothing about it.

MR. BRESLIN:  You can answer.

MR. MILLER:  Asked and answered.

MR. BRESLIN:  You can answer.

MR. MILLER:  Asked and answered.

THE WITNESS:  I don't know nothing about those documents.

(FVP Exhibit B-01C was marked for

Page 259

Identification.)

BY MR. BRESLIN:

Q    I'm going to show you now what purports to be -- this is Exhibit B-01C which purports to -- and this Bates is 267 and 268 which purports to show payment by Mr. Mazzarella to Karma Palm Beach for that same vehicle on July 14th, 2021.

As you look at the screen, do you have any knowledge that this payment did not take place?

MR. MILLER:  Objection to the form of the question.  The document speaks for itself.

MR. BRESLIN:  You can answer.

THE WITNESS:  I don't know nothing about this transaction.

BY MR. BRESLIN:

Q    Let's go back to the AWB transactions.

So let me ask you some questions about AWB.  I show you on the screen Bates 199 which purports to be -- 198 and 199 -- which purports to be the sale of the Mercedes 7603 to Excell Auto Group on July 29th, 2021 for $255,000.  Do you see that?

A    Yes.

Q    All right.  Do you see these checks written that were never deposited or cashed, right?

A    Yes.

Page 260

Q    And you see there is this Excell sale to AWB two weeks prior, right?  And also another check that wasn't cashed, right?  Do you see that?

A    Yes.

Q    Can you explain how Auto Wholesale of Boca could sell to Excell Auto Group on July 29th, 2021 an automobile that was purchased by Mr. Mazzarella from Karma Palm Beach two weeks earlier?

A    It's very, very simple.  Always you go back for all of the fold been done by Excell.  He has 90 days.  So if you give it to him -- based on our knowledge now, if you give to somebody a temporary tag, it's mean he can extend the first month and he can go up to till 90 days.

So we are -- in this transaction, we purchased the car.  Excell sold it.  Maybe he told us verbally this vehicle sold.  We don't have nothing to do with the buyer, because it's private information and you put in public all of his financing transaction and everything very private.

But it's not for today to discuss.  It's not my -- that's why have nothing to do with that.  And probably when you're looking at it, Mr. Zankl give to him a temporary tag.  He got paid by his bank.  He's got to wait until his bank going to make sure the funds

13 (Pages 257 - 260)

Page 261

clean and everything, and then he tell me the transaction complete.

So sometimes it take him a week. Sometimes it take him 30 days. But that's the whole scam here. What he did to the people, he took cars, he sold it, and he sold it again to different person. So that's the only problem we are all here. And you always mention it like we did something wrong. We have nothing to do with his deal jacket or whatever you call it, and you show me paper and I try to explain to you the only things we did, we buy and we sell car as AWB.

Q   Okay.

A   And we have something require for our money and possession. Every time we buy, just remember, title, vehicle and exception, and that's it.

Q   Well, my question to you, sir, is: I'm looking at what purports to be the sale of an automobile on 7/29/2021 that other records show Auto Wholesale of Boca did not own on that day.

Is it your contention that Auto Wholesale of Boca owned that Mercedes on July 29th, 2021?

A   You can't look at it this way because you always got to look at it if he sold the vehicle to end user, he doesn't receive the whole fund right away. When he receive all the funds, then he told us, I closed

Page 262

the job. I closed the deal. Now I can pay you.

That's why we are wholesaler. Sometimes we have exceptions. We always purchase the car, selling the cars. That's our business. It's working for nine and-a-half years.

Q   All right.

A   Our relationship, we have everything working for both parties for nine and-a-half years.

Also, remember that --

Q   Did Auto Wholesale of Boca ever purchase or own the Mercedes G550 VIN 7603? Yes or no?

A   Yes, based on those paper what you showed me from Auto Wholesale of Boca, yes.

Q   When did Auto Wholesale of Boca purchase the Mercedes G550?

A   Look on the dates.

Q   Well, we know that you allegedly sold it on 7/29.

MR. MILLER:  Can you slow down, Mr. Breslin. You're going down too fast.

MR. BRESLIN:  Well, I was going down to the purchase date.

BY MR. BRESLIN:

Q   These documents show allegedly that Auto Wholesale of Boca sold the car -- excuse me -- Excell

Page 263

Auto Group sold the vehicle to Auto Wholesale of Boca on 7/14.

So it would appear that both of these transactions occurred after Karma Palm Beach both bought and sold the car which was the day before.

So my question to you is: Did AWB ever purchase this car? Did it ever possess that car? Did it ever have this car?

MR. MILLER:  Objection to the form of the question. Compound question.

MR. BRESLIN:  You can answer.

THE WITNESS:  I can't tell you today. I got to look at more of my paperwork.

BY MR. BRESLIN:

Q   Now, the signatures of Michelle Martin on all those documents, they were directed by you, correct?

A   Yes.

Q   Now, the second file we went through yesterday is B-03, and on this one we again have an undated wholesale work order for the Alfa Romeo.

Now, on this document, Michelle Martin's signature was at your direction, correct?

A   Let me look at it please.

MR. MILLER:  Jerry, what Exhibit Number is this?

Page 264

MR. BRESLIN:  B-03.

MR. MILLER:  D-03?

MR. BRESLIN:  B. B as in "boy." B as in "Breslin."

BY MR. BRESLIN:

Q   This is again an undated work order, correct?

A   Say again. I'm sorry.

Q   I'm sorry. I didn't hear you.

A   Keep going a little bit up.

Q   Up or down?

A   Let's see the whole jacket again. And you're looking at the 7/1, date of sold --

Date of purchase 6/24/21. You saw that?

Q   Are you done? Do you want me to scroll?

A   No, just stay where you are.

Date of purchase --

MR. MILLER:  Let him ask the question. Jerry, did you ask him a question?

MR. BRESLIN:  No.

My question was do you want me to scroll? And he said no, and now I'm not sure what he's doing.

MR. MILLER:  He said yes. Go ahead and scroll down please.

BY MR. BRESLIN:

Q   Mr. Farache, would you like me to scroll

14 (Pages 261 - 264)

Page 265

through the entire document?

A    Keep going please. Wait one second. I'm sorry. One second. Keep going please. Slow down. Slow down. Keep going. Keep going. I don't -- I'm trying -- wait. Slow down please. Keep going please. Keep going. Keep going. Slow down. Keep going.

MR. MILLER: Slow down. Slow down.

THE WITNESS: Keep going.

What's your question, Jerry? Can you repeat it please, Mr. Breslin.

MR. BRESLIN: Yes.

BY MR. BRESLIN:

Q    Did Auto Wholesale of Boca sell this car to Excell Auto Group on July 6th, 2021?

A    Based on what you showed me, we bought it sometime in between I think on 6/24, between the 6 -- I'm just guessing based on the paperwork you show me, but it's got to be more attached to the jacket which you no see it here emails, and require to purchase the car and basically make sure the car is located in 1001. And you have a title here with just one side picture and it's attached to a jacket. So it's been in our office, so ...

Q    All right. Let's talk about these jackets. The jackets that were supplied to us in

Page 266

discovery, they were, I assume, in some sort of a file cabinet or in some system at AWB, correct?

A    That's year of '21. Maybe it's in some boxes and some shelves because, you know, it's already deals we closed and we just put it in a box.

Q    Okay. But these deal jackets, the AWB deal jackets, did they contain whatever documents AWB thought were relevant to that particular transaction?

A    No. Some of the stuff we have emails. We have a lot of attachments to it between the team of Excell, Karma Broward and Karma Palm Beach. So you see what you want to see, and I think you're missing some part of the record. I don't know if you're doing that on purpose, but you're missing a lot of records, emails sent back and forth and paperwork.

Q    Well, do you know, sir, whether or not this was the entire file on this car that was delivered to us by your attorneys?

A    Say it again. I'm sorry.

Q    Do you know whether or not there were more documents in this deal jackets that were delivered to us by your attorneys?

A    I don't know if you have email and request. You know, everything, it's very organized on our side as much as we know about it. But, you know, you show me

Page 267

also jackets that come from Excell Auto or Karma Broward or Karma Palm Beach, and as you mentioned a few times, you know, the guy is selling cars to three or four people in the same time. You know, so I don't know what to tell you. You show me what you want to show me. Maybe this car being sold three or four times.

Q    Well, sir, you were suggesting that I was withholding documents and my question to you was: Do you know whether or not this jacket that was supplied by your attorneys had additional information in it? Because we got this from your lawyers. Not in Mr. Miller, your prior lawyers.

MR. MILLER: Jerry, not to cut you off, but it might be easier if you opened our jackets that we sent you. Maybe that's what he's wondering about.

MR. BRESLIN: Okay.

BY MR. BRESLIN:

Q    So I now show you what's been marked as B-03 which is Bates 359, 360 and 361. And I'm going to scroll through this very quickly and I'd like you to take a look at it.

MR. MILLER: Jerry, you just gave us B-03.

MR. BRESLIN: No, this is B-03A.

MR. MILLER: Okay. You didn't say A.

MR. BRESLIN: And this is B-03B.

Page 268

THE COURT REPORTER: Oh, boy. We're going to have to go through this.

MR. MILLER: Madam Court Reporter, can you clarify which exhibit is which now?

THE COURT REPORTER: No, I can't because I'm confused.

MR. BRESLIN: Just so you know, this folder that will be shared with you. This is all the exhibits. This is the A folder, this is the B folder. In the B folder is B-01 and B-03. These are the B-03 documents. In this you have B-03, B-03A and B-03B. Okay?

THE COURT REPORTER: I have to look at it. It's so small and hopefully it's going to all make sense.

MR. BRESLIN: Okay. But it's clear from what I'm saying on the record.

(FVP Exhibit B-03A and Exhibit B-03B were marked for Identification.)

MR. BRESLIN: Now the second document within the Bs, B-03A and B-03B. So B-03A I just went through with him which is this deal jacket. Now we have B-03A which is Bates 359 through 362.

BY MR. BRESLIN:

Q    And I'm going to scroll through this, Mr.

Page 269

Farache, and I'd like you to take a look at it.

A   Can you go back please.

Q   Sure.

A   To the beginning please.  No, you're too fast. I'm sorry.

Q   The date says June 21st, 2021 right there at the top.

A   Okay.

Q   Can you go -- I'm trying -- can you go back. I just want to see when we received the funds.

MR. MILLER:  Jerry, can you just edge up a little bit.  Okay.

BY MR. BRESLIN:

Q   Are we good?

A   Keep going please.  Can you go back all the way to the top.

Q   Are you good?

A   Not yet.

Q   Are we ready do go?

A   Yes.

Q   All right.  What is on the screen is Bates 359 through Bates 362 which is Exhibit B-03A which purports to be a Purchase Agreement between Karma Palm Beach and a Charlotte Rae Stribling as the end user of the Alfa Romeo 3628.  So I've scrolled through this which shows

Page 270

what purports to be a document, a Karma Palm Beach document selling this vehicle and being paid for this vehicle on June 21st, 2021.

And I ask you if you have any information that would lead you to believe that this is not an accurate document?

MR. MILLER:  Objection.  The document speaks for itself.

Go ahead, Mr. Farache.

THE WITNESS:  I have nothing to do with that document.

BY MR. BRESLIN:

Q   All right.  I now show you what's been marked as B-03B which is Bates 317 through 318 which purports to show the back of the document that's in the AWB deal jacket.  This purports to show a sale of this vehicle on 6/12 to Karma Palm Beach and the sale of this car by Karma Palm Beach to Charlotte Stribling on 6/21/21.

So I'll scroll through the document and I ask you whether or not you have any information that would lead you to believe that this is not an accurate title document and title transfer document?

MR. MILLER:  Objection.  The document speaks for itself.

MR. BRESLIN:  You can answer.

Page 271

THE WITNESS:  I don't know nothing about those documents.  Sorry.

BY MR. BRESLIN:

Q   So would you agree that between B-03A and B-03B, this would appear to show that Karma Palm Beach purchased this vehicle and sold -- purchased the vehicle on 6/12 and sold the vehicle on 6/21?  Is what these documents say to you?  Does it appear like that to you?

MR. MILLER:  Objection.  The documents speak for themselves.

MR. BRESLIN:  You can answer.

THE WITNESS:  I don't know nothing about those documents.

BY MR. BRESLIN:

Q   Getting back to your deal jacket, the Auto Wholesale order that is again undated, this appears to show that Auto Wholesale of Boca sold that car to Excell Auto Group on July 6th.  Do you see that?

A   Yes.

Q   How did Auto Wholesale of Boca sell on July 6th, 2021 a car that was owned by Charlotte Stribling for at least two weeks?

MR. MILLER:  Objection to the form of the question.  Assumes facts not in evidence.

THE WITNESS:  I'm going to tell you very

Page 272

simple things.  I mean, when he sold the car to Charlotte or whatever her name, when he sold it, what he giving to her is temporary tag, and that's the whole fraud.  When he giving to you a temporary tag, he come back to Auto Wholesale because we have the title probably.

And I'm telling you based on I see what he did with the rest of the victim in this case, and if he giving to her a temporary tag, he still got to the Motor Vehicle with the original title and that's when he paid AWB after he receive his funds.

So as much as, you know, you try to prove point, you know, I don't know exactly what happened in this particular jacket, but that's the whole case.  And you try to make us as a fraudster.  We have nothing to do with the fraud here.  And I told you many, many times, you know, you're working the paperwork directly or undirectly and you just try to make me commit to some paperwork and you're taking advantage of the whole situation.

BY MR. BRESLIN:

Q   All right.  You mentioned in that statement that AWB had the title.

A   Yes.

Q   I show you B-03B which purports to be the

16 (Pages 269 - 272)

Page 273

title being transferred from Jeanette Gorgas to Karma Palm Beach on 6/12 and then transferred to the end user/buyer from Karma Palm Beach on 6/21.

Are you saying that there are documents other than these documents to show that AWB had title?

A   I don't know in the moment. But, you know, maybe I'm -- I hope -- maybe I'm wrong. Maybe I don't see the whole picture. But you show me again and again what you want me to see, and I think AWB has nothing to do with the paperwork what Excell, Karma or Karma Palm Beach or Broward create.

We are not creating three sales of the same vehicle to three people within the banks. We are dealing with our own money. AWB is a purchaser of any vehicle with our own funds. And that's the way we did business from nine and-a-half years, and you're showing up and you're just going -- before even you got involved with the Zankl team, and you're bringing up stuff, it's nothing to do with you.

And we are here on this deposition to talk about all the cars that's sitting in the warehouse what AWB own and paid all the costs. And you should look in the mirror and say to yourself, What I'm doing here? You did a bad loan. That's what you did. And before you come in and accusing the rest of the world, you

Page 274

should look in the mirror.

Q   So when you say "you," I assume you mean FVP made a bad loan?

A   Maybe.

Q   How did they make a bad loan?

A   Look where we are.

Q   When did you first become aware of the FVB loan?

A   When you served me -- when basically you talk to me about the landlord and access to the premises and Mr. Lee parting with Mr. Excell and all of his associates and partners. You know, it's in the news.

(FVP Exhibit B-05 was marked for Identification.)

BY MR. BRESLIN:

Q   All right. Sir, I'm showing you what's been marked as Exhibit B-O5 which purports to be a AWB deal jacket, and I'm going to scroll through it very slowly.

MR. BRESLIN:  And for the record, Ms. Court Reporter, this is Bates 394 through 403.

THE WITNESS:  Can you go back to the beginning.

MR. BRESLIN:  Yeah, yeah, no, I'm sorry. I'm just checking the Bates Numbers.

THE WITNESS:  I'm sorry.  That's a different

Page 275

car we're talking about now, no?

BY MR. BRESLIN:

Q   Right. This is a different deal jacket. This is a Lamborghini Uris VIN 7128. Let me show you your deal jacket. Let's start there so you acquaint yourself with the vehicle we're talking about.

A   So wait. That's a new one. That's totally different. We start fresh. That's another one.

Q   Yeah, this is a different car now. This is a different car.

MR. BRESLIN:  This is B-05 and then we're going to have a follow-up B-05A. And, Ms. Court Reporter, once you see these folders, you're going to say, Oh, okay. Now it makes sense.

(FVP Exhibit B-05A was marked for Identification.)

BY MR. BRESLIN:

Q   Can I scroll, sir?

A   Yes, sir. Slow down a little bit. Keep going please. Slow down a little bit. Can you take it back a little bit. Keep going. Keep going. One second. Go back a little bit please.

Q   Do you want me to go back to this document?

A   Wait, wait. I'm trying to see. Go up a little bit please. No, no, go to the other side. I'm

Page 276

sorry. Keep going. Keep going. Keep going. Okay. Wait. Slow down a little bit. Keep going. Wait. Slow down. Go back.

Q   Sorry.

A   Keep going slow.

Q   Are we good?

A   Yeah.

Q   All right. Mr. Farache, I'm showing you B-05 what purports to be a deal jacket for a 2020 Lamborghini VIN finishing in 7128. And I first ask you to look at the screen which purports to be a wholesale order where Auto Wholesale of Boca is selling this vehicle to Excell Auto Group. Do you see that?

A   Yes.

Q   And it says that you're selling it to them for $253,750. When I say "you," I mean AWB. Do you see that?

A   Yes.

Q   This is undated again and it's signed by Michelle Martin. Do you see that?

A   Yes.

Q   Did you instruct her to sign this document?

A   Yes.

Q   It says, The seller covenants with the Purchaser that he is that true and lawful owner of the

Page 277

above described vehicle.

Is that a true statement?

A   Can you repeat it please.

Q   Yes.

It says, "The Seller covenants with the Purchaser that he is the true and lawful owner of said described automobile."

A   I'm trying to understand.  That's too big for me.

Q   Well, what it says is it says that AWB owned the car and it was selling the car to Excell Auto Group for $253,000.  Do you see that?  Would you agree with that?

A   If we say we bought it, we bought it.  If we say we sell it, we sell it.

Q   So this is a true and accurate document, and as far as you can tell, it's an authentic AWB business record, correct?

A   Based on what you show me, yes.

Q   All right.  Now, all of these folders that I've shown you so far, none of them are dated, the wholesale orders, they're not dated and there's no odometer disclosure.  Can you tell me why?

(Brief interruption.)

THE WITNESS:  Go back again.  I'm sorry.

Page 278

BY MR. BRESLIN:

Q   This wholesale order where this car is being sold to Excell Auto Group, there's no date, there's no odometer statement.  You would agree with that, at least on this particular document, correct?

A   You know, I mean, we've been dealing -- and I repeat and I repeat it again.  We've been doing business for nine and-a-half years.  We are basically hundreds and hundreds transactions, hundreds and hundreds thousand dollars in transactions, millions.  You know, if it's misspelled in one of the piece of paper and you want to cherrypick and try to make us look bad -- you know, if you're looking at dates here, it's again prior to FVP get involved.  We are here to talk about the vehicle what is in my storage.

Q   Would you agree, sir, that there is no date and there's no odometer statement on this wholesale order?

A   Based on what you show me, yes.

Q   Now I'm showing you what purports to be an invoice dated October 25th, 2021 between Auto Wholesale of Boca to Excell Auto Group where Auto Wholesale of Boca is selling this Lamborghini for $253.  Do you see that?

A   Yes.

Page 279

Q   On October 25th, 2021, did Auto Wholesale of Boca own that car?

A   I can't -- you know, I'm very slow when it's come to this paperwork.  You know, if you want to give me like a week to get back to you and I can giving you my breakdown.

Q   No.  We're going to look at all the paperwork right now.  My question to you is:  Did Auto Wholesale of Boca own this car on October 25th, 2021?

A   Again and again I tell you that I have my way of looking at paperwork, and I looking at it with the people I confidence and that's how I make my final decision.  You know, I need -- you know, these kind of paperwork, you know, Michelle is my bookkeeper and, you know, she explained to me exactly, because I see some credit coming back and stuff like that and I'm not that much knowledge with the whole things.  Because I see a credit for 250,000, I see 3,750 credit, and I just want to make sure we don't miss each other here and I'm giving you the wrong answer.

Q   Did AWB have title to this vehicle on October 25th, 2021?

A   I got to look in all my paperwork and emails.  You know, you receive paperwork and I don't know who is giving to you this paperwork, Mark Brandes, Excell Auto.

Page 280

I just don't know.

Q   All right.  Now, let me just ask you a general question.  Did AWB ever sell an automobile that it didn't own?

A   It's no such a thing.  If we have a bill of sale, we buying something and we got to sell it.  You know, if we don't sell it, we don't create paperwork.

Q   Did AWB ever sell an automobile that it did not own?

A   No such a thing.

Q   So if AWB sold an automobile, it had ownership and title, correct?

A   Can you repeat yourself please.

Q   Yes.

For AWB to sell an automobile, it had ownership and title to that automobile prior to selling it, correct?

A   Not in every case.  Sometimes we purchased a car and the vehicle we purchased, we got to pay the bank.

Q   All right.

A   Let me finish.  Let me finish.

Q   I'm sorry.  Go ahead.

A   When you purchase a car, if I buy your vehicle tomorrow and you have a loan with U.S. Bank or Bank of

18 (Pages 277 - 280)

Page 281

America or Wells Fargo or any of the lenders, and you agree to me I purchase it for 50,000 but you still have $25 mortgage on it, the loan; so it means I got to write you 25,000, that's your equity in the car, and then I got to right away wire or Federal Express a check to U.S. Bank to receive the title.

Based on the Corona and all the delays in the industry, sometimes it takes -- let me finish please -- sometimes it takes up until 60 day. Sometimes it takes 30 days. Sometimes they send to you electronic title and then you got to go through the Motor Vehicle and still print the title. You got to show them all the paperwork. You got to do everything.

So it's nothing always in a perfect world. That's how the Zankls get away with all of his fraud based on all of these techniques and that's how he fraud all the people.

Q   Did AWB have title to this vehicle on October 22nd, 2021?

A   I don't know.

Q   I'm showing you a check on the screen.
Was this check ever deposited? Was this payment ever made?

A   I don't know. I can check and let you know.

Q   All right. This next document would appear to

Page 282

show that Excell Auto Group sold the same vehicle that was sold back to it on 10/22 that vehicle on September 10th, 2021. Do you see that?

A   Say it again. I'm sorry.

Q   If you look at the screen, this is purportedly a document between Excell Auto Group and AWB showing that Excell Auto Group was selling this Lamborghini to AWB on September 10th, 2021.

A   That's what the document is showing.

Q   Do you recall this transaction? It's a quarter-of-a-million-dollar car. It's a lot of money. Do you remember this one?

A   We did a hundred and hundred vehicle a year.

Q   So that's a no, you have no independent recollection about that car, right?

A   To me it's just another vehicle, another business transaction.

Q   All right. Now, did Michelle Martin sign this document with your authority or without your authority?

A   With my authority.

Q   Now, this next page shows a payment of Auto Wholesale of Boca to Excell Auto Group for $250,000 dated September 20th, 2021. Do you see that?

A   Yes.

Q   Was that payment ever made?

Page 283

A   I don't know. Sometimes you see a check, and I explained to you yesterday we have a bookkeeping record and I go to the bank and I do the wire. So I don't know on this time right now.

Q   Sir, I show you what is marked as or what's labeled as Exhibit B-05A and this is Bates 408 through --

A   You're going too fast. Sorry.

Q   No, no, no. I'm going to slow down. Let me just find the Bates numbers. It's 408, 409 --
Give me one second.
MR. MILLER: Can we take a five-minute break?
MR. BRESLIN: Let's take five and then we'll probably take a break around 12:30.
(A break was taken.)
BY MR. BRESLIN:

Q   I'm sharing the screen, Mr. Farache, and we're now at folder B-05 and we're at Exhibit B-05. And this is Bates 394 to 403.
So, Mr. Farache, I'm going to scroll through the deal jacket. This is in reference to the Uris. I believe we just went through and I'm now going to show you A and B. We went through this. This is a sale to Excell on 10/25 and it shows from Excell to AWB on 9/10.

A   No.

