Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

IN RE:                                CASE NO.:   22-15627-EPK
                                      Chapter 11 SUB V

AUTO WHOLESALE OF BOCA, LLC,

             Debtor.
_____/

March 22, 2023
10:04 a.m. to 3:35 p.m.

DEPOSITION VIA ZOOM VIDEO CONFERENCE

OF

MOSHE FARACHE,

AS CORPORATE REPRESENTATIVE OF AUTO WHOLESALE OF BOCA, LLC

Taken pursuant to Notice,
On behalf of Nicole Testa Mehdipour, as Chapter 7 Trustee
for Excell Auto Group, Inc.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Movant's
Trial Exhibit
122

Page 2

APPEARANCES VIA ZOOM VIDEO CONFERENCE:


LINDA M. LEALI, Subchapter V Trustee


NICOLE TESTA MEHDIPOUR, Chapter 7 Trustee
for Excell Auto Group, Inc.


FURR AND COHEN, P.A., by
ALAN R. CRANE, ESQUIRE
JASON S. RIGOLI, ESQUIRE
JONATHAN CRANE, ESQUIRE
Special Counsel
On behalf of Nicole Testa Mehdipour, Chapter 7 Trustee
for Excell Auto Group, Inc.


JAMES B. MILLER, P.A., by
JAMES B. MILLER, ESQUIRE
On behalf of the Debtor


SCOTT C. GHERMAN, P.A., by
SCOTT C. GHERMAN, ESQUIRE
On behalf of Moshe Farache and Calvin Erbstein


WEISS HANDLER & CORNWELL, P.A., by
HARRY WINDERMAN, ESQUIRE
On behalf of the Karma Entities


BARON BRESLIN & SARMIENTO, by
JERRELL A. BRESLIN, ESQUIRE
and
DAVID R. SOFTNESS, P.A., by
DAVID R. SOFTNESS, ESQUIRE
On behalf of the FVP Parties


BAKER DONELSON, by
TRAVIS HARVEY, ESQUIRE
On behalf of Bal Investments, LLC

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

ALSO PRESENT VIA ZOOM VIDEO CONFERENCE:


ALAN BARBEE

KRISTEN BOKINSKY ZANKL


- - - - - - -


I-N-D-E-X

| WITNESS | DIRECT | CROSS |
|---------|--------|-------|
| MOSHE FARACHE | | |
| By Mr. Crane | 6 | -- |


- - - - - - -


E-X-H-I-B-I-T-S

| Excell Trustee's | Description | Page |
|------------------|-------------|------|
| No. 1 | Deposition Notice | 42 |
| No. 2 | Plan of Reorganization | 76 |
| No. 3 | November 12, 2021 e-mail | 96 |

** All Exhibits were retained by Mr. Crane.


- - - - - - -

THE COURT REPORTER:  Would counsel please state their appearances for the record and express their stipulation that this Deposition of Moshe Farache, as corporate representative of Auto Wholesale of Boca, LLC, may take place with a remote administration of the oath and remote reporting of the deposition?

MR. CRANE:  This is Alan Crane, I'm special counsel for Nicole Testa Mehdipour.  Ms. Mehdipour is on audio only.  Jonathan Crane, who's an attorney in our office, is also on, also as special counsel.  Jason Rigoli is also on as special counsel, also with my firm.

And so all of us on behalf of Nicole Testa Mehdipour, as Chapter 7 Trustee for the Excell Auto bankruptcy case, so stipulate.

MR. MILLER:  James Miller on behalf of the debtor-in-possession, not so special counsel because apparently Mr. Crane took the word "special," so just regular counsel.

MR. WINDERMAN:  Jim, you're very special.

MR. MILLER:  We so stipulate.

MR. BRESLIN:  Jerry Breslin for the FVP parties, so stipulated.

MR. WINDERMAN:  Harry Winderman on behalf of the Karma entities, so stipulated.

MS. LEALI:  Linda Leali, I'm the

Subchapter V Trustee.

MR. GHERMAN:  Scott Gherman, I'm representing Mr. Farache, individually, and Calvin Erbstein, and so stipulated.

Thereupon,

MOSHE FARACHE,

having been first duly sworn, was examined and testified as follows:

MR. CRANE:  This is Alan Crane on behalf or Nicole Testa Mehdipour, who is the Chapter 7 Trustee for Excell Auto Group.

Pursuant to an agreement between me and Mr. Miller, we are going to take a break at this point in time so that he can attend a 341 Meeting in another matter.  We'll take a break until 10:40.

Mr. Miller will contact me either by e-mail or text if his deposition or 341 Meeting is going long, but otherwise, we will reconvene at 10:40.

MR. MILLER:  Thank you, Alan.  Correct, and I will e-mail you immediately when I'm aware of any overage on that.

MR. CRANE:  Thank you.

All right.  We're off for now.

(Thereupon, a recess was taken, after which the following proceedings were had:)

Page 6

THE COURT REPORTER:  Alan, we have three people that joined during the break, Alan, David and Kristen.

MR. CRANE:  Okay.  Alan Barbee is the expert witness in this matter for Nicole Testa Mehdipour, as Trustee for Excell Auto Group.

MR. BARBEE:  Good morning.

THE COURT REPORTER:  David, can you state your appearance?

MR. MILLER:  Who, me?

THE COURT REPORTER:  No, David Softness.

MR. SOFTNESS:  This is David Softness for the FVP Parties.  I believe Jerry Breslin is also on the line.

THE COURT REPORTER:  Thank you, and Kristen also joined.

MR. CRANE:  Kristen, you need to make an appearance, please or Harry for Kristen, if you're representing her.

MR. WINDERMAN:  She's just listening, she's not appearing.

THE COURT REPORTER:  Okay.  Thank you.

DIRECT EXAMINATION

BY MR. CRANE:

Q.   Mr. Farache, you've been previously sworn

Page 7

in.  We're back, so you understand that you're still under oath?

A.    Yes, sir.

Q.    Thank you.  My name is Alan Crane.  I am special counsel to Nicole Testa Mehdipour, who's the trustee in the Excell Auto Group bankruptcy case.

I'm going to be asking you a series of questions today.  If you do not understand what I've asked, please stop me and I will be happy to rephrase.

If you need a break at any time, I just ask that you answer the question that's pending, and then we'll take breaks as needed.

The court reporter is taking everything down, so please, no shakes of the head, nods or uh-huhs or uh-uhs, you have to audibly say yes or no if that's the appropriate answer.

If you need a document to refresh your memory or refer to something, you need to tell me what the document is, either you'll have it or I'll have it hopefully, and then I'll give you the document and we can go from there.

Understood on that?

A.    Yes.

Q.    And you can hear me okay, we're doing this over Zoom?  I just want to make sure that my -- you're

Page 8

hearing my voice.

A.    Yes.

Q.    Okay.  Thank you.  Please state your role with Auto Wholesale of Boca, LLC.

A.    I'm basically the managing member and I run the daily operation.

Q.    Okay.  Who else are members of Auto Wholesale of Boca, and I'm going to, if it's okay with you, I'll refer to Auto Wholesale of Boca as either AWB or the debtor?

So who else is -- who else is a member of the debtor?

A.    I -- I'm not sure how all the paperwork behind the scene going, but it's basically me and my wife and my son.

Q.    Okay.  Do you know offhand what the percentage of ownership is?

A.    I think my son own one or two point just because we got additional licensing.

Q.    Okay, and what was his role at -- what is his name, first of all, your son?

A.    Chase Farache.

Q.    Okay, and what is his role with AWB?

A.    Basically just relocation cars, you know, looking for deals, and just the same like anybody else,

Page 9

just helping with what we need, and try to build the whole found -- the whole infrastructure -- infrastructure of the business.

Q.    Okay.  Does he have any management responsibilities with AWB?

A.    No, I'm the person make decision.

Q.    Okay.  Does he have the authority to make decisions without your consent or without your knowledge?

A.    I mean, no.

Q.    Okay, and for your wife, her name is Lisa Farache?

A.    Yes.

Q.    Okay, and what is her role at AWB?

A.    I mean, just PR, you know, people, you know, basically just helping with the developing new -- new location for AWB.  So just helping with, you know, permitting, make sure we get the right product for the bay and that's it.

Q.    Okay, and does she have, you know -- I'm talking about currently.  We'll start so we have a timeframe.  Currently does she have a management role with AWB?

A.    No.

Q.    Okay.  Does she have the ability to make decisions without your knowledge or -- knowledge?

Page 10

A.    I don't know.  I mean, you know, we always -- you know, it's basically we buying and selling cars.

Q.    Is she involved in the buying and selling cars process?

A.    I mean, I can't tell you on the top of my head, no.

Q.    Okay, and has that changed over time?  Let's say over the last four years, Lisa -- Lisa Farache's role and her day-to-day responsibilities at AWB, can you briefly describe those to me?

A.    What do you -- I mean, I don't know what you try to -- I mean, usually we run the business.  She's not involved in a daily role.

Q.    She's not involved on a daily basis?

A.    No.

Q.    Okay, and that's been true for the last four years?

A.    Say it again, I'm sorry.

Q.    And that's been true -- has that been true for the last four years, that she's not been involved in the day-to-day operations of the -- of the business if that's -- if I'm understanding you correctly?

If I'm not, please tell me that, let me know where I'm not understanding.

Page 11

A.    You're talking about AWB; correct?

Q.    Yes, I'm just talking about -- I'll rephrase the question.

For the -- for the four years prior to the filing of the bankruptcy, what was Lisa Farache's day-to-day responsibilities at AWB?

A.    Basically she's more helping and if we need help with the design of a new space, and just behind the scene, but nothing on a daily operation.

Q.    Okay.  Where -- where is the location of AWB, currently we'll start with?

A.    6560 West Rogers Circle.

Q.    Okay.  Is that a commercial building or is that a home?

A.    Commercial building.

Q.    Okay, and where previously -- well, does AWB have any other locations currently that it either owns or rents space from or stores vehicles?

A.    Yes, but you talking about, you want me to tell you today or you want me to tell you 2022?

Q.    No, I'm asking today.

A.    Yes.

Q.    So let's start with today.  What are the current locations of AWB, the other locations?  You gave me the main location.

Page 12

A.      6560 West Rogers Circle.

Q.      Okay.

A.      5471 North Dixie Highway, Boca Raton.

Q.      Okay.  So Rogers Circle and Dixie Highway.

Okay, and --

UNIDENTIFIED SPEAKER:  Good morning.

MR. CRANE:  Travis, can you keep yourself on mute?

BY MR. CRANE:

Q.      In the main location, are there any other businesses that operate in the main -- in the main location?

A.      Which, use the address so I can tell you.

Q.      The first address that you gave me, and I didn't write it down fast enough, 6560.

A.      Can you repeat the question, please?

Q.      6560, that's I believe where your main office is, is that correct, the first four -- the number of the street?

A.      Yes.

Q.      Okay.  Is that a particular -- are you in a particular suite or -- or is it a stand-alone building?

A.      It's a suite.

Q.      Okay.  Inside --

A.      I'm sorry, it's B27.  I'm sorry, I should

Page 13

say that to you, B27.

Q.    B27.

A.    I use the main address, I no given to you the suite, sorry.

Q.    At 6560 and then B27, does that -- does AWB share space with any other entity?

A.    Yes.

Q.    Okay, and what are the other entities that AWB shares space with at 6560, B27?

A.    I mean, we -- basically that's our main office for different businesses.  So we just use it like, you know, we have an office over there for EES and other corporation we own, what is basically just, you know, bookkeeping purpose we use it.

Q.    Can you tell me the name of those entities?

A.    I mean, M & M Development, 1001.  I mean, you have Moshe Farache, I think, and Mazel Tov.  I mean, it's just an address, we use it as the address.

Q.    Okay.  Are all of -- are all of those entities in some manner or shape related to AWB?

A.    I just want to let you know maybe it's more or less corporation we use it as the address.

Q.    Okay.

A.    Maybe I miss one or two or whatever, just want to let you know.

Q.   Okay.

A.   Okay.

Q.   Do you -- do you have -- do you personally have some sort of ownership interest in all of those entities?

A.   Not all of them.

Q.   Okay.  Which one would you not have any ownership interest in?

A.   Mazel Tov.

Q.   Okay, and then who owns Mazel Tov?

A.   My kids.

Q.   Okay.  So all of them are family businesses in some manner, shape or form?

A.   Can you repeat it?

Q.   I said, all of the entities that share space with -- at 6560, B27, are all family owned businesses, whether it's you, personally, whether it's your children, your wife, whoever it is, all of the businesses there are family -- some way related to the family, the overall Farache family?

A.   Friendship and family, yes.

Q.   Okay.  So I'll just ask about the one that's a friendship.  So which one is the one that's just a friend that owns a business?

A.   Osce.

Page 15

Q.   I'm sorry?

A.   Osce.

Q.   Can you spell that for me, and probably the court reporter needs it, too?

A.   You ask the wrong guy to spell it.

MR. GHERMAN:  Alan --

MR. CRANE:  Yes.

MR. GHERMAN:  -- it's O-s-c-e.

BY MR. CRANE:

Q.   And who is the person that owns that entity?

A.   Miles Junior.

Q.   Miles Junior, and is that a car business?

A.   No.

Q.   Okay.  At the Rogers address, other than AWB, who's at the Rogers address?

I'm sorry.  Oh, this is the same address, okay.

At the Dixie Highway address, what other entity or entities, if any, are located in the same premises that AWB occupies?

A.   It's -- how I going to say it?  It's not the same address, we have different addresses --

Q.   Okay.

A.   -- but the whole building, you know, you have Excell Auto Sport Service, and then you have the rest

Page 16

of the building --

Q.    Okay.

A.    -- and then you have AWB.

Q.    Okay, and do you still have an ownership interest in Excell -- you personally have an ownership interest in Excell Auto Service -- Sport and Service?

A.    Moshe Farache or AWB?

Q.    Yes, Moshe Farache.

A.    Yes.

Q.    Okay, and that's a repair shop --

A.    Yes.

Q.    -- but does not sell vehicles; is that correct?

A.    You talking -- can you repeat?  Can you --

Q.    Yes.  Does, Excell Auto Sport and Service sell vehicles or just repair vehicles or both?

A.    Basically repair more.  That's based on my knowledge, repair vehicles --

Q.    Okay.

A.    -- and part, selling parts.

Q.    Okay, and those are the only addresses that AWB has that it occupies space in?

A.    Based in 2023, yes.

Q.    Okay, and prior to 2023, and let's just go back only up to four years, where else would AWB have had

Page 17

space?

A.      In 1001.

Q.      Okay, and that's Clint Moore?

A.      Yes.

Q.      And that's where -- is that the same address that Excell had its Boca address?

A.      Yes.

Q.      Excell Auto Group, Inc.?

A.      Yes, but, you know, it's a different bay.

Q.      Okay, and how long did it have offices at 101 Clint Moore?

A.      From the day 2011 or '12.

Q.      Okay, and then when did it stop?

A.      When?  I mean, April -- I mean, sometime in '22.

Q.      Around the time that Excell Auto Group filed bankruptcy?

A.      No.

Q.      No, so it had space there afterwards?

A.      For a little bit, yes.

Q.      Okay.  Just the layout of Excell, the Excell -- or that building, the 101 building.  If one walked -- and I'm just going to take it from the timeframe of four years prior to Excell Auto filing bankruptcy, so that was April of 2022, back four years.

Page 18

There is a -- it's a single-story building; correct?

A.    Yes.

Q.    Okay.  There -- when you -- when someone would walk in from the front of the building, they would see a sign on the building; is that correct?

A.    Yes.  In 2018, yes.

Q.    Okay, and what would that sign say?

A.    Excell Auto Group.

Q.    Okay.

A.    Based on my knowledge, Excell.

Q.    It would just say Excell; correct?

A.    Yes.

Q.    I believe it was in big red letters, if I remember correctly?

A.    Yes.

Q.    Okay, and if you walked into the door, there were some offices to the right, but mainly a show -- a showroom; correct?

