Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

In re:                                  Case No. 22-15627-EPK

                                        Chapter 11

AUTO WHOLESALE OF BOCA, LLC,            Subchapter V

        Debtor.

_____/

VIDEO CONFERENCE 7030 EXAMINATION

OF

NICOLE TESTA MEHDIPOUR

Taken on behalf of the Debtor before Maggie Rubio, Registered Professional Reporter, Notary Public in and for the State of Florida at Large, on Thursday, March 16, 2023, at 10:07 a.m., via Zoom Video Conference, pursuant to a Notice of 7030 Examination filed in the above cause.

- - - - -

**OUELLETTE & MAULDIN  COURT REPORTERS, INC.**
(305) 358-8875

Page 2

APPEARANCES:

JAMES B. MILLER, P.A., by
JAMES B. MILLER, ESQUIRE
19 West Flagler Street, Suite 416
Miami, Florida  33130
jbm@title11law.com
and
KATIE S. PHANG, P.A., by
JONATHAN S. FELDMAN, ESQUIRE
9699 N.E. 2nd Avenue
Miami Shores, Florida  33138
feldman@katiephang.com
Attorneys for the Debtor

FURR & COHEN, P.A., by
ALAN R. CRANE, ESQUIRE
JASON S. RIGOLI, ESQUIRE
2255 Glades Road, Suite 419A
Boca Raton, Florida  33431
acrane@furrcohen.com
jrigoli@furrcohen.com
and
YOUNG FOSTER PLLC, by
MICHAEL C. FOSTER, ESQUIRE
1600 S. Federal Highway, Suite 570
Pompano Beach, Florida  33062
michael@youngfoster.com
Attorneys for Nicole Testa Mehdipour

SCOTT C. GHERMAN, P.A., by
SCOTT C. GHERMAN, ESQUIRE
902 Clint Moore Road, Suite 120
Boca Raton, Florida  33487
sgherman@scottghermanpa.com
Attorneys for Calvin Erbstein and
Moshe Farache

HARRY WINDERMAN, ESQUIRE
One Boca Place, Suite 205E
2255 Glades Road
Boca Raton, Florida  33431
harry4334@hotmail.com
Attorneys for the Karma entities

APPEARANCES (continuing):

ALSO PRESENT:

KATIE GLEASON, ESQUIRE
LINDA LEALI, ESQUIRE
TRAVIS HARVEY, ESQUIRE
JERRY BRESLIN, ESQUIRE
JOEL GLICK, CPA


INDEX

| Witness | Direct | Cross | Redirect |
| ------- | ------ | ----- | -------- |

NICOLE TESTA MEHDIPOUR
  (by Mr. Feldman)     6


EXHIBITS

| DEBTOR'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| No. 1 | Amended Proof of Claim | 22 |
| No. 2 | Motion To Dismiss or Convert | 96 |
| No. 3 | 4-22-22 Stipulation/Agreement | 109 |

(All exhibits were retained by Mr. Feldman.)

Page 4

THE COURT REPORTER:  This is the deposition of Nicole Testa Mehdipour being taken via Zoom Video Conference.  Today's date is March 16, 2023 and the time is 10:07 a.m.

Will counsel please state their appearances for the record and stipulate to the remote administration of the oath.

MR. MILLER:  Jim Miller and Jonathan Feldman for the Debtor and we consent.

MR. WINDERMAN:  Harry Winderman for the Karma entities.  We consent.

MR. CRANE:  Alan Crane on behalf of Nicole Testa Mehdipour, who is also here.  We consent.

MR. GHERMAN:  Scott Gherman on behalf of Calvin Erbstein and Moshe Farache personally.  We consent.

MR. FOSTER:  And good morning.  Michael Foster here on behalf of Ms. Mehdipour.  We consent.

THE COURT REPORTER:  Is that everyone?

THEREUPON:

NICOLE TESTA MEHDIPOUR

after having been first duly sworn, was examined and testified as follows:

MR. CRANE:  Who's taking the -- this is Alan Crane.  Who's taking the deposition?

MR. FELDMAN:  I am.

THE WITNESS:  Madam Court Reporter, do you require a driver's license?

THE COURT REPORTER:  Sure, if you can hold it up. That's fine.

MR. CRANE:  Jonathan, your last name is?  I'm sorry, I don't want to refer to you by Jonathan, but your screen only says "Jonathan" on it.

MR. FELDMAN:  Feldman, F-E-L-D, as in David, M-A-N.

THE WITNESS:  Okay.  I know that there's usually an issue in some of the cases.  I'm not sure how close to go.

THE COURT REPORTER:  Keep going.  Keep going a little closer, maybe a little bit more.  Lower it.  Maybe you can just lower it a little bit.  M316---

THE WITNESS:  There's a glare as well.  There's also a glare.

MR. MILLER:  Nicole, we can all stipulate that you are you.

THE COURT REPORTER:  Thank you.

THE WITNESS:  Okay.  Wonderful.  Thank you, Mr. Miller.

MR. CRANE:  Mr. Feldman, in advance of your -- before you start questioning, I just wanted to -- this is a 7030 of a bankruptcy trustee which is in another estate.

Page 6

Most of what she knows is through attorney-client privilege.  So, we're going to have to work those sort of things out as we go.  I just wanted to let you know in advance that there may be some things that she does not have personal knowledge of other than through what her attorneys have done in this particular matter, so ---

MR. FELDMAN:  Understood, but I think our response to that would be if she's putting it at issue, then privilege is waived.  If it's just facts, then it's not privileged.  So, you know, that would be our response on that.  But let's just see where it takes us and we'll ---

MR. CRANE:  Yeah.

DIRECT EXAMINATION

BY MR. FELDMAN:

Q.  Ms. Mehdipour, are you ready?

A.  Yes, I am.  Mr. Feldman, will I have the pleasure of seeing you or not?

Q.  Oh, yeah, you will.  Sorry.

A.  Okay.  Thank you.

Q.  There we go.

A.  There you are.  Good morning.

Q.  Good morning.  So, let's roll.

How long have you been a trustee for?

A.  2011, I believe.

Q.   And you are asserting a claim in this case for the approximate amount of $100 million; is that right?

A.   I filed a Proof of Claim in the AWB matter.  I'd have to look at the actual document to tell you the exact number, but I did file a claim on behalf of the Excell Auto Group bankruptcy estate.

Q.   Okay.  I notice you have some documents in front of you.  What do you have in front of you?

A.   Nothing.

Q.   Nothing?  There's some papers right there.

A.   Nothing at all.  I have a portfolio that is closed.

Q.   So, you filed a claim -- I'm looking at -- in the amount of $114 million.  Does that ring a bell?  Does that sound about right?

A.   If you show me the document, I can tell you the exact amount.

Q.   I'll show you the document later, but fair to say that you filed a very large claim in this case?  That much you can remember?

A.   I filed a claim for somewhere around $114 million.

Q.   Okay.  How did you get to that number?

MR. CRANE:  Objection.  The 70 -- let's talk this through.  This is a 7030 Examination only on the issues

Page 8

related to our Motion to Convert or Motion to Dismiss.  If there -- we filed an Amended Complaint that's required by the Court.  That has not been objected to.  The claim is presumptively allowed and it's not at issue on this 7030 Examination or in this motion.

MR. FELDMAN:  I appreciate that, but one of the issues is that we don't believe your client is a creditor of this estate; and, so, therefore, she has no standing to bring this motion.  So, we do intend to file that objection prior to the hearing.

So, can you explain to me ---

MR. CRANE:  Well, that's not -- that's not ---

MR. FELDMAN:  Are you instructing her -- you can instruct her not to answer, then, please, let's move on. Instruct her not answer.  Are you going to instruct her not to answer?

MR. CRANE:  What's the question?

MR. FELDMAN:  The question is:  How did you calculate that amount of 114 million?

MR. CRANE:  Yes, I'm going to instruct her not to answer as it's beyond the scope of the 7030 Examination.

BY MR. FELDMAN:

Q.  Okay.  So, what's the basis of you filing a Motion to Convert in this case, Ms. Mehdipour?

A.  After doing some due diligence in this case and

reviewing the Monthly Operating Reports, it appears that this particular debtor has no business operations.

Also, in reviewing the Plan of Reorganization in this case, it appears that -- my understanding of the Plan is that it includes a proposed bar order which is solely for the benefit of the insiders.

For those reasons, as well as legal theories that I was instructed as to by my counsel, we believe that the Motion to Convert was appropriate.

Q. What legal theories?

A. You'd have to speak with my attorney as to the legal theories.

Q. What are they?

MR. CRANE: Objection. Privileged.

BY MR. FELDMAN:

Q. Are you asserting that there's some type of clawback claims that could be asserted against the insiders of this estate?

A. We are still investigating. I don't know that.

Q. So, the answer is you don't know.

Okay. Are you aware of some type of breach of fiduciary duty claim that could be asserted against the insiders of this estate?

A. You would have to speak with my attorneys as to the legal theories.

Page 10

Q.   You don't know?

MR. CRANE:  Objection.

BY MR. FELDMAN:

Q.   I'm just asking.  Do you know, Ms. Mehdipour, if there are potential breach of fiduciary duty claims that could be asserted against the insiders of this estate?

A.   I have no personal knowledge of that outside what my attorneys have instructed me.

Q.   What is the factual knowledge that's being provided to you that there may be a breach of fiduciary duty claim regarding the insiders of this estate?

A.   I never said there may be a fiduciary -- breach of fiduciary duty claim.  It's still being investigated.

Q.   Have you been provided any facts that would suggest the insiders of this estate have committed any wrongdoing?

MR. CRANE:  Objection to privilege.

MR. FELDMAN:  Facts are privileged?

MR. CRANE:  What her attorneys advised her?

MR. FELDMAN:  I just want to -- you're taking the position that facts provided to your client are privileged?

MR. CRANE:  No, just opinions.

MR. FELDMAN:  Yeah, I agree with that.  Are you -- Mr. Crane, are you taking the position that facts

that you have provided to your client are privileged regarding your investigation?

MR. CRANE:  The opinions that I've provided her or her attorneys have provided to her are privileged.

MR. FELDMAN:  Okay.  I'm not asking about opinions.  I asked her about facts.

BY MR. FELDMAN:

Q.  So, please, Ms. Mehdipour, describe the facts, if any, that you think relate to wrongdoing that the insiders have committed against this debtor.

A.  Could you rephrase the question, please?

Q.  I just rephrased it.  Do you not understand it?

A.  Well, when someone asks to have a question rephrased, it would typically mean they don't understand the question and need it to be rephrased.  So, that's what I'm asking you to please do.

Q.  Okay.  Are you aware of any facts that would suggest the insiders of this estate have committed any type of wrongdoing against this debtor?

A.  It's still under investigation.

Q.  So, the answer is you don't know?

A.  I do not know at this point because the investigation is incomplete.

Q.  Okay.  What's the status of this investigation?

A.  It's ongoing.

Page 12

Q.   Okay.  So, who's leading this investigation?

A.   I'm sorry, it's very hard to hear you.  Would you please speak up, Mr. Feldman?

Q.   Sure.  Who's heading up this investigation?

A.   As a creditor in this estate, I am ---

Q.   No, no, no.  Not my question.  Who is heading up this investigation on your behalf?

A.   At my direction, my attorneys.

Q.   Anybody else?

A.   To the extent that a financial analysis is required, my financial advisors.

Q.   Who's that?

A.   B. Riley, and that's Alan Barbee.

Q.   Okay.  So, I want to go back to the basis of your Motion to Convert.  You said it was because there doesn't appear to be any ongoing operations; you were troubled by the releases; and you think there is some type of amorphous legal theory.  But you don't, as you sit here today, have any facts that describe what causes of actions that could be asserted against the insiders?  Does that sum up the basis of your Motion to Convert?

A.   Not the last part.

Q.   Okay.  So, how did I get the last part wrong?

A.   I simply told you, after reviewing the Plan, I thought it benefited the insiders in my opinion.  The

Page 13

basis of the Motion to Convert is a lack of business

operations to justify a reorganization.

Q.   You think the creditors are better off in a

liquidation scenario in this case?

A.   I'm trying to be careful as to whether that

requires a legal opinion, and that would be something that

my attorneys would have advised me of.

Q.   You've been a trustee for over a decade.  In your

experience as a trustee, have you just looked at this

case, Auto Wholesale, and made a determination that the

creditors would be better off in a liquidation versus

reorganization?

MR. CRANE:  Objection to form.

MR. FELDMAN:  Go ahead.

Mr. Winderman, can you just mute?

MR. WINDERMAN:  Oh, I'm sorry.  I bumped into it

accidentally.

MR. FELDMAN:  That's okay.  Thank you.

BY MR. FELDMAN:

Q.   Go ahead, Ms. Mehdipour.

A.   I can't speak to the legal theories behind it.

Q.   Do you know anything in this case that you can't

otherwise -- that you can't discuss with me because of

privilege?

A.   I have very little personal knowledge in this

case.

Q.   Okay.   So, you certainly wouldn't be an appropriate witness, then, to testify as to the Motion to Convert and Motion to Dismiss; is that correct?

