Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

IN RE:                              CASE NO.:  22-15627-EPK
                                    Chapter 11
AUTO WHOLESALE OF BOCA, LLC,

          Debtor.
_____/        Volume I


ECF# 390, 403


March 27, 2023


          The above-entitled cause came on for hearing before the Honorable ERIK P. KIMBALL, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler Drive, West Palm Beach, Palm Beach County, Florida, on Monday, March 27, 2023, commencing at or about 9:30 a.m., and the following proceedings were had:


          Transcribed from a Digital Audio Recording by:
                Margaret Franzen, Court Reporter

Page 2

APPEARANCES:


FURR AND COHEN, P.A., by
ALAN R. CRANE, ESQUIRE
JASON S. RIGOLI, ESQUIRE
Special Counsel
On behalf of Nicole Testa Mehdipour, Chapter 7 Trustee
for Excell Auto Group, Inc.


JAMES B. MILLER, P.A., by
JAMES B. MILLER, ESQUIRE
and
PHANG & FELDMAN, by
JONATHAN S. FELDMAN, ESQUIRE
On behalf of the Debtor


BARON BRESLIN & SARMIENTO, by
JERRELL A. BRESLIN, ESQUIRE
JONATHAN SCHWARTZ, ESQUIRE
and
DAVID R. SOFTNESS, P.A., by
DAVID R. SOFTNESS, ESQUIRE
On behalf of the FVP Parties


SHRAIBERG PAGE, by
BRADLEY S. SHRAIBERG, ESQUIRE
On behalf of Franklin Capital


SCOTT C. GHERMAN, P.A., by
SCOTT C. GHERMAN, ESQUIRE
On behalf of Calvin Erbstein


ALSO PRESENT


MOSHE FARACHE


DAWN LEONARD, Courtroom Deputy and
ECRO - Electronic Court Reporting Operator

- - - - - - -

PRESENT VIA ZOOM VIDEO CONFERENCE:

WEISS HANDLER & CORNWELL, P.A., by
HARRY WINDERMAN, ESQUIRE
On behalf of the Karma Entities

- - - - - - -

I-N-D-E-X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARC BRANDES | | | | |
| By Mr. Breslin | 41 | | -- | |
| By Mr. Feldman | | -- | | -- |
| SCOTT ZANKL | | | | |
| By Mr. Breslin | 72 | | 207 | |
| By Mr. Feldman | | 165 | | -- |
| MOSHE FARACHE | | | | |
| By Mr. Breslin | 213 | | 310 | |
| By Mr. Feldman | | 305 | | -- |
| By Mr. Shraiberg | 309 | | -- | |

- - - - - - -

EXHIBITS ADMITTED INTO EVIDENCE

Movants' No.  3..................................Page  47
Movants' No. 35..................................Page  35
Movants' No.  7..................................Page  56
Movants' No.  6..................................Page  56
Movants' Nos. 8-14..............................Page  57
Movants' No. 105................................Page  57
Movants' No. 15.................................Page  57
Movants' No. 21-25..............................Page  58
Movants' No. 40.................................Page  59
Movants' No. 43.................................Page  59
Movants' No. 44.................................Page  59
Movants' No. 83.................................Page  61
Movants' Nos. 26-29.............................Page  62
Movants' No. 82.................................Page  62

Continued...

Page 4

Movants' No. 31.................................Page  63
Movants' Nos. 55-72............................Page  63
Movants' Nos. 16-17............................Page  66
Movants' No. 14................................Page  68
Movants' No. 122...............................Page  69
Movants' Nos. 46-54............................Page  70
Movants' No.  5................................Page  77
Movants' No. 32................................Page 134
Movants' No. 33................................Page 137
Movants' No. 41................................Page 162
Movants' No. 42................................Page 163
Movants' Nos. 73-75............................Page 165
Movants' No. 126...............................Page 289
Movants' No. 37................................Page 297
Movants' No. 39................................Page 300

- - - - - - -

Page 5

THE COURT:  All right.  We are here in the matter Auto Wholesale of Boca.

For all of you in the courtroom, there are a number of parties watching on the Zoom hook up.  They are not going to be making appearances, we'll just consider them as audience.

Let's start with appearances in courtroom, if we could.

Good morning, Mr. Miller.

MR. MILLER:  Good morning, Your Honor.

James Miller, with Mr. Jonathan Feldman, for the debtor, and Mr. Moshe Farache is present, as well, for the debtor.

MR. FARACHE:  Good morning.

THE COURT:  Thank you.  Good morning, gentlemen.

MR. SOFTNESS:  Good morning, Judge.

David Softness representing the various FVP -- FVP parties.  With me in the courtroom is Jerry Breslin and Jonathan Schwartz.

MR. BRESLIN:  Good morning, Judge.

THE COURT:  Good morning, gentlemen.

MR. CRANE:  Good morning, Your Honor.

Alan Crane with Nicole Testa Mehdipour representing Nicole Testa Mehdipour, as the Chapter 7

Page 6

trustee in the Excell Auto case.

I do want to tell the Court in advance that there was a settlement last night that was reached between Excell and the debtor, and as part of that settlement we are withdrawing our motion to convert or dismiss the case.

THE COURT:  Very good.  Thank you.

MS. MEHDIPOUR:  Good morning, Your Honor.

THE COURT:  Good morning.

Mr. Shraiberg.

MR. SHRAIBERG:  Good morning, Your Honor.

Brad Shraiberg on behalf of the creditor, Franklin Capital.

MR. GHERMAN:  Good morning, Your Honor.

Scott Gherman on behalf of Calvin Erbstein, one of the creditors in the case.

THE COURT:  Very good.

MR. RIGOLI:  Good morning, Your Honor.

Jason Rigoli on behalf of Nicole Mehdipour, as the Chapter 7 Trustee for the Excell estate.

THE COURT:  They left you out.

MR. RIGOLI:  They left me out, so I figured I'd make an appearance.

THE COURT:  How could they do that?

MR. BRESLIN:  Judge, on behalf of Mr. Winderman, Mr. Scott Zankl, and his wife, they're

parties, they're the Karma entities, they're in the courtroom, and I believe Mr. Winderman is on the Zoom, but I guess he cannot participate.

Thank you.

THE COURT: Well, he asked to have the Zoom link and was told that anybody on Zoom was not to be participating in the evidentiary hearing, so he is just watching.

Anyone else? Very good.

Are there any preliminary matters before we get started, and who will be taking the lead on the motions today?

MR. BRESLIN: I will be taking the lead for the FVP parties, Judge, and I would invoke the rule except for the experts, I believe the experts can stay.

THE COURT: That's true. So who would that eliminate? Why don't you let the parties decide and you --

MR. BRESLIN: The only witness that's in court -- Michele Martin is a witness, Marc Brandes is a witness, so they would have to step outside until we conclude the preliminary matters.

MR. FELDMAN: I think Mr. Zankl would have to step out, as well, since he's not a party.

MR. BRESLIN: He's a party.

Page 8

MR. FELDMAN: In the motion to convert?

THE COURT: Is he a movant, I don't remember?

MR. BRESLIN: He is.

THE COURT: No.

MR. FELDMAN: No.

THE COURT: So if he's not a party --

MR. BRESLIN: I believe -- I believe they joined. I believe the Karma entities joined the motion.

THE COURT: I do not remember.

MR. MILLER: They're not appearing.

THE COURT: Hold on.

MR. BRESLIN: That's my understanding. Let's take a look at the docket. My understanding is, is that everybody joined the motion.

THE COURT: Let's have a look, I have them all in my notes of course. I have FVP at 390; I have now withdrawn 403, which was Ms. Mehdipour's request. Mr. Hess, (phonetic) do you know?

Well, have a look. Let's ask Mr. Winderman, even though he's not supposed to be participating.

Mr. Winderman, could you unmute yourself, please.

MR. WINDERMAN: I can, Your Honor, and I have. Karma -- the Karma entities did join in the motion

Page 9

to dismiss or convert.

THE COURT:  So why are you not here?

MR. WINDERMAN:  Because I've steaded all of my time to FVP, and there was nothing more for us to add to the motion.

THE COURT:  All right.  Mr. Zankl is a party.  All right.  Anybody else?

MR. MILLER:  I believe Mr. Zankl's wife.  I don't know if Mr. Breslin is calling her as a witness.

MR. BRESLIN:  Yeah, I am calling her as a witness, Judge.  My understanding is she's also a party.  She's a half owner of the Karma entities.

THE COURT:  Well, half owner doesn't make her a party.  Are you an officer?

MS. ZANKL:  Yes.

THE COURT:  Yes.  What office do you hold?

MS. ZANKL:  Vice-president.

THE COURT:  All right.  Usually the reason we eliminate parties is so they can consult with their counsel during the hearing, which they will not be able to do, since he is not at all participating.  They will each be excluded from the room.  You can both go out in a couple of moments.

Anyone else?

MR. MILLER:  Ms. -- Ms. Mehdipour,

Page 10

Your Honor, but she's a party rep, so -- but they've withdrawn their --

THE COURT:  Not anymore she's not.

MR. MILLER:  Exactly.

THE COURT:  All right.  Is Ms. Mehdipour a potential witness?

MR. BRESLIN:  Yes, yes, she's been subpoenaed.

THE COURT:  Well, you'll be enjoying the conference room, Ms. Mehdipour.

MS. MEHDIPOUR:  Thank you, Judge.

THE COURT:  All right.

MR. BRESLIN:  Your Honor --

THE COURT:  Yes.

MR. BRESLIN:  I'm sorry.  I didn't hear you.  Did you say that they both --

THE COURT:  They both are excluded.

MR. BRESLIN:  They both are excluded.

THE COURT:  Right, the only -- the only reason to have somebody remain in the courtroom is so they can be the party and consult with their counsel.

If their counsel is not going to be participating in this hearing, then they don't need to consult with him and they will not be witnessing any of the other testimony, so they'll be in the hallway.

Page 11

All right.  Anything else?

All right.  So the witnesses who are excluded from the courtroom for now, you should go and make yourselves at home in the conference room.  Someone will come and get you when it's time.

All right.  Any other preliminary matters?

MR. SHRAIBERG:  Just that we would like to move to this table, if that's possible?

THE COURT:  Yeah, go ahead, of course.

All right.  All righty.  So who would like to take the lead on opening, if you wish to have an opening for -- assuming there are no other preliminary matters on the movants' side.  I assume that's way over here to my right, Mr. Breslin.

MR. BRESLIN:  Well, Judge, one very brief preliminary matter.  I believe Mr. Feldman was never officially admitted to represent the debtor in the -- in the main bankruptcy case, only in the adversary case.

So as a housekeeping matter, I think that Your Honor would need to allow the participation.

THE COURT:  And I assume no one is objecting.  Good morning, Mr. Feldman.

MR. FELDMAN:  Good morning, Your Honor.

So Mr. Breslin is correct, my retention is with respect to the adversary proceeding.  To be precise,

Page 12

I'm not seeking compensation from the estate in the main bankruptcy case to represent the debtor, it's still going to be my contingency arrangement.

The issue is, is that the issues in the adversary proceeding overlap directly with the issues in this case, that's why I'm assisting Mr. Miller.  I will not be seeking compensation from the estate with respect to my efforts in the main case.

THE COURT:  All right, and so the only primary difference between engagement, other than that, between engagement as special counsel, which you have in the adversary and here, would be to the extent that you have any entanglement with a party that would result in you being not disinterested.

MR. FELDMAN:  Correct.

THE COURT:  So is there anything that I should know in terms of disclosure?

MR. FELDMAN:  So thank you, Your Honor.  So with respect to my application, I did include my affidavit.  We did review the creditor body with respect to this case, as well as any other interested parties that were participating, and there is no conflict.

THE COURT:  Well, disinterestedness and conflict --

MR. FELDMAN:  Right.

Page 13

THE COURT: -- one of them is a subset of the other --

MR. FELDMAN: Uh-huh.

THE COURT: -- and disinterestedness is broader than conflict.

So is there anything that you would disclose that might lead me to conclude you are not disinterested?

MR. FELDMAN: There's nothing to disclose, Your Honor.

THE COURT: Do you have any questions?

MR. BRESLIN: No, I don't, Your Honor.

THE COURT: Very good. Thank you.

MR. FELDMAN: Thank you, Your Honor.

THE COURT: You, of course, may participate.

All right. So would you like to begin with an opening?

MR. BRESLIN: Judge, I'd like to give a very brief opening statement.

Your Honor, we're here on a motion --

THE COURT: Well, hold on everyone. Please be careful to not speak unless you're reasonably close to a microphone. You don't need to lean over to it, but I would hate for you to not be on the transcript, it would just say inaudible.

MR. BRESLIN: Thank you, Judge.

THE COURT:  Okay.  Very good.

MR. BRESLIN:  Judge, for the FVP parties, we're one of the movants to convert or dismiss the case. Judge, we're here under 11 U.S.C. 112(b), we're asking that the Court either convert or dismiss this case for cause.

One of the -- the grounds under -- under 112 are that cause includes substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, and the gross mismanagement of the estate.

So, Your Honor, what -- what the FVP parties believe the evidence is going to show is that Your Honor is going to have to make a determination at the conclusion of this hearing, as to whether or not AWB is, in fact, in the car buying and selling business or is, in fact, a lender.

Now, our -- our evidence, and we think we will establish by overwhelming evidence, is that AWB is not -- never has been in the buying and selling car business, and has always been in the lending business.

We believe that -- that Mr. Farache and AWB acted as both a legitimate lender and a -- and a loan shark, and by -- when I say a loan shark, I mean a lender that charged usurious rates and with undisclosed loans,

and I think the evidence will very clearly establish that.

So, Judge, what the evidence is going to show is that back in around 2012, Mr. Farache approached Mr. Zankl and he talked to Mr. Zankl about taking -- taking a space in a building that he wanted to buy.

At that time Mr. Zankl had a small -- you know, a small company that he was buying and selling cars and -- and sure -- sure enough, he -- he agreed to become a tenant in the -- in the location. We will show Your Honor the lease, and after he took that space, a relationship developed over the years.

Mr. Farache was never in the car business and he was not in the car business then, but nonetheless, at that time he did become a lender.

So after -- after Mr. Zankl became a tenant, then over the years there is -- there was loan, after loan, after loan, and these loans ultimately added up to a substantial amount.

And the evidence that you will see, Your Honor, is that there were both notes that were executed to support the loans, and that there were loans off the books, and when -- when you look at the financial transactions between the companies, it's going to show that there's -- there's no other conclusion that can be drawn other than that AWB was a lender, and, in fact, a

Page 16

usurious lender.

So what the evidence is going to show in a nutshell, Judge, is that this relationship went on year after year and -- and over the years the debt just accumulated, and finally in 2021 it was around six million, $7 million.

There was a substantial amount of debt and the way Mr. Zankl viewed it was he had a credit line. So the credit line was the money that he had borrowed from -- from Mr. Farache and his companies, and he would take money from the credit line and he would put the money back.

So if you -- if you take a look at the monetary transactions back and forth between the companies, you'll just see money going back and forth, back and forth, back and forth throughout the years. So money in/money out, money in/money out with really no -- no rhyme or reason, and the evidence will show that there was at least two banks that saw these transactions going in and out, money in and out, sometimes the same amount, you know, the same day and, you know, they were asked to leave, take their business elsewhere because it appeared to be, quite honestly, a money laundering operation.

So this went on for a period of time, and Mr. Farache came up with the idea that he would -- he

would be -- he would engage in what would be on paper, at least, in his -- in his mind, would be that he would be part of an auto wholesale business, and that he would buy and sell cars from, in essence, one customer.

So what we have done, Judge, we have examined the deal jackets, and what the deal jackets are, whenever a car was -- was bought and sold by either the Excell or the Karma entities, they would create paperwork and they would put it in a jacket, and these deal jackets contained the buy paperwork, when a car was bought from a customer, the sell paperwork, and it had all the necessary elements in there, titles, title transfers, et cetera.

So when this case initiated, we got all the deal jackets from Mr. Farache.  So there's two different sets of deal jackets, there's the Farache deal jackets, and then there's the Excell deal jackets, the Excell/Karma deal jackets that were taken by the trustee and are now in the possession of the trustee.

So there's two different sets of deal jackets and oftentimes they -- they say different things, but what they -- and I'm talking about the year 2021 because I'm going to go through this chronologically.

What happened -- what happened in 2021 is, either Karma or Excell would buy a car, and then Karma or Excell would sell the car.  So let's say if the car was

Page 18

purchased for $100,000, then sometime later it would be sold for 120, and there would be, you know, a profit that would be realized by the selling company, which would always be one of the Karma entities. It would either be Karma of Palm Beach, it would be Karma of Broward or Excell, but Excell was rare because you'll hear testimony that Mr. Zankl was trying to transition the Excell business to the Karma companies because the Karma entities wanted all their business to go through their -- their new -- their company, because Karma is a type of car. It's like a Chevy dealership, it's a Karma dealership.

So -- so the evidence will show that all the -- all the cars were transitioned to the Karma companies, but most importantly, Judge, in 2021, we -- we have looked at over 120 deal jackets, and these are the same deal jackets that were provided by Mr. Farache, and here's what the deal jackets in 2021 show.

They show that one of the Karma entities purchased the car, one of the Karma entities sold the car, and then there would be paperwork that would be created at the request of Mr. Farache to show that that car that was just purchased was -- was sold by Excell to AWB, and then sold back from AWB to Excell. Even though one of the Karma companies bought it, the paperwork would always be between Excell and AWB, and the reason for that will

Page 19

become obvious, because the reason is, is that Mr. Farache and AWB had a UCC on Excell inventory, but they didn't have a UCC on Karma inventory, and that's going to be a very -- a very critical part of this case.

So in 2021 when you look at all the transactions that occurred, and these are -- we've looked at 120 of them, the buy and sell price is the same.  So Karma would buy a car for X, that car would then be sold or -- or not sold, but Excell would then sell that car to AWB for X, that exact same amount of money, and then AWB would sell it back to Excell for that exact same amount of money, and then the car would be sold.

So if you -- if you look at -- you know, it's at least 120 transaction.  Karma buys a car, Karma sells a car, and then there's this side -- side paperwork between Excell and AWB for the exact same amount of money.

So when you look at it on a business level and -- and -- and, you know, business logic, it makes absolutely no sense for Karma to buy a car; Karma to give the car for no consideration to Excell; then for Excell to sell that car for the exact same amount of money to AWB; and AWB to sell it for the exact same amount of money back to Excell; and then Karma would ultimately sell to a buyer.

So what was happening here was Karma was

Page 20

buying a car, Karma was selling a car because that was their business, and they were very good at it.  They sold -- they bought and sold a lot of cars.

This paperwork was created, and it was created for the sole purpose to give Mr. Farache what he believes would be some sort of a security interest in the inventory that was purchased by the Karma companies.

So this went on in 2021, until the end of 2021, when Mr. Zankl told Mr. Farache that, you know, I'm not going to be able pay you back.  You know, I owe you six or $7 million, and I'm not going to be able to pay you, and I need more time, and, you know, I need other circumstances.  That led to threats and pressure, and you will hear that from the witness stand.

And what happened then in 2022, Mr. Farache said, we're going to do things different in 2022.  Because in 2021 it was just all paperwork, there was no actual money that went back and forth.  The only money that was paid was from Karma to -- to AWB, and what it was paid for was for interest payments.

So -- and, you know, there was some -- occasionally some money that went back and forth, but it was, you know, the -- the -- the primary money that went from -- from the Karma entities or Excell to AWB in 2021 was either interest or -- or some repayment of the loan.

It was either the VIG or some the actual money on the notes, and there was monthly interest invoices.

So now it's 2022 and the only difference is, is that they have a meeting and Mr. Farache and Mr. Zankl say, okay, we're going to do things different in 2022. We're going to keep the same business model, but instead of just the paperwork back and forth between us for, you know, some imaginary amount, the exact same amount of money, in 2022 it was different, because now money actually started moving back and forth for these actual cars.

So in 2022, the exact same thing happened. Karma would buy a car in 2022, Karma would sell a car in 2022. So if Karma would -- if Karma paid $200,000 for the car in 2022, they would buy it with their money and then after that, there would be a transfer of -- a reassignment of the title to Excell or some sort of sale paperwork. Again, just like '21, then Excell would sell it to AWB, for that exact same amount of money; then AWB would sell it back to Excell for that exact same amount of money; and then Karma would sell the car.

So in 2022 the exact same thing happened that happened in 2021, the only difference is, is that money was exchanged. There -- there was actually -- they're moving money back and forth, but they were moving

Page 22

money back and forth not for buy -- not for buy/sell transactions, they were moving money back and forth because Mr. Zankl had a credit line for a certain amount of money and -- and he had hit that limit.  So before Mister -- before Mr. Farache would give him additional money, Zankl had to pay him.

So when you look at the -- when you look at the monetary transactions in 2022, the money goes from Excell almost exclusively to AWB, and then it would come back from AWB to Excell, but in 2022 they showed it as -- as AWB buying and selling cars.

So what happened was the same thing happened in 2022 that happened in 2021, and -- Karma would buy a car, Karma would sell a car, in between there's all this paperwork with Excell that was just created for the same price that makes no business sense, and you'll see it for yourself, and that continued until April 1st.

And what happened on April 1st was that -- and you'll see that there was about 30 -- you know, at least 30 transactions in 2022 where that exact same thing happened.  But now it's April 1st and Mr. Farache is told by his attorney, Marc Brandes, that the feds are going to come raid the place.  Now -- and you're going to hear that from the witness stand from several witnesses, and what Mr. Farache does, is he tells Mr. Zankl and his wife that

Page 23

he's -- the feds are going to raid the place, I'm taking all the cars.

So in 2022, many of these -- many of these transactions that involve money included an assignment of title to -- to AWB, but it was never an actual sale, it was just part of like this security agreement that they had.

So now Mr. Farache on April 1st, and you've heard about this from other cases before Your Honor, he takes every car. He takes every car on the lot, you know, other than some (inaudible) and some, you know, other vehicles, you know, that don't have -- didn't really have any value, and just drove them off the lot, and then he went to the service center and he took all the cars out of the service center.

Now, Your Honor has already given back many of these cars to their lawful owners, every car was taken.

So now what happens? So now it's April 1st, Mr. Farache has a whole bunch of cars, and he's got titles for some of them, but he doesn't have titles for some of the other ones.

So now there's -- there's conversations with Scott and Kristen Zankl, and what Mr. Farache is saying, listen, you owe me all this money, I want you -- I want all the titles, give me -- give me all the titles for all

Page 24

the cars, even the titles that I didn't already take.

So you will hear that there was some negotiation and there was a piece of paper signed, and ultimately Mister -- Mr. Farache got all the titles, and what -- what Scott Zankl wanted was, he believed he was going to give him these certain titles, and get the other titles back.  And those titles were for cars that he had -- that he had already sold, because he was fully authorized to sell the cars even -- it didn't matter what name the title was in, because it was always Karma that sold the cars, whether Excell held the title or AWB, it didn't matter in 2022.

He sold the cars.  He was authorized to sell the cars, and now there's this negotiation on April 1st and 2nd and through the 8th, where he's trying to get the rest -- where Mr. Farache is trying to get the rest of the titles to the cars he's already taken.  Ultimately he gets all the titles, but he's supposed to give some back and he doesn't.

And what he does, he goes to the DMV and for every title he's got, and you'll see them, you know, without -- most of the time without any clear chain, he gets all of these cars titled to himself.

So now what happens?  Now it's April 1st, and, you know, Mr. Farache has taken all the cars and he

Page 25

has to, you know, try to explain what he did, you know, legally because he certainly wasn't allowed to do that legally, just take all these cars, regardless of -- of title or security interest or anything, he files a lawsuit in the -- in Palm Beach.

And what does the lawsuit say?  The lawsuit is a foreclosure action.  He files a lawsuit under oath, and you will see it, and he says that I am a lender, and I have a security interest in these cars, and he lists the cars, and these are the ones that he took, and he wants the Court to enter an order foreclosing on those cars.  So he makes that statement under oath.

So now a week goes by and, you know, FVP becomes aware that all their collateral is gone, and during that week, communications are had between myself and Mr. Brandes, who's going to be the first witness, and, you know, a list is provided of all the cars that -- that we claim an interest in, and we go to court in -- in Broward County.

So we go to court on an emergency motion for us to get our collateral back because what you will see, Judge, for every car he has, every single car, Karma bought the car.  Karma bought the car, Karma paid for the car, and then there's all these other transactions.

So our position is, and always will be, that

Page 26

when that car was purchased by Karma, it became Karma inventory, and if it's Karma inventory, it's our collateral.

So I understand that there's all these transactions that don't make any business sense, but the reason that it happened that way is because just in January when they had these meetings, and I'm going to show you the e-mail from Mr. Farache and the paperwork that was signed, Mr. Farache sent an e-mail to Mr. Zankl on January 18th, and he sent him an agreement.

And what that agreement says is, I know you're getting money on January 26th, that's the day that FVP funded.  When you get that funding, you're going to pay off these loans that you owe me money, and he lists the loans, he identifies the loans that are outstanding and he says when you get that money, you're going to pay me over $2 million.  So sure enough, that's exactly what happens.

So what's the importance of that e-mail? The importance of that e-mail is, is that on January 18th, Moshe Farache knew that FVP was lending a substantial amount of money to Mr. Zankl and his companies, and what we also know and the evidence is just, you know, is going to be crystal clear, is that every one of these cars that are at issue here was purchased by the Karma companies,

Page 27

okay.

So Mister -- Mr. Farache's own deal jackets show that the cars were bought by Karma, and then there's all this, you know, you know, paperwork that got cooked up that makes no business sense and you'll see it for yourself. So that is why all this paperwork occurred.

The reasons -- the reason that the cars got reassigned from AWB to Excell for the same amount of money, and then from Excell to AWB, all for the same amount of money, was an intentional ploy to try to defeat the FVP security interest. It was an intentional act for one purpose. There's no other logical explanation why that would happen, other than to try to move a car out of a lawful security interest that we had in the collateral, outside of it to where Mr. Farache could ostensibly, you know, in his mind legitimately claim whether or not that he had either a security interest, because he had a UCC in Excell, or actually owned the vehicle.

So what the evidence is going to show is that all of these transactions were -- were some kind of ham-handed, backward, inexplicable attempt to take a security interest in cars that Mr. Farache says that he bought.

So now we're back to the lawsuit. He says I'm -- I'm a lender, and Judge, I want you to foreclose on

Page 28

this, on all my collateral, because he calls all the cars that he now has that he says that he owns, in that lawsuit he called them his collateral.

We go before the Court in Broward County, the Judge denies the -- the emergency relief, but enters a stay order.  We then on the -- on the eve of -- of a replevin hearing, where we were very confident that the Court was going to order all these cars to be -- to be returned to us, that's when the bankruptcy got filed.

So our position is, Judge, is that this bankruptcy was filed in bad faith, and the reason that it was filed in bad faith on the eve of that replevin hearing was because Mr. Farache was simply trying to not have that hearing and bring it in before the -- bring this matter before this Court and take -- take the protection of the Bankruptcy Code, so a Chapter 11 was filed.

So we are -- we are now before the Court on the Chapter 11, and I understand that we -- we must focus on postpetition conduct, and for Your Honor to understand why the postpetition conduct is what it is, and why it's mismanagement, you have to have some understanding of the prepetition conduct, and I don't mean in great detail, but just on a summary basis like I explained to Your Honor.

So the postpetition conduct has been nothing more than Mr. Farache, through his attorneys, just, you

Page 29

know, just being -- you know, objecting to every -- every claim by every legitimate owner that comes and claims their cars, and just throwing pebbles in the road to try to -- to try to let Mr. Farache keep the cars that he unlawfully took.

Now, why is this mismanage -- why is it mismanagement and why should it be converted because of postpetition conduct?

The reason is, Judge, is because Mr. Farache has never admitted under oath, and he has -- and he has urged others to perjure themselves on his behalf, and we will show you the excerpts from his deposition, to this day he says I wasn't a lender. He still doesn't say he's a lender, he says I'm a buyer of cars. I purchase cars, I purchase cars, I purchase cars, I'm a purchaser of cars.

So what his position in this filing, in this Chapter 11 filing, is that he was a purchaser of cars. When, in fact, he was not a purchaser of cars, he was a lender.

So the question then becomes, when you look at the evidence in this case, you have to determine whether or not to convert this case.

So if Mr. Farache is a buyer and seller of cars, and by Mr. Farache I mean AWB, then you have to determine whether or not there's been mismanagement or the

estate has been diminished.

So for the mismanagement prong, you know, we believe that all the evidence that was submitted in this case, including the testimony at deposition and under oath on multiple occasions where Mr. Farache said that he's a buyer, was false, and intentionally false, and that everything that went to support that was mismanagement. And I'm sure there's just been many, many hundreds of thousands of dollars of attorney's fees trying to support that position.

Now, I don't know what position is going to be made today, but I believe that, you know, you'll see -- you'll see it's been made -- that statement has been made numerous times under oath.

So if he -- if he, in fact, is a buyer and seller of cars, the case should be converted because if you look at just the filings that are -- that are of record before Your Honor, there is -- if he was a buyer and seller of cars, he's a buyer and seller of cars that never had any -- any business sense; that lost money every month; that filed tax returns every year at a loss; and since the -- since this petition has been filed, hasn't made any money.  Every month just more money is going out paying lawyers, and the only reason that lawyers are being paid is to try to protect the principals from lawsuits

Page 31

for -- for what happened here.

So it is our position that their -- the debtor has lost money consistently, and if you look at the business record and the transactions that occurred buying and selling, you know, well over a hundred cars at the same price, it's not the type of company that can rehabilitate itself.

So the next thing is, is that the debtor lists -- the only thing that the debtor lists as its assets are the cars at issue in the -- in the adversary. If you look at Mr. Glick's -- and Mr. Glick will testify, and Mr. Glick will tell Your Honor that of all those cars that are listed in -- in the adversary, ten of them are cars where actual cars were exchanged.

Our position is, is that that means nothing, that the evidence will be overwhelming that he's not a buyer in the ordinary course as to those cars, but that's not an issue that will need to be decided today.

But importantly is for the rest of the cars, they acknowledge that the debtor -- excuse me -- that AWB took possession for antecedent debt.  It's right -- it's right in there, it's right in our papers.  All these cars, all the rest of the cars, there's ten cash, the rest is antecedent debt.

So we know he can't be a buyer in the

Page 32

ordinary course for the antecedent debt cars, so the question becomes is, are those -- are those other ten, which are really the only assets of the estate, what's the likelihood of him prevailing on that?

And I think when you see the evidence that comes before Your Honor in the next couple of days, I think that you will, you know, hopefully agree that the chances of that are slim.

Now, Mr. Farache was deposed by Mr. Crane and he was asked, you know, how do you plan to rehabilitate this company?  And he asked him some questions, and Mr. Farache stated, he would figure it up. Quote, "Figure it up."  I assume he meant figure it out. That was his response, how are you going to rehabilitate this company, figure it out.

He said, I'm doing this for 40 years, figure up, figure it out, and he went on to say that he will reinvent the wheel.

So I -- I believe that when you look at the ability for this company to rehabilitate itself, you have to look at what it did in 2021 and 2022 where it lost money every month, the tax returns consistently show a loss, and if you look at the monthly operating reports it's the same thing, they sold one car, you know, a little while ago.  I believe in December they bought and sold a

car.

And the reason, Judge, the reason that Mr. Farache, if you do find that this is an actual -- it actually was a company that bought and sold cars, if -- if you -- if look at it, the -- AWB cannot meet the liquidation analysis.

Now, I'm not a bankruptcy person, but what I'm told is that if -- you know, if you analyze, you know, the assets that are available to the estate, even if he won, that they couldn't meet the liquidation analysis, because quite frankly, there was no ordinary course transactions.

So, Judge, you know, to conclude, I believe that at the conclusion of the evidence Your Honor is going to have to make a decision whether or not this was an actual company that bought and sold cars.

Our position is, of course, that it was not, but even if it was, and you look at that company as a company that bought and sold cars, you have to look at -- you know, I believe you would have to look at how it conducted its business, whether or not it made any money, what did it do since the petition was filed, and it didn't do anything since the petition was filed, and it lost money all -- all along before that because Mr. Farache just kept throwing money at this business in the form of

Page 34

loans, there were promissory notes, but he put in far more money than what was in the promissory notes.

So if -- if he, in fact -- if it is, in fact, a company that buys and sells cars, it's not salvageable because it can't be rehabilitated and therefore, should be converted or dismissed.

If you find that if, in fact, it was a lending operation, which everybody -- everybody seems to agree on, Mister -- you know, all the experts, then the petition was false and everything that was done since it was filed, and all the testimony that -- that has been given to support the buy/sell fiction has been false.  So it should be converted and/or dismissed for those grounds.

So, Judge, those -- those -- that is my opening statement.  I would simply ask Your Honor to look carefully at the evidence, and at the conclusion and when Your Honor sets this matter for -- for closing argument, we believe that we'll be able to establish everything that I've said today.

Thank you.

THE COURT:  Thank you.  Yes, Mr. Shraiberg.

MR. SHRAIBERG:  Thank you, Your Honor.  Very briefly.

Just to sum up Mr. Breslin's opening, I believe that the evidence is going to show that cause

Page 35

exists to convert the case to Chapter 7 under 1112(b), specifically the evidence is going to show a substantial or continuous loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.

And I also think there was just a little misspeak in the opening, the debtor -- the evidence is going to show gross mismanagement of the estate, as opposed to just simple mismanagement.

THE COURT:  Thank you.  Anyone else on the movants' side?  Yes.

MR. FELDMAN:  Judge, I will be brief.

THE COURT:  Mr. Breslin said --

MR. FELDMAN:  I heard a very --

THE COURT:  Mr. Breslin said that, as well.

MR. FELDMAN:  I know, but I actually will be, Judge.

MR. BRESLIN:  Sorry, Judge.

THE COURT:  That's fine.  It's useful.

MR. FELDMAN:  I heard a lot in Mr. Breslin's presentation there, and I think it's important just to kind of bring this back to home, which I believe Mr. Shraiberg attempted to do.

I just want to be clear at the outset. Mr. Breslin's client is an interested party, not a creditor.  What I mean by that, if you actually look at

Page 36

the proof of claim, the evidence will show, you actually look at the complaint that they attach, they do not seek one dollar of relief from this debtor.  So as an interested party, they are coming into this case and they are articulating that a -- it's in the best interest of creditors, not FVP, but in the creditors of this bankruptcy estate that this case be converted or dismissed.

Now, Mr. Shraiberg, and I have discussed this issue before, the evidence as to Mr. Shraiberg's client and what we will show here, is that at the end of the day Mr. Shraiberg's client is also going to be an interested party, not a creditor.  So we have a series of interested parties that are seeking to convert this case for whatever motive they have.

The creditors of this estate, as the evidence is clear, is that they are not moving.  The one creditor that actually filed the motion to convert, we have resolved that.

So what is the evidence going to be before Your Honor in terms of substantial diminution without reasonable likelihood of rehabilitation, is that I'm hearing a whole bunch of evidence regarding a loan debt and this back and forth relationship going over multiple years.

Well, Your Honor, the issue is, is that evidence is going to be irrelevant.  The sole person who had standing to fight about that has resolved and settled whatever claim that can come out of that.

So with respect, why we would ever focus on that, I don't think is really important.  What we're really trying to do here, apparently is from the interested parties, is to litigate the adversary proceeding that's set forth to go forward, I'm sorry, in May.

And so Mr. Breslin has talked about a bunch of evidence about these cars, and that we're taking ownership interest in them, and somehow they disagree with our position, and that somehow that is gross mismanagement.

It's not gross mismanagement.  We say that we own these vehicles, and Mr. Breslin and anyone else who wants to come in, they can say you're an ordinary course buyer or you're not, and we have a lien, but our plan that we filed with this case ultimately addresses all of that, Judge, which is if you have a -- if we have an ownership interest in this car and there is no lien on that car, then, yes, it's ours.

