Page 315

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                          CASE NO. 22-15627-EPK

AUTO WHOLESALE OF BOCA, LLC,

          Debtor.                    VOLUME II
_____/


                    ECF #390, 403

                    March 28, 2023


          The above-entitled cause came on for hearing before the Honorable ERIK P. KIMBALL, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler Dr., West Palm Beach, Palm Beach County, Florida, on March 28, 2023, commencing at or about 9:30 a.m., and the following proceedings were had.


          Transcribed from a digital recording by:
               Cheryl L. Jenkins, RPR, RMR

APPEARANCES:


JAMES B. MILLER, P.A., by
JAMES B. MILLER, Esquire
and
PHANG & FELDMAN, by
JONATHAN S. FELDMAN, Esquire
On behalf of the Debtor


BARON BRESLIN & SARMIENTO, by
JERRELL A. BRESLIN, Esquire
and
DAVID R. SOFTNESS, P.A., by
DAVID R. SOFTNESS, Esquire
On behalf of the FVP Parties


SHRAIBERG PAGE, by
PATRICK DORSEY, Esquire
On behalf of Franklin Capital


SCOTT C. GHERMAN, P.A., by
SCOTT C. GHERMAN, Esquire
On behalf of Calvin Erbstein


ALSO PRESENT
ECRO - Electronic Court Reporting Operator

- - - - - - - -

Page 317

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RE-CROSS |
|---|---|---|---|---|
| RICHARD GRAY | | | | |
| By Mr. Breslin | 330 | | 368 | |
| By Mr. Feldman | | 377 | | |
| KRISTEN ZANKL | | | | |
| By Mr. Breslin | 382 | | | |
| By Mr. Feldman | | 402 | | |
| JOEL GLICK | | | | |
| By Mr. Feldman | 410 | | | |
| By Mr. Breslin | | 446 | | |
| MOSHE FARACHE | | | | |
| By Mr. Feldman | 457 | | 500 | |
| By Mr. Breslin | | 495 | | 502 |
| MICHELE MARTIN | | | | |
| By Mr. Miller | 511 | | | |
| By Mr. Breslin | | 519 | | |
| By Mr. Dorsey | | 521 | | |

EXHIBITS

|  | Page |
|---|---|
| Movant's Exhibit 30 (portion) | 368 |
| Debtor's Exhibits 1-9 | 506 |
| Debtor's Exhibit 14 | 507 |

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

THE COURT:  All right.  Everyone, we're here in Auto Wholesale of Boca, the second day of an evidentiary hearing on the motion to dismiss or convert. Let's take appearances, if we could.

Mr. Feldman.

MR. FELDMAN:  Good morning, your Honor. Jonathan Feldman, Jim Miller on behalf of the debtor.

THE COURT:  Good morning.

MR. DORSEY:  Good morning, Judge. Patrick Dorsey, on behalf of Franklin Capital Funding, LLC.

THE COURT:  Good morning.

MR. SOFTNESS:  Good morning, Judge. David Softness and Jerry Breslin, on behalf of the FVP parties, and Jonathan Schwartz is on his way.

THE COURT:  On his way.  All right.  Thank you.

MR. GHERMAN:  Good morning, your Honor. Scott Gherman on behalf of Calvin Erbstein.

THE COURT:  Thank you very much.

MR. FELDMAN:  Your Honor, could I just address a quick housekeeping matter?

THE COURT:  Sure.

MR. FELDMAN:  With the Court's permission, I actually have an uncontested summary judgment hearing at

11:45.  So, if the Court would indulge me with a break at around 11:40, if I could just attend that hearing, just take an early lunch.

THE COURT:  It's fine with me.

MR. BRESLIN:  No objection.

THE COURT:  Very good.

MR. FELDMAN:  Thank you.

MR. BRESLIN:  Judge, I have a housekeeping matter as well --

THE COURT:  Sure.

MR. BRESLIN:  -- that's on this case.

THE COURT:  Sure.  Why don't you come over so you're recorded.

MR. BRESLIN:  Judge, it addresses the Barbee subpoena matter that your Honor issued a ruling on last night.

THE COURT:  Right.

MR. BRESLIN:  So, I just want to explain a little bit what's going on, and then I have an oral motion.

In preparation for this hearing, as your Honor knows, this was a joint motion filed by the FVP parties, as well as the Excell trustee, Nicole Mehdipour, and Furr & Cohen, and we were preparing for this hearing for weeks, you know, on a daily basis, and it involved,

Page 320

you know, obviously, a substantial coordination of witnesses, and law, and coordination.

So, as it turns out, Sunday evening, during our final hearing prep, where we were, you know, aligning, getting together which witnesses were going to be called in what order, and the very first witness that was going to be called in this case was going to be Alan Barbee, the expert from B. Riley, he was the first witness, and it was always understood that he was going to be the first witness. It was brought to our attention, literally after 11:00 p.m. Sunday night, that the trustee was entering into an agreement with the debtor and that, therefore, that they were going to withdraw.

So, needless to say, that kind of threw everything on its head, and so the very first thing I said was, okay, you know, I'll spend all night, you know, rearranging and re-evaluating how we're going to present our case, which is exactly what I did. I said, well, you know, just, please, make sure Mr. Barbee is going to be in Court tomorrow morning so -- you know, because he's still going to be the first witness.

So, they said, okay, no problem, you know, we'll give you his phone number and you call him up and that will -- and, you know, that will be fine.

So, I said, just -- you know, and this was

Page 321

almost midnight.  I said, could you just, please, call him and let him know I need him in Court tomorrow morning because, you know, he was their witness, they were bringing him, and so to make a long story short, you know, then they say, well, you're going to have to subpoena him because we excused our witness, and he just can't show up because I called him, and he didn't answer my call, and then I asked them to call him, and they said, okay, well, no, you know, you're going to have subpoena him.

So I just don't want your Honor to think that I'm subpoenaing witnesses, you know, at the last minute, the day of the hearing.  It was done that way because he was the first -- it was always understood he was going to be a witness in this case, and he was deposed.

So, you know, I had him served.  So they said, no, you've got -- and I said, will you accept service for him?  They said, no.  Okay.  You've got to serve him.  So then I had him served.  So yesterday we had him served.

So, that was -- and so now I get him served, because I was told I had to serve him, and then the file a motion for protective order, and this was brought up yesterday before we left the courtroom, I said, you know, let's just, please, have everybody in Court tomorrow so we

Page 322

can deal with it, and then your Honor issued the order.

So, now your Honor has --

THE COURT:  Is there any representative of Mr. Barbee or of the Excell trustee here today?

MR. BRESLIN:  No, no.

THE COURT:  Okay.

MR. BRESLIN:  Because your order mooted that.

So now your Honor has issued an order quashing the subpoena.  So now Mr. Barbee is unavailable. So he's an unavailable witness, even though I was assured he would be here, and then after that, those assurances were withdrawn, now it's just the opposite, it's everything to prevent his participation.  So he is now an unavailable witness.

I have ordered his deposition, and I have a copy of his deposition, and I would like to move his deposition into evidence under Rule 32 because he's now an unavailable witness.  The debtor parties have taken his deposition last week.  So, I'd like to introduce that deposition into evidence at this time.

Thank you.

THE COURT:  All right.  Thank you.

Yes, Mr. Feldman.

MR. FELDMAN:  Your Honor, I actually have to

check the case law on this, but I'm pretty certain he's not an unavailable witness. He's within 100 miles of the subpoena power of this Court, and the issue is --

THE COURT: A subpoena has been issued and I quashed it. So --

MR. FELDMAN: The issue here -- sorry, your Honor.

THE COURT: -- right now he's not subject to subpoena.

MR. FELDMAN: Understood your Honor, but it is inadmissible hearsay by definition, and the issue here is they're trying to get an expert opinion from some other party's expert who is no longer a party to this litigation, and so the notion that they can somehow just airdrop in Mr. Barbee's deposition testimony is certainly (inaudible) and this wasn't a joint motion. They filed their own motion. Ms. Mehdipour filed her separate motion.

They should have prepared adequately for this hearing to address whatever Mr. Barbee was going to address in anticipation that there could be a settlement with one of the movants in this. So, the idea that they could just take someone else's deposition testimony, who is not subject to cross-examination here, just because I take their deposition doesn't mean that I'm not

Page 324

necessarily going to have additional questions.  So the idea you can just dump it all in here, and just say, oh, because he's now unavailable, respectfully, Judge, that is not unavailability under the rules, and we're happy to submit additional case law on this.

THE COURT:  All right.  So, let's go back to that argument --

MR. FELDMAN:  Sure.

THE COURT:  -- and then we can address hearsay separately, because I have no idea what the deposition was about, or what his proposed testimony would have been.

All right.  So, right now I have quashed the subpoena, and so he is currently not subject to subpoena because of an order of the Court.

I find it hard to believe that there is not case law that would say that person is now unavailable for purposes of Rule 32.  Do you really think there is going to be case that says that --

MR. FELDMAN:  I'd like to check it, Judge, before I just commit to this, your Honor.  I mean, I have not seen your order from last night.  I've not seen the motion, but nonetheless, the other issue here is that --

THE COURT:  The order says, having reviewed the motion, it is denied.

Page 325

MR. FELDMAN:  I haven't seen the motion, your Honor.

THE COURT:  It's the entire order, it's an e-order.

MR. FELDMAN:  Okay.  I haven't seen the motion.  I don't know what the position is they argued as to why Mr. Barbee should not be compelled to testify today.

THE COURT:  What difference does it make?  I've quashed the subpoena.

MR. FELDMAN:  Okay.

THE COURT:  Whatever argument they've made, I have -- whether I relied on that argument or not, obviously not apparent from the wording of the order, there is no subpoena and he's not here, and he is not compelled to show up.  He could show up if he wants to, but apparently he doesn't wish to be here.

MR. FELDMAN:  Does not wish to.

THE COURT:  Okay.  So, under Rule 32, you think that there is potentially an argument, and you want to be able to tell me what that argument is?

MR. FELDMAN:  Sure, Judge.  So, at --

THE COURT:  So, how -- what procedure what we follow on that, by the way?

MR. FELDMAN:  In terms of --

Page 326

THE COURT: Well, let me point out, where we have a timed trial, right?

MR. FELDMAN: Uh-huh.

THE COURT: It's over today. So when will I be somehow reading that in such a way that I can then apparently later determine whether to admit the deposition transcript.

MR. FELDMAN: Sure, I can look at it during the lunchtime, your Honor, and I can advise the Court whether or not we agree that there is actually no pathway we can say that he's unavailable or not.

THE COURT: It's a Rule 32 issue. After that, if you wish to raise objections to whatever components of the deposition I'm pointed to, that's a separate matter in my view.

MR. FELDMAN: Sure.

THE COURT: Okay.

MR. FELDMAN: Sure.

So, I'd just ask to have until the lunch break, when we come back, I can just look at that and see if there is any position I can advocate before your Honor.

THE COURT: All right. That would be very helpful.

MR. FELDMAN: Okay.

THE COURT: Okay. Very good.

Page 327

So, let's -- Mr. Breslin, so right now I'm -- the motion is -- we're not ruling on it right now. We're going to hold off, and you can talk at lunch, which is going to be really early today, and we can then figure out whether it will be admitted.

Yes.

MR. FELDMAN:  And I just want to point out, Mr. Breslin's motion is that they point out -- I'm sorry, not the motion, but the disclosure that we require for witnesses here, Mr. Breslin states here that Mr. Breslin is expected -- I'm sorry, Mr. Barbee is expected to testify consistently with the facts outlined in the Chapter 7 trustee's proof of claim.  The FVP parties have no other information at this time regarding the testimony.

So, the settlement with Ms. Mehdipour is that she's going to have an allowed $50,000 claim in this case.  So, that's what the ultimate is, so Mr. Barbee --

THE COURT:  I know, but still that document incorporates a proof of claim.  So the fact that the claim has been resolved is not relevant to your argument.

MR. FELDMAN:  I understand, but the point is, is that it's a settlement of a disputed issue, because that claim --

THE COURT:  So what?

MR. FELDMAN:  -- has been objected to.

Page 328

THE COURT:  So what?  I mean, are you complaining about what the disclosure says?  I'm trying to figure out what the argument is.

MR. FELDMAN:  Okay.  My point is, Judge, at this point they had a proof of claim, they advocated a $114 million claim --

THE COURT:  Okay.

MR. FELDMAN:  -- on a number of legal theories.

THE COURT:  What does that have to do with whether a deposition should be admitted today?

MR. FELDMAN:  Well, the point is, is that Mr. Barbee's testimony on that proof of claim is no longer --

THE COURT:  He's not -- it didn't say he was testifying on the proof of claim.

MR. FELDMAN:  But --

THE COURT:  You can read it again.  Go ahead, read it.

MR. FELDMAN:  This is from Mr. Breslin's, Alan Barbee is expected to testify consistently with the facts outlined in the Chapter 7 trustee's proof of claim.

THE COURT:  Consistently with the facts outlined in, not in support of.  Those are different statements.

MR. FELDMAN:  Okay.

THE COURT:  So it's not about whether the claim should be allowed or not necessarily.  I don't know what his testimony is going to be, but this argument is wasting time.

MR. FELDMAN:  Okay.

THE COURT:  All right.  So, Mr. Breslin, and everybody else in the courtroom, this is a lesson to be learned, when you have a matter that you've joined in, and this also happens when you should have served a notice of deposition, for example, let's say you have several parties who are pursuing the same matter, and somebody serves a notice of deposition, and everybody intends to go to that deposition, and then at the last moment the person who served the notice decides they're going to settle, and they cancel the deposition, and you did not cross-notice, what happens?  The deposition does not happen.

If you have a matter that's set for an evidentiary hearing and you are not -- it is not a joint request under one document, and we have somebody who has been subpoenaed by one of the movants, and not by another, you need to subpoena every witness.  Simply take the subpoena, copy it, and serve it on all the same parties, so they are your witnesses, because right now this person is not your witness, and you're left in the position of

Page 330

arguing that given the results of my order granting the motion to quash last night, whether the person is unavailable, and I'll hear about that immediately after lunch.

So, let's go with the next -- whatever you have next, Mr. Breslin.

MR. BRESLIN:  Just one moment, Judge, let me change gears for a second.

Judge, my next witness is Richard Gray.

THE COURT:  Good morning.

MR. GRAY:  Good morning.

THE COURT:  If you could please come over to the witness box.

If you could please raise your right hand?

Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. GRAY:  I do.

THE COURT:  Thank you, sir.

Thereupon,

RICHARD GRAY,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRESLIN:

Q.    Sir, please state your name for the record.

A.    Richard Gray.

Q.    And how are you employed, Mr. Gray?

A.    I am self-employed currently, my own firm.

Q.    And what's the name of your firm, please?

A.    GrayValuation, PLLC.

Q.    All right.  Mr. Gray, I'm going to be asking you questions.  I'd like you to direct your answers to His Honor?

A.    Certainly.

THE COURT:  That's actually unnecessary. I'm perfectly fine with you having a conversation with counsel as you testify.

BY MR. BRESLIN:

Q.    All right.  Mr. Gray, I would like you to direct your answers to me.

A.    Okay.

(Laughter.)

MR. BRESLIN:  Thank you, your Honor.

BY MR. BRESLIN:

Q.    All right.  So you said that you're currently employed for your own company?

A.    Yes.

Q.    All right, and the name of the company is GrayValuation?

Page 332

A.   Yes, sir.

Q.   All right.  What's your educational background?

A.   I have a bachelor of science degree from the University of Maryland, and that's actually medical technology.  I have a master's in business administration from Loyola University in Baltimore, concentrations in healthcare finance and -- healthcare administration and finance.  I also hold three certifications, I hold two CPA licenses, one in the State of Maryland, one in the State of Florida, that are active, and I have two -- three certifications in valuation, providing valuation services.

Q.   All right, and at the time that you were retained to act as an expert in this case, which firm were you working with?

A.   At that time I was working with Fiske & Company, in Plantation, Florida.

Q.   And in what capacity?

A.   I was a director.

Q.   Of what?

A.   Of valuation and litigation support services.

Q.   All right, and how long were you with Fiske & Company?

A.   A little over a year.

Page 333

Q. And prior to that where did you work?

A. I was with Caler Donten & Levine up in West Palm Beach.

Q. And I think we're in Palm Beach, so we're not up in.

A. Oh, sorry, I'm still in Delray Beach or --

Q. I understand.

A. -- in Parkland.

Q. I understand.

And what did that firm do?

A. That was a full-service CPA firm as well, and I was the director of valuation and litigation support services with that firm.

Q. All right. So -- and prior to that?

A. Prior to that I was with a firm, Alpern Rosenthal, in West Palm Beach, which merged in with BDO, and I was with them for a period of time.

Q. All right, and so is it safe to say in the last 20 years you've acted as a certified public accountant/valuation expert in litigation support services for various people or companies that retained or required your services?

A. That is correct.

Q. All right, and do you hold -- or did you already indicate what your professional certifications

Page 334

are?

A.    Yes, I believe I did, the two certified public accountancy licenses, State of Maryland and the State of Florida, as well as the three certifications in valuation services.

Q.    And do they have letters associated --

A.    Yes.

Q.    -- with them?

A.    The first one is a CVA, which stands for Certified Valuation Analyst.  That certification is offered by the National Association of Certified Valuators and Analysts.

I also hold the accredited and business valuation certification from the American Institute of Certified Public Accountants, and I am a senior -- accredited senior appraiser issued by the American Society of Appraisers.

Q.    And do you -- have you published?

A.    Yes, I have.

Q.    All right, and you have filed an expert report in the adversary cases associated with this case, correct?

A.    That is correct.

Q.    And your publications were listed and supplied as a matter of public record in that matter?

Page 335

A.   That is correct.

Q.   All right, and have you testified as an expert in any cases?

A.   Yes, a number of cases.

Q.   All right, and do you teach?

A.   Yes, I also instruct, yes.

Q.   All right, and where is that?

A.   I serve as an adjunct professor at Florida Atlantic University, in their graduate school.

Q.   And what do you teach?

A.   Valuation and forensic accounting.

MR. BRESLIN:   All right.   I will tender Mr. Gray as an expert at this time, your Honor.

MR. FELDMAN:   No objection.

THE COURT:   Thank you.

You may continue.

BY MR. BRESLIN:

Q.   Mr. Gray, when did you first become involved in this litigation?

A.   I believe that occurred in December of 2022.

Q.   All right, and there came a time when you took over for Mr. Roll (phonetic) as the testifying expert in this case, correct?

A.   Yes, supplemented Mr. Roll's role.

Q.   All right, and in the adversary case you

Page 336

filed an expert report, did you not?

A.   Yes, I did.

Q.   And did that expert report require that you evaluated the business practices of the debtor, AWB?

A.   Yes, it did.

Q.   All right, and as you sit here today, have you evaluated those business practices?

A.   Yes, I have.

Q.   Have you had a chance to review the books and records of AWB?

A.   Yes, I have.

Q.   Have you reviewed the tax returns of AWB?

A.   Yes.

Q.   And have you returned (sic) the balance sheets to QuickBooks, all the records?

A.   Correct, yes.

Q.   And how about the banking records, have you reviewed their banking records?

A.   Yes, I have.

Q.   And have you reviewed those in conjunction with the banking records of both Excell and the Karma entities?

A.   Yes.

Q.   All right.  Now, you've also reviewed deal jackets, have you not?

Page 337

A.   That is correct.

Q.   All right, and the deal jackets you've reviewed, you've reviewed those strictly related to the years of 2021 and 2022, correct?

A.   Yes.

Q.   All right, and you have -- have you taken to summarize the data that's -- certain data that would be in those deal jackets?

A.   Yes.

Q.   All right.  Now, let's just get this out of the way, you know, in the beginning, you are not here to offer testimony as to whether AWB ever was a bona fide purchaser in good faith of any vehicles, correct?

A.   That is correct.

Q.   All right.  So, your testimony today is whether -- you're here to talk about bank records, business practices, things of that nature, correct?

A.   That is correct.

Q.   All right.  Now, let's start with the 2021 deal jacket.  So, do you -- have you been able to review the 2021 deal jackets to determine whether or not there was transactions on paper or otherwise between AWB and Excell?

A.   Yes, I did.

Q.   All right.  Now, were you able to take a

Page 338

look at those business transactions to determine whether or not there appeared to be actual transactions for any legitimate business reason?

MR. FELDMAN:  Objection, argumentative.

THE COURT:  Overruled.

THE WITNESS:  Yes, I did.

BY MR. BRESLIN:

Q.    All right.  Did you come to a conclusion on that?

A.    Yes, I did.

Q.    And what's your conclusion?

A.    There appear to be a number of, quote, unquote, transactions in which documentation was prepared, that didn't really substantiate an actual transaction.

Q.    All right, and --

MR. FELDMAN:  Judge, I'm going to object. This is outside the scope of the expert opinion, written opinion that this witness provided in this case.  He's providing a new opinion that's never been testified to. We actually took his deposition.

THE COURT:  Okay.  One sentence was enough. Yes.

MR. BRESLIN:  Judge, there has been no opinion issued in this matter, this is the bankruptcy matter.  He issued an opinion in the --

Page 339

THE COURT:  Oh, I see.

MR. BRESLIN:  -- in the adversary.

THE COURT:  And your comment on that is? Did I require -- did that rule apply in this contested matter?

I don't think I --

MR. FELDMAN:  Do you mind if I just look at the disclosure that they provided again?

THE COURT:  Well --

MR. BRESLIN:  Judge, it's --

THE COURT:  -- overruled.

If you wish to raise another objection later, you can.

Yes.

MR. FELDMAN:  I'm just saying, this is Mr. Breslin's disclosure in this case.  Mr. Gray is expected to testify consistently with the opinions outlined in his expert report, and summaries to provide content filed of record.

So, if we knew he was going to provide additional opinions, which he's doing right now, we would have redeposed him.

THE COURT:  Okay.

MR. BRESLIN:  Judge, they did -- A, they did depose him.

Page 340

THE COURT:  Okay.

MR. BRESLIN:  And, B --

THE COURT:  Hold on.

But what is his opinion -- so you've adopted the report from the other matter --

MR. BRESLIN:  Judge --

THE COURT:  -- correct?

Hold on.  I just want to make sure I understand the background before you continue.

So, here in the disclosure you've adopted the report from the adversary, yes?

MR. BRESLIN:  Well, not exactly.

Mr. Gray was listed as a witness in the adversary --

THE COURT:  Hand waving doesn't help you.

MR. FELDMAN:  I'm sorry, I'm not trying, Judge.

THE COURT:  Okay.

MR. FELDMAN:  It's just I'm a little frustrated.  My apologies.

THE COURT:  Remain calm.  Well, I get frustrated, too, but I don't wave my hands around.  Go ahead.

MR. BRESLIN:  Thank you.

Mr. Gray was listed as a witness in the

Page 341

adversary case. He issued an opinion in the adversary case, and that opinion was certainly, you know, given to opposing counsel, which is the debtor.

Now on a parallel matter is the motion to convert and/or dismiss, and the motion to convert and/or dismiss encompasses different legal issues and more streamlined factual issues.

The streamlined factual issues and opinions that Mr. Gray is offering today are within, within the larger, you know, universe of the opinions and information that he analyzed in the adversary case.

So in the adversary case he created charts, summaries of content, he went through a complete analysis of the banking records, of the buying and the selling for 2021 and 2022, in a far more detailed way. All of that was in his expert report.

What I'm asking him today is just a subset of that much larger analysis that was performed in the adversary case.

So, Mr. Gray was deposed in the adversary case, and they asked him whatever questions they wanted to ask him.

Now we have this case. In this case there has never been a trial order to list experts, you know, give reports, anything of that nature. The only thing

Page 342

that happened in this matter, in this motion to convert or dismiss, Mr. Miller issued interrogatories.  So he issued interrogatories, and I answered his interrogatories, and when I answered his interrogatories I gave the best information I had available to me on the date that I answered those interrogatories.  Now -- and so what I put in those interrogatories is what I believed that Mr. Gray may or may not be testifying to when we got to a hearing.

THE COURT:  Okay.  Hold on.

MR. BRESLIN:  Now --

THE COURT:  Stop for a moment.

So in those interrogatories, did you list the topic that you were just asking him about, which is to elicit testimony that the debtor's records represent things that didn't happen?

MR. BRESLIN:  Well, what I -- I don't have the answer in front of me.  Can I see it, please?

THE COURT:  That's the interrogatory response.

MR. BRESLIN:  All right.  It says Mr. Gray is expected to testify consistently with the opinions outlined in his expert report, and the summaries to prove content filed of record.

THE COURT:  Okay.  So the objection is that he's not, that's the objection.  So --

Page 343

MR. BRESLIN:  I go on to say, the FVP parties reserve the right to call Mr. Gray for any material or relevant testimony, including rebuttal or impeachment.

So, it's certainly -- it is certainly within the universe of information that he analyzed in the adversary case, and it's consistent with that.

THE COURT:  All right.  This is what I'm going to do, I'm going to hear the testimony, and later on you can argue to me why I should ignore it.  Remember I'm not a jury.  I'm really good at ignoring things.

