# EXHIBIT B

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 22-15627-EPK

IN RE:

   AUTO WHOLESALE OF BOCA, LLC,

      Debtor.
_____/

**EXCERPT FROM PROCEEDINGS**
ORAL RULING

MOTION TO DISMISS OR CONVERT CHAPTER 11 CASE (390)

May 1, 2023

          The above-entitled cause came on for hearing before the Honorable ERIK P. KIMBALL, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler Drive, West Palm Beach, Palm Beach County, Florida on May 1, 2023, commencing at or about 9:30 a.m., and the following proceedings were had:

          Transcribed from a digital recording by:
          Anna M. Meagher, Stenographic Reporter

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 2

APPEARANCES:

Phang & Feldman, P.A., by
Jonathan S. Feldman, Esquire
On behalf of the Debtor
Email: Feldman@katiephang.com


James B. Miller, P.A., by
James B. Miller, Esquire
On behalf of the Debtor
Email: Jbm@title11law.com


Schwartz Breslin, PLLC, by
Jerrell A. Breslin, Esquire
On behalf of FVP Investments, LLC,
FVP Opportunity Fund III, LP, and FVP Servicing, LLC
Email: Jb@jsjb.law


David R. Softness, P.A., by
David R. Softness, Esquire
On behalf of FVP Investments, LLC,
FVP Opportunity Fund III, LP, and FVP Servicing, LLC
Email: David@softnesslaw.com


Shraiberg Page, P.A., by
Patrick R. Dorsey, Esquire
Bradley S. Shraiberg, Esquire
On behalf of Franklin Capital Funding, LLC
Email: Pdorsey@slp.law
Email: Bss@slp.law


Scott C. Gherman, P.A., by
Scott C. Gherman, Esquire
On behalf of Calvin Erbstein, Moshe Farache
and the Farache Entities
Email: Sgherman@scottghermanpa.com


Linda Marie Leali, Subchapter V Trustee
Email: Trustee@lealilaw.com

- - - - - - -

Page 3

THE COURT:  We're here in Auto Wholesale of Boca. If I could have appearances, let me start with the debtor's counsel.

MR. FELDMAN:  Good morning, your Honor.  Jonathan Feldman and Jim Miller on behalf of the debtor.

THE COURT:  Good morning.

Mr. Softness.

MR. SOFTNESS:  Good morning, Judge.  David Softness for the FVP parties.  With me in the courtroom is Jerry Breslin and Jonathan Schwartz.

THE COURT:  Gentlemen, good morning.

UNIDENTIFIED SPEAKER:  Good morning, Judge.

MR. DORSEY:  And good morning, Judge.  Patrick Dorsey on behalf of Franklin Capital Funding, LLC.  Brad Shraiberg is in the court as well.

THE COURT:  Gentlemen, good morning.

MS. LEALI:  Good morning, your Honor.  Linda Leali, I'm the Subchapter V trustee that was appointed in this case.

THE COURT:  Thank you.  Good morning.

MR. GHERMAN:  Good morning, your Honor.  Scott Gherman on behalf Calvin Erbstein, Mr. Farache personally and various Farache entities.

THE COURT:  Thank you.  Good morning.

* * * * * * * * * * * * * * * * * * * *

Page 4

THE COURT:  Please have a seat.

Ms. Leonard, please let me know when we're all set.

THE CLERK:  All set.

THE COURT:  Good.  Thank you.

All right.  This is my ruling on ECF No. 390, which is FVP's motion to dismiss or convert to Chapter 7, as joined in by Franklin Capital Funding, LLC at ECF No. 428. Various other parties joined in the motion at ECF Nos. 399, 407, 3 -- excuse me, 418, 419, 424, and 428, but only Franklin Capital appeared at the hearing to prosecute its joinder.  I held a two-day evidentiary hearing on the motion on March 27 and 28, 2023 and entertained closing arguments today, May 1, 2023.

