# EXHIBIT A
# AMENDED PLEADING

**Exhibit A**

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: CACE-22-05125

FVP OPPORTUNITY FUND III, LP, a Delaware limited partnership; FVP INVESTMENTS, LLC, a Delaware limited liability company; and FVP SERVICING, LLC, a Delaware limited liability company,

     Plaintiffs,

vs.

KARMA OF BROWARD, INC., a Florida corporation; KARMA OF PALM BEACH, INC., a Florida corporation; SCOTT ZANKL, an individual; KRISTEN ZANKL, an individual; MOSHE FARACHE, an individual; LISA FARACHE; 1001 CLINT MOORE, LLC, a Florida limited liability company; MMS ULTIMATE SERVICES, INC., a Florida profit corporation; HI BAR CAPITAL, LLC, a New York limited liability company; YISROEL HERBST; an Individual; SPIN CAPITAL, LLC., a New York limited liability company; AVRUMI LUBIN a/k/a JOSH LUBIN, an individual; YOEL GETTER, an individual; GRANER LAW GROUP, P.A., a Florida profit corporation d/b/a GRANER PLATZEK & ALLISON, P.A.; THOMAS U. GRANER, an individual; VANTIFF LLC, a Florida limited liability company; MILLCO-ATWATER, LLC, an Illinois limited liability company; and FRANKLIN CAPITAL FUNDING, LLC, a Delaware limited liability company;

     Defendants.

_____/

**FOURTH AMENDED COMPLAINT**

**JURY TRIAL DEMANDED IN COUNTS I THROUGH XIX AND XXVIII**

COME NOW the Plaintiffs, FVP Opportunity Fund III, LP, a Delaware limited partnership (the "FVP Fund"), FVP Investments LLC, a Delaware limited liability company ("FVP Investments"), and FVP Servicing, LLC, a Delaware limited liability company ("FVP Servicing") (collectively, the FVP Fund, FVP Investments, and FVP Servicing are the "Plaintiffs" or the "FVP Parties"), by and through their undersigned counsel, and sue the Defendants, Karma of Broward, Inc., a Florida corporation ("Karma of Broward" or "KB"); Karma of Palm Beach, Inc., a Florida corporation ("Karma of Palm Beach" or "KPB") (collectively, Karma of Broward and Karma of Palm

Beach are the "Karma Entities"); Scott Zankl, an individual ("Scott Zankl" or "Zankl"); Kristen Zankl, an individual ("Kristen Zankl"); Moshe Farache, an individual ("Moshe Farache"); Lisa Farache, an individual ("Lisa Farache"); 1001 Clint Moore, LLC, a Florida limited liability company ("1001 Clint Moore"); MMS Ultimate Services, Inc., a Florida profit corporation ("MMS"); Hi Bar Capital, LLC, a New York limited liability company ("Hi Bar"); Yisroel Herbst, an individual ("Herbst"); Spin Bar Capital, LLC, a New York limited liability company ("Spin"); Avrumi Lubin a/k/a Josh Lubin, an individual ("Lubin" or "Josh Lubin"); Yoel Getter, an individual ("Getter" or "Yoel Getter" or "Joel"); Graner Law Group, PA, a Florida profit corporation d/b/a Graner Platzek & Allison, P.A. (the "Graner Law Group"); Thomas U. Graner, an individual ("Graner"); Vantiff LLC, a Florida limited liability company ("Vantiff"); and Millco-Atwater, LLC, an Illinois limited liability company ("Millco-Atwater") .

For the purposes of this Fourth Amended Complaint collectively, Moshe Farache, Lisa Farache, 1001 Clint Moore, MMS, Hi Bar, Lubin, Getter, the Graner Law Group, and Graner are the "Part I Defendants". The FVP Parties sue the Part I Defendants for monetary damages and equitable relief, and demand a trial by jury on Counts I through XIX of this Fourth Amended Complaint.

In Part II of this Fourth Amended Complaint, the FVP Parties sue the Karma Entities, Scott Zankl, Kristen Zankl, Hi Bar, and Franklin (collectively, the "Part II Defendants") for foreclosure of security interests and contract claims.

In Part III of this Fourth Amended Complaint, the FVP Parties sue Vantiff and Millco-Atwater to recover fraudulent transfers under Florida's Uniform Fraudulent Transfer Act.

## Amendments to the Third Amended Complaint

This Fourth Amended Complaint keeps the numbering of the Counts in the Third Amended Complaint ("TAC") to avoid confusion, and adds claims against newly added party Defendant Yoel Getter in Counts I, II, III, and IV. Parties have been dropped in Counts V, VI, VII, VIII, and XIX. The counts against the remaining Defendants plead the same causes of action in the same numbered counts as the TAC with additional ultimate facts and Exhibits as to certain Defendants. The counts that have been dismissed or on which judgments having been entered are so indicated.

## Incorporation of Exhibits By Reference

The FVP Parties, pursuant to Fla. R. Civ. P. 1.130(b), hereby expressly re-plead, adopt, and incorporate, as if fully re-pled herein and attached hereto for all purposes, all Exhibits attached to the

TAC, Exhibits A through Exhibit NN are refiled with the addition of Exhibits OO through Exhibit UU which are included with this filing. The FVP Parties state as follows:

### Introduction

1.      This is an action for monetary damages brought on behalf of the FVP Parties against the Part I Defendants who have engaged in illegal acts, including fraud, fraud in the inducement, and other tortious conduct which induced the FVP Parties to loan Seven Million Five Hundred Thousand Dollars ($7,500,000.00) to Zankl and the Karma Entities (the "FVP Loan"). As pled herein, the Part I Defendants committed other tortious acts after the FVP Parties made the FVP Loan. Part II of this Fourth Amended Complaint brings claims on the FVP Loan documents themselves; and Part III brings fraudulent transfer claims.

2.      The FVP Parties made the FVP Loan because the FVP Parties were led to believe that the FVP Loan was fully secured by the inventory and assets of the Karma Entities. The FVP Parties were led to believe this by intentional and material misrepresentations by Defendants Lubin, Herbst, Getter, Hi Bar, Moshe Farache, Lisa Farache, 1001 Clint Moore as well as by other aiders and abettors and co-conspirators named and unnamed in this Complaint.

3.      The FVP Parties made the FVP Loan to Zankl and the Karma Entities pursuant to certain loan documents executed on or about January 26, 2022.  The FVP Loan was fully funded by February 18, 2022 and the FVP Parties were led to believe that it was fully secured by defined collateral. By April 1, 2022, the FVP Loan proceeds and all of the collateral represented to secure the loan were gone.

4.      By this action, the FVP Parties seek to recover their damages against Defendants Herbst, Lubin, Getter, Hi Bar, and their co-conspirators who perpetrated a scheme to defraud the FVP Parties by taking actions and making representations that would, and did, lead the FVP Parties into believing that they would have a first priority security interest in the Karma Entities' collateral, while intentionally hiding their interests and surreptitiously filing a financing statement at the proverbial eleventh hour – literally in the dead of night on the eve of the FVP Parties' closing of the FVP Loan with the Karma Entities so that the FVP Parties would not become aware of the filing prior to the closing of the FVP Loan. This was done to attempt to fraudulently gain a priority interest in the Karma Entities' collateral contrary to what was represented to the FVP Parties.

5.      By this action, the FVP Parties also seek to recover their damages against Defendant

Moshe Farache, in his individual capacity and as a co-conspirator, Lisa Farache, in her individual capacity as a co-conspirator as well as in her individual capacity through piercing the corporate veil of Defendant 1001 Clint Moore, and other aiders and abettors and co-conspirators, known and unknown, who engaged in a scheme to defraud the FVP Parties by inducing the FVP Parties into believing that the FVP Loan to the Karma Entities would be used for the purposes stated in the FVP Loan documents, when, in fact, each conspired and schemed to divert the FVP Loan proceeds to their personal accounts.

6.      In furtherance of the scheme, in or around January of 2022, Defendants Moshe Farache, Lisa Farache, 1001 Clint Moore, and others conspired to convince the FVP Parties to fund the FVP Loan by representing that the FVP Parties would have access to their loan collateral at the Karma Entities' business located at 1001 Clint Moore Road, Boca Raton, FL 33487, when they knew full well that the representation was materially false.

7.      In furtherance of the scheme, in or around January of 2022, Moshe Farache, Lisa Farache, MMS, and other aiders and abettors and co-conspirators conspired to convince the FVP Parties that the FVP Loan proceeds would not be diverted to 1001 Clint Moore, or any of the members of 1001 Clint Moore for their own business or personal accounts. *See* **Exhibit W**. This statement was premeditated and intentionally and materially false as Defendants Moshe Farache, Lisa Farache, 1001 Clint Moore, MMS, and other aiders and abettors and co-conspirators knew full well that the FVP Loan proceeds were to be diverted to the benefit of Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore to repay prior debt completely unrelated to the FVP Loan. The knowledge of the conspirators is indisputable because Defendant Moshe Farache demanded a signed document from Zankl assuring him (Moshe Farache) that the FVP Loan proceeds would be diverted from their intended purpose. *See* **Exhibit DD**.

8.      By this action, the FVP Parties also seek to recover their damages against Defendants Moshe Farache and Lisa Farache for engaging in a separate scheme to defraud the FVP Parties both before and after the loan was funded by engaging in fraudulent transactions regarding the Plaintiffs' collateral and then outright converting the FVP Parties' collateral.

9.      As pled herein, this lawsuit brought by the FVP Parties seeks to recover the damages suffered by the FVP Parties at the hands of multiple tortfeasors and bad actors.

### Jurisdiction, Venue, and Parties

10.     This is an action brought by the FVP Parties against the Part I Defendants, the Part II

Defendants, and the Part III Defendants to recover money damages for claims whose values exceed Fifty Thousand Dollars ($50,000.00), exclusive of attorney's fees and costs, as well as for equitable relief.

### A. The Plaintiffs.

11.    At all times material hereto, Plaintiff the FVP Fund was and is a Delaware limited partnership with its principal place of business in New York County, New York.

12.    At all times material hereto, Plaintiff FVP Investments was and is a Delaware limited liability company with its principal place of business in New York County, New York.

13.    At all times material hereto, Plaintiff FVP Servicing was and is a Delaware limited liability company with its principal place of business in New York County, New York.

### B. The Part I Defendants and the Part II Defendants.

14.    At all times material hereto, Defendant Karma of Broward was and is a Florida corporation with its principal place of business in Broward County, Florida, and is otherwise *sui juris*.

15.    At all times material hereto, Defendant Karma of Palm Beach was and is a Florida corporation with its principal place of business in Palm Beach County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*.

16.    At all times material hereto, Defendant Scott Zankl was and is an individual residing in Palm Beach County, Florida, and is otherwise *sui juris*.

17.    At all times material hereto, Defendant Kristen Zankl was and is an individual residing in Palm Beach County, Florida, and is otherwise *sui juris*. Defendant Kristen Zankl is named as party of interest only as a signatory party to the FVP Parties / Karma Entities Loan Documents as to the claims made in Part II of this complaint.

18.    At all times material hereto, Defendant Moshe Farache was and is an individual residing in Palm Beach County, Florida, and is otherwise *sui juris*. Moshe Farache is sued in his individual capacity as a co-conspirator, and for individual torts as pled herein.

19.    At all times material hereto, Defendant Lisa Farache was and is an individual residing in Palm Beach County, Florida, and is otherwise *sui juris*. Lisa Farache is sued in her individual capacity as a co-conspirator, as well as in her individual capacity as the manager of 1001 Clint Moore through piercing the corporate veil as pled herein.

20.     At all times material hereto, Defendant 1001 Clint Moore was and is a Florida limited liability company with its principal place of business in Palm Beach County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*.

21.     At all times material hereto, Defendant MMS was and is a Florida profit corporation with its principal place of business in Palm Beach County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*. At all times material hereto, Moshe Farache was authorized to, and did, act for and on behalf of MMS as its authorized representative. Indeed, Moshe Farache and MMS filed a joint proof of claim on June 27, 2022, numbered Claim 54-2, in the United States Bankruptcy Court in and for the Southern District of Florida, Case Number 22-12790-EPK, for a joint debt; and the liability of MMS, as pled in this Fourth Amended Complaint, is based on the acts and representations of Moshe Farache.

22.     At all times material hereto, non-party Excell Auto Sport and Service, Inc., a Florida corporation ("Excell Auto"), was and is a Florida corporation with its principal place of business in Palm Beach County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*. Defendant Moshe Farache is the President of Excell Auto, and Defendant Scott Zankl is the Vice President of Defendant Excell Auto.

23.     At all times material hereto, Defendant Hi Bar was and is a New York limited liability company doing business in Broward County, Florida, and is otherwise *sui juris*.

24.     At all times material hereto, Defendant Spin was and is a New York limited liability company ("Spin") doing business in Broward County, Florida, and is otherwise *sui juris*. Defendant Spin is named as a party Defendant as one of the alter egos of Defendant Lubin which engaged in illegal activity in Broward County, Florida.

25.     At all times material hereto, Defendant Herbst was and is an individual residing in the State of New York who intentionally did business in, and directed business to, Broward County, Florida and committed torts and engaged in illegal activity within Broward County, Florida and is otherwise *sui juris*.

26.     At all times material hereto, Defendant Getter was and is an individual residing in the State of New York who intentionally did business in, and directed business to, Broward County, Florida and committed torts and engaged in illegal activity within Broward County, Florida and is otherwise *sui juris*.

27. At all times material hereto, Defendant Lubin was and is an individual residing in the State of New York and in Miami-Dade County, Florida who intentionally did business in, and directed business to, Broward County, Florida and committed torts and engaged in illegal activity within Broward County, Florida and is otherwise *sui juris*.

28. At all times material hereto, non-party Steven Zakharyayev ("Zakharyayev") was and is an individual licensed to practice law in the State of Florida and in the state of New York, and having a principal office in New York, New York, and is otherwise *sui juris*.

29. At all times material hereto, the Graner Law Group was and is a Florida profit corporation with its principal place of business in Palm Beach County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*.

30. At all times material hereto, Graner was and is an individual licensed to practice law in the State of Florida and having a principal office in Palm Beach County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*.

31. At all times material hereto, Defendant Franklin, upon information and belief, was the servicing agent or assignee of that certain debt now held by Franklin, as pled herein. Franklin Capital Funding was f/k/a Wing Lake Partners, f/k/a Franklin Capital Group, and is a Delaware limited liability company doing business in Broward County, Florida and is otherwise *sui juris*.

### C. *The Fraudulent Transfer Defendants.*

32. At all times material hereto, Defendant Vantiff was and is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida, and doing business in Broward County, Florida, and is otherwise *sui juris*. Final Judgment has been entered against Vantiff on the Third Amended Complaint and this Complaint recites those claims and those claims are included only for the purposes of reopening the claims after appeal if required.

33. At all times material hereto, Defendant Millco-Atwater was and is an Illinois limited liability company with its principal place of business in Chicago, Illinois, and doing business in Broward County, Florida, and is otherwise *sui juris*.

### PIERCING THE CORPORATE VEIL OF HI BAR
### THROUGH THE ACTS OF ITS PRINCIPALS AND OWNERS HERBST, GETTER, AND LUBIN

34. Defendant Herbst, at all times material hereto, was the controlling owner of the membership interests of Hi Bar, and acted for Hi Bar in his individual capacity; and for the acts and

conduct alleged herein, the acts of Hi Bar and the acts of Herbst were identical.

35.     Defendant Lubin, at all times material hereto, also acted for Hi Bar in his individual capacity with the authorization and consent of Herbst and Hi Bar, and for the acts and conduct alleged herein, the acts of Hi Bar and the acts of Lubin were identical.

36.     Defendant Getter, at all times material hereto, also acted for Hi Bar in his individual capacity with the authorization and consent of Herbst and Hi Bar, held himself out as the authorized decision maker for Hi Bar and for the acts and conduct alleged herein, the acts of Hi Bar and the acts of Getter were identical.

37.     Lubin, at all times material hereto, held himself out as the authorized decision maker for Hi Bar to the principals and representatives of the Karma Entities.

38.     Lubin testified at deposition that Getter was a primary decision maker at Hi Bar.

39.     Herbst testified at deposition that both Getter and Lubin had authority to act for Hi Bar with the full knowledge and consent of Herbst.

40.     At all times outlined in this Complaint, all acts and statements of Lubin alleged in this Complaint, alleged as being done under the guise of acting for, and on behalf of, Hi Bar or Spin, were done or made after consultation with, and with the consent and prompting of, Getter and Herbst. All acts and statements of Lubin alleged in this Complaint were done or said for Lubin, Getter, and Herbst, personally and individually, in addition to Hi Bar or Spin, and were done for an illegal and illicit purpose.

41.     The corporate identity of Hi Bar was used by Lubin, Getter, and Herbst, to accomplish some ulterior purpose, to evade some statute, or to accomplish some fraud, and was used as part of the enticement to the FVP Parties to fund the FVP Loan to Zankl and the Karma Entities, while Herbst, Lubin, Getter, and Hi Bar plotted and schemed to receive the loan proceeds as well as the beneficial interest of the inventory purchased with, or secured by, the Plaintiffs' FVP Loan.

42.     At all material times outlined in this Complaint, Lubin, and only Lubin, spoke for and represented himself to Zankl to be the owner and controller of Hi Bar. This was done intentionally to attempt to shield Herbst and Getter from civil and criminal liability who were aware of and promoted and assisted Lubin's actions and statements.

43.     At all times during the pendency of this action until the filing of this Complaint,

including during the AWB Bankruptcy, Lubin has continued to do hold himself out to all parties and attorneys as the person controlling Hi Bar together with Herbst. *See, e.g.*, **Exhibits HH, NN and RR**.

44. Defendants Lubin, Getter, and Herbst together used Hi Bar for fraudulent and/or misleading purposes, particularly to creditors and in particular to the FVP Parties as creditors. At all times outlined in this Complaint, the FVP Parties were defrauded creditors.

45. Defendant Lubin together with Defendant Herbst and Defendant Getter, dominated and controlled Hi Bar to such an extent that Hi Bar's independent existence was, in fact, non-existent, and Defendant Lubin was, in fact, an alter ego of Hi Bar.

46. Defendant Herbst together with Defendant Lubin and Defendant Getter, dominated and controlled Hi Bar to such an extent that Hi Bar's independent existence was, in fact, non-existent, and Defendant Herbst was, in fact, an alter ego of Hi Bar

47. Defendant Getter together with Defendant Herbst and Defendant Lubin, dominated and controlled Hi Bar to such an extent that Hi Bar's independent existence was, in fact, non-existent, and Defendant Getter was, in fact, an alter ego of Hi Bar.

48. The corporate form of Hi Bar was used fraudulently and/or for an improper purpose by Defendant Lubin and Defendant Herbst in a manner that harmed and caused injury and damages to the FVP Parties.

### PIERCING THE CORPORATE VEIL OF SPIN
### THROUGH THE ACTS OF ITS PRINCIPAL AND OWNER LUBIN

49. Defendant Spin is named as a Defendant and a party of interest in this action as the alter ego of Defendant Lubin.

50. Defendant Lubin, at all times material hereto, acted for Defendant Spin in his individual capacity; and for the acts and conduct alleged herein, the acts of Defendant Spin and the acts of Lubin were identical.

51. At all times outlined in this Fourth Amended Complaint, all acts of Lubin as alleged herein as being done under the guise of acting for and on behalf of both Hi Bar and Spin were done for Defendant Lubin, individually, and were done for an illegal and/or illicit purpose.

52. The corporate identity of Defendant Spin was used by Defendant Lubin to accomplish some ulterior purpose, to evade some statute, or to accomplish some fraud, and was used as part of the

enticement to the FVP Parties to fund the FVP Loan to Zankl and the Karma Entities, while Lubin and Spin plotted and schemed to receive the beneficial interest for the inventory purchased with the Plaintiffs' FVP Loan.

53. At all material times outlined in this Fourth Amended Complaint including during the pendency of the AWB Bankruptcy, Defendant Lubin, and only Defendant Lubin, spoke for and represented himself to Zankl to be the owner and controller of Defendant Spin. And, to date, Defendant Lubin has continued to do so.

54. Defendant Lubin used Defendant Spin for fraudulent and/or misleading purposes, particularly to creditors and in particular to the FVP Parties as creditors. At all times as outlined in this Fourth Amended Complaint, the FVP Parties were defrauded creditors.

55. Defendant Lubin dominated and controlled Defendant Spin to such an extent that Defendant Spin's independent existence was, in fact, non-existent, and Defendant Lubin was, in fact, an alter ego of Defendant Spin.

56. The corporate form of Defendant Spin was used fraudulently and/or for an improper purpose by Defendant Lubin in a manner that harmed and caused injury and damages to the FVP Parties.

### PIERCING THE CORPORATE VEIL OF 1001 CLINT MOORE THROUGH THE ACT OF ITS OWNER

57. This Fourth Amended Complaint seeks damages against Defendant Lisa Farache as the manager and owner of Defendant 1001 Clint Moore through piercing the corporate veil of Defendant 1001 Clint Moore. This Fourth Amended Complaint also sues Defendant Lisa Farache in her individual capacity as a co-conspirator with Defendant Moshe Farache, as well as with non-parties Michelle Martin, and other aiders, abettors, and co-conspirators, as alleged herein.

58. During the time periods outlined in this Fourth Amended Complaint, the acts of Defendant Lisa Farache, as alleged herein under the guise of acting for and on behalf of Defendant 1001 Clint Moore, were, in fact, done for Defendant Lisa Farache, individually, and were done for an illegal and/or illicit purpose.

59. The corporate identity of Defendant 1001 Clint Moore was falsely and illegally used by Defendant Lisa Farache to accomplish some ulterior purpose, to evade some statute, or to accomplish some fraud, and was used as part of the enticement to the FVP Parties to make the FVP

Loan to Zankl and the Karma Entities so that Defendants Lisa Farache and 1001 Clint Moore could divert the FVP Loan proceeds to their personal and corporate accounts.

60.     Defendant Lisa Farache dominated and controlled Defendant 1001 Clint Moore to such an extent that Defendant 1001 Clint Moore's independent existence was, in fact, non-existent and Defendant Lisa Farache was, in fact, an alter ego of Defendant 1001 Clint Moore.

61.     The corporate form of Defendant 1001 Clint Moore was used fraudulently and/or for an improper purpose by Defendant Lisa Farache in a manner that harmed and caused injury and damages to the FVP Parties.

### VENUE AND JURISDICTION

62.     Venue is proper in this Court as Defendant Karma of Broward, whose principal address is 1717 SE 17th Street, Fort Lauderdale, FL 33316, is located within Florida's Seventeenth Judicial Circuit in and for Broward County, Florida and one or more of the Defendants reside in Broward County, Florida.

63.     Jurisdiction is proper in this Court because all named Defendants either reside in, operate, conduct, engage in, or carry-on businesses or business ventures in the State of Florida, or otherwise have committed tortious acts within the State of Florida, and engaged in substantial, not isolated and continuous contacts within Florida. Jurisdiction is further proper in this Court because any remaining portion of the FVP Parties' collateral or the funds derived from the sale of that collateral is located within the State of Florida.

### FACTUAL ALLEGATIONS

A.     **THE LUBIN / GETTER / HERBST / HI BAR FRAUD PERPETRATED ON THE FVP PARTIES.**

1.     **BACKGROUND.**

64.     Spin is a New York limited liability company. Lubin is the president, controlling principal, and alter ego of Spin.