Page 284

Q   All right. This is the file that we just went through, okay, the Uris file, which shows the sale to Excell on 10/20.
I now show you what's been marked as B-05A, and this is Bates 408 and 409 and this is what purports to be title and transfer from VA Leasing Corp. to Karma Palm Beach 8/30/21 and then a transfer from Karma Palm Beach to Road Rich Motors on 9/13/21.
So my question to you is: As I show you this Certificate of Title, do you have any personal knowledge or does your company have any knowledge that what's depicted on this title is not accurate?
MR. MILLER: Objection. The document speaks for itself.
MR. BRESLIN: You can answer.
THE WITNESS: I don't know this document. It's not AWB document.
(FVP Exhibit B-05B was marked for Identification.)
BY MR. BRESLIN:

Q   And then we have another document. Let me make the page a little bigger. This is Exhibit B-05B and I'm going to scroll through it.
MR. MILLER: Could you go slow, Jerry.
MR. BRESLIN: Yes, of course.

19 (Pages 281 - 284)

Page 285

MR. MILLER: Back to the top please. Thank you. Slow down.

MR. BRESLIN: Let me know when you're ready to scroll.

THE WITNESS: Keep going please.

BY MR. BRESLIN:

Q   So it jumps to the next page. So going back to the first page, if you see, this purports to be a sale document between Karma Palm Beach and Road Rich Motors dated September 13th, 2021 selling the Lamborghini Uris for $256,000. The second page on this document purports to be a confirmation from the bank that they, in fact, received an incoming transfer of $256,000 for this car.

I ask you when looking at those two pages, do you have any knowledge or does your company have any knowledge that what's depicted in these documents is inaccurate?

MR. MILLER: Objection. The document speaks for itself.

MR. BRESLIN: You can answer.

THE WITNESS: I don't know.

BY MR. BRESLIN:

Q   Now, going back to the Auto Wholesale of Boca deal jacket, your deal jacket and your paperwork within

Page 286

your business records purports to show that over a month later, six weeks later, Auto Wholesale of Boca sold that car, that same car, to Excell Auto Group.

Do you see that?

A   Yes.

Q   That's Bates 396.

Can you explain how Auto Wholesale of Boca sold a car on 10/25 to Excell Auto Group that was owned by Road Rich Motors for at least six weeks?

MR. MILLER: Objection. Assumes facts not in evidence.

To the extent you know, Mr. Farache.

THE WITNESS: Basically we always got to wait until Excell or any of the Zankl entities close on the deal, and then he tell us, I sold this car and I just receive a payment, everything is clean, and that's when we do the transaction of sale.

BY MR. BRESLIN:

Q   So what you're saying is after Scott Zankl told you that he completed a transaction and sold the car and was paid for the car, then AWB would create paperwork to reflect that transaction? Is that accurate?

A   Based on my knowledge, yes.

Q   So what you're saying is that this invoice was

Page 287

created six weeks later showing a sale to Excell Auto Group because Scott Zankl told you that Karma Palm Beach sold that car six weeks earlier?

A   Or if we did inventory and we see it's not on the floor and we start sending email and asking question. But, you know, that's my side of the story, and the paperwork what you show me going back to the same story. You show me paperwork what you dealing with a guy that sold cars to four, three, four, five people, and he took people's vehicle and basically sold them to somebody else. So he sold stolen vehicle because he never no pay for the vehicle.

And you try to me to commit to something I can't tell you about this paperwork. I don't know his paperwork. I don't have nothing to do with this paperwork. We are all AWB and everything we did for the last nine and-a-half years doing business with Excell Auto Group and Zankl family, everything work. So I can't tell you about stuff it's in the past. I can't. The only things I can tell you is about some stuff we have to clean and then I can sit with you and go over all the stuff with you.

(FVP Exhibit B-07 was marked for Identification.)

BY MR. BRESLIN:

Page 288

Q   All right. We'll now turn to folder B-07. And I'll scroll through this slowly. This is B-07. And we have one follow-6up document. This is an AWB deal jacket. So I'll scroll through it slowly. This is regarding a Ferrari 488 VIN 6981.

A   Can you go back up please.

Q   Do you want me to go to the prior page?

A   All the way to the green. I want to see the green color. Keep going please slowly.

MR. BRESLIN: All right. Just so everyone knows, we'll stop at 12:30 and take a break until say 1:10 for lunch.

THE WITNESS: Wait. Can you keep going. I'm sorry. Stop for a second. I'm sorry. Keep going.

BY MR. BRESLIN:

Q   Are we good?

A   Slow down. I'm sorry. Wait one second. Keep going. Slow down for a second. Wait. Keep going please. Wait, wait. Go back a little bit. Sorry. Keep going. Go back a little bit. Stop for a second.

Q   Are we good?

A   Keep going.

Q   That's it.

So I show you what's Exhibit B-07, and it's Bates 452 through 461 which purports to be the AWB deal

20 (Pages 285 - 288)

800-726-7007                                        305-376-8800

Page 289

jacket for a Ferrari VIN 6981, year 2017.

On the screen is Bates 453 which purports to be a wholesale order, and that would be AWB selling this vehicle to Excell Auto Group for the sum of $263,000.

Do you see this document? Do you recognize what's on the screen?

A    Purchaser Excell Auto Group.

Q    What's on the screen appears to be an order, a purchase order, a wholesale order, between AWB and Excell selling to Excell the Ferrari for 263,000 signed by Michelle Martin. Do you see it?

A    Yes.

Q    Does this appear to be a legitimate business record of AWB?

A    To the best of my knowledge, yes.

Q    I've shown you several of those now. None of them have been dated. Do you know why?

A    It can be a typo things. But, 6you know, if you look in the deal jacket and you look in the checks and everything, everything is matching. That's what I'm writing just small notes about the dates.

Q    All right. This is your deal jacket though. This is what we're looking at, just so you know. Would you agree?

A    Yes.

Page 290

Q    So, again, there is no Odometer Disclosure Statement. Would you agree?

A    I agree, but maybe the vehicle at the time of purchase is in transport. So we don't have the opportunity to look in everything.

Q    Now, when you sold that vehicle, did your company, AWB, sell this vehicle to Excell on March 2nd, 2022?

A    That's what the paperwork say, yes.

Q    Do you have any recollection of this? This is a more recent transaction.

A    At this time I sit here, I don't have.

Q    I'm sorry? I didn't understand what you said.

A    Right now I don't.

Q    So it shows $263,000 was paid or invoiced to Excell Auto Group for this vehicle.

A    Okay.

Q    And that's dated 3/2, March 2nd, 2022.

And then the next document purports to show Excell selling that automobile to AWB on October 26th, 2021 for $263,000 which is the same price. Do you see that?

A    One second. So that's the paperwork Auto Wholesale sold to Excell Auto Group or Excell sold it to Auto Wholesale?

Page 291

Q    This document which is Bates 455 appears to show Excell Auto Group selling this vehicle to AWB on October 26th, 2021. Do you see that?

A    Yes.

Q    Now, that appears -- is that your signature?

A    No, it doesn't look like my signature.

Q    Now, we have an invoice date at least on this document that would appear to show a February 18th date.

Do you know where this information came from?

A    Keep going. Let me see. I don't --

Q    I'm asking you to look at the screen. It says, "Invoice Date 2/18." And if we go up to your invoice, it's dated 3/2.

Are you aware of another invoice?

MR. MILLER: Can you scroll up, Jerry. You went really fast.

MR. BRESLIN: Yeah, I went up to the invoice that's dated 3/2.

BY MR. BRESLIN:

Q    Now we have this Excell purchase order. Now we have this document which is an AWB business record which appears to show an invoice date of 2/18.

And my question to the witness is: Is there another invoice that you're aware of, that AWB is aware of?

Page 292

A    Based on my knowledge, I don't see any other invoice to AWB. But maybe they prepare the check for this vehicle because one has to bring the title back. So the check is not cleared to deposit, so that's why you see all of these paperwork this way.

Q    So you're saying that AWB did have the title to this car?

A    I'm not sure.

MR. MILLER: Jerry, can you scroll back up to the invoice you're talking about.

MR. BRESLIN: The first one?

MR. MILLER: You showed me an invoice. Stop. Stop.

MR. BRESLIN: 454 Bates.

MR. MILLER: Now go down one page. Okay. Stop. Go down. No, go back up a bit. Keep going. No, up. Up please. Stop. It's just hard to follow you. Can you go back up please to the invoice. Stop. Slowly. Go back down. Okay. And then down again. Right there. Right there.

MR. BRESLIN: Mr. Miller, I'm happy to accommodate you, but all those documents are in the drop box. You can look at them while we are doing this. If I have to show the witness and you, I mean, we're going to be here until next month.

21 (Pages 289 - 292)

Page 293

MR. MILLER: That's the entire purpose of a deposition. You've got to show the attorney for the witness.

MR. BRESLIN: You have the document.

MR. MILLER: No. Let me finish.

You're talking about a link that if you've got me on one computer, then I have to be able to watch you on Zoom and then I have to shrink it to go open up another computer screen to see the drop box. That's why you're scrolling through this. So if I ask you to scroll through it, it's because I need to see because I am the witness's attorney.

MR. BRESLIN: All right. But just so you know, this is the same -- everybody watching this depo has access to these documents.

MR. MILLER: I don't care about everybody else. I care about my client.

MR. BRESLIN: I understand. You client, if he has a question about this document, he can ask it.

MR. MILLER: And if I have a question and I need to see it, I'm going to ask.

MR. BRESLIN: Well, you're not the witness. I'm not deposing you.

MR. MILLER: Are you going to refuse to show me a document?

Page 294

MR. BRESLIN: I've been showing it to you, but my point is just please go to the drop box and they're all there.

MR. MILLER: I don't understand what you don't get about the fact that I don't have two computer windows open -- or two computers open to be able to simultaneously look at your Dropbox link and simultaneously watch your Zoom deposition of a witness. If you're going to show my client a document, I need to see the document. I don't know why we're having this debate.

BY MR. BRESLIN:

Q   Mr. Farache, is there some part of this document you'd like me to scroll through?

A   I mean, like I say to you, I'm trying to figure out because, you know, it's emailed to this document. Maybe the check has been write and signed by Mr. Zankl but then they're waiting for funds to release it. Because if you look at the dates, it's not much different between the dates.

So I don't know exactly what is the specific deal. And I go back and I always tell you that, you know, we did hundred and hundred deals and it's working for nine and-a-half years. And now you show me some stuff which you cherrypick documents from the Trustee

Page 295

and Mr. Zankl the fraudster and you show me what you want me to see. And, you know, it's always a way to look at stuff, and we're looking at it different because we got to wait until he close the deal a hundred percent and then he clean us out --

Q   This --

A   -- checking us out.

Q   Not to interrupt, but this would go a whole lot quicker if you'd just wait for my question because it might be a really easy question.

A   Go ahead.

Q   Okay. You're anticipating a hard one and it might be an easy one.

So let's take a look at the screen. And my first question is: As far as this Bates 455 which purports to be a wholesale purchase order between Excell and Auto Wholesale of Boca, is it your understanding that Auto Wholesale of Boca purchased this car from Excell Auto Group on October 26th, 2021?

A   Based on what you show me, yes.

Q   Now, what this document purports to show is a payment from Excell Auto Group to Auto Wholesale of Boca dated February 18th, 2022 for the amount of $263,000.

Do you see that?

A   Yes.

Page 296

Q   Do you know whether or not Auto Wholesale ever received that money or that check and it was ever deposited or cleared?

A   I got to find out. Same like yesterday.

Q   But as you sit here today, you don't know?

A   Say it again. Sorry.

Q   As you sit here today, you don't know, correct?

A   Right now I don't know.

Q   Okay. Now, here is what purports to be a check -- and this is 457 -- of a payment to Excell Auto Group of $263,000 on October 27th, 2021 of $263,000. And there's a check signed, a company check.

Do you see that?

A   Yes.

Q   Does that check look familiar to you?

A   Yes.

Q   Is that your signature?

A   Yes.

Q   Was that check ever delivered to Excell? Was Excell paid this amount or is this just for bookkeeping purposes?

A   I don't know based on what you show me.

Q   Okay. My question to you is: Why would Auto Wholesale of Boca write a check for $263,000 on

22 (Pages 293 - 296)

Page 297

12/27/2021 when on that day Excell Auto Group owed AWB around $5 million? Why would AWB write a check for that?

A   Can you repeat it please.

Q   Right.

I've already shown you the document showing that within a month of this transaction, there were Notes showing at least $5 million owed by Excell Auto Group to AWB. So if AWB was owed all that money at this time, why would AWB write a check to Excell for $263,000?

A   Because our business, he buy from us cars, we sell them to him, we're buying cars from him. That's the nature of our business. We are a dealership. We are a wholesale dealer, you know, we have business relationship with the Zankl family for the last nine and-a-half years, and it's working.

Q   But, again, and I just want the record to be clear, Bates 457, as you sit here today, you don't know if that check was ever negotiated, correct?

A   Based on my knowledge right now, I can't answer you. Wow, it's a title. You never no show me.

Q   I show you now a document that's identified as B-07, and this is Bates 464, 465, 466.

MR. MILLER:  What exhibit is this going to be,

Page 298

Jerry?  This is Exhibit 7-0A but I'm going to break it up during the lunch break because this is two different documents.

All right.  It's 12:29.  We're going to take our lunch break.  I'll see everyone back at 1:10 and we'll start back up.

(The luncheon recess was taken after which the following proceedings were had:)

MR. BRESLIN:  All right.  We're back on the record.

(FVP Exhibit B-07A was marked for Identification.)

BY MR. BRESLIN:

Q   I showed you Exhibit B-07 which indicated that Auto Wholesale of Boca sold this Ferrari to Excell Auto Group in March of 2022.  So now I'm going to show your what's been marked as B-07.  This is what purports to be a title.  This is Bates 464 through 467.  So I'm going to go nice and slow.

THE COURT REPORTER:  We can't see it.

MR. BRESLIN:  Here we go.  Here we go.

BY MR. BRESLIN:

Q   As the corporate representative of AWB, have you ever seen the document that's on the screen before?  And by that I mean the title documents to the Ferrari.

Page 299

A   We still speaking about the 2017 Ferrari what you show me before?

Q   Right, the 2017 Ferrari that is listed on your invoice on Bates 454 as being sold to Excell on March 2nd, 2022.  So this is what purports to be the title documents to that vehicle.

A   Okay.  Can you go back.  I'm sorry.  Okay.

MR. MILLER:  Slow down, Jerry.  Jerry, go back up a little bit please.  Right there.  Can you go down.

THE WITNESS:  Can you go up one second.  Keep going.  I'm sorry.  One more time go back.  Keep going.  Go back for a little bit.  I just want to see the bottom of title.  Okay.

MR. MILLER:  Jerry, can you go back a page -- you went really fast -- to the affidavit.  Right there.

BY MR. BRESLIN:

Q   Are we good?  Are we good?  Have you had a chance to review this document, Mr. Farache?

A   Can you go back a little bit please.

Q   Sure.

Are you ready?

A   As much as I can.  It's a lot of paperwork.

Q   Have you ever seen any of these documents

Page 300

before today?  And I ask you as the corporate representative of AWB.

A   Based on my memory, the paperwork -- I'm sorry.  The paperwork what you show me before, yes, I saw it for AWB.  But this paperwork, I see the car sold between three entities owned by the same family.  So I can't tell you what is this paperwork.  I have nothing to do with that.

Q   Would you agree that the title shows that Excell Auto Group purchased this car on November 12th, 2021 from Quick Shift Capital?

MR. MILLER:  Objection.  The document speaks for itself.  He's already testified he knows nothing about this paperwork.

MR. BRESLIN:  You can answer.

THE WITNESS:  I don't know.

BY MR. BRESLIN:

Q   All right.  Let me ask you something.

AWB is a licensed dealer, correct?

A   Yes.

Q   And is that license in the name of the company or is that license in your name personally?

A   The name of the company.

Q   So as a licensed auto dealer, you're certainly familiar with what these entries on this title mean,

23 (Pages 297 - 300)

Page 301

correct?

A   I mean, the best of my knowledge.  But, you know, you see a vehicle, in two days you see three --

Q   Right.  The first one is on November 12th, 2021.  That appears to be when the car was purchased, correct?

A   I don't know.  You know, you show me other dealership paperwork and you want me to give you the answer.  It's not my -- you know, it's not my cup of tea.

Q   Okay.  And you would you agree that this document would appear to show that Karma Palm Beach sold the car to Shipley Auto Sales on November 15th, 2021?

A   I don't know this paperwork.

(FVP Exhibit B-07B was marked for Identification.)

BY MR. BRESLIN:

Q   Now I show you what's been marked as B-07B which is the corresponding documents.  And this is Bates 485 and 486 which purports to be the sale of this vehicle from Karma Palm Beach to Shipley Auto Sales on November 15th, 2021.

The next document at 486 would appear to be a confirmation of money received there Shipley Auto Sales on November 16th, 2021.

Page 302

And then the next page would appear to be copies of the check written to Karma Palm Beach on November 16th.

Do you have any reason to believe that any of the documents that I'm showing you in Exhibit B-07B are inaccurate?

A   I don't know.

Q   Well, let's go back.  But it appears, does it not, sir, you being an automobile dealer, that this vehicle was sold to Shipley Auto Sales on November 15th, 2021, correct?

A   I don't know.

Q   I'm asking you if it appears to you from this paperwork that this is what happened?

A   Jerry, I don't know.  And you try me to giving you my true statement about somebody else paperwork and, you know, you got to be realistic in the whole deposition.  You know, you're talking about somebody else evidence, you know.

Q   Here's what I would like to know from AWB:

Explain to me please how Excell Auto Group sold to AWB an automobile that wasn't even purchased for two weeks after this document and then AWB sold that car, that same car back to the exact same amount, exact same price, months after the car was sold to a third

Page 303

party.  Can you explain to me how that happened?

A   You got to look in the whole paperwork.  I think you're missing some paperwork for the deal jacket.  There's always explanation for something, and I think even on your side, you just cherrypick what you want to show me and it's not the whole paperwork.

You know, but it's nothing to do with me, so I can't -- it doesn't affect me.  You know, I know if we bought a car and we sold a car, we have a transaction going on, you know, that's one of a couple hundred cars.

Q   Well, I understand.  And I'm trying to find out how Auto Wholesale of Boca sold cars that it appears from the papers it didn't own.  You can understand why I'm asking you those questions, right?

A   Not really, because you don't know if we got paid for this vehicle.

Q   Well, did you get paid for this vehicle?

A   Maybe.  You know, check your paperwork.  You know, you -- sometimes if we got paid for the vehicle, we own the vehicle, and that's what I tried to remind you.  You don't get 265,000, what you told me before, you write $250,000 check based on what?  If we got paid for this vehicle, so you think the Zankl family, they are not smart and they just giving away money?

It's a business transaction.  Every vehicle in

Page 304

this lawsuit it's separate from the others, and you try to mixing a lot of deals together and you try to confuse me and make me lie to the court.  And you check if we got paid.  We don't got paid because it's not right.  We got paid because we own the vehicle.

Q   All right.  Mr. Farache, you understand that you're being deposed as a representative of AWB, correct?

A   Yes, sir.

Q   Do you also understand that your answers are binding on AWB as far as the business of AWB?  Are you aware of that?

A   Yes.

Q   And prior to this deposition, you were aware you were going to be deposed about records, about the business records of AWB, correct?

A   As far as I know, yes.

Q   So I'm asking you about the business records of AWB.  You understand that, right?

A   Yes.

(FVP Exhibit B-09 was marked for Identification.)

BY MR. BRESLIN:

Q   Now I direct your attention to the screen which is Exhibit B-09, and B-09 is Bates 496 and 506

24 (Pages 301 - 304)

Page 305

which involves a Porche 911 VIN ending 2124. I'm going to scroll through this and then I'm going to ask you some questions about it. Okay?

A   One second. Let me just write some notes because of the date.

Q   Are we good? Can I start?

A   Yes.

Wait, wait. Can you go to the top.

Q   Are we good? Can I go to the next page?

A   One second. Yes, thank you.

Q   All right. Let's go to the next page. We have here an Auto Wholesale of Boca order again undated for the Porche.

Regarding Bates 497, did Michelle Martin sign this document at your direction?

A   Yes, on behalf of Auto Wholesale of Boca, yes.

Q   This appears to show an invoice from Auto Wholesale of Boca to Excell Auto Group dated 9/23/21.

Do you see that?

A   One second. Let me write it. Okay.

Q   Now, again we have Bates 499, a document which purports to show that Excell Auto Group sold this car to AWB on 7/12. That would be July 12th, 2021.

Do you see that?

A   Yes.

Page 306

Q   Does that appear to be Michelle Martin's signature?

A   Based on my knowledge, yes.

Q   Did you direct her to sign this?

A   Yes.

Q   So as far as you know, we've looked at these advertisements in a lot of these. Who advertised it? Was that Excell companies that advertised these cars?

A   Yes. I mean ...

Q   I've never seen an ad that had Auto Wholesale of Boca as the seller. Were there any such ads?

A   Not in this magazine.

Q   Did Auto Wholesale of Boca advertise cars anywhere in the world?

A   We have a group of Auto Wholesale and Facebook and stuff like that, different places. We put it in the OV, different places, because we try to wholesale it. We don't like to deal with the retail people.

Q   All right. So you have advertisements that you placed in 2021 and 2022 for cars that Auto Wholesale of Boca owned?

A   Yeah. I mean, it's different advertise. Usually we have advertise -- you know, we put them in OV, it's a system what given to all the dealers opportunity to buy them.

Page 307

Q   But my question to you is: Did you advertise any of your cars?

A   No, no, I don't want to spend money for advertisement. I don't want to sell retail. It's not my shtick.

Q   All right. I show you what purports to be a check written, an Auto Wholesale of Boca check payable to Excell Auto Group on July 12th, 2021.

Do you see this check?

A   Yes.

Q   Does that look familiar to you?

A   Yes.

Q   Is that your signature?

A   Yes.

Q   Was that check ever given to anyone? Was it tendered or negotiated?

A   I don't know if it's a wire transfer or something. Don't forget, always we make the check. Even if I go to the bank and I wire transfer, it's still a check for a bookkeeping record. So I don't know.

MR. BRESLIN: Is there someone laughing? Does someone have their microphone on?

THE WITNESS: Jerry, you should not let people laugh at me.

MR. BRESLIN: It certainty didn't come from my

Page 308

microphone.

THE WITNESS: You should not let people laugh at me.

MR. BRESLIN: Well, you see me correcting it.

BY MR. BRESLIN:

Q   Now here we are at 506, a this is also an Auto Wholesale of Boca business record, correct?

A   Say again. I'm sorry.

Q   This document on this screen at 506, this is an Auto Wholesale of Boca business record, correct?

A   I'm not sure. Can you show me a little bit more.

Q   This purports to show a payment of $167,000 from Excell Auto Group to Auto Wholesale of Boca on September 22nd --

A   Okay.

Q   -- which corresponds with the Auto Wholesale of Boca sale to Excell Auto Group on 9/23.

Would you agree with that?

A   What is the check for on that 9/23? I don't pay attention. I'm sorry.

Q   It says 167.

A   So the invoice is 9/23 but the check is 9/22nd, correct?

Q   Right. The check is dated 9/22/2021 for

25 (Pages 305 - 308)

Page 309

$167,000. That's at Bates 506. And if we look at the invoice, it's an invoice dated 9/23/2021 for $167,000.

Q Do you see that?

A Yes, sir.

Q Did Excell Auto Group ever actually pay Auto Wholesale of Boca for this automobile?

A It's a term of payment. I don't know if it's been in a wire. Maybe it's a wire.

Q Well, let me make it simple.

Did Auto Wholesale of Boca own this Porche --

A Yes.

Q -- on September 23rd, 2021?

A September 23rd? Maybe we sold it on September 23rd.

Q Well, I'm looking at a paper that says you sold it on September 23rd, 2021 to Excell Auto Group, right? I mean, that's what this paper says, right?

A If that's what they say, that's what happened.

Q Did Auto Wholesale of Boca own this car on September 23rd, 2021?

A Prior to that, we probably own it.

Q But on the date that it sold it, on 9/23, did Auto Wholesale of Boca own this car?

A I don't know what time you're talking about.

Q I'm talking about September 23rd, 2021, the

Page 310

date of your invoice to Excell.

A You got to be more specific.

Q How much more specific can I be?