A.    Yes, office to the right, office to the left, kitchenette, another hanging out area, I would call that, and basically just showroom.

Q.    Okay, and it was one extended showroom; correct?  In other words, there weren't barriers between -- in the middle of the showroom floor?

A.    In Excell space?

Q.    Well, in the space that -- the 101 space that -- regardless of whether it was Excell, Karma or AWB, it was all -- so when you walked into the door, right, there was a showroom floor where there were vehicles parked.  Do you remember that?

A.    Yes.

Q.    Okay.  Were -- were there any barriers between -- that would separate -- you know, structural barriers that would separate out vehicles, whether they were Karma vehicles, Excell vehicles or Auto Wholesale -- Auto Wholesale vehicles?

A.    It's always rotating.

Q.    I'm sorry?

A.    It's always movement.

Q.    Movement of cars I understand, but no -- there were no walls or any other --

A.    I mean, there's a wall over there, but it's always movement.

Q.    What does that mean, movement of walls?

A.    If Alan, for example, if you purchase a car and you come to try it, and the car all the way by Mr. Zankl office, so, you know, they got to move ten cars before they get to your car.  So it's always movement, taking car outside, move it to the shop, move it to the

Page 20

service, move it -- you know, it's all over.

And what I'm trying to say is, you know, it's not --you know, you can't -- I don't know how to explain that, but, you know, it's always -- you know, if tomorrow I come and I say, where is this car?

Then you say to me, this one is in service at XYZ, this one it's here, it's always a movement, so you can't really specify movement.

I mean, you know, in the past we used to have my daughter cars over there, you know, we have our own cars, what we have refurbishing, you know, what we bought, you know, it's always movement.

Q.   Right, but it's one long -- it's one long open space where there were a lot of cars that were moving in and out of; correct?

A.   I mean, it's always an interest between the space, but you have also different tenant in the building, so you can't say it's one whole space.

Q.   No, no, physically.  I'm talking about physically, the space.  When you went into -- if you would walk in, there were -- there was the large open area where there were vehicles; correct?

A.   The showroom, yes.

Q.   Yes.  So let's just talk about -- I'm just talking about the showroom space right now, where they --

Page 21

where they put vehicles.

You're familiar with that, correct, because you were the landlord, as well?

A.    Yes.  When you say showroom, it mean where all the disposal cars.  You know, it's also kind of like mechanical, polishing and storage cars, it's a different space.

You're talking about just the showroom; correct.

Q.    Yeah.  We're going to start with just the showroom.

A.    Okay.

Q.    We're going to just start with the showroom where cars were out on display.  That was one long big open space; is that correct?

A.    Yes.

Q.    Okay, and then in the back there was a -- and that's where all the vehicles that were -- not all the vehicles, but that's where the vehicles were displayed for sale, whether they were -- is that correct, in that large open space?

A.    I mean, it's always movement.  Some of the cars sit outside, they waiting to get washed.  Sometimes I meet people, they want to sell the cars, I come to get valuate before I pay for it, and, you know, it all

Page 22

depends.

Q.   Okay, but mainly inside -- inside the building on the showroom floor, those were generally cars for sale?

A.   I don't know.  Sometimes people just drop the cars for some wrapping position, tinting, and you know, they keep the car inside because it's, you know, it's somebody friend of a friend or kindness of clients and, you know, I mean, I don't know.

I can't tell you which one particular its belong to -- which one it's for sale, what's -- what's the position of the vehicle.

Q.   Okay.  So if you would walk in, you would not necessarily know which car -- immediately you wouldn't know which car is for sale, which car is there for -- just for show, which car is being stored for a -- for convenience, is that my understanding of what your testimony is?

A.   Yes.

Q.   Okay.  That was a yes?

A.   Yes.

Q.   Okay, and if you walked in, also you wouldn't -- would you know which car -- by walking in, would you know which one -- which car, if you were a consumer -- and I'll start over.

Page 23

If you were a consumer and you walked into the showroom and you were just looking in the showroom floor, would you be able to tell which vehicle was an Excell vehicle, a Karma vehicle or AWB vehicle?

A.   Can you -- can you explain to me what you mean consumer?

Q.   If I'm -- if I'm a person who wants to buy a vehicle.  So we're now while -- you know, we're back before Excell shut down, and you said AWB is operating out of there, Karma is operating out of the same space and Excell.

So Excell, Karma and AWB is operating out of the same space, and it's one large open showroom floor, and if I wanted -- during that time if I am a consumer, which is I wanted to -- I'm somebody off the street and wanted to buy, you know, a high-end, luxury vehicle, and I walked into the showroom floor knowing nothing about it other than it says -- a big red sign that says Excell on it, would I be able to tell which vehicle was a Karma vehicle, which vehicle was an Excell vehicle or which vehicle was an AWB vehicle?

A.   Depends who you ask.

Q.   No, no, would I be able to tell without asking?

A.   I don't know.

Page 24

Q.    Okay.  What would indicate one vehicle from another without asking?

A.    I mean, if you check the VIN number, if you check with the motor vehicle.

Q.    Okay.  Just by looking at the vehicles, would I be able to tell it without checking VIN numbers, without checking -- without talking to anybody?

But if I just walked in off the street and looked at all of the various very high-end, luxury vehicles that looked very pretty, were they -- would I be able to know just by looking at the vehicles themselves what was a Karma vehicle, what was an AWB vehicle or what was an Excell vehicle?

A.    No.

Q.    Okay.  I'm going to mark my first exhibit, which is the renotice of taking Rule 2000 -- taking Deposition pursuant to Bankruptcy Rule 7030(b)(6) Duces Tecum.  I'm going to share my screen.

I have set up a OneDrive link that I've provided to all counsel, you should have access to it, so you can look at it either on the screen or your counsel there can help you, if you need help, pulling it up so you have the same copy in front of you.

MR. MILLER:  Alan, when you say you sent the OneDrive link, what e-mail address would that have come

Page 25

from?

MR. CRANE:  Most likely acrane@furrcohen.com.  If you need me to, I will send it again.

MR. MILLER:  Yeah, I don't see it.  When did you send it out?

MR. CRANE:  A while ago.  It will just be easier to send it again.

MR. GHERMAN:  Can you make sure I get a copy so I can open it for him, Alan?

MR. RIGOLI:  It was sent at 10:15 a.m.

MR. GHERMAN:  All right.  Let me see if I have it.

MR. RIGOLI:  It's under -- the subject line is Zoom invite, 3-22-23, it was a reply all to that.

MR. MILLER:  I don't have a 10:15 a.m. e-mail from anybody.  I'll just double check and see. Okay.  At 10:14 a.m., where it says Moshe Farache deposition?

MR. CRANE:  Yes.

MR. MILLER:  Okay.

MR. CRANE:  And I just sent it to you again.

MR. MILLER:  It's in an e-mail chain, then. Okay.  I got it.

BY MR. CRANE:

Page 26

Q. Okay. Mr. Farache, did you see the renotice --

MR. GHERMAN: Hold on, I'm pulling it up for him right now.

MR. CRANE: Okay.

MR. GHERMAN: The renotice?

MR. CRANE: Yes, please.

MR. GHERMAN: So that is what Alan is sharing the screen with you on that computer, and then this is from the link.

THE WITNESS: Okay.

BY MR. CRANE:

Q. Have you seen this before?

A. If I see it before?

Q. Yes, have you seen this document, and it's called Renotice of Taking Deposition pursuant to Bankruptcy Rule 7030(B(6) Duces Tecum?

A. I mean, you're talking about today's deposition?

Q. Yes.

A. Yes, I mean my --

Q. This is the document that sets today's deposition.

A. Yes, I mean, my lawyer -- my legal team, yes, yes.

Page 27

Q.    Okay.  I requested that Auto Wholesale designate one or more officers, directors, managing agents or persons who has sufficient knowledge to testify to various matters that are listed in the -- in the notice.

And I'm going to go through, and I want to see -- to see if it's you or if it's somebody else that is the person with the most knowledge of the -- of these -- of these categories.

The first one is the business operations of the debtor, and that would be AWB, from the formation of the debtor through the date of the deposition.

Are you the person that has the most knowledge for the business operations of the debtor from formation through the date of deposition?

MR. MILLER:  Just for the record, I filed an objection to the scope and breadth of these areas of inquiry, but go ahead and ask your question, Alan.

MR. CRANE:  Yeah, as I indicated, you know, for anything prior to the four years, I would only be asking, I guess, 50,000 foot level questions, but nothing -- nothing in detail.

BY MR. CRANE:

Q.    So are you the person with the most knowledge of the business operations of AWB from the formation of AWB through today?

Page 28

A.    To the best of my knowledge.

Q.    Is there anybody else that would have more knowledge than you regarding the operations of AWB?

A.    No.

Q.    Okay.  Who had the decision -- are you the person that had the decision making authority for AWB?

A.    Yes.

Q.    Okay, and the person or entities, other than Excell Auto Group, Karma, and -- Karma of Broward, Karma of Palm Beach with whom AWB conducted business.

Are you the person with the most knowledge of that category?

A.    What is -- can you -- can you try to give me more information about --

Q.    Yes.  I'm going to rephrase it for you.

So other than Excell Auto Group, Karma of Broward and Karma of Palm Beach, who at AWB would have knowledge better than you about who AWB conducted business with?

A.    You mean like other people who sold cars or we help them to relocate vehicle, something like that you talking about?

Q.    Yes, yes.

A.    When it come to the maintenance of the vehicle or transportation and stuff like that?

Page 29

Q.    Any business that AWB conducted business with that's not Excell Auto Group, Karma -- or Karma, is there anybody that would have greater knowledge than you about who the debtor conducted business with?

A.    I don't think so.

Q.    Okay.  There's a -- the next category, I'm going to paraphrase it rather than read it, but it's there in front of you to read it if you want.

There was a promissory note dated November 5th of 2017 for $2,500,000 between AWB and Excell Auto Group, and that was restated on November 11, 2021, and is there anybody that would have more knowledge than you about how that promissory note came into effect and the reason for it?

A.    You're talking about the promissory note for AWB?

Q.    Yes, in favor of AWB and signed by Excell for $2.5 million.

A.    When you say the favor of Excell, what do you mean?

Q.    Not in favor of Excell, Excell signed it, agreeing to pay AWB.

A.    Yes.

Q.    Is there anybody that would have more knowledge than you about that promissory note?

Page 30

A.    No.

Q.    Okay, and there's another promissory note dated November 5, 2017 -- no, excuse me, November 11 -- excuse me, November 11, 2021 for $2,664,450.

Is there anybody that would have more knowledge than you about the reason how that -- the reason for the note coming into existence, how the note came about?

A.    What do you -- what do you mean?

Q.    Well, I'll ask you, are you familiar with the promissory note that Excell signed for and agreed to pay $2,664,450 to AWB in or around November 11, 2021?

A.    Yes.

Q.    Okay.  Is there anybody that would have -- that's with AWB that would have greater knowledge than you about that note?

A.    No.

Q.    Okay, and including about how -- if there were any payments made, how the payments were applied, was that you?  Are you the one that would have the most knowledge of that?

A.    Yes.

Q.    You have some hesitation.  Is there anybody else?

A.    No.

Page 31

Q. Okay. Is there anybody that -- that has greater knowledge than you of any of the sales that were -- of vehicles by AWB to Excell Auto Group?

A. Can you repeat this one?

Q. Sure, and it's Number 8 in the -- in the document that -- you know, in Exhibit -- what will be Exhibit 1, and it states all -- you know, the person with the most knowledge of all sales of vehicles by the debtor to Excell Auto Group.

So is there anybody that would have greater knowledge than you about the sales of vehicles between AWB or by AWB to Excell?

A. I mean, the only thing is Michele, some -- you know, she did the inventory and sometimes she get the news before me. Usually Mr. Zankl used to call me and tell me, hey, I just want to let you know where is this car, if it's park somewhere else, we sold it, we need it back or something like that.

Q. Okay. But would you -- Mr. Zankl obviously is not with AWB. So this is directed only at AWB, and Michele -- what's Michele's last name?

A. Martin.

Q. Martin. So who had greater knowledge of the sales between AWB, and that AWB had with Excell, is that you or is that Michele Martin?

A.    Depends on the day.

Q.    I'm sorry, it depends upon the day?

A.    Yeah.

MR. MILLER:  Just for the record, this is a corporate representative deposition under the federal rules, it's not a most knowledgeable deposition, so you can go on and ask your questions, Mr. Crane.

MR. CRANE:  Okay, and obviously you're designating -- AWB is designating Mr. Farache as the person -- as the corporate representative of -- regarding this particular category, actually out of all 14 categories; is that correct?

MR. MILLER:  He is the designated corporate representative for the debtor.

MR. CRANE:  Okay.

MR. MILLER:  Subject to our objections that we filed.

MR. CRANE:  Uh-huh.

BY MR. CRANE:

Q.    Does anyone have any more knowledge than you do of purchases of vehicles by AWB from Excell Auto Group?

A.    Can you repeat it, please?

Q.    Sure, and it's Number 9, all purchases of vehicles by the debtor from Excell Auto Group.  Is there anybody that would have more knowledge than you about what

Page 33

vehicles were purchased by AWB from Excell?

A.    It's like I said to you before, AWB is running by Moshe Farache and Michele, so it all depends.

Q.    Okay.  The next category was all short-term financing transactions of specific vehicles by AWB for Excell Group.

Is there anybody that would have better knowledge than you about any short-term financing transactions of specific vehicles by AWB -- between AWB and Excell?

A.    When you say short-term finance, what do you mean?

Q.    Well, are you -- I'm going to turn that because the -- you know, were there situations, to your knowledge, that AWB lent money to Excell on a short-term basis, for a very short specific period of time or short period of time?  It doesn't have to be specific, just a short -- relatively short period of time?

A.    I mean, you talking about relocation, what are you talking about?

Q.    Anything.

A.    Be more specific.

Q.    No, just -- I'm just trying to figure out what happened.  So did -- were there times where Excell borrowed money for vehicles, because it does specifically

say for vehicles.  So did Excell borrow money from AWB for financing of specific vehicles?

A.    When you say financing, AWB no financing the cars.  If we bought it, we pay for it and we have bill of sale and purchase agreement.

Q.    Okay.

A.    So I think you a little bit -- I don't know. I don't know.  I mean --

Q.    Well --

A.    -- I try to answer you the right way.

Q.    That's okay.  The question was -- my question now is just was there ever a time when Excell borrowed money from AWB for the financing of vehicles in which there was an expectation that a repayment would be made in a short period of time?

A.    You mean -- that's why I'm asking you, you talking about the relocationing?

Q.    What do you mean by relocation, because I may have a different understanding of relocation than what happened in these particular -- in this?

A.    We used to do like -- you know, but that's -- AWB has nothing to do with that.  Relocation, when Mr. Zankl used to relocate vehicle for clients and to the period of time until the transportation, the vehicle arrive and everything, it's like, you know, it's base --

Page 35

we used to do some business with them, but that's nothing to do with AWB.

Q.     Okay, and when you're talking about relocation, is that like moving from New Jersey -- moving a car from New Jersey?  If I'm an owner -- if I'm moving from New Jersey to Florida, you would relocate -- what you're talking about location or relocation, it would be moving a car from New Jersey to Florida?

A.     No, he used to have a program, you know, new program, he basically -- you know, people used to tell him which car they looking for, and he used to relocate it all over the country, and you know, sometimes take two weeks to get the whole transaction together or a month, or sometimes six weeks, depends on the transaction.

And, you know, he invite us to be part of the program, so we did it for little bit and then we exit also from it.