A.   For the factual allegations behind it?  Again, I have very little personal knowledge other than what ---

Q.   Let me ask the question this way.  Do you plan on being a witness at the Motion to Convert hearing?

A.   That would be up to my attorney.

Q.   Do you personally know, at this point in time, that you plan on being a witness?

A.   I don't know the answer to that.

Q.   We received some interrogatory responses from you yesterday.  Are you aware of that?

A.   Of course.  Yes.

Q.   Okay.  Do you know who the witness is you plan on calling to date with respect to the hearing on the Motion to Convert?

A.   They are in the Interrogatories.  Certainly.

Q.   Okay.  Did you look at the Interrogatories before you signed them?

A.   Yes, I did.

Q.   Okay.  Do you recall if you're disclosed as one of the witnesses?

A.   Well, my name is not on there, but there are some

general categories at the end of the list that could certainly apply to me.

Q.  Okay.  So, do you plan on being a witness?  As you sit here today, do you think you'll be a witness, predicted?

A.  I don't know.  I don't know the answer to that. You'd have to ask my attorneys.  I assume it would depend on the conclusion of this deposition.

Q.  Okay.  So, if you were to testify at the hearing next week, what could you possibly testify about?

A.  The factual allegations that I could testify as to would be the review of the Monthly Operating Reports, which I previously testified to, a few moments ago, showing a lack of business operations, as well as the issue I brought up regarding the fact that the Plan appears to benefit the insiders only in this case versus the creditor body as a whole.

Q.  Okay.  And the only thing as to that point is the Plan itself?  You have no other knowledge, right, other than what's in that Plan?

A.  I'm not sure I understand what you mean by that.

Q.  In other words, you say there's provisions in the Chapter 11 Plan that's been filed in this case that appear to benefit the insiders, and all you're looking at to there is the Plan itself?  There's no other document

Page 16

you're relying on that would allow you to testify about that insider release, correct?

A.  I'm not sure.  I'd have to speak with my attorneys as to the legal theory behind that.

Q.  Okay.  And we've already discussed that with respect to -- and you understand that the release would potentially release fraudulent transfer type claims that could be asserted against the insiders, right?  This isn't a mystery to you, correct?

A.  I can't testify -- I'm here as a fact witness, and in terms of my opinion as an attorney, I can't speak to that.  You'd have to ask my attorneys as to that.

Q.  I appreciate that you're trying to wear a different hat right now, but you are a lawyer, correct?

A.  Yes, I am.

Q.  You've seen insider releases before in Chapter 11 plans, right?

A.  Yes.

Q.  Okay.  Have you actually ever been a plan proponent on behalf of a client where you have an insider release?

A.  I can't recall.

Q.  Okay.  It's possible, right?

A.  Again, I can't recall.

Q.  Okay.  Have you ever represented a debtor?

A.   Yes.

Q.   Okay.   Have you ever represented a debtor where a plan, a Chapter 11 plan was filed?

A.   Yes.

Q.   Okay.   When was the last time you represented a debtor where you filed a Chapter 11 plan?

A.   I can't recall exactly.

Q.   You can't remember one Chapter 11 plan that you have filed on behalf of a debtor in your entire career?

MR. CRANE:   Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   I can't recall as I sit here today.

Q.   When's the last time you think you represented a Chapter 11 debtor in which you filed a plan?

A.   When is the last time that I believe I represented a debtor filing a Chapter 11 plan?   I have no idea.

Q.   Okay.   It's been a long time?

A.   Yes.

Q.   Okay.   Just in terms of your professional career, I know you -- you worked at Adorno & Yoss.   Where else after that?

A.   Bilzin Sumberg.

Q.   Okay.   What years were you at Bilzin?

A.   2006 through 2009.

Q.   While you were at Bilzin did you represent debtors?

A.   I'm sure I did.  I just don't recall.

Q.   Okay.  So, if I were to just look back through PACER and I saw your name associated with a Chapter 11 plan with a debtor during that time period and I saw insider releases, certainly you have no problem as a lawyer seeking insider releases in a plan on behalf of clients, right?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   I don't recall any of that.

Q.   Okay.

A.   I'd have to look through my case list.

Q.   Okay.  I just want to be clear, though, insider releases aren't uncommon, right?  Nicole Testa Mehdipour, bankruptcy lawyer, been practicing for quite some time now, you've seen these, right?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   They exist and I have seen them.

Q.   Okay.  And courts routinely authorize them,

Page 19

correct?

MR. CRANE:  Objection to form.

MR. FELDMAN:  Go ahead.

MR. WINDERMAN:  I object to form also.  Lack of foundation.

MR. FELDMAN:  That's not a proper objection, but anyway, go ahead.

THE WITNESS:  Courts have approved them in other cases.

BY MR. FELDMAN:

Q.  Okay.  And what is it about the specific insider release in this case that is troublesome to you?

A.  You'd have to speak with my lawyers about legally why it is.

Q.  Okay.  You don't know?

A.  Not what I said before.

Q.  Okay.  Factually, can you explain to me ---

MR. CRANE:  Objection.  Only to the extent -- okay.

BY MR. FELDMAN:

Q.  Factually, can you explain to me what is troublesome about these insider releases?

MR. CRANE:  Objection to form.

THE WITNESS:  Again, I've said this three times in my testimony, they benefit the insiders, possibly at

Page 20

the expense of other creditors.  I don't know --

BY MR. FELDMAN:

Q.  You said possibly ---

A.  -- what else you want me to say.

Q.  Well, that's what I'm trying to get at because I don't know if you know what you're saying.  So, you're saying it possibly ---

A.  Excuse me?

MR. CRANE:  Objection.

BY MR. FELDMAN:

Q.  You said it's possibly to the detriment of the creditors.  Do you either know it's detrimental to the creditors or it's not detrimental to the creditors?

A.  We're investigating the insider claims.

Q.  Okay.  So, as you sit here today, you have no way of knowing one way or the other if the insider releases are, in fact, detrimental to creditors?  Is that a fair characterization?

MR. CRANE:  Objection to form.

THE WITNESS:  It's an incomplete investigation.

BY MR. FELDMAN:

Q.  Okay.  So, the answer is you don't know right now, correct?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Page 21

Q.  Is that correct, Ms. Mehdipour?

MR. CRANE:  Objection to form.  You've asked the question multiple times.  She's given you an answer.  You're badgering ---

MR. FELDMAN:  She's giving responses that aren't answering the question, but I get it.  All she has to just say is "I don't the know as I sit here" and I'll move on.  That's what she's saying.  She just doesn't want to say it that way.  Just say it.  Come on, guys.  It's not difficult.

MR. WINDERMAN:  I move to strike the editorial, that soliloquy.

MR. FELDMAN:  Sure.

MR. WINDERMAN:  Ask questions.

THE WITNESS:  May I have the question read back, Mr. Feldman?

BY MR. FELDMAN:

Q.  Sure.  Actually, let's not do that, because I don't want to waste the court reporter's time.

You said it's possible that the insider releases are detrimental to the creditors.  Do I have that correct?

A.  Yeah.

Q.  Okay.  So, as you sit here today, you don't know in fact if it is detrimental to creditors or it's not detrimental to creditors; is that correct?

A.   That's correct, for the reasons I stated.

Q.   Okay.  Well, "for the reasons I stated" -- as you sit here, you factually don't know one way or the other because you have an ongoing investigation; is that correct?

A.   That's my testimony.  Yes.

Q.   Okay.  So, I am going to ask questions about your claim because at the end of the day we are taking the position you don't have standing to assert this motion.  That will be our response.

My understanding is your claim is predicated on RICO; is that right?

A.   You'd have to speak with my attorneys about the legal theories.

Q.   Okay.  You don't know the legal theories that your group of claim is predicated on?

A.   They're in the proof ---

MR. CRANE:  Objection to -- objection.  Privileged.  She stated that her knowledge is based upon the opinions of her counsel.

MR. FELDMAN:  Okay.  Well, let's just look at the claim itself.  I'll bring it up on the screen.  We'll just mark this Exhibit 1.

(Thereupon, Debtor's Exhibit Number 1 was identified for the record.)

BY MR. FELDMAN:

Q.   Do you see this, Ms. Mehdipour?

MR. CRANE:  Not yet.

THE WITNESS:  Yes, I do now.  Yes.

BY MR. FELDMAN:

Q.   Okay.  So, for example, you say here -- actually, just to -- before I even go through this, I just want to understand something right now.  How much money do you currently have in your estate?

MR. CRANE:  Objection.  It's outside the scope of 7030 Examination and I'm going to instruct her not to answer.

BY MR. FELDMAN:

Q.   Okay.  Do you file trustee reports in this case? Ms. Mehdipour, do you file internal reports in this case? In Excell, to be exact.

A.   They're not yet due.  The answer is no.

Q.   Okay.  I'll look at the docket, but do you recall -- I know you announced yesterday a potential settlement relating to a motorcycle.  Other than that, have you recovered any monies from third parties, whether it be a litigation or a settlement?

MR. CRANE:  Objection.  It is outside the scope of the 7030 Examination and the matters that are before the Court.  This is not a 2004 Examination and it's not a

Page 24

7030 on the ---

MR. FELDMAN:  I'll cut to the chase.  It's fine. Just say "form."  Like, I don't need to hear the lengthy objection.  If I'm curious, I'll ask.

BY MR. FELDMAN:

Q.  Let me ask you this question.  Have you ever met Mr. Zankl?

A.  Yeah.

Q.  Okay.  How many times have you met him?

A.  Many.

Q.  Okay.  And you've met him in your office, Zoom, by telephone, something else?

A.  I've met him on several occasions, including initial interviews with him at Excell Auto Group, Inc.

Q.  Okay.  You know Mr. Zankl was deposed in connection with all of this litigation in one way or the other, right?

MR. CRANE:  Objection to form.  I didn't understand the question because you're muffled.

MR. FELDMAN:  I'm sorry.

THE WITNESS:  Can you just rephrase it or repeat it?

BY MR. FELDMAN:

Q.  You're aware Mr. Zankl has been deposed, correct?

A.  I can speak to -- I can speak to my attorneys

Page 25

having deposed him.  In terms of any other depositions, I don't know.

Q.  Okay.  So, you know at least one deposition.  Do you know if he took the Fifth Amendment at his deposition?

A.  Which deposition are you referring to?

Q.  The one that your attorneys took of him.  Are you aware of whether or not he asserted the Fifth Amendment privilege at his deposition?

A.  It was at a 2004 Exam and, yes, he did.

Q.  Okay.  So, what I'm trying to understand here, is part of your factual basis of the Motion to Convert based on any information that Mr. Zankl has provided to you?

A.  Yes.

Q.  Okay.  And, so, you would concede that you are relying on information provided to you by someone who believes he may have committed one or more crimes?  Do I have that correct?

MR. WINDERMAN:  Object to form.  Taking the Fifth is not an admission of committing crimes.

MR. FELDMAN:  I didn't say that, Mr. Winderman.

MR. WINDERMAN:  Exactly what you said.  Do you want the court reporter to read it back?

MR. FELDMAN:  No, I don't, and I don't need your -- what you just criticized me for, some ongoing soliloquy.  So, I'd appreciate just object to form.

BY MR. FELDMAN:

Q.   Go ahead, Ms. Mehdipour.

A.   I can speak to some factual knowledge that I acquired from Mr. Zankl at the initial interviews that I conducted.

Q.   Okay.  That's not my question, though.  My question is:  Part of the factual basis of your Motion to Convert, it's relying on information provided to you by a gentleman who has asserted his Fifth Amendment privilege, correct?

MR. CRANE:  Objection to form.

THE WITNESS:  Can you show me in my motion where I've done that?

BY MR. FELDMAN:

Q.   I'm asking you.  You said part of the information that you're relying on is information provided to you by Mr. Zankl.  That was your testimony just a moment ago.  Is that incorrect?

A.   It's with respect to the loan transactions between AWB and Excell Auto Group that I have information from Mr. Zankl's interview.

Q.   Okay.  And I just want to be clear.  Mr. Zankl, you are relying on information provided by him, even though he has asserted his Fifth Amendment privilege in your bankruptcy case, correct?

Page 27

MR. CRANE:  Objection to form.

THE WITNESS:  I'd like you to show me where you believe I am doing that in the papers.

BY MR. FELDMAN:

Q.  That's not what I'm asking.  Please listen to the question, Ms. Mehdipour.  It will go a lot faster.

I'm asking you:  The person who provided this information is also the same person in your bankruptcy case that has asserted his Fifth Amendment privilege; is that right?

MR. CRANE:  Objection to form.

THE WITNESS:  He has asserted his Fifth Amendment privilege, yes.

BY MR. FELDMAN:

Q.  Do you believe Mr. Zankl has committed one or more crimes based on factual information that you've discovered in your case?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  Any potential commission of a crime would be something that my lawyers conveyed to me and I cannot speak to that.  Privileged information.

Q.  I'm just trying to -- I'm asking factually.

A.  It's privileged information.

Page 28

Q.   Ms. Mehdipour, I'm going to ask the question this way:  Do you believe Mr. Zankl did something wrong based on the facts that you've reviewed or been provided in connection with your case?

A.   To tell you whether I think he's done something wrong would be to go into legal theories that were provided by my attorneys and, so, I cannot answer the question.

Q.   I'll ask it simpler.  Do you think Mr. Zankl has made a misrepresentation to somebody, factually?  Do you know that?  Do you think that?

MR. WINDERMAN:  Form.

MR. FELDMAN:  Go ahead.

MR. CRANE:  Objection.  This is outside the 7030 Examination.