But if there's an ownership interest in this car that we assert that you establish your lien, whoever

Page 38

it is among all these warring parties, the plan provides that we're going to abandon that vehicle, so you can leave the estate.  One way or another it's either ours, you don't have a lien on it, or alternatively it is ours, you have a lien on it, take it back, we're not going to deal with it.

That's what we're trying to do to accomplish it to be most efficient for creditors so it is in the best interest of creditors to allow us to proceed to liquidate cars that we own, that are not subject to any lien, so then we can pay creditors of the estate.  That's what's in the best interest of creditors of this estate.

As to the idea of gross management, just to flip it back one more time, is the fact that we're litigating with them is somehow gross management.

With respect, Judge, FVP is on their fifth amended complaint.  They want to go to war with everyone, that's their right, but the fact that there's any substantial diminution or gross management because we're fighting with them, shouldn't be held against us.  That's not the appropriate way to look at this case.

And what we're looking at again, Your Honor, is in terms of the testimony, FVP is not going to have one corporate rep walk into this courtroom and talk about any of this.  What instead is going to happen is they're going

to rely on Mr. Zankl.

Mr. Zankl has asserted his Fifth Amendment privilege on any number of issues, Your Honor.  That's going to be the credibility of the person before you, who will not talk about anything that would implicate him in any wrongdoing, and certainly I think everybody in this courtroom could agree that Mr. Zankl has committed some serious wrongdoing, but it's only when he has a chance to go on offense and throw it at somebody else, that's how Mr. Zankl is going to approach this case.

So his testimony, because that's all FVP is really going to point to is Mr. Zankl, who's got a personal guaranty to FVP for God knows how many millions of dollars, and ultimately he's going to say whatever it is that's going to save his hide with respect to FVP, and so that is the evidence they're going to be pointing to.

At the end of the day, Your Honor, this is really an 1112 motion, it's not an 1104 motion.  We have removed the insider releases so that issue, we believe, is addressed.  If there's insider claims that can be asserted, those claims could be asserted by any of these interested parties, they have the ability to go forward and do that.

But otherwise, Judge, what's in the best interest of creditors of this estate is you won't see the

Page 40

evidence.

Thank you, Your Honor.

THE COURT:  Thank you.  All right.

Anything else on -- on the left side of the courtroom?

All right.  Would you like to call your first witness?

MR. BRESLIN:  Judge, before -- oh, yeah, let me call my first witness.  I'm going to go get him.

THE COURT:  I assume it's someone in the hallway?

MR. BRESLIN:  All right.  Daniel, we're going to be looking for -- we're going to start with 3, and then we may or may not go to 77, and then we may or may not go to 35.

THE COURT:  Sam, pay attention to what I've just said.

If you could go to the podium so we can hear what you're saying, and also state for the record who you've called.

MR. BRESLIN:  Thank you, Judge.  For the record, we have an IT specialist here, we have all our exhibits in the register prepared to show on the screens, so with Your Honor's --

THE COURT:  Excellent.

Page 41

MR. BRESLIN:  -- permission, we would do that.

THE COURT:  Yes, of course.

MR. BRESLIN:  Yes.  All right.

Sir, please state your name --

MR. BRANDES:  Marc Brandes.

THE COURT:  Well, hold on a moment.  I'd like to swear him in, okay?

MR. BRESLIN:  Oh, okay.  Sorry, Judge.

THE COURT:  Could you please raise your right hand?

Do you swear under penalty of perjury that the testimony you're about to give before this Court, will be the truth, the whole truth, and nothing but the truth?

MR. BRANDES:  Yes, Your Honor.

THE COURT:  Thank you.

Thereupon,

MARC BRANDES,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRESLIN:

Q.    Sir, please state your name for the record.

A.    Marc Brandes.

Q.    And how are you employed, sir?

Page 42

A.    I'm an attorney.  I am employed by my law firm, Kurkin Forehand Brandes.

THE COURT:  Could you either move a little bit forward or -- you don't need to be right on top of the microphone, but get closer or move the microphone.

THE WITNESS:  Is this better, Your Honor?

THE COURT:  Yes.  Ms. Leonard?  Okay.

BY MR. BRESLIN:

Q.    All right.  Sir, and you're currently a member of the Florida Bar?

A.    Yes, I am.

Q.    And how long have you been practicing law?

A.    Since 1990.

Q.    And, sir, do you know a gentleman by the name of Moshe Farache?

A.    Yes.

Q.    Do you see him in the courtroom?

A.    Yes.

Q.    Would you point him out, please?

Let the record reflect that he's indicating Mr. Farache.

All right.  Mr. Brandes, when did you first become acquainted with Mr. Farache?

A.    I want to say end of March 2021 -- '22, excuse me.  March '22.

Page 43

Q.   All right.  So you had no -- you had no relationship, attorney/client or otherwise with him prior to March of 2022?

A.   I believe it was March 31st, but, yes.

Q.   All right.  So without getting into any attorney/client communications, did -- did you prepare a lawsuit on behalf of Mr. Farache and his companies that was ultimately filed in the Circuit Court of Palm Beach County?

A.   Yes.

Q.   All right, sir.  Let's put up number 3.

All right, sir.  I show you what's on your screen as Exhibit 3, and I'd ask you to look at it and Daniel, if you can scroll through it slowly so the witness can see it?  Can you scroll?  Okay.  Stop it right there for the moment.

All right.  Mr. Brandes, you've had a chance to review the complaint, part of this -- this document. Does it look familiar to you?

A.   Yes.

Q.   All right, and why is it familiar?

A.   Because I drafted it.

Q.   And did you cause it to be filed in the Circuit Court of Palm Beach County?

A.   Yes.

Page 44

Q.   And is it a verified complaint?

A.   It is.

Q.   All right.  So when you drafted that complaint, did you -- did you believe that everything that you alleged in that complaint was true and accurate?

A.   Yes.

Q.   And the page that's on your screen right now, is that a signature of Mr. Moshe Farache?

A.   I didn't witness it.  It's -- it's notarized by a notary public in Florida, so it speaks for itself.

Q.   Okay.  It's notarized by Mr. Scott Gherman; is that right?

A.   Yes, that's what that states.

Q.   All right, and do you know whether or not he's an attorney?

A.   Yes, he is.

Q.   Okay.  So this document -- what is the nature of the lawsuit?

MR. MILLER:  Objection, document speaks for itself.

THE COURT:  Overruled.

BY MR. BRESLIN:

Q.   What's the nature of the document?

A.   It's a -- it's a breach of contract complaint enforcing various notes between the parties that

Page 45

were in default.

Q.    All right, and isn't it -- also is a foreclosure, is it not?

A.    That's one of the causes of action.

Q.    All right, and this -- this complaint, does it not, seeks to foreclose on automobiles; correct?

A.    It seeks to foreclose on the notes.

Q.    Okay, and it seeks to foreclose on the collateral of the notes, which in -- in this document is listed as automobiles; correct?

A.    That's true.

Q.    All right, and --

THE COURT:  Just a moment.  Ms. Leonard, is the -- is the level okay?  Okay.  It is, go ahead.

BY MR. BRESLIN:

Q.    All right.  So why don't you scroll through it very quickly, Daniel, for the rest of the complaint and you have -- you have the jurat, and now we have various notes and security agreements, and we'll go through it quickly and we'll take it to the very end.  Back it up one.  Did you back it up?

UNIDENTIFIED SPEAKER:  Yes.

BY MR. BRESLIN:

Q.    All right.  The -- the page that's on your screen, that lists cars that you're seeking to foreclose

Page 46

on in the lawsuit; correct?

A.    Yes.

Q.    All right.  You can continue.

UNIDENTIFIED SPEAKER:  That's the last page.

MR. BRESLIN:  Is that it?

BY MR. BRESLIN:

Q.    All right.  So we've scrolled through it all.

Is this document a true and accurate depiction of the lawsuit that you filed for Mr. Farache and his company, Auto Wholesale of Boca on April 8, 2022?

A.    Yes.

MR. BRESLIN:  All right.  I would move it into evidence at this time, Your Honor.

THE COURT:  Any objection?

MR. MILLER:  Objection, relevance, Your Honor.

THE COURT:  Overruled.  It's admitted.  Can we be -- I'd like to be consistent in what we call the exhibits.  Is it Movants' 3, is that what it is?

MR. BRESLIN:  This is -- yes, they're all listed by number and this would be Number 3, yes.

THE COURT:  Okay, and so is there -- there's only one set on the movants' side; correct?

MR. BRESLIN:  Right.  FVP filed a list of

Page 47

exhibits and then Mr. Crane filed a list, which were numbered consecutively, I think it goes through 124, so this is Number 3 of the combined movants' exhibits.

THE COURT:  All right.  We'll just call it Movants' 3 is admitted.

(Thereupon, Movants' Exhibit Number 3 was admitted into evidence.)

MR. BRESLIN:  All right.  Thank you, Judge.

BY MR. BRESLIN:

Q.    All right.  So now, Mr. Brandes, when I -- can I assume that it's your practice before you file a sworn document in a court of law that you endeavor to make sure that it's true and accurate?

A.    Yes.

Q.    All right, and did you do that in this case?

A.    Yes.

Q.    All right.  Now, there came a time approximately April 1, 2022, where Mr. Farache became aware that -- that, quote, "the feds were going to raid the Karma Excell business."

Were you aware --

MR. FELDMAN:  Objection, foundation.

BY MR. BRESLIN:

Q.    -- were you aware of that?

THE COURT:  Sustained.

Page 48

BY MR. BRESLIN:

Q.   Why don't we just ask you outright, did you ever tell Mr. Farache that the feds were going to raid the place?

MR. FELDMAN:  Objection, predicate.

THE COURT:  Overruled, I'll give him some leeway.  Go.

THE WITNESS:  I did -- I did not have a conversation with Mr. Farache about that concept.

BY MR. BRESLIN:

Q.   Who did you have a conversation with?

A.   I had a conversation with Lisa Farache, his wife.

Q.   All right.  Tell me -- tell me the nature of that conversation.

MR. FELDMAN:  Objection, Your Honor, privileged.

THE COURT:  This is between who, you and Mrs. Farache --

THE WITNESS:  Yes.

THE COURT:  -- Mrs. Zankl?

THE WITNESS:  No, Mrs. Farache.

THE COURT:  Mrs. Farache.  Okay.  Do you want to respond?

MR. BRESLIN:  Yes, Judge.

Page 49

BY MR. BRESLIN:

Q.    Did you represent Mrs. Farache, Lisa Farache?

A.    My understanding, Mrs. Farache was an officer of Auto Wholesale, so, yes, I would have represented her.

Q.    Did you -- did you have a fee agreement between you and Mrs. Farache?

A.    Not with Mrs. Farache, but with Auto Wholesale of Boca, which she's an officer of.

Q.    All right.  When you had that conversation with Mister -- Ms. Farache, did you believe that you were expressing a legal opinion to her?

Did you believe that was an attorney/client communication?

A.    The conversation I had with her is -- is an attorney/client communication.

Q.    All right.  Did you become aware that -- that Mrs. Farache acted on what you said?

MR. FELDMAN:  Objection --

THE COURT:  Hold on, I haven't ruled on the objection yet at this point.  Sustained.

All right.  Go ahead.

BY MR. BRESLIN:

Q.    Did -- did you become aware that Ms. Farache

acted on information that you stated to her?

MR. FELDMAN:  Objection, Your Honor, this is invading into the privilege.

MR. BRESLIN:  But it's not, Judge.  Just for the record, Mrs. Farache told numerous people, number one and --

THE COURT:  Are those other people going to say that she told them?

MR. BRESLIN:  Yes.

MR. FELDMAN:  No.

MR. BRESLIN:  A witness will testify that Mrs. Farache told them that she was told that the -- that she had a conversation with Mr. Brandes and that the feds were going to raid the place, that's A.  B --

THE COURT:  So she revealed the data to other people?  Is this agreed?

MR. FELDMAN:  If he wants to identify those witnesses and call them to say that, that's fine, but he can't get it in through the attorney.

THE COURT:  So you'd like him to do that first?

MR. FELDMAN:  Pardon me, Your Honor?

THE COURT:  You'd like him to do that first?

MR. FELDMAN:  Yeah.

THE COURT:  You realize we have two days;

Page 51

right?

MR. FELDMAN:  Correct.

THE COURT:  Would you like me to add hours to their time because --

MR. FELDMAN:  I don't, Your Honor, but --

THE COURT:  -- I'll consider it.

BY MR. BRESLIN:

Q.    All right.  Well, let's -- let's do it this way.  Mr. Brandes, isn't it true that in the hallway at the Broward County Courthouse, you relayed to both myself and several other attorneys that you, in fact, said to either Mr. Farache or now you say his wife, that you had learned that the feds were going to raid the place and that they should go and grab all the vehicles?

MR. FELDMAN:  Objection, foundation.

THE COURT:  Overruled.

BY MR. BRESLIN:

Q.    Did you make that statement?

A.    Not exactly like that.

Q.    Well, how did you say it exactly?

A.    My recollection was I mentioned that I understood that the feds were coming in, but I would never told -- have told the Faraches to go and grab every specific car that was there.

Q.    Okay.  All right.  There -- there came a

Page 52

time -- well, let's just explore that a little bit.

What exactly did you hear about the feds raiding the place and from whom?

A.    It's privileged, Your Honor.

THE COURT:  The question was when did you hear, that's privileged?

THE WITNESS:  No, I thought he asked what -- who --

BY MR. BRESLIN:

Q.    Right.  From whom --

A.    -- from whom.

Q.    -- did you hear that the feds were going to raid the place, and what exactly did you hear?

A.    That's privileged, Your Honor, the information that I learned.

THE COURT:  You need to rephrase the question.

MR. BRESLIN:  Okay.

BY MR. BRESLIN:

Q.    Did you -- did you receive that information from a person?

A.    A person on behalf of an entity that I represent and I have an attorney/client privilege with.

Q.    Okay.  All right.  So you received the information from a person that you have an attorney/client

Page 53

privilege with; correct?

A.    That's correct.

Q.    All right.  Let's -- let's go to Number 35, please.

All right.  There came a time, Mr. Brandes, that after you filed the lawsuit in Palm Beach County that you started to have e-mail communications with me; correct?

A.    Correct.

Q.    All right.  I'd like you to take a look at Exhibit Number 2 -- no, this is 35, e-mail.  Is this Exhibit 35?  Oh, okay.

Yeah, I did it in traunches, so it says 2 at the top.  I'm sorry, that confused me.  This is Exhibit 35.

Mr. Brandes, please review the exhibit.

A.    Okay.

Q.    Next page, please.

A.    Okay.

Q.    Next page.

A.    Okay.  Okay.

Q.    All right.  Is that a true and accurate copy of the e-mail that you sent to me -- let's go back up to the top -- on April 13, 2022 at 10:14 a.m.?

A.    That's correct.

Page 54

MR. BRESLIN: All right. I would move it -- I'd move Movants' 35 into evidence at this time.

THE COURT: Any objection?

MR. FELDMAN: No objection.

THE COURT: Movants' 35 is admitted.

(Thereupon, Movants' Exhibit Number 35 was admitted into evidence.)

THE COURT: Mr. Brandes, just so the record is clear, could you spell your last name?

THE WITNESS: Sure, B as in boy-r-a-n-d-e-s.

THE COURT: Thank you.

THE WITNESS: And it's Marc with a C.

MR. BRESLIN: I have no further questions of Mr. Brandes, Your Honor.

THE COURT: Thank you.

MR. FELDMAN: Nothing for this witness, Your Honor.

THE COURT: Very good. Next.

MR. BRESLIN: Well, Your Honor, at this time we agreed to take Mister -- you're excused, sir.

THE WITNESS: Thank you very much.

THE COURT: Thank you, you can step down, Mr. Brandes.

THE WITNESS: Thank you.

THE COURT: Thank you.

Page 55

MR. BRESLIN:  Judge, at this time I'd like to just go through various exhibits -- various exhibits --

THE COURT:  Sure, you can do that if you think that's appropriate.

MR. BRESLIN:  -- and introduce them.

THE COURT:  Could you make sure you're at the podium while you're speaking?

MR. BRESLIN:  Yes, of course.

MR. SHRAIBERG:  Thank you.

MR. BRESLIN:  You're welcome.

Yes, Judge, there are -- I guess there's various exhibits, and what I'd like to do at this time before we get into, you know, the heavy-duty factual witnesses, is go through what we have filed and what Mr. Miller has filed to see whether or not we can agree on many of these documents being introduced into evidence.

So I will start with Exhibit 7.  If you can put that up, which is the amended schedules that were filed in this case.

THE COURT:  So you're offering that?

MR. BRESLIN:  Yes, I'm offering that into evidence at this time.

THE COURT:  Yes, Movants' 7 --

MR. FELDMAN:  No objection.

THE COURT:  Movants' 7 is admitted.

Page 56

(Thereupon, Movants' Exhibit Number 7 was admitted into evidence.)

MR. BRESLIN:  All right.  Next is Number 6, Exhibit 6, which is the case management summary.

THE COURT:  Any objection?

MR. FELDMAN:  No objection.

THE COURT:  Movants' 6 is admitted.

(Thereupon, Movants' Exhibit Number 6 was admitted into evidence.)

MR. BRESLIN:  Next would be Exhibits 8 through 14 and 105, these are the monthly operating reports for the debtor.

MR. FELDMAN:  No objection.

MR. BRESLIN:  All right.  So that's 8, 9, 10, 11, 12, 13, 14, and 105.

Daniel, can you just pull up 105, I just want to make sure that's numbered correctly?

MR. MILLER:  Judge, we --

THE COURT:  Hold on.

MR. MILLER:  I'm sorry, I don't see 105 on the exhibit register for Mister --

MR. BRESLIN:  It's in the -- it's in the joint exhibit register.

MR. MILLER:  I don't see it.

MR. BRESLIN:  I filed, I believe, 77

Page 57

exhibits and the rest were filed by Mr. Crane.

MR. MILLER:  No objection to 105, but that's not -- I don't believe that's an exhibit in Mister --

MR. BRESLIN:  It was separately filed.

THE COURT:  Hold on, let's just make sure it's somewhere in the official record.  So it is there? Is it there?  Let me have a look.

Ms. Leonard.

ECRO:  531.

THE COURT:  ECF 531, 105 is there, yes?

All right.  So each of those, it's 8 through 14 inclusive; correct?

MR. BRESLIN:  Yes.

THE COURT:  And 105 in movants' list, those are admitted.

(Thereupon, Movants' Exhibit Numbers 8 - 14 and Exhibit Number 105 were admitted into evidence.)

MR. BRESLIN:  All right.  Now, the next is the amended plan, which is Exhibit 15.

THE COURT:  Any objection?

MR. MILLER:  No objection.

THE COURT:  Movants' 15, admitted.

(Thereupon, Movants' Exhibit Number 15 was admitted into evidence.)

MR. BRESLIN:  All right.  Then next we have

Page 58

the AWB tax returns, and that would be Exhibits 21, 22, 23, 24 and 25.

MR. MILLER:  No objection.

THE COURT:  So Movants' 21 through 25, inclusive, admitted.

(Thereupon, Movants' Exhibit Numbers 21 - 25 were admitted into evidence.)

MR. BRESLIN:  Then next we have -- we have Exhibits 40 through 44.  There was an objection to two of them.  Let's just go through -- do you have a copy of their objections?

MR. FELDMAN:  Your Honor, I can short circuit this for Mr. Breslin.  40 through 44, we have no objection except with respect to 41 and 42, we'd like to just preserve a relevance objection, but we'll raise it if the exhibit at some point in time --

THE COURT:  You're going to preserve a relevance objection?

MR. FELDMAN:  In other words, if --

THE COURT:  Was there an objection filed other than relevance?  No, so it's only relevance.

MR. FELDMAN:  Yeah, with 41 and 42 we filed for hearsay, but we'll withdraw those objections, Your Honor, as to hearsay.

THE COURT:  Okay.  That means I'm not

Page 59

admitting them right now.  So right now I have two choices, admit it or refuse, and if you want to offer it later, you can do that.

So which ones can you offer now that would not be subject to objection?

MR. BRESLIN:  Well, 40, 43 and 44.

THE COURT:  40, 43 and 44 are admitted.

(Thereupon, Movants' Exhibit Numbers 40, 43 and 44 were admitted into evidence.)

MR. FELDMAN:  Yes.  Thank you, Your Honor.

MR. BRESLIN:  41 and 42, relevance; correct?

THE COURT:  Yes, when you offer them, it may elicit an objection, and then I can rule on it in that context.

MR. BRESLIN:  The next would be Exhibit 83, and that is the proof of claim filed by AWB in the Excell bankruptcy.

MR. FELDMAN:  Relevance.

MR. MILLER:  Judge, relevance and hearsay on that.  That's what was just resolved with the Chapter 7 Trustee, Ms. Mehdipour.

MR. BRESLIN:  It's not hearsay because it has independent legal significance.

MR. MILLER:  It is hearsay.

MR. BRESLIN:  No, it's a verbal --

Page 60

MR. MILLER:  They're bringing it in for the truth of the matter asserted.

MR. BRESLIN:  -- it's a verbal act.

THE COURT:  Hold on, you're both speaking at the same time, the imaginary stenographer cannot keep up with you.

All right.  So the response on relevance.

MR. BRESLIN:  Oh, on relevance, Judge, it's very relevant to the issues before Your Honor because in that case, it was -- a claim was filed, where it indicated that Mr. Farache was a lender.

THE COURT:  Relevance overruled and hearsay, you want to offer it for what purpose?

MR. BRESLIN:  To -- to establish that Mr. Farache is, in fact, a lender and not a buyer and seller of cars, which is the entire thrust of our -- of our presentation here, other than the -- you know, the rehabilitation and cause issues.

MR. MILLER:  Going back, Judge, to relevance and hearsay.  Relevance --

THE COURT:  I've already overruled relevance.

MR. MILLER:  Okay.  Well, hearsay -- it's hearsay.  It's inadmissible because it was filed in another case, they're bringing it in for the truth of the

Page 61

matter asserted here, and there's no basis for it in this case.

THE COURT:  It's an inconsistent statement by a representative of your client, and the point is that it's an inconsistent statement, it might be false. Therefore --

MR. MILLER:  Well --

THE COURT:  -- therefore, the hearsay objection is overruled.

MR. MILLER:  Actually, the argument is an inconsistent statement.  They misunderstand the proof of claim, but it is what it is.

THE COURT:  Well, then you can explain to me why I should give it little weight or write it off, overruled.

All right.  So what number was that, 83; is that correct?

MR. BRESLIN:  Yes.

THE COURT:  Movants' 83, admitted.

(Thereupon, Movants' Exhibit Number 83 was admitted into evidence.)

MR. BRESLIN:  Okay.  Number 3 is in.

All right.  The next is the AWB general ledgers, that's 26, 27, 28, 29 and 82.

MR. MILLER:  No objection.

Page 62

MR. FELDMAN:  No objection, Judge.

THE COURT:  Thank you.  So 26 through 29, inclusive, and 82 on the movants' list, all admitted.

(Thereupon, Movants' Exhibit Numbers 26 - 29 and Exhibit 82 were admitted into evidence.)

MR. BRESLIN:  Thank you.  Next we have Number 5.  Can you pull that up, please, Daniel?  That's the lease agreement between Excell and Mr. Farache wife's company for the space where all of this occurred, which will become relevant during the course of the proceeding.

MR. MILLER:  We did object based upon relevance and hearsay, Judge.  This is not a transaction between the debtor, AWB, and anybody.  This is between two different parties.

THE COURT:  All right.  So am I going to be hearing testimony relative to this that might shed light on it?

MR. BRESLIN:  Yes.  Well, yes, Judge, because Mr. Farache has testified that at that space, A, he kept --

THE COURT:  That is fine, offer it in the context of the other evidence, and then it's easier for me to make a ruling on that objection, okay?

MR. BRESLIN:  Okay.  All right.

The next is Number 31.  This is the UCC

Page 63

filing and termination by Auto Wholesale of Boca on the Karma entities' inventory.  It's obviously relevant and it --

THE COURT:  You don't have to anticipate the objections, let's see if there are any.  Yes.

MR. FELDMAN:  No objection.

THE COURT:  Okay, and what number was that, Mr. Breslin?

MR. BRESLIN:  That would be 31, Judge.

THE COURT:  Movants' 31, admitted.

(Thereupon, Movants' Exhibit Number 31 was admitted into evidence.)

MR. BRESLIN:  All right.  The next are deal jackets, 55 through 72, and these are all the deal jackets that are referenced in Mr. Glick's report.

MR. FELDMAN:  No objection.

THE COURT:  55 through 72, inclusive, on the movants' exhibits, all admitted.

(Thereupon, Movants' Exhibit Numbers 55 - 72 were admitted into evidence.)

MR. BRESLIN:  Then we come to the Farache transcripts, whether or not Your Honor will permit all of the Farache transcripts to be introduced into evidence as he is a representative of a party, and under the -- under the federal rule, the depos can be used for any purpose

Page 64

for a party.

So we would like the entirety of it in the record.

THE COURT:  Okay, and what numbers are they?

MR. BRESLIN:  It's Number 16 -- pull up Number 16, please, Daniel.  Make sure there's -- there's all three volumes there.  There's actually another Volume 4 that's somewhere.

THE COURT:  So it's just this one or there are other exhibits?

MR. BRESLIN:  I believe these should be the first three.

THE COURT:  These are depositions in this case or in the adversary, excuse me?

MR. BRESLIN:  Yes, yes.

THE COURT:  Yes.

MR. BRESLIN:  In the adversary.

THE COURT:  Okay.  Mr. Feldman.

MR. FELDMAN:  Yeah.  Objection, Your Honor, relevance.  It's not about a hearsay issue, it's about a process issue.  The proper way to do this is to provide excerpts, we can provide counter excerpts, and then we can read those into the record.

But just dumping in an entire transcript in and of itself, the process is -- it's just improper, and

Page 65

more importantly, there's probably all kinds of irrelevant stuff in there.

So I think the better thing for him to do is provide us excerpts, read those into the record.  Those would be admissions against a party opponent and there you go.

MR. BRESLIN:  Well, Judge, under the rule, since it's a party, I'm permitted under the rule to introduce a transcript for any purpose, and it's black and white -- it's black and white in the rule and it's only for parties.

THE COURT:  All right.  Would it help the parties if I say that I will not consider in my ruling anything in these depositions unless specifically pointed to by the movants or the debtor?

MR. FELDMAN:  That's acceptable, Judge.

THE COURT:  Okay.  So they're admitted and I need to know what exhibit numbers they are, but to be clear, I will not make any finding based on the text in that -- in these depositions unless you have pointed them out to me.

What I'm saying to you is I'm not going to read the whole thing.  I'm going to look for your evidence, yes.

MR. BRESLIN:  No, nor did I expect that,

Page 66

Judge.  I just wanted it to be in our record.

THE COURT:  Understood.  So I need to know what they are so they can be admitted.

MR. BRESLIN:  Yes, they're Exhibits 16, 17 and 18.

THE COURT:  Movants' 16, 17 and 18 are admitted.

(Thereupon, Movants' Exhibit Numbers 16 - 17 were admitted into evidence.)

MR. BRESLIN:  And then there's an additional one --

THE COURT:  Hold on, hold on.  Mr. Miller.

MR. MILLER:  There is nothing attached to 18.

THE COURT:  18 is an empty exhibit.  Well, in that case, Mr. Miller, how could you object?

MR. MILLER:  Well, I'm just saying there's nothing to admit.

THE COURT:  Let's hope it's not all in white ink.  All right.

MR. BRESLIN:  Could I have one moment, please?

MR. MILLER:  I've got an honesty problem, I apologize.

THE COURT:  That's fine, you point out to

Page 67

them their exhibit is empty.  You can do that later.

Ms. Leonard, do we have it?

ECRO:  (Inaudible.)

MR. BRESLIN:  16 and 17 are --

UNIDENTIFIED SPEAKER:  The two depositions and 18 is the excerpts.

MR. BRESLIN:  All right.  So 16 is both days, 12th and 13th and --

UNIDENTIFIED SPEAKER:  And 17, also.

MR. BRESLIN:  17 is the third.  Okay and 18, the excerpts are not in there?

UNIDENTIFIED SPEAKER:  That's what they're saying.

THE COURT:  The official version of Movants' 18 simply says to be supplied --

MR. BRESLIN:  I'm sorry, Judge.

THE COURT:  -- which is like a mystery for the Court.

MR. BRESLIN:  It should be excerpts.  Okay. Number 4.

Okay.  Judge, I would -- I would move into -- let me -- yeah.  Let me -- let me move Number 4 into evidence, those are, in fact, excerpts of the larger whole.

THE COURT:  Okay.  4, gentlemen?

Page 68

MR. BRESLIN:  And then for Number 18, I'm going to have to just figure that out on a break, Judge --

THE COURT:  Okay.  Mr. Feldman.

MR. BRESLIN:  -- because I believe what that was going to be was excerpts from Deposition Number 4.

THE COURT:  Okay, but I don't have that right now, so we don't need to address it.

We have Movants' 4, which are excerpts?

MR. BRESLIN:  Yes.

THE COURT:  Mr. Feldman.

MR. BRESLIN:  Pull up Number 4, please.  Yeah.  Okay.

MR. FELDMAN:  No objection, Judge.

THE COURT:  Okay.  Movants' 4 is admitted.  Thank you, Mr. Feldman.

(Thereupon, Movants' Exhibit Number 4 was admitted into evidence.)

MR. BRESLIN:  And also 122, Judge, that is the most recent deposition of Mr. Farache, and I would move to admit it under the same condition that the last -- the other transcripts were.

THE COURT:  And the number, I apologize?

MR. BRESLIN:  1-2-2, 122.

THE COURT:  122, Mr. Feldman.

MR. FELDMAN:  As long as the condition

Page 69

attaches, no objection, Judge.

THE COURT:  That is correct.

MR. FELDMAN:  Thank you.

THE COURT:  122 is admitted, subject to designation for the benefit of the Court.

(Thereupon, Movants' Exhibit Number 122 was admitted into evidence.)

MR. BRESLIN:  All right, Judge.  Those are the only ones that I would be moving in at this time.

If Mr. Miller wanted to go through his at this point or Mr. Feldman.

THE COURT:  Would it be useful on the debtor's side for you to offer exhibits at this point or do you wish to wait?

MR. FELDMAN:  We wish to wait, Judge.

THE COURT:  Very good.

MR. FELDMAN:  Thank you.

THE COURT:  Mr. Breslin.

MR. BRESLIN:  Thank you, Judge.  Could we take a five-minute break before I decide who my next witness is?

THE COURT:  Yes, absolutely.  Court's in recess.

MR. BRESLIN:  Thank up, Judge.

(Thereupon, a brief recess was taken, after

Page 70

which the following proceedings were had:)

THE COURT:  All right.  Thank you.  Please have a seat.

All right.  Mr. Breslin, where is he?  There he is.  Please let me know when you're ready.

MR. BRESLIN:  Yes, Judge.  I'd just like to make an announcement on the record.

I'm going to be releasing Trustee Mehdipour from her subpoena, and we are going to be admitting into evidence Exhibits 46 through 54.  These are all deal jackets, these are Farache deal jackets.

THE COURT:  Okay.

MR. FELDMAN:  No objection.

MR. BRESLIN:  They're listed as a sampling.

THE COURT:  Is that agreed, Mr. Feldman, 46 through 54, no objection?

MR. FELDMAN:  No objection, Judge.

THE COURT:  Okay.  So Movants' 46 through 54 are admitted.

(Thereupon, Movants' Exhibit Numbers 46 - 54 were admitted into evidence.)

THE COURT:  And so do you wish me to excuse Ms. Mehdipour and her counsel?  Yes?

MR. BRESLIN:  Yes, Your Honor.

THE COURT:  Any concerns with that

Page 71

Mr. Feldman?  I'm excusing Ms. Mehdipour and her counsel.

MR. FELDMAN:  That's fine, Judge.  We don't intend to call her.

THE COURT:  Okay.  Very good.  I think she may have already left, is that possible?

MR. BRESLIN:  She didn't waste any time.

MR. MILLER:  I'll check the hallway, Your Honor.

THE COURT:  Okay.  Well, let them know they don't need to grace the conference rooms anymore.

We're paused at the moment, just for a minute.

(Pause in proceedings.)

All right.  Are we all set, Mr. Breslin?

MR. BRESLIN:  Yes, Judge.

THE COURT:  Okay.

MR. BRESLIN:  I'm calling Mr. Zankl.

THE COURT:  Mr. Zankl, please have a seat.

MR. ZANKL:  Good morning.

THE COURT:  Good morning.

MR. ZANKL:  I can bring my water; right?

THE COURT:  Of course, yes.  We don't -- we don't try to dry out the witnesses.

Could you -- could you please raise your right hand?

Page 72

Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. ZANKL:  Yes, sir, I do.

THE COURT:  Thank you.

Please make sure you get his full name and spelling before you start.

THE WITNESS:  Scott, S-c-o-t-t, Z-a-n-k-l.

Thereupon,

SCOTT ZANKL,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRESLIN:

Q.   Mr. Zankl, you've already stated your name for the record, have you not?

A.   Yes.

Q.   So you understand you're under oath?

A.   Yes.

Q.   All right.  Mr. Zankl, tell the Court a little bit about your background leading up to 2012, when you first rented the space at 1001 Clint Moore.

A.   The background on that is in 2000, my wife and I started the business.  I was playing a sport professionally, I stopped, and my next love was the car

Page 73

business.

So we had started Excell in 2000 as a finance company, and then it morphed in and transitioned into a car dealership.

Q.   All right.  So what do you mean it started as a finance company, explain that.

A.   We started off -- I started off just trying to help people that had trouble getting financing acquire financing for cars that they wanted to purchase.

Q.   All right.  Were they like high-end cars?

THE COURT:  Just -- just a moment.

Mr. Zankl, you look a little uncomfortable. You don't have to be right on top of the microphone.

THE WITNESS:  Yeah, I just want to make sure you can hear me.

THE COURT:  Oh, you're fine, and I don't want you to bend over for the entire time you're testifying.

Go ahead.

MR. BRESLIN:  Thank you very much, Your Honor.

BY MR. BRESLIN:

Q.   So that was financing for high-end automobiles?

A.   It wasn't just for high end, it was -- it

Page 74

was really for any vehicle.

Q.   Okay.  So tell me how it transitioned into a -- a luxury automobile dealership.

A.   Well, one deal that we helped a client get financing, he was trading in a car and the dealer -- I said to the dealer, I said, you're giving this guy a pretty good deal and you're taking his trade in pretty cheap.

I said, could you give me the opportunity to buy the trade?  He said, absolutely.  He goes, go ahead, we've -- we've been doing so much business together.

I didn't have the money to buy the car, so my wife and I just did a personal loan and we -- we bought the car from the dealer, and she was teaching school at the time, so she drove it for a couple weeks.

I just took pictures, put it in the Sun Sentinel Newspaper, and we sold it two weeks later.  It was our first deal we ever did.  It was -- it was fun.

So my wife said, why don't we try looking into doing this, as well as the financing, so it just transitioned and started educating myself about the cars and the values and the market.

Q.   All right.  So how did that business progress?  Bring us up to 2012.

A.   So when I started to educate and learn about

Page 75

the car values, I went and applied for a small little line of credit with a company called Manheim, which is Manheim Auto Auction.

And at the time they had like a dealer floor plan you could get, and I applied for a floor plan back then.  I think it was 2003, I think, and we got approved for 250,000, and within 12 months, we built it up to a million, and it just grew from there.

And then 2008 happened and we had to downsize and move to another facility.

Q.    Okay.  So explain to the Judge how your relationship commenced with Mr. Farache.

A.    Well, I was in my office in Boca, I had a small little warehouse.  It was just myself and I had one employee that was a young lady, Teddi, who was doing my accounting and stuff, and a couple guys in the back that were cleaning the cars and helping me keep the cars clean.

I was doing all the sales, marketing and everything myself, and Moshe walked in and introduced himself, and he was referred to me by quite a few people that I knew that were friendly with -- with Mr. Farache.