So, I'm going to let you elicit the testimony, and then I want you both to point to me later, and you, in particular, as offering this testimony, how it is within the report, which I have not reviewed.

MR. BRESLIN:  Okay.

THE COURT:  So, I don't know the answer to that.

Let me also point out to both of you that whether I entered an order with regard to providing disclosures under Rule 26, Rule 26 is automatically applicable in this matter as a result of Rule 9014.

So, you needed to provide it, and you need to be governed by it, and the objection raised by Mr. Feldman is that he was not provided with an

Page 344

opportunity to cross-examine this witness under a deposition -- in a deposition on this topic, because he claims that it's not within the report. I don't know the answer to that.

MR. BRESLIN: Okay.

THE COURT: And I don't want to stall the presentation right now.

MR. BRESLIN: I understand, but just a comment, please, your Honor, you know, and you certainly have more experience than me, but I have quite a bit, but when it comes to expert testimony, the experts can sit in the courtroom and listen to the testimony of witnesses and can opine about what they have in their mind, and what they've heard on the witness stand. I mean, that happens every day in trials.

So it's not like Mr. Gray is limited to some little subset of information he put in his report. He can offer his opinion on any information that is available to him.

THE COURT: Okay. Let's not go there, because I don't want to have an endless back-and-forth. I see Mr. Feldman moving for the microphone. So --

MR. BRESLIN: All right. All right. Okay.

THE COURT: -- let's get back to questions.

BY MR. BRESLIN:

Page 345

Q.    Okay.  Let's talk about the 2021 deal jackets, and have the 2021 deal jackets been analyzed to a great extent in your analysis?

A.    Yes.

Q.    All right, and not only are there deal jackets themselves, there have been summaries to prove content that evaluate the 2021 deal jackets, correct?

A.    That is correct.

Q.    And also the banking records for 2021?

A.    Yes.

Q.    All right.  Let's talk about -- let's just talk about the 2021 deal jackets just for a moment, just a subset of that information.

Were you able to review the paperwork regarding transactions between Excell and AWB in the 2021 deal jackets?

A.    To the extent that information was in those deal jackets, yes.

Q.    Okay.  Now, was it -- is it your opinion that there was consistent paperwork in the 2021 deal jackets that had a paperwork transaction where Excell was selling the car to AWB, and then AWB was selling the car back to Excell for the same amount of money?

MR. MILLER:  Objection, leading.

THE COURT:  I'm going to give him leeway on

Page 346

that.

All these deal jackets are in evidence, correct?

MR. BRESLIN:  Not all of them, but there is a --

THE COURT:  Most of them.

MR. BRESLIN:  -- sampling of it.

THE COURT:  Okay.  Thank you.  Overruled.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.   All right.  So, you know, the point is that in the 2021 deal jackets, would you -- could you opine that consistently in 2021 there were transactions where one of the Karma companies would buy a car, and after that Karma company buys a car, there were paper transactions between Excell and AWB for the exact same price, and then thereafter a Karma company would sell a car?

MR. FELDMAN:  Objection, leading.

THE COURT:  Overruled.

Go ahead.

THE WITNESS:  Yes.

BY MR. BRESLIN:

Q.   All right, and did that appear consistently in 2021?

A.   Yes.

Page 347

Q.   All right.  If you had to opine about a percentage of the deal jackets that had that exact same type of transaction, what would your opinion be?

A.   If I were to determine a percentage, 95 percent of the deal jackets --

Q.   Okay.

A.   -- were that way.

Q.   All right.  So, in essence, Karma would buy a car, then there would be a sale from Excell to AWB, and AWB back to Excell for the exact same amount of money, and then Karma would sell the car, correct?

A.   Correct.

Q.   All right, and you've analyzed the banking records in 2021, and those banking records indicate that there was no money transferred back and forth for those transactions between Excell and AWB, correct?

A.   That is correct.

Q.   Now, have you come to a conclusion whether or not AWB was, in fact, in the business of buying and selling automobiles?

A.   Yes, I have.

Q.   And what is that opinion?

A.   That they were not a buyer and seller of automobiles.

Q.   Okay, and on what do you base your opinion?

Page 348

A.    I base that opinion on a number of sources that I've analyzed, the company's tax returns, for example, as well as those banking records and the deal jackets.

Q.    Okay.  Now let's talk about the tax returns. Do you want to have a look at the tax returns when you talk about them?

A.    I think that might be beneficial.

MR. BRESLIN:  All right.  Let's put 21 up.

BY MR. BRESLIN:

Q.    All right.  Sir, you've reviewed Exhibit 21, have you not?

A.    Yes, I have.

Q.    And so is there -- would you like us to scroll through it, or is there a particular page that you would like us to --

A.    Can you scroll to the first page of the -- right there, that --

Q.    All right.  Now, I'm not an accountant, and I don't know what any of this means.  Could you explain what you mean?

A.    Well, one thing I've noticed, and again, this holds true for the tax returns from 2017, all the way through 2021, this happens to be the 2017 return, when I looked at the gross sales, and the cost of goods sold, a

Page 349

remarkable similarity in those amounts.

As a matter of fact, I calculated the gross profit percentage for the firm, for the company, AWB, from 2017, 2018, 2019, 2020, and 2021, gross profit percentage for these transactions, 2017 was the only year in which it was -- it exceeded 2 percent, 2.1 percent.  Most years it was in the 1 percent, 1.5 percent range.

The industry benchmark for wholesale dealerships in terms of gross profit percentage is over 18 percent.  So this indicated to me that, one, that there was certainly an issue in terms of the lack of profitability in these particular transactions, and then that, coupled with the expenses that were incurred in order to perform these operations, again, for each of the years that I analyzed in terms of the tax return information, showed an operating loss.

So, over a five-year period a firm cannot sustain loss, after loss, after loss, and so that would indicate to me that this firm actually, although it was recording these transactions, really wasn't trying to maximize the profitability and the economic benefit to the owner or owners of this business.  So it doesn't really constitute a solid business at all.

Q.    Okay.  Now, so is it your opinion that this company did not make any money buying and selling

Page 350

cars?

A.   It certainly appears that way.

Q.   Okay.  Now, tell me how this company made money if it didn't make money buying and selling cars.

A.   The one focus of the company that actually did bring in income was through interest income it was receiving, 300,000 to 400,000 per year for these five-year periods that were analyzed.

Q.   Okay.  So if I understand you correctly, if we look at the tax returns, the company made no money buying and selling cars, but did make money generating interest?

A.   In terms of passive income, yes.

Q.   Okay.  Now, on what did the company make interest?

A.   That's the interesting part, because if we go to the balance sheet of these tax returns, there is no asset that would be an asset that would generate interest income.  There is no portfolio of marketable securities.  Many times the company had no cash.  So there was nothing that was recorded on the balance sheets of the company that would indicate that that asset was an asset that was generating investment income.

So the investment income was coming into the company, but the tax returns don't say how it was coming

Page 351

into the company.

Q.    All right.  So, do I understand that to mean that there was -- the company apparently had loans outstanding that it did not reflect on its books and records?

A.    That would be certainly one source of this interest income, yes.

Q.    Okay.  So, but the bottom line is, there is interest income reflected on the tax returns, and there is nothing to indicate where that interest came from?

A.    Correct.

Q.    And is that consistent with the books and records of the company?

A.    Yes.

Q.    Now in the 2021 deal jackets, you stated that you saw repeatedly transactions where the Excell company is selling a car to AWB, and it's being sold right back to them for the exact same amount of money, correct?

A.    That's correct.

Q.    All right.  Can you think of any business reason for that to happen?

MR. FELDMAN:  Objection, calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  No, not specifically.  In my

Page 352

years of experience I've never seen that type of an activity for any business in any particular industry.

BY MR. BRESLIN:

Q.    Okay.  Now, let's move to 2022.  Did that pattern remain?

A.    Actually the pattern remained, but the -- there was some cash that evidently was going between the parties --

Q.    Okay.  So --

A.    -- in that year.

Q.    -- in 2022, the buying and selling for the same amount of money remained, is that correct?

A.    I believe so, yes.

Q.    All right, and then for -- but in 2022 there is actually now some cash going back and forth between the parties, correct?

A.    Yes.

Q.    Okay.  Let's pull up -- and you did the analysis of 2022 for your expert report in the adversary case, did you not?

A.    That's correct.

         MR. BRESLIN:  Okay.  Let's pull up --

         THE WITNESS:  Actually if I may make one correction to one of my statements?

BY MR. BRESLIN:

Page 353

Q.    Sure.

A.    With regard to the balance sheets of AWB, I did note in 2021, on the tax return, they did record a loan receivable to Excell company, I think for about $398,000.

Q.    All right.  So you're saying in the tax returns, up until 2021, you couldn't identify any loans, but in 2021 there was a loan?

A.    There was a loan, yes.

Q.    And what was the amount of the loan?

A.    I think it was around $398,000.

Q.    All right.  Now, you're aware, are you not, that AWB claims loans to -- or, you know, and it's not clear if they claim a loan or not, but debt, you know, in excess of $5 million, correct?

A.    Yes, I've seen documentation to that effect.

Q.    All right, and none of that is reflected on the tax returns, correct?

A.    No, it's not.

MR. BRESLIN:  What number is the summaries to prove content?  It is -- I'm sorry, just give me a moment.

All right.  Please pull up Number 30.  Let's make it bigger, and let's scroll down.

BY MR. BRESLIN:

Page 354

Q.    All right.  Sir, these are the --

MR. BRESLIN:  Go to the next page.  Next page.  Next page.  Next page.

BY MR. BRESLIN:

Q.    All right.  So, this -- when we get to your Schedule 3 in your summaries to prove content, that you attached to your expert report in the adversary case, you did an analysis of the money in and money out to AWB -- between AWB and all of the Zankl companies, for lack of a better word, that would be Excell and the Karma companies combined, correct?

A.    Yes.

Q.    All right, and does this chart, in Schedule 3, indicate the monies that went in and out between those various companies?

A.    Yes, it does.

Q.    And this particular chart was put together to address allegations by AWB that they, in fact, were buying and selling cars, correct?

A.    Correct.

Q.    All right.  So, let's -- so this data, this information, this was made into some charts, was it not?

A.    Yes, it was.

MR. BRESLIN:  All right.  Let's go to the next page, please.  All right.  Let's blow that up.

Page 355

BY MR. BRESLIN:

Q.   Explain to the Judge what's in Schedule 3 of that chart.

MR. FELDMAN:   Judge, we're going to object to this.  We have a pending hearsay foundation objection to this exhibit.  This is a summary that was provided to us, but the underlying documents, we're not even sure about.  So it's a 1006 summary, the underlying documents was the basis that's actually within their exhibit register.

THE COURT:   Okay.  So this is a summary objection, that's it?

MR. FELDMAN:   Yes.

THE COURT:   Yes.

MR. BRESLIN:   All right.  Judge, we provide -- "we", the FVP parties, followed the rule and provided the debtor in the adversary case these charts -- excuse me -- these charts, and we served them with a notice of summaries to prove content, and I have the email, and I can give you the date, and we gave them all the underlying data, just like we were supposed to under the rules, we said here is our summaries, here is our charts, here is all the underlying data.  We served that on them, you know, well over a -- you know, long before the expert report was filed.

Page 356

So, they have had our summaries for weeks, many weeks, and they have had our charts for many weeks, and they have not raised any objections.

So, to the extent that they have objections, they didn't raise any, and these summaries were included in the expert report, and Mr. Gray was deposed.  So --

THE COURT:  All right.  That's a lot of words.

Yep.

MR. MILLER:  Your Honor, we did raise our objection, it's Court Paper 546.

THE COURT:  Okay, and the objections are?

MR. MILLER:  Well, aside from hearsay, lack of foundation, predicate, we've addressed the 1006 rule requirements that --

THE COURT:  Okay, and you were or were not provided with the underlying documents?

MR. MILLER:  Judge, here is the difference, Mr. Gray's testimony today --

THE COURT:  I don't care about his testimony.  This is an objection raised at a summary.  The question is were you provided with the underlying documents, and counsel says you were.

MR. MILLER:  Your Honor, to say that we were provided with the documents, I can tell you, if you

Page 357

recall, the history of the adversary case, where we served a discovery request in August of 2022.  It took Mr. Breslin seven different machinations to try and figure out how to give us the documents.  What we effectively ended up with was a document dump.

THE COURT:  Do I know for a fact that all the documents that relate and support what this purported expert supposedly created the summary on --

THE COURT:  These are the debtor's own records, correct?  The debtor's own records, Mr. Miller.

MR. FELDMAN:  It's Excell.

MR. MILLER:  It's Excell records.

THE COURT:  Oh, it's Excell's records.

MR. MILLER:  These --

THE COURT:  All right.  So you were provided those records, yes?  No?

MR. MILLER:  I don't know.

THE COURT:  You don't know.

MR. MILLER:  I can't say that, because -- and I say this only because Mr. Breslin has -- as I said, we got document dumps from Mr. Breslin --

THE COURT:  Those motions --

MR. MILLER:  -- of tens of thousands of pages.

THE COURT:  -- were fully resolved by the

Page 358

Court, in my view.  That's water under the bridge.

If you thought that the production was still inadequate, I should have already had a hearing about it.

MR. MILLER:  Well, this --

THE COURT:  So, hold on.

What do you want to show me, Mr. Breslin?

MR. BRESLIN:  Well, just the email where I supplied the summaries.

THE COURT:  May I see it, please?

MR. BRESLIN:  Of course.

THE COURT:  Please hand it over to Ms. Leonard, and then you can hand it to Mr. Feldman in a moment.

Thank you.

MR. BRESLIN:  And the notice was filed of record --

THE COURT:  Stop talking.

February 15th.  You got this or did not get this?

MR. MILLER:  Your Honor --

THE COURT:  Hand it back.

MR. MILLER:  The documents relied upon by the expert were documents --

THE COURT:  That is not the question I'm hearing an objection about right now.  So, hold on, I need

Page 359

to turn the timer over to your side.

The objection --

MR. MILLER:  (Inaudible) -- made several objections.

THE COURT:  -- I'm hearing about right now is solely about a summary, it is specifically aimed at that.  I've just been handed an email that shows you were offered the documents to support the summaries.

So you're saying you didn't get them because there was a document dump.  This is a separate email.

MR. MILLER:  Your Honor -- well, I haven't seen the email.  Mr. Breslin handed it to the Court, but let me address, it was a number of objections.

1006 requires --

THE COURT:  We have one objection right now.

MR. MILLER:  1006 requires that the documents reviewed and considered for purposes of establishing an expert report must be reliable.  Mr. Zankl has been --

THE COURT:  We're talking about, the objection right now is summary.  What other objection am I hearing?  Summaries have nothing to do with reliability.

MR. MILLER:  Of course, under 901.

THE COURT:  They have to do with whether the documents are available.

Page 360

So right now the documents are made available. That objection is overruled.

Next objection.

And I want to know why there is two of you delivering objections. After this one it's one, one person, Mr. Feldman speaks, unless you want it to be you.

Okay. Next, what's the next objection? Right now we're talking about a single table, correct? Because that's the only thing I have --

MR. MILLER: I don't know if --

THE COURT: -- in front of me.

MR. MILLER: -- Mr. Breslin was referring just to the single table, or to the entirety of this exhibit.

THE COURT: Right now I'm looking at a table, which has not been offered, by the way, I might add.

MR. MILLER: Well, the other part was Rule 901, as to Excell's documents. Mr. Zankl -- the Court has had many hearings with Mr. Zankl where he's testified that he didn't prepare, or understand his own records. Mr. Zankl has pled the 5th Amendment, not once, not twice, but at three different depositions in the parent case, and --

THE COURT: Okay, and the objection under

Page 361

the rules of evidence is what?

MR. MILLER:  Reliability, 901.

THE COURT:  Okay, and so I can -- we can talk about where the documents came from, and whether or not they are reliable, but right now I'm going to allow the witness to say what he used, which, by the way, can be hearsay, and render his opinions.

All right.  Overruled.  Next.

MR. BRESLIN:  Thank you.

BY MR. BRESLIN:

Q.    All right.  Mr. Gray, we were talking about the chart that talks -- that actually puts in visual terms the monetary columns that were on the last page, correct?

A.    Correct.

Q.    All right.  Now, when we look at the -- let's just go back one page, just so we're clear.

All right.  This page here, this was from bank records, right?

A.    Correct.

Q.    Okay.

THE COURT:  Hold on.  Can you ask him what that means, What are bank records?

BY MR. BRESLIN:

Q.    Oh, is it your understanding that through subpoenas and discovery, that the FVP parties were given

Page 362

the bank records for Excell, AWB and the Karma companies?

MR. FELDMAN: Objection, leading.

THE COURT: Overruled.

I specifically asked the question because --

MR. FELDMAN: I understand.

THE COURT: -- the argument was made that these were Excell's records, and no one knows what they are, and the document apparently is compiled from bank statements. So the objection should not have been raised at all.

Go ahead.

MR. BRESLIN: Thank you.

BY MR. BRESLIN:

Q. All right. So --

A. May I clarify as well? Not only bank statements, but again, part of the deal -- the information that was found in the deal jackets.

MR. BRESLIN: Okay. Thank you.

THE COURT: Hold on. Stop.

Whose deal jackets?

THE WITNESS: I believe these were the Farache deal jackets.

THE COURT: And these are the debtor's deal jackets?

THE WITNESS: Yes, your Honor.

Page 363

THE COURT: So, statements from banks, and the debtor's deal jackets, is that correct?

THE WITNESS: That's correct.

THE COURT: Okay. The objection remains overruled.

Go ahead.

MR. BRESLIN: Thank you.

All right. Let's go to the next page.

BY MR. BRESLIN:

Q. Can you explain to the Judge exactly what that document means? That chart, what does that chart show?

A. This chart is based -- it is a visual representation of the data in the table preceding it, showing the inflows as green bars that were coming from, in terms of cash from Excell/Karma entities to Farache, through the Farache entities.

The yellow bars represent the sum of outflows from Farache to those Excell/Karma entities.

Q. Okay. Now, just let me stop you right there. So the green and the yellow, that's compiled from bank records, correct?

A. Correct.

Q. All right. Go on.

A. The red bars show the sum of dollars

Page 364

necessary if the -- if AWB actually funded the vehicle purchases that was found in the deal jackets.

Q.    Okay.  So the red, that is a compilation of the money that would have been necessary if AWB purchased the cars that it represented to have purchased in its own records, correct?

A.    Correct.

Q.    All right.  Go on.

A.    And then the purple bars, that represents the sum of the difference needed for the actual purchase by Farache according, again, according to that deal jacket, deal jacket data.

Q.    Okay. All right.  So, did this information -- was this information, when you look at the books and records, and the bank records between the various companies, did that -- was that included as part of your analysis, when you came to the conclusion that AWB was not in the business of buying and selling cars?

A.    Correct.

Q.    Now, again, just so the record is clear, you are not opining on any individual vehicles, whether or not it was an actual bona fide purchase for value, correct?

A.    That is correct.

Q.    All right.  Just so we're clear, I showed you one --

Page 365

MR. BRESLIN:  Or, Judge, I will move into evidence the -- let me put that chart back up.

I would move into evidence only the chart. Daniel, just the chart, and that would be, that would be Schedule 3, that would be page -- you can put it back so I can see where it is.  So this would be Page 9 of 24, it would be Page 8 of 24 and 9 of 24, and as part of Exhibit 30, just those two portions that we addressed today.

THE COURT:  What do you mean by two portions, that one page I'm looking at or something else?

MR. BRESLIN:  Well, no, and it's the page before.  That page is a visual representation of that page.  So --

THE COURT:  Oh, I see.

MR. BRESLIN:  -- it's those two pages.

THE COURT:  So you want the table, as well as the -- yes.

MR. BRESLIN:  As well as the chart.

THE COURT:  Yes.

MR. BRESLIN:  And there are other, there are other -- there are more schedules there that we can address if necessary, and may, but for today I believe this makes the point.  So I would move just those two documents into evidence at this time.

Page 366

THE COURT:  Yes.

MR. FELDMAN:  Your Honor, just to preserve the objection, we object, but we understand your Honor has already overruled it.

THE COURT:  Okay.  Well, which objection are you preserving?

MR. FELDMAN:  The summary.

THE COURT:  Okay.  So the objection that you didn't get the documents, which apparently are the debtor's deal jackets and bank statements, you don't have those?

MR. FELDMAN:  Your Honor, it's also Excell documents what's in here.  This is Excell data that was included in here.

THE COURT:  Okay.  The Excell data is bank statements, apparently obtained from banks.

MR. FELDMAN:  The point is --

THE COURT:  So, did you receive those?

MR. FELDMAN:  I don't -- as Mr. Miller articulated --

THE COURT:  You don't know.

MR. FELDMAN:  As Mr. Miller articulated --

THE COURT:  Well, you need to be able to tell me right now --

MR. FELDMAN:  -- we don't know, Judge.

Page 367

THE COURT:  -- that you didn't receive them, because I've had counsel show me an email that he tendered exactly the documents.

MR. FELDMAN:  I understand, your Honor, but as Mr. Miller told you, there was a dump, so --

THE COURT:  No --

MR. FELDMAN:  -- whether or not that --

THE COURT:  -- that's an individual email, an individual -- with the documents, correct?  Yes.

So, you need to be prepared today to tell me what you didn't have that they've said are the components that were summarized, which are the debtor's own deal jackets and bank statements, that's what the witness has testified that he used.

MR. FELDMAN:  Understood, your Honor.

THE COURT:  Okay.  So that's the objection that you're holding.  Okay.  Overruled.

All right.  Those two pages are admitted.

MR. BRESLIN:  Thank you.

THE COURT:  They are a component of what exhibit, if any, 30?

MR. BRESLIN:  Yes, they're part of 30, Exhibit 30.

THE COURT:  Okay, and at the top they're Pages 8 of 24?

Page 368

MR. BRESLIN:  So it's Page 8 of 24 and 9 of 24 of Exhibit 30.

THE COURT:  Thank you.

(Thereupon, the said portion of Exhibit 30 was admitted into evidence.)

THE COURT:  Are you tendering the witness?

MR. BRESLIN:  Just very, very quickly.

BY MR. BRESLIN:

Q.   Now, you already talked about all of the tax returns, correct?

A.   Yes, sir.

Q.   All right, and you've also examined the books and records of AWB, the QuickBooks that were supplied to you, correct?

A.   Yes, I have.

MR. BRESLIN:  All right.  I tender the witness.  Thank you.

THE COURT:  Mr. Feldman.

CROSS-EXAMINATION

BY MR. FELDMAN:

Q.   Mr. Gray, let's just address the issue at the outset.  You did a written report in the adversary proceeding, correct?

A.   I'm sorry, can you repeat?

Q.   You did a written report in the adversary

Page 369

proceeding, correct?

A.    Yes, I did.

Q.    And in fact, I had asked you, did you intend to amend your report, do you remember that testimony?

A.    Yes, I do.

Q.    Okay, and I asked you if you intended to amend it, to do some type of written report, is that correct?

A.    I'm sorry, can you restate the question?

Q.    Yes.  In other words, if you were going to amend your report, you were going to do it in written fashion, is that correct?

A.    Yes, that would be correct.

Q.    Okay, and since you've issued that report, you haven't issued any amended written report, is that correct?

A.    That is correct.

Q.    Okay, and so the opinions that you issued in the adversary proceeding are as follows, I just want to make sure I have this right, Opinion A, AWB was acting as a floor plan financier vendor for Excell/Karmas as opposed to AWB's portrayal as a serial purchaser and seller of vehicles from and to either Excell or the Karma entities for the same price.  That was one of your opinions?

A.    Yes.

Q.   Okay.  Second opinion you have was that the financial records of 2021 establish that AWB was paid a substantial sum, when the records should have shown that AWB was paid substantial sums throughout 2021 if it was truly a purchaser of automobiles.  Did I read that right?

A.   AWB being paid.

Q.   AWB.

A.   If they're a purchaser, that should have been an outflow.  I'm sorry --

Q.   Do you have a copy of your report in front of you?

A.   No, I do not.

Q.   Okay.  Let me just give it to you.  Look at it.  Tell me if I read that right?

A.   Oh, that the financial records of 2021 establish that AWB was paid a substantial sum, when the records should have shown that AWB was paying substantial sums throughout 2021 if it was truly a purchaser, purchasers of all automobiles, I'm sorry, I misunderstood.

Q.   Is that your opinion?

A.   Yes.

Q.   Okay, and then the third opinion had in 2021 there were relatively consistent payments from Excell/Karma entities to AWB, which appear to have been consistent with interest payments, that was another one of

Page 371

your opinions?

A.   Yes.

Q.   Okay, and then the last one -- or, sorry, you have two more, that the financial records of 2022 establish that AWB was paid more funds than was transferred to the Karma entities and Excell, and that, therefore, AWB was receiving substantial sums, where the record should have showed that AWB was paying substantial sums if it was truly a purchaser of automobiles.  In 2022 AWB would have had to have paid $6.7 million for the vehicles it alleges to have purchased.  In 2022 AWB, in fact, (inaudible) received 6.7 million in 2022, and paid only $4.8 million to the Karma entities and Excell, resulting in a net receipt to AWB and related companies of $1.9 million in 2022 alone.