In preparation for this ruling, I considered the motion, Franklin Capital's joinder, the debtor's response, FVP's reply, the evidence admitted at the evidentiary hearing, and arguments of counsel.  In addition to presiding over the evidentiary hearing, I reviewed the transcript and all relevant documents that were admitted during the hearing.  Some documents in the parties' exhibit registers were not admitted during the hearing.  I have not considered any of those documents, except to the extent they were read into the record, or there was testimony on material components of such documents.  I carefully considered the

Page 5

testimony of witnesses both in person, during the evidentiary hearing, and when reading the transcripts.

It's useful in this case to comment upfront on the demeanor and credibility of the witnesses who testified. The financial experts called by the parties, Richard Gray and Joel Glick, were both businesslike and credible. That's not to say I found their testimony equally useful, as that was not the case. The debtor's bookkeeper, Michelle Martin, also testified. She appeared credible, but did not provide particularly useful testimony. Marc Brandes, a lawyer who represents the debtor in state court litigation, was called by the movant. Mr. Brandes was credible.

Scott Zankl, a principal of the Karma entities and EXCEL was credible throughout his testimony. Not only did his demeanor indicate that his statements on material issues were truthful, but his description of the history of the debtor's business relations with his own entities is consistent with the documentary evidence and other credible testimony.

I also preside over the Chapter 7 case of EXCEL, an entity previously controlled by Mr. Zankl. I am, of course, aware of allegations that Mr. Zankl used EXCEL and the Karma entities to defraud others. To date I am not aware that any of those allegations have been proven, but here, again, I have no reason to doubt his testimony

Page 6

regarding the transactions between this debtor and Mr. Zankl's entities, as his testimony is well supported by other evidence.

I found Kristin Zankl to be an important witness in this matter. The entirety of her testimony was forthright and truthful. Her testimony was consistent with the documentary evidence. From the moment Ms. Zankl entered the courtroom, it was obvious she was intimidated by Moshe Farache, the debtor's principal. Mr. Farache sat at the counsel table closest to the witness box and in the chair closest to the witness. For the entirety of her testimony, Ms. Zankl canted her body to her right, away from Mr. Farache. She avoided looking at him. Mr. Farache stared at her unblinkingly nearly the entire time of her testimony.

The debtor's principal, Moshe Farache, also testified at length. Mr. Farache may have little formal education, but he is an intelligent business person, who has amassed some wealth. He has difficulty reading English and has some apparent limitations in speaking and understanding English. Nevertheless, his ability to comprehend simple questions differed greatly depending on who was asking the questions. When questioned by debtor's counsel, he was quick to understand and answer swiftly. When questioned by movant's counsel, he feigned misunderstanding, evaded

answering simple inquiries, no matter how many times the question was rephrased, and claimed ignorance of basic business matters concerning the debtor.

Having watched Mr. Farache testify in this matter and studying his testimony in light of the documentary exhibits and other testimony elicited during the evidentiary hearing, I conclude that Mr. Farache would say whatever he thought necessary to defend his position in this case without regard to its truth.  Note that I said "his" position, not that of the debtor, as I believe most of Mr. Farache's actions in this case, including his testimony in this particular matter, are aimed at protecting personal interests.

The parties dispute whether the debtor is a wholesale car dealer, as its name would imply, or a lender. The question for the Court is not whether the debtor is exclusively or even primarily one of those things.  Although I think the evidence is pretty clear on the answer to that. The real questions are why is the debtor here in this Chapter 11 case, and what does the debtor hope to achieve by remaining in Chapter 11?

Mr. Farache and Mr. Zankl met more than a decade ago.  At the time Mr. Zankl had a small enterprise buying and selling high-end vehicles.  Mr. Farache had acquired a building that had better suited Mr. Zankl's growing needs,

Page 8

and Mr. Zankl leased the space.  With more showroom area to fill and inadequate capital, Mr. Zankl soon obtained financing from Mr. Farache.  Thus started a decade-old lending relationship.