65.     Hi Bar is a New York limited liability company. Herbst is the president, controlling principal, and alter ego of Hi Bar.

66.     Hi Bar and Spin are both merchant cash advance companies ("MCA").

67.     Lubin and Getter were business partners in the MCA business.

68. Lubin, Getter, and Herbst were all involved in the Merchant Cash Advance business prior to 2020. Lubin and Getter, who were business partners in the MCA business, were signing and brokering the deals with Herbst who prior to 2021 was then acting primarily as an investor.

69. In early 2021, Lubin and Getter, represented to Herbst that they had a large network of contacts, both brokers and business operators, that they could utilize to bring deals to Herbst. After conversations with Lubin and Getter, Herbst wanted to cash in on the windfall of profits in the business and formed his own cash advance business – Hi Bar Capital LLC. Herbst agreed to share his Hi Bar profits with Lubin and Getter with Getter being promised 50 percent of the profits.

70. After Herbst formed Hi Bar, he worked closely with Lubin and Getter, to bring him deals and manage the transactions.

71. Herbst testified in deposition that it was Getter who negotiated Hi Bar transactions and commissions to pay the brokers that were bringing business to Hi Bar. Herbst would oversee the transaction and become involved if the arrangement was unusual. For all acts outlined in this Complaint, the acts of Getter were those of a partner, principal, officer, or authorized agent of Hi Bar with Herbst's consent and approval.

72. Herbst testified in deposition that both Getter and Lubin played key roles in Hi Bar's daily operations regarding whether to enter into a contract and background due diligence.

73. Herbst testified in deposition that he first heard about Excell Auto Group, Inc. ("EAG"), Zankl and the Karma Entities from Getter and Lubin, who were operating in Florida. It was Getter and Lubin who made the primary decisions on all of the transactions with Excell, Zankl, and the Karma Entities over which Herbst had ultimate authority and final say.

74. Since the formation of Hi Bar in January of 2021, Herbst and Lubin engaged in scores of transactions in which Herbst would give money to Lubin and Spin for a participation in Spin's MCA contracts, and Lubin would give money to Herbst to participate in Hi Bar's MCA contracts. No formal corporate records were kept.

75. Defendant Herbst testified in deposition in this case that there was an "account" between Herbst and Lubin where millions of dollars would be sent back and forth with no written bookkeeping, promissory notes, or other documentary evidence that could be examined by Herbst and Lubin's victims. *See e.g.* **Exhibits KK and LL.**

76. Hi Bar is an affiliate of Spin. Lubin, the principal of Spin, negotiated for and spoke for

Hi Bar with the consent of and support of Herbst, at all times outlined in this Fourth Amended Complaint.

77.     No person other than Lubin made statements for, or demands by, Hi Bar or Herbst to Zankl or the Karma Entities. Lubin was the only person to speak to Zankl regarding both the Spin transaction and the Hi Bar transactions for the entire time period outlined in this Fourth Amended Complaint (hereinafter, this "Complaint").

78.     Nonetheless, both Getter and Herbst were aware of and approved all the representations and demands that Lubin made to Zankl and the Karma Entities.

79.     After the initiation of this litigation in 2022, Lubin has made multiple and repeated representations and admissions to Zankl, and others, that he (Lubin) controlled Hi Bar and bragged that he (Lubin) controlled the Hi Bar claims against the Karma Entities and Zankl. In a text to Zankl, Lubin stated: "I own 100% of the Hi Bar claim and obligation. Herbst has zero to do with this obligation. I am the only one that can sign settlement / agreements in my sole discretion on this claim. And I never authorized anyone to sign any settlements / agreements on my behalf." *See* **Exhibit NN.**

80.     Non-party Zakharyayev acted at the instruction of Lubin and Herbst for Hi Bar.

81.     In June of 2021 and again in August of 2021, Spin entered into a usurious loan agreement with Zankl and the Karma Entities, which Spin entitled a "Revenue Purchase Agreement." *See* **Composite Exhibit A** (which includes both the Spin MCA and the "Hi Bar / Zankl MCA" which have identical terms and conditions and are referred to hereinafter collectively as the "Hi Bar / Zankl Transaction Documents").

82.     To understand the onerous nature of the Spin financing, as is seen in the Hi Bar / Zankl Transaction Documents, Zankl was offered the early payment "benefit" of "only" paying Four Hundred Thousand Dollars ($400,000) in interest on the Two Million Dollar ($2,000,000) loan, if the loan was paid off in 45 days – an interest rate of One Hundred Sixty Percent (160%).

83.     In or around September of 2021, Zankl, on behalf of non-party EAG, named herein for background and informational purposes only, entered into communications with Franklin (then known as "Wing Lake") to borrow money from Franklin to pay off the aforementioned MCA loan that EAG and the Karma Entities had with Spin and two other MCAs.

84.     Franklin advised Zankl that it would fund a loan to pay off the other two MCA loans only if the Spin MCA loan was satisfied, removed, or otherwise declared by Spin to be paid off.

85. In response, Zankl had extensive conversations with Lubin, the principal of Spin, about the fact that Zankl would not be able to borrow the money from Franklin without Franklin being advised that Spin's MCA loan was paid off.

86. After consulting with Herbst and Getter who agreed to participate, Lubin advised Zankl that he would arrange to shift the debt owed to Spin to another company that Lubin controlled named Hi Bar and that Franklin could then be advised that the Spin debt was paid off. Lubin explained that the debt would remain, but Franklin would be fooled into thinking that the debt was satisfied.

87. In or about October of 2021, Zankl and Lubin agreed that Hi Bar would take over the Spin debt and that Zankl and his companies, EAG and the Karma Entities, would then only have a debt to Hi Bar, so that it would appear to Franklin that the Spin debt was satisfied.

88. On October 27, 2021, Zankl, on behalf of EAG and the Karma Entities, executed MCA transaction documents with Hi Bar. *See* **Composite Exhibit A** (the "Hi Bar / Zankl Transaction Documents" which includes the "Hi Bar / Zankl MCA").

89. Herbst testified in deposition that it was Getter and Lubin who promoted Herbst and Hi Bar getting involved in the Hi Bar / Zankl MCA and that Getter and Lubin were involved in all discussions regarding EAG and the Karma Entities through 2022. Herbst testified that the agreement between Herbst, Lubin, and Getter was that each would profit from the Hi Bar / Zankl MCA.

90. At the time of the execution of the Hi Bar / Zankl MCA, Zankl, EAG, and the Karma Entities, were in full compliance with the terms and conditions of the Spin loan documents. *See* **Exhibit MM**.

91. Nonetheless, Lubin, Herbst, and Getter fraudulently used the Hi Bar / Zankl MCA to substantially increase the debt owed by Zankl, EAG, and the Karma Entities by approximately One Million Dollars ($1,000,000.00) and to change the name of the holder of the debt from Spin to Hi Bar for no reason.

92. No money was paid by Hi Bar to Spin for a purchase, assignment, purported satisfaction, payoff, or refinance of the supposed Zankl / EAG debt to Spin. Likewise, no money was paid to Zankl, EAG, or any of Zankls' companies, including the Karma Entities, by Hi Bar at any time.

93. On November 1, 2021, days after the Hi Bar / Zankl MCA was signed, and as a part of the scheme to defraud Franklin, Herbst, Getter, and Lubin agreed among themselves to make a sham bank transfer so that it would appear as though Herbst / Hi Bar was actually paying Lubin / Spin the

money that Lubin claimed it was owed by Zankl. Herbst, Getter, and Lubin agreed that a transfer would go to Spin to make it appear as though Spin was paid when, in fact, Herbst, Getter, and Lubin agreed that the money would be immediately returned to Hi Bar.

94. As part of the scheme, on November 1, 2021 at 2:34 pm, Herbst through Hi Bar wired to Lubin / Spin the sum of $2,114,312.50. **Exhibit KK**. Then, Lubin, on November 1, 2021 at 3:23 pm, immediately wired the identical sum of $2,114,312.50 back to Herbst / Hi Bar. **Exhibit LL**.

95. In sum, Herbst / Hi Bar paid no consideration whatsoever for its imaginary multimillion dollar "merchant advance" "receivables purchase" Hi Bar / Zankl MCA contract with Zankl, EAG, and the Karma Entities and Lubin, Getter, Herbst, and Hi Bar created a false and fraudulent money transfer document to support the scheme.

96. The Hi Bar / Zankl MCA was intentionally created by Lubin, Getter, Herbst, and Hi Bar for the express purpose of perpetrating a fraud on Franklin, Zankl, and the Karma Entities and future creditors of the Karma Entities, including the FVP Parties who were then already in initial talks with representatives of Zankl and the Karma Entities.

97. In response to this sham paperwork, Lubin and Spin notified Franklin that EAG and the Karma Entities no longer owed any sums to Spin; however, Lubin and Spin intentionally and fraudulently withheld from Franklin that Spin had merely rebranded the debt in the name of Hi Bar and created a false wire transfer record to add credence to the scam. *See* **Exhibit KK.**

98. Based on this misrepresentation, Franklin entered into a loan facility with EAG and the Karma Entities not knowing that Lubin, Getter, Herbst, and Hi Bar now had the debt that Lubin and Spin said was paid off and satisfied simply relabeled in the name of Hi Bar to scam Franklin.

99. As part of the EAG / Franklin loan transaction documents, Lubin, for Spin, executed an Assignment Agreement in which Spin represented that Spin had no rights to any sums from Zankl and his companies. This document was intentionally false as Lubin still controlled the debt but now through Hi Bar with Herbst's and Getter's plotting, support and participation.

100. This was a materially false statement by Lubin, as Spin and Hi Bar were interchangeable given that Lubin acted for both Spin and Hi Bar, and that the Herbst / Hi Bar debt was, in fact, Lubin / Spin debt.

101. Herbst, Getter, Lubin, Spin, and Hi Bar, and others known and unknown to the FVP Parties, colluded and conspired to defraud Franklin, as the Hi Bar debt, which was *de facto* the Spin

debt, was hidden from Franklin. As such, Franklin was intentionally defrauded by Lubin, Getter, Herbst, Spin, and Hi Bar.

102.    All of the Lubin representations and acts were done with the full support, knowledge and participation of Herbst and Getter, and the schemes were meant to benefit Herbst, Getter, and Lubin individually as well as Herbst and Lubin's alter ego companies Hi Bar and Spin.

### 2. THE HI BAR / ZANKL MCA PROHIBITED ZANKL AND THE KARMA ENTITIES FROM ENTERING INTO ANY THIRD PARTY FINANCING WITH SECURITY AGREEMENTS RELATED TO THE KARMA ENTITIES' INVENTORY ABSENT HI BAR'S WRITTEN CONSENT.

103.    The Hi Bar / Zankl MCA expressly granted Hi Bar a security interest in the Karma Entities' inventory. In relevant part, those documents state:

> "Merchant will obtain from HBC written consent prior to granting a security interest of any kind in the Secured Assets to a Third Party."

> "Merchant and Guarantor(s) agree to execute and deliver to HBC such instruments and documents HBC may reasonably request to perfect and confirm the lien, security interest and right to set off in this agreement. HBC is authorized to execute all such instruments and documents in Merchant's and Guarantor's name."

> "Merchant and Guarantor(s) each hereby authorizes HBC to file any financing statements deemed necessary by HBC to perfect or maintain HBC's security interest. Merchant and Guarantor(s)(s) shall be liable for, and HBC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by HBC in protecting, preserving and enforcing HBC's security interests and rights."

> "Merchant and Guarantor(s) each agree not to create or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or Additional Collateral."

**Composite Exhibit A** (providing the Hi Bar / Zankl MCA).

104.    Therefore, the Hi Bar / Zankl MCA made clear that Zankl and the Karma Entities could not enter into any financing agreement with any of the FVP Parties without Hi Bar's, meaning Herbst, Getter and Lubin's, express written consent.

### 3. THE LUBIN / GETTER / HERBST / HI BAR FRAUDULENT CONDUCT CONTINUES AND EXTENDS TO THE FVP PARTIES.

105.    Shortly after the Hi Bar / Zankl MCA and the Zankl / Franklin transaction documents were signed, Zankl, through his representatives, continued communications with the FVP Parties regarding a loan from the FVP Parties to the Karma Entities.

106.    To that end, between November and December of 2021, Zankl, both personally and

through his representatives, had detailed and extensive conversations with the FVP Parties about a Seven Million Five Hundred Thousand Dollar ($7,500,000) loan from the FVP Parties to Zankl and the Karma Entities which would be fully collateralized by the existing and future inventory of the Karma Entities. It was understood and agreed that the rights of the FVP Parties would specifically not include any collateral or security interests in non-party EAG.

107.    The Hi Bar / Zankl MCA, as quoted above from **Composite Exhibit A**, granted Hi Bar a security interest and lien, and contemplated the filing of a UCC financing statement and, indeed, charged Zankl a fee that was used to pay for the filing of the same on the Karma Entities' inventory and assets. It further expressly stated that the Karma Entities could not enter into another loan transaction pledging inventory or assets with anyone without Hi Bar's written consent.

108.    Notwithstanding the fact that Hi Bar was authorized to file a UCC financing statement on October 27, 2021 to give notice of its security interests and lien to any future lenders, Lubin, Getter, Herbst, and Hi Bar chose not to do so. This was to keep the agreement hidden from Franklin and FVP.

109.    The decision of Lubin, Getter, and Herbst, through their alter ego Hi Bar, not to file a financing statement was intentional and part of a scheme and artifice to defraud.

110.    It was Lubin, Getter, Herbst, and Hi Bar's intent to keep the fraud against Franklin hidden as long as possible, and to commit further fraud against the FVP Parties who Lubin, Getter, and Herbst were aware may loan funds to Zankl and the Karma Entities in the near future. The scheme being that a FVP loan to Zankl and the Karma Entities would be then paid to Lubin, Getter, Herbst, and Hi Bar under the onerous Hi Bar / Zankl MCA.

111.    By the beginning of December of 2021, Zankl and the Karma Entities were, unsurprisingly, already in arrears on the Hi Bar / Zankl MCA debt. At that same time, Zankl had ongoing conversations with Lubin regarding the FVP Parties' prospective loan. Lubin, Getter, and Herbst were fully aware that the FVP Parties were unaware of the Hi Bar debt as Lubin, Getter, and Herbst intentionally did not file a UCC financing statement for that specific purpose.

112.    Lubin specifically requested that Zankl let him know when the FVP Parties' loan was going be funded and told Zankl to forward all of the FVP Parties' loan documents to him (Lubin) for his review.

113.    It was Herbst, Lubin, Getter, and Hi Bar's intent in making this request to have Zankl secure the FVP Parties' loan without the FVP Parties knowing about the Hi Bar loan so that the FVP

Parties would make the loan without being aware of the Hi Bar loan and security agreement. It was Herbst, Lubin, Getter, and Hi Bar's intent that upon the Karma Entities receiving the FVP Parties' loan proceeds, that Zankl and the Karma Entities would pay a substantial part of the proceeds of the FVP Loan to Hi Bar to satisfy its illegal and usurious loan.

114.    As instructed, Zankl kept Lubin informed of the progress; and, on or about December 15, 2021, Zankl advised Lubin that he would be imminently closing on the FVP Loan with the FVP Parties.

115.    In response to this information and in anticipation of the FVP Parties' loan closing and funding, Lubin notified Herbst and Getter who instructed either non-party Zakharyayev or another of their agents, to file a UCC Financing Statement for Hi Bar on EAG and the Karma Entities. This first Hi Bar UCC Financing Statement was filed on December 15, 2021. **Exhibit B**. Lubin, Getter, and Herbst directed this Hi Bar UCC to be filed on that date because Lubin believed that the FVP Parties were funding the FVP Loan to the Karma Entities loan imminently and wanted the UCC to be filed just before any filing by the FVP Parties.

116.    When the FVP Parties' loan initially did not close on or about December 15, 2021, Lubin accused Zankl of misleading him and pressured Zankl to email him the actual loan documents provided to Zankl by the FVP Parties to confirm Zankl's representations. On or about December 17, 2021, Zankl emailed Lubin all of the FVP Parties' loan documents. *See* **Exhibit C.**

117.    After Lubin received the FVP Parties' loan documents, Lubin, Getter, and Herbst were fully aware of the fact that a loan by FVP to the Karma Entities violated the Hi Bar / Zankl MCA and that the FVP Parties' loan proceeds could not be used to repay any other lenders, including Hi Bar.

118.    On or about December 19, 2021, Zankl told Lubin that the FVP Parties became aware of Hi Bar's December 15, 2021 filing of the UCC Financing Statement and advised Zankl that the FVP Parties' funding was off and that therefore Zankl could not pay Hi Bar.

119.    Zankl advised Lubin that the UCC filing by Hi Bar needed to be withdrawn or the FVP Parties' loan to the Karma Entities would not occur and that Zankl needed the FVP loan to pay Lubin and Hi Bar.

120.    In response, after consulting with Getter and Herbst, Lubin told Zankl that he (Zankl) would need to pay $400,000.00 to Herbst and Hi Bar and sign a settlement agreement with Hi Bar that guaranteed substantial payments in addition to the exorbitant sums already owed to Hi Bar and, if

Zankl did so, Lubin, Herbst ,and Getter would remove the UCC filing so that Zankl could proceed with the FVP Loan.

121. Lubin, Getter, and Herbst, discussed and agreed on what they wanted from Zankl to terminate the UCC Filing and directed the preparation of a "Settlement Agreement" which astronomically increased the amounts due Hi Bar. This was with the knowledge that if they removed the UCC Filing, Zankl and the Karma Entities could proceed with the FVP loan which a portion of which would be paid to Lubin, Getter, Herbst, and Hi Bar.

122. Succumbing to Lubin's pressure, Zankl paid the $400,000.00 demanded by Lubin, Getter, Herbst, and Hi Bar and signed the "Settlement Agreement." *See* **Exhibit D**. All $400,000.00 paid by Zankl and the Karma Entities in December of 2021 was immediately transferred to Lubin's bank account in the name of Spin.

123. The December 19, 2021 Settlement Agreement between Hi Bar, Zankl, EAG, and the Karma Entities (the "December 19, 2021 Settlement Agreement"), **Exhibit D**, did the following:

   a. Falsely and fraudulently described a "default" that never occurred.

   b. Increased the amount due Hi Bar to Four Million Sixteen Thousand Eighty-Two Dollars ($4,016,082) with payments of Two Hundred Thousand Dollars ($200,000) per week, with only Two Million Nine Hundred Forty-Five Thousand Six Hundred Sixty-Eight Dollars ($2,945,668) needed to be paid if it was paid within 30 days.

   c. Granted Hi Bar a renewed security interest in the Karma Entities' assets and inventory and reaffirmed Hi Bar's rights to both file and maintain a UCC Financing Statement.

   d. Stated that when all sums were paid, Hi Bar would terminate the Hi Bar UCC Financing Statement which was filed four (4) days prior on December 15, 2021 only after the debt was paid in full.

 *See* **Exhibit D**.

124. Notwithstanding the clear language in the December 19, 2021 Settlement Agreement, that Hi Bar would maintain the just-filed (December 15, 2021) UCC filing, Lubin, Getter, and Herbst, did the exact opposite of what the agreement provided.

125. Instead, as promised, on December 19, 2021, Lubin, Getter, and Herbst caused the termination statement of the four (4) days old UCC Financing Statement to be filed. **Exhibit E**.

126.     This termination statement of the four (4) days old UCC Financing Statement, **Exhibit E**, was specifically and intentionally made by Lubin, Getter, Herbst, and Hi Bar as a material, direct, false, and fraudulent misrepresentation to the FVP Parties that Hi Bar had no secured interests in the Karma Entities' collateral.

127.     This statement was made specifically and intentionally by Lubin, Getter, Herbst, and Hi Bar to the FVP Parties to cause the FVP Parties to reinstitute its loan processing with the Karma Entities. The termination statement states:

> "Effectiveness of the Financing Statement identified above is terminated with respect to the security interests of the Secured Party authorizing this Termination Statement."

 **Exhibit E**.

128.     This termination statement was a representation filed of record intentionally directed and made to the FVP Parties by Lubin, Getter, Herbst, and Hi Bar, who each knew that the FVP Parties were in the process of making a loan to Zankl and the Karma Entities.

129.     This termination statement was filed by Lubin, Getter, Herbst, and Hi Bar for a single purpose: to represent to the FVP Parties, and to deceive the FVP Parties into believing, that Lubin, Getter, Herbst, and Hi Bar had no security interests to protect so that FVP would make the loan to the Karma Entities from which a substantial portion would be paid to Lubin, Getter, Herbst, and Hi Bar. This representation in a public filing by Lubin, Getter, Herbst, and Hi Bar was false when made and intentionally false. The FVP Parties justifiably relied upon the misrepresentation to their detriment. *See* Zankl Affidavit. **Exhibit UU.**

130.     To double down on the fraud, non-party Zakharyayev, acting for Lubin, Getter, Herbst, and Hi Bar, advised non-party Frank O'Donnell ("O'Donnell"), an agent intermediary for Zankl, that the Hi Bar UCC Financing Statement of December 15, 2021 was a *mistake and was "erroneously filed."* **Exhibit F**. *See also* O'Donnell affidavit. **Exhibit QQ.**

131.     This representation made by non-party Zakharyayev, acting for and on behalf of Lubin, Getter, Herbst, and Hi Bar was specifically made to O'Donnell whom they intended to and knew would relay the information to the FVP Parties. This was done for the sole and specific purpose of notifying the FVP Parties that Hi Bar had no security interests to protect in order to induce the FVP Loan.

132.     These statements by Lubin, Getter, Herbst, and Hi Bar were false when made and

intentionally false. The FVP Parties justifiably relied upon these misrepresentations to their detriment.

133.    The sole purpose of the termination statement was to convince the FVP Parties that Defendant Hi Bar maintained no valid or protectable interest in the collateral of the Karma Entities so that the FVP Parties would rest assured that Defendant Hi Bar was not a threat to the FVP Parties' security interests – which was already provided to Lubin, Herbst, and Getter - and proceed to fund a loan to the Karma Entities – a loan that in substantial part would be improperly directed back to Lubin, Getter, Herbst, and Hi Bar. See Zankl Affidavit. **Exhibit UU.**

134.    The scheme among Lubin, Getter, Herbst, and Hi Bar was that they would wait in the wings to pounce with a second UCC Financing Statement that would – again – be filed just before the FVP Loan closed and before the FVP Parties could detect the filing through a UCC search. This, they schemed, would allow Lubin, Getter, Herbst, and Hi Bar to not only be paid a part of the loan proceeds but put them into a superior position against the FVP Parties' UCC filing that would surely take place upon closing.

135.    The purpose of the Lubin, Getter, Herbst, and Hi Bar scheme was to defraud the FVP Parties into making the FVP Loan, so that Lubin, Getter, Herbst, and Hi Bar would receive a large, and undeserved, payment from Zankl from the FVP Loan proceeds.

    **4.    THE LUBIN, GETTER, HERBST, AND HI BAR FRAUD ACHIEVED ITS PURPOSE. LUBIN, GETTER, HERBST, AND HI BAR WERE PAID $1,300,000.00 AS A RESULT OF THE FVP PARTIES' LOAN TO THE KARMA ENTITIES.**

136.    Upon being supplied the UCC termination statement notice at the direction of Lubin, Getter, and Herbst, the FVP Parties, who were unaware of the scheme, reinstituted the loan process with Zankl and the Karma Entities.