A Because you try to make me mistake. That's the way I feel.

Q I'm just trying to -- I'm just trying to know what your knowledge is. I'm asking you if Auto Wholesale of Boca owned the Porche on September 23rd, 2021, the date that it shows it sold the car to Excell Auto Group?

A Prior for us to receive a payment from Excell Auto Group, we own the vehicle.

Q Did you have title to this vehicle?

A I don't see -- you don't show me the whole paperwork, so I can't tell you.

Q Did you have possession of the vehicle?

And when I say "you," I mean AWB.

A AWB, probably it's on the floor somewhere between Excell and AWB area, but I don't know exactly what to answer you this. It's almost -- you know, 9/23/21. It's almost a year and-a-half ago.

Q Give me one minute.

Sir, I show you what's been marked as Exhibit B-09 which purports to be a title.

MR. BRESLIN: And excuse me one minute please.

Page 311

MR. MILLER: Jerry. The last exhibit was B-09?

MR. BRESLIN: This will be mark B-09A. I'm sorry. That is B-09A. This is Bates 515.

(FVP Exhibit B-09A was marked for Identification.)

BY MR. BRESLIN:

Q Exhibit B-09A purports to be a title.

MR. MILLER: Jerry, nothing is on the screen.

MR. BRESLIN: Okay. Let me go ahead and share the screen.

BY MR. BRESLIN:

Q I'm going to scroll through this. This is Bates 515 Exhibit B-09A.

Mr. Farache, I'd like you to take a look at this page that we're on right now which is page 515 which purports to show Mr. James Kaufman sold that vehicle to Karma Palm Beach on September 18th, 2021.

Q Do you see that?

A Okay.

MR. MILLER: The document speak for itself.

BY MR. BRESLIN:

Q Is that what this document appears to you to represent, sir?

MR. MILLER: The document speaks for itself.

Page 312

MR. BRESLIN: You can answer.

THE WITNESS: I think you are wrong.

BY MR. BRESLIN:

Q You think I am wrong?

A I think so. Based on my knowledge now after Mr. Zankl pitches the whole fraud cases, looking in here, it's a POI. That's mean power of attorney.

Q Okay.

A So we don't know if he sold it to Karma Palm Beach or maybe he took it as a consignment.

Q But this document, this title document, appears to transfer this car to Karma Palm Beach on September 18th, 2021, correct?

A I don't know.

Q I know you don't know. I'm asking you on its face, is that what it appears to show?

MR. MILLER: Objection. The document speaks for itself.

MR. BRESLIN: And Mr. Farache is an expert.

BY MR. BRESLIN:

Q So, Mr. Farache, as the representative of a car dealer, a licensed car dealer, does this document, this title document, appear to transfer title from Mr. Kaufman to Karma Palm Beach on September 18th, 2021?

MR. MILLER: Objection.

26 (Pages 309 - 312)

Page 313

Mr. Farache is here as a corporate representative of AWB, Debtor in bankruptcy. He's not tendered as an expert. I'm glad you accept him as an expert, Jerry. You're finally admitting that. But he's not going to opine on a document he didn't prepare. He just said he doesn't know anything about this document.

MR. BRESLIN: Are you asking me if I will agree that he's an expert?

MR. MILLER: I don't know. You said he's an expert, right?

MR. BRESLIN: Do you want to stipulate to it right now?

MR. MILLER: You want to call him an expert?

MR. BRESLIN: If you want him to be deemed an expert, I'm happy to make that agreement.

MR. MILLER: No, today he's not testifying as an expert. Today he's testifying as a corporate representative of the Debtor AWB on a Noticed deposition that did not provide the area of inquiry. So it seems like it's a free-for-all for you today. So I don't know. You can ask your questions.

But he said he doesn't know about this document. He's not going to opine on a document he

Page 314

didn't prepare, he doesn't know about. You're asking for his opinion.

MR. BRESLIN: No, he didn't say that. You did.

MR. MILLER: You're asking him for his opinion and he's not going to give his opinion. He's not going to speculate.

MR. BRESLIN: All right. Mr. Farache, are you refusing to answer my question?

MR. MILLER: He answered your question.

BY MR. BRESLIN:

Q   Mr. Farache, does this title document appear to transfer title from Mr. Kaufman to Karma Palm Beach on September 18th, 2021?

A   I don't know.

Q   Now, you're familiar with how these title documents work. There is a next page, and we're going to look at the next page. I'd like you to tell me what this next page means.

MR. MILLER: Objection. The document speaks for itself.

MR. BRESLIN: You can answer.

MR. MILLER: It speaks for itself. I don't want him to speculate.

THE WITNESS: I don't know.

Page 315

BY MR. BRESLIN:

Q   All right. This document says that it was transferred from Karma Palm Beach to a purchaser by the name of Daniel Shamooil on September 18th, 2021.

Do you see that?

A   Yes.

MR. MILLER: The document speaks for itself.

BY MR. BRESLIN:

Q   Now let's go to what appears to be a Purchase Agreement.

A   Can you go back to the title please. One second.

You know, I think what you show me is all copy of title. Because you see the "void, void, void, void," so that means somebody put it in the copy machine. So I can -- you know, I think you're relying on paperwork -- I don't know if it's real or not. You know, I learn that from my copy machine and now I pay attention to it.

I think the way I look in it, if you put a title in a copy machine, that's what you get. So I don't know if it's a copy. You know, if you don't print it black and white, it's always going to show you. So I don't know if this paperwork is real legit.

Q   Well, let me ask you this: These are the AWB papers. So this deal jacket that you supplied and your

Page 316

lawyers supplied to us doesn't have a title in it. So how did you sell this car if you didn't have a title?

A   I don't know. You know, I mean, you show me what it's missing or it's -- you know, like I said to you when you show me the Ferrari, you told me you no receive a payment for it. But, you know, you got to really check your paperwork and your records. All of the papers so far yesterday you told me about some checks I no deposit, and then I find out this money goes to my bank account. So I don't feel comfortable with all your paperwork anymore. So ...

Q   Okay. Well, then you're certainly free to tell me that.

Now, are you familiar with what a Karma Palm Beach Purchase Agreement looks like?

A   Yes.

Q   You've dealt with these documents many, many times, right?

A   Not this one. That's for I think for clients. It's nothing to do with us as a wholesaler.

Q   But you've seen their documents before, correct?

A   Based on what you show me today and yesterday, yes.

Q   All right. So I'm going to scroll through

27 (Pages 313 - 316)

Page 317

what purports to be a Purchase Agreement between Karma Palm Beach and Daniel Shamooil for the automobile on September 18th, 2021.

From your experience in dealing with Karma Palm Beach, do these documents regarding the sale of this car to this customer on September 18th, 2021 appear to be legitimate?

MR. MILLER:  Objection.  Calls for speculation.

MR. BRESLIN:  You can answer.

THE WITNESS:  I don't know.

BY MR. BRESLIN:

Q   Do you have any reason to believe that these documents are not accurate?

MR. MILLER:  Objection.  Calls for speculation.

THE WITNESS:  I don't know.

BY MR. BRESLIN:

Q   The answer is you don't know?

A   I don't know.

Q   Now let's go back to the AWB paperwork which purports to sell that same car five days after it was sold to Mr. Shamooil of Excell Auto Group.

Can you explain how that happened?

MR. MILLER:  Assumes fact not in evidence.

Page 318

Go ahead, Mr. Farache.

THE WITNESS:  Maybe Excell Group closed the deal jacket a couple days after and sold it to him. I don't know.

(FVP Exhibit B-011 was marked for Identification.)

BY MR. BRESLIN:

Q   All right.  Let's take a look at Exhibit Bates B-011 and this is 592 through 598.

A   It's a new car.

Q   Yeah, this is a different car.  This Exhibit B-011.  This is a Porche 911 with VIN 6822.

MR. MILLER:  Jerry, what was Bates stamps 561 to 564?  What was that exhibit?

MR. BRESLIN:  What are you talking about, 561 through 564?

MR. MILLER:  That's the one you just had on the screen before this.

MR. BRESLIN:  The title to the last car -- all right.  This is Bates 9.  Let me get it back up. Bates 9, the one we were just looking at, is --

MR. MILLER:  It's after Bates 9-A.  You brought something up that started with Bates 561.

MR. BRESLIN:  No.

MR. MILLER:  You were just asking him about

Page 319

it.

THE WITNESS:  I'm confused.

MR. MILLER:  Yeah.

THE WITNESS:  All right.  This is the file we just had up.  This is Bates 9 and that starts at 496 and it goes to 506.  That's the one we just went through.

MR. MILLER:  After --

MR. BRESLIN:  Right.  And then we went through this document.

MR. MILLER:  No.

MR. BRESLIN:  That's B09A.  That's 515.  And then the Purchase Agreement is 561.  That page is 561.  It's 515 page 1, 516 for page 2, 561 for page 3, 562 for page 4, 563 for page 5, 564 for page 6.

BY MR. BRESLIN:

Q   Now we are back to Exhibit B-011, and this is for a Porche 911.  So this a whole new car, Mr. Farache. Please take a look at the cover and let me know when you're ready to go through it.  Are you ready?

A   Yes.

Q   All right.  So now we are talking about a 911, 6822 where we have the wholesale order --

A   Yes.

Page 320

Q   -- where AWB is selling to Excell signed by Michelle Martin undated?

A   I'm not sure if -- we're purchasing the car from Excell.  We don't sell them the car.

Q   It says Auto Wholesale sold as-is to purchaser Excell Auto Group.

A   Okay.  Now I want you to pay attention.  Go back to the green jacket.  Look what the green jacket say about the date.  The purchase date is 9/22.  The sold date 10/8, sold date 10/8.  So, you know, maybe something is missing over there in the paperwork, but you have the information also on the form.

Q   So what you're saying is that this writing, whoever wrote that on the cover of your folder --

A   Maybe that's the way we did business.  It's inside documents.

Q   -- that's more important than the papers?

A   It's inside documents.

Q   Well, these are your records, so they are what they are.

A   Yes.

Q   Let's just go through them.

We have a purchase order that's undated, right?  Bates 593 is another undated purchase order to Excell Auto Group, correct?

28 (Pages 317 - 320)

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

Page 321

A    When you say it's undated?

Q    There's no date.

A    Yeah.

Q    Correct?

A    Everything is there.

Q    Is there a date on this document?

A    No.

MR. MILLER:  Show him the whole document please.

THE WITNESS:  But you have to look on the top of it, the green folder.

BY MR. BRESLIN:

Q    And did Michelle Martin sign this at your direction?

A    Yes.

Q    Let's go now down here to the invoice.  The invoice appears to show that Auto Wholesale of Boca sold this car to Excell Auto Group on 10/8/2021.  So October 8th, 2021, correct?

A    Yes.

Q    And it shows it sold this car for $137,000 to Excell Auto Group, correct?

A    Yes.

Q    And now we have your internal records showing that on 10/8, there was an amount paid of $137,000.  Is

Page 322

that right?

A    Let me see the whole document please.

Q    You want it all on one page?  Is that what you're saying?

A    I'm trying, yeah, please.

Q    All right.  This is this whole document on one page, 596.

A    Okay.

Q    All right.  So it shows amount paid 137,000.  It shows a check from Excell Auto Group payable to AWB.  Was that check ever cashed deposited?  Do you know?

A    I don't know.

Q    Now we back up a little bit and we go back to 9/22 where it shows that Excell Auto Group on September 22nd sold this car to AWB.

A    One second.

Q    So this transaction occurred on 9/22 allegedly.

A    Okay.

Q    And so is that the date that AWB bought this car?

A    Based on the paperwork what you show me, yes.

Q    Did AWB get title to this car?

A    You don't show me the rest of the paperwork.

Page 323

Q    Well, it shows here a check from Auto Wholesale of Boca to Excell Auto Group $137,000.  Is that your signature?

A    Yes.

Q    Did Auto Wholesale of Boca actually pay Excell Auto Group $137,000 for this vehicle or is this just another record entry?

A    I'm not sure if it's a wire behind it or any sort --

Q    So are you saying that payment was made in some form either by check or wire?

A    I'm not sure.

Q    Is that what you're saying?

A    I don't know right now.  You don't show me the whole document.

Q    You don't know -- well, I'm showing you your own records.

A    But you got to show me the whole document.  Maybe it's a wire copy somewhere.

Q    All right.  This is your entire deal jacket.  It shows your deal jacket has the purchase order from Excell dated 9/22, a check purportedly where Auto Wholesale of Boca wrote a check on 9/23 for $137,000 to buy this Porche.

A    Yes.

Page 324

But always remember it can be a swap, and all what you see here, it's only paperwork to keep the files and organization and QuickBooks and checking account and everything.  And all our inventory, it's got to be very organized.  So if it's a swap or something and you see checks, it's just for in-house and bookkeeping.

(FVP Exhibit B-011A was marked for Identification.)

BY MR. BRESLIN:

Q    Okay.  So I show you what's been marked as Exhibit B-011A.  And the first page of this document is 607.  The second page is 608.  The third page is Bates 658.  The fourth page is 659.  The fifth page is first 60.  The seventh page is Bates 661.  The eighth page is Bates 662 and the ninth page is Bates 663.

So I show you Exhibit B-011A which I just identified page by page and I'm going to scroll through this document for you.

MR. MILLER:  Jerry, this is an eight-page document according to what you said.

MR. BRESLIN:  Yeah.  What did I say, nine?

MR. MILLER:  Yeah.

MR. BRESLIN:  Okay.  I didn't count it correctly.  We're going to scroll through it.  So the first page is 607.  Let's go through that.  The

Page 325

second page is 608. The third page is 658. The fourth page is 659. The fifth page is 660. The seventh page is 661. The eighth page is 662. I count nine again. I don't know what to tell you. The ninth page is 663.

MR. MILLER: I count eight.

MR. BRESLIN: And it shows eight. I don't know why.

BY MR. BRESLIN:

Q Anyway, let's take a look at this title.

Do you see where this title appears to be sold from a Bryan Rampersad to Karma Palm Beach on September 27th?

MR. MILLER: Objection. The document speaks for itself.

THE WITNESS: I don't know.

BY MR. BRESLIN:

Q Is that what it appears to be to you?

MR. MILLER: The document speaks for itself.

BY MR. BRESLIN:

Q Please listen to my question.

Is that what this appears to be to you, Mr. Farache? I'm not asking you what the document says. I'm asking what it appears to you as a auto wholesale dealer.

Page 326

MR. MILLER: Objection. The document speaks for itself.

MR. BRESLIN: You can answer.

MR. MILLER: You're calling for his opinion on something.

THE WITNESS: I don't know because, again, you see POA.

BY MR. BRESLIN:

Q Okay. The next page, it appears that this document, this title document, shows that Karma Palm Beach sold this car to a Matthew Rosenthal on 9/27/2021.

Is that what this appears to you, Mr. Farache?

MR. MILLER: Objection. The document speaks for itself. Calls for speculation.

MR. BRESLIN: You can answer.

THE WITNESS: I don't know.

BY MR. BRESLIN:

Q Again, we have a Purchase Agreement between Karma Palm Beach and a Matthew Rosenthal dated 9/27/21, and I'm just going to go through this.

This appears to be the Purchase Agreement.

MR. MILLER: Same objection. The document speaks for itself and calls for his opinion and speculation.

BY MR. BRESLIN:

Page 327

Q I'm going to go through all these documents, and they appear to be the Purchase Agreement and transaction documents between Karma Palm Beach and Mr. Rosenthal, his payment of $210,000 to Karma Palm Beach, all of which occurred on September 27th, 2021.

Do you have any information, sir, that any of these documents are not accurate?

MR. MILLER: Objection. Form. You gave a long diatribe before you even asked him a question. I object. It's also speculation and the document speaks for itself. He's not going to --

MR. BRESLIN: Ms. Court Reporter, I would like an excerpt of Mr. Miller's objection. I'd like it today.

Mr. Miller, these objections are inappropriate. You're coaching the witness. You've done it numerous times. Just please stop.

MR. MILLER: Listen.

MR. BRESLIN: It's the witness that answers, not you.

MR. MILLER: All right. Let me finish. Because you're not supposed to give a diatribe. You know how to ask a question. Is this your document or not your document? You're giving a five-minute diatribe reading out off of every

Page 328

document every single thing you see and ask him if that's true and correct.

He's testified that if it's not his document, he doesn't know about it. But the point is I am allowed to make an objection, calls for speculation and the document speaks for itself. You can ask a question. I have not directed him not to answer the question.

MR. BRESLIN: None of those objections are appropriate in a deposition.

Ms. Court Reporter, I want a transcript of this.

BY MR. BRESLIN:

Q Now I'm going back to my question, Mr. Farache.

Do you have any knowledge -- does AWB have any knowledge that these transaction documents regarding a car sold by AWB are not accurate?

A I don't know.

Q Let's go back to the AWB documents.

These AWB documents purport to show that AWB sold that same car to Excell Auto Group on 10/8.

Do you see that?

A Yes.

Q Is this an accurate document?

Page 329

A   I don't know.  You're asking me questions. You know, I got to really go over, you know, to put everything together and make sure everything is correct. And I mentioned that yesterday.  You did the same thing for me and I find out you make a mistake and I giving you the wrong answer, and I want to make sure everything I tell you it's the right answer.

So it's a very -- you know, it's hundreds and hundreds deal jackets and you're going back so far. And, you know, as much as I want to give you all the answers, it's very hard to really focus on one particular vehicle and tell you yes, I know for sure. You know, everything I tell you is based on, you know, as much as I can.  And, you know, we all in a lot of pressure to giving you the right answer and I'm sitting here and yesterday I make a mistake.  I give you a couple of wrong answers and I find out later on and it doesn't make me feel good.

Q   All right.  Mr. Farache, that's why you have a lawyer.  If you find that your answers were inaccurate, he can ask you questions and you can clarify.  That's his job.  Okay.

MR. MILLER:  Mr. Breslin --

MR. BRESLIN:  I would just simply like you to answer my question.

Page 330

MR. MILLER:  Ask a question.  Ask a question, Mr. Breslin.  You don't need to advise my client.

MR. BRESLIN:  Well, your client is having dialogue with me.

MR. MILLER:  Ask a question.

MR. BRESLIN:  All the sudden you want me to ask questions?  I'm going to ask another question.

MR. MILLER:  I've been waiting for you to ask a question.  The whole day we've spent here, you've been reading off of documents trying to establish your own basis for the legitimacy of them.

MR. BRESLIN:  Okay.

MR. MILLER:  Just ask a question.

BY MR. BRESLIN:

Q   All right.  Mr. Farache, I'm now going to show you Bates 17 which purports to be another AWB deal jacket.  Do you recognize this deal jacket?

A   Wait.  That's a new one?

Q   It's a new one.

A   Okay.

Q   Correct.

A   Go ahead, Mr. Breslin.

THE COURT REPORTER:  This is B-017?

MR. BRESLIN:  It's B-017.  For the record, this is Bates 845 through 857.

Page 331

MR. MILLER:  845 to 857?

MR. BRESLIN:  845 to 857.

(FVP Exhibit B-017 was marked for Identification)

BY MR. BRESLIN:

Q   All right.  Let's talk about Bates 847.  This appears to be AWB wholesale order to Excell Auto Group, it's undated, for the amount of 76,500 for a 2013 Dodge, VIN 0680.

Did Michelle Martin sign this document at your direction, Mr. Farache?

A   Yes.

Q   The next document appears to be an AWB invoice dated 12/7/2021 to Excell Auto Group selling this Doge Viper for 76,500.  Do you see that?

A   Can you repeat yourself please.

Q   Yes.

On the screen we have an Auto Wholesale Boca invoice to Excell Auto Group, correct?

A   Yes.

Q   So this appears to show the sale of this vehicle to Excell Auto Group on this date, 12/7/21, right?

A   Yes.

Q   Now, the next document, Bates 849, appears to

Page 332

show Auto Wholesale of Boca buying the car that it sold on 12/7 back to itself from Excell on November 5th, 2021, correct?

A   One second.  I'm sorry.  Okay.

Q   So this document shows that AWB purchased this vehicle on 11/5 and it sold it back to Excell on 12/7 of '21, right?

A   Okay.

Q   Now, did Boca buy this car on November 5th, 2021?

A   Based on the paperwork, yes.

Q   Did Boca ever get title to this car?

A   Keep going with the paperwork.  I can tell you.

Q   So let's go down to Bates 856.  This appears to show a payment from Auto Wholesale of Boca to Excell Auto Group for $75,000 on November 12th, 2021.

Do you see that?

A   Yes.

Q   Was that payment actually ever made?

A   I can't tell you.  It's probably a wire or something.  I can't tell you.  Based on what I see, I can't give you a final answer.

Q   So is there some reason why you'd write a check and do a wire?

31 (Pages 329 - 332)

Page 333

A   We always a write a check. As I mentioned that before, for bookkeeping records, we're doing everything through QuickBooks and we write a check. And if I got to go to the bank and do a wire, I go to the bank, I do a wire, and we still have the check with the backup of a wire just to make sure our book record is very organized.

Q   So what you're saying is you're saying unequivocally that AWB paid Excell Auto Group $75,000 on or around November 12th for this car either by wire or by check, correct?

A   Or by swap or by any kind of payment. I don't see -- don't try to push me to say stuff I don't say. You know, I appreciate if you let me say my things. You know, you always try to direct me for your garden and it's wrong.

Q   Sir, these are your company's business records. I'm just trying to find out what they mean.

A   AWB business.

Q   Right.

MR. MILLER:  Wait for a question.

BY MR. BRESLIN:

Q   Now we're at the bottom of the page, and we have what purports to be a check from Excell Auto Group to AWB dated 12/6/2021. Do you see that?

Page 334

A   Yes.

Q   Did AWB ever receive this 75,000?

A   I can't tell you right now. I can check it.

Q   But if you look at your records here it says, "Amount paid 75,000." Would that lead you to believe that your company actually received 75,000?

A   I can't tell you on the top of my head. I got to check with my bookkeeper.

(FVP Exhibit B-017A was marked for Identification.)

BY MR. BRESLIN:

Q   All right. I'm going to show you what's been marked as Exhibit B-017. Let me make sure the Bates Numbers are in the record. So page 1 is 860. Page 2 is 861. Page 3 is 862. Page 4 is Bates 886. Page 5 is Bates 887. And page 6 is 888. And that's Exhibit B-017A. So let's scroll through the this document.

MR. MILLER:  Go to the top.

MR. BRESLIN:  This is the very top of the first page.

MR. MILLER:  What was the number of the first page?

MR. BRESLIN:  860.

MR. MILLER:  Okay.

BY MR. BRESLIN:

Page 335

Q   Mr. Farache, are you familiar with titles from the state of Louisiana?

A   As much as I can.

Q   So do you see on the second page it appears to show that this title was assigned to Karma Palm Beach on November 1st, 2021?

A   Can you repeat it one more time.

Q   If you look at the page, it appears as if this title was transferred to Karma Palm Beach on 1/11/21, November 1st, 2021. Do you see that on your screen?

A   Yes.

Q   Do you have any reason to believe that that is inaccurate?

A   I don't know.

Q   I show you Bates 862 which appears to show a Motor Vehicle Title Reassignment of this car's title from Karma Palm Beach to OTM Vehicle Consulting, Inc. on November 3rd, '21.

Do you have any reason to believe that that is not an inaccurate document?

A   I don't know.

Q   I show you what has been identified as Bates 886 which appears to be a Karma Palm Beach sales document which would appear to show the sale of the vehicle -- and by "the vehicle," I mean the Doge

Page 336

Viper -- to OTM Vehicle Consulting on November 3rd, 2021.

Do you see that?

A   I see it, but I don't know what it's mean.

Q   The next document 887 appears to show money being paid in the amount of $106,000. It doesn't say from whom or where it's going, but it appears to show incoming funds to some company for $160,000.

Do you see that?

A   I don't know. I mean, you show me numbers. I don't know.

Q   I'm not asking you to vouch for these.

What I'm going to ask you is: As the corporate representative of AWB, the same company that sold this vehicle to Excell, whether or not AWB has any information that would indicate that these documents are not accurate?

MR. MILLER:  Objection. The document speaks for itself. Calls for speculation.

THE WITNESS:  Which document are you talking about, Jerry?