Q.     Okay, and was that AWB?

A.     No.

Q.     Okay, and I've heard the term locate deals, and -- and I just want to see if -- if what you were talking about is what my -- my understanding was, which is a locate deal from Excell would be Mr. Zankl, on behalf of Excell, would find a buyer for a vehicle, and then he would also find the vehicle, he would need assistance in

Page 36

purchasing the vehicle, but basically the vehicle was pre-sold.  So as soon as he got the money, then there would be a split of the profits.

Does that sound familiar?

A.    I'm trying to understand how you present it. Can you repeat it one more time?

Q.    I had -- as I said, one of the -- one of the programs, you know, from Excell Auto Group, was a situation where Scott Zankl, on behalf of Excell, would find a potential -- actually, someone who was willing to purchase a vehicle at a specific price.

So hypothetically it would be a Lamborghini and they were willing to buy it for $250,000, and he would go to a private investor or somebody else, and -- and find the vehicle and say, hey, I need $200,000 to purchase the vehicle.

And then as soon as I get the money for the vehicle to purchase, I can sell it to the -- to the new buyer for 250, and so there will be a $50,000 profit and we'll split the profits.

Does that type of transaction sound familiar to you?

A.    I mean, it's -- it's -- I can't tell you specific, but it's very similar.  But, you know, we did it -- we did it for short time, we've been successful, we

Page 37

got paid, everybody is happy and we call it a day.

Q. Over what period of time, beginning about when, until when did it stop, were those type of transactions that I'm just going to describe in short form as a locate transaction, happen between AWB and Excell?

A. AWB, nothing to do with that.

Q. Okay. So --

A. I'm going to repeat myself because I told you that before. AWB has nothing to do with any loan or any relocation to Excell in this particular transaction.

Q. Okay.

A. Thank you.

Q. Let's see, the next category that I'm going to ask about was the financial structure of the debtor.

Is there anybody that would have more knowledge than you about the financial structure of the debtor, including any sources of funding for the debtor's business operation from inception through the date of the examination?

Just in general terms, is there anybody else that would have better knowledge than you about AWB's financing?

A. That's a lot of big word you ask me over there.

Q. Okay. If you need me to rephrase it, I'll

Page 38

rephrase it.

A.    Yeah, it's a lot of big word, and you say it very fast, so I'm trying to --

Q.    Sure, and it's Number 11 -- it's Number 12, rather, but in short form, if AWB borrowed money from any other entity, would you be the person for me to ask questions about or is there somebody else that would have more knowledge than you about any money that AWB borrowed?

A.    You mean, like if -- when you say we borrow money, I mean, we have one person, it's not entity, it's a person.

Q.    Okay, and who has better knowledge than you of that lending relationship?

A.    Nobody, it's basically myself.

Q.    Okay.  NextGear.  Did AWB borrow money from NextGear at all?

A.    I mean, we did it for short terms, yes.

Q.    Okay.  At the time of the filing of the bankruptcy, did AWB owe NextGear any money?

A.    You're talking about the filing of bankruptcy of Excell or --

Q.    No, of AWB.  So at the time that AWB filed bankruptcy, did AWB owe NextGear any money?

A.    No.

Q.    Okay.  Do you recall when AWB no longer owed

money to NextGear?

A.    On the top of my head, I can't -- sometime in -- I'm not sure how many years ago.

Q.    Was it more than two years ago?

A.    I'm not sure.  They always calling me to do stuff, I don't know.  I -- I can't tell you on the top of my head, I'm sorry.

Q.    Well, what documents would help you refresh your memory as to when the last time AWB borrowed money from NextGear?

A.    Just, you know, just go back to my office and ask the same question you ask me.

Q.    Who would you ask for in the back office?

A.    Michele.

Q.    Okay.  If at some point in time I show you your general ledger that was provided to me from -- by your lawyer, would that help you refresh your memory?

A.    As much as I can.

Q.    Okay.  We'll do that.  All distributions -- who would have any better knowledge about distributions or transfers of funds by the debtor, AWB, to any other person or entity?

A.    Can you repeat it a little bit?

Q.    If -- if -- if AWB paid money to another entity or person or transferred assets, who would have

Page 40

better knowledge than you about those transfers?

A.    I mean, you know, the daily bills we pay it as they come.  You know, like if we get -- how I going to say it?  Like, you know, we have insurance, we have -- we purchase something, you know, before we purchase we just -- you know, we are just straight company.  We no have the money, we no buy.

Q.    Okay.  Who makes those decisions?

A.    Myself.

Q.    Okay.  Anybody else?

A.    I mean, Michele paid the bills.  So, you know, I mean, you know, it all depends what bills.

Q.    Okay.  For the sale of -- the purchase or sale -- excuse me.  For the sale of vehicles and deciding whether to sell a vehicle, would that be your decision?

A.    Depends.

Q.    Okay.  Who else might decide to sell a vehicle from AWB?

A.    Basically it's myself, but, you know, sometimes, you know, we just look at it, we make sure we value it the right way and that's it.

Q.    But who else would make the final decision, yes, I'm going to sell it?

A.    Myself.

Q.    Okay.  Anybody else that would have that

Page 41

final decision?

A.    Nope.

Q.    Okay, and who would decide for AWB whether payments were going to be made to you, to Lisa Farache, to Chase, to one of your other entities, who would have that decision-making authority, other than you?

A.    You mean if we sell a vehicle, who is going to receive the check?  AWB, it's AW money.

Q.    No, no.  If -- if AWB was going to pay money to Lisa Farache for any reason, who would make that decision?

A.    Myself.

Q.    Okay.  Same question for Chase Farache?

A.    I mean, I don't know how much money he got from the company, but myself.

Q.    Okay.  If it was to any of the other entities that you own, who would decide that those monies were going to be paid out, was that you or was that somebody else?

A.    Myself.

Q.    Okay.

A.    Can we get a quick bathroom or no yet, or you want to --

MR. CRANE:  Yes, this is a perfect time for you to have a bathroom break.  Go ahead.

Page 42

THE WITNESS:  Appreciate it.

MR. CRANE:  Take five minutes.

THE WITNESS:  Thank you.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

MR. CRANE:  We can go back on.  So, Madam Reporter, the notice is Exhibit 1.

(Thereupon, Excell Trustee's Exhibit Number 1 was identified on the record.)

MR. CRANE:  All right.  The next item that I have in the shared folder, and that I'll share the screen with, is the First Amended Plan of Reorganization of Auto Wholesale of Boca, which is at Docket Entry 196.

I'll ask Mr. Miller if I'm missing -- because there looked like there were several filings of the first amended plan and I think that this is the most recent one.  I just want to make sure that I'm correct on that.

MR. MILLER:  Do you have it on the screen or is it --

MR. CRANE:  It's going to be both, it's definitely in the OneDrive, now it's on the screen.

MR. MILLER:  That's the last filed amended plan, but we're filing another amended plan soon.

MR. CRANE:  Okay.

BY MR. CRANE:

Q. I'll ask Mr. Farache, have you seen the First Amended Plan of Reorganization of Auto Wholesale of Boca?

A. Say it again, I'm sorry.

Q. Do you see the document on the screen?

A. Yes.

Q. Okay. That is the -- and it's titled First Amended Plan of Reorganization of Auto Wholesale of Boca, and you should have a copy of it at Mr. Gherman's office. As I said --

MR. GHERMAN: I'm pulling it up now.

MR. CRANE: I'm sorry?

MR. GHERMAN: I'm pulling it up for him now. Okay. It's on the screen.

MR. CRANE: Okay.

BY MR. CRANE:

Q. And you can look at it on your screen or my screen, I'm just going to flip through it. I'm just questioning as to whether or not you've seen this document before.

A. Scott, that's the document we filed, the Chapter V plan?

MR. GHERMAN: I can't answer.

THE WITNESS: But I see so many paperwork.

Page 44

BY MR. CRANE:

Q.   I'm just scrolling through it.  Again, you have a copy of it.  I believe somewhere along the line you signed it, but I'm going to double check and get down to that page.

Is that your signature?

A.   Yes.

Q.   Okay, and you signed Moshe Farache, as managing member of Auto Wholesale of Boca on or around November 11th of 2022?

A.   Yes.

Q.   Okay, and then there are certain schedules.

Do you -- do you know how the plan -- the plan is going to change from here?

Are you able -- are you able to tell me how Mister -- Mr. Miller said that you're working on another amended -- a second amended plan.  This is the first amended plan.

Do you know -- do you have knowledge as to how that plan is going to look differently or what it's going to provide differently?

MR. MILLER:  Alan, I'm going to object, it's attorney/client privilege.  We haven't finalized it yet, so I'm going to instruct him not to answer the question.

MR. CRANE:  Okay.

Page 45

BY MR. CRANE:

Q.   In the first amended plan, there's a provision -- a spot on the first amended plan that asks for the description and history of the debtor's business, and it says that the debtor is a limited liability and it was incorporated in or around September 20, 2012.

Does that sound familiar to you?

A.   When we opened the corporation?

Q.   Yes.

A.   Yes.

Q.   Okay, and --

A.   I don't know exactly the date, but it's in 2012 some time.

Q.   Okay, and it says in here that -- it says that over the years while operating the debtor -- while operating, debtor, as is customary in the automobile business, would purchase and resell high-end, luxury automobiles between other automobile dealers and sometimes to the public; is that correct?

A.   Yes.

Q.   Okay, and we're talking about AWB.  What type of license did -- does AWB have?

A.   A dealer license.

Q.   Are there different types of dealer licenses under the State of Florida?

Page 46

A.    It's -- for sure it's a lot of different licences.  You know, it's kind of -- you know, I can't tell you exactly how many of them out there.  But, you know, I know we have the automobile -- auto wholesale, you know, it's not like we're allowed to put cars in front of our office.  So, you know, we have some rules we've got to follow, the same like any license, yeah.

Q.    To your under -- do you -- do you know the name of the license that you have or that -- the name of the license that AWB has?

A.    It has a dealer license.

Q.    Well, again, I think that there are specific types of dealer licenses.

Do you know the specific name of the type of dealer license that you have?

A.    I can't tell you on the top of my head today.

Q.    Okay.  Do you know what you're allowed to do with the dealer license you have and what you're not allowed to do with the dealer license that you have?

A.    We allowed to buy and sell cars between dealership, we allowed to buy and sell cars to individual.

Q.    Okay.  So under the license that you have, you're allowed to sell vehicles to the general public?

A.    I'm not sure if it's by appointment or how

exactly it's written down, but yes, sir, we're allowed to.

Q.   Okay.  Has your license from 2012 through current changed?  In other words, did you have one type of license at one time, and then you changed it to another license or has it always been the same, whatever the dealer license that you have, is the same dealer license that you have now?

A.   Same dealer license, same insurance, same bank, same thing, we no change.

Q.   Okay, and it says sometime in the year 2012 or 2013, AWB was approached by Scott Zankl regarding the sale, purchase and funding of exotic cars.

Tell me, is that -- is that correct?

A.   I mean, you've got to be more specific.

Q.   I'm -- I'm reading your -- I'm reading directly from your plan.

So it says, sometime in the year 2012 or 2013, debtor, which is AWB, was approached by Scott Zankl regarding the sale, purchase and funding of exotic cars.

A.   Yes.

Q.   Okay, and it says, after this meeting, debtor also began to purchase automobiles from a Zankl related entity known as Excell Auto Group, Inc., also known as Excell; is that correct?

A.   Yes.

Page 48

Q.   Okay.  It says that over the years Excell owed monies to the debtor for automobiles sold by the debtor to Excell, and for which Excell had not yet repaid, so debtor obtained executed promissory notes and guaranties eventually with the UCC-1, which has been recorded, and security agreements to evidence funding of numerous transactions over time; is that correct?

A.   Yes.

Q.   Is that the November -- the notes that we talked about earlier, November 11, 2021?

A.   That's the last one, yes.

Q.   And there are two of them, right, one for 2.5 and one a little over 2.6 million?

A.   Yes.

Q.   Okay, and I'm going to skip down a little bit, and it says, at all times debtor retained its records evidencing its ownership of its automobiles, and Excell, Karma of Palm Beach, and Karma of Broward never had authority to sell or otherwise subject the debtor's cars to financing as if they were a part of the inventory of Excell, Karma of Palm Beach or Karma of Broward.

Is that your understanding?

A.   Can you repeat this one?

Q.   I'm just reading it.  At all times debtor retained its records evidencing its ownership of its own

Page 49

automobiles, and Excell, and then slash, Karma of Broward, Karma of Palm Beach, it actually says KPB or KB, never had authority to sell or otherwise subject the debtor's cars to financing as if they were part of the inventory of Excell, Karma of Palm Beach or even Karma of Broward.

A.    I'm trying, this one is too hard for me with all the movement.

Q.    I'm not sure I understand.  What movement are you talking about?

A.    No, no, I mean with all the word you're using, it's a little bit too big for me.

Q.    Okay.  I'll try to break it down.  Did Excell ever have the authority to sell vehicles owned by Auto Wholesale?

A.    Wait, before that you said Karma, Excell and Karma Palm Beach, now you break it down.

Q.    I was breaking it down for you, so I was -- I was doing it one by one.  So I was going to ask the same question three times.

Did -- did Excell ever have authority to sell vehicles owned by AWB?

A.    Depends which vehicle.

Q.    Okay.  Did Karma of Palm Beach ever have authority to sell any of AWB's vehicles if they were owned by AWB?

Page 50

A.    Depends which vehicle.

Q.    Okay, and the same for Karma of Broward, did it ever have authority to sell a vehicle owned by AWB?

A.    Depends which vehicle.

Q.    The debtor -- Excell, excuse me, filed bankruptcy sometime around April 14th of 2022.

You have a statement in here, which led to a series of -- the filing of the bankruptcy led to a series of revelations that fraud was being committed by Zankl, Excell and the Karma entities, upon not only automobile buyers, sellers and lenders, but also the debtor.

This fraud led to multiplication of litigation over the same cars by various alleged buyers, sellers and financiers, which named debtor, among others, as defendants.  Is that accurate?

A.    Where do you reading -- the paperwork you just reading now, where it's coming from?

Q.    Your plan, your first amended plan that you filed and that you signed.

A.    That's the one in the -- in the V 11, Chapter V 11?

Q.    Yes, this is your -- I'm reading from your -- from the AWB first amended plan filed in the bankruptcy case.

A.    So can you repeat it one more time?  I'm

Page 51

sorry.

Q.    If you want me to paraphrase it, I'll paraphrase it.

A.    Please.  Can you just read it one more time so I pay attention?

Q.    Okay.  I'll read the whole thing. Eventually in March of 2022, Kristen Zankl advised debtor to remove debtor's overage cars that were stored at 101 Clint Moore, which debtor did under the direction and supervision of Kristen Zankl.

Then on or about April 14, 2022, Excell filed a voluntary petition in bankruptcy under Chapter 7 of Title 11, Case Number 22-12790-EPK, also known as the Excell bankruptcy, which led to a series of revelations that fraud was being committed by Zankl, Excell and the Karma entities, upon not -- not only automobile buyers, sellers and lenders, but also the debtor.

This fraud led to a multiplication of litigation over the same cars by various alleged buyers, sellers and financiers, which named debtor, among others, as defendants.

Do you understand that or do you want me to --

A.    No, no, now I'm good.  Yes.

Q.    All right.  What fraud are you talking

Page 52

about?

A.   I mean, when you -- you -- basically you own a car, and somebody sold it to somebody else --

Q.   Okay.

A.   -- you're basically selling a stolen vehicle.  I mean, that's the way I look at it, that's fraud, and you know, I don't know how to tell you exactly, but I'm trying to figure out exactly.

Q.   I'm trying to understand because you state that -- that Zankl, Excell and the Karma entities committed some sort of fraud that led to -- that you felt important enough to mention here, so I'm trying to understand what the fraud was that affected AWB.