MR. FELDMAN:  It's not.  I'm not going to do this.  Just say "objection to form" and instruct her not to answer, then.  Please, we don't have to go through this.

Are you going to instruct her not to answer?

MR. CRANE:  Can we take a break for a moment?

MR. FELDMAN:  Does your client need to take a break?

THE WITNESS:  That would be wonderful.  Thank you.

Page 29

MR. FELDMAN:  Okay.  Let's do that.  We'll come back in five minutes, 10:41.

THE WITNESS:  Thank you.

(Thereupon, a brief recess was taken at 10:36 a.m., after which the examination reconvened at 10:40 a.m.)

MR. FELDMAN:  Ms. Mehdipour, are you ready?

MR. CRANE:  Yes.

THE WITNESS:  Yes.  Thank you, Mr. Feldman.

MR. FELDMAN:  No problem.  Madam Court Reporter, are you ready?

THE COURT REPORTER:  Yes.

BY MR. FELDMAN:

Q.  So, we were looking at your Proof of Claim and we actually objected to the claim.  The objection has been continued to May 10th.  So, we certainly take the position that the claim is improper, but we're going to ask questions about it and if your lawyer wants to instruct you not to answer, we will deal with it accordingly. So ---

MR. CRANE:  Just as a rebuttal, Mr. Feldman, or additional knowledge, since you're new to the case, there was an initial objection to our first group of claims.

MR. FELDMAN:  I know.

MR. CRANE:  An Amended Proof of Claim in the

Court -- as required by the Court.  There has not yet been an objection to the Amended Proof of Claim.

MR. FELDMAN:  I appreciate that, but we are certainly taking the position that the Motion to Convert is not well taken because your client doesn't have standing because she's not a creditor.

So, we will certainly object to the claim before the hearing.  If you want to just continue the deposition to later next week so we can file the objection and we can remove that as a hurdle, I'm happy to accommodate that.

MR. MILLER:  Actually, guys, the objection to claim still stands.

THE COURT REPORTER:  Excuse me, gentlemen.  I've only got four little screens on the bottom.  I don't know who's speaking right now.

MR. MILLER:  Miller speaking.

THE COURT REPORTER:  Okay.  Thank you, Mr. Miller.

MR. MILLER:  So, the point of the matter is that the objection to claim is still standing.  It has been continued per the Court order that directed the Chapter 7 Trustee of Excell to amend her claim for purposes of that hearing.  The judge gave an opportunity for her to amend the claim to put what the judge said was more meat on the bones and that's where they filed the amended claim, but

Page 31

the objection is still there and will be heard.

MR. CRANE:  Okay.  And this is a 7030 Examination to the Motion to Convert, not on anything to do with our Proof of Claim.

MR. MILLER:  That is not true.  The Proof of Claim is the impetus for FVP's Motion to Dismiss and Ms. Mehdipour is a witness per FVP as well and the Proof of Claim was the basis for their Motion to Dismiss.  We are not limited to just Ms. Mehdipour's Motion to Dismiss itself.

MR. FELDMAN:  He's got a point.  Good job, Jim Miller.

BY MR. FELDMAN:

Q.  So, let's go.  Let's talk about the claim.

Ms. Mehdipour, you see on here what we've marked as Exhibit 1.  This is the Amended Proof of Claim.  Do you recall seeing this document before?

A.  Yes.

Q.  Okay.

A.  Could you scroll all the way up, please, so I can see the beginning of it?

Q.  Yeah, right there.

A.  You pulled the exhibit from it; is that correct?

Q.  Yes, this is ---

A.  The claim is not there.

Q.   No, this is what your lawyer filed.

A.   No, he didn't.   There is a claim that's supposed to be in front of it.

Q.   I get that.   Ms. Mehdipour, it says Page 1 of 4.

A.   And it also says Part 2.   So, you're missing the first document, which is the actual claim, and I'm asking you if you have it.

Q.   Ms. Mehdipour, here we go.   We'll just go back.  Oh, you're talking about this.

A.   Thank you.

Q.   All right.

A.   Thank you so much.

Q.   You're right.   So, let's look at it.

All right.   So, we'll mark, actually, this as Exhibit 1 once it opens.

So, this the Proof of Claim you filed in this case, correct?

A.   That's correct.   Yes.

Q.   All right.   And you filed it in the amount of $114 million and change; is that about right?

A.   That appears correct.   Yes.

Q.   Have you ever filed previously a Proof of Claim in this amount?   And when I say "this amount," I'm talking about magnitude.   Have you ever filed a nine-figure Proof of Claim as a trustee in any case?

MR. CRANE:  Objection to form.

THE WITNESS:  I don't recall.

BY MR. FELDMAN:

Q.   Okay.  And, actually, your prior claim was significantly less than that, right?  It was like 30 million?

A.   If you show me the document, I can speak to that.

Q.   You don't recall?

A.   It was less.  Correct.

Q.   Okay.  It was less.  Okay.

So, what was the basis, factually, as to how your claim increased so significantly?

A.   Based on legal theories provided by my attorneys.

Q.   Can you name the specific legal theories? Without getting into the actual information, just what is the legal theory?

A.   It's detailed in the document, which speaks for itself.

Q.   Okay.  Okay.  So, I just want to focus on RICO. I love RICO.

Let me ask you a question.  Have you, as a trustee, ever asserted a RICO claim against a third party?

A.   I don't recall.

Q.   Okay.  Have you ever represented a client that was sued for RICO, just in your capacity as a lawyer?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  Not that I recall.

Q.  Okay.

A.  It's possible, but as I sit here, I can't recall one.

Q.  Okay.  Have you ever represented a plaintiff, as a lawyer, in which you sued a third party for RICO?

A.  Possibly.  I can't recall.

Q.  You understand the legal elements of RICO?

A.  Any legal elements would have been provided by my attorneys in terms of the legal theory.

Q.  I understand that.  I'm saying you, Nicole Testa Mehdipour -- when did you pass the Bar?

MR. CRANE:  Objection to form.

THE WITNESS:  In 1999.

BY MR. FELDMAN:

Q.  Okay.  So, you've been practicing in excess of 20 years.  Are you familiar, just as a lawyer, with the legal elements of RICO?

A.  I'm here as a fact witness.  I'm not here as an attorney.

Q.  Ms. Mehdipour, I appreciate you want to change the hat here, but I'm asking you:  Are you aware of the

legal elements of a RICO claim?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.  It's a yes or no question.  If the answer is no, just say no.  Ms. Mehdipour?

A.  Yes.  That's not the answer to my question.  Yes, I'm somewhat familiar with them.  But, again, any legal analysis or theory would have come from my attorneys.  It's privileged.  I can't discuss it.

Q.  Well, I understand the legal theory, but you already have RICO in here.  So, I want to talk about the facts of the RICO claim because facts are very important in RICO claims.

So, you understand, just as a lawyer who's maybe seen RICO from time to time, that one of the necessary elements of a RICO claim are predicate acts?  You understand that?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Do you understand it, Ms. Mehdipour?

MR. CRANE:  You're asking her as a lay witness about legal theories that are actually set forth in the Proof of Claim, in the document that you have set forth, including the elements that are out there, and you're asking her to give you a legal opinion.

MR. FELDMAN:  So what?  Who cares if I'm asking her to give a legal opinion?  Whether it's admissible is the other issue -- is what you're addressing.  I can ask her all kinds of questions.  Admissibility is another issue altogether at trial.  This is a deposition where information is reasonably calculated to lead to admissible evidence.  I'm okay to ask the question.

BY MR. FELDMAN:

Q.  So, my question to you, Ms. Mehdipour, is:  Are you aware that one of the elements of a RICO claim are that you have to assert predicate acts?

MR. CRANE:  Objection to form.

THE WITNESS:  The elements --

BY MR. FELDMAN:

Q.  Go ahead.

A.  -- my attorneys have asserted are in the document in front of you.

Q.  Okay.  So, let's talk about predicate acts.

What predicate acts were committed in furtherance of this RICO conspiracy that's set forth in your Proof of Claim?  What are the facts?

A.  You'd have to speak with my attorneys.  I don't have personal knowledge of the facts that ---

Q.  Of course, you don't have personal knowledge. You're a Chapter 7 trustee.  I get that.  I've represented

Chapter 7 trustees.  But what facts are you aware of, whether personally or that has been told to you, just facts that would support any predicate act with respect to the RICO claim that you're asserting here?

A.  Why don't you give me a moment to read the document?

The only factual knowledge that I can speak to as to any factual basis for the legal theories is not through personal knowledge; it is through conversations that I had at my initial interview with Mr. Zankl and subsequent interviews with Mr. Zankl, where he explained to me that the lending relationship between AWB and Excell was that of a lending relationship where a car would be sold, profits would be split 50/50, and that there was an intentional disguise of interest as to this lending relationship where lenders would -- and knew about it, according to Mr. Zankl.  Lenders wanted to avoid the reporting of interest and, so, the lending relationships were done through corporations, not individuals.

And, again, I don't have personal knowledge of the relationship and the lending relationship when it occurred, but this is what Mr. Zankl conveyed to me on numerous occasions.

Q.  Did you actually independently verify any of what you just said?  I know you said Mr. Zankl told you this,

Page 38

but did you independently verify any of this?

A.   Other than conducting some due diligence and reading the lawsuit where AWB sued Excell Auto Group and the promissory notes, no, I -- I have, again, no actual personal knowledge of it.

Q.   You keep on talking about actual personal knowledge.  I will stipulate you have no personal knowledge whatsoever, but you can, obviously, learn facts through your investigation, right?  You didn't live there in the moment.  I get it.  You weren't there with Mr. Zankl.  I understand that, Ms. Mehdipour.  You don't have to clarify that any further.  Okay?

I'm asking you:  Mr. Zankl tells you a story.  Did you independently verify his story?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   You asked me what factual basis I had and I testified ---

Q.   Not my question.  Not my question.  Ms. Mehdipour, not my question.

A.   Well, can I finish speaking?

Q.   No, because you're not answering my question.

A.   Okay.  Okay.  So, go ahead, please.

Q.   My question to you was:  Mr. Zankl told you a

Page 39

story.  Did you independently verify the facts that he told you?

A.  Other than looking through -- other than my attorneys legally analyzing documents, which I can't speak to, because it's privileged, no.

Q.  Okay.  You said a couple of things.  I want to go back to your answer from a couple of moments ago.  You said you did some due diligence.  You said you looked at a complaint that was filed in state court, apparently.  What other due diligence did you do other than looking at that state court complaint?

A.  Again, I can't speak to what was done because anything that would have been done legally was through my attorneys or my financial advisors, who would have analyzed any transfers or claims, including the ones we're discussing, and Mr. Barbee, as my financial advisor, would be the person that would be able to most completely talk about the basis financially of those claims.

Q.  When was Mr. Barbee retained?

A.  Excuse me?

Q.  When was Mr. Barbee retained?

A.  In the beginning of the case.  It's on the docket.  I couldn't speak to the date.

Q.  Okay.

MR. CRANE:  Objection to form.  And then ---

MR. FELDMAN:  And ---

MR. CRANE:  Mr. Feldman, for one second.  When we're talking about estate, for everybody, probably, because there are two estates, everyone should be clear whether they are talking about the Excell estate or the AWB estate, for the record.

MR. FELDMAN:  Yeah, I don't plan on necessarily using this depo at the hearing.  This is just for information at this point, but -- and since she plans on being a witness, it doesn't matter what the record really says.

BY MR. FELDMAN:

Q.  Anyway, you understand Mr. Barbee is going to be a witness at the Motion to Convert?

A.  I believe he is listed on the witness list.

Q.  Okay.  What's he's going to testify about?

A.  You'd have to ask him.  I don't know.

Q.  You don't know what your financial advisor is going to testify about in connection with the Motion to Convert that you filed in this Auto Wholesale of Boca case?

A.  Well, obviously, it would be based on financial analyses that he performed.

Q.  What financial analyses is Mr. Barbee going to perform that he is going to testify about in your motion?

Page 41

A.   He has performed.

MR. CRANE:  Objection to form.

THE WITNESS:  He has performed them and they were provided to you.

BY MR. FELDMAN:

Q.   Okay.  And what did he do?  Do you know?

A.   Again ---

MR. CRANE:  Objection to form.

THE WITNESS:  Again, if you're going to ask about the financial analyses, he is the witness you should ask since he generated them.

BY MR. FELDMAN:

Q.   He's your professional, correct?

A.   He is.

Q.   In the Excell case?  Okay.

A.   Correct.  In the Excell estate case.  Yes.

Q.   I'm asking Nicole Testa, Chapter 7 Trustee, can you tell me at all what financial analyses Mr. Barbee has performed?

A.   He analyzes the standard analyses of claims and transfers that could be brought by a Chapter 7 trustee.

Q.   Okay.  So, you've looked at his analysis?

A.   Yes, I have.

Q.   Okay.  And what types of claims does Mr. Barbee believe can be brought against the insiders of this

Page 42

estate?

A.   You would need to ask him or refer to his reports.

Q.   You don't know?

A.   I do know.  I've seen them.

Q.   Okay.  So, tell me about them.

A.   Well, again, if you pull up the document you're referring to, I can -- I can speak generally about it. I'm not sure what you're asking me.

Q.   When did you send -- I'm asking you about Alan Barbee's analysis.  You said you reviewed it.  You said he has analyses about claims that could be brought against the insiders and I asked you tell me about them.  So, what can you tell me about them?