So he came in, introduced himself, and -- and asked me how much longer I had on my lease that I currently was in in that smaller warehouse space, and I said it's actually up in six months.

Page 76

And he said, look, I'm looking at this building just down the street, it's on the main road on Clint Moore, and it's in foreclosure, and I can get a good deal on it.  I just don't want to buy it unless I know that I've got a tenant, and I'd like to offer you to come over and lease the building if I purchase it.

I went and looked at the spot with Mr. Farache, and it was amazing.  The spot was incredible. I just didn't think the City of Boca would approve it.  It was everything I wanted, it was absolutely the most ideal situation building where it was, and it took me a few months to get the City of Boca to go ahead and approve it, and they did approve it, and then I entered into a lease on the building with Mr. Farache.

Q.    All right, and when did that occur?

A.    We did the lease, I believe -- I know it was in 2012, and it was in the summertime.  I think it was either in May or June.

Q.    All right.  Would you bring up Number 5, please, Daniel?

All right, sir.  I'd like you to take a look at the -- at the screen and review that document and tell me if you recognize it?

A.    Just one second, let me get my glasses.  Is there any way to make it bigger, I'm sorry?

Page 77

Q.    Yes.

A.    Oh, perfect.  Thank you.  Yes.

Q.    All right, and so what this appears to be is an amendment to a lease agreement.

Does that refresh your recollection as to the original agreement?

A.    Yes.

Q.    All right.  Tell me -- tell me about the original lease agreement, approximately when it was dated?

A.    Well, I mean, it says here in this agreement, which is what I thought, it was June 22, 2012 was the first lease agreement when that was executed.

Q.    All right.  So that -- that -- is that consistent with your memory, it would have been June of 2012 that you moved into that 101 -- 1001 Clint Moore space?

A.    Yes.

Q.    All right, and when you first -- all right. I'd move Number 5 -- what number is this -- Number 5 into evidence at this time.

THE COURT:  Gentlemen?

MR. MILLER:  No objection.

THE COURT:  Movants' 5 admitted.

(Thereupon, Movants' Exhibit Number 5 was admitted into evidence.)

Page 78

BY MR. BRESLIN:

Q.    So now it's June of 2012, you're -- you're in the new space, you have a bigger space.  What happened next?

A.    Well, I actually, when I moved in, and I had a conversation with Moshe beforehand and I had expressed to him that, you know, the building was amazing and it would be a great opportunity for myself and my family and the business, but I didn't have enough money to fill the building because it was quite a large building and compared to -- compared to what I had.

The facility that I was in at that time, I could only house probably maybe 12 to 14 cars in total, and the building that Mr. Farache was presenting could hold probably, packed in there, probably close to 35, maybe even 40 cars.

So I didn't -- I -- right away I was excited and it's what I always wanted, but I knew that I didn't have the money to fill the dealership.

So I had expressed that to Mr. Farache and he said that he may be willing to invest money and help me increase the inventory at the dealership.

Q.    Okay, and do you recall when that conversation first took place?

A.    Well, it actually took place before I even

Page 79

signed the lease because I expressed to him that I didn't have enough money to -- to fill the building with cars in the first place.

So I was a little bit reluctant to do the move, but it was such an amazing opportunity, I was trying to figure out a way to do it, and when I expressed that to Mr. Farache, he said, well, there might be an option for me to invest and help you with the inventory.

Q. All right, and so you explored those conversations prior to you entering into the lease at the space --

A. Yes.

Q. -- the 1001 space?

A. Yes.

Q. So did there come a time on or about the summer of 2012, that either a loan or some sort of an investment was extended from Mr. Farache to you and your business?

MR. MILLER: (Inaudible.)

THE COURT: Sustained.

THE WITNESS: It wasn't --

THE COURT: Don't answer, sustained.

THE WITNESS: Oh, I'm sorry.

THE COURT: Go ahead.

BY MR. BRESLIN:

Page 80

Q.     All right.  Did there come a time when a loan was extended to you?

A.     Yes, it -- I don't recall exactly when in 2012 because we were talking about it and the one thing that -- that he wanted to make sure was, which he had never been in the car business and he was learning about it, and he wanted to know that if he put money into the cars or invested money or loaned money to the business, how he would be able to be protected.

So I had expressed to him that, you know, there's floor plan companies.  I told him about those entities and how they do it, and he wanted to know about how to get -- like if he could lien titles and this and that.

I said, well, you can't as an individual, you cannot do that in the State of Florida because you have to pay sales tax, you've got to be registered to do that.

And we went back and forth on how to do it properly so that he knew that he was okay, and he came up -- they came up with the idea of the Auto Wholesale because by getting his dealer's license, then if I was going to do anything paperwork-wise over to Auto Wholesale, then he felt it was more protected as a dealer.

Page 81

But then we come to find out that after we -- we agreed to do it that way in '12, that -- and I didn't know this and I learned it, that in the State of Florida, a car dealer isn't supposed to own a car and put it on consignment with another car, and I learned that as well after the fact.  So --

Q.    Let me stop you right there.

You said a car dealer cannot own a car and put it on consignment, you said with another car.  Did you mean with another dealer?

A.    Yes, sir.  Yes, it's a very strict rule in --

MR. FELDMAN:  Objection, Your Honor. Mr. Zankl is a fact witness, he's not an expert witness.

THE COURT:  Sustained.

BY MR. BRESLIN:

Q.    All right.  Is it your understanding as a person that's been in the automobile business for at least the last 12 years, that you are not permitted as a automobile dealer to consign a car to another dealer?

MR. FELDMAN:  Objection improper opinion.

THE COURT:  Overruled.  You can -- you can testify as to your understanding.

THE WITNESS:  Yes, it -- it's -- it's

Page 82

actually in the dealer handbook.  It's -- it's in the handbook, it says it, and it's just specifically --

THE COURT:  I think -- I think yes was enough.  Go ahead.

BY MR. BRESLIN:

Q.   All right.  So were you licensed?

A.   Yes.

Q.   All right.  So you, at that time in 2012, you had a license to sell automobiles to the public?

A.   Yes.

Q.   All right.  Did Mr. Farache, on or about that time, get a license to do the same thing that you're aware of?

A.   He did in -- I'm not sure when in '12, but he did get the license, and I think when he first got it, I'm not a hundred percent sure, but I believe it was a wholesale license to start off with to do just wholesale.

Q.   All right.  So how did the relationship with Mister -- with you and Mr. Farache progress then from 2012 over the years, and try to explain it with as much detail as you can.

A.   Well, when he made the first initial investment in '12, it was towards the end of '12, I believe, each year as the business was growing, and the name was growing, and the number counts, the sales,

Page 83

everything, the revenue was growing, and it was -- there was a need for more inventory, and being a used car independent dealer, which is what I was, which is -- it's a VI license, vehicle independent license, it's very, very difficult to get traditional financing, a bank.  They tend to just want to do loans for car dealers if you have what's called a flag, which is a new car franchise.

So I kept trying to meet with different banks, I wasn't having any success, kept getting turned down just because of my license.

So Mr. Farache kept offering to increase his investment, which he did, and his investment, it just kept growing, and his loan just kept growing and growing and I think it capped out, if I remember correctly, 2016 or '17 is when it capped out.

Q.    All right.  When you say, "capped out," what do you mean?

A.    He had in -- in loan to the store, I believe it was between six and seven million.

Q.    All right, and that was in 2017?

A.    I believe so.

Q.    All right.

A.    It might have been '18, but it was within that timeframe.

Q.    All right.  So up until 2017, you're saying

Page 84

that there was six or $7 million in loans extended from Mr. Farache, and was that without paperwork?

A.    No, we had -- we had paperwork.

Q.    All right.  Prior to 2017 or in 2017?

A.    I believe there was promissory notes that were done prior to '17.

Q.    Okay.  Would you pull up Number 40, please, Daniel?  All right.  Go to the first page, please.

This -- take a look at Exhibit Number 40. This has already been admitted into evidence, which purports to be a promissory note for two and a half million it's dated November 2017.

So take a look at that, please.

A.    Is there a way to make it a little bit bigger, please?  Oh, thank you.  Yes.

Q.    All right, and so you're saying that there were notes prior to this note?

A.    I believe so, there was, yes.

Q.    All right.  Have you been able since this -- any of the lawsuits have commenced, to locate any of those old notes?

A.    No, I don't have the e-mails, the Excell e-mail was taken.

Q.    Okay.  All right.  So in 2017, there was a promissory note signed, and with that promissory note did

Page 85

you understand that there was a security agreement?

MR. MILLER:  Objection, leading.

THE COURT:  I'll give him some leeway, overruled.  You can answer.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.    All right, and what is your understanding of what the security agreement was?

A.    The security agreement was I was personally signing and guarantying for the loan.

Q.    Okay.  Did -- did Mr. Farache, together with the promissory note, have a secured interest in any -- any assets or inventory?

A.    I believe that -- without seeing the security agreement, I believe the security agreement stated all assets of Excell Auto Group.

Q.    All right.  Do you want to scroll through that, Daniel?

A.    Can you enlarge it just a little bit?  Thank you.

Q.    So does this refresh your memory that there was a security agreement associated with the promissory note?

A.    Yes.

Q.    All right, and was it your understanding

Page 86

that the security agreement secured various assets of your companies to secure the money loaned?

A. Yes.

Q. All right. So in 2017 when this note was signed, did you believe that the assets, the cars you were selling, that Mr. Farache had a lien interest in them?

A. Well, if -- yes.

Q. All right. Now, at that time in 2017, you were operating under the company Excell Auto Group; correct?

A. Yes.

Q. All right. There were no other companies other than Excell Auto Group at that time; correct?

A. Correct.

Q. All right. So all of the debt that was incurred through 2017, which you've testified is at least five or six million, was with Excell Auto Group; correct?

A. Yes, yes.

Q. All right. All right. So what happened -- how did it work, that, you know, you owed him all this money, there's a promissory note that only says two and a half million, how did you deal with the rest of the money that was owed?

MR. FELDMAN: Objection, leading.

THE COURT: I'll give him some leeway,

Page 87

overruled.

THE WITNESS:  Well, I believe there's another agreement with this one, as well, for more money, but what -- what do you mean, how did we handle it?

BY MR. BRESLIN:

Q.    Well, there were -- weren't there notes for certain debt, and then other debt that there were no notes for?

A.    Yes, that's correct.

Q.    All right, and is it true that for the notes, that the interest rate was stated in the note?

A.    Yes.

Q.    And is it true that for the debt that did not have a note, there was another interest rate --

MR. FELDMAN:  Objection, leading.

BY MR. BRESLIN:

Q.    -- and a different interest rate?

THE COURT:  You can ask the questions in a slightly different way.  Sustained.

MR. BRESLIN:  Okay.

BY MR. BRESLIN:

Q.    Explain to the Court the nature of the debt that was not represented by a promissory note, as well as the interest rate.

A.    The -- the two -- there's two promissory

Page 88

notes, and I believe if you total up the dollar amounts of the two promissory notes, it's roughly 5.1 million and change, and then there was another -- I believe another million eighty thousand, and that didn't have a promissory note at that time, and that was -- because there wasn't an interest rate that was printed against that money, and all the money combined, I was required to get to that 30, 31 percent interest rate return.

Q.    All right.  So let me back up.  Is it your testimony that Mr. Farache wanted a 30 percent or 31 percent interest rate on all of the debt combined?

A.    Yes.

Q.    All right.  So correct me if I'm wrong, if there was, let's say, half the debt at 20 percent, then the rest of the debt would have to be higher than 30 percent to average out 30 percent for the entire debt, is that what you're testifying to?

MR. FELDMAN:  Objection, leading.

THE COURT:  Sustained.

BY MR. BRESLIN:

Q.    Well, explain how that exactly worked when there was -- there were notes on paper with a fixed -- fixed interest rates, and there was debt not on paper with a variable interest rate.

A.    Well, on the -- on the first promissory

Page 89

note, which I'm not sure if this is the first one, the payment that I was required to make each month for one of the notes was $31,250.

The second note, there was a payment that had to be made every month of $10,000, and those -- those were the two payments for the notes.

The other money that was loaned to the company was not on the promissory notes, it wasn't accounted for, and that was where the additional interest was paid on to get to that blend average of 30 to 31 percent.

Q.   And who was it that required that the total interest on all the notes was going to be 30 or 31 percent?

A.   I'm sorry, who?

Q.   Yeah, who required that interest rate?

A.   Moshe did.

Q.   Would you call up Number 45, please, Daniel?

All right.  I show you what purports to be -- this is Exhibit Number 45, which purports to be an invoice.  I'd ask you if you recognize it?

A.   Yes.

Q.   All right.  What is that exactly?

A.   That was -- that was one of the invoices that was e-mailed over.  It was e-mailed every month to

the girls in my office, and we'd cut a check for it -- for the interest for the 31,250.

Q.     All right.  So scroll through it, please, Daniel.

All right.  So you've seen approximately five pages of invoices for -- starting in February 2021 and going through April of 2022.

Do these documents appear to be copies of the interest invoices that you received from Auto Wholesale of Boca?

A.     Yes.

Q.     How often did you get these invoices?

A.     We got them every month.

Q.     And how often were they paid?

A.     Every month.

Q.     All right.  So is it your testimony that every month you paid $31,250 plus ten on the -- on the other note every month?

A.     Every single month, yes.  In fact, I think I supplied 48 months of these invoices with cancelled checks attached to them.

Q.     All right.  So that would have been just on the paper notes, $41,250 a month, and how much in interest was paid on the debt that was not reflected by a note every month?

Page 91

A.    I don't have the exact -- I mean, I don't have the exact dollar amount.  Just all the blend average, the 41,250, plus the additional interest in the other million eighty combined had to get to that 30, 31 percent.

Q.    All right.  Well, you made -- did you make the payments?

A.    Yes.

Q.    All right.  So you can't estimate what those payments were on a monthly basis that you actually paid?

A.    Well, I know the total was -- the total payments when it got to fully -- when he was fully funded into where he was done, capped the line of credit he gave me, the loan, we were sending out right around 150,000 to 160,000 per month.

Q.    And all of those payments were interest payments?

A.    Yes.

Q.    All right.  So let's take us to 2021.  What happened in 2021 with your businesses?

A.    What happened?

MR. MILLER:  Objection to the question, Judge.

THE COURT:  That's really open-ended, but your objection is?

MR. MILLER:  There's no -- it's like so

Page 92

broad, you don't know what he's asking.

THE COURT:  What happened in 2021, we had the pandemic, it was still ongoing.  Maybe you can ask a more narrow question.

MR. MILLER:  You missed COVID, I mean.

THE COURT:  Well, no --

MR. BRESLIN:  Well, I didn't want to make it --

THE COURT:  Well, that depends on who you ask, Mr. Miller.  Go ahead.

MR. BRESLIN:  I didn't want to lead him, Judge, so I'm trying to be very careful here.

THE COURT:  Go ahead.

MR. BRESLIN:  Okay.

THE COURT:  Maybe a little bit more -- more specific than that.

MR. BRESLIN:  All right.  I'll try to find a happy middle ground.

BY MR. BRESLIN:

Q.    So let's -- let's go back to when you began to have conversations with the Karma companies.

A.    Yes, that was --

Q.    When was that?

A.    That was in the end of 2020 or actually, sorry, it was third -- yeah, third quarter of '20.  I had

Page 93

received notification from a few of my lenders in the car business, the most important thing besides having inventory --

MR. MILLER:  Objection, Judge, he's going beyond the scope of the question.

THE COURT:  Sustained.

THE WITNESS:  It is, I'm sorry.

THE COURT:  Sustained.

BY MR. BRESLIN:

Q.   All right.  What -- did you enter into a relationship with any companies to sell their cars?

A.   Yes.

Q.   All right.  What was the name of the company?

A.   Karma.

Q.   All right.  Explain to the Judge how that circumstance occurred, and what the arrangement was between you and the Karma companies.

A.   Yes.  As I was just saying, in -- in 2020, as an independent dealer, to have access to lenders to do loans for customers when they come in to buy a car, is a key to the business, and I got notification from my -- the current lenders that I had stating that they were going to be cutting off all independent used car dealers.

So I was getting very nervous and scared

Page 94

because without the lenders to offer financing for customers that walk into the dealership, I couldn't compete with any other stores, it put me out of business.

So right away I had to find a new car franchise, I had to become a new car dealer, and I didn't want to have the scope of big huge franchise, I still wanted it to be very boutique style.

I applied to four or five different franchises that were small and I didn't get them, and then I got approached by Karma, and I went out to California and met with them, and it was a great relationship and they offered me the franchises.

Q.     All right, and so when was that, exactly?

A.     That was the third quarter of '20.

Q.     All right, and so did there come a time when you entered into transactional paperwork with this Karma dealership parent company?

A.     Yes, we entered into a dealer agreement to become a dealer, new car dealer for them, representing them.

Q.     All right, and did you personally enter into that contract or did a company enter into that contract?

A.     That's a great question, the company, but the dealer is also responsible, so, I mean, it's both, but the company was the main agreement with Karma.

Page 95

Q.   Now, did your contractual relationship with Karma, the Karma companies, cause you to change the way that you conducted your business in any way?

A.   Not really.  I did make some internal changes, but nothing -- just dress codes.  I wanted everyone to dress a little bit nicer since we were becoming a new car store, but nothing really.

Q.   Did there come a time when you began to transition business from the Excell company to the Karma companies?

A.   Yes, January of '21.

Q.   All right.  Let's back up.  So after you entered into the agreement with the Karma entities, did you form one or more companies?

A.   We did.  We formed Karma of Palm Beach and Karma of Broward.

Q.   All right, and both of those companies were Karma dealers; is that accurate?

A.   Yes.

Q.   All right.  So now it's 2021 and explain to the Judge what, if anything, you did regarding Excell and the Karma -- the two Karma stores?

A.   Well, one of the things that Karma expressed to me was because Excell had been around for so many years and had a strong name in the industry nationwide, they --

Page 96

but they would not allow me to have the Excell brand owning or having a direct involvement in the Karma stores.

So I had to separate the entities, and I had let all my staff know that come January 1, all the retail deals going forward would be sold, bought and purchased out of the Karma stores moving forward after January of '21.

Q.   All right.  So what internal changes did you make at Excell and/or the Karma stores to effectuate that plan?

A.   Well, we had to, at that time come January of '21, the inventory and the assets needed to be transitioned over to the Karma entities because Excell, from that point on once that transition was done, was just going to be a name only, and we were going to keep the name in the background, just because that name was very well-known around the United States in the car business world, so I didn't want to lose it.  So we wanted to just keep it as a name only.

Q.   Okay.  All right.  So how did you go about transitioning the Excell inventory to become Karma inventory?

A.   The young ladies that ran my accounting office and inventory office, they were doing transfers from Excell over to the Karma entities, transferring

Page 97

ownership over to the Karma entities.

Q.   All right.  In what time period did that occur?

A.   So that started throughout the first quarter of '21, and it continued -- it continued probably until the summer of '21, and then it was pretty much -- it was pretty much done doing that transition.

Q.   All right.  So even though the -- now, when -- when Karma transitioned a car to one of the Karma companies, did Karma pay for that car?

A.   Yes, especially in the very beginning of '21, the young ladies in my office, they -- if they transferred a car from Excell to Karma for a hundred thousand -- they just did it for equal values, too, for whatever Excell owned it for.  If it was a hundred thousand dollars, then Karma would transfer a hundred thousand from their bank account to Excell's bank account.

Q.   Now, so in 2021, there were certain vehicles and/or customers in which Excell continued to do business with; is that correct?

A.   Yes, it just -- it was on a case by case.

Q.   All right.  Explain to the Judge why that occurred.

A.   So the only -- what I had told my staff was in '21 the only deal that Excell would do to an end user

Page 98

or retail customer, was if that individual had in the State of Florida what's called a tax credit that we were holding for them under the Excell tax credit number.

And what that means is if we bought a car from a client or he traded a car in or we bought from a customer, and the individual didn't take the money, he opted to leave the money into -- in our account and didn't take his cash, in the State of Florida, then the dealer is allowed to hold that tax credit for 12 calendar months from the date of the transaction, so they could buy a car in the future within those 12 months and utilize that number as a tax credit towards the future purchase.

So if we had those on our books going into '21, you cannot transfer a tax credit to another entity. So I had told the girls, those would be the only deals that should be transactional out of Excell, were the ones that we're still holding for tax credits.

Q. All right. Now, in 2021, approximately how many cars were bought and sold by either Karma or the Excell company?

A. On the Karma side -- well, Excell -- but on the Karma side, I believe, I mean, it was right around 560 cars, maybe, 562.

Q. Okay. All right. So you're aware, are you not, that various deal jackets were provided by

Page 99

Mr. Farache as discovery in the adversary case; correct?

A.    Yes.

Q.    All right, and did you have an opportunity to review those deal jackets?

A.    Yes, I looked at them.

Q.    All right, and in fact you studied them quite meticulously, did you not?

A.    Yes.

MR. FELDMAN:  Objection, leading.

THE WITNESS:  Sorry.

THE COURT:  Already answered --

MR. FELDMAN:  Already answered.

THE COURT:  -- too late.  Go ahead.

THE WITNESS:  Sorry.

BY MR. BRESLIN:

Q.    And so let's talk about the -- the transactions between Karma and the end-user customer in 2021, and any paperwork transactions that existed in various deal jackets, okay?

A.    Okay.

Q.    Do you understand what I'm -- what I'm talking about?

A.    Yes.

Q.    All right.  So in 2021 for all of the cars, did Karma buy the car and sell the car if it wasn't an

Page 100

Excell car?

A.   Yes.

Q.   All right.  In 2021, did AWB ever sell a car to an end user that you're aware of?

A.   Not that I'm aware of, no.

Q.   All right.  So for every car that Karma purchased in 2021, Karma would have been the seller of that car; correct?

A.   Yes.

Q.   All right.

A.   Except for the couple of cases that I talked about earlier with Excell.

Q.   With Excell.

A.   Just a couple, yeah.

Q.   All right.  Now, when I say Karma, I mean Karma collectively, I mean Karma of Palm Beach and Karma of Broward, okay?

A.   Yes.

Q.   Okay.  Just so you understand.

All right.  Now, you're aware, are you not, that there are numerous deal jackets where Karma would -- in 2021, where Karma would purchase a car --

MR. FELDMAN:  Objection, leading.

BY MR. BRESLIN:

Q.   -- and Karma would sell a car --

THE COURT:  Hold on, he's not done with the question.  Go ahead.

MR. FELDMAN:  Sorry.

BY MR. BRESLIN:

Q.    -- where Karma would purchase a car and Karma would sell a car, and then there was paperwork that was generated to show a buy/sell between Excell and AWB; correct?

MR. FELDMAN:  Objection, leading and foundation.

THE COURT:  Sustained, and frankly, by the end I was lost.  So --

MR. BRESLIN:  Well, these documents are already in evidence.

THE COURT:  Okay.  So ask a question --

MR. BRESLIN:  All right.

THE COURT:  -- or two.

BY MR. BRESLIN:

Q.    All right.  So let's -- let's just go through them.

Let's pull up 48, please.  All right.  So stop right there.

So this green -- what does this green jacket mean to you?

A.    That is a -- it's a deal jacket.

Q.   All right.  Is it a Karma or Excell deal jacket?

A.   No.

Q.   All right, and whose deal jacket was it?

A.   I believe that's an AWB deal jacket.

Q.   All right.  You, in fact, had an opportunity to review well over a hundred AWB deal jackets, did you not?

MR. FELDMAN:  Objection, leading.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.   All right.  Did they all have green covers?

A.   Yes, they did.

Q.   All right.  Scroll -- let's scroll down.  All right.  Stop right there.

What's the document that's on the -- on Page 3 of our Exhibit 48?

A.   Can you make it just a little bigger?

MR. FELDMAN:  Objection, it calls for speculation.

THE COURT:  What?

MR. FELDMAN:  I said it's speculation, Judge.  He's asking what -- what's this -- he's asking him to speculate about our corporate record.

THE COURT:  Can you just repeat the question for my benefit?

MR. BRESLIN:  Yes.

THE COURT:  You were asking what the vehicle is?

MR. BRESLIN:  No, I'm asking what the document on the screen is.

THE COURT:  Overruled.

BY MR. BRESLIN:

Q.   Go ahead.

A.   That is a wholesale purchase agreement from Auto Wholesale of Boca to Excell Auto Group.

Q.   All right, and do you see that it's not dated?

A.   Yes.

Q.   And do you see that this appears to show that Auto Wholesale of Boca is -- is selling a car to Excell Auto Group; correct?

A.   Yes.

Q.   All right.  Let's scroll down, and do you see there's no odometer disclosure statement on that paperwork?

A.   Yes.

Q.   Is that irregular?

A.   Well, if a car dealer, one of the

Page 104

responsibilities that we're -- that we're taught, and it's actually -- it's -- once again, it's in the dealer handbook, and it's actually a federal law, that whenever a dealer sells a car to another dealer or an end user, you have to, have to, have to, have to have the odometer disclosure statement with the mileage and the date that the transaction happened because that's how the DMV tracks the mileage, that's how they keep it correct --

Q.    All right.

A.    -- through the computer systems.

Q.    All right.  Let's move to the next page, please.

All right.  What does that appear to be?

A.    That -- that's an invoice.

Q.    All right.  So that appears to be Auto Wholesale of Boca invoicing Excell Auto Group for 253,750 -- $253,750 on or about 10/25/2021; correct?

A.    Yes.

Q.    And that would be for the Lamborghini that we just looked at that -- that blank buy/sell agreement; correct?

A.    Yes.

Q.    All right.  Let's go to the next page.

All right.  This appears to show that this, on or about that same date, $250,000 was supposedly paid

Page 105

by Excell Auto Group to Auto Wholesale of Boca; correct?

A.    Yes.

Q.    All right.  Do you know whether or not that payment occurred?

A.    If you were to scroll down a little further, I could tell you a hundred percent.

Q.    All right.  Let's stop right there.

All right.  So this appears to show --
all right.  Take a look at this document.

THE COURT:  Hold on, hold on.  He just asked you to scroll down further on a one-page document, I think, which I thought was fully visible.

I'm trying to figure out whether there was a question that was answered or not answered.

MR. BRESLIN:  Okay.  Let's go back to the prior page, please, Daniel.

THE COURT:  You asked him if the payment was actually delivered, and he said scroll down I'm not sure to what?

BY MR. BRESLIN:

Q.    Did you mean scroll down to another page?

A.    Yes, in -- in the deal jacket there should be a copy of the AWB check written to Excell, and there's a word that would be on his check that I can say or tell you a hundred percent if my check was deposited or not.

Page 106

Q.    Okay.  Let's go to the next page, please.

All right.  So what does this show?

A.    That's a wholesale order from Excell Auto Group to Auto Wholesale of Boca.

Q.    All right.  So this appears to show that on 9/10/2021, Auto -- Excell Auto Group sold the very same vehicle that we just saw in the -- on the prior transaction to AWB; correct?

A.    Yes.

Q.    All right, and that sale price is for $250,000; correct?

A.    Yes.

Q.    All right.  Now, this one has an odometer statement on it, doesn't it?

A.    Yes.

Q.    All right.  Let's -- let's back up one page, Daniel, please.

All right.  So it's -- so Excell -- so on 9/10 we have Excell is selling it -- excuse me.  Go down one, scroll down.

All right.  So on 9/10 we have Excell selling the car to AWB; correct?

A.    Yes.

Q.    All right.  Let's back up a page, and then on 10/22, we have Excell buying the car from AWB; correct?

Page 107

A.    Yes.

Q.    If this paperwork is accurate and legitimate; correct?

A.    Yes.

Q.    All right.  Back up one page, please, Daniel.  All right.  Scroll down, keep going.  All right.  Keep going, keep going.

What's this page that you're looking at, what does that reference, this payment for $3,750 on 10/25 that Excell purportedly paid to Auto Wholesale of Boca?

A.    That would be interest.

Q.    Now, it's -- it's referred to as profit.  Was it, in fact, profit?

A.    No, it was interest.

Q.    All right.  Keep scrolling, please.

All right.  Now, if you -- what does that document tell you?

A.    Could you enlarge it a little, please?  Anything specific that --

Q.    Scroll down, please.  Scroll down.  Stop.

All right.  Does this appear to show that Karma of Palm Beach purchased this vehicle on August 30, 2021?

A.    Yeah, yes.

Q.    Let's scroll down, please, and -- all right.

Page 108

Does this now appear that this vehicle was sold by Karma of Palm Beach to Road Rich Motors on September 13, '21?

A.    Yes.

Q.    Okay.  Keep going.  Is that the end of the -- all right.  Stop.

All right.  What's the -- what's the document on the screen right now?

A.    That is a Karma of Palm Beach wholesale order to Road Rich Motors.

Q.    Okay, and that would -- would that indicate to you that this vehicle was sold to Road Rich Motors on September 13, 2021?

A.    Yes.

Q.    Scroll down, next page.

UNIDENTIFIED SPEAKER:  That's the last page.

MR. BRESLIN:  That's it.

BY MR. BRESLIN:

Q.    All right.  So in this deal jacket, it would appear to show that on August 30, 2021, Karma of Palm Beach purchased the vehicle; correct?

MR. FELDMAN:  Objection, leading.

THE COURT:  Overruled.  He's already testified on this, we're just summarizing.

MR. FELDMAN:  Yeah, okay.

THE COURT:  Go ahead.

Page 109

BY MR. BRESLIN:

Q.    Is that correct?

A.    Yes.

Q.    And Karma of Palm Beach sold the vehicle on 9 -- on September 13, 2021; correct?

A.    Yes.

Q.    All right, and it also appears to show that on September 10, 2021, Excell Auto sold this same vehicle to Auto Wholesale of Boca; correct?

A.    Yes.

Q.    And it would also appear to show that on 10/22/2021, Auto -- Auto Wholesale of Boca sold the car back to Excell; correct?

A.    Yes.

Q.    All right, and that was for the same price; right?

A.    Yes.

Q.    All right, and so this paperwork from Auto Wholesale of Boca selling this car back to Excell on 10/21, that would have occurred, you know, five weeks after a customer drove away with this car; correct?

A.    Umm.

Q.    You can answer, don't worry about (inaudible).

A.    I don't -- I wouldn't -- by the paperwork, I

Page 110

don't know when the customer -- that's a dealer, by the way.  Road Rich Motors is another car dealer, and I don't know when he would have --

Q.    All right.

A.    -- taken the car.

Q.    All right.

A.    I don't know if he took it that day or he took it the following month.

Q.    All right.  Let me just rephrase.  The car was -- the car was sold -- AWB sold this car to Excell on October 22, 2021 for 200 -- allegedly for $250,000; correct?

A.    Yes.

Q.    And that would have been five weeks after title went to Road Rich Motors, who purchased that vehicle for $255,000; correct?

MR. FELDMAN:  Objection, leading, foundation.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  Well, the purchase agreement, yes, to Road Rich Motors, but once again, I -- I wouldn't be able to tell you when the title went to Road Rich Motors or when they actually picked up the car --

BY MR. BRESLIN:

Q.    All right.

Page 111

A.      -- but the bill of sale and the funding is that date, yes.

Q.      Okay.  Scroll up, scroll up, stop.

Okay.  Do you see that page?

A.      Yes.

Q.      When did title go to Road Rich?

A.      September 13, '21.

Q.      Okay.  So you -- this is -- this is a 2021 deal jacket; correct?

A.      Yes.

Q.      All right.  How many deal jackets did you look at from 2021 that are virtually identical to this, where a car is bought by a Karma entity, sold by a Karma entity, and then there's intermediate paperwork that could not possibly have occurred?

MR. FELDMAN:  Objection, leading, foundation, argumentative.

THE COURT:  Why don't you rephrase the question?

MR. BRESLIN:  All right.

BY MR. BRESLIN:

Q.      Did you review the 2021 deal jackets?

A.      Yes, I did.

Q.      All right, and there's approximately 127, 130 deal jackets; correct?

Page 112

A.      Yes.

Q.      All right, and would it be true to say that these types of transactions reflected in this deal jacket were standard in the deal jackets that you examined?

A.      Yes.

Q.      All right.  So what they appear to show is Auto Wholesale of Boca and Excell Auto Group engaging in paper transactions that were impossible; correct?

MR. FELDMAN:  Objection, leading, foundation.

THE COURT:  Sustained.

BY MR. BRESLIN:

Q.      How would you characterize the paper transactions between Excell and Auto Wholesale of Boca?

A.      The -- the paperwork that Moshe and -- well, actually, Moshe, I think, and Michele and Teddi came about to do this paperwork, was for them to track how much money they had invested and loaned with the business tied to the inventory amount.

So the paperwork was only just to recognize what -- what the store had in inventory because in '21, even though there's a bill of sale, there was never money exchanged back between the companies and the titles in '21 were never, ever, ever signed over to Auto Wholesale and from a dealer selling to another dealer, that's a

Page 113

requirement.

Any time a dealer buys a car or sells a car, by law the title has to go through their dealer license number and has to go through their books.

MR. BRESLIN:  All right.  Thank you.

All right.  Judge, all the sample deal jackets are -- are in evidence.  That was Number 48. These are 46 through 54, and they're in evidence, so we will save the analysis of those for our closing argument.

BY MR. BRESLIN:

Q.    Now, it is 2021, Karma is buying and selling cars; correct?

A.    Yes.

Q.    Now, in 2021, let's take the fall, how many employees did the Karma entities employ?

A.    Both -- both entities?

Q.    Well, you can talk about either one.

A.    Okay.  Let me just count real quick.  One, two, three, four, five, six, seven, eight, nine, ten --

MR. MILLER:  Your Honor, I apologize, what's he looking at?

THE WITNESS:  I'm counting on my hands, sorry.

MR. MILLER:  Oh, okay.  I thought he was looking at -- it looked like he was using a phone or

Page 114

something.

THE WITNESS:  No, no.  I was counting, I'm sorry.

MR. BRESLIN:  He's using his fingers.

MR. FELDMAN:  Now he's got to start over.

THE WITNESS:  Yeah, exactly.  We had around -- right around 23, 24 total.

BY MR. BRESLIN:

Q.    All right, and that was in both stores combined?

A.    Yes.

Q.    All right.  So what was your monthly overhead expenses just to run the stores, if you never sold a car?

A.    For fixed, fixed expenses?

Q.    Yeah, if you can estimate.

A.    I mean, it changed, but -- it changed throughout the years.  I'd say, if you want to go by '21?

Q.    Yeah, '21, fall of '21.

A.    '21, right around 200,000 a month.

Q.    Okay.  Now, was Karma in the business of buying and selling cars for the same amount of money?

A.    No.

Q.    All right.  Now, is it true that while you were evaluating the deal jackets, that you encountered

many, many transactions where Karma would sell a car for the same amount of money that it purchased?

A.   Yes.

Q.   All right, and did you encounter many, many transactions where Excell Auto Group sold a car for the same amount of money that it purchased it for?

A.   Yes.

Q.   All right.  Now, in your business, in your actual legitimate business, was it ever your business model to purchase a car and sell a car for the same amount of money?

A.   No.

Q.   If we see a deal jacket where Auto Wholesale of Boca or Karma of Palm Beach purchased a car for a certain amount of money, and sell that car for the exact same amount of money, either Excell Auto Group or AWB, was that a legitimate business transaction?

MR. FELDMAN:  Objection.  Leading, foundation, argumentative.

THE COURT:  Overruled on each count.  You can answer.

THE WITNESS:  No.

BY MR. BRESLIN:

Q.   What -- all right.  So what you do know is that there are scores of deal jackets that have that

Page 116

exact -- that exact transaction; correct?

A.    Yes.

Q.    All right, and explain to the Judge what exactly those transactions were in reality, not on paper, but in reality?

A.    Like I said earlier, it's -- it's -- he had at that time -- I'm just going by '21.  So he had at that time somewhere between six and seven million that he had loaned the business, and to see exactly where the money was, the girls devised this plan and came up with an idea that we would give them a bill of sale showing that the cars were there at the dealership, and it was just paperwork to monitor the inventory.  It changed on a daily basis.