Does that sound like one of your opinions?

A.   Yes.

Q.   Okay, and then the last one is, this opinion extends to the 23 vehicles at issue in this matter.  Does that sound correct?

A.   Yes.

Q.   All right.  So you didn't issue any other written opinions other than what I just read right there?

A.   No, I have not.

Q.   Okay.  So I just want to talk about your

Page 372

qualifications.

Can you tell the Court if you have a designation of certified fraud examiner?

A.   No, I do not.

Q.   Do you have a designation with respect to forensic accounting?

A.   No, I do not.

Q.   Okay, and it's fair to say that, in terms of just looking at your resume, we asked you about this in your deposition, is that primarily your written presentations have been on valuation issues?

A.   Yes, that's correct.

Q.   We're not doing any valuation in this case, right?

A.   No.

Q.   Okay, and then is it your testimony, just so I'm clear, that AWB has never sold a vehicle?

A.   No, I don't believe that's my testimony.

Q.   Okay.  So, do you concede that AWB has, in fact, sold vehicles?

A.   A small number of vehicles based upon the records that we have analyzed.

Q.   Okay.  So why don't you tell the Court, what do you mean by small number of vehicles?

A.   Three.

Page 373

Q. You believe AWB has only sold three vehicles in its entire existence?

A. Maybe not its entire existence, but I believe we actually asked a subpoena for a schedule of -- I believe this might have been for twenty twenty -- no, I have to take a look at the record as to when it was.

Q. Okay.

A. But, specifically, in terms of, again, the actual purchases and sales that were consummated with a cash transaction, again, I think it certainly was the minority of the transactions that were recorded by AWB.

Q. So, you gave a specific number, three.

A. Well, I know that in one schedule that there was only three vehicles, I believe, that were indicated.

Q. Isn't it a fact that just in 2021 alone, AWB sold 20 cars?

A. Again, I would have to go back to my records and look at that, look at that data.

Q. Okay. So the answer is that you don't know how many cars AWB sold in 2021, is that a fair statement?

A. Not off the top of my head --

Q. Okay.

A. -- at this point, no.

Q. But it's certainly not three. You can't say for certain it's three in 2021?

Page 374

A.     Again, no.  Like I said, I'd have to go back to my records.

Q.     Okay.  Do you know how many cars AWB sold in 2020?

A.     Again, I'd have to go back and look at the records.

Q.     Okay.  So, I asked you in your deposition about the relationship between Excell and the debtor, AWB, and one of the questions I had asked you, is it possible that someone can also be a creditor of an entity, and also be engaged in the purchase and sale of vehicles with that same entity.  Do you recall that testimony?

A.     I believe so.

Q.     Okay, and is it your testimony that AWB has never purchased a vehicle from Excell Auto Group?

A.     Again, I don't believe I stated that.

Q.     Okay.  So please explain then what you did say?

A.     I have to go back to the specific question.

Q.     Okay.  Would you concede that AWB probably has, in fact, bought some vehicles from Excell Auto Group?

A.     That may be the case.

Q.     Okay, and then -- so your opinions in the adversary proceeding were that AWB was a lender to Excell Auto Group.  I asked you -- I believe your opinion said

Page 375

something to the effect of it's a floor financing lender, is that right?

A.     Well, I believed it was just they were provided loans, they were a debtor.

Q.     In your report you specifically --

A.     -- excuse me, creditor.

MR. BRESLIN:  Object.  Please --

MR. FELDMAN:  I'm sorry.

THE WITNESS:  I'm sorry.

MR. BRESLIN:  -- let the witness finish.

MR. FELDMAN:  Sorry.

THE WITNESS:  That they provided loans.

BY MR. FELDMAN:

Q.     Okay.  Your report specifically used the term "floor financing", right?

A.     I believe so.

Q.     Okay.  So why don't you explain what a floor financing arrangement is.

A.     This is where an entity provides the capital that automobile dealerships need in order to purchase their inventory.

Q.     Okay.  Typically are you familiar with the types of documents that a floor financing agreement would have?

A.     I believe we covered this in the deposition,

Page 376

yes.

Q. Okay. So let's talk about what those documents would be. There would be, like, a loan agreement, right?

A. Correct.

Q. Okay. There would be probably a promissory note, right?

A. Correct.

Q. Okay. There would probably be some personal guarantees?

A. Maybe.

Q. Okay. Depending on how large the company is, right?

A. Correct.

Q. Okay, and is there in this instance some type of loan agreement, some floor financing agreement specifically in writing detailing the receivership between Excell and AWB?

A. I don't recall if there is or not.

Q. Okay, and then you certainly looked at the email traffic regarding the purchases and sales of vehicles between Excell and AWB, correct?

A. Yes.

Q. Okay. Do you see any reference to some type of floor financing agreement in those email communications

Page 377

between AWB and Excell?

A.   I don't recall.

Q.   Okay, and I asked you in your deposition about your familiarity with floor financing agreements, and you mentioned that you've done some valuation work for auto dealerships, correct?

A.   That's correct.

Q.   Okay, but you've never been involved in the actual analysis of any type of floor financing agreement, isn't that right?

A.   Only to the extent that it would be necessary for the valuation of an automobile dealership, yes.

Q.   Understood.

MR. FELDMAN:  Your Honor, just give me one moment.  Let me just check my notes.  Thank you.

Nothing further, your Honor.  Thank you.

MR. BRESLIN:  Very brief, your Honor.

Are these yours?

MR. FELDMAN:  Sorry.

REDIRECT EXAMINATION

BY MR. BRESLIN:

Q.   Mr. Gray, were you able to look at the monetary transactions between AWB and the Karma companies, and/or Excell for 2022?

Page 378

A.    Yes, I --

MR. FELDMAN:  Objection, it's outside the scope.

THE COURT:  Could you repeat the question for me?

MR. BRESLIN:  Yes.

BY MR. BRESLIN:

Q.    Were you able to review the monetary transactions between AWB and Excell and the Karma entities for 2022?

THE COURT:  Okay.  So he said that's outside the scope.

Your response.

MR. BRESLIN:  Yes, what he -- it's within the scope because he talked about money being put up for purchases of cars as a floor plan financier.  So, I'm addressing whether or not the monetary transactions in 2002 (sic) reflect that any money went in before a car was actually purchased.

THE COURT:  Overruled.  Go ahead.

MR. BRESLIN:  All right.

BY MR. BRESLIN:

Q.    So, a floor plan financier might put up some money with an automobile company, and then they would use that money to buy cars, correct?

Page 379

A.    Correct.

Q.    All right.  So, and I know that you talked about generally floor plan financing.  Have you been able to look at the financial transactions between AWB and Excell and Karma in 2022 to determine whether or not monies that were used, or arguably used to buy cars was actually sent to AWB, and then sent back before a car was purchased?

A.    There did seem to be a pattern of that occurring in 2022, where Excell -- again, this is based upon general ledger and banking records, Excell would submit amounts of cash to AWB, and then a short time later AWB would then take that cash and send it back to Excell.

Q.    Okay, and you were specifically looking at whether or not that occurred before certain individual car transactions occurred, correct?

A.    Correct.

Q.    All right, and you said that you found a pattern?

A.    There seemed to be a pattern, yes.

Q.    All right.  Now you heard Mr. Zankl testify that there was, in fact, a credit line, and a credit line had a limit, and before any more money could come back to the Karma companies or Excell, that a certain amount of that had to be paid off --

Page 380

MR. FELDMAN:  Objection, scope.

BY MR. BRESLIN:

Q.    -- correct?

THE COURT:  Objection, scope, meaning what?

MR. FELDMAN:  Outside the scope.  This wasn't --

THE COURT:  Oh, no, you opened the door, and now he's walked through it.  Overruled.  Go ahead.

BY MR. BRESLIN:

Q.    Correct?

A.    Yes.

Q.    All right.  So would that be consistent with Mr. Zankl's testimony, that there was a fixed credit line, and before any more money could come from AWB, that the money had to be paid back?

A.    Yes, certainly.

MR. BRESLIN:  All right.  Thank you.

I have nothing further.  Thank you, your Honor.

THE COURT:  Very good.

Thank you, you can step down.

THE WITNESS:  Thank you, your Honor.

THE COURT:  All right.  What do we have next?

MR. BRESLIN:  My next and last witness is

Page 381

Kristen Zankl.

THE COURT: Okay. If someone can gather here, I assume she's in the hallway.

Everyone, I'm going to take a brief break. Mr. Breslin, I'm going to take a brief break. We're going to take five minutes and I'll be back.

(Thereupon, a recess was had, after which the following proceedings were had:)

THE COURT: Okay. If you could make your way over to the witness box.

Ms. Leonard, is everything running?

ECRO: Yes, sir.

MR. BRESLIN: Judge, we're -- I'm so sorry. I was going to ask you where I'm at on time.

THE COURT: 537.

Would you raise your right hand? Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MS. ZANKL: Yes.

THE COURT: Thank you.

Thereupon,

KRISTEN ZANKL,

having been first duly sworn, was examined and testified as follows:

Page 382

DIRECT EXAMINATION

BY MR. BRESLIN:

Q.    Please state your name for the record.

A.    Kristen Zankl.

Q.    And are you married to Scott Zankl?

A.    Yes, I am.

Q.    And, Mrs. Zankl, let me ask you about the business of -- the business that the Karma company store on 1001 Clint Moore road, you're familiar with that --

A.    Yes.

Q.    -- are you not?

A.    Yes.

Q.    Now, were you typically involved in the day-to-day transactions of that business?

A.    No.

Q.    All right.  Did there come a time in February, or March, and April of 2022 that it was -- you were required to go to that store because of certain circumstances?

A.    Yes.

Q.    All right.  So, explain to the Court how it is that in those months it became necessary for you to become involved in the business of the company.

A.    So, I started going in -- I had a little more free time, so I started to go in to help.  I have

Page 383

three kids, so I -- my youngest was able to come home from school with my second son, so I had more time to go in.  I went in a little more in January, February, and then the last two weeks of March I was in there almost every day.

I had -- in the beginning I was trying to write policies and procedures, we had started to grow, and I felt like because we had more employees, we needed tighter policies, procedures, we needed help in HR.  I started, like, a drug testing -- we were going to start drug testing employees.  That was more January, February.  March, we were away, and then when we came back -- Scott had gotten sick while we were away.  So the last two weeks he was really sick.  So I had to go in.  I was going in every day.  Teddi had called and said we need to have somebody in here, I need an owner in here every day.

Q.    When did that call occur?

A.    That was, like, the beginning of the last two weeks of March.  So that was maybe, I want to say around March 20th.  I'd have to look at a calendar to be exact, but she said I need an owner, I need an owner in here because Moshe is here, he's giving us -- everyone a hard time, I need a warm body, an owner here, and there was no way Scott could go in.

Q.    All right.  So let me stop you right there.

When you say there is no way Scott could go

Page 384

in, why?

A.    He has Crohn's, and his Crohn's was acting up.

Q.    All right.  So, he was physically ill?

A.    Yes, he was going to the doctor.  I think he even, we went to the emergency room one night, and he was going back for testing.  The Crohn's can flare up, and it just comes and goes.  So --

Q.    Okay.

A.    -- we were trying to figure out what was going on.

Q.    All right.  So tell me what happened after that call.

A.    So, then I started going in, and it was -- so, Moshe was in there, he would come a lot.  I was -- since I wasn't part of the day-to-day, I was just -- I would go in, I would meet with whoever came in, if there was anybody looking to talk to Scott, I would talk to them.  I met with whoever came in.  If they had questions, I'd try to answer them.

Because I wasn't there on a day-to-day, I couldn't make all the decisions, but I tried to do the best that I could.

Moshe was there, it seemed to me like all the time.  We would -- I would have conversations with

Page 385

him, but it was more of a, I was listening to him, it was a one-sided conversation in a sense, he would say to me, listen to what I'm telling you, and I would listen to what he was telling me, but because I wasn't the one who did the day-to-day, I didn't have answers for him. That wasn't my area that I helped out in the business, so I couldn't answer, I couldn't give him the answers he was looking for.

He was, he was not happy. He was -- wherever I was, I felt like he was there. I sat -- I took -- I sat in Alana's office and had a glass partition, and he sat on the outside, while I would sit on the inside. If people come to meet with Scott, I just met with them sitting in there. I didn't have my own office. So they would come, he would sit on the outside. It was stressful, it was extremely stressful. I --

Q. All right. Now, when you say it was extremely stressful, do you say -- do you mean that it was extremely stressful that Mr. Farache was shadowing you?

A. Yes. I just --

Q. Do you feel -- and when I say that, you know, I'd like you to articulate exactly how it was that you felt that he was, you know, trying to stay close to you in some fashion.

A. Well, he was there all the time, and he was

Page 386

giving the girls in the office a hard time.  They would come to me.  There was -- I didn't know what to do, that's why I tried to talk and be a peacekeeper.  I wanted to make sure everything was peaceful as much as I could.

In the evenings Jonathan would stay late, and Alana would stay late, and I would ask Jonathan to please stay with me, do not leave, because Moshe was there, I didn't want to be there by myself.  So Jonathan Martin would stay with us, would stay with me until we walked out together.

Q.    Did you feel intimidated?

A.    Yes.

Q.    All right.  When did you first become aware that Mr. Farache had threatened your husband?

MR. FELDMAN:  Objection, leading.

THE COURT:  Sustained.  You need to ask another question.

BY MR. BRESLIN:

Q.    Okay.  Did there ever come a time when you felt that there may be an issue involving your husband and Mr. Farache?

A.    Well, when we were in Colorado I was sitting right next to him, and I could hear him on the phone, and I could hear the tone.  It was an aggressive tone I could hear, so I knew it wasn't a pleasant conversation.

Page 387

So, I pressed Scott for that, but he didn't want me to worry, he didn't want to spell out that he had been threatened right away.  I continued to press him because I knew that it was something -- you know, when you're sitting next to somebody, and you can hear somebody talking on the phone, you can get a little bit of a gist of what's going on, and that's what happened.  So I knew it was -- I knew it was not a good thing, and eventually he told me, because I kept pressing him.  So that was a very uneasy feeling.

Q.    All right, and so tell me the circumstances surrounding the events of April 1st, when some cars were removed from the store, do you recall that?

A.    Yes.

Q.    All right.  Explain to the Judge your involvement in that, please.

THE COURT:  Let me ask a question, you asked earlier when did you learn.  The conversation that you were talking about while you were in Colorado, when was that?

THE WITNESS:  So, that was -- okay.  So that's when we were --

THE COURT:  Just date, or approximate date.

THE WITNESS:  I would probably say he had this conversation around March, I want to say 17th or

Page 388

18th.

THE COURT:  All right.  Thank you.

Go ahead with the questioning.

BY MR. BRESLIN:

Q.   All right, and after you pressed your husband, he advised you of a threat, is that correct?

A.   Yes.

Q.   Okay, and that would have been at a prior time?

A.   Yes.

Q.   Okay.  All right.  Let's talk about April 1st.

So, tell us how those events transpired, from your view?

A.   Okay.  So I went in on Friday, April 1st, I was at the office.  I --

Q.   Did you become aware there was a problem before you went?

A.   No, I just showed up like I was going in every day --

Q.   Okay.

A.   -- just to, I needed to be in there.

So I went in.  I was trying to keep the peace.  I was worried about the employees because they felt uneasy.  So --

Page 389

Q.    Why did they feel uneasy?

A.    Because Moshe kept telling them -- you know, like, he would go into the office and ask Alana for titles, and if money come in, and he kept asking her, you know, if money was coming in and titles.  So, they felt uncomfortable, and I felt, I didn't want them to feel uncomfortable.

Q.    All right, and this is when Scott was sick?

A.    Yes.

Q.    Okay.

A.    So Friday --

Q.    So, tell us about April 1st.

A.    Right, okay, so Friday, April 1st, I went in, I was there.  Different people came in, I met with -- I met with different people who came into the office, and then in the evening Moshe left, I want to say maybe around 5:30 or 6 o'clock, 5:30 he left.  Another investor came in, and then I -- he wanted to meet with Scott.  So I called Scott and I said can you, please, just come after everybody leaves.  I didn't want him coming while business was still going, because I knew he wasn't going to -- everybody would come to him with questions.  So I was trying to wait until everybody went home before he came in.

So, he came in, we all sat down on the

Page 390

couch, which is -- it was a large showroom, it was over in

the corner, and we sat down, we were talking with him,

just going over transactions, things that occurred, why --

what happened, what was happening with the business, and

then Moshe and Lisa and their sons came in, and by then it

was around 8:45, and it struck me as funny, why would they

be coming back to the building this late?  There is never

anybody at the building that late.  We're not even there

that late, and they were coming in.

So, they came in, and Lisa said to us, she

said, we got a phone call from our very well-connected

attorney, and he said the Feds were coming, and they were

coming to raid the whole building, and that Scott and I

were going to get arrested.

So, it was complete chaos and confusion.  I

had no idea where this was coming from.  Like, there is

nothing in my life that would warrant Feds coming in to

arrested me.  So, I didn't know what they were talking

about.  I didn't know if maybe it was something that Moshe

had done.  I was trying to figure it out.  I had

absolutely no answers.  When I asked her why, she said I

don't know.  So nothing made sense at all.

Q.    All right.  So what happened then?

A.    So, then -- so that's really when the chaos

started, because they started taking the cars out of the

Page 391

building.  She said we have to take -- our attorney told us to take the cars, that's our collateral for the loan.  So I didn't understand it.  I'm not one -- how was I going to stop them?  They took the cars.

Q.    All right.  When you say they took the cars, physically what happened?

A.    So they each -- they backed the cars, they took all the cars out of the showroom.

Q.    How did they get the keys?

A.    I don't know.  When she -- the keys were in the back, and I don't know how they got the keys, because when she was telling me all of this, I had -- my kids were at home.  So my daughter is 11, and I'm usually not out on a Friday night that late.  So, I'm thinking, I want to make sure that my middle son doesn't go over to his friends, and that somebody is there with my daughter, because I thought I was coming home.  I figured when I was done with this meeting, I was going to be right home.  So I went to call to check on my kids, and I was on the phone with them and saying, I'm not sure when I'm going to be home, we've kind of got some stuff going on here.

So, anyway --

Q.    Well, let me ask you this, did you observe cars being removed?

A.    Yes.

Page 392

Q.   Who removed them?

A.   It was Lisa, it was their two sons, they brought a helper, Moshe was there, and they would just -- they were yelling, it was chaos, they were yelling, they were taking the cars out, they were backing them out, I don't know where they were going with them, I don't know what they were doing.  They were -- it was just a constant flow of cars.

Q.   And was Scott there at that time?

A.   He was there.

Q.   Okay.  All right.  So, let me ask you something, did you personally remove any cars?

A.   No.

Q.   Did you ever back any cars out at the request of Mr. Farache?

A.   I've never backed a car out.  In 10 years I've never backed a car out of there.

Q.   Okay.  Now, if Mr. Farache testified that you, in fact, backed out cars for him, that you volunteered and moved cars for him, would that be a false statement?

A.   That's a false statement.

Q.   All right.  Now, before those cars were removed, did you ever tell Mr. Farache that he could have any of these cars, that you were authorizing him to take

Page 393

these cars?

A.   No.

Q.   All right.  If he testified that you, in fact, volunteered to give him these cars, would that be a false statement?

A.   That's a false statement.

MR. FELDMAN:  Objection, your Honor.  It's leading, argumentative.

THE COURT:  Overruled and overruled.

BY MR. BRESLIN:

Q.   Did you give anyone authorization to remove any vehicles?

A.   No.

Q.   Now, was there a particular car that you remember that Mr. Farache or the people assisting him wanted to remove, and Jonathan Martin tried to prevent that car from being removed?

A.   So, I believe that was on Saturday.

Q.   Okay.  Let's finish on Friday --

A.   Okay.

Q.   -- before we get to Saturday.

A.   Okay.

Q.   All right.  So, how late were you there on Friday?

A.   I think until almost midnight.

Page 394

Q.   Okay, and prior to you leaving, do you recall how many cars were removed?

A.   Almost all of them.

Q.   All right.  When you say "almost all of them", what does that mean?

A.   The Mokes, they're battery-operated little Mokes.  It's not an actual -- it's a vehicle, but it's more like a golf cart.  The Mokes were still there.  I believe the black Ferrari, Mr. Stevens' Ferrari was still there, and that's all I remember.

Q.   Okay.

A.   It was -- I was completely caught off guard.  It was --

Q.   All right.  Was every vehicle of value that was --

A.   Yes.

Q.   -- in the inventory removed?

A.   Yes, yes.

Q.   All right, and -- all right.  So that was Friday.  Did anything else happen on Friday that you recall?

A.   I just, I just remember Lisa coming in and telling us that the Feds were coming, her attorneys called, her very well-connected attorney called, that the Feds were coming.  She told me if I had any nice handbags

Page 395

or jewelry, I should go home and hide them, because the Feds will take them from you.

Q.    All right.  Just to be clear, you never authorized, or gave anyone consent to remove any of those vehicles --

A.    No.

Q.    -- is that correct?

A.    No, I didn't.

Q.    All right.  Now, tell me what happened the next day.

A.    So the next day I went in.  Ed came in.

Q.    Ed who?

A.    Ed Brown came in.

Q.    What time did you get there?

A.    I think we -- I think I got there around 10:00.

Q.    Okay, and then --

A.    And then Ed came in, he said he wanted Teddi to come.  So I texted Teddi and said please come in, and she said, well, I'm bringing -- she brought Stacy, her husband, because she was afraid to come in, she was afraid of Moshe.  She said she wasn't coming by herself, she was bringing Stacy, and I said -- his name is Stacy.  Their names are swapped, I know, it's Teddi and Stacy.

Q.    Stacy is the guy?

Page 396

A.   Stacy is the guy and Teddi is the woman, yes.

Q.   Okay.

A.   So, anyway, she said I'm -- and I said, okay.  So Stacy came in, and we came in, and we were there for a little while, and then --

Q.   All right.  So, you were there, Ed Brown was there, Teddi Soufol was there, her husband was there?

A.   Her husband, yes.

Q.   Who else?

A.   I asked Alana to come in, too.

Q.   Did Alana come in?

A.   Alana came in.

Q.   What time did she get there?

A.   Alana came in -- I think she had an appointment at the vet with her dog, Penny, and then she said I'll come in after I'm done at the vet, I believe that's what --

Q.   Okay.  Let's try to shorten this.

A.   But she came in.

Q.   Let's try to shorten this up.  What time did Alana --

A.   Okay.  Around 11 o'clock, maybe.

MR. BRESLIN:  Okay.  Let's put Number 34 up, please.

Page 397

BY MR. BRESLIN:

Q.   All right.  So let's -- I'd like you to take a look at what's been introduced as Exhibit Number 34 in this case, and I ask you if you recognize it?

A.   Yes.

Q.   All right.  So tell us how that document came to be in existence.

A.   Okay.  So, Moshe was wanting titles.

Q.   All right.  So, let's back up.  So you're there, and everyone else that you described was there, but you didn't say anything about Moshe.  Did Moshe come that day?

A.   Moshe, yes.  Moshe, Lisa.  Moshe and Lisa were there.

Q.   Okay.  So Moshe and Lisa came when?

A.   They came, they came a little later.  They came after lunchtime.

Q.   Okay, and when you say Moshe wanted titles, were you aware before you went there that day that he wanted something from you?

A.   Yes, he was asking for titles, he wanted titles.  So, somewhere along the line I had talked to Teddi and said that Moshe wanted titles.  So Teddi drew up like a blanket -- this agreement, but it didn't have all the information, it didn't have the exact titles in there,

Page 398

and then Alana took it from Teddi, and Alana filled it out.

Q. Okay. So --

A. So, Alana typed up -- Alana was our title clerk, so she knew what we had and what we didn't have, and that was her draft.

Q. All right. Stop right there.

Before you got there that day, you were aware that Moshe wanted titles?

A. Yes.

Q. Okay. How did you become aware of that?

A. Because he said he wanted them.

Q. Okay. How, did you talk to him on the phone? How did that conversation take place?

A. It must have come up --

Q. From the night before, or was it from that day?

A. It must have been from the day before.

Q. Okay. All right. So just to be clear, you were aware that Saturday that he wanted more titles to more cars, correct?

A. Yes, he said he wanted the titles as collateral against the loan.

Q. Okay. Now, was there -- for this document that is on the screen, was there some negotiation

Page 399

regarding this document and other titles that either you or Scott wanted to get from him?

A.    Yes.  So the agreement was, was that we were going to give him these titles as collateral for his loan, and in return he had titles that we needed for cars that were sold.

Q.    All right.  Let me stop you right there.

So when you say cars that were sold, so you're saying that cars were sold in the normal, ordinary course of business to customers --

A.    Exactly.

Q.    -- from Karma?

A.    Yes.

Q.    And that Mr. Farache had those titles, and you wanted him to give you those titles to give to the customers that already bought the cars?