Mr. Farache protests that debtor is actually licensed as a wholesale auto dealer in the State of Florida and has had purchase and sale transactions with entities other than EXCEL or the Karma entities.  Undoubtedly that is true.  But there is scant evidence regarding such transactions.  This is one of the topics Mr. Farache assiduously avoided testifying on, feigning ignorance of the exact numbers.  The more credible evidence suggests that the debtor's true vehicle transactions, not involving one of Mr. Zankl's entities, particularly in the few years prior to this bankruptcy, were minimal compared to its real enterprise, which was lending money to Mr. Zankl.

Mr. Farache made a lot of money from his transactions with Mr. Zankl.  Mr. Zankl testified credibly regarding his company's monthly interest payments to Mr. Farache, which were quite large compared to Mr. Zankl's debt balance.  Mr. Farache claims that those payments included interest payable under two secured promissory notes and also payments under a profit sharing arrangement on certain vehicles.  But in his own testimony, Mr. Farache concedes that there was a minimum monthly payment on the

Page 9

alleged profit sharing arrangement.

It appears the movant wanted to introduce expert testimony in the form of a deposition on the issue of usury. I excluded that evidence. I don't need an expert to tell me that the payments credibly described by Mr. Zankl in relation to the actual outstanding advances likely represent usurious transactions. But it is not necessary for me to make any formal ruling on that issue today. It is enough that Mr. Farache received very substantial sums from Mr. Zankl's entities over a period of years, and it is clear that those payments arose from a lending arrangement.

Over the years Mr. Farache tried to protect his loans by different methods. Initially he obtained two promissory notes that included grants of liens on the inventory of EXCEL, but these notes did not cover all of Mr. Farache's advances. In 2021 each time one of Mr. Zankl's entities acquired a new vehicle, Mr. Zankl and the debtor would exchange paperwork making it look like the vehicle was transferred to the debtor, typically via EXCEL, until Mr. Zankl found a buyer and then the vehicle would be transferred back, again, typically through EXCEL, to facilitate the sale. No money exchanged hands between the debtor and Mr. Zankl's entities. Mr. Farache apparently felt the debtor would be protected by paper ownership of Mr. Zankl's inventory, in lieu of properly perfected liens.

Page 10

I note that all the vehicles remained in the possession of Mr. Zankl.

By late 2021 Mr. Zankl sought financing from several other sources, including the movant, FVP.  In late 2021 knowing that Mr. Zankl was about to receive substantial new money from FVP for the benefit of the Karma entities, Mr. Farache terminated his UCC financing statement covering assets of the Karma entities.  It is unclear why he had a financing statement covering the Karma entities, as his promissory notes and lending arrangements appear to have focused on EXCEL.  But Mr. Farache terminated the UCC to make way for FVP.  Mr. Farache knew that FVP intended to obtain a lien on all of Mr. Zankl's auto inventory, which by that time was bought and sold almost exclusively through the Karma entities.

In 2022 Mr. Farache decided to try to strengthen his position with Mr. Zankl by not only papering the transfers of Karma's newly acquired vehicles in the name of the debtor, but by having the debtor actually pay for some of the vehicles.  Karma would acquire a new vehicle, which would in most cases flow through EXCEL to the debtor, and the debtor would, in some cases, pay the purchase price. Then when Karma sold the vehicle to a customer, the transactions would be reversed, the debtor selling the vehicle for, typically, the exact same value as its original

Page 11

purchase price.  During closing argument there was a suggestion that after sales, Mr. Zankl would provide profit sharing to Mr. Farache, but I received no credible evidence to support that contention.