137.    The negotiations carried through to mid-January of 2022. During that time, Zankl and Karma Entities were, again unsurprisingly, in even further arrears of the draconian terms of the Lubin / Hi Bar financing and the December 19, 2021 Settlement Agreement. Zankl was under constant pressure by Lubin to pay or suffer financial ruin. *See e.g.,* **Exhibits K and L**.

138.    In January of 2022, Zankl continuously promised Lubin that the FVP Parties' loan was imminent, and Lubin again requested that Zankl provide him with the FVP Loan documents so that Lubin, Herbst, and Hi Bar would know of the closing date.

139.    On or about January 21, 2022, Zankl, like in December of 2021, again emailed Lubin,

and Hi Bar the FVP Parties' loan documents, **Exhibit G**, and promised Lubin that as soon as he got the FVP Loan from the FVP Parties, he (Zankl) would pay Lubin and Hi Bar from the FVP Loan proceeds.

140.    Again, after Lubin received the FVP Parties' loan documents, Lubin, Getter, and Herbst were fully aware of the fact that the FVP Loan violated their Settlement Agreement and that the FVP loan proceeds could not be used to repay any other lenders, including Hi Bar. Specifically, the FVP Loan proceeds could only be used "for purposes of purchasing exotic car inventory for Palm Beach and Broward, paying transaction costs and expenses incurred in connection [t]herewith, for general working capital purposes." *See* FVP Loan Documents detailed below.

141.    On Monday, January 24, 2022, Lubin again demanded that Zankl email him all of the actual FVP Loan closing agreements. In response, Zankl sent Lubin four (4) separate emails which included all of the FVP Loan documents. **Composite Exhibit H**. Later that day, when no closing occurred, Zankl texted Lubin that he would be closing the FVP Loan the following day, January 25, 2022. **Exhibit I**. This January 25, 2022 text message again confirmed that Lubin would be receiving the Plaintiffs' FVP Loan, the proceeds of which Lubin was fully aware that neither he nor Hi Bar could receive under the terms of the FVP Parties' transaction documents. **Composite Exhibit H**.

142.    On January 25, 2022, Zankl advised Lubin that he would be closing the FVP Loan with the FVP Parties the following day, January 26, 2022, with certainty. Lubin relayed this information to Getter and Herbst.

143.    In response and to finalize the fraud, at the direction of Lubin, Getter, Herbst, and Hi Bar, non-party Zakharyayev, for Lubin, Getter, Herbst, and Hi Bar refiled Hi Bar's UCC Financing Statement on January 25, 2022 at 10:55 P.M. **Exhibit J**.

144.    Defendants Lubin, Getter, Herbst, and Hi Bar caused the second Hi Bar UCC Financing Statement on January 25, 2022 at 10:55 P.M. knowing that:

a.  the FVP Parties' funding was to close the next day – on January 26, 2022;

b.  the public record stated Hi Bar had no secured interest to protect;

c.  the FVP Parties were wholly unaware of any Lubin, Getter, Herbst, and/or Hi Bar secured interest in the Karma Entities' collateral;

d.  that neither Lubin, Getter, Herbst, nor Hi Bar gave written consent to Zankl or the

Karma Entities for the FVP Parties to have a secured interest in the Karma Entities' collateral as required by both the Hi Bar / Zankl MCA and the December 19, 2021 Settlement Agreement;

e. that neither Lubin, Getter, Herbst, nor Hi Bar notified the FVP Parties of either the Hi Bar / Zankl MCA or the December 19, 2021 Settlement Agreement;

f. the FVP Parties would have no way of discovering the UCC filing prior to closing on the FVP Loan;

g. the Plaintiffs' FVP Loan could not be used to pay Lubin, Getter, Herbst, or Hi Bar;

h. Zankl, in response to Lubin's pressure, promised Lubin that the Karma Entities would pay Hi Bar with the FVP Loan proceeds as stated in the text message of January 24, 2022; and

i. but for the material misrepresentation of the December 19, 2021 UCC Termination Statement, **Exhibit E**, filed as part of the scheme to defraud by Lubin, Getter, Herbst, and Hi Bar, there never would have been a loan from the FVP Parties to Zankl and the Karma Entities in the first instance.

145. At all times, Lubin acted for both Spin and Hi Bar in an identical fashion, and all of Zankl's communications with both Spin and Hi Bar were with Lubin. In fact, on January 3, 2022, Lubin told Zankl to wire the funds due to Hi Bar to Spin. **Exhibit K**.

146. It was always Lubin who personally pressured and threatened Zankl and the Karma Entities with a (Hi Bar) lawsuit ("I have to file tomorrow") if payments were not made to Lubin's satisfaction. *See, e.g.*, **Exhibit L** (evidencing pressure and threats on January 13, 2022). Lubin at all times referred to himself as Hi Bar or Spin when it suited his purposes.

147. It was Lubin who personally directed Zankl where to send every payment due to Herbst, Getter, and Hi Bar after the Hi Bar documents were executed. For example, on February 7, 8, and 9 of 2022, Lubin directed Zankl to wire money to an attorney's account, which, upon information and belief, was that of non-party Zakharyayev. On those dates, a total of One Million Three Hundred Thousand Dollars ($1,300,000) was wired to Lubin, Herbst, and Hi Bar with funds that traced to the FVP loan. *See* Affidavit of Richard Gray. **Exhibit OO.**

148. It was Lubin who attempted to fabricate a defense to the late night UCC filing in a text

message exchange with Zankl. Lubin suggested that Hi Bar would argue that *maybe* it (Hi Bar) filed the UCC late at night the night before the FVP Loan closing because it just happened to notice the late payments. *See* **Exhibit EE** (from Lubin to Zankl stating "if it was just filed because ur [sic.] weren't paying and Hi Bar noticed a few months later then your fucked[,]"). This comment was a continuation of the fraudulent conduct.

149.    The actions of Lubin, and statements of Lubin as alleged in this Complaint were made for himself and for his co-conspirators Getter, Herbst, and Hi Bar and comprise fraudulent conduct with the intended and expressed target of the fraud being the FVP Parties.

150.    The UCC Financing Statement filed on December 19, 2021 was an "instrument" as defined in Section 817.535 of the Florida Statutes and contained a materially false, fictitious, or fraudulent statement or representation and was filed with the intent to defraud.

151.    The UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. was an "instrument" as defined in Section 817.535 of the Florida Statutes and was filed with the intent to defraud.

152.    The UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. contained a materially false, fictitious, or fraudulent statement or representation as it represented that Hi Bar had a legitimate lien in the property defined therein, when, in fact, Hi Bar had no legitimate enforceable interest to protect as:

    a.   The filing was made for the sole purpose of defrauding the FVP Parties;

    b.   Hi Bar paid no consideration for the alleged interest;

    c.   The alleged Hi Bar interest was created as a part of a fraud;

    d.   Lubin, Getter, Herbst, and Hi Bar were participants in the scheme to defraud Franklin and the filing equally defrauded Franklin;

    e.   Lubin, Getter, Herbst, and Hi Bar were participants in a fraudulent transfer as defined in Section 726.105 of the Florida Statutes; and

    f.   Lubin, Getter, Herbst, and Hi Bar were participants in an illegal and usurious shake down of Zankl and the Karma Entities, and surreptitiously filed this UCC Financing Statement with the intent to defraud the FVP Parties.

153.    The UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. was therefore

an overt act as part of the conspiracy to defraud the FVP Parties and an instrument used to perpetrate and effectuate the fraud, and, as such, must be set aside and voided.

154.   The fraud achieved its purpose, Lubin, Getter, Herbst, and Hi Bar were paid the sum of $1,300,000.00 by the Karma Entities as a direct result of the funds available to the Karma Entities from the FVP Parties loan proceeds. **Exhibit OO.**

**B.    CO-CONSPIRATORS LUBIN, GETTER, AND HERBST:   FIRST UNITE, AND THEN TURN ON EACH OTHER AND SUE EACH OTHER.**

155.   As is often the case, after the crime, it is every man for himself. After the fraud achieved its purpose, co-conspirators Lubin, Getter, and Herbst at first united and then, predictably, turned on each other.

156.   Lubin and Herbst entered into an undated agreement but with an effective date of January 28, 2022 whereby Lubin agreed to pay all the legal fees to defend the fraud for himself, Herbst, Spin, and Hi Bar and with Herbst and Hi Bar agreeing that Lubin and Spin would be entitled to 70 percent of the proceeds that Lubin, Herbst, Spin, or Hi Bar could extract from any of their victims. **Exhibit RR** "Common Interest and Joint Litigation Agreement".

157.   Herbst then turned on Getter. On October 22, 2022, Herbst, ironically, sued Getter for defrauding Herbst in the United States District Court for the Eastern District of New York in Case No: 1:22-cv-01743-ENV-RML. In that complaint, Herbst alleges that Getter: (i) falsely held himself out as an owner of Hi Bar and diverted at least $500,000 to himself; (ii) caused Hi Bar to enter into over $6 million in deals with uncreditworthy companies so that Getter could collect in excess of $1 million in unearned payments from Herbst; and (iii) extorted Herbst to make payments to Getter with threats to destroy Herbst's business. **Exhibit SS.**

158.   Thereafter, on August 1, 2023, Lubin, Herbst, Spin, and Hi Bar entered into a joint "Authority to Represent" with Herbst and Hi Bar agreeing that Lubin would pay for Herbst and Hi Bar's Attorney's Fees with the attorney agreeing that Herbst, Lubin, Hi Bar, and Spin were all "joint client[s]". **Exhibit RR.**

159.   On April 4, 2024, Herbst (and Lubin) and Hi Bar's "joint attorney" then turned on Lubin and sued Lubin and Spin, *see* Complaint. **Exhibit TT**.

160.   Lubin then sent an email to all relevant counsel on August 24, 2024 attacking his own

co-conspirators and the lawyer Lubin retained to represent him and his co-conspirators. **Exhibit RR.**

161. Although guised as a "Common Interest and Joint Litigation Agreement" and "Authority to Represent", each agreement is evidence of the common scheme and plan adopted by both Lubin and Herbst to both engage in fraudulent conduct and then jointly defend and cover up the fraudulent conduct with Lubin paying the bills for the conspiracy and the co-conspirators dividing up any further money that could be obtained through legal proceedings.

### C.    THE SPIN / HI BAR MCA LOAN TO ZANKL AND THE KARMA ENTITIES WAS USURIOUS AND ILLEGAL, AND VIOLATES FLORIDA PUBLIC POLICY.

162. Both Spin and Hi Bar are MCAs. Both have been subject to multiple lawsuits and scrutiny by numerous governmental agencies.

163. MCAs have come under intense scrutiny for their unconscionable and unlawful conduct. *See, e.g.*, *Attorney General of the State of New York, v. Various MCA Companies*, Index No. 451368/ 2020 (Supreme Court of the State of New York, County of New York) (alleging that Richmond, Giardina, and others have preyed upon thousands of small businesses throughout the United States by offering funding under "merchant cash advances" that "are in fact fraudulent, usurious loans with interest rates in the triple and even quadruple digits, far above the maximum rate permissible for a loan under New York law") (Criminal Usury, Fraud in the Form of Unconscionability – *pending*); *Fleetwood v. RAM Capital Funding, et al.,* Case No. 20-cv-5120 (S.D.N.Y.) (LJL) (June 6, 2022, Opinion and Order); *see also, e.g.*, *Federal Trade Commission v. RCG Advances*, LLC, No. 20-cv-4432 (S.D.N.Y.) (same).

164. On August 31, 2021, Spin entered into a "Revenue Purchase Agreement" with Zankl and EAG to ostensibly purchase EAG's "Receivables" (the "First Agreement"). As EAG's business model had no receivables, it would purchase cars and sell them for payment on sale.

165. Under the First Agreement, and the only agreement pursuant to which either Zankl or any of his companies received any funds, and which was self-defined as a sale of receivables, EAG received Two Million Dollars ($2,000,000) but was indebted to Spin in the amount of Two Million Nine Hundred Ninety-Eight Thousand Dollars ($2,998,000).

166. The First Agreement stated:

*E[AG] is selling a portion of future revenue stream to SPC at a discount, and is not borrowing money from Spin, therefore there is no interest rate or payment schedule*

*and no time period during which the Purchased Amount must be collected by Spin.*
**Exhibit A** (emphasis added).

167.    The First Agreement then goes on to state that EAG must pay One Hundred Fifty Thousand Dollars ($150,000) weekly, or twenty percent (20%) of its receivables, notwithstanding the fact that EAG had no receivables.

168.    EAG made payments to Spin as agreed. Despite the fact that EAG had paid Spin Seven Hundred Fifty Thousand Dollars ($750,000) between August 31, 2021 and October 18, 2021, on October 18, 2021 Spin issued to Zankl and EAG a balance notice stating that EAG owed Spin Two Million Two Hundred Sixty-Four Thousand Three Hundred Twelve Dollars and Fifty Cents ($2,264,312.50).

169.    In sum, Two Million Dollars ($2,000,000.00) was borrowed on August 31, 2021, Seven Hundred Fifty Thousand Dollars ($750,000.00) was repaid, and on October 18, 2021 Two Million Two Hundred Sixty-Four Thousand Three Hundred Twelve Dollars and Fifty Cents ($2,264,312.50) was alleged to be owed to Spin – meaning over One Million Dollars ($1,000,000) in interest and charges were somehow claimed by Spin over a period of approximately 10 weeks.

170.    *It gets worse.* As above stated, notwithstanding the fact that neither Zankl nor EAG were in default, Zankl was required to eliminate the Spin debt to comply with the Franklin demands for its financing.

171.    In response to Franklin's requirements, Lubin agreed to "transfer" the Spin debt to Hi Bar, which he described to Zankl as a "no net refi." At all times, Lubin represented to Zankl that Hi Bar was a company that Lubin controlled and that they would simply exchange the creditors' names with no change in terms. This statement by Lubin to Zankl was an intentionally false statement.

172.    Lubin emailed the Hi Bar paperwork to Zankl which Zankl viewed on his phone, and, trusting Lubin's representations about what was in the paperwork, "DocuSigned" the documents on his phone on October 27, 2021.

173.    After Zankl was able to intelligently review the documents, he learned that the Hi Bar paperwork increased the amount owed to Spin by over Nine Hundred Thousand Dollars ($900,000) from the week before, and that EAG, and now the Karma Entities, owed Hi Bar Three Million One Hundred Seventy-Seven Thousand Eight Hundred and Eighty Dollars ($3,177,880), with weekly payments of One Hundred Fifty Thousand Dollars ($150,000).

174.    Therefore, Lubin, Herbst, and Hi Bar increased the debt by more than One Million Dollars ($1,000,000) in interest and charges that were somehow claimed by Spin over a period of approximately 10 weeks and added another Nine Hundred Thousand Dollars ($900,000) of interest with the stroke of a pen. In sum, Two Million Dollars ($2,000,000) was borrowed on August 31, 2021, Seven Hundred Fifty Thousand Dollars ($750,000) was repaid, and on October 18, 2021 Three Million One Hundred Seventy-Seven Thousand Eight Hundred Eighty Dollars ($3,177,880) was alleged to be owed – meaning almost $2 million dollars in interest and charges were somehow claimed by Spin over a period of approximately 10 weeks on a $2 million dollar loan by relabeling the Spin debt to be Hi Bar debt.

175.    No funds were ever paid by Hi Bar to EAG or the Karma Entities at any time for the Three Million One Hundred Seventy-Seven Thousand Eight Hundred Eighty Dollars ($3,177,880) it was alleged to be owed at the time of the Hi Bar / Spin refinancing.

176.    No funds were paid by Hi Bar to Spin.

177.    Over the next two (2) months, Zankl and EAG paid Hi Bar approximately Five Hundred Thousand Dollars ($500,000) – and with this payment making total payments of $1.25 million on the original $2 million dollar debt –, and in mid-December 2021 Hi Bar alleged that it had a balance owed of Two Million Six Hundred Seventy-Seven Thousand Eight Hundred Eighty Dollars ($2,677,880).

178.    Therefore, over the course of three and one half (3 ½) months, EAG and the Karma Entities received Two Million Dollars ($2,000,000) and repaid One Million Two Hundred Fifty Thousand Dollars ($1,250,000) and were told they owed a balance of Two Million Six Hundred Seventy-Seven Thousand Eight Hundred Eighty Dollars ($2,677,880).

179.    Incredibly, Zankl, EAG, and the Karma Entities were told that they were in default and would be sued unless they signed a "Settlement Agreement."

180.    Fearing what a lawsuit would do to his business, Zankl executed the December 19, 2021 Settlement Agreement which somehow magically increased the balance owed to Hi Bar to Four Million Sixteen Thousand Eight Hundred Twenty Dollars ($4,016,820) – an increase in the already fictitious amount owed by One Million Three Hundred Thousand Dollars ($1,300,000) with yet another stroke of a pen. Again, no money was paid by Hi Bar for the execution of the December 19, 2021 Settlement Agreement.

181. So, in approximately 100 days, EAG received Two Million Dollars ($2,000,000), repaid One Million Two Hundred Thousand Dollars ($1,200,000) and owed Four Million Sixteen Thousand Eight Hundred Twenty Dollars ($4,016,820).

182. It gets even worse.

183. By mid-January of 2022, EAG and the Karma Entities paid Lubin, Herbst, and Hi Bar an additional One Million Three Hundred Thousand Dollars ($1,300,000), bringing the total payment by EAG and the Karma Entities to Lubin, Herbst, and Hi Bar to Three Million Eighty-Three Thousand Six Hundred Eighty-Seven Dollars and Fifty Cents ($3,083,687.50) on the original debt of Two Million Nine Hundred Ninety-Eight Thousand Dollars ($2,998,000), with only Two Million Dollars ($2,000,000) received, incurred on August 31, 2021.

184. So, in four (4) months, EAG repaid over One Hundred Percent (100%) of the incurred debt – which was thirty-three percent (33%) more than the money received – and somehow still owed One Million Six Hundred Thousand Dollars ($1,600,000) more than the original debt. See **Exhibit MM.**

185. Incredibly, Hi Bar never paid a penny to EAG or the Karma Entities at any time to receive this patently illegal and usurious windfall.

186. Hi Bar never paid Spin any money to "pay off" the Spin debt, and worse, created a false bank transfer record to attempt to legitimize a purported transfer. *See* **Exhibits KK and LL.** The "Balance Transfer" transaction was simply a fiction invented by Herbst, Lubin, and their associates to mercilessly rip off Zankl, EAG, and the Karma Entities and lure the FVP Parties into a false sense of security.

187. All of Zankl's communications regarding the money owed to Hi Bar were with Lubin, personally. It was Lubin who constantly pressured Zankl for the Hi Bar payments with both the consent and prompting of Getter and Herbst.

188. The acts of Spin, Lubin, Herbst, and Hi Bar are outrageous, violate Florida public policy, and are illegal in Florida.

189. Spin and Hi Bar may call it an "advance" or "purchase of receivables," but it was, and is, an obvious usurious and illegal loan, plain and simple. Lubin, Hi Bar, and Spin attempted to mask their loan agreements as receivables purchases, but even the most cursory examination establishes it as a loan transaction given that they attempted to securitize the transaction to eliminate risk to them.

190.    On January 28, 2022, Hi Bar sued Zankl, EAG, and the Karma Entities for breach of the December 19, 2021 Settlement Agreement. By suing under the December 19, 2021 Settlement Agreement, Hi Bar masked the nature of the underlying transaction as it made it appear that the underlying loan was greater than $2.5 million as New York usury laws do not apply to loans that exceed $2.5 million. In that lawsuit, the New York Court ruled that since the debt in question exceeded $2.5 million, the New York usury laws do not apply. The New York Court, however, failed to contemplate and rule on the fact that the initial loan was under $2.5 million, and that therefore the New Your usury laws did apply because it was only the illegal interest rate that pushed the debt amount over the $2.5 million threshold.  That ruling is presently under reconsideration and appeal.

191.    The underlying Hi Bar transaction was a criminally usurious loan contract under both New York law and Florida law. As to the "Balance Transfer" to Hi Bar, the loan charges increased by Fifty and Three-Tenths percent (50.3%). When Hi Bar, on the one hand, and Zankl, EAG, and the Karma Entities, on the other hand, executed a "Settlement Agreement," the loan charges increased another Fifty Percent (50%) – without a penny being paid to E[AG] or the Karma Entities.

192.    The merchant contract agreements entered into between Spin, Hi Bar, Zankl, EAG, and the Karma Entities were unconscionable, illegal, and violative of both New York and Florida public policy, and are therefore void and unenforceable. *See* Declaration of Richard Gray, **Exhibit OO.**

193.    The Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. was the product of a scheme to defraud, as above pled, and was additionally the product of unconscionable and illegal contracts and has materially damaged the FVP Parties and, as such, must be voided or deemed void, as a matter of law.

D.    **THE FVP / ZANKL – KARMA ENTITIES LOAN AND THE LOAN DOCUMENTS.**

194.    As and part of the due diligence subsequent to a loan application, the FVP Parties were provided with Scott Zankl and Kristen Zankl's tax returns and signed personal financial statements, and confirmed that no security interests hypothecated any of the FVP Parties' anticipated collateral, which would be comprised of all of the assets of the Karma Entities.

195.    As part of the due diligence, and as a required condition of the FVP Loan closing and funding, the FVP Parties were provided with an opinion letter issued by Defendants Graner and the Graner Law Group. *See* **Exhibit M** (the "Graner Opinion Letter"). The statements and opinions

expressed in the Graner Opinion Letter were false, and Defendants Graner and the Graner Law Group knew or should have known of the falsity of their opinions and statements. In particular, the following statements and opinions were false:

4. The consummation of the transactions contemplated by the Loan Documents and the carrying out of the terms thereof will not result in violation of any provisions of the articles of incorporation, bylaws or other governing documents of any Borrower, or result in the violation of any provision of, or in a default under, any indenture, mortgage, deed of trust, indebtedness, agreement, judgment, decree, order, statute, rule or regulation to which any Credit Party is a party or by which it or its property is bound.

5. There are no legal or governmental actions, suits, proceedings, inquiries or investigations pending, threatened or contemplated, or any basis therefor, to which any Credit Party is or may become a party or of which any property of any Credit Party is or may become subject, which, if determined adversely to such Credit Party, would not, individually or in the aggregate, have a material adverse effect on the financial position or results of operations of such Credit Party or on any Collateral owned by such Credit Party.

6. The provisions of the Security Agreement and the Pledge Agreement are effective to create a security interest in favor of the Administrative Agent, for the benefit of the Lenders, in all of each Borrower's right, title and interest in and to the Collateral described therein and all proceeds thereof. Such security interest has been properly perfected.

*Id.*

196.    Relying on the aforementioned representations and assurances, the FVP Parties entered into, *inter alia,* the loan documents with the Karma Entities through their owners, the Zankls. *See* **Exhibit N** (affixing the Loan Agreement) [hereinafter, the "Loan Agreement"].

197.    Zankl sought from the FVP Parties, and received, a substantial loan in the amount of Seven Million Five Hundred Thousand and No/100 Dollars ($7,500,000) (as above defined, the "FVP Loan") expressly "for purposes of purchasing exotic car inventory for Palm Beach and Broward." **Exhibit N** at 1.