BY MR. BRESLIN:

Q   What I'm talking about is the title transfer. These are the documents I'm talking about. I'm talking about the title that shows that Karma Palm Beach took

32 (Pages 333 - 336)

Page 337

title to this car on November 1st, 2021; that Karma Palm Beach reassigned the title to OTM Vehicle Consulting on November 3rd, 2021; that Karma Palm Beach sold this car to OTM on November 3rd, 2021; and that Karma Palm Beach received $106,000 for this car.

My question is: Does AWB have any information that any of these documents are not accurate?

MR. MILLER: Same objection.

MR. BRESLIN: I'm not calling for speculation.

MR. MILLER: Let me -- let me --

MR. BRESLIN: I'm asking for information.

MR. MILLER: We're not going to argue. That's not how this works. I can make my objection, but you don't have to shout. You know, keep your voice monotone. I'd appreciate it. Be professional.

And I'm just saying you started this off with saying he's here as the corporate representative for AWB. Why don't you ask him if these are AWB's records?

MR. BRESLIN: I asked him if AWB has any information whether or not these documents are inaccurate. There's nothing wrong with that question.

MR. MILLER: Yes. You're backloading it. You're presuming that they are accurate and that

Page 338

they're not AWB's records.

MR. BRESLIN: No, no. I'm asking him -- he represents AWB.

MR. MILLER: Are these AWB's records?

MR. BRESLIN: AWB sold this car a week after this transaction occurred.

MR. MILLER: No. Again, Jerry, you're assuming your records you got from Scott Zankl are accurate and you're challenging the witness who is not a representative of Excell or Karma Palm Beach or Karma Broward to challenge the voracity of a document that's not AWB's record. He's telling you he doesn't know.

MR. BRESLIN: I'm asking him if he has any information that would prove these documents false, and I'm entitled to ask that question because his company sold this car a week later.

MR. MILLER: I'm going to say if you want to make it easy, you give me a standing objection to the documents speaks for itself and calls for speculation on any non-AWB records, and I won't have to raise it. How about that?

MR. BRESLIN: I agree for the record.

MR. MILLER: You agree?

MR. BRESLIN: You have objected to every

Page 339

question on speculation grounds.

MR. MILLER: No, no. No, sir. No, sir. I haven't objected.

MR. BRESLIN: State your objection and whatever you want it to be, I agree to it.

MR. MILLER: You can conduct your deposition how you wish.

MR. BRESLIN: Thank you.

MR. MILLER: But typically you want to ask, Are these your records or not? Like you did with general jackets.

MR. BRESLIN: Thank you.

Is there anything else you want to make for your standing objection? Because I agree to your standing objection.

MR. MILLER: Yeah, we should probably take a five-minute break and you need to go feed your kitty cat.

MR. BRESLIN: All right. Let me just finish with this folder.

BY MR. BRESLIN:

Q   Mr. Farache, does AWB have any information that you're aware of that would tend to indicate that this automobile was, in fact, not sold by Karma Palm Beach to this buyer OTM Vehicle Consulting on

Page 340

November 13th, 2021?

A   I don't know. It's not my paperwork.

MR. BRESLIN: All right. Thank you. Let's take five minutes. We'll be back at 2:35.

THE WITNESS: Thank you.

(A break was taken.)

BY MR. BRESLIN:

Q   Mr. Farache, let me ask you. You said that the dealer, the license for AWB, the wholesale dealer license for AWB, is held in the name of a company and not by you personally.

Did I understand you correctly?

A   Best of my knowledge is the dealership is going by the AWB.

Q   Right.

But did you have to take any type of course or education or anything like that for AWB to get that license?

A   It's so many years ago. I don't remember. Whatever it take, we did it.

(FVP Exhibit B-019 was marked for Identification.)

BY MR. BRESLIN:

Q   Let's go to B-019.

A   That's a new one?

33 (Pages 337 - 340)

Page 341

Q   This is a new one.

A   I can write down just to follow through with you, no?  That's okay with you?

Q   Yeah, of course.

This is a green AWB dealer jacket.

Just for the record, you're aware, are you not, that all the deal jackets that were held by AWB had a green folder, correct?

A   Say again.  I'm sorry.

Q   The AWB deal jackets, they came in green folders, correct?

A   Yes.

Q   Now, what was the policy of AWB as far as what it would put into these deal jackets?  What was supposed to go in them?

A   That's a very kind of question -- you know, it's kind of -- you know, we are not -- we are not, you know, a big dealership.  So whatever we did, it's a small business.  You know, whatever we did, we tried to keep up our paperwork.

Q   Well, let me ask this:  If AWB had title to an automobile that it claimed it owned, would it keep a copy of that title?

A   Can you repeat yourself one more time.

Q   Yes.

Page 342

If AWB claimed that it owned an automobile -- so, in other words, if you had a deal jacket for a car that you believe AWB owned, would AWB keep a copy of the title to that vehicle?

A   Just a copy?

Q   Um-hmm.

A   If I owned the vehicle, I have the title.

Q   Right.  I understand that.

My question to you is:  These are your corporate records that are kept in these green folders, correct, for each car, right?

A   Go slow because I don't know where you're going with this question.

Q   Try not to think about where I'm going.  If you just think about my question, it will be real easy.

A   You tricked me a couple times, Jerry.  I got to watch you.

Q   Hey, I didn't try to trick you.

A   You tricked me yesterday.

Q   I'm asking you very easy questions.

A   And you called me names.

Q   My question to you is:  If you have a title, do you make a copy of it and do you put it in your deal jacket?

A   You trick me and call me names.

Page 343

Q   I didn't call you names.

A   You called me names and you tricked me.

Q   All right.  Come on.  We're going to be here all day.

Now, if AWB had a title, it made a copy and put it in the deal jacket, correct?  Can you agree on that if there was a title, there would be a copy of it in the deal jacket, right?

A   Or it's got to be in the safe.  We have a safe.  We put all the original titles inside the safe so nobody stealing it.

Q   Now, at what point would a record of that title be put into your business records?

A   I don't know.  Usually it's there.  That's what I'm a little bit confused.  I see you show me paperwork, and even if it's my deal jacket, you still missing, you know, communication, email communication between Mr. Zankl or Ms. Zankl and AWB and his team.  You know, we all communicate for the last nine and-a-half years.  So it's a lot of communication which you don't see it.

Q   So there is a lot of emails between your company and the Zankls and Excell, correct?  You, Michelle, AWB, Excell, and the car entities and the Zankls, correct?

Page 344

A   I mean, it's always an email.  You know, so every time you see a deal jacket, maybe Mrs. or Mr. Zankl call me say, Hey, Moshe, I just want to let you know I'm purchasing vehicle.  I have X, Y, Z vehicle Ferrari coming in and, you know, I probably -- do you have available a couple hundred thousand to buy a vehicle?

And I say, What do you think the deal can bring in?  And if it's a good deal, we buy it.  You know, that's our business.

Q   So are you telling me that there are many, many, many emails between you and the Zankls and their companies?

A   Not me.  I just get a copy of the email.  Maybe over a year, you see one thing I reply and I say yes or no.  But I'm not -- you know, we trying to keep up organization, you know, based on our relationship.  You know, we are -- you know, we doing business for nine and-a-half years.

Q   How many emails are we talking about per month would you think?

A   I don't know.  Jerry, you're asking me -- Mr. Breslin, you're asking me question like I'm computer savvy.

Q   But as far as you know, there's a lot of

34 (Pages 341 - 344)

Page 345

emails, right?

A   Not a lot.  I mean, it is what it is.  We're no talking about -- you know, we no say, Hey, what did you do this weekend?  We are straight business people.  It's no not friendship.  I'm not -- I'm not friend -- you know, the friendship is over.  After what I go through, it's no friendship.

Q   Okay.

A   But prior to that, I thought he's part of my family.  You know, I got hurt.

Q   All right.  Let's get back to these documents.
    I'm showing you Bates 897.  That's Exhibit B-019.  So is this a Mercedes G63, VIN 9244.
    MR. MILLER:  Jerry, what exhibit is this?
    MR. BRESLIN:  This is B-019.
    THE WITNESS:  Can you go back to the top please.
    MR. BRESLIN:  Yes.
    THE WITNESS:  I'm ready.

BY MR. BRESLIN:

Q   Now we're at page 897.  This is another wholesale order signed by Michelle Martin with no date, showing a sale to Excell for 97,100.
    Do you see that?

A   Say again.  I'm sorry.  Go back a little bit.

Page 346

Q   This appears to be a purchase order from your company to Excell.  You're selling the car to Excell.

A   Okay.

Q   And it's signed by Michelle Martin, correct?

A   Yes.

Q   And she signed this document at your request?

A   Can you repeat it please.

Q   Yeah.  There's an echo.
    Michelle Martin signed this document at your request, correct?

A   Yes.

Q   Now, the next document is what purports to be a sale -- excuse me -- an invoice from AWB to Excell Auto Group dated 9/20/21 for $97,000, correct?

A   One second.  Okay.

Q   So this appears to show that AWB sold this car to Excell Auto Group on September 20th, correct?

A   Yes.

Q   Now, the next document, Bates 899, appears to show that Excell Auto Group sold this car to Auto Wholesale of Boca on July 30th, 2021, correct?

A   Okay.

Q   That's again signed by Michelle Martin, right?

A   Yes.

Q   And she is signing on behalf of AWB and making

Page 347

certain representations, correct?

A   Yes.

Q   All right.  Now, the next thing we have here is an accounting record from your AWB that's Bates 900 showing that $95,000 was paid on 9/10/2021.  So, in other words, this check here at the bottom from Excell Auto Group to AWB for $95,000 was paid to AWB on September 10th for that car.

A   Okay.

Q   Correct?

A   That's what it shows, yes.

Q   All right.  Now, this document dated August 2nd, 2021 appears to show that Auto Wholesale of Boca is paying Excell Auto Group $95,000 for this car on August 2nd 2021, right?

A   Yes.
    MR. BRESLIN:  This will be B-019A.
    (FVP Exhibit B-019A was marked for Identification.)

BY MR. BRESLIN:

Q   Now, we have Exhibit B-019 and the first document appears to Bates 914 --
    THE COURT REPORTER:  That was B-019?
    MR. BRESLIN:  This is B-019A.
    THE COURT REPORTER:  Okay.

Page 348

BY MR. BRESLIN:

Q   This is B-019A which is a Certificate of Title, and registered owner, Mr. Ennis, is selling the car to Karma Palm Beach on August 31st, 2021.
    Page 2, Bates 915 is the back of that which appears to show Karma Palm Beach as the seller selling the car to a purchaser, Sarah Attichison Mileto, on August 31st, 2021.
    The next document is Bates 9775 which appears to be a Purchase Agreement between Karma Palm Beach and Sarah Mileto dated August 3rd, 2021, and that's selling the vehicle for $87,000 with a balance due of 68 on August 31st.
    The next appears to be -- the next document which is 979 appears to be a receipt for $10,000 as a down payment, and that is dated 9/1/2021, September 1st.
    The next document appears to be a check written to Karma Palm Beach for $10,000 on 8/31/2021.
    The next document appears to be a Dealertrack entry for $68,000 for the remaining balance on that vehicle.
    Going back up, these documents, the title documents, if accurate, would appear to show that this automobile, the 2013 Mercedes G3 VIN 9244, was sold to Karma Palm Beach on August 31st and then on the same day

35 (Pages 345 - 348)

Page 349

it was sold to Sarah Attichison Mileto.

Does AWB have any information that you're aware of that would indicate that, in fact, Karma Palm Beach did not purchase this car on August 31st, 2021 and sell it the same day?

A   I don't know.  You're asking me questions I don't know.

Q   That's a perfectly fine answer.  And so let's go back and let's take a look at the AWB records.

AWB appears to sell this car to Excell Auto Group on September 20th, which is 20 days after the buyer bought this car from Karma Palm Beach.

Can you explain that?

A   Say it again.  I'm sorry.

Q   Your papers, your records, show you sold this vehicle to Excell Auto Group on September 20th, when on September 20th some buyer had that car for at least two days.  Can you explain this business record that I'm looking at on my screen?

A   I can't explain to you, because the moment we receive an email and he say, This car is sold, this car is sold, but our invoice and sale agreement, that's where we doing it.

Q   But if Karma bought the car and Karma sold the car, what does Auto Wholesale of Boca and Excell have to

Page 350

do with it?

A   I don't know what to tell you because you show me a paper it's nothing to do with AWB.

Q   Well, I'm showing you the paperwork from AWB that says it sold this very same car 20 days after a purchaser had it.

MR. MILLER:  There is no question pending.  He wants to argue.  Let him ask a question.

THE WITNESS:  What's the question, Jerry?  I'm sorry.

BY MR. BRESLIN:

Q   The question is:  In fact, on September 20th, 2021, did Auto Wholesale of Boca sell this car to Excell Auto Group?

A   Based on the paperwork, yes.

Q   And on that date, on September 20th, 2021, did Auto Wholesale of Boca have title to the Mercedes G3 VIN 2944?

A   I don't know because you show me the paperwork what you cherrypick.  So I can't tell you what exactly happened with this jacket, because it can be an email -- the title is in the process.  It can be an email, we no receive the title yet.  So whenever you show me, I don't know the whole package and I can't answer to you with the wrong answer.

Page 351

Q   But you would agree that this deal jacket accurately reflects the AWB business records that were held in the normal course of business and supplied to us by your attorneys?  You would agree with that, would you not?

A   I'm not agree with you because I don't know where you're missing where the deal jacket.

Q   Okay.  One more?

A   That's a a new one now?

Q   We're going to do a new one.

A   Wait.  Let met write it down.

Q   That is a Porche --

MR. MILLER:  Did you say Exhibit B-020?

MR. BRESLIN:  That is B-021.  This is Bates 1019 through 1032.

MR. MILLER:  It's goes to 1032?

MR. BRESLIN:  Yes.  So here we go.  Exhibit B-021.

(FVP Exhibit B-021 was marked for Identification.)

THE WITNESS:  Can you go back for a second.

MR. BRESLIN:  Sure.

THE WITNESS:  Keep going please.

MR. BRESLIN:  Do you want me to talk about these pages as I just scroll through them or do you

Page 352

want me to wait until the end?

THE WITNESS:  You can ask me questions and then I'll go back.

BY MR. BRESLIN:

Q   So let's just back up a little bit.

The document, 1020, appears to show a transaction for an amount paid to Auto Wholesale of Boca for $100,000, correct?

A   Based on what you show me, yes.

Q   And then at the bottom of this we have what appears to be a check written from Excell Auto Group to Auto Wholesale of Boca for $100,000 dated 12/29/21, correct?

A   Yes.

Q   Now, do you know whether or not this money was actually ever paid?

A   Again, you know, don't forget if we're doing all of these checks, for book record also it can be a wire.  It can be a swap.  It always can be a different transaction of a deal jacket.  I don't know exactly what's happened in this particular one.

Q   So if there's a swap, there's a check issued?

A   Always check issued.  Check issued for bookkeeping record no matter what.  It's always a check issued.

36 (Pages 349 - 352)

Page 353

Q   All right.  So if there a swap, you show it as a cash transaction?

A   I don't know how we show it, but it's still a transaction.

Q   I understand.

But a swap is you swap one car for another car, right?

A   Yes.

Or sometimes you have -- excuse me.

Sometimes we swap three cars against two or one car against three.  It's all depends what is available out there.

Q   So as you sit here today, you don't know if this money was ever paid or not, right?

A   I can't tell you, but I can tell you one thing.  Those checks is also for bookkeeping records to show it's a deal jacket, it's a bookkeeping, and it can be a swap, it can be a wire transaction, or it can be a deposit of the check.

Q   Okay.  Let's go to 1020, and this is another undated order where this car is being sold to Excell Auto Group for $102,000.  Do you see that?

A   Yes.

Q   And Michelle Martin signed that?

A   Yes.

Page 354

Q   Did she sign that at your direction?

A   Yes.

Q   No odometer statement again?

A   Maybe the vehicle is in transit.

Q   Okay.

A   So we don't receive the vehicle, so you can't just put whatever you want.  You got to make sure you see it.

Q   Now, in the next set we have an invoice again, and this is dated 12/29/21 where Auto Wholesale of Boca is selling this vehicle to Excell Auto Group, correct?

A   Yes.

Q   For $102,000, correct?

A   It's more money than 102 over of there.

Q   I'm sorry.  It's 102,200.

A   Yes.

Q   Now, the next document at Bates 1023 shows that Excell Auto Group sold this car to Auto Wholesale of Boca on October 14th, 2021.

A   Say it again.  I'm sorry.

Q   Well, if you look at the page, it says -- this document would seem to say that Excell Auto Group sold this vehicle to AWB on October 14th, 2021, right?

A   Wait.  Say it one more time.  I'm sorry.

Q   Let's take a look at this screen.

Page 355

What does that document say?

A   Basically we see Excell Auto Group sold to AWB the Porche.

Q   Exactly.  What date?

A   The date is 10/14/2021.

Q   Is this an accurate statement?  Did AWB, in fact, buy this car on that date from Excell Auto Group?

A   Based on what I see on the screen, yes.

Q   And Michelle Martin signed this document, didn't she?

A   Yes.

Q   And she signed it again on the bottom and dated it 10/15/2021, right?

A   Yes.

Q   Now we go down to a title, and the next thing it shows Auto Wholesale of Boca paying to Excell $100,000 on 10/18/2021.  Is that accurate?

A   Based on what you show me, yes.

Q   But as you sit here, you don't know if that payment was ever made, if a check was -- if this was deposited.  You don't know.  Correct?

A   I can't tell you based on what you show me.

Because always remember, he can be also to the point when we go and I did the wire from the bank and then I would bring it back to my office.  Or if we did a

Page 356

swap or if we did something in terms of payment, you know, you always -- you know, it's based on the relationship in every deal jacket.

Q   Now, was it AWB's practice when it kept a copy of a title like the one we're seeing here in the deal jacket --

A   Wait.  Can you start from the beginning.

Q   Yes.

Was it AWB's practice when it actually had a title like this one here, that it kept copies of both sides of the title to show all the transactions?

A   It should be there, because I look in my -- you know, I'm looking and they exist all the cars AWB own and I see everything.  That's why I'm a little bit confused here.  It's like somebody cherrypicked what you want to show us.

Q   So are you saying that this is not the deal jacket that we were provided?

A   No, no, I'm not saying anything.  But it's looks like, like I say to you, it's always an email attached to it.  It's Mr. Zankl call me and say to me, Moshe, I want to buy two cars today.  Do you have money available?  Do you be available to go to the bank to do swap, to do wires?

You know, he always call me, Good morning, how

37 (Pages 353 - 356)

Page 357

are you? We have a relationship. It's nine and-a-half years of relationship, hundred and hundred deal jackets going back and forth.

So just remember, the problem start after 50 -- wait. Nine, ten years. It's 600 months. So the problem start after 594 months. I don't know. I mean, it's a long-term relationship. So we all kind of just did the business.

MR. MILLER: Jerry, I'm not trying to cut you off. I just want to ask the client if he would like some coffee please.

MR. BRESLIN: Yeah. Let me go through one more document and we'll take ten minutes and we're going to go to a whole new area.

MR. MILLER: All right.

MR. BRESLIN: So now we're going to look at B-021A, and this is Bates 1034.

THE WITNESS: I'm sorry. Go ahead. I'm sorry, Jerry. I'm with you now.

MR. BRESLIN: Okay. This is Bates B-021A and this is Bates 1034, 1035, 1036, 1041, 1087, and 1088, 1089. So we have those Bates numbers for this document.

(FVP Exhibit B-021A was marked for Identification.)

Page 358

BY MR. BRESLIN:

Q   Let me scroll through this for you.

So this is the same. This appears to be the same title that you have a copy of in your deal jacket, correct?

A   Based on what you show me.

Q   Okay. Now, if we look at the back at this --

A   Go slow.

Q   -- it appears to show that Karma Palm Beach purchased this vehicle.

A   I don't know.

Q   Well, okay. I'm not asking you -- so you don't know what this means on the back of it, correct?

A   I mean, keep scrolling. I don't know who bought it.

Q   This document, 1041, that's a Motor Vehicle Title Reassignment Supplement, what does that document mean?

A   I think it's like somebody reassigned the title.

Q   Okay. So would this appear to be from your experience that Karma Palm Beach is assigning the title to this vehicle to Murry Bartholome on December 13th, 2021, correct?

A   I don't know.

Page 359

Q   But from your experience in the industry, is that what this appears to be?

MR. MILLER: Objection. He's corporate representative not being asked as any other reason.

MR. BRESLIN: You can answer if you know the answer.

THE WITNESS: I don't know.

BY MR. BRESLIN:

Q   All right. 1087 appears to be a Purchase Agreement between Karma Palm Beach and Mr. Bartholome on 12/13/2021 where he is purchasing this vehicle, the Porche 9039, for $112,000.

You're familiar with the Karma Palm Beach Purchase Agreements, correct?

A   No.

Q   Now, the next document, 1089, appears to be a wire transfer of $47,000 to an account. It doesn't indicate the account. It doesn't identify it other than 6603. Do you see that?

A   I see it, but I don't know what this means.

Q   You don't know which company had an account ending in 6603?

A   I don't know.

Q   So my question to you is: If that car was sold to Mr. Bartholome on December 18th, how is it Auto

Page 360

Wholesale of Boca sold the car to Excell on December 29th, 2021?

A   I mean, you show me something I don't know. I mean, if we bought it and we sold it, good for all of us. We all make a couple dollars and we keep going.

Q   Okay.

A   It's just another deal. We don't looking at this -- you're looking at it to find something wrong.

Q   Well, no.

I just don't understand if Mr. Bartholome owned this vehicle on December 18th, how is it that Auto Wholesale of Boca sold the car on December 29th.

Can you explain that to me?

A   Because we got to wait until Excell receive all payment, close the deal jacket, then he closed the deal with us. Don't forget it. We are a wholesaler. So it's always waiting till he do the transaction, then he come back to us. Even if we had the title, he still can give to the new owner temporary tag. And as soon as it pass, he receive the title and then he send it to the Motor Vehicle.

Q   Would you agree that the -- now I'm looking at your records, your business records.

Would you agree that the AWB business records show nothing to do with Karma Palm Beach in this

38 (Pages 357 - 360)

Page 361

vehicle? Karma Palm Beach is not mentioned in this deal jacket. Would you agree with that?

A    I can't tell you anything because I don't know how he did the deal, his transaction on the other side. I have no clue.

MR. BRESLIN: All right. Thank you very much. It's 3:14. Let's start this back up at 3:30 and we're going to go to a whole new area.

(A break was taken.)

MR. BRESLIN: All right. Back on the record.

BY MR. BRESLIN:

Q    Mr. Farache, so from the documents that we talked about yesterday and this morning, you were owed over $5 million from Excell Auto Group, correct?

A    I can't tell you exactly what amount because I have a lot of vehicle in my storage. So I got to sell them and then I got offsite with what --

Q    Okay. Listen to my question very carefully.

What I'm talking to you about is the beginning of 2022. I'm not talking about today. We're going back to the beginning of 2022. Let's talk about January of 2022. Okay? Can you put your mind there for these questions?

A    You're talking about last year, January?

Q    Yes.

Page 362

A    Okay.

Q    In January of 2022, you were owed over $5 million by Excell Auto Group, correct?

A    When you say over $5 million, you know, I own cars over $5 million. It's $5 million-and-one. $5,000,999? You know, you're very vague again.

Q    Okay. Well, let me put it to you this way:

You had a Promissory Note that was signed, an Amended and Restated Promissory Note that was signed in November of 2021 for $2 and-a-half million, correct?

A    Yes.

Q    And as part of that Promissory Note, you had a a security interest in certain inventory and assets, correct?

A    I got to look at it. You tell me stop. I need to see it.

Q    But the papers you signed where the Zankls told you that they agreed to pay you $2 and-a-half million, there was a document associated with those that's called a Security Agreement, which allows you, if they don't pay you, to take, you know, assets of the company. You were aware of that, correct?

A    I don't know what you mean.

Q    Okay. So in November of 2021, there was one document that indicated that Excell Auto Group owed you

Page 363

$2 and-a-half million, right?