A.   I mean, basically, you know, prior to April, the beginning of April, his wife basically tell me, Moshe, you've been nothing but good to my family, just remove your vehicle.  You no need to be involved with my husband.

Q.   Okay.  That was in April -- around April of -- in April of 2022?

A.   Sometime the end -- it's sometime in March, I can't tell you the specific dates.

Q.   Okay.

A.   She basically no want me to be involved in all the fraud.  Later on I find out all the stuff he did.

Q.   Okay.  So tell me about the fraud you found

Page 53

out about.

A.    I mean, you can see in every -- how many vehicle AWB given back because the vehicle been sold, he receive a payment, and he never no pay us.

Q.    And how would I identify which vehicles were -- that involved AWB were the result of some sort of fraud by Excell?

A.    I mean, when you look in AWB and you speaking about Excell, you can say, EX, Karma Palm Beach, Karma Broward, you know, for example, take the example of Frank Evans.

Q.    What about Frank Evans?

A.    AWB purchase the vehicle, Mr. Zankl receive a payment from Mr. Evans, and AWB never no receive a payment for the vehicle.

Is that fraud or -- and, you know, I mean, is that fraud?  What do you call that?  He sold a basically stolen -- sold a stolen vehicle.

Q.    How was AB -- so there was a vehicle -- what type of vehicle was Mr. Evans involved?

A.    Ferrari.

Q.    I'm sorry?

A.    Ferrari.

Q.    Okay, and how was AWB involved in the Ferrari that was related to Frank Evans?

Page 54

A.    We purchase it.

Q.    And who did you purchase it -- you being AWB.  Who did AWB purchase the vehicle from?

A.    I'm not sure, one of the Zankl entities.

Q.    Okay.  So how would I be able to tell -- which books and records would show that AWB purchased the Ferrari that was owned by Mister -- Mr. Evans?

A.    Look in the deal jacket.

Q.    Okay.  All right.

Let's see, Mr. Miller, I'm still waiting for the deal jackets.

MR. MILLER:  Yeah, I've just been waiting for a break to send it to you.  Can I send it now?

MR. CRANE:  Yeah, if you want a minute or two break or whatever, we'll --

MR. MILLER:  Yeah, two minutes and I'll send it out to you.  I was just waiting for you to take a break.

MR. CRANE:  Yeah, I'd like to have it so I can process it, so we'll take a minute.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

BY MR. CRANE:

Q.    Okay.  So other than the Frank Evans transaction, how else was AW -- AWB defrauded by Excell

Page 55

Auto Group?

A.    I mean, when you looking at -- I mean, just look at all the lawsuit AWB got prior because all the selling of basically stolen vehicle, that we owned the vehicle or we have possession of the vehicle.  I mean, what do you call that, fraud?  What do you call that?

Q.    No, I'm asking you what your definition of fraud is and what your understanding of the fraud was, and then how AWB was injured.

So let me -- the vehicles that are subject to the FVP lawsuit, right, there's a whole bunch of vehicles that are associated with the FVP lawsuit; right?

You're familiar with the FVP lawsuit; correct?

A.    Yes.

Q.    Okay.  So other than the vehicles that are subject to that lawsuit, how was AWB defrauded by Excell?

A.    Very simple, you selling something its not belong to you and you no pay me, AWB.  You know, you sold a vehicle that belonging to AWB.  You selling out of trust, you no pay AWB, you put AWB out of business, millions and millions of dollars just sitting.

Q.    What does it mean when you say, "selling out of trust"?

A.    You sell something it's not belong to you.

Page 56

Q.   Was there an agreement between AWB and Excell that created that type of a trust?

A.   Say it again, I'm sorry.

Q.   Was there an agreement between Excell and AWB that created some sort of trust, where you said it was sold out of trust?

A.   I mean, we bought cars from -- you know, if you say it's agreement, no, it's no agreement, but, you know, we buying and selling cars, that's our business.

Q.   Well, is there a written agreement between Excell and AWB that created a trust that -- that you're describing?

A.   No.

Q.   Okay.  So what you're describing is a -- is it a verbal agreement that Excell and AWB had where -- that created some sort of trust that you're describing?

A.   No.

Q.   So then please explain how a trust was created, as to your understanding.

A.   You buying something, you pay for it.  You sell something, you've got to pay the guy you bought it from.

Q.   Okay.  What vehicles, other than the ones that are subject to the FVP lawsuit, we'll go over those separately, and other than Mr. Evans, where would I find

other vehicles that were sold out of trust by Excell Auto Group that caused damages to AWB?

A.    I mean, look at all the vehicle we got lawsuit against AWB.

Q.    You just said you had a lawsuit against AWB. So I think you mean AWB has a lawsuit or AWB -- I didn't really understand that because AWB wouldn't sue AWB, so which lawsuit are you referring to?

A.    I'm referring to all the people that basically purchased vehicle from the Zankl entity, and I'm talking about Excell, Karma, Karma Palm Beach, Karma Broward, Karma Palm Beach, Excell Auto Group, that purchase from his entity vehicle, then we own the vehicle, we took possession of the vehicle, and hello, I own the vehicle, were given back to them.

Q.    Okay.  Which vehicles are those or you can identify them by vehicles or people?

A.    I mean, you have Road Rich, you have Frank Evans, you have another guy from Orlando, you have another guy from Atlanta, you have Mr. Lipman, I think, you know, all of these.

Q.    How would I find those -- because you're giving me, I think it was Road Rich or something along those lines, and you said Orlando, Atlanta, Lipman or something like that.

Page 58

Where would I find those?  Did they file motions in the Bankruptcy Court asking for their vehicles back?

A.    Based on my knowledge, yes.

Q.    Okay, and in those instances the vehicles were returned to the party requesting them that filed the motion?

A.    I mean, some of them they still, you know, they still pending, but, yes.

Q.    Okay, and are those the vehicles that you're -- other than that and -- those vehicles and the FVP vehicles, are those the ones that you're talking about in which AWB was the victim of fraud, and fraud being something from -- from whether it's Excell, Karma of Palm Beach or Karma of Broward?

A.    Can you repeat yourself, please?

Q.    Other than the -- other than people who have -- may have -- individuals or entities that filed motions with the Bankruptcy Court in the AWB case seeking their vehicles back, and the FVP cars, subject to that lawsuit, are there any other vehicles or people in which AWB was damaged as the result of some sort of fraud by Karma of Palm Beach, Karma of Broward or Excell?

A.    Yes, I mean, it's more vehicle.

Q.    Okay.  Which other vehicles are there, other

Page 59

than those?

A.   I can't tell you on the top of my head.

Q.   Where would I go to find those vehicles?

A.   I mean, you just need to ask my legal team, they can give you a list of vehicles we have no possession.

Q.   Okay.  There's a list of vehicles somewhere that was given to your legal team about vehicles that you state are subject to the fraud that Mr. Zankl or his entities committed?

A.   I think, yeah.

Q.   And then who would have prepared that list for your legal team?

A.   Michele.

Q.   Okay, and was the fraud, in all of these instances, Mr. Zankl -- well, I'll ask you.

In these instances, how did Mr. Zankl commit the fraud as it relates to AWB?

A.   I don't know.  You've got to ask him.  You ask me how he did the fraud.  I mean, you know, we bought a vehicle and he sold it to somebody else, what is left?

Q.   Okay, and all of these were vehicles that you allege that AWB -- AWB owned at the time that they were sold to a third party?

A.   If we have a bill of sale and we showing a

Page 60

payment, yes.

Q. Okay. I'm going to put up -- I'll go back to some of that, but I'm going to put back up the plan.

FVP, how is -- what is your plan, I'm not -- I'm not talking about the bankruptcy plan, but how do you envision that AWB is going to get back up and running or you know, conduct business into the future with this bankruptcy?

What's your -- I don't mean it in the definition of a Chapter 11 plan, but just what are the steps that AWB is going to take to try to reorganize itself from a business standpoint?

A. It's my specialty.

Q. Okay. Well, what steps are you going to take?

A. Reinvent the wheel.

Q. Okay, and how do you plan on doing that?

A. We have everything ready to go. We just basically waiting for liquidate of assets and start purchasing and selling vehicles.

Q. And then who would you be purchasing from?

A. Anybody.

Q. Okay. Do you have anybody in mind?

A. I have plenty people. They just basically waiting until we liquidate asset, and we have room in our

Page 61

storage, and we can buy and sell vehicle.

Q.    Can you name some entities that you would --
that you plan on doing business with for the purchase of
vehicles if you're successful with the FVP litigation?

A.    I mean, we have plenty high-end dealership.
We have Manheim, we have plenty people in the country, you
know, they -- you know, look at it this way, we -- we have
a great reputation of myself and AWB paying everybody.
You know, we always pay the bills.  You know, it's no --
it's no such a thing, you walk in the street and you ask
anybody about it, it's not ours, we no touch it.

Q.    Okay.  Other than Manheim, who are your
prospective companies that you would look for to purchase
vehicles?

A.    I mean, we have --

MR. MILLER:  Hold on, I'm going to object.
This is beyond the scope of the areas of inquiry
identified in your notice of corporate rep.  The
anticipated future operations is not identified anywhere
in your notice, and he's maybe stepping into arenas that
we just don't want to end up spooking potential sellers or
buyers based upon the efforts of FVP to destroy this
bankruptcy case.

So I don't think it's relevant to your line
of inquiry.  If you can find on your 14 areas of inquiry

Page 62

where this is, then I may allow him to answer the question, but for now, no.

MR. CRANE:  Hold on, one second, I'll go up to my 14 areas of inquiry.

BY MR. CRANE:

Q.    All right.  I will -- since you've been instructed not to answer, I'll move on to a different question, which is prior to the filing of the AWB bankruptcy, who are the entities in which Auto Wholesale purchased vehicles from in the four years prior to filing the AWB bankruptcy?

A.    You mean -- what you trying to say?  I mean, we have many people.  We have individuals and we have companies, and you know, we always have -- always remember, you can take any vehicle to Manheim and sell it, as long as you are dealer and you are member.

Q.    How many vehicles -- how many times did you purchase vehicles from Manheim?  So if I want to make that much more clearer, in the four years prior to the filing of the bankruptcy --

A.    I mean --

Q.    -- how many times did AWB purchase vehicles from Manheim?

A.    I mean, it's not just Manheim.  It's also, you know -- you know, you can go in Off Lease, and people

Page 63

want to sell the vehicle, we purchase cars over there.  We start building the whole structure of the business.  So, you know, always we buying -- we always trying to come up with different concept, and that's my specialty.

So you see a few million been buying and sell.

Q.    A few million -- again, I'm -- I'm -- because your lawyer asked me not to inquire into post -- you know, future operations, I'm focused on the four years prior to AWB filing bankruptcy.

So I want to make sure that -- because your answer sounded like more of what you're going to do in the future.

So in the past four years prior to filing bankruptcy, other than Manheim, who did AWB actually purchase vehicles from?

A.    I mean, you have few million what we purchase and sell vehicle beside -- between Manheim, anybody else, so --

Q.    Other than Excell, other than -- not including Karma, Excell -- the two Karma entities -- other than the two Karma entities, Excell, and Manheim, who did AWD -- B actually purchase vehicles from in the four years prior to filing the bankruptcy?

A.    Different people, different dealers.

Page 64

Q.     And where would I go to find those deals that -- to see how -- to see what vehicles were purchased by AWB during that timeframe?

A.     I think you have it somewhere or if you need it, just we can provide you.

Q.     Okay.  What -- what would I look at?  Would I look at deal jackets, would I look at your QuickBooks, what else would I look at?

A.     You can look at my QuickBook, I mean you see a term of payment.  If we pay -- you know, we no send to Bentley Finance a hundred, $200,000 if we no receive a vehicle.  We no send to Range Rover a hundred fifty thousand if we no receive a vehicle, it's the reason we send the money from AWB.  We have bill of sale, we have -- it's all legit.  It's very simple business.

Q.     Would you be buying the vehicles from Land Rover or would you be paying off a vehicle from Land Rover that somebody else purchase?

A.     Depends.  You know, people call us, you know, people call me, they know I'm in the -- people know I'm in the industry, they call me all day.  You know, I have unlimit network, 30 years.

Q.     Okay.  If you're unsuccessful in your litigation with FVP, how do you -- how does AWB plan on moving forward with business?

Page 65

MR. MILLER: Same objection, Alan, it's outside the scope of the 14 areas.

MR. CRANE: Okay. Are you instructing him not to answer that question?

MR. MILLER: Rephrase it.

BY MR. CRANE:

Q. If you are -- if AWB is unsuccessful in the FVP litigation, what would be AWB's plan of action in general to move forward with business?

A. We figure up.

Q. I'm sorry?

A. It's my life, to figure up.

Q. I understand your life, but AWB's life, how would AWB move forward?

A. I'm doing for 40 years, figure up.

Q. And is there a source of capital -- outside the vehicles that are subject to the FVP lawsuit, is there other capital that AWB would have access to to purchase new vehicles?

A. Forty years I'm doing it, I am going to figure up.

Q. I know, that's a length of time that you were working, and I'm not asking you who you would get it from, I just want to know whether or not there is such a funding source in which AWB could actually continue

Page 66

operations if it lost its case with FVP?

A.    We -- soon as we know it, we figure up.  We always going to be in business, just a bump in the road.

Q.    Okay.

MR. WINDERMAN:  Alan, do you intend to break for lunch?

MR. CRANE:  If I'm being asked to break for lunch.  We had a couple of breaks in there.

MR. MILLER:  I do not need a lunch break.

MR. CRANE:  I can keep going.

MR. WINDERMAN:  Fine with me, too.  I just wanted to know.

MR. CRANE:  Okay.  So we'll just keep going.

MR. WINDERMAN:  Do you have any idea how much longer?

MR. CRANE:  I never know how much longer.

MR. WINDERMAN:  A wise answer.  Okay.  Sorry to interrupt.

BY MR. CRANE:

Q.    Mr. Farache, did you assist in -- because I know that Michele Martin does a lot of your bookkeeping, I'm showing on the screen the liquidation analysis, which is part of the first amended plan.

Did you participate in the -- in coming up with this list of assets?

A.   You mean the whole plan, what we try to -- try to sell the vehicle and keep the business open?

Q.   No, I'm talking about a list of assets that's part of the -- that's attached as Exhibit A to the bankruptcy plan.

A.   Okay.

Q.   And did you -- did you personally participate in coming up with this -- the assets that are listed here and the values?

A.   Yes.

Q.   Okay, and it says that the value of your assets, including the undisputed assets and the disputed assets, is $3,239,210.  Do you see that?

A.   Yes.

Q.   Okay, and you have -- there are various secured creditors that are listed here that you state are alleged secured creditors.  I think in other parts of the plan it says that you dispute them, them being secured creditors.

So do you dispute that Woodside Credit is a creditor as to AWB?  Does AWB owe -- did AWB take out a loan with Woodside Credit for the purchase of any of the vehicles?

A.   No.

Q.   Okay.  Same with FVP, there was -- was there

Page 68

an agreement between AWB and FVP for the purchase or sale of vehicles?

A.    No.

Q.    Okay.   Same question with Franklin Capital Funding?

A.    No.

Q.    Okay, and then same with Ed Brown?

A.    No.

Q.    And then Hi Bar Capital, same question, any agreements between AWB and Hi Bar Capital regarding the purchase and sale -- you know, the securing of -- of vehicles?

A.    No.

Q.    And how about Prestige Luxury Cars?

A.    No.

Q.    Okay.  So if you were to prevail in all of the litigation, then you would have -- you would keep the vehicles that you have listed there, so your liquidation analysis then would be $3,239,210, and you would have no secured creditors, and so would you be expecting to pay somewhere in that neighborhood to your creditors, including admins?