A.   You just misstated my testimony.

Q.   Okay.

A.   I did not say anything about who the claims were against.  I did not say they were against insiders.  My testimony was that he has done the normal financial forensic review of claims that could be brought by a Chapter 7 trustee on behalf of a Chapter 7 estate.

Q.   Okay.  And what were those claims?

A.   You'd have to bring up the document and speak to him.

Q.   You can't speak about the document?  You don't

understand it or -- I don't understand.

A.  I do.

MR. CRANE:  Okay.  Hold on.  I'm going to assert an objection.  To the extent that you're asking her what Mr. Barbee may have provided reports on that's unrelated to the AWB bankruptcy, I'm going to instruct her not to answer those questions.  Form.

BY MR. FELDMAN:

Q.  Let me ask the question this way, Ms. Mehdipour. You said Mr. Barbee has provided a document in connection with the Auto Wholesale of Boca case?

A.  That's correct.

Q.  Are you sure about that?

A.  Yeah, they're in your Dropbox or your share file, whatever -- however it was provided to you.

MR. FELDMAN:  Mr. Crane, was that produced to us?

MR. CRANE:  Yes.  Mr. Rigoli was in charge of actually transmitting the documents between our office and Mr. Miller, but yes.  That's my understanding.

MR. FELDMAN:  Okay.  Can you ask Mr. Rigoli real quickly, because I haven't seen it.  Mr. Miller just texted me right now he's never seen it.  Can you have Mr. Rigoli e-mail that document specifically over to us right now and we'll take a look at it at a break at some point?  Thank you.

MR. CRANE:  Okay.  Can we please take a break so I can go do that?

MR. FELDMAN:  No, let's keep on going, but if you can just e-mail him right now.  We'll just keep moving things along.  And at the next break I'll just go through it real quick.

MR. CRANE:  Can you hold on?

MR. FELDMAN:  Sure.  No problem.

MR. CRANE:  All right.  Well, I texted him, so -- so, you didn't want to take a break, so I can't go talk to him, so ---

MR. FELDMAN:  Don't worry about it.  It's fine.  Texting is fine.  I have to imagine Mr. Rigoli is going to respond to you.  Let's keep going.

MR. MILLER:  Just for the record, Alan, late on Wednesday evening, you made a production.  We could not download it.  We coordinated with Mr. Rigoli.  Yesterday afternoon, Mr. Rigoli finally got a hold of your company that you guys were using; put it through a Dropbox production yesterday afternoon and in that Dropbox production, which was over 8500 documents, I don't know why it's so large, but it is, there is nothing in here that makes reference to Alan Barbee's report or analysis or anything of the nature.  If you know where that is, point us at it, rather than burying it, we could easily

Page 45

pull it up and review it.

MR. CRANE:  Again, Mr. Rigoli was in charge of getting the documents over to you.  I've texted him.  I've offered to take a break to go talk to Mr. Rigoli to make sure that it's done right now.  I was told no.  That offer still stands.  I did text Mr. Rigoli to send those to you.

MR. FELDMAN:  Let's do this.  Mr. Crane, let's just keep on going.  We'll take a break in about 20, 30 minutes and then you'll have an opportunity to speak with him.  Okay?  If he doesn't send it already.  I just want to keep moving.  I really do want to get this depo done before 2 o'clock.  So, that's my intent, just to keep moving.

MR. CRANE:  Well, just so you know, there's a 1:30 hearing.  So, we're going to have to take a break before ---

MR. FELDMAN:  Okay.

MR. CRANE:  Mr. Rigoli is on, so ---

MR. FELDMAN:  Yes.  Mr. Rigoli, provide us Mr. Barbee's analysis, please.  Please e-mail it to Mr. Miller and me.

MR. RIGOLI:  It was already uploaded, but I'll send it again.

MR. FELDMAN:  That's fine.  Thank you very much.

BY MR. FELDMAN:

Page 46

Q.   Ms. Mehdipour, let's keep rolling.

So, I'm looking again at this RICO section, again because I just love RICO.

So, have you, in fact, reviewed Mr. Farache's deposition testimony?

A.   No, but I sat through some of it.

Q.   Okay.  You say the notes were fraudulent notes. What's the factual basis for asserting the notes between AWB and Excell were fraudulent?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   There were no actual cars that were linked to any of the notes.

Q.   What do you mean by that?

A.   Exactly what I just said.  There were no VINs associated with the lending relationship that would tie to specific vehicles.

Q.   Are you saying that Auto Wholesale of Boca did not lend money to Excell?

A.   No.

Q.   What are you saying?

A.   I'm telling you that the lending relationship was supposed to be for the purchase of vehicles and that the promissory notes failed to list any specific vehicles that

Page 47

the lending relationship was tied to.  That's what I'm telling you.

Q.   Okay.  And you think that's fraudulent?

MR. CRANE:  Objection to form.

THE WITNESS:  I have relied upon my attorneys to analyze legal theories and suggest those to me.

BY MR. FELDMAN:

Q.   Can you factually explain how that's fraudulent?

A.   I just ---

MR. CRANE:  Objection to form.

THE WITNESS:  I just gave you the facts that I believe were material.

BY MR. FELDMAN:

Q.   Okay.  But you are saying that Auto Wholesale lent money to Excell; is that correct?  Putting aside the cars.  You're saying there were loans; is that right?

A.   It appears that there were loans.

Q.   Okay.  Are you saying those loans were usurious?

A.   Based on legal advice and analysis from my attorneys, that is one of the legal theories that we are asserting.

Q.   Certainly, as a Florida Bar lawyer, I'm sure you know the Florida usury statute, right?

A.   That's not why I'm here today.

Q.   Ms. Mehdipour, just answer the question.  Are you

familiar with the usury statute?

A. Yes.

Q. You are here today because of this, because we're looking at your claim and your claim is the predicate --

A. Well, no.

Q. -- for the Motion to Convert. So, I'm not going to debate you.

A. I'm here to give you facts. I'm a fact witness. I'm not an expert witness.

Q. I'm not asking you -- I'm not asking you to be an expert witness, but I am going to ask you questions and if you know it based on your experience, then you can testify to it. I'm not appointing you or designating you as an expert witness in this case. All right? So, don't worry about that.

So, anyway ---

A. I'm not worried about anything.

Q. That's great. So, don't worry about being an expert witness. We're not calling you as one.

So, just as a Florida Bar lawyer you're certainly familiar with the usury statute. So, are you aware of any facts that would lead you to assert that the interest rate charged by any loan from Auto Wholesale of Boca to Excell was in excess of 18 percent?

MR. CRANE: Objection to form.

Page 49

BY MR. FELDMAN:

Q.   Go ahead.

A.   You're asking me to provide you with information learned from my attorneys that's privileged based on legal theories.

Q.   I'm asking for facts.  Are you aware of any ---

A.   No, you're not.

Q.   I just said so.  Are you aware of any facts? Like, for example, did you see a document from Mr. Zankl to my client where it said, "Wow, the interest rate on this loan is 45 percent?"  Have you seen something to that extent?

A.   Any analyses that were performed which would show interest rates that suggest usury would have been performed by Mr. Barbee and you need to look at those reports or ask him about them.

Q.   Literally, the example I just gave you, Ms. Mehdipour, was not an analyses.  I just told you an example where Mr. Zankl e-mails Mr. Farache and says this loan is at 45 percent.  Have you seen a document of that type in connection with you being the Chapter 7 trustee in the Excell case?

A.   I don't recall seeing one.  My attorneys may have.

Q.   Okay.  So, you don't recall your attorney showing

you a document, a fact document of that type?

A.   That would be privileged and I can't testify to that.

Q.   You're saying the debtor's documents are privileged?

A.   My attorneys showing me a document and providing me legal opinion is privileged.

Q.   I'm not asking what they told you.  Them showing you a document is not privileged, Ms. Mehdipour, and I don't know how else to explain it to you.  But if that's the position you're going to take ---

A.   Well ---

Q.   If that's the position you're going to take, you just keep on asserting privilege.  We'll take it up with the judge.  Okay?  But bottom line is, have you been shown any historical documents, debtor's documents, communications with third parties where Mr. Zankl states this loan, any loan, is in excess of 18 percent?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   I don't recall seeing that.

Q.   Okay.  Do you recall any communication, not even Mr. Zankl, anyone on behalf of the debtor e-mailed a third party stating that a loan has an interest rate in excess

Page 51

of 18 percent?

A. Which debtor?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q. Excell.

A. Can you repeat the question with the ---

Q. Sure.  Prior to Excell filing for bankruptcy, have you seen any type of communication where someone is acting on behalf of Excell, where they communicate with a third party and state something to the effect that a loan is in excess of 18 percent?

MR. CRANE:  Objection to form.

THE WITNESS:  I don't recall.

BY MR. FELDMAN:

Q. Okay.  You have the tax returns of Excell, correct?

A. Yes.

Q. Okay.  You've reviewed those tax returns?

A. At one point.  Yes.

Q. And do you know if the tax returns for Excell disclose payment of interest to third parties?

A. I don't.

Q. Okay.  If it was on the tax returns, has Mr. Zankl provided you with any information that would lead you to believe that those tax returns are, in fact,

Page 52

incorrect?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  Would you rephrase that, please?

Q.  I'm saying you met with Mr. Zankl, correct?

A.  Yes.

Q.  He's told you a story about loans, correct?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Actually, let me ask the question this way.  So, Mr. Zankl, as you know, asserted his Fifth Amendment privilege in a deposition.  When you had interviews with him, was there anything that he told you he was uncomfortable discussing?

MR. CRANE:  Objection to form.

THE WITNESS:  I can't speak to his emotions or feelings.

BY MR. FELDMAN:

Q.  I'm not asking you to speak.  Did you ask him a question where he just told you "I cannot answer that, Ms. Mehdipour?"

MR. CRANE:  Objection to form.

THE WITNESS:  No.

BY MR. FELDMAN:

Q.   Okay.  Did he tell you the information that you found out later on factually was false?

MR. CRANE:  Objection to form.

THE WITNESS:  I don't understand your question.

BY MR. FELDMAN:

Q.   In other words, Mr. -- for example, just using an example, hypothetical here, he told you that he was born in 1965 and then you looked at other records and you found out he was born in 1960.

So, my question to you is:  Did Mr. Zankl tell you anything in your interviews that you found out later was factually false?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   I can't recall.

Q.   Do you believe Mr. Zankl is truthful?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   That's for the trier of fact to determine.

Q.   No, I'm asking you, a Chapter 7 trustee for over a decade.  You've seen them all, right?  You've seen that many debtors.  Based on your interviews with Mr. Zankl, what does Nicole Testa's gut tell her?  Is Mr. Zankl a

Page 54

truthful person?

MR. CRANE: Objection to form.

BY MR. FELDMAN:

Q. Go ahead.

A. I got the impression that there may have been misrepresentations made of third parties. That is still being investigated and -- so, I -- I don't know.

Q. What do you mean by misrepresentations of third parties? Who made them, Mr. Zankl?

A. Possibly.

Q. Okay. And when you say third parties, would a generic description be lenders?

A. Could be lenders, yes.

Q. And I think, for example -- I don't think you're unaware of this, but, for example, there's an adversary proceeding in our case, a gentleman up in Wisconsin. I think his name is Benidt, B-E-N-I-D-T. Are you aware of the fact situation in that case?

A. I'm not, but I know there's an adversary.

Q. Okay. Let me more generically describe it. There are people that thought they acquired cars and then found out later on that there may be other people asserting interest in those same cars.

MR. CRANE: Objection to form. If you can answer.

Page 55

BY MR. FELDMAN:

Q.  Go ahead.

A.  That is one of the scenarios that I have heard of, yes.

Q.  You've heard of, just as a practicing lawyer, I'm sure, double hypothecation, right?  You've heard of that?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  I'm not familiar with that.

Q.  Okay.  Let me rephrase it, then, in layman's terms.

You're aware that multiple parties are asserting a lien interest in vehicles that at one time or another were owned by Excell, right?

A.  Yes.

Q.  Okay.  Did Mr. Zankl ever explain to you how that could have occurred?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  I don't recall if there was ever any justification or explanation by Mr. Zankl for that.

Q.  Okay.  It's fair to say you certainly asked him about that, right?

Page 56

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  In the interview, that would have been something we most likely would have talked about.

Q.  Okay.  And just to your recollection, you didn't get a satisfactory answer to your question?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  His responses left me with some concerns that there should be further investigation --

Q.  Understood.

A.  -- into these matters.

Q.  Okay.  Do you know if Mr. Barbee -- just sitting here, without looking at his report, do you know if Mr. Barbee did any type of usury analysis?

A.  Any usury analysis would have been through my attorneys to Mr. Barbee and I do believe he has conducted -- I do believe he has conducted an analysis and there is a report, but -- and I thought that was turned over to you all, but I'm not certain.  I'd have to look at the Dropbox.

Q.  I'm just asking you as you sit here ---

A.  Or the share box.

Page 57

Q.   We'll look at them in a moment, during a break, but do you know if Mr. Barbee, in fact, did a usury analysis with respect to loans from Auto Wholesale of Boca to Excell?

A.   I ---

MR. CRANE:   Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   I -- I -- again, I'd want to see the share file reports.