The inventory was never transitioned or sold to AWB at any point in time, they were just there to keep track of how much money that he had loaned and how much money that I was using of that money towards cars.

And the girls would -- every time we sold a car, we -- the girls would give him a new bill of sale if his money was used for it, and he would give me a bill of sale back from the car that we sold if his money was used in it, but the title and ownership was never transitioned over to AWB.  It was more of a collateral, like a floor plan, which in a floor plan traditionally they don't ever

Page 117

take ownership, they have a lien, but not ownership.  It's a difference.

So that is just how the girl wanted to keep track of the fluctuations of inventory and the collateral.

THE COURT:  By "him" --

BY MR. BRESLIN:

Q.    All right.

THE COURT:  Hold on, just so the record is clear.  By "him" you mean?

THE WITNESS:  Mr. Farache and -- and Michele Martin.

BY MR. BRESLIN:

Q.    All right.  Now, did there come a time in late 2021, where you had a conversation with Mr. Farache regarding the debt that was owed to him?

A.    Yes, it was towards the end of November, beginning of December.

Q.    All right.  Explain to the Judge exactly what happened regarding that conversation.

A.    We were -- we were having some issues in -- started probably in September.  The interest payments were being made, no problem, every month, not an issue.

The additional payments were not coming as fast as they were supposed to.  They were still being made every month, but not in the beginning of the month like I

was supposed to.

Q.    All right.  When you say additional interest payments, what do you mean?

A.    On that additional million eighty thousand.

Q.    The unwritten -- the unwritten loan?

A.    Yes, sir, yes.

Q.    The one that, together with the written loan, had to be 30 percent?

A.    Yes.

Q.    All right.  Go on.

A.    So I went to Moshe, because at that time I think we had been doing this for eight years, I believe, and I went to him and I said look, I've got the Karma entities and I'm opening a second location in Broward.

I said, I'm currently behind on -- on money right now, and I have a debt to you that I -- I'm behind. I said, but I'm going to make it up, and when I get the new store opened in Broward, between the two dealerships, the cash flow based on the analysis and projections that we did, and my accountants did, I can catch up quick.  And he got mad, extremely mad, and stormed out of the store.

And then we had another meeting that he wanted to have with Michele and myself and him, I think it was the second week in December, and then he wanted to change up the procedures going forward until I could get

him caught -- until I could get the money caught up.

Q.   Did there come a time when you were actually threatened?

A.   Yes, yes, I was.

Q.   All right.  Tell the Judge exactly what it was and when it was.

A.   It was during that conversation in November. I was in -- I was in my office, and I was telling him about it.  I didn't think he was going to handle it that way.  I didn't think he was going to lose his mind like he did.

And what made me the most nervous was when he said what he said to me, it was very calm, he wasn't -- he wasn't yelling at me, he wasn't -- at that point he stopped yelling, and he was just very calm, and he just said you need to make sure that you make good on this and that the money is paid back.

He goes, I have responsibilities to other people that have loaned me money that I have in this with you, and he said, please, I don't want to go back to the old days, but I can just make you disappear, chop you up, take you to the Everglades, and the alligators will have you, and -- but it was very eerie how calm and it just wasn't right.

Q.   All right.  Did that scare you?

Page 120

A.    Yes.  I mean, I don't want to say that I can't take care of myself, but yeah, that -- that -- that made me -- that's the first time in my life that anyone has ever said something like that.

Q.    All right.  Okay.  Now, in -- in November or -- or about November, did you enter into any negotiations with -- with the Phoenix Company?

A.    Yes, I believe I started talking to FVP Phoenix in -- I don't recall if it was November or December, but it was in '21.

Q.    Okay.  Now, talk to the Judge and explain to the Judge exactly how that occurred, that you were seeking a loan from FVP.  How did that happen?

A.    Well, when I -- one of the things when I got the Karma franchises that I was excited about, was all the lenders that I was doing business with at that time, just they were doing customer loans.  I thought that because it's a new car franchise, I thought I'd be able to get a floor plan, which is what every dealer wants, a traditional floor plan at a reasonable bank rate.

Well, when I contacted the lenders who I had and I said, I've got the franchise, I'm all signed up and I want to apply for the floor plan, all the lenders told me that I couldn't do it.

I said why?  They said well, Scott, there's

Page 121

two divisions of the bank, there's one bank that does commercial lending --

MR. FELDMAN:  Objection, Your Honor, it's pure hearsay at this point.

THE COURT:  It might be useful if you testify based on what your experience is rather than describing everything in terms of what people said, do you understand?

You are telling a story as a dialogue and it's useful to just answer the question without doing that, if you can.

Can you reask the question, please?

MR. BRESLIN:  Of course.

BY MR. BRESLIN:

Q.    All right.  What I would like you to tell the Judge is, how did you -- and try not to, you know, talk about what other people said to you, how did you come to negotiate or begin negotiations with FVP for financing?

A.    I just -- I -- I ran out of choices because I thought I could get the floor plans, being a new car store, and I couldn't, and then I met a gentleman that was a broker that does financing and establishes lines of credit for companies, and I met him and he's the one that brought me and introduced me to FVP.

Q.    All right.  Let's put 31 up, please, Daniel.

All right.  This document appears to be a -- both a UCC filing that was made in July of 2021, it's already admitted into evidence.  Scroll down, please. Keep going.  All right.  Is that all of it?  Keep going.

Okay.  So please -- please take a look at what's on your screen.  This document is already in evidence.  It purports to be a UCC termination, November 11, 2021, where Auto Wholesale of Boca is terminating a UCC filing that it had made on the Karma entities' assets.

A.    Yes, I see that.

Q.    All right.  Did that termination -- was that termination a result of -- of anything that -- any conversations you had with FVP?

A.    Yes, it did.

Q.    All right.  Explain to the Judge why that termination occurred.

A.    Well, when I -- when I applied to FVP and sent in my documentation, they ran a UCC search on the business before we got started, and they -- FVP is the one who told me that Mr. Farache, AWB, had filed a UCC on the Karma entities.

MR. FELDMAN:  Objection, Your Honor, move to strike.  He's doing hearsay again.

THE COURT:  Granted.  If you could focus on

the answer without describing it as so and so said, and so and so said.

THE WITNESS:  I just didn't know -- yeah, I didn't know that these UCCs were filed.

So when they -- I asked Mr. Farache, I told him I was getting the loan with FVP, FVP would not move forward with anything until these UCCs were removed.

BY MR. BRESLIN:

Q.   All right.  So is it your understanding that Mr. Farache, in fact, removed that UCC in response to your request?

A.   Yes.

Q.   All right, and what you see on this screen, is that the termination that you believe occurred because you asked him to terminate it so you could continue your negotiations with FVP for financing?

A.   Yes.

Q.   Did your negotiations with FVP continue in December?

A.   Yes.

Q.   All right.  Did you expect to be funded in December?

A.   Yes.

Q.   All right, and was that funding delayed?

A.   Yes.

Page 124

Q.   All right.  Did there come a time when you understood that the funding with FVP was going to occur on January 26th --

MR. MILLER:  Objection.  Leading.

BY MR. BRESLIN:

Q.   -- 2022?

THE COURT:  I'll give him some leeway, overruled.  Go ahead.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.   All right.  Would you please pull up Number 32, Daniel?

All right.  So -- enlarge this, please. This is Exhibit 32.  This is not of record yet and I'd like you to take a look at it carefully and describe for the Court exactly what this is.

A.   It's an e-mail from -- from Moshe to myself, it looks like Lisa, Scott Gherman, Nidia, Teddi and Michele Martin.

Q.   Okay, and please read it.

A.   The subject says, temp loans, and then it has attachments, Auto Wholesale inventory report dated 1/18/22; MMS loan; AW.EES loan, 1/18/2022; short-term loan inventory report dated 1/18/22; Excell inventory report dated 1/18/22; outstanding loans as of 1/18/2022.

Page 125

Q.   All right.  Continue to read it, please.

A.   "Please see the attached documents.  Thank you, Moshe."

Q.   Do you recall getting this e-mail on or about January 18, 2022?

A.   Yes.

Q.   All right.  Let's scroll down to the next page, please, Daniel.

All right.  Now, there were documents attached to that e-mail; correct?

A.   Yes.

Q.   And they were just -- they were just described, were they not?

A.   Yes.

Q.   All right, and one of the documents that was described was the Excell Auto Group inventory document; correct?

A.   Yes.

Q.   All right.  The document that you see on your screen, you received similar documents to this on numerous occasions; correct?

A.   Yes.

Q.   All right, and were these documents created by Mr. Farache and/or his representatives, Michele Martin?

A.   I believe Michele Martin.

Page 126

Q.   Okay.  But they certainly came from AWB; correct?

A.   Yes.

Q.   All right, and so this -- this Excell Auto Group inventory lists various cars; correct?

A.   Yes.

Q.   All right.  Now, when this was sent to you on -- on January 18, 2018, in fact, Excell Auto Group did not own these cars; correct?

MR. FELDMAN:  Objection, leading.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  Correct.

BY MR. BRESLIN:

Q.   All right. All right.  Let's go down to the next page, please.  All right.  Well, let's go back up for one moment.

All right.  So take a look at the bottom right and it says, total inventory credit line, open credit line.  Do you see where it says that?

A.   Yes.

Q.   All right.  So what was your understanding of what those words and numbers meant?

A.   That was what I had to utilize.  It was a line of credit.  I had 2.5 million on that line.

Q.   Okay, and that line was the Moshe line?  Do

Page 127

you know which line that was?

A.   What -- what do you mean?

Q.   Was there a name for that particular line of credit because there were several names, was there not?

A.   No, it just was under -- it just was titled the Excell Auto Group.

Q.   Okay.  All right.  So was it -- was it your understanding that when you see credit line and open credit line, that was money that you owed on a loan to AWB?

A.   Yes.

Q.   All right.  Let's go to the next page and -- all right.  So try to blow that up.  Good.  All right.

So please explain what is on the screen.

A.   That is the other line and that was categorized as Auto Wholesale.

Q.   Okay.  Now, was it your understanding that these spreadsheets were created by Michele Martin to express to you what cars she believed were covered under certain loans?

MR. FELDMAN:  Objection, foundation.

THE COURT:  Sustained.

BY MR. BRESLIN:

Q.   All right.  Look at the document and let's just start at the top and tell the Judge what you -- you

Page 128

believe it meant, and what you believe they thought it meant.

MR. FELDMAN:  Objection, speculation.

THE COURT:  Let's start with the first question.

THE WITNESS:  Could you repeat it?  I'm sorry.

BY MR. BRESLIN:

Q.  Yeah.  What -- what did this document mean to you?

A.  It was just a way for -- for -- this document was to track how much money they had loaned and how much money I had out, and it was -- they were tying it to cars.

Q.  Okay.  So when you see the phrase first credit line, was it your understanding that that was money that was owed to AWB?

A.  Yes.

Q.  And when we go down to the second line, where it says total credit second line, is it your understanding that 1.664 million was money that was owed to AWB?

A.  Yes.

Q.  Okay.  Now, let's -- let's go down and let's take a look at that right -- the -- the words on the

Page 129

bottom right.  Let's blow those up.

And do you see where there is like an accounting there regarding various loans that were alleged to be owed by either you or your companies?

A.   Yes.

Q.   All right.  So we have 2.5 million for the Excell line, 2.6 million for the Moshe line, and then there are other lines and other loans that total to 7.594 million; correct?

A.   Yes.

Q.   Was it your understanding that this document was stating to you that that's how much money you owed?

A.   Correct.

Q.   And you received documents like this frequently, did you not?

A.   Yes, just about every week.

Q.   Okay.  All right.  Let's go to the next page.  All right, and this -- this page shows the accounting on two other loans; correct?

A.   Yes.

Q.   All right.  Did you understand this statement to you as money that it was alleged that you owe?

When I say, "you," I mean either Excell or one of your other companies?

A.    No, it was only Excell, but yes.

Q.    All right.  So all of these -- all of this debt was Excell debt and only Excell debt; right?

A.    Yes.

Q.    All right.  Let's scroll down, and the short term Excell Auto Group inventory loan, what's that all about?

A.    It just additional money that was borrowed.

Q.    Okay.  So different -- different loans I assume given to you at different times were given different names, is that your understanding?

A.    Yes.

Q.    All right.  Let's go to the next page.

All right.  So let's blow this up.  Now, you received this -- this document, did you not?

A.    Yes.

Q.    All right, and you received this document on January 18, 2022 in this e-mail Mr. Farache; correct?

A.    Yes.

Q.    All right.  Please read it.

A.    "Excell Auto Group, Karma of Palm Beach, together with Scott and Kristen Zankl hereby acknowledge the following outstanding Auto Wholesale loans secured by the attached inventory."

Q.    Keep reading.

Page 131

A.    "Loans labelled as $2,664,450 Auto Wholesale/Moshe's line; 2.5 million Auto Wholesale/Excell line; 1,080,000 MMS line, locate cars; 300,000 AW/EES line locate cars; 650,000 Karma Palm Beach short-term loan for '21 Ferrari, VIN Number ZFF97CMA4M0261176; then 400,000 Karma Palm Beach short-term loan for a 2019 Ferrari ZFF90HLA8K0245966."

Q.    Okay.  Please read the rest of it.

A.    "Within five days of closing your line of credit on January 26, 2022, Auto Wholesale will require repayment in full of some of the loans as follows: Return of the MMS locate loan of 1,080,000; return of the $440,000 1001 line, which is included as part of the 2,664,450; number three, return of the AW/EES locate loan of 300,000."

Q.    All right.  Scroll down to the next page, please.  All right.  So and then there were signature lines; correct?

A.    Yes.

Q.    All right.  Scroll back up, please, blow it up.  Now scroll down.

        The credit line that you were closing on January 26, 2022 was with who?

A.    With FVP.

Q.    Okay, and did Mr. Farache, to your

knowledge, know that you were closing the loan with FVP on January 26, 2022?

A.   Yes.

Q.   All right.  In fact, Mr. Farache was provided with all the FVP loan documents, was he not?

A.   Yes.

Q.   And it was the conversation with Mr. Farache about getting the FVP loan that caused him to terminate the UCC on the Karma companies; correct?

A.   Yes.

Q.   Now, while we're talking about it, this return of the MMS locate loan, what was the locate loan?

A.   That was -- the million eighty was additional capital that a lot of -- most of -- a lot of the interest was paid on against that.

Q.   All right.  So say that a little slower and articulate it a little more clearly.  Is the locate loan referenced in this document, is that the unwritten loan that -- for over -- for a million eighty thousand that the interest rate was paid on in a rate to average out to 30 or 31 percent?

A.   Yes, it was.

Q.   All right.  So what they call the locate loan here, was, in fact, the -- the high interest unwritten loan; correct?

A.   Correct.

Q.   All right.  Now, there are references from time to time about locate deals; right?

A.   Yes.

Q.   What was a locate deal?

A.   Well, categorized for this or --

Q.   What -- what -- what in reality, in your relationship with Mr. Farache, was a locate deal?

A.   That was just the terminology that was used to secure the interest so that it wasn't straight up interest on a contract or a document, because then it would have put it above the 25 percent.

Q.   All right.  Put it -- put it in English.  What was the locate deal?

A.   Well, a traditional locate deal.

Q.   I'm not asking what a traditional locate deal is --

A.   Oh.

Q.   -- I want to know what the locate deal was with Mr. Farache.

A.   There wasn't one, it was just a way to pay him the interest.

Q.   All right.  So the references to locate deals, and money being paid, was simply you paying interest rates that exceeded the lawful rate; correct?

A.    Yes.

Q.    So in -- in -- would we be able to find a VIN number associated with any locate deals?

A.    No.

Q.    All right.  Scroll down.  Keep going. All right, and let's just go slowly.

Does this appear to be an e-mail back to you on January 24th with signed documents?

A.    Yes.

Q.    Scroll down, please.  Scroll through them slowly one by one.  All right.  Scroll up one.

Now, this was not a page that was attached to the prior e-mail, but this is attached to this e-mail; correct?

A.    Yes.

Q.    All right, and you signed all of these documents, did you not?

A.    Yes.

MR. BRESLIN:  All right.  At this time I would move Exhibit 32 into evidence, Your Honor.

MR. FELDMAN:  No objection.

THE COURT:  Movants' Exhibit 32 is admitted.

(Thereupon, Movants' Exhibit Number 32 was admitted into evidence.)

Mr. Breslin, let me know when it's

Page 135

appropriate to lunch break.

MR. BRESLIN:  This would be a good time, Judge, I'm going to go into the FVP documents at the moment.

THE COURT:  Very good.  All right.  We'll take a break for an hour.  We'll come back -- we'll resume at 1:20.

Mr. Zankl, you're instructed not to discuss your testimony with anyone during the break, do you understand.

THE WITNESS:  Yes, sir.

THE COURT:  Anything I need to know before we depart?

THE WITNESS:  Can I ask you a question, Judge?

THE COURT:  Yes, sir.

(Recording ends.)

(Thereupon, a lunch recess was taken, after which the following proceedings were had:)

THE COURT:  Welcome back, everyone.  Are we all set, Ms. Leonard?

ECRO:  We're all set.

THE COURT:  Thank you.  Please have a seat in the courtroom.  Just a moment.

Let me know, do we have the record running,

Page 136

Ms. Leonard?

ECRO:  Yes.

THE COURT:  We do.  All right.  Very good.

Before we resume, Mr. Zankl, could you confirm that you remain under oath?

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.  Whenever you're ready.

MR. BRESLIN:  May I -- may I begin, Your Honor?

THE COURT:  Yes, please.

MR. BRESLIN:  All right.  Thank you.

BY MR. BRESLIN:

Q.    All right.  Mr. Zankl, did there come a time when there were closing transactional documents that were supplied to you by FVP?

A.    Yes.

Q.    And when was that?

A.    The closing documents?

Q.    Uh-huh.

A.    I believe it was in the beginning of January, I believe, to review them.

THE COURT:  2022?

THE WITNESS:  Yes, sir, 2022, yes.

BY MR. BRESLIN:

Page 137

Q.    All right.  Daniel, could you please bring up 33?

All right.  I'd like you to take a look at 33, which this purports to be the closing transactional documents that were executed between you and FVP.

A.    Yes.  Can you make it a little bigger, I'm sorry?  Thank you.

MR. BRESLIN:  Counsel, do we need to go through it?  Will you agree these are the transactional docs so I can move them into evidence?

MR. FELDMAN:  Can you just scroll down? Sorry.  Yeah, agreed.

MR. BRESLIN:  All right.  Great.  We won't need to go through them.  We will move Exhibit 33 into evidence.

MR. FELDMAN:  No objection.

THE COURT:  Movants' 33 is admitted, so that's a composite.

(Thereupon, Movants' Exhibit Number 33 was admitted into evidence.)

MR. BRESLIN:  Yes, that's all -- that's all of them, Judge.

THE COURT:  Right.

MR. BRESLIN:  Thank you.

BY MR. BRESLIN:

Page 138

Q.    All right.  So, Mr. Zankl, what was your understanding of the loan transaction documents with FVP?

A.    My understanding was they were doing a loan to the Karma entities for 7.5 million.

Q.    All right.  Now, tell me what changed in the -- in -- in 2022 when it came to how you and Mr. Farache structured your -- your transactions.

A.    Well, we had the meeting at the end of December and Mr. Farache, like I said, was -- I had told him that I was short, and that I was going to make it up once I got the store in Broward open.

And he said that he wanted to change the policies going forward in '22, whereas instead of just giving him a bill of sale and a check that was basically a voided check, and him vice versa, that he wanted me to give -- wanted my office to give him an actual bill of sale, and then sign the title over to AW -- to AWB, and then once the car was sold, then I would have to transfer that money back to AWB, and then AWB would sign the title back over to me.

Q.    All right.  So in 2022 -- let me ask a couple of questions about 2022.

In 2022, did Karma buy -- when I say Karma, I mean either Karma of Palm Beach or Karma of Broward, did Karma buy every car that came into the dealership?

A.    Yes.

Q.    All right.  So if we were to look at a -- a summary of all the purchases of vehicles that occurred in 2022, was one of the Karma entities the company that actually purchased the car?

A.    Yes.

Q.    All right.  So just so there's no confusion, when Karma purchased a car, did Karma use its own money?

A.    Yes.

Q.    And thereafter, there was some transactions with AWB; is that correct?

A.    Yes.

Q.    All right, and at whose requests were those transactions?

A.    Well, they were -- they were under -- in the meeting we had, Moshe wanted that done and I, in the beginning of '22 -- actually, sorry, it was the end of December of '21, I had told the young ladies that worked for me that handled the titles and all that stuff, I had four girls that did all that, and I said, guys, going forward in '22, whatever -- whatever Moshe needed or wanted or Michele, just do it.  Don't argue, don't talk back, don't fight, just do it, because I had told them that I was in the process of getting some financing in place to actually get him paid off and get him out.

Page 140

Q.    Okay.  Now, in 2022, did the transactions that happened between Karma, one of the Karmas, and customers, did -- I already asked you that the Karma companies actually paid the money for that; right?

A.    Yes.

Q.    All right.  So if we look -- if we look at those transactions for all the cars prior to when Mr. Farache took the cars, because, you know, let's just talk about what happened before he took the cars.  Let's have a line of demarcation, all the transactions before he took the cars, and then everything that happened after he took the cars.

Can we talk about that?

A.    Yes.

Q.    Okay.  So let's talk about before he took the cars, and -- and when did he take the cars?

A.    He took them on Friday, April 1st.

Q.    Okay, and we'll get to what -- exactly what happened on that date in a moment, but for all the transactions before he took the car -- before he took the cars, did one of the Karma companies buy every car that came into the business and sell every car that came into the business?

A.    Yes.

Q.    Okay.  So regardless of what happened with

Page 141

the paperwork or the titles or the money or transfers between the buy and the sell, whatever happened in between, did the Karma companies buy the car and did the Karma companies sell the car?

A.    Yes.

Q.    Okay.  Now, for many of those transactions in 2022, title was transferred over to AWB or Excell or money was transferred back and forth; correct?

A.    Yes.

Q.    All right.  Now, regardless of whether or not that happened, wherever the title went, wherever -- whatever money went back and forth, whoever -- whatever entity the title was with, were you authorized to sell those cars?

A.    Yes.

Q.    Okay.  So -- and how would it work then if in 2022 you bought a car, and then now -- then Excell sells it to AWB, and AWB sells it back to Excell, and then ultimately you've got a customer that comes in that wants to buy it, how would you get that title to that customer? How would that work?

A.    Can I use an example or --

THE COURT:  Sure.

THE WITNESS:  So if a customer came in and bought a car, let's just say a Mercedes, and it was

Page 142

$50,000, when the consumer bought the car, paid for the car and took the car, then the girls in my office would let AWB know that the car was sold.

Then they would wire transfer 50,000 over to AWB, and then that same day or the next day or could be within 48 hours, they would send over another car to Michele and Moshe, and then they would send back the $50,000 within a day or two.

BY MR. BRESLIN:

Q.   Okay.  So --

THE COURT:  Okay.  Hold on.  The word "they" appears twice in your testimony, and I don't know who you're referring to.

THE WITNESS:  I'm sorry.

THE COURT:  So if you can summarize again and use names.

THE WITNESS:  I'm sorry, Moshe and Michele Martin.

THE COURT:  You've got to do it all over again.

THE WITNESS:  Oh, okay.  Sorry.  So to use an example of a $50,000 car, if a consumer came in and bought it, paid us the money, took the car, my office, either Alana, Nidia or Teddi, would send $50,000 over to AWB, notify Michele Martin -- wouldn't notify Moshe, just

Page 143

Michele Martin, and then within a day or two either Nidia Teddi or Alana would send over a new car to Michele Martin, and then Moshe would send back the 50,000.

BY MR. BRESLIN:

Q.   Pull up Number 76, please.  All right. Scroll down.  I'd like you to take a look at the screen.

Mr. Zankl, this -- this appears to be transactions that were conducted by the Karma companies in 2022.  I'd like you to take a look at it and see if that seems familiar to you.

A.   I do recognize some of the -- some of the names and some of the deals, yes.

Q.   Okay.  All right.  So these would be transactions that occurred in 2022?

A.   Yes.

Q.   All right.  So if you -- if you recall, and I know you can't remember every deal, this would have been under the new protocol where titles went back and forth between Excell and AWB; correct?

MR. FELDMAN:  Objection, lack of foundation.

MR. MILLER:  Leading.

MR. FELDMAN:  He said he recalled some of them, he doesn't know if it's all of them.

THE COURT:  Understood, sustained.

BY MR. BRESLIN:

Page 144

Q.   All right.  Mr. Zankl, let's talk about money.  In 2022, did you still have a credit line?

MR. FELDMAN:  Objection vague, with who?

THE COURT:  Okay.  You can rephrase.

BY MR. BRESLIN:

Q.   All right.  In 2022, did you still owe Mr. Farache a substantial amount of money?

A.   Yes.

Q.   And was that substantial amount of money reflected in the same credit lines that he showed you in his e-mail of January 18th?

A.   Yes.

Q.   All right.  So how did it work with the credit line when you reached your limit and you needed more money?

A.   At a certain point, I don't know which date it was, but there wasn't -- there wasn't any, and you know, in fact, some of the -- there wasn't any on top of that.  It got to a point where there wasn't any more.

Q.   There wasn't any more what?

A.   Any more additional money for loans.

Q.   Okay.  All right.  So do you know when that happened?

A.   That's what I just said, I don't know the exact date.  It was towards the end of '21, beginning of

Page 145

'22.

Q.   All right.  So for you to get money from Mr. Farache or AWB, what did you have to do?

A.   Well, if it was over and beyond the amount of roughly the six million and change, there was periodic times when I would call Moshe and say, Moshe, I'm short, do you have a couple of extra bucks, this much money I need?

And he would say, okay, how long do you need it for?  I would tell him.  He'd send it over and that was it, and then I'd pay him back the principal and then the interest.

Q.   All right.  Now, do you recall testifying in your deposition that in 2022 before money was sent by AWB to purchase a vehicle from Excell in one of these transactions that happened, that money had to be sent to AWB first?

MR. FELDMAN:  Objection, leading. Mr. Breslin is effectively testifying now.

THE COURT:  He's asking what he testified previously, overruled.

MR. MILLER:  Improper.

MR. FELDMAN:  Improper refreshing of recollection.

THE COURT:  That's true, sustained.

Page 146

BY MR. BRESLIN:

Q.   Okay.  Did AWB require that money be sent to it before it sent money to Excell?

A.   Yes.

Q.   Okay, and --

THE COURT:  Did you mean to say Excell in that question?

MR. BRESLIN:  Yes.

THE COURT:  Okay.

BY MR. BRESLIN:

Q.   All right.  Now, just to clarify.  All the money that went back and forth in 2022, other than for a couple of transactions, were by and between AWB and Excell; correct?

A.   Yes.

THE COURT:  Thank you.

BY MR. BRESLIN:

Q.   All right, and did you -- was it your understanding that the money went back and forth, the buy/sell happened between Excell and -- and AWB, for a reason?

A.   Yes.

Q.   And what was that reason?

A.   Well, it was, as I stated, he -- until I got caught up with the money that I was behind, he wanted to

do it this way because he felt it -- it gave him more protection.

Q.   Against who?

A.   Against, well, me and then he wanted -- he wanted also to make sure that everything went through Excell because he knew that he had released the UCCs on the Karma stores and knew that I had the loans with -- the loan with FVP.

Q.   All right.  So he was aware, as far as you know, fully aware that FVP had a security interest in the Karma collateral; correct?

A.   Yes.

Q.   All right, and was it your understanding that that is why all of these transactions occurred?

A.   Yes.

Q.   All right.  Now, are you aware of any of these transactions where Karma would buy a car, and then Karma would either transfer and sell a car to -- to Excell, and then Excell would sell the car to AWB and back again, are you aware of any of those transactions in 2022 when the price was different in any of those transactions?

A.   I -- I -- I do remember one transaction, I just -- I can't recall the customer's name.  But there was one transaction where we -- we bought a car for 250, and girls in my -- and Alana, I think it was Alana that

e-mailed Michele to give them the car for 250 against my line, but at that time, I only had 185,000 available.

So she e-mailed back, Michele to Alana, saying you only have 185 available, so we can only do it for 185, so we changed the bill of sale from 250 to 185.

Q.   Okay.  So the price in that -- for that particular car was -- had nothing to do with the value of the car, it had everything to do with -- with the amount of money you had available on the credit line?

A.   Yes, that's true.

Q.   All right.  So that was one transaction out of how many in 2022?

A.   Probably 75, I'm guessing, 60, 70 transactions.

Q.   Now, we're -- we're talking about what happened before April 1st; right?

A.   Yes, yes.

Q.   Okay.  Now, tell me what happened on April 1st.

A.   April 1st, I -- my wife had gotten a call from one of my guys that was a partner, and an investor, and loaned money to the business, wanted to have a meeting, and I was at home.

And my wife and I went to the store to meet him, I think it was like 5:30, six o'clock, my wife was

already there.  I went and met, and we were there until probably, I'd say, about nine o'clock.  My wife and I were meeting with him.

And then about 9:30, I think, Moshe walked in the store with himself, his wife, and his two sons, and I think there was one other guy with him, and he came running in telling me that the feds were on their way to arrest me and my wife, and that he needed to take all the cars out right then and there.

Q.   Okay.  So what happened then?

A.   I was in shock, and we said, what are you talking about?  What do you mean and why, I don't understand.

They said, I don't know why, but we just got a call from our attorney that said he had a very good connection with them, and they told him that they were coming and that he should notify Moshe about it.

Q.   Okay.  All right.  You can take that exhibit off the screen.

So then what happened?

A.   I argued for a little while, and then the other gentleman who I was meeting with said, Scott, you're not going to win this argument, and you're not well --

MR. FELDMAN:  Objection, Judge, hearsay.

THE COURT:  Sustained.

Page 150

THE WITNESS:  I ended up giving in and giving him the keys to the cars, so he took them.

BY MR. BRESLIN:

Q.    Okay.  Where were the keys to the cars?

A.    They were in the back of the store in a box that we kept that had a lock on it.

Q.    All right.  When you say you gave him the keys, did you hand him each key or did you just allow him access to it?

A.    No, no, I just -- I had to call actually one of my guys because I didn't know the key code, and once I got the key code, then I opened the door and then his sons and him just started grabbing all the keys.

Q.    All right.  So you had like an area where you had a bunch of keys hanging there?

A.    They were in a locked secured box.

Q.    Okay.  All right.  So you unlocked that box and then he started grabbing keys?

A.    Yes.

Q.    All right.  How many cars did he take?

A.    That night?

Q.    Yeah, let's start with that night.

A.    I think that night it was over 20.  I don't know the exact number that night.  It was over 20.

Q.    Okay.

A.   I'd say 25 to 26, maybe.

Q.   Okay.  How did -- how did that happen?  How were they physically taken?

A.   Oh, they were driving them right out of the store.

Q.   Okay.

A.   They'd go drop them off across -- down the -- his -- his office was just down the street from -- from the building, and they were driving them over there and then coming right back and grabbing another one, drive it over, come back, and then I think eventually they moved them all to his house.

Q.   All right.  So you mentioned an office.  Did Mr. Farache have an office at that location, 1001?

A.   He had a -- yes, it was one little office in the -- in the very front of the building on the one side.

Q.   Okay.  Did he -- did he or his company, AWB, have any space outside or anywhere inside to show vehicles?

A.   No.

Q.   So regardless of who held title, whether it was Excell or AWB or one of the Karma companies, all the cars remained at that lot and for sale by the Karma companies; is that correct?

A.   Yes.

Q.   Now, what happened -- so that was April 1st. What happened the next day?

A.   The next day my wife went to the store and had a conversation with Teddi, and with Moshe, and I believe his wife, Lisa, I wasn't there.  They called me and they wanted more collateral and they required -- wanted us to give them more collateral because we had more cars that we -- that we owned.

And Teddi and my wife talked to them, and they agreed that if we gave them these additional titles as collateral --

MR. FELDMAN:  Objection, hearsay, Judge, Teddi and my wife discussed.

THE WITNESS:  I was on the phone with them.

THE COURT:  Hold on, hold on.

MR. BRESLIN:  It's the statement of a -- of a -- of the opposing party.

THE COURT:  His -- his spouse?  I'm asking you this question.  His spouse is a representative of the opposing party?  I don't know that.

MR. BRESLIN:  Well, that's -- that's what I heard from the prior witness, Mr. Brandes, when he said that the wife was, you know, part of --

THE COURT:  Also an officer, and your response?

Page 153

MR. MILLER:  He's testifying as to what his wife told him.

MR. FELDMAN:  He's testifying as to what his wife told him.

THE COURT:  He's testifying as to what his wife told him.

MR. MILLER:  Yeah, what Mr. Zankl's wife told Mr. Zankl --

THE COURT:  Okay.

MR. MILLER:  -- and another person, Teddi Soufol.

THE WITNESS:  Well, I --

THE COURT:  Hold on.  No, don't speak. All right.  I'm a little confused.

MR. BRESLIN:  It's -- it's -- it's state of mind, Judge.  I'm asking him not for the truth of what was said, but what he did in response to it.

MR. FELDMAN:  That's not state of mind, it's literally describing --

THE COURT:  All right.  Sustained, just move on.

MR. BRESLIN:  Okay.

THE COURT:  And, by the way, this is Saturday, April 2nd, yes?

BY MR. BRESLIN:

Page 154

Q.   Was this --

A.   Yes, yes.

THE COURT:  And April 1st was a Friday?

THE WITNESS:  Yes.

THE COURT:  Okay.  Go ahead.

BY MR. BRESLIN:

Q.   How late was it April 1st when the cars were taken?  When did they finish up?

A.   It was just after midnight.

Q.   All right.  So tell me what happened the next day.

A.   So the next day I was on the phone with -- with my wife, and with Teddi, and Moshe.  They wanted more titles as collateral that I had, more cars that I had, and we -- we made an agreement that if we gave the additional titles to Moshe for collateral, then the titles that I needed back, because my sales guys had sold cars in the last two weeks, three weeks, that we needed to get those titles back to give to our customers.  We would only give these additional titles up as collateral as long as we got those titles back.

Q.   All right.  So when you say that you wanted the titles back for the cars that you sold, these would have been cars that Farache had the titles to, but were sold in the normal course of business to customers?

Page 155

A.    Yes, yes.

Q.    All right.  So he had the titles and you needed those titles to give to customers?

A.    Yes.

Q.    All right, and in the past before he took the cars, they would just be routinely handed over as part of the normal course of business; correct?

A.    Yes.

MR. MILLER:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.    So you were trying to get the titles for the people that paid money for cars?

A.    Yes.

Q.    And you -- you tried to trade and bargain to get those titles from Mr. Farache; is that accurate?

A.    Yes.

Q.    And to do that, you gave him titles to cars; correct?

A.    Yes.

Q.    And in return, you wanted him to give you those titles so you could give them to your customers?

A.    Yes.

Q.    All right.  Now, were some of those

customers some of the people that came into court to try to get the cars back in this case?

A.    Yes.

Q.    Now, what was the deal, was it made?

A.    Well, we all agreed on it, and Teddi, my wife, all agreed on it, Moshe agreed, Lisa agreed, I agreed, and then they drew up the document.  Moshe signed it, my wife signed it, gave him all the titles, but then they -- they backed out and wouldn't bring us the titles that we needed.

Q.    All right.  So and that was something that your wife did?

A.    Yes.

Q.    All right.  Now, the location at 1001 Clint Moore, was there a second section of that property that you leased?

A.    There was the main warehouse showroom and then there was a small parcel attached to it, yes.  I didn't have a full lease, it was like a month to month.

Q.    And what was important about that space?

A.    When I originally was going to do the lease on the property, the main showroom warehouse part of it, which is where I was going to display all the cars, had two garages in the back, but they didn't have drive ups, they just were like for 18 wheelers to load stuff, so I

needed to get a ramp to drive cars in.  I went to the city, and the city would not approve me to do -- to build the ramps.