A.    That's exactly right.

Q.    Okay.  So, you attempted to get the cars, the titles to the cars that were sold to the ordinary course buyers, correct?

A.    Right, and that was what this was -- that was part of our agreement, that he was going to hand over the titles so we could get them to the clients.

Q.    All right.  So I'm clear, you were going to give Mr. Farache these titles, under the agreement

Page 400

outlined in this document, and his agreement was if you gave me this, I will give you the titles so you can give them to your customers that have already bought a car?

A.   That's correct.

Q.   Okay, and so take a look at that document. Did you sign that document, Number 34, on the screen?

A.   Yes, I did.

Q.   Okay, and did Mr. Farache sign that document?

A.   Yes, he did.

Q.   Did he sign it in your presence?

A.   We signed it in Alana's office.

Q.   Okay, and was it your understanding that when you handed him those titles, that you would have the ability to get those titles back if money was paid to him?

A.   This was our agreement.

Q.   Okay, and what were the terms of the -- when were you expecting the titles that he was supposed to give you for his -- for the customers that had already purchased cars?

A.   Immediately, Monday at the latest, the next business day because that was Saturday.

Q.   Did Mr. Farache tell you, I will give you the titles --

A.   Yes, that --

Page 401

Q.   -- if you give me these titles?

A.   Yes, that was the deal, that's why we had it typed up that way.

Q.   Okay.  All right, but my question to you is, did he say that to you?

A.   Yes.

Q.   Did he promise you that --

A.   Yes.

Q.   -- you would get those --

A.   Yes.

Q.   -- titles --

A.   Yes.

Q.   -- for your customers?

A.   Yes.

Q.   Okay.  Did he supply them?

A.   No.

Q.   Okay.  Ever?

A.   No.

Q.   All right.  Did you ever say to Mr. Farache, oh, you've been so good to us, I want you to have these cars?

A.   No.

Q.   If he testified to that under oath, would that be a false statement?

A.   Yes.

Page 402

MR. BRESLIN:  I have no further questions. Thank you.

THE COURT:  Mr. Feldman.

CROSS-EXAMINATION

BY MR. FELDMAN:

Q.    Good morning, Ms. Zankl.  Just a quick question.

You testified you were in Colorado when you overhead a phone call between your husband and Mr. Farache, is that correct?

A.    Yes.

Q.    Where were you in Colorado?

A.    Where was I?

Q.    Yes, where in Colorado, what city, town?

A.    It's Beaver Creek.  I don't -- it's --

Q.    A ski vacation?

A.    Yes.

Q.    Okay, and you signed the bankruptcy petition just a couple of weeks later for Excell Auto Group, is that right?

A.    That's correct.

Q.    Okay, and do you recall approximately how much debt Excell owed to its creditors at the time that you filed that bankruptcy petition?

A.    I don't recall the exact number, no.

Page 403

Q.   Okay.  Tens of millions of dollars sounds about right?

A.   I don't remember exactly.

Q.   Okay.  Your background is in accounting, correct?

A.   No.

Q.   What's your degree in?

A.   Marketing and finance.

Q.   Okay.  So certainly, though, when you signed the bankruptcy petitions you made sure they were true and correct to the best of your ability?

A.   Yes, I did.

Q.   Okay, and so is it fair to say Excell Auto Group owed people a lot of money?

A.   Yes.

Q.   Okay.  Now, certainly within the bankruptcy case of Excell Auto Group, you're aware that creditors have accused you and your husband of fraud?

A.   Yes.

Q.   Okay, and just going back to that phone call, that's the first time you recall Mr. Farache saying something threatening, was on a ski vacation in Beaver Creek, between your husband and Mr. Farache?

A.   Could you --

Q.   I'm sorry, yes.

Page 404

A.      -- yes, rephrase that?

Q.      The first time you recall Mr. Farache speaking in a threatening manner to your husband is when you overheard this phone call in March of 2022 when you were in Beaver Creek?

A.      Yes.

Q.      Okay, and FVP, you've signed a personal guarantee with FVP, is that right --

A.      Yes.

Q.      -- of the debt?

A.      Yes.

Q.      Okay, and that debt is about 7 million and change?

A.      Yes.

Q.      Okay, and you have some form of cooperation agreement with FVP, is that right?

A.      I don't think it's a -- the way I understood it --

MR. BRESLIN:  Your Honor, I object to that, that's attorney/client.

THE COURT:  The existence of -- is it a joint defense agreement that you're asking about?

MR. FELDMAN:  I don't even know if it's a joint defense agreement because I haven't even seen it.

THE COURT:  All right.  So, you're saying

Page 405

the existence of such an agreement would be privileged?

MR. BRESLIN:  Well, Judge, I don't represent Ms. Zankl, but my understanding is, is that --

THE COURT:  So you're objecting on her behalf?

MR. BRESLIN:  I'm just objecting.

THE COURT:  Okay.  Overruled.  Go ahead.

MR. FELDMAN:  Thank you.

BY MR. FELDMAN:

Q.    Did you have a cooperation agreement?

THE COURT:  Let me -- hold on.

MR. FELDMAN:  Yes.

THE COURT:  I'd like to make clear that although the Karma entities were joined in the motions today, they are not here, they are not prosecuting their joinder, and the fact that the Court permitted parties, including Mr. Winderman, to listen in on the hearing by Zoom, that is not an appearance.  This is an in-person-only hearing, just so all the parties are aware of this.

Go ahead.

MR. FELDMAN:  Thank you, your Honor.

BY MR. FELDMAN:

Q.    So do you have a cooperation agreement with FVP?

Page 406

A.    The way I understand it it's an attorney/client privilege agreement.

Q.    Are you a signatory to the document?

A.    Am I?  Yes, I believe I signed it.

Q.    And what does it require you to do?

A.    What does it require I do?  I haven't -- I've spoken to Mr. Breslin, but we haven't -- but I haven't really done much.

Q.    Okay.  What have you spoken to Mr. Breslin about?

A.    This, that document that I signed.

Q.    Okay.  Has FVP threatened to sue you?

A.    Yes.

Q.    Okay.  Why have they not filed a lawsuit against you, to your knowledge?

A.    To the best of my knowledge, they still are.

Q.    Okay.  You still -- you and your husband still own a boat, right?

A.    I'm sorry?

THE COURT:  Can you repeat that?  I can't hear you.

MR. FELDMAN:  I'm sorry, Judge.

BY MR. FELDMAN:

Q.    You and your husband --

THE COURT:  If you can slow down your speech

Page 407

a tiny bit --

MR. FELDMAN:  Yes.

THE COURT:  -- that would be helpful.

MR. FELDMAN:  It's the Israel in me, Judge, my apologies.

BY MR. FELDMAN:

Q.    You and your husband still own a boat, right?

A.    Yes.

Q.    Okay.  FVP hasn't come to seize that boat yet?

A.    No.

MR. FELDMAN:  Okay.  One minute, your Honor.

Just, Mr. Miller reminded me of something.

BY MR. FELDMAN:

Q.    Just in terms of precision, the date you said you were in Beaver Creek was March 17th, is that right?

A.    I'd have to look at the calendar to be -- to give you exact dates.

Q.    Okay, but certainly around that time you were in Beaver Creek, is that correct?

A.    Somewhere in that time.

MR. FELDMAN:  Great.  Thank you.

THE COURT:  Anything?

Page 408

MR. BRESLIN:  No.

THE COURT:  All right.  Ms. Zankl, thank you very much.

THE WITNESS:  Okay.

THE COURT:  You can step down.

THE WITNESS:  Thank you.

THE COURT:  Is she excused for the remainder of the hearing?

MR. BRESLIN:  No.

THE COURT:  No.  All right, you get to enjoy --

MR. BRESLIN:  I don't know if I need her for rebuttal.

THE COURT:  You get to enjoy the --

MR. BRESLIN:  That's the end of my case, Judge.  Do we --

THE COURT:  Hold on.

MR. BRESLIN:  That's my time?

THE COURT:  I'd just like to talk to Ms. Zankl for a moment.

MS. ZANKL:  Oh, sorry.

THE COURT:  So if you could hang around, thank you.  We will take a lunch break, and if you could come back after lunch --

MS. ZANKL:  Okay.

Page 409

THE COURT:  -- that's helpful.  Thank you.

MS. ZANKL:  Okay.  Am I done?

THE COURT:  You can go into the lobby, yes.  Thank you.

Yes.

MR. BRESLIN:  Timing?

THE COURT:  You're at exactly six hours.

MR. BRESLIN:  Okay.  So I have one hour.

THE COURT:  You do, and the debtor's side is one hour and ten minutes.

All right.  So, we have 25 minutes until you need to take a break.

MR. FELDMAN:  So my hearing starts at 11:45.  If your Honor wants to take a break now, we can --

THE COURT:  No, I'd rather use it, because I would --

MR. FELDMAN:  Okay.  Let's do it.

THE COURT:  -- I would like to get done at 5:30.

MR. FELDMAN:  Sure.

THE COURT:  All right.  What do you have?

MR. FELDMAN:  Your Honor, we'll call Joel Glick.

THE COURT:  Very good.  Mr. Glick.  Good

Page 410

afternoon.

Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. GLICK:  I do.

THE COURT:  Thank you.

MR. GLICK:  I do.

Thereupon,

JOEL GLICK,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FELDMAN:

Q.  Good morning, Mr. Glick.

A.  Good morning.

Q.  Can you tell me where you work?

THE COURT:  Start with his name and spelling, please.

MR. FELDMAN:  Sure.

BY MR. FELDMAN:

Q.  Can you please tell us, the Court your name?

A.  Joel Glick, J-o-e-l G-l-i-c-k.

Q.  Okay.  Mr. Glick.  Where do you work?

A.  The firm Berkowitz Pollack Brant.

Q.  Okay.  How long have you been there for?

Page 411

A.    I'm in year 26.

Q.    Okay, and do you have an undergraduate degree?

A.    I do.

Q.    What's your undergraduate degree in?

A.    In accounting -- a bachelor's of science in -- BA or BS in accounting, I forget what it is.

Q.    Okay, and where did you get your accounting degree from?

A.    University of Florida.

Q.    Okay.  When did you graduate, what year?

A.    1989.

Q.    Okay.  Do you maintain a CPA license?

A.    I do.

Q.    Okay.  Do you have any other forms of accreditations or designations?

A.    Yes, through the -- also through the AICPA, I am -- I have the CFF certification, certified for -- forensic -- financial forensics, and then also the CFE, certified fraud examiner, through the Association of Certified Fraud Examiners.

Q.    Okay, and in the 26 years at Berkowitz Dick -- or, I call it Berkowitz Dick Pollack & Brandt, but Berkowitz Pollack & Brandt, but at that firm, generally what practice group have you been in?

A.    The forensic practice.

Q.    Okay, and what does the forensic practice at Berkowitz Pollack Brandt do?

A.    We do a lot.  We deal with all sorts of commercial economic damages, fraud forensic cases, consulting engagements, valuations, a bunch of stuff.

Q.    Okay.  So in terms of a particular engagement, what type of records do you commonly look to in order to understand something from a forensic perspective in accounting?

A.    I mean, you obviously want to look at bank records, and you want to look at general ledgers.  The tax returns can be helpful.

Q.    And let's just kind of drill down a little bit further.  Have you been retained in connection with this case?

A.    "This case", being the bankruptcy?

Q.    Yes, Auto Wholesale of Boca.

A.    Yes, yes.

Q.    Okay, and can you tell the Court, just briefly, what your engagement encompassed?

A.    Well, I believe, if my recollection is -- I was retained as the financial advisor to the estate, and then specifically also to be a rebuttal witness in the adversary action.

Page 413

Q.   Okay, and did you have an opportunity to review Auto Wholesale of Boca's books and records?

A.   I did.

Q.   Okay.  What books and records did you review?

A.   The general ledgers from their QuickBooks systems.

Q.   Okay.  Any other documents, other than the general ledgers?

A.   Tax returns and bank statements.

Q.   Okay, and with respect to a review of those documents, did you then formulate some opinions?

A.   Yes.

Q.   Okay, and, in fact, you looked at Mr. Gray's report specifically, right?

A.   I did.

Q.   Okay, and then you issued a rebuttal report to Mr. Gray's report?

A.   I did.

Q.   Okay, and do you recall, as to Mr. Gray's report, he issued some opinions regarding whether or not Auto Wholesale of Boca was a lender versus the purchaser of cars, is that right?

A.   That was one of his opinions.

Q.   Okay.  So let's just talk about, first, the

idea of Auto Wholesale of Boca being a purchaser of vehicles.

Did you have an opportunity to look through the books and records of Auto Wholesale of Boca and determine whether or not it purchased and sold cars?

A.    From the perspective of the accounting records, there were recorded purchases and sales.

Q.    Okay, and let's be more precise, putting aside Excell Auto Group, or Karma, or anything related to Mr. Zankl, did Auto Wholesale of Boca, from your review of the records, purchase cars and sell cars to third parties?

MR. BRESLIN:  Judge, I object, unless he's going to proffer him as an expert, which I will be happy to stipulate.

THE COURT:  Well, he hasn't asked for an opinion.  That wasn't an opinion, it's a fact.

MR. FELDMAN:  Yeah.

THE COURT:  Overruled.

BY MR. FELDMAN:

Q.    Okay.  Go ahead, Mr. Glick.

A.    I'm sorry, could you repeat the question?

Q.    Sure.

Based on the books and records that you reviewed, and putting aside Mr. Zankl's companies, were you able to observe whether or not Auto Wholesale of Boca

Page 415

purchased and sold cars?

A.    Yes.

Q.    Okay.  Was it just, as Mr. Gray testified, about three transactions, do you believe Mr. Gray is correct?

A.    It was more than three transactions.  I couldn't give you the exact number.

Q.    Okay, and the type of vehicles we're talking about, by the way, are what exactly?

A.    All those, all the high-end vehicles, the Rolls-Royces, and Bentleys, and McLarens, and Ferraris, and -- I mean, specifically which cars were sold to someone other than --

Q.    Okay.

A.    -- is that the question?

Q.    Yes.

A.    Oh, that, I couldn't tell you the specific cars that were sold to NextGear or others.

Q.    Certainly high-end cars, it appears from the books and records?

A.    Yes.

Q.    Okay, and then just to close the loop on this, while you were at Berkowitz Dick Pollack -- or since you've joined Berkowitz Pollack & Brandt, any other work you've done other than forensic accounting?

Page 416

A.    Economic damage and forensic accounting, your Honor.

MR. FELDMAN:  Okay.  Your Honor, I'd tender the witness as an expert in forensic accounting.

MR. BRESLIN:  No objection.

THE COURT:  Go ahead.

BY MR. FELDMAN:

Q.    So, let's talk about your opinions in this case.

Specifically as to Mr. Gray's opinion and your rebuttal to it.  Do you agree with Mr. Gray's opinion that Auto Wholesale of Boca was exclusively a lender to Excell Auto Group?

A.    Exclusively a lender, no.

Q.    Okay.  Do you believe that Auto Wholesale of Boca was some type of floor financing company, as Mr. Gray characterized it in his report?

A.    I'm not an expert in financing, so I couldn't give you an opinion on that.

Q.    Okay, but did you see anything indicative of your review of Mr. Gray's report in the documents he cited that would suggest that Auto Wholesale of Boca was a floor financing company?

A.    No, I saw no underlying loan documents or any of that type of --

Page 417

Q.     Okay, and then, as you understand the adversary proceeding, there is a series of cars that are at issue in that case, where there is an argument by the various sides as to whether or not Auto Wholesale of Boca actually purchased those vehicles, is that correct?

A.     Correct.

Q.     Okay.  Did you have a chance to review the documents associated with those cars that are the subject of that adversary?

A.     Yes, I believe there was 23 on the list originally.

Q.     Okay, and were there a series of cars that you determined were, in fact, purchased by Auto Wholesale of Boca?

A.     Yes.

Q.     Okay, and can you walk the Court through as to how you made that determination?

A.     We looked in the books and records of Auto Wholesale, we looked at the bank statements to see that a cash payment was actually made for that particular vehicle.

Q.     Let's talk about that.  So you actually went to a bank statement and tied out the dollar amounts that was then paid over to Excell or Karma for the purchase of the vehicle?

Page 418

A.   I believe so, yes.

Q.   Okay.  Did you look at the deal jackets?

A.   We looked at deal jackets.  Specifically those?  I know that Mr. Gray had summarized what we referred to as his rainbow schedule of the 23 vehicles.

Q.   Okay, and within those deal jackets, did you see, for example, certificates of title?

A.   I can't tell you if I saw one in every single jacket, but we -- those were the type of documents that we saw within --

Q.   Okay.

A.   -- the various jackets.

Q.   Did you see bills of sale?

A.   Yes.

Q.   Okay, and, again, you would then -- did you look at Excell Auto Group's books and records?

A.   I did not.

Q.   Okay.  So you focused solely on just the Auto Wholesale of Boca side of it?

A.   Correct.

Q.   Okay.

A.   I did -- well, I got -- I did receive Excell bank statements, Excell and the Karma entity bank statements, but not general ledgers.

Q.   And did you have an opportunity to look at

Page 419

those bank records to determine whether or not you'd see a corresponding transfer, or a deposit or receipt of money from -- that was sent by Auto Wholesale of Boca?

A.    Yes.  I mean, we're actually still in the process of trying to match up the -- excuse me, my water is over there -- the transactions between not only just the Excell and -- thank you -- the Excell and Auto Wholesale accounts, but also within either the Excell or Karma entities themselves, because there was money moving back and forth there as well.

Excuse me.

Q.    Do you need a moment, Mr. Glick?

A.    No, sorry, I was just a little dry.

Q.    Okay.  Now, just going back to Mr. Gray's report, I don't want to get into specifics.  You know, you have several criticisms.  I want to just ask you, just from a rebuttal standpoint, what were your main critiques of Mr. Gray's report, and the opinions he rendered within that report?

MR. BRESLIN:  Object, relevance.

THE COURT:  Overruled.

THE WITNESS:  Well, my recollection was, there wasn't much I could rebut, because there wasn't much that he said.

He made those opinions.  He had a lot of

Page 420

qualitative background about the case, talked about his -- what he saw as far as how things were processed, but then would have one sentence with a footnote, see Schedule whatever, and there was no explanation of what that schedule really was supposed to represent, how it was prepared, with what documents.  I mean, yes, there was a document-considered list attached to his report, but in any of his schedules, there was no link between those documents and what he used to prepare any of the schedules.  So it was difficult, if not impossible.

Q.    Okay, and then just going through your report here, I just want to ask a couple of questions a little bit more specifically.

Mr. Gray, for example, I think, characterizes Auto Wholesale of Boca solely as a lender. Notwithstanding whatever designation, just, again, going through the books and records, do you agree with that statement that Auto Wholesale of Boca is primarily just a lender?

A.    Based on the accounting records that I saw, no.

Q.    Okay, and what do you mean by that, could you just expand on that, the accounting records?

A.    So, they -- if a car was purchased -- I mean, do you want me to get into the debits and credits?

Page 421

I don't want to put people asleep, but I can.

So, if a car was purchased, a hypothetical car, there would be -- and depending on whether it was related to the -- as the prior testimony was, the Excell line, or the AWB line, as it was in quotes, that inventory group was debited, increased, and a payable was increased for the amount of the purchase, and then a subsequent transaction was then, depending if it was a swap, which was a cash -- just a car for car, or multiple car for multiple car, trade, or a cash transaction, you would see the payable being reduced, and either cash going out to cover that payable, or the swap, which was effectively their -- they treated it as a bank account, obviously, like, cashless, but a bank account, and so that would go down, and conversely, if they sold the car, it would be a very similar set of transactions.

Q.    Got it.

I want to transition just real quickly to something else that's an issue with this case, there is this concept of insider releases that have been removed.

Did you have an opportunity to look to what transfers have been made within one year and for years to the insiders, specifically Mr. Farache or other individuals associated with them?

A.    As I sit here, I don't recall the numbers

Page 422

but, yes, I did prepare those schedules.

Q.   Okay.  Can you tell the Court approximately what you believe the numbers were?

A.   I know that -- so I looked at the Farache -- Mr. Farache, Mrs. Farache, the two sons, across the entities, I think that there was actually net inflows into the company for certain of the individuals.  I think Lisa Farache was the only one who had net outflows.

Q.   Okay.  If I showed you a document, would that maybe help refresh your recollection?

A.   That would be great.

Q.   Sure.

MR. BRESLIN:  Can I see it?

MR. MILLER:  It's Exhibit 27, your Honor, of the debtor, which would be Court Paper 537-29.

BY MR. FELDMAN:

Q.   Just take a look at the exhibit, and once you're done, let me know.

A.   It looks like my schedule.

Q.   Okay.

MR. MILLER:  The other exhibit is Exhibit 28, which is Court Paper 537-30.

THE COURT:  Thank you.

BY MR. FELDMAN:

Q.   Did you have an opportunity to look at the

Page 423

document, sir?

A.    I'm still looking at the second one, but I wish I had my glasses, but, yes, this is also one of my schedules.

MR. MILLER:  (Inaudible.)

THE WITNESS:  They're in my bag, don't worry about it.

MR. FELDMAN:  (Inaudible) glasses.

BY MR. FELDMAN:

Q.    Mr. Glick, now that you've had an opportunity to review the document, do you recall approximately how many dollars of transfers were going out to Mr. Farache or his family members from Auto Wholesale of Boca?

A.    Well, for which ones --

Q.    Let's say four years.

A.    So, for Chase Farache, I'm rounding up, $25,000 is the net out --

THE WITNESS:  I'll give it a shot.  No, sorry.

MR. MILLER:  Those are mine.  I had to get these this morning.  I couldn't find my other ones.

MR. BRESLIN:  Judge, I'm happy to wait until Mr. Glick can get his glasses.  Are they in the courtroom?

THE WITNESS:  Yes, they're in my bag right

Page 424

there.

THE COURT:  Oh, yeah, give him the glasses.

THE WITNESS:  Apologies.

BY MR. FELDMAN:

Q.   What kind of accountant doesn't come up with his glasses?

A.   It's not an accountant, it's old age.

Q.   It's old age.

MR. MILLER:  Ease up on the old age.

THE COURT:  Really.

THE WITNESS:  Apologies.  Now I can see.

So, on the 4-year, this is Exhibit -- Debtor's Exhibit 28, Chase Farache has a net out, and this is, yes, for 2018 through '22, I'm rounding up, to 25,000; Jake, 16,000 and change; Lisa, 450,000; Mazal Tov actually has a net inflow of 248,000; and Moshe has a net inflow of 273,000.

BY MR. FELDMAN:

Q.   Okay, and the manner in which you did that analysis, can you explain to the Court?

A.   I'm sorry?

Q.   Yes, what documents did you review to make this -- to come up with these calculations?

A.   We looked at the accounting records and bank statements.

Page 425

Q.   Okay.  So, in other words, you tied them out, not only are you just relying on the accounting records, but also then going to the bank statements?

A.   That's correct.

Q.   Okay.  Now, one of the issues in connection with this case, just in the adversary proceeding specifically, but let's just talk about it in terms of what happened in April of 2022, and just leading up to that moment in time, you've heard the term of "swaps", is that right?

A.   I have.

Q.   Okay.  What was your understanding of what swaps are?

A.   A dealer trade.

Q.   Can you be more specific?

A.   A vehicle for vehicle trade.

Q.   Okay.  Can you give --

A.   Or --

Q.   -- me an example?

A.   -- multiple vehicles for multiple vehicles.

Q.   Okay.  Can you give me an example?

A.   So there was one, I mean, I can't tell you which cars, but so on a particular date, there would be a swap, and I have, I attached to my rebuttal report, it is an entire schedule --

Q.    Yep.

A.    -- of swaps.

There may be that AWB was giving over four vehicles to EAG, and in return receiving three vehicles for the same agreed dollar amounts.

Q.    Okay.  So, in other words, one dealer, in this case Excell Auto Group, would give some cars to AWB, and AWB then would give some cars it owned over to Excell Auto Group?

A.    Correct.

Q.    Okay, and there is documents that record those types of transactions that you reviewed?

A.    We didn't look at every single one.  There was, I think, 177 --

Q.    Okay.

A.    -- swaps.

Q.    But there were certainly transactions documents that recorded these types of events occurring, right?

A.    Certainly in the accounting records, and then, again, I believe in the other records that we saw that we saw evidence of it, yes.

Q.    Okay, and the other records, again, are what, just the books and records of both -- or Auto Wholesale of Boca?

Page 427

A.    Well, again, some of the deal jackets you were referencing before.

MR. FELDMAN:  Okay.  Your Honor, if I can just look at my notes real quickly, I think I'm --

THE COURT:  Sure.

MR. FELDMAN:  So, your Honor, actually the issue is is that I'm going back to that Barbee issue, and certainly Mr. Glick is prepared to issue a rebuttal report to Mr. Barbee, but because Mr. Barbee isn't appearing, you know, we don't believe we need Mr. Glick to do so, but if your Honor is actually going to consider Mr. Barbee's report --

THE COURT:  You need to make the strategic decision whether to elicit that testimony now or not.  I'm not going to rule on the issue of Mr. Barbee, and this is a limited time trial, until after lunch.