Why would Mr. Farache insist on this change of transactions?  Because he knew FVP claimed a security interest in all vehicles obtained by Karma.  He was trying to defeat FVP's interest in the vehicles.  Why would the debtor repeatedly buy a vehicle and then sell it for the exact same price?  Because the sole purpose of this arrangement was to provide Mr. Farache with the appearance that the debtor was the owner of the vehicles and not just a security lender.

Everything fell apart in late March and early April 2022.  Mr. Farache came to believe that EXCEL and Karma would be raided by federal agents.  He went to Mr. Zankl's showroom late on Friday night, April 1st, and again on Saturday morning, April 2nd, and took all of the vehicles in the lot, other than a handful of low-speed electric vehicles called Mokes.  Mr. Farache took vehicles without regard to whether they were, in fact, owned by EXCEL or the Karma entities.  He took vehicles that had already been sold to others.  He took vehicles that were present only for repair.  He took vehicles held under consignment. He took them all.  Mr. Farache also insisted that all of the

Page 12

titles be endorsed in favor of the debtor.  He obtained those titles based on the promise that he would return titles to vehicles that the Karma entities had already sold to customers.  He never followed through on that agreement.

Mr. Farache lied under oath about various aspects of this history.  For example, he claimed he did not execute Movant's Exhibit 34, which clearly indicates that the debtor is a lender.  Although Movant's Exhibit 34 was not admitted in evidence, material portions of it were read into the record, and both Moshe Farache and Kristin Zankl testified about it.  Ms. Zankl testified credibly that Mr. Farache signed it in front of her on the night he began removing the vehicles from the showroom.  Mr. Farache testified that the signature on the document is not his.  I did not believe him.  Mr. Farache testified in this evidentiary hearing and previously that Kristin Zankl offered him the vehicles, that she specifically told him to come take them away.  Ms. Zankl testified she did no such thing.  Ms. Zankl testified that she was afraid of Mr. Farache and let him do as he please out of fear.  I believe her.  I do not believe Mr. Farache.

Contrary to a mountain of documentary and testimonial evidence, Mr. Farache insists the debtor is really a wholesale car dealer.  In support he points to the fake transactions he insisted on in an effort to protect his advances to Mr. Zankl.  Mr. Farache claims the debtor has

Page 13

bought and sold cars with other parties, but provides no evidence to support that, other than his and Mr. Glick's vague testimony.

Mr. Gray thoroughly described the actual nature of the transactions between the debtor and Mr. Zankl's companies.  His testimony was consistent with that of Mr. and Ms. Zankl and the documentary evidence.  I credit his opinion that the debtor is mostly a lender and only occasionally a wholesale car dealer.  Although I easily come to that conclusion myself based on the other credible evidence.

Mr. Glick's expert testimony for the debtor was less helpful.  If you pay close attention to his testimony, you will see that it is quite narrowly stated.  In sum, he says only that the debtor's accounting records indicate that the debtor is a buyer and seller of cars.  The reason the debtor's accounting records are consistent with buying and selling of cars and reflect relatively little interest income is because the debtor hoped to hide its true business in those transactions and likely falsified its tax returns as well.  The accounting records that Mr. Glick relied on are a sham that only a detailed forensic review is likely to untangle.  In contrast Mr. Gray looked to outside data and bank records.

After Mr. Farache took Mr. Zankl's entire

Page 14

inventory of high-end vehicles, he caused the debtor to file suit in state court.  In that suit the debtor initially, specifically, sought to collect unpaid loans by realizing on its collateral, meaning the cars then in Mr. Farache's possession.  Mr. Farache disowns that suit as mistakenly stated, testimony that I did not find credible.  It suited him at the time to be truthful about his relationship with Mr. Zankl's entities.  Apparently, now it does not.