198.    Contemporaneous with the Loan Agreement, Karma of Broward and Karma of Palm Beach executed a Note with FVP Investments and FVP Servicing in the principal amount of Three Million Dollars ($3,000,000). *See* **Exhibit O** (attaching the FVP Investments Note) [hereinafter, the "FVP Investments Note"].

199.    Contemporaneous with the Loan Agreement, Karma of Broward and Karma of Palm Beach also executed a Note with the FVP Fund and FVP Servicing in the principal amount of Four Million Five Hundred Thousand Dollars ($4,500,000). *See* **Exhibit P** (providing the FVP Fund Note)

[hereinafter, the "FVP Fund Note," and  the FVP Investments Note are collectively, the "Notes"].

200.    The FVP Loan was funded as follows: Three Million Five Hundred Thousand Dollars ($3,500,000) at closing, Two Million Dollars ($2,000,000) on February 2, 2022, and Two Million Dollars ($2,000,000) on February 18, 2022.

201.    Contemporaneous with the Loan Agreement, Scott and Kristen Zankl entered into a Personal Guaranty Agreement personally guaranteeing all sums due under the Loan Agreement. *See* **Exhibit Q** (supplying the Guaranty Agreement) [hereinafter, the "Guaranty Agreement"].

202.    Contemporaneous with the Loan Agreement, the Karma Entities entered into a Security Agreement with FVP Servicing, as administrative agent for FVP Investments and the FVP Fund, granting a continuing security interest in certain Collateral, as the term Collateral is defined therein. *See* **Exhibit R** (attaching the Security Agreement) [hereinafter, the "Security Agreement"].

203.    The Security Agreement makes clear, at Schedule 2.1, that the Collateral is located at the Karma Entities' locations. *See id.* at Schedule 2.1. Zankl, on behalf of his companies, asserted that "[t]he Collateral is free and clear of all Liens[,]" *Id.*, and thus, that the "Security Agreement create[d] a valid security interest in the Collateral and the proceeds thereof securing the payment and performance in full of the Secured Obligations." *Id.* at § 2.7 (alterations added).

204.    Contemporaneous with the Loan Agreement, Scott and Kristen Zankl also entered into a Pledge and Security Agreement with the FVP Parties. *See* **Exhibit S** (attaching the Pledge and Security Agreement) [hereinafter, the "Pledge Agreement"] which states:

| Pledgor | Pledged Entity | Description of Equity Interests Owned | Percentage of Issued Equity Interests Owned |
|---|---|---|---|
| Scott Zankl | Karma of Broward, Inc. | Stock | 50% |
| | Karma of Palm Beach, Inc. | Stock | 50% |
| | Excell Auto Sport and Service, Inc. | Stock | 23% |
| | Excell Auto Finance, LLC | Membership Interests | 25% |
| Kristen Zankl | Karma of Broward, Inc. | Stock | 50% |
| | Karma of Palm Beach, Inc. | Stock | 50% |
| | Excell Auto Sport and Service, Inc. | Stock | 0% |
| | Excell Auto Finance, LLC | Membership Interests | 0% |

205.    Contemporaneous with the Loan Agreement, the FVP Parties filed a UCC financing

statement recording their security interests in the Karma Entities' collateral under the Loan Documents. *See* **Exhibit T**. This Financing Statement secured as collateral: "ALL ASSETS OF DEBTORS NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED."

206.   Contemporaneous with the Loan Agreement, the FVP Parties filed a UCC financing statement recording their security interests in the pledged collateral under the Loan Documents. *See* **Exhibit U**.

207.   Contemporaneous with the Loan Agreement, the FVP Parties entered into an Intercreditor Agreement with an existing lender. *See* **Exhibit V**.

208.   All of the aforementioned various documents between all or some of the FVP Parties, on the one hand, and Scott and Kristen Zankl and/or the Karma Entities, on the other hand (collectively, the "Loan Documents"), were executed and came into full force and effect upon such execution and the funding of the FVP Loan and receipt by the Karma Entities of the FVP Loan in the aggregate amount of Seven Million Five Hundred Thousand Dollars ($7,500,000).

209.   After repeated attempts to communicate went unanswered, and with the FVP Parties' representatives having observed numerous of their collateral automobiles missing from the lots of both of the Karma Entities, the FVP Parties notified Scott and Kristen Zankl and the Karma Entities of their default, **Exhibit X,** and immediately retained a private investigator with federal law enforcement experience to attempt to determine what happened to Zankl and the Karma Entities, and what happened to the FVP Parties' Collateral automobiles.

**E.   DEFENDANTS MOSHE FARACHE AND LISA FARACHE'S PARTICIPATION IN THE DUE DILIGENCE ASSURANCES INDUCING THE APPROVAL OF THE FVP LOAN.**

210.   Defendant Moshe Farache is well known to Zankl. In fact, as above stated, Moshe Farache and Zankl have been co-owners of non-party Excell Auto since 2016.

211.   Moshe Farache and Lisa Farache were fully aware of the FVP Parties' anticipated loan to Zankl and the Karma Entities.

212.   In fact, Moshe Farache, Lisa Farache, non-party Michele Martin, and their attorney, non-party Scott Gherman, demanded copies of, and were provided copies of, the FVP Parties' Loan Documents in January of 2022 prior to the making of the FVP Loan. On January 5, 2022, Michele Martin, the bookkeeper and assistant to Moshe Farache, wrote to Zankl and stated:

On Jan 5, 2022, at 10:37 AM, Michele Martin <michelemartin1010@gmail.com> wrote:

>

> Scott,

>

> Moshe said that he wants to see the loan documents, including, but not limited to, the list of collateral that you are pledging to get this loan, which was referenced as an attachment in the document you supplied, but there was no attachment.

>

> Upon receipt of these documents he will authorize  our attorney to speak with you as you have requested.

>

>

> Thank You.

>

> Michele Martin
> 1001 Clint Moore LLC
> 6560 W Rogers Circle, Suite 27
> Boca Raton FL  33487
> 561-372-9001

213.    In response, on or before January 6, 2022, Zankl provided all of the FVP Parties' loan documents regarding the FVP Loan to Defendant Moshe Farache, Defendant Lisa Farache, non-party Michele Martin, and non-party Scott Gherman.

214.    After the receipt of the FVP Parties' Loan Documents, and thus knowing full well that the FVP Loan proceeds were to be used only for the purchase of vehicles and business operations of the Karma Entities, Defendant Moshe Farache, Defendant Lisa Farache, and non-party Michele Martin combined and conspired to assure the FVP Parties that the FVP Loan to the Karma Entities was safe and secured in the Karma Entities' inventory, when they believed, at all times, that the Karma Entities had no exotic car inventory whatsoever. These intentionally false assurances were made for the sole purpose of taking the FVP Loan proceeds for the benefit of Defendant Moshe Farache, Defendant Lisa Farache, Defendant 1001 Clint Moore, and Defendant MMS without the knowledge or consent of the FVP Parties.

### F.    LISA FARACHE, 1001 CLINT MOORE, AND OTHERS CONSPIRE TO FRAUDULENTLY INDUCE THE FVP PARTIES INTO MAKING THE FVP LOAN.

215.    On January 18, 2022, Moshe Farache, with the assistance of Lisa Farache and Michele Martin, sent an email to Zankl pressuring him (Zankl) to sign a document that promised he (Zankl) would pay over a substantial portion of the FVP Loan to MMS and 1001 Clint Moore. **Exhibit DD**.

216.    As **Exhibit DD** makes clear, Moshe Farache demanded that Zankl sign a contract to

make the following payments to Defendants Moshe Farache, MMS, and 1001 Clint Moore "within 5 days of closing your line of credit, on January 26, 2022" – the closing date of the FVP Loan – :

1. Return of the MMS locate loan of $1,080,000.00.

2. Return of the $440,000.00 1001 Line which is included as a part of the $2,664,450.00.

217.    As **Exhibit DD** also makes clear, Zankl executed the contract promising to pay Defendants MMS and 1001 Clint Moore a substantial portion of the FVP Loan proceeds when received.

218.    Upon the receipt of the signed contract acknowledging that they were to receive approximately $1.8 million of the FVP Loan proceeds, Defendants Moshe Farache, Lisa Farache, and 1001 Clint Moore, intentionally and with premeditation, misled the FVP Parties in their due diligence inquiries.

219.    As part of the FVP Parties' due diligence and preconditions to the FVP Loan closing, Defendant Lisa Farache, by and through Defendant 1001 Clint Moore, was requested to provide assurances to the FVP Parties that the FVP Parties would have access to the Karma Entities and that Defendants Lisa Farache, and 1001 Clint Moore would _not_ receive any direct or indirect consideration from the FVP Loan.

220.    In response, Defendants Lisa Farache and 1001 Clint Moore, with the assistance and urging of Defendant Moshe Farache, provided those assurances to the FVP Parties. *See* **Exhibit W** (affixing a letter from Defendant Lisa Farache, as manager of Defendant 1001 Clint Moore, which directs that any and all future notices be sent to Defendant Lisa Farache, Defendant Moshe Farache, non-party Michele Martin, and non-party Scott Gherman) [hereinafter, the "Landlord's Waiver and Consent"].

221.    Specifically, Defendant Lisa Farache, as the manager of Defendant 1001 Clint Moore, in a communication entitled: "Re: Loan to Karma of Palm Beach, Inc./Karma of Broward, Inc.[,]" **Exhibit W**, represented to the FVP Parties that:

a.    1001 Clint Moore declared its understanding that the Karma Entities are attempting to obtain funding from the FVP Parties, and that, as a condition of the FVP Loan, the FVP Parties require 1001 Clint Moore's agreement that 1001 Clint Moore will allow FVP Servicing access to Karma of Palm Beach in the event of a default for the purposes of allowing the FVP Parties to retrieve the collateral securing the FVP Loan,

thereby establishing Defendants Moshe Farache, Lisa Farache, and 1001 Clint Moore's understandings that the Plaintiffs' FVP Loan was to be collateralized with automobile inventory located at the 1001 Clint Moore property and that the FVP Parties had the right to seek their collateral;

b. Defendant 1001 Clint Moore agreed to allow the FVP Parties' access to the premises to retrieve their collateral securing the FVP Loan under circumstances separate and apart from a default of the subject lease; and, critically,

c. Defendant 1001 Clint Moore declared that neither it, ***nor any of its members, "will in any way either directly, or indirectly, receive any consideration by virtue of the [L]oan . . . ."*** *Id.* (emphasis added).

It further stated to "**[p]lease send any and all future notices pertaining to this matter by email to: (Lisa Farache, Moshe Farache, Michele Martin, and Scott Gherman).**"

222.    Defendant Lisa Farache made the representations in **Exhibit W** for herself, and for 1001 Clint Moore at the request of her husband, Defendant Moshe Farache, who was acting for himself and as an agent of MMS.

223.    Defendant Lisa Farache was fully aware that Defendants 1001 Clint Moore, Moshe Farache, and MMS would receive substantial consideration from the FVP Loan once funded. Therefore, Defendants Lisa Farache and 1001 Clint Moore, together with her husband Defendant Moshe Farache, who was acting for himself and Defendant MMS, all participated in the representation, and all expected to receive consideration from the FVP Loan.

224.    This representation was made after the January 18, 2022 agreement executed by Zankl, **Exhibit DD**, to take over $1.8 million of the FVP Loan proceeds for the "MMS" and "1001 Line[.]"

225.    Therefore, **Exhibit W** was a knowing and intentional misstatement of facts made by Defendants Lisa Farache and 1001 Clint Moore for herself, her company and Defendants Moshe Farache and MMS with their urging knowledge and consent, with the intention that the FVP Parties would rely on it.

226.    The FVP Parties did, in fact, rely on the misrepresentation to their detriment and damage.

**G.**    **THE LUBIN / GETTER/ HERBST / HI BAR FRAUD, AND THE MOSHE FARACHE / LISA FARACHE / 1001 CLINT MOORE FRAUD, ACHIEVED ITS ILLEGAL PURPOSE.**

227.    The manipulations, bad acts and fraudulent inducement by Defendants Lubin, Getter, Herbst, Hi Bar, Moshe Farache, and Lisa Farache worked.

228.    On January 26, 2022 the FVP Parties funded the first tranche of the FVP Loan to the Karma Entities, not knowing that the Hi Bar UCC was filed just before midnight the night before or that Defendants Lubin, Getter, Herbst, Hi Bar, Moshe Farache, and Lisa Farache all made material misrepresentations to induce the FVP Loan, which they expected to receive payments from.

229.    Shortly after Zankl and the Karma Entities received the FVP Parties' loan proceeds, Defendants Hi Bar, MMS, and 1001 Clint Moore received the funds they demanded from the FVP Loan proceeds from Zankl and the Karma Entities, either by direct payment or to a designated payee for their benefit.

**H.**    **MOSHE FARACHE, WITH THE ASSISTANCE OF LISA FARACHE AND THEIR LAWYERS, CONSPIRED TO DEFRAUD, AND DID DEFRAUD, THE FVP PARTIES AFTER THE LOAN CLOSING.**

230.    Nonparty O'Donnell is an agent of Zankl and assumed the obligation to the FVP Parties to confirm inventory. Together with his colleagues, O'Donnell monitored the inventory of the Karma Entities.

231.    On April 7, 2022, at or around 11:39 A.M., O'Donnell was advised by a telephone call that, earlier that morning, Defendants Moshe Farache, Lisa Farache, and Chase Farache, and others at their direction, removed over 35 automobiles from the lot of Karma of Palm Beach, all of which represented the FVP Parties' Collateral for the FVP Loan and all of which Defendants Moshe Farache and Lisa Farache were fully aware constituted the FVP Parties' Collateral for the FVP Loan.

232.    After repeated attempts to communicate went unanswered, and with the FVP Parties' representatives having observed numerous of their collateral automobiles missing from the lots of both of the Karma Entities, the FVP Parties notified Zankl and the Karma Entities of their default, **Exhibit X,** and immediately retained a private investigator with federal law enforcement experience to attempt to determine what happened to Zankl and the Karma Entities, and what happened to the FVP Parties' collateral automobiles.

233.    The private investigator hired by the FVP Parties, coincidentally, was personally known to Zankl. After contacting Defendant Zankl and gaining his trust, Defendant Zankl gave several

statements to the investigator regarding the events that occurred with Defendants Farache, Lisa Farache, and Chase Farache and the FVP Parties' collateral automobiles. Defendant Zankl told the investigator:

a. That Zankl was indebted to Defendants Moshe Farache and Lisa Farache from past loans which were years old.

b. That Defendant Moshe Farache had threatened the life of Defendant Scott Zankl.

c. That Defendant Moshe Farache had threatened to make Defendant Scott Zankl "disappear" if he did not turn over to him (Moshe Farache) the FVP Parties' collateral.

d. That Defendants Scott Zankl and Kristen Zankl both feared Defendant Moshe Farache.

e. That Defendant Moshe Farache had bragged that he was associated with Israeli intelligence and criminal underworld figures, and that he was a very dangerous person.

f. That Defendant Moshe Farache sent thugs to Zankl's business location to intimidate Zankl.

g. That Zankl believed the threats.

h. That because of fear and intimidation, Scott and Kristen Zankl turned over all of the FVP Parties' collateral automobiles, keys, and titles on the lot to Defendant Moshe Farache.

234.    In an attempt to have Defendant Moshe Farache give back titles to cars that were already sold, Defendant Kristen Zankl signed a document demanded to be signed by Defendant Moshe Farache, **Exhibit Y**, which on its face indicates that the nine (9) cars listed in the document are "collateral" for the money owed to Defendant Moshe Farache by Zankl.

235.    On April 8, 2022, Scott and Kristen Zankl reported to the police that Defendant Moshe Farache had, in fact, stolen the vehicles through extortion the week before. *See Boca Raton Police Department – Report Case No.: 22-4685.*

236.    On April 9, 2022 at 3:00 P.M., the FVP Parties' attorneys emailed Farache's attorney Mark Brandes, then counsel for Defendant Moshe Farache, and demanded the return of the FVP Parties' collateral, an accounting, and the location of the vehicles. The demand was not complied with.

237.    On April 9, 2022 at 7:30 P.M., Defendant Moshe Farache appeared at the location of

Karma of Broward and attempted to take possession of even more vehicles illegally and without court process. The police were called, and Defendant Moshe Farache left the facility.

I.      **M**OSHE **F**ARACHE, **W**ITH THE **A**SSISTANCE OF **H**IS **L**AWYERS, **M**ADE **M**ATERIAL **M**ISREPRESENTATIONS TO THE **FVP P**ARTIES' **L**AWYERS, **F**ILED **I**NCONSISTENT **A**FFIDAVITS, AND **M**ISLED THIS **C**OURT TO **P**ERMIT **M**OSHE **F**ARACHE TO **C**ONVERT AND **S**ELL THE **FVP P**ARTIES' **C**OLLATERAL.

238.    The information that precipitated Defendants Moshe Farache, Lisa Farache, and Chase Farache to remove all of the vehicles from the Karma Entities' lots on April 1, 2022 was that at or around the end of March of 2022, Farache attorney Mark Brandes told Defendant Lisa Farache that Brandes had heard from a reliable source in the automobile dealer industry, of which Brandes was a veteran, that "the feds" "were going to raid" the Zankls business locations and that Defendant Moshe Farache should collect as may cars as he could.

239.    And that is exactly what Defendants Moshe Farache, Lisa Farache, and Chase Farache did.

240.    After Defendants Moshe Farache, Lisa Farache, and Chase Farache took the automobiles from the Karma Entities' lots, Defendant Moshe Farache, through his attorney Brandes and the Brandes Firm, on April 8, 2022, in an attempt to legitimize the unlawful acts, filed a lawsuit in Palm Beach County, Florida, in which Defendant Moshe Farache alleged, under oath, that he (Defendant Moshe Farache) and his companies were entitled to *foreclose a security interest in all of the aforementioned vehicles because he and his companies had a security interest in the vehicles*. **Exhibit Z**.

241.    As is seen in **Exhibit Z**, Defendant Moshe Farache's *sworn* complaint materially misrepresents that he did not yet have possession of the vehicles – the same vehicles that he had just taken, and his lawyers knew he had just taken – and attempts to mislead the Court that he is seeking possession of vehicles that he did not yet possess, when he, in fact, had already taken possession of the vehicles. *See, e.g.*, **Exhibit Z** at ¶¶ 106-107.

242.    Critically, Defendant Moshe Farache described himself as a *lender* and the automobiles that he sought (already took) as the *"Financed Inventory." See id.* at Master Inventory List – Exhibit D to Exhibit A thereto. The aforementioned Palm Beach sworn complaint makes clear that Defendant Moshe Farache was seeking replevin and foreclosure of the "Financed Inventory," and that "EAG is the record owner of the subject Financed Inventory." *See id.* at ¶ 121.

243.    Like magic, with the help and assistance of his co-conspirators over the next seven (7) days, Defendant Moshe Farache, the *lender*, became Defendant Moshe Farache, the *buyer*.

244.    Farache and his co-conspirators knew that this Palm Beach Verified Complaint was false when filed, as they well knew that the vehicles were already removed from the Zankls business' lots and were in the possession of Defendant Moshe Farache at the time the Verified Complaint was filed.

245.    On April 12, 2022, counsel for the FVP Parties, via email, requested that Farache's attorney Mark Brandes notify the FVP Parties of the vehicles that were in the possession of Defendant Moshe Farache. In response, on April 13, 2022, Brandes sent counsel for the FVP Parties a list containing 32 vehicles. **Exhibit AA**.

246.    The following day, April 14, 2022, a hearing was held on the FVP Parties' Motion for Appointment of a Receiver. *See Transcript of April 14, 2022 Hearing, Filed of Record on June 2, 2022 as Filing No. 150717053.*

247.    At that hearing, attorney Craig Blinderman, on behalf of the Brandes Firm, represented to the Court that 27 of the expensive luxury cars that Defendants Moshe Farache, Lisa Farache, and Chase Farache took from what the FVP Parties claim as their collateral on the list sent to undersigned counsel the day before, on April 13, 2022, were in the possession of Defendant Moshe Farache. *See id.* at 20 (emphasis added) ("**We only have these 27 vehicles. The other vehicles were sold**.")

248.    However, minutes before that hearing, which again occurred on April 14, 2022, Defendant Moshe Farache, through his attorneys, filed a *sworn affidavit* that stated:

9.    AWB also purchased, obtained title and took possession of the vehicles listed as numbers 28-36 on **Exhibit 1**. These vehicles, prior to their purchase by AWB, were in Palm Beach County, Florida, and continue to be held in Palm Beach County, Florida.

10.    AWB is presently storing the aforementioned vehicles in its possession in an air-conditioned, secured facility located in Palm Beach County, Florida. Moreover, AWB procured a commercial general liability insurance in the sum of $500,000, per vehicle, each occurrence. A copy of the certificate of insurance is attached hereto as **Exhibit 4**.

*Affidavit of Moshe Farache, Filed of Record in this matter on July 21, 2022 as Filing No. 153792567*

Page 40 of 90

*(filed then as Exhibit GG – not to be confused with Exhibit GG to this Complaint ).*

249.    The Exhibit attached to Defendant Moshe Farache's aforementioned Affidavit, Exhibit 1, listed the following *22 cars*:

| | MAKE | MODEL | YEAR | COLOR | VIN | PURCHASE DATE | TITL |
|---|---|---|---|---|---|---|---|
| 1 | ASTON MARTIN | DB11 VOLANTE | 2019 | BEIGE | SCFRMFCW6KGM07671 | 2/28/2022 | Y |
| 2 | FERRARI | F12 BERLINETTA | 2017 | RED | ZFF74UFA7H0221036 | 2/2/2022 | Y |
| 6 | MERCEDES | G63 | 2020 | GREEN | W1NYC7HJ6LX346462 | 2/23/2022 | Y |
| 8 | ROLLS ROYCE | GHOST | 2021 | GRAY | SCATV0C04MU207524 | 3/9/2022 | N |
| 10 | BENTLEY | FLYING SPUR | 2017 | BLACK | SCBEC9ZA0HC065523 | 4/1/2022 | Y |
| 11 | BMW | X7 | 2019 | BLUE | 5UXCX4C56KLS39222 | 12/29/2021 | Y |
| 13 | GMC | YUKON | 2019 | WHITE | 1GKS1CKJ8KR354378 | 3/15/2022 | Y |
| 16 | MCLAREN | 720S | 2018 | WHITE | SBM14DCA9JW000606 | 3/1/2022 | Y |
| 17 | MERCEDES | G WAGON | 2021 | WHITE | W1NYC7HJ0MX390328 | 2/16/2022 | Y |
| 18 | MERCEDES | G63 | 2020 | BLUE | W1NYC7HJ6LX362080 | 2/9/2022 | Y |
| 20 | PORSCHE | 911 | 2008 | RED | WP0AD29978S783176 | 3/15/2022 | Y |
| 24 | MCLAREN | 720S | 2020 | WHITE | SBM14FCA5LW004229 | 1/19/2022 | Y |
| 26 | LAMBORGHINI | URUS | 2019 | BLUE | ZPBUA1ZLXKLA01961 | 3/7/2022 | N |
| 27 | FERRARI | 812 SUPERFAST | 2020 | BLACK | ZFF83CLA1L0254693 | 3/9/2022 | Y |
| 28 | CADILLAC | ESCALADE | 2018 | BLACK | 1GYS4BKJXJR261612 | 4/2/2022 | Y |
| 29 | FERRARI | 458 ITALIA | 2013 | BLACK | ZFF68NHA8D0191526 | 4/2/2022 | Y |
| 30 | JEEP | GLADIATOR | 2021 | BLACK | 1C6HJTAG0ML564806 | 4/2/2022 | Y |
| 31 | JEEP | GLADIATOR | 2021 | BLACK | 1C6HJTAG1ML571540 | 4/2/2022 | Y |
| 32 | LAMBORGHINI | HURACAN | 2017 | BLACK | ZHWUR2ZF8HLA08121 | 4/2/2022 | Y |
| 34 | MCLAREN | 720S | 2018 | BLACK | SBM14DCA7JW001804 | 4/2/2022 | Y |
| 35 | MCLAREN | 720S | 2019 | ORANGE | SBM14FCA9KW003714 | 4/2/2022 | Y |
| 36 | MERCEDES | G CLASS | 2020 | BLUE | WDCYC7HJ9LX334940 | 4/2/2022 | Y |

250.    While Farache's attorneys Brandes and Blinderman represented that "27 vehicles that currently are in Mr. Farache's possession. They're being held in an air conditioned secure location[,]" Defendant Moshe Farache stated in writing and under oath that 22 were in his possession by Affidavit on April 14, 2022. *Meaning 10 cars were removed from the list sent to the FVP Parties' attorneys the previous day.*

251.    At the hearing of April 14, 2022, Farache's attorneys stated, in no uncertain terms, that the number of cars as represented as being held by Defendant Moshe Farache were safe.