A    I don't know which document you're talking about.

Q    All right. Let me share the screen with you.

A    Okay. Thank you.

Q    All right. So on November 11th, 2021, there is an Amended and Restated Promissory Note that shows $2 and-a-half million, correct?

A    One second. That's November 11th.

MR. MILLER: When you say "you," Jerry, are you referring to Auto Wholesale of Boca?

MR. BRESLIN: Yes.

THE WITNESS: That's my next question. When you say, you know, everything is Auto Wholesale of Boca, and I want to make sure we put that in the record.

MR. BRESLIN: Absolutely. Agreed. The only time we talked about you personally was with the MMS document.

BY MR. BRESLIN:

Q    So you will agree that there was this Promissory Note for $2 and-a-half million between AWB and Excell, correct, dated November 11th?

A    Yes.

Q    You would agree that there was a second one

Page 364

for $2,664,450 dated the same date as between Auto Wholesale of Boca and Excell, correct?

A    One second. I'm just writing it down. It's a lot of numbers.

Q    Well, my point is: You were owed money in January of 2022, a lot of money?

And when I say "you," I mean Auto Wholesale of Boca.

A    Say it again. I'm sorry.

Q    Auto Wholesale of Boca was owed a lot of money by Excell Auto Group in January of 2022, correct?

A    Yes. But we own a lot of vehicle. So you always got to look at it ...

Q    Now, so there were these Promissory Notes.

Did that come a time when you became concerned that you might not be able to collect your money?

A    In January?

Q    Yes.

A    No.

Q    When did you first become aware of FVP and the FVP loan?

A    Basically Mr. Zankl sent to us an email, the Google ad. You know, it's basically in the news.

Q    Was that your answer?

A    I answered you.

39 (Pages 361 - 364)

Page 365

Q   When, as far as like a month or a time period, did you first become aware that Scott Zankl and his companies were attempting to borrow money from FVP?

A   Somewhere around 2021.  Sometime in '21.

Q   Do you remember when in 2021?

A   Toward the end of the year.

Q   I'm sorry.  I just want to -- give me one second here.  I'm sorry.

How did you first learn about the transaction?  What was said to you?

A   Basically they ask me for permission to get -- you know, I know he told me he's trying to apply to get a loan to purchase new vehicle for Karma, the electric automobile, in Broward County and Palm Beach.

Q   So that was a conversation that you had with Scott Zankl?

A   Yes.

Q   And in that conversation, did he tell you how much he was seeking to borrow?

A   No.

Q   Did he tell you in that conversation or any later conversations that he would need something from you?

A   No.

(FVP Exhibit D-09 was marked for

Page 366

Identification.)

BY MR. BRESLIN:

Q   Let me show you a document.  Let me share my screen.  All right.  I show you a document that's Exhibit D-09, Bates 4150 and 4151, and this purports to be a UCC filing for Karma of Palm Beach company.

Do you see that document?  Are you familiar with that document?

A   A little bit.

Q   Do you know what it is, what it means?

A   It's a UCC.

Q   What does that mean to you?

A   Just extra security for my investment.

Q   So did you understand that to mean that that would give you some rights to the Karma Palm Beach assets?

A   Yes.

Q   And that document, was that filed with your permission?

A   Yes.

Q   And we see here that this document was filed on July 13th, 2021, correct?

A   That's what we show, yes.

Q   Now, did there come a time when you decided that you wanted to terminate your UCC on the Karma Palm

Page 367

Beach company?

A   Yes.

Q   When was that?

A   I don't remember exactly.

Q   All right.  Why did you do that?

A   Because Mr. Zankl explained to me if he cannot buy those electric cars, he can't be in Karma business in Broward County.

And I say to him, So what do you need from me?

So he said, You have UCC in Karma and you need to remove it.  If not, you basically interfere with my Karma business.  I need to buy those electric cars, and I need to get my line of credit to get them.

So I say, No problem.  Let me just make sure everything is legit, and if it's any problem, I'm going to move it.

Q   Now, the financing that he was seeking for the Karma companies, was that with FVP?

A   I don't know.

Q   All right.  What you do know is that Mr. Zankl came to you and he said that I want you to terminate your UCC filings in the Karma entities so he could get financing for the Karma companies, Karma Palm Beach Karma Broward, correct?

A   Can you repeat yourself.

Page 368

Q   Yes.

Mr. Zankl asked that you terminate your UCC filing so he could get financing for the Karma companies, Karma Palm Beach and Karma Broward, correct?

A   I don't know.  But he explained to me and he explained to me also, you know, you're dealing with Excell, and as a dealership you have nothing to worry about UCC.  Because you purchase a vehicle and that's how you secure yourself.  Every vehicle, you purchase it.

Q   So do you recall when you agreed to terminate your UCC filing in Karma?

A   Say again.  I'm sorry.

Q   Do you recall when you terminated your UCC filing in the Karma companies?

A   I don't understand you.

Q   Did there come a time when you told your lawyer to terminate the UCC filing in Karma of Palm Beach?

MR. MILLER:  Objection.  Calls for attorney/client privilege.

Every communication you have with your lawyer is privileged.

If you want to ask a different question, Mr. Breslin, that's fine, but he's not going to answer

40 (Pages 365 - 368)

Page 369

that question.

BY MR. BRESLIN:

Q    Did there come a time when you instructed anybody to terminate the UCC filed with Karma Palm Beach?

MR. MILLER:  Objection.

To the extent that you were communicating with you attorney, I instruct you not to answer the question.  Anyone other than your attorney, you can answer the question.

MR. BRESLIN:  Do you refuse to answer the question?

THE WITNESS:  I don't remember.

(FVP Exhibit D-010 was marked for Identification.)

BY MR. BRESLIN:

Q    All right.  Take a look at the screen.  I show you what's marked as Exhibit D-010, and that's Bates 4152.  This purports to be a UCC termination filed November 11th, 2021.  Do you see that document?

A    Yes.

Q    Do you know what that document means?

A    It's showing a file 2021 November 11, 4:46.

Q    And do you see what it says here?  It says "termination" with a check mark here?

Page 370

A    Yes.

MR. MILLER:  Jerry, which exhibit is this?

MR. BRESLIN:  D-010.

MR. MILLER:  What was the earlier one?

MR. BRESLIN:  The filing, UCC filing was D-09, Bates 4150, July 13th, 2021.  The termination, D-010, Bates stamped 4152.

BY MR. BRESLIN:

Q    So I'm showing you a document that was filed of the public record terminating AWB's security interests in the Karma Palm Beach assets filed November 11th, 2021.  Were you aware that it was filed on that date?

A    Say it again.

Q    Were you aware that this document was filed in the public record in November of 2021?

A    If I'm aware of it?

Q    Were you aware of it?

A    I don't remember.

Q    Was this done without your knowledge?

A    Probably not.

Q    Were you aware in November of 2021 that this document released any security interest that you had in any property owned by Karma Palm Beach?

A    I don't know how you're looking at it, but we

Page 371

always have bill of sale of vehicle.  So every deal jacket, it's one transaction.

Q    I'm asking you about this UCC filing, sir.

A    We still have security in vehicles.

Q    I'm not asking you about security in vehicles.  What I'm asking you is what you recall about the filing of this termination document in November of 2021.

A    I tried to understand your question.  You got to ask a different one.

Q    Did you have this document filed because you were requested to do it by Scott Zankl?

A    I don't remember exactly what go to this.

Q    Do you recall whether or not you were aware of this FVP financing or potential financing in November when you filed this document?

A    I know about -- he told me about some opportunity.  He's dealing with some banks to borrow money to purchase new vehicle for Karma Broward.  And he say to me he filled the application.  He doesn't know if it's going to go through.  He's just planning.

And I said, Good luck.  I hope you get it.

Q    And so you're saying that this document was filed to assist Mr. Zankl in getting financing for Karma Palm Beach and Karma Broward, correct?

A    I don't assist them to do any finance.  You

Page 372

know, I'm not going to give him something that's not in my hand.

Q    Well, you did, in fact, have this document filed at your direction, correct?

A    Say again.  I'm sorry.

Q    You had to this UCC termination filed at your direction, correct?

MR. MILLER:  Objection.

What do you mean by information?

MR. BRESLIN:  I didn't say information.

BY MR. BRESLIN:

Q    You directed that this termination be filed, correct?

A    Say it again.  I'm sorry, Jerry.

Q    Okay.  If you look at the screen, there's a UCC termination, right?

A    Yes.

Q    This document was filed on behalf of AWB at AWB's direction, correct?

A    Yes.

Q    So when Mr. Gherman filed this thing, he didn't just file it on his own.  He filed it because he was directed to do so.  Correct?

MR. MILLER:  Objection to the extent it calls for attorney/client privilege.  Any communications

41 (Pages 369 - 372)

Page 373

with Mr. Gherman are privileged.

MR. BRESLIN: You can answer.

MR. MILLER: Well, if it calls for attorney/client privilege, you're not to answer.

MR. BRESLIN: Are you refusing to answer?

MR. MILLER: If you're asking him about his communications with counsel --

MR. BRESLIN: I'm not talking to you. I'm asking the witness.

MR. MILLER: I'm his attorney and I'm instructing him not to answer the question if it's --

MR. BRESLIN: Are you going to follow your attorney's instruction and not answer that question, Mr. Farache?

MR. MILLER: Your question was did he direct his counsel to do something. That is privileged.

MR. BRESLIN: There's a public record with Mr. German's name on it.

MR. MILLER: Okay.

MR. BRESLIN: And I'm asking him if he directed this document to be filed in the public record or if this document was filed without his knowledge.

MR. MILLER: You can ask him if he authorized

Page 374

it.

BY MR. BRESLIN:

Q Did you authorize this document?

A Yes.

Q Why?

A I don't know. The Promissory Note. We have a lot of stuff we secure ourself in the same line.

MR. MILLER: I haven't heard a question.

BY MR. BRESLIN:

Q Did you understand that when this document was filed, that there were no longer any security interests in the Karma Palm Beach assets?

MR. MILLER: Objection. Calls for a legal conclusion.

MR. BRESLIN: You can answer.

THE WITNESS: I don't know.

BY MR. BRESLIN:

Q Did there come a time when you had any conversations with anyone regarding the FVP loan?

A Can you repeat yourself.

Q Yes.

Did there come a time when you had any conversations with anyone regarding the FVP loan to the Karma entities?

A I don't know. You know, you ask me questions

Page 375

if I -- I don't talk to anybody.

(FVP Exhibit D-01 was marked for Identification.)

BY MR. BRESLIN:

Q I show you what's been marked as Exhibit D-01.

MR. MILLER: Is that D as in "dog"?

MR. BRESLIN: D as in "dog".

MR. MILLER: So was this last one D as in "dog" 10?

MR. BRESLIN: The last one is D as in "dog" 10.

And this is D-01 and it's number 4001.

BY MR. BRESLIN:

Q I have in front of me and on the screen a document that is addressed to FVP Servicing, LLC from 1001 Clint Moore, LLC and with a date left blank, but it says, "January of 2022."

Have you ever seen this document before?

A I think so, but I'm not sure. Because we go to a lot of documents, so I'm not sure.

Q So this was a document from January of 2022 that was requested from the landlord company, your wife's company, 1001 Clint Moore, LLC, from FVP as part of their due diligence.

Does that refresh your memory?

Page 376

A Can you repeat the question.

Q Yes.

Do you remember a letter being requested from your wife's landlord company addressed to FVP as part of their due diligence to loan money to Scott Zankl and his companies?

A I don't know about the diligent and all of this stuff. I know about this letter, but I don't know about any of the diligent.

Q Tell me what you know about this letter.

A Just basically what you see over there. If you read it to me, I can explain to you. I try.

Q Okay. Were you aware of this letter at the time it was signed?

A Read it to me and I can tell you exactly. Because I know it's a couple letters going back and forth, so I want to make sure it's the right one.

Q Now, are you telling me that there was more than one letter going back and forth between FVP and your wife's company as the landlord?

A They try to make us sign some papers. We no agree to it.

Q Who did? FVP?

A FVP.

Q So you're telling me that FVP attempted to

42 (Pages 373 - 376)

Page 377

have you sign some documents and you refused to sign them?

A   Hundred percent. If it's wrong, why I going to sign it?

Q   Well, can you tell me about that. Tell me what happened and when it happened.

A   It's just the wrong paper, and we no agree to it, so we don't sign it.

Q   Okay. But tell me -- you know, I have no clue what you're talking about. Tell me what happened.

A   I can't tell you. Mr. Breslin, if you show me the paperwork and you read it to me, I'm going to do my best.

Q   And, Mr. Farache, I will show you this paper and I will read it to you. But before I do that, tell me about the other documents that you refused to sign.

A   I don't remember. And if we refuse to sign it, it's mean it's something that doesn't make sense.

Q   Now, did you receive those papers from a lawyer that represented FVP?

A   I don't remember how we receive it.

Q   Does the name Joel Weigert sound familiar to you? Joel?

A   He never no spoke to me, but it sounds familiar.

Page 378

Q   So are you telling me that you may have received documents from Mr. Weigert back when Scott was trying to get his loan?

A   No, I think we receive it from Scott.

Q   So you're saying that Scott sent you documents that he wanted you to sign but you didn't sign them?

A   If it's wrong, why we are going to sign them?

Q   Is the answer to my question that you were given documents that you refused to sign? Is that accurate?

A   You got to show me the document. If you show me, I'm going to tell you yes or no.

Q   Mr. Farache, you're telling me about documents that I don't have. Okay. I'm trying to find out what you're talking about. So you said that you were shown documents and that you refused to sign them because, in your words, Why would I sign something that's wrong? So what I'm trying to find out is what those documents were and who presented them to you. Can you answer that question for me please?

A   I don't remember, but I know it's documents going back and forth and we don't agree to some stuff with the documents, so we don't going to sign it.

Q   And when you say "we," was that you and your wife?

Page 379

A   I'm not sure. I think myself, we no agree to something and we say, What the hell?

Q   Now, how did those documents come to you? Was that by email?

A   I'm not sure. Maybe Scott Zankl hand it to us. I don't know. I don't remember exactly.

Q   And as you sit here today, you can't recall what those documents said or what they were about?

A   I don't -- I can't tell you on the top of my head.

Q   And on how many times did that happen?

A   I can't tell you that.

Q   What you're telling me is that documents were presented to you -- and when I say "you," I assume it was AWB -- and that AWB was asked to sign some things and that AWB refused to sign those things, and you can't tell me what those documents said, what they asked of AWB or why AWB refused. Is that accurate?

A   Can you repeat yourself please.

Q   No. I think you understood my question perfectly.

A   No.

MR. MILLER: Objection. He asked for clarification. Just give him clarification, Mr. Breslin.

Page 380

BY MR. BRESLIN:

Q   Do you know when these documents came to you?

A   This one in January 2022?

Q   Well, that's the landlord letter. We're going to get to that in a moment. I'm talking about the other documents.

A   The other documents I'm not sure.

Q   So you don't know when those documents were presented to you. Is that correct?

A   I don't remember exactly.

Q   And you don't know what they said?

A   Not exactly.

Q   And you don't know why you refused to sign them?

A   Something is wrong.

Q   So you were asked to do something that -- the company was asked to do something that you didn't agree with and that you therefore refused to sign some documents, correct?

A   Say it again. I'm sorry.

Q   Right.

Your company, AWB, was asked to sign some documents and you refused to sign those documents?

A   Nothing to do with AWB, those documents.

Q   All right. So I must have misunderstood.

43 (Pages 377 - 380)

Page 381

What are you talking about?

A   I want to put it in the record and I want to let you know.  Those documents, it's nothing to do with AWB.

Q   Which documents?

A   What you just showed me.  It's nothing.

Q   The document that's on the screen?

A   Yes.  It's nothing to do with --

Q   Well, all right.  I'm very well aware that that's with your wife's landlord company, but that's not what I'm asking you about.

I'm asking you about documents that you said you were presented with that you refused to sign.

A   I don't think it's anything to do with AWB.  It's with the building, the rent or the lease or something like that.  I explained to you from before, it's nothing to do with AWB.  AWB got nothing to do with FVP.  I explained that to you.  I apologize, but you maybe understand it wrong.

Q   Right.

Well, I understood you to say that documents were presented to you -- and when I say "you," I mean AWB -- that you refused to sign.  So I assumed what you were talking about was the loan.

A   No.

Page 382

Q   It has nothing to do with the loan?

A   Nothing to do with the loan.  I'm talking about 1001, they represent to us paperwork.  And, you know, my wife own the building.  I have nothing to do with that.  My name is there, and I'm not sure exactly what's the reason we say we cannot sign this paperwork.

Q   Now, the documents that's on your screen which is 4001 and 4002, did you have any conversations with your wife about this document?

A   I mean, we talk about it.

Q   Do you have any own ownership interest in 1001 Clint More, LLC?

A   No.  My wife own the corporation.

Q   But you were aware of this letter at the time when your wife and her company finally elected to sign some version of it, correct?

A   No.  I mean, you show me a letter.  You know, it can be an attachment on a different letter.  You know, you got to really -- you know, if I have my original document, I can compare it and I ask you to read it to me please so, you know, this way I a little bit understand.

Q   All right.  And I'm going to read this to you right now.  Before I do that, my question to you is:  At the time this was presented to your wife, you were aware

Page 383

that FVP was requesting your wife and her companies to sign this letter, correct?

A   No.

Q   You were not aware of it?

A   No.

Q   Did you and your wife discuss the contents of this letter back in January of 2022?

A   No.

Q   So in January of 2022, you had no idea what your wife agreed to in this letter?

A   I still don't understand this letter.  I asked you to read it to me please so this way I'm trying to understand it.

Q   Well, if you say that you were not aware of what was in it at the time, is there some reason that I need to read it to you?

A   It's up to you.

Q   Okay.  So I repeat my question, and just so the record is very clear, what you're saying is that in January 2022 when your wife was given this letter to sign on behalf of her company, the landlord, also your landlord, that talked about Karma entities' inventory, no one brought this letter to your attention?

A   I don't know.

Q   So what you're saying then is your wife talked

Page 384

to you about a letter that she refused to sign, but she never talked to you about the letter that she, in fact, did sign?

A   I don't know.

Q   In January of 2022, were you aware of any inventory that the Karma entities had at 1001 Clint Moore?

A   No.

Q   So as far as you know, in January of 2022, Karma Palm Beach or Karma Broward had no inventory for automobiles at the 1001 Clint Moore location?

A   I can't tell you that because I got to look in my inventory report and I can answer you that.

Q   All right.  But, you know, this was just a month or two before this whole thing blew up.

So are you telling me that you don't know as you sit here today whether or not you were aware that the Karma companies had any inventory on those lots in January?

A   Can you repeat it one more time.

Q   Did the Karma companies have any cars that they owned on the lot at 1001 Clint Moore in January of 2022?

A   The only things I know is about my own vehicle.  Whatever is not mine in my inventory, it's not

44 (Pages 381 - 384)

Page 385

my business.

Q   Okay.  Now, how about in February of 2022?  Were you aware that the Karma companies had inventory there?

A   The only things I know it's my own inventory.  Anybody else, it's not my business.  It's Mr. Zankl's business.  Him and his wife run the business.  You know, it's not my business.  I have nothing to do with something that's not belongs to AWB.  AWB, any car it own, that's what I care about.  I'm here for AWB.

I'm not here to represent Karma.  I'm not here to represent Excell.  I'm not here to represent anybody that's not AWB.  And you asked me about vehicles, it's nothing to do with AWB.  You know, it's nothing to do with us.

Q   Okay.  And so I'm asking you, are you aware that in January or February or March of 2022 that Karma Palm Beach or Karma Broward had any cars whatsoever located at the 1001 Clint Moore location?

A   Can you repeat it please.

Q   Yes.

Are you aware whether or not Karma Palm Beach or Karma Broward had any cars in inventory at 1001 Clint Moore in January or February or March of 2022?

MR. MILLER:  Objection.  Asked and answered.

Page 386

MR. BRESLIN:  Answered?

THE WITNESS:  Say again.  I'm sorry.

MR. BRESLIN:  I'm glad we had a little comic relief.

THE WITNESS:  Can you repeat yourself please.

BY MR. BRESLIN:

Q   I'm trying to find out if Karma has any inventory at this location that you're aware of.

A   The only things I pay attention is my own inventory.

Q   Sir, I know that you say that.  I know you're only paying attention to your own inventory.  But it seems to me that if you're a businessman and this company Excell owes you millions and millions and millions of dollars and you're doing transactions with Excell and you know that Karma Palm Beach is doing transactions, that it might occur to you to ask whether or not some of the cars you're seeing on the lot might be owned by another company.

A   What's make it different if I ask?  You know, behind the scene, whatever paperwork they have, it's nothing to do with me.

Q   Okay.

A   You asked me questions and I repeat it and I tell you that again.  The only thing I'm here for and

Page 387

the only thing when I work to the store, I only care about all the vehicle owned by AWB.  That's what I care.  You asked me about Karma.  I can tell you one thing.  It's very simple.  I care about AWB.

Q   You went to the 1001 Clint Moore Avenue address almost every day, right?

A   No.

Q   How often did you go there?

A   Depends.

Q   Every other day?

A   No.

Q   Once a week?

A   I can't tell you.  Sometimes I don't go for three weeks.  I might not go for a month.

Q   Go ahead.

A   Don't forgot, I'm working all over the country, so I leave sometimes for a month.

Q   All right.  So what you're telling me is that you don't know how many cars were at this location that were not AWB inventory?

A   I can't tell you that, because sometimes if not I'm busy somewhere else, I pay more attention.  But AWB inventory, that's what I'm there for.  I'm not there to check anybody else inventory.

Q   Well, if a new car came in, weren't you

Page 388

curious as to whether or not it was a Karma or an Excell car?

A   Doesn't mean nothing to me.  Jerry, I'm driving a car that's got 175,000 miles.  Do you think about those cars?

Q   So my question to you is:  You did not make it your business to review the new cars and the new purchases that came in to the address at 1001 Clint Moore Avenue.  Is that correct?

A   You got to be more specific.

If AWB purchased the vehicle, sure.  Every time you purchase a vehicle, between me and Michelle, we always go and check to make sure before we purchase it, the vehicle is there, the title is there and it's some exception.

Exception it's mean I pay for the car, the title is in a way -- as much as we protect ourselves, look what's happened to us with Road Rich.  Look what's happened to us with Frank Evans.  Mr. Zankl sold it.  We get the loss.

You know, we're dealing with the fraudster.  You know, yesterday you called me a fraudster, but the real fraudster is --

Q   No, you know that's not true.  I never said that.

45 (Pages 385 - 388)

Page 389

MR. MILLER: Mr. Breslin, let him finish. Don't cut him off.

MR. BRESLIN: Yeah, that's a false accusation.

MR. MILLER: No, it's true. You did say that.

MR. BRESLIN: No, it's not true.

THE WITNESS: That's okay.

MR. BRESLIN: How dare you?

MR. MILLER: Well, how dare you? You're the one that's using the hyperbole in the depositions.

THE WITNESS: You know, I mean, that's okay. I'm not the fraudster.

MR. BRESLIN: So if I call a document fraudulent, that somehow is inferring that Mr. Farache is a fraudster?

MR. MILLER: I would very much think that's exactly what it is.

THE WITNESS: If I own the corporation and you call the document fraudster, it's mean I'm a fraudster.

BY MR. BRESLIN:

Q   All right. Let's get back to the issue at hand. We're talking about the number of cars that were on the Karma Palm Beach lot in February of 2022 and March of 2022.

Your testimony is you don't know how many cars

Page 390

were on that lot that were owned by Karma. Is that correct?

A   Mr. Breslin, I repeat myself. I'm there for AWB, and if it's any problem with the building, I'm basically the maintenance guy. I'm the guy that clean the building. I'm the guy that makes sure the roof is working. I'm the guy that makes sure the AC is working. If any problem with the building, they call me, I help them. I clean outside for them.

You know, I'm just a normal guy. I'm not the fraudster. Even if you think I'm the fraudster and you mention it, you see I paid for vehicle and I return them because somebody fraud me and I lost millions and millions of dollars because of them.

MR. BRESLIN: Ms. Court Reporter, please bookmark the last three minutes of this transcript.