A.    Say it again, I'm sorry.

Q.    Well, if you're -- if you're successful in your litigation as to FVP, and you're successful in

Page 69

disputing all of the claims, the secured claims, then you would have assets of about 3.2 -- about $3.2 million to pay towards your -- towards your plan, is that -- is that correct?

MR. MILLER:  Objection, assumes facts not in evidence.

Can you show him the entire document there?

MR. CRANE:  Sure, there it is.

BY MR. CRANE:

Q.    There's a total, undisputed assets is 282,000, I'm rounding numbers.  Disputed assets, he has listed -- you have listed as, again rounding numbers, 3.2 million.

And so if we hypothetically say that you win on everything, you'd have $3.2 million of assets.  If you win against all the creditors against the claims, there would be no claims against these assets, and so, therefore, your liquidation test, which should be around 3.2 million, again, still having to pay for the administrative expenses, but you'd have 3.2 million that you'd be able to pay towards your unsecured creditors at that point in time and administrative creditors; is that correct?

A.    Whatever my plan say, I got to follow my plan.

Page 70

Q.    Okay.  Is that your answer?

A.    Yes.

Q.    Okay.  Did you participate in coming up with the five years of projections?

A.    If I'm -- can you repeat yourself, please?

Q.    Yeah.  I'm looking at Exhibit B of your plan, which is the five year plan projection.

A.    Okay.

Q.    Okay, and I'm just asking whether you personally participated in coming up with this -- with these projections?

A.    Yes, we try to figure up how we can use the money and purchase, and you know, I mean, how we going to use the money in purchase and selling car.

Q.    Okay, and I see that there's a line item for commissions, and that's $7,000.  Who in your -- who at AWB receives commissions?

A.    It depends, you know.  Sometimes a guy like you coming to me and he say, hey, I just want to let you know, my friend leaving the state and want to liquidate his vehicle, and you say to me, Moshe, put something for me.  And I say, what do you need?  So you get like a finder fee, same like any industry.

Q.    Okay.  So that is for -- the commissions are for non-AWB employees, and it's a, in your words,

Page 71

"a finder fee"?

A.    I mean, you know, you can call it the way you want it, but, you know, it's the same like in your industry, you introducing clients to a legal team, you get something in it.

Q.    Okay.  My real question is whether or not that that commission is for somebody that's inside -- you know, that that -- you know, those are commissions for AWB employees or for something -- for people outside of AWB that's referring business to AWB?

A.    It can be both.

Q.    Well, these are your projections.  So are you projecting to pay $7,000 to AWB employees or was that -- when you were preparing this, was this a finder fee?

A.    I mean, it's -- it can be both.  I mean, we used to have employee in AWB until all the problems start, and then the problems start and then we stop it.  And, you know, it's -- you know, they stop us from doing business and we just basically let them go.  But based on him finding cars, we buying them, we sell them, you know, he deserve to make commission.

Q.    And who is the "him" in this?

A.    You know, we used to have a guy after college basically come and, you know, we giving to him

Page 72

some advance, and you know, eventually it's supposed to be advance plus commission.

Q.    Okay.  Do you have any salespeople at AWB at this time?

A.    We used to have one salesperson on our team, yes.

Q.    No longer, though?

A.    We can't, I mean look where we are.

Q.    Okay.  Subcontractors, $15,500 a month.  Who are your subcontractors that you pay?

A.    I mean, you still have the towing company. You still have, you know, depends if you looking at, you know, we have W-9, we have others, mechanic.  You know, you have tires installer, you have transportation, you have waxing cars, tinting cars.  You know, you have the whole thing.

Q.    Okay.  So where in this is Michele Martin, where in your budget?  Is she under commission, is she under subcontract, is she someplace else?

A.    She is subcontractor, basically, plus commission.

Q.    So she gets a commission and she's a subcontractor?

A.    Yeah, she get percent --

Q.    And then --

Page 73

A.    -- plus commission.

Q.    And then what -- what are her commissions based upon?

A.    Profit.

Q.    Profit of the business -- profit of the business as a whole or profit in a particular sale of a vehicle?

A.    Whole vehicle.

Q.    In a vehicle?

A.    Yes, sir.

Q.    Okay, and how would she get a profit -- how would she be entitled to a profit in a vehicle?

A.    Depends on the deal.

Q.    I know, but is it -- does she have to find the buyer, find the seller, does she have to -- I mean, what is it -- what would make her entitled to a commission?

A.    Depends on the deal.

Q.    Okay.  Give me an example of a deal that she would be entitled to a commission, any deal in the past that she's done that you have paid her a commission on. Under what circumstances have you, in the past, paid her a commission for a deal?

A.    I mean, you know, we are -- we are, you know, we have long background between each other, so we

Page 74

always there for each other.  I'm very good to my own people.

Q.    I'm sure you are, but that doesn't answer my question.  My question is:  Give me an example in the past where you have given a commission to Ms. Martin, and under what circumstances was she entitled -- did she become entitled to that commission?

A.    I mean, you know, some vehicle we sold them, we make excess of few thousand dollars, she deserve to get excess of a thousand dollar commission.  You know, we have no problem.

Q.    Okay.

MR. MILLER:  Alan, this line of questioning, can you show me in your 14 areas where this is, because I had to take a few minutes and reread your subject matter and I don't see that in here.

Can you show that to us?

MR. CRANE:  The business operations of the debtor from the formation of the debtor through the date of the deposition.  I asked --

MR. MILLER:  So -- so on the matters you've been asking for purposes of after the date of the deposition, you'd agree it's beyond that scope; right?

MR. CRANE:  I -- I would say that those were not categories I listed, but my question was --

Page 75

MR. MILLER:  Okay.  You can ask about the past, in the last four years, but you can't ask about --

MR. CRANE:  That's what I did.

MR. MILLER:  -- the future.  Let's try to keep it within the 14 areas of inquiry, although I objected to these things because you didn't define the terms, but you can ask about the past.

MR. CRANE:  My question was very specific about sometime in the past, what was the circumstances that she was paid a commission.

THE WITNESS:  Can we take a bathroom break?

MR. CRANE:  Yes.

THE WITNESS:  How long, a couple minutes?

MR. CRANE:  Ten minutes.

THE WITNESS:  Thank you, I appreciate.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

MR. CRANE:  All right.  We're back on.

BY MR. CRANE:

Q.   So, Mr. Farache, since the filing of the bankruptcy, how many vehicles were sold by AWB to today?

A.   From the day you -- you talking about, we sold one.

Q.   Okay.

A.   We purchased and sold one.

Q.    Okay, and is that the one that's reflected in your monthly operating report?

A.    I don't know which one -- which monthly operating report you're looking at, which month?

Q.    I don't remember -- what month did you sell it?  I know that there was a --

A.    December and January.

Q.    I apologize.  Go ahead, say it again.

A.    December and January.

Q.    Okay.  So I did see that there was one vehicle in one of the monthly operating reports, so I'm assuming that since there's only one vehicle, that would be the vehicle; right?

A.    Yes.

Q.    Okay.  You were talking -- I'll mark the plan as Exhibit Number 2 for the trustee.

(Thereupon, Excell Trustee's Exhibit Number 2 was identified on the record.)

BY MR. CRANE:

Q.    You were talking before about the vehicles that were being sold out of trust, and I'm going to stick to Excell.  So I only want to talk about Excell vehicles or transactions with Excell, not Karma of Palm Beach or Karma of Broward, but really just between AWB and Excell.

So for the vehicles that were sold out of

Page 77

trust -- that you say were sold out of trust by Excell,
how did the -- how did the vehicles get into Excell's
possession?

          A.    I mean, we basically share a building, so --

          Q.    So the vehicles that were sold out of trust
were on that showroom floor that we talked about earlier
in the deposition?

          A.    I don't know --

          Q.    Okay.

          A.    -- how and a time when this happened.

          Q.    Well, you know, you said that they -- that
the vehicles were sold out of trust.  So I don't know
when -- what timeframe was it that Excell sold vehicles
out of trust?

          A.    When I say sold vehicle of trust, can you
explain to me better?

          Q.    I'm using your words.  You said that the --
that one of the frauds that was going on was that -- and
I'm paraphrasing, so you can correct me if I'm incorrectly
paraphrasing, one of the frauds that was going on was that
there were vehicles being sold out of trust.  Those were
your words.

          A.    I mean, he sold my vehicle, that's what I
mean.  AWB vehicle, I'm sorry.  AWB vehicle.

          Q.    Okay.  So when Excell would have sold the

vehicles, where would the vehicles have been physically located at, at the Excell building at 101 or was it -- could it have been someplace else?

A. I don't know. Maybe sold it based on purchasing and he show the guy the picture, you know, I mean, I can't tell you exactly.

Q. Who would have had the title to the vehicle in order for him to have sold a car out of trust?

A. I mean, we have the title.

Q. You being AWB?

A. AWB has the title.

Q. So Excell was able to sell a vehicle of AWB's, when AWB had the actual physical possession of the title?

A. Yes.

Q. Okay, and then how many of those cars were there that Excell did that with approximately?

A. I don't know exactly.

Q. Okay, and other -- during that time that he could have sold the vehicles out of -- or that Excell could have sold the vehicles out of trust, where else was AWB storing vehicles, other than 101 Clint Moore?

A. I mean, we always -- you know, we have also our own storage at 6560, we kept over there some vehicle. We have storage by the 5471. You know, it's just we are

Page 79

between permitting, painting, and all of the process to get the place going on, so it's just everything happen the same time.

Q.    I'm talking about pre-bankruptcy, pre-Excel filing bankruptcy, so that's the timeframe.  Obviously Excell wasn't selling any of your vehicles out of trust after the filing of the Excell bankruptcy.

So I'm talking about the timeframe before Excell filed bankruptcy, where did Auto Wholesale have vehicles that it was storing?

A.    I mean, like I said to you before, we have location in East Boca, we -- just for storage, we have location in Rogers Circle.

Q.    Okay.  How would Scott or excuse me, how would Excell have sold a vehicle that was located at either one of those other two -- two or three locations that you mentioned, and with AWB having title, how could Excell have sold one of those vehicles?

A.    I mean, those vehicles we sold by ourself. We have our own inventory of vehicle, what we buying and selling also.

Q.    I'm talking about specifically the vehicles that were sold out of trust, that you said were sold improperly by Excell.

How would Mister -- how would Excell have

Page 80

sold a vehicle if it didn't have actual possession of the car or actual possession of the title?

A.    We have a bay in 1001 also, so we have an office over there and store it.

Q.    Okay.  Other than vehicles that were stored in some manner, shape or form at 101 Clint Moore, how would Excell sell a vehicle that belonged to AWB, if AWB was in both possession of the vehicle and possession of the title?

A.    I mean, we have possession of the vehicle -- possession of the title, we have possession of the vehicle in the time, but then, you know, everything happened so quick, you know.

I mean, some of the cars when we realize, you know, when Mrs. Zankl say to me, Moshe, pick up your vehicle, you know, we stop it, but, you now, prior to that we have relationship of ten years.

Q.    I understand.  You're still not answering my question.  On vehicles that were not in physical possession of Excell, so it was not located at 101 Clint Moore, where Auto Wholesale had physical possession of the vehicle and the title, was there a time that Excell sold a vehicle when, again, when AWB had possession of both the vehicle and the title?

A.    I mean, yes.  Now I know everything, I can

Page 81

tell you yes.

Q.   Okay.  So give me an example of a time or a vehicle, please, where -- where AWB had both physical possession of the vehicle and physical possession of the title, and Excell was still able to sell the vehicle to somebody else?

A.   2021 G-Wagon Mercedes.

Q.   And then who was the purchaser of that vehicle?

A.   I think Mr. Periu.

THE COURT REPORTER:  Can you repeat the name please, sir?

THE WITNESS:  Periu.

THE COURT REPORTER:  Periu?

THE WITNESS:  Yes, Mr. Periu.

BY MR. CRANE:

Q.   Do you know -- how do you spell his name, his last name?

A.   Periu.

Q.   Do you remember his first name?

A.   Mr. Periu.

Q.   Had you met him before?

A.   Yes.

Q.   Okay.  How did you meet him before?

A.   Different business.

Q.    Did you meet him -- did he have also a relationship with Excell Auto and Scott Zankl?

A.    I -- yes.

Q.    And do you know of that relationship that Mr. Periu had with Scott Zankl and Excell, separate and apart from buying the G-Wagon?

A.    I mean, it's a YouTube video, so it's public knowledge after the fact.

Q.    I saw a series of -- of YouTube videos.  Was he the -- he was the -- did he have sort of a YouTube TV show about vehicles?

A.    Something like -- I mean, you know, it's a -- it's a motivation speaker.

Q.    Okay.  I remember seeing a video of him and Ed Brown.  Do you know an Ed Brown?

A.    Yes.

Q.    How do you know Ed Brown?

A.    I basically did for him some, you know, how do you say that, consulting, you know, owner represent -- owner representative.

Q.    Owner representative in what capacity?

A.    Basically he build large homes in Palm Beach County and I'm his representative.

Q.    Okay.  Was that one house or multiple houses?

Page 83

A.    One house.

Q.    Okay, and then how long ago was that?

A.    A few years ago.

Q.    And what's your understanding of Mr. Brown's relationship with Excell?

A.    Just another victim.

Q.    Okay.  Was Mr. Brown, to your knowledge, involved in any of the fraud that was going on with Excell?

A.    No.

Q.    Okay.

A.    I don't know, no.

Q.    Not to your knowledge?

A.    No.

Q.    Have you heard any rumors about Mr. Brown being involved in any fraud as it relates to Excell Auto?

A.    Great guy, can't say one word bad, just a great guy.

Q.    Okay.  Thank you.

Mr. Miller, is the G-Wagon in the deal jackets that you gave me?

MR. MILLER:  I don't know.  I'm assuming, I don't know.

MR. CRANE:  Okay.  We'll look through them. Thank you.

Page 84

MR. MILLER:  Alan, just look for G -- AMG G 63 Mercedes.

MR. CRANE:  Okay.

MR. MILLER:  It will probably be labelled white.

MR. CRANE:  Okay.  Give me one minute.

BY MR. CRANE:

Q.    I just put in an e-mail between Michele Martin and Nidia Leiva, and I put it into the shared folder that we have, and I'm going to put it up on the screen.

MR. GHERMAN:  You just put it in now?

MR. MILLER:  Alan, the file is in the production you asked about.

MR. CRANE:  Okay.  Thank you.

MR. GHERMAN:  Give me a minute.

MR. MILLER:  Who's that?

BY MR. CRANE:

Q.    Here's an e-mail between Michele Martin and Nidia Leiva and it's dated November 12th of 2021.  It's got an attachment that's attached also to this PDF, which is called inventory reports and dated November 12 of 2021.

Are you familiar with these inventory reports?

A.    Yes.

Q.   Okay.   Now, I know that on the top here it says March 22, 2023, but these inventory reports auto populate some of the fields with whatever the current date is.

So whenever I would have looked at this, it would populate with that date, but the original one seems to have been, because it was attached to a November 12, 2021 e-mail, that that would have been the inventory as of that date.

A.   Probably.   I mean, I see 3/22/23.

Q.   Right.   You didn't have any inventory on 3/22/23, that is today.   So this --

A.   Oh, I'm sorry.   What's happened is when you doing QuickBooks --

Q.   Yes, that's what I'm saying.

A.   -- no matter what, you always -- you know, I mean, we have an argument about it, and Michele told me I'm wrong, so --

Q.   I'm going to tell you I've had the same argument with my legal assistant and I overruled her and told her to not use automated dates because if I pull up the document, I want to see when the document was drafted originally not -- not repopulate, auto populate the date.