Q.   Sure.

A.   I thought he did, but I might -- I would need to refresh my memory.

Q.   Okay.   That's fine.

Just so I understand, with respect to the issues for the Motion to Convert, you're not going to assert that Auto Wholesale of Boca hasn't historically purchased cars from Excell or the Karma entities; is that correct?

A.   Factually, what I understand is that it was a lending relationship.

Q.   Understood.   But you're not going to take the position factually that cars may have been purchased from Auto -- by Auto Wholesale of Boca from either Excell or the Karma entities?

A.   I don't know.

Page 58

Q.   Okay.   Well, you know Joel Glick has done a report in this case, correct?

A.   I'm not familiar with it.

Q.   Okay.   So, Mr. Glick, in his report identified the series of transactions of vehicle purchases that took place, I believe, in 2022.   You're unaware of that?

A.   I've not seen the report.

Q.   Are you aware of any facts that would suggest that any acquisition of a vehicle by Auto Wholesale of Boca in 2022 from Excell or Karma was not an actual purchase of a vehicle?

MR. CRANE:   Objection to form.

BY MR. FELDMAN:

Q.   And I'm focused on 2022.

A.   In 2022 you said?

Q.   Yes.

A.   Can you repeat the question one more time?

Q.   Sure.   Do you believe -- are you aware of any facts that would suggest that any acquisition of a vehicle by Auto Wholesale of Boca from Excell or Karma wasn't, in fact, a purchase of that vehicle?

MR. CRANE:   Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   I don't know.   I don't know.

Q.   Okay.  So, I'm trying to understand this statement here in your claim.  I got to be honest, I don't.

So, is the predicate act that you're following under is the criminal usury statute; is that correct?  Do I understand that right?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   If you don't know, just say you don't know.

A.   You'd have to ask my attorneys.  I don't know.

Q.   Okay.  Okay.  So, for example, you're not asserting wire fraud, right?

MR. CRANE:  Objection to form.

THE WITNESS:  I don't know.

BY MR. FELDMAN:

Q.   Okay.  So, the sentence I'm focused on here is this one right here.  I'm going to just read it out loud and let's just kind of break it down.

"During a deposition of Moshe Farache, a member of the Debtor and who exercised management and control of AWB, testified that the promissory notes, on which state court lawsuits were filed by AWB and AWB's proof of claim was filed, between AWB and Excell were fraudulent notes only existing to protect Mr. Farache's family if something were to happen or if a vehicle in which the Debtor

purportedly had a lien or other interest was sold without the Debtor being compensated."

So, let's break this down.  Is it your recollection that Mr. Farache testified the notes were fraudulent?

MR. CRANE:  Objection to form.

THE WITNESS:  I would need to see his deposition transcript.  I'm not sure I was present during that portion.

BY MR. FELDMAN:

Q.  Let me ask the question this way.  At the portion that you were present, do you recall Mr. Farache testifying that the notes were fraudulent?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  I don't recall.  I don't recall that.

Q.  Are you aware of any -- is it your position that the relationship from Excell and Auto Wholesale of Boca was always a lending relationship?  Factually, are asserting that?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  I don't know.  I don't know the complete

historical relationship.

Q.   But from what you do know.  You said you don't know the complete one, but from what you do know, based on what you know, are asserting that at no point in time Auto Wholesale of Boca ever purchased a car from Excell?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   It's my understanding that it was a lending relationship.

Q.   I get it, but you could also appreciate that sometimes you can -- just as you've been doing today, someone can wear two hats.  I can lend to you and I can also buy stuff from you, correct?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   As a hypothetical?  As a hypothetical, yeah. Yes.

Q.   Okay.  So, using that hypothetical, let's juxtapose it on our situation.  Are you aware of any facts that would lead you to believe that Auto Wholesale of Boca also purchased vehicles from Excell?

A.   Not that I -- as I sit here now, no.

Q.   What documents have you, Nicole Testa, personally

Page 62

reviewed relating to this debtor?

MR. CRANE:  Objection to form.

THE WITNESS:  Who's the debtor?

BY MR. FELDMAN:

Q.  Excell.  Sorry, I should have made it clear.

A.  You're asking me now about Excell?

Q.  Yeah.  What documents have you reviewed of Excell?

A.  This is the seven -- this is not a 2004 Exam for Excell.

Q.  Yeah, but I'm looking at Proof of Claim.  So, I'm just trying to understand -- you keep on asking about facts, right?  So, I'm trying to understand where you're drawing these facts from.

So, what documents of the debtor, Excell, have you reviewed personally?

MR. CRANE:  Objection to form.

MR. FELDMAN:  Go ahead.

MR. CRANE:  And of which debtor are you talking?

MR. FELDMAN:  I just said Excell.

BY MR. FELDMAN:

Q.  Go ahead, Ms. Mehdipour.

A.  I have reviewed all the docket entries pretty much.  I have reviewed reports and analyses from my financial advisors, legal analyses from my attorneys.  I

have reviewed the initial documents that a debtor would be required to turn over to me, as well as the debtor's books and records.  I can't speak to the fact that I've reviewed all of them, but -- but I've reviewed some of them.  I've reviewed some tax returns.  I have reviewed some state court complaints.  I mean, there's quite a bit that I have reviewed in terms of the Excell books and records.

Q.  Okay.  So, the books and records of the company are kept in Excel?

A.  What was the last part of your question?  I couldn't hear it.

MR. CRANE:  You are very muffled.

BY MR. FELDMAN:

Q.  You said the books and records of the company were kept in Excel?

A.  The Excell books and records, when I took over the premises my responsibility was to secure those.

Q.  I apologize.  I misunderstood.  Excel -- I was thinking Microsoft.  The books and records of the company.

Was there a general ledger for the company?

A.  I don't recall.  Mr. Barbee would know specifically.

Q.  Let me ask the question this way.  Did you personally review the general ledger of the company?

A.  No.

Page 64

Q.   Did you review the bank statements of the company?

A.   Only some.

Q.   Okay.  Which ones did you review?  Why did you review them?

MR. CRANE:  Objection to form.  This is now -- I gave you some leeway, but you're way outside of 7030 Examination on a motion to convert.  You're now turning this into a 2004 Examination in the Excell bankruptcy.

MR. FELDMAN:  We disagree because the ideal here is -- I'm trying to test your client's knowledge regarding how she filed a claim of $114 million.  So, I'm trying to understand factually where she's getting all of this from.  So, I just want to understand what facts she's reviewed.  I'm not going to ask her about specific bank statements.

BY MR. FELDMAN:

Q.   So, I'm just asking:  You said you reviewed some bank statements.  Why did you review those particular group of bank statements versus others?

MR. CRANE:  Objection to form.  And if you can even answer that.

BY MR. FELDMAN:

Q.   I'm going to move quickly through this.  I promise you.  I'm not going to delve into this any further.  I want to know why you looked at a certain

Page 65

subset of bank statements versus others.  That's it.

A.  Okay.  So, initially, I would have reviewed debtor's -- let me rephrase that -- Excell Auto Group's banking information, to the extent available, in order to make sure that I was securing any funds that would be held in any bank accounts, consistent with the fiduciary duty to do so, and also to determine whether there were any bank accounts that were potentially not disclosed in the case.

Q.  Okay.

MR. CRANE:  Mr. Feldman, when you have a chance -- whenever it's a good time, I need to take a break.

MR. FELDMAN:  Sure.  Let's do it at 11:30.  Just give me five more minutes.  I just want to kind of roll through the rest of that sentence again and then we'll wrap up for -- we'll take a break.  Is that okay?

MR. CRANE:  Yes.

BY MR. FELDMAN:

Q.  Okay.  So, just with respect to the second part, are you aware of any facts that would lead you to believe that Auto Wholesale of Boca did not have one or more lien interests in vehicles that were being sold by Excell?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Page 66

Q.  Go ahead.

A.  Are you asking me whether I believe they had proper liens?

Q.  I'm not asking proper liens.  That's a legal issue.  You told me you can't opine on legal issues.  So, I'm just asking you:  Are you aware of any facts that would lead you to believe that Auto Wholesale of Boca did not have a lien interest in vehicles owned by Excell?

MR. CRANE:  Objection to form.

THE WITNESS:  I don't recall.  I don't recall that and it would have been something that my attorney analyzed for me.

BY MR. FELDMAN:

Q.  So, you certainly, Nicole Testa Mehdipour, has never separately reviewed any factual information to make that determination; is that right?

A.  Not that I can recall sitting here.

MR. FELDMAN:  Okay.  So, let's do this.  It was actually produced three minutes earlier.  So, let's just take a break now.  You guys want to come back at 11:35?  Does that work?

THE WITNESS:  Sure.

MR. CRANE:  Yes.

MR. FELDMAN:  And then I'll look at the analysis from Mr. Barbee now.  Thank you.

(Thereupon, a brief recess was taken at 11:27 a.m., after which the examination reconvened at 11:37 a.m.)

MR. CRANE:  We're here.  We're back on.  Or you can go back on, but we're here and ready.

MR. FELDMAN:  All right.  Ready to roll?

THE WITNESS:  Yes.

BY MR. FELDMAN:

Q.  Okay.  So, let's go back to that Proof of Claim. I want to talk about this section in the Proof of Claim. It's (B) Fraudulent Transfer of Vehicles.  You talk here about 20 vehicles that were transferred from Excell to Auto Wholesale of Boca.

Factually, you believe that's accurate?  In other words, do you believe these 20 vehicles -- do you have facts in front of you that these 20 vehicles were, in fact, owned by Excell?

A.  The basis of that statement would have been based on information from my attorneys.  So, I do believe it to be true.

Q.  Okay.  But you, Nicole Testa, have not reviewed any documents that would allow you to independently state that these 20 vehicles were, in fact, owned by Excell; is that right?

A.  My attorneys would have done it on my behalf.

Page 68

Q. Okay. Again --

A. So, yes.

Q. -- you, Nicole Testa, have not looked at anything independent to determine whether or not those 20 vehicles were, in fact, owned by Excell, correct?

A. Correct.

Q. Okay. And these vehicles you reference are part of the adversary proceeding in 22-1218, correct? You have it right here. Excluding the Brown Vehicles, right?

A. You're asking me if the 20 vehicles are the same vehicles that were the subject of that particular adversary proceeding?

Q. That's correct.

A. Yes.

Q. Okay.

A. That's what the document says and my attorneys would have investigated on my behalf.

Q. So, with respect to those 20 vehicles, it states that they are avoidable transfers.

Just so I understand, factually, are you taking the position that Excell Auto Group did not receive any consideration from Auto Wholesale of Boca in connection with the transfer of these 20 vehicles?

A. If you read the next sentence, that's exactly what it says.

Q.   Okay.   So, have you looked at, independently, the bank records of Excell Auto Group at the time period these 20 vehicles that were allegedly owned by Excell were transferred to Auto Wholesale of Boca?

A.   I have not, personally.

Q.   Okay.   If those bank records reflect payments or transfers of money from Auto Wholesale of Boca to Excell, would you have any basis to factually contest that transfer money wasn't for the purchase of a vehicle?

MR. CRANE:   Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   That would be something my financial advisors would have analyzed and, so, I would -- they would be the appropriate people to ask that question.   I don't have any personal knowledge.

Q.   Thank you.   That's all -- I just want to understand.   You don't have any personal knowledge one way or another that occurred or anything of that sort, correct?

A.   Correct.

Q.   Got it.

A.   Correct.

Q.   Okay.   Now, you state here that the transfers of these vehicles were done with the intention to delay,

Page 70

hinder, or defraud creditors.  My question to you is:  Can you please explain how?

A.  Can I factually -- the line went out.

Q.  Can you factually explain how the transfer of these vehicles were done with the intent to delay, hinder, defraud Excell's secured creditors?

A.  Well, I'm trying to understand your question that you want the facts to support it.  My Proof of Claim has the two sentences above which explain that the vehicles were transferred with no consideration and, so, that would be the reason that I've alleged that there was an intent.  I'm not aware of any facts as I sit here that --  that I could point to.

Q.  Okay.  Understood.  So, I think you're kind of saying what I'm trying to get to.

So, you say they were transferred for no consideration, but you have no independent knowledge whether or not that's true or false, right?  You're relying on your lawyers to make that determination, or Mr. Barbee, right?

A.  I'm relying on my attorney.  Correct.

Q.  Okay.  And when you say here that it was done with the intent to delay, hinder, or defraud Excell's secured creditors, you have no independent information as to factually how that is?  You're relying on your

attorneys or Mr. Barbee, right?

A.   Correct.

Q.   Okay.  And you have no factual information whatsoever, independent, that would allow you to determine whether or not the transfer of these vehicles from Excell to Auto Wholesale of Boca met any of the elements of civil theft under Florida law, right?

A.   Other than information provided to me by Mr. Zankl at the initial interview and by other third parties as to what transpired when the vehicles were taken from Excell.

Q.   What did Mr. Zankl tell you about how the vehicles were taken from Excell?

A.   I'm just reading the Proof of Claim language one more time, if you give me a second.

When I spoke with Mr. Zankl initially at the debtor -- not the debtor interview -- excuse me -- at an informal interview with him he had explained that Mr. Farache had come into the premises and retrieved numerous vehicles from the floor and that he had no basis to do so.  I'm trying to understand whether my Proof of Claim includes those vehicles and I'm not sure if it does.

Q.   Okay.  So, just so I understand, so, Mr. Zankl tells you a story that Mr. Farache just shows up and just steals a bunch of cars?