So then I went to Moshe and I said, we have a problem.  I don't know if I can do the lease because the city won't let me build the ramps.

He said, well, the next parcel I own that's attached, it's another 3500 square feet, we can just knock part of the wall down and you can just drive your cars in here, and then drive right through there, and you're in the showroom.

I said great.  He goes, but I won't give you a lease on that space, it will just be month to month, but I'm not going to rent it out to anybody, it's your space. I said that's fine, so that's -- that's what we did.

Q.    Okay.  Did -- did that space ever become a point of contention?

A.    Yes, yes, it did.

Q.    When?

A.    I had a -- when I had that conversation in November with him about the money, and then I had another conversation with him in January that I explained that I was going to get him paid off, and then we had the same conversation actually a year prior, and I said listen, I'm going to get some more capital, and I'm going to have to

Page 158

pay you off.  I can't afford this.

And he said that's fine, he goes, but I just want you to know that you've got to pay the lease off up -- all the lease payments that are owed and he goes, I'm going to put the wall back up because I have to lease the space out to somebody else and I have to close the wall off so you won't have any access to bring cars in. So I would have no way to get cars in and out of the building, so I couldn't -- I couldn't do it.

Q.    Okay.  Did there come a time at the end of March before these cars were taken that you were negotiating with someone to come in and take out Mr. Farache?

A.    Yes, yes.

Q.    Tell the Judge about that.

A.    There's a car dealer, he's a good friend of mine in St. Louis, Missouri, he's a big dealer, and I called him and told him what was going on, and I needed help.  And he told me that he'd help me, and from -- he would pay the money to me so that I could pay Moshe off, and we negotiated that deal the last couple of days of March.

And then actually on April 1st -- March 31st and April 1st, Alana in my office started actually sending bill of sales and stuff to the St. Louis dealer so that we

could expedite and close the loan, that he was going to then pay Karma so that I could pay Moshe to get rid of -- to get rid of him.

Q.   Okay, and do you recall how much money you needed to take out Mr. Farache at that time?

A.   It was just over -- it was right around six million and change, low six millions.

Q.   And your testimony is, is that that purchaser was going to do what, was going to buy -- buy cars, lend you money, what was that person going to do?

A.   He was lending money.

Q.   Okay, and was he going to take any type of interest in any vehicles?

A.   No, because he -- he knew that -- he was going to have me sign a promissory note and a security agreement.

Q.   Okay.  But that never happened, did it?

A.   No, it -- no, it -- it -- it blew up on April 2nd.

Q.   Now, did there come a time when Mr. Farache went and took cars from another location?

A.   Yes, my other store in Broward.

Q.   How about a service shop?

A.   Oh, yes, and the service shop, as well, but some of those cars weren't mine.

Q.   Okay.  But my question to you is:  Did you become aware that Mr. Farache went to other locations and picked up cars?

A.   Yes.

Q.   And what were those locations?

A.   The service facility that did all of our service work that was in Boca on Dixie Highway.  I don't -- I don't know the address right off the top of my head, it's on Dixie, and then my other location in Broward, as well, down there.

He, himself, didn't take a car out of Broward, they went down there and tried to get in my store and actually broke my lock, but my -- another guy did load up two of my cars at the Broward -- that were sitting outside the building and brought those to Moshe on a flatbed.

Q.   Now, this service -- this service shop, you actually have an ownership interest in it, do you not?

A.   Yes, I have 25 percent.

Q.   And Mr. Farache has an ownership interest in it; correct?

A.   Yes.

Q.   Let me just take a -- let me take a look at a couple more exhibits here.  Please bring up Number 41 Daniel.

Page 161

MR. MILLER:  What number?

MR. FELDMAN:  41.

MR. BRESLIN:  41.

MR. MILLER:  31?

MR. FELDMAN:  41.

MR. BRESLIN:  4-1.

MR. FELDMAN:  4-1.

BY MR. BRESLIN:

Q.    All right.  I'm showing you what -- what purports to be a secured promissory note dated December 31, 2018 between Excell Auto Group and Auto Wholesale of Boca, and I'd like you to, Daniel, scroll through it slowly.

I'd ask you if you recognize it?

A.    Is there a way to make it bigger?  Sorry. Can you enlarge it just a little?  Thank you.

Q.    Bigger.  Just scroll through it, please.  As he scrolls -- scrolls through it, if you recollect it, just please tell me.  There's 18 pages, if we can just make it a little smaller and a little quicker.

Do you recall that promissory note?

A.    I -- I do.

Q.    All right, and do you recall the circumstances of it?  Let's go back to the first page.

A.    I'm sorry, what was that?

Page 162

Q.   Do you recall the circumstances of why this note was executed?

A.   It just was 500,000 that he loaned additional money to the -- to the business.

Q.   Okay, and on that particular time he gave you a promissory note; correct?

A.   Yes.

Q.   All right, and there were other times when you got money without a promissory note; correct?

A.   Yes.

MR. BRESLIN:  All right.  I'd move Number 31 into evidence -- excuse me, I believe it's 41 actually.

MR. FELDMAN:  No objection.

THE COURT:  It's 41; correct?

MR. BRESLIN:  4-1, yes.  Thank you.

THE COURT:  Yes, 41, Movants' 41 is admitted.

(Thereupon, Movants' Exhibit Number 41 is admitted into evidence.)

BY MR. BRESLIN:

Q.   All right.  Let's go to 42, and this is July 7, 2021, and this would be between Excell and MMS and Mr. Farache, personally.  Scroll down slowly, please.

Do you remember this note?

A.   Yes.

Q.   All right.  I'd move -- and you executed this note, and this represented a contract between you and Mr. Farache and MMS, and go to the top, please, Daniel, between Excell, MMS and Mr. Farache?

A.   Yes.

MR. BRESLIN:  All right.  I'll move that into evidence at this time.

MR. FELDMAN:  No objection.  Just to clarify, this is 42?

MR. BRESLIN:  Yes.

THE COURT:  That's correct.

MR. BRESLIN:  42.

THE COURT:  It's Movants' 42, admitted.

(Thereupon, Movants' Exhibit Number 42 is admitted into evidence.)

BY MR. BRESLIN:

Q.   Now, is this loan -- is this the locate loan that -- with the floating interest rate?

A.   Yes.

Q.   Okay.  Now, when it came to purchasing cars, did Mr. Farache have knowledge of -- of these high valued cars sufficient to where he could price them and know what was a good deal and a bad deal?

A.   No.

Q.   All right.  Who was -- who made those

Page 164

decisions?

A.      It was just myself.

Q.      And that was based on your experience in the industry?

A.      Yes, 20 years.

MR. BRESLIN:  If I can have one moment, please, Judge?

THE COURT:  Sure.

UNIDENTIFIED SPEAKER:  Take five, let's go in the conference room.

MR. BRESLIN:  Can we have a five-minute break, Your Honor?

THE COURT:  Sure.

MR. BRESLIN:  Thank you.

THE COURT:  We're going to take a break. You should not discuss your testimony with anyone during the break.

THE WITNESS:  Stay here?

THE COURT:  You can step down in the meantime or you can stay there as you'd like.

THE WITNESS:  I'll stand up.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

MR. BRESLIN:  I have no further questions of Mr. Zankl.  I wanted to clarify for the record there was

Page 165

an agreement on the deal jackets.  I believe Your Honor has it through 72, it should be through 75 of the FVP exhibits.

THE COURT:  So that adds 3, 4 and 5, 73, 4 and 5 are admitted, yes?

MR. BRESLIN:  Yes, Your Honor.

MR. FELDMAN:  No objection, Judge.

THE COURT:  Okay.  Very good.  So we'll add those three to the -- to the exhibit register.

(Thereupon, Movants' Exhibits Number 73 through Number 75 were admitted into evidence.)

MR. FELDMAN:  Your Honor, with the Court's permission, there may be instances where we approach the witness.

Would you like me to just ask in every instance or --

THE COURT:  You do not need to ask every time, but please keep in mind that you shouldn't be talking in the no man's land between those two places.

MR. FELDMAN:  Sure.

THE COURT:  Okay.

MR. FELDMAN:  Absolutely, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. FELDMAN:

Page 166

Q.    Good afternoon, Mr. Zankl.  I just want to get a couple things at the outset out of the way because you talked today extensively about titles, sales of vehicles to end users, and whatnot.

So I just want to understand here, last week we took your deposition; correct?

A.    Yes.

Q.    Okay, and at that deposition last week you had two criminal defense attorneys at that deposition; is that right?

A.    Yes.

Q.    What were their names?

A.    Guy Fronstin and Marc Nurik.  Well, Marc was on Zoom, yeah.

Q.    And certainly at that deposition you asserted your Fifth Amendment privilege in several instances; is that right?

A.    I believe it was just a couple -- yes.

Q.    Okay.  So let's just understand something because you were just talking about sales of vehicles to end users versus sales of vehicles to AWB, and whether or not those are actual sales.

I just want to understand something.  You agree with me that it's not a good business practice for Excell or the Karma entities to sell the same car to two

Page 167

different people; is that right?

A.   We didn't do that.

Q.   Okay.  So it's your testimony that Excell never sold the same vehicle to two different people?

A.   Correct.

Q.   Okay.  Is it your testimony then that you didn't grant the same lien on the same vehicle to a creditor, as well as to another creditor?

A.   Correct.

Q.   Okay.  So you're not concerned testifying at all today about the sale of any vehicle to more than one person, same vehicle?

A.   Yes, correct.

Q.   So you won't be asserting your Fifth Amendment to any of those types of questions anymore?

A.   No.

Q.   Okay.  So I also want to talk about something else you asserted the Fifth Amendment.  You talked about this threat that Mr. Farache made to you in terms about throwing you in the swamp, the gators, I just want to understand something.

Last week I asked you if you went to the police authority, and you said you went to the Boca Police Department; is that correct?

Page 168

A.    Yes.

Q.    Okay, and when I asked you what you discussed with them, you asserted your Fifth Amendment Privilege.  Do you recall that?

A.    Yes.

Q.    Okay.  So tell me what you told the Boca Police Department about Mr. Farache and this threat.

A.    I went in and told them exactly what happened, and this was after he had taken all the cars, and I went in and told them -- the police officers what happened.

Q.    Okay.  So originally, though, this threat was issued to you in November of '21; is that right?

A.    It was towards the end of November, very beginning of December, right within a couple of weeks there.

Q.    So you waited four months before you went to the Boca Police Department to tell them that your life was threatened?

A.    Yes.

Q.    Okay.  So I guess you didn't think that threat was that serious enough that it required you immediately to go to the police department in November of 2021 and tell them somebody has threatened my life?

A.    No, I -- I took it very seriously.  I

Page 169

didn't --

Q.   You didn't go to the police department, did you --

A.   No.

Q.   -- in November of 2021?

A.   No.

Q.   So you keep on saying today "the girls". These are the girls at your office, correct, at Excell Auto Group?

A.   Yes.

Q.   Okay, and that's Alana Bailey; correct?

A.   Yes.

Q.   Nidia, I forget her last name.  What is it?

A.   Leiva.

Q.   Okay, and Teddi, what's Teddi's last name?

A.   Well, Soufol or Powlen, just depending on --

Q.   And those are the girls?

A.   There was also Myora, I can't think of Myora's last name and then Kathy Ret -- Retclaf (phonetic).

Q.   Now, what I want to understand here is you said, this is a quote from today, "the girls devised this plan," and this is this exchange of paperwork that you're talking about with Excell Auto Group regarding these fictitious sales.

Page 170

Do you recall your testimony earlier today about that?

A.    Yes.

Q.    Okay.  So you're saying it's not your plan, your low level employees somehow made a decision just to create this entire paper trail, to create fictitious sales?

A.    Why are you saying low level?  I don't understand.

Q.    Okay.  Let's take out the word low level. You're saying it's your girls that devised this plan to create this series of fictitious sales over more -- well, eight years?

A.    Yes.

Q.    Okay.  You didn't know anything about this?

A.    No, no, I did.  They came to me.  Teddi -- it was actually Teddi Soufol, she's worked for me for 13 and a half years.

Q.    Okay.

A.    She was my comptroller.

Q.    So she said, hey, boss, I've got a great idea.  I'm going to create this paper trail so we can have these fictitious sales, and that this is how we're going to disguise these loans, that's her idea?

A.    No, it's not exactly how it went down.

Q.    Sure.  Tell us how.

A.    It was actually Teddi and Michele got together, because Michele had no experience in the car business, Moshe had no experience in the car business, and Moshe wanted to have as much protection and security as possible, and that's why he got the license at AWB.

And Teddi being in the business as a comptroller for at this time I think 37 years, she's the one that said hey, why don't we do it this way, and we're not doing anything where we're actually reassigning titles because everybody knew that you can't reassign a title to another dealer and then have it on consignment.  So this was the safest way to do it that they -- that Moshe and Michele felt comfortable.

Q.    So then you said some very interesting things here.  So you agreed to this; right?

A.    Yes.

Q.    Okay.  Now, I asked you last week in your deposition as to whether or not you told Teddi about this secret loan agreement that you had with Mr. Farache.

Do you remember those questions I asked you last week?

A.    Yes.

Q.    Okay, and you told me that you didn't tell Teddi about this loan agreement; isn't that correct?

Page 172

MR. SHRAIBERG:  Objection, Your Honor, improper impeachment.

MR. FELDMAN:  I'm not trying to -- literally I'm just asking him the question, it's a leading question.

THE COURT:  He's not impeaching him.

MR. SHRAIBERG:  He's asking about his testimony --

THE COURT:  It's a fact question, overruled.

MR. FELDMAN:  If he wants to say that's not how I testified --

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  That's not entirely true what you're saying.

BY MR. FELDMAN:

Q.    Okay.  So tell me what you told Teddi about this secret loan agreement with Mr. Farache.

A.    Well, it wasn't a secret loan agreement because there were the promissory notes that were signed and executed.  There wasn't anything of a secret.

Teddi is the one that came up with the way to do the bill of sales and back and forth that they were comfortable with.

Teddi was aware that -- that these payments were all interest because based on what they are saying in

Page 173

their paperwork it was profit splitting, which it wasn't, it was all interest, so I'm not sure what -- the only thing I didn't tell Teddi is -- and I didn't tell my wife is about the threat.

Q.    Okay.  So your testimony today is you told Teddi I have this loan agreement outside of these promissory notes that is intended to pay additional interest, and Teddi, great idea how are we going to document this.  This is the entire universe of information that Teddi had?

A.    You're talking about two different things.

Q.    Sure.  Go explain.

A.    You're talking about the promissory notes and now you're talking about something completely different, which was the additional interest.  The additional interest money that I paid him was -- basically was on that $1,080,000, and there was never the bill of sales done for those transactions.

Q.    So I'm trying to understand --

A.    It never was done.

Q.    So I'm trying to understand, sir.  So Teddi knew that these fictitious sales were, in fact, interest payments going to Mr. Farache's company?

A.    Yes.

Q.    Okay, and by 2018, how much do you think

Page 174

approximately was owed to Mr. Farache's company?

A. I'm sorry, say that again.

Q. 2018, approximately how much was owed to Mr. Farache's company?

A. I'd be guessing right now.

Q. Sure.

A. I'd say probably in that neighborhood of the five million, maybe a little bit more. I don't think he had gotten to six yet by then, he might have.

Q. Okay. So you're saying it's about a 30 percent interest rate; is that right?

A. Yes.

Q. And you made sure that in 2018 that those payments were always made, those interest payments; right?

A. Yes, I have copies of the checks that were cancelled.

Q. Okay. So then what about 2019, approximately how much was owed to Mr. Farache then?

A. I'd say about the same. In '19 it fluctuated a little bit, but it was about the same.

Q. Okay. So about 1.5 million a year in interest payments in '18 and '19; is that right?

A. Yes.

Q. And then 2020, approximately how much was owed to Mr. Farache then according to your narrative?

Page 175

A.    About the same, about that.

Q.    So we get another 1.5 million in interest payments; right?

A.    Yes.

Q.    Okay, and like you said, Teddi knows about these sales, in fact, being interest payments; right?

A.    Yes.

Q.    Okay.  Now, you talk a lot about the law and how important it is to follow the law, so let's talk about the law in terms of filing tax returns.

So Excell Auto Group certainly filed tax returns for 2018, '19 and '20; is that right?

A.    Yes.

Q.    Why don't you tell the Court how much in declared interest Excell Auto Group had to the IRS in calendar year 2018?

A.    Do you want to show me the -- I don't know off the top of my head.  You've got to show me the return.

Q.    Can I show you a document that would help you refresh your recollection?

A.    Yes, please, yes.

Q.    Take a look at this document.  Once you look at it, let me know and I have a question.

A.    Okay.  I see it.

Q.    Okay.

A.    This is 2018.

Q.    That's correct, that's what I asked you.

Now that you've had a chance to review that document, can you tell the Court approximately how much in interest was declared to the federal government for calendar year 2018 for Excell Auto Group?

A.    It says on the tax returns, $335,872.

Q.    So tell me who's responsible within Excell Auto Group for the preparation of the federal income tax returns for that company?

A.    It was Teddi.

Q.    Okay.  So Teddi knows about this secret deal where all this over a million dollars in 2018 is going to Mr. Farache's company, and yet somehow she gets a false tax return being filed with the IRS?

A.    No, there's other deductions and she could have also put it in cost of goods.

Q.    You're speculating; right?

A.    I'm just saying the obvious, though.

Q.    Okay.

A.    That's possible, it's not --

Q.    So you agree with me, though --

A.    You don't have to claim interest if it's interest.

Q.    -- that the 2018 tax return certainly

Page 177

reports interest far less than what you say and testifying in court today was paid to Mr. Farache's company; is that correct?

A.    It says it on the tax returns, yes.

Q.    Okay.  So let's talk about 2019.  Certainly Teddi could have gotten it right in 2019.

Do you know how much was declared in interest to the federal government for Excell Auto Group in calendar year 2019?

A.    I don't.

Q.    Can I show you a document to help you refresh your recollection?

A.    Sure.

Q.    Tell me when you've reviewed it.

A.    Yes, I see it.

Q.    Okay.  Why don't you -- now that you've had a chance to review that document, can you tell the Court how much in interest was declared to the federal government for calendar year 2019?

A.    $314,627.

Q.    Okay.  That certainly doesn't sound like the in excess just to Mr. Farache of over a million dollars in interest that you say was paid to him for 2019; is that correct?

A.    My understanding is that you don't -- if you

Page 178

don't want to -- you don't have to claim it as interest, as long as you claim it as an expense, that's my understanding.

Q.    Oh, so you --

A.    I'm not an accountant, but that's my understanding.

Q.    -- you think somewhere else in the 2019 tax return the interest is declared.  So you know what, do you know if it was declared somewhere else in the tax return for this company?

A.    I -- I don't.

Q.    Okay.  So if I showed you another section of the 2019 return, maybe that would help you testify to the Court whether or not this million dollars in payments just to Mr. Farache, in fact, are reflected in this return?

A.    I'd love to look at it.

Q.    Okay.  Great.  So can I have the document, please?  Why don't you take a look at this section, which is -- just take a look at it, tell me when you're done.

A.    Can I unhook it so I can see it?  Can I take it apart so I can see it?

Q.    Sure, go ahead.

A.    Okay.  I see it.

Q.    Can you tell the Court if somewhere in the other deductions in the tax return, the 2019 return for

Page 179

Excell Auto Group, is it reflected anywhere interest payments being paid to Mr. Farache?

A.     It could be -- I told you two things.  It could be in Line 23, where it says total other deductions of $1,479,466 or --

Q.     Sir, that's the total aggregate of it.

A.     -- or -- no, that's not the total aggregate, is it?  No, that's --

Q.     Actually, sir, if you look on the front page of the document, it has the total aggregate.

A.     Yeah, it has the total there, it's --

Q.     Okay.  So that's not the number --

A.     -- 3. --

Q.     -- sir, is it, sir?

A.     -- 3.4.

Q.     So tell me where I see a seven figure sum in the tax return, 2019 --

A.     Sir, look at --

Q.     -- for over a million dollars to Mr. Farache.  Tell me if it's in there.  If it is, it is, tell me.

A.     I can't talk.

MR. FELDMAN:  Sorry, Judge.

THE COURT:  You might want to let him answer.

Page 180

MR. FELDMAN:  My apologies, Judge.

BY MR. FELDMAN:

Q.    Go ahead, sir.

A.    I know you're excited.  Can I talk?

Q.    I just want to see if you can tell me where it is.

A.    Well, I don't -- didn't do my tax returns, I had somebody do it, but Line 19 says other deductions of $1,479,466.  Do you have a list and breakdown of what those other deductions are?

Q.    I'm sorry, what number did you say, sir?

A.    Line 19.

Q.    Line 19, other deductions.  Line 19, other deductions says freight of $18,177.

A.    Where does it say that?

Q.    Line 19, other deductions.  Oh, you're on the front page of the document?

A.    I'm on the front page, yeah.

Q.    Oh, okay.  Well, that's what it says, Line 19, other deductions.  It says attached statement and I just showed you the other documents where that's where I told you, it adds up to the $1,479,466, and you'd agree with me that's totalling bank charges --

A.    Well, I haven't added it up.

Q.    -- credit and collection costs --

Page 181

MR. BRESLIN:  Judge, I object to the question.  That's such a compound question.  It's a speech with a couple of questions thrown in between.

THE COURT:  Sustained.

MR. FELDMAN:  Okay.

BY MR. FELDMAN:

Q.    My question back to you, sir, is as follows: You agree with me that 2019 the reported interest to the federal government was $314,627; correct?

MR. BRESLIN:  Object, asked and answered.

THE COURT:  Sustained.

BY MR. FELDMAN:

Q.    Do you know anywhere else where in 2019 Excell Auto Group reported all of this interest being paid to Mr. Farache?

A.    It could have been also in cost of goods.

Q.    Oh --

A.    On Line 2.

Q.    -- okay.  So Teddi you think just somehow confused the concept of interest with cost of goods sold?

A.    No, I don't think she confused it.

Q.    Do you even know what cost of goods sold is?

A.    Yes, I do.

Q.    Okay.  So can you explain to me how interest has ever been included in cost of goods sold?

Page 182

A.     Well, let me -- let me tell you -- so let me ask you this question.

Q.     You don't ask me questions --

A.     I'm not asking --

Q.     -- I ask you the questions.

A.     -- I'm making a statement.

The payments that were made to Mr. Farache on the so-called profit sharing, when we issued those checks they were cut as he wanted them, as profit sharing because once again, if you're taking it as a profit sharing and it's not as interest, then I'm not required to give him a 1099.  So we --

Q.     I'm just trying to understand this (inaudible).

A.     -- we gave him --

MR. BRESLIN:  Judge, I object.

THE COURT:  Sustained.  You need to let him answer, you've asked.

MR. FELDMAN:  Sorry, Judge.  I apologize.  I thought he was finished.

THE WITNESS:  So Teddi --

THE COURT:  I don't know how you could have thought he was finished, he was in the middle of a word.

Go ahead.  Go ahead.

THE WITNESS:  So Teddi -- Teddi -- Teddi

knew that the payments were interest, but the way that it was set up, and the way that Mr. Farache wanted it set up so that he could get around the usury of the 25 percent, was the payments were classified as profits.  So she -- what I'm thinking is the money is in cost of goods because it wasn't shown as an interest expense.

I don't have to -- it's every company's objective to take it as a deduction, as an interest expense.  She can classify it anywhere else, as long as I take it as a deduction.

BY MR. FELDMAN:

Q.    Sir, did you help prepare these tax returns, yes or no?

A.    No.

Q.    Okay.  So you're just speculating right now; is that correct?

A.    Well, you asked me earlier if there's any place else it could be.

Q.    You're guessing; right?

A.    Yes, yes.

Q.    Okay.  Great.  So let's just close the loop on this because, you know, again, you're talking about all these millions of dollars being paid to Mr. Farache.

A.    I have the cancelled checks.

Q.    Can you tell the Court how much interest was

Page 184

paid by Excell Auto Group in terms of declared interest, how much was declared to the federal government in calendar year 2020?

A.    No, not without seeing the backup.

Q.    Can I show you a document to maybe help refresh your recollection?

A.    Sure.

Q.    Great.  Why don't you review the document and let me know.

A.    I have it.

Q.    Okay.  Can you tell the Court -- now that you've had a chance to review the document, has your recollection been refreshed?

A.    Yes, I see it.

Q.    Okay.  Can you tell the Court how much in declared interest was paid in calendar year 2020?

A.    $129,228.

Q.    Okay.  So, again, you don't see that seven figure sum in that line item right there; is that right?

A.    Not in that line item.

Q.    Okay.  Now just so I understand it because you talked about this --

A.    Do you want these back?

Q.    You can keep them there.

You talked about this paperwork, all this

Page 185

continuous paperwork, transfer money and then transfer back of money, all of this exercise, it took up a lot of time, is that your testimony, to disguise this loan?

A.    Yes, it did.  The girls --

Q.    I'm just trying to understand something.

A.    -- complained all the time.

Q.    You testified --

THE COURT:  He's in the middle of --

BY MR. FELDMAN:

Q.    -- about other lenders --

THE COURT:  Hold on.  He's in the middle of answering.

MR. FELDMAN:  I'm sorry, Judge.

THE COURT:  Don't start asking a question until he's done.

MR. FELDMAN:  I apologize, Judge.

THE WITNESS:  I said, yes, it did.  In fact, I got complaints from the office girls all the time about the paperwork.

BY MR. FELDMAN:

Q.    So what I'm trying to understand then, since this is such a difficult procedure that you had here, you talked about other lenders.

Certainly Excell Auto Group had other lenders at this point in time; right?

Page 186

A.   Depends what time you're referring to.

Q.   Let's throw 2020 out there, Excell had other lenders at that point in time?

A.   Yes.

Q.   Okay.  Why don't you tell the Court how many other lenders Excell had at that point in time.

A.   In 2020?

Q.   Yeah.

A.   Not including AWB.  I'm not using, I'm counting.  I think four, probably four other ones, I think, maybe five.

Q.   Okay.  Approximately how much money did you borrow from these folks?  If it's better, let's do it this way, you said four or five.

Who are the four or five lenders?

A.   An entity called Savannah Row.

Q.   What interest rate were they at?

A.   They were at just under 30, like 28 percent.

Q.   Okay.  Who else?

A.   This is 2020 you said?

Q.   Yes.

A.   Prestige Luxury, called Prestige Luxury.

Q.   Okay.  How much?

A.   1,320,000, I think.

Q.   What rate?

Page 187

A.    That one was at 32 percent.

Q.    Okay.  Who else?

A.    I had DCG Trust.

Q.    How much?

A.    That was at -- right around three million.

Q.    What rate?

A.    Thirty-three percent, I think.

Q.    Who else?

A.    And AJA Realty.

Q.    How much?

A.    1.5.

Q.    What rate?

A.    That was at 30 -- I think it was 30 -- that one I don't have in -- 34 percent, I think.  I mean, these are -- I'm speculating on the rates, but they're right -- they're pretty close.

Q.    Okay.  Certainly all of them seem to be at 30 percent or above 30 percent; is that right?

A.    Yes.

Q.    Okay.  Now, 2021, who else, additional lenders beyond just the folks we spoke about?

A.    Yes, I had a gentleman come in and put a loan into the company, but he got ownership in the business.

Q.    What was that gentleman's name?

Page 188

A.    Ed Brown.

Q.    How much did Mr. Brown lend?

A.    He came in, he paid off a note that he had cosigned, and then additional capital into the business. The total note was ten million and he was at six percent.

Q.    Did you ever pay Mr. Brown in cash?

A.    Yes.

Q.    Okay.  Why don't you tell the Court how that came about.

A.    That was just how he wanted the -- the payment structured.  He wanted a certain amount every month wired on the payment, and then another dollar amount he wanted cash.

Q.    And the total amount of the cash you wired, was that an interest rate in excess at six percent?

A.    No, it was at -- it was at six percent.

Q.    Six percent total for Mr. Brown?

A.    Yes.

Q.    Okay.

A.    I think it was.  I know the one -- the one note I paid him 41,666, that was at six percent.

Q.    Okay.  Did he have any other notes in excess of, let's say, 20 percent?

A.    No, he had -- the other note was for three million, and that was the one that he wanted cash

every month, a payment.

Q.    Okay.  Was it --

A.    It was 30,000.

Q.    What was the interest rate on that note?

A.    Well, it was 30,000 a month.

Q.    Okay.

A.    I'm sorry, 15,000 a month.  Yeah, 15,000 a month.

Q.    And you just paid that to him in cash every month?

A.    Yes.

Q.    Okay.  So you had someone go to a bank account and actually withdraw cash, and then hand over to Mr. Brown cash?

A.    Yes.

Q.    Okay.  Why did you do that?

A.    Because that's what he wanted.

Q.    Okay.  Did you issue him a 1099?

A.    I don't know, that would be a question for Teddi.  I don't know, I didn't handle that.

Q.    Who else, other than Mr. Brown?  Let me throw a couple names out at you.  Have you ever heard of a company called HiBar or Snap?

A.    Yes.

Q.    Okay.  Tell us about Snap.

A.    Snap?  No, I don't know Snap.

Q.    What about HiBar?

MR. MILLER:  Spin.

MR. FELDMAN:  What?

MR. MILLER:  Spin.

MR. FELDMAN:  Write it down.

MR. MILLER:  Spin.

BY MR. FELDMAN:

Q.    Spin, I'm sorry.

A.    Yes, Spin Capital -- Snap.  Spin Capital, yes.

Q.    Who's Spin?

A.    They're an MCA.

Q.    What was their interest rate?

A.    Well, it changed because the original deal, I don't know if you know what an MCA is, but if the payoff -- when I did the deal with Spin, the payoff, if I had paid it off in time, the rate was much, much lower.  I think it was just under 30 percent.

Q.    Okay.

A.    But if I went one day past that, I mean, it went to 90 percent.

Q.    Okay.

A.    It was -- it was absurd.

Q.    Did you ever hear of a company called

Page 191

Franklin?  I believe that's Mr. Shraiberg's client?

A.    Yeah, Winglake.  Yeah, Franklin Winglake, yes.

Q.    Okay.  Did they lend money to Excell?

A.    Yes.

Q.    How much was their rate?

A.    Well, when you factored in all their fees and everything, it was right around 26.

Q.    Did you pay off Mr. Shraiberg's client, Franklin?

A.    No.

Q.    Okay.  How much do you owe them?

A.    I think it's just under five.

Q.    Okay.  So I just want to understand something.  All these lenders we're talking, these were lenders to Excell Auto Group; right?

A.    Yes, to Excell.

Q.    Okay.  So it sounds like we're talking, at least just based on when I looked at the claims filed in the Excell case, it looks like there was in excess of $30 million of debt in there.  Does that sound about right?

A.    Yes.

Q.    Okay.  So Excell certainly had a lot of debt, and I'm just trying to understand with all these

Page 192

interest rates, this is all money that you willingly took from people; correct?

A.    Yes.

Q.    Okay.  You didn't say no, I don't want your money, you, in fact, took it; right?

A.    Yes.

Q.    Okay.  That includes my client; right?

A.    Well, I tried to get out of that a few times, but, yeah.

Q.    Okay.  But certainly you could have gone to any of the others -- it certainly sounds like you went to other people to get money from them, too; right?

A.    I did, yes.

Q.    Okay.

A.    But I didn't want to -- I didn't want to have them close my --

Q.    I just want to understand -- sorry.

A.    -- business, so --

Q.    So I just want to understand something, though, is that all these other lenders that gave you all this additional money, none of them ever asked you to go through this disguised lending relationship; right?

A.    No.

Q.    Okay.  So all this paperwork that you were complaining about --

A.   No, no, they did, some of them did, yes.

Q.   Oh, who?

A.   Not -- not the paperwork to this magnitude, no.

Q.   Who?

A.   Prestige and DCG.

Q.   So you're saying they're also involved in this game of trying to kind of hide what, in fact, the true interest rate of their loans were?

A.   Well, my understanding, and this was all new to me going into this because I didn't even know about this, but my understanding is that when someone is loaning somebody money and if they are charging over 25 percent, not many attorneys are going to draw up a promissory note with a 30 percent interest rate on there, so they had to figure out a way to get around it.

Q.   What I'm just trying to understand, though, Mr. Zankl, is that you took this money voluntarily, and certainly at any point in time you could have told people I don't need the loan; right?

A.   Yes.

Q.   Okay.  So just to close the loop on those tax returns, certainly you don't have any reason to explain, other than speculation, as to why the stated interest rates or the stated amount of interest paid in

Page 194

those tax returns are incorrect?

A.     Without speculating, no.

Q.     Okay, and I'm just trying to understand something here.  You know, as my dad always told me when I was a kid, my dad grew up in a different era, he always said the buck stops with you, right?  My dad was a big Harry Truman fan.

So you are the owner --

MR. BRESLIN:  Objection, it's not a question, Judge, it's a speech.

MR. FELDMAN:  Is Mr. Breslin a republican?

THE COURT:  We're not going there.  Just -- just -- just get to the -- just get to question, please.

MR. FELDMAN:  Sure.

BY MR. FELDMAN:

Q.     So the buck stops with -- do you agree that as the owner of the company the buck stops with you?

A.     Yes.

Q.     Okay.  So ultimately it's very important that accurate -- because you talked about following the law, that accurate tax returns get filed with the government?

A.     Yes.

Q.     Okay.  You talked about -- in your direct examination about this deal where you're going to have

Page 195

this third party buy all these vehicles that was going to generate enough money, it's a loan, I guess, that somehow that money is going to be used to pay off Mr. Farache, is that -- do you recall that?

A.    Yes.

Q.    Okay, and so just so I understand, who owned the vehicles that were going to be sold to Karma?

A.    Well, it depends.  I mean, some of the cars were Excell and some were in Karma's, but he wasn't really buying the cars per se.

Q.    I'm just trying to understand.  We talked last week about an e-mail exchange in March of 2022 about a series of cars that needed to be transferred --

A.    Yes.

Q.    -- from Excell to Karma.  Do you recall that?

A.    Yes.

Q.    And this is that deal you're speaking about right now today?

A.    Part of the deal, yes.

Q.    Okay.  So I just want to understand.  In 2022 Excell still owns vehicles?

A.    No, at that time the -- those cars, the girls had already taken them out of Karma and put them into Excell so that they could do the switch to AWB

Page 196

because once again, following the DMV protocol and the laws, like you like to refer to, once we reassign the title from Karma to Excell, Excell to AWB, it had to go back from AWB to Excell to Karma.  They couldn't -- it's called jumping title, they couldn't skip.

Q.    I just want to understand something.  Your e-mail address is scott@ecxcellauto.com; right?

A.    Yes.

Q.    Let me show you an exhibit.

Your Honor, this is marked for demonstrative purposes as Debtor's Exhibit 13.

Sir, do you recall sending an e-mail to Alana, your colleague, on March 31, 2022, titled -- actually I don't see a title, about selling certain cars from Excell Auto to Karma of Palm Beach?

A.    Yes.

Q.    Okay, and so is it fair to say that as of March 31, 2022, Excell owned 14 vehicles at least?

A.    Based on this e-mail, yes.

Q.    Okay.  You have no reason to dispute that Excell Auto, as of March 31, 2022 owned these 14 vehicles; is that right?

A.    Like I said before, it was -- that was the paperwork.

Q.    I'm sorry, it was what?

A.     That was the paperwork.  They needed to reassign the cars back to Karma from Excell.

Q.     That's not what this e-mail says, though, sir.  It says, we need to sell all these cars from Excell Auto to Karma of Palm Beach.  So what's going on here, what --

A.     Understood.  Sell means also in our world, in the auto world, selling is also transferring.  So it's an in -- it was -- these are internal companies.  They're all three internal companies.  So the girls -- when this means sell, it's also the same thing as transferring.