MR. FELDMAN:  Okay.

THE COURT:  So it is up to you whether you attempt to elicit appropriate testimony in connection with the anticipated, potential use of the deposition.

MR. FELDMAN:  Okay.  So, I'll continue with Mr. Glick on other issues, but -- at this point in time, but we'll see, I know we're coming up on a break, so I'll keep going with Mr. Glick on what his rebut is.

THE COURT:  Sure.

Page 428

BY MR. FELDMAN:

Q.    Mr. Glick, what I want to understand here is, just going back to the purchase and sale of vehicles, did you look at any type of documents?  So, you sat in here actually yesterday when Mr. Zankl testified, is that correct?

A.    I did, yes.

Q.    Okay, and you listened to him describe that pretty much all of the -- not pretty much, the entire relationship between that of Auto Wholesale of Boca and Excell Auto Group was one of creditor/lender, is that correct?  I'm sorry, creditor/debtor, is that correct?

A.    Yes, yes.

Q.    Specifically there was a secret lending agreement that was being undertaken here, did you hear that testimony?

A.    I did.

Q.    Okay, and based on listening to that testimony, and also looking at the books and records of Auto Wholesale of Boca, do you agree with Mr. Zankl's characterization of the relationship between these two entities?

A.    No, and I don't think it was a secret.

Q.    Okay.  Can you describe?

A.    Describe?

Page 429

Q.    Yes, describe -- in other words, you say you don't think it's a secret.  What do you mean by that?

A.    Well, there was clearly payments of the 31,250, which was basically the 15 percent interest rate. There was the 10,000, which was the minimum on the 2.6 promissory note, which, again, was no secret, then there were the individual profit payments for each car, and they were applied against the 10,000.  If it went over 10,000, then it was whatever that sum total was, otherwise they got the guaranteed 10,000.

Q.    Okay.  So, in other words, you believe that by looking for the documents, and this -- you say there is profits, but where are you getting this information from?

A.    One is the recording in the books, and two is the, what we talked about before, the invoices that were going back and forth.

Q.    Okay, and when you say it's recorded in the books, it's recorded as a purchase or a sale?

A.    Yes.

Q.    Okay.  In other words, you don't say recorded in some way, shape, or form that this is some type of loan of the vehicle as collateral -- or, I'm sorry, issuance of the vehicle as collateral to secure a loan?

A.    The accounting entry, if it was a loan,

Page 430

would have been cash out receivable -- you know, loan receivable, and when a payment comes in, a principal payment, it would be cash in, and reduce principal, and then -- or cash in and interest income.

Q. Okay, and certainly when you say interest income, you see that designated as a certain part of the books and records of Auto Wholesale of Boca, right?

A. Yes.

Q. Okay. In other words, in these profit payments, where are they characterized in the books and records of Auto Wholesale of Boca?

A. Income.

Q. Income. Okay. Not interest?

A. No.

Q. Is there a difference between the two, can I just say, to heck with it, I'll just put it income versus just dump it somewhere else, in interest receivable?

A. I guess it depends on who you ask. If you ask the IRS, they don't care, but, I mean, if you ask -- I mean, a tax return and financial statements have sections for reasons.

Q. Okay. Did you see, when you looked at the books and records of Auto Wholesale of Boca, seeing some type of just disregard to where they just dumped things, or based on your review of it, did it appear that things

Page 431

were placed in the appropriate place, the category, whatever it may be?

A.    Yeah, I mean, throughout the transactions were, you know, again, depending on which -- whether it was the 15 percent -- a 15 percent car, or a 50/50 car, is they were all recorded the same way.

Q.    Okay.  When you say 50/50 car, what do you mean by that?

A.    So there is these two promissory notes that were referenced, I think it was Exhibit 32 yesterday, the 2,664,000.  So if you look at that note, that calls for a profit split, a 50/50 profit split.  So there is cars that relate to that note, and then there were cars that related to the two and a half million note, which was a 15 percent --

Q.    Okay.

A.    -- stated rate.

Q.    Okay, and did you see documents that identify -- I mean, let's use an example.  Did you see the same profit split, what I mean by that, literally just the same dollar amount for each vehicle, like, 10,000, 10,000, 10,000?

A.    No.

Q.    Okay.  The amounts were different per vehicle?

Page 432

A.    Yes.

Q.    Okay.  So you didn't see anything that would indicate that this secret lending agreement, if someone was really trying hard here, like, you'd have to more or less kind of come up with just random numbers, you didn't see anything, though, they could have been lazy, and just done the same consistent numbers, you didn't see that anywhere, where it was just the same consistent number over, and over, and over again, in any email exchange between Auto Wholesale of Boca and Excell?

A.    I did not.

Q.    Okay.  You criticized Mr. Gray because he made a statement in his report, these were not transactions, but only papers being created, and were without money representing the market value of the vehicles really being paid between any of the parties.

In your rebuttal report, you talk about these are very real economic transactions.  What do you mean by that, "these are very real economic transactions"?

A.    An economic transaction doesn't have to mean that cash changes hands.  If I like his glasses, and he likes my glasses, and we exchange, that's an actual, real transaction.

Q.    Okay, and in this instance, again, the transaction can be the --

Page 433

A.    Cars.

Q.    -- swaps?

A.    Well, yeah, they would be cars.

MR. FELDMAN:  Okay.  Your Honor, I'm just looking at the clock.  It's 11:40.  Can we take the break now, is that okay?

THE COURT:  Sure, if you wish.

MR. FELDMAN:  Okay.

THE COURT:  All right.  We'll take a lunch break.  We'll get back at 12:45.

MR. FELDMAN:  Great.  Thank you, your Honor.

THE COURT:  Thank you, everyone.

MR. FELDMAN:  Thank you for the accomodation, everyone.

THE COURT:  Court is in recess.

(Thereupon, a lunch recess was had, after which the following proceedings were had:)

THE COURT:  Welcome back, everyone.  I apologize for starting a little bit later than I said.

MR. FELDMAN:  Your Honor, should I address Mr. Barbee at the outset?

THE COURT:  Hold on.

MR. FELDMAN:  I'm sorry.

THE COURT:  Yes.  Make sure we're back on the record.

Page 434

All set.  Mr. Feldman.

MR. FELDMAN:  Sure, your Honor.  So the objection that we're raising to Mr. Barbee's testimony is two-fold, from the Federal Rules of Evidence.  So first and foremost, we believe that it's hearsay, and the question is whether or not the exception under 804 applies, and specifically the exception I'm looking at, your Honor, is 804, and I don't believe there is any contest here, it's 804(a)(5), and the language of that particular rule provides that, and I'm just reading off of it, your Honor, a declarant is considered to be unavailable as a witness if the declarant, Subsection (5), is absent from the trial or hearing, and the statements proponent has not been able, by process or other reasonable means, to procure sub (A), and this is the application section, your Honor, the declarant's attendance in the case of a hearsay exception under Rule 804(b)(1) or (6).

As your Honor knows, 904(b)(1) is the former testimony that was given in a prior proceeding or deposition.  So our argument is as follows, is that they could never have procured Mr. Barbee's testimony by process because, as your Honor correctly ruled, under the subpoena Rule 45 you cannot get -- serve process on an unretained expert, to get their opinion in the case.  So

Page 435

they could never have secured --

THE COURT:  When did I say that?

MR. FELDMAN:  (Inaudible) at, your Honor, yesterday.

THE COURT:  I don't remember saying that.

MR. FELDMAN:  I'm sorry, I'm looking at the argument raised by Mr. Crane's office --

THE COURT:  Okay.

MR. FELDMAN:  -- is that specifically Subsection 45(d)(3)(B)(ii) states that you cannot -- to protect a person subject to or affected by a subpoena, the court, the district court where the compliance is required may, on motion, quash or modify the subpoena if it requires (ii), disclosing an unretained expert's opinion.

THE COURT:  Disclosing an un --

MR. FELDMAN:  So they couldn't --

THE COURT:  Hold on.

MR. FELDMAN:  I'm sorry.

THE COURT:  Hold on.

That's usually, it's your opponent's unretained expert's opinion.  Not one on your side of the case.

MR. FELDMAN:  I'm just saying -- well, we didn't retain Mr. Barbee.

THE COURT:  I know that.

Page 436

MR. FELDMAN:  Okay.

THE COURT:  Exactly.  So you just made my point.

I'm confident that that case involved one party seeking to subpoena the unretained expert of another, who was their opponent.  Do you see what I just said?

MR. FELDMAN:  I understand what you're saying, but you can always subpoena the other side's expert, Judge.

THE COURT:  Okay.  In that case, that means what you just read to me, that citation is incorrect in your view?

MR. FELDMAN:  Well, my point is, Judge --

THE COURT:  You just relied on the citation, and now you're telling me it's wrong.

MR. FELDMAN:  Your Honor, I'm not trying to debate with you.  I'm just saying --

THE COURT:  Well, you are.  I'm trying to figure out what your argument is.

You cited a case, which you apparently are relying on, and now you're telling me it's wrong.

MR. FELDMAN:  I'm not citing the case.  I'm citing the rule, Judge.

THE COURT:  Okay.

MR. FELDMAN:  Okay.  So the rule provides that they could never have subpoenaed Mr. Barbee, so they could never have secured him by process under the hearsay exception.  So then it's whether or not, by other reasonable means, and in this instance, this party separately filed their motion.  They certainly were aware, as your Honor pointed out, that you could have done -- any other issues, you could have gotten your own expert to opine in the same manner that Mr. Barbee opined, you could have just walked away from it, you could have deposed Mr. Barbee.  There is other ways they could have done this, but they didn't do that, but long story short, they knew they're a separate movant, they could very retained an expert.  They had Mr. Moody here.  They could have retained him to opine on the same issues that Mr. Barbee did, knowing full well -- I mean, Mr. Softness has been practicing long enough to know this, that at some point in time other movants may drop out, and so, therefore, they could have procured this by other reasonable means, the testimony that they're now trying to present before your Honor.  They didn't do so.

The second issue is as follows, is under 702, is that Mr. Barbee is not a fact witness.  Mr. Barbee is an expert witness and so, therefore, they have tendered him as an expert, and there is nothing within that

Page 438

transcript they're going to point to that's going to say that they can tender him for an expert on the issues he's opining before.  So they're effectively trying to get expert testimony in, without meeting the initial threshold of tendering him as an expert, and meeting those qualifications.

THE COURT:  Thank you.

Would you like to respond?

MR. BRESLIN:  Mr. Dorsey is going to respond, and then I'll just respond briefly, your Honor.

THE COURT:  Mr. Dorsey.

MR. DORSEY:  Thank you, Judge.

Usually I like to have a little more time to prepare, but I'll do the best I can.

THE COURT:  I think this is a challenge for a lawyer.

MR. DORSEY:  Very briefly, Judge, I'm going to focus on Rule 32, and why we think Mr. Barbee is unavailable, despite the fact he, as I understand it, is within 100 miles of the Court.

Rule 32(a)(4)(D) specifically provides that a witness is not available when, quote, he cannot be procured -- or, excuse me, quote, could not procure witness' attendance by subpoena.  We all know what happened here, FVP issued a subpoena to Mr. Barbee, after

Page 439

it was told at approximately 11:00 p.m. the night before the trial, the trial which we all expected him to attend, that he would not be attending.  The Court quashed that subpoena.  I think we made good faith -- or, excuse me, FVP made a good faith effort to procure his attendance, and I think his unavailability is satisfied under that subsection, and I did manage to locate a case, Rey v State Farm Mutual Insurance Company, that's 2008 WestLaw 11324053, it's a District of New Mexico case from 2008, where the Court said a subpoenaed witness was not there, and it allowed that -- it quashed the subpoena, excuse me, because the witness was out of his geographical range, and the Court allowed the deposition testimony.

THE COURT:  Well, then even if the subpoena had never been served, the person would not be available, correct?  So --

MR. DORSEY:  Correct.  I just don't want to get over my skis.

THE COURT:  Okay.  I'm just trying to figure out why that case is helpful here, if the facts would support that the person is unavailable in any case.  There was an attempt to subpoena the person, and it was quashed because the subpoena was ineffective on whoever it was because of their location.

MR. DORSEY:  Correct, Judge.  I just

Page 440

introduced it for the preparation, the case I found where a subpoena was quashed, and the Court said by virtue of me quashing the subpoena, I am declaring the witness not available under this subsection.

THE COURT:  That was the -- that's the standard, or I thought you suggested it was because the person -- the reason the subpoena was quashed is because the person was outside the subpoena area.

MR. DORSEY:  That was the reason the subpoena was quashed.  The reason it was quashed was different than from in this case, but the point I'm trying to make is that a subpoena was nonetheless quashed, and the Court found that that subsection applied.

The second subsection, we would say that Mr. Barbee is a non-available witness, it's 32(a)(4)(E), and that states, quote, that, in exceptional circumstances it makes it desirable in the interest of justice, and with due regard to the importance of live testimony in open court, that the deposition be used.

And, again, I know your Honor will point out discrepancies, but I did find a 4th Circuit case -- pardon me -- Williams v Johnson -- no, that's not the case, excuse me.

This is the 4th Circuit of Appeals case, Huff v Marine Tank Testing Corporation, it's at 631 F.2d

Page 441

1140, and there you had witnesses who were parties who assured informally they would be at trial, they didn't show, and I'll just read very briefly from that opinion in the case, Rule 32 -- this is an older version of the rule, so the subsection is different, but it says Rule 32(a)(3)(E) of the Federal Rules of Civil Procedure provides for the admission of depositions in exceptional circumstances, in the interest of justice.  Such exceptional circumstances were present here, the absence of the Perrys, those are people who didn't show, was a completely unexpected turn of events.  There was a report they were ill.  Moreover, the interest of justice were clearly served, more than any other witness they knew of -- and then it goes into the details of the case.

But in this case, Judge, their attorney had assured the court at a pretrial conference they will be here, and so in reliance on that, co-parties did not issue a subpoena.  There was an unexpected turn of events.  They didn't show, and the Court allowed their deposition testimony.

I will represent to the Court that I was on a Zoom call with Mr. Breslin and counsel for the trustee on Sunday night, kind of going over the lay of the land for the upcoming trial, and it was not until, you know, Sunday night, to the best of my knowledge, that hints were

Page 442

dropped that, well, we might be settling with Auto Wholesale of Boca after all, and Mr. Barbee may not be there, and if you want to bring him in, you're going to have to issue a subpoena, and that was, again, a completely unexpected turn of events.

I will finally add that in the interest of justice, Mr. Barbee is a -- has been a forensic expert for decades.  I've worked with him in several cases.  I know he's been before the Court in several cases.  I don't think there is anything improper, or that would go against the interest of justice, when he has a thorough track record, the other side had the ability to take his deposition, and did take his deposition prior to this case, and we all expected him to show.

THE COURT:  Would your argument under the hearsay rule be parallel to the one under Rule 32?

MR. DORSEY:  Yes, sir.

THE COURT:  That is Mr. Feldman focused on in his presentation.

MR. DORSEY:  Correct, my hearsay argument essentially mirrored Rule 32.

THE COURT:  Thank you.

Mr. Breslin.

MR. BRESLIN:  Judge, I have nothing to add.

THE COURT:  Okay.  Yes --

Page 443

MR. FELDMAN:  A brief response, Judge.

THE COURT:  -- briefly.

MR. FELDMAN:  So, the exceptional circumstances that Mr. Dorsey was just referring to, that's typically in the context of fact witnesses.

So, again, this is an expert witness.  These parties all had the ability in a point in time to get their own expert witness.  Mr. Dorsey certainly well knows at any point in time a movant in connection with a contested matter can drop out and so, therefore, you're putting all your eggs in one basket, that's the risk you take.  That's not on us.  They certainly could have gotten this expert from somewhere else if they so chose.

Last but not least, your Honor, with respect to Mr. Barbee, the reason why the exceptional circumstance doesn't apply, we took his deposition on Friday afternoon, after he opined on any number of issues, and then we figured out what he was trying to do in his report, we then spent the whole weekend getting ready so that we could put him up on here and contest him on any number of issues that he testified about.

THE COURT:  Why does that -- why is that relevant to this argument?

MR. FELDMAN:  Because it's relevant for one reason, is that the exceptional circumstance doesn't apply

Page 444

because we should be able to --

THE COURT:  I'm not going to --

MR. FELDMAN:  -- cross-examine him on the issues that we now --

THE COURT:  That's different.

MR. FELDMAN:  -- understand, Judge.

THE COURT:  I'm not going to consider what his testimony might have been, except in the hearsay context.  So, all right, and so what else?

MR. FELDMAN:  So on 702, they still have not addressed that, Judge, is that they had to tender him an expert on a usury issue, that is a hotly contested issue, that the trustee has ultimately settled for, for a very reduced claim.  So that settlement will be filed with the Court, but reasonable minds can differ as to that argument.  That was Mr. Barbee's opinion.  So now they're just going to try and just airdrop in a whole bunch of expert testimony, where Mr. Barbee is not showing up, is not testifying, not subject to cross, and they're just going to airdrop that in.  You can't use that under Rule 32, exceptional circumstances.  You still have to separately comply with the Federal Rules of Evidence.

THE COURT:  Just a moment.

All right.  So let me point out that -- and I think I said something different from this earlier, I

Page 445

apologize if I did, but in this particular situation we have a motion filed by the Excell trustee, which has now been withdrawn, and we have a separate motion filed by FVP, it's not a joinder, it's an independent request for relief.  In my view, under the circumstances, the witness is not unavailable.

The witness would be unavailable but for the fact that FVP has not subpoenaed that person in a timely manner.  The fact that they were left with having, in their view, to serve a subpoena on Sunday, or Monday, whenever that happened, apparently during the beginning of the trial, is a situation that they created by not arranging to have their own witness, or subpoena -- serving a subpoena on this witness in a timely way prior to today, and for that reason I will not accept the deposition transcript.

All right.  So, back to you.

MR. FELDMAN:  Nothing further for Mr. Glick, your Honor.

THE COURT:  Anything?

MR. BRESLIN:  Yes.

To clarify, your Honor's ruling, are we permitted to examine the expert witnesses on Mr. Barbee's report, that they both received, and reviewed, and were prepared to rebut --

Page 446

THE COURT:  Okay.

MR. BRESLIN:  -- as part of their testimony?

THE COURT:  Why don't you try to ask questions about topics that you think are useful for today, and we'll see what happens.

My suggestion to you is that it would be a bad idea to start by saying, have you read the report of so-and-so, that has not been admitted, and the person is not testifying, but you try whatever you like, and then we'll see if there are objections.

MR. BRESLIN:  Okay.

THE COURT:  And you have 51 minutes.

MR. BRESLIN:  Thank you, Judge.

THE COURT:  You have 51 minutes total.

MR. BRESLIN:  I thought we had an hour.

THE COURT:  There has been argument back and forth.

MR. BRESLIN:  Oh, that counts?

THE COURT:  Oh, yes.  All of your time counts.

MR. BRESLIN:  All right.

CROSS-EXAMINATION

BY MR. BRESLIN:

Q.   All right.  Sir, you testified -- let's just go to the tax returns.

Did the AWB tax returns show that AWB had any outstanding loans?

A.   You'd have to put them in front of me, I don't recall.

Q.   Did you look at their tax returns?

A.   Yeah, but I --

Q.   All right.  Do you know whether or not there was loans reflected on them?

A.   I don't recall for --

Q.   All right.  Did you --

A.   -- certain.

Q.   Did you review the AWB books and records?

A.   I did.

Q.   Were there any, were there any loans on the AWB books and records?

A.   I do not recall, no.  I mean, I don't recall seeing any, sorry.  Yes, I do not -- I do not recall seeing any loans on their books.

Q.   Okay.  So you testified earlier that there was a promissory note worth millions of dollars.  You tell me that was not on their books and records?

A.   It was not on their books and records in the form of a note.

Q.   Okay.  Now, you -- a large part of your analysis was based on the books and records of AWB,

Page 448

correct?

A. Correct.

Q. All right. Now, were you aware that Michele Martin kept the books and records of AWB?

A. I'm aware of that.

Q. All right. Were you aware that she testified under oath that her books and records were designed to record car purchases and sales only?

A. I don't recall that.

Q. All right. Now, the books and records that you received, there were -- there was a -- there was entries regarding antecedent debt that were made just prior to this bankruptcy case being filed, correct?

A. I think they were July 21st.

Q. Okay. So right before the hearing was scheduled in the state court, and this bankruptcy case filed, there was entries put into the books and records of AWB that talked about antecedent debt, correct?

A. Yes, I saw those.

Q. All right, and they were not there before that date, correct?

A. No, they were posted on July 21st.

Q. All right. So --

THE COURT: Could you speak up just a little bit? I'm having a hard time hearing you. Could you

Page 449

repeat that answer?

THE WITNESS:  They were posted on July 21st.

BY MR. BRESLIN:

Q.    All right, and that reflected transactions that would have occurred over many years prior to that, correct?

A.    I'd have to look at the specific records.  I believe the antecedent debt was for specific vehicles, and so I don't know, I would have to look to see that vehicle and see where, in the history of the activity, that vehicle showed up.

Q.    All right, but you can certainly testify that based on their books and records, there was entries made right before this case was filed to refer to some vehicle transactions as antecedent debt that was not there before July of 2022, correct?

A.    Again, I'm not sure.  The transaction, booking the antecedent debt, was not there, was not there before it was booked, but I can't tell you that the vehicles that it relates to were never previously on the books.

Q.    All right.  Were you aware that Ms. Michele Martin testified that she was not aware of any lines of credit between AWB and Excell?

A.    I'm not aware of that.

Page 450

Q.   All right.  So, you were not aware that she testified under oath, when questioned about lines of credit, she said I don't know about lines of credit, I'm really not clear what you're talking about, you weren't aware of that?

A.   I was not aware.

Q.   Did you review her deposition before you testified?

A.   I believe I did.

Q.   Okay.  So you would agree then that Ms. Martin testified that there were no loans between AWB and Excell, correct?

A.   I mean, I guess her testimony speaks for itself.

Q.   I'm asking you.  You reviewed it, and you're the expert, and you're opining on it.

A.   And I just told you I don't recall.

Q.   All right.  So, you don't know whether or not the bookkeeper of AWB testified that there were no loans between the two companies?

A.   I think I just told you that I'm not aware of her testimony.

Q.   Well, are there -- were there loans between the two companies, what's your opinion?

A.   I mean, there is -- the physical promissory

Page 451

notes exist.

Q.   All right.  So, it's your testimony that there were actual loans between the company, correct?

A.   I mean, there is a document evidencing it.

Q.   Okay.  So is your testimony that there was loans between AWB and Excell, yes or no?

A.   Yes.

Q.   Okay.  Now, the books and records of Excell don't show that loan, correct?

A.   Again, they don't show the loan, they show the amount of -- equal to each one of those as a category of inventory.

Q.   Okay.  So you're saying that there is loans, but they call it inventory?

A.   They call it "inventory", yes, and there is a piece of paper that is a promissory note for the same amount, yes.

Q.   All right.  So all you're saying is that they have inventory listed for an amount that seems to be the same amount as the promissory note, but they don't call it a note, they call it inventory in the books and records, is that accurate?

A.   Yes, because it's revolving inventory.

Q.   All right.  So tell me about this swap account, is there a swap account in the books and records

Page 452

of AWB?

A.   Yes, it's like a -- they treat as a bank account.

Q.   All right.  So I'd like you to tell me exactly what a swap is, in the view of AWB, what does AWB view as a swap?

A.   They view it as a dealer trade, a car for a car.

Q.   Okay.

A.   Or cars for cars.

Q.   All right.  So you're saying that AWB would buy and own a car, right?

A.   Yes.

Q.   And there would be another company that would buy and own a car, right?

A.   Correct.

Q.   Okay, and they would swap those cars?

A.   Yes.

Q.   Why?

A.   Because maybe one dealership had a car that the other dealership wanted.  I've purchased -- personally have been to dealerships to buy cars, and they've said, oh, well, I can try and locate that at a different dealership.

Q.   Okay.  All right.  Well, you're talking --

Page 453

didn't you testify earlier that there was 127 swaps?

A.    177, but, yeah.

Q.    177 swaps.

All right.  There were 177 swaps between which companies?

A.    I believe it was AWB and EAG.

Q.    Okay.  So, 177 times AWB owned a car and EAG owned a car, and they traded, they swapped them?

A.    Over a period of time, yes.

Q.    Okay.  Over what period of time?

A.    I think the first swap took place March 9th of 2020, and the last swap took place the end of December '21.

Q.    Okay, and you're saying that these swaps occurred for the same amount of money?

A.    In total.  Like, as I said before, there may have been four cars, I'm making up a number --

Q.    Okay.

A.    -- the aggregate were 650, in exchange for three cars, in an aggregate worth 650.

Q.    Okay.  So you're saying that EAG owned cars, and AWG (sic) owned cars, and they swapped them for some reason?

A.    For some reason.

Q.    All right, and you don't know what that

Page 454

reason is?

A.   I do not.

Q.   All right.  Can you think of any business reason why they would be swapping these cars back and forth, one car owned by EAG, one car owned by AWB, why they swapped them?