When the movant here managed to obtain a state court order freezing the cars in Mr. Farache's possession, this bankruptcy case soon followed.  What has happened since the filing of the petition last summer?  Well, that's a very interesting question.  Did the debtor swiftly pursue the sale of its claimed existing inventory to obtain rulings that the debtor owns the vehicles and has the power to sell them?  No, it did not.  Did the debtor file an adversary proceeding seeking similar relief?  No, it did not.  Did debtor obtain other capital to buy and sell vehicles?  No. Instead, the debtor waited for the various secured creditors to file suit against the debtor in an extremely complex proceeding.

In spite of the statements of the Subchapter V trustee, I suspect that the debtor failed to take charge of this case, because it hoped that the extreme cost of the alternative would bring the movants and others to the

negotiating table.  The litigation in this court has certainly cost all the parties and the estate a lot of money and created substantial delay.  But it did not cause parties in interest to cave.

Financially what is the debtor's condition at this point in the Chapter 11?  The debtor has sold a single vehicle during this case.  The debtor has very little regular income, including rent and payments on a single car. The debtor has substantial monthly expenses, particularly for insurance, and has incurred large administrative expenses in this case.

What is this bankruptcy case really about?  Just as Mr. Zankl's business was about to collapse, Mr. Farache took Mr. Zankl's entire inventory for himself, under circumstances where Mr. Farache knew at a minimum that certain individuals had already paid for some of those cars and that FVP claimed a lien on those cars.  Is the debtor owed a lot of money?  Perhaps.  Does the debtor rightly own all of the vehicles it has held hostage for more than a year?  Probably not.  Who is this case designed to protect? Mr. Farache.

This case is about protecting the interests of the debtor's principal and his family and no one else. Mr. Farache should not be in charge of a debtor-in-possession.  The debtor has a fiduciary duty to

Page 16

all creditors.  Mr. Farache's actions show that his only goal is to protect himself.  Nor should anyone willing to testify falsely before this Court maintain control over a debtor-in-possession.

I find there is cause under Section 1112(b) for several independent reasons, each of which is sufficient for relief under that provision.  The debtor's monthly expenses greatly exceed its income.  In addition, the debtor has incurred very large administrative expenses.  This case is administratively insolvent at present.  The debtor has no ability to rehabilitate.  The debtor has not shown, before or during this case, that it has the ability to operate as a true auto wholesaler.

In the years leading to this bankruptcy case, the debtor was used primarily to capitalize on Mr. Farache's relationship of Mr. Zankl, by making loans and receiving substantial interest payments.  That relationship has come to an end.  The debtor's substantial and continuing loss and inability to rehabilitate constitute cause under Section 1112(b)(4)(A).

Mr. Farache's actions in prosecuting this bankruptcy case, indeed, in stonewalling everyone and failing to actually move the case forward, coupled with this obvious goal of protecting only his own interests over those of creditors, constitute gross mismanagement.  That is cause

under Section 1112(b)(4)(B).  The list of examples of cause in Section 1112(b)(4) is not exhaustive.  There are two additional and also independently sufficient bases for cause in this case.  Mr. Farache is consistently not acting as fiduciary for creditors.  Indeed, he has shown himself as the antithesis of a fiduciary.  Under no circumstances should Mr. Farache remain in control of this bankruptcy case.  This is by itself cause under Section 1112(b).

Finally, this entire bankruptcy case was filed and is being pursued in bad faith.  This case is not about realizing the best recovery for creditors.  This case is about protecting a number of high-end vehicles that Mr. Farache absconded with, knowing of the various claims of others.  I do not need to find today that the debtor does not own any of the vehicles in its possession, or even that debtor does not own a substantial number of them.  The evidence admitted in this matter is sufficient to show that the debtor has very weak and probably no claim to ownership of a number of those vehicles.  It would not surprise me if the debtor in the end can claim no ownership at all.

It does not change my mind that the debtor has previously agreed to release several vehicles for which others had paid prior to Mr. Farache's late night raid of Mr. Zankl's showroom.  It is not a show of good faith to give in where there is no claim at all.  Good faith would

have been to offer up those vehicles willingly, rather than to make their rightful owners hire expensive lawyers and come before this Court.  This case was filed and is being pursued in bad faith.  This alone is cause under Section 1112(b).