252.    The Court took Defendant Moshe Farache at his word and ordered a "freeze frame," wherein no cars could be sold, and ordered that cars, the number of which were represented as being held by Defendant Moshe Farache and his attorneys, be safeguarded. The Court authorized the FVP Parties to immediately check the vehicles, and the location of the vehicles was stated on the record at the hearing.

253.    Immediately after the hearing, Robert Crispin, the FVP Parties' investigator, went to the "airconditioned warehouse" identified by Defendant Moshe Farache and *found only 13 vehicles*. Defendants Moshe Farache and Lisa Farache confirmed to Mr. Crispin that those were all the remaining vehicles from the over 32 vehicles that were originally taken by Defendants Moshe Farache, Lisa Farache, and Chase Farache from the Karma Entities' lots.

254.    Further, one of the vehicles that Defendant Moshe Farache represented in his April 14, 2022 Affidavit as being "safeguarded" in the "air-conditioned warehouse" – Vehicle No. 30 in Exhibit 1 to the Moshe Farache Affidavit (a 2021 Jeep Gladiator Black, VIN: 1C6HJJAG0ML564806 (Gladiator 4806)) which came into the possession of Defendant Moshe Farache on or about April 1, 2022 – was, in fact, sold during or after the hearing. **Exhibit BB**.

255.    The Affidavit of Defendant Moshe Farache, filed by his attorneys on April 14, 2022, diametrically changed the claim that Defendant Moshe Farache was making to the vehicles from that made under oath in the foreclosure action in Palm Beach County just six (6) days prior. In Defendant Moshe Farache's April 14, 2022 Affidavit, Defendant Moshe Farache swore under oath that he *purchased* all of the vehicles and that he was entitled to the possession of the vehicles because he or his companies then owned them.

256.    On April 15, 2022, the FVP Parties immediately moved to hold Defendant Moshe Farache in contempt for his intentional misrepresentations to the Court the previous day.

257.    In an attempt to defend against the rule to show cause in contempt and to spin the obviously false affidavit filed of record on April 14, 2022, Defendant Moshe Farache filed a *third* Affidavit on May 26, 2022 in which he offered various excuses for his April 14, 2022 sworn statement and then stated that he was holding *19 vehicles*. Meaning he added six (6) vehicles that he was hiding at a different location when questioned by the investigator on April 14, 2022. **Exhibit CC**.

258.    In the May 26, 2022 Affidavit, Defendant Moshe Farache makes clear that the reason that his prior affidavit filed on April 14, 2022 was inaccurate was the fault of his attorney Mark Brandes who filed the affidavit without verifying any of the facts within it and, in fact, filed a document that was inaccurate. See **Exhibit CC**.

259.    From the date the Plaintiffs' collateral was taken from the Karma Entities' lots, Defendants Moshe Farache and Lisa Farache sold several of the vehicles that comprise the FVP Parties' collateral and conspired with others to sell the FVP Parties' collateral.

260.    The acts of Defendants Moshe Farache, Lisa Farache and other co-conspirators in making the aforementioned misrepresentations to the attorneys for the FVP Parties and the Court were intentional and made for the sole purpose of delaying and obfuscating the ability of the FVP Parties to retrieve and reclaim their Collateral, permitting Defendants Moshe Farache and Lisa Farache, and their aiders, abettors and co-conspirators, to convert, sell, or otherwise fraudulently transfer the FVP Parties'

collateral and the proceeds therefrom.

261.    None of the funds from the sale of any of the vehicles that the Brandes Firm announced were sold at the April 14, 2022 hearing were safeguarded pending the FVP Parties' claims.

262.    Due to the acts Moshe Farache and Lisa Farache, in conspiring to and actually converting the FVP Parties' collateral, the FVP Parties were damaged in an amount of no less than $3.1 million dollars. **Exhibit PP.**

**J.      MOSHE FARACHE'S CLAIM TO OWNERSHIP OF ANY OF THE VEHICLES TAKEN WAS FRAUDULENT AND AN INTENTIONAL ACT TO DEFRAUD THE FVP PARTIES.**

263.    Defendant Moshe Farache's claim to ownership of any of the vehicles or other property removed from the lots of the Karma Entities, either personally or through any of his companies, was fabricated. The Karma Entities, at all times, owned all of the vehicles that were taken by Defendants Moshe Farache, Lisa Farache, Chase Farache, and their co-conspirators on or about April 1, 2022.

264.    Defendants Farache and Zankl had a creditor / debtor relationship. Part of the creditor / debtor relationship was pursuant to a written loan agreement, while the other part was oral. The result being that Defendant Moshe Farache was charging and collecting a usurious interest rate from Zankl and his companies over the years.

265.    To hide the illegal loans, Defendant Moshe Farache created false paperwork to ostensibly show that after one of the Karma Entities purchased a vehicle, it would then purportedly be sold to non-party EAG and then to one of the Farache's companies.

266.    These transactions were completed without money representing the market value of the vehicles actually being paid between any of the parties and were done at the request of Defendant Moshe Farache, who apparently believed that these transactions would give him (Defendant Moshe Farache) a basis to assert a security interest in the vehicles to make up for the lack of a security agreement and financing statement from the Karma Entities.

267.    At no time in 2021 for the over 100 fabricated transactions did Defendant Moshe Farache or his companies ever take possession of any of the vehicles. At all times, the vehicles remained on the Karma Entities' lots until ultimate customers bought the vehicles by paying funds directly to the Karma Entities. In other words, the Karma Entities sold the vehicles to the end customer.

268.    Transactions in 2022 were no different. Defendant Moshe Farache, with the forced

acquiescence under duress of Zankl and other Karma Entities' employees, created false paperwork to show, ostensibly, that after one of the Karma Entities purchased a vehicle from a third party, the vehicle would then be sold to non-party EAG, which would then either transfer it to Defendant Moshe Farache or his companies, or back to one of the Karma Entities.

269. The 2022 transactions were completed without objective market value being paid or adequate consideration being exchanged between any of the parties when compared to the value of the vehicles ostensibly transacted. All of the paper transactions were done at the demand of Defendant Moshe Farache who believed that these transactions would give him or his companies a legitimate claim to either a security interest in the vehicles, or ownership of the vehicles.

270. All of the paper transactions were false and intentionally false.

271. All of the applicable bank records and other documentary evidence reflect that Defendant Moshe Farache and his companies received millions of dollars from the Karma Entities when it should have been paying those sums if the created putative purchase and sale paperwork was in fact true.

272. The reason for all of the above sham transactions and the participation of Zankl in the false paperwork is that when Zankl told Defendant Moshe Farache that he and non-party EAG were having problems paying the money that Zankl and non-party EAG borrowed from Defendant Moshe Farache, Zankl was threatened by Defendant Moshe Farache who created an atmosphere of extreme duress and intimidation.

**K.** **AS A CONTINUATION OF THE FRAUD, MOSHE FARACHE, WITH THE HELP OF HIS LAWYERS FILED A FALSE AND FRAUDULENT BANKRUPTCY PETITION FOR THE SOLE PURPOSE OF MAKING THE FVP PARTIES SPEND EXTRAORDINARY FEES AND COSTS TO RECOVER THEIR COLLATERAL IN A SEPARATE LAWSUIT.**

273. On the eve of a hearing scheduled for July of 2022 in which the FVP Parties sought to recover their collateral by replevin, Defendant Farache, for non-party AWB, filed the AWB Bankruptcy.

274. The filing of the AWB Bankruptcy required the FVP Parties to spend an extraordinary amount of money in attorney's fees and costs as it placed the FVP Parties in a position where it was necessary to protect their interests in a suit against the AWB Bankruptcy estate as well as against Defendants Hi Bar and Franklin as a result the fraud of Defendant Moshe Farache and his co-conspirators.

275. The fraud committed by Defendant Moshe Farache and his co-conspirators placed the FVP Parties in a position where it was necessary to protect their interests in a suit against the AWB Bankruptcy estate as well as Hi Bar and Franklin in the Bankruptcy Case in an adversary complaint.

276. The FVP Parties demand, from Defendant Moshe Farache and his co-conspirator Defendant Lisa Farache, their attorney's fees and costs incurred in the AWB Bankruptcy which were wholly caused by Defendant Moshe Farache and his co-conspirator Defendant Lisa Farache's fraud and deceit and were the natural and necessary consequences of their fraudulent acts.

**L.** **THE BANKRUPTCY COURT FOUND THAT THE AWB BANKRUPTCY WAS FILED IN BAD FAITH, SUGGESTED THAT DEFENDANT MOSHE FARACHE ENGAGED IN ACTS TO DEFRAUD THE FVP PARTIES AND THAT DEFENDANT MOSHE FARACHE COULD NOT BE BELIEVED.**

277. The salient order of the United States Bankruptcy Court in and for the Southern District of Florida entered in the AWB Bankruptcy is filed herewith as **Exhibit FF**.

278. That order converted the AWB Bankruptcy case to a Chapter 7.

279. As a result of this conversion to a Chapter 7, the remaining vehicles taken by Defendant Moshe Farache were ordered auctioned, with the proceeds to be placed into an escrow account pending the outcome of the priority determination that is the subject matter of the claims in this Complaint against Hi Bar regarding the priority of the claimed security interests to the claimed collateral (the "Auctioned Vehicle Fund"). **Exhibit GG**. The Auctioned Vehicle Fund will also include those funds derived from the sale of any other vehicles which comprise the FVP Parties collateral  not included in the AWB Bankruptcy and those funds held in escrow by agreement of the parties.

280. The FVP Parties seek, *inter alia*, an order directing the entire Auctioned Vehicle Fund be paid over to them (the FVP Parties) as well as any other FVP Parties' collateral or funds derived therefrom.

281. Neither Defendants Moshe Farache nor Lisa Farache nor non-party AWB, were ever a purchaser in good faith of any of the vehicles that are being sold to comprise the Auctioned Vehicle Fund.

282. The FVP Parties have retained undersigned counsel and have agreed to pay undersigned counsel a reasonable fee for their services.

283. All conditions precedent to bringing this action have been met, have occurred, or have been waived.

## PART I
## TORT CLAIMS

## COUNT I
## FRAUD AND FRAUD IN THE INDUCEMENT
### AGAINST LUBIN, GETTER, HERBST, AND HI BAR

284.    The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283 and further allege:

285.    At all times outlined in this Complaint, all acts and statements of Lubin alleged in this Complaint, alleged as being done under the guise of acting for, and on behalf of, Hi Bar or Spin, were done or made after consultation with, and with the consent and prompting of, Getter and Herbst. All acts and statements of Lubin alleged in this Complaint were done or said for Lubin, Getter, and Herbst, personally and individually, in addition to alter egos Hi Bar and Spin, and were done for an illegal and illicit purpose.

286.    Commencing in and around October of 2021, and continuing through the date of the filing of this Complaint, Defendants Lubin, Getter, Herbst, and Hi Bar made representations to the FVP Parties and others, including lawyers, witnesses, and representatives of the FVP Parties, that Hi Bar did not have a protectable security interest in the inventory of the Karma Entities.

287.    Lubin, Getter, Herbst, and Hi Bar specifically and intentionally caused the filing of a UCC termination statement on or about December 19, 2021 for the express purpose of representing to the FVP Parties and their due diligence investigators that Hi Bar did not have a protectable security interest in the inventory of the Karma Entities.

288.    This termination of the four (4) days old UCC Financing Statement - **Exhibit E** - was specifically and intentionally made as a material direct, false, and fraudulent misrepresentation to the FVP Parties that Hi Bar had no secured interests in the Karma Entities' collateral. The termination states:

> "Effectiveness of the Financing Statement identified above is terminated with respect to the security interests of the Secured Party authorizing this Termination Statement."

*Id*.

289.    This representation filed of public record, **Exhibit E**, was intentionally made to the FVP Parties and was so made for the sole purpose of notifying the FVP Parties that Hi Bar had no security interests to protect. This representation was false when made and intentionally false. The FVP Parties justifiably relied upon the misrepresentation to their detriment.

290.   To double down on the fraud, non-party Zakharyayev, an attorney acting for Defendants Lubin, Getter, Herbst, and Hi Bar, advised non-party O'Donnell, an agent intermediary between the FVP Parties and Zankl, that the Hi Bar UCC Financing Statement of December 15, 2021 was a mistake and was "erroneously filed." **Exhibit F** and **Exhibit QQ.**

291.   This representation was specifically made to the FVP Parties for the sole purpose of notifying the FVP Parties that Hi Bar had no security interests to protect, and was false when made and intentionally false. The FVP Parties justifiably relied upon the misrepresentation to their detriment.

292.   The sole purpose of the termination filed in the public record and communicated to the FVP Parties, together with the explanation that the filing was a mistake, was to convince the FVP Parties that Hi Bar had no protectable interest in the collateral of the Karma Entities so that the FVP Parties would rest assured that Hi Bar was not a threat to their security interests and proceed to fund a loan to the Karma Entities with Defendants Lubin, Getter, Herbst, and Hi Bar waiting in the wings to pounce with a second UCC Financing Statement which would be filed minutes before any filing by the FVP Parties.

293.   Defendants Lubin, Getter, Herbst, and Hi Bar knew that the statements were false.

294.   Defendants Lubin, Getter, Herbst, and Hi Bar knew or should have known that the FVP Parties would rely on their intentional misrepresentations.

295.   The FVP Parties did, in fact, rely upon these false and intentional misrepresentations to their detriment.

296.   In justifiable reliance on the aforementioned false and intentional misrepresentations, the FVP Parties loaned the FVP Loan to Zankl and the Karma Entities in tranches beginning on January 26, 2022; only to later learn that late the night before, Defendant Hi Bar, at the request of Defendant Lubin, filed a UCC financing statement to ostensibly create a superior position for Defendants Lubin, Herbst, and Hi Bar  in the FVP Parties' collateral.

297.   The actions of Defendants Lubin, Getter, Herbst, and Hi Bar constitute fraud.

298.   The fraud was perpetrated by Defendants Lubin, Getter, Herbst, and Hi Bar to unlawfully receive the funds that the FVP Parties would loan to the Karma Entities by transfer from the Karma Entities that the FVP Parties were unaware of and did not approve, and would not have made the loan had they been aware of such.

299.     As a direct and proximate result of Defendants Lubin, Getter, Herbst, and Hi Bar's fraud, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

300.     But for the fraud, the FVP Loan would not have been made. Accordingly, the FVP Loan was the direct result of, and induced by, the fraud of Defendants Lubin, Getter, Herbst, and Hi Bar.

301.     The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

302.     The fraud committed by Defendants Lubin, Getter, Herbst, and Hi Bar placed the FVP Parties in a position where it was necessary for the FVP Parties to incur fees and costs to protect their interests in a separate action filed in the United States Bankruptcy Court – *In Re Auto Wholesale of Boca, LLC*, Case No.: 22-15627-EPK and Adversary Case No.: 22-01218-EPK – against Hi Bar and other Defendants (the "Bankruptcy Court Litigation").

303.     In addition to other damages, the FVP Parties demand from Defendants Lubin, Getter, Herbst, and Hi Bar those attorney's fees and costs incurred in the Bankruptcy Court Litigation resulting from the fraud and deceit of Defendants Lubin, Herbst, and Hi Bar as the natural and necessary consequences of their fraudulent acts.

304.     The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants Lubin, Getter, Herbst, and Hi Bar for damages in an amount within the jurisdictional limits of this Court. The FVP Parties demand a trial by jury on this Count I.

## COUNT II
## CIVIL CONSPIRACY TO COMMIT FRAUD
### LUBIN, GETTER, HERBST, AND HI BAR

305.     The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283, and further allege:

306.     At all times outlined in this Complaint, all acts and statements of Lubin alleged in this Complaint, alleged as being done under the guise of acting for, and on behalf of, Hi Bar or Spin, were done or made after consultation with, and with the consent and prompting of, Getter and Herbst. All acts and statements of Lubin alleged in this Complaint were done or said for Lubin, Getter, and Herbst,

personally and individually, in addition to alter egos Hi Bar or Spin, and were done for an illegal and illicit purpose.

307.    This is an action for civil conspiracy, seeking damages in excess of $50,000, exclusive of interest, attorneys' fees and costs.

308.    Commencing in and around October of 2021, and continuing through the date of the filing of this Complaint, Defendants Lubin, Getter, Herbst, and Hi Bar, together with non-party co-conspirator Zakharyayev and others known and unknown to the FVP Parties, acted in concert to develop and pursue the scheme detailed in this Complaint to wrongly defraud the FVP Parties.

309.    Defendants Lubin, Getter, Herbst, and Hi Bar and non-party Zakharyayev and others known and unknown to the FVP Parties, acted in concert to make representations to the FVP Parties and others, including lawyers, witnesses, and representatives of the FVP Parties, Zankl, and the Karma Entities, that Hi Bar did not have a protectable security interest in the inventory of the Karma Entities. These representations were false and intentionally false.

310.    The misrepresentations were made to fraudulently induce the loan that the FVP Parties intended to make to Zankl and the Karma Entities for the express intent that Defendants Lubin, Getter, Herbst, and Hi Bar would be given a portion of the loan proceeds, sums to which they were not entitled.

311.    Specifically, each of Defendants Lubin, Getter, Herbst, and Hi Bar, and non-party Zakharyayev, undertook an overt act, or multiple overt acts, in pursuit of the conspiracy, which include, but are not limited to:

a.  Lubin, Getter, and Herbst pressuring Zankl to supply the FVP Parties / Karma Entities confidential and private loan documents to them (Lubin, Getter, and Herbst) so that Lubin, Getter, Herbst, and Hi Bar could plan when to file UCC financing statements just prior to loan funding.

b.  Lubin, Getter, and Herbst causing the filing of the UCC Termination Statement on or about December 19, 2021 for the sole purpose of making a false representation to the FVP Parties;

c.  Lubin, Getter, and Herbst representing to the FVP Parties, by filing the UCC Termination Statement, that Defendant Hi Bar did not have a protectable security interest in the inventory of the Karma Entities;

d. Co-conspirator Zakharyayev telling Zankl's representative O'Donnell that the UCC December 15, 2021 UCC Financing Statement was a mistake.

e. Lubin, Getter, and Herbst planning to file a UCC financing statement late at night for the express purpose of hiding the filing from the due diligence inquiries of the FVP Parties;

f. Lubin, Getter, and Herbst instructing non-party Zakharyayev to file the UCC financing statement late at night before the FVP loan closing for the express purpose of hiding the filing from the pre-closing due diligence inquiries of the FVP Parties;

g. Defendant Lubin pressuring Zankl and the Karma Entities to deliver $1,300,000.00 derived from the FVP Loan to Defendants Lubin, Getter, Herbst, and Hi Bar knowing full well that the loaned funds could not be used for such purposes, and directing the funds be paid to the account of non-party Zakharyayev for distribution to the co-conspirators; and

h. Lubin, Getter, and Herbst demanding unconscionable and illegal payments on loans masquerading as a purchase of "receivables."

312.    The agreement, scheme, and overt acts of Defendants Lubin, Getter, Herbst, and Hi Bar, together with non-party co-conspirator Zakharyayev and other co-conspirators unknown to the FVP Parties at this time, in furtherance of their unlawful and fraudulent scheme constitutes a civil conspiracy in violation of Florida law.

313.    Defendants Lubin, Getter, and Herbst, together with non-party co-conspirator Zakharyayev, each had a personal stake in the conspiracy, separate from Hi Bar, which personal stake was more than incidental and motivated by personal bias.

314.    As a direct and proximate result of the acts of Defendants Lubin, Getter, Herbst, and Hi Bar, together with non-party co-conspirator Zakharyayev, and other co-conspirators unknown to the FVP Parties at this time, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

315.    But for the conspiracy, the FVP Loan would not have been made. The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

316. The fraud committed by Defendants Lubin, Getter, Herbst, and Hi Bar placed the FVP Parties in a position where it was necessary for the FVP Parties to incur fees and costs to protect their interests in a separate action filed in the United States Bankruptcy Court – *In Re Auto Wholesale of Boca, LLC*, Case No.: 22-15627-EPK and Adversary Case No.: 22-01218-EPK – against Hi Bar and other Defendants (the "Bankruptcy Court Litigation").

317. In addition to other damages, the FVP Parties demand from Defendants Lubin, Getter, Herbst, and Hi Bar those attorney's fees and costs incurred in that Bankruptcy Court Litigation resulting from the fraud and deceit of Defendants Lubin, Getter, Herbst, and Hi Bar as the natural and necessary consequences of their fraudulent acts.

318. The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants Lubin, Getter, Herbst, and Hi Bar for an amount within the jurisdictional limits of this Court. The FVP Parties demand a trial by jury on this Count II.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
LUBIN, GETTER, HERBST, AND HI BAR

319. The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283 and further allege:

320. At all times outlined in this Complaint, all acts and statements of Lubin alleged in this Complaint, alleged as being done under the guise of acting for, and on behalf of, Hi Bar or Spin, were done or made after consultation with, and with the consent and prompting of, Getter and Herbst. All acts and statements of Lubin alleged in this Complaint were done or said for Lubin, Getter, and Herbst, personally and individually, in addition to alter egos Hi Bar or Spin, and were done for an illegal and illicit purpose.

321. Commencing in and around October of 2021, and continuing through the date of the filing of this Complaint, Defendants Lubin, Getter, Herbst, and Hi Bar made representations to the FVP Parties and others, including lawyers, witnesses, and representatives of the FVP Parties, that Hi Bar did not have a protectable security interest in the inventory of the Karma Entities.

322. Lubin, Getter, Herbst, and Hi Bar specifically and intentionally caused the filing of a UCC termination statement on or about December 19, 2021 for the express purpose of representing to

the FVP Parties and their due diligence investigators that Hi Bar did not have a protectable security interest in the inventory of the Karma Entities.