MR. MILLER: You should bookmark four minutes because you talk a lot, Jerry.

MR. BRESLIN: Make sure you include that statement.

BY MR. BRESLIN:

Q   Do you know how many -- so just so we're clear on the record, you don't know how many cars Karma Palm Beach had in its inventory in January or February or March of 2022, correct?

Page 391

MR. MILLER: Objection. Asked and answered. Go ahead, Mr. Farache. Take another shot at it.

THE WITNESS: No.

BY MR. BRESLIN:

Q   Can you estimate how many cars were on that lot that were not AWB cars?

MR. MILLER: Objection. Calls for speculation.

THE WITNESS: No.

MR. BRESLIN: You can answer.

THE WITNESS: No.

BY MR. BRESLIN:

Q   After your wife signed the letter that's on the screen that's 4001 and 4002, is it your testimony that she never brought it to your attention and that you never saw this letter back in January of 2022?

A   Like I say to you, we talk about it and I said, Just make sure we're doing everything right because this is your building and you got to protect your asset.

Q   So my question to you is: Did you actually see this document? Did you ever take a look at it back then?

A   If you want to memorize me, you can read it to

Page 392

me and I tell you where I am with that.

Q   No. I'm just asking you if you ever were made aware of the contents of the letter back then? Not now. Back then.

A   Jerry, sometimes I'm working 48 hours straight on the job site, so I don't even pay attention. I just come home, take a shower, go to sleep. The next morning, five, six hours, I'm out to work. You know, I'm not that kind of guy, luxury guy just hanging out. I'm a working guy.

Q   Now, when did you first decide -- well, strike that.

MR. BRESLIN: It's 4:20. Lets take five minutes. We'll come back at 4:25.

THE WITNESS: Thank you.

(A break was taken and the proceedings were continued in Volume III.)

46 (Pages 389 - 392)

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).




DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019. PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 393

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION
CASE NO.22-15627-EPK

In Re:

AUTO WHOLESALE OF BOCA, LLC,

        Debtor,
_____/

FVP OPPORTUNITY FUND II, LP, a
Delaware limited partnership; FVP
INVESTMENTS, LLC, a Delaware
limited liability company; and FVP
SERVICING, LLC, a Delaware limited
liability company; and HI BAR CAPITAL,
LLC, a New York limited liability
company,
        Adversary Plaintiffs,
vs.
AUTO WHOLESALE OF BOCA, LLC,
        Adversary Defendant.
_____/

                        Virtual Proceeding
                        Friday, 9:37 a.m. - 6:06 p.m.
                        January 13th, 2023


        VIDEOCONFERENCE DEPOSITION OF MOSHE FARACHE
                        VOLUME III
        Taken on behalf of the Adversary Plaintiffs before
Amber Cheek, Court Reporter, Notary Public in and for
the State of Florida at Large, pursuant to Amended
Notice of Deposition, Notice of Subpoena Duces Tecum For
Deposition in Adversary Case Of Corporate Representative
of Debtor in the above cause.

Page 394

APPEARANCES:

ATTORNEYS FOR FVP

JERRELL BRESLIN, ESQUIRE
jb@richardbaronlaw.com
BARON, BRESLIN & SARMIENTO
169 East Flagler Street
Suite 700
Miami, Florida 33131
(305)577-4626

JONATHAN SCHWARTZ, ESQUIRE
jschwartz@jonschwartzlaw.com
JONATHAN SCHWARTZ LAW PLLC
10200 Northwest 25th Street
Suite 111
Doral, Florida 33172
(973)936-2176

ATTORNEYS FOR MOSHE, LISA AND CHASE FARACHE AND FARACHE
ENTITIES

SCOTT GHERMAN, ESQUIRE
sgherman@scottghermanpa.com
SCOTT C. GHERMAN, P.A.
902 Clint Moore Road
Suite 120
Boca Raton, Florida 33487
(561)757-6266

ATTORNEY FOR HI BAR CAPITAL

JARRET HITCHINGS, ESQUIRE
jarret.hitchings@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER
301 South College Street
Suite 2150
Charlotte, North Carolina 28202
(704)749-8965

Page 395

APPEARANCES:

ATTORNEYS FOR AUTO WHOLESALE OF BOCA, LLC

JAMES MILLER, ESQUIRE
jbm@title11law.com
JAMES B. MILLER, ESQUIRE, P.A.
19 West Flagler Street
Suite 416
Miami, Florida 33130
(305)374-0200

ATTORNEYS FOR KARMA OF BROWARD and PALM BEACH

HARRY WINDERMAN, ESQUIRE
harry4334@hotmail.com
LAW OFFICES OF WEISS, HANDLER & CORNWELL
2255 Glades Road
Suite 205E
Boca Raton, Florida 33431
(561)241-0332

ATTORNEY FOR NICOLE MEHDIPHOUR

JASON RIGOLI, ESQUIRE
jrigoli@furrcohen.com
FURR & COHEN, P.A.
2255 Glades Road
Suite 419A
Boca Raton, Florida 33431
(561)395-0500

JONATHAN CRANE, ESQUIRE
jcrane@furrcohen.com
FURR & COHEN, P.A.
2255 Glades Road
Suite 419A
Boca Raton, Florida 33431
(561)395-0500

Page 396

APPEARANCES:

ATTORNEYS FOR FRANKLIN CAPITAL FUNDING

ERIC PENDERGRAFT, ESQUIRE
ependergraft@slp.law
SHRAIBERG, LANDAU & PAGE, P.A.
2385 Northwest Executive Center Drive
Suite 300
Boca Raton, Florida 33431
(561)443-0800

ATTORNEYS FOR EDWARD BROWN

AMANDA KLOPP, ESQUIRE
amanda.klopp@akerman.com
AKERMAN LLP
777 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
(561)653-5000

EYAL BERGER, ESQUIRE
eyal.berger@akerman.com
AKERMAN LLP
777 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
(561)653-5000

ALSO PRESENT:  Lisa Farache
Scott Zankl
Kristen Zankl
Katie Gleason
Shaya Baum
Greg Nelson
Brian Rohl
Keith Lee
Linda Leali
Miriam Jaime

Page 397

I N D E X

WITNESS:                    PAGE:

MOSHE FARACHE

Continued Direct-Examination by Mr. Breslin........398
Witness Signature Page............................467
Errata Sheet......................................468
Certificate of Oath of witness....................469
Letter to Witness Re:  Reading....................471

EXHIBITS

NUMBER              DESCRIPTION              PAGE:

EXHIBIT D00     Collateral Letter dated 4/1/22...419
                (Bates 004000)
EXHIBIT D02     Affidavit of Moshe Farache.......432
                dated 4/14/22
                (Bates 004003 - 004006)
EXHIBIT D03     Amended Affidavit of Moshe.......450
                Farache
                (Bates 004007 - 004012)
EXHIBIT D04     Verified Complaint For Damages...423
                For Breach of Note and Security
                Agreement, Replevin,
                Foreclosure of Security Interest
                and Appointment of A Receiver
EXHIBIT D05     Email String.....................427
                (Bates 004078 - 004081)

EXHIBIT D07     Affidavit of Robert W. Crispin...448
                (Bates 004098 - 004099)
EXHIBIT D08     Bill of Sale, 2021 Jeep..........443
                Gladiator
                (Bates 004100 - 004102)

2 (Pages 394 - 397)

Page 398

Thereupon:

(The proceedings were continued from Volume II as follows:

CONTINUED DIRECT-EXAMINATION

BY MR. BRESLIN:

Q   Mr. Farache, were you not aware that the letter that your wife's company signed permitted her company to allow FVP to access their collateral? Were you aware that that letter said that?

A   I have no idea.

Q   Now, Mr. Farache, when did you first become concerned that you may lose vehicles that you believe you were entitled to from the lots in Palm Beach?

A   I'm trying to understand. Say again.

Q   Right.

There came a time where you became concerned enough for you to start taking vehicles in Palm Beach, right?

A   When Mrs. Zankl approached me.

Q   So let's talk about that. I'd like to hear that whole story. How did that first happen?

A   As you know, Mr. Zankle is very sick. At the time you know he has cancer, stage 4 cancer?

Q   Are you asking me a question?

A   Yes. Do you know about it or no?

Page 399

Q   I am not.

A   So sometime around '21, he basically called me and cry on the phone and explain to me he has stage 4 cancer and he's really worried about his family and everything. You know, we are all kind of -- besides business, you know, we kind of -- sometimes we talk to each other. And, you know, I'm very straight when it's come to my business, so when it's come to all of this stuff.

You know, I'm not a normal guy. I'm not a guy-guy. You know, I don't go to lunches. I don't go to dinners with people. If you see me out there, it's very rare. I'm just work and go home. So it's no social friendship. You know, maybe once every two or three years we did dinner together just to make sure we see each other.

And he basically approached me and say to me he has stage 4 cancer. And then when I can't see him in the dealership, I start that worry.

Q   When was that?

A   Sometime around February.

And I try to reach his wife. And, you know, I call and I call her, nobody answer, and I tried to call him, some stories, some stuff. And I start to pay attention more to the inventory in the beginning of 2022

Page 400

because, you know, you hear a rumor here, a rumor over there. He bounced some checks on us.

You know, you to start worry. And, you know, every time I see him, he explained to me, you know, I'm just want to let you know, everything is very good, everything is this. But he's also a very sick man at the same time. You know, stage 4 cancer is not a game. You know, I lost my mom for cancer. So whatever he tell me, you know, I always feel like, you know, I don't know if it's the last day, the last month. So hopefully he live forever.

But then I also hear some rumors, you know, this guy bought the car and he drive it. And I look in the title, I have the title but I don't have the car. And he tell me, Moshe, I'm wiring tomorrow, the next day. And then it's a week or two weeks later, and then he tell you, I'm giving you a check, and then the check bounce.

So his wife basically told me, I've been nothing but good to my family. I don't want you to get hurt from my husband. I want you to pick up your vehicle.

Q   Okay. So let's stop right there and let's dig a little deeper.

So what you're saying is that Scott Zankl told

Page 401

you at some point that he has stage 4 cancer which I think everybody knows is, you know, a terminal disease, correct?

A   Yeah. I mean, I felt -- at the time being, I felt really bad for the guy, you know, stage 4 cancer.

Q   Of course. When did he tell you that?

A   Sometime in '21.

He don't even tell that to his wife.

Q   So then there came a time when you say that he bounced some checks. When you say, he bounced some checks, I assume you mean one of his companies?

A   One of his entities.

Q   Do you know which one?

A   I don't remember.

Q   And do you recall when those checks bounced?

A   Yes.

Q   When was that?

A   I don't remember exactly.

Q   Do you remember if it was '21 or '22?

A   I can't tell you. Sometime.

Q   So there came a time then that you say Kristen Zankl came to you and said what?

A   Basically, you know, everything start in the beginning of March. I basically told her at the end of the year, you know, I'd really like to see --

3 (Pages 398 - 401)

Page 402

Because she got involved in the business because her husband I think with the stage 4 cancer, she tried to help as much as she can with the business. So she's really involved from toward the end of '21. Because besides that, they're expanding the business and, you know, we all thought the business is doing very well at the time.

And she basically told me, you know, I going to be very involved. And her strength and her major is accounting. So she say to me, you know, my strength is my husband's weakness. My husband's strength is sales and marketing and I'm major in accounting. That's what I graduate. So just give me a bit of time. I promise you I'm going to straighten up everything. And you guys been nothing but so good to my family for the last nine and-a-half years.

I even giving to his daughter my own piano from the house when she took lessons. I did everything for them.

Q   So this was in March of 2022 that you had this conversation with Kristen?

A   No. We had conversation back and forth, but in March really basically every day we talk. Because I see some vehicle using my address and I told her, you know, I prefer, and I make it very mandatory from the

Page 403

beginning, I don't want people to drive AWB vehicle for any purpose. They buy it, they allowed to drive it. They don't buy it, nobody allowed to use AWB vehicle.

And he just disrespect the system and let people use the car. And now we know the whole truth. So, you know, I mean, it's nothing but a fraud guy.

Q   So what you're saying is that in March, you had conversations with Kristen and she said that she was going to resolve any problems with the business. Would that be a fair statement?

A   We have conversations prior to that, but in March she basically give me -- she say to me, I want you to pick up all your vehicle.

Q   All right. So let's dig into that a little bit. So in March of 2022, you're saying that Kristen Zankl told you to pick up all your vehicles?

A   Yes.

Q   And where was she when she said made that statement?

A   She was in the store. She's in the Excell building.

Q   All right. So tell me about this conversation. When did it happen?

A   Like I say to you, sometimes, you know, we talk about -- we see the problem coming up, so we talk

Page 404

about them December '21. Then we never no told what, you know, he did to us in the beginning of every when we find out all the truth. So you can say between January, February, March, we basically spoke to Kristen because she's involved in the business and Scott is very sick. He's been in the hospital. He's been -- she explained to me he can't even hold his stomach. He has diarrhea. He's wearing diapers. That's how bad he is.

And I explained to her, I hope he feel good.

And, you know, I worry about him and worry about her family because, you know, the guys is a family man the way I know him. And --

Q   Where -- go ahead.

A   You know, and I explain to her, I said, Kristen, you know, you have some vehicle -- you let some of your friends, social friends, whatever you call them, they use them. And I say to her, I really appreciate you brought this vehicle back. I don't want people to drive AWB vehicle.

And she say to me, Just tell me everything it's yours. I going to protect it. You've been nothing but good to my family.

And, you know, some nights I stay over there until she close the store, and I think one of the nights I drove her home.

Page 405

Q   Tell me where you were when she said to you that she wanted you to take allegedly the AWB vehicles. Where did that conversation take place?

A   In her office.

Q   All right. So that was in her office.

And I assume when she made that statement to you, that was kind of shocking to you, wasn't it?

A   It's not shocking to me. It just show me the person care about my family and myself and AWB. Don't forget, we've been together for nine and-a-half years. You know, it's a long relationship business.

Q   Tell me exactly --

A   To do business and buying cars for hundred and hundred thousand dollars and do hundred and hundred transactions every years and still keeping healthy relationship for nine and-a-half years. You know how hurt it is to be around people that fraud you after nine and-a-half years?

Q   Mr. Farache, please just answer my question.

What time of day did this conversation take place when Kristen Zankl said to you that she wanted you to take your vehicles?

A   I don't remember exactly, but it's late afternoon.

Q   Who else was there?

4 (Pages 402 - 405)

Page 406

A    Who else is there?

Q    Yeah.  Who else was there?

A    Teddi.

Q    Teddi?

A    Yes.

Q    So Teddi Sofoul was in the room when she made this statement?

A    Teddi Sofoul is -- she giving to Teddi authorization to bring all the vehicle for AWB from all over.  Make sure you bring everything back to the store.

Q    All right.  So we're just talking about the conversation between you and Kristen right now.

So what you're saying is it was late afternoon one day, it was in her office, you came in, Teddi Sofoul was there, and she told you that she wanted you to take all your vehicles.  Is that accurate?

A    Yes.

Q    And so --

A    Wait.  Let me stop you for a second.

Q    Go ahead.

A    When I'm talking about all the vehicle, I'm talking about all the AWB vehicle.

Q    I understand.

A    Not my vehicle.  It's AWB vehicle.

Q    Of course.  And that is exactly what I mean.

Page 407

A    And I just want to make sure you know that.

Q    Of course.

So that being said, so this occurred late afternoon, Teddi Sofoul was in the office, and you went into her office and she said to you what?  How exactly did she express that to you; that she wanted you to take all the cars?

A    She basically -- you know, she sit over there and she explained to me she don't want me and my family to get hurt.  We've been nothing but good to her family.

When I say good to her family, look at the text message information how good we are to them.  How much they thank us every time they go to vacation, the Zankl family.  You know, we've been nothing but -- you know, we opened the door for them in every business opportunity.  They have unlimited funds for nine and-a-half years.

Q    So what did she say?  Did she say, Take your cars?

A    She cried.  She cried.

Q    And said what?

A    She said, I just don't know what to do.  You know, you don't understand.  It's nothing -- you know, my husband is the best salesman in the world, but when it's come to accounting, something doesn't make sense.

Page 408

And that's my strength, and I promise you I going to fix it.  But meantime I don't want you to get hurt.  I want you to pick up the vehicle.  She cried.

Q    Okay.  And what did you do in response to this?

A    I said, you know, I just want to let you know, I want to protect my company.  I'm here to protect my company assets.  That's what I'm there for.  You know, and I took position of protecting my business.

Q    And tell me exactly how you did that.

A    I basically make sure nobody used my vehicle in the street.  I bring every vehicle.  I make sure all the titles --

THE WITNESS:  You need a minute, Jerry?

MR. BRESLIN:  Yeah, yeah.  I'm sorry.  Just hold on one second.

THE WITNESS:  You need a couple minutes?

MR. BRESLIN:  Yeah, let's take five.

(A break was taken.)

MR. BRESLIN:  We're back on the record.

BY MR. BRESLIN:

Q    So, Mr. Farache, in response to Kristen Zankl telling you she wanted you to take the vehicles, what did you do?

A    I basically get myself in a position to pick

Page 409

up my vehicle.  She helped me to bring vehicle from clients.  She helped me to pick some vehicle they are in a different location.  She basically -- you know, she been nothing but just good.  You know, she did the best she can between her and Teddi to try to bring all the vehicle back to the Boca location, the Excell location so I can pick them up.  And we basically go back and forth, back and forth.  We tried to make it work.  You know, I mean, it's a very, very hard position for everybody.

Q    So you're telling me then when you on April 1st went and took all the vehicles from the lots, that was in response to Kristen Zankl's request?

A    I mean, we received -- you know, we have email.  We have conversations back and forth.  She even the next day we met and she give me --

Q    What email are you talking about?

A    We have emails.  She sent to us an email to please pick up your vehicle.

Ask your client, Mr. Zankl.

Q    That email has never been provided to me.  So I would request that for the record.

A    Ask your client, Mr. Zankl.  You have it.  You have text message.

Q    All right.  Now, if you recall, I asked you

5 (Pages 406 - 409)

Page 410

some questions about some comments from Mr. Brandes.

Q Do you recall that?

A Not really. You don't talk to me about Mr. Brandes.

Q Do you remember at the hearing we had on the Stevens case, I asked you about the Feds coming to raid the place?

A Yes. I don't think you asked me about it.

Q Yeah. You testified to that on the record. You said that Mr. Brandes told you that the Feds were going to come raid the place.

A He told me that, yes.

Q When did he tell you that?

A Friday, sometime Friday.

Q Friday the what?

A I think -- I'm not sure if it's March 31st or April 1st. I mean, I got to check -- check in the calendar on your phone, what is Friday?

Q Friday, April 1st was a Friday.

A So it's April 1st.

Q Tell me exactly what Mr. Brandes said to you and how the conversation came up.

A He basically tell me, I just want to let you know the Feds coming to -- you know, it's a rumor and the Feds is coming to pick up the cars or whatever it is

Page 411

to the store. Just be ware.

Q All right. Tell me exactly how this conversation happened with Mr. Brandes.

A I don't remember exactly.

Q So you're telling me that you and Mr. Brandes had a conversation. Was it on the phone or was it in person?

A Not in person. It's Friday night, Friday late afternoon.

Q So it was Friday night and you had a conversation with Mr. Brandes and he told you that the Feds were coming to raid the place and you should pick up your cars?

A Something like that. I don't remember exactly, but I don't want to tell you exactly and maybe I'm wrong the way I say it or something like that. But, you know, we basically position ourself with most of AWB vehicle to the side so this way we know what's going on.

Q All right. So when he told you that the Feds were going to raid the place, what was your understanding of why the Feds were going to raid the place?

A What do you think, I'm the FBI? I don't know this stuff.

Q Well, I don't know. You tell me.

Page 412

A I don't know. I'm like you. What do you think, I'm the FBI? I'm the Secret Service? I have nothing to do with that.

Q Did you believe him?

A No, not really. I mean, you know, I got to do what I got to do to protect AWB asset no matter what.

Q Okay. When he told you that the Feds were going to raid the place, did you believe that the Feds were going to raid the place?

A Not really.

Q Then why did you come and take all the cars?

A Because Kristen Zankl asked me to pick up my cars with the email.

Q Okay. What you're telling me is that the fact that Mr. Brandes told you that the Feds were going to raid the place had nothing to do with the fact that you picked up the cars?

A Nothing to do with that. But read your email. It's an email.

Q Please just answer my questions. I'm asking you a question about Mr. Brandes.

A You know, when you're talking about Mr. Brandes, it's still my legal in the time. So I tell you what I hear from him. I go to the store and that's it.

Q All right. So you heard this from him, you

Page 413

went to the store and did what?

A I bring up AWB vehicle.

Q And how many vehicles was that?

A I can't tell you exactly.

Q Well, it was over 30, right?

A I wish.

Q How much vehicles -- so are you telling me that when you went and picked up the vehicles, that it was less than 30 cars?

A For sure.

Q So tell me exactly what you did in response to these conversations from Kristen Zankl and the conversation from Mr. Brandes to pick up your vehicles. What did you do? How did you do it?

A I basically come to the store. Mr. Zankl and his wife over there, he handed to me the key I'm missing, and I pick up my vehicle.

Q How did you do that? How did you physically remove all those vehicles from the lot? What did you do?

A I basically come, they handed to me the key, and I pick up my vehicle.

Q Now, when you say you picked up your vehicles, okay, it's not one vehicle. It's dozens of vehicles.

How did you do that? How did you remove those

6 (Pages 410 - 413)

Page 414

vehicles? Who helped you? How was it done?

A   I drove some of them. My son helped me.

Q   So when did you start removing the vehicles? What day?

A   Friday night.

Q   So it was Friday night, April 1st, that you started moving vehicles. Is that right?

A   Yes.

Q   So you personally yourself moved vehicles. Is that accurate?

A   Yes.

Q   All right. So what you did was you went to the 1001 Clint Moore address, you got a key, you got in a vehicle, you turned it on and you drove that vehicle off the lot. Is that accurate?

A   It's 1001 Clint More.

Q   Right.

A   That's the address.

Q   Okay. So when you did that --

A   Say it again. I'm sorry.

Q   So it's Friday night.
What time was it when you took the first vehicle off the lot?

A   I don't remember.

Q   Was it late?

Page 415

A   It's dark out.

Q   Okay. So it's April and it's dark out.
So what, 8:00 or 9:00? Do you recall?

A   I don't know exactly.

Q   All right. So you decide you're going to start removing the cars Friday night, April 1st. Is that accurate?

A   Yes.

Q   Okay. So the first thing you do is you go, you get a key, you go and you turn on a car, you turn it on, and you drive it off the lot, correct?

A   Yes.

Q   Now, who else did you contact to help you remove cars?

A   Just my son.
Don't forgot, I have security in the premises to make sure nobody steal vehicle.

Q   Let's talk about -- I'm talking about physically removing the cars. You got in, you got in the car, you turned it on, drove it off the lot. You got your son to help you, right, Chase?

A   My wife was there too.

Q   All right. So you wife was also there.
This is all Friday night, correct?

A   Yes, sir.

Page 416

Q   All right. So when you got in the car and you turned it on, what was the first vehicle that you took? Do you recall?

A   I don't remember.

Q   All right. But you got in the car and you drove it where?

A   Out of the building.

Q   Where did you drive the car to?

A   Out of the building.

Q   To where?

A   To my other building.

Q   What other building? What address?

A   6560 West Rogers Circle.

Q   So you got in the car and you drove to that address and how long did that drive take?

A   A couple minutes.

Q   Okay. Now, when you got there, what did you do?

A   Just parked the car.

Q   Then what did you do?

A   Go back.

Q   How did you get back?

A   I can walk. I can get somebody give me a lift.

MR. BRESLIN: Hold one. Can you give me just

Page 417

one second. I'm sorry.

THE WITNESS: I'm sorry. Go ahead.

BY MR. BRESLIN:

Q   So you drove it to another location and then someone gave you a lift back and you picked up another car, correct?

A   Yes, sir.

Q   And at the same time, was your son always doing that?

A   Yes, sir.

Q   So your son got in the car, he turned it on, he left the 1001 location, and he drove it to the same place that you took your car, correct?