That's why I'm giving it to you with this -- with the e-mail, because the e-mail, as you can see, is

Page 86

dated November 12th of 2021, and then attached is what was the Auto Wholesale inventory as of that date.

Does this look familiar to you?

A.    Yes.

Q.    Okay, and it says there's three categories of vehicles, Auto Wholesale inventory, Excell Auto Group inventory, and short-term loan.

Can you explain what -- to me what it means by Wholesale -- Auto Wholesale inventory?

A.    I mean, it's basically in-house name of the way we put the money.  So we just -- it's AW -- it's just a name how we call it so we know how to treat it in-house.

Q.    Okay.  But it was being provided to Excell, so Excell had to understand what it meant; correct?

A.    I mean, they don't -- you know, you've got to always go by the cars.  You know, all the names you see and stuff like that, that's basically our in-house funding information and stuff like that.

But, you know, for -- for them, it's just the vehicle, serial number, bill of sale, always you've got to looking at buying and selling cars --

Q.    Okay.

A.    -- that goes back to the industry.

Q.    All right.  So for the first one, that's the Aston Martin, dated -- it's a 2001 Aston Martin, purchase

date, and it has a VIN number.  What was the -- who owned that vehicle?  Can I tell by this document who the owner of the vehicle was?

A.    You can -- I mean, you can look at that and if you want to go farther, you always got to go to the bill of sale.

Q.    Okay.  From this, what does it tell?  From your reading of this document, does this tell you who the owner of the vehicle was?

A.    I mean, you looking at Auto Wholesale.

Q.    Inventory, yes.

A.    AWB own it, Aston Martin DBX, 2021, gray. We purchase it on 7/01/21, and it show you how many day we own it, 134 day, the VIN number, the title, and how much we pay for it.

Q.    Okay, and who did you buy it from?  Is there a way to tell?

A.    Let me look for a second.  No, you've got to go back to the bill of sale, then it tell you exactly how we bought it.

Q.    Is there a difference between the title and the bill of sale in your mind?

A.    Bill of sale, if you -- you know, you got to read the whole bill of sale.  Bill of sale is part of the purchase and then the title, it basically show you you

Page 88

have the title.  You know, between dealer, I think the most important is the bill of sale.

Q.   Okay.  So for you, the bill of sale is -- what would be -- the bill of sale is more important than the title?

A.   I -- I don't tell you a hundred percent, but the bill of sale, that's the commitment to purchase it.

Q.   And what would -- what information would be contained on a bill of sale?

A.   I just -- I don't want, you know, tell you on the top of my head, but if you read the whole bill of sale, the seller got commitment and purchaser has commitment to follow up.

Q.   And the Excell Auto Group inventory, how is that different than the Auto Wholesale inventory?

A.   I don't understand your question.

Q.   Well, there's two listings, right, there's Auto Wholesale inventory and a list of cars, and there's Excell Auto Group inventory and a list of cars.

What's the --

A.   (Inaudible.)

Q.   -- difference?  I'm sorry?

A.   The same thing, buying and selling cars, it's just in-house names.

Q.   Okay.  How did -- were there different ways

Page 89

that there was -- that Auto Wholesale and Excell transacted business?

A.   Say it again.

Q.   Were there different ways that Excell and Auto Wholesale were involved within each other -- with each other in the purchase and sale of vehicles?

In other words, are there different methods that you -- that were used between the two entities?

A.   You know, if I -- if I tell you, I mean, you know -- you know, we are just both of us dealer license holder, and we buying and selling cars.  You know, we have ten years of relationship.

Q.   Okay.  That really doesn't tell me -- that doesn't tell me how the transactions were effected.  So in other words, how did -- how did a typical transaction at or -- at or around November of 2021 work between Auto Wholesale and Excell?

A.   Basically he say to me, I -- I have couple vehicles I want to purchase.  I say just make sure you have the vehicle, the title, and create a bill of sale.  I have the funding to buy.  That's my business.

Q.   And then who is buying the vehicle?

A.   Depends.

Q.   Okay.  So give me how it -- how it might work one way and how it might work another way.

A.      Sometime AWB bought the vehicle and Excell sold it or any of the Karma sold it.  Sometime Excell bought it, and AWB bought it from them, and then been wholesale.  Sometime AWB bought it in different state, brought it, nobody can sell it, AWB took it to the auction and sell it.

Q.      I've seen things called profits between them, between Excell and Auto Wholesale.

A.      Where do you see that?

Q.      I've seen it in various things.

Are you familiar with that there would be a time when Auto -- Excell Auto would owe a profit to -- a profit payment to Auto Wholesale?

A.      Oh, yes, for sure.

Q.      Okay.  So under what circumstances might there be a profit that Excell would owe to Auto Wholesale?

A.      Depends on the deal.

Q.      Well, give me an example of a deal that Excell would owe a profit to Auto Wholesale.

A.      I mean, AWB bought a car for 450,000.  Excell sold it to end user for excess of high 400.  Excell make, after all the expense, 50 percent of the profit.

Q.      Okay.  So in that case, Auto Wholesale bought the vehicle --

A.      Yes.

Page 91

Q.    -- correct?

A.    Yes.

Q.    And the vehicle was sold by Auto or Excell?

A.    Excell or Karma or --

Q.    I'm just sticking with right now --

A.    -- one of the entities.

Q.    Excell.  Just -- just stick with me with Excell, because I'm not -- the trustee that I represent is not the trustee of, you know, of the Karma entities.  The Karma entities are not in bankruptcy.  So I'm really sticking just focused on how it worked with Excell.

So when would there be a profit, and I'm still trying to figure that out, when -- you know, if Auto Wholesale bought a vehicle, purchased a vehicle, it would -- there was a time when Excell might sell that same vehicle?

A.    Yeah.  I mean, if I can look in my list I can tell you exactly.

Q.    Sure.

A.    You know, I mean, that's basically the whole vehicle.  You know, in '21 we bought a vehicle, for example -- I'm allowed to look in the paperwork, no?

Q.    You can look at whatever you want, I would just ask you to tell me what you're looking at.

A.    I mean, I'm just looking in selling and

Page 92

buying purchase car besides Excell, you know, or AWB. So I mean, we bought -- one second. Let me look, my eyes. Just give me one second, please.

Q. Sure.

A. I mean, I know we bought it for like 300, low 300, and we sold it for high 300. Excell sold it for high 300, and we basically bring up all the expense, and after the expense, he make 50 percent of the profit.

Q. Which vehicle are we talking about?

A. It's a 2000 -- just give me a second, I'm trying to figure out. I have so much paperwork. It's -- basically it's -- its a Rolls Royce convertible.

Q. What type of convertible, I'm sorry?

A. Rolls Royce.

Q. I didn't --

MR. GHERMAN: Rolls Royce.

BY MR. CRANE:

Q. Rolls Royce, I'm sorry. Rolls Royce convertible.

What's the last four digits of the VIN?

A. Just give me one second, I'm not fast as anybody else.

Q. Okay.

A. I'm trying to figure out which vehicle. Oh, okay. I'm sorry, here it is. It's -- the VIN number is

SCAZ8C02LU201949.  We purchase it for 320,127.33.

Q.    Okay.  Hold on one second.

A.    No problem.  You want me to show you, highlight it and show you?

Q.    I'm going to look for the deal jacket, would that help me?

A.    Yeah, I mean, you should.

Q.    While -- while I'm looking for that, at or around -- I'm looking at the e-mail again of November 12th of 2021, and then attached to it the inventory lists, the Auto Wholesale inventory, the Excell Auto Group inventory, the Auto Wholesale inventory has a balance -- a purchase price and it has at the bottom $2,664,450.

Is that how much was owed by Excell regarding these -- these specific vehicles or to Auto Wholesale at that time?

A.    I mean, that's one -- I mean, that's, I don't know how many vehicle, one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen.  That's just partial of the vehicles. It's more vehicle owned by AWB.

Q.    And I'm only talking about the ones on November 12th of 2021.

A.    Okay.  That's 15, and I can keep going.

Q.    And then there's these others.  So there's

Page 94

one set of numbers that equal out to $2,664,450.

A.    And then you have --

Q.    Another one for 2.5 million.

A.    I mean, you've got to count and you know, that's -- I go by the vehicle.  All of the in-house name, it's not -- you know, you've got to look at each vehicle.

Q.    Well, I'm trying to figure out whether or not Excell owed you or Excell owed AWB 2.6 -- $2,664,450 in or around November 12th of 2021 separately, and then I understand combined; also owed two -- 2.5 million; and then separately, and I know combined ultimately, $877,500.

And for whatever the internal bookkeeping, it was never kept as a combined amount, it seems as it was kept as $2,664,450 labelled as Auto Wholesale inventory, 2.5 million as Excell Auto Group inventory, and then short-term loan of $877,500.

A.    I mean, what you see over there is the tracking of all the vehicle and the money AWB has.

Q.    Okay, and is this the amount of money that -- do these -- do these numbers represent money that Excell at this time would have owed to AWB?

A.    We own the cars.

Q.    Okay.  Again, does this reflect amounts of money that A -- and whether it's cash or whether it's

Page 95

cars, is this a reflection of -- of money or cars that -- a debt that Excell owned to Auto Wholesale?

A.    It's a tracking of inventory or money owning by AWB vehicle.

Q.    Okay.  So did AWB -- so these are all vehicles then.

So did Excell owe, at this point in time, November of 2021, did Excell owe AWB $2,664,450 for one group of vehicles, 2.5 for another group of vehicles, and 877,500 for another two vehicles?

A.    When you looking at, you know, it's each vehicle until the car is sold, you know.  AWB owned the vehicle.

Q.    Okay.  So you're still not really answering my question whether or not these amounts were owed to -- from Excell to AWB.

A.    But if we own the vehicle, you can't say he owed us the money and we owned the vehicle.

Q.    I would agree that you don't get both, but that's what I'm trying to figure out.

A.    So that's why I say to you, it's each vehicle.  You've got to look at each vehicle.

MR. CRANE:  All right.  I'm going to mark this e-mail as Exhibit Number 3.

I'm going to stop sharing my screen.

Page 96

(Thereupon, Excell Trustee Exhibit Number 3 was identified on the record.)

BY MR. CRANE:

Q.   What does it mean by swaps?  I've seen that. In looking through a lot of the records, I've seen the word "swaps".  What does that mean?

A.   Swap, it mean we trade a vehicle.

Q.   Okay, and why would you trade -- who -- who was trading vehicles?

A.   Between AWB and other dealers or anybody.

Q.   Okay.  Was Excell one of the -- one of the companies that you traded vehicles with?

A.   Yes.

Q.   Okay.  So specifically with a -- with Excell, explain how a typical swap would work between AWB and Excell.

A.   I mean, it's basically you take Vehicle X and you trade it for Vehicle Y.

Q.   And why would you trade vehicles?

A.   Because sometime the funds is not there and you're waiting for funds to hit, people trade a vehicle and between trading the vehicle and Excell pay off the debt, the finance take day, week, two weeks, three weeks, so he swap it with the vehicle he's selling.

Q.   I completely didn't understand, I apologize.

Page 97

A.   Let's go back, me and you.   When I go to the dealership and I have a Chevy Tahoe --

Q.   Yes.

A.   -- and I want to trade my Chevy Tahoe, you agree with me sometime I carry some debt?

Q.   Yes, you would have a payoff to Chevy for the debt.

A.   So if I buy new Chevy, so let's call it I have $10 in my Chevy, so I get a $10 credit on what I purchase.

Q.   Okay.

A.   They still got to send to GM Finance the check to receive the title so they can sell the used car to any auction or any other dealer, correct.

Q.   Until the -- until they get the title and the vehicle is paid -- until the vehicle is paid off, and the title comes back, then they shouldn't be able to sell the vehicle to the auction, is that -- are we on the same page?

A.   Wait.   So if Excell took somebody car as a trade, but then he's got to pay the debt --

Q.   Yes, so he has to pay the lienholder.

A.   The lienholder.   So sometimes it take, let's call it, ten, 20 day --

Q.   Yes.

Page 98

A.   -- mail the check, the check arrive in different state, credit, get the title released, send it back to them, takes some time.

So he trade this vehicle against vehicle he sold, so that's the swap.  It's a term of payment.  You trade, you know, it's swapping.

Q.   So it would be -- because if -- if it's a consumer, like if I'm coming in and buy -- or if I'm a consumer, and I go in and I sell my vehicle to -- or I trade my vehicle in to Excell, and I owe money to GMC, and we'll use the Chevy Tahoe example.

So Excell takes in my Chevy Tahoe, needs to pay the --

A.   GM Finance.

Q.   -- GM Finance before he can otherwise sell the vehicle, I get that part because he needs the title to be able to sell it.

But why would there be a -- why would Excell, at that point in time, swap -- because he doesn't have the -- he doesn't have the title yet, because it hasn't been released from GM Finance.  So he then is swapping the vehicle with Excell -- I mean, with AWB, pardon me?

A.   Basically a term of payment.  You know, if you -- if you are -- you know, you are in a business, you

Page 99

basically swap cars because sometimes not all the cash in the dealership account, you know what I'm saying?

Also don't forget, the industry goes through the sky, and Mr. Zankl been cancel, schedule for cancel. So the process is so fast, so a lot of time we did swap against vehicle.

Q. But if he didn't -- he didn't have the title for the vehicle because the title hadn't been paid off yet, what -- and -- and so he's swapping that with AWB, for what? What is he getting, what is he swapping?

A. It's basically we own the vehicle, he sold it to XYZ, and he need the title to completion the sale.

Q. But he can't get the title because GMC hasn't --

A. No, no, we own the vehicle he sold. So he ask us, can I do a swap because I no receive the funds to completion his deal jacket.

Q. So it's another vehicle that he's selling?

A. No, you're -- you're --

Q. You're right, I'm completely lost on the swaps, I -- I admit it.

A. He's basically confirm -- you know, he's giving to us -- he sold the vehicle AWB owned. Instead of paying us money, he giving to us a vehicle against that.

Q. Well, that's a different example than what

Page 100

we were talking about before.  We were talking about me, Alan, coming into Excell.  Excell taking my Chevy Tahoe, and --

A.    I'm going to give to you GMC.  If you go to GMC, sometime it take time to receive the title --

Q.    Right, but --

A.    -- sometime that's the reason.  You know, that's why he always has cash flow to get everybody going on, but if we come, he say, Moshe, I need the title for the Porsche.  I wholesale it, and instead of the Porsche, I going to give to you the Bentley.  So I look at the value, it's equal value, I take it.

Q.    Okay.  So I want to make sure --

A.    It's a term of payment.

Q.    So I want to make sure I understand this because you changed vehicles on me.  We were using a -- we were using a --

A.    No, no, I use it before just to make it simple --

Q.    Yes.

A.    -- you would go to the dealership in the street, the GMC dealer, the normal dealer --

Q.    Yes.

A.    -- how the transaction happened.

Q.    Okay.

Page 101

A.    When it comes to Excell, it's very simple.

Q.    Yes.

A.    If I own a vehicle and he sold it or I sold it, you need the -- you need the title to completion the deal; correct?

Q.    That is correct, I follow you so far, so --

A.    Sometimes he doesn't have the funds, so he swap a car against car, that's it.  It's a term of payment.

Q.    So it would be he was selling a vehicle that was owned by Auto Wholesale and swapping with a car that was owned by Excell?

A.    You -- you take me to different direction now.

Q.    I'm -- I didn't follow the first direction, I apologize.  Well, I followed the first one with GMC, and then you went into a Porsche and something else, and you completely lost me.

A.    He sold a car, it belonged to AWB.

Q.    Okay.  So he -- he -- so Excell sells a vehicle that belongs to AWB in this example.

A.    But Excell no -- let's call it the guy say here is a check for $100, but the check, it's coming from different state, shipping the car, it takes five business days to clean the check, correct.