Page 72

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  He explained to me what had transpired in his view, and that was corroborated by a number of other people who I interviewed informally.

Q.  Who did you interview informally?

A.  I believe at one point Mr. Bradagacus (phonetic) may have explained that that was consistent with his understanding.  And I'm not certain, but Mr. Brown may have also explained that that was consistent with his understanding about the improper removal of the vehicles from the showroom.

Q.  Just so I understand --

A.  Again, I have no personal knowledge.

Q.  Well, you testified you spoke with Mr. Zankl.  So, he's told you about a narrative.  So, I just want to test this a little bit.

You agree with me you've actually abandoned your estate's interest in these 20 vehicles; is that right?

A.  I'd have to look at the Notice of Abandonment filed with the Court to determine whether those are the same vehicles or not.  I don't recall.

Q.  As you sit here today, you don't know that you, in fact, abandoned your interest in these 20 vehicles?

MR. CRANE:  Objection to form.

THE WITNESS:  The docket would very clearly show whether those vehicles were abandoned or not.  They were not on the premises when I secured the business location.

BY MR. FELDMAN:

Q.  I get that, but since then you've done an investigation, you've hired a lawyer, you've hired a financial advisor.

Let me ask the question this way.  Have you made any determination or has anyone made a determination on your behalf that there is actually equity in any of these 20 vehicles that you reference here above and beyond what's owed to the secured creditors?

A.  I don't know if my attorneys have done that.

Q.  Okay.  You certainly aren't aware of any such analysis, correct?

A.  As I sit here today, I can't recall.

Q.  Okay.  And, so, if I were to look at the Notice of Abandonment and compare that notice to the vehicles at issue in this adversary proceeding and if they match up, it would be fair to say then that would accurately reflect that your estate has abandoned any interest in these 20 vehicles, correct?

A.  That's a lot of ifs.  But, again, I'd have to look at the Notice of Abandonment.  I don't recall those

Page 74

20 vehicles being included in any abandonment.  But those lists would, of course, have to be compared to determine that.

Q.   So, that's the best document to look at, is the list and your Notice of Abandonment versus the vehicles at issue in this adversary, correct?

A.   Yes.

Q.   Okay.  Do you believe there's other vehicles that your estate has an interest in that are typically -- that are currently being asserted to be property of Auto Wholesale of Boca's estate?

A.   I didn't understand your question.

Q.   Sure.  Do you think there's a car that Excell rightfully owns that Auto Wholesale of Boca is, in fact, asserting that it owns?

A.   I don't know the answer to that.

Q.   Okay.  Who would?

A.   Possibly my attorneys.

Q.   How long has -- your case has been open for a while now, right?  At least a year?

A.   That's not correct.

Q.   How long has your estate been open for?  Sorry, I don't know.

A.   11 months.

Q.   I'm sorry, since when?

Page 75

A.   April 8th of 2022.

Q.   Okay.  Almost a year.

So, in the almost a year that you've been in this case, as you sit here right now, you don't know if there's vehicles of which Auto Wholesale of Boca asserts it owns but simultaneously Excell Auto may also assert an ownership interest in that vehicle?

MR. CRANE:  Objection to form.

THE WITNESS:  I'm not aware of any as I sit here.

BY MR. FELDMAN:

Q.   Okay.  You think it would be important to do that type of analysis as part of preparing this Proof of Claim?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   Well, you can speak with my attorneys legally, but a fraudulent transfer is different than when a trustee would file a motion for turnover believing they have an interest in estate property.  They're two different things and two different claims.

Q.   I get it.  So, one of the most important things you have to do in a fraudulent transfer claim, you would agree with me, is that you have to assert it's a transfer of the debtor's property, right?  That's element number one?

Page 76

A.   Again, you can speak to my attorneys about what legal elements are required.

Q.   You, Nicole Testa Mehdipour, Chapter 7 Trustee, have been doing this for a while.  You're certainly familiar with fraudulent transfer claims, right?

A.   Yes.

Q.   Okay.  So, I presume it's not a mystery to the streets here when I tell you or ask you:  You're aware that one of the elements of a fraudulent transfer claim is you have to assert it's a transfer of the debtor's property?  You know that, right?

A.   Yes.

Q.   Okay.  So, knowing that is a legal element, as you sit here, factually, today, are you aware whether or not Excell had an ownership interest of any of these 20 vehicles that you assert were then transferred to Auto Wholesale of Boca?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   Based on information from my attorneys, we would not have alleged it if we did not believe that there was an ownership interest in the vehicles in question.

Q.   Okay.  And what type of documents typically does one have to look to to determine whether or not Excell,

Page 77

your debtor, had an ownership interest in these vehicles? Do you know?

A.   Certificates of Title.

Q.   And you believe there's 20 Certificates of Title that identify these specific vehicles that you reference in this adversary are all owned or were owned by Excell Auto at one point in time?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   Do I believe that there are Certificates of Title for each of the 20 vehicles?

Q.   Yes, in which it represents that Excell owned these vehicles that you reference here.

MR. CRANE:  Objection to form.

THE WITNESS:  My attorneys would have reviewed that.  I don't know.

BY MR. FELDMAN:

Q.   Okay.  Certainly, though, you want to make sure that it's correct, you put accurate information in your Proof of Claim, right?

MR. CRANE:  Objection to form.

THE WITNESS:  And I rely on my attorneys for those reasons.

BY MR. FELDMAN:

Q.   Okay.  And my question then is this:  You filed this Proof of Claim on January 25th, 2023.  At that point in time, had you made any information requests on Auto Wholesale of Boca?

MR. CRANE:  Objection to form.

THE WITNESS:  I don't recall.  It would have been through my attorneys.

BY MR. FELDMAN:

Q.   Okay.  So, the docket would accurately reflect any type of subpoena or document request you served in this case, right?

MR. CRANE:  Objection to form.

THE WITNESS:  It would, but it would not request -- it would not reflect an informal request, if that had been made, and I don't know the answer.

BY MR. FELDMAN:

Q.   Okay.  So, you don't know whether or not your attorneys had made an informal request prior to January 25th, 2023, when this Proof of Claim was filed, right?

A.   I do not know the answer to that.

Q.   Okay.  Do you know what documents Mr. Barbee reviewed in the preparation of his analyses?

A.   You would have to ask him.

Q.   You're unaware that Mr. Barbee has not reviewed any of Auto Wholesale of Boca's books and records in the

Page 79

preparation of his analyses?

A. I can't speak to ---

MR. CRANE: Objection to form.

THE WITNESS: Sorry. I can't speak to that. I don't know.

BY MR. FELDMAN:

Q. Okay. So, looking at this, 36.4 million in cash transfers from Excell to Auto Wholesale of Boca. Actually, let me just take a step back on the secured creditors.

Have you reviewed any of the claims in connection with the Auto Wholesale of Boca case, other than yours, I assume?

A. I don't recall if I've reviewed the claims in that case. My attorneys most likely have.

Q. Are you aware of any contract between Auto Wholesale of Boca and FVP?

A. No, I'm not.

Q. Are you aware of any type of contract between Auto Wholesale of Boca and Hi Bar?

MR. CRANE: Objection to form.

BY MR. FELDMAN:

Q. Go ahead.

A. I don't recall.

Q. Just big picture. Are you aware of any

Page 80

contract -- lending relationship.  Let's make it more precise.  Are you aware of any lending relationship between Auto Wholesale of Boca and the other named parties in Adversary Proceeding 22-1218?

A.  I don't recall.

Q.  Okay.  You're aware that some of those folks that are participants in that adversary have filed Proofs of Claim in the Auto Wholesale of Boca case?

A.  Perhaps.  I don't know.

Q.  Are you aware factually that -- outside of any interest one of those third parties may assert to a vehicle, are you aware of any facts that would lead you to believe that Auto Wholesale of Boca owes them money, outside of whatever interest they may have in a vehicle?

A.  "Them" being?

Q.  The other named parties.  Like, for example, FVP.

A.  Could you repeat the question, please?

Q.  Sure.  For example, you understand FVP is asserting a lien interest in certain vehicles that were -- that Auto Wholesale of Boca maintains it owns, correct?

A.  Yes.

Q.  Okay.  And outside of that lien interest that FVP is asserting in the vehicle, you're unaware of any other agreement between FVP and Auto Wholesale of Boca that would require Auto Wholesale of Boca to pay additional

monies to FVP, correct?

A.  I don't know.

Q.  Okay.  Now, if the Court determines that these vehicles, in fact, are owned by the debtor -- actually, strike that.  I won't go there.

Let me rephrase the question.  If the Court determines that FVP or any other participants in that adversary do not, in fact, have a lien interest, are you aware factually of any other basis that those parties could assert to be creditors in the Auto Wholesale of Boca estate?

A.  I don't know.

Q.  Okay.  Now, in connection with the vehicles that were transferred -- I asked this, but I want to just ask it a little bit differently, just so I understand the full extent of it.

At any point in time has anyone done an evaluation on your behalf with respect to the valuation of those vehicles?

A.  It's possible.  I don't -- I don't know.

Q.  Okay.  And then, just looking at my notes here, I just want to close the loop on something regarding Mr. Zankl.

Certainly, you have -- at least looking through the docket in your case, certainly you have taken the

Q. position or had to approach the Court and ask to force Mr. Zankl to cooperate with you; is that right?

A. Yes.

Q. In other words, I think there's a motion where you filed to compel turnover of books and records; is that correct?

A. There was a motion to compel various things early in the case, that is on the docket, that I filed.

Q. Okay. For example, I think you were told there were no actual books and records for the company; is that right?

MR. CRANE: Objection to form.

BY MR. FELDMAN:

Q. Go ahead.

A. I'm not recalling whether that was -- that may have been told to me in the very beginning, but if I could see my Motion to Compel, it would refresh my memory.

Q. Well, let me ask this: So, do you recall telling the Court the debtor didn't file any schedules or Statement of Financial Affairs with its petition? Is that correct? Is that your recollection?

MR. CRANE: Objection to form.

THE WITNESS: I believe that's correct.

BY MR. FELDMAN:

Q. And then, for example, does this refresh your

Page 83

recollection, this statement:  "In response to the Trustee's initial demand for the customary asset and banking information on April 8th, 2022, Debtor's counsel replied that there were no bank accounts in the name of the Debtor and no physical assets located anywhere?"

Do you recall being told that or your counsel being told that?

MR. CRANE:  Objection to form.

THE WITNESS:  I believe so.  Again, as to the specific allegations I made in the motion, I'd have to refresh my memory.

BY MR. FELDMAN:

Q.  There were actually local news stories regarding this debtor, specifically Auto -- Excell?  I'm sorry.

A.  Are you asking me if there were?

Q.  Yeah.  Were there?

A.  Yes.

Q.  Okay.  And what were those news stories about to your recollection?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

MR. CRANE:  Now you're -- I mean, we're so far ---

MR. FELDMAN:  That's fine.  I'll move on.  I

Page 84

don't really care. The news stories speak for themselves.

BY MR. FELDMAN:

Q. Have you sued Mr. Zankl?

MR. CRANE: Objection to form and ---

BY MR. FELDMAN:

Q. Have you made demand on Mr. Zankl?

A. The best people to speak with regarding whether I have sued Mr. Zankl would be my attorneys; however, I do believe that we have recently filed a complaint in a state court action where we were intervening and he was a defendant. Again, I'd have to check that pleading to refresh my memory, but I'm fairly certain that we recently did that.

Q. Okay. I'm just trying to understand because you're, obviously, relying on some part on Mr. Zankl and information he provided you to prepare this Proof of Claim. I'm trying to understand the relationship between you and Mr. Zankl.

And, so, what I'm just trying to understand here, have you or anyone on your behalf sent a demand letter to Mr. Zankl requesting that he pay the bankruptcy estate money for any type of wrongdoing or the receipt of a fraudulent transfer?

A. I'm not sure if demand letters were sent out. I think the answer is no, because the investigation is

Page 85

pending, but that's something I'd have to ask my attorneys.

Q.   Okay.  Have you executed or someone asked, on your behalf, to Mr. Zankl to execute a tolling agreement?

A.   Not that I'm aware of.

Q.   Okay.  When was the last time you met with Mr. Zankl, whether you personally or with your lawyers?

A.   I recall there were meetings April 21st and 22nd. Outside of any formal depositions or hearings, I'm not recalling -- that's what I'm recalling is the last time we met, but I'm not certain.

Q.   Okay.  So, you filed this Proof of Claim on January 25th, and I just want to focus on breaches of contract.

So, what are the specific written or oral contracts that you allege that Auto Wholesale of Boca breached with Excell?

A.   Well, if you look down in the next subsequent paragraph, I believe that it expands upon that.

Q.   Understand, but it's now March 16, 2023.  Are you aware of any contracts that Auto Wholesale of Boca, in fact, has breached between it and Excell?

A.   My attorneys are investigating it.  If we alleged it at the time, it was, in fact, true and correct, but subject to further investigation.  So, I can't answer that

Page 86

question.

Q. So, as you sit here now, you don't know, in fact, what specific contracts, whether oral or written, have been breached? Is that a fair statement?