Q.     Okay.

A.     Transferring back over to Karma from Excell.

Q.     So what you wanted to do is transfer all the assets of Excell, these 14 cars, and send them over to Karma; right?

A.     That's what the e-mail says, yes.

Q.     Okay.  Why don't we just all understand, at that point in time we just talked about $30 million in debt that Excell had.  They filed for bankruptcy just -- let me withdraw that.

Excell filed for bankruptcy what, just a couple of weeks later; right?

A.     But Excell didn't pay for those cars, Karma did.

Q.   Did Excell file for bankruptcy just a couple weeks after this e-mail was sent?

A.   Yes, because all the cars were taken April 1st.

Q.   Okay.

A.   There was no more business.

Q.   I understand.  But you wanted to transfer all the assets of Excell over to Karma, and the justification you have is that Karma, in fact, paid for all these vehicles?

A.   Karma paid for all of them, Excell didn't pay for any of those cars.

Q.   Okay.  So if Karma paid for those vehicles, why did Excell own them?

A.   Because like I said before, that was -- I had to transfer -- we had to transfer the cars to Excell to get them to AWB.  They would not take it directly from Karma to AWB.

Q.   But that's not what you're saying here.  Now you're saying I want to transfer these cars back to Karma.

A.   Right, because I was trying to get him paid off.  So I had to get the stuff back to Karma because that's where the gentleman was going to pay and loan the money, was to Karma, not Excell.

Q.   And just so I understand, Karma is now going

to be saddled with how much in debt by doing this deal?

A.    Right around six million.

Q.    Okay, and just so I understand, did you tell FVP that you were about to do this deal?

A.    No.

Q.    Okay, and just bigger picture, just talking about disclosure, so if you're talking about this loan, you talked about the tax returns.

When you went to third-party lenders, other than supposedly my client, did you ever disclose the existence of this loan that you have with Mr. Farache, for example, to FVP?

A.    Yes.

Q.    Okay.  So in other words, FVP would have financial documents where you'd say, notwithstanding whatever is in our tax returns and anything else, or the promissory notes, in fact, the debt I owe to Mr. Farache and his companies is, in fact, six million and change and the interest rate is in excess of 30 percent?

A.    No, never discussed the interest rate with FVP.

Q.    Okay.

A.    And FVP -- when I spoke to FVP and -- and told them about -- and they knew about the AWB, their loan was to Karma, they didn't have any involvement with

Page 200

Excell.  So they didn't have a concern about any debt that was on Excell, they only were concerned about the Karma entities.

Q.    What I'm trying to understand, did you tell FVP, going back to this exhibit right here, did you tell FVP that these vehicles that Karma paid for were being transferred over to Excell?  Did you tell them about that?

A.    No, there was no reason to tell them.

Q.    You didn't tell FVP, who's a lender to Karma, that assets that Karma just paid for are, in fact, being transferred to a company that has in excess of $30 million in debt?

A.    Like I said before, my -- the way my office looked at the transactions, the cars that were transferred from Karma to Excell, and then Excell to AWB, every girl, Alana, Teddi, Nidia, they all knew what was going on.  It was -- he was never -- AWB was never buying the cars. They were never going to advertise the car, they didn't have a website, they didn't have marketing, they didn't have advertising, they didn't have salespeople, they didn't classify them as sales.

Q.    Who bought these cars?

A.    So to follow -- Karma bought all the cars.

Q.    Okay.  Did you tell FVP that Karma just bought 14 cars and we're going to give those cars to

Excell Auto Group?

A.   No, there's -- like I said, there was -- that was -- there was no reason to.  It's not in my loan documents.  My loan documents were I had a set payment to make every month in principal and interest, that's it.

Q.   Okay.  So now, as we sit here today, how much do you owe FVP?

A.   I think I made two payments, so somewhere in the seven million figure.

Q.   Right.  The amount of the loan was about $7 million; right?

A.   Seven-five.

Q.   Seven-five.  Okay, and the loan went into default not after a couple of years, it went into default within pretty much months; right?

A.   Well, it went into default because, yeah, all the cars were taken, every car was taken.  There was no more business.

Q.   Okay, and certainly FVP, did you explain to them that Karma money was used to purchase cars that were then transferred to Excell?  Did you then tell them that?

A.   Oh, we went over everything, yes.

Q.   Okay.  So you didn't tell them at least at inception when Karma bought these cars they were transferred to Excell Auto, but at a later point in time

you did finally tell them; is that right?

A.   Yeah, it was in our -- yes, in the paperwork.

Q.   Were they happy about that?

A.   Well, once they looked at everything and they reviewed everything, they understood why.

Q.   Oh, so they think this transaction that you engaged in where you used Karma money to buy cars and then transfer them to Excell, they thought that was okay?

A.   Not that it was okay, but they understood why --

Q.   Okay.

A.   -- I did it.

Q.   So did they withdraw the default letter?

A.   I -- I think I've signed an agreement to -- to -- with them.  So I don't -- if they were -- if they thought I did something wrong, I don't think they'd be, you know --

Q.   What do you mean by you signed an agreement --

A.   -- joint agreement.

Q.   -- with them?

A.   For -- for whatever, just a witness and stuff, adversary, whatever.

Q.   Oh, so you signed a cooperation agreement

Page 203

with them; is that right?

A.    No, no, no, it's not that.  I don't know what you -- I'm not a lawyer, I don't know what you call it.

Q.    Okay.  So describe to the Court this document you signed because I don't think I've seen it.

A.    I don't even know what to call it.

Q.    Why don't you describe to the Court, regardless of what you call it, tell the Court what you're required to do pursuant to the agreement?

A.    Well, I'm not required to do anything.

Q.    It's an agreement.

A.    Yes, just to -- for, I guess, my text messages and e-mails and stuff, that's all it was, that, that's all the agreement was about, I guess.

Q.    What else?

A.    It's not that I'm required to do anything.

Q.    Okay.  So you're supposed to do what with your text messages?

A.    Which I guess someone was trying to get them turned over, which they did turn them over, that's all.

Q.    Okay.  Did they ask you to also appear for testimony?

A.    Did they ask me to come here and be a witness?

Page 204

Q.   Yeah.

A.   Well, yeah, yeah.

Q.   Okay.

A.   So did the trustee, too, my trustee for Excell.

Q.   What I'm trying to understand is pursuant to this contract, what are you required to do other than just show them some text messages?

A.   Nothing.

Q.   So --

A.   I'm not required to do anything.

Q.   Okay.  Do you have a copy of this document?

A.   I don't personally, no.

Q.   Okay.  Who has a copy of it?

A.   I'm sure they do and -- and my lawyers do.

Q.   Okay, and who drafted it?

A.   I don't know.

Q.   Okay.  You signed it though; right?

A.   Yes.

Q.   Okay.  What type of consideration are you being paid?

A.   Nothing.

Q.   So literally you just agreed to do a whole bunch of stuff for them; right?

A.   I didn't -- like I just said to you, I

Page 205

didn't agree to do anything.  There wasn't an agreement to do anything.

There was an agreement just about that we were working together for my text messages and e-mails, that's all, correspondence, I guess.  I don't know what you actually call it.

Q.    Okay.  But certainly you said it's not an agreement to do anything, but yet you had to sign something?

A.    Right.

Q.    Okay.

A.    But there was nothing that said I had to do something is what I'm saying.

Q.    So as we sit here today -- by the way, you're a personal guarantor of this seven plus million dollar loan to FVP; right?

A.    Yes.

Q.    Okay.  Have they threatened you with litigation on that personal guaranty?

A.    In the very beginning, yes.

Q.    Okay.  Since then they haven't?

A.    Well, nobody has really done, since I filed the bankruptcy.

Q.    Well, you filed the bankruptcy for Excell Auto Group; right?

A.   Right.  Well, your client filed against me, too, and he hasn't done anything.

Q.   You personally haven't filed for bankruptcy; right?

A.   No.

Q.   Okay, and is your wife a guarantor of that loan?

A.   Yes.

Q.   Okay.  So both of you are on the hook for the FVP loan; is that right?

A.   Yes.

Q.   So to date -- they declared it in default sometime in early 2022, does that sound right?

A.   I don't have the -- I don't know the exact date, but I think you're -- yes.

Q.   Okay.  So since they've issued a default, they have yet to pursue you and your wife with respect to collection on any aspect of that loan?

A.   That's correct, just like your client.

MR. FELDMAN:  Okay.  Nothing further, Judge.

THE COURT:  Is there any redirect?

MR. BRESLIN:  Very brief.

Daniel, can you put up Number 13, please, and that would be their 13.

Page 207

REDIRECT EXAMINATION

BY MR. BRESLIN:

Q.    All right.  Mr. Zankl, you were shown Exhibit 13 by Mr. Feldman; correct?

A.    Yes.  Yes.  Sorry.

Q.    And if we looked at the deal jackets for every one of those -- those cars in that -- in that list, would Karma of Palm Beach have purchased every single one of them?

A.    Yes.

Q.    Was there a business reason why any of those cars were transferred to Excell Auto Group?

A.    No.

Q.    All right.  Do you know if any of those cars were transferred to Excell Auto Group for any amount greater than the money than Karma paid for those cars?

A.    No.

Q.    All right.  So it was just -- all these transfers were always for the same amount of money?

A.    Yes.

MR. BRESLIN:  Thank you, I have nothing further.

THE COURT:  Thank you.  Very good.

Mr. Zankl, you can step down.

THE WITNESS:  Do I give these back to

Page 208

anybody?

THE COURT:  Where do we go next?

MR. BRESLIN:  Can we take a break, Judge, and I'll decide who my next witness will be?

THE COURT:  Sure.  Please, yes, give them back to him.  Are we all set?  Is there any reason that Mr. Zankl cannot remain in the courtroom?

MR. BRESLIN:  I would prefer that he didn't just in case we need him for rebuttal.

THE COURT:  Unfortunately you get to cool your heels in the lobby.

All right.  We'll take a five-minute break.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

THE COURT:  Thank you, everyone.  Hopefully that was enough time.

Ms. Leonard, let me know when we're ready.

ECRO:  We're ready.

THE COURT:  We're all set.  All right.

MR. BRESLIN:  Thank you, Judge.

THE COURT:  Whenever you're ready.  Should I wait?

MR. BRESLIN:  No, we're going to call Mr. Farache.

THE COURT:  Ahh.

MR. BRESLIN:  Daniel, do you have the recent depo of Mr. Farache?

THE COURT:  CMI started and stopped, by the way.

MR. SHRAIBERG:  Twenty years ago I spilled it all over the table, and now I have -- I'm scared to death about pouring it.

THE COURT:  You didn't spill it today --

MR. SHRAIBERG:  Oh, no, no.

THE COURT:  -- it was another day.

MR. BRESLIN:  Jonathan, are these from the first one?

MR. SHRAIBERG:  It's still in my head.

THE COURT:  I don't remember it.  It's just water.

MR. SHRAIBERG:  I think it was Judge Friedman.

THE COURT:  Oh --

MR. SHRAIBERG:  It was that long ago.

THE COURT:  -- and that's why you're afraid, I get it, I get it.

MR. FELDMAN:  Judge, just a housekeeping matter.

THE COURT:  Sure.

MR. FELDMAN:  We did ask during the break

Page 210

the other side to see this cooperation agreement with -- between FVP and Mr. Zankl.

We hope that they give it to us.  They're saying it may not have been in our discovery request, but we do think for purposes of having a full and forthright trial that that document should be provided overnight tonight and we can certainly look at it and if Mr. Zankl gets called back tomorrow on rebuttal, we can ask him questions about it if appropriate.

THE COURT:  And why are you telling me about this?

MR. FELDMAN:  Pardon me, Your Honor?

THE COURT:  Why are you telling me -- why are telling me about this?

MR. FELDMAN:  I just want to put it out there, Judge, just we've asked for it.

THE COURT:  All right.  Are we almost ready?

MR. BRESLIN:  Yes.

THE COURT:  Yes.  All right.  Go ahead.

MR. BRESLIN:  Mr. Farache.

THE COURT:  Good afternoon, Mr. Farache.

MR. FARACHE:  Good afternoon.  Can I take my paperwork and my water?

THE COURT:  You can take your water.  You can talk to counsel about whether you should take the

Page 211

other things.

MR. FELDMAN:  Yeah.

THE COURT:  Did you say no?

MR. FELDMAN:  No, I didn't say --

THE COURT:  Okay.

MR. MILLER:  I think it's in -- it's in Hebrew, I don't think anybody is going to be able to read it.

MR. BRESLIN:  Judge, where are we at on time?

THE COURT:  In terms of your used time, two hours and 55 minutes.

MR. BRESLIN:  Two hours?

THE COURT:  Yes, two hours and 55 minutes.

MR. SOFTNESS:  You've got seven left.

MR. FARACHE:  Just don't want nobody to drink it by mistake.

THE COURT:  I'm using a chess clock, it's digital.  Two hours and 55 minutes so far is what you've used.

MR. BRESLIN:  I'm pretty sure it was like two hours this morning, Judge.  I think we've used more time than that in all honesty.

THE COURT:  No, it doesn't include the cross-examination.

Page 212

MR. BRESLIN:  Oh, it doesn't?

THE COURT:  No, you should read my order more closely.

All right.  Could you please raise your hand?

Do you swear under -- under penalty of perjury that the testimony you're about to give before this Court is the -- will be the --

MR. FARACHE:  Yes, sir.

THE COURT:  -- hold on -- will be the truth, the whole truth, and nothing but the truth?

MR. FARACHE:  Yes, sir.

THE COURT:  Thank you.  You can have a seat.

You don't get punished for the time spent by your opponent questioning your witnesses, that's their time.

MR. BRESLIN:  Okay.

THE COURT:  All right.  Whenever you're ready.

MR. BRESLIN:  Thank you.  Thank you, Judge.

THE COURT:  They, by the way, have 46 minutes.

MR. BRESLIN:  Okay.

Page 213

Thereupon,

                    MOSHE FARACHE,

having been first duly sworn, was examined and testified

as follows:

                    DIRECT EXAMINATION

BY MR. BRESLIN:

          Q.    All right, sir.  Please state your name.

          A.    Moshe Farache.

          Q.    And, Mr. Farache, are you familiar with

the -- the plan that's been filed by your attorneys in

this case?

          A.    You talking about the Chapter 11?

          Q.    Yes.

          A.    Yes, as much as I -- as far as my knowledge.

          Q.    All right, and do you recall any information

that's in that plan?

          A.    Yes.

          Q.    All right, and, sir, since this petition for

reorganization -- this bankruptcy petition has been filed,

how many cars has Auto Wholesale of Boca bought and sold?

          A.    One.

          Q.    All right, and when was that?

                THE COURT:  Hold on, please.  Could you move

the microphone closer to you?

                THE WITNESS:  Oh, I'm sorry.

Page 214

THE COURT:  I'm just concerned it's not getting -- I can hear you fine, but I'm concerned the record won't reflect.

THE WITNESS:  You hear me or no?

MR. BRESLIN:  Yeah, I can hear you fine.

THE COURT:  Yes, we can all hear you.

THE WITNESS:  Ahh, okay.

THE COURT:  I'm just worried that the record, it won't record you.

THE WITNESS:  Got it.  Thank you.

THE COURT:  Go ahead.

BY MR. BRESLIN:

Q.    All right.  So you've sold one car; correct?

A.    Yes.

Q.    All right.  Now, in -- before you filed the petition, how many cars did you buy and sell with Excell Auto Group?

A.    How long you talking about?  2012 we start the operation until 2022, sometime in '22.

Q.    Well, let's just talk about '22.  How many cars did you buy and sell between Auto Wholesale of Boca and Excell Auto Group --

A.    So from --

Q.    -- in '22?

A.    -- 2012 until 2022?

Page 215

Q.    Just '22, just 2022.

A.    I don't know exactly.

Q.    Okay.  Did you -- in 2022, did Auto Wholesale buy cars from any company other than Excell Auto Group?

A.    I got to look in my paperwork.

Q.    I'm just -- just tell me what you remember.

A.    Probably, yes.

Q.    Can you name any of them?

A.    Let me look in my paperwork.

Q.    All right.  But can you name -- as you sit here today, can you name a customer or company that you bought and sold a car with in 2022?

A.    If you let me look in my paperwork, I can given you the whole paperwork.

Q.    Now, do you recall being asked about what you would do if you were -- if the Judge allows you to reorganize in this case?

A.    Yes.

Q.    All right.  Do you recall that you answered that question by saying you'd figure it out?

A.    I'm an owner of a business, so I got to figure out.

Q.    All right.  So -- so my question to you is, do you have any concrete plans on how to reorganize your

business?

A.   You want me to tell you verbal or you want me to create a business plans?

Q.   No, I want you -- I want you to tell me what plans you have for this business if the Judge allows this business to reorganize.

A.   If you look in AWB in 2011, it require additional space in 47 -- 4871 North Dixie Highway, and if you -- all the car been store -- all AWB vehicles storage over there.

If you look in the front of the building and it's still in process until today, the building going to get paint, we paving the building.  We have by -- we supposed to start last -- the end of last years, moving vehicles, buying and selling.  The same like automobile, it's not --

Q.   All right.

A.   -- you don't have to be a genius.  You just need to use your own money, buy vehicle, sell vehicle.  If you borrow money and you pay interest, maybe you -- and you use the money for lifestyle, maybe you should not be in business.

Q.   So what you're saying is that you've been in business for 40 years, and that you would figure out how to make money, would that be an accurate statement?

Page 217

A.    I been in this country from 1995, and I think I always employer over excess, sometime over 120 employee, sometime subcontractor all over the country for millions and millions.  You can put my name in the top of the world and nobody can point the finger and say I owe them one penny, and if I owe them, I got to pay them. That's the way I run my life and my business.

Q.    Now, so are you -- well, let me ask you this just straight, is -- is AWB a car dealer or is it a lender?

A.    AWB is a car dealer.  When AWB go to the auction, what is a billion and billion dollars every years, do you think they going to accept AWB as a lender to buy cars or as an end user or as a dealer?  We have the license.

Q.    All right.  So you're saying because you have a license, that AWB is a buyer and seller of cars?

A.    Same like you.  You are a lawyer.  You have a license.

Q.    No, but my question to you is, I'm trying to figure out what -- what you're going to do with the company if -- if the Court allows this company to reorganize, and what you're telling me is that you -- that AWB is, in fact, a buyer and seller of cars because you have a license; is that accurate?

Page 218

A.    Give me one year and I show you what I can do.

Q.    All right.  Now, would you agree in the past three years that AWB has lost money every year?

A.    If -- if you read the tax return and you understand what you read, AWB always reinvest the money from its business.  AWB, the owner of AWB, they no have a lifestyle, luxury lifestyle with the milking the company, so the company stay healthy.  If you look in AWB, always reinvest the money.

Q.    Now, would you agree, sir, that if you're in the car business and you buy a car and you're going to sell the car, that it would be a good business decision to sell that car for a profit?

A.    At the end of the years we make profit, and we no have any -- besides one friends any lender.

Q.    All right.  So my question to you, sir, is, if AWB buys a car, would you agree that it is a sound business decision to sell that car for a profit?

A.    Always.

Q.    Okay.  Now, let's look at just 2022, and let's look at Excell Auto Group.

Did AWB ever buy a car from Excell and sell it back to Excell for a profit?

A.    All the cars, you have the spreadsheet.

Q.    Sir, my question to you is very simple, in 2022, AWB alleges that it purchased a lot of cars from Excell; correct?

A.    Yes.

Q.    A lot of cars; right?

A.    In 2022?

Q.    Yeah.

A.    Normal.

Q.    Huh?

A.    Normal.

Q.    Normal?

A.    I mean, we doing business for ten years.

Q.    Okay, but let's talk about 2022.  In 2022, AWB bought numerous cars from Excell; correct?

A.    As a normal business, yes.

Q.    Okay.  Now, can you recall any of these transactions in 2022 where AWB purchased a car from Excell, and then sold the car back to Excell for a profit?

A.    All the cars, you always going to see bill of sale when we purchase it, bill of sale when we sell it back to end user, dealership or anybody, and then if it's a profit, we create additional invoice for the profit.

Q.    All right.  So name one transaction, name one time you bought a car from Excell in 2022 where you sold it to an end user.

Page 220

A.    Say it again, I'm sorry.

Q.    In 2022, and I'm not talking about the cars that you -- that you took --

A.    I got to look in my spreadsheet.

Q.    All right.  Is there any cars that -- that you purchased from AW -- from Excell in 2022, that you sold to an end user?

A.    I just need to look in my paperwork.

Q.    All right.  So as you sit here today, you knew you were coming to court today, you knew --

A.    I have it.

Q.    -- you knew you were going to have to testify; right?  Did you look at your records before you came to court?

A.    I look in all my record.

Q.    Okay.  So when -- when you look at your records, is there -- is there a car that you purchased in 2022 that you sold for a profit?

A.    If you have excess of few million dollars, AWB bought a car, but it got nothing to do with Excell, and we sold them to end user, we sold them to other dealers or we sold them in the auction.

Q.    How many salespeople does AWB retain?

A.    In the time it's happen, we have one salesperson.

Page 221

Q.    And who -- who was that salesperson?

A.    One of my son friends.

Q.    Okay.  Now, let's take a look at the cars that are the subject of the adversary complaint.  Can we -- can we just look at those cars, talk about those cars for a moment?  Do you know which cars I'm talking about?

A.    Just ask me and I tell you.

Q.    Okay.  All right.  So one of the first cars that is listed in the adversary complaint is a 2017 Ferrari with a VIN 1036.

Are you familiar with that car?

A.    That's a red Ferrari?

Q.    I don't know.  It's the number one car in this -- in the adversary lawsuit.

A.    2017 Ferrari 612?

Q.    It's a 2017 Ferrari.

A.    Can you look in the color, please?

Q.    I don't have the color.  So let me ask you this --

A.    You need to be more specific.  I want you to ask me the question.

Q.    All right.  Good.  So how much did -- who bought that car, what company?

A.    You got to show me the paperwork.

Page 222

Q.    Well, did -- did AWB buy the car from -- from a customer or did it buy it from a company?

A.    I need to look in the paperwork, please.

Q.    Now --

MR. MILLER:  Objection, Judge, argumentative.  The witness is trying to get his recollection -- refresh his recollection.  The attorney is not offering the document to refresh his recollection, so he's asking him to guess.

THE COURT:  Okay.  Well, the objection was way too long for -- for what's required.  Sustained.

He's already told you he doesn't know what car you're talking about.  So you can ask as many questions as you want about whatever Ferrari that is, but he doesn't know what Ferrari it is.

MR. BRESLIN:  Okay.

THE WITNESS:  I -- I tried to help him, I'm sorry.

THE COURT:  Yep.  Just wait.

THE WITNESS:  I'm sorry.

BY MR. BRESLIN:

Q.    All right.  What -- what document are you referring to that may help you refresh your memory about this particular Ferrari?

A.    I mean, we have one Ferrari 2017 in the

Page 223

list. So if you -- you know, if you tell me, you know, red, maybe it's helping. You know, I want to give you the right information.

Q.   All right. If there's one on the list, that's the one I'm talking about.

A.   Please show me the document.

Q.   What document would you like to see?

THE COURT: Hold on a document. Is there only one on the list in the adversary? There's only one Ferrari? I don't remember that, I thought there was more than one.

MR. BRESLIN: Well, there's a BMW, GMC --

THE COURT: No, don't read them all out loud. This is not counting on fingers.

THE WITNESS: It's two red Ferrari. I just --

THE COURT: All right. So if you want to ask questions and there's two on the list and they're both red, you have to be more specific.

It's got to be the most popular Ferrari color one would expect.

BY MR. BRESLIN:

Q.   Okay. Why don't you find whatever you're referring to and let me take a look at it, what you want to look at.

THE COURT:  You can go ahead, sure.

THE WITNESS:  Can I get up and do it?

THE COURT:  Yes.

THE WITNESS:  Thank you.

BY MR. BRESLIN:

Q.   And may I see, sir, what you -- what you have in your hand?

A.   I going to tell you the VIN number.  You know your stuff.

Q.   May I -- may I see?

A.   Yes.  Thank you.

Q.   All right.  That would be the number two car on your list.

A.   Okay.  Number -- can I talk or --

THE COURT:  Well, why don't you ask a question.

BY MR. BRESLIN:

Q.   All right, sir.  You can sit.

All right.  The number two car on your list, who purchased that car from a customer?

A.   Say it again, I'm sorry.

Q.   Who bought that car from a customer, the Ferrari?

A.   I've got to look, you're going even farther.  Not -- not AWB, we don't buy it from the clients --

Page 225

Q.   Okay.

A.   -- this particular vehicle.

Q.   Okay.  Did AWB buy that car?

A.   Yes.

Q.   Who did AWB buy that car from?

A.   I going to look for a second and I tell you.
Excell Auto.

Q.   Okay, and when did Excell Auto sell that car
to -- to AWB?

A.   February 2, '22.

Q.   Okay, and where did Excell get that car?

A.   You should ask him before he left.

Q.   Okay.  All right.  Let's go to the -- do you
know -- do you know what -- where that car came from?  Do
you know if Karma bought that car?

A.   I can't tell you.

Q.   Okay.

A.   I got to look farther.

Q.   All right.  So all you know is that you
purchased the car for $300,000 from Excell Auto Group;
correct?

A.   Yes, sir.

Q.   Do you know how Excell got that car or how
much it paid for it; correct?

A.   I know he paid 300,000 based on a verbal

phone call.

Q.   Okay.  So you bought that car for the same amount of money that it was purchased for; is that accurate?

A.   I don't know exactly, base on a verbal. When I say to you base on a verbal, its mean Mr. Zankl call me in the morning and he say to me, Moshe, I have a good deal to buy a Ferrari, 2017.  We can make couple dollars on it.

I say, as long as you have the clean title, the vehicle, I can see it, and see it's there, I no mind to write the check, that's our business, we buying and selling vehicle.

If we have the fund, anybody can call -- any dealer -- any dealership, you knock on the door and you say, I have this vehicle for sale.  As long as they have the position of the vehicle, the title, they can buy it. It's a business.  That's everybody business, a dealership, buying and selling vehicle.

Q.   All right.  So my question to you, sir, is, you don't know what company bought that car or when or for how much?

A.   I can't tell you on the top of my head.

Q.   All right, and so how do you know that that car was worth 300,000?

Page 227

A.    Michele does our inhouse, she look in all the retail dealership for exotic car in the country.  You know, you go to Manheim, you plug the VIN number, you plug the year of the car, you doing everything, and you can see in every jacket deal we have all the research, and we just want to make sure we are not above water, and if it's a good deal for AWB, that's our business, we buying.

Q.    Okay, and so in 2022 before the cars you took, how many cars did AWB purchase from Excell Auto Group, just generally, ballpark?

A.    I can't tell you.

Q.    All right.  Well, let me ask you this, for all the cars that AWB bought from Excell in 2022, did it ever sell even one of those cars back to A -- to Excell for a profit?

A.    Yes.

Q.    Which car?

A.    I can't tell you just by looking, this is a different spreadsheet.

Q.    All right.  So you're telling me there was a car that -- that AWB purchased from Excell, and then when it sold it back to Excell, it sold it at a greater price?

A.    Have to.

Q.    Okay.  Now, why would Excell sell you a car and then buy it back for a higher price?

Page 228

A.    Because AWB, as a dealership and as authorized dealer, always can buy the vehicle and not have the end user or lender or anybody else, they have to pay sales tax.

We, as a dealer, we don't have to pay the sales tax because it's dealer to dealer, and that's why we doing those transaction of buying and selling.

You should also look in the other jacket when AWB purchase the car from auction or somebody else, and sold it to Excell, so it's similar two transaction. AWB is the initial, bought the car from clients and sold it to Excell or sold it to the auction or sold it to the end user.  It's the same transaction, bill of sale.

Q.    All right.  Mr. Farache, can you identify this -- this transaction you're talking about where AWB purchased a car from a customer?

A.    Can I look in my paperwork, please?

Q.    You have the paperwork in front of you, don't you?

A.    No, that's not the right paperwork.

Q.    All right.  Well, let's -- let's just talk about the --

A.    Give me a minute.

Q.    Well, let's talk about the 20 cars you have in front of you.

Page 229

Now, we talked about the Ferrari, and you would agree that the car was purchased by AWB for the exact same amount of money that it was purchased by Excell; correct?

A.    Yes.

Q.    Okay.  Now, let's go to the Aston Martin. Okay.  I believe that's probably car number one.

All right.  Now, you -- you were aware, sir, that Karma bought that company from a company called HitFigure in -- on February 1st for 175,000; correct?

A.    I have no idea.

Q.    Okay.  Now, if Karma bought that car for 175,000 on February 1, 2022, how was it that AWB purchased that car for the same 175,000 three weeks later on February 28th?  How did that work?

A.    If Excell Auto sitting here, pick up the phone and say, hey, Mr. AWB, I have an opportunity to buy vehicle, Aston Martin it's called, and it's 175,000.

Hey, Mr. Zankl, what do you think we can sell it?  I never no going to disappoint you, we always going to make profit.  We doing it for ten years, no problem.  Please make sure I stop by the store, I want to see the vehicle, I want to see the title, money is not issue --

Q.    Okay.  So you would --

Page 230

A.   -- buying it.

Q.   You would agree that Karma bought that car for $175,000 on February 1, 2022; correct?

MR. FELDMAN:  Objection, mischaracterizes his testimony.

THE COURT:  Sustained.

BY MR. BRESLIN:

Q.   Do you know if Karma bought that car for 175,000?

MR. FELDMAN:  Objection, asked and answered.

THE COURT:  Sustained.

THE WITNESS:  No.

BY MR. BRESLIN:

Q.   Okay.

A.   I know --

Q.   Can you -- all right.  Let me ask this --

THE COURT:  There was a -- hold on.  If --

THE WITNESS:  I'm sorry, I'm just --

THE COURT:  That's okay, I understand.  If counsel to the debtor --

THE WITNESS:  I'm trying to make his life short because he ask me --

THE COURT:  Well, that --

UNIDENTIFIED SPEAKER:  Whoa, whoa, whoa, whoa, whoa.

Page 231

THE COURT:  Yeah, don't do that.

MR. BRESLIN:  That's hard.  I don't want to die.

THE COURT:  All right.  So hold on, hold on. That's enough, that's enough, that's enough.  No, just --

THE WITNESS:  No, no, I'm trying to make it simple.

THE COURT:  I get it, I get it.

THE WITNESS:  God forbid.  I'm trying to -- I know the answer.

THE COURT:  Okay.  Hold on, hold on, Mr. Farache.  If there's an objection from counsel table on your side of the courtroom and I say sustained, don't answer, okay?

THE WITNESS:  Then its mean don't answer.

THE COURT:  Don't answer.

THE WITNESS:  Okay.  I going to practice.

THE COURT:  Right.  Okay.

THE WITNESS:  I'm sorry.

THE COURT:  Go ahead, Mr. Breslin.

BY MR. BRESLIN:

Q.   Okay.  Let's -- we'll let -- the paperwork speaks for itself.

Let's go to the next car.  That's a 2020 Mercedes with VIN 6462.  That's one of the cars at issue

Page 232

in this case.

Are you familiar with that car?

A.    Let me --

Q.    The 6462 Mercedes.

A.    Wait, you are too fast now.  What's the VIN number, I'm sorry?

Q.    6462.

A.    Okay.

Q.    And would you agree, sir, that your own business records show that Karma bought that car for $235,000 on February 18, 2023?

A.    I have no idea.

Q.    Okay.  Well, do your records show that Excell sold that car to AWB for $235,000 five days later?

A.    If you look in the deal jacket, you look in the bill of sale, you look if we pay for it?

Q.    No, I'm not asking if you paid for it, I'm talking about the price.  We're just talking about prices.

A.    If that's what the bill of sale say, that's what we pay for it.

Q.    Well, I'd like you to explain to me why a company would pay $235,000 for a car and give it to you for the same price?

A.    That's our business.

Q.    Well, I understand that's your business, but

Page 233

how do you explain their business?

MR. FELDMAN:  Objection, speculation.

THE COURT:  Overruled.  If you know the answer.

THE WITNESS:  You should ask him couple minutes ago.  I don't know what to tell you.  I mean, you know, you ask me question like I'm Mr. Excell.

BY MR. BRESLIN:

Q.   Okay.  Well -- well, you're a businessman. When you buy -- when you buy something, and you're in the business of buying and selling, you typically then sell it for more money, don't you?  You don't know?

A.   It's his business.  I -- I do it.

Q.   Okay.  So if you're in the car business, you buy a car for a certain amount of money and the goal is to sell it for more money; right?

A.   Look in the website, maybe you going to find out.

Q.   Okay.  Well, if you're in business with Karma, you're doing business with Karma or you're doing business with Excell, and you would -- you would want them to make money, wouldn't you?

A.   I always want to make sure everybody make money.

Q.   Okay.

Page 234

A.    But, you know, it's 20 years of experience.

Q.    All right.  Well --

A.    Ten in years of experience.

Q.    Well, can you -- can you -- let's just get to the bottom line here.

Can you point out any car on your list, on your entire list, where you didn't -- where AWB didn't get that car for the exact same amount of money that -- that Karma paid for it?

A.    If you give me a second.

Q.    No, I'm talking about the list you have in your hand.

A.    Say it again, I'm sorry.

Q.    The list you have in your hand, those are the cars that we're -- that we're fighting over in the adversary case; right?

A.    Yes.

Q.    Okay.  If you -- if you look at that list, every one of those cars was purchased by Karma, correct, from a customer?

A.    I don't know.

Q.    A hundred percent -- a hundred percent of them; right?

A.    I don't know.

Q.    Okay.  Well, wouldn't -- if you're in the

car business, wouldn't it be -- shouldn't you know where the car is coming from?

MR. FELDMAN:  Objection, calls for improper opinion.

THE WITNESS:  It's --

THE COURT:  Interesting, stop.  I don't even know, is that an evidentiary objection?

MR. FELDMAN:  Yes, it's actually evidentiary --

THE WITNESS:  I'm trying -- I'm trying --

THE COURT:  Wait, no, just hold on.

MR. BRESLIN:  It's an improper opinion.

THE COURT:  Don't talk, don't talk.

MR. FELDMAN:  Improper opinion.

THE COURT:  It's opinion testimony?

MR. FELDMAN:  Yes, correct, Judge.  It's -- it's -- either he's a fact witness or he's an expert.

THE COURT:  He's testified he's a car dealer.  Overruled.

BY MR. BRESLIN:

Q.  Let's try another car, and we'll just do a couple more because I asked you whether or not any of the cars were purchased by -- well, let me -- let me rephrase that.

Would you agree with me that every car on

the list that we're fighting over in court was purchased by Karma?  Would you agree with that?

MR. FELDMAN:  Objection, asked and answered.

MR. BRESLIN:  I didn't get an answer.

THE COURT:  I'm not sure it was.  Overruled.

THE WITNESS:  I don't know.  I mean, I -- I don't -- you know, you are -- you are the professional. If you say to me I did something, you know, you should bring to me every -- one by one vehicle and prove to me it's bought by Karma and then sold to Excell, and Excell sold it to AWB or sold it to end user.

You know, when you -- I just going to tell you something.  When you go to the auction, you buy a car. You agree for $10.  The end of the day my office, I have line of credit over there, so they don't worry about the money, they give me ticket to leave the auction with the vehicle.

I Federal Express to them the money or I wire to them the money, send to them by check or be fast, go to my office, bring a check because I got to pick up the car, whatever.

I bring the car.  You know what they give me, title.  Then if I ask them --

MR. BRESLIN:  Judge --

THE WITNESS:   -- excuse me, if Jerry Breslin

Page 237

own the car prior --

MR. BRESLIN:  -- can you instruct the witness to answer --

THE WITNESS:  -- they no tell me.

MR. BRESLIN:  -- my question, please?

THE COURT:  Yes.  You should focus on the questions and answer the questions, please.

THE WITNESS:  Okay.  Sorry.  I'm sorry about it.

MR. BRESLIN:  All right.

THE COURT:  I had to wait a long time for you to say that, Mr. Breslin.