A.   I don't know.  I --

Q.   You're the expert.

A.   No, I'm not an expert in car dealerships.  I never --

Q.   Okay.  Well, you recall --

A.   -- said I was.

Q.   -- that you were hired to opine why these transactions occurred.  Why did they occur?

A.   I don't think I was opined to do that either.

Q.   What's the business reason?

A.   I don't know, I wasn't -- that's not what I was retained to do.

Q.   What were you retained to do?

A.   I think Mr. Feldman already asked that question.

Q.   Are you refusing to answer my question?  What were you retained to do?

A.   I was asked to be the financial advisor to

Page 455

the bankruptcy estate --

Q.    Okay.

A.    -- and also to rebut Mr. Gray and Mr. Barbee's reports.

Q.    All right.  Now, how do you financially advise a company that's swapping a car with another company for the exact same amount of money, where neither company profits, what's the financial advice in those circumstances?

A.    Well, I don't know what they ultimately do with their cars.

Q.    Well, you would agree that there was never a profit made on any of these swaps, right?

A.    That's the whole point of a swap.

Q.    To do what?

A.    I give you some -- we exchange something of equal value.

Q.    But why?

MR. FELDMAN:  Objection, asked and answered.

THE WITNESS:  Because --

THE COURT:  Hold on.  Sustained.

BY MR. BRESLIN:

Q.    Would you agree, sir, that for these swaps, every single one of those cars was purchased initially by one of the Karma companies?

Page 456

A.   I couldn't tell you that.

Q.   All right.  Would you agree, sir, that in 2022 every car that came into the possession of AWB was first purchased by one of the Karma companies?

A.   I'd have to look at the paperwork.

MR. BRESLIN:  Excuse me.

I have no further questions.  Thank you.

THE COURT:  Is there any redirect?  Yes.

MR. FELDMAN:  No redirect, your Honor. Thank you.

THE COURT:  All right.  Thank you very much. You can step down.

What do you have next?

MR. FELDMAN:  Your Honor, how am I on time, just out of curiosity.

THE COURT:  An hour forty-one.

MR. FELDMAN:  An hour and forty-one left?

THE COURT:  No, that's your elapsed time.

MR. FELDMAN:  Okay.  Great.  Thank you, your Honor.

We call Moshe Farache at this point in time.

THE COURT:  Mr. Farache, good afternoon.

MR. FARACHE:  Good afternoon, your Honor.

THE COURT:  How do you like your last name pronounced?  Because nobody seems to agree on it.

Page 457

MR. FARACHE:  F-a-r --

THE COURT:  No, not spell it.  How do you say it?

MR. FARACHE:  Moshe Farache.

THE COURT:  Farache.

MR. FARACHE:  Farache.

THE COURT:  Farache.  Okay.  Good, because everybody is getting it wrong.

Could you raise your right hand?

Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MR. FARACHE:  Yes.

THE COURT:  Okay, and you should tell your clients (sic) that it's a good idea for them to get your name right.

Okay.  Go ahead.

MR. FELDMAN:  And I'm embarrassed, your Honor, because I grew up in Israel, so I should know how to pronounce his last name.

DIRECT EXAMINATION

BY MR. FELDMAN:

Q.   Good afternoon, Mr. Farache.

A.   Good afternoon.

Q.   Let's just talk about some really basic

Page 458

information.   Where are you originally from?

A.   Israel.

Q.   Okay.   What year were you born?

A.   1969.

Q.   Okay, and what particular town are you from in Israel?

A.   Kiryat Gat.

Q.   Okay.   How did your family get to Israel?

A.   My mother from Algeria and my father from Spain.   After the Revolution, they both moved to Israel.

Q.   Okay, and at some point in time you moved to the United States, is that correct?

A.   Yes.

Q.   Okay.   While you were in Israel, let's just talk about your education.   You went to elementary school?

A.   One till six.

Q.   Sixth grade?

A.   Yes.

Q.   Okay.   Did you go to junior high -- or, I'm sorry, I mean, did you go to middle school?

A.   (No verbal response.)

Q.   Okay.   You dropped out of school?

A.   (No verbal response.)

Q.   Why did you drop out of school?

A.   Financial.

Q.   Okay.  So you never went to high school?

A.   No.

Q.   Have you ever gotten some type of high school diploma?

A.   Just three day working, four days working and one day education.

Q.   Okay.  You never went to college, you never got any type of license, or some type of -- notwithstanding the fact you didn't go to college, did you get some type of nighttime degree?

A.   No.

Q.   Okay.  So at some point you moved to the United States?

A.   Yes.

Q.   What year was that?

A.   1995, or maybe the end of '4.

Q.   Okay, and actually, let me just go back to Israel real quickly.  Having actually gone to the Israel schools myself, did they teach you English in the Israel school system?

A.   A little bit.

Q.   Okay.  Is most of your English known when you came to the United States based on what you watched on TV?

A.   Barely speaking.

Page 460

Q.   Okay.   Do you read and write English very well?

A.   Say again, I'm sorry.

Q.   Do you read and write English very well?

A.   No.

Q.   Okay.   In fact, when you write out English, I've noticed sometimes in your notes, you write it out phonetically, is that correct?

A.   Yes.

Q.   Okay.   Now, you moved to the United States, and I want to fast-forward a little bit here.   You certainly didn't get any additional education in the United States, is that right?

A.   Nope.

Q.   And when you moved to the United States, did you move to Florida?

A.   Yes.

Q.   Okay.   Excuse me.

A.   But working for a couple months, help my friend in his business, and then I moved to South Florida.

Q.   And so you've been a South Florida resident ever since?

A.   Yes.

Q.   All right.   So let's talk about Scott Zankl. Can you tell the Court when you first met Scott Zankl?

Page 461

A.   I basically purchased a building in 2012, and when I purchased the building, I asked the real estate person, who is the potential buyer for the building, and she mentioned to me XYZBY, I basically go to two of them, nothing to do with the Zankl, and I ask him what's the reason they want to rent the real estate or buy it and, you know, I basically try get the best tenant for my building, the same time I rent space to different entity, which is interior design, she been in the market for decade, 25 and up years in business, and Mr. Zankl at the time has a person, what is, his company Savannah Road (phonetic), he used to be partner/investor in this company, and the both come and approach me for the building.  The moment they approached me for the building, I see the potential of better view for their business and, you know, I say to them, you know, I'm trying to get the best tenant and make sure it's qualified for this space, because any time there are approximately 6 to 8,000 square foot, I show him the space, they love it.  I said before you do anything, go couple days, sleep on it.  If you need the key to bring your family and make the decision, just make sure you make the right decision, because I invest a lot of money of my family in this entity, and we got to make sure it's successful.

Q.   So I just want you to listen to my

Page 462

questions, okay, because I want to move quickly here.

Now, you understood that Mr. Zankl was -- do you understand his business?

A.    In the time, a little bit.

Q.    Okay, and just briefly, what did you understand Mr. Zankl's business to be?

A.    Basically buy and sell vehicle.

Q.    Okay.  Now, Mr. Zankl expressed an interest to put his business into this new property that you acquired?

A.    Yes.

Q.    Okay, and did you have a discussion with Mr. Zankl -- this is what year, I'm sorry?

A.    2012.

Q.    Did you have a discussion with Mr. Zankl about inventory, of his car business?

A.    Not right away.  We discussed more as the term of the lease, you know, because they -- in the time they don't have money to fix the space the way they want it.  So I basically ask him what the allowance, the need for every position in the space so they can be looking professional, and representable for the public and area, and I give to them whatever they ask me.  I go through the term of the lease, we all agree about it, and him and his wife sign personal guarantee --

Page 463

Q.    Okay.

A.    -- for the lease.

Q.    So I just want to understand something, and just briefly, again, you provided them tenant improvements?

A.    Yes.

Q.    Okay, and they built out the space, to your knowledge, as to how they wanted to present it?

A.    Yes.

Q.    Okay.  So, then did Mr. Zankl approach you and discuss with you at all about inventory?

A.    Yes, in some point after.

Q.    Okay.  So just briefly describe to the Court what the discussion was that Mr. Zankl had with you about inventory?

A.    What he basically say, he took a space from 68,000 square foot, and he move to 10,000 square foot, and when he moved to 10,000 square foot, he explain to me he need to fill the display with more cars.  So we come to some terms, and in a time I just basically lend to him the money.

Q.    Okay, but did that ultimately change at some point in time?

A.    Yes.

Q.    Okay, and, again, I'm just focused in

Page 464

between 2012 and, let's say, 2017, before -- actually 2012, before 2017, what ultimately did you come to an agreement with Mr. Zankl about inventory?

A.   Basically he introduced me to one of his friends, what is a wholesaler guy on the street, and he go from auction to auction, and travel in the country and find vehicle, what is supplied to the dealership, and he say, Moshe, if you continue with this industry, just be the wholesaler, it's much more easy, and as long as you buy the right merchandise, people going to buy it from you.

So, you know, in the beginning, in the time I spend probably -- probably minimum it's two day, go to Orlando, Monday morning leaving, I think the auction start 8 o'clock, I think Monday or Tuesday.  So I drove probably 3 o'clock in the morning, meet the guy in the auction, and then he explain to me how he look in the inventory, and how we look in the number, and basically you purchase cars.  So I travel between Orlando and Palm Beach, and we bought few cars, sometimes Mr. Zankl, Excell bought it from us, and we sell it to other entity or other dealership.

Q.   Okay. Now, just so I understand this, was Auto Wholesale of Boca set up, I guess the name implies it, to be a wholesaler of the purchase and sale of

Page 465

vehicles?

A.    Yes, that's our strategy of business.  We have a dealer license from 2012, or maybe the beginning of '13.  It's between '12 and '13, that's the moment we start family money to invest.

Q.    Okay.  Now, I want to understand Auto Wholesale's relationship specifically to Excell.  Just so I understand what you were just saying about the agreement with Mr. Zankl, first and foremost, did Mr. Zankl propose to you this idea of starting up Auto Wholesale of Boca?

A.    Yes.

Q.    Okay, and now the idea was, is that Auto Wholesale of Boca could go purchase cars, and then sell them to third parties?

A.    Third party or Excell.

Q.    Okay.  I just want to understand as it relates to Excell, because there was this discussion, and we're all trying to wrap our heads around this, I think we're all a little frustrated in here, we're all just trying to wrap our heads around this, Mr. Farache, is that there is this discussion about the back-and-forth of payment of cars.  So let's just focus on that, okay?  Were these cars that we talked about, Mr. Zankl talked about, the back-and-forth purchase, where we see the bill of sale and all these documents, tell the Court why exactly Auto

Page 466

Wholesale of Boca would buy that car from Excell.

A.   It's very simple, if you looking at, he bought a car, he got trade-in a vehicle, for Excell always looking at us as a dealership, as a basically boutique dealership.  He can't get finance, he can't get this.  So, to expand his display, he sold to us, Auto Wholesale of Boca, and then if he find an end user, he sell it, we get paid for our vehicle, and we continue doing business.

Q.   Okay.  So let's use an example.  Would it be fair to just characterize it the right way, Mr. Zankl identifies a car, a Ferrari, and he says to you then, Moshe, I think this is a good opportunity, he purchases that car, sells it to Auto Wholesale of Boca, and then at a later point in time, if he identifies an end user, he'll buy the car back from you, and you'll split the profit?

A.   Yes.

Q.   Okay.  Now you could also -- now Mr. Zankl wasn't required to ever purchase that car back from you, is that correct?

A.   If he doesn't want to, and he say to me, listen, I don't want to deal with you, take your cars out of here --

Q.   Okay.

A.   -- I got to take my cars.

Q.   Or alternatively you were never obligated to

Page 467

sell that car back to Mr. Zankl, is that correct?

A.    Yes.

Q.    Okay.  So if you said, if he came to you and said, hey, someone is going to pay $50,000 more than we bought this for, but you found someone who would sell it for -- or buy it for $100,000 more, you could tell Mr. Zankl, no, I'm going to sell it to somebody else?

A.    For sure, that's business.

Q.    Okay.  So that's generally how the business operated, this back-and-forth, with Excell Auto, let's say up to 2016, is that fair to say?

A.    Up till 2017, and then we have small issue.

Q.    Okay.  So, we'll get to that in one moment, but generally up to 2016, is that a fair characterization, that example I just walked back through?

A.    Yes.

Q.    Okay.  Now, in this back-and-forth with Mr. Zankl, and this description that you just gave to the Court, did you trust Mr. Zankl?

A.    Is I trust him?  Yes, it's the perfect picture of the family and the whole thing saying, you always got to look at, you know, we have 10 years of relationship, it's a long, long time business relationship.  You know, in 2000 we have an incident --

Q.    Can I interrupt you?  I just want to talk up

Page 468

to 2016.

A.    I mean, if I trust him?  Yes, I trust him, with the dinner probably twice a year, you know, as husband and wife, you know, we have relationship.

Q.    Okay.  Now, I want to just talk about the lease.  Did you give Mr. Zankl beneficial lease terms, in terms of, say, rent amount, compared to what you otherwise could have leased the property for?

A.    I mean, yes, but you also got to look at the time, you know, I basically let him use 3,500 square foot of the building, and he no pay me rent for few years.  So he used 10,000 square foot, but I have the space, the 3,500, me and my daughter and my wife, we use it for our own businesses.  So we have offices and space over there but, you know, to come to the building he go through us.

Q.    What do you mean by that, the 3,500 square feet, he has a 10,000 square foot bay, right?

A.    Yes.

Q.    And then this 3,500 square foot, what are you talking about, what is that?

A.    The total building, it's 17,000 square foot, you have 3,500 to the west, 3,500 to the east, 10,000 in the center.

Q.    Okay.

A.    Excell Auto rented 10,000 square foot in the

Page 469

center, and then we opened entrance from the east, 3,500. So in the beginning because, you know, he moved from 68,000 square foot, you know, he no have -- he's afraid to default on lease or anything with me. So what's happen is I never no charge him rent for it, for the 3,500.

Q. By the way, I don't mean to embarrass you, you keep on saying 68,000, you mean 6,800, is that correct?

A. 6,800 square foot.

Q. Okay. So, he moved into a bigger space in your building, right?

A. Yes.

Q. Okay. Now, let's talk about 2017. Because we keep on seeing these promissory notes, and we keep on -- we just heard Mr. Glick's testimony, and I think it finally clicked for me right now, and what I want to talk to you about is what happened in 2017 with Mr. Zankl?

A. Basically in 2017, sometime in 2017, he sold couple vehicle. So our team is basically going, probably every day to check our inventory, between me and Michele, you know, we just always after the inventory -- after all the vehicles we own, and what we try to do is always verified where is the vehicle.

So in 2017 I come to the store in the morning and I ask where is specific vehicle, last night

Page 470

it's here, today it's not here and, you know, I always played tricks, as like everybody else, ask question, and he told me it's in the shop, vehicle one.  Vehicle two, it's in the shop, too.  I go to the shop, I say, Rob, where is the vehicle?  I have a problem.  And he say to me, Moshe, it's no vehicle here, this vehicle.

I go back to the store, I say I just want to let you know, I'm missing my vehicle, I'm nervous.  So they say to me, basically to spell out the vehicle is sold.

Q.   Okay.  So let me just actually go back in time real quickly.  This back-and-forth sales of vehicles from Excell to Auto Wholesale, we keep on talking about these dealer jackets, and sometimes the reference is, is that there is no titles in there.

Can you explain to the Court why you may not see titles in the deal jacket, but nonetheless see a bill of sale from Excell to Auto Wholesale of Boca?

A.   Okay.  So if Mr. Zankl trade the car -- people come and bought a car, so they have a debt and a trade.  So when they have a debt and a trade, he's got to wire the money, or send the money with the check, or Federal Express to the finance company, and sometime he take two weeks, sometime he takes three.  During the corona, sometime it take two months.

Q.    Okay.

A.    So we did the bill of sale, we have the vehicle in the premises, and we wait for the title.  So part of our inventory, every day we ask where is this title, where is this car, where is this -- that's our business.

Q.    Okay.  So, in other words, when I see emails back and forth, from people from your company to Excell, you're asking for title, that's a sincere request, you want the title for the car that you bought?

A.    Yes.

Q.    Now, going back to 2017, you talk about how there is a vehicle missing.  Do you confront Mr. Zankl?

A.    Yes, what I did is basically send to him a certified letter, and I put him and his wife, I send it to his house, his business, and I put him in a spot, because I tried to call him a few times, he no answer my phone.

Q.    Okay.

A.    So later on in the afternoon, I send to him certified letter, he got very upset.  I said to him, listen, just remember one thing, my position here, you got the opportunity, treat me the same way you want to be treated.  Don't ever try to take my family, my family money, or my family cars.  If you sell it, you make money, I deserve to make money.  If you don't make money, don't

Page 472

worry about it.

Q.    Okay.

A.    I'm okay.

Q.    So I just want to ask, what was Mr. Zankl's response to you?

A.    He basically come -- you know, right away he call me, as soon as he receive the certified letter, and he say to me, you no understand what I go through, he has all the excuse, and he say to me, Moshe -- we met, and he say to me, Moshe, what about if I write you the promissory note, me and my wife, we personal responsible for this money.

Q.    So I want to understand this.  So this promissory note, because yesterday you testified, you said, no, it's not a loan, but it is a debt.  So what are you talking about?  Can you explain that to the Court, where we're kind of getting a detachment here?

A.    It's basically memorialization of the whole cars we own.  You know, we have bunch of cars, and it's an amount of money, and this promissory note, if tomorrow, God forbid, I die, my wife can come and say you owe me XYZ, or if, God forbid, something happen on his side, we protecting each other.

Q.    Okay, and so the idea is that it's to memorialize what we were just talking about a moment ago,

Page 473

is that you bought approximately a couple million dollars in inventory. If Mr. Zankl wanted to buy those cars from you, he certainly could buy them from you. If you wanted to sell them somewhere else, you could certainly sell them somewhere else, but is that what you're trying to memorialize?

A.   Yes.

Q.   Okay. Now, here is the other question, this is important. If you decided, you have a -- that note is about $2.5 million, right?

A.   (No verbal response.)

Q.   If you decided to sell those cars to someone, a third party, let's say $4 million, and you got paid by that third party 4 million, would Mr. Zankl still owe you the 2.5 million?

A.   (No verbal response.)

Q.   No?

MR. BRESLIN:  Object to the form, Judge. It's compound and --

THE COURT:  Sustained.

BY MR. FELDMAN:

Q.   Okay. Let's just break it down a little bit. That inventory that Auto Wholesale of Boca, that it owned at the point in time in 2017, it's approximately $2.5 million?

Page 474

A.    Yes.

Q.    Okay.  Now, if Auto Wholesale of Boca sold those cars to a third party, and you got whatever amount of money, would Mr. Zankl still be responsible for the $2.5 million?

A.    No.

MR. BRESLIN:  Objection, leading.

THE COURT:  Sustained.

BY MR. FELDMAN:

Q.    Okay.  What would happen to the $2.5 million that's evidenced in that promissory note if Auto Wholesale of Boca sold those cars to somebody else?

A.    You can throw it out.

Q.    Thank you.

Now, I see in that $2.5 million note an interest rate.  So, Mr. Farache, can you explain why there is an interest rate in that note, if what we're talking about is this just effectively evidencing or memorializing the inventory that Auto Wholesale of Boca -- why is there an interest rate in there?

A.    Because what's happen is, you know, we -- in some point he explain to me, Moshe, I need to use this, basically I can pay you up to 31,250, what is equal to the 15 point a year, and I say, I'm okay with that, and then I have a guy, he's one of my good friends, older guy, and he

Page 475

want to -- he basically knows Scott, and he explained to us, you want to do it.  So we agreed to it, and whenever we bought and sell cars, we got monthly fee.

Q.    Okay.  So, I want to talk about there is a $2.66 million promissory note, you're aware of that?

A.    Yes.

Q.    Okay.  What's the circumstances regarding that note, is it similar to what we were just talking about, the 1215 (sic) note, the 2015 note?

A.    No.

Q.    What is it?

A.    Basically we get minimum, minimum just for the operation and the cost of the big large amount of money, minimum of the $10,000, but then you have, we buying and selling cars.  So it's very weird, we get paid based on the amount, because most of the time we make above the $10,000.

Q.    Okay.  What you're talking about is a --

A.    Profit.

Q.    -- profit split?

A.    Sure.

Q.    Okay.  Well, not sure, is that it, a profit split?

A.    Yes.

Q.    Okay, but I'm just trying to understand

Page 476

here, again, the idea is, is that Auto Wholesale of Boca is going to buy cars from Excell Auto, is that right?

MR. DORSEY:  Objection, leading.

MR. FELDMAN:  I'm sorry, I'll rephrase --

THE COURT:  Sustained.

MR. FELDMAN:  -- your Honor.

THE COURT:  Yep.

BY MR. FELDMAN:

Q.    With respect to that 2.66 million, was it -- what were you trying to evidence or memorialize with that 2.66 million?

A.    It's basically memorizes of the amount of buying and selling cars, if he sell any cars, and we have an issue.  It's just to support us if God forbid we have a problem.

Q.    Okay, and, again, Auto Wholesale of Boca, is it buying cars from Excell?

A.    Not just from Excell, from anybody.

Q.    But I just want to talk about the 2.66 million, is that Excell?

A.    Sometime he no have use for the money, so we buy somewhere else or --

Q.    Okay.  So, 2017, this is the origination of these promissory -- I'm sorry, 2017 the 2.5 million originates from the confrontation with Mr. Zankl?

Page 477

MR. DORSEY:  Objection --

THE WITNESS:  Yes.

MR. DORSEY:  -- leading.

THE COURT:  Sustained.

BY MR. FELDMAN:

Q.    Let's move forward from 2017.

So the promissory note is executed.  Can you describe to the Court what the relationship is with Mr. Zankl up until 2021?

A.    Basically the same, like any business, we have up and down, you know, good days, bad days, you know, sometime he give to us the fund, the bank bounce, he blaming everybody in the world, it seemed like he does that every day here.  His girls, they make a mistake, they wrote the check from different account, he apologize. Does he make it right?  Yes, he make it right eventually.

And, you know, we continue with business, we chase the title, chase the vehicle, the same like any business, you chase your money, and it's business.

Q.    Now, there is this discussion about swaps, can you tell the Court, what was the purpose of the swaps?

A.    What's happen is as soon as the corona start, approximately in 2020, sometime in February, when Kobe Bryant, always go back to the Kobe Bryant death, that's to me the beginning of the corona, and what's

Page 478

happen is, you know, between the banks close, business actually took to the sky, cars is the hottest things in the market because most of the people bought online, interest rates reduce, we sell cars like piece of cake. Even if you buy a car, the auction pay more than retail. So in the time, we just -- we can't make it to the bank. Also Mr. Zankl, in the time, stage four cancer, he let me know about it and, you know, we basically make the decision because we can't get to the bank all the time, we're just going to do bill of sale, swap, and just for accounting purpose we always create all the QuickBooks and everything legit, besides moving money from account to account.

Q.   So would cars be swapped from Auto Wholesale to Excell?

A.   Yes.

Q.   Okay, and Excell would swap cars with Auto Wholesale?

A.   Yes.

Q.   Okay, and how would you go about determining what cars to swap on both sides, can you tell the Court that?

A.   I mean, we have bill of sale, and we have Michele in my office basically shares register for each vehicle, and where is the money in-house, where does the

Page 479

money come from.  Like, you see Excell loan Calvin and Moshe, so it's mean Mr. Erbstein, he's in my plan, he's my very, very close friend, and he put a million bucks, I put a million and a half, so that's this.  Everything you see, when you see all the group of cars, you have a name, what we call it, in-house, what he tell us, where is the money coming from?

Q.   So I want to come back to that in just one moment, but just with respect to these swaps, in other words, these were swaps with cars that Excell owned, they would swap cars with cars that Auto Wholesale of Boca loaned, is that correct?

A.   Can you repeat yourself?

Q.   Sure.

In other words, when we see these swaps, these are when -- there is a swap, it's Auto Wholesale of Boca swapping cars it owns?

A.   Yes, we always own the car.  It doesn't matter swap or anything, it's agreement between the two parties, that how we swap cars.

Q.   Let me be more precise, Auto Wholesale of Boca would never swap a car it didn't own, is that right?

MR. DORSEY:  Objection, leading.

MR. FELDMAN:  Sorry, I'll rephrase.

THE COURT:  Sustained.