Having found cause, Section 1112(b) requires me to convert or dismiss this case, whichever is in the best interest of creditors and the estate.  Technically Section 1112(b) requires me to also consider whether appointment of a Chapter 11 trustee under Section 1104(a) is in the best interest of creditors.  But Section 1104(a) does not apply in this Subchapter V case.  Even if Congress intended that I consider the similar relief provided in Section 1185, that is not an appropriate choice here, as there is no business to reorganize.

I can dismiss the entire bankruptcy case, but that would merely reward Mr. Farache for his actions, sending everyone back to the state court for expensive litigation. I can convert this case to Chapter 7, a true fiduciary, in the form of a Chapter 7 trustee, can then investigate the debtor's claims of ownership and either litigate or reach agreement with the various parties claiming interests in the vehicles.  The Chapter 7 trustee can also look into potential avoidance actions against Mr. Farache, his family, and others.

Page 19

Having considered the circumstances of this case, I find that it is in the best interest of creditors and the estate to convert this case to Chapter 7.  I will enter a brief order converting this case, incorporating this oral ruling.

Because a Chapter 7 trustee will substitute for the debtor-in-possession in this case, I will enter an order abating Adversary Proceeding No. 22-01218.  The trial set to commence on May 22, 2023 will be canceled.  I will set a status conference with sufficient time to permit the new Chapter 7 trustee to get up to speed.

Now, before I forget, Mr. Breslin, an issue that I need to address with you.  There was a notice filed with the rebuttal exhibit.  Okay.  I have two concerns about it.  First the number of the rebuttal exhibit is wrong in the notice.

MR. BRESLIN:  Yes, I was told -- (inaudible.)

THE COURT:  Okay.  And the other is the exhibits that I admitted which were actually, originally, from Ms. Mehdipour's list, those are the ones that are the official record and you should not submit them again.  They've already been admitted.

MR. BRESLIN:  Okay.

THE COURT:  I have them.  So I'd like you to withdraw the one that you filed and file a new one with just

Page 20

that one rebuttal exhibit with the right number.

MR. BRESLIN:  Yes, your Honor.

THE COURT:  Okay.

MR. BRESLIN:  I will do that.

THE COURT:  Any questions?

MR. BRESLIN:  No, your Honor.

MR. FELDMAN:  Yes, your Honor.

THE COURT:  Yes.

MR. FELDMAN:  With respect to my retention --

THE COURT:  Yes.

MR. FELDMAN:  -- I know you are going to abate the adversary.  I would like to file a motion to withdraw with respect to the debtor with respect to that adversary.

THE COURT:  Well, go ahead and file it.

MR. FELDMAN:  Pardon me, your Honor?

THE COURT:  Go ahead and file it.

MR. FELDMAN:  I can file that?

THE COURT:  Of course, you can always file a motion to withdraw.

MR. FELDMAN:  I understand.  I just want to make sure, it's specifically the adversary.  I know you're --

THE COURT:  Oh, I see what you mean.

Because it's been abated?

MR. FELDMAN:  Exactly.

THE COURT:  Yes, you may file a motion.

MR. FELDMAN:  Okay.  Thank you, Judge.

THE COURT:  Yes, of course.

Any other questions?

No.

All right.  Very good.  Thank you all.

Court is adjourned.

(Whereupon, the hearing was concluded.)

Page 22

CERTIFICATION

STATE OF FLORIDA                    :

COUNTY OF BREVARD                   :


        I, Anna M. Meagher, Stenographic Reporter, and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on page 1 to the best of my ability.

        WITNESS my hand this 4th day of May 2023.




_____
Anna M. Meagher, Stenographic Reporter
          and Notary Public
in and for the State of Florida at Large
          Commission #HH59960
          January 9, 2025