323.    This termination of the four (4) days old UCC Financing Statement - **Exhibit E** - was specifically and intentionally made as a material direct, false, and fraudulent misrepresentation to the FVP Parties that Hi Bar had no secured interests in the Karma Entities' collateral. The termination states:

324.    "Effectiveness of the Financing Statement identified above is terminated with respect to the security interests of the Secured Party authorizing this Termination Statement." *Id.*

325.    This representation filed of public record, **Exhibit E**, was intentionally made to the FVP Parties and was so made for the sole purpose of notifying the FVP Parties that Hi Bar had no security interests to protect. This representation was false when made and intentionally false. The FVP Parties justifiably relied upon the misrepresentation to their detriment.

326.    To double down on the fraud, non-party Zakharyayev, an attorney acting for Defendants Lubin, Getter, Herbst, and Hi Bar, advised non-party O'Donnell, an agent intermediary between the FVP Parties and Zankl, that the Hi Bar UCC Financing Statement of December 15, 2021 was a mistake and was "erroneously filed." **Exhibit F**. **Exhibit QQ**.

327.    This representation was specifically made to the FVP Parties for the sole purpose of notifying the FVP Parties that Hi Bar had no security interests to protect, and was false when made and intentionally false. The FVP Parties justifiably relied upon the misrepresentation to their detriment.

328.    The sole purpose of the termination filed in the public record and communicated to the FVP Parties, together with the explanation that the filing was a mistake, was to convince the FVP Parties that Hi Bar had no protectable interest in the collateral of the Karma Entities so that the FVP Parties would rest assured that Hi Bar was not a threat to their security interests and proceed to fund a loan to the Karma Entities with Defendants Lubin, Getter, Herbst, and Hi Bar waiting in the wings to pounce with a second UCC Financing Statement which would be filed minutes before any filing by the FVP Parties.

329.    Defendants Lubin, Getter, Herbst, and Hi Bar knew or should have known that the statements were false.

330.    Defendants Lubin, Getter, Herbst, and Hi Bar knew or should have known that the FVP Parties would rely on their intentional misrepresentations.

331.	The FVP Parties did, in fact, rely upon these false and intentional misrepresentations to their detriment.

332.	The FVP Parties, in fact, justifiably relied upon the misrepresentations and acted upon the misrepresentations to their detriment.

333.	In justifiable reliance on the aforementioned misrepresentations, the FVP Parties loaned the FVP Loan to Zankl and the Karma Entities in tranches beginning on January 26, 2022, only to later learn that late the night before, Defendant Hi Bar, at the request of Defendant Lubin, filed a UCC financing statement to ostensibly create a superior position for Defendants Lubin, Herbst, and Hi Bar in the FVP Parties' collateral securing the FVP Loan.

334.	The actions of Defendants Lubin, Getter, Herbst, and Hi Bar constitute negligent misrepresentation.

335.	As a direct and proximate result of Defendants Lubin, Herbst, and Hi Bar 's negligent misrepresentation, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

336.	But for the negligent misrepresentation, the FVP Loan would not have been made. The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

337.	The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants Lubin, Herbst, and Hi Bar for an amount within the jurisdictional limits of this Court. The FVP Parties demand a trial by jury on this Count III.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**
LUBIN, GETTER, HERBST, AND HI BAR

338.	The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283 and further allege:

339.	At all times outlined in this Complaint, all acts and statements of Lubin alleged in this Complaint, alleged as being done under the guise of acting for, and on behalf of, Hi Bar or Spin, were done or made after consultation with, and with the consent and prompting of, Getter and Herbst. All

acts and statements of Lubin alleged in this Complaint were done or said for Lubin, Getter, and Herbst, personally and individually, in addition to alter egos Hi Bar or Spin, and were done for an illegal and illicit purpose.

340.    This is an action for intentional interference with advantageous business relationships, seeking damages in excess of $50,000, exclusive of interest, attorneys' fees and costs.

341.    Commencing in and around October of 2021 and continuing through the date of the filing of this Complaint, the FVP Parties had a prospective and ongoing business relationship with Zankl and the Karma Entities.

342.    Defendants Lubin, Getter, Herbst, and Hi Bar were fully aware of the existence of the prospective and ongoing business relationship.

343.    Through statements and acts, Defendants Lubin, Getter, Herbst, and Hi Bar, personally or by and through their agents, intentionally, knowingly and without justification interfered with those advantageous and prospective business relationships by making material misrepresentations, engaging in unlawful acts, and surreptitiously scheming to impose their interests in a superior position to the FVP Parties by unconscionable and tortious acts as pled in this Complaint.

344.    As a direct and proximate result, the FVP Parties have suffered damages within the jurisdictional limits of this Court.

345.    The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

346.    The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants Lubin, Getter, Herbst, and Hi Bar for an amount within the jurisdictional limits of this Court. The FVP Parties demand a trial by jury on this Count IV.

## COUNT V
## COMPLAINT TO VOID OR SUBORDINATE HI BAR UCC FILING BASED ON FRAUD
### HI BAR

347.    The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283 and further allege:

348.    The FVP Parties seek to void or subordinate any lien arising from the January 25, 2022

Hi Bar UCC filing, **Exhibit J**, based on fraud in any of the Karma Entities' inventory and the Auctioned Vehicle Fund.

349. The actions of Defendant Hi Bar comprise fraudulent conduct with the intended and express target of the fraud being the FVP Parties.

350. The UCC Termination Statement filed on December 19, 2021 was an "instrument" as defined in Section 817.535 of the Florida Statutes, and contained materially false information and was filed with the intent to defraud.

351. The UCC Financing Statement filed on January 25, 2022 at 10:55 pm was an "instrument" as defined in Section 817.535 of the Florida Statutes, and was filed with the intent to defraud and was the second act to the immediately aforementioned December 19, 2022 fraudulent filing.

352. The UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. was a materially false, fictitious, or fraudulent statement or representation as the filing itself was the final overt act to execute the sting and the last deliberate action taken to carry out the con and perpetrate a fraud against the FVP Parties; was filed for the sole purpose of defrauding the FVP Parties; and Defendant Hi Bar paid no consideration for the alleged interest.

353. The FVP Parties demand that the UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. be declared null and void *ab initio* or otherwise subordinating it to the UCC filing of the FVP Parties.

354. The FVP Parties demand a finding of intent to defraud or harass to be determined by a jury.

355. The FVP Parties demand actual damages and such other relief as the Court deems just and proper within its sound discretion.

356. The FVP Parties have retained undersigned counsel and have agreed to pay undersigned counsel a reasonable fee.

WHEREFORE, the FVP Parties demand judgment against Hi Bar voiding the UCC statement in whole or in part, or otherwise subordinating it to the UCC filing of the FVP Parties, such other relief as the Court deems just and proper. The FVP Parties demand a trial by jury on this Count V.

**COUNT VI**
**COMPLAINT TO VOID OR SUBORDINATE HI BAR UCC FILING**
**BASED ON ILLEGALITY**

H<small>I</small> B<small>AR</small>

357.    The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283 and further allege:

358.    The FVP Parties seek to void or subordinate any lien arising from the January 25, 2022 Hi Bar UCC filing, **Exhibit J**, based on illegality in any of the Karma Entities' inventory and the Auctioned Vehicle Fund.

359.    The acts of Lubin, Getter, Herbst, and Hi Bar are outrageous, violate Florida public policy, are unconscionable and are unquestionably illegal in Florida. To the extent that this Court is required to view the acts of Defendant Hi Bar through the prism of New York law; it is clear that the loans were less than $2.5 million at commencement and the usurious interest, itself, cannot be used to bootstrap an illegal loan into a legal loan by combining legal principal and illegal interest.

360.    Defendants Lubin, Getter, Herbst, and Hi Bar may call it an "advance" or "purchase of receivables," but it was, and is, an obvious usurious loan, plain and simple. None of the borrowers had receivables. Hi Bar and Spin attempted to mask their loan agreements as receivables purchases, but Hi Bar never bothered to analyze the receivables because the fact that borrowers had no receivables would have made no difference.

361.    These were criminally usurious loan contracts under both New York law and Florida law created by very smart lawyers for very unethical lenders. As to the "Balance Transfer" to Defendant Hi Bar, the loan charges increased by Fifty and Three-Tenths Percent (50.3%). When Hi Bar, Zankl, non-party EAG, and the Karma Entities executed a "Settlement Agreement," the loan charges increased another Fifty Percent (50%) – without a penny being paid to non-party EAG or the Karma Entities.

362.    The FVP Parties demand that this Court find that the merchant contract agreements entered into between Hi Bar, Zankl, non-party EAG, and the Karma Entities, and ensuing conduct and pressure tactics, were unconscionable, illegal, and violative of Florida public policy and therefore the UCC that spawned from the illegal conduct was void and unenforceable.

363.    The Hi Bar UCC Financing Statement filed on January 25, 2022 was the intended result and the fruit of the unconscionable and illegal conduct and was intended to cause direct harm to the FVP Parties.

364. The FVP Parties demand that the court declare the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. null and void or otherwise subordinated to the lawful UCC filing of the FVP Parties.

WHEREFORE, the FVP Parties demand judgment against Hi Bar  voiding the UCC statement in whole or in part, or otherwise subordinating it to the UCC filing of the FVP Parties, and such other relief as the Court deems just and proper. The FVP Parties demand a trial by jury on this Count VI.

## COUNT VII
## COMPLAINT TO VOID OR SUBORDINATE HI BAR UCC FILING BASED ON THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT
### HI BAR

365. The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283 and further allege:

366. The FVP Parties seek to void or subordinate any lien arising from the January 25, 2022 Hi Bar UCC filing, **Exhibit J**, based on the Florida Uniform Fraudulent Transfer Act (the "FUFTA") in any of the Karma Entities' inventory and the Auctioned Vehicle Fund.

367. This is a claim to avoid a fraudulent obligation as to a future creditor pursuant to Sections 726.105(1)(a) and (b) as well as Section 726.108(1) of the Florida Statutes, the FUFTA.

368. The FVP Parties are a creditor as defined in Section 726.102 of the Florida Statutes as they hold claims against the Karma Entities under loan agreements and as a future creditor as defined in Section 726.105 of the Florida Statutes.

369. The Karma Entities are a debtor as defined in Section 726.102 of the Florida Statutes to both the FVP Plaintiffs and Hi Bar.

370. On or about October 17, 2021, Zankl, for non-party EAG and the Karma Entities, entered into a financial transaction with Defendant Hi Bar.

371. The result of that transaction was that non-party EAG, and the Karma Entities became obligated to Defendant Hi Bar as debtors, resulting in Defendant Hi Bar having purported rights under the transaction documents, to which the FVP Plaintiffs object, to file a UCC Financing Statement against the Karma Entities' inventory.

372. The obligation to Hi Bar was incurred by Zankl for non-party EAG and the Karma Entities with the actual intent of hindering, delaying, or defrauding creditors, including the FVP Parties, and was made (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation.

373. At the time of the obligation, Zankl, for non-party EAG and the Karma Entities, was engaged in, or was about to engage in, a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or, intended to incur, or believed or reasonably should have believed that he or she or it would incur, debts beyond his or her or its ability to pay as they became due.

374. At the time the obligation was incurred, Zankl, for non-party EAG and the Karma Entities, concealed the obligation; prior to the obligation, non-party EAG and the Karma Entities were sued or threatened with suit; the obligation was incurred just days before another substantial debt was incurred; non-party EAG and the Karma Entities received no equivalent value for the obligation, and, in fact, received additional debt instead of consideration; no proceeds of the Hi Bar "financing" were funded to, or for, the benefit of the Karma Entities; and non-party EAG and the Karma Entities were insolvent at the time the obligation was incurred, or were rendered insolvent by such obligation, or became insolvent shortly after the obligation was incurred.

375. The FVP Parties are entitled to the avoidance of the Karma Entities / Hi Bar obligation to the extent necessary to satisfy their claims to their security interests in the Karma Entities or the Auctioned Vehicle Fund pursuant to Section 726.108(1)(a) of the Florida Statutes.

376. The FVP Parties have a claim in the amount of $7.5 million dollars against the Karma Entities, which is reflected in a lien on the inventory and assets of the Karma Entities.

377. Defendant Hi Bar alleges to have a corresponding lien on the Karma Entities' inventory or the Auctioned Vehicle Fund or other proceeds from the collateral that arises from a transaction that is voidable under the FUFTA.

378. The FVP Parties demand that the Court avoid or subordinate the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. if, and only to the extent that, it creates a lien that could be deemed superior to that of the FVP Parties in any of the Karma Entities' inventory and the Auctioned Vehicle Fund.

WHEREFORE, the FVP Parties demand judgment against Defendant Hi Bar voiding the UCC statement in whole or in part, or otherwise subordinating it to the UCC filing of the FVP Parties, and such other relief as the Court deems just and proper. The FVP Parties demand a trial by jury on this Count VII.

**COUNT VIII**
**COMPLAINT TO EQUITABLY SUBORDINATE THE HI BAR UCC FILING**

HI BAR

379.    The FVP Parties reallege paragraphs 1-56, 62-209, 227-229, 283 and further allege:

380.    The FVP Parties seek to void or subordinate any lien arising from the January 25, 2022 Hi Bar UCC filing, **Exhibit J**, based on common law equitable subordination in any of the Karma Entities' inventory and the Auctioned Vehicle Fund.

381.    The actions of Defendants Lubin, Getter, Herbst, and Hi Bar as outlined in this Complaint comprise fraud, gross misconduct, and inequitable conduct.

382.    The actions of Defendants Lubin, Getter, Herbst, and Hi Bar as outlined in this Complaint are unconscionable, egregious and severely unfair to other creditors, including the FVP Parties.

383.    The gross misconduct and inequitable conduct of Defendants Lubin, Getter, Herbst, and Hi Bar caused injury to the FVP Parties.

384.    The gross misconduct and inequitable conduct of Defendants Lubin, Getter, Herbst, and Hi Bar conferred an unfair advantage to Defendant Hi Bar over the FVP Parties.

385.    The FVP Parties have a claim in the amount of $7.5 million dollars against the Karma Entities which is reflected in a lien on the inventory and assets of the Karma Entities.

386.    Hi Bar alleges to have a corresponding lien on the Karma Entities' inventory or the Auctioned Vehicle Fund that arises from gross misconduct and inequitable conduct.

387.    The FVP Parties demand that the court avoid or subordinate the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. if, and only to the extent, that it creates a lien that could be deemed superior to that of the FVP Parties in any of the Karma Entities' inventory and the Auctioned Vehicle Fund under the common law doctrine of equitable subordination.

WHEREFORE, the FVP Parties demand judgment against Defendant Hi Bar voiding the Hi Bar UCC Financing Statement filed on January 25, 2022 at 10:55 P.M. in whole or in part, or otherwise subordinating it to the UCC filing of the FVP Parties, and such other relief as the Court deems just and proper. The FVP Parties demand a trial by jury on this Count VIII.

## COUNT IX
## NEGLIGENT MISREPRESENTATION

### GRANER AND GRANER LAW GROUP

388. The FVP Parties reallege paragraphs 1 – 33, 57–283 and further allege:

389. As and part of the FVP Parties' due diligence and as a required condition of the loan closing and funding, the FVP Parties required Zankl and the Karma Entities to arrange a licensed attorney in the state of Florida with knowledge of the business activities of Zankl and the Karma Entities to issue an opinion letter regarding Zankl and the Karma Entities' status, and the ability of the FVP Parties to perfect their security interest in the Karma Entities' inventory.

390. To that end, Defendants Graner and the Graner Law Group undertook the responsibility to investigate the facts and issue the opinion.

391. From December 16, 2021 through January 26, 2022, Defendants Graner and the Graner Law Group signed and forwarded to the FVP Parties five identical opinion letters issued by Defendants Graner and the Graner Law Group. The last of the five on January 26, 2022. *See* **Exhibit M** (the "Graner Opinion Letter").

392. Defendants Graner and the Graner Law Group rendered the following opinions:

4. The consummation of the transactions contemplated by the Loan Documents and the carrying out of the terms thereof will not result in violation of any provisions of the articles of incorporation, bylaws or other governing documents of any Borrower, or result in the violation of any provision of, or in a default under, any indenture, mortgage, deed of trust, indebtedness, agreement, judgment, decree, order, statute, rule or regulation to which any Credit Party is a party or by which it or its property is bound.

5. There are no legal or governmental actions, suits, proceedings, inquiries or investigations pending, threatened or contemplated, or any basis therefor, to which any Credit Party is or may become a party or of which any property of any Credit Party is or may become subject, which, if determined adversely to such Credit Party, would not, individually or in the aggregate, have a material adverse effect on the financial position or results of operations of such Credit Party or on any Collateral owned by such Credit Party.

6. The provisions of the Security Agreement and the Pledge Agreement are effective to create a security interest in favor of the Administrative Agent, for the benefit of the Lenders, in all of each Borrower's right, title and interest in and to the Collateral described therein and all proceeds thereof. Such security interest has been properly perfected.

*Id.*

393.    Relying on the aforementioned representations and assurances, the FVP Parties entered into the Loan Documents with the Karma Entities through their owners, the Zankls, and loaned Zankl and the Karma Entities $7.5 million dollars. *See* **Exhibit N,** *et seq.*

394.    The statements and opinions expressed in the Graner Opinion Letter were false, and Defendants Graner and the Graner Law Group knew or should have known of the falsity of the opinions and statements.

395.    These representations were specifically and intentionally made to the FVP Parties to rely upon in their funding decision, and Defendants Graner and the Graner Law Group intended that the FVP Parties would rely on them to fund the FVP Loan.

396.    Defendants Graner and the Graner Law Group either knew the statements and opinions were false or made the statements and opinions without knowledge as to their truth or falsity, or made the representations under circumstances in which Defendants Graner and the Graner Law Group ought to have known of their falsity.

397.    The misrepresentations were of material facts.

398.    The FVP Parties, in fact, justifiably relied upon the misrepresentations and acted upon the misrepresentations to their detriment.

399.    In justifiable reliance on the aforementioned misrepresentations, the FVP Parties loaned the FVP Loan to Zankl and the Karma Entities, on January 26, 2022, only to later learn that there were numerous and substantial indebtedness, agreements, claims, and threatened proceedings in direct contradiction to the statements and opinions of the Graner Opinion Letter, and that the FVP Parties' security interests were not perfected.

400.    The actions of Defendants Graner and the Graner Law Group constitute negligent misrepresentation.

401.    Worse, at the time of the opinion letters Defendants Graner and the Graner Law Group were heavily conflicted in that Graner was himself doing business with Zankl and the Karma Entities both personally and through his clients and was personally owed well over $100,000.00 and his clients were owed over $1,000,000.00. As such, Defendant Graner personally knew full well that he could not act objectively as he had a vested interest in seeing the Karma Entities obtain substantial funding.

402.     As a direct and proximate result of Defendants Graner and the Graner Law Group's negligent misrepresentation, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

403.     The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

404.     The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants Graner and the Graner Law Group for an amount within the jurisdictional limits of this Court, including costs and prejudgment interest. The FVP Parties demand a trial by jury on this Count IX.

## COUNT X
## BREACH OF FIDUCIARY DUTY

GRANER AND GRANER LAW GROUP

405.     The FVP Parties reallege paragraphs 1 – 33, 57–283 and further allege:

406.     As and part of the FVP Parties' due diligence and as a required condition of the FVP Loan closing and funding, the FVP Parties required Zankl and the Karma Entities to arrange a licensed attorney in the state of Florida to issue an opinion letter regarding Zankl and the Karma Entities' status and the ability of the FVP Parties to perfect their security interest in the Karma Entities' inventory.

407.     To that end, Defendants Graner and the Graner Law Group undertook the responsibility to investigate the facts and issue the opinion.

408.     From December 16, 2021 through January 26, 2022, Defendants Graner and the Graner Law Group signed and forwarded to the FVP Parties five identical opinion letters issued by Defendants Graner and the Graner Law Group. The last of the five on January 26, 2022. *See* **Exhibit M** (the "Graner Opinion Letter").

409.     Defendants Graner and the Graner Law Group rendered the following opinions:

4. The consummation of the transactions contemplated by the Loan Documents and the carrying out of the terms thereof will not result in violation of any provisions of the articles of incorporation, bylaws or other governing documents of any Borrower, or result in the violation of any provision of, or in a default under, any indenture, mortgage, deed of trust, indebtedness, agreement, judgment, decree, order, statute, rule or regulation to which any Credit Party is a party or by which it or its property is

bound.

5. There are no legal or governmental actions, suits, proceedings, inquiries or investigations pending, threatened or contemplated, or any basis therefor, to which any Credit Party is or may become a party or of which any property of any Credit Party is or may become subject, which, if determined adversely to such Credit Party, would not, individually or in the aggregate, have a material adverse effect on the financial position or results of operations of such Credit Party or on any Collateral owned by such Credit Party.

6. The provisions of the Security Agreement and the Pledge Agreement are effective to create a security interest in favor of the Administrative Agent, for the benefit of the Lenders, in all of each Borrower's right, title and interest in and to the Collateral described therein and all proceeds thereof. Such security interest has been properly perfected.

*Id.*

410. Relying on the aforementioned representations and assurances, the FVP Parties entered into, *inter alia*, the Loan Documents with the Karma Entities through their owners, the Zankls. *See* **Exhibit N, *et seq*.**

411. The statements and opinions expressed in the Graner Opinion Letter were false, and Defendants Graner and the Graner Law Group knew or should have known of the falsity of the opinions and statements.

412. These representations were specifically and intentionally made to the FVP Parties to rely upon in their funding decision relative to the FVP Loan, and Defendants Graner and the Graner Law Group intended that the FVP Parties would rely on them to issue the FVP Loan.

413. Defendants Graner and the Graner Law Group made representations to the FVP Parties about Graner's legal background, education, training, and licensure to satisfy the FVP Parties that Defendants Graner and the Graner Law Group could render an opinion on which the FVP Parties could rely.

414. There existed a relation of trust and confidence between Defendants Graner and the Graner Law Group, on the one hand, and the FVP Parties, on the other hand, where confidence was reposed by the FVP Parties in Defendants Graner and the Graner Law Group, and a trust was accepted by Defendants Graner and the Graner Law Group.

415. The trust in Defendants Graner and the Graner Law Group was intentionally acquired and abused. Defendants Graner and the Graner Law Group had a fiduciary duty to the FVP Parties.

Defendants Graner and the Graner Law Group breached their fiduciary duty to the FVP Parties.

416.    Worse, at the time of the opinion letters Defendants Graner and the Graner Law Group were heavily conflicted in that Graner was himself doing business with Zankl and the Karma Entities both personally and through his clients and was personally owed well over $100,000.00 and his clients were owed over $1,000,000.00. As such, Defendant Graner personally knew full well that he could not act objectively as he had a vested interest in seeing the Karma Entities obtain substantial funding.

417.    As a direct and proximate result of Defendants Graner and the Graner Law Group's breach of fiduciary duty, the FVP Parties have been damaged in an amount within the jurisdictional limits of this court.

418.    The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

419.    The FVP Parties demand damages from Defendants Graner and the Graner Law Group.

WHEREFORE, the FVP Parties demand judgment against Defendants Graner and the Graner Law Group for an amount within the jurisdictional limits of this Court, including costs and prejudgment interest. The FVP Parties demand a trial by jury on this Count X.