A   Yes, sir.

Q   And did your wife also do that?

A   Yes, sir.

Q   All right. So --

A   Can I say something? Excuse me.
I'm the guy that move most of the cars from the building. You know, maybe they helped me to bring me back or something like that, but I'm the principal. I'm the guy who make the move.

Q   Now, did you employ any tow trucks to move cars?

A   No.

7 (Pages 414 - 417)

Page 418

Q   Did you ever make any deals with any flatbeds or any truck drivers to pay them a fixed amount of money for a car?

A   In this particular night you're talking about or in general?

Q   To remove the cars from 1001 Clint Moore.

A   You got to be very specific, Mr. Breslin.

Q   Did you have any help from any tow truck drivers or flatbeds to remove any cars from the Excell or Karma lots on April 1st, April 2nd or April 3rd to remove any of those cars?

A   No.  From 1001, correct?

Q   All right.  Right.

A   You're talking about 1001, correct?

Q   Right.

   Okay.  So how many cars did you remove from the 1001 lot on April 1st?

A   I can't tell you that on the top of my head.

Q   Well, how late did you do it?

A   I don't remember.

Q   Well, did you do it late into the night?

A   Pretty much.

Q   So when did you start and when did you finish?

A   I don't remember.

Q   Do you recall how many cars you removed?

Page 419

A   I don't remember exactly.

Q   Did you come back the next day to continue removing cars?

A   Yes.

Q   Okay.  So you moved some cars Friday night late into the night and then you went back Saturday morning and continued to remove cars.  Is that accurate?

A   Yes.

Q   And you were assisted in this chore by your wife and son, correct?

A   Excuse me.  No.

Q   Your wife and son didn't help you?

A   Saturday, no.

Q   Did anybody help you on Saturday?

A   I'm not sure.  I don't remember.

Q   So when were you finished removing the cars?

A   It take me almost two weeks to remove cars.

   (FVP Exhibit D-00 was marked for Identification.)

BY MR. BRESLIN:

Q   I show you what's been marked as D-00, and it's Bates 4000 which purports to be a letter dated 4/1/2022.  And it says, "The following vehicle titles are being given to Auto Wholesale of Boca as collateral against the loan amount."

Page 420

You've seen this document before, correct?

THE COURT REPORTER:  I'm sorry.  Can you read that again.

BY MR. BRESLIN:

Q   It says, "The following vehicle titles are being given to Excell Auto Group, LLC as collateral against the loan amount."

And then it goes on and names cars.

It says, The values of these vehicles, along with the 115,000 wired to Excell Auto Group on 4/1 towards the Bentley Flying Spur, shall serve as collateral for the aforementioned loan amount.

As the loan is reduced, these the vehicle titles will be returned.

Do you see this document?

A   Yes.

MR. MILLER:  Jerry, what exhibit number?

MR. BRESLIN:  What?

MR. MILLER:  What exhibit number is that?

MR. BRESLIN:  D-00, Bates 4000.

MR. MILLER:  No, the exhibit number.

MR. BRESLIN:  It's D-00.

MR. MILLER:  B-04?

THE COURT REPORTER:  D as in "dog".

MR. BRESLIN:  D as in "dog," 00.

Page 421

MR. MILLER:  I can't help it.  You're mumbling, man.

MR. BRESLIN:  Who is mumbling?

MR. MILLER:  You.

MR. BRESLIN:  I'm not mumbling.  You can't hear.

MR. MILLER:  No.  You're a mumbler, man.

MR. BRESLIN:  No.  I'm a lot of things.  I'm not a mumbler.

BY MR. BRESLIN:

Q   All right.  Mr. Farache, take a look at this letter.  And I see that this has your name there and it says, "Moshe Farache MGY."

Do you know who wrote that in there?

A   No.

You show me that yesterday.

Q   It was shown to you in court as well.

So you don't know who wrote that?

A   No.

Q   You don't know who wrote your name on it.

Were you handed this letter?

A   Say again.  I'm sorry.

Q   Were you handed this letter?  Did Kristen Zankl hand you this letter?

A   You have two letters similar to this.  One

8 (Pages 418 - 421)

Page 422

more you have.  That's why you don't see my signature.

Q   This is the only one I'm aware of, so let's just talk about this.

Do you know who wrote your name on here?

A   Nope.

Q   On April 1st were you given this letter?

A   Nope.

Q   Were you ever given this letter?

A   I don't remember about this one.

Q   All right.  So now this is April 1st, and it talks about money being wired to AWB towards a Bentley Spur.  What's that all about?  What does that mean?

A   I can't tell you in the top of my head.  I got to look on my accounting and my bookkeeping to answer you.

Q   Now, you're aware, sir, that there was video filming everything that happened on the premises on April 1st and 2nd, correct?

A   That's fine.

Q   Are you aware of that?

A   I hope so.

Q   Okay.  Now, at what point were all the cars that you were going to take removed?

A   Say it get.  I'm sorry.

Q   When did you remove all the cars that you

Page 423

intended to remove?

MR. MILLER:  Objection.  Asked and answered.

BY MR. BRESLIN:

Q   When were you done taking the cars that you planned on taking?

A   It take us two weeks.

Q   So it took two weeks for you to remove all the cars you wanted to remove?

A   Approximately.

Q   Now, so at the end of you removing the cars, how many cars had you removed?  Do you know?

A   I have the list what I have in my warehouse.

Q   I didn't understand what you just said.

A   I have the list what we have in the warehouse, how many cars.

Q   Now, after you took these vehicles, do you recall a lawsuit being filed in Palm Beach County on AWB's behalf?

A   Say it again.  I'm sorry.

Q   Are you aware of a lawsuit filed by Auto Wholesale of Boca in the Circuit Court of Palm Beach County on April 8th, 2022?

A   Yes.

(FVP Exhibit D-04 was marked for Identification.)

Page 424

BY MR. BRESLIN:

Q   All right.  I'm going to put that on the screen.  And this is D-04.  This is Bates 413 through 4077.

MR. MILLER:  Jerry, wasn't the letter D-04?

MR. BRESLIN:  D as in "dog," 4.

MR. MILLER:  That was the letter.  That was the exhibit number for the letter you just had out.

MR. BRESLIN:  No.  That was D-00.  This is D-04.

MR. MILLER:  What was the letter?  D-01 was the letter?

MR. BRESLIN:  D-00 was the collateral letter, this letter.  D-01 was the landlord letter.  They're all in the Dropbox.  You'll see.  They're all numbered.

BY MR. BRESLIN:

Q   So, Mr. Farache, you were aware that this lawsuit was filed, were you not?

A   Yes.

Q   And prior to it being filed, did you authorize its filing?

A   Yes.

Q   Now, were you aware, Mr. Farache, that this lawsuit was sworn to?

Page 425

A   Say it again.  I'm sorry.

Q   Were you aware that this lawsuit that was filed on behalf of AWB on April 8th, 2022 was sworn to?

A   What do you mean?

Q   That means that you swore that it was true when it was filed.

A   For the best of my knowledge at the time.

Q   All right.  So you know that when this lawsuit was filed, that if we go down to page -- let me see.  When we go down to page 27, that's your signature, isn't it?

A   Yes.  But before that, you got to show me the whole document.

Q   And that I'm not going to do, because that's taking way too much time and I'm in a hurry.

So you were aware, sir, that when this document was filed, you had to sign it, right?

MR. MILLER:  Objection.  The witness has asked to see the whole document and you're refusing --

MR. BRESLIN:  That's what's taken two days.

MR. MILLER:  That's what?

MR. BRESLIN:  That's what's taken two days.

MR. MILLER:  No, it's taking too long because you can't get to the point.  But the matter is the witness has asked to review the document and you're

9 (Pages 422 - 425)

Page 426

refusing to let the witness see it.

BY MR. BRESLIN:

Q   All right.  Mr. Farache, let me just make this very simple for you.  Were you aware that you signed a Complaint back on April 7th, 2022?  Were you aware that you signed that?

A   I signed it, but I still want to see the whole Complaint.  You show me one --

Q   All right.  Let me just ask my questions.

On April 7th, 2022, you signed a Complaint that you were aware was being filed in Palm Beach Circuit Court, correct?

A   That's what the piece of paper was you show me saying, yes.

Q   All right.  Now, were you aware when you signed that document that you were swearing to the truth of what was in the document?

A   Based on my knowledge at the time.

Q   All right.

A   You know, it's a bit different April 7th and now.

Q   Right.  Of course.

All I'm saying is on April 7th, what you signed on April 7th, was it true to the best of your knowledge on that date?

Page 427

A   I got to really look into it.  And, you know, today I'm ten times smarter about everything over there, so I got to really look into it.

Q   Are you telling me that when you signed this under oath and it was filed in a court of law, that you don't know if it was true?

A   Based of my knowledge.

Q   So at the time you believed it to be true, correct?

A   Based on my knowledge at the time.

Q   Okay.  Now, so that was on April 7th.

Now, you then became aware that a lawsuit was filed by FVP, correct?  Or was going to be filed by FVP, right?

A   No.

Q   Didn't your lawyer, Mr. Brandes, tell you that I had contacted him regarding a lawsuit that was filed?

MR. MILLER:  Objection.  Attorney/client privilege.  Any communications on that matter are privileged.  Don't answer the question.

BY MR. BRESLIN:

Q   Were you aware that Mr. Brandes was having communications with me?

A   When?

(FVP Exhibit D-05 was marked for

Page 428

Identification.)

BY MR. BRESLIN:

Q   That would have been in -- let me tell you exactly.  That would have been -- let me show you the exhibit.  This is Exhibit D-05, Bates 4078 through 4081.

Were you aware that Mr. Brandes was communicating with me on April 13th, 2022?

A   No.

Q   No?

A   Wait.  Which day?  I'm sorry.  I'm sorry.  Go ahead.  Tell me.

Q   Well, it's on the screen.

Were you aware that Mr. Brandes was communicating with me on April 13th, 2022?

A   Yeah, he tell me something on this.  I'm not know exactly when, but he told me basically it's --

MR. MILLER:  Don't discuss the content.

THE WITNESS:  Sorry.

MR. MILLER:  He's just asking if were aware that Mr. Brandes was communicating with Mr. Breslin on that date, on or about that date.

Did you say on or about that date, Jerry, or on that date?

MR. BRESLIN:  Well, I'm looking at the email, and I'm asking him if he was aware of the

Page 429

communication that Mr. Brandes had with me on April 13th.

BY MR. BRESLIN:

Q   Were you aware that Mr. Brandes was having conversations with me on that date?

A   I don't remember exactly which date, but ...

Q   Well, you were certainly aware that you had to be in court the next day, April 14th, right?

A   Yes.

Q   So I'm showing you a communication to me which is certainly not attorney/client privilege.  This is your attorney sending me.

It says, "Jerry:  Attached is the AHB list of vehicles in their possession that FVP is alleging is their collateral."

So this is April 13th, 2022.

Were you aware that this email was sent to me?

A   No.

Q   And if we go down, this is my email to Mr. Brandes where I am asking him to tell me how many vehicles are in AWB's possession that we are claiming as our collateral.

Were you aware of my communications with him?

A   Nope.

Q   Now, attached to his email back to me was a

10 (Pages 426 - 429)

Page 430

spreadsheet, and this is part of the same spreadsheet that was filed in Palm Beach, is it not?

A I don't know.

Q Well, where did this spreadsheet come from?

A I don't know.

Q As the corporate representative of AWB, you're telling me under oath that you have no clue where Mr. Brandes got this list of cars that he emailed to me the day before we had a hearing in court?

A Show me from the top to the bottom please.

Q Okay. The top is my email. This is his email to me: "Jerry: Attached is the AHB list of vehicles in their possession the FVP is alleging is their collateral."

Just so you know, we had already filed our lawsuit by then.

Now, underneath that is my email to him requesting that list. But this document here is the list that he attached to his email to me. So he listed 36 -- well, there's 36 on the list and a couple of -- so he listed 33 cars as those cars that were in Auto Wholesale of Boca's possession that FVP was claiming as its collateral.

A Something doesn't make sense, because I don't see anything say -- that's why I ask you to see the

Page 431

whole page -- AWB inventory or anything. Anybody can make this list.

Q Well, no.

This is from Mr. Brandes.

It says, "Jerry: Attached is the AHB list of vehicles in their possession that FVP is alleging is their collateral."

Do you see where it says that?

A Do you see me on the email or any of my team on the email?

Q All right. It's a very simple question.

Are you telling me that Mr. Brandes, the attorney for AWB, just made up this list and sent it to me?

A I don't know. I don't know about this list at all. You know, if I know about something, I tell you.

Q Okay. So what you're saying is that I was sent this list by the attorney -- hold on a second.

I was sent this list by the same attorney that filed the lawsuit in Palm Beach that listed all the loan agreements, all the Security Agreements, and made a list of collateral. Were you aware of that?

A I don't see all the -- you know, you see the different between this list and the other list?

Q My question to you, sir, is: Do you know

Page 432

where Mr. Brandes got this list?

A You see the difference. I don't know.

Q Mr. Farache, do you know where Mr. Brandes got this list?

A I don't know.

Q Did you authorize him as your attorney and the attorney for the company to represent to me, the attorney for FVP, that this was the list of vehicles that were in AWB's possession that FVP was claiming as its collateral?

A No.

Q Now, you were aware, sir, that you were in court the next day, correct, on April 14th?

A Yes.

(FVP Exhibit D-02 was marked for Identification.)

BY MR. BRESLIN:

Q And I show you what's been marked as Exhibit D-02. And this Bates is 4003. And I will complete this exhibit. But you, in fact, filed a sworn affidavit through your attorney in court that day, correct?

A You're going to something -- you know, I signed an affidavit. I never don't see the attachment.

Q Okay. So let's talk about that.

A Go ahead.

Page 433

Q So you were aware, Mr. Farache, that on April 14th, your attorneys requested an affidavit from you so your attorneys could go into court and oppose FVP's motion to have either a receiver appointed or an injunction issued so the cars could be safeguarded while we litigated in court? You were aware of that, were you not?

A We've all been in court, yes.

Q But you were aware of what FVP was seeking in court, right?

A No.

Q So your testimony is that when you went to court on the 14th, you don't know why you were going?

A I know why I'm going, but I don't think I have anything to worry about it at the time.

Q I'm not asking you if you were confident. I'm asking you if you knew why you were going to court?

A Yes.

Q All right. Why were you going to court?

A Because FVP, some lender I find out looking for his collateral.

Q And so you were aware by the time you went into court on the 14th that FVP was claiming its collateral in all of the cars you took, correct?

A Excuse me again.

11 (Pages 430 - 433)

Page 434

Q   All right.  You became aware by April 14th when we went into court that FVP was claiming all of the collateral in the cars you took, right?  On every car you took, they were claiming as their collateral.  You were aware of that, right?

A   No.

Q   So when you went into court on April 14th, what did you think FVP was claiming?

A   Karma cars.

Q   Okay.  Now, if we go back to the email from your lawyer to me on the 13th, he made it very clear to me that this was the list of cars that were in AWB's possession that we were claiming.  You were certainly aware of that sir, were you no not?

A   No.

Q   So your testimony is that Mr. Brandes on his own without authorization from the company just sent me a list of cars that he had no authority to tell me were cars that were in your possession that were claimed by my client?

A   Based on my knowledge, no.

Q   All right.  Now, this affidavit that was filed in court on April 14th -- and that's Exhibit D-02, and it goes from 4003 to 4006 -- are you telling me that this affidavit was not accurate?

Page 435

A   I need to look at the attachment.

Q   Well, let me just talk to you about it.
    You later filed another affidavit saying that this was not accurate.  Is that correct?

A   I need to see what you tell me about.

Q   Well, without showing you anything, I just want to know what's in your head.  When you signed this affidavit, did you believe it to be true?

MR. MILLER:  Can you show him the affidavit, Jerry.

MR. BRESLIN:  No, no.  I'm asking him a question.

MR. MILLER:  Come on.

BY MR. BRESLIN:

Q   When you signed the affidavit, Mr. Farache, did you believe what was in it to be true?

MR. MILLER:  Objection.  The witness has asked that you refresh his recollection.  The party opponent is not willing to show him the document.

MR. BRESLIN:  He didn't say anything about his memory.

MR. MILLER:  He said he wanted to see the document.

MR. BRESLIN:  All right.  Let me just ask the question.

Page 436

BY MR. BRESLIN:

Q   Mr. Farache, did you sign the affidavit on April 14th?

A   I want to see what you're talking about.

Q   Did you sign an affidavit on April 14th?

A   Yes, I signed one.

Q   When you signed it -- when you signed it, did you know it was --

MR. MILLER:  Mr. Breslin --

THE COURT REPORTER:  Hold on.

MR. MILLER:  Mr. Breslin, you've got to let him finish his answer.  You keep cutting him off.

MR. BRESLIN:  What's your answer?

MR. MILLER:  I know it's late in the day and you're getting excited, but let him finish the answer.

MR. BRESLIN:  I'm a lot of things.  Excited in not one of them.

MR. MILLER:  I don't know.  You look like you're pulling your hair out over there.

MR. BRESLIN:  I've been pulling my hair out for two days.

MR. MILLER:  And it's still growing back.

MR. BRESLIN:  Yeah, it really is.

BY MR. BRESLIN:

Page 437

Q   Let's just make this simple.
    You signed an affidavit on the 14th, right?

A   Yes.

Q   Before you signed it, did you read it?

A   No.

Q   Before you signed it, did someone tell you what was in it?

A   No.

Q   Where were you when you signed it?

A   In a rush to get to the hearing.

Q   So when you went into court that day, were you aware that this document that you signed without reading and that you don't know what was in it, were you aware that it was going to be filed in the court record?

A   No.

Q   When did you first become aware that the paper you signed was filed in the court record?

A   When I'm in court.

Q   And did you bring to anyone's attention that day in court that what you signed was not accurate?

A   Yes.

Q   Who did you tell?

A   The judge.

Q   What did you say?

A   You know, it's not that many cars and it's all

12 (Pages 434 - 437)

Page 438

not true. You've been there. You know it.

Q   All right. So, now, during that hearing there was a car sold, was there not?

A   Say again.

Q   On the 14th, there was a car being sold up at Manheim, wasn't there?

A   Prior to the hearing in the morning of the 14th.

Q   How many cars were sold prior to that hearing?

A   A few of them.

Q   How many?

A   A few.

Q   You don't know?

A   Exactly I don't know, but I don't want to give you the wrong answer.

Q   You could generally tell me.

A   More than one.

Q   I won't hold you to it.

A   More than one.

MR. MILLER: If you're not going to hold him to it, then don't ask him.

THE WITNESS: More than one. A few.

MR. BRESLIN: The check's in the mail.

MR. MILLER: Jerry, it's getting late for you, man. I could see it on your face.

Page 439

MR. BRESLIN: No. I'm just trying to get as far as I can.

THE WITNESS: I don't want you to call me names anymore, so I got to give you --

BY MR. BRESLIN:

Q   Okay. So anyway let's get --

So several cars were sold.

What happened to the money?

A   We put them in an operation account for AWB.

Q   Was any money from any cars that were sold put in an account other than the AWB accounts?

A   If we put it, it's just in an S. Corp account for the legal team.

Q   So my question to you is: Were any cars that were taken from the lots sold and the funds from those sales put into an account other than the AWB accounts?

MR. MILLER: Asked and answered.

BY MR. BRESLIN:

Q   Please answer that.

A   If you show me any document, I told you --

Q   I don't have any documents. I'm asking you where the money went?

A   If it went anywhere, it's to the legal team.

Q   All right. So other than the AWB account, the only place that any money could have gone was to a legal

Page 440

team account. Is that accurate?

A   Wherever we want. It's our money. It's an AWB account.

Q   I didn't make a comment about it. I'm simply asking where the money went?

A   Wherever AWB make the decision.

Q   What account are you talking about when you say, "the legal team"? Which account is that?

A   Be very specific with your question.

Q   My question is very specific.

Other than the AWB account, what account did money go into? Please name that account.

A   Which money?

Q   Any money from any sale of the cars.

A   Which cars?

Q   Any of the cars that were removed from the Karma lots.

A   Depends which day you're talking about. You got to be more specific.

Q   Any day after April 1st, 2022.

A   You got to be very specific.

Q   I'm not going to be -- are you evading the question? If you don't want to answer say, I'm not answering.

A   I want to answer if you're more specific.

Page 441

Q   I'm asking you where the money went from the cars that were sold. That's all. Any of the cars that were sold.

A   Which cars?

Q   You took cars, you sold some of them -- you just got done telling me that -- and then after a certain period of time, specifically April 14th, you couldn't sell them anymore. But you sold some before April 14th.

The ones you sold before April 14th, you just told me that the money went into your business account and it also went to as S Corp. for the legal team, right?

A   But I want you to be very specific. You know, we moved money after April 14th, but I want you to be --

Q   No. I want you to tell me where the money went.

A   You've got to be very specific.

Q   I'm not getting any more specific than that. If you're not going to tell me, then say, I'm not going to tell you. I want to know where the money went from the cars that were sold. That's a very simple, easy question to answer.

A   It went to legal. It went to pay bills. It went to insurance. It went to rent. It went to payroll

13 (Pages 438 - 441)

Page 442

if we have. It went to electric bill. It went to water bill. It went to -- I got to look in my, you know, expense paperwork and I can giving you exactly. If you give me a chance, I can tell you exactly.

Q   Sir, I'm not looking for an accounting. I'm just asking what accounts the money went into?

A   AWB.

Q   All right. So the money went into the AWB account. Did it go into any other accounts other than the AWB account?

A   I got to look at my paperwork and then I can give you a specific answer.

Q   Okay. Now, did some money go into the trust account?

A   At some point.

Q   Do you recall how that happened?

A   I don't remember. I got to look at my paperwork.

Q   How did it happen that money from the sale of one of the cars went into a trust account?

A   Just same decision. I can't tell you exactly. You know, I don't memorize everything.

Q   Why was the money put into the trust account?

A   I can't tell you right now.

Q   Why not?

Page 443

A   Because I got to -- you know, I got to really think about it and make sure I giving you the right answer.

Q   Well, why you don't you just give me the correct answer without worrying about it. Why was the money from one of the cars put into a trust account?

A   I got to think about it. You know, maybe I spoke to my legal team or anything. I got to think about it. I don't want to give you the wrong answer. Then you're going to call me a fraudster again.

Q   Okay. We already went through that. I never called you a fraudster.

A   One time.

Q   No, that's not what I said and you know it.

A   I wish if you know me better, because I'm not a fraudster.

Q   Okay. And I'm not a false accuser. I never called you a fraudster.

A   That's okay.

(FVP Exhibit D-08 was marked for Identification.)

BY MR. BRESLIN:

Q   All right. I'm showing you what's been marked as Exhibit D-08, and that is the bill of sale from an automobile that was sold the same day as the court

Page 444

hearing in Broward County.

Are you familiar with this document?

A   Let me look at it please.

Q   Okay.

A   Yes, I can see it.

Q   All right. So that's the money that got ultimately put in the trust account, right, from the sale of the Gladiator?

A   I got to look at it.

Q   So you don't know as you sit here today?

A   When the check comes, it goes to Auto Wholesale.

Q   I understand.

But ultimately the money got put into Mr. Farrow's trust account, didn't it?

A   I got to look into it.

Q   Were you ever requested to give permission to remove that money from the trust account?

A   I got to look into it.

Q   Listen to my question.

Were you ever requested, did anybody ask you for permission to take that money out of the trust account?

A   I got to really look into it and, you know, I got to memorize myself and make sure I'm giving you the

Page 445

right answer.

Q   So what do you need to memorize to answer that question?

A   To make sure I giving you the right answer.

Q   Now, there came a time, Mr. Farache, that you signed another affidavit that was filed in the state court. Do you recall that?

A   I appreciate if you show me the document please.

Q   Before I show you anything, do you remember a second affidavit that got filed in the state court after April 14th?

A   I'm not sure. I signed so many papers with these lawsuits. I'm all over.

Q   All right. I understand.

But you became aware that the judge in the state court had cited you and issued a rule to show cause in contempt, correct?

A   Explain to me which court you're talking about the.

Q   We're talking about the state court.

A   That's the Broward court?