Page 102

Q.   Okay.  So but still it's Auto Wholesale owns the vehicle, Excell is trying to sell the vehicle that is owned by Auto Wholesale?

A.   So then Mr. Zankl call me and he say, Moshe, I just want to let you know I sold the car.  I need the title for X car.  I bring the -- I say, what, you write us a check?  No, he say, I'm going to swap this vehicle against different vehicle.

Q.   Okay, and was that of usually reasonably equivalent value, pretty close to the same value of the vehicle?

A.   Sometime it's one car against two, sometime it's two car against one, depends on the deal.

Q.   But pretty even, it was meant to be when you do a swap, that it's an even trade, whether it's one car or two -- one car versus one car, one versus two cars, it would be an even trade?

A.   Minus or plus, yes.

Q.   Okay.  A little bit plus or minus whatever, but pretty close to even, you make it as even as you can make it; right?

A.   I can't tell you exactly, but minus or plus, $2 up, $1 down, I can't tell you exactly, but I don't want you to hold me --

Q.   I -- I clearly said close enough or as close

as you could get it, and I actually said reasonable value.

So it was within -- I'm not saying it was penny for penny or dollar for dollar.  There were a lot of cars that were going back and forth, so if it was a little bit higher or little bit lower on one trade, it would made up -- you would make it up on the next?

A.    Most of the time it's -- you know, it's very -- we know everything by the penny.  We try to adjust ourself with QuickBook, we have everything, number is the number.

Q.    So it was as close as you could get; is that fair?

A.    Trying.

Q.    Am I -- am I getting it now?

A.    I think you are very smart.

Q.    All right.  So the trade -- so just in a swap from one -- you know, let's assume that there was a 2017 Porsche and 2017 Lamborghini, and I don't know my cars, so even if they're not exactly the same value, I'm going to pretend that they are.

So Excell had a 2017 Porsche and Auto Wholesale had a 2017 Lamborghini, and they were -- you know, he wanted to sell the Lamborghini, and he said can we swap; right?

A.    Yep.

Q.   And if it's -- would he owe a commission based upon just swapping the vehicles if they were equal value?

A.   Depends on the deal.

Q.   When would he -- on a swap?

A.   It's no commission.

Q.   No commission on a swap?

A.   No commission.  It's (inaudible) --

Q.   Okay.  But just on a swap --

THE COURT REPORTER:  Wait a minute, I didn't catch the end of that.  I didn't catch the end of it after you said no commission.  I couldn't understand what you said.

MR. MILLER:  Alan, let him finish answering, please.

BY MR. CRANE:

Q.   I apologize, I didn't mean to cut you off at all.  So say it again.

A.   You purchase a vehicle, you got to get profit.  We are a dealership, Alan.  We open the door, it cost money every day.

Q.   I get that, but I'm just talking about when two vehicles are being swapped for equal value, just on that part of the transaction, is there a -- is there a profit that goes back and forth?

Page 105

I mean, there's no -- a $150,000 vehicle is being swapped for another $150,000 vehicle, and that's all that's happening at that moment.

Does that -- is there a profit for the exchange or swapping of two equally -- two equally valued vehicles?

A.     There's always a profit.  We are a dealership, we buying and selling cars.

Q.     Okay.  So on the swaps there's a profit?

A.     On a swap?

Q.     That's what I was asking.  Just purely on a swap, Excell is going to give -- you know, is going to give a $150,000 vehicle to AWB, and AWB is going to give a $150,000 vehicle to Excell, just on that part of the transaction, does that -- is there a profit that's supposed to be made?

A.     AW bought a vehicle from Excell and sold it to Manheim dealer and make profit.

Q.     No, you're taking it out of my example.  My example is very clean.

Excell transfers a vehicle to Auto Wholesale for 150 -- worth $150,000 and Auto Wholesale transfers back to Excell a vehicle of equal value of $150,000.

In that situation, is there a profit just on that part of the transaction?

Page 106

A.     Whatever is the profit by Excell selling to an end user, 50/50.

Q.     Okay.  So I think you're taking it to the next step, which is that the vehicle is sold.  I'm talking about just the transfer, the exchange of the two vehicles.

A.     Say it again, I'm sorry.

Q.     Okay.  Excell transfers a vehicle to Auto Wholesale worth $150,000, and Auto Wholesale transfers a vehicle back to Excell for $150,000.  Is there expected to be a profit on that part of the transaction?

A.     Depends which vehicle.

Q.     What do you mean?

A.     Every vehicle, it's a different subject.

Q.     Well, I gave two vehicles of equal value, there's a profit?

A.     Depends which vehicle.

Q.     And what vehicle might change the answer?

A.     Depends which vehicle.

Q.     Give me an example of a vehicle that -- you give me an example.  I tried to give you an example, give me an example where there would be a profit on a swap.

A.     I've got to look in my paperwork.

Q.     Okay.  Go ahead.

A.     No, I don't have that kind of paperwork with me.  I mean, I've got to look --

Page 107

Q.    What paperwork would I look at?

A.    I mean, you've got to look at in-house paperwork, pull each bill of sale.  You know, it all depends which vehicle.

Q.    Okay, and what type of profit would someone -- would Auto Wholesale expect to get from Excell if they were just swapping two $150,000 vehicles?

A.    Sometimes we make a thousand dollars, sometimes we make $2,000, sometimes we make $750 --

Q.    Okay.

A.    -- or we make other, depends.

MR. CRANE:  All right.  I'm going to take a five-minute break.

THE WITNESS:  No problem.

MR. CRANE:  I'm sorry?

THE WITNESS:  Take it.

MR. CRANE:  Okay.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

BY MR. CRANE:

Q.    All right.  I'm going to give you a couple different scenarios to see on the -- on the swaps and profits.

So in a situation where Excell sells a vehicle that's owned by Auto Wholesale, Excell does not

have the money to pay -- the ready cash to pay Auto Wholesale for the vehicle, is that a situation in which there might be a swap?

A.    Depends, but always -- always go back to the same thing, AWB purchase a car for $100.  Always AW get paid for the purchase of the $100, and if it's $2 left and the agreement is 50/50, $1 go to them, $1 go to us.

Q.    But someone is buying the vehicle at that point in time; right?

A.    You mean on Excell side?

Q.    Yes, someone was -- the way I understood is that, again, if there's -- that there might be a -- hypothetically, that there's -- I'm going to use a Porsche and I'm going to -- this is a hypothetical Porsche.

Hypothetically, the Porsche could sell for -- it's -- it's titled under AWB's name, and the Porsche is -- Excell sells the Porsche or has a buyer to sell -- to sell -- has a buyer for the Porsche, doesn't have the money to pay AWB the 150,000 for the Porsche, but then goes -- but has another vehicle on its lot that's worth 150,000.

So the -- is -- is that a situation where Auto Wholesale would say, okay, you can give me your $150,000 vehicle, and that AWB swaps with Excell $150,000 vehicles.  The AW vehicle that Excell sold or has sold or

pre-sold for 175,000 would then get sold because AWB would release that vehicle, and then the profit would be split on that vehicle 50/50?

MR. MILLER:  Objection to form of the question.  Honestly, Alan, you lost me.

BY MR. CRANE:

Q.   Well, I mean, did you understand it, Mr. Farache?  I mean, I can rephrase it.

A.   You a little bit on a positive side, but, you know, I can -- I think I got most of it.

Q.   Okay.  I'll -- I'll --

A.   It's very simple, Alan.  Can I explain to you something?

Q.   Yes, please.

A.   You go to the convenience store, you buy pack of cigarettes.  The guy from the convenience store collects your money, he's the end user.  Call the wholesaler, buy the same pack of cigarettes, that's it. He's got to pay the wholesaler to get the pack of cigarettes; correct?

Q.   Yes.  So the vehicles subject to these swaps, the vehicles have already been pre-sold or there's a ready available buyer for those vehicles?

A.   It's not pre-sold.  Everything you see over there, it's -- again, in a good scenario, look at it this

Page 110

way.

Q.   Yeah.

A.   Alan walk to the dealership.

Q.   Yep.

A.   Okay.  Say I want Car XYZ.  Mr. Zankl say to him, a hundred dollars.  Alan write to him a hundred dollar check; correct?

Q.   Uh-huh.

A.   You deserve to get the vehicle, you're driving with the vehicle; correct?

Q.   Yep.

A.   AWB own the vehicle.  Mr. Zankl call, Mosh, I just want to let you know we sold the XYZ vehicle to clients, okay.

Q.   Okay.

A.   I got a hundred, you have a check ready for you for a hundred dollar for the amount what I spent to purchase this vehicle.

Q.   Okay.

A.   Then he say, I just want to let you know we did good, we made $2 after all my expense.

Q.   Uh-huh.

A.   No problem, I take a dollar, have a great day.  Everybody is happy.

Q.   Okay.  That's really just about a straight

Page 111

up sale, but where does the swap come in?

A.    If --

Q.    Use that same example, but use a swap.

A.    Okay.

Q.    Because in that scenario he had the cash to buy the vehicle, and to pay -- to pay you.

A.    Let's call it Alan walked to dealership --

Q.    Yeah.

A.    -- say I like this vehicle.  I have XYZ vehicle, I have $10 equity in it, but I have $90 debt in it.

Q.    Okay.

A.    He say -- Mr. Zankl call me, just say to me, okay, just want to let you know, I sold the vehicle, but I no got paid because the guy trade in a vehicle.  The vehicle he trade in has some debt.

Q.    Okay.

A.    But I have a different vehicle.  Take this vehicle against this vehicle, no problem.  I get equal money for the purchase of the vehicle, and if it's a profit $2 after all of these expense, I got a dollar, he get a dollar, have a great day.  I get new car in my --

Q.    Okay, and is your -- the trade -- the value of the trade that you have to do or the value of the swap, is that based upon the sale value, so the retail value or

Page 112

is it the wholesale value?

A.   I -- you always got to look at it, you know, I always get the value of the purchase.

Q.   Okay.

A.   If I purchase it for a hundred dollars, I deserve to get my hundred.

Q.   Okay.  So what you purchase the vehicle for.  Whatever you purchase the vehicle for is what -- is what the trade is worth for a swap?

A.   Yes.

Q.   Okay.  So your -- your -- the price that you purchased it at is the value for the purposes of swapping?

A.   Say it again.  I'm sorry, I lost you.

Q.   The value that you purchased it for, is the value of what you would give for a swap?

A.   Basically equal money for what I purchase.

Q.   Okay.  I got it.

A.   Yes, sir.

Q.   Okay.

A.   It's very simple.  If you don't make it complicate, and you follow through, it's very simple.  It's just so many -- you know, you going by somebody put all the documents together and make it complicated.

Q.   And then in that situation, when there -- when the swap is going on, who has title to the vehicle,

is it -- does -- does the title transfer from -- in that situation, does the -- does the title transfer from Auto Wholesale to Excell, then to the end user?

A.   I mean, say it again.  I'm sorry, I lost a little.

Q.   In that -- in the example that you were giving before, does the title -- Auto Wholesale owns the vehicle, Excell is about to sell the vehicle that Auto Wholesale owns, does the title go from Auto Wholesale to Excell, and then to the end user or does it go from Auto Wholesale to the end user or how does that work?

A.   Okay.  So look at it this way, the difference between us and end user, we are a dealer.

Q.   Yeah.

A.   That's why you see all the transaction going on.  Between dealer to dealer, you avoid the sales tax.

Q.   Right.

A.   So it's very simple.  You are an end user, you pay the sales tax.

Q.   Yes.

A.   So if you coming -- let's go back to the same transaction.  You bought the car, $100,000, six and a half percent or seven percent Palm Beach or Broward, depends where you register; correct?

Q.   Yes.

Page 114

A.    You add to that amount dealer fee, miscellaneous, whatever it is, tag fee, everything, you come to the end, you pay XYZ, that's a straight deal.

What do you do?  You call AWB, good afternoon, just want to let you know I sold your XYZ vehicle.  I have a -- we prepare a bill of sale, send to them an invoice.  With a profit $2, we send to them $1 invoice for the profit, we get paid for the vehicle, one invoice.  Everything is straightforward, no bullshit.

Q.    Okay.  So I'm still not sure how the title transfers and the -- and the title goes.

So if the title was originally in Auto Wholesale's name and Excell is selling it, does the title transfer from Excell -- from Auto Wholesale to Excell, then to the end user or does the -- does the title -- or is it just a notation on the title?  Because if the title is in -- if the title starts in Auto Wholesale's name, then is it -- you know, when it gets reported to the DMV, does it look like Auto Wholesale sold the vehicle to the end user or does it look like -- you know, is the -- is there a notation on the title where Auto Wholesale sells -- transfers the vehicle to Excell, and then Excell transfers the vehicle to the end user?

A.    Go by bill of sale.  Dealer to dealer, you've got to go by bill of sale.  End user --

Q.    But what title is the end user getting under that?  Is the end user getting the title from Auto Wholesale or -- or Excell?

A.    Where the end user bought the car from.

Q.    Well, it bought the car from Excell, but the car was owned by Auto Wholesale in our example.

A.    Auto Wholesale wholesale the vehicle to Excell Auto, and Excell does its end user sales.

Q.    Okay.  So would the title go -- would there be a notation -- would there be a notation on the title that the title went from Auto Wholesale to Excell, then to the end user?

A.    You have bill of sale, and usually you -- you know, I -- I can't, if I don't see the document, but the bill of sale, that's what you go by.

Q.    Okay.  That doesn't answer my question as to who the -- what title -- who is the title -- who is the end user getting the title from?

A.    The end user, whoever sold it to them.

Q.    Well, in this case the dealer that sold it to them would be Excell, but the car wasn't owned by Excell, it was owned by Auto Wholesale.

A.    That's where you -- if you looking at the register and to the end user --

Q.    Uh-huh.

Page 116

A.    -- if it's Excell, Excell prepare the document, submit it to the motor vehicle, and the guy receive the title from the motor vehicle.

Q.    Okay.  Would Auto Wholesale sign over the title to Excell in that situation, and then Excell sends the title over to the end user?

A.    Say it again, I'm sorry.

Q.    Would Auto Wholesale title it over to Excell or make a notation on the title, and then Excell sell it to the end using, assuming there's no financing involved?

A.    We just sign over the title to Excell.

Q.    Okay.  So, yes, you would sign over the title to Excell?

A.    Yes.

Q.    Okay, and then Excell would be responsible for the profits, is that correct, under that scenario? Excell would be responsible for the profit to -- Excell would be responsible for the profits to Auto Wholesale in our scenario?

A.    Depends which scenario.

Q.    The one that we were talking about, where Auto Wholesale --

A.    Alan, we're going back to the hundred dollars?

Q.    Yes, the hundred -- the hundred dollars.

Page 117

The vehicle that's owned by Auto Wholesale, Auto Wholesale -- Excell has sold the vehicle to an end user, and -- and --

A.   Little bit lost over there.

Q.   I'm trying.  Auto Wholesale --

A.   Auto Wholesale own the vehicle --

Q.   The vehicle, Excell sells the vehicle --

A.   -- Excell sold it --

Q.   I apologize, you give me the scenario and I'll stop.  Give me -- give me the scenario.

A.   AWB owned the vehicle --

Q.   Yes.

A.   -- right.  Excell Auto sold the vehicle.

Q.   Yes.

A.   $2 profit.  First thing, Excell write the check for the amount of the value of the vehicle --

Q.   Yes.

A.   -- back to AWB.

Q.   Uh-huh.

A.   $2 profit after all of the expense, $1 apiece.

Q.   Okay.  So on the -- on the profit, so I understand, is the profit after -- what expenses is he allowed to deduct from the sale before splitting the profits?

Page 118

A.      Ten years of relationship, a lot of trust until last years, that's it.

Q.      No, no, no.  Monetarily, what is he allowed to deduct?  So if -- if there's sale tax, does that get deducted before the split of the profit?