A. Well, if you scroll back up, it speaks to the promissory notes and security agreements.

Q. Are those the contracts that you are asserting have been breached?

A. I'm not certain. I'd have to speak with my lawyers about that, about the legal theory.

Q. So, I just want to go back to something you said before, about what Mr. Zankl was telling you. He said that people were engaging in lending transactions that were really disguised transactions; in fact, they were intended to do splits. Maybe I misunderstood that. Can you -- tell me that again. What was Mr. Zankl telling you about loans versus profit splits?

MR. CRANE: Objection to form.

BY MR. FELDMAN:

Q. Go ahead.

A. Mr. Zankl -- excuse me?

Q. Yeah, go ahead. I'm sorry.

A. Mr. Zankl advised me during our interview that the lending -- that the lending instruments provided that a car would be sold and that the purchase price would be

split amongst the two parties.

Q.   For what purpose?

A.   For -- I don't know.

Q.   So, I'm trying to understand.  Mr. Zankl was telling you that there's a loan between that other party and Excell?

A.   Mr. Zankl -- Mr. Zankl advised me that AWB and Excell entered into agreements where the car would be sold and then the purchase price would be split 50/50, and he described to me that the arrangement was that they were trying to -- wanted -- or they did want it, in fact, through corporations versus individuals because they were trying to avoid reporting purposes.  And that's all I can recall from what he told me.

Q.   Avoid reporting purposes of what?  Reporting to who?

A.   I can't speculate.  I don't know.

Q.   Mr. Zankl didn't tell you?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Mr. Zankl didn't explain to you who they were trying to avoid reporting to?

A.   It ---

MR. CRANE:  Objection to form.

THE WITNESS:  He may have -- he may have referred

Page 88

to 1099s and the idea that -- my understanding was the idea was that it would avoid issuing a 1099, so that you wouldn't have to report on the interest.

BY MR. FELDMAN:

Q. You mean the profit, right?

A. Well ---

Q. Let's go to -- go ahead. go ahead.

A. He described it as disguised -- disguised interest is how it was described. So, I ---

Q. So, he's saying that someone is trying to avoid reporting to a taxing authority a payment of interest and instead the transaction is being described as a sale? Is that it?

A. That's not how he -- that's not how he described it to me. He described it as it being really interest split 50/50, but that -- I assume to avoid any issues with taxing. It would -- that it was disguised interest. I don't really -- again, I have no personal knowledge. This was what he told me.

Q. I get it. So, is it fair to say you didn't understand what -- and I'm not saying it as an assault. You know, sometimes people just describe things and you sit there and you just kind of look at them like "Huh?"

Is it fair to say that what Mr. Zankl described to you wasn't particularly cogent?

A.   No, I believe that he and the lenders knew exactly what they were doing, which was -- which leads to the usury claims that I've made.  Usurious.

Q.   I'm trying to understand -- I'm trying to understand -- well, let me be clear.

Mr. Zankl had authority to act on behalf of the debtor; is that correct?

A.   I don't know.  I wasn't involved at that point.

Q.   Are you aware of anyone factually that had authority to act on behalf of the debtor other than Mr. Zankl?

A.   When you refer to the debtor, are you talking about Excell?

Q.   That's correct.

A.   At one point -- I -- I don't know.

Q.   Okay.  Are you aware of anyone who acted on behalf of Excell other than Mr. Zankl?  And let me be more precise ---

A.   I don't know.

Q.   Okay.  Because I'm trying to understand.  These lending agreements that you assert are usurious, is it just with Auto Wholesale of Boca?  Were there other people that you believe entered into usurious lending agreements with Excell?

MR. CRANE:  Objection to form.  Outside the 7030.

Page 90

I'm going to instruct her not to answer that.

MR. FELDMAN:  Okay.

MR. CRANE:  That's investigations that are -- that are beyond this.

BY MR. FELDMAN:

Q.  Well, I'm just trying to understand.  You're certainly picking on AWB, filing a $114 million claim.

Do you believe -- did Mr. Zankl tell you there were other lenders, outside of AWB, that engaged in usurious lending transactions?

MR. CRANE:  I'm going to object to form.  It's outside the -- and I'm going to instruct her not to answer.

BY MR. FELDMAN:

Q.  Did Mr. Zankl tell you that AWB was the only usurious lender?

MR. CRANE:  I'm going to ---

MR. FELDMAN:  That's a fair question.  Come on, stop.  That's a fair question.

BY MR. FELDMAN:

Q.  Did Mr. Zankl tell you that AWB was the only usurious lender?

A.  I'm not answering on the instruction of counsel.

Q.  I'm asking you about AWB.  Was AWB the only -- did Mr. Zankl tell you was that the only usurious lender?

Page 91

I'm not asking you the names of other lenders.

A.  He did not.  I don't believe he did.  I don't believe he did.

Q.  Okay.  Now, just so I understand this, so who purchased these vehicles, which then the purchase price was split?  Who actually bought the vehicle?  Did Mr. Zankl tell you that?

A.  He told me that he purchased them.

Q.  Okay.  So, when you say "he," you mean Excell, right?

A.  Through Excell.  Correct.

Q.  Did Mr. Zankl explain to you what was the source of funds to purchase these vehicles?

A.  I don't remember him getting into that.

Q.  Okay.  And Mr. Zankl advised you that the debtor, Excell, in fact, voluntarily entered into every one of these lending transactions, right?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  Did Excell voluntarily enter into these agreements?

Q.  Yes.

A.  I believe he said it did.

Q.  Okay.  And let me be clear.  Are you aware of who

approached who?  In other words, do you know if Mr. Zankl

approached Mr. Farache at AWB and advised him of a

potential lending transaction as you just described?

    A.   I don't know.

        MR. CRANE:  Objection to form.

        THE WITNESS:  Sorry.  I don't know.

BY MR. FELDMAN:

    Q.   Could you let me know the -- well -- when

Mr. Zankl told you this story, did you then do some type

of analysis of the books and records of Excell to

determine whether or not these were purchase transactions

or lending transactions that Mr. Zankl described?

    A.   I believe that would have been done through my

attorneys.

    Q.   Okay.  I'm just trying to understand.  Factually,

is it, in fact, correct what Mr. Zankl told you, that

these were all lending transactions and not purchase

transactions?

    A.   Based on what my attorneys and financial advisors

have told me, they appear to be lending transactions and

that's why we've pled or alleged that.

    Q.   Okay.  But you would agree with me if they were,

in fact, purchase transactions, then you would have no

basis to assert usury, at least as to those transactions,

right?

Page 93

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  I think you're asking me for a legal conclusion.

Q.  Go ahead, opine.

A.  I'm not going to opine as a fact witness.

Q.  I get it, but you're also a Florida Bar lawyer.

So, you would agree with me if a court of law ordered that these were, in fact, purchase transactions, at least as to those transactions, then you couldn't assert that that was a usurious loan, right?

MR. CRANE:  Objection to form.

THE WITNESS:  Answer?

BY MR. FELDMAN:

Q.  Yes.  Let me ask the question this way. Factually, do you believe if the Court rules that these were purchase transactions, that you could still somehow assert a usury claim as to those particular transactions?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  You're asking me for a legal conclusion and I'm not going to answer it.

Q.  I said factually.  I said:  Factually, are you aware of any other basis that you could assert a usury

Page 94

claim if the Court rules that these were purchase transactions?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

MR. CRANE:  You're still asking for a legal conclusion.

MR. FELDMAN:  I asked her factually.  Guys, this is not -- Alan, please stop, stop.  Please stop with all the speaking objections.  Just form.  If I'm curious to know what the basis of the form is, I will inquire.  Okay?  But, otherwise, keep it to form, stop coaching the witness.  Okay?  Say "objection to form."  That's all I ask.  You've been doing it all day.  Please stop.  I'm asking the witness and it's totally fine to ask her a legal opinion.  Whether or not it's admissible as evidence at trial, that's the Federal Rules of Evidence.

BY MR. FELDMAN:

Q.  So, Ms. Mehdipour, if the Court rules that these are purchase transactions, are you aware of any factual basis for you to maintain that nonetheless you can assert it's a usurious loan?

MR. CRANE:  Objection to form.

THE WITNESS:  I told you three times that you're asking me for a legal conclusion.  You can say the word

Page 95

"factually" as many times as you want.  I'm not answering it.

BY MR. FELDMAN:

Q.  Okay.  So, you're not competent to answer a question of that nature is what you're telling me, based on your experience as ---

A.  Why don't you -- why don't you keep your editorializing to yourself, Mr. Feldman.

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  I'm not editorializing.  I'm asking you:  Based on your legal experience as a lawyer, you wouldn't be in a position to opine on something of that nature; is that right?

A.  I'm not ---

MR. CRANE:  Objection to form.

THE WITNESS:  I'm not drawing a legal conclusion.  Please move on.

BY MR. FELDMAN:

Q.  Well, you certainly don't intend on expressing any legal opinions if you're called to testify in connection with this case, right?

MR. CRANE:  Objection to form.

THE WITNESS:  That's correct.  I'm a fact witness.

Page 96

BY MR. FELDMAN:

Q.   Okay.  But, again, the facts you have are apparently very limited.  So ---

A.   Is that a question?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   The facts you have are based on some books and records you looked at, some filings in various cases, your interview with Mr. Zankl, nothing really beyond that, right?

A.   The factual basis that I have has been set forth in this deposition, since this morning, and, yes, it consists of some of the things that you just mentioned.

MR. FELDMAN:  So, let's look at Exhibit 2. Exhibit 2 will be your motion.

(Thereupon, Debtor's Exhibit Number 2 was identified for the record.)

BY MR. FELDMAN:

Q.   And this is FVP.  Let's see here.  Let's see here.  Hold on one second.

You certainly reviewed your motion in preparation for today's deposition, right?

A.   Yes.

Q.   Let's see.  Give me one moment.  I'll pull it up, and this is just ---

MR. FELDMAN:  Mr. Miller, do you know what ECF it is?

MR. MILLER:  For the -- which one?  403.

MR. FELDMAN:  Ms. Mehdipour's.  There it is.  I got it.  Okay.

BY MR. FELDMAN:

Q.  Okay.  You assert, Ms. Mehdipour, that the basis is that it's in the best interest of creditors to convert this case; is that right?

A.  Are you pulling up the document, Mr. Feldman?

Q.  I'm just asking you.  Obviously, you're a bankruptcy lawyer.  I mean, do you recall why you asked the Court, under the legal standard basis, for converting the case?

A.  Because there's no business operations which would support a reorganization.

Q.  Okay.  And you believe it's better to convert or to dismiss the case?

A.  I believe we asked for conversion as our primary relief and I'm not sure if we put an alternative relief for dismissal.  I'd have to see the document.  I believe we did.

Q.  Okay.  So, let's look at -- I just want to ask about some of the statements you have in this motion.  I want to understand the extent of your knowledge.

Page 98

You say here in Paragraph 13 -- this will be Exhibit 2. You see this paragraph?

A. Yes.

Q. Okay. You say: "Here, the Debtor, through its principal, has omitted material assets and transfers of assets in his schedules and amendments thereto."

What are you referring to there?

A. May I see the paragraph above it?

Q. Sure. You cite case law.

A. Thank you.

Q. So, you discuss the cause factors and then, based on the cause factors, you say: "Here, the Debtor, through its principal, has omitted material assets and transfers of assets in the schedules and amendments thereto." What are you talking about?

A. That would have been something that I learned through my attorneys and I'm not -- I'm not certain if I can speak to that specifically.

Q. Well, what's the facts that would allow you -- you don't plan on testifying at trial about how the debtor, through its principal, has omitted material assets and transfers of assets in his schedules and amendments thereto; is that correct?

A. I don't believe a determination has been made if I'm testifying.

Q.   If you testify, do you plan on testifying and asserting in your testimony that the principal of Auto Wholesale of Boca has omitted material assets and transfers of assets in his schedules and amendments thereto?

A.   No.  I have no knowledge right now as I sit here today of that.

Q.   Okay.  And between today -- well, certainly -- so, the only people that know about this statement is your lawyers or maybe Mr. Barbee?

A.   There could be another witness I'm not aware of that might testify as to that.  I'd have to ask my attorney.

Q.   You also say here:  "The Debtor, through its principal, has falsely testified in this Court and the Circuit Courts for the State of Florida."

Please explain to me how Mr. Farache, I assume that's who you are referring to here, has falsely testified in the Bankruptcy Court?

A.   I believe that has to do with the inconsistency made in the Bankruptcy Court testimony or adversary versus the state court proceeding where AWB sued Excell in past promissory notes asserting a lending relationship.

Q.   So, you certainly don't plan on testifying on that.  That's going to be testimony that would be

introduced from Case A, then compared to Case B, correct? In other words, you have no personal knowledge as to Mr. Farache making false statements under oath; is that right?

A.    Other than what I just explained to you from the review of records, I do not, but I also haven't gone through the deposition transcripts.

Q.    You say here the debtor filed a false Proof of Claim in the Excell bankruptcy case.  What do you mean by that?

A.    This would have been something that I learned through my attorneys and it says it in Paragraph 21.  I can read it if you want me to.

Q.    No, just whatever is here is the basis of your -- and, factually, you don't even know this, right?  This is argument your attorney would make, correct?

A.    Well, it's set forth below that.  It explains it in -- it appears to explain it in 22 and 23 and it would have been based on investigations from my attorneys, who would have come up with the legal theory.

Q.    So, let me ask you a question.  You say here in Paragraph 28:  "As stated above, Promissory Note #2 called for a 50/50 profit split from the sale of any vehicles obtained with the funds of Promissory Note #2."  Are you asserting that a split of profit that's paid to a lender

is interest?