BY MR. BRESLIN:

Q.    Okay.  Well, let me -- let me ask one more question.  Let me just tell you that every car on the litigation list was purchased by Karma Palm Beach.

Were you aware of that?

A.    Nope.

Q.    Now, were you also -- all right.  So you were not aware of that.

So were you aware, sir, that every one of those cars was then sold, if it was sold at all, because some were and some weren't, to AWB for the exact same amount of money that Karma paid for the car?

Were you aware of that?

Page 238

A.    No.

Q.    Okay.  Well, if you're in the car business and you're asking this Judge to let you stay in the car business, don't you think that's something that you ought to know?

A.    You -- you ask a question, you know, if tomorrow you sell to me something and you agree, and to me it's a good deal, what I should worry about the last person?

I'm a businessman, and always remember one things, if I make the decision to buy the vehicle or buy anything, as a businessman, as an owner of the business, you know, we take care about -- over my lifetime I'm always in the service business, over hundred and hundred -- millions of resident of all America, and I can tell you one things, if my employee make a mistake or I make a mistake, I pay for it.

So if I make the decision to purchase the vehicle, and we lose money, that's my responsibility.  I'm the owner of the business.  What else you want me to tell you here.

Q.    Well, Mister -- I'm trying to -- I'm trying to figure out how much you know about the car business because it seems to me that you buy cars for one price, and you sell them for the exact same price.

A.    It's not true because you always has an invoice attach with the profit.

Q.    Okay.  All right.  So you would agree then that -- that your company would buy a car for a price from Excell, and then sell it right back to Excell for the same price, but then there would be a little check called profit; right?

A.    You can't bill, we own the -- when you look in a business, you always have every car is an asset of the company, and when you sell it, you always want to bring back the asset, when you sell the vehicle, and then after that, you bill the clients for the profit.

We working in different businesses, so we charge machine --

Q.    Sir, I --

A.    -- we charge the time of the machine, and then we have labor and we have overhead and profit.  We entitled to charge for labor and machine, overhead and profit.  So it's the same -- every business is the same thing --

Q.    All right.

A.    -- different invoice.

Q.    Sir, getting back to the car business and -- and when we look at all the transactions that occurred in 2021, and there were over a hundred of them, where Excell

Page 240

sold the car to AWB, and AWB sold it back to Excell for the same amount of money, would you agree with that?

A.   You look in the invoice for the profit?

Q.   No, I'm looking at the invoice for the car. We'll talk about the -- we'll talk about the profit in a moment.

But would you agree, would you -- just listen to me.  Would you agree that in 2021 there were over a hundred transactions where Excell sold a car to AWB, and then AWB sold it back for the exact same amount of money?  Would you agree with that?

A.   But you looking in the same thing and I explain to you AWB --

MR. BRESLIN:  Please instruct the witness to answer.

THE COURT:  Can you -- it's a yes or no.  Is the answer no or yes?

THE WITNESS:  I mean, yes, we receive one check -- we receive one check for the automobile, what we sold, and then we invoice them for the profit.

BY MR. BRESLIN:

Q.   How do you determine profit when you buy and sell a car for the same amount of money?

A.   Because we have ten years of relationship and he tell me, Moshe, in this vehicle, we -- after all my

Page 241

expense, that's the profit, and if it's 50/50, I get my share.

Q.    Okay.  But -- all right.  Let me ask you something.  How does profit come into this?  If -- if Karma bought a car for, let's say, a hundred thousand dollars, and sold the car for, let's say, $110,000, would AWB then be entitled to $5,000?

A.    Depends if AWB own the vehicle.

Q.    Okay.  So -- all right.  So what you're saying then is, AWB is only entitled to a profit for the vehicles that it bought from Excell and sold back to Excell for the exact same amount of money; is that your testimony?

A.    You little bit -- I lost little bit over there, I'm sorry.

Q.    Okay.  All right.  I'm trying to figure out -- and you're a businessman, and you've said how successful you are.  I'm trying to figure out why a business would buy a car for a certain amount of money, and then sell it for the exact same amount of money.

Okay.  Why would a business buy a car for a hundred thousand dollars, and sell it to you for a hundred thousand dollars, and then buy it back from you for a hundred thousand dollars, just to sell it to a customer for $110,000?  How does that work?

Page 242

A.    You got to be -- you got to be more specific.  Show me the deal jacket, show me our paperwork from AWB, and I can answer you a better answer.

Q.    Okay.  Let's -- let's go back to the cars that are at issue in this case.

Let's go to the GMC, the 2019 GMC, and this happened on the same day.  Karma Palm Beach -- Excell sells the -- Excell sold the car to AWB on March 15th for 57,000, and Karma of Palm Beach sold the same car to AWB on -- on March 15th for 57,000.

Can you explain that in your deal jackets?

A.    The only things I can tell you if I look in my deal jacket, and I can bring Michele also to just refresh my memory, I going to tell you exactly.  But if we have a bill of sale, we see the vehicle, we got the clean title, we wire the money.

Q.    Okay.  Let's -- let's take a look at car number six, the 2018 McLaren.  Karma Palm -- Karma of Broward --

A.    Wait, wait, I'm sorry, number six is not McLaren in my list.

Q.    All right.  Well, it's this 0606 VIN McLaren?

A.    Wait, you're too fast.  Can you give me one second?

Page 243

Q.    Sure.

A.    Can you tell me the year?

Q.    Yeah, it's a 2018 McLaren, the 0606.

A.    2018 McLaren.

Q.    Now, would you agree, sir, that Karma of Broward --

A.    Wait, you've got to give me -- can you give me a little bit chance, please?

Q.    Yep.

A.    Can you repeat the four digits of the VIN number, please?

Q.    Yes, it's 0606, 2018 McLaren.

A.    Wait, I no find it yet.

Q.    Did you find it?

A.    No yet.

Q.    Well, let me just ask you a question, and I'll give you a question.

          Assume for the purpose of my question that Karma of Broward bought that car for $255,000 on January 25, 2022.  Explain then why that Excell sold that car to AWB on February 28th, a month later, a little over a month later, for the same 200 -- $255,000.

          Can you explain that?

A.    I -- I going to explain to you, but I'm still looking because I have -- I have 2018 -- I just want

Page 244

to find the car so I can be more specific.  It's a McLaren, correct, 2018?

Q.    All right.  We can move on to the next one.

A.    No, no, we won't, you want -- you want answer now.

Q.    Okay.  Just what I'm trying -- what I'm trying to find out from you is how these car transactions work where your car -- your company that you're asking this Judge to keep in business, buys and sells cars over a hundred times for the same amount of money.

A.    I -- I think you -- I no have this car on my list.

Q.    Okay.  Well, let's go to the next one. Let's take a look at O328 2021 Mercedes.

A.    Tell me again, what kind of Mercedes, please?

Q.    It's a Mercedes -- I don't know.  It's a -- it's a 2021 Mercedes, VIN 0328.

A.    Okay.

Q.    Got it?

A.    Yes.

Q.    Okay.  Now, did Karma of Broward buy that car on January 25, 2022 for $265,000?  Do you know?

A.    I don't know.

Q.    Okay.  Now, would you agree that -- that

Page 245

it's your contention in this lawsuit that AWB bought that car for $265,000 on February 16, 2022?

A.    Yes.

Q.    Okay.  So if your company bought this car for $265,000 on -- on February 16, 2022, didn't you like look at where it came from?  Didn't you take a look at who owned it before you?

MR. FELDMAN:  Objection, asked and answered.

THE COURT:  Sustained.

MR. BRESLIN:  This is a different car.

THE COURT:  Oh, okay.  Overruled.

THE WITNESS:  What's this mean, I can say --

THE COURT:  You can answer, sure.

THE WITNESS:  I mean, I don't know where -- you know, it's not my business.  As long as the number work for me, I bought it.  It's my business decision.

BY MR. BRESLIN:

Q.    Okay.  Listen, and just so we're clear, I'm not arguing about ownership here, I'm just trying to figure out where these prices come from.

Can you explain why -- why Karma of Broward would spend $265,000 to buy a car just so another company can sell it to you for the exact same amount of money? How does that pay their rent?

MR. FELDMAN:  Objection, asked and answered.

Page 246

THE COURT: Overruled. I'm hoping there will be eventually an answer.

THE WITNESS: It's the owner of the vehicle, the company -- the dealership make the decision to sell to AWB the vehicle. And when he make the decision, I now go, I check it, I see the retail price, it can be excess of 275, 280,000, and the number make sense to me, so I go with the deal based on the relationship and a lot of trust, ten years of relationship.

BY MR. BRESLIN:

Q. Okay. So you got a good deal is what you're saying. You got it -- you got it for the exact same amount of money that they paid for it; right?

A. I can tell you one thing, this particular car, it's another guy he told to get a better deal, and the car sold to third party, so --

Q. Well, you get a lot of good deals with -- with Excell, didn't you?

MR. FELDMAN: Objection, argumentative.

THE COURT: Sustained. So, Mr. Breslin, I'm assuming that the documentary evidence would support the kind of questions you've been asking for the last 15 minutes, yes?

MR. BRESLIN: Well, yeah, I'm going into the rehabilitation thing a little bit because, you know, I

Page 247

think -- I think we need to test whether or not this is a real -- a real business, and like -- like I said in my opening statement, and there -- there have been questions to Mr. Farache about how are you going to rehabilitate this business.

And he says, well, I'm going to reinvent the wheel, I'm going to figure it out --

THE COURT:  Well, you may ask those questions.

MR. BRESLIN:  -- and -- and I'm just --

THE COURT:  I'm talking about -- hold on. I'm talking about the sales in and out, identical prices.

MR. BRESLIN:  Right, right.

THE COURT:  All that's in the documentary evidence; right?

MR. BRESLIN:  Yeah, that evidence is unquestionable.  Now -- now, I'd like to find out how -- how he will transition a business where he's buying and selling --

THE COURT:  You don't need to preview that, you can go ahead and ask the questions.

MR. BRESLIN:  All right.  Okay.

BY MR. BRESLIN:

Q.   Well, let me ask this, every one of these transactions we -- we look at, you bought a car from

Page 248

Excell Auto Group; right?

A.    I don't know what you referring to.  You know, you -- these cars --

Q.    Well, look at every one on your list.  Every one of those cars on your list you bought from -- you bought from Excell or you say you bought from Excell; right?

A.    Not all from Excell.  If you look in the list, I mean, some of -- there are Karma Palm Beach, there are Karma Palm Beach, Karma Palm Beach, Karma Palm Beach, some from Karma Palm Beach, some from Excell.

Q.    Okay.  All right.  So that's -- that's one customer, that's Scott Zankl; right?

A.    You have also some vehicle -- I'm not sure during -- we bought it and he bought it from us.

Q.    Okay.  Well, but, you know, Karma Palm Beach is out of business, Karma Broward is out of business, and Excell is out of business, would you agree?  Yes or no?

A.    I don't know.  I know about Excell, yes.

Q.    Okay.  So where -- where are you going to find another company to buy cars and sell them to you for the exact same amount of money?  Where are you going to find such a -- such a company?

MR. FELDMAN:  Objection, calls for speculation.

Page 249

THE COURT:  Sustained.

THE WITNESS:  I can answer?

THE COURT:  No.

BY MR. BRESLIN:

Q.   All right.  Let's -- they're in evidence. All right.  So let's -- let's take a look at Exhibit 32.

Now, I'd like you to take a look at that and ask you if you recognize that e-mail?

A.   Can you please read it to me so I can understand it, please?

Q.   Yes.  It's an e-mail from you to Scott Zankl, and it's -- it's -- there's a copy to your wife, Scott Gherman, Nidia Leiva, Teddi Powlen, and Michele Martin, and it's dated January 18, 2022, and it says temp loans.  Do you remember that?

A.   Yes.

Q.   Do you recall -- do you recall that e-mail?

A.   Yes.

Q.   Did Mr. Gherman write that e-mail for you?

A.   I don't think so.

Q.   All right.  There's -- there's agreements attached to it, there's spreadsheets and agreements and things of that nature.

Would you agree that someone else prepared that?

Page 250

A.   I no see the rest of the paperwork.

Q.   Okay.  Let's scroll down.  All right.  Let's make that bigger.  That's the first exhibit.

Does that document look familiar to you?

A.   Yes.

Q.   All right.  Now, so do you recall when I took your deposition and I asked you if you were a lender, that if you loaned money, and you said no, I'm a purchaser of cars, I'm not a lender.

Do you remember saying that?

A.   Yes.

Q.   Is that still your testimony?

A.   If I have bill of sale, the same like I told you in the deposition, based on my memorize, if I have a bill of sale and I purchase the car and I pay for it, I'm buying and selling vehicle.

Q.   All right.  My question during the deposition, I asked you it many times, I asked you whether or not you ever loaned any money to the Excell company and you told me no.

Do you remember that?

A.   I told you I have one loan with Excell.  I have short term -- if you look at it in the past, we have some agreement about loan.  I have a loan with MMS and you no see -- when its come to a loan, you never no going to

Page 251

see any vehicle or any bill of sale.

Its mean we lend to him the money based on him tell us I going to relocate this vehicle to the owner in Florida or Michigan and we lend to him the money.

THE COURT:  Hold on a moment.  Could you restate that question so I understand what your question was because I want to know if that was responsive at all.

I don't think it was, but your question was, is he still testifying that he never made a loan to Excell?

MR. BRESLIN:  Yes.

THE COURT:  Okay.  Did you ever make a loan to Excell?

THE WITNESS:  Yes.

THE COURT:  Okay.  Go ahead.

BY MR. BRESLIN:

Q.   All right, and when did you make a loan to Excell?

A.   In the past.

Q.   All right.  Was that a short-term loan?

A.   Depends, you got to show me the paperwork.

THE COURT:  No.  He asked you if it was a short-term loan.

Do you understand what a short-term loan is?

THE WITNESS:  For individual deal like --

THE COURT:  No, ask a different question.

BY MR. BRESLIN:

Q.    All right.  Well, let's just take a look at -- what it talks about here, it talks about a credit line.  Did -- did Excell have a credit line with AWB?

A.    He has agree amount to purchase vehicle. What we say is, this particular commitment you can buy and sell vehicle.  It's not mean we giving to him the money and he can go and use it for operation, cost of operation, he have to purchase vehicle with this money.

So he purchase the vehicle, we purchase -- we buy -- he send to us a bill of sale base on clean title, vehicle, and we purchase it from him.

Q.    Well, sir, getting back to my question -- well, let's just look at the screen.

Do you see where it says monthly interest?

A.    Yes.

Q.    Is that monthly interest that's paid on a loan?

A.    I mean, that's what we agree on the time.

Q.    You agreed at the time with who for what?

A.    We have -- if you go back to 2012, we have -- before we can be a dealer, we agree to -- we no play with this kind of number, we start small.  But you know, when you look at it overall, that's the agreement

base on him using this portion of the money, and if he sell them and he make a million dollar a month, he no have to worry about it, that should be enough for him to feel comfortable with his business.  He commit to amount of money, monthly fee, and that's what we agree for, and this money is only to buy and sell vehicle.

Q.    All right.  So this -- this monthly interest number in this spreadsheet that you sent to Mr. Zankl, that's not interest that -- that he was paying on a loan; is that right?

A.    Excuse me?

Q.    Was that interest that he was paying on a loan?

A.    It's a promissory note, but if you look in it, that's the way we bought and sold cars, and that's the number we agree for a monthly payment.

Q.    Okay.  So what you're saying is there's a promissory note, and like you testified in your deposition, the promissory note was your safety net just in case he didn't pay you for one of your cars that he sold; right?

A.    It's the memorization of the whole amount of money what we buying and selling cars, the two and a half million for this particular portion.

Q.    Okay.  So you didn't -- he didn't -- there

Page 254

was no such thing as a credit line?

A.     No such thing as credit line --

Q.     Okay.

A.     -- because you buying and selling cars.

Credit line is you -- you basically have the money and you just take as much as you need.  I don't know how do you --

Q.     Let's go to the next page.  Now, this talks about Auto Wholesale inventory, right, first line and second line.

Explain to the Judge what that's all about.

A.     This particular -- if you looking at it, it's $2 million, $664,000 and $450, and zero, zero, zero, this particular portion of the money, we bought and we sold cars.

So if he bought a car, if XYZ stop in the store and he bought a car for a hundred fifty thousand, and he trade back a hundred thousand dollar car, so Mr. Zankl use this particular money to purchase that.

So he call me, he say, Moshe, I just want to let you know, I have couple cars coming this week, I need you to buy them.

As soon as I struck the deal, I going to send you the bill of sale with the title, with the vehicle.

Q.   All right.  Just -- just to be clear --

A.   Let me finish, please.

Q.   Go ahead.

A.   When Michele -- between me and Michele, we go, we make sure the vehicle is there, we purchase it, and when he sell it, we sell it back to him.

Q.   Okay.  So what this -- what this list, this spreadsheet shows, is that these are cars that -- that AWB purchased; right?

A.   All the cars AWB purchased --

Q.   So every -- every car --

A.   Excuse me, let me finish.

THE COURT:  Well, actually, no, you're not answering the question.

Could you please look at the document in front of you?

THE WITNESS:  I look at it.

THE COURT:  Okay.  He asked you if all of those cars were purchased by AWB.

The answer is either a yes or a no.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.   Okay.  So when -- when this -- at the bottom of each of -- of these columns it says credit line, that's not, in fact, a credit line, that's a list of cars that

AWB owns; correct?

A.    Where you -- you know, when you looking at, you know, all of this particular list, this is AWB inhouse paperwork to --

Q.    Oh, okay.  All right.  So this was not for publication, it was inhouse?

A.    It's -- what do you see, I mean, it's your spreadsheet inside your office to track where is all your asset, your vehicle.  Every company, you have vehicle if you are in the service business.  So you have an asset list with the title with all the -- if you own them.  It's the same thing.

THE COURT:  This is 32; correct?

MR. BRESLIN:  Yes, Your Honor.

THE COURT:  Yes.  Go ahead.

BY MR. BRESLIN:

Q.    All right.  So let's -- so credit line doesn't mean credit line, credit line means --

THE COURT:  Hold on, wait a minute.  It's not -- does everybody agree this is Exhibit 32?

MR. BRESLIN:  Yes.

UNIDENTIFIED SPEAKER:  I think he's looking at his paper not the screen.

THE COURT:  Oh, whatever.

MR. BRESLIN:  Yes, it's -- it's --

THE COURT:  Counsel can ask about that and let's not comment from the -- from the gallery, but this is Exhibit 32?

MR. BRESLIN:  Yes, yes, Your Honor.  It's 32, right, Daniel?

THE COURT:  I ask because --

MR. BRESLIN:  Yes, Your Honor.

THE COURT:  I ask because I'll be asking counsel about it later.  Go ahead.

MR. BRESLIN:  All right.  Thank you.

BY MR. BRESLIN:

Q.  Okay.  Now, all right, so let's go down to the bottom right-hand corner of the page.  Can you blow that up, please, Daniel.  All of it, thank you.

So when -- what this says is, it says Excell line, Moshe line, and then underneath it says Moshe line, Moshe/Calvin, MMS line, AWES line, and then some short-term loans.

So is it your testimony, sir, that these numbers do not reflect amounts due and owing from Excell to AWB, these numbers reflect the total amount of cars that has been purchased by AWB?

A.  You -- when you look in the paperwork, you have here some -- like a million eighty MMS.  That's a loan to Excell.  So that's nothing to do with purchasing

Page 258

vehicle.  That's a loan to Excell.

What he use it to relocate vehicle for clients.

Q.    Okay.  How about the Moshe line, is that -- is that a loan or is that -- does that show vehicles purchased?

A.    Moshe line, it's buying and selling vehicle.

Q.    Okay.  How about the Moshe/Calvin line, is that buying and selling vehicles, too?

A.    That's buying and selling vehicle.

Q.    Okay.  Now, the two on the bottom, those are definitely loans; right?

A.    Which two on the bottom?

Q.    It says 650,000 short-term loan and 400,000 short-term loan.  Those are definitely loans; right?

A.    You're wrong.

Q.    They're not loans?

A.    No.

Q.    What are they?

A.    We purchase the vehicle.

Q.    Okay.  So can you explain to the Judge if -- if that represents a piece of property that was purchased by AWB, why you're calling it a loan in this document?

A.    It's inhouse document.  We lend -- Moshe Farache lend to AWB the money, so it's Moshe Farache

Page 259

is the lender to AWB.  It's inhouse how we track all the money coming to AWB.

If I took it from my line of credit from the house, it's my house going to AWB.  It's our own tracking. It's nothing to do with the public or the rest of the world.

Q.    Okay.  So what this is, this is your own internal document, it's not for anybody else to see; right?

A.    You're absolutely right.

Q.    Okay.  So let's move to the --

A.    It's Farache entity money and one of my friend.

Q.    Okay.  All right.  So, right, and you've testified to that, that these were all internal documents and that they -- they were not for publication; right? This is your own internal -- this is how you kept track of the cars you purchased; right?

A.    Nothing to do with the cars, it's amount of money been (inaudible) to AWB, and AWB, it's automobile dealership, and the purchasing and selling cars, and you know, you got to have inventory, you got to have an asset, the end of the year for the company, and you have if you -- you know, if you pay anybody, you got to have all the backup.

Page 260

You know, if we pay Mr. Erbstein every month interest for his money, we have the backup.

Q.    All right.  Let's go to the next page.

Okay.  How about -- how about these, are these actual loans or are these again internal documents?

A.    I can tell you about the one in the top, the MMS loan.  That's a loan to MMS, what is a company not owned by AWB or the Farache family.  It's a friend of mine, he has some saving and he want to invest.

And I say to him, let me introduce you to Mr. Zankl, and we agree about the terms, and it work for everybody.  We got paid for the loan and we call it a day.

Q.    All right.

A.    So why to even bring it up?

Q.    All right.  So are you saying that this million ninety thousand dollars, this shows the amount of money that your friend gave to AWB, excuse me?

A.    No, I think you saying it wrong.  He ask me to invest and I --

Q.    All right.

A.    Let me finish please.  And I introduce my friend to Zankl because at the time I say to him, you know, I'm in a position today, I don't -- everything I do, I want to act like a dealer because we expanding to the east side of Boca.

So I said the only thing I can tell you is if you want to do it, I can invest some of the money, I can't do the whole thing, and if you feel comfortable with that, we do it.  We make him sign a note for the amount. We've been very successful, we got paid, we walk away from it, we did good.  Thank you.

Q.   Okay.  Let's go to the next page.  No, no, let's go to the next page.  All right.  Let's -- let's -- let's focus on this page because this -- this page describes and defines all of those other numbers.  So let's blow that up.

Would you like me to read it to you, sir?

A.   As much as you can, thank you.

Q.   All right.  It says, "Excell Auto Group, Karma of Palm Beach, together with Scott and Kristen Zankl, hereby acknowledge the following outstanding Auto Wholesale loans secured by the attached inventory."

Okay, and then it says, loans labelled as, it says, loans labelled as:  $2,664,450 Auto Wholesale/Moshe's line; then it says 25 -- 2.5 million Auto Wholesale/Excell line; then it says 1,080,000, the MMS line for the locate cars; and then it goes on, 300,000 for AWEES, locate cars; then 650,000, Karma Palm Beach short-term loan; 400,000 Karma short-term loan.

Do you see where it says that?

Page 262

A.    Yes.

Q.    Okay.  This would seem to say that when we look at this number for 2.664 million for Auto -- for the Auto Wholesale/Moshe's line, that it is, in fact, a loan from AWB to Excell.

Would you now agree that that is, in fact, a loan?

A.    You a little bit -- if you look in MMS, that's a loan.  But if you look in 2.664450, when you look in it, you got to understand, it's always a promissory note behind to memorize both party about all the money, it's the memorization of all the document.

After what's happened in '22, the beginning of '22 and probably prior to it when Mr. Zankl entity sold vehicle to three or four people, if I no have those paperwork, I sit here today and who I can -- nobody believe me.

You know, if I no did what I did, I got to have -- make sure the memorization, and also you've got to -- you've got to remember, and I mentioned that to you in a deposition, Mr. Zankl has cancer, stage four cancer in '21.  So we did all the paperwork in '21

Q.    All right, sir.  I don't mean to interrupt you --

A.    -- to make sure.

Page 263

Q.    -- but -- but let me -- let's get back to the questions.

So, all right.  Now, you say the 2.664, that's not, in fact, a loan, even though it says loans labelled as.

How about the 2.5 million, Auto Wholesale Excell line.  Was that, in fact, a loan?

A.    It's you have a promissory note behind the 2.664450, and you have the same thing in the 2.5 million.  You have the promissory note to memorization of the whole amount of money we buying and selling cars.

Q.    Okay.  So this is again, this would be two and a half million dollars worth of cars that AWB purchased; correct?

A.    You have more than that.  You have --

Q.    No, just -- just --

A.    No, but look in your --

Q.    -- the Auto Wholesale line?

A.    -- you have $650,000 Karma Palm Beach short-term loan for 2021 Ferrari.  So is any promissory note for those vehicle?  No, it's a bill of sale.  We wire the money, we purchase the car.  It's no promissory note.  So we no own the vehicle?  Yes, we own the vehicle.  You can't say we no own the vehicle if we pay for it.

Q.    Mr. Farache, is there some reason that you

Page 264

do not want to admit that you had $6 million in loans to Excell?

A.    I don't have.  I have over $6 million --

Q.    Okay.

A.    -- not in a loan to -- to Excell Auto.

Q.    But it's not in a loan, it's -- it's cars that you purchased?

A.    How do you -- when you look in $650,000 Karma Palm Beach short-term loan, what it say here, 2021 Ferrari.  You see any document say about any loan for this vehicle?  Show me a document.

Q.    Okay.  Let's -- let's scroll down on the page, please.

All right.  Let me read what it says now, and before I read it, were you aware, sir, that the FVP loan to Mr. Zankl was going to close on January 26, 2022?

A.    No, it supposed to -- again, based on what Mr. Zankl explain to me, the loan supposed to close in 2021.

Q.    Okay.  But this -- this e-mail you sent on January 18, 2022, would you agree with that?

A.    Yes.

Q.    Okay.  Good.  So we know that this was sent on January 18, 2022, and it says here, it talks about a date a week away.  It says, "Within five days of closing

Page 265

your line of credit on January 26, 2022, Auto Wholesale will require repayment in full of some of the loans as follows:  Return of the MMS locate loan of $1,080,000; return of the $440,000 101 line, which is included as part of the 2.664450; and return of the AWEES locate loan of $300,000."

Do you see where it says that?

A.    Yes.

Q.    Okay.  So would you agree with me, sir, that this would certainly appear to state that what you are requesting of Mr. Zankl is to pay off loans, not car purchases, but to pay off loans in the amount of 1,080,000, 440,000, and 300,000 when -- when Mr. Zankl gets his line of credit on January 26, 2022?

Would you agree with that, that's what that says?

A.    It has nothing to do with when he get his line of credit.  AWB don't have nothing to do with your lender, nothing.

Q.    All right.  Well my question is, were you aware -- you were obviously aware that -- that Zankl was going to get money on January 26th; right?

A.    No, I request --

Q.    Well, why does it say within five days of closing your line of credit on January 26th, why does it

Page 266

say that?

A.   Because maybe he told Michele I'm getting some line of credit, and the moment he said that, I said, Michele, I need -- either way, I need some money to pull out to buy real estate, and that's my business decision to call in some of my note.

Q.   Okay.  Well, you also knew, sir, did you not, that FVP had a UCC on the Karma inventory?  You knew that; right?

A.   Is I know that?  No.

Q.   You didn't know that?

A.   I know in the time I have UCC in Karma entity, and basically Mr. Zankl threaten me, to sue me. And I say, you know, I'm not there to fight with you, we have relationship, and I pull it back.

Q.   All right.  So your testimony, sir, is that you had a UCC on the Karma entities, and that Mr. Zankl threatened to sue you, and because he threatened to sue you, you took the UCC off the Karma entities; is that correct?

A.   Yes.

Q.   Okay.  When did he -- when did he threaten you?

A.   That's sometime in 2021.

Q.   And explain to the Judge exactly how that

threat happened.

A.    It's not threat.  He said, Moshe, basically I just want to let you know, I have to grow my business in Broward Karma, it's nothing to do with what we doing here. I appreciate if you move all the UCC from the Karma Broward and the Karma Palm Beach.

I say to him, you know, Scott, I've got to secure my position with all the vehicle I'm buying and selling here, and he basically say to me, you know, you have all the cars, you have bill of sale, you see the vehicle, you have a title, what else you need?

And that's why we ask for some -- you know, I want to make sure my partner get paid for his investment.  So I make sure that's pay first before anything, and then some of the cars in this list, prior to this list, we been full promise every day it's going to come the payment, and then we been in your courtroom and what's happened, we (inaudible) the title.

Q.    All right, sir.  Let's -- so your testimony, just so we're clear is, you did not know that FVP was going to give Mr. Zankl money on January 26th?

A.    When you say we don't know, we no have access to his account.  He supposed to has the loan close by November, December '21, and then it's moving.  When I ask him, when is this loan going to come, so you can start

Page 268

releasing us from all of the liability and --

Q.    Mr. Farache, who drafted this document?

A.    Say again, I'm sorry.

Q.    Who typed this up, was that --

A.    My lawyer.

Q.    Okay.  So Mr. Gherman typed this up; right?

A.    This document?

Q.    Yeah.

A.    The loan document?

Q.    No, this document you're looking at on the screen, who drafted this?

A.    Probably Michele in the office.

Q.    Okay.  This was sent to Mr. Gherman, wasn't it?

A.    It was sent to Mister -- maybe.

Q.    Well, you copied him.  He's listed on the e-mail.

A.    I copy him with everything, he's my lawyer for the last ten years.

Q.    All right.  You're aware that Mr. Gherman got copies of the FVP closing documents; correct?

A.    No.

Q.    You're not?

A.    No, that's not true.

MR. SHRAIBERG:  Objection, I know he's not

Page 269

doing it purposely, but I believe Mr. Gherman is nodding his head and I think the witness is seeing that.

MR. GHERMAN:  I'm looking at my computer.

MR. SHRAIBERG:  I'm sorry?

MR. GHERMAN:  I was looking at my computer.

THE COURT:  I did not see it.  If that's happening, please do not be coaching the witness from the gallery, but I didn't see anything.

Go ahead.

MR. BRESLIN:  All right.

BY MR. BRESLIN:

Q.   So you would agree, sir, that you agreed to take the AWB UCC off of the Karma companies so that Mr. Zankl could get a loan from FVP on the Karma entities; correct?

A.   Yes, that's happen in 2021.  We have this discussion, he make sense --

THE COURT:  The answer is yes.  Go ahead.

MR. BRESLIN:  Thank you -- thank you, Your Honor.

THE COURT:  The yes was good.  Go ahead.

MR. BRESLIN:  I was shocked.

BY MR. BRESLIN:

Q.   So now in -- now in -- after this, this is January 18th, and you know FVP is going to have a UCC on

Page 270

the Karma cars, isn't that why when Karma bought a car, that you required that that car be transferred to Excell and that Excell would then sell the car to AWB?

A.   I don't know.  You know, you ask me question if -- you know, if I see behind the scene who purchase the car.  They approach me to purchase the car, some of them they are Karma, some of them Excell, some of them end user.  What Excell introduce me to, we bought it.  Some of it we bought in the auction.

You know, you ask me specific question and you want me to commit.  If you show me the document, I love to answer you.

Q.   Mr. Farache, I'm only talking about your business records.  From the records that you gave us, your deal jackets, your green deal jackets, okay, you supplied your business records to us.

A.   Yes.

Q.   Okay.  In your business records, it shows that the Karma companies bought these cars.  Would you agree with that?

A.   But you -- you going back, when Mr. Zankl sit here and say sold the car from Karma to Excell.

THE COURT:  Could you please focus on the question?

THE WITNESS:  What you trying to me --

Page 271

THE COURT:  You need to focus on the question.  Mr. Farache, Mr. Farache, Mr. Farache, you need to focus on the question.  If you don't start focusing on the question, I will interrupt you every time you start answering.

THE WITNESS:  Okay.

THE COURT:  Clear?

THE WITNESS:  Sorry, sorry.

THE COURT:  Okay.  Listen specifically to the question.  I'm confident your counsel will cross-examine you later.

So right now you're going to answer only the questions that are being asked.

Go ahead.

BY MR. BRESLIN:

Q.    Sir, is it not true that the reason that you required Karma to transfer a car to Excell to sell it to AWB for the very same price, is because you were attempting to defeat the security interest that FVP had in the Karma purchase?

MR. FELDMAN:  Objection, argumentative.

THE WITNESS:  No.

THE COURT:  Okay.  Overruled.  I would have overruled it anyway.

BY MR. BRESLIN:

Q.   Did you, sir, review any of the deal jackets, your own deal jackets, not any other deal jackets, the AWB records, prior to your testimony today?

A.   As much as I can.

Q.   Would you agree, then, for all the cars that you have on that list sitting in your lap, that each and every one of those cars was purchased by one of the Karma companies?

A.   Can you repeat yourself?

Q.   Yes.  Since you've reviewed your records before coming to court today, your own business records, would you agree that your own business records show that every one of the cars on that list that's in your lap was purchased by one of the Karma companies?

A.   When you say Karma, you talking about Karma Broward, Karma Palm Beach?

Q.   Either one, it doesn't matter any Karma.

A.   You have Excell -- you have Excell, you have Karma Palm Beach, and you have Karma Broward, both of the Karma.

Q.   Okay.  Let's move on.  Now, in -- in August -- excuse me, in April of 2022 -- well, let's just -- let's just talk about April 1st.

Tell the Judge what happened on April 1st when you went and picked up all the cars.

Page 273

A.   It start in March 31st.  March 31st I make a very -- basically, Mr. Zankl been out of the store for the last probably two months, just hiding and hiding, and every time I call him, you no understand, I'm going through cancer, and stage four, and I have (inaudible) my kidney, my everything in the world, it's a problem.

So I say -- you know, we have back and forth e-mail.  You sold this car, you supposed to pay me.  You sold this car, you supposed to pay me.  Moshe, I promise you, they're going to the bank to do the wire, they're doing this, and we always back and forth in the last ten years, we have the same, similar problem, not to this extent.

So in some point, you know, in March I told him, and then he say deal with my wife because I'm not in the store.  So, you know, I come and I speak to her, and I spoke to the general manager, what's her name, is Teddi, and I'm basically very particular about, guys, just remember one things, you cannot transfer any of these vehicle to people without paying others, and what I mean by that, AWB purchase the car, and with Excell or without Excell and he sell it, and then I hear people paid and he no pay us.  So I say, guys, we own the vehicle, we have the title, we pay for it.

And we took a meeting, and I make it short,

we took a meeting in March 31st between Mrs. Zankl, Mr. Zankl, his wife, myself, my wife is there and Michele, and I'm not sure, my son is there also.

So when we took the meeting, we met in mutual -- mutual place, not in the store, not in anyplace. And I explain to him, I said, Scott, just remember very simple things, all the cars I own prior to the meet -- you know, I say to him, I just want to tell you, I don't care what you doing with others, write to me the check, wire to me the money, I'm out.  It's not going to work anymore.

It's too many party in this game because his wife prior to this Wednesday told me, Moshe, do to me a favor, take your car out of here, and she sent to us an e-mail, back and forth, to pick up all our vehicle, AWB, move them out.

So when we met with Mr. Zankl, he show us the cars, what he sold and not paying us, and some particular cars he said, let me call the guy from the service in Ferrari Fort Lauderdale, for example.  He call him and he say, go pick up Saturday if you no believe me.

I call my mechanic, my partner, I said I got to -- can you help me?  I no drive this car.  He go and pick up the vehicle, and we find out somebody else own it.

Q.   What time -- what time did you start moving the vehicles?

Page 275

A.    Let me finish.  So after the meeting in March --

THE COURT:  After the meeting on which date, March 31st, which is a Friday; right?

THE WITNESS:  No, March 31st is Thursday.