Page 480

BY MR. FELDMAN:

Q.   Did Auto Wholesale of Boca ever swap a car it did not legally own?

A.   Never.

Q.   And just to understand the magnitude of what Auto Wholesale of Boca was doing, you mentioned that Auto Wholesale of Boca, did it buy cars from other folks --

A.   Yes.

Q.   -- other than Excell?

A.   Yes.

Q.   Okay.  Can you just identify some of the places that Auto Wholesale of Boca --

A.   I mean --

Q.   -- would buy cars from?

A.   -- just for example you have Prestige leasing, you have other dealer, exotic one in West Palm Beach, you have unlimit -- you know, people we know, our network, people -- you know, we start chasing people, they have a lease, and they want to get rid of the vehicle, we bought it.  I mean, we bought high-end cars, we bought low-end, we bought a lot of vehicles from small company when they approach us.  So we bring them to our office, we show them how we do everything, and we just charge them a fee, and some time in 2021 we hire young kids to try to develop this --

Page 481

Q.   Okay.

A.   -- to the whole different level of business.

Q.   What about Manheim, do you ever sell vehicles to Manheim?

A.   Yes.

Q.   Okay.  Do you ever buy vehicles from Manheim?

A.   Yes.

Q.   Okay, and so there was, outside of Excell Auto Group, there was purchasing and selling with other third parties?

A.   Yes.

Q.   Okay.  Now, let's talk about -- at some point in time did the relationship with Mr. Zankl deteriorate, just yes or no?

A.   Yes.

Q.   Okay.  Can you briefly describe to the Court how the relationship with Mr. Zankl deteriorated?

A.   Deteriorated, can I ask a question?

Q.   Let me --

A.   Deteriorate, it mean like going bad?

Q.   Let me put it simpler.

Did there come a point in time where the relationship with Mr. Zankl went bad?

A.   Yes.

Page 482

Q.   Okay.  Can you briefly describe to the Court how the relationship with Mr. Zankl went bad?

A.   I mean, basically he sold cars of AWB, and every day he promised to us, hey, I'm going to pay you, I'm going to pay you, I'm going to pay you.

MR. DORSEY:  Judge, I'm going to object to, it's hearsay when he's quoting Mr. Zankl.

THE COURT:  Sustained.

BY MR. FELDMAN:

Q.   Okay.  Can you frame your answer without telling -- without specifically referring to what Mr. Zankl said?

A.   So I can use Excell, the Zankl family?

Q.   Just go ahead and try and answer the best you can, we'll work through it.

A.   I mean, you know, basically some time in the end of '21, he basically told me, Moshe, I just want to let you know --

MR. DORSEY:  Objection, hearsay.

THE COURT:  Sustained.

MR. FELDMAN:  Okay.

THE WITNESS:  He basically --

THE COURT:  Stop.

MR. FELDMAN:  Let me ask a question.

THE COURT:  Ask another question.

Page 483

MR. FELDMAN:  Yes.

BY MR. FELDMAN:

Q.    I asked you to describe how the relationship went badly with Mr. Zankl.  So let me ask you this, was Mr. Zankl, just yes or no, was Mr. Zankl providing you money for cars that were sold?

A.    He provide me money and the check bounce.

Q.    Okay.  Was he providing you --

A.    That's --

Q.    Just listen to the question.

A.    -- bad.

Q.    Did he provide you documents that you were requesting with respect to Auto Wholesale of Boca's ownership of vehicles?

A.    Yes.

Q.    Okay.  Was it taking time to get documents from Mr. Zankl?

A.    No.  I mean, it's procedure.  You know, he send to us an email, he say, you know, I just want to let you know I buy some cars, and then we share with them the cars we bought, and if there is a buyer for it, we just sell it.

Q.    Okay.  I want to understand how the relationship went badly.  Without saying what Mr. Zankl said to you, what did Mr. Zankl do that made the

Page 484

relationship go bad?

A.    Receiving of bad check, deposit to our bank account, and basically the check bounce.

Q.    Okay.  Now, again, without talking about what Mr. Zankl said to you, did you confront Mr. Zankl about these bounced checks?

A.    Yes.

Q.    What happened after Mr. Zankl gave you bounced checks?  Again, not talking about what he said to you, but what happened?

A.    He basically say to me --

Q.    No, no.

A.    Oh, I'm sorry.  You know, I receive an email from his banker, and he make all the excuse, and two weeks later he bounce another check.

Q.    Now, we keep on hearing about this raid on Excell Auto Group.  I just want to talk to you about this raid.

Can you briefly describe to the Court, don't talk about what people said, just briefly describe why vehicles were moved from Excell Auto Group.

A.    Basically, the week of -- the end of March, between Mrs. Zankl, because Mr. Zankl no show up in the business for the last couple of weeks, between Mrs. Zankl and me, she push me, Moshe, you've been --

Page 485

MR. DORSEY:  Objection, hearsay.

THE COURT:  Sustained.

BY MR. FELDMAN:

Q.    Stop.  Yes, stop saying what someone said to you.

A.    Oh, I'm sorry.

Q.    Just talk about what occurred, okay?

A.    So, basically what's happen is, I got a lot of pressure to move my cars from the premises.

Q.    Okay.  Now, actually I just want to take a step back in time, because Mr. Zankl, you say Mr. Zankl testify yesterday, saying in November of '21, November of '21 you threatened to throw him in the swamp with the alligators, is that right?

A.    I never no been in the Everglades, never no been around alligators.

Q.    Let me be more precise.  Did you threaten Mr. Zankl?

A.    Never.

Q.    You were certainly upset with Mr. Zankl, though, right?

A.    Yes.

MR. DORSEY:  Objection, leading.

THE WITNESS:  Very upset.

THE COURT:  Sustained.

Page 486

BY MR. FELDMAN:

Q. Were you upset with Mr. Zankl?

A. Yes.

Q. All right. Why were you upset with Mr. Zankl?

A. Basically bounced check or selling cars and not let me know, selling AWB cars, and lying to me.

Q. Okay, and just to be clear, did you ever threaten to throw somebody in the swamp?

A. Never.

Q. Okay, and, in fact, you heard Mrs. Zankl testify that that threat came in March of 2021. My question to you is --

MR. DORSEY: Objection, leading.

THE COURT: Sustained.

BY MR. FELDMAN:

Q. Okay. In March of 2021 did you threaten -- I'm sorry, March of 2022, did you threaten Mr. Zankl?

A. Never, just protect him as much as I can, till the last minute.

Q. Okay. Now, just going back to the so-called raid of Excell Auto Group. With respect to the cars -- the cars were removed from Excell Auto Group, is that correct?

A. Yes.

Page 487

Q.    Okay.  Now, the cars that were removed, were those cars that you believed Auto Wholesale of Boca owned?

A.    Yes.

Q.    Okay.  Can you explain to the Court why you thought Auto Wholesale of Boca owned those cars?

A.    We basically -- you have, if you look in our list of vehicles, you have cars, we wired the money, write checks, term of payment, all legit.  So we get all the pressure.  By Friday night, my wife receive a phone call from one of our lawyer, and he basically say remove your vehicle because something going to happen tonight.

Q.    Okay.  Now, I don't want you to talk about the conversation you had with your lawyer.  So I just want to be clear about this, is that the -- certainly the cars that were removed, did you believe you were acting improperly?

A.    A hundred percent.

Q.    You thought you were acting improperly, or you thought you were acting properly?

A.    I mean --

Q.    Let me ask it simple.  Do you think you were doing something wrong when you took the cars from Excell Auto Group?

A.    No.

Q.    Okay.  Why not?

Page 488

A.    Because we owned those cars.

Q.    Now, without getting into what Mr. Zankl said, did you get a feeling from your interactions with him that he was grateful for what you did to help his company?

A.    Look in the text message, yes.  He appreciate everything I did to him.

Q.    Okay.  Did Mr. Zankl ever, to your knowledge, reach out to any police department and say that you somehow threatened him?

A.    Sometime in the middle of May or April of 2022.

Q.    Okay.  What happened?  Without talking about what was said, what happened?

A.    I mean, I read -- you know, Michele actually read to me the police report, and he say, you know, right away, you know, this, this, this, but then he say, no, I have nothing with Moshe Farache, but I bounce a couple checks to people.  So, you know, if it's a problem, like he say, in 2011, dial 911.  Besides that, why you ask me for more money if business continue?

Q.    Got it.

Now, without getting into, again, conversations, did you have an understanding that Excell Auto Group borrowed money from third parties?  Just yes or

Page 489

no.

A.    Yes.

Q.    Okay, and with respect to those third parties, did you have any reason to believe that somehow Excell Auto Group wasn't going to be able to pay back those third parties?

A.    Yes.

Q.    Okay.  Talk to me, just briefly explain that.

A.    On Friday the 31st I met --

Q.    What month?  What year?

A.    Oh, I'm sorry, in March '22, the end the month, I met with Mr. Brown, what he's basically -- you know, he's a friend of mine from the past, I build his house in Palm Beach.  You know, I'm his right man, and for a couple years building his custom homes, and basically he told me, Moshe, I just want to let you know --

Q.    Don't talk about what anyone told you, sir.

A.    Oh, so basically I got the information from him after the meeting, he say to me, Moshe, this guy took 30 to $50 million from people in Boca Raton and Palm Beach area.  He's a bad -- he's not a good person.  He's a bad person.  He says, Moshe, take all the vehicle, whatever is belong to you, don't leave to them anything.

Q.    Okay.

Page 490

A.   He's a bad person.

Q.   Okay.

MR. DORSEY:  Objection, hearsay.

THE COURT:  Too late.

Go ahead.

MR. FELDMAN:  Thank you, Judge.

(Laughter.)

BY MR. FELDMAN:

Q.   So I want to transition here a little bit. Let's talk about the present, okay?

Actually one thing I did want, because it came up yesterday, there was a discussion about FVP, and releasing liens that Karma -- that there was UCCs.  I just want to ask you this, Auto Wholesale of Boca had some UCCs filed with respect to the Karma entities, is that correct?

A.   Yes.

Q.   Okay, and those liens were ultimately released, yes or no?

A.   Yes.

Q.   Okay.  Can you explain to the Court who asked you to release those liens?  Not -- just who asked you, not actually the conversation, who asked you?

A.   Mr. Zankl.

Q.   Okay, and can you explain why the liens were released?  Don't refer to any conversations, just explain

Page 491

why the liens were released.

A.     The first thing we receive is basically paperwork to 1001, and that basically -- FVP kind of want my wife company, what she own, 1001, is the real estate, to kind of guarantee, and my legal at the time explain to them, listen --

Q.     Don't talk about your conversations with your counsel.

A.     Oh, okay, I'm sorry.

Q.     But go ahead.

A.     So, it's -- they basically want us to be part of whatever Zankl does.  We have nothing to do with Mr. Zankl.  This is a real estate entity, and we mentioned to -- I think we, based on my conversation with my legal, you know, with my people, we all the time mention to him about our relationship with Excell, you know, and the lease with Excell, and we come to conclusion, we giving to him access to the premises, if God forbid something happens, something like that.

Q.     Well, I want you to also answer this, were you ever concerned that Mr. Zankl would somehow send cars that Auto Wholesale of Boca owned somehow to the Karma entities?

A.     At some point he did it to a lot of places.  I've been in this court, and I basically given the title

Page 492

for vehicle, what I purchased, to many people already.

Q.    Okay.  Now, let's talk about the present. Auto Wholesale of Boca is in bankruptcy, correct?

A.    Yes.

Q.    Okay, and with respect to Auto Wholesale of Boca, you answered yesterday, you used a quote, and you said something to the effect of, when you were asked by Mr. Breslin, we'll figure it out, in terms of what's the pathway to reorganization.

Can you just give the Court a little bit more color, when you say we'll figure it out quickly?

A.    It's very simple, you know, tomorrow we get the release, we start selling some cars, buying cars, family money coming to the company right away, increase inventory and purchasing of vehicle.  If you go back to our new space, there is still stucco, painting, we get a new design for the whole building, we investing approximately excess of quarter of a million dollar, and the new real estate opportunity for the next 20 years for automobile dealership.

We have a tenant over there, what he is under us, the mechanicship (sic), and you can see Auto Wholesale is still making money every month.  We have tenant, we have some cars being paid to Auto Wholesale.

Q.    Well, here is what I want to ask you, so

Page 493

since the bankruptcy was filed, I believe only one car was sold, is --

A.    Yes.

Q.    Okay.  Is the intent to come out of bankruptcy and engage in the purchase and sale of vehicles?

A.    Yes.

Q.    So the idea was you're not going to just come out of bankruptcy and just let the company sit idle?

MR. DORSEY:  Objection, leading.

THE COURT:  Sustained.

BY MR. FELDMAN:

Q.    Are you going to let -- I'll rephrase.

Is the company just going to sit and do nothing out of bankruptcy?

A.    No, we're going to continue buying and selling cars, and if we owed anybody money, we take a plan for five years, and we make sure they get paid --

Q.    Okay.

A.    -- the same like everybody else.

Q.    Now you mentioned there is going to be some investment into the company.  I looked at your Chapter 11 plan.  I don't see any investment.  Can you please just explain to the Court what the intent is there, what you just discussed?

A.      Basically family money, different company, and everybody just going to bring more money to the company.

Q.      Okay.  So, are you saying the plan -- I mean, I know you're not a bankruptcy lawyer, but is the intent to change the plan?

A.      Yes.

Q.      Okay, and the idea was to put more money into the company?

A.      Yes.

MR. FELDMAN:  Okay.  Your Honor, just one moment.

Nothing further, Judge.  Thank you.

THE COURT:  Thank you.

MR. BRESLIN:  Just a couple of questions, sir.

Oh, can I do a housekeeping matter?

Judge, Exhibit 39 yesterday, it was missing a page.  I've supplied a new last page, a different exhibit, the actual one that was filed in the circuit court.  I've supplied it to Daniel, but that doesn't get it into the Court file.  I would just like to -- I can show it to everybody, what I'd like to replace it with.

THE COURT:  Yes.  Please, go ahead.

MR. BRESLIN:  Would you put 39 up, please,

Page 495

Daniel?

UNIDENTIFIED:  The new 39?

MR. BRESLIN:  Yes, this is the new 39.

All right.  It's the exact same document as yesterday.  This is the second affidavit that was filed in in the circuit court.  Just go to the last page.  Yes, this was the -- this is part of the court filing, that's the page that was missing.  So, that's -- I will file that, your Honor, after --

THE COURT:  Thank you.

MR. BRESLIN:  -- the conclusion of the hearing, substitute it out.

So, I would just ask to move the new 39 into evidence, and I will supplement the record.

THE COURT:  It's still admitted.

MR. BRESLIN:  Thank you.

CROSS-EXAMINATION

BY MR. BRESLIN:

Q.  All right.  Mr. Farache, just a couple of questions.

Now, you said that on April 1st you removed all the cars that you owned, correct?

A.  Based on my knowledge I move all the cars AWB owned.

Q.  Okay, and after you removed all the cars

Page 496

that AWB owned, how many cars were left?

A.   A few of them, plus -- which Monday morning we received a couple more.

Q.   All right.  Now, sir, so are you saying that all of the cars that you took, the ones that were on the AWB lot, they were owned by AWB, but they were there being sold by the Karma entities, correct?

A.   Can you -- you're going -- can you ask one more time, please?

Q.   Certainly.

The cars that you had took were on the lot there being sold, right?

A.   They sold to AWB.

Q.   No, you're saying that the cars you took you owned, right?  You went and took cars that you say you owned, right?

A.   One more time, sorry.

Q.   Okay.  There were cars at 1001 Clint Moore?

A.   Yes.

Q.   Those cars you say were owned by AWB, correct?

A.   Some cars.

Q.   Right.

A.   Yes.

Q.   The cars you took are the ones you say you

Page 497

owned, right?

A.   Yes.

Q.   Okay, but so the cars you took were there before you took them for a reason, right?

A.   They are for sale.

Q.   Exactly.  So, the cars, it was your -- it was AWB cars that were there on that lot to be sold, correct?

A.   Yes.

Q.   Okay, and Mr. Zankl had authority to sell those cars, didn't he?

A.   He have to let us know when he sell it.

Q.   But he certainly had the authority to sell those cars, didn't he?

A.   Yes.

Q.   Okay.  All right.  So let me back up.

Now, you said to Mr. Feldman that, you were talking about these transactions that occurred back in 2021, you said that a car would be sold to AWB, and AWB would have that car, and then if Excell wanted to buy that car back, it would buy it back from AWB, correct?

A.   Yes.

Q.   Okay.  So, in essence, what you were saying is, is that if Excell had a car, it had a car, but it needed money, it would sell the car to AWB, AWB would pay

Page 498

the money to Excell, and then Excell would have that money to use, right?

A.    (No verbal response.)

Q.    Correct?

A.    Yes.

Q.    Okay, and then if it wanted the car back, it would buy the car back?

A.    Depends, yes.

Q.    Right, but that was the idea.

So it would sell the car to AWB, take the cash, use the cash, and then if it needed the car back, it could buy the car back, right?

A.    Yes.

Q.    All right.  So, that's --

(Telephone rang.)

MR. FELDMAN:  Your Honor, I'm so sorry.

BY MR. BRESLIN:

Q.    And that's what happened in 2021, correct?

A.    (No verbal response.)

Q.    Those were those transactions in 2021, right?

A.    I mean, it can happen in -- yes.

Q.    Okay.  So let me ask you this, if no money was exchanged, how would that work?

A.    When you say no money exchanged.

Page 499

Q.    Right, you're saying that Excell would give you the car, get money, so it would have money to use, but why would Excell give you the car if you never gave any money for it?

A.    Because we swapped for different vehicle.

Q.    Okay.  So you're telling me that in the deal jackets for 2021, when it shows a purchase agreement from Excell, and then a sell back from AWB to Excell, that that was a swap?

A.    Sometime it's a swap, sometime it's term of payment.

Q.    Well --

A.    You've got to look in the whole deal jacket.

Q.    How would a swap -- how would you have a swap if you're buying and selling the same car?

A.    You can look at it this way, sometime you selling a car, it's worth 400,000, and then you trade it for two cars that worth 200 apiece.

Q.    I'm talking about one car.  You testified that AWB -- that Excell would sell a car to AWB, get the money, and then if it wanted it, it would buy it back. Let's just talk about one car, okay, all right?

A.    Okay.

Q.    Now, how would that work if no money was exchanged?

Page 500

A.    Because we have bill of sale.

Q.    I understand you had a bill of sale, but why would Excell give a -- do a transaction with AWB if no money changed hands?  What's the purpose of it?

A.    That's the nature of our business.

Q.    Exactly.  Thank you.

MR. FELDMAN:  Just some brief redirect, your Honor.

THE COURT:  You can take as much time as you want until the timer hits --

MR. FELDMAN:  No, I'm not worried about it. I'm going to be below my time, I know that.

REDIRECT EXAMINATION

BY MR. FELDMAN:

Q.    So, Mr. Breslin was just asking you some questions about the swaps versus sales and whatnot.  I'm just trying to understand something, let's put a time stamp on this, after November 2021, did the relationship with Excell Auto Group change?

A.    Yes.

Q.    Can you explain?

A.    Basically we change it to --

MR. BRESLIN:  It's outside of the scope of my cross.

THE COURT:  It is.  Sustained.

Page 501

BY MR. FELDMAN:

Q.   Okay.  I just want to understand, is Mr. Breslin talking about these deal jackets where there is a swap, and the -- but sometimes it could also be the repurchase of a vehicle.  Okay.  Can you explain why that occurred?

A.   Because basically all the banks, everything open, and we go back to normal business.

Q.   Okay, and this is what time period?

A.   Say again, I'm sorry.

Q.   What time was this?

A.   Sometime the end of November of 2021.

Q.   Okay, and when you say "normal business", what do you mean by that?

A.   Prior to that we have the corona issue, and we have health issue by Mr. Zankl, so we can't get to the bank to do wire transfer.

Q.   Okay.  So that's why we had the swaps?

A.   That's why we have the swap, and then go back to normal by the end of 2021.

Q.   Okay.  When you say "back to normal", you mean the exchange of money?

A.   Yes, sir.

MR. FELDMAN:  Okay.  Nothing further.

MR. BRESLIN:  May I cross on those two

Page 502

matters?

THE COURT:  Extremely short, yes.

RECROSS-EXAMINATION

BY MR. BRESLIN:

Q.    All right.  Is it your --

THE COURT:  Wait until you're at the podium, please.

BY MR. BRESLIN:

Q.    Are you saying, sir, that you were not able to wire money back and forth from the banks in 2021?

A.    In some point we cannot.

Q.    All right.  At what point were you unable to wire money from the banks?

A.    If you look in our bank records, in our bank records some of the wire go through, and some of them we are not -- you know, between getting the title, and getting some vehicles, so we just get paper tracks for everything with the bill of sale and everything.

Q.    Which bank would not allow you to wire money, and which months?

A.    It's not like they not allow us to wire money.  You've got to make appointment, and every -- don't forget it, every wire transfer I go by myself to the bank. We no do wire from my office.  I go personal to the bank, and I take for them all the paperwork so they can see all

Page 503

the bank records, and the check, and that's how we did it.

MR. BRESLIN:  Thank you.

THE COURT:  Mr. Feldman.

MR. FELDMAN:  Nothing further, Judge.  Thank you.

THE COURT:  You can step down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Where to next?

MR. MILLER:  Five-minute break?

THE COURT:  Sure.

MR. FELDMAN:  Actually, Judge, can we make it 10 minutes?  I think we're going to call our last witness.

THE COURT:  Sure.

MR. FELDMAN:  And so we're just going to get our notes ready, and I think (inaudible) --

THE COURT:  Yep, 10 minutes, that will be twenty past the hour.

MR. FELDMAN:  Thank you, your Honor.

(Thereupon, a recess was had, after which the following proceedings were had:)

THE COURT:  Thank you, everyone.  Please have a seat.

Mr. Miller.

Ms. Leonard, we're ready, right?

Page 504

ECRO:  Yes.

THE COURT:  Okay.

MR. MILLER:  Judge, Miller -- Jim Miller on behalf of the debtor, your Honor.  I know you missed listening to my melodic voice.

THE COURT:  I have.

MR. MILLER:  So, I am back.

THE COURT:  I have.

MR. MILLER:  I will be much more slowly in my speech than some other people, you know.

So, your Honor, what I'd like to do is a little housekeeping before we get started, because I think we were addressing this, Mr. Breslin had invited it yesterday, so we'll -- but we'll do it today.

The exhibits of the debtor, Mr. Breslin didn't object to the debtor's exhibits composite -- and I'll read off the exhibit numbers, and then match them to the --

THE COURT:  You just need to read off the exhibit numbers.

MR. MILLER:  Okay.

THE COURT:  Because they're identified in the filing.

MR. MILLER:  Yes, in the exhibit register.

THE COURT:  There is an outline, yep?

Page 505

MR. MILLER:  Okay.

MR. BRESLIN:  I don't have the list in front of me.  I wasn't prepared for this.  So, if I could just --

MR. MILLER:  Feel free to read my attorney/client privileged document here, Jerry.

MR. BRESLIN:  If you don't want me to look at it --

MR. MILLER:  If you can read that, Jerry, you'll get $10, because you can't read my handwriting, so that's okay, but --

THE COURT:  It's written in code, it's like --

MR. MILLER:  Yeah.

THE COURT:  -- Leonardo da Vinci.

All right.  Go ahead.

MR. MILLER:  They did not object to Exhibits 1 through 9.

THE COURT:  Are you able to confirm that while looking at his notes, Mr. Breslin?

MR. MILLER:  You know what, I'll get you -- do you want to see a copy of your objections?

MR. BRESLIN:  Yes, that would be great.

MR. MILLER:  Let me --

MR. BRESLIN:  Then I won't have to look at

Page 506

your --

MR. MILLER:  Let me help you, Jerry.

MR. BRESLIN:  -- notes.

No, all you had to do was tell me you were going to do this.

MR. MILLER:  I tell you what, John touched my files.  Just roll with me on this, it's true.

1 through 9 were not objected to.

MR. BRESLIN:  Fine, no objection 1 through 9.

MR. MILLER:  The highlighted ones --

THE COURT:  Debtor's 1 through 9, admitted.

(Thereupon, Debtor's Exhibits 1 through 9 were admitted into evidence.)

MR. BRESLIN:  (Inaudible) to 511 -- you said the highlighted ones are the ones you want to admit?

MR. MILLER:  No, those are the ones you objected to.  I don't know why but you did.

MR. BRESLIN:  I don't know what your exhibits --

MR. MILLER:  Well, no, the next exhibit I'm seeking admission of is Composite 14, which they did not object to, the general ledgers of the debtor.

MR. BRESLIN:  They're already in, right?

MR. MILLER:  They should be, but --

Page 507

MR. BRESLIN:  Yeah, they're in.

MR. MILLER:  I just want to make sure.

THE COURT:  Just in case, Debtor's 14 is admitted.

MR. BRESLIN:  14 is in.

(Thereupon, Debtor's Exhibit 14 was admitted into evidence.)

MR. MILLER:  26, Composite 26, the monthly operating report.

MR. BRESLIN:  That's fine.

MR. MILLER:  And 31 -- or, I'm sorry, 30, insurance policies.

MR. BRESLIN:  That's fine.

MR. MILLER:  Okay.

MR. BRESLIN:  That's it.

MR. MILLER:  We good?

MR. BRESLIN:  Thank you.

MR. MILLER:  Any time, Jerry.

Your Honor, at this point in time I would call Michele -- is there something else?

MR. BRESLIN:  No.

MR. MILLER:  Michele Martin to the stand.  I may take one of the hearing aids out because --

THE COURT:  Is there feedback?

MR. MILLER:  Huh?

Page 508

THE COURT:  Are you having feedback issues?