**COUNT XI**
**FRAUD IN THE INDUCEMENT OF THE FVP LOAN**

LISA FARACHE AND 1001 CLINT MOORE

420.    The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

421.    Defendant Lisa Farache is sued in her individual capacity and as the owner of 1001 Clint Moore through piercing of the corporate veil as pled in this Complaint.

422.    In or around January of 2022, Defendants Lisa Farache and 1001 Clint Moore made material misrepresentations to the FVP Parties regarding or relating to the fact that Defendants Lisa Farache and 1001 Clint Moore would not benefit, directly or indirectly, from the FVP Loan to the Karma Entities.

423.    The material misrepresentations made to the FVP Parties are based on the representations in **Exhibit W**, wherein Defendant Lisa Farache, for Defendant 1001 Clint Moore, declares that neither it, nor any of its members, ***"will in any way either directly, or indirectly, receive***

*any consideration by virtue of the [L]oan . . . ." Id.* (emphasis added).

424.   The material misrepresentations were made by Defendants Lisa Farache and 1001 Clint Moore for both herself and 1001 Clint Moore, and for and on behalf of her husband, Defendant Moshe Farache, with his knowledge, consent, and urging to benefit himself, personally, and in his representative capacity for MMS.

425.   Defendants 1001 Clint Moore and Lisa Farache received direct consideration, and Defendants Moshe Farache and MMS received indirect consideration.

426.   The material misrepresentations of Defendants Lisa Farache and 1001 Clint Moore were specifically and intentionally made as a material direct, false, and fraudulent misrepresentation to the FVP Parties regarding the destination and use of the FVP Loan proceeds for the purpose of assuring the FVP Parties that the FVP Loan proceeds would be used for their intended purpose.

427.   The representations were false when made and Defendants Lisa Farache and 1001 Clint Moore knew or should have known that the FVP Parties would rely on them.

428.   The FVP Parties, in fact, relied on the representations to their detriment.

429.   The material misrepresentations were specifically and intentionally made to convince the FVP Parties that the FVP Loan would be used for its intended purpose and not paid over to Defendants Lisa Farache and/or 1001 Clint Moore, or indirectly to other companies or family members for money owed to them unrelated to the purpose of the FVP Loan as stated in the FVP Loan Documents which they were provided.

430.   Defendants Lisa Farache and 1001 Clint Moore, at all times, knew that the representation to the FVP Parties that they would not receive any direct or indirect consideration from the FVP Loan was false.

431.   Defendants Lisa Farache and 1001 Clint Moore knew or should have known that the FVP Parties would rely on these intentional misrepresentations.

432.   The FVP Parties did, in fact, rely upon these false and intentional misrepresentations, which caused the FVP Parties to close the FVP Loan.

433.   But for the material misrepresentations, the FVP Loan would not have been made.

434.   The actions of Defendants Lisa Farache and 1001 Clint Moore constitute fraud.

435.    As a direct and proximate result of Defendants Lisa Farache and 1001 Clint Moore's fraud, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

436.    But for the fraud, the FVP Loan would not have been made. The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

WHEREFORE, the FVP Parties demand judgment against Defendants Lisa Farache and 1001 Clint Moore for an amount within the jurisdictional limits of this Court, including costs and prejudgment interest. The FVP Parties demand a trial by jury on this Count XI.

## COUNT XII
## UNJUST ENRICHMENT
### MMS AND 1001 CLINT MOORE

437.    The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

438.    This is an action for unjust enrichment in equity for damages in excess of $50,0000.00 and within the jurisdictional limits of this Honorable Court.

439.    In or around January of 2022, Defendants Lisa Farache, MMS, through its representatives, 1001 Clint Moore, and other co-conspirators wrongfully conspired to divert, and did divert, the FVP Loan proceeds that were loaned to the Karma Entities to which they were not entitled.

440.    By such taking, Defendants MMS and 1001 Clint Moore received a benefit from the FVP Parties, albeit without their knowledge or consent.

441.    Defendants MMS and 1001 Clint Moore had knowledge of, accepted, and have retained the benefit conferred.

442.    The circumstances are such that it would be inequitable for Defendants MMS and 1001 Clint Moore to retain the benefit without paying fair value for it.

443.    The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants MMS and 1001 Clint Moore for an amount within the jurisdictional limits of this Court, including costs and prejudgment interest. The FVP Parties demand a trial by jury on this Count XII.

<u>**COUNT XIII**</u>
<u>**CONSPIRACY TO COMMIT FRAUD TO INDUCE THE FVP LOAN**</u>

<u>MOSHE FARACHE, LISA FARACHE, MMS, AND 1001 CLINT MOORE</u>

444. The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

445. Defendant Moshe Farache is sued in his individual capacity and in his capacity as the representative of MMS.

446. Defendant Lisa Farache is sued in her individual capacity and as the owner of 1001 Clint Moore.

447. This is an action for civil conspiracy, seeking damages in excess of $50,000, exclusive of interest, attorneys' fees, and costs.

448. In or around January of 2022, Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore, along with non-party Michele Martin and others known and unknown to the FVP Parties at this time, acted in concert to develop and pursue the scheme detailed above to wrongly induce the FVP Parties into making the FVP Loan to Zankl and the Karma Entities so that Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore would receive a large portion of those funds loaned to the Karma Entities to which they were not entitled.

449. Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore acted in concert to make material misrepresentations to the FVP Parties and their lawyer that Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore had no claim to or interest in, and would not receive any consideration from, the FVP Loan to Zankl and the Karma Entities.

450. Specifically, each of Defendants Moshe Farache, Lisa Farache, MMS and 1001 Clint Moore undertook an overt act or multiple overt acts, in pursuit of the conspiracy, which include, but are not limited to:

    a. Sending the January 18, 2022 email to Zankl and the Karma Entities. **<u>Exhibit DD</u>**.

    b. Requiring Zankl and the Karma Entities to execute documents requiring Zankl and the Karma Entities to divert the FVP Loan proceeds to Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore in direct contravention of the FVP Loan Documents. **<u>Exhibit DD</u>**.

    c. Making intentional material misrepresentations to the FVP Parties. **<u>Exhibit W</u>**.

451. The agreement, scheme, and overt acts of Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore in furtherance of their unlawful and fraudulent scheme constitutes a civil conspiracy in violation of Florida law.

452. Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore each had a personal stake in the conspiracy, which personal stake was more than incidental and was motivated by personal bias.

453. As a direct and proximate result of Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore's conspiracy, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

454. But for the conspiracy, the FVP Loan would not have been made. The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

455. The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore for an amount within the jurisdictional limits of this Court including costs and prejudgment interest. The FVP Parties demand a trial by jury on this Count XIII.

## COUNT XIV
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### MOSHE FARACHE, LISA FARACHE, MMS, AND 1001 CLINT MOORE

456. The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

457. Defendant Moshe Farache is sued in his individual capacity and in his capacity as the principal of MMS.

458. Defendant Lisa Farache is sued in her individual capacity and as the owner of 1001 Clint Moore.

459. This is an action for intentional interference with advantageous business relationships, seeking damages in excess of $50,000, exclusive of interest, attorneys' fees, and costs.

460. In or around January of 2022, the FVP Parties had a prospective and ongoing business relationship with Zankl and the Karma Entities.

461. Defendants Moshe Farache, Lisa Farache, MMS and 1001 Clint Moore were fully aware of the existence of the prospective and ongoing business relationship.

462. Through statements and acts, Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore, personally, or by and through their agents, intentionally, knowingly, and without justification, interfered with those advantageous and prospective business relationships by making material misrepresentations, engaging in unlawful acts, and surreptitiously scheming to divert the Plaintiffs' FVP Loan proceeds, and then, on information and belief, receiving a substantial portion of the Plaintiffs' FVP Loan proceeds to personal or company accounts and thereby disrupting the financial benefits flowing to the FVP Parties from their business relationship with the Zankls and the Karma Entities.

463. By scheming and taking a portion of the FVP Loan proceeds for their own account, Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore interfered with the business relationship between the FVP Parties, on the one hand, and Zankl and Karma Entities, on the other hand, by undermining the purpose of the FVP Loan and the ability of the FVP Loan to achieve its intended purpose.

464. After the FVP Loan was funded, Defendants Moshe Farache and MMS acted intentionally to create false book transactions to attempt to subvert the FVP Parties' security interests in and to the Karma Entities' inventory.

465. As a direct and proximate result, the FVP Parties have suffered damages within the jurisdictional limits of this Court.

466. The FVP Parties' damages are the amount of the FVP Loan plus costs and prejudgment interest minus any recovery from joint tortfeasors.

467. The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

468. All conditions precedent to this action have occurred, have been performed or have been waived.

WHEREFORE, the FVP Parties demand judgment against Defendants Moshe Farache, Lisa Farache, MMS, and 1001 Clint Moore for an amount within the jurisdictional limits of this Court, including costs and prejudgment interest. The FVP Parties demand a trial by jury on this Count XIV.

## COUNT XV
## FRAUD AFTER THE FVP LOAN
### MOSHE FARACHE AND LISA FARACHE

469. The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

470. Commencing in January of 2022 and continuing through the time of the filing of this Complaint, Defendants Farache and Lisa Farache made numerous material representations to the FVP Parties and others, including lawyers, witnesses, and representatives of the FVP Parties, Zankl, and the Karma Entities, regarding or relating to:

a.  the FVP Parties' security interests in the Karma Entities' inventory;

b.  Moshe Farache and Lisa Farache's claims to interests in the Karma Entities' collateral;

c.  the ownership of the vehicles in the Karma Entities' collateral;

d.  the possession of automobiles formerly in the Karma Entities' inventory;

e.  the sale of vehicles in the Karma Entities' inventory;

f.  false purchase and sale transactions regarding the Karma Entities' inventory; and

g.  the creation of false paperwork to suggest that Defendants Moshe Farache and Lisa Farache claimed an interest in the Karma Entities' inventory.

471. The representations of Defendants Moshe Farache and Lisa Farache were specifically and intentionally made as a material direct, false, and fraudulent misrepresentation to the FVP Parties regarding the rights of the FVP Parties in and to the Karma Entities' inventory, and the rights of Defendants Moshe Farache and Lisa Farache in and to the Karma Entities' inventory.

472. The representations of Defendants Moshe Farache and Lisa Farache were specifically and intentionally made to dissuade the FVP Parties from enforcing their rights by providing the FVP Parties with false and fraudulent statements and documents, and to delay and obfuscate the Plaintiffs' attempts to locate and retrieve their collateral.

473. Defendants Moshe Farache and Lisa Farache, at all times, knew the statements, documents, and representations were false.

474. Defendants Moshe Farache and Lisa Farache knew or should have known that the FVP Parties would rely on their intentional misrepresentations.

475.     The FVP Parties did, in fact, rely upon these false and intentional misrepresentations, which caused the FVP Parties to delay their collection and retrieval efforts to their detriment and which permitted Defendants Moshe Farache and Lisa Farache to sell vehicles to which they were not entitled and fraudulently transfer the funds from those sales outside of the jurisdiction of this Court.

476.     The actions of Defendants Moshe Farache and Lisa Farache constitute fraud.

477.     As a direct and proximate result of Defendants Moshe Farache and Lisa Farache's fraud, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

478.     The fraud committed by Defendants Moshe Farache and Lisa Farache placed the FVP Parties in a position where it was necessary for the FVP Parties to incur fees and costs to protect their interests in a separate action filed in the United States Bankruptcy Court – *In Re Auto Wholesale of Boca, LLC*, Case No.: 22-15627-EPK and Adversary Case No.: 22-01218-EPK – against AWB and other Defendants. (the "Bankruptcy Court Litigation").

479.     In addition to other damages, the FVP Parties demand from Defendants Moshe Farache and Lisa Farache those attorney's fees and costs incurred in the Bankruptcy Court Litigation resulting from the fraud and deceit of Defendants Moshe Farache and Lisa Farache as the natural and necessary consequences of their fraudulent acts.

480.     The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

WHEREFORE, the FVP Parties demand judgment against Defendants Moshe Farache and Lisa Farache for an amount within the jurisdictional limits of this Court, including costs and prejudgment interest. The FVP Parties demand a trial by jury on Count XV.

## COUNT XVI
## CONVERSION OF THE FVP PARTIES' COLLATERAL
### MOSHE FARACHE AND LISA FARACHE

481.     The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

482.     This is an action for conversion against Defendants Moshe Farache and Lisa Farache for the intentional tort of conversion of the corporate assets of the FVP Parties.

483.     Commencing in January of 2022 and continuing through the time of the filing of this

Complaint, Defendants Moshe Farache and Lisa Farache wrongfully asserted dominion and control over the assets and property of the FVP Parties in the form of the secured collateral of the FVP Parties in the inventory of the Karma Entities as pled herein.

484.    Defendants Moshe Farache and Lisa Farache's acts in wrongfully depriving the FVP Parties of their assets and property comprised a wrongful exercise or assumption of authority over the assets and property of the FVP Parties to the detriment of the FVP Parties.

485.    Defendants Moshe Farache and Lisa Farache's acts in wrongfully depriving the FVP Parties of their assets and property comprised a wrongful exercise or assumption of authority over the assets and property of the FVP Parties for an indefinite period of time.

486.    Defendants Moshe Farache and Lisa Farache wrongfully refused to relinquish dominion and control over the FVP Parties' collateral despite demands from the FVP Parties who have the right to possess the collateral.

487.    The acts of Defendants Moshe Farache and Lisa Farache comprise conversion of the corporate assets of the FVP Parties.

488.    The FVP Parties have been damaged by the conversion of their corporate assets.

489.    The value of the wrongfully converted assets and property are within the jurisdictional limits of this Court. The FVP Parties demand damages in an amount within the jurisdictional limits of this Court in an amount in excess of $3 million dollars. **Exhibit PP.**

490.    There is no dispute as to the respective rights, duties, and obligations of the parties.

491.    The conversion committed by Defendants Moshe Farache and Lisa Farache placed the FVP Parties in a position where it was necessary for the FVP Parties to incur fees and costs to protect their interests in a separate action filed in the United States Bankruptcy Court – *In Re Auto Wholesale of Boca, LLC*, Case No.: 22-15627-EPK and Adversary Case No.: 22-01218-EPK – against Hi Bar and other Defendants. (the "Bankruptcy Court Litigation").

492.    In addition to other damages, the FVP Parties demand from Defendants Moshe Farache and Lisa Farache those attorney's fees and costs incurred in the Bankruptcy Court Litigation as the natural and necessary consequences of their wrongful acts.

WHEREFORE, the FVP Parties demand judgment against Defendants Moshe Farache and Lisa Farache for an amount within the jurisdictional limits of this Court, including costs and

prejudgment interest. The FVP Parties demand a trial by jury on Count XVI.

## COUNT XVII
## CIVIL CONSPIRACY

### MOSHE FARACHE AND LISA FARACHE

493. The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

494. This is an action for civil conspiracy, seeking damages in excess of $50,000, exclusive of interest, attorneys' fees, and costs.

495. Commencing in and around October of 2021, and continuing through August of 2023, Defendants Moshe Farache, and Lisa Farache, together with nonparties Chase Farace and lawyers both retained and consulted and others known and unknown to the FVP Parties, to be proven at trial, acted in concert to develop and pursue the scheme detailed above to wrongly convert the collateral of the FVP Parties.

496. Defendants Moshe Farache, and Lisa Farache, together with nonparties Chase Farace and lawyers both retained and consulted and others known and unknown to the FVP Parties, acted in concert to make representations to the FVP Parties and others, including lawyers, witnesses, and representatives of the FVP Parties, Zankl, and the Karma Entities, that Defendants Moshe Farache and Lisa Farache had a legitimate ownership interest in the inventory of the Karma Entities and therefore the FVP Parties' collateral.

497. Specifically, each of Defendants Moshe Farache and Lisa Farache, together with nonparties Chase Farache and lawyers both retained and consulted and others known and unknown to the FVP Parties, undertook an overt act or multiple overt acts, in pursuit of the conspiracy, which include, but are not limited to:

    d. Making material misrepresentations to the attorneys for the FVP Parties regarding the possession and whereabouts of the Karma Entities' inventory unlawfully seized on or about April 1, 2022.

    e. Lying to investigator Robert Crispin about the location of the Karma Entities' inventory unlawfully seized on or about April 1, 2022.

    f. Filing a false Affidavit of Moshe Farache in this action on April 14, 2022.

    g. Materially misleading both the FVP Parties and Judge Tobin Singer regarding the

possession and whereabouts of the Karma Entities' inventory.

h.  Hiding and disguising the sale of the Karma Entities' inventory, in which the FVP Parties have a secured interest, through the creation of false sales paperwork.

i.  Making false assurances to the FVP Parties and their attorneys that the FVP Parties' collateral was safeguarded, only to hide the sale of several of the vehicles.

498.  The agreement, scheme, and overt acts of Defendants Moshe Farache and Lisa Farache, together with nonparties Chase Farache and lawyers both retained and consulted and others known and unknown to the FVP Parties, in furtherance of their unlawful and fraudulent scheme constitutes a civil conspiracy in violation of Florida law.

499.  Defendants Moshe Farache and Lisa Farache each had a personal stake in the conspiracy, which personal stake was more than incidental and motivated by personal bias.

500.  As a direct and proximate result of Defendants Moshe Farache and Lisa Farache's conspiracy, the FVP Parties have suffered damages in an amount within the jurisdictional limits of this Court.

501.  The conspiracy to convert the FVP Parties' collateral committed by Defendants Moshe Farache and Lisa Farache placed the FVP Parties in a position where it was necessary for the FVP Parties to incur fees and costs to protect their interests in a separate action filed in the United States Bankruptcy Court – *In Re Auto Wholesale of Boca, LLC*, Case No.: 22-15627-EPK and Adversary Case No.: 22-01218-EPK – against AWB and other Defendants (the "Bankruptcy Court Litigation").

502.  In addition to other damages, the FVP Parties demand from Defendants Moshe Farache and Lisa Farache those attorney's fees and costs incurred in the Bankruptcy Court Litigation as the natural and necessary consequences of their wrongful acts.

WHEREFORE, the FVP Parties demand judgment against Defendants Moshe Farache and Lisa Farache for an amount within the jurisdictional limits of this Court, including costs and prejudgment interest. The FVP Parties demand a trial by jury on Count XVII.

COUNT XVIII

DISMISSED

### COUNT XIX
### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP

MOSHE FARACHE AND LISA FARACHE

503. The FVP Parties reallege paragraphs 1-33, 57-63, 194-283 and further allege:

504. This is an action for intentional interference with advantageous business relationships, seeking damages in excess of $50,000, exclusive of interest, attorneys' fees and costs.

505. Commencing in and around October of 2021, and continuing through the date of the filing of this Complaint, the FVP Parties had a prospective and ongoing business relationship with the Zankls and the Karma Entities.

506. Defendants Moshe Farache and Lisa Farache were fully aware of the existence of the prospective and ongoing business relationship.

507. Through statements and acts, Defendants Moshe Farache and Lisa Farache personally, or by and through their agents, intentionally, knowingly, and without justification, interfered with those advantageous and prospective business relationships by making material misrepresentations, creating false financial transactions to show a false claim to the FVP Parties' collateral, making threats to Scott Zankl, demanding vehicles and titles to vehicles which were the rightful property of the Karma Entities and the FVP Parties' collateral, engaging in conspiracies and schemes to defraud and convert the FVP Parties' collateral, converting the FVP Parties' collateral, fraudulently transferring funds that should have been available to be paid to the Karma Entities and then to the FVP Parties, and disrupting the financial benefits flowing to the FVP Parties from their business relationship with the Zankls and the Karma Entities.

508. As a direct and proximate result, the FVP Parties have suffered damages within the jurisdictional limits of this Court.

509. The FVP Parties demand damages in an amount within the jurisdictional limits of this Court.

510. All conditions precedent to this action have occurred, have been performed or have been waived.

WHEREFORE, the FVP Parties demand judgment against Defendants Moshe Farache and Lisa Farache for an amount within the jurisdictional limits of this Court, plus costs and prejudgment

interest. The FVP Parties demand a trial by jury on Count XIX.

COUNT XX

DISMISSED

COUNT XXI

DISMISSED

**DEMAND FOR TRIAL BY JURY**

The FVP Parties demand trial by jury on those Counts I through XIX above, not identified as dismissed, which are identified in Part I of this Fourth Amended Complaint as requesting a trial by jury.

**PART II**

**COUNT XXII THROUGH COUNT XXVIII**
**THE LOAN DOCUMENTS AND FORECLOSURE COUNTS**
AGAINST KARMA OF BROWARD, KARMA OF PALM BEACH,
SCOTT ZANKL, KRISTEN ZANKL, HI BAR AND FRANKLIN.


**COUNT XXII**
BREACH OF CONTRACT – LOAN AGREEMENT
KARMA OF BROWARD AND KARMA OF PALM BEACH

JUDGMENT ENTERED


**COUNT XXIII**
BREACH OF CONTRACT – DEFAULT OF FVP INVESTMENTS NOTE
KARMA OF BROWARD AND KARMA OF PALM BEACH

PARTIAL JUDGMENT ENTERED


**COUNT XXIV**
BREACH OF CONTRACT – DEFAULT OF FVP FUND NOTE
FVP FUND V. KARMA OF BROWARD AND KARMA OF PALM BEACH

PARTIAL JUDGMENT ENTERED

### COUNT XXV
### BREACH OF CONTRACT – GUARANTY AGREEMENT
#### SCOTT ZANKL AND KRISTEN ZANKL

511.    The FVP Parties reallege paragraphs 1 through 283 as if fully set forth herein, and further allege:

512.    The FVP Parties, on the one hand, and Defendants Scott Zankl and Kristen Zankl, on the other hand, entered into the Guaranty Agreement. *See* **Exhibit Q**.

513.    The Guaranty Agreement imposed duties and obligations on Defendants Scott Zankl and Kristen Zankl.

514.    The FVP Parties complied with all obligations under the Guaranty Agreement.

515.    Defendants Scott Zankl and Kristen Zankl failed to pay when due and after demand, and defaulted on the Guaranty Agreement, both monetarily and in other respects.

516.    Defendants Scott Zankl and Kristen Zankl owe the FVP Parties unpaid principal plus default interest at the rate defined in the guaranteed obligations, plus other costs and expenses defined in the Guaranty Agreement.

517.    The FVP Parties have been required to retain the services of the undersigned attorneys to prosecute this claim and therefore are entitled to attorney's fees and costs in addition to the sums due the FVP Parties under the Guaranty Agreement.

518.    The FVP Parties demand their attorney's fees and costs pursuant to the terms of the Guaranty Agreement and the Loan Documents.

WHEREFORE, the FVP Parties demand judgment for an amount within the jurisdictional limits of this Court, plus court costs, attorney's fees, prejudgment interest, and default interest; additionally, the FVP Parties demand any other and further injunctive and/or equitable relief as this Court deems just and proper in order to do justice.

### COUNT XXVI
BREACH OF CONTRACT – SECURITY AGREEMENT
#### FVP SERVICING V. KARMA OF BROWARD AND KARMA OF PALM BEACH

#### PARTIAL JUDGMENT ENTERED

## COUNT XXVII
## BREACH OF CONTRACT – PLEDGE AND SECURITY AGREEMENT
### FVP SERVICING V. SCOTT ZANKL AND KRISTEN ZANKL

519.    FVP Servicing realleges paragraphs 1 through 283 as if fully set forth herein, and further alleges:

520.    FVP Servicing and Defendants Scott Zankl and Kristen Zankl entered into the Pledge and Security Agreement. *See* **Exhibit S**.