Q   Yeah, in the Broward court.

You certainly have been made aware that the judge in the Broward court issued a rule to show cause

14 (Pages 442 - 445)

Page 446

in contempt. Is that correct?

A   Yes.

Q   And I assume you believe that to be a serious matter, correct?

A   If I contempt of court, yes.

Q   So you've been taking that seriously, have you not?

A   Very serious.

Q   So after the judge issued that rule to show cause in contempt, another affidavit was prepared for you to sign in the state court. Do you recall that?

A   Sometime, you know, between April and now, I signed a couple of them I think. I'm not sure. I signed a lot of document, so I appreciate if you show me the affidavit.

Q   Before I show you it, can you tell me why you wanted to file another affidavit?

A   Because maybe something been told the court and it's not true.

Q   Before you signed the second affidavit, what did you believe to be untrue in your first affidavit?

A   I can't tell you. I got to look in the affidavit please.

Q   So after you left court on the 14th, it never occurred to you that you may have made

Page 447

misrepresentations to the court?

A   No. I stand up and I spoke for myself.

Q   Now, after the court hearing on the 14th, Mr. Crispin went to investigate the cars that you were storing, correct?

A   I invite him on the 14th.

Q   Well, the judge ordered that we could inspect the cars and he went after court to inspect the vehicles, did he not?

A   I invite him and the judge say it's a great idea.

Q   All right. So whoever invited who, Mr. Crispin went and inspected the vehicles, correct?

A   Yes.

Q   Now, when you were with Mr. Crispin, did you give him access to all the vehicles that you were holding?

A   Based on my knowledge, yes.

Q   Now, when Mr. Crispin did that inspection on the 14th, how many vehicles were available?

A   Ask Mr. Krispin.

Q   Well, how many did you show him?

A   Everything. And if it's something --
Let me finish please.
If it's anything missing, I told him I have

Page 448

one vehicle in my premises. I have one vehicle in my AWB warehouse. I told them everything and I giving to them addresses and I invite him, but he's in a rush to go back to have dinner with your guys. That's what he told me.

Q   So what you're telling me is that you showed him every vehicle?

A   Yes.
And then told me, I got to go because I got to meet my team for dinner tonight.

Q   So he was in a big hurry?

A   I don't know. I mean, that's what he told me.
(FVP Exhibit D-07 was marked for Identification.)

BY MR. BRESLIN:

Q   Now I'm going to show you Mr. Crispin's statement for the investigation. And this is Exhibit D-07. You actually know Mr. Crispin from prior matters, right?

A   Can you repeat yourself.

Q   You know Mr. Crispin, correct?

A   If I know him? No.

Q   You never knew him before this?

A   Never.

Q   All right. So he went and he went to the

Page 449

warehouse and he located 13 vehicles. Do you see that?

A   But it's not just him. You remember, he has two more people with him, two or three people. He has a team with him.

Q   I'm not asking you how many people came with him. I'm asking you how many cars were in your possession when he inspected.

A   Whatever is there, we opened warehouse, we show him everything.

Q   And so you showed him all the cars and he filed the report that said that there was 13 cars?

A   Whatever it is.

Q   So these 13 cars that he looked at that day, you told him that these were all the cars that you had in your possession, correct?

A   That's not true.

Q   So what did you tell him exactly?

A   I say to him -- I opened the door -- that's all the cars and I have some cars in back. I have more vehicle on my other warehouse. I have more vehicle in my house.
And he said, I can't do everything tonight. I got to go back to dinner or some appointment.
And I said, No problem. Let me know when you want to come back.

15 (Pages 446 - 449)

Page 450

Q   So it's your testimony that when he went there to inspect the vehicles and he inspected 13 vehicles, that you told him that there were even more vehicles in other locations, but he neglected to go to those locations despite having the opportunity to do so. Is that correct?

A   Yes.

(FVP Exhibit D-03 was marked for Identification.)

BY MR. BRESLIN:

Q   Now, in the second affidavit that you filed, and that is D-03 --

THE WITNESS: Can we take a quick bathroom break or not yet?

MR. BRESLIN: Yes, absolutely.

MR. MILLER: Hold on a second. We're not taking a bathroom break.

MR. BRESLIN: Why not?

MR. MILLER: We're not.

MR. BRESLIN: Why not?

MR. MILLER: Because we're not. We have a hard stop at 6:00 because I they got to catch the train, Jerry.

MR. BRESLIN: All right.

MR. MILLER: I told you that this morning.

Page 451

MR. BRESLIN: All right. Well, that's why I asked.

MR. MILLER: I'm telling you.

MR. BRESLIN: So there's a hard stop at 6:00. That's what you're telling me. Okay.

BY MR. BRESLIN:

Q   So, Mr. Farache, I'm to go to through this second affidavit. And do you recall this affidavit was filed by your attorneys on May 26th? Do you recall that?

A   Can you please show me the dates and read to me the --

Q   Sure, sure. Let me show you the last date first.

A   The 26th day of May.

MR. MILLER: You've shown him the jurat, the Notary jurat. That's what you're showing him. That's what you see.

MR. BRESLIN: Oh, I'm sorry. I thought he wanted to see the date.

BY MR. BRESLIN:

Q   There's your signature. There's the date.

MR. MILLER: Jerry, is he asking too much to actually see the entire exhibit without you zooming through it?

Page 452

MR. BRESLIN: That's what I'm doing. He asked to see the date.

MR. MILLER: No, he wanted to see the document. He's asked you 12 times.

MR. BRESLIN: I'm going through the document.

BY MR. BRESLIN:

Q   All right. We're going to go through the document very slowly.

A   Can you read it.

Q   You want me to read it. Okay.

A   This way I understand it.

Q   Okay. It says: Amended Affidavit of Moshe Farache.

Comes Now, MOSHE FARACHE, pursuant TO 28 U.S.C. 1746(2), under penalty of perjury and states the following to be true:

My name is Moshe Farache. I am over the age of 18 years of age; and, I have personal knowledge of the facts states herein.

I am the managing member of Auto Wholesale of Boca.

AWB's principal address is 6560 West Rogers Circle, Suite is B-27, Boca Raton.

The business location.

AWB is a duly-licensed motor vehicle dealer in

Page 453

the State of Florida; and, has been in business over nine years.

AWB's primary business is to buy and sell automobiles.

I am submitting this affidavit to clarify my April 14th, 2022 affidavit ("April 14 affidavit") filed by my former counsel Marc Brandes ("Brandes").

On Sunday, April 10th, 2022, the FVP plaintiffs file a Verified Complaint (the "Complaint") along with an Emergency Ex Parte Motion for Appointment of Receiver and for Temporary and Permanent Injunction (the "Ex Parte Motion").

On Wednesday, April 13th, 2022, the FVP plaintiffs filed a Notice of Hearing (at 12:34 p.m.) for purposes of scheduling the Ex Parte Motion for the following day, April 14th at 3:30 p.m. (the "TRO Hearing").

I have since discovered that the FVP plaintiffs universally scheduled the TRO Hearing without consulting my attorneys for their availability or mine. Apparently, my previous counsel, Brandes, had accepted service of process via email on April 11th, 2022 on behalf of AWB.

It wasn't until April 14th at or about 1:54 p.m. that AWB's then-attorney, Brandes, sent me an email

16 (Pages 450 - 453)

Page 454

with the April 14 Affidavit, drafted by Brandes attached (in pdf format) for the very first time, which also referenced Exhibits that were not attached to the email containing the April 14th Affidavit.

Given the extremely tight time frame between receiving the April 14th Affidavit at 1:54 p.m. and the time to travel to the TRO Hearing from Boca Raton to Fort Lauderdale, I was relying upon my memory as to the automobiles AWB had in its possession and was trying to get the information relating to the inventory while en route. Further, I did not see any exhibits for the Affidavit, as they were apparently in Brandes' possession without my having seen them.

I must mention that my native language is Hebrew; and, while I speak English conversationally, I neither read nor write it fluently -- which further challenged my abilities to understand the April 14th Affidavit. In fact, I only had time for my wife, Lisa Farache, to read me the first few paragraphs before it was signed. Note, this Amended Affidavit has been read to me by my family so could I properly understand its contents.

If the Court would recall, I stood up at the back of the Courtroom at the TRO Hearing indicating the number of automobiles referenced by my attorneys were

Page 455

not correct; as AWB did not have in its possession 27 automobiles. Even my counsel had indicated the same at the conclusion of the TRO Hearing, and the Court, to me, appeared to note there was disagreement with the number of automobiles and appeared to direct the parties to confer regarding the inventory.

Therefore, I want to clarify the automobiles in AWB's possession as of the TRO Hearing.

For example, although Exhibit 1 of the April 14th Affidavit referenced a list of automobiles between numbers 1 through 36, certain consecutive numbers are omitted therein; and, there were not 27 automobiles referenced in Exhibit 1, but rather 22 automobiles were referenced therein.

Exhibit 1 was not provided to me at the time I received the April 14th Affidavit at 1:54 p.m. on April 14 nor was it produced to me prior to the TRO Hearings (which commenced at 3:30 p.m.); and, Exhibit 1 was not an accurate representation of the vehicles in AWB's then-current possession at the time of the TRO Hearing.

At the commencement of the TRO Hearing, AWB was in possession of the 20 automobiles which are accounted for in Exhibit "A" hereto. AWB continues to be in possession of 19 of these vehicles, as AWB

Page 456

released a certain Rolls Royce Ghost pursuant to this Court's order.

At the time of the TRO Hearing, Exhibit "A" hereto represents all of the vehicles in AWB's then-possession.

Of the 22 vehicles identified in the original Exhibit 1 to the April 14th Affidavit, three of these vehicles were not in AWB's possession as of the commencement of the TRO Hearing as result of sales prior to the TRO Hearing.

One of these automobiles set forth in Exhibit 1, -- the Bentley Flying Spur (identified as Exhibit 10) -- was sold at Manheim Palm Beach on April 7th, 2022.

Another automobile, a Jeep Gladiator (identified as Exhibit 30 on Exhibit 1), was sold at Manheim prior to the TRO Hearing.

As such, these two automobiles (Bentley Flying Spur and Jeep Gladiator) were sold before this Court's Freeze Order; and, these two automobiles should not have been on "Exhibit 1" to the originally-filed Affidavit.

There was a third automobile listed on Exhibit 1 to the April 14th Affidavit that was not in AWB's possession at the time of the TRO Hearing, and still is not. Specifically, that certain Lamborghini Huracan

Page 457

(identified as 32 on Exhibit "1") was not in AWB's possession; but, was observed at Karma Broward as recently as May 4th, 2022. It should be noted that this automobile was listed as being black in color; however, when I recently saw it at Karma of Broward, it was wrapped in the red color.

Although omitted from Exhibit 1 to the Affidavit, the automobile identified as number 4 on the attached Exhibit "A", (a Lamborghini Urus), was in AWB's possession, and said Lamborghini Urus continues to be held by AWB per the Court's verbal Freeze Order. And, the automobile identified as number 33 in Exhibit "A" hereto, a Lamborghini Huracan, was also in AWB's possession at the time of the TRO Hearing (even though it was not listed on Exhibit 1 to the April 14th Affidavit) and continues to be held by AWB per this Court's verbal Freeze Order.

The confusion about the numbers and types of automobiles that AWB possessed at the time of the TRO Hearing was a function of limited information relating to the number and type of automobiles being available, the lack of time I had to confirm AWB's Inventory count, that I did not receive any of the exhibits from my attorney to review, and the miscommunication between myself and AWB's former attorneys.

17 (Pages 454 - 457)

Page 458

Additionally, at the TRO Hearing, when my former counsel advised this Court that there were 27 automobiles in AWB's possession, I immediately attempted and did tell him that the information my counsel was referencing regarding the number of automobiles currently in AWB's possession was not accurate and needed to be verified and corrected.

Respectfully, the Court may recall that, at the end of the TRO Hearing, after I spoke to Mr. Brandes in open court, Mr. Brandes advised this Court that he needed to be sure of the number of automobiles; and, the Court appeared to understand that the number had to be addressed between the Parties to this litigation.

As a result of this Court's verbal Freeze Order, the remaining 19 vehicles are being housed, and insured by AWB, at its expense; and, unfortunately, the Freeze Order has effectively shut down AWB's business operations and caused AWB to sustain damages financial and otherwise on a continuing basis.

In conclusion, I did not intend to mislead the Court in any way; and, to the extent confusion was created and mistakes were made, I believe the same was the function of what I have stated above.

FURTHER AFFIANT SAYETH NOT.

A    Excuse me, Jerry?

Page 459

Q    Right.  I just read the affidavit.

MR. MILLER:  You did a wonderful job, Jerry.

THE WITNESS:  What's your question?

MR. BRESLIN:  I've never had a depo where I've done so much reading.

BY MR. BRESLIN:

Q    So my question to you is:  This affidavit was prepared and filed on May 26th by your new attorneys, correct?

A    Yes.

Q    And this affidavit was filed in response to the rule to show cause in contempt where the court had scheduled a hearing to determine whether or not the Court was going to hold you in contempt for making misrepresentations to the court, correct?

A    That's a big word what you use.  I can't even answer.  I can't even understand what you're saying.

Q    All right.  The long and short of this is: What you're saying in this affidavit is that it was Mr. Brandes' fault that the court was given the wrong number of automobiles, correct?

A    I don't understand what you're trying to say.

Q    This affidavit says that you signed the April 14th affidavit without looking at any list, and Mr. Brandes prepared that affidavit for you, correct?

Page 460

A    Yes.

Q    All right.  So if the information in the affidavit on April 14th was wrong, it was Mr. Brandes' fault, correct?

A    I'm not God.

Q    What does that mean?

A    I'm not going to tell -- I don't even tell my kids when they do something wrong any more.

Q    Well, here's my point:  On April 14th, you filed an affidavit with the court that was wrong, correct?

A    I'm trying to answer you but, you know, I just don't -- you know, it's -- you know, we have some -- you know, I can't just blame on anybody till I really find the fact issue and tell you the answer.  You know, I don't make -- you know, it's hard for me to say it's this guy's fault, this guy's fault.  I make my decision. I change legal teams.  I don't make my final whose fault it is here.

Q    All right.  But this affidavit says that a list of cars was submitted to the court that you swore to because Mr. Brandes attached that list to a document without your permission, correct?

A    Yes, because you're talking about because I don't see the car list.  That's what you're talking

Page 461

about?

Q    I'm just talking about what you say in this new affidavit, the second affidavit.  The second affidavit is saying that Mr. Brandes submitted a list, that you never saw the list, that it never should have been submitted, and it's not your fault and it was all a big mistake, right?

A    Yes.

Q    Okay.

A    You're talking about the second affidavit?

Q    The second affidavit --

A    Oh, okay.

Q    -- talks about the first affidavit, right?

A    That's why I want to make sure.  I don't want you to think about the first AWB affidavit.  I'm talking about the second one.

Q    Okay.  Well, this affidavit talks about --

A    The second?  You're talking about the second?

Q    Two second affidavit, the one that's on the screen, says that the first affidavit filed on April 14th was incorrect, right?

A    Yes.

Q    Okay.  And this affidavit says the reason that the first affidavit that was filed on April 14th was incorrect was because Mr. Brandes gave you a document to

18 (Pages 458 - 461)

Page 462

sign and that you signed it without reading it and he attached the lists to it that he was not authorized to attach, correct?

A   Yes.

Q   Okay.  So that is in essence what this document says is that if there was -- that there was a mistake made and that it was Mr. Brandes that made that mistake by having a false affidavit or an incorrect affidavit filed of record, correct?

A   You're talking about the second affidavit, correct?

Q   Right.

A   Yes.

Q   I'm talking about the second affidavit and what it says about the first affidavit, correct?

A   Yes.

Q   Now, what the April 14th affidavit does not address and what the May 26th affidavit does not address is the affidavit that you filed in Palm Beach on April 8th, 2022, right?

A   I can't answer you this one.

Q   Well, you have testified under oath on numerous occasions in this deposition that you, in fact, purchased the vehicles and that AWB is the owner of vehicles as opposed to a lender with a security interest

Page 463

in vehicles, correct?

A   Can you repeat yourself.

Q   Yes.

On April 8th under oath you filed a lawsuit in Palm Beach asking the court in Palm Beach to grant you a foreclosure on collateral, correct?

A   I need to see the paperwork.  It seems like you showed me this one and I am -- you know, something --

Q   Am I going to have to read it?

A   I mean, you've got to show me -- you know, you are --

Q   Well, let me ask you a couple questions before I'm forced to read it.

When this document, this lawsuit, was filed in Palm Beach on April 8th, 2022, were you aware of its contents before you signed it?

A   I got to look at what you're talking about.

Q   I'm not asking you to look at it.  I'm asking you to remember what happened back then.

A   I can't.

Q   Because on April 8th you signed a piece of paper that said all this other stuff in this paper is true.  Do you remember that event?

A   I don't remember exactly.  And, you know, if

Page 464

you don't show me a piece of paper and really help me to understand that -- you know, you take your three minutes and you read a piece of paper, and after three minutes, you know, whatever it is, I tell you yes or no.

Q   Okay.  Well, let me just --

MR. MILLER:  Jerry, it's after 6:00.  They've got to catch their train.

MR. BRESLIN:  Okay.  I'm not done.  So I assume we are going to have to take this up with the court, right?

MR. MILLER:  It's after 6:00.  They need to catch their train, Jerry.  You can talk to me later.

MR. BRESLIN:  So you're terminating, correct?

MR. MILLER:  They have no choice.  They've got to get on their train, Jerry.  You've had eight and-a-half hours of their day.

MR. BRESLIN:  All right.  Just note for the record that I'm not done and the witness is --

THE WITNESS:  You want to come pick us up and take us to Boca?

MR. BRESLIN:  You know, you give me three more hours and I'll pick you up and even buy you some dinner.  How is that?

THE WITNESS:  I don't know.  You don't want to

Page 465

be seen with a fraudster.

MR. BRESLIN:  No, no, no.

THE WITNESS:  Remember, I don't want to ruin your reputation over there.

MR. MILLER:  Mr. Farache, hold on.  You don't know Mr. Breslin's friends.  Now stop that.

THE COURT REPORTER:  Do we want all this on the record?

MR. BRESLIN:  All right.  The record is clear. I'm not done.  The witness is leaving.  To the extent that we can't reschedule, we'll take it up with the court.

Mr. Farache, thank you very much for your time.

THE WITNESS:  Thank you.  Have a great weekend.  I appreciate your time.

MR. BRESLIN:  Ms. Court Reporter, I sent you the link.  I will take a copy of everything we've had today and not on an expedited basis.  If I want to expedite, I'll let you know.

Just note for the record that I was examining the witness, commencing to examine the witness on the representations made in Exhibit D-02, that's the Palm Beach lawsuit.  Okay.

MR. MILLER:  The deponent will read and we'll

19 (Pages 462 - 465)

Page 466

take a courtesy copy of the examination making sure that Mr. Breslin is the first order so he has to pay the bigger fee.

You know what, Jerry? It's probably less than you'd pay on dinner with us anyway.

(The Reading and Signing is not waived and the deposition was adjourned at 6:06 p.m.)

Page 467

RE : Auto Wholesale of Boca, LLC, FVP Opportunity Fund, III, LP, et al., vs. Auto Wholesale of Boca, LLC

DEPO OF : MOSHE FARACHE

TAKEN : January 13th, 2023

EXCEPT FOR ANY CORRECTIONS MADE ON THE ERRATA SHEET BY ME, I CERTIFY THIS IS A TRUE AND ACCURATE TRANSCRIPT. FURTHER DEPONENT SAYETH NOT.

_____
MOSHE FARACHE

STATE OF FLORIDA    )
                    ) SS:
COUNTY OF BROWARD    )

Sworn and subscribed to before me this _____ day of _____, 2023.

PERSONALLY KNOWN _____ OR I.D. _____

_____
Notary Public in and for the State of Florida at Large.

Commission No. HH398636
Expires: 9/17/2026

Page 468

ERRATA SHEET

RE : Auto Wholesale of Boca, LLC, FVP Opportunity Fund, III, LP, et al., vs. Auto Wholesale of Boca, LLC

DEPO OF : MOSHE FARACHE

TAKEN : January 13th, 2023

DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

Page  # | Line # | Change            | Reason
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____
_____| _____|_____|_____

State of Florida    )

County of BROWARD    )

Under penalties of perjury, I declare that I have read my deposition transcript, and it is true and correct subject to any changes in form or substance entered here.

_____        _____
Date                    MOSHE FARACHE

Page 469

CERTIFICATE OF OATH OF WITNESS

STATE OF FLORIDA    )
                    ) SS:
COUNTY OF BROWARD   )

I, AMBER CHEEK, COURT REPORTER, Notary Public in and for the State of Florida at Large, certify that the witness, MOSHE FARACHE, appeared via videoconference on January 13th, 2023, and was duly sworn by me.

WITNESS my hand and official seal this 26th day of January, 2023.

_____
AMBER CHEEK, Court Reporter
Notary Public, State of Florida
at Large

Commission No. HH398636
Expires: 9/17/2026

20 (Pages 466 - 469)

Page 470

REPORTER'S DEPOSITION CERTIFICATE

I, AMBER CHEEK, Court Reporter, certify that I was authorized to and did stenographically report the deposition of MOSHE FARACHE, the witness herein on January 13th, 2023; that a review of the transcript was requested; that the foregoing pages numbered from 181 to 472 inclusive is a true and complete record of my stenographic notes of the deposition by said witness; and that this computer-assisted transcript was prepared under my supervision.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action.

DATED this 26th day of January, 2023.

*Amber Cheek*

AMBER CHEEK

Court Reporter

---

Page 472

VERITEXT FLORIDA REPORTING CO.
One Biscayne Tower
Two South Biscayne Boulevard
Suite 2250
Miami, Florida 33131
(305) 376-8800

January 26th, 2023

Jarrell Breslin, Esquire
Barron, Breslin & Sarmiento
169 East Flagler Street
Suite 700
Miami, Florida 33131
RE    : Auto Wholesale of Boca, LLC, FVP Opportunity
        Fund, III, LP, et al., vs. Auto Wholesale of
        Boca, LLC
DEPO OF : MOSHE FARACHE
TAKEN   : January 13th, 2023
READ & SIGN BY:  February 24th, 2023

Dear Counsel:
The original transcript of the deposition listed above is enclosed for your file.  The witness did not waive reading and signing and has been sent a letter notifying them to come in and read and sign their deposition transcript.
The witness will be provided a copy of their deposition transcript for reading in our office should they come in to review the transcript, and we will forward to you any corrections made by the witness at that time, along with an original signature page which should be attached to the original transcript which is in your possession.

Sincerely,
AMBER CHEEK, Court Reporter

---

Page 471

VERITEXT FLORIDA REPORTING CO.
One Biscayne Tower
Two South Biscayne Boulevard
Suite 2250
Miami, Florida 33131
(305) 376-8800

January 26th, 2023
Mr. Moshe Farache
c/o James Miller, Esquire
James B. Miller, Esquire, P.A.
19 West Flagler Street
Suite 416
Miami, Florida 33130

RE    : Auto Wholesale of Boca, LLC, FVP Opportunity
        Fund, III, LP, et al., vs. Auto Wholesale of
        Boca, LLC
DEPO OF : MOSHE FARACHE
TAKEN   : January 13th, 2023
READ & SIGN BY:  February 24th, 2023

Dear Mr. Moshe Farache:

This letter is to advise you that the transcript of the deposition listed above is completed and is awaiting reading and signing.

Please arrange to stop by our office in Suite 2250, One Biscayne Tower, Two South Biscayne Boulevard, Miami, Florida 33131 to read and sign the transcript.  Our office hours are from 8:00 a.m. to 4:00 p.m. Monday through Friday.  Depending on the length of the transcript, you should allow yourself sufficient time. If the reading and signing has not been completed prior to the referenced date, we shall conclude that you have waived the reading and signing of the deposition transcript.  Your prompt attention to this matter is appreciated.
Sincerely,
AMBER CHEEK, Court Reporter
cc:  All counsel on appearance page

---

21 (Pages 470 - 472)

Veritext Legal Solutions

800-726-7007                                                        305-376-8800

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.