A.      Nobody money, sales tax is the government money.

Q.      Okay.  But the buyer would -- would pay the sales tax.

A.      You know, when you go to the convenience store you say, hey, you make six percent on the top of my money.  It's not the convenience store money, they've got to send it to the government.

Q.      So if Excell had to pay a salesman a commission, did the -- does Excell get to deduct the salesman's commission from the -- from the sales price before the profit split?

A.      It's expense, everything is expense. It's -- it's his -- you know, I don't know behind the scene until now all the paperwork, but, you know, it's ten years of experience.

Q.      But I have a very specific question.  In a sale in which Excell has sold the vehicle that was -- had belonged to Auto Wholesale, in determining the profit split, is -- is Excell able to deduct the commissions for

the salesperson before determining the profit split?

A.    If commission is expense, he's entitled.

Q.    So the answer is yes, he would be entitled under those.  Assuming that it was, you know, one of the salespeople sold it, he actually had to pay the commission to the salesperson for the sale of that vehicle, and he would be able to deduct that expense before splitting the profit?

A.    Expense, in-house expense.

Q.    Okay.

MR. MILLER:  Alan --

MR. CRANE:  Yeah.

MR. MILLER:  -- do you mind if you or Alan Barbee could e-mail me Alan Barbee's e-mail address, I don't have it, so I can send you guys the link for tomorrow?

MR. CRANE:  Sure.

BY MR. CRANE:

Q.    Just give me a moment, I'm sorry.

A.    Do you want to take a break again?

Q.    No, I'll just --

MR. MILLER:  Are you searching for Alan Barbee's e-mail address?

MR. CRANE:  Jason is.

BY MR. CRANE:

Page 120

Q.    I am going to show you, and then I'll add to the -- I'll add it as I can to the share folder.

I'm going to show you an e-mail dated 11/11/2021 from Michele Martin to Excell Auto Scott, which I'm assuming is Scott at Excell Auto, and copied to you. Do you see this e-mail?

A.    Yes.

Q.    Okay, and if I click on the e-mail address, moshefarache@gmail, is that your e-mail address?

A.    Yes.

Q.    All right, and then michelemartin101 -- 1010@gmail.com, is that Michele's e-mail address?

A.    Yes.

Q.    And then scott@excellauto.com, is that Scott's address --

A.    I believe so.

Q.    -- or it was?

So I'm going it open up what's listed as a promissory note, and that's a promissory note for $2,664,450.

Do you recall the promissory note being provided, this is a blind promissory note, by Michele to Scott with a copy to you?

A.    Yes.

Q.    Okay, and there was a security agreement

that was attached to it, as well; is that correct?

A.   Yes.

Q.   Okay, and then there was a personal guaranty by Scott, Kristen, and Karma of Palm Beach in favor of Auto Wholesale; is that correct?

A.   Yes.

Q.   All right.  So there was another promissory note for 2.5 million.  Do you recall that?

A.   Yes.

Q.   So tell me how -- how it came about that there was the 2.6 million and the 2.5 million promissory notes.  How did you come up -- go ahead.

A.   First thing it's, you know, the biggest things you see over there, it's memorialization of the debt.  So we always purchasing cars, you know, over the years, and we going up, we going down, but that's always the memorialization of the debt.

Q.   Okay.  So it was a memorialization of the debt?

A.   Yes, sir.

Q.   Okay, and how did you determine what the debt was owed at the time that you came up with the 2.5 -- the 2.5 and the 2.6?

A.   You have list of vehicle, what AWB always purchase and sell, it's always going up, down, sideway,

Page 122

you know, it's always there.

Q.   So it was based upon your books and records?

A.   I mean, you always got to look in each vehicle what we paid for it and, you know, it's going up and down, the same like any other business.  We buying and selling cars.

Q.   I'm trying to figure out how you came up with 2.6 million and 2.5 million, and I am rounding, I understand.

A.   I mean, it all depends, you know, how much we purchasing at the time.

Q.   At the time -- at the time that you -- at the time that the -- at the time that the notes were transmitted by Michele Martin to Scott Zankl and to you, what was the method that you used or what did you look at to determine that that was the amount that was owed?

A.   You know, it's based on the books and the general ledger, and always remember, this -- this money, it's always available to purchase cars, and then if we need more money, if we find better deals, we just do it. That's our business.

Q.   Uh-huh.

A.   Tomorrow you come back and you say, hey, I have five, six cars to buy, and it's a great deal, we buy it.

Page 123

Q.    And so if I understand, and I just want to make it clear, that you looked at the books and records of -- of Auto Wholesale to determine what the amount was?

A.    Say it again, I'm sorry, Alan.

Q.    Did you look at -- did you look at the books and records of Auto Wholesale to determine what the amount was that was owed?

A.    Which time, today, yesterday, two years ago, three years ago?

Q.    When that e-mail was sent by -- by Michele, when the promissory notes were drafted.

A.    Yes, but you always got to go, we bought one more car at the time, the next day we sold it, you know, it always depends on the purchase and sale.

Q.    Okay.  For the two notes, the 2.5 and the 2.6 million, were there any payments that Auto -- that Excell made towards the payment of those notes, either principal or interest?

A.    You mean if it paid vehicle and we no bought other vehicle?

Q.    No.  There are two notes, one is for 2.6 and the other one is for 2.5.  There's a requirement that -- I'm assuming that there's a requirement under those notes that Excell pay on those notes; correct?

A.    It's -- you mean he pay in a note?  No, you

Page 124

can't look at it this way, you've got to look at it it's memorialization of the vehicle we own.

Q. Were you expecting any -- were you expecting Excell to pay you money on the notes on a monthly basis?

A. What kind of payment, explain to me?

Q. Payment towards paying down the note.

A. We bought cars. It depends. If we no buy cars, we keep the money in the account.

Q. And then what happens with the 2. -- the notes? Does he still owe you money -- is there interest accruing on the notes?

A. It's always buying, selling, buying, selling. If he doesn't buy, the money is still in the account. We have more money in the account.

Q. I'm not getting it. There's two promissory notes. Is it your understanding that Excell was obligated to pay you -- pay AWB on the promissory notes?

A. If he sell the vehicle.

Q. If he sells vehicles. Only if he sells vehicles is he obligated to pay on either one of those notes?

A. He have to pay, yes. He have to pay the note. I mean, it's memorialization of the whole vehicle we own.

Q. How about if he doesn't sell a vehicle, is

Page 125

he still obligated on the note?

A.    All day.

Q.    I'm sorry?

A.    All day.

Q.    I'm not understanding, I'm sorry.

A.    Yes.

Q.    Yes.  Okay.  So he has to pay on the note whether he sells vehicles or not.

A.    I mean, it's memorialization.  You know, if tomorrow he win in a lottery and he no want to see my -- he no want to do business with AWB, still got to buy the inventory or say take your inventory or get out of here.

Q.    Okay.  So we've established that there are two notes, and that he had an obligation to pay on those two notes; right?

A.    Yes.

Q.    Okay, and my question is:  Did he make payment -- he -- did Excell make payments on the note, on either one of the notes?

A.    Explain to me again.

Q.    Did Excell transfer money to AWB for the purposes of paying its obligation under the note?

A.    If he sold the car, he paid AWB, yes.

Q.    Okay.  Was there ever a time that he did not or Excell did not sell a vehicle, but still made a payment

Page 126

under the note?

A.    Based on my knowledge today, I can't tell you anything like that.

Q.    Okay.

A.    You know, I've got to look in my books and records.  Sometimes he pay and he no bought a car for a week, two weeks or ten days, it can be.

Q.    What document would refresh your memory -- because I have a lot of them.  So what document could I show you that would refresh your memory as to whether or not Excell, from November 11th of 2021, paid any money towards either one of the two notes?

A.    I mean, I just need to look because sometimes, you know --

Q.    What do you need to look -- I'm sorry, I didn't mean to interrupt.

A.    If he pay us for the vehicle and he no bought anything today, so he paid, you know, the number change.  But, you know, and then he bought something after a couple of days, so then the number change again.

Q.    So what is it that you could look at to figure out what payments were actually made, if any, by Excell to Auto Wholesale on account of the notes?

A.    He no pay the note, he pay interest.

Q.    Okay.

Page 127

A.   What we agree about lump sum, so he pay us several month.

Q.   He paid you -- I'm sorry.  He paid you what every month?

A.   Lump sum in one of the buying and selling vehicle.

Q.   He would pay -- explain that to me, I don't understand.

A.   You understand.

Q.   No, you said that he paid you lump sum every month.

A.   Some portion -- portion of the vehicle.

Q.   He would pay you lump some of a vehicle. No, I don't understand, I'm sorry.

A.   We have a portion of vehicle, what we commit for them to go in buying and selling cars to Auto Wholesale, and instead of paying us profit, he pay us lump sum.

Q.   Okay, and that would be towards the interest under the note?

A.   Either way you want to call it, but basically he pay us lump sum every month.

Q.   And how much lump sum would he pay you every month?

A.   31,250.

Q.   And then would he have to pay you additionally profits on vehicles on top of that?

A.   No.

Q.   No?

A.   No.

Q.   So if he paid you 3150 -- 31,250 per month, then he would not have to pay profits on any other vehicles or on any other transactions?

A.   On this portion, yes.

Q.   And on the other portion?

A.   Different deal.

Q.   Okay.  What's the different deal?

A.   50/50 based on the profit.

Q.   Okay, and what vehicle would determine whether it would be subject to the profit?

A.   Can you repeat yourself?

Q.   What vehicles would he sell that -- where AWB would be entitled to a profit?  We talked about one scenario where AWB owned the vehicle and Excell purchased -- and Excell sold a vehicle that was owned by Auto Wholesale.

Is there any other scenario that Scott or Excell would owe a profit to AWB?

A.   Go back a little bit, I think you a little bit mixed up the whole thing.

Q.   Okay.  In a scenario where, which we talked about earlier, AWB owned a vehicle, Scott sold the vehicle that was owned by AWB, AWB would be entitled to a profit split from that vehicle.

A.   All the -- let me stop you for a second because AWB, no matter what, always owned the vehicle.  It doesn't matter how we get paid for the profit or monthly fee or whatever we want to call it, AWB owned the vehicle.

Q.   Okay.  So on all of the vehicles -- well, were there other vehicles that Excell sold from November of 2021 through the -- its filing of the bankruptcy, was there ever a time that Excell bought a vehicle and sold a vehicle, and AWB had nothing to do with the sale?

A.   For sure.

Q.   Okay.  Would -- on those vehicles would -- would Excell owe AWB a profit split, if AWB had nothing to do with the sale?

A.   Nothing to do with us, why would -- you know, it's not us.  Whatever is not us, it's not us.

Q.   Just making sure.

A.   Nothing to do with us.  Any business he did, God bless him, I wish for him the best in luck.

Q.   Okay.  How about if Karma sold a vehicle that was owned by AWB, would Excell owe the profit for it or would Karma owe the profit for it?

A.    Depends, you know, how the paper were created.  So --

Q.    Well, if Karma owned the vehicle when the vehicle was sold to an end user, would -- would -- would there be a profit split?

A.    You got to look in the bill of sale.  If AWB bought the vehicle from Karma, and AWB sold it back to Karma, and it's profit, or AWB bought the car from XYZ on the street and sold it to Karma, and it's -- you know, AWB deserve to get paid for the vehicle, plus what they agree about the profit.

Q.    Okay, and under those scenarios, would Excell owe the profit or does Karma owe the profit?

A.    You've got to look in the paperwork.  You've got to show me the paperwork.

Q.    We're just giving hypothetical scenarios. So under the one that said, which is -- that you -- that you just gave, which is Karma -- that the transaction was strictly between an end user, Karma and AWB, and Excell was nowhere involved in the transaction, would Excell still owe the profit?

A.    Nothing to -- I mean, you've got to show me the paperwork.  I can't just go in scenario.  You know, I've got to be careful exactly what I say to you, but, you know, if Excell -- you know, it's the same like if I sold

Page 131

the car to Alan, is Excell has anything to do with that?

No.  I sold it to you, whatever it is, it is.  You pay me for the vehicle, I supplied the vehicle with the clean title, have a great life.  If it's any problem, you call me after some period of time, you know, I mean, you're by your own if you bought a used vehicle.

MR. CRANE:  Okay.  I'm going to take a five-minute break.

THE WITNESS:  No problem.  Thank you.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

MR. CRANE:  I'm done asking questions.

MR. GHERMAN:  Mr. Farache is still in the bathroom, so --

MR. CRANE:  Oh, okay.

MR. MILLER:  Go ahead, Alan, what were you saying?

MR. CRANE:  I am done asking questions and he has to elect whether he wants to read or waive unless you're asking him questions yourself.

MR. MILLER:  He'll read.  Thank you for your time.

MR. CRANE:  Thank you.

MR. MILLER:  Have a good day.

MR. CRANE:  Okay.  Bye-bye.

Page 132

MR. GHERMAN:   Thanks.

(Thereupon, the Deposition was concluded at 3:35, and the reading and signing of the Deposition were not duly waived.)

_____

MOSHE FARACHE

Sworn to before me this _____ day of _____, 2023.

_____
NOTARY PUBLIC

My Commission Expires:

Page 133

CERTIFICATE

STATE OF FLORIDA          )

COUNTY OF MIAMI-DADE   )

I, Margaret Franzen, Court Reporter and Notary Public for the State of Florida at Large, do hereby certify that I reported in shorthand the DEPOSITION of MOSHE FARACHE, the witness herein; that the said witness was first duly sworn by me; and that the foregoing pages, numbered from 1 to 135, inclusive, constitute a true record thereof.

I further certify that I am not of counsel, I am  not related to, nor employed by any attorney in this case.

DATED this 24th day of March 2023.

My Commission Expires:      _____
Commission #HH237464
April 14, 2026              MARGARET FRANZEN, Court Reporter
                            Notary Public
                            State of Florida

Page 134

OUELLETTE & MAULDIN COURT REPORTERS
Kendar Building - Suite 333
1550 Madruga Avenue
Coral Gables, Florida 33146
305-358-8875
March 24, 2023

TO:  Moshe Farache
C/O James B. Miller, Esq
19 West Flagler Street, Suite 416
Miami, Florida 33130
bkcmiami@gmail.com
IN RE:  AUTO WHOLESALE OF BOCA, LLC
CASE NO.: 22-15627-EPK

Please take notice that on Wednesday, March 22, 2023, you gave your Deposition in the above-referred matter.  At that time, you did not waive signature.  It is now necessary that you sign your Deposition.

Please call our office at the below-listed number to schedule an appointment between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday.

Please read the following instructions:

At Page 135 of the transcript, you will find an errata sheet.  As you read your Deposition, any changes or corrections that you wish to make should be noted on the errata sheet, citing page and line number of said change.  DO NOT write on the transcript itself.  Once you have read the transcript and noted any changes, be sure to sign and date the errata sheet and return these pages.  You need not return the entire transcript.

If you do not read and sign the Deposition within a reasonable time, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.  If you wish to waive your signature, sign your name in the blank at the bottom of this letter and return it to us.

                              Very truly yours,

                         _____
                              Margaret Franzen, Court Reporter

I do hereby waive my signature:
_____
        MOSHE FARACHE

cc via transcript:  Alan Crane, Esq.

Page 135

# E R R A T A   S H E E T

DEPOSITION OF:  MOSHE FARACHE   TAKEN: 03/22/2023
REPORTER:  Margaret Franzen
     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
PAGE #   LINE #    CHANGE                  REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Please forward the original signed errata sheet to this
office so that copies may be distributed to all parties.

Under penalty of perjury, I declare that I have read my
Deposition and that it is true and correct subject to any
changes in form or substance entered here.

DATE:_____ SIGNATURE OF DEPONENT:_____