MR. CRANE:  Object to form.

BY MR. FELDMAN:

Q.  Go ahead, Ms. Mehdipour.

A.  If you give me a moment.  I'm reading it.

Q.  Okay.  Can you go ahead and answer the question?

A.  I'm still reading it.

Q.  Okay.

A.  The allegations that we've made for usury are based on the financial analysis that Mr. Barbee prepared and, so, we can look through that and you could see the percentage rates that he came up with, with respect to these lending agreements.

Q.  Well, I get it, but have you ever heard of an equity kicker?  Is that term unfamiliar to you?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead, Ms. Mehdipour.

A.  I'm not -- I'm not certain that in this -- no, I have -- I can't understand -- no, I have not.  No, I have not.

Q.  You never heard the term "equity kicker"?

A.  No.

Q.  Have you ever seen a loan document in which the borrower and lender agree that aside from any interest

Page 102

being paid, that if there's a profit to be realized in connection with the sale of the widget, that the parties will split that profit?  Are you aware of that?

A.  I'm not sure if I've seen one.

Q.  Okay.  You've never seen a transaction of that nature in all your years practicing law?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  I just answered you.  I just answered you.  I don't recall.  I don't recall.

Q.  Okay.  Do you ---

A.  It's possible, but I don't recall.

Q.  Okay.  Just as a lawyer, have you ever seen an instance where a court has ruled that an equity kicker is, in fact, disguised interest and should be utilized as part of a usury calculation?

A.  I don't know.

Q.  Okay.  So, are you taking the position that factually any profit split was, in fact, disguised interest that was being paid to Auto Wholesale of Boca?

A.  I'm not sure if it's -- let me read 28 again. I'm not sure if it's written properly where it says "profit split."

Q.  What do you think it should say?

Page 103

A. Well, I'd have to refer to my attorneys. I don't -- I don't know.

Q. Well, what do you think is incorrect about it? What word should be written there?

A. I don't know.

Q. What words are incorrect there?

MR. CRANE: Objection to form.

BY MR. FELDMAN:

Q. Go ahead.

A. It was designed, according to Mr. Zankl, as a 50/50 split and our position is that the monies paid constitute usurious interest based on the high rates of interest. I don't really know much more than that.

Q. I get it, but -- so, your position is if there is an agreement to split any profit between Excell and Auto Wholesale of Boca, those monies, those additional monies from any profit that could be paid to Auto Wholesale of Boca, in fact, should be treated as interest?

MR. CRANE: Objection to form.

BY MR. FELDMAN:

Q. Go ahead.

A. My position has been -- my position has been, based on the promissory notes entered into between the two parties, that I've been advised by my attorneys that we have claims for usury. Other than that, I have no

Page 104

personal knowledge and the information that I've gained

has been through the attorneys or the financial advisors.

I have no personal knowledge of fact to support that.

Q.   I get that.  What I'm just trying to understand,

though, is factually are you -- do you believe factually

that any profit split, in fact, is disguised interest?

MR. CRANE:  Objection to the form.

BY MR. FELDMAN:

Q.   Go ahead.

A.   Do I believe that any profit split is disguised

interest?

Q.   Yes.

A.   I don't know.

Q.   Okay.  So, certainly you're aware that

historically this debtor has done business, correct?  You

mentioned the gross revenues, 37 million, 2020; 41

million, 2021; and at least for the beginning of 2022, $7

million.  So, certainly at the time that this company

filed for bankruptcy, you disagree that there were

operations, ongoing operations?

A.   I have no personal knowledge of the company's

operations.

Q.   So, the sole basis of asserting that the company

is no longer operating is based on the DIP reports?

MR. CRANE:  Objection to form.

THE WITNESS:  Correct.

BY MR. FELDMAN:

Q.  And do you understand how the debtor generated revenue to continue ongoing business operations?

A.  In the bankruptcy?

Q.  Just historically.  In other words, how would the debtor generate its revenues historically?  Do you have any understanding whatsoever?

A.  Allegedly, from the sale of luxury vehicles, is my understanding.

Q.  But, just to be more precise, there would be a vehicle acquired, a vehicle would be sold, and then the monies used from that sale would then be used to purchase new vehicles?  Do you understand that?

MR. CRANE:  Objection to the form.

THE WITNESS:  I have no knowledge of that.

BY MR. FELDMAN:

Q.  Okay.  You certainly have no basis to dispute what I just described to you, correct?

MR. CRANE:  Objection to form.

THE WITNESS:  As I sit here today, I don't have personal knowledge to dispute that.  My attorneys may.

BY MR. FELDMAN:

Q.  Okay.  Paragraph 35, you said:  "The Debtor is clearly not going to investigate and bring all the

Page 106

possible avoidance or other causes of action that arise from any transfers of property by the Debtor."

What do you mean by that?

A.   The debtor will not be going after the debtor's insiders.

Q.   Okay.  But that presupposes that there's actual avoidance claims to be pursued, to begin with, right?

A.   Correct.

Q.   Okay.  In other words, if there is nothing to pursue -- I mean, if there are no avoidance claims, then the debtor has nothing to pursue?  Do you agree with that statement?

MR. CRANE:  Objection to form.

THE WITNESS:  If there are any avoidance actions against insiders?  Is that what you're asking me?  I don't ---

MR. CRANE:  Objection to form.

THE WITNESS:  I don't know the answer to that, whether there are.  We are still investigating that.  I don't know the answer as to whether there are claims.

BY MR. FELDMAN:

Q.   When is that investigation going to be concluded?

A.   I can't speak to that.  I don't know.  It's been ongoing.

Q.   Is it going to be concluded prior to March 27th,

2023?

A.   I don't know.  I'd have to confer with my professionals.

Q.   I've seen a drafted settlement agreement between you and FVP.  Have you had settlement discussions with FVP?

A.   I believe possibly, yes, at one point.

Q.   You're aware there's a written document that was drafted with respect to a settlement between you and FVP, correct?

A.   If it's the one you're referring to that was early on, yes.

Q.   And one of the terms of the settlement is that the 20 vehicles that are at issue in this adversary proceeding would ultimately be sold by you, correct?

A.   I'd have to see that document, but that sounds somewhat familiar.

Q.   And, certainly, you would get some type of compensation or fee for doing that task, right?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.   Go ahead.

Let me ask the question again.  You're not going to sell 20 vehicles just gratuitously, right?  You expect to get paid something, correct?

Page 108

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  Any payment for fees or compensation would be governed by the statute for trustee compensation or the fee applications that would be filed with the Court.

Q.  I get it.  And, certainly, if you sold 20 vehicles, you would seek compensation pursuant to those rules that you just cited, right?

MR. CRANE:  Objection to form.

THE WITNESS:  Correct.

BY MR. FELDMAN:

Q.  Why wasn't that settlement ultimately finalized and presented to the Court?

A.  I don't recall.

Q.  Okay.  What is the status of the settlement discussions with FVP as we sit here today?

A.  I don't recall.

Q.  You don't recall?  When was the last time you had a settlement discussion with FVP?

A.  That's correct.  Excuse me?

Q.  When was the last time you had a settlement discussion, either you or your lawyer, with FVP?

A.  My lawyers would have had the discussion and I don't recall when that was.

Page 109

Q.   Okay.   Settlement discussions are still ongoing with FVP?

A.   I don't know.

Q.   Okay.   Who would best know?

A.   My attorneys.

Q.   Mr. Crane, sitting right next to you?

A.   Correct.

Q.   The written settlement agreement I've seen, that's no longer going forward; is that correct?

A.   The written settlement agreement that you've seen?

Q.   Yes.

A.   That's your question?

Q.   Yeah, let me show it to you real quick.

A.   Thank you.

Q.   Sorry, my computer is unbelievably slow today.

Okay.   This is actually my last part of questioning.   We'll take a quick break and I'll just confer with Mr. Miller, look at my notes, but I think we'll wrap up in the next, let's say, 15 or 20 minutes. Okay?

A.   Thank you.

MR. FELDMAN:   Just give me one second.   Okay. This will be Exhibit 3.

(Thereupon, Debtor's Exhibit Number 3 was

Page 110

identified for the record.)

BY MR. FELDMAN:

Q.   This is a document dated April 22nd, 2022, among -- I guess really between a whole bunch of FVP entities and you.

Do you recall seeing this document before?

A.   Yes.  If I could just have you continue to scroll, please.

Q.   Sure.

A.   Okay.  And what was the question, Mr. Feldman?

Q.   Why didn't this agreement go forward?

A.   Don't recall the reason.

Q.   Okay.  Seems like a pretty lengthy deal that was negotiated between the parties; is that right?

A.   Yes, and it was quite some time ago.  It looks like it's dated from April of last year.

Q.   Okay.  Has anyone on behalf of FVP told you that Mr. Zankl has defrauded FVP?

A.   I may have heard that allegation.

Q.   Okay.  Has any lender, aside from FVP, told you that Mr. Zankl has defrauded them?

A.   I believe so, but I'm -- I'm -- I'm struggling trying to think who that would be.

Q.   Okay.  Did you push back on that statement, say, "No, Mr. Zankl didn't defraud.  Maybe you breached the

Page 111

contract?"  You know, something to that effect?

MR. CRANE:  Objection to form.

THE WITNESS:  Is the question whether I pushed back?

BY MR. FELDMAN:

Q.  Yeah.  Did you say, "No, you got it wrong. Mr. Frankl is a good guy?"

A.  Of course not.  I have no reason to have knowledge of that.

Q.  Okay.  But certainly you haven't learned anything factually, in connection with this case, that would lead you to push back if someone accused Mr. Zankl of fraud, correct?

MR. CRANE:  Objection to form.

BY MR. FELDMAN:

Q.  Go ahead.

A.  No, I would investigate that.

MR. FELDMAN:  Okay.  Let's just take a quick break.  It's 12:40.

Mr. Winderman, you may make your lunch date after all.  Give me five minutes and at 12:45 we'll get back on. Okay?

(Thereupon, a brief recess was taken at 12:40 p.m., after which the examination reconvened at 12:45 p.m).

Page 112

MR. FELDMAN:  Ms. Mehdipour, nothing further.
Thank you.

THE WITNESS:  Yes.  I'm sorry?

MR. FELDMAN:  I said nothing further.  I'm good.
Have a good day, everyone.

THE WITNESS:  Oh, we're all done.  Okay.  Thank
you, Mr. Feldman.

MR. CRANE:  Thank you.

MR. MILLER:  Alan, look at your e-mail.  I'm
going to send this to you.

MR. CRANE:  Okay.  Thanks.


AND FURTHER DEPONENT SAITH NOT.


(Thereupon, formalities having not been

waived, the examination was concluded at 12:46 p.m.)

Page 113

CERTIFICATE OF OATH

STATE OF FLORIDA        )

                        ) SS

COUNTY  OF  MIAMI-DADE)

I, Maggie Rubio, RPR, Notary Public in and for the State of Florida at Large, certify that the witness, NICOLE TESTA MEHDIPOUR, personally appeared before me via Zoom Video Conference and was duly sworn pursuant to the COVID-19 Emergency Procedures for the Administering of Oaths Via Remote Audio-Video Communication Equipment dated March 18, 2020.

WITNESS my hand and official seal this 20th day of March, 2023.

MAGGIE RUBIO
Notary Public - State of Florida
Commission No. HH 208208
My Commission Expires: April 14, 2026

REPORTER'S CERTIFICATE

I, Maggie Rubio, RPR, certify that I was authorized to and did stenographically via Zoom Video Conference report the 7030 Examination of NICOLE TESTA MEHDIPOUR the witness herein; that the said witness was duly sworn by me; and that the foregoing pages numbered from 1 to 117 inclusive is a true and complete record of my stenographic notes of the deposition by said witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action.

Dated at Miami-Dade County, Florida, this 20th day of March, 2023.

MAGGIE RUBIO, RPR

Page 115

OUELLETTE & MAULDIN
Court Reporters, Inc.
1550 Madruga Avenue, Suite 333
Coral Gables, Florida   33146
Phone:   (305) 358-8875

March 20, 2023

NICOLE TESTA MEHDIPOUR
c/o Furr & Cohen, P.A.
(via e-mail:  acrane@furrcohen.com)
     CASE:          IN RE:  AUTO WHOLESALE OF BOCA, LLC
     DATE TAKEN:  March 16, 2023

 Dear Ms. Mehdipour:

     Please be advised that your 7030 Examination taken in the case and on the date described above has been transcribed and is ready for your review.

     Please contact us for an appointment to read and sign this 7030 Examination at your earliest convenience.

     The transcript will be sent to counsel with or without your signature in 30 days or at the time of trial, whichever comes first.

     Our office hours are 9:00 a.m. to 4:30 p.m., Monday through Friday.
     If you have any questions regarding this matter, please feel free to contact us at the above number.

                         Sincerely,


                         MAGGIE RUBIO, RPR


   cc: Jonathan Feldman, Esquire

Page 116

7030 EXAMINATION ERRATA SHEET

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to: _____

Reason for change: _____

Page No. _____ Line No. _____ Change

to: _____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page 117

7030 Examination ERRATA SHEET

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to: _____

Reason for change: _____

Page No. _____ Line No. _____ Change

to: _____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____

Page No. _____ Line No. _____ Change

to:_____

Reason for change: _____