THE COURT:  Thursday, right.

THE WITNESS:  Thursday, around one o'clock, we sit for an hour and a half.  And he say to me, Moshe, listen, I own a lot of vehicle, me and my wife, we own them.  She's going to go with you to the store, make sure you see the vehicle, we have the title, she going to bill of sale, and that's what's come the intercedal (sic) debt, he giving to us some vehicle.

First thing he want to giving to us Karma vehicle, you know, the Karma brand.  And I say, Scott, I don't want nothing to do with that -- with Karma vehicle. Whatever you have in the other side with Karma, I have nothing to do with that.

Then it's come Friday morning.  What he does, try to move cars.  I say, stop it.  Those cars, I own them.  I park my car, the car I own, and I said no more cars moving until you pay me.  So he wired to me some money for the vehicle.

He say to me, the difference, tomorrow I trade it, you can take the trade and then we come to like

Page 276

3:00 -- 3:30 in the afternoon.  I hired a professional security to be there for the night.

I said, Scott, whatever is yours, take it, I have no problem, but if I own it, put it on my side.

Q.    Did you say put it on your side?

A.    Yes.

Q.    You had -- you had space there?

A.    Yes, if you look in the building --

Q.    All right.  Let me ask you a question --

A.    Let me finish.

THE COURT:  Well, okay.

THE WITNESS:  If you look in the building --

THE COURT:  Save the question just for one moment, okay?

MR. BRESLIN:  Okay.

THE COURT:  This is a very, very long answer to what happened on the 1st, and you started two days before that.

So the question was, what happened on the 1st?

THE WITNESS:  So I'm already in 3:30 in the afternoon.

THE COURT:  Uh-huh.

THE WITNESS:  Then Mr. Brown show up around 4:30, and he say, Moshe, what's going on?

Page 277

And I explain to him, I say, Ed, we have line of -- you know, we have all of these car lined up here, we own it, and Mr. Zankl supposed to giving to us some intercedal (sic) debt for some car he sold.  He supposed to be here, he no show up.  He been promise to me from eight o'clock in the morning.

Then the professional security come. Mr. Brown tell me, Moshe, you know me for so long.  Do to me a favor, let me take a meeting with Mr. Zankl and Mrs. Zankl.  They going to come here.  They don't want you to be part of this meeting.

I say no problem.  I have my guy outside. If God forbid you need something, just holler on me or call me, I going to run back.

I go to my office, I start just to think, looking all the paperwork, looking everything.  Then my wife got a phone call from my lawyer, and he say, Moshe, I just want to let you know, she told me, they going to come and in (inaudible) the whole place for all the bad checks and in the time, we just know he giving bad checks.  We don't know all the selling of vehicle two, three, four people the same time.

So when we come back, I say to him, Scott, look at me, and his wife, look at all the good things I did for you.  I brought you from the back of the building.

He say, Moshe, I'm not here to hurt you.  I going to open, take all the cars, whatever I'm allowed you to take in a time.  Tomorrow one o'clock come here, we going to do all the paperwork.

We come back Saturday at one o'clock.  We did all the bill of sale, all the transactions, some of the clients has the cars.  Like, you know, he lend the car to some of the lender or whatever they are.

I call the people, I say do me a favor, can you bring the vehicle?  So it take me from Saturday until almost ten day later to regroup.

THE COURT:  Okay.  Now we've gotten way after the question at this point.

THE WITNESS:  Okay.

THE COURT:  The question was, was on a particular day and it was very open-ended, but not as very open ended as that.

Go ahead.

MR. BRESLIN:  I -- I -- I've learned my lesson in trip -- in triplicate.

BY MR. BRESLIN:

Q.    All right.  So let me ask you a question. You had space there at 101 Clint Moore, you had -- you had space to keep your cars, right, the AWB cars?

A.    I have an office, and I have another storage

Page 279

area in 5471, and I have my main office in Rogers Circle.

Q.    All right.  Well, do you recall testifying in other matters under oath in this case, that you were -- that you were able to keep your AWB cars there at 101 -- 1001?

A.    Some of them they're there, they're always rotating.

Q.    Okay.  All right.  So but your testimony is, is that you had vehicles there at 1001 Clint Moore, AWB vehicles; correct?

A.    Yes.

Q.    All right, and you had an office there; right?

A.    Yes.

Q.    All right.  So on April 1st, you went there to remove the vehicles that you owned; right?

A.    Yes.

Q.    Okay.  So you didn't take any cars that you didn't own; right?

A.    Base on my knowledge, no.

Q.    Okay.  But my point is, there are a lot of cars there, right there, you were the landlord, you had an office there, you had space there, you had cars that you owned that were there; right?

A.    Yes.

Page 280

Q.    Okay.  If you owned the cars and you had space there, why did you move them?

A.    I move them to my side and I move them out to be more secure.

Q.    Okay.  So you thought the feds were coming, so you -- you had cars that you say you lawfully owned, and were there in a location that you say you had the right to use, but you nonetheless took them off the premises and -- and parked them in some other location, is that -- is that your testimony?

A.    You got to be more specific.

Q.    Okay.  Let me -- I will.

So when did you finish taking the cars, what time?  It was the middle of the night, wasn't it?

A.    No.

Q.    When did you finish taking the cars on Friday night?

A.    Sometime Friday after -- after 10:30, but I no took all the cars.

Q.    How many did you take?

A.    I can't tell you exactly, but some of them I took Monday morning because we no have the paperwork.

Q.    Okay.  So let's -- let's take a look at Exhibit 34.

Judge, it's 4:30, are we going to quit at

Page 281

5:00 -- 4:25, are we going to quit at 5:30?

THE COURT:  Yep.

MR. BRESLIN:  How much time do I have used -- I've used so far?

THE COURT:  Four hours 21 minutes, almost 22.

MR. BRESLIN:  And out of -- out of seven?

THE COURT:  Correct.

MR. BRESLIN:  Okay.  Can we take a five-minute break and then come back for the last hour?

THE COURT:  Sure.

MR. BRESLIN:  Thank you.

THE COURT:  Let's take a break.

Mr. Farache, you're instructed not to discuss your testimony with anyone during the break, understood?

THE WITNESS:  My lawyer I can talk to?

THE COURT:  No one.

THE WITNESS:  Okay.

THE COURT:  You can talk to him about his vacation --

THE WITNESS:  No problem.

THE COURT:  -- you can talk to him about when he's going to the dentist next, don't talk about this case.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

THE COURT:  Good afternoon, again, gentlemen and ladies.  Please have a seat.

All right, and where is -- we're missing people.  No, we're not.  Okay.

MR. BRESLIN:  I am here.

THE COURT:  Very good.

All right.  Mr. Farache, could you please acknowledge you remain under oath?

THE WITNESS:  Yes.

THE COURT:  You remain under oath.  Thank you.

Ms. Leonard, let me know when we're ready.

ECRO:  All set.

THE COURT:  Okay.

BY MR. BRESLIN:

Q.    Mr. Farache, before we go to this next matter, let me ask you something.  Is it your testimony that Mrs. Zankl told you she wanted you to have the cars that you took?

A.    Yes.

Q.    Okay.  So she said -- you actually testified

Page 283

to this in the past at the Stevens hearing that she told you what a good man you were, and how good you were to her family, and that she wanted you to have the cars; right?

A.   She say if you own them, it's all yours. Don't leave them here.

Q.   All right.  So -- so she insisted that you take them?

A.   Yes.

Q.   All right.  Let's take a look at Exhibit 32 -- 34?

THE COURT:  Mr. Breslin, is it possible you've turned off the microphone?

MR. BRESLIN:  I did.

THE COURT:  It has a green -- okay.  Good.

MR. BRESLIN:  We were talking secret strategy.

THE WITNESS:  I see, okay.

MR. MILLER:  Is this 34?

MR. FELDMAN:  No -- yeah.

BY MR. BRESLIN:

Q.   All right, sir.  I'd like you to take a look at this.  You've seen this document before.  Can you blow it up, please, Daniel?

Would you like me -- if you can't read it, sir, I'm happy to read it to you.

Page 284

A.    Yes, please.

Q.    All right, and I mean this as no disrespect. You have difficulty reading the English language; correct?

A.    Yes.

Q.    Okay.  Let me read it to you.  This is dated 4/1/2022.  It says, "The following vehicle titles are being given to Auto Wholesale of Boca as collateral against the loan amount of," and it's blank, and then it lists nine cars.

Okay, and the cars are a Ferrari, Gladiator, Cadillac, McLaren, Lamborghini, another Lamborghini, another McLaren, a Mercedes and Gladiator.

And it says, "The value of these vehicles, along with the 115,000 wired to Auto Wholesale of Boca on 4/1/22 towards 2020 Bentley Flying Spur 082455, shall serve as collateral for the aforementioned loan amount."

Do you see that?

A.    No, can you go through the page?  I just see the top of the page.

Q.    All right.  Scroll down.  But what I read, at the top -- at the top of the page now it says the values of these vehicles, okay, that's what I just read.

Do you need me to read it again?

A.    Let's go -- let's go to the top again, please.

Q.   Okay.  All right.  What this says is, just take my word for it, your lawyers can correct me if I'm wrong, it says that you're being given nine titles as collateral against the loan that Excell -- the loan amount, meaning the money that Excell owes you on a loan, that's what this says, that you're getting titles as collateral.

A.   It's basically reflect to the meeting in 3/31.

Q.   Okay.  All right.  But my point is, what this document says is they're giving you nine titles as collateral on the -- on the loan amount.

Okay.  Do you understand that?

A.   It's a intercedal (sic) debt.

Q.   It's a what?

A.   Intercedal (sic) debt.

Q.   Antecedent debt?

A.   Yes.

Q.   Okay.  All right.  Let's scroll up.  The word -- the word antecedent debt, what does that mean exactly?

A.   Its mean the person sold my vehicle, so he give me something against the debt, intercedal (sic).

Q.   All right.  So in your mind antecedent debt means, is that if -- if Excell sold one of your vehicles

and didn't pay you, that would be antecedent debt, is that your understanding?

A. Yes.

Q. Okay. So, and it goes on to say, "As the loan is reduced, these vehicle titles will be returned."

Okay. So what this letter says is that they're giving -- Kristen Zankl and/or Scott Zankl, whoever gave you this piece of paper, they gave this with nine titles. Do you remember that?

A. Yes.

Q. Okay. Who gave you this letter with nine titles?

A. It's two letter, it's another letter, Kristen.

Q. Okay. So it was Kristen Zankl that signed this letter right in front of you; right?

A. I'm not sure. I mean, she sign it in front of me, both of them, I think.

Q. Okay. Now, you signed it, too, didn't you?

A. I'm not sure about it.

Q. Okay. Well, didn't you tell --

A. It's not my signature.

Q. -- didn't you tell me before under oath that you did not sign it and that is not your signature?

A. It's not my signature.

Page 287

Q.   That is not your signature?

A.   It's not my signature.

Q.   Do you understand you're under oath?

A.   Yes, it's not my signature.

Q.   All right.  Bring up Exhibit XX, please.

Sir, I'm going to show you what purports to be -- let's go to the top, Daniel, what purports to be -- all the way to the top, Daniel.  Show me what the document is, please.  Bigger.

This is an amendment to the operating agreement of Excell Auto Sport & Service.  Okay.  This is -- this is a document that shows the ownership interest in Excell Auto Sport & Service.

Okay.  You're an owner of that company; right?

A.   Yes.

Q.   And you're an owner with Scott Zankl?

A.   Yes.

Q.   And you have other owners; right?

A.   Yes.

Q.   Okay.  Let's scroll to the bottom of the page and let's take a look at your signature.

All right.  Let's highlight that signature, please, Daniel.  Okay.  Can you split your screen and bring up the -- well, actually it's on both sides.  Go to

Page 288

the one on the right, as well.  All right.  Now, let's --
let's split screen to the document we just had, 34.  Are
you able to do that?  I'm sorry, I didn't give you any
advance notice.  Let's highlight the signature on the left
and let's blow them both up.  Okay.  So -- and then the
other one, there's a third one there, Daniel, please
include it.

Okay.  So, would you agree, sir, that your
signature on your operating agreement for Excell Auto
Sport was very similar to the agreement on the collateral
letter that was signed on -- on 4/8 --

A.    It's still --

Q.    -- 2022?

A.    It's still not my signature.

Q.    Okay.  All right.  Now, if people actually
saw you sign it, would they be liars?

A.    It's another document similar to what you
show me without my signature.

Q.    Well, this is the one -- this one has a
signature.

A.    So you got to -- you got to look in both
side, but I can show you my signature.

Q.    All right.  Now, let me ask you something,
the signature on the operating agreement, did you sign it?

A.    I'm not sure if that's my signature.

Page 289

Q.    Okay.

A.    We have a lot of issue with the signature with the shop.

MR. BRESLIN:  All right.  Judge, I'm going to introduce the rebuttal document and that will be Number -- where are we?

UNIDENTIFIED SPEAKER:  126.

MR. SOFTNESS:  126.

MR. BRESLIN:  126.

THE COURT:  126 is the operating agreement?

MR. BRESLIN:  Yes, it's the operating agreement.

THE COURT:  Yes, it's admitted as a rebuttal document.

(Thereupon, Movants' 126 was admitted into evidence.)

MR. BRESLIN:  Thank you.

BY MR. BRESLIN:

Q.    All right.  Let's take a look at a couple more documents and then I'm going to be done.  Let's take a look at Exhibit Number 3.  Now, let's blow that up.

Now, you were here when Mister -- I'm sorry, what's your attorney's name that testified, the first witness, Brandes?

A.    Marc Brandes.

Page 290

Q.    Brandes, I'm sorry.

A.    Mr. Brandes.

Q.    All right.  So Mr. Brandes testified that he -- he filed this lawsuit on your behalf.  Do you recall that?

A.    Yes.

Q.    All right, and this is -- this -- this lawsuit, it's under oath, do you agree with that?

A.    Yes.

Q.    Okay.  Now, this lawsuit says that -- that you lent money to Auto Wholesale -- to Excell Auto Group, and that Excell Auto Group has your collateral and you're asking the Court in Palm Beach to enter an order ordering Excell Auto Group to give you your cars back.

Do you understand that that's what this says?

A.    Yes.

Q.    And you signed this document, didn't you?

A.    I sign it, yes.

Q.    Okay.  When you signed it, was it true?

A.    It's a confusion point between me and my lawyer, and that's the reason, you know, I basically no use him anymore.

Q.    Because he's -- he was confused or you were confused?

A.   I can't -- it's -- you know, I'm still kind of trying to figure up, and to me to say anything bad about anybody, it's the wrong thing.

Q.   Sir, I'm not asking you to say anything bad about anybody.  I'm just trying to find out why you signed this document saying that A, that you were -- you were a lender, that you had a loan, okay, the same thing you've denied all day today; two, that you're asking the Court in Palm Beach to enter an order so you could go pick up cars that you say are in the possession of Excell, when, in fact, you already had them in your possession.

Do you understand that that's what this says?

A.   You got to look on the dates.  We no pick up all the cars.

Q.   Well, this is --

A.   Take time to --

Q.   -- this is -- this was --

A.   -- to locate --

Q.   -- this was filed on April 8th.

A.   April 8th, I'm not sure if we have all the vehicle.

Q.   Okay.  Well, how many did you have by April 8th?

A.   I can't tell you specific.

Page 292

Q.    Okay.  Well, let's go to the last page of this document.  Let's get a list of the cars that you're asking the Judge in Palm Beach to give you.

Can we go to the last page, please, Daniel?

UNIDENTIFIED SPEAKER:  One second.

MR. BRESLIN:  Just my luck.

BY MR. BRESLIN:

Q.    All right.  Let's scroll up, you're going to -- you're going to find a list of automobiles.  Stop.  Okay.  Blow it up.

All right.  So what you're saying is, is that you're asking the Court in Palm Beach to order that you are entitled to take possession of all of these cars that you claim you have a security interest in, were you aware of that?  Were you aware that that's what this lawsuit says?

A.    Whatever it say, that's what I sign.

Q.    No, I'm asking you if you knew what it says.

A.    In the time being, as much as I know now about the whole case, I rush through stuff and maybe I make a mistake.

Q.    Okay.  Well, what you certainly did not say in this document is that you owned any of these cars.  In fact, you -- you said under oath you own none of the cars, and you're asking the Court to order that Excell give you

your cars.  Do you know that now?

A.    Now I know it.

Q.    All right.  Now you know it.  Okay.  So was this a truthful petition or was it a mistake?

A.    I -- I can't tell you because, you know, we are year to the case and now I know a lot of things different, so I rush through it and mistake happen.

Q.    All right.  Well, all right.  So what you're saying is, is this was a mistake, that what you swore to under oath was not -- was a mistake and that you -- and as you say today, that you are, in fact, an owner of these cars and not a lender that's seeking to foreclose on them; correct?

A.    I am the owner of the vehicle.

Q.    Okay.  All right.  So now there came a time when you blamed Mr. Brandes for this affidavit, didn't you?  You said it was all his fault that -- that he put in here that you, in fact, did not own the cars, and that you had a loan, and you asked the Court to order the cars be foreclosed; correct?

A.    I'm not sure what you regarding to.

Q.    Well, didn't you blame Mr. Brandes for making this mistake with this complaint?

A.    I no blaming him about this complaint.

Q.    Okay.  Well, didn't -- now, let's go to a

Page 294

week later, let's go to Exhibit 37.  Now, Exhibit 3 is already in.

All right.  Exhibit 37, remember we went to court on April 14th in the Broward County Court?

A.    Yes.

Q.    Okay, and when we went to court, you -- you recall after that hearing the Judge issued a rule to show cause and there's still a contempt hearing pending against you; correct?

A.    Yes.

Q.    Okay.  So for that hearing you filed an affidavit, remember?

A.    For that hearing, yes.

Q.    Okay, and you -- and you testified that that affidavit was also wrong, and the reason that it was wrong was because Mr. Brandes rushed you, remember?  You said that this was wrong because he rushed you and that it was inaccurate, remember you saying that?

A.    I basically stand up and I told the Judge whatever vehicle I have, they more than welcome to come see them.  I open my warehouse to everybody because he giving to the Court the wrong amount of vehicles.  So I said please, stop it for a second --

Q.    Okay.

A.    -- to the Judge, and I explain the Judge,

Page 295

Your Honor, the only things I can do is open my warehouse, show everybody what I have, and that's where is the problem start.

Q.    All right.  So my point is, you signed this affidavit and it got filed in the court; right?

A.    I signed the affidavit, but I'm -- again, you know, I don't want to tell you anything wrong here because I still open case over there, but we go to my warehouse, we show them everything we have and --

Q.    Mr. Farache --

A.    -- and we go from there.

Q.    -- I'm only asking you about this document, that's all I'm asking about.

You signed this document, it got filed in court; correct?  This document that you're looking at, this document got filed in a court of law --

A.    That's the one from Broward County?

Q.    -- you signed it, and swore to it; correct?

A.    Can you show me the whole document, please?

Q.    Sure.  Scroll down, please, to his signature line.  Stop.

A.    Yes, that's my signature.

Q.    That's your signature?  Isn't that Mark Gherman's signature?

A.    Scott Gherman.

Q.   Isn't that Scott Gherman's signature?

A.   Yes.

Q.   All right.  So the signature on that page is Scott Gherman's signature, isn't it?

A.   Yes.

Q.   Okay.  So you just said that's your signature, and then you said in the very next breath that it's Scott Gherman's signature.  Which is it, is it your signature or is it Scott Gherman's signature?

A.   No, Scott Gherman is the bottom signature notarize the document.

Q.   Okay.  So --

A.   My signature is where it say Moshe Farache, that's my signature.

Q.   All right.  So the circle -- the circle thing is -- is your signature, and the one at the bottom, the big -- the big S, that's Scott Gherman; correct?

A.   Yes.

Q.   All right.  All right.  So, but you did sign this and you swore that it was true; right?

A.   Yes, but then I stopped the -- I basically told the Judge, Your Honor, I -- everybody here is more than welcome to come.  It's a mistake.  I open my warehouse, he send three of his investigator to my warehouse.  They come to my warehouse, I open the door, I

Page 297

show him every vehicle I have.

I say, it's all yours, do your own document, your own spreadsheet.  Then I explain to him I have two more vehicle sitting in different location and I'm --

THE COURT:  Okay.  You've gone well beyond the question, okay.

MR. BRESLIN:  All right.  Thank you.

Okay.  So I'm going to move -- I'll be moving 37 into evidence.

THE COURT:  Gentlemen.

MR. MILLER:  I'm sorry, 37 did he say?

MR. BRESLIN:  Yes.

THE COURT:  The one we're looking at.  It's an affidavit.

MR. BRESLIN:  The state court affidavit.

MR. FELDMAN:  No objection.

MR. BRESLIN:  All right.  Let's go to 39.

THE COURT:  Hold on.  I get to say that it's admitted.

Movants' 37 is admitted.  Go ahead.

(Thereupon, Movants' Exhibit Number 37 was admitted into evidence.)

MR. BRESLIN:  I'm feeling time pressure here.

THE COURT:  Oh, well.

MR. BRESLIN:  Like in the chess championships, you know, I'm looking at my clock.

BY MR. BRESLIN:

Q.    Okay.  One more.  Let's go to your amended affidavit, that's Number 39.

Okay.  Now, after the Court issued a rule to show cause, and what I mean by a rule to show cause, is the Judge said you have to explain to her why you shouldn't be held in contempt for making statements to her that she felt may be untrue; correct?

A.    Can you explain that?

Q.    Right, the contempt case in the state court. Is it your understanding that the Judge issued an order telling you to explain to her why you should not be held in contempt for not being honest with her; correct?

A.    You can't say that, it's not like I'm not honest.

Q.    Well, I'm not saying that you --

A.    I stop it because, you know, you show me a document what is not true in front of the Judge, and I say, stop it, it's a mistake here.

Q.    But my point is, that matter is still pending in the state court; correct?

A.    Yes.

Q.    All right.  Now, you then, in -- in May, you

filed another affidavit to explain why the first affidavit was inaccurate; correct?

A.    Please show me, probably, yes.

Q.    It's on your screen.

A.    I mean, can you roll it down, please?

Q.    Sure, make it a little bigger and scroll through it slowly.  This is your -- this is your affidavit that you signed to try to explain why the first affidavit was wrong.  Stop right there.

So you talk about, if you -- if you read this affidavit, you're basically saying it was Marc Brandes's fault; correct?

A.    I mean, I can't -- you know, if somebody put inventory of vehicle and it's wrong, we send to him an e-mail and we send a new affidavit.

Q.    Okay.  All right.  So, but you did sign this document; correct?

A.    Show me to the bottom and I tell you exactly.

Q.    Okay.  Is that your signature?

A.    Yes.

Q.    All right.  So I will now move Number 39 into evidence.

MR. FELDMAN:  No objection.

THE COURT:  Movants' 39 --

Page 300

BY MR. BRESLIN:

Q.    So --

THE COURT:   Movants' 39 is admitted.

(Thereupon, Movants' 39 is admitted into evidence.)

BY MR. BRESLIN:

Q.    So now let me ask you something, after -- after you went to court on April 14th, the -- our investigator, Rob Crispin, he went to your -- to wherever you had these cars stored and he counted them, didn't he?

A.    Basically it's Rob and two more people.  I open the door, I show him -- first thing I show him the whole cars outside, the SUV and vehicle they no need to be air condition, I show him that.

THE COURT:   No, no, he did not ask you what happened.  He asked you if a particular person counted the cars, that's a yes or no or I don't know.

THE WITNESS:   I don't know --

THE COURT:   Okay.  Go ahead.

THE WITNESS:   -- what he did.

BY MR. BRESLIN:

Q.    All right.  Did you meet with Rob Crispin that same day, right after court you both drove to where the cars were?

A.    Yes.

Page 301

Q.    Okay, and did Rob count the cars in your presence?

A.    He did whatever he supposed to do.

Q.    Okay, and do you recall him asking you to show him all the cars, every one of them?

A.    I show him all the cars, we all took video and picture of them.

Q.    Okay, and how many cars did you show him?

A.    I got to look in my inventory list from the April 14th, what is sitting over there, and I can count it now.  I can tell you.

Q.    Okay.  So he counted -- he counted cars and he actually filed -- he filed a paper in the court or gave it to me and I filed it in the court, for the -- for the cars that -- that he counted; correct?

A.    Based on what you tell me.

Q.    Okay.  In the -- in the exhibit register, it will be the April 14th Crispin report.  Can somebody tell me what number it is?  It should be right after the --

UNIDENTIFIED SPEAKER:  36.

MR. BRESLIN:  36.  Okay.  Let's pull 36 up on the screen.  Scroll down.  No, it's not -- no, it's not that.  That's the report, that's the investigative report.  This should be from April 14th or 15th.

UNIDENTIFIED SPEAKER:  38.

Page 302

MR. BRESLIN: 38, please.

BY MR. BRESLIN:

Q. Okay. All right. So there's an affidavit of Mr. Crispin, and it lists every car that he -- that he inspected; correct? You've seen this before, haven't you?

MR. FELDMAN: Judge, we have a hearsay objection to this, so --

MR. BRESLIN: It's impeachment.

MR. FELDMAN: He first has to set him up that he's testifying, then use the document to impeach.

MR. BRESLIN: Right. I asked him how many cars there were.

THE COURT: But this is somebody else's report, is the problem.

MR. BRESLIN: Right, right.

MR. MILLER: Yes.

MR. FELDMAN: Yes.

THE COURT: It's not his document. He says he has a document. You can use that if you want. This is someone else's report. The objection is sustained.

MR. BRESLIN: Well, here's -- right, well, here's what happened. He filed an affidavit --

THE COURT: I got what happened. The objection is sustained.

MR. BRESLIN: Okay. All right.

Page 303

BY MR. BRESLIN:

Q.    How many cars -- how many cars did Mr. Crispin count?

A.    I -- I tell you the truth, I don't know.  I opened the door, I say --

THE COURT:  Okay.  That's fine, you don't know.

BY MR. BRESLIN:

Q.    Did you show him all the cars?

A.    I show him all the cars, yes.

Q.    Okay.  Just scroll up one bit.  Don't put -- can you just -- I just want to see the number.  Okay. All right.  You can take it off.

All right.  So would you agree that Mister -- Mr. Crispin counted 13 cars?

MR. FELDMAN:  Objection, foundation.

BY MR. BRESLIN:

Q.    Do you know whether or not Mister --

THE COURT:  Hold on, stop.

If there's an objection, could you please wait for me to rule on it.

MR. BRESLIN:  I'm very sorry, Judge.

THE COURT:  Okay.  Sustained.

BY MR. BRESLIN:

Q.    Okay.  So did you have 13 cars there on

Page 304

April 14th, when he inspected them?

A.   Whatever I have, that's what I have.

Q.   Okay.  So you would agree that there were no cars anywhere else in the world other than the ones he counted on that date; correct?

A.   I can't tell you.  He doesn't work for me --

Q.   Okay.

A.   -- Mr. Crispin.

Q.   Okay.  All right.  Okay.  So now would you agree or do you know that he counted 13 cars?

A.   I don't know.

Q.   Okay.  So let's go to Exhibit 39, please, and this is the affidavit that you filed about two months later.

Let's scroll to the bottom or let's just scroll through to it until we get to the list, keep going, keep going, keep going, keep going.

UNIDENTIFIED SPEAKER:  This is the last page.

MR. BRESLIN:  There's no list of cars?

UNIDENTIFIED SPEAKER:  That's the last of what I have.

MR. BRESLIN:  Okay.  Sorry, take it off.  Now just let me just have one moment.

MR. SHRAIBERG:  I think everything else is

Page 305

in the documents.

MR. BRESLIN:  Do you want to ask him some questions?  I think I'm done unless there's somewhere you want me to go?

MR. SHRAIBERG:  Do you have handy the monthly operating reports that I can look at them?

MR. BRESLIN:  They're all in -- they're all in evidence --

MR. SHRAIBERG:  Right.

MR. BRESLIN:  -- every one of them is in evidence and I can pull every one of them up.

MR. SHRAIBERG:  Yeah.  No, then we're fine, it's all in evidence, it's closing argument.  You have them.

MR. BRESLIN:  All right, Judge.  I believe that's all the questions I have for Mr. Farache.

THE COURT:  Very good.  What would you like to do?

MR. FELDMAN:  Yes, Judge, just briefly.

MR. BRESLIN:  Excuse me.

CROSS-EXAMINATION

BY MR. FELDMAN:

Q.   Good afternoon, Mr. Farache.  Just a couple of questions.  I just want to focus in on the issue of business outside of Excell Auto Group.

Has AWB sold cars to other companies, other than Excell Auto Group?

A.   Yes.

Q.   Okay.  Can you just briefly describe to the Judge, briefly describe to the Judge that type of sales activity?

A.   I mean, we have the list, and basically when you looking at like we buy car from network or somebody know us or we just -- my son friends look for people that try to get rid of lease vehicle, and we buy the lease out, we pay off the car.

We go to the auction, we sell it, we get paid.  Before we go to the auction we make sure we sell the lender -- we pay the lender, we get the title shipped to us, we have the vehicle in possession.

Take it to the auction, we sell it.  Friend of a friend bring a car, we buy it.  People call us, other dealers, they say, hey, it's a deal here, you want to buy it?  I have a buyer for it later on.  We buy it, we move it, we sell it back.

Some of the vehicle, if you look in my list, we bought it, we sold it to Excell, he sold it to end user, everybody make money, that's the nature of the business.

Q.   Okay.  Just, for example, have -- has

Page 307

Auto Wholesale of Boca sold cars to Manheim?

A.    Yes.

Q.    Has Auto Wholesale of Boca sold cars to a company called Exotics One?

A.    Yes.

Q.    Okay, and when we're talking about cars, we're not talking about the stuff that I drive, we're talking about really high-end sports cars; right?

A.    Yes, both.

Q.    Okay.  So sports -- or do you sell these types of cars to a company called NextGear?

A.    Yes.

Q.    Okay.

A.    No, we no sold to NextGear, sorry.

Q.    Okay.

A.    NextGear is -- basically it's a partner with -- with the auction, and they basically offer to us, if we want to buy a car, we sell it, we pay them back.

Q.    Okay.  So if given the opportunity to reorganize through the bankruptcy process, is the intent to go forward and continue business just like we were talking about right now?

A.    Yes.

Q.    Okay, and then certainly, Auto Wholesale of Boca, you just alluded to, I just want to talk about real

quickly, you bought cars from third parties other than Excell Auto?

A.   Yes.

Q.   So, for example, you've purchased cars from Manheim, as well; right?

A.   Yes.

Q.   Okay, and you've purchased cars from companies called like Motorworks BMW?

A.   I mean, we bought it from them, but we make agreement with the, you know, end user, like person like you, you own the car, we contact you.  We -- you say to us, here is the bill of sale, I agree to this number.

If it's a difference between the finance and you, we write you the check, then we write to the finance the money or we wire to them.  We receive the title, we bought the car, we took it to Manheim or we sell it to somebody else.

Q.   Okay.  The reason why I'm asking you these questions, because you heard the opening statement that was given by Mr. Breslin in this case.  He talked about Auto Wholesale of Boca is just a lender, and they're just masquerading around as a car dealer, but you're just a lender.

Do you agree with that statement?

A.   No.

Q.    Okay.  So long story short is, you have --
Auto Wholesale of Boca has purchased and bought high-end
luxury vehicles outside of the transactions we're talking
about with Excell Auto Group?

A.    Yes.

Q.    And just to be clear, the level of sales
activity, we're not talking like one car a year, right,
there's multiple sales?

A.    Yes.

Q.    Okay.  When I refer to sales, we're not
talking about Excell Auto Group, I'm talking about with
other folks, third parties not affiliated with anything to
do with Scott Zankl.

A.    Yes.

MR. FELDMAN:  Can I have one moment?

THE COURT:  Of course, it's your time to run
down.

MR. FELDMAN:  Nothing further, Judge.

THE COURT:  Very good.  Yes, Mr. Shraiberg.

MR. SHRAIBERG:  I just have one question.

DIRECT EXAMINATION

BY MR. SHRAIBERG:

Q.    With regard to the purchasing of
automobiles, since the filing of this case, the company
has only purchased one automobile; correct?

Page 310

A.   Yes.

MR. SHRAIBERG:  Nothing further.

THE COURT:  All right.

MR. BRESLIN:  Do I get to go again?

THE COURT:  You can do redirect briefly if you wish.

MR. BRESLIN:  Yeah, just a couple of questions, Judge.

REDIRECT EXAMINATION

BY MR. BRESLIN:

Q.   Mr. Farache, Mr. Feldman asked you about buying high-end vehicles, other than through Excell; correct?

A.   Yes.

Q.   Okay.  When is the last time you did that?

A.   In 2000 -- let me look, and I can tell you. I mean, you have some transaction in '22 I see on the list, and you have some cars I bought for excess of 300,000 and change.

Q.   In what year?

A.   In -- you have in '22, the way I look in the list, and you have in '21 also.

Q.   When you say "you," are you talking about --

A.   Oh, AWB, I'm sorry.

Q.   All right.  So you're saying that the list

Page 311

that you have in your hand has a list of transactions on various vehicles that occurred in 2022?

A.   Yes, I mean, the way I look in the list, you have some from '22, some of them they go to export, we sell them to overseas, to a dealership in Israel.  You know, you have some vehicle we bought from --

Q.   Okay.  Well -- so that list that you have in your hand, is that all -- everything on that list, are these all transactions that AWB did with companies other than Excell?

A.   I mean, it's basically vehicle been trans -- sold by AWB or bought by AWB and sold it to others.

Q.   Okay.  But my question to you is, the list that you have in your hand --

A.   Yes.

Q.   -- that purports to be a list of transactions that AWB was involved in with a company other than Excell; correct?

A.   It's not just a company, it's other user, end user.

If a person bought a car from AWB, you know, it's a person, it's not a company.

Q.   And may I -- may I take a picture of that?

A.   Yeah, why not?

MR. BRESLIN:  Thank you.  All right.  I have

no further questions, Judge.

THE COURT:  All right.  So where -- where could you go next?

MR. BRESLIN:  I would go home.

THE COURT:  You would go home, really?

MR. BRESLIN:  Judge, it's --

THE COURT:  I mean --

MR. BRESLIN:  -- it's 5:07.  My next witness is Mr. Gray, who's my expert.

THE COURT:  Okay.

MR. BRESLIN:  He'll be an hour, I'd like to do him in one shot.  Then I have a very short witness and I'm done.

THE COURT:  All righty.  Yes.  I thought you were going to speak.

MR. FELDMAN:  Your Honor, we'll obviously call Mr. Farache in our rebuttal case tomorrow, but just in terms of Mr. Gray, I just want to make clear, he hasn't issued a report and a motion --

THE COURT:  I'm not hearing about that right now.

MR. FELDMAN:  Okay.

THE COURT:  We're just talking about what's happening today.

MR. FELDMAN:  Okay.

Page 313

THE COURT:  Okay.  Very good.  You can step down.

All right.  Is there anything else we need to accomplish this afternoon?

No.  Everybody's silent.

All right.  Let me tell you where we stand on time.  Four hours 50 minutes on the movants' side; 51 minutes on the debtor.  Just so the record has that, I'm going to preserve it over night.

Anything else?

MR. BRESLIN:  No, Your Honor.

THE COURT:  Great.  Good afternoon.  Court is in recess.

(Thereupon, the hearing was adjourned.)

Page 314

CERTIFICATION

STATE OF FLORIDA        :

COUNTY OF MIAMI-DADE    :


                I, Margaret Franzen, Court Reporter and

Notary Public in and for the State of Florida at Large, do

hereby certify that the foregoing proceedings were

transcribed by me from a digital recording held on the

date and from the place as stated in the caption hereto on

Page 1 to the best of my ability.

                WITNESS my hand this 6th day of April 2023.




            _____

                    MARGARET FRANZEN

            Court Reporter and Notary Public
           in and for the State of Florida at Large
                  Commission #HH237464
                    April 14, 2026