MR. MILLER:  I have, I've got all kinds of issues.

THE COURT:  I mean, we have these devices, but I have a funny feeling they would clash with the hearing aid.

MR. MILLER:  You have a listening device here?

THE COURT:  Yeah, you want to try it?

MR. MILLER:  Yes.

THE COURT:  Yes, try it.

MR. MILLER:  And I apologize, Judge, sometimes I struggle to hear you, because you're usually leaning back from the thing.

THE COURT:  I mean, see if they work.  Are you going to try this with the hearing aid?

MR. MILLER:  No, I'm going to take the hearing aid out.

THE COURT:  You're going to take them out?

MR. MILLER:  I have about 15 percent in the right ear, and about 30 percent in the left ear.

MR. FELDMAN:  Do you want to use mine?

MR. MILLER:  No, I don't want to use yours.

MR. FELDMAN:  I'm taking over the world, Judge, I'm taking over the world.

Page 509

MR. MILLER:  And going blind, I wear glasses.

THE COURT:  Did you get them at Hear USA? Because that's one of my former cases.

(Laughter.)

THE COURT:  All right.  So --

MR. MILLER:  That's why they don't work.

MR. FELDMAN:  It's actually a scam, what they were running, by the way.  Anyway --

THE COURT:  All right.

MR. MILLER:  I was -- what I was going to do is to try to dial in on my phone, and then wear AirPods to hear, but I've noticed that there is, like, a half-a-second delay between the communication I hear and what I see, so --

THE COURT:  And that would be really annoying.

MR. MILLER:  And then you would be, like, too late, too late, and too late.  Favorite word of the day.

THE COURT:  Oh, my gosh.  Well, you know -- it won't turn on?

ECRO:  There is a lot of feedback.  Say something.

THE COURT:  Hello.  Hello.  Testing.

Page 510

MR. MILLER:  I'm waiting.

THE COURT:  Testing.  Can you hear anything?

MR. MILLER:  You can't hear?

THE COURT:  Now we need the IT person.

MR. MILLER:  All right.  We'll go back to the --

THE COURT:  Okay.

MR. MILLER:  I have, like, multiple pairs of these, so -- believe it or not, these are the cheap ones, and they work better than the very expensive ones.

THE COURT:  They now have all kinds of ones that are becoming available without --

MR. MILLER:  You don't need prescriptions, yeah.

THE COURT:  -- prescriptions.  Yes, which would be good because they're extremely expensive.

All right.  Are we almost ready, and I'll swear Ms. Martin in.

MR. MILLER:  You can swear Ms. Martin in.

THE COURT:  All right.  Ms. Martin, would you please raise your right hand?

Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

MS. MARTIN:  I do.

Page 511

THE COURT:  Thank you.  Make sure you get her name on the record.

MR. MILLER:  Yes, I will, your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Good afternoon, Ms. Martin.  Can you please, for the record, state your full legal name?

A.   Michele Anne Martin.

Q.   How do you spell Michele?

A.   M-i-c-h-e-l-e.

Q.   Okay, and Martin, M-a-r-t-i-n?

A.   Yes.

Q.   Okay.  Ms. Martin, I'm going to try to cut to the chase, and try to get everybody out of here early. What -- do you have any affiliation with Auto Wholesale of Boca, which I'll refer to as the debtor from here on out, okay?

A.   I worked -- I do their books, I'm a subcontractor.

Q.   And how long have you worked there?

A.   Almost 10 years.

Q.   Okay, and, Ms. Martin, so you're continuing to work there since the bankruptcy was filed in this case?

A.   Yes.

Q.   Do you recall the date of that filing,

Page 512

roughly?

A. I believe it was around July 22nd, but I don't know the exact date off the top of my head.

Q. Of what year?

A. Oh, I'm sorry, 2022.

Q. Okay, and do you continue to maintain the books and records of the debtor postbankruptcy?

A. Yes, I do.

Q. Okay, and are you familiar with whether or not the debtor is compliant with maintaining insurance obligations postbankruptcy?

A. Yes, they are.

Q. Are they in compliance?

A. Yes, they are.

Q. Okay, and has the debtor been filing its monthly operating reports every month?

A. Yes.

Q. Okay, and has the debtor been operating as a business postbankruptcy?

A. Yes.

Q. And can you describe to the Court what type of business it has been performing postpetition -- postbankruptcy, I should say.

A. Okay. Well, we're trying to buy and sell cars. It's hard to find cars right now with all that's

Page 513

going on, but if we hear about a deal, we'll jump on it and buy the car, and sell it, and try and make a profit off of it.

Q.    And is there any other type of activity that the -- is the debtor also collecting rent perhaps?

A.    Yes.

Q.    Okay.  Is it collecting it every month?

A.    Yes.

Q.    Okay.  Is the debtor collecting any other income?  Has the debtor collected any other income other than from the rent, and from the sale of a car, any other sources of income?

A.    There is one person that we sold a car to that's making payments, and we get that every month.

Q.    So you get a monthly payment from a car that you sold to somebody else?

A.    Yes.

Q.    And that car was sold prepetition, prebankruptcy?

A.    Yes.

Q.    Okay, and to the best of your knowledge, as far as the debtor's bankruptcy schedules, Statement of Financial Affairs, are they -- have they been filed with the Court?

A.    As far as I'm aware --

Page 514

Q.    Okay.

A.    -- they have.

Q.    And has the --

ECRO:  Can you --

MR. MILLER:  Oh, lean in.

THE WITNESS:  I'm sorry.

THE COURT:  Or you can also move the microphone, to make it more comfortable.  Yep.

MR. MILLER:  That's actually a good point, I was -- I guess I was reading your lips, because --

THE COURT:  Why don't you try to get a lot -- Ms. Martin, for his benefit, why don't you try to get a lot closer to the microphone.

THE WITNESS:  Okay.  Is that better?

MR. MILLER:  Yes, that's perfect.

THE COURT:  You don't need to lean over. You can move it around if you wish.

MR. MILLER:  You can pull it to you, if you'd like.

THE COURT:  Yes.

THE WITNESS:  Okay.  How is that?

MR. MILLER:  Thank you.

BY MR. MILLER:

Q.    In regards to the operations of the debtor, are you aware of whether or not the Office of the United

Page 515

States Trustee, has it -- have you seen any complaints in writing from the Office of the United States Trustee since the filing of the bankruptcy?

A.   I haven't seen any.

Q.   Okay.  Have you seen or heard of any complaints from the Subchapter V Trustee, Ms. Leali?

A.   I have not.

Q.   Okay.  Outside of the fact that the debtor's inventory of vehicles have been frozen in place since the filing of the bankruptcy, has the debtor tried, though, to operate as a car buyer and seller?

A.   Yes.

Q.   Okay, and the car that was bought and sold postpetition, was that bought from Excell Auto Group?

A.   No.

Q.   Was that car bought from Karma of Palm Beach?

A.   No.

Q.   Was it bought from Karma of Broward?

A.   No.

Q.   Was it sold to Karma of Broward?

A.   No.

Q.   Was it sold to Karma of Palm Beach?

A.   No.

Q.   Was it sold to Excell Auto Group?

Page 516

A.    No.

Q.    Okay.  So was it sold to anybody affiliated with Scott Zankl or his family?

A.    No.

Q.    Was it purchased from anybody affiliated with Scott Zankl or his family?

A.    No.

Q.    Okay.  Since the filing of the bankruptcy has Auto Wholesale sold any of the automobiles that his Honor has directed to be retained by Auto Wholesale until further order of the Court?

A.    No.

Q.    Okay.  Are those automobiles that his Honor has directed to be maintained by the debtor, are they maintained in any particular place?

A.    Yes.

Q.    Where?

A.    They're located at 5471 North Dixie Highway in Boca Raton.

Q.    Okay, and is this a premises that the debtor owns or leases?

A.    We lease.

Q.    Okay.

A.    They lease.

Q.    And are we timely on our monthly payments

Page 517

for that?

A.    Yes.

Q.    Okay, and aside from paying for the monthly maintenance, are we paying for any type of insurance coverage for these automobiles?

A.    Yes.

Q.    Okay.  Has any of the insurance coverage lapsed since the filing of the bankruptcy that's not been renewed?

A.    No.

Q.    Okay.  To the best of your knowledge is the debtor compliant in the maintenance of books and records in regards to the Florida Department of Highway Safety and Motor Vehicles requirements?  You refer to it sometimes as the DMV?

A.    Can you repeat that, please?

Q.    Yes.

To the best of your knowledge is the debtor, Auto Wholesale of Boca, in compliance with the records maintenance requirements of the Florida Department of Highway Safety and Motor Vehicles?

A.    Yes.

Q.    Okay.  I know some people get confused over Department of Highway Safety and Motor Vehicles and DMV.  So, it's really one in the same.

Page 518

In your duties as the bookkeeper for the debtor, historically, have you assisted in the tax return preparation of the debtor?

A.    I gave our accountant access to our QuickBooks records, and he did the taxes.

Q.    So he does the account -- the tax returns based upon the QuickBooks --

A.    Correct.

Q.    -- maintained by the debtor?

A.    Yes.

Q.    And who makes the entry into the QuickBooks for the debtor?

A.    I do.

Q.    Okay, and to the best of your knowledge has the IRS ever audited the debtor?

A.    No, not that I'm aware of.

Q.    Okay, and has the Florida Department of Revenue ever sent any type of deficiency notice to the debtor for failure to pay sales tax?

A.    Not that I'm aware of.

Q.    But are there times in which the debtor has sold automobiles to consumers, or end-users, and had to collect sales tax?

A.    Yes.

Q.    And does it pay that sales tax to the State

Page 519

of Florida then?

A.    Yes.

Q.    Okay, and it files a tax return with the State of Florida?

A.    Excuse me?

Q.    It files a tax return with that State of Florida?

A.    A sales tax return or a tax return?

Q.    A sales tax return.

A.    Yes.

Q.    Okay.

MR. MILLER:  Okay.

UNIDENTIFIED:  We're walking on egg shells with this witness.

MR. MILLER:  Nothing further, your Honor.

THE COURT:  What was that?

MR. MILLER:  That is it, nothing further. Would you like --

THE COURT:  No, no.

MR. MILLER:  I've never been accused of being too quiet.

CROSS-EXAMINATION

BY MR. BRESLIN:

Q.    Ms. Martin, you testified that you were the bookkeeper for AWB, and have been the bookkeeper for many

Page 520

years, correct?

A.    Yes.

Q.    And you were the bookkeeper for the company just prior to the filing of this bankruptcy?

A.    Yes.

Q.    And there has been testimony about the creation of an antecedent debt file in the books and records of AWB just before the bankruptcy was filed.  Are you familiar with that?

MR. MILLER:  Objection, scope.

THE COURT:  I don't think I heard about that on direct.

MR. BRESLIN:  No, Judge, there was a very, a very confined direct.  I'd like a little latitude --

THE COURT:  Okay.

MR. BRESLIN:  -- if I could?

THE COURT:  You could have called her.  You did not call her.

MR. BRESLIN:  And I still can --

THE COURT:  Sustained.

MR. BRESLIN:  -- on rebuttal.

THE COURT:  Okay.  You can try that, but right now you're cross-examining her.

MR. BRESLIN:  Right.

BY MR. BRESLIN:

Page 521

Q.    Okay.  Let's talk about the DMV.  You said that the company was in -- it maintained that it was within the requirements of the regulations of the Department of Highway and Motor Vehicles, correct?

A.    To the best of my ability.

Q.    Okay.  Now, are you aware of whether or not an automobile dealer is permitted -- one automobile dealer is permitted to hold its inventory or cars for sale on the lot of another automobile dealer?

A.    I don't know.

MR. BRESLIN:  That door was open, I believe.

THE COURT:  And if she knows the answer, he asked if she's aware.

I don't know if you answered the question.

THE WITNESS:  Oh, yes, I did, I said I don't know all the laws for the DMV.

THE COURT:  Okay.

MR. BRESLIN:  Can I have just one minute?

THE COURT:  Sure.

MR. BRESLIN:  I have no further questions.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. DORSEY:

Q.    Ms. Martin, you testified earlier that the

Page 522

debtor was trying to buy and sell cars during its bankruptcy case, is that correct?

A.   Can you, please, speak a little bit louder?

Q.   Sorry, I'm too tall.  I need a book to put under this.

You testified earlier that the debtor was trying to buy and sell cars during its bankruptcy case, is that correct?

A.   Yes.

Q.   Could you elaborate as to what the word "trying" means?

A.   Well, we're looking for cars, and if we find something that's a good deal, that we can afford to pay for at the moment, they would buy it, and then they would turn around and sell it.

Q.   Okay.  How many cars has the debtor actually bought and sold postpetition?

A.   We sold one.

Q.   Okay.  So, it's been trying since last July and it sold one car?

A.   Yes.

Q.   Okay.  You said the debtor collects rent?

A.   Yes.

Q.   Approximately, how much in rent does it

Page 523

collect every month?

A.    I think it's somewhere around $7,000, but I wouldn't swear to that.

Q.    Well, you are under oath, ma'am, but --

A.    I know, but --

Q.    -- point taken.

A.    -- I wouldn't swear that I'm accurate on that.

Q.    Okay, and you said there was a monthly payment from a car sold prepetition?

A.    Yes.

Q.    Approximately how much is that monthly payment?

A.    That's $5,054.

Q.    Okay.  So besides the approximate $7,000 in rent, and $5,000 in car payments, does the debtor have any other sources of income?

A.    (No verbal response.)

Q.    I'm sorry, are you waiting for me or are you thinking?

A.    No, I'm thinking.

Q.    Oh, take your time, I'm sorry.

A.    Not steady income, no.

Q.    Okay.  What expenses, monthly expenses does the debtor have?  You mentioned, for example, insurance

Page 524

payments, rent payments.  Can you --

A.    Insurance payments, rent payments.

Q.    Can you just quickly itemize the amount of monthly expenses the debtor has?

A.    Excuse me?

Q.    Could you quickly itemize, if you can, the monthly expenses the debtor has, what each expense is, and the approximate amount of that expense?

A.    We pay 10,031, approximately, in rent. There is electric.  There is actually two electric bills that we pay because there is two separate meters.

Q.    Do you recall the approximate amount of that?  I don't need it down to the nickel.

A.    One small, about $80, and one is a little larger, usually about 2, $300.  However, we did just have to pay a deposit, they requested a deposit in the amount of approximately $800, and then they pay me.

Q.    How much is your salary?

A.    750 a week I get.

Q.    3,000 a month, give or take?

A.    Okay, give or take.

Q.    Insurance?

A.    Yes.

Q.    How much is the insurance?

A.    The insurance for the $4.9 million policy is

Page 525

about $4,600.  We just renewed the other policy, and I haven't seen the new finance agreement yet, and I haven't paid any of it yet.  So, I really don't know.

Q.    Okay.  Is it --

A.    But it will be probably anywhere from 1,000 to $1,500.

Q.    Is it fair to say that the debtor is cash flow negative on a month-to-month basis?

A.    Yes.

Q.    Okay.  Are you aware that last December the debtor's counsel was awarded $159,000, approximately, in interim fees?

MR. MILLER:  Outside the scope, Judge.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat that?

BY MR. DORSEY:

Q.    Are you aware that last December the Bankruptcy Court awarded Mr. Miller approximately $150,000 in interim compensation?

A.    I know that he was awarded, but I don't remember the exact amount.

Q.    Does Mr. Miller submit monthly invoices to the debtor, or otherwise keep the debtor apprised of fees he is accruing?

A.    No.

Page 526

Q.    So do you have any idea how many fees Mr. Miller has accrued in 2023 on behalf of the debtor?

A.    No.

Q.    Are you aware that the court last December awarded the Subchapter V Trustee approximately $25,000 in interim compensation in this case?

A.    Yes.

Q.    The last question, do you have any experience in valuing cars or appraising cars?

MR. MILLER:  Objection, outside the scope.

THE COURT:  Sustained.

MR. DORSEY:  No further questions.

MR. FELDMAN:  Your Honor, if I can inquire?

We have no redirect, I apologize.

THE COURT:  You can step down.  Thank you. You can step down.  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Is Ms. Martin excused?  Yes, no?

MR. FELDMAN:  Yes.

THE COURT:  Okay.  Yes?

MR. BRESLIN:  Yes, your Honor.

THE COURT:  Yes.  Thank you, Ms. Martin.

MR. FELDMAN:  Your Honor, can I just find

Page 527

out where we are on time right now on both sides?

THE COURT: Two hours forty-one minutes on the debtor's side. Six hours, almost thirty minutes on the movant's side.

MR. FELDMAN: Okay. Thank you, your Honor. May I just confirm with Mr. Miller real quickly?

THE COURT: Sure, it's your time.

MR. FELDMAN: Your Honor, the debtor rests.

THE COURT: Very good.

MR. BRESLIN: Can we have five minutes, Judge? I don't believe I'm going to have any rebuttal, but I'd like to consult with counsel.

THE COURT: Sure. Yes, of course. We'll take a recess. It's almost 2:50. Let's go to 3 o'clock. I'll see you at 3:00.

(Thereupon, a recess was had, after which the following proceedings were had:)

THE COURT: Okay. Ms. Leonard, let me know when we're all set.

ECRO: We're all set.

THE COURT: All right. Very good.

Mr. Breslin.

MR. BRESLIN: Thank you, your Honor. We have no rebuttal.

Page 528

THE COURT:  Very good.

All right.  So should we plan then for when the closing argument will be?

MR. BRESLIN:  Yes, your Honor.

THE COURT:  Have you all talked to Ms. Leonard during any of the breaks?

MR. BRESLIN:  No, your Honor.

THE COURT:  How soon from now do you wish it to be, Mr. Breslin?

MR. BRESLIN:  10 days.

THE COURT:  Okay.  Mr. Feldman?

MR. FELDMAN:  I assume -- I'm sorry. Assuming no one is ordering the transcript, that's perfectly fine, but if Mr. Breslin is anticipating ordering the transcript, then I think doing it at a normal price, it usually takes about 10 days, and I think we'd want five days after, but at least as we sit here, we don't intend to -- anticipate ordering the transcript. So --

THE COURT:  Okay.  So after all that, 10 days is probably fine.

MR. MILLER:  Are you assessing us that time, Judge?

THE COURT:  I mean, I -- well, it doesn't matter anymore.  Oh, this, during right now, yes.  No, I'm

Page 529

not.

MR. FELDMAN:  Your Honor, can I just say 10 days, let's say April 10th, that's a little bit more than 10 days, but I just have a -- I just got back from vacation, so I have a couple of commitments that I'm trying to catch up with.

THE COURT:  Understood.

MR. BRESLIN:  Judge, are you going to put it on, like, one of your regular --

THE COURT:  No.

MR. BRESLIN:  -- court days?

THE COURT:  No, I'll put it on a separate day.

MR. BRESLIN:  Yes, we're going to order the transcript.  So figure that's going to take a week.

THE COURT:  Or more, there is no reason to do a rush on the transcript.

MR. BRESLIN:  Right.  Thank you.

So, what, like, if you want to set it, like, the week of --

THE COURT:  Don't say the 17th, because I have four days of trial that week.

MR. FELDMAN:  And I actually have trial that week, too, Judge.

THE COURT:  Okay.

MR. FELDMAN:  I'm actually, your Honor, just so you're aware, I am set for a three-week jury trial period in Broward for a 2018 case, and Judge Howery in that case, we just survived summary judgment.  So Judge Howery advised us it's highly likely we're going to trial during that three-week trial period.

I have my calendar call next Monday.  So, I'll know specifically what week we'll be in, but once I find that out, I can commit specifically during that time period, but otherwise it's a little bit dangerous for me to say I'm available.

THE COURT:  Well, how about the 13th?  Is that enough time?

MR. FELDMAN:  Yes.

MR. BRESLIN:  Yes.

THE COURT:  That would be 16 days, I think.  So you should be able to get a transcript.  All right.  Let's do 9:30 a.m. on the 13th.

MR. FELDMAN:  Your Honor, with one caveat, that is my trial week in Broward.

THE COURT:  Okay, and then if you have that, file a motion to continue.

MR. FELDMAN:  Sure, that's great.  Thank you, your Honor.

MR. BRESLIN:  I have another trial for sure

Page 531

coming up.  I just don't know when, but if it happens to be then, Judge, I'll certainly let you know.

MR. FELDMAN:  Thank you.

THE COURT:  Right, and then we can -- if we have to, then I'll have Ms. Leonard get on the phone with both of you, and then try to narrow it down, and anybody else who wishes to --

MR. BRESLIN:  Mine is only going to be a day or two, it's not a long one.

THE COURT:  Your closing argument will only be a day?

MR. BRESLIN:  Your Honor, my trial, my trial.

THE COURT:  I couldn't help myself, I couldn't help myself.

Well, I did have one closing argument that took the whole day not long ago, I think.  I'm not encouraging you, and that won't happen.

MR. SOFTNESS:  Judge, I read your order and --

THE COURT:  Which order?

MR. SOFTNESS:  -- thought I understood (inaudible) -- are we going to be submitting --

THE COURT:  No.

MR. SOFTNESS:  -- in advance of this

Page 532

hearing?

THE COURT:  No.

MR. SOFTNESS:  Just bring ourselves --

THE COURT:  Bring yourselves.

MR. SOFTNESS:  -- and our (inaudible).

THE COURT:  And I wish you to walk through the evidence that you believe supports the relief requested, and then the debtor will explain to me why you're wrong, but it's important to point to the evidence, and I find it very useful to have the back-and-forth on what we've heard in the last two days.  That was -- I just saw myself on camera.  So this is me doing Mr. Feldman.

MR. BRESLIN:  Daniel, I'm going to need you here that day, okay?

MR. FELDMAN:  Your Honor, if I can inquire? I just have a brief issue.

Does your Honor have any unpublished decisions on the applicable standard for 1112, 11 USC --

THE COURT:  Oh, my gosh, not that I know of.

MR. FELDMAN:  Okay.

THE COURT:  We -- I don't know if you realize this, you do -- you were a law clerk at one point, were you not?

Page 533

MR. FELDMAN:  Judge Mark 2004 to '6, but that was the old website.

THE COURT:  Well, it's not the website.  If we have anything that has analysis in it, usually something beyond what's tendered at the motion calendar, it goes on the website and then Westlaw takes it.  So, they're not published.

MR. FELDMAN:  Okay.

THE COURT:  They're unpublished, but they're all there.

MR. FELDMAN:  Okay.

THE COURT:  So it should be that anything that has discussion that I've written in the last 14 years --

MR. FELDMAN:  Okay.

THE COURT:  -- should already be on Westlaw, because I'm usually pretty diligent about designating them as tagged.  So, we'll see.

The website, I think -- did we stop putting things on the website because of that?

MR. FELDMAN:  I've heard rumors that they stopped.

UNIDENTIFIED:  Yes, there is nothing on the website.

THE COURT:  Okay.

Page 534

UNIDENTIFIED:  The website sends you to a (inaudible) --

THE COURT:  All right, and I see somebody giving me on the -- it's on the national website.  Oh, apparently there is a national website.  Okay.  Try Westlaw.

MR. FELDMAN:  Okay.

THE COURT:  Yes.

UNIDENTIFIED:  (Inaudible.)

THE COURT:  Correct.

UNIDENTIFIED:  (Inaudible.)

THE COURT:  Yes.

UNIDENTIFIED:  Would you like us to do that verbally?

THE COURT:  Yes, yes.  As you walk through, I want you to point to what supports each of your statements.  I don't mean with tiny citations, necessarily, and we can have back-and-forth, and if there is disagreement about what somebody testified, for example, you should be prepared to tell me what component of the transcript that I would need to look at in order to understand your view.

If after that you still think that briefing is useful, I will talk to you about it on that date.

UNIDENTIFIED:  Thank you, Judge.

Page 535

THE COURT:  All right.  Anything else?

(No verbal response.)

THE COURT:  Great.  That's it, we're done.

MR. MILLER:  I guess we'll find out some other day if those headphones work?

THE COURT:  What's that, if what?

MR. MILLER:  If the headphones work.

THE COURT:  Well, we need to get IT in, because they do need to work.  I mean, we have used them before.  They work on a -- there is little sensors around the room that send -- they're, like, by light, right?  Yeah.

MR. MILLER:  I know that Judge -- the last I ever saw those used was years ago in the old Claude Pepper Federal Building, Judge Cristol used to invite, like, I think it was Ukrainian or Russian judges, and they had those for interpreters.

THE COURT:  Oh, really?

MR. MILLER:  Yeah.

THE COURT:  All this does is rebroadcast the sound in the room.  It's the same thing that goes to the speakers, and we have used it because we've had people who we've offered them to.

All right.  Clearly I'm not necessary anymore.

Page 536

MR. MILLER:  Have a good day.

MR. FARACHE:  Thank you.


(Thereupon, the hearing was concluded.)

Page 537

CERTIFICATION

STATE OF FLORIDA          :

COUNTY OF MIAMI-DADE   :


I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

WITNESS my hand this 5th day of April, 2023.




_____

CHERYL L. JENKINS, RPR, RMR

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #HH 170910
December 27, 2025