521.    The Pledge and Security Agreement imposed obligations on the parties to it.

522.    The FVP Parties complied with all of their duties and obligations under the Security Agreement.

523.    Defendants Scott Zankl and Kristen Zankl materially breached their duties and obligations under the Pledge and Security Agreement.

524.    As a direct and proximate result of the above described breaches of the Pledge and Security Agreement, the FVP Parties have sustained direct and consequential monetary damages in an amount in excess of the jurisdictional limits of this Court; and the FVP Parties' damages are continuing and ongoing, and such damages continue to accrue on a daily basis.

525.    As a direct and proximate result of the above described breach of the Pledge and Security Agreement, the FVP Parties have sustained direct and consequential monetary damages in addition to any other damages set forth in the Pledge and Security Agreement or permitted at law or in equity, and all of the FVP Parties' expenses incurred with respect to such default, including reasonable attorneys' fees, money expended in reliance on the contract, and lost business opportunity.

526.    FVP Servicing demands all damages available under the Pledge and Security Agreement and Florida law.

527.    FVP Servicing was required to retain undersigned counsel to prosecute this action and have agreed to pay undersigned counsel a reasonable fee.

528.    FVP Servicing demands its attorney's fees and costs pursuant to the Security Agreement between the parties.

WHEREFORE, FVP Servicing demands judgment against Scott Zankl and Kristen Zankl under the Pledge and Security Agreement for the interests pled therein, court costs, attorney's fees,

and additionally demands any other and further injunctive and/or equitable relief as this Court deems just and proper in order to do justice.

### COUNT XXVIII
### FORECLOSURE OF SECURITY INTERESTS
KARMA OF BROWARD, KARMA OF PALM BEACH,
SCOTT ZANKL, KRISTEN ZANKL, HI BAR, LUBIN, SPIN AND FRANKLIN

529.    The FVP Parties reallege paragraphs 1 through 283 as if fully stated herein, and further allege:

530.    This is an action to foreclose the FVP Parties' security interest and lien in their collateral owned, possessed, or controlled by the obligor Defendants Scott Zankl, Kristen Zankl, Karma of Broward, Karma of Palm Beach (collectively, the "Obligors" for this Count) as outlined in the Loan Documents. *See* **Exhibits N et seq.**

531.    The Obligors entered into the Loan Agreement, the Security Agreement, the Guaranty, and the Pledge and Security Agreement (collectively, for purposes of this Count together with the promissory notes, the "Loan Documents").

532.    The Obligors have defaulted in their obligations under the Loan Documents.

533.    The FVP Parties declared all sums due under the Loan Documents.

534.    The Obligors' obligations are secured, *inter alia*, by the FVP Parties' collateral, defined in the Loan Documents which collateral is now held through judicial process in the Auctioned Vehicle Fund and those funds contained therein as those funds represent the funds derived from the sale of the Plaintiffs' collateral, in addition to those funds held in the trust account of Mathew Leto, Esq., by agreement arising from the sale of the FVP Parties' collateral, any collateral or vehicles not included in the AWB Bankruptcy and therefore not reduced to cash, and any collateral or the proceeds from the sale of that collateral that is either added to the Auctioned Vehicle Fund or held separately in escrow by the agreement of the parties or court order pending a determination of the party entitled to those funds.

535.    The FVP Parties seek those funds to satisfy the Obligors' indebtedness to the FVP Parties that remains unpaid.

536.    The Obligors may claim some right, title, or interest in and to the FVP Parties' collateral, but any such interest is subordinate and inferior to that of the FVP Parties.

537. Hi Bar, Lubin (by assignment or otherwise), Spin (by assignment or otherwise), or Franklin may claim some right, title, or interest in and to the FVP Parties' collateral, but any such interest is subordinate and inferior to that of the FVP Parties.

538. The FVP Parties demand a judgment of foreclosure of the security interests of the FVP Parties in the collateral securing the FVP Loan which includes the Auctioned Vehicle Fund and those funds contained therein as those funds represent the funds derived from the sale of the Plaintiffs' collateral, and those funds held in the trust account of Mathew Leto, Esq.

539. To the extent that Defendant Hi Bar claims a security interest in and to any of the Plaintiffs' collateral and / or the Auctioned Vehicle Fund or other funds held, those interests are inferior to those of the FVP Parties as pled *supra* in Counts I through VIII of this Complaint.

540. To the extent that Defendant Hi Bar claims a security interest in and to any of the Plaintiffs' collateral and / or the Auctioned Vehicle Fund which Defendant Hi Bar suggests are superior to those interests of the FVP Parties, **then the FVP Parties demand trial by jury on Counts I through VIII of this Complaint as well as this Count XVIII to determine the priority of the competing interests claimed by Hi Bar or its assignee**.

541. To the extent that Franklin claims a security interest in and to any of the Plaintiffs' collateral and / or the Auctioned Vehicle Fund, those interests are inferior to those of the FVP Parties.

542. The collateral securing the FVP Loan does not include residential real property.

543. The FVP Parties were required to retain undersigned counsel to prosecute this action and have agreed to pay undersigned counsel a reasonable fee.

544. The FVP Parties demand their attorney's fees and costs pursuant to the Loan Documents between themselves and Defendants Scott Zankl, Kristen Zankl, Karma of Broward, and Karma of Palm Beach.

WHEREFORE, the FVP Parties request a judgment against Defendants Scott Zankl, Kristen Zankl, Karma of Broward, and Karma of Palm Beach, and any and all competing claimants to the collateral or funds derived from the collateral, including, without limitation, Defendant Hi Bar, Defendant Lubin, Defendant Spin, and Defendant Franklin, foreclosing any security interest and lien in the collateral claimed by them, pursuant to the Loan Documents evidencing the Obligations, and any other claims of lien, or interests claimed by any of the named defendants to this Complaint, and if proceeds of such are insufficient to fully satisfy the Obligations, a deficiency judgment against Scott

Zankl, Karma of Broward, and Karma of Palm Beach and any other relief the court deems proper.

**The FVP Parties demand trial by jury as to all factual disputes between the FVP Parties and any other claimants including, without limitation, Defendant Hi Bar, Defendant Lubin, Defendant Spin, and Defendant Franklin regarding the priority to the collateral or the Auctioned Vehicle Fund or other proceeds from the FVP Parties' collateral as pled in this complaint in this Count XVIII.**

**PART III**
**FRAUDULENT TRANSFER**

**COUNT XXIX**
**FRAUDULENT TRANSFER – FL. STAT. §§ 726.105, *ET. SEQ.***

**AGAINST FRAUDULENT TRANSFER DEFENDANT VANTIFF**

545.    The FVP Parties reallege paragraphs 1, 10-13, 32-33, 194 - 209, as expressly re-pled herein and all exhibits thereto further and allege as follows:

546.    This is a claim to avoid and recover fraudulent transfers pursuant to Section 726.105(1)(a)-(b) of the Florida Statutes in an amount far greater than the $50,000.00 jurisdictional limits of this Honorable Court.

547.    This Count is brought by the FVP Parties against Defendant Vantiff.

548.    This claim seeks to hold Defendant Vantiff liable for funds received by fraudulent transfer under Florida law, and to make the FVP Parties whole with other property of Defendant Vantiff, in accordance with applicable law, for the following transfers made by the debtor, Karma of Palm Beach ("KPB"), against the rights of the FVP Parties as creditor, as follows:

| Date | Transfer to: | Amount: | Account Ending in: | From Company |
|------|-------------|---------|--------------------|--------------|
| 3.11.2022 | Vantiff LLC | $100,000.00 | 8711 | KPB |
| 3.17.2022 | Vantiff LLC | $100,000.00 | 8711 | KPB |

(hereinafter in this Count XXIX, the "KPB Transfers").

549.    Vantiff were lenders to, or otherwise were owed money or obligations from, non-party Excell Auto Group, Inc., a Florida corporation ("EAG"), or another person or entity other than the payor company KPB. Nonetheless, Vantiff was paid sums from KPB when KPB had no obligations to Vantiff for the sums transferred.

550.    At no time did KPB receive reasonably equivalent value for any of the aforementioned KPB Transfers, and in fact KPB received no value at all.

551.    At all material times to the above KPB Transfers, the FVP Parties had a security interest in certain bank accounts held at Chase Bank pursuant to the FVP Parties' security agreements and the UCC Financing statement filed on January 26, 2022. *See* **Exhibits N – T**. The FVP Parties' security agreements and the UCC Filing statement (**Exhibits N-T**) are incorporated by reference to this Fourth Amended Complaint.

552.    At all material times to the above transfers, the FVP Parties, KPB, KB, and Chase Bank had a Blocked Account Control Agreement (commonly known and hereinafter referred to as the "DACA"). **Exhibit II.**

553.    The DACA and the FVP Parties' loan documents permitted KPB to make all "withdrawal, payments, transfers or other fund disposition" under its deposit agreement with Chase bank from the secured accounts. *See* **Exhibit II**. The FVP Parties' loan documents did not restrict such payments in the ordinary course of business for ordinary defined business expenses. The funds in the secured accounts were, therefore, an asset of KPB and were permitted to be used for the purposes agreed upon between the FVP Parties and KPB.

554.    Finally, to the extent that any valid lien existed on the aforementioned KPB Chase Account ending in 8711, no valid lien transferred with the money transferred from that account once the money left the account.

555.    Accordingly, the transfers were assets that KPB controlled and a conveyance of property which could have been applicable to the payment of the debt due the FVP Parties, and therefore constituted a fraudulent transfer to the FVP Parties.

556.    Only the FVP Parties were creditors to which the secured account funds could have been applicable to a debt due as the holder of the lien.

557.    In 2022, Defendant KPB was, and is now, a debtor as defined under the Florida Uniform Fraudulent Transfer Act.

558.    The FVP Parties have and had a claim against KPB at the time of the aforementioned KPB Transfers.

559.    At the time of the KPB Transfers, the FVP Parties were a "creditor" of KPB as defined

under Florida's Uniform Fraudulent Transfer Act.

560.    In violation of Fla. Stat. § 726.105(1)(b), all of the above KPB Transfers were made by KPB without receiving a reasonably equivalent value in exchange for the KPB Transfers or obligations, and KPB:

   a.  Was engaged or were about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

   b.  Intended to incur, or believed or reasonably should have believed that KPB would incur debts beyond their ability to pay as they became due.

   c.  KPB received no equivalent value for the KPB Transfers, and in fact no value at all. Likewise, the FVP Parties received no value.

561.    And, or alternatively, in violation of Fla. Stat. § 726.106(1), at the time the above KPB Transfers were made, the FVP Parties had a claim that arose with KPB before the KPB Transfers were made and KPB made the KPB Transfers without receiving a reasonably equivalent value in exchange for the KPB Transfers or obligations and KPB was insolvent at the time of the KPB Transfers or became insolvent as a result of the transfers or obligations.

562.    As a result, the above KPB Transfers to Defendant Vantiff constitute "transfers" within the meaning of Florida's Uniform Fraudulent Transfer Act.

563.    Accordingly, KPB's transfers to Vantiff are avoidable and recoverable by the FVP Parties pursuant to Chapter 726 of the Florida Statutes.

564.    The FVP Parties seek all remedies available under Section 726.108 of the Florida Statutes, including:

   (a)  avoidance of the KPB Transfers or obligations to the extent necessary to satisfy the FVP Parties' claim;

   (b)  an attachment or other provisional remedy against the assets transferred or other property of Defendant Vantiff in accordance with applicable law;

   (c)  and, subject to applicable principles of equity and in accordance with applicable rules of civil procedure, on proper motion:

      1.  an injunction against further disposition by KPB and/or Defendant Vantiff

of the assets transferred or of other property;

2.    appointment of a receiver to take charge of the assets transferred, or of other property of the Transferee; and/or

3.    any other relief the circumstances may require.

565.    The FVP Parties demand all remedies under Florida's Uniform Fraudulent Transfer Act against Defendant Vantiff who is a recipient of the fraudulently transferred funds, including, without limitation, judgment against the Transferee (Defendant Vantiff) for the amount transferred plus prejudgment interest.

566.    The FVP Parties reserve the right to amend this Fourth Amended Complaint to name other transferees under Florida's Uniform Fraudulent Transfer Act or proceedings supplementary.

WHEREFORE, the FVP Parties demand judgment against Defendant Vantiff setting aside and avoiding the KPB Transfers described above, to the extent necessary to satisfy the FVP Parties' creditor's claims, judgment for an attachment or other provisional remedy against the assets transferred or judgment against other property or funds of the Transferee (Defendant Vantiff) in the amount of the funds transferred plus prejudgment interest and for injunctive relief if properly raised by motion, or other relief as the Court deems appropriate.

## COUNT XXX
## FRAUDULENT TRANSFER – FL. STAT. §§ 726.105, ET. SEQ.

### AGAINST FRAUDULENT TRANSFER DEFENDANT MILLCO -ATWATER

567.    The FVP Parties reallege paragraphs 1, 10-13, 32-33, 194-209, as expressly re-pled herein and all exhibits thereto and further allege as follows:

568.    This is a claim to avoid and recover fraudulent transfers pursuant to Section 726.105(1)(a) and (b) of the Florida Statutes in an amount far greater than the $50,000.00 jurisdictional limits of this Honorable Court.

569.    This Count is brought against Defendant Millco-Atwater ("Millco-Atwater").

570.    This Count seeks to hold the transferee Millco-Atwater liable, under Florida law, for funds Millco-Atwater received, or to make the FVP Parties whole with other property of Millco-Atwater, in accordance with applicable law, for the transfers identified in the below table made by the debtor KPB, against the rights of the FVP Parties as creditor.

571.    Millco-Atwater entered into numerous written financial transactions wherein Millco-Atwater was a lender to third party Excell Auto Group, Inc. ("EAG"). The transactions involved Millco-Atwater lending money to EAG pursuant to a written contract wherein EAG agreed to use the loan proceeds to purchase a specific defined vehicle identified in the written loan agreement by vehicle identification number (VIN) and when that specific vehicle was sold by EAG then EAG and Millco-Atwater would calculate the interest on the loan for that specific car to be an amount equal to half the selling price minus the cost of the vehicle.

572.    Millco-Atwater and EAG conducted hundreds of these transactions for the years 2019 through 2022.

573.    In 2021, Millco-Atwater loaned EAG in excess of $2 million dollars pursuant to seven separate written contracts for seven separate and identified luxury vehicles which were identified by VIN and assigned a specific "car number" by Millco-Atwater.

574.    In 2021, Millco-Atwater and EAG entered into written contracts as to "car number": "210", a second transaction as to "210", "214", "215, "216" "218", "221", and car "222".

575.    In March of 2022, while EAG was insolvent and KPB was insolvent, KPB paid the debt of EAG owed to Millco-Atwater on the Millco-Atwater / EAG agreements as to "car": "210", "214", "215, "216", "218", "221", and "222".

576.    The debt that KPB paid on the debt of EAG is depicted in the following table which depicts the date of the Millco-Atwater loan to EAG and the date that KPB paid the debt of EAG to Millco-Atwater:

| Karma of Palm Beach, Inc. (KPB) | | | | | | |
| Chase - Checking | | | | | | |
| Account No. xxxxxxxxxx6603 | | | | | | |
| KPB Transfers to Millco | | | | | | |
| Date | KPB Transfer to Millco | Amount | Millco Vehicle No. | Millco Vehicle Identity | Contract Borrower | Date of Loan |
| | | | | | | |
| 3/3/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $230,000.00 | 218 | 4570 Bently | Excell | 12.2.2021 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 3/3/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $178,000.00 | 222 | 2963 Porshe | Excell | 1.13.2022 |
| | 3/3/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $285,000.00 | 215 | 7184 Rolls | Excell | 12.1.2021 |
| | 3/4/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $335,000.00 | 214 | 6246 Ferrari | Excell | 12.1.2021 |
| | 3/4/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $329,500.00 | 221 | 2931 Lambo | Excell | 1.3.2022 |
| | 3/7/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $387,500.00 | 216 | 4541 Rolls | Excell | 12.1.2021 |
| | 3/8/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $500,000.00 | 210 | 6515 Ferrari | Excell | 9.28.2021 |
| | 3/9/2022 | Online Wire Transfer A/C: Millco Atwater LLC | $150,000.00 | 210 | interest | Excell | 9.28.2021 |
| | | | | | | | |
| | Total Transfers | | $2,395,000.00 | | | | |

(hereinafter in this Count XXX, the "KPB – Millco-Atwater Transfers").

577.    The above KPB – Millco-Atwater Transfers from KPB's bank account ending in 6603 were made for an obligation owed by EAG in which KPB was not liable and, at the time of the transfer, the FVP Parties were a present creditor, or a future creditor, of KPB. **Exhibit JJ Composite**.

578.    Specifically, the aforementioned KPB – Millco-Atwater Transfers from KPB's account ending in 6603 to Millco-Atwater were made for identified and defined debt of EAG to Millco-Atwater, and under identified and defined contracts between Millco-Atwater and EAG on identified and defined cars in those contracts. *See* **Exhibit JJ Composite**.

579.    At no time did KPB receive reasonably equivalent value for any of the aforementioned KPB – Millco-Atwater Transfers and in fact received no value at all. Likewise, the FVP Parties received no value at all and the above KPB – Millco-Atwater Transfers were expressly prohibited in the loan transaction documents between KPB and the FVP Parties.

580.    The above sums could have, and should have, been paid to the FVP Parties.

581.    At all material times to the above transfers, the FVP Parties had a security interest in the assets of KPB pursuant to the FVP Parties' security agreements and the UCC Financing statement filed on January 26, 2022. *See* **Exhibits N-T.**

582.    The FVP Parties' security agreements and the UCC Filing statement (**Exhibits N-T**) are incorporated by reference to this Fourth Amended Complaint.

583.    Although the FVP Parties had a blanket security interest in the assets and accounts of KPB, the FVP Parties did not have a DACA control agreement on KPB Chase account ending in 6603 and therefore no valid lien attached to that account.

584.    Accordingly, the KPB – Millco-Atwater Transfers were transfers of assets that the Karma Entities controlled and a conveyance of property which could have been applicable to the payment of the debt due to the FVP Parties and a therefore a transfer fraudulent to the FVP Parties.

585.    Although Millco-Atwater entered into loan transactions with KPB in March of 2022, during the same time period in which the above KPB – Millco-Atwater Transfers to EAG were made, those transactions were for specific identified cars unrelated to the cars depicted in the above table and unrelated to the above KPB – Millco-Atwater Transfers from KPB for EAG debt on the Millco-Atwater / KPB agreements on "car": "210", "214", "215, "216", "218", "221", and "222".

586.    The FVP Parties are and were a present or future creditor of KPB as defined in the Florida Uniform Fraudulent Transfer Act, as they hold and held claims against KPB under those certain loan agreements pled in this Complaint at the time of the transfers.

587.    Defendant KPB is and was a debtor as defined under the Florida Uniform Fraudulent Transfer Act.

588.    The FVP Parties have and had a claim against KPB at the time of the aforementioned KPB – Millco-Atwater Transfers above defined and pled in this Count XXX.

589.    At the time of the transfers, the FVP Parties were a "creditor" of KPB as defined under Florida's Uniform Fraudulent Transfer Act.

590.    The transfers were in violation of Fla. Stat. § 726.105 (1)(b) as all of the above KPB – Millco-Atwater Transfers were made by KPB without KPB receiving a reasonably equivalent value in exchange for the transfer or obligation, and KPB:

a. was engaged or was about to engage in a business or a transaction for which the

remaining assets of KPB were unreasonably small in relation to the business or transaction; or

b.  intended to incur, or believed or reasonably should have believed that KPB would incur, debts beyond its ability to pay as they became due.

c.  KPB received no equivalent value for the transfers, and in fact no value at all. Likewise, the FVP Parties received no value.

591.  And, or alternatively, in violation of Fla. Stat. § 726.106 (1) at the time the above KPB – Millco-Atwater Transfers were made, the FVP Parties had a claim that arose with KPB before the transfers were made and KPB made the transfers without receiving a reasonably equivalent value in exchange for the transfers or obligations and KPB was insolvent at the time or became insolvent as a result of the transfers or obligations.

592.  As a result, the above transfers to Millco-Atwater constitute "transfers" within the meaning of Florida's Uniform Fraudulent Transfer Act.

593.  Accordingly, the KPB transfers to Millco-Atwater are avoidable and recoverable by the FVP Parties pursuant to Chapter 726 of the Florida Statutes.

594.  The FVP Parties seek all remedies available under Section 726.108 of the Florida Statutes, including:

(a)  avoidance of the KPB – Millco-Atwater Transfers or obligations to the extent necessary to satisfy the FVP Parties' claim;

(b)  an attachment or other provisional remedy against the assets transferred or other property of Millco-Atwater in accordance with applicable law;

(c)  and, subject to applicable principles of equity and in accordance with applicable rules of civil procedure, on proper motion:

1.  an injunction against further disposition by KPB or Millco-Atwater, or both, of the assets transferred or of other property;

2.  appointment of a receiver to take charge of the assets transferred, or of other property of Millco-Atwater; and/or

3.  any other relief the circumstances may require.

595. The FVP Parties demand all remedies under Florida's Uniform Fraudulent Transfer Act against Millco-Atwater who is the recipient of the fraudulently transferred funds, including, without limitation, judgment against Millco-Atwater for the amount transferred plus prejudgment interest.

596. The FVP Parties reserve the right to amend this Fourth Amended Complaint to name other transferees of Millco-Atwater or under proceedings supplementary under Florida's Uniform Fraudulent Transfer Act.

WHEREFORE, the FVP Parties demand judgment against Millco-Atwater setting aside and avoiding the transfers described above, to the extent necessary to satisfy the creditor's claims, judgment for an attachment or other provisional remedy against the asset transferred or judgment against other property or funds of Millco-Atwater in the amount of the funds transferred plus prejudgment interest and for injunctive relief if properly raised by motion, or other relief as the Court deems appropriate.

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing document was filed with the Clerk of the Courts and served via email through the Florida Courts eFiling Portal in accordance with Rule 2.516 of the Florida Rules of Judicial Administration upon all counsel of record.

On August 29, 2024.

Respectfully jointly submitted,

**Schwartz | Breslin PLLC**
**Fl. Rule of Jud. Admin. 2.516 Notice**
**Primary email: EService@JSJB.LAW**
**Secondary Email: JB@JSJB.LAW**

**s/ Jerry Breslin**

Jerry Breslin Esq.
Fla. Bar # 269573
Email: JB@JSJB.Law
Schwartz | Breslin, Attorneys at Law
The DuPont Building
169 East Flagler Street
Suite 700
Miami, Fl 33131
Tel.: 305-577-4626
Fax.: 305-577-4630

**/s/ Jonathan Noah Schwartz, Esq.**

Jonathan Noah Schwartz, Esq.
Florida Bar No. 1014596
Email: JS@JSJB.Law
Schwartz | Breslin, Attorneys at Law

**COHEN & MCMULLEN, P.A.**

**/s/ Bradford Cohen, Esq.**

**/s/ Michael J. McMullen, Esq.**

1132 SE 3rd Avenue
Fort Lauderdale, Florida 33316
Telephone: (954) 523-7774
Facsimile: (954